Shayla Myers (SBN: 264054)
Romy Ganschow (SBN: 320294)
LEGAL AID FOUNDATION OF
LOS ANGELES
7000 S. Broadway, Los Angeles, CA 90003
Tel.:    (213) 640-3983
E-Mail: smyers@lafla.org
          rganschow@lafla.org

*Attorneys for Gladys Zepeda, Miriam Zamora,
Ali El-Bey, James Haugabrook, Pete Diocson Jr.,
Marquis Ashley, and Ktown for All*

Catherine Sweetser (SBN: 271142)
Kristina Harootun (SBN: 308718)
SCHONBRUN SEPLOW HARRIS
& HOFFMAN LLP
11543 W. Olympic Blvd.,
Los Angeles, CA 90064
Tel.:  (310) 396-0731
Email: csweetser@sshhlaw.com
          kharootun@sshhlaw.com

*Attorneys for Plaintiffs*

Benjamin Allan Herbert (SBN: 277356)
William L. Smith (SBN: 324235)
KIRKLAND & ELLIS LLP
333 S. Hope St., Los Angeles, CA  90070
Tel.:    (213) 680-8400
Email:   benjamin.herbert@kirkland.com
          william.smith@kirkland.com

*Attorneys for Ktown for All*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JANET GARCIA, GLADYS ZEPEDA, MIRIAM ZAMORA, ALI EL-BEY, PETER DIOCSON JR, MARQUIS ASHLEY, JAMES HAUGABROOK, individuals, KTOWN FOR ALL, an unincorporated association; ASSOCIATION FOR RESPONSIBLE AND EQUITABLE PUBLIC SPENDING, an unincorporated association<br>                    Plaintiff(s),<br><br>          vs.<br><br>CITY OF LOS ANGELES, a municipal entity; DOES 1-50,<br>                    Defendant(s). | CASE NO.  2:19-cv-6182<br><br>CIVIL RIGHTS COMPLAINT<br><br>42 U.S.C. § 1983: Fourth and Fourteenth Amendments<br>Cal. Civ. Code § 52.1<br><br><br><br>**DEMAND FOR JURY TRIAL** |

1

## JURISDICTION AND VENUE

1.      This is an action for injunctive relief and damages pursuant to 42 U.S.C. § 1983 based upon the continuing violations of Plaintiffs' rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.  Jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1343 based on 42 U.S.C. § 1983 and questions of federal constitutional law.  Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.  This Court has supplemental jurisdiction over Plaintiff El-Bey's state law claim pursuant to 28 U.S.C. § 1367, as it arises from the same case or controversy as Plaintiff's federal claims.

2.      Venue is proper in the Central District because all of the events and conduct complained of occurred in the Central District.

## PRELIMINARY STATEMENT

3.      By all accounts, Los Angeles is in the midst of a housing crisis and a resulting homelessness crisis. According to the 2019 Homeless Count[1], there are approximately 36,300 people in the City of Los Angeles (the "City") who lack a fixed, regular, and adequate nighttime residence.

4.      This crisis did not occur overnight.  For decades, the number of people experiencing homelessness in Los Angeles has risen steadily, as housing costs in Los Angeles have soared and wages have remained stagnant.  While city leaders have failed to address this crisis, more and more people have ended up homeless on the streets of Los Angeles.

_____

[1] The Los Angeles Homeless Count is a point-in-time count conducted each January throughout Los Angeles County by the Los Angeles Homeless Services Authority (LAHSA), a joint powers agency of the City and County of Los Angeles. The point in time count is mandated by the U.S. Department of Housing and Urban Development, which approves the methodology.  The count is conducted by volunteers, and the statistical analysis is done by the University of Southern California.

5.      And there has been little progress towards abating the crisis.  Currently, there is a massive shortage of affordable housing units in Los Angeles:  an annual study released in May 2019 found that Los Angeles County needed more than 515,000 additional affordable units to house the area's very low income population. [2]  In 2019, a Los Angeles renter earning minimum wage ($13.25 an hour) would need to work 79 hours per week to afford rent for a one bedroom apartment,[3] and more than 720,000 households in Los Angeles County are severely rent-burdened, meaning that the household spends more than 50% of their household income on rent.[4]

6.      As a result, every month, thousands of people fall into homelessness.  So even as the City has attempted to address this crisis by building new housing, any progress it has made has not kept pace with the number of new people becoming homeless.  Year after year, this number continues to rise, and in 2019, the number of people who became homeless far outpaced the number of people who are moving into housing.  This imbalance led to a 16% increase in the number of people who are homeless in Los Angeles, one of the largest year-to-year increases in recent years.

7.      In addition to the shortfall in affordable housing, the City lacks sufficient emergency shelter for its homeless residents.  According to an inventory of shelter beds conducted by the Los Angeles Homeless Services Authority (LAHSA) in 2018, the City needed an additional 23,000 shelter beds to provide even the most basic shelter option for the City's unhoused population.  During the winter months, the City and County add approximately 1,146 additional shelter beds through the Winter

---

[2] According to the California Housing Partnership Corporation, "Los Angeles County Annual Affordable Housing Outcomes Report," May 2019, the City needs 516,946 additional affordable rental units to affordably house all of the county's very low and extremely low income residents.

[3] The Federal Home Loan Mortgage Corporation, "Rental Burden by Metropolitan Area," 2019.

[4] Joint Center for Housing Studies of Harvard University, "The State of the Nation's Housing," 2018.

COMPLAINT

Shelter program, but that program runs only from November to March, at which point, the beds are not available again until November, and the individuals who resided in the beds are once again left to sleep on city streets and in other public spaces.

8.     Measures to quickly increase the stock of emergency shelters for people living on the streets have proven inadequate.  In 2018, the City launched A Bridge Home, the promise of which was to construct temporary shelters in each of the City's 15 City Council districts, with a goal of providing 1,500 of the more than 20,000 needed shelter beds.  Even opening these shelters, which were intended to be temporary and available quickly to address the crisis, has proven extremely difficult. To date, only four Bridge Home shelters have opened, providing only about 150 new shelter placements for individuals and families.

9.     As a result of this severe shelter crisis and lack of affordable housing options, when a person loses their housing, there are very few alternatives to them actually ending up on the street. Of the 36,300 people who are homeless in Los Angeles, 75% are unsheltered, living in vehicles, tents, and other makeshift encampments.  This is the largest unsheltered homeless population in the country.[5] According to the 2019 Homeless Count, roughly 8,000 people in the city of Los Angeles have only tents and makeshift encampments to provide any shelter at night.[6] Another untold number don't have even that.

10.     As the number of people living in tents and makeshift encampments on the streets has increased every year for the past decade, the City has not invested in adequate public health infrastructure or basic municipal services to respond to the

_____

[5] Department of Housing and Urban Development, "The 2018 Annual Homeless Assessment Report," December 2018.
[6] Los Angeles Homeless Services Authority, "2019 Greater Los Angeles Homeless Count-Vehicles, Tents, and Makeshift Shelters by Geographic Area," at p. 5.

COMPLAINT

needs of its residents who are unsheltered.  The City has not provided even the most rudimentary level of municipal services for its thousands of unsheltered residents, such as bathrooms, handwashing stations, showers, storage, or even routine trash pickups.

11.     The need for these services is well-documented: since at least 2012, the Los Angeles County Department of Public Health has repeatedly warned the City that services like toilets, handwashing stations, and routine trash services are necessary to maintain adequate public health in areas with high concentrations of people living in encampments.  In 2017, concerns about Hepatitis A prompted the Department of Public Health to survey select homeless encampments throughout the County and identify locations with insufficient public health infrastructure to support the population of residents living in those areas.  Every location surveyed in the city of Los Angeles was found to be lacking; most locations had no infrastructure for the thousands of people living on the streets.

12.     Following the Department of Public Health's report, the City Administrator's Office conducted its own review and identified 55 locations where people were living in encampments that were more than a quarter of a mile away from any kind of publically-accessible restroom.  The City launched a pilot project to provide portable toilets and handwashing stations to five of the 55 designated areas.  Despite the success of this program, the City has provided only five additional stations, bringing the total number of portable toilets and handwashing stations in the City to only 10 outside Skid Row.

13.     Most homeless individuals also have no place to store their belongings, even though the City has long identified this as a critical need for people who are living in encampments.  The City currently funds the BIN, a storage facility for unhoused residents in Skid Row, and a temporary program with 41 storage containers near the City's first A Bridge Home location at El Pueblo.  Other attempts to build storage have stalled or failed.  As a result, most unhoused people throughout Los

COMPLAINT

Angeles have no accessible options to store their belongings, other than with them on the street.

14.     Nor do most unhoused people have places to simply throw out their trash. Even at most large encampments, the City has not provided trash receptacles or even routine trash pickups.  Many residents attempt to minimize the impact of trash by, for example, containing their trash to a single area.  But without routine pickups, this trash piles up on city sidewalks.  These piles then become magnets for illegal dumping—not by residents of the encampments, but by others who take advantage of the City's disinvestment and leave behind their trash and waste.

15.     As the number of people living on the streets has risen, and with woefully insufficient investment in public health infrastructure like bathrooms or basic municipal services like trash pickups, the inevitable and visible impact of homelessness has continued to increase throughout Los Angeles.  And so too have complaints from housed residents and businesses throughout the City.  These complaints have flooded City Council offices and the City's 311 complaint system, which includes "homeless encampments" in its list of nuisance complaints (along with, for example, illegal auto repairs and illegal sign removal.  Housed residents demand that City leaders address the visible signs of homelessness in their neighborhoods by removing encampments.

16.     Rather than investing in solutions like bathrooms, handwashing stations, and trash cans, which would both meet the real and immediate public health needs of the City's thousands of unhoused residents, and in turn, would also respond address many residents' complaints, the City has responded instead by seizing and destroying homeless people's belongings. [7]

_____

[7] As discussed *infra* ¶¶ 74-77, in June 2019, after months of meetings with the Mayor's office and political pressure from advocates and organizers, the Mayor announced a plan to address growing concerns that that the City was failing to respond to the needs of people living on the streets.  While the plan purports to focus efforts on

17.     This is not a new response to unsheltered homelessness in Los Angeles. In fact, for decades, the seizure and destruction of homeless people's belongings has remained a consistent and often singular strategy deployed by the City to erase the visible signs of homelessness in Los Angeles.  And as a result of these practices, City has faced almost a dozen lawsuits in the last 30 years, by unhoused residents who allege that the City has violated their constitutional rights by seizing and destroying their tents, medications, documents, and other items they need to survive on the streets.[8]

18.     In 2011, eight unhoused residents of Skid Row sued the City for unconstitutionally seizing and destroying their belongings, which they left momentarily unattended on the sidewalk.[9]  In its defense, the City took the untenable position that homeless people do not have a constitutionally-protected property

_____

addressing the public health needs of the community, the plan fails to call for adequate resources to effectuate this shift.  For example, while acknowledging that routine trash services are of critical importance, the plan calls for just 500 additional trash cans and pickups for the more than 500 square miles in the City of Los Angeles.  Similarly, the new deployment plan discusses the importance of hygiene resources, but fails to provide any increased funding for toilets or handwashing stations.  Meanwhile, as discussed *infra* ¶¶ 74-77, the plan calls for increased funding for encampment cleanups and specifies that LA Sanitation will continue to enforce Los Angeles Municipal Code 56.11, the ordinance under which the City currently seizes and destroys homeless peoples' belongings.

[8] *See Schellenberg v. City of Los Angeles*, CV 18-07670 CAS (C.D. Cal. 2018); *Cooley v. City of Los Angeles*, CV 18-09053 CAS (C.D. Cal. 2018); *Mitchell v. City of Los Angeles*, CV 16-01750 SJO (C.D. Cal. 2016)*; Los Angeles Catholic Worker v. Los Angeles Downtown Industrial District*, CV 14-07344 PSG (C.D. Cal. 2014); *Hanson v. City of Los Angeles*, No. CV 13-02571 (C.D. Cal. 2013); *Lavan v. City of Los Angeles*, No. CV 11-02874 PSG (C.D. Cal. 2011); *Noe v. City of Los Angeles*, No. CV 05-08374 AG (C.D. Cal. 2005); *Justin v. City of Los Angeles*, No. CV 00-12352 LGB (C.D. Cal. Dec. 5, 2000); *Bennion v. City of Los Angeles*, C637718 (L.A. Sup. Ct. Feb. 25, 1987).

[9] *Lavan v. City of Los Angeles*, No. CV 11-02874 PSG (AJW) (C.D. Cal. 2011).

7

COMPLAINT

interest in those belongings.  First the District Court and then the Ninth Circuit issued a strong rebuke of that position.  The Ninth Circuit "reject[ed] the City's invitation to impose this unprecedented limit on the Fourth Amendment's guarantees"[10]  and noted that due process protections attach to people's belongings, "regardless of whether the property in question is a . . . Cadillac or a cart."[11]

19.　　Despite the explicit judicial condemnation of the City's view of homeless people's property rights and the long history of lawsuits that preceded it, the City has remained steadfast in its position that unhoused people do not enjoy the same constitutionally-protected property interest in their belongings that housed residents enjoy.

20.　　In 2016, the City codified this position as part of its municipal code.  The Los Angeles City Council amended Los Angeles Municipal Code Section 56.11 (LAMC 56.11) to allow the City to seize and in many instances, summarily destroy homeless individuals' belongings.  The stated purpose of the amendment to LAMC 56.11 was to "balance the needs of all of the City's residents."  LAMC 56.11(1).  But the ordinance is far from balanced—as written, it fails to provide the constitutional protections the Court found lacking in *Lavan v. City of Los Angeles*.

21.　　The City has also constructed a comprehensive strategy to enforce this ordinance. Through comprehensive cleanups, which are noticed, and rapid responses, which are not, the City, through the Department of Public Works, Bureau of Sanitation ("LA Sanitation") and the Los Angeles Police Department ("LAPD"), routinely seize and destroy tents, sleeping bags, carts, clothing, medication, important documents, and other items that homeless residents need to survive on the streets.  These actions, purportedly justified by the ordinance and couched in regulations and bureaucracy, are remarkably similar to the City's past actions that courts have repeatedly struck down as unconstitutional.

---

[10] *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1031 (9th Cir. 2012).
[11] *Id*. at 1032.

COMPLAINT

22.    LAMC 56.11 and its enforcement evidence the City's longstanding refusal to acknowledge that, although homeless residents may not have a roof over their heads, they are nevertheless entitled to the constitutional protections that every other resident of the City enjoys.  To that end, this ordinance and its enforcement are simply further attempts by the City to legitimize and bureaucratize what courts have repeatedly prohibited the City from doing:  summarily seizing and destroying homeless people's belongings.

## PARTIES

**PLAINTIFFS**

23.    **JANET GARCIA** is an unhoused resident of Los Angeles who lives in a tent near the Metro Orange Line station in the Van Nuys area of Los Angeles.  She lost her apartment in Van Nuys in March 2017 and has not been able to find housing she can afford since then.

24.    On or about January 29, 2019, an LA Sanitation crew seized and summarily destroyed Ms. Garcia's tent and all of her belongings, including the cleaning supplies she needed for work, when she momentarily stepped away from her belongings to go to the bathroom and get ready for work.  This is not the first or last time that Ms. Garcia's property has been seized and destroyed by the City.  On April 29, 2019, during a comprehensive cleanup, LA Sanitation workers took most of Ms. Garcia's belongings while she was watching her neighbors' property so her neighbors could go with outreach workers—to sign up for unemployment benefits and obtain a new identification card.

25.    The repeated seizure and destruction of her belongings has made it more difficult for Ms. Garcia to look for new housing or even to just keep working, since each time her belongings are seized and destroyed, she has to replace her cleaning supplies, along with the rest of her belongings.

26.    **GLADYS "JANE" ZEPEDA** is a 30-year-old unhoused resident of the Koreatown neighborhood in Los Angeles.  She has lived in Los Angeles for most of

9

her life. Ms. Zepeda lives with her girlfriend, **MIRIAM ZAMORA**, a 26-year-old lifelong Los Angeles resident.  Ms. Zepeda and Ms. Zamora have been homeless since February 2019, when they were evicted from the apartment where they were staying and have not been able to find another apartment they can afford.  They are currently living in in a tent on a parkway in Koreatown.

27.     On March 21, 2019, LA Sanitation and LAPD were deployed to their neighborhood and conducted a rapid response at 6th St. and Ardmore, where Ms. Zepeda and Ms. Zamora were staying.  LA Sanitation workers seized and destroyed the belongings that Ms. Zepeda and Ms. Zamora could not fit into a single 60-gallon trash bag.  Among the items that were destroyed was their tent, which was less than seven weeks old, tarps that were in good condition, clean clothing, and a small chest containing most of their important documents.  On other occasions, including as recently as June 11, 2019, Ms. Zepeda and Ms. Zamora have repeatedly lost critical items they needs to survive on the street, including tents, blankets, and food.  The constant threat of losing their belongings has made it difficult for them to look for work or to get help finding housing.

28.     **ALI EL-BEY** is a 39-year-old resident of Los Angeles.  He has been homeless for approximately four years.  For the past six months, Mr. El-Bey has been living in various locations in the Koreatown neighborhood of Los Angeles.

29.     On or about January 10, 2019, Mr. El-Bey was living on the corner of 6th Street and Alexandria in Koreatown.  That morning, LAPD and Sanitation conducted a rapid response and instructed Mr. El-Bey that he had approximately 10 minutes to pack up and move.  When he took too long, he was forced to leave the rest of his belongings behind, including his ID, medications, and tent, which LA Sanitation summarily destroyed.  Since then, Mr. El-Bey has lost other belongings to sanitation sweeps, including as recently as June 4, 2019.

COMPLAINT

30.     **JAMES HAUGABROOK** is a 50-year-old resident of South Los Angeles.  He has lived in South Central for his entire life, and has been homeless there for the past two years.

31.     Over the past six months, Mr. Haugabrook has been subjected to a number of rapid responses and had his belongings destroyed as a result.  In or about March 2019, while Mr. Haugabrook was attempting to respond to LA Sanitation's demand to limit his belongings to only 60 gallons, sanitation workers threw away a number of his belongings, including his backpack and all of its contents, which included medication to treat his diabetes and other important items.  On yet another occasion, Mr. Haugabrook left his belongings for a short period of time, and returned to find that they were all gone.  His neighbors informed him that city workers had come and thrown them all away.  On other occasions, LA Sanitation has conducted "bulky item" pickups and taken chairs, leaving him nowhere to sit while he is guarding his belongings.

32.     Mr. Haugabrook has a Section 8 Voucher, and if he is able to find a landlord that will accept the voucher, he will be able to move off the streets.  But he never knows when LA Sanitation will conduct a rapid response and throw away his belongings, and he has found it incredibly difficult to actually look for an apartment.

33.     **PETE DIOCSON JR.** is a 50-year-old unhoused resident of the Harbor City neighborhood of Los Angeles.  He was born in Carson, California, which borders Harbor City, and he has lived in the area for much of his life.  He has been homeless in and around the Harbor City area for the past four years.  In April 2019, Mr. Diocson was living in an encampment on the corner of Vermont and Lomita Blvd with Bella, a two-and-a-half-year-old dog who helps him deal with his anxiety and makes him feel safe, less anxious, and less alone.  To keep Bella safe at night, Mr. Diocson kept Bella in a wire kennel that a neighbor donated to him.

34.     On April 24, 2019, LAPD officers and LA Sanitation workers conducted a comprehensive cleanup on Lomita Blvd, and as part of the cleanup operation, seized

11

COMPLAINT

and destroyed Bella's kennel because they contended it was a "bulky item."  Without a kennel to secure Bella at night, Mr. Diocson has been constantly worried that Bella will escape, which makes it difficult for him to sleep and exacerbates his anxiety.

35.    **MARQUIS ASHLEY** is an unhoused resident of the Harbor City neighborhood of Los Angeles.  He has lived in and around Harbor City for most of his life.  He currently lives at the homeless encampment on Lomita Blvd.

36.    On or about May 21, 2019, as part of a comprehensive cleanup of the Lomita encampment, LA Sanitation seized and destroyed two carts that Mr. Ashley uses to move his belongings.  One of the carts, which he built himself, was attached to his bicycle and at the time the cart was seized, he was using it to transport his belongings from the cleanup area.  The other cart was broken, and he intended to fix it after the cleanup.  Instead, LA Sanitation informed Mr. Ashley that the carts were "bulky items," and he e was forced to surrender them to LA Sanitation.  He had to drag the rest of his belongings out of the cleanup area, and then back to the place where he stays when the cleanup was completed.  The carts were summarily destroyed.  After the cleanup, Mr. Ashley built a new cart to replace the ones that were taken, but he worries that this cart will be taken as well.

37.    **KTOWN FOR ALL** is a volunteer-based unincorporated association founded in 2018 to form connections between housed and unhoused residents of the Koreatown neighborhood of Los Angeles, and to advocate for housing and shelters in their community.  As part of their outreach efforts, Ktown for All holds fundraisers and donation drives to obtain items like hygiene kits, backpacks, and other items that are necessary and useful for people to survive on the streets.  As part of their weekly outreach, they distribute these items to their neighbors who are experiencing homelessness.

38.    The constant enforcement of LAMC 56.11 in their neighborhood has frustrated Ktown for All's mission and forced them to divert resources away from their advocacy and outreach.  Specifically, the enforcement of the ordinance has made

12

it much more difficult to locate and remain connected to their unhoused neighbors, who are constantly relocating as a result of the City's enforcement actions.  Moreover, as a result of the enforcement of LAMC 56.11, Ktown for All has had to divert resources, including volunteer hours and donations, away from outreach and advocacy and instead, spend that time and energy raising funds to replace tents, blankets, and other items that have been seized and destroyed by the City.

39.    **ASSOCIATION FOR RESPONSIBLE AND EQUITABLE PUBLIC SPENDING** ("**AREPS**") is a membership organization comprised of taxpayers in Los Angeles that was founded to ensure that their tax dollars are used to promote responsible public spending.  They advocate for spending on public health, housing, and other public infrastructure for all residents of Los Angeles, including its unhoused residents and against the use of their  tax dollars to enforce illegal laws that harm vulnerable residents of the City.  All members of AREPS are residents of the City of Los Angeles and pay one or more municipal taxes to the City of Los Angeles, which provides revenue into the City's general fund.

40.    Kristina Meshelski is a member of AREPS.  She was born in Los Angeles and has continuously resided within the City of Los Angeles for the past eight years.  Ms. Meshelski regularly pays municipal taxes into the general fund of the City of Los Angeles.

41.    James Parriott, IV, is a member of AREPS and a lifelong resident of the City of Los Angeles. Mr. Parriott regularly pays municipal taxes into the general fund of the City of Los Angeles.

**DEFENDANTS**

42.    Defendant City of Los Angeles ("City") is a municipal entity with the capacity to sue and be sued.  It is a Charter City under the laws of the State of California.  The departments of the City include the Los Angeles Police Department and the Los Angeles Department of Public Works and its departments and agencies,

COMPLAINT

including LA Sanitation.  Employees of the City have engaged in the acts complained of herein pursuant to the policies, practices, and customs of the City.

43.     Each of the Defendants, their employees and agents, participated personally in the unlawful conduct challenged herein and, to the extent that they did not personally participate, they authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and the harm suffered by Plaintiffs.  Each acted in concert with each other.  The challenged acts caused the violation of Plaintiffs' rights.

44.     The identities and capacities of defendants DOES 1 through 50 are presently unknown to Plaintiffs, and on this basis, Plaintiffs sue these defendants by fictitious names.  Plaintiffs will amend the Complaint to substitute the true names and capacities of the DOE defendants when ascertained.  Plaintiffs are informed, believe, and thereon allege that DOES 1 through 50 are, and were at all times relevant herein, employees and/or agents of the City and are responsible for the acts and omissions complained of herein.  Defendants DOES 1 through 50 are sued in both their official and individual capacities.

## FACTUAL ALLEGATIONS

**LOS ANGELES MUNICIPAL CODE SECTION 56.11**

**History of LAMC 56.11**

45.     In 2016, the Los Angeles City Council amended Los Angeles Municipal Code Section 56.11 ("LAMC 56.11") to allow the City to seize and in certain instances, destroy the belongings of individuals who are experiencing homelessness.[12]

46.     Prior to the amendment, LAMC 56.11 provided only that "[n]o person shall leave or permit to remain any merchandise, baggage or any article of personal property upon any parkway or sidewalk."

---

[12] A true and correct copy of LAMC 56.11, as amended, is attached as Exhibit A to this complaint.

47.     In 2011, the City of Los Angeles was sued by eight individuals in Skid Row, whose belongings were seized and summarily destroyed by the City  after they left them momentarily unattended on the sidewalk where they stayed.  The plaintiffs sued for violation of their Fourth and Fourteenth Amendment rights, as guaranteed by the United States Constitution.  The District Court issued a preliminary injunction against the City, holding that the plaintiffs had established a likelihood of success on the merits of both their Fourth and Fourteenth Amendment claims.  The City was enjoined from:

- Seizing property in Skid Row absent an objectively reasonable belief that it is abandoned, presents an immediate threat to public health or safety, or is evidence of a crime, or contraband; and
- Absent an immediate threat to public health or safety, destruction of said seized property without maintaining it in a secure location for a period of less than 90 days.[13]

48.     The City appealed the injunction to the Ninth Circuit Court of Appeals, arguing that homeless people did not have a property interest in their belongings, such that the seizure and destruction of their belongings did not implicate the Fourth or Fourteenth Amendment.

49.     In 2012, the Ninth Circuit Court of Appeals affirmed the District Court's ruling and upheld the injunction.[14]

50.     In 2015, while *Lavan* was still pending in the District Court, the Los Angeles City Council amended LAMC 56.11, and then amended the ordinance again in 2016.  The current version of LAMC 56.11 went into effect in April 2016.[15]

---

[13] 797 F. Supp. 2d 1005, 1020 (C.D. Cal. 2011).
[14] 693 F.3d 1022 (9th Cir. 2012).
[15] After the initial amendment of LAMC 56.11 in 2015, the parties in *Lavan* settled the litigation and the case was dismissed in 2016.

COMPLAINT

51.     In addition to revising the ordinance, the City also adopted the Los Angeles Municipal Code 56.11 Standard Operating Protocols (56.11 Protocols).  The protocols were prepared by LA Sanitation, which serves as the Designated Administrative Agency for the implementation and enforcement of the ordinance.

52.     Since the current version of LAMC 56.11 went into effect in 2016, the City has been and is currently enforcing the ordinance against homeless individuals throughout the City, including the individual Plaintiffs.

**Overview Of LAMC 56.11**

53.     LAMC 56.11 codifies the City's longstanding policy of seizing and destroying homeless people's belongings.  As with prior versions of LAMC 56.11, individuals are prohibited from "storing"[16] most belongings in public.  Unlike prior versions, however, the current version removes criminal liability for most violations of the ordinance, and instead, allows the City to simply seize and in many instances, summarily destroy those items the City determines are inconsistent with the ordinance.

54.     Specifically, the current ordinance allows the City to seize and immediately destroy an item it deems 1) "bulky"; 2) an "immediate threat to the health

_____

[16] Section 56.11(2)(o) defines "store" broadly to mean:
to put Personal Property aside or accumulate for use when needed, to put for safekeeping, and/or to place or leave in a Public Area.  Moving Personal Property to another location in a Public Area or returning Personal Property to the same block on a daily or regular basis shall be considered Storing and shall not be considered to be removing the Personal Property from a Public Area.  This definition shall not include any Personal Property that, pursuant to statute, ordinance, permit, regulation or other authorization by the City or state, is Stored with the permission of the City or state on real property that is owned or controlled by the City.
Public Area is defined equally broadly to include "all property that is owned, managed or maintained by the City, except property under the jurisdiction of the Department of Recreation and Parks which is governed by Los Angeles Municipal Code Section 63.44, and shall include, but not be limited to, any Street, medial strip, space, ground, building or structure."  LAMC 56.11(2)(k).

and safety of the public," or 3) evidence of a crime or contraband.  In addition, the ordinance allows the City to immediately seize 1) property that it deems "excess"; 2) tents that are constructed between the hours of 6:00 a.m. and 9:00 p.m.; 3) property that is blocking city sidewalks; 4) property within 10 feet of operational doorways; 5) property that is attached to any public fixture or any private fixture where it interferes with a public right of way; or 6) property that is interfering with city services.[17]

55.     Section 56.11(2)(c) defines a Bulky Item as:

> [A]ny item, with the exception of a constructed Tent, operational bicycle or operational walker, crutch or wheelchair, that is too large to fit into a 60-gallon container with the lid closed, including, but not limited to, a shed, structure, mattress, couch, chair, other furniture or appliance.  A container with a volume of no more than 60 gallons used by an individual to hold his or her Personal Property shall not in itself be considered a Bulky Item.

56.     Despite providing a definition of Bulky Item, the ordinance provides no further information about what "container" is contemplated, nor does the ordinance define what makes a bicycle, walker, crutch, or wheelchair "operational."  Likewise, the ordinance provides no definition of what constitutes a "constructed" tent.

57.     LAMC 56.11(3)(b) allows the City to seize "excess personal property" from homeless individuals, which is defined as "any and all Personal Property[18] that cumulatively exceeds the amount of property that could fit in a 60-gallon container with the lid closed."  But as with Bulky Items, the ordinance provides no further guidance about what 60 gallon container the City contemplates as the heuristic to determine whether property is "excess."

---

[17] LAMC 56.11(3)(a)-(h); (7); (8)(a)-(c).

[18] Personal Property is defined comprehensively to include mean "any tangible property, and includes, but is not limited to, goods, materials, merchandise, Tents, tarpaulins, bedding, sleeping bags, hammocks, personal items such as household items, luggage, backpacks, clothing, documents and medication." LAMC 56.11(2)(j)

COMPLAINT

58.     Despite the lack of guidance, the consequence of a determination by LA Sanitation that an item is too large or the amount of property is too voluminous is steep:  Section 3(i) provides that "the City may remove and may discard any Bulky Item, whether Attended or Unattended, Stored in a Public Area."  Similarly, section 3(b) gives the City the authority to immediately seize any items in excess of "60 gallons."  Under the ordinance, the City does not need to obtain a warrant, nor does it need to determine that an exception to the warrant requirement applies, prior to seizing the items, or in the case of Bulky Items, before immediately destroying them. In fact, there is no check of any kind on LA Sanitation's power to seize and destroy items it sees on the street—sanitation workers can simply take what they determine is "bulky" or "in excess" of 60 gallons."

59.     The ordinance also purports to codify some of exceptions the Court in *Lavan* carved out from its injunction against the City's seizure and destruction of property: Section 3(h) allows for the seizure and immediate destruction of property that is contraband or evidence of a crime.  Section 3(g) allows sanitation workers to seize and immediately destroy "any Personal Property Stored in a Public Area if the Personal Property poses an immediate threat to the health or safety of the public." LAMC 56.11 provides no further information about what constitutes an "immediate threat to the health or safety of the public" and is therefore prohibited.  Instead, that term is defined only in the 56.11 Protocols.[19]

60.     Under Section 5 of the ordinance, Personal Property that is seized pursuant to LAMC 56.11 and not immediately destroyed is supposed to be "moved to a place of storage" and held for 90 days.[20]  After 90 days, items that are have not been claimed may be discarded, and the City "shall not be required to . . . return" any property stored for longer than 90 days.[21]

---

[19] *See* 56.11 Protocol No. 7.
[20] LAMC 56.11(5)(a).
[21] LAMC 56.11(5)(b).

COMPLAINT

1    61.    Although the ordinance and implementing protocols allow the City to

2    seize and in many instances immediately destroy individuals' belongings, the

3    ordinance provides no process to challenge these actions, much less constitutionally-

4    adequate due process.  There is no mechanism to contest LA Sanitation's on-the-spot

5    determination that an item is "bulky," or that a person has more property than will fit

6    within a 60 gallon container with the lid closed.  There is no way to challenge whether

7    a bike is "inoperable" or a tent is "constructed."  Nor is there is any way to challenge

8    whether an item constitutes an immediate threat to public health and safety.  LAMC

9    56.11 provides absolutely no mechanism to contest any decision by city workers, even

10   though the consequence of those decisions is the immediate and often permanent

11   deprivation of property.

12   62.    In fact, this is by design.  LAMC 56.11 actively prevents individuals from

13   contesting LA Sanitation's on-the-spot decisions about what constitutes a violation of

14   the ordinance.  It imposes criminal liability on anyone who interferes in any way with

15   the City's seizure or destruction of property: Sections 10(a), (d) of the ordinance make

16   it a misdemeanor, punishable by up to 6 months in jail or $1,000 for any individual to

17   "willfully resist, delay, or obstruct a City employee from moving, removing,

18   impounding or discarding Personal Property stored in a Public Area in violation" of

19   the ordinance, including Excess Personal Property, constructed tents, Bulky Items, and

20   property the City determines constitutes an immediate threat to public health or safety

21   or is contraband.  This stands in stark contrast to the other violations of the ordinance,

22   which do not lead to the criminal liability that ordinarily attaches to violations of the

23   Municipal Code.[22]

24   _____

25   [22]*See* LAMC 56.11(10).  LAMC Section 11(m) provides that "[i]t shall be

26   unlawful for any person to violate any provision or fail to comply with any of the
     requirements of this Code.  Any person violating any of the provisions or failing to

27   comply with any of the mandatory requirements of this Code, shall be guilty of a
     misdemeanor unless that violation or failure is declared in this Code to be an

28   infraction."

COMPLAINT

**ENFORCEMENT OF LAMC 56.11**

63.     Since the ordinance was amended in 2016, the City has and continues to enforce LAMC 56.11 throughout Los Angeles.

**Overview of Cleanup Teams**

64.     To enforce LAMC 56.11, the City deploys teams of sanitation workers and LAPD officers to conduct cleanups of homeless encampments.  These teams conduct two types of cleanups:  noticed cleanups, which are either noticed in advance or in the case of Skid Row and Venice, conducted on a regular schedule, and rapid responses, which are neither noticed nor scheduled.  As part of both types of cleanups, City workers routinely seize and destroy homeless people's belongings, consistent with LAMC 56.11.

65.     Noticed cleanups of homeless encampments began in 2012 in Skid Row as "Operation Healthy Streets."  Comprehensive cleanups were expanded City-wide as part of the Mayor's "Clean Streets LA" program in 2015.  Operation Healthy Street cleanups currently occur on a regular schedule in Skid Row and Venice while comprehensive cleanups are scheduled as needed throughout the rest of the City.  This scheduling is done by the Mayor's office in consultation with City Council offices and with authorizations from a number of agencies, including the Los Angeles Homeless Services Authority, which signs off that outreach has been conducted to the encampment residents.[23]

66.     When LA Sanitation conducts a comprehensive cleanup, it will generally gives 24 hours' notice of the cleanup, by posting paper notices on trees, buildings, walls, and other fixed structures in the area, indicating a nine hour window when the cleanup can occur.  Other than these notices, the date, time, and location of cleanups

---

[23] As discussed *infra* ¶¶ 74-77, as part of a new deployment strategy, the City has  announced that it is combining Operation Healthy Streets and Clean Streets LA under one name: CARE+ or "Comprehensive Cleaning and Rapid Engagement Plus".

are not made publicly available, and cleanups are often cancelled, without notice to encampment residents that the cleanup will not occur that day.

67.     If the cleanup does take place as scheduled, when the cleanup crew arrives on the scene, pursuant to the 56.11 Protocols, individuals are generally given 15 minutes to move out of the cleanup area.  Consistent with custom, policy, and practice, sanitation workers and LAPD officers prohibit individuals from taking more than 60 gallons of belongings or any Bulky Items with them.  Individuals are also allowed to remove only their own items from the cleanup area; LA Sanitation and LAPD prohibit individuals from moving their neighbors' belongings or at times, even helping their neighbors remove their belongings from the cleanup area.  When an individual is not present to move his own belongings, the items are considered "unattended," as defined by LAMC 56.11(2)(r), regardless of whether someone is watching the belongings for another person or is capable of moving them out of the way for their neighbor.

68.     Once the cleanup team determines that individuals have been given enough time to remove their belongings, LA Sanitation will "close" the area for cleaning.  Items left behind in the cleanup area, including items that individuals were forced to leave behind because they were considered "excess" or "bulky," are seized by LA Sanitation and "processed" according the 56.11 Protocols.[24]

69.     In addition to these noticed cleanups, the City also conducts rapid responses, the primary purpose of which is to enforce LAMC 56.11.  Currently, these rapid responses are conducted by specialized enforcement teams, called "Homeless Outreach and Proactive Engagement" teams, or HOPE teams, which are made up of

---

[24] *See infra* ¶ 90.

COMPLAINT

four LA Sanitation workers and six LAPD officers. HOPE Teams were piloted in 2016 and launched city-wide in 2017.[25]

70.     As with noticed cleanups, the location of rapid responses are set based on demands by City Council offices and complaints by residents, mainly through the City's 311 system.  Unlike noticed cleanups, rapid responses are not conducted pursuant to the 56.11 Protocols for encampment cleanups.  On information and belief, a rapid response does not require prior authorization and can happen at any time. Homeless individuals are not provided notice that a rapid response is happening before LA Sanitation and LAPD arrive.  Instead, sanitation workers and LAPD officers simply arrive at homeless encampments, inform any residents who may be present that they are enforcing LAMC 56.11, and seize and destroy people's belongings.

71.     Deployment of sanitation teams to conduct comprehensive cleanups and rapid responses occurs on most days in the City of Los Angeles.  In 2018, the City conducted cleanups and enforcement actions at more than 9,000 encampments throughout Los Angeles.

72.     The deployment of LA Sanitation to conduct rapid responses has been increasing steadily over the past year, and these rapid responses now far outnumber the noticed cleanups conducted by the City.  In the fourth quarter of 2018, LA Sanitation impounded 2,319 tents through rapid responses, compared to only 783 through the City's comprehensive cleanups.

73.     The expenditure of tax dollars to enforce LAMC 56.11 through these programs is significant.  In FY 2018-19, the City of Los Angeles spent approximately $10,692,104 to fund rapid responses, including $4.7 million to pay for the LAPD officers assigned to the HOPE teams and $5.22 million to fund LA Sanitation.  The approved budget for FY 2019-20, which began on July 1, 2019, includes the same

---

[25] As part of the City's new deployment plan, discussed *infra* ¶¶ 74-77, HOPE Teams have been renamed CARE teams ("Comprehensive Cleaning and Rapid Engagement").

COMPLAINT

allocation for LAPD and a $5.98 million allocation for LA Sanitation to continue the rapid responses.  In addition, the FY 2019-20 budget allocates over $18 million to conduct noticed cleanups through Clean Streets LA and Operation Healthy Streets.

74.     In June 2019, the Bureau of Sanitation introduced a new deployment plan for the teams that conduct homeless encampment cleanups. The plan calls for 47 additional sanitation workers, paid for with an additional $6.45 million in funding, which is in addition to the $32 million already allocated to these programs in the FY 2019-20 budget.  The increased funding for the plan was authorized by the Los Angeles City Council on June 28, 2019 and finally approved on July 3, 2019.

75.     Under the new plan, the number of CARE teams has increased dramatically, from nine HOPE teams operating in FY 2018-19 to 17 CARE teams funded under the new plan—one for each council district, one for the LA River, and one floating team.  For comprehensive cleanups, the number of teams deployed has been increased from 11 to 13.  Venice and Skid Row continue to have a dedicated cleanup team, and LA Sanitation has added additional dedicated teams to clean up the corridor along the 110 Freeway in South Los Angeles and in downtown Los Angeles.

76.     While the programs have been renamed—from HOPE to CARE and Clean Streets LA and Operation Healthy Streets to CARE+—the newly renamed CARE teams will still conduct rapid responses and CARE+ teams will conduct comprehensive cleanups, although with the promise of a more regular schedule and increased trash collection. Like the HOPE teams and Clean Streets LA, the new CARE and CARE+ teams are explicitly tasked with enforcing LAMC 56.11.

77.     The new deployment is not scheduled to be rolled out until October 2019. In the meantime, on July 3, 2019, City Council approved more than $1 million in funding for overtime, in order to dramatically expand the capacity of HOPE and Clean Streets LA through the summer.

//

//

23

COMPLAINT

**Enforcement of Specific Provisions**

78.     Through the deployment of these cleanup teams, the City has enforced and will continue to enforce provisions of LAMC 56.11 against unhoused residents living in encampments throughout Los Angeles.

     **a.     Bulky Items**

79.     Consistent with City policy, LA Sanitation workers, with the support of the LAPD, routinely seize items from homeless individual that they determine are "bulky" as defined in LAMC 56.11.  When LA Sanitation determines that something is a Bulky Item, it is the City's policy and practice to seize and immediately destroy the item.

80.     LA Sanitation crews have no mechanism to measure whether an item meets the definition in LAMC 56.11 of a Bulky Item and is therefore subject to seizure and destruction.  Determinations about what constitutes a Bulky Item and is therefore subject to seizure and destruction, are arbitrary and based solely on the individual sanitation worker's judgement and perception of item's size. As a result, one day, sanitation workers will seize carts and camp chairs from residents.  On another day, at another encampment, they will seize "inoperable" bicycles and pallets. Individuals who are homeless have no way of knowing what LA Sanitation will deem a Bulky Item, which is then subject to immediate seizure and destruction.

81.     As part of its Bulky Item enforcement, the City also enforces a "one operable" bicycle rule against people who are unhoused.  If an individual who is homeless has more than one bicycle, sanitation workers will seize the additional bicycle(s). At times, the bicycles are summarily destroyed.  At other times, the bicycles are taken by LA Sanitation away from the scene.  In addition, sanitation workers will seize bicycle parts, including bicycle frames where the bicycle tire is simply separated from the bicycle.  On information and belief, this is done because the bicycle is deemed "inoperable," and LA Sanitation interprets these items to fall under the Bulky Item provision of LAMC 56.11.  Decisions about whether a bicycle is

COMPLAINT

"inoperable" are, as with all other decisions, made on the spot, and the consequence of this determination is the immediate and permanent deprivation of the item.

82.     Once LA Sanitation determines that an item constitutes a Bulky Item, sanitation workers will demand the item be surrendered or will simply seize the item from among an individual's belongings.  The City will do so regardless of whether an individual is present and asserting ownership over the item, or if they come upon the item and it has been left unattended.  After the Bulky Item is seized, sanitation workers immediately destroy it by throwing it in the back of a trash compactor, crushing the item.

83.     Bulky Items are seized and destroyed solely because LA Sanitation has determined that the items meet the definition of "bulky."  The Bulky Item need not be blocking access to a building, preventing individuals from passing on the sidewalk, or otherwise threatening public safety in any way for it to be seized and immediately destroyed.  And once LA Sanitation has determined that an item is "bulky" there is no way to challenge this determination prior to the item being destroyed.

   **b.     Other Limitations on Property**

84.     The City also routinely enforces other provisions of LAMC 56.11 that allow the City to summarily seize individuals' belongings.  To enforce LAMC 56.11's prohibition on Excess Personal Property, which prohibits individuals from having more property than will fit within a 60 gallon container with the lid closed, sanitation workers and LAPD officers pass out 60 gallon trash bags to individuals at encampments and inform them that they can fill up the trash bags with the items they want keep; the rest has to be surrendered to the City.  Homeless residents are allotted only 15 minutes to fit what they can in a trash bag, and then they are required to move from the area, leaving behind anything they did not put in the trash bag.

85.     During this time, if homeless residents attempt to move more than what will fit in the trash bag and the City is enforcing the Excess Personal Property or "60 gallon rule" that day, the individuals are stopped by LA Sanitation or LAPD and

informed they cannot take more than what will fit in the trash bag. If individuals attempt to use a commercial shopping cart to move their belongings, the City will seize the cart and require the individual to carry their belongings from the area.  Even if a person has a store-bought or handmade cart, these carts are seized as Bulky Items.

86.     Once an individual fills up their trash bag or LA Sanitation determines that they have been given enough time to choose which belongings to keep, individuals are required to leave behind any items they could not fit in the 60 gallon bags and leave the area.  Anything that is left behind is then seized by LA Sanitation.

87.     In addition to enforcing the "60 gallon rule," the City also seizes the property of individuals who are violating LAMC 56.11(7) and (8).  Section 7 prevents an individual from having their tent constructed outside the hours of 6:00 a.m. and 9:00 p.m.  Section 8 prevents an individual from attaching barriers against public property or against private property in a way that causes an obstruction on or across streets and sidewalks.  As part of the rapid responses, LA Sanitation teams seize tents, tarps, and other items used to construct makeshift encampments if the tent is constructed during the day or the makeshift encampment is attached to public or private property.  When LA Sanitation has come upon a constructed tent or encampment attached to public or private property, they have seized the entire encampment, not just the tent or the attachment.

88.     The City also routinely seizes individuals' property when it is left unattended.  When rapid response teams come upon an encampment and a resident is not present with their property, the City has a custom, policy, and practice of seizing that property.  It provides no notice before the property is seized, and if the City determines that the property falls into one of the categories that allows it to immediately destroy the items, it will do so without any notice to the owner or opportunity for the owner to contest the destruction.  Whether individuals are gone from their property for a few minutes, a few hours, or the whole day is irrelevant.  Nor

is it relevant whether an individual has left their belongings in the care of another person.

89.     On information and belief, because LAMC 56.11 provides that property is "unattended" unless the person who "asserts or claims ownership" over the property is there,[26] LA Sanitation informs individuals that they cannot watch other people's belongings.  As such, another person cannot safeguard a person's belongings when that person goes to the bathroom, goes to a medical appointment, meets with a housing counselor, or works an afternoon shift.  If the owner of the property is not with their belongings, the property is unattended, and the City can and does seize these items.

**Processing Of Encampments**

90.     Once LA Sanitation seizes property, they search and sort through the items they have seized, which they refer to as "processing" an encampment.  In 2018, LA Sanitation teams processed over 5,000 tents and encampments through rapid responses and almost 4,000 tents and encampments through noticed cleanups.

91.     When LA Sanitation processes a tent or an encampment, sanitation workers take apart the encampment and decide which items will be immediately discarded and which items will be sent to storage.  Although LAMC 56.11 and the 56.11 Protocols state that the City will store the items it seizes, in reality, and consistent with official policy, practice, and custom, the City destroys nearly every item it comes in contact with during the course of "processing" an encampment.

92.     In the fourth quarter of 2018, LA Sanitation teams "processed" 2,283 encampments through rapid responses.  Out of these over 2,000 encampments that were processed by the City, the City sent only 155 bags of property to storage.  In contrast, LA Sanitation collected and disposed of 455 tons of "debris" from these encampments.  For every bag these teams sent to storage, the City threw away nearly three tons of debris.  Included in these 455 tons of debris were tents, blankets, items

---

[26] LAMC 56.11(2)(r).

stored in containers deemed "bulky," and countless other personal items used by individuals to survive on the streets of Los Angeles.

93.     On information and belief, the City justifies the destruction of these belongings on the ground that the items it destroys are either "bulky" or constitute an "immediate threat to the health and safety of the public," either of which, pursuant to LAMC 56.11, results in an item being immediately destroyed.  However, because the City's definitions of what constitutes a Bulky Item or an "immediate threat to the health and safety of the public" are overbroad and vague, when processing an encampment, LA Sanitation exercises unfettered discretion to throw away everything it comes in contact with.  Items ranging from household cleaning supplies to batteries are considered "an immediate threat" to public health. This definition is frequently interpreted to include items that are simply dirty, "smelly," or even stained.

94.     In fact, the City has a policy, custom, and practice of throwing away any item it determines should not be stored by the City.  This includes throwing away any item that is wet, because the City is concerned that these items may become moldy in storage.  City workers routinely throw away items that contain food, including closed containers and non-perishable food.  They will also dispose of clothing, blankets, tents and other items that have stains, are dirty, or have signs of spills on them, because LA Sanitation alleges these items cannot be stored.

95.     LA Sanitation will destroy entire encampments based on the presence of one or two items the City determines are "contaminated," regardless of whether the rest of the items are also "contaminated."  If LA Sanitation determines an item is "contaminated," this will cause the entire bag, tent, or even encampment to be thrown away.

96.     LA Sanitation also sorts through the property in such a way as to cause the very conditions it uses to justify the destruction of property.  In the course of "processing" tents and encampments, LA Sanitation workers will tear or rip tents,

COMPLAINT

break items, or spill containers with liquid, and then justify the destruction of property on the basis of these tears, rips, or spilled liquids.

97.     LA Sanitation has a custom and practice of throwing away furniture, regardless of the type of material it is made of or the size of the item.  Items that are routinely thrown away include chairs that people use to sit on at their encampments, tables, and other small pieces of furniture.

98.     Consistent with LA Sanitation custom and practice, containers are also routinely thrown away, along with bags and other luggage, without the contents being sorted or, often, without the containers even being opened.  As a result, LA Sanitation routinely throws away items like medications, important documents, and identification cards, as well as items individuals need to survive on the streets, such as tents, blankets, clothing, and personal hygiene supplies.

**Due Process**

99.     Individuals who have lost and continue to lose personal items pursuant to these policies and practices are given no notice or opportunity to be heard when their belongings are taken and often, immediately destroyed.  They receive no notice of the rapid responses and no notice of the basis for the seizure or destruction of their belongings or even, the fact of the destruction.  And they are given no opportunity to challenge the determination that their belongings can be seized, let alone the determination that these items can be immediately destroyed.

100.     When LA Sanitation conducts a rapid response and seizes and then processes an encampment, the City provides no notice prior to the seizure of property.  They provides post-deprivation notice only when LA Sanitation actually sends items from that encampment to storage.  When that occurs, the City will leave a notice taped to a wall, fence, or tree, indicating that items have been stored and can be retrieved from a location in downtown Los Angeles.  The notice that is provided is intended only to inform an individual that belongings have been stored and that the owner can contact the storage facility about their belongings.  The notice does not explain what

items were seized, let alone why they were seized.  And when items are summarily destroyed, rather than stored, the City provides absolutely no information about the items it destroyed.

101.    When every item in an encampment is destroyed and nothing is sent to storage, which is a frequent occurrence, the City does not leave any notice that a rapid response has occurred, let alone notice that items were seized and destroyed or why. As such, individuals routinely return from work, an appointment with a housing provider, a medical appointment, or simply a trip to the bathroom, to discover that everything they own is gone.  If they are lucky, a neighbor may have been present and can tell them that the City seized and destroyed their belongings.  If no one was present for the rapid response, individuals have no way of knowing what happened to their belongings, let alone an opportunity to contest the seizure or destruction.

102.    Even when an individual is present when their encampment is being "processed," there is no mechanism for them to contest the on-the-spot determination by LA Sanitation that their belongings will be seized or destroyed.  Pursuant to LAMC 56.11(10), individuals challenging the seizure of their property and those unwilling to cooperate with the seizure or destruction of their belongings can be fined $1,000.00 or face six months in jail, and LAPD officers are available to arrest anyone who interferes with LA Sanitation.  As a result, individuals are forced to stand and watch as their belongings are sorted and, in almost every instance, thrown away.  They are left with no recourse whatsoever when this occurs.

103.    These enforcement actions are taken nearly every day in the City of Los Angeles.  As a result of the City's funding allocation in July 2019, the number of enforcement actions taken pursuant to LAMC 56.11 will only increase in the coming months.

//

//

//

COMPLAINT

## INDIVIDUAL PLAINTIFFS' ALLEGATIONS

**JANET GARCIA**

104.    Ms. Garcia lives near the Metro Orange line in the Van Nuys neighborhood of Los Angeles.  She has lived there for approximately two years, since she was evicted from her apartment just up the street from where she now lives.

105.    At all times relevant to this complaint, Ms. Garcia was staying near the intersection of Aetna Street and Tyrone Avenue, an industrial area bounded on one side by the Orange line bus line and on the other side by a Los Angeles Department of Water and Power plant.  She stays in the area because a number of other people who are experiencing homelessness live in the area, and it is relatively out of the way.  Ms. Garcia shared a living area with her boyfriend, David, who had a tent directly next to Ms. Garcia's tent.

106.    Ms. Garcia works as a domestic cleaner, finding jobs through online postings and word of mouth.  Ms. Garcia must maintain her own cleaning supplies to bring with her to her jobs.  Ms. Garcia does not have a car and travels to these jobs on her bicycle.  David is good at fixing bikes and fixes bikes for people in the neighborhood, so Ms. Garcia and David keep various tools and bike parts to make the necessary repairs to Ms. Garcia's and others' bikes.

107.    On the morning of January 29, 2019 at approximately 8:30 a.m., LA Sanitation and LAPD were deployed to the encampment to conduct a rapid response. On information and belief, this rapid response was planned in advance and was part of a multi-day cleanup at the encampment.  It was not, however, conducted pursuant to the comprehensive cleanup protocols which would have required notice of the cleanup.  Instead, because it was conducted as a rapid response, residents of the encampment were not provided any notice that it would be occurring that day.

108.    At the time LA Sanitation and LAPD arrived that morning, Ms. Garcia had stepped away from her tent to get ready for work.  At no point prior to leaving that morning had Ms. Garcia received notice that a street cleaning was imminent.  There

COMPLAINT

were no notices posted in the nearby area.  Rather, on information and belief, two LAPD officers deployed as part of the cleanup crew began knocking on tents that morning, telling individuals that they had only 15 minutes to pack up their belongings. Individuals who happened to be gone in this narrow 15-minute window, like Ms. Garcia, had no opportunity to pack up their belongings.

109.    While Ms. Garcia was gone, LA Sanitation workers began "processing" her tent and all of her belongings.  David was present with Ms. Garcia's tent and attempted to explain to the LAPD officers that Ms. Garcia would be returning shortly. He also attempted to move Ms. Garcia's belongings, but he was prevented from doing so.

110.    When Ms. Garcia returned, she found several sanitation workers rummaging through her tent and saw that some of her belongings were loaded into the basket of the garbage truck.  Before she had left to get ready for work, her belongings had been packed in bags and a trunk; when she came back, these items were strewn about and were being thrown into the garbage truck.

111.    Ms. Garcia attempted to tell officers that the tent and belongings were her property and she could remove them, but she was not  permitted to take any of her belongings.  She was simply told that her time was up.  Because Ms. Garcia had previously seen officers detain individuals were trying to gather their belongings during the cleanups, she feared she would be arrested if she protested any further. Running late to her job that day and not being able to remove any of her belongings, Ms. Garcia left.  She simply could not watch her belongings being so carelessly thrown away and discarded.

112.    Ms. Garcia lost all of her belongings that day.  She had purchased brand new cleaning supplies the day before, which she needed for the job she had booked. On information and belief, these cleaning supplies were thrown away because, pursuant to the 56.11 Protocols, these items were deemed "hazards" and pursuant to

COMPLAINT

1  LAMC 56.11, could be summarily destroyed as "an immediate threat to the health and
2  safety of the public."

3       113.    Among the items that were thrown away that day was a small, portable
4  "Shark" vacuum cleaner, a powerful vacuum Ms. Garcia lovingly referred to as her
5  "baby shark," which she took with her to her various cleaning jobs.  Ms. Garcia also
6  lost other electronics.  David informed LAPD that one of the baskets they had taken
7  and loaded into the garbage truck had a laptop, but he was ignored and the laptop was
8  destroyed.  Moreover, Ms. Garcia lost her clothes, shoes, blankets, bike repair tools,
9  and her tent.  She was not provided any notice about the cleanup before it occurred,
10  and after her belongings were destroyed, she received no notice about the destruction,
11  let alone an opportunity to challenge LA Sanitation's determinations about her
12  belongings.

13       114.    After the rapid response on January 29, 2019, Ms. Garcia struggled to
14  replace her belongings, only to lose many of the items again on April 29, 2019.  That
15  time, LA Sanitation and law enforcement returned to the encampment as part of a
16  noticed cleanup.  Ms. Garcia's neighbors had asked her to watch their belongings so
17  they could go with outreach workers—one to sign up for unemployment benefits, and
18  the other to obtain a new identification card.  While they were gone. LA Sanitation
19  came to conduct the cleanup.  Ms. Garcia attempted to move both her belongings and
20  her neighbors' belongings during the allotted time, but was unable to do so, and many
21  of her belongings and her neighbors' belongings were seized and destroyed.

22       115.    Ms. Garcia has also lost property at the hands of the City on other
23  occasions. Each time Ms. Garcia's encampment is "processed" and her belongings are
24  thrown away, she has to rebuild—find a new tent, blankets, and clothing, replace her
25  ID, and buy new cleaning supplies.

26       116.    Since the April 29, 2019 cleanup, Ms. Garcia has slowly been replacing
27  her lost items, but the process of having to repeatedly replace all of her belongs has
28  taken a toll on Ms. Garcia.  These rapid responses are particularly difficult for Ms.

COMPLAINT

Garcia.  Because she works, she cannot stay with her belongings all day long, yet she cannot plan for or anticipate the cleanups.  As a result, Ms. Garcia has lost cleaning jobs because she has had to suddenly move her belongings out of the way of the cleanup.  And when she does leave for a cleaning job, she has no way of knowing whether her property will still be there when she returns from work.  These sweeps leave her feeling that she has an impossible choice:  either lose her job or lose all of her belongings.

**JANE ZEPEDA AND MIRIAM ZAMORA**

117.    Plaintiffs Jane Zepeda and Miriam Zamora are homeless and live in the Koreatown neighborhood of Los Angeles.  Both Ms. Zepeda and Ms. Zamora have lived in Los Angeles most of their lives and have family here.  Until February 5, 2019, Ms. Zepeda and Ms. Zamora lived in an apartment in Koreatown.  The family was evicted and has been living on the streets of Koreatown near their old apartment ever since.

118.    Currently, Ms. Zepeda and Ms. Zamora stay in a tent on a residential street, and they did so at all times relevant to this complaint.  Since they have become homeless, it has been difficult for Ms. Zepeda and Ms. Zamora to find work.  Without any steady income, Ms. Zepeda and Ms. Zamora have been unable to find an apartment that is affordable anywhere in Los Angeles, so they remain in Koreatown because it is the neighborhood where they have lived for years, and it is close to a support system of friends, family members, and neighbors who help look after them.  Ms. Zepeda's uncle also lives in a tent close by, and they are able to visit with him frequently.

119.    Living on the streets, they have limited access to restrooms, and there are no dumpsters or trashcans near where they stay.  Ms. Zepeda and Ms. Zamora attempt to keep their area as clean as possible, including cleaning up trash left on the sidewalk by other people who walk by and dump trash where they are living.  They do laundry at a laundromat one block away to keep their clothing clean.

COMPLAINT

120.   On March 21, 2019, Ms. Zamora and Ms. Zepeda were living near the northeast corner of 6th and Ardmore, along with other people experiencing homelessness.  There were approximately five other tents on their block, including the tent belonging to Ms. Zepeda's uncle.  They chose that spot because the sidewalk is wide, and it was easy to ensure they were not blocking the sidewalks.  It is also one of the few locations where there is shade in the area.

121.   On the morning of March 21, 2019, LA Sanitation and LAPD arrived to conduct an unnoticed rapid response.  When they arrived, they handed Ms. Zepeda and Ms. Zamora a single clear trash bag.  They were instructed that they could take only what they could fit in the bag.  Anything else would be destroyed.

122.   Ms. Zepeda and Ms. Zamora worked frantically to fit their belongings into the single trash bag in the allotted time.  Because they had only 15 minutes, all they could do was shove what they could grab into the bag, which was quickly filled with two sleeping bags and some blankets.

123.   Among the belongings Ms. Zepeda and Ms. Zamora had with them on the street was a wooden chest that was approximately two feet by three feet by two feet. Inside the chest, they kept personal hygiene items, electronics, and important documents, like their social security cards, birth certificates, Ms. Zepeda's identification card, and documents related to Ms. Zamora's family.  The chest was in good condition, and it kept their personal items safe and clean.

124.   The chest would not have fit in the trash bag with their bedding, and even on its own, it likely would have ripped the bag, so Ms. Zepeda and Ms. Zamora attempted to take out the contents of the chest and move them into the trash bag.  They managed to fit some hygiene items and electronics into the bag, but before they could grab the remaining items from the chest, they were instructed that their time was up. Ms. Zepeda and Ms. Zamora were forced to leave the rest of the contents of the chest and all of their other belongings behind.

COMPLAINT

125.    Thereafter, LAPD officers put yellow caution tape up around the area. Ms. Zepeda and Ms. Zamora watched as sanitation workers pulled items from their tent and threw them into the back of a garbage truck.  Among the items that were destroyed was their wooden chest.  A few minutes later, Ms. Zepeda and Ms. Zamora witnessed sanitation workers throw their tent and the rest of their belongings into the back of the garbage truck, including the chest, tarps they used to protect themselves and their belongings from the rain, their tent, other blankets, and some of their clothing.

126.    All of the items that were thrown away were clean and in good condition. The tent was less than seven weeks old.  The blankets had been regularly laundered, as had their clothing.  Before it was thrown in the back of the trash truck and crushed, the wooden chest was clean and sturdy.

127.    Ms. Zepeda and Ms. Zamora had no warning prior to LA Sanitation's arrival that that such an action would occur.  Upon information and belief, the City gave no advance notice, written or otherwise, to the residents at 6th and Ardmore prior to the March 21, 2019 cleanup.

128.    Nor were Ms. Zepeda and Ms. Zamora provided any notice regarding their belongings after the action was completed.  They were not given an inventory of any of the items that were destroyed or a justification for their destruction.  Instead, after LA Sanitation finished crushing their belongings, LA Sanitation simply drove away.

129.    Because their tent was destroyed, Ms. Zepeda and Ms. Zamora had to share a small tent with Ms. Zepeda's uncle, who also lost his bedding during the same rapid response.  On or about March 28, 2019, a member of Ktown for All provided Ms. Zepeda and Ms. Zamora with a new tent.  Other items like Ms. Zepeda's identification, have been much more difficult to replace.

COMPLAINT

130.    After a second sweep in the same area a few days later, Ms. Zepeda and Ms. Zamora moved a few blocks away, where they continued to experience rapid responses by the City.

131.    On June 11, 2019, LA Sanitation once again threw Ms. Zepeda and Ms. Zamora's tent and its contents into a garbage truck.  Among the belongings that were thrown away were freshly cleaned clothing and a mirror that LA Sanitation workers broke while processing their tent.  As a part of the June 11 rapid response, LA Sanitation workers also threw out items that Ms. Zepeda and Ms. Zamora kept just outside of their tent including tools they use to repair bikes, hygiene items, canned food, and cleaning supplies and tools that they used to keep their area clean.

132.    As a result of these actions, Ms. Zamora and Ms. Zepeda have had a difficult time leaving the place where they live.  One of them tries to stay with their belongings at all times, but this also means that Ms. Zepeda and Ms. Zamora are exposed to the elements—first the rain in May and now the heat.  This has made it difficult to look for work.  In addition, even if they do find work, they are concerned that they will lose their work uniforms or equipment in the next unannounced cleanup.  All of this makes it difficult for them to even imagine moving out of homelessness.

**ALI EL-BEY**

133.    Ali El-Bey has been homeless for approximately four years and currently stays in the Koreatown neighborhood of Los Angeles.  He does not stay in one particular location for long, because he experiences frequent harassment from neighbors and law enforcement officers.  He also suffers from mental health issues, and does not like to be around other people.  As a result, he moves from location to location, but generally stays within the boundaries of Koreatown.

134.    On or about January 10, 2019, Mr. El-Bey was staying on the corner of 6th and Alexandria.  He has been staying there for approximately four to five days prior to January 10, 2019.  He had a tent, which was wet because he had washed it the

day before, and it had not dried, but it was otherwise in good condition and clean, and his belongings were packed inside the tent.

135.    That morning, several LAPD patrol cars began circling the block.  The officers did not make any announcements or provide warnings about an imminent cleanup in the area.  Nevertheless, the patrol cars were soon followed by an LA Sanitation truck, which parked near Mr. El-Bey.

136.    Two LAPD officers approached Mr. El-Bey and instructed him that he would need to pack up his belongings and that he had ten minutes to do so.  They did not inform Mr. El-Bey why he needed to move his belongings from their present location or where he was expected to go; they simply instructed him to pack up and move.

137.    Mr. El-Bey struggled to pack up his belongings into a suitcase and a cart, in an attempt to comply with the officers' orders in the allotted time.  A passer-by stopped to help Mr. El-Bey move some of his belongings.

138.    After ten minutes, the officers informed Mr. El-Bey that his time was up. Mr. El-Bey was not permitted to pack up his tent or the remainder of the items in the tent, including his medication, government-issued identification card, clothing, and blankets.  When he requested additional time to remove his ID, medication, and his tent, he was threatened with arrest.

139.    After Mr. El-Bey was informed he could not retrieve his tent or any additional items, sanitation workers packed up his tent with the remainder of his belongings inside, and threw it into the back of the garbage truck.

140.    When it was destroyed, Mr. El-Bey's tent was clean and in good condition, but it was wet because he had cleaned it the day before and it had not yet dried.  On information and belief, the tent was destroyed because it was wet and therefore could potentially become moldy if it was stored by the City.  Because it was determined that the tent could not be stored, Mr. El-Bey had to watch LA Sanitation workers throw the tent into a garbage truck.  Neither the LAPD officers nor the

COMPLAINT

sanitation workers offered to store Mr. El-Bey's property; they simply threw all of his belongings into the trash.

141.    Along with his tent, Mr. El-Bey lost his state-issued ID, prescription medications for mental health treatment, health services card, social security card, information concerning obtaining welfare benefits, blankets, clothes, and shoes.

142.    This is not the first or last time Mr. El-Bey has lost his belongings due to enforcement of LAMC 56.11.  On or about June 4, 2019, Mr. El-Bey was staying near the intersection of Oakwood and Western in Koreatown.  That morning, he put his tent down and left most of his belongings on the sidewalk while he went across the street to do laundry in a laundromat.  While he was doing laundry, Mr. El-Bey saw LA Sanitation workers throwing his belongings into a garbage truck.

143.    When Mr. El-Bey saw sanitation workers going through his belongings, he attempted to save some of what remained.  He was told that his belongings were being taken because they had been left unsupervised and that they had to throw his property away for "safety" reasons.  LA Sanitation ultimately allowed him to keep some of what had not yet been thrown out, but sanitation workers took and destroyed the poles from Mr. El-Bey's tent, several carts that Mr. El-Bey used to help move his belongings from location to location, and the contents of those carts, including a bag that contained his medication, shoes, and some blankets.

**JAMES HAUGABROOK**

144.    James Haugabrook is a 50 year old resident of the South Central neighborhood of Los Angeles, where he grew up and has spent most of his life.  Mr. Haugabrook is a veteran of the United States military.  He has been homeless and lived on the streets for the past two years.

145.    For the past four to six months, Mr. Haugabrook has stayed a few blocks away from the the 110 freeway in South Los Angeles.  He stays in this location because the sidewalk is wide, and he is able to keep his belongings out of the way of pedestrians.  It is also shaded and next to an empty lot owned by the City, and it is

quieter than other areas where he has stayed in the past.  Mr. Haugabrook works hard to keep his area neat and clean.

146.     Despite his efforts to keep the area clean and sidewalks passable, Mr. Haugabrook has repeatedly been subjected to a number of rapid responses by LA Sanitation and the LAPD, resulting in the loss of many of his belongings.

147.     On or about March 2019, LA Sanitation and LAPD came to Mr. Haugabrook's tent to conduct a rapid response.  He had no advance notice that they would be conducting the cleanup that day.

148.     When LA Sanitation and LAPD arrived on the scene, they gave Mr. Haugabrook a trash bag and told him he had 15 minutes to pack his belongings and move them out of the way.  While Mr. Haugabrook was still in the process of packing up his belongings, LA Sanitation began processing the encampment and throwing away his belongings.  Among the items that LA Sanitation threw away was a backpack, which contained medication and other items he needed to survive.

149.     About a month later, Mr. Haugabrook was with his belongings when LA Sanitation came to his tent.  This time, they were there to collect Bulky Items.  Mr. Haugabrook had a small plastic lawn chair that he sat in during the day and a second dining room chair in his tent.  LA Sanitation confiscated both chairs as Bulky Items and immediately threw them away.  Although Mr. Haugabrook needed the chairs to rest during the day and he disagreed with the determination that the items were "bulky," he did not fight with the sanitation workers because he did not want to get arrested for refusing to cooperate with city workers.

150.     On yet another occasion, Mr. Haugabrook had left his belongings for a short period of time.  When he returned, all of his belongings, including his tent and other items were gone. His neighbors had been present for the cleanup and informed him that city workers threw his belongings in the back of a garbage truck.  He saw a notice posted nearby, indicating that the City had seized and stored some items in a storage facility in downtown Los Angeles, but the notice had no information about

COMPLAINT

what items were stored.  Mr. Haugabrook did not have a reliable phone to call the number to find out if any of the items that had been stored were his, and he did not have reliable way to go to the City's storage facility in Skid Row and bring his belongings back if the City had stored them.  As a result, he was not able to contact the City to determine if any of his belongings were stored, and he lost all of his belongings.

151.    Since LA Sanitation took his tent, Mr. Haugabrook has not had a proper tent to use as shelter.  He has only the canvas from another tent that someone gave him, which lacks proper tent poles.  Therefore, he has to tie the canvas to the fence and prop the rest of it up with items he has found on the street.  On at least one occasion, LA Sanitation has seized the items he has used to prop up the tent because the items were "bulky."

152.    The constant threat of rapid responses makes it difficult for Mr. Haugabrook to leave his belongings during the day.  On or about June 24, 2019, LA Sanitation conducted another unannounced rapid response where Mr. Haugabrook lives.  This time, Mr. Haugabrook was present, and LA Sanitation did not seize his belongings.  However, his neighbors were not present, and LA Sanitation seized and destroyed all of their belongings, even though Mr. Haugabrook was present and knew who owned the belongings.

153.    Knowing that he could lose his belongings at any time has made it difficult for Mr. Haugabrook to leave his encampment.  He currently has a Section 8 voucher, issued by the Housing Authority.  Finding a landlord to accept the voucher is already incredibly difficult, but because of the sweeps and the need to stay with his belongings, Mr. Haugabrook has found it even more difficult to search for an apartment that will accept the voucher.  He is constantly concerned that he will leave and return to find that all of his belongings have been taken and destroyed.

**PETE DIOCSON JR.**

154.    Pete Diocson Jr. was born and raised in Carson, California and at all times relevant to this complaint, lived in the Harbor City area of Los Angeles, where he had been staying for the past four or five years.

155.    On April 24, 2019, the City conducted a noticed cleanup of a homeless encampment on Lomita and McCoy in the Harbor City neighborhood of Los Angeles. That morning, Mr. Diocson was at the encampment.

156.    The City posted notices about the cleanup, and Mr. Diocson was aware that it would be taking place that day.  In anticipation of the cleanup, Mr. Diocson brought his dog Bella to stay with his ex-girlfriend, who does not live in the encampment.  He knew that cleanups could be extremely chaotic, and he was worried that Bella would be scared by all the commotion.

157.    On the morning of the cleanup, Mr. Diocson packed up his belongings to move out of the area, including his tent and other possessions.  Among his belongings was a medium-sized wire kennel for Bella, which he kept in his tent and used to keep her secure at night.

158.    As Mr. Diocson attempted to remove his belongings from the area, including Bella's kennel, he was stopped by LAPD Officer Lopez, who, on information and belief, is a member of the South HOPE team.  Officer Lopez informed Mr. Diocson that Bella's kennel was a Bulky Item, and that he could not take it with him.  He had to leave it behind.

159.    Although Mr. Diocson did not realize that the kennel would be considered a Bulky Item or agree with the determination that it was a Bulky Item, he was afraid to challenge the LAPD officer.  Mr. Diocson had seen other individuals arrested by LAPD officers when they tried to challenge sanitation workers' determinations about what items would be thrown away.  Because he feared arrest, he left the kennel behind.  He moved around the corner with the rest of his neighbors to wait for the cleanup to finish.

160.    Approximately two hours later, the kennel was crushed by an LA Sanitation bulldozer and thrown away.

161.    After Mr. Diocson's kennel for Bella was taken and destroyed, he was constantly worried that Bella would get loose and run into traffic.  He had difficulty sleeping because he did not have the peace of mind he had when Bella was secure in the kennel at night.  A friend helped him get another kennel to replace the one that was taken, but he now he is worried that this one will be taken and destroyed as well.

**MARQUIS ASHLEY**

162.    Marquis Ashley is an unhoused resident of the Harbor City neighborhood of Los Angeles.  He has lived in and around Harbor City for most of his life.  He currently lives at the homeless encampment on Lomita Boulevard.  Mr. Ashley is creative and likes to work with his hands.  He is currently going to welding school, and he hopes that this will help him get a job and permanent housing.  During his spare time, he often finds items that have been discarded and repurposes them into useful items to use on the street.  For example, he has made carts to move his belongings.  Mr. Ashley constructed one cart out of old found objects and wheelchair wheels, and he attached it to his bicycle to help him move his belongings.

163.    On May 21, 2019, LA Sanitation conducted a noticed cleanup at Lomita and McCoy in Harbor City.  Although Mr. Ashley was present at the encampment that morning, he did not see any signs indicating that the cleanup would take place that day, so he was unaware that LA Sanitation would be conducting the cleanup.

164.    When LA Sanitation arrived, sanitation workers and LAPD officers gave residents a short window of time to pack up their belongings and move from the area.  A sanitation worker gave Mr. Ashley a trash bag for his belongings, which he filled up with his tent and other items he needed to survive.  He was instructed to leave the area with his belongings.

165.    Mr. Ashley packed up what he could fit in the trash bag and piled it onto his homemade cart.  He also had another handmade cart in need of repairs, which he piled on top of his belongings.

166.    As he was attempting comply with LA Sanitation's instructions to remove his belongings from the area, a sanitation worker stopped him and informed him that the cart attached to his bicycle and the second cart were Bulky Items.  He was therefore not allowed to take them with him.  He was not given any explanation why the carts were considered Bulky Items.  Nor was he provided any opportunity to challenge this determination.

167.    Although Mr. Ashley disagreed that the items were "bulky," and he knew that he relied on the carts to move his belongings, he did not feel he could challenge LA Sanitation's determination.  Indeed, an LAPD officer who was present at the cleanup had informed Mr. Ashley that, if he did not want to go to jail, he would have to hurry up and move from the area.  Because Mr. Ashley did not want to go to jail and did not feel as though he could challenge the LA Sanitation worker's order to surrender the carts, he left the carts behind.  He knew from watching past cleanups that if he left the items behind, they would be destroyed.

168.    Without the cart he used to transport his belongings, Mr. Ashley was forced to drag the rest of his belongings outside of the area that had been cordoned off by LAPD officers.

169.    After LA Sanitation completed the cleanup and the LAPD officers removed the yellow caution tape, Mr. Ashley was able to drag his belongings back to the area where he lives.  His carts were nowhere to be found.

170.    Following the cleanup, Mr. Ashley managed to construct another cart similar to the ones that were seized and destroyed.  Although the cart is incredibly useful, he is now concerned it too will be seized and destroyed as a Bulky Item.

COMPLAINT

**FIRST CAUSE OF ACTION**
**Right to Be Secure From Unreasonable Seizures**
**42 U.S.C. § 1983 – Fourth Amendment**
**(Facial Challenge)**

171.   Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth here.

172.   As written, Section 3(h) of LAMC 56.11 permits the City to immediately seize any items the City deems "bulky."  LAMC 56.11 does not require the City to seek a warrant prior to the seizure of an item it determines is "bulky," nor must the City determine that an exception to the warrant requirement applies, such that probable cause exists to seize the item.  As such, LAMC 56.11 as written violates the United States Constitution because the seizure of an item based solely on the size of the item, without a warrant or probable cause, is unreasonable and contrary to the Fourth Amendment of the U.S. Constitution, as applied to the states by the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

173.   In addition to allowing the warrantless seizure of Bulky Items, as written, Section 3(h) of LAMC 56.11 explicitly permits the City to immediately destroy any items the City deems "bulky."  LAMC 56.11 does not require the City to seek a warrant prior to the destruction of an item it determines is "bulky," nor must the City determine that an exception to the warrant requirement applies, such that probable cause exists to immediately destroy the item.  As such, LAMC 56.11 as written violates the U.S. Constitution because the destruction of an item based solely on the size of the item, without a warrant or probable cause, is unreasonable and contrary to the Fourth Amendment of the U.S. Constitution, as applied to the states by the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

174.   Further, as written, LAMC 56.11(10)(d) allows the Defendant and its employees and agents to arrest and prosecute anyone who interferes with the seizure or destruction of an item, even though the seizure or destruction of that item may violate the Fourth Amendment of the U.S. Constitution, as applied to the states by the

Fourteenth Amendment to the U.S. Constitution.  This provision, which prohibits an individual from interfering with a constitutionally impermissible seizure, is unconstitutional under the Fourth Amendment of the U.S. Constitution, as applied to the states by the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

175.    Defendant has and will continue to spend municipal taxes paid by Plaintiffs into the General Fund on the enforcement of LAMC 56.11.

176.    As a direct and proximate consequence of the acts of Defendant's agents and employees, Plaintiffs have suffered and continue to suffer injury and loss. Plaintiffs are entitled to compensatory damages for the loss of and damage to property and other injuries to their persons that resulted from the violation of their Fourth Amendment and analogous state constitutional rights.

### SECOND CAUSE OF ACTION
### Right to Be Secure From Unreasonable Seizures
### 42 U.S.C. § 1983 – Fourth Amendment

177.    Plaintiffs re-allege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth here.

178.    Plaintiffs have a vested interest in their property pursuant to the U.S. and California Constitution and statutory law.  Defendant and its employees and agents violated Plaintiffs' Fourth Amendment right to be free from unreasonable seizure of their property by confiscating Plaintiffs' property without a warrant and without probable cause.  Defendant and its employees and agents further violated Plaintiffs' Fourth Amendment right to be free from unreasonable seizure when it summarily destroyed these items, without a warrant and without probable cause.  These unlawful actions were done with the specific intent to deprive Plaintiffs of their constitutional right to be secure in their property.

179.    Plaintiffs are informed and believe that the acts of the Defendant and its employees and agents were intentional in failing to protect and preserve Plaintiffs' property and that, at a minimum, Defendant and its employees and agents were

deliberately indifferent to the likely consequence that the property would destroyed unlawfully, even though the right at issue was well-established at the time of the seizure and destruction.

180.    Defendant's and its employees' and agents' actions were taken pursuant to Defendant's policies, patterns, and/or customs of seizing and destroying homeless individuals' property without a valid warrant or probable cause.

181.    These policies, patterns, and/or customs are unreasonable and contrary to the Fourth Amendment of the U.S. Constitution, as applied to the states by the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

182.    To the extent Defendant and its employees and agents' actions were taken pursuant to LAMC 56.11 and the 56.11 Standard Operating Protocols, these policies and practices as applied to Plaintiffs are unreasonable and contrary to the Fourth Amendment of the U.S. Constitution, as applied to the states by the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

183.    Defendant has and will continue to spend municipal taxes paid by Plaintiffs into the General Fund on the enforcement of LAMC 56.11.

184.    As a direct and proximate consequence of the acts of Defendant's agents and employees, Plaintiffs have suffered and continue to suffer injury and loss. Plaintiffs are entitled to compensatory damages for the loss of and damage to property and other injuries to their persons that resulted from the violation of their Fourth Amendment and analogous state constitutional rights.

**THIRD CAUSE OF ACTION**
**Void for Vagueness**
**42 U.S.C. § 1983 – Fourteenth Amendment**

185.    Plaintiffs re-allege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth here.

186.    As written, LAMC 56.11 is void for vagueness under the Fourteenth Amendment of the U.S. Constitution because it fails to define the terms Bulky Item

with sufficient precession, which encourages and has resulted in arbitrary and discriminatory enforcement by the City against Plaintiffs.  It also fails to provide Plaintiffs with fair notice of what items the City makes illegal for Plaintiffs to have with them in public spaces.

187.   LAMC 56.11 is also void for vagueness because it fails to define the term Excess Personal Property with sufficient precision, which encourages and has resulted in arbitrary and discriminatory enforcement by the City against Plaintiffs.  It also fails to provide Plaintiffs with fair notice of what items the City makes illegal for Plaintiffs to have with them in public spaces.

188.   LAMC 56.11 is also void for vagueness because, through the 56.11 Protocols, Defendant has defined the term "immediate threat to the health and safety of the public" so broadly as to render the phrase meaningless, leaving officers with unfettered discretion to enforce the ordinance, resulting in arbitrary and discriminatory enforcement by the City against Plaintiffs.  It also fails to provide Plaintiffs with fair notice of what items the City makes illegal for Plaintiffs to have with them in public spaces.

189.   Relying on the vague ordinance, the City has seized Plaintiffs' property and in many instances alleged herein, immediately destroyed their property.

190.   Plaintiffs fear arrest if they interfere or even protest the arbitrary decision-making by Defendant regarding their personal property, even though these decisions have and will continue to result in the permanent loss of these items.

191.   Defendant has and will continue to spend municipal taxes paid by Plaintiffs into the General Fund on the enforcement of LAMC 56.11.

192.   As a direct and proximate consequence of the acts of Defendant's agents and employees, Plaintiffs have suffered and continue to suffer injury and loss. Plaintiffs are entitled to compensatory damages for the loss of and damage to property and other injuries to their persons that resulted from the violation of their Fourteenth Amendment rights.

**FOURTH CAUSE OF ACTION**
**Right to Due Process of Law**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**(Facial Challenge)**

193.   Plaintiffs re-allege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth here.

194.   As written, Section 3(h) of LAMC 56.11 permits the Defendant to immediately seize any items Defendant deems "bulky."  LAMC 56.11 does not require Defendant to provide any notice or opportunity to be heard before or after the items are seized.  The provision also allows Defendant to permanently deprive Plaintiffs of their property by immediately destroying their belongings without any notice or opportunity to be heard.  As such, LAMC 56.11 as written violates the United States Constitution because the seizure of an item without any due process, including adequate notice and an opportunity to be heard, violates the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

195.   Defendant has and will continue to spend municipal taxes paid by Plaintiffs into the General Fund on the enforcement of LAMC 56.11.

196.   As a direct and proximate consequence of the acts of Defendant's agents and employees, Plaintiffs have suffered and continue to suffer injury and loss. Plaintiffs are entitled to compensatory damages for the loss of and damage to property and other injuries to their persons that resulted from the violation of their Fourteenth Amendment rights.

**FIFTH CAUSE OF ACTION**
**Right to Due Process of Law**
**42 U.S.C. § 1983 – Fourteenth Amendment**

197.   Plaintiffs re-allege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth here.

198.   Plaintiffs have a vested interest in their property pursuant to the U.S. and California Constitution and statutory law.  Defendant and its employees and agents

49

COMPLAINT

violated Plaintiffs' Fourteenth Amendment right to due process of law by seizing and destroying their property without adequate notice and opportunity to be heard prior to depriving Plaintiffs of their property.  Defendant and its employees and agents further violated Plaintiffs' Fourteenth Amendment right to due process of law by destroying their property without adequate notice and opportunity to be heard prior to permanently depriving Plaintiffs of their property by immediately destroying their belongings.  These unlawful actions were done with the specific intent to deprive Plaintiffs of their constitutional right to due process of law.

199.    Plaintiffs are informed and believe that the acts of the Defendant and its employees and agents were intentional in failing to protect and preserve Plaintiffs' property and that, at a minimum, Defendant and its employees and agents were deliberately indifferent to the likely consequence that the property would be seized and destroyed unlawfully, even though the right at issue was well-established at the time.

200.    Defendant's and its employees' and agents' actions were taken pursuant to Defendant's policies, patterns and/or customs of seizing and destroying homeless individuals' property without adequate notice and opportunity to be heard prior to being deprived of their property.  These policies, patterns, and/or customs are contrary to the Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

201.    To the extent Defendant's and its employees' and agents' actions were taken pursuant to Los Angeles Municipal Code 56.11 and the 56.11 Standard Operating Protocols, these policies and practices as applied to Plaintiffs violate the Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

202.    Defendant has and will continue to spend municipal taxes paid by Plaintiffs into the General Fund on the enforcement of LAMC 56.11.

203.    As a direct and proximate consequence of the acts of Defendant's agents and employees, Plaintiffs have suffered and continue to suffer injury and loss. Plaintiffs are entitled to compensatory damages for the loss of and damage to property

and other injuries to their persons that resulted from the violation of their Fourteenth Amendment rights.

**SIXTH CAUSE OF ACTION**
**Violation of Bane Civil Rights Act**
**Cal. Civ. Code § 52.1**
**(Plaintiff Ali El-Bey)**

204.    Plaintiff realleges and incorporates the allegations set forth in the proceeding paragraphs as though fully set forth herein.

205.    Defendant's agents and employees have used arrests, threats of arrest and intimidation to interfere with Plaintiff's right to maintain his personal possessions as secured by the Constitution of the United States, the Constitution of the State of California, and the statutory laws of the State of California.

206.   As a direct and proximate consequence of the acts of Defendant's agents and employees, Plaintiff has suffered and continues to suffer injury and loss.  Plaintiff is entitled to statutory and compensatory damages for the loss of and damage to property, violation of constitutional and statutory rights, and other injuries to his person that resulted from the violation of his rights.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray as follows:

1.      For a declaratory judgment that Los Angeles Municipal Code Section 56.11 as written and as applied to Plaintiffs violates the United States Constitution;

2.      For a declaratory judgment that Defendants' policies, practices, and conduct as alleged herein, violate Plaintiffs' rights under the United States Constitution;

3.      For an order enjoining and restraining Defendants from engaging in the policies, practices, and conduct complained of herein, including an order enjoining and restraining Defendants from enforcing the provisions of Los Angeles Municipal Code Section 56.11;

51

_____

COMPLAINT

4.      For damages according to proof for the loss of Plaintiffs' property, the violation of their constitutional and statutory rights; and for pain and suffering resulting from the unlawful conduct of Defendants;

5.      For costs of suit and attorney fees as provided by law; and

6.      For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby respectfully demand that a trial by jury be conducted with respect to all issues presented herein.

Dated:  July 18, 2019                   Respectfully submitted,

LEGAL AID FOUNDATION OF LOS ANGELES


/s/
_____
By: Shayla Myers
*Attorneys for Plaintiffs Gladys Zepeda, Miriam Zamora, Ali El-Bey, Pete Diocson Jr., Marquis Ashley, James Haugabrook, and Ktown for All*

SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP

 /s/
_____
By: Catherine Sweetser
*Attorneys for All Plaintiffs*


KIRKLAND & ELLIS LLP


/s/
_____
By: Benjamin Allen Herbert
*Attorneys for Ktown for All*

_____
COMPLAINT

EXHIBIT A

Print

Los Angeles Municipal Code

### SEC. 56.11.  STORAGE OF PERSONAL PROPERTY.
**(Amended by Ord. No. 184,182, Eff. 4/11/16.)**

1.  **Declaration of Legislative Intent - Purpose.**  The City enacts this section to balance the needs of the residents and public at large to access clean and sanitary public areas consistent with the intended uses for the public areas with the needs of the individuals, who have no other alternatives for the storage of personal property, to retain access to a limited amount of personal property in public areas.  On the one hand, the unauthorized use of public areas for the storage of unlimited amounts of personal property interferes with the rights of other members of the public to use public areas for their intended purposes and can create a public health or safety hazard that adversely affects those who use public areas.  On the other hand, the City's large and vulnerable homeless population needs access to a manageable amount of essential property for their personal use and well-being.  This section attempts to balance the needs of all of the City's residents.

2.  **Definitions.**  The definitions contained in this subsection shall govern the construction, meaning and application of words and phrases used in this section.

(a)  **"Alley"** means any Highway having a Roadway not exceeding 25 feet in width which is primarily for access to the rear or side entrances of abutting property.

(b)  **"Bikeway"** means all facilities that provide primarily for, and promote, bicycle travel.

(c)  **"Bulky Item"** means any item, with the exception of a constructed Tent, operational bicycle or operational walker, crutch or wheelchair, that is too large to fit into a 60-gallon container with the lid closed, including, but not limited to, a shed, structure, mattress, couch, chair, other furniture or appliance.  A container with a volume of no more than 60 gallons used by an individual to hold his or her Personal Property shall not in itself be considered a Bulky Item.

(d)  **"City Employee"** means any full or part-time employee of the City of Los Angeles or a contractor retained by the City for the purpose of implementing this Section.

(e)  **"Essential Personal Property"** means any and all Personal Property that cumulatively is less than two cubic feet in volume, which, by way of example, is the amount of property capable of being carried within a backpack.

(f)  **"Excess Personal Property"** means any and all Personal Property that cumulatively exceeds the amount of property that could fit in a 60-gallon container with the lid closed.

(g)  **"Highway"** means a way or place of whatever nature, publicly maintained and open to the use of the public for purposes of vehicular travel.

(h)  **"Parkway"** means the area of the Street between the back of the curb and the Sidewalk that typically is planted and landscaped.

(i)   **"Person"** means any individual.

(j)   **"Personal Property"** means any tangible property, and includes, but is not limited to, goods, materials, merchandise, Tents, tarpaulins, bedding, sleeping bags, hammocks, personal items such as household items, luggage, backpacks, clothing, documents and medication.

(k)   **"Public Area"** or **"Public Areas"** means all property that is owned, managed or maintained by the City, except property under the jurisdiction of the Department of Recreation and Parks which is governed by Los Angeles Municipal Code Section 63.44, and shall include, but not be limited to, any Street, medial strip, space, ground, building or structure.

(l)   **"Roadway"** means that portion of a Highway improved, designed or ordinarily used for vehicular travel.

(m)   **"Sidewalk"** means that portion of a Highway, other than the Roadway, set apart by curbs, barriers, markings or other delineation, for pedestrian travel.

(n)   **"Storage Facility"** means any facility, whether operated by a public, non-profit or private provider, which allows and has capacity for voluntary storage, free of charge, for a homeless person to store Personal Property up to the equivalent of the amount of property that would fit into a single 60-gallon container with the lid closed.

(o)   **"Store"**, **"Stored"**, **"Storing"** or **"Storage"** means to put Personal Property aside or accumulate for use when needed, to put for safekeeping, and/or to place or leave in a Public Area.  Moving Personal Property to another location in a Public Area or returning Personal Property to the same block on a daily or regular basis shall be considered Storing and shall not be considered to be removing the Personal Property from a Public Area.  This definition shall not include any Personal Property that, pursuant to statute, ordinance, permit, regulation or other authorization by the City or state, is Stored with the permission of the City or state on real property that is owned or controlled by the City.

(p)   **"Street"** includes every Highway, avenue, lane, Alley, court, place, square, Sidewalk, Parkway, curbs, Bikeway or other public way in this City which has been or may hereafter be dedicated and open to public use, or such other public property so designated in any law of this state.

(q)   **"Tent"** means a collapsible shelter made of fabric such as nylon or canvas or a tarp stretched and sustained by supports, which is not open on all sides and which hinders an unobstructed view behind or into the area surrounded by the fabric.  In order to qualify as a Tent for purposes of this subsection, a Tent, when deconstructed, must be able to fit within a 60-gallon container with the lid closed.

(r)   **"Unattended"** means no Person is present with the Personal Property who asserts or claims ownership over the Personal Property.  Conversely, property is considered **"Attended"** if a Person is present with the Personal Property and the Person claims ownership over the Personal Property.

3.    **Regulation and Impoundment of Stored Personal Property; Discard of Certain Stored Personal Property.**

(a)    No Person shall Store any Unattended Personal Property in a Public Area.  With pre-removal notice as specified in Subsection 4.(a), the City may impound any Unattended Personal Property in a Public Area, regardless of volume.  Post-removal notice shall be provided as set forth in Subsection 4.(b), below.

(b)    No Person shall Store any Attended Excess Personal Property in a Public Area.  With pre-removal notice as specified in Subsection 4.(a), the City may impound any Attended Excess Personal Property Stored in a Public Area.  Post-removal notice shall be provided as set forth in Subsection 4.(b), below.

(c)    No Person shall Store any Personal Property in a Public Area in such a manner as to obstruct City operations, including a Street or Sidewalk maintenance or cleaning.  Without prior notice, the City may temporarily move Personal Property, whether Attended or Unattended, which is obstructing City operations in a Public Area, including a Street or Sidewalk maintenance or cleaning, during the time necessary to conduct the City operations.  The City also may impound Personal Property that is obstructing City operations in a Public Area, pursuant to Subsection 3.(a) or 3.(b).

(d)    No Person shall Store any Personal Property in a Public Area in such a manner that it does not allow for passage as required by the Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 328 (1990), as amended from time to time (ADA).  Without prior notice, the City may move and may immediately impound any Personal Property, whether Attended or Unattended, Stored in a Public Area in such a manner that it does not allow for passage as required by the ADA.  Post-removal notice shall be provided as set forth in Subsection 4.(b), below.

(e)    No Person shall Store any Personal Property within ten feet of any operational and utilizable entrance, exit, driveway or loading dock.  Without prior notice, the City may move and may immediately impound any Personal Property, whether Attended or Unattended, Stored in a Public Area within ten feet of any operational and utilizable entrance, exit, driveway or loading dock.  Post-removal notice shall be provided as set forth in Subsection 4.(b), below.

(f)    No Person shall Store in a Public Area that has a clearly posted closure time any Personal Property after the posted closure time.  Without prior notice, the City may remove and impound Personal Property, whether Attended or Unattended, Stored in a Public Area that has a clearly posted closure time, provided the Personal Property is removed and impounded after the posted closure time.  Post-removal notice shall be provided as set forth in Subsection 4.(b), below.

(g)    No Person shall Store any Personal Property in a Public Area if the Personal Property, whether Attended or Unattended, constitutes an immediate threat to the health or safety of the public.  Without prior notice, the City may remove and may discard any Personal Property Stored in a Public Area if the Personal Property poses an immediate threat to the health or safety of the public.

(h)    No Person shall Store any Personal Property in a Public Area if the Personal Property,

whether Attended or Unattended, constitutes an evidence of a crime or contraband. Without prior notice, the City may remove and may discard any Personal Property that constitutes evidence of a crime or contraband, as permissible by law.

(i)   No Person shall Store any Bulky Item in a Public Area. Without prior notice, the City may remove and may discard any Bulky Item, whether Attended or Unattended, Stored in a Public Area unless the Bulky Item is designed to be used as a shelter. For any Bulky Item that is designed to be used as a shelter but does not constitute a Tent as defined in Subsection 2.(q), with pre-removal notice as specified in Subsection 4.(a), the City may remove and discard the Bulky Item, whether Attended or Unattended. If the Bulky Item violates Subsection 3.(d)-(h) herein, even if it is designed to be used as a shelter, without prior notice, the City may remove and discard the Bulky Item, whether Attended or Unattended.

(j)   Upon the creation of any new Storage Facility, increased capacity at an Existing Storage Facility or subsidized transportation assistance to a Storage Facility, the Chief Administrative Officer shall report to the Council to inform the Council's consideration of whether to prohibit a Person from Storing more than Essential Personal Property in a Public Area in a specified radius from a Storage Facility, based upon the amount of the additional storage capacity and the accessibility thereto. In consideration of the CAO's report, the Council may, by resolution, prohibit a Person within a specified radius of a Storage Facility from Storing more than Essential Personal Property in a Public Area.

4.  **Notice.**

(a)   **Pre-Removal Notice.** Pre-removal notice shall be deemed provided if a written notice is provided to the Person who is Storing or claims ownership of the Personal Property, or is posted conspicuously on or near the Personal Property and the actual removal commences no more than 72 hours after the pre-removal notice is posted. The written notice shall contain the following:

(1)   A general description of the Personal Property to be removed.

(2)   The location from which the Personal Property will be removed.

(3)   The date and time the notice was posted.

(4)   A statement that the Personal Property has been stored in violation of Section 56.11, Subsection 3.

(5)   A statement that the Personal Property may be impounded if not removed from Public Areas within 24 hours.

(6)   A statement that moving Personal Property to another location in a Public Area shall not be considered removal of Personal Property from a Public Area.

(7)   The address where the removed Public Property will be located, including a telephone number and the internet website of the City through which a Person may receive information as to impounded Personal Property as well as information as to voluntary storage location(s).

(8)   A statement that impounded Personal Property may be discarded if not claimed within 90 days after impoundment.

(b)   **Post-Removal Notice.**  Upon removal of Stored Personal Property, written notice shall be conspicuously posted in the area from which the Personal Property was removed.  The written notice shall contain the following:

(1)   A general description of the Personal Property removed.

(2)   The date and approximate time the Personal Property was removed.

(3)   A statement that the Personal Property was stored in a Public Area in violation of Section 56.11, Subsection 3.

(4)   The address where the removed Personal Property will be located, including a telephone number and internet website of the City through which a Person may receive information as to impounded Personal Property.

(5)   A statement that impounded Personal Property may be discarded if not claimed within 90 days after impoundment.

5.   **Storage and Disposal.**
(a)   Except as specified herein, the City shall move Personal Property to a place of storage.

(b)   Except as specified herein, the City shall store impounded Personal Property for 90 days, after which time, if not claimed, it may be discarded.  The City shall not be required to undertake any search for, or return, any impounded Personal Property stored for longer than 90 days.

(c)   The City shall maintain a record of the date any impounded Personal Property was discarded.

6.   **Repossession.**  The owner of impounded Personal Property may repossess the Personal Property prior to its disposal upon submitting satisfactory proof of ownership.  A Person may establish satisfactory proof of ownership by, among other methods, describing the location from and date when the Personal Property was impounded from a Public Area, and providing a reasonably specific and detailed description of the Personal Property.  Valid, government-issued identification is not required to claim impounded Personal Property.

7.   **Ban on Erection of Tent during Certain Daytime Hours.**  No Person shall erect, configure or construct a Tent in any Public Area from 6:00 a.m. to 9:00 p.m. (except during rainfall or when the temperature is below 50 degrees Fahrenheit).  A Person must take down, fold, deconstruct or put away any Tent erected, configured or constructed in any Public Area between the hours of 6:00 a.m. and 9:00 p.m. (except during rainfall or when the temperature is below 50 degrees Fahrenheit).  Without prior notice, the City may deconstruct and may impound any Tent, whether Attended or Unattended, located in any Public Area in violation of this subsection or in violation of Subsections 3.(c)-(h) hereof.  The City shall provide post-removal notice for any impounded Tent, as set forth in Subsection 4.(b), herein.

8.   **Ban on Attachments to Public and Private Property.**

(a)   **Public Property.**  No Person shall erect any barrier against or lay string or join any wires, ropes, chains or otherwise attach any Personal Property to any public property, including but not limited to, a building or portion or protrusion thereof, fence, bus shelter, trash can, mail box, pole, bench, news rack, sign, tree, bush, shrub or plant, without the City's prior written consent.

(b)   **Private Property.**  No Person shall erect any barrier against or lay string or join any wires, ropes, chains or otherwise attach any Personal Property to any private property in such a manner as to create an obstruction on or across any Street or area where the public may travel.

(c)   **Removal.**  Without prior notice, the City may remove any barrier, string, wires, ropes, chains or other attachment of Personal Property, whether Attended or Unattended, to any public property, or to any private property which creates an obstruction to any Street or area where the public may travel.

9.   **Illegal Dumping.**  Nothing herein precludes the enforcement of any law prohibiting illegal dumping, including but not limited to California Penal Code Section 374.3, and Los Angeles Municipal Code Sections 41.14, 63.44 B.13. or 190.02, or any successor statutes proscribing Illegal dumping.

10.   **Unlawful Conduct.**  Los Angeles Municipal Code Section 11.00 shall not apply to violations of this section except as follows:

(a)    No Person shall willfully resist, delay or obstruct a City employee from moving, removing, impounding or discarding Personal Property Stored in a Public Area in violation of Subsections 3.(a)-(h).

(b)    No Person shall refuse to take down, fold, deconstruct or otherwise put away any Tent erected or configured between the hours of 6:00 a.m. and 9:00 p.m., in violation of Subsection 7., or willfully resist, delay or obstruct a City employee from taking down, folding, deconstructing, putting away, moving, removing, impounding or discarding the Tent, including by refusing to vacate or retreat from the Tent.

(c)   No Person shall refuse to remove any barrier, string, wire, rope, chain or other attachment that violates Subsection 8., or willfully resist, delay or obstruct a City employee from deconstructing, taking down, moving, removing, impounding or discarding the barrier, string, wire, rope, chain or other attachment, including by refusing to vacate or retreat from an obscured area created by the attachment.

(d)    No Person shall willfully resist, delay or obstruct a City employee from removing or discarding a Bulky Item Stored in violation of Subsection 3.(i), including by refusing to vacate or retreat from within the Bulky Item or from an obscured area created by the Bulky Item.

(e)   If Subsection 3.(j) becomes operative by resolution in any area of the City, no Person shall willfully resist, delay or obstruct a City employee from removing or impounding any Personal Property that exceeds the limit on Essential Personal Property.

(f)   A violation of Subsection 9. prohibiting illegal dumping.

Case 2:19-cv-06182   Document 1   Filed 07/18/19   Page 60 of 60   Page ID #:60

11. **Designated Administrative Agency.**  The City's Department of Public Works, Bureau of Sanitation, is hereby charged with serving as the Designated Administrative Agency (DAA), for the purposes of this ordinance.  The DAA shall promulgate rules, protocols and procedures for the implementation and enforcement of this ordinance, consistent with the provisions herein.

12. **Severability.**  If any subsection, sentence, clause or phrase of this article is for any reason held to be invalid or unconstitutional by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this ordinance.  The City Council hereby declares that it would have adopted this section, and each and every subsection, sentence, clause and phrase thereof not declared invalid or unconstitutional, without regard to whether any portion of the ordinance would be subsequently declared invalid or unconstitutional.