# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANET GARCIA, et al.,<br>    Plaintiffs,<br><br>               v.<br><br>CITY OF LOS ANGELES, et al.,<br>    Defendants. | CV 19-06182-DSF-PLA<br><br>Order GRANTING in part and DENYING in part Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction (Dkt. 21) |

Defendant City of Los Angeles moves to dismiss all claims asserted by Plaintiffs Ktown for All (KFA) and Association for Responsible and Equitable Public Spending (AREPS) for lack of subject matter jurisdiction. Dkt. 21 (Mot.).[1]

## I. FACTUAL BACKGROUND

### A.   The Challenged Ordinance

In 2016, the Los Angeles City Council amended Los Angeles Municipal Code (LAMC) § 56.11 (the Ordinance).[2] Dkt. 20 (Suppl.

---

[1] The City's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is addressed in a separate order.

[2] The City requests judicial notice of the Ordinance. Dkt. 23 (RJN), Ex. 1. Federal Rule of Evidence 201 permits judicial notice of a "fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Municipal ordinances are proper subjects for judicial notice. See Tollis Inc. v. County of San Diego, 505 F.3d 935, 938 n.1 (9th Cir.

FAC).  The Ordinance regulates the storage of personal property in public areas.  Its stated purpose is to "balance the needs of the residents and public at large to access clean and sanitary public areas . . . with the needs of the individuals, who have no other alternatives for the storage of personal property, to retain access to a limited amount of personal property in public areas."  LAMC § 56.11(1).  In most situations, the City is authorized to impound personal property in a public area so long as it provides pre-removal and post-removal notice.  See, e.g., LAMC § 56.11(3)(a)-(b).  In other situations, including where the property obstructs City operations or interferes with the City's compliance with the Americans with Disabilities Act of 1990 (ADA), only post-removal notice is required to impound personal property.  See, e.g., id. § 56.11(3)(c)-(f).  There are also limited situations where the City can immediately destroy personal property without notice, including if the property "poses an immediate threat to the health or safety of the public," id. § 56.11(3)(g), "constitutes evidence of a crime or contraband," id. §56.11(3)(h), or is a "Bulky Item" that is not "designed to be used as a shelter," id. §56.11(3)(i) (Bulky Item Provision).  A Bulky Item is "any item, with the exception of a constructed Tent, operational bicycle or operational walker, crutch or wheelchair, that is too large to fit into a 60-gallon container with the lid closed," but not "a container with a volume of no more than 60 gallons used by an individual to hold his or her Personal Property."  Id. § 56.11(2)(c).

      To enforce the Ordinance, the City, through the Bureau of Sanitation (Sanitation) and the Los Angeles Police Department (LAPD), conducts noticed cleanups and random rapid responses where personal property that does not comply with the Ordinance is seized or destroyed.  Suppl. FAC ¶¶ 21, 69.

      The City also adopted the Los Angeles Municipal Code 56.11 Standard Operating Protocols (the Protocols) regarding the

---

2007).  The Court grants the City's unopposed request for judicial notice of the Ordinance.

implementation and enforcement of the Ordinance.[3] The Protocols contain detailed instructions on how Sanitation and LAPD should enforce the Ordinance. For example, Procedure 7 explains that items are "health hazards" if "there is statistically significant evidence based on at least one study conducted in accordance with established scientific principles that acute or chronic health effects may occur in exposed persons." RJN, Ex. 2 at 29.

## B.   Enforcement of the Ordinance Against Individual Plaintiffs

### 1.   Garcia

On or about January 29, 2019, without any prior notice, a Sanitation crew seized and destroyed Garcia's tent and all of her belongings, including a vacuum and other cleaning supplies she uses for her work as a domestic cleaner, while she had momentarily left to use the bathroom. Suppl. FAC ¶¶ 24, 125-132. On April 29, 2019, as part of a noticed cleanup, another Sanitation crew seized Garcia's belongings while she was watching her neighbors' property. Id. ¶¶ 24, 133. On August 14, 2019, Sanitation workers again seized and destroyed all of her belongings when she left them to go to work, even though she had attempted to move them out of the noticed cleanup area before leaving for work. Id. ¶¶ 25, 134-145.

### 2.   Zepeda and Zamora

On March 21, 2019, without notice, Sanitation workers seized and destroyed all of Zepeda's and Zamora's belongings that could not fit into a single 60-gallon trash bag, including a new tent, tarps, clean clothing, and a chest containing important documents. Id. ¶¶ 28, 155-165. Shortly thereafter, KFA provided Zepeda and Zamora with a new tent. Id. ¶ 166. On or about June 11, 2019, Sanitation again destroyed

---

[3] The Court grants the City's unopposed request for judicial notice of the Protocols. RJN, Ex. 2.

Zepeda's and Zamora's tent, along with the belongings inside of the tent. Id. ¶ 168.

### 3. El-Bey

On January 10, 2019, without notice, Sanitation and LAPD gave El-Bey 10 minutes to pack up his belongings and move. Id. ¶¶ 30, 173-77. When El-Bey required additional time to collect his belongings, one of the LAPD officers threatened him with arrest. Id. ¶ 179. The rest of his belongings, including his ID, medications, and a tent, were destroyed. Id. ¶¶ 30, 178-82. On June 4, 2019, Sanitation workers destroyed his belongings, including his medication, while El-Bey had left to do laundry. Id. ¶¶ 183-87. El-Bey was told that his belongings needed to be destroyed for "safety reasons." Id. ¶ 185.

### 4. Haugabrook

On or about March 2019, without any notice, Sanitation gave Haugabrook 15 minutes to pack up his belongings and move. Id. ¶¶ 193-95. Sanitation then destroyed Haugabrook's backpack and its contents, including medication and other important items. Id. ¶¶ 32, 196. On another occasion, Sanitation took Haugabrook's chairs as part of a "bulky item" pickup. Id. ¶¶ 32, 197-98. On a third occasion, City workers destroyed his tent and other items while he was gone for a short period of time. Id. ¶ 201.

### 5. Diocson

On April 24, 2019, LAPD and Sanitation, pursuant to a noticed cleanup, seized and destroyed Diocson's dog kennel, where his dog slept at night, as a "bulky item." Id. ¶¶ 34-35, 209-214.

### 6. Ashley

On or about May 21, 2019, as part of a noticed cleanup, Sanitation seized and destroyed two carts that Ashley used to move his belongings as "bulky items." Id. ¶¶ 37, 218-226.

## II. LEGAL STANDARD

The plaintiff bears the burden of establishing subject matter jurisdiction. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). Motions to dismiss for lack of subject matter jurisdiction are governed by Rule 12(b)(1) of the Federal Rules of Civil Procedure. A Rule 12(b)(1) jurisdictional challenge may be facial or factual. Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial challenge, the moving party asserts that the allegations in the complaint are "insufficient on their face" to establish federal jurisdiction. Id. "Whether subject matter jurisdiction exists therefore does not depend on resolution of a factual dispute, but rather on the allegations in [the] complaint." Wolfe v. Strankman, 392 F.3d 358, 362 (9th Cir. 2004). The court accepts the allegations as true, and the plaintiff need not present evidence outside the pleadings. Id.

## III. DISCUSSION

The City asserts that neither KFA nor AREPS has standing to pursue its claims against the City.

As the party invoking jurisdiction, Plaintiffs bear the burden of establishing standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). For Plaintiffs to allege Article III standing, they must sufficiently plead an (i) injury-in-fact, (ii) that is causally connected to the City's challenged conduct, and (iii) likely to be "redressed by a favorable decision." Id. at 560-61 (quoting Simon v. E. Kentucky Welfare Rights Org., 426 U.S. 26, 27 (1976)). The alleged injury-in-fact must be: (i) "concrete and particularized" and (ii) "actual or imminent, not 'conjectural' or 'hypothetical.'" Id. at 560 (first citing Allen v. Wright, 468 U.S. 737, 756 (1984), abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014); then quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)). "[T]he same analysis is used to determine whether an organizational plaintiff has standing in a particular case." La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest, 624 F.3d 1083, 1088 (9th Cir. 2010). "An organization suing on its own behalf can establish an injury when it

5

suffered 'both a diversion of its resources and a frustration of its mission.'" Id. (quoting Fair Hous. of Marin v. Combs, 285 F.3d 899, 905 (9th Cir. 2002)). "In other words, an organizational plaintiff must show that the defendant's actions run counter to the organization's purpose, that the organization seeks broad relief against the defendant's actions, and that granting relief would allow the organization to redirect resources currently spent combating the specific challenged conduct to other activities that would advance its mission." Rodriguez v. City of San Jose, 930 F.3d 1123, 1134 (9th Cir. 2019). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977).

**A.     KFA**

    **1.     Organizational Standing**

KFA "was founded in 2018 to form connections between housed and unhoused residents of Koreatown, and to advocate for housing and shelters in their community." Suppl. FAC ¶ 38. KFA also "engages in weekly outreach efforts" and "provides resources such as food, water, hygiene kits, and other consumable items that their neighbors need." Id. ¶ 39. KFA alleges it has standing to sue on its own behalf because the City's enforcement of the Ordinance impairs and frustrates KFA's mission to form connections by causing homeless residents to move around or be displaced from the neighborhood, making it difficult for KFA to stay in contact with them, and because KFA has had to devote significant resources to counteract the City's practices, including by replacing tents, blankets, or other items that were destroyed by the City and helping unhoused residents locate seized property, rather than advocating for shelters or connecting with neighbors. Id. ¶¶ 40-41.

The City contends these allegations are insufficient to establish standing. First, the City argues that an interest in a particular issue "is insufficient, by itself, to establish an injury-in-fact or Article III standing." Mot. at 12. While that may be true, KFA has alleged substantially more than just an interest in an issue.

Second, the City claims KFA has suffered no injury-in-fact because "[t]he City owes no duties under LAMC Section 56.11 or any other law to ensure that unhoused residents are easily accessible for KFA's advocacy and outreach." Mot. at 12. But this is not the standard for determining whether an organization has standing. Numerous cases have found organizational standing where the defendant did not have a statutory or constitutional duty to ensure the organization was able to fulfil its mission. See, e.g., E. Bay Sanctuary Covenant v. Trump, 932 F.3d 742, 766 (9th Cir. 2018) (organization had standing to challenge enforcement of a rule that "frustrated their mission of providing legal aid" to asylum seekers because the rule "significantly discourages a large number of those individuals from seeking asylum given their ineligibility"); Am. Fed'n of Gov't Employees Local 1 v. Stone, 502 F.3d 1027, 1033 (9th Cir. 2007) ("[A]n increased difficulty in recruiting . . . members qualifies as a 'concrete and demonstrable' injury."); People for the Ethical Treatment of Animals v. U.S. Dep't of Agric., 797 F.3d 1087, 1095 (D.C. Cir. 2015) ("denial of access to bird-related AWA information including, in particular, investigatory information, and a means by which to seek redress for bird abuse" is "a cognizable injury sufficient to support standing"). KFA need not allege it has a legal right to contact unhoused residents to sufficiently allege organizational standing.

To support its claim, the City attempts to distinguish the seminal case on organizational standing. In Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982), HOME, a nonprofit organization "whose purpose was to make equal opportunity housing a reality," asserted that the defendants' steering practices had "frustrated the organization's counseling and referral services, with a consequent drain on resources." Id. at 368-69 (internal quotation marks omitted). Specifically, HOME alleged that defendants' actions frustrated "its efforts to assist equal

7

access to housing through counseling and other referral services" and that HOME "had to devote significant resources to identify and counteract" those actions. Id. at 379. The Supreme Court held that because HOME alleged defendants' actions had "perceptibly impaired [its] ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact . . . [that] constitutes far more than simply a setback to the organization's abstract social interests." Id. The City claims Havens is distinguishable because the Supreme Court found standing because there was an "enforceable right to truthful information," and "Section 56.11 imposes no right enforceable against the City to ensure that KFA is able to stay in contact with its unhoused members without difficulty." Mot. at 14. But the reference to an enforceable right in Havens addressed whether individual plaintiffs who were "testers," and therefore not actually looking for housing, suffered an injury-in-fact. 455 U.S. at 373-74. It had nothing to do with organizational standing. To the contrary, the "ability to provide counseling and referral services" to potential home buyers, id. at 379, is not an "enforceable right" either. Rather, as in Havens, KFA has alleged that because of the actions of City employees in enforcing the Ordinance, it has had to spend resources helping unhoused residents locate items that were seized or replacing items that were destroyed, rather than advocating for shelters or providing outreach.[4] These allegations are sufficient to establish injury-in-fact at the pleading stage.

Third, the City claims KFA's alleged injury is "conjectural or hypothetical" because "there is no meaningful way to quantify or measure the difficulty in staying in contact with unhoused residents in the Koreatown area." Mot. at 12. The City also claims that because LAMC § 56.11 was in effect at the time KFA was founded, there is "no reasonable basis to measure the purported harm." Id. at 16. There are

---

[4] As an example, KFA specifically alleges that it provided Zepeda and Zamora with a new tent after their tent was destroyed by Sanitation. Suppl. FAC ¶¶ 162, 166.

two problems with this argument. One, allegations that the City's actions "perceptibly impaired" KFA's ability to provide services to unhoused members is sufficient at the pleading stage; it will have to prove at trial that "it has indeed suffered impairment in its role." Havens, 455 U.S. at 379 n.21. KFA sufficiently alleges that its efforts are perceptibly impaired by the City's actions that make it more difficult to locate unhoused residents, including for the purpose of providing "resources such as food, water, hygiene kits, and other consumable items." Suppl. FAC ¶ 39. To the extent KFA had to expend more resources than it otherwise would have to locate and connect with unhoused residents, the harm is quantifiable. See Nat'l Council of La Raza v. Cegavske, 800 F.3d 1032, 1040 (9th Cir. 2015) (allegations that plaintiffs "expended additional resources that they would not otherwise have expended, and in ways that they would not have expended them" sufficient to establish standing, even where organization was already spending some resources on certain activities). At this stage, it is enough for KFA to allege that it spent more resources than it otherwise would have as a result of the City's actions. It need not allege exactly how much more.

Two, the City ignores the allegations that KFA had to expend "volunteer hours and scarce financial resources that it would have spent on its advocacy efforts, to replace an increasingly large number of tents, blankets, and other items that were seized and destroyed by the City" and "has also had to expend hours assisting unhoused residents track down items that were seized by Defendants and responding to calls from unhoused residents related to sweeps." Suppl. FAC ¶ 41. There is nothing abstract or conjectural about these claims. Even without a "before and after," KFA presumably can show how many volunteer hours and dollars were spent purchasing replacement tents, helping individuals locate their property, and responding to calls related to sweeps. The City argues that KFA's claim is similar to the plaintiffs' claims in Clapper v. Amnesty Int'l USA, 568 U.S. 398 (2013). The City is wrong. In Clapper, plaintiffs lacked standing because they "inflicted harm on themselves based on their fears of hypothetical future harm that is not certainly impending." Id. at 416. But the City

9

conducts sweeps almost daily, see Suppl. FAC ¶ 84, and KFA has spent money replacing personal property that was destroyed by the City pursuant to LAMC § 56.11, and time helping individuals recover their property or otherwise respond to sweeps. The harm is not hypothetical.

Fourth, the City argues that, despite KFA's allegations regarding diversion of resources, the "diversion was not to counteract any actual or imminent injury to KFA itself." Mot. at 13. But the diversion of resources to counteract the frustration of KFA's mission is itself the actual or imminent injury to KFA. See Animal Legal Def. Fund v. United States Dep't of Agric., 223 F. Supp. 3d 1008, 1017 (C.D. Cal. 2016) ("[T]he frustration of an organization's mission *is* the personalized injury that 'forces' the organization to spend money to alleviate the frustration; an organization is only 'choosing' to spend money if the defendant's conduct '[would] not affect the organization at all.'" (quoting Valle del Sol Inc. v. Whiting, 732 F.3d 1006, 1018 (9th Cir. 2013)); see also Smith v. Pac. Properties & Dev. Corp., 358 F.3d 1097, 1105 (9th Cir. 2004) (allegations that organization had to "divert its scarce resources from other efforts to promote awareness of—and compliance with—federal and state accessibility laws and to benefit the disabled community in other ways" to "monitor[ing] the violations and educat[ing] the public regarding the discrimination at issue" are sufficient to allege standing). To the extent the City is arguing that because LAMC § 56.11 is not enforced against KFA there is no injury to KFA to counteract, the City is simply wrong.

Finally, the City argues KFA has not established causation because "Section 56.11 does not directly impact KFA's efforts to build relationships or advocate for housing." Mot. at 14. KFA alleges otherwise. Allegations that KFA replaced personal property the City destroyed pursuant to the Ordinance clearly establish causation. Moreover, KFA alleges the sweeps impair unhoused residents' ability to participate in KFA's advocacy efforts "because they have to spend time guarding their belongings and replacing items that have been thrown away as a result of the City's practices." Suppl. FAC ¶ 43. This adequately alleges causation.

10

Again, the City ignores the allegations related to the destruction and replacement of personal property and focuses solely on the allegations that enforcement of Section 56.11 "has made it incredibly difficult for [KFA] to stay in contact with unhoused neighbors" because they "have been moved around or been displaced from the neighborhood."  Suppl. FAC ¶ 40.  The City argues that because "Section 56.11 does not require unhoused residents to either leave or remain in or around the Koreatown area," causation is not established.  Mot. at 15.  However, part and parcel of the cleanups is requiring the unhoused residents to leave the cleanup area, at least temporarily.  See, e.g., Suppl. FAC ¶ 77-80, 97-99, 160, 176, 211-13, 221, 227.  And the Supplemental Complaint specifically alleges that Zepeda and Zamora, Koreatown residents, moved to a different area in Koreatown after the area they were originally living in was subjected to two sweeps within a few days.  Id. ¶ 167.  At this stage, KFA has sufficiently alleged that enforcement of the Ordinance causes unhoused residents to move around or be displaced, making KFA's mission difficult to achieve.

The City also claims that causation and redressability are not established because "there are many reasons why an unhoused person might choose to relocate to another area."  Mot. at 15.  That there are other reasons for a change of location, however, does not mean that the City's enforcement of the Ordinance does not also cause displacement that requires KFA to spend more resources than it otherwise would on locating and staying in touch with unhoused neighbors.  See WildEarth Guardians v. U.S. Dep't of Agric., 795 F.3d 1148, 1157 (9th Cir. 2015) ("[T]he mere existence of multiple causes of an injury does not defeat redressability . . . .  So long as a defendant is at least partially causing the alleged injury, a plaintiff may sue that defendant, even if the defendant is just one of multiple causes of the plaintiff's injury.").

### 2. Associational Standing

KFA also asserts standing on behalf of its members.  KFA alleges that its unhoused members "have been subjected to the City's enforcement of LAMC 56.11 and have suffered harm as a result of that

enforcement, including the loss of property and the deprivation of their constitutional and statutory rights," Suppl. FAC ¶ 42, as well as the increased difficulty of participating in KFA's advocacy efforts, id. ¶ 43. KTA further alleges that those unhoused members "are at imminent risk of continued enforcement of LAMC 56.11, and as a result, the deprivation of their constitutional rights." Id. ¶ 42. The City argues that KFA has failed to established standing under all three parts of the Hunt test.

First, the City argues KFA has failed to establish standing because "it does not identify a specific member who suffered an injury-in-fact . . . ." Mot. at 17. The Supreme Court has stated that the "requirement of naming affected members" can only be dispensed with "where *all* the members of the organization are affected by the challenged activity." Summers v. Earth Island Inst., 555 U.S. 488, 498-99 (2009). The Ninth Circuit has confirmed that naming members is required at the summary judgment stage. Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. California Dep't of Transp., 713 F.3d 1187, 1194-95 (9th Cir. 2013) (failing to establish standing at summary judgment where organization "does not identify any affected members by name nor has it submitted declarations by any of its members attesting to harm they have suffered or will suffer under Caltrans' program").

The Ninth Circuit has indicated, however, that Summers does not require organizations to name allegedly injured members in all circumstances. Nat'l Council of La Raza v. Cegavske, 800 F.3d 1032, 1041 (9th Cir. 2015) ("We are not convinced that *Summers,* an environmental case brought under the National Environmental Policy Act, stands for the proposition that an injured member of an organization must always be specifically identified in order to establish Article III standing for the organization."). Naming individual members may not be necessary at the motion to dismiss stage "[w]here it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's

12

claim of injury." Id.; see also Torres v. United States Dep't of Homeland Sec., No. EDCV 18-2604 JGB (SHKx), 2019 WL 5883685, at *10 (C.D. Cal. Oct. 24, 2019) ("[I]t is not necessary at this early stage to name specific members impacted by the alleged violations"; the court can "reasonably infer[] that at least one . . . member . . . has standing to sue in her own right."); League of Women Voters of California v. Kelly, No. 17-CV-02665-LB, 2017 WL 3670786, at *8 (N.D. Cal. Aug. 25, 2017) ("The court cannot discern why—at the pleadings stage—the identity of particular members is required for fair notice of the claims."). The Court concludes this is a case where it is "relatively clear" that one or more of KFA's unhoused members have been and will be adversely affected by the challenged provisions of the Ordinance and the City need not know the identity of the allegedly harmed members to understand and respond to the Supplemental FAC. KFA need not specifically name its allegedly harmed members at this stage. Nor must KFA allege all of the specific details listed by the City (time and date of each incident, the reason the property was allegedly taken by the City, etc.), Mot. at 18, to sufficiently allege that its unhoused members would have standing at this stage. See Torres, 2019 WL 5883685, at *10 (finding it sufficient to allege that organizations members "lose time travelling to meet clients . . .due to the communication obstacles at the facility and could represent more clients were it not for the difficulties alleged"); League of Women Voters of Arizona v. Reagan, No. CV-18-02620-PHX-JAT, 2018 WL 4467891, at *5 (D. Ariz. Sept. 18, 2018) (allegations that the organization "has at least one member who has updated [her] driver's license address with ADOT/MVD and has been harmed by [Defendant's] failure to update [her] residence address for voting purposes" sufficient to allege associational standing (alteration in original)).

Second, the City argues that KFA does not connect its mission to the claims in this action and again misconstrues KFA's mission as a "general interest in helping the homeless residents in the City." Mot. at 18. KFA's mission to "to support unhoused neighbors through the provision of food, water, and hygiene, and to build connections between housed and unhoused neighbors," Opp'n at 14 (citing Suppl. FAC ¶¶

13

38-39), is clearly germane to their members' loss (and replacement) of property destroyed pursuant to the Ordinance, as well as their decreased ability to participate in KFA advocacy and outreach. The purpose of an organization need not exactly match the challenged conduct to be "germane." For example, in <u>Associated General Contractors of California, Inc. v. Coalition for Economic Equity</u>, 950 F.2d 1401 (9th Cir. 1991), an organization of contractors challenged a city ordinance that used racial and gender preferences in awarding city construction contracts. <u>Id.</u> at 1403. The Ninth Circuit found that the "germane" prong was met because the organization's interest in "preserving favorable conditions for bidding by its members" was "clearly germane" to its purpose of "fostering, promoting, and protecting the common interests of its member[s]." <u>Id.</u> at 1406.

Third, the City argues KFA cannot satisfy the third <u>Hunt</u> prong because "the fact intensive nature of assessing the merits of [an] individual[] [member's] specific claim . . . will require the participation of the individual member(s) in the lawsuit who suffered the alleged injuries." Mot. at 18. KFA concedes that a claim for damages on behalf of individual members would prevent standing, but argues that it is not seeking such damages. Opp'n at 15. However, as currently pled, the Supplemental FAC asserts as-applied challenges and seeks damages for loss of property for all Plaintiffs, including KFA. The Supplemental FAC uses the word "Plaintiffs" indiscriminately and does not distinguish between claims made by the organizational plaintiffs and the individual plaintiffs. <u>See, e.g.</u>, Suppl. FAC ¶ 237 ("Plaintiffs have a vested interest in their property"); <u>id.</u> ¶ 242 ("The City has and will continue to spend municipal taxes paid by Plaintiffs into the General Fund"); <u>id.</u>, Prayer for Relief ¶ 4 ("For damages . . . for the loss of Plaintiffs' property"). The Court agrees that if KFA is bringing as-applied challenges or seeks damages, participation of the individual members would be required. <u>See</u> <u>Santiago v. City of Los Angeles</u>, No. CV 15-08444-BRO (EX), 2016 WL 7176694, at *6 (C.D. Cal. Nov. 17, 2016) (where organization requests "injunctive or declaratory relief as to Defendants' policies," the third prong is satisfied; "individualized inquiries . . . to determine whether the seizure of each individual street

vendor's property was unlawful . . . is a different inquiry that occurs outside of the scope of this litigation, and not the form of relief requested by [the organization] in this proceeding.").

As the Supplemental FAC is currently pled, KFA does not have associational standing to assert claims on behalf of its members. The Court grants leave to amend to permit KFA to clarify whether certain claims and remedies are only being sought by certain Plaintiffs.

### B. AREPS

AREPS is an organization "comprised of taxpayers in Los Angeles that was founded to ensure that their tax dollars are used to promote responsible public spending." Suppl. FAC ¶ 44. For example, it advocates for spending on "public health, housing, and other public infrastructure for all residents of Los Angeles, including its unhoused residents and against the use of their tax dollars to enforce illegal laws that harm vulnerable residents of the City." Id. AREPS identifies two of its members who were allegedly harmed by the City's actions. Id. ¶¶ 45-46.

Municipal taxpayers have suffered an injury-in-fact "if it has been shown that the 'peculiar relation of the corporate taxpayer to the [municipal] corporation' makes the taxpayer's interest in the application of municipal revenues 'direct and immediate.'" ASARCO Inc. v. Kadish, 490 U.S. 605, 613 (1989) (Kennedy, J., plurality) (alteration in original) (quoting Frothingham v. Mellon, 262 U.S. 447, 486-87 (1923) (decided with Massachusetts v. Mellon)). The City argues that AREPS has not alleged any such "peculiar relation" that has resulted in a "direct and immediate interest," but instead "simply alleges that it objects to the use of its tax payments to enforce what it contends is an 'illegal law.'" Mot. at 20-21.

AREPS argues that the Ninth Circuit has found that "municipal taxpayer standing simply requires the 'injury' of an allegedly improper expenditure of municipal funds." Cammack v. Waihee, 932 F.2d 765, 770 (9th Cir. 1991). All plaintiffs must allege is "their status as . . . municipal taxpayers" and "the amount of funds appropriated and

15

allegedly spent by the taxing governmental entit[y] as a result of the" allegedly unconstitutional conduct. Id. at 771. AREPS argues that it has met this standard. Dkt. 24 (Opp'n) at 18 (citing Suppl. FAC ¶¶ 45-46 (status as municipal taxpayers), 86-87 (amounts allegedly spent on sweeps)).

The City notes that while Cammack has not been expressly overruled, the Supreme Court has overruled the authority on which the Ninth Circuit relied. Dkt. 27 (Standing Reply) at 8 (citing DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 346 & n.4 (2006)). However, in DaimlerChrysler, a case addressing tax credits, the question of municipal taxpayer standing was not before the Supreme Court because "[t]hat challenge was rejected by the Court of Appeals on the merits, and no issue regarding plaintiffs' standing to bring it [was] raised." 547 U.S. at 349. Nevertheless, the Court agrees that Villa v. Maricopa Cty., 865 F.3d 1224 (9th Cir. 2017), cert. denied sub nom. Maricopa Cty., Ariz. v. Villa, 138 S. Ct. 1696 (2018) impliedly overruled Cammack in holding that a county taxpayer does not have standing to seek prospective relief against a county for allegedly using county taxes to "investigate, detain, prosecute and imprison persons based on communications obtained from illegal wiretaps" because "the standing analysis in a non-establishment clause case should [not] be different for a county taxpayer challenging an allegedly illegal act of the county." Id. at 1229.

Even under Cammack, AREPS fails to establish standing. While AREPS has identified the total amounts spent on the sweeps, it has not identified whether any or all of those amounts were expended "as a result of" the allegedly unconstitutional portions of the Ordinance. As the City appropriately points out, "AREPS does not allege whether it seek[s] to enjoin the use of all funds to support any cleanups under Section 56.11 or just some of the funds." Mot. at 22. AREPS does not fully respond to this issue, instead asserting that "the City cannot argue that expenditure of funds would happen regardless of the unlawful portions of LAMC 56.11." Opp'n at 18-19. This flips the standing inquiry on its head. See Kokkonen, 511 U.S. at 377 ("The plaintiff bears the burden of establishing subject matter jurisdiction.").

It is AREPS that must allege that enforcement of the allegedly unlawful portions of the Ordinance was "supported by a[] separate tax or paid for from a[] particular appropriation or that it adds any sum whatever to the cost of conducting the [sweeps]." Doremus v. Bd. of Ed. of Borough of Hawthorne, 342 U.S. 429, 433 (1952). AREPS has not satisfied its burden of alleging any unconstitutional seizure or destruction of Bulky Items or items that were purportedly a threat to health and safety increased the costs of sweeps in a measurable way. As in Doremus, AREPS does not "show[] a measurable appropriation or disbursement of [City] funds occasioned solely by the activities complained of." See id. at 434; see also Doe v. Madison Sch. Dist. No. 321, 177 F.3d 789, 794 (9th Cir. 1999) (en banc) ("[W]hen a plaintiff has failed to allege that the government spent tax dollars solely on the challenged conduct, we have denied standing").

In Madison School District, the plaintiff challenged a prayer at a high school graduation ceremony and alleged that "defendants spent tax dollars on renting a hall, printing graduation programs, buying decorations, and hiring security guards." 177 F.3d at 794. The Ninth Circuit found that "those expenditures cannot establish taxpayer standing" because "those are ordinary costs of graduation that the school would pay whether or not the ceremony included a prayer." Id. Like the plaintiffs in Doremus and Madison, AREPS does not allege a "a direct dollar-and-cents injury" caused by the challenged sections of the Ordinance. Id. at 434. Although AREPS has identified the amount the City spends on the sweeps each year, AREPS does not allege that the unconstitutional aspects of the sweeps add any cost to conducting the sweeps (probably because they cannot, as it is surely cheaper for the City to conduct the sweeps in the challenged manner, spending less money on notice and storage).

AREPS' reliance on We Are America/Somos America, Coalition of Arizona v. Maricopa County Board of Supervisors, 809 F. Supp. 2d 1084 (D. Ariz. 2011) is misplaced. In We Are America, plaintiffs alleged defendants used taxpayer funds to illegally arrest, detain, and incarcerate migrants. Id. at 1104-05. The district court found that there was a "direct dollar-and-cents" injury because "while there are

17

some fixed expenditures associated with implementing the [challenged policy], there are also additional incremental costs of housing and feeding individuals in the county jails." Id. at 1108 (internal citations and quotation marks omitted). Here, as noted above, there are no incremental costs – but rather likely savings – from the fact that the City is not storing more items or spending more time or resources providing notice to unhoused residents. Although AREPS asserts that "the rapid response teams conduct the Bulky Item pickups and seize and destroy unattended property," Opp'n at 18, it fails to show that the rapid response teams would not otherwise conduct sweeps or seize and destroy property if the challenged provisions were found to be unconstitutional.

AREPS has not adequately plead organizational standing and is therefore DISMISSED with leave to amend.

## IV. CONCLUSION

Defendant's motion to dismiss for lack of standing is DENIED as to KFA's direct standing and GRANTED with leave to amend as to KFA's associational standing and as to AREPS' standing. An amended complaint may be filed and served no later than March 12, 2020. Failure to file by that date will waive the right to do so. The Court does not grant leave to add new defendants or new claims. Leave to add new defendants or new claims must be sought by a separate, properly noticed motion.

IT IS SO ORDERED.

Date: February 15, 2020

Dale S. Fischer
United States District Judge