MICHAEL FEUER, City Attorney
KATHLEEN A. KENEALY, Chief Assistant City Attorney (SBN 212289)
SCOTT MARCUS, Senior Assistant City Attorney (SBN 184980)
GABRIEL DERMER, Assistant City Attorney (SBN 229424)
FELIX LEBRON, Deputy City Attorney (SBN 232984)
**A. PATRICIA URSEA, Deputy City Atty (SBN 221637)**
200 N. Main Street, City Hall East, Room 675
Los Angeles, CA 90012
Telephone (213) 978-7569
Facsimile (213) 978-7011
Felix.Lebron@lacity.org
Patricia.Ursea@lacity.org

*Attorneys for Defendant,* CITY OF LOS ANGELES

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANET GARCIA, GLADYS ZEPEDA, MIRIAM ZAMORA, ALI EL-BEY, PETER DIOCSON JR., MARQUIS ASHLEY, JAMES HAUGABROOK, individuals, KTOWN FOR ALL, an unincorporated association, ASSOCIATION FOR RESPONSIBLE and EQUITABLE PUBLIC SPENDING an unincorporated association,<br><br>*Plaintiffs,*<br><br>vs.<br><br>CITY OF LOS ANGELES, a municipal entity; DOES 1-50,<br><br>*Defendant(s).* | Case No.: 2:19-cv-6182-DSF-PLA<br>Assigned to Judge Dale S. Fischer<br><br>**DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Concurrently Filed Documents:<br>• Declarations ISO Opposition: Dermer, Wong, Pereida, Ramirez, Rankin, Guerrero, Haines, Medina, Banks, Bernal, Rodriguez, Diaz<br>• Request for Judicial Notice<br>• Evidentiary Objections<br><br>**Date:** March 30, 2020<br>**Time:** 1:30 p.m.<br>**Ctrm:** 7D |

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................1

II.   STANDARD OF REVIEW ........................................................................2

III.  INDIVIDUAL PLAINTIFFS' INCIDENTS.............................................3

  A.   April 24, 2019 Cleanup (Diocson) ......................................................4

  B.   May 21, 2019 Cleanup (Ashley) .........................................................5

  C.   CARE+ Program....................................................................................6

IV.   PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY ARE ENTITLED TO INJUNCTIVE RELIEF ...........................................................................6

  A.   Plaintiffs Lack Standing To Seek This Injunction .........................6

    1.   Diocson and Ashley Lack Standing ................................................7

    2.   KFA Lacks Standing to Pursue Injunctive Relief........................7

  B.   Plaintiffs Have Not Shown They Are Likely To Succeed On The Merits.......9

    1.   Fourth Amendment Claim..................................................................9

      a. The Bulky Item Provision..............................................................10

      b. Removal of Bulky Items ...............................................................11

      c. Disposal of Bulky Items ...............................................................15

    2.   Procedural Due Process......................................................................19

  C.   Plaintiffs Have Not Shown They Are Likely To Suffer Irreparable Harm....22

  D.   The Balance of Equities Weighs In Favor of the City ....................24

V.    CONCLUSION...........................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*American Passage Media Corp. v. Cass Communications, Inc.*,
  750 F.2d 1470 (9th Cir. 1985) ....................................................23

*Amoco Production Co. v. Gambell*,
  480 U.S. 531 542 (1987)...........................................................24

*Amylin Pharmaceuticals, Inc. v. Eli Lilly and Co.*,
  456 F. App'x 676 (9th Cir. 2011) ..............................................23

*Assoc. Gen. Contractors of America v. Cal. Dept. of Transp.*,
  713 F.3d 1187 (9th Cir. 2013) .....................................................9

*Bell v. Wolfish*,
  441 U.S. 520 (1979)..................................................................12

*Cafeteria & Restaurant Workers Union v. McElroy*,
  367 U.S. 886 (1961)..................................................................19

*Caribbean Marine Services Co., Inc. v. Baldridge*,
  844 F.2d 668 (9th Cir. 1988) .....................................................23

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983)......................................................................2

*Clement v. City of Glendale*,
  518 F.3d 1090 (9th Cir. 2008) ...................................................20

*Covelo Indian Cmty. v. Fed. Energy Regulatory Com*,
  895 F.2d 581 (9th Cir. 1990) .....................................................21

*Cty. of Santa Barbara v. More*,
  175 Cal. 6 (1917) ......................................................................11

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) .....................................................23

*Gluck v. Cty. of L.A.*,
  93 Cal. App. 3d 121 (1979) .......................................................22

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*HAGUE v. Comm. For Indus. Org.,*
  307 U.S. 496 (1939)..................................................................................10

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982)....................................................................................8

*Hudson v. Palmer,*
  468 U.S. 517 (1984)..................................................................................21

*Hunt v. Wash. State Apple Adver. Comm'n,*
  432 U.S. 333 (1977)....................................................................................9

*Ingraham v. Wright,*
  430 U.S. 651 (1977)..................................................................................22

*Joyce v. City and County of San Francisco,*
  846 F. Supp. 843 (1994) ..........................................................................25

*Knoxville Iron Co. v. Harbison,*
  183 U.S. 13 (1901)......................................................................................2

*Laura Vincent Co. v. City of Selma,*
  43 Cal.App.2d 473 (1941) .......................................................................10

*Lavan v. City of L.A.,*
  693 F.3d 1022 (9th Cir. 2012) ...........................................................13, 18

*Lawton v. Steele,*
  152 U.S. 133 (1894)..................................................................................20

*Leite v. Crane Co.,*
  749 F.3d 1117 (9th Cir. 2013) ...................................................................7

*Lone Star Sec. & Video, Inc. v. City of L.A.,*
  584 F.3d 1232 (9th Cir. 2009) .................................................................20

*Mathews v. Eldridge,*
  424 U.S. 319 (1975)..................................................................................20

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997)....................................................................................2

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Mich. Dep't of State Police v. Sitz,*
    496 U.S. 444 (1990)......................................................................................12, 18

*Mitchell et al. v. City of Los Angeles,*
    Central District Case No. 2:16-cv-01750-SJO-JPR......................................16

*Morrissey v. Brewster,*
    408 U.S. 471 (1972)..........................................................................................1

*Nat'l Treasury Emps. Union v. Von Raab,*
    489 U.S. 656 (1989)........................................................................................12

*New Jersey v. T.L.O.,*
    469 U.S. 325 (1985)........................................................................................12

*Or. Prescription Drug Monitoring Program v. United States DEA,*
    860 F.3d 1228 (9th Cir. 2017) .........................................................................2

*Puente Ariz. v. Arpaio,*
    821 F.3d 1098 (9th Cir. 2016) .........................................................................1

*Rise v. Oregon,*
    59 F.3d 1556 (9th Cir. 1995) .........................................................................21

*San Diego County Gun Rights Comm. v. Reno,*
    98 F.3d 1121 (9th Cir. 1996) ...........................................................................7

*Schmidt v. Lessard,*
    414 U.S. 473 (1974)........................................................................................25

*Schneider v. State,*
    308 U.S. 147 (1939)........................................................................................10

*Sid Berk, Inc. v. Uniroyal, Inc.,*
    425 F. Supp. 22 (C.D. Cal. 1977) ..................................................................22

*South Dakota v. Opperman,*
    428 U.S. 364 (1976)........................................................................................12

*Stoianoff v. Montana,*
    695 F.2d 1214 (9th Cir. 1983) .....................................................................7, 8

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Sundance Saloon v. City of San Diego*,

    213 Cal. App. 3d 807 (1989) .......................................................... 1

*Texaco, Inc. v. Short*,

    454 U.S. 516 (1982) .................................................................... 19

*Town of Chester v. Laroe Estate, Inc.*,

    137 S. Ct. 1645 (2017) ................................................................. 6

*United States v. Cortez*,

    449 U.S. 411 (1981) ..................................................................... 1

*United States v. Jacobsen*,

    466 U.S. 109 (1984) ............................................................... 16, 19

*United States v. Martinez-Fuerte*,

    428 U.S. 523 (1976) ............................................................... 12, 13

*United States v. Salerno*,

    481 U.S. 739 (1987) .................................................................... 19

*Vanderhurst* v. *Tholcke*,

    113 Cal. 147 (1896) .................................................................... 11

*Vivid Entm't, LLC v. Fielding*,

    774 F.3d 566 (9th Cir. 2014) ...................................................... 16

*Weinberger v. Romero-Barcelo*,

    456 U.S. 305 (1982) ..................................................................... 2

*Williams v. Mukasey*,

    531 F.3d 1040 (9th Cir. 2008) .................................................... 22

*Willis v. City of Seattle*,

    943 F.3d 882 (9th Cir. 2019) ........................................................ 8

*Winter v. Natural Res. Def. Council, Inc.*,

    555 U.S. 7 (2008) ......................................................................... 3

**Statutes**

Cal. Gov. Code, § 37359 .............................................................. 10

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

Cal. Gov. Code, § 38775 ........................................................................................10

**Rules**

Fed. R. Civ. P. 65 ...............................................................................................25

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

## I.    INTRODUCTION

Plaintiffs claim they are entitled to a preliminary injunction, but, despite the City producing thousands of pages of cleanup reports,[1] Plaintiffs have failed to show a single unconstitutional application of the Bulky Item Provision.  Just three Plaintiffs – Pete Diocson Jr., Marquis Ashley, and Ktown for All – move for an injunction, but none demonstrate they have standing to seek an injunction or are likely to succeed on the merits.  Dkt. 38 ("Motion").  Their motion relies almost exclusively on this Court's ruling denying (in part) the City's motion to dismiss Plaintiffs' facial challenge under Rule 12(b)(6). But the Court's finding that the Supplemental First Amended Complaint states a facial challenge to the Bulky Item Provision does not automatically entitle Plaintiffs to a preliminary injunction.  *See, e.g., Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1108 (9th Cir. 2016) (holding that preliminary injunction on facial challenge to an identity theft statute was inappropriate "without a fully developed record"); *Sundance Saloon v. City of San Diego*, 213 Cal. App. 3d 807, 810 (1989).

In reality, Plaintiffs seek to enjoin City from removing any and all Bulky Items from the public right of way in any and all circumstances.  But neither the facts, the law, nor this Court's prior ruling support such a broad prohibition against any city.  The Motion allows the Court to consider Plaintiffs' facial claim in the relevant factual context outside the constraints of the pleadings.  As the Supreme Court has counseled, "the totality of the circumstances—the whole picture—must be taken into account" when analyzing Fourth Amendment claims.  *United States v. Cortez*, 449 U.S. 411, 417-19 (1981).  Similarly, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewster*, 408 U.S. 471, 481 (1972).

When the circumstances facing the City and its residents—housed and unhoused alike—are considered in the context of the record as a whole, it is evident that the threat of substantial harm and the balance of interests require the Motion be denied.  The

---

[1] Declaration of Gabriel S. Dermer, ¶ 9.

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

collection of Bulky Items from public spaces is a crucial component in the City's duties to keep public spaces clean, safe, and useable by all.  The need for the City to fulfill its obligation as the steward of public spaces is all the more compelling today in the face of the health risks arising from the spread of the coronavirus, which has led the City's Mayor[2] to announce states of emergency.  A Bulky Item that is not an immediate threat to public health and safety may still spread the coronavirus or other diseases.  (*See* Declaration of Howard Wong ("Wong Decl.") at ¶ 53.)  Plaintiffs focus exclusively on their right to property, entirely ignoring the other side of the necessary balancing test— the public's interest in using public space.  The public's right to use sidewalks for purposes other than storage cannot be ignored.  The City must be able to clean its sidewalks and public spaces to protect "the safety, health, morals, comfort and welfare of its people."  (*Knoxville Iron Co. v. Harbison*, 183 U.S. 13, 20 (1901) (internal quotations omitted).)  The Motion should be denied.

## II.   STANDARD OF REVIEW

The award of preliminary injunction "has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982) (internal citations omitted). It is an "extraordinary and drastic remedy" and one that should not be granted unless the moving party demonstrates *both* that they (1) have Article III standing (*Or. Prescription Drug Monitoring Program v. United States DEA*, 860 F.3d 1228, 1233 (9th Cir. 2017)); and (2) are entitled to preliminary injunctive relief.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  To establish Article III standing, Plaintiff must show that "[t]he injury or threat of injury must be both real and immediate, not conjectural or hypothetical.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).  To establish entitlement to preliminary injunctive relief, Plaintiffs must make a "clear showing" that: (1) they are "likely to succeed on the merits" and (2) "likely to suffer irreparable harm";

---

[2] https://www.lacity.org/highlights/mayor-garcetti-strengthens-readiness-against-coronavirus-declaring-local-emergency

that (3) "the balance of equities tips in [their] favor"; and (4) the injunction "is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## III.   INDIVIDUAL PLAINTIFFS' INCIDENTS

Plaintiffs Diocson and Ashley allege that the City seized and destroyed a dog cage and two bicycle carts, respectively.  The record reveals that both seizures occurred as part of noticed cleanup operations, less than a month apart, in the same location – near the corner of S. McCoy Avenue and Lomita Blvd.  (Wong Decl. ¶¶ 23-25, 27-29, Exs. 4, 8, 9.)  What Plaintiffs characterize as "an industrial area" (Mot., Dkt. 38 at 16:4) is actually the sidewalk abutting the public entrance of the Harbor City Greenway ("Greenway"), one of the few "park-like" environments in an otherwise "heavily industrialized community."  (Declaration of Gordon Haines ("Haines Decl."), ¶¶ 4, 19).

The City restored portions of the Greenway through funding from Proposition O (Water Bond) and the County Flood Control District.  (*Id.*, ¶ 5.)  Upon completion in 2015, the restored Greenway provided improved stormwater quality, rehabilitated native habitats, and served to protect federally endangered species.  (*Id.*, ¶ 6.)  It also provided 4.5 acres of green space for the community to use for recreational uses and wildlife viewing, featuring a decorative ADA-accessible walking path adjacent to a restored creek. (*Id.*, ¶ 5.)  The entire project site involved over 20 acres and cost approximately $24 million.  (*Id.*, ¶ 5.)

Within months of the opening, the Greenway and surrounding areas deteriorated rapidly due to a proliferation of homeless encampments and vandalism.  (*Id.*, ¶ 8.)  Items of all kind were being stored (or dumped; as discussed below, it is often difficult to distinguish) in the area, including mattresses, furniture parts, and sofas, as well as an innumerable number of smaller personal items like clothes, blankets, food waste and debris. (*Id.*, ¶¶12, 15; *see* Medina Decl. ¶ 5; *see also* Wong Decl. ¶ 25, Ex. 5 at p. 111.)  These items threaten the landscape and habitat in the Greenway.  (Haines Decl. ¶¶ 9, 10.)  Even more alarming, although the sidewalk on Lomita Boulevard is 14-feet wide, children walking to a nearby school must often walk onto the street to avoid items in their path.

(Medina Decl. ¶ 6.)[3]

The City has received numerous complaints from residents and stakeholders, concerning the loss of access to the Greenway, threats to public safety, and the general degradation of the community's quality of life.  (*Id.*; Haines Decl. ¶ 13, Ex. 3.)  Despite regular cleanings and the City's other varied efforts to address the problems in the area, new items of all sorts appear in the area almost daily.  (*Id.*, ¶15.)  As a result, just three years after the grand opening, the City was forced to close the Greenway.  (*Id.*, ¶ 12)

### A. April 24, 2019 Cleanup (Diocson)

Plaintiff Diocson asserts that the City conducted a noticed cleanup on April 24, 2019 during which his dog cage was seized and discarded.  (Diocson Decl., Dkt. 38-5 at ¶¶ 8, 13.)  This cleanup occurred on the sidewalk adjacent to the Greenway (Wong Decl. ¶ 24, Ex. 4 at p. 75; ¶ 25, Ex. 5 at p. 110 (depicting Greenway sign).  Two days before the cleanup, LASAN environmental compliance inspectors ("ECIs") conducted a survey of the area, identified over 25 homeless encampments and numerous health and safety risks, and posted 31 notices of the anticipated cleanup.  (Wong Decl. ¶ 24, Ex. 4 at pp. 71-73; ¶ 25 Ex. 5 at pp. 107-116.)  The notices, which were posted on both sides of the street and the adjoining blocks, stated the date, time, and location of the cleanup and advised: "PLEASE REMOVE ALL PERSONAL BELONGINGS, INCLUDING BULKY ITEMS BY Wednesday, April 24, 2019, at 8:00a.m."  (*Id.*, ¶ 25, Ex. 5 at p. 107.)

At 8:30 a.m. on April 24, 2019, nine LASAN employees arrived at the location along with personnel from Los Angeles Homeless Services Authority (LAHSA) who provided mental health and other services to any individuals who remained at the site.  (*Id.*, Ex. 4 at p. 74.)  The inspectors recorded that 15 (out of 25) encampments remained at the location.  (*Id.*, Ex. 4 at p. 75.)  Among the items remaining in the noticed cleanup areas was a pet cage.  (*Id.*, ¶ 26, Ex. 4 at p. 90; ¶ 25, Ex. 6 at p. 120-121.)  As Diocson concedes, he saw the City's notices before the cleanup and knew he needed to move his

---

[3] Bulky items are left on sidewalks regularly used by children to walk to and from school throughout the City.  *See* Banks Decl. ¶ 6; Rodriguez Decl. ¶ 3; Bernal Decl. ¶ 3.

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

belongings.  (Diocson Decl. ¶ 8.)  Indeed, in anticipation of the cleanup, he had removed his dog from the area.  (*Id.*, ¶ 8.)  For reasons that neither the declaration nor the FAC explain, Diocson did not move the dog cage nor any of his other belongings along with his dog, despite being on notice to do so; instead, he waited until Sanitation crews arrived to begin moving.  (Diocson Decl. ¶¶ 8-10.)

The ECIs inspected the items remaining in front of the Greenway "for hazardous and non-hazardous items and to take custody of unattended personal property for storage."  (Wong Decl. ¶ 24, Ex. 4 at p. 75.)  The inspected items included not only the dog cage but many other, both Bulky and non-Bulky, items.  (*Id.* at Ex. 4 at pp. 74-78.)  Nine sanitation employees spent four hours inspecting and cataloging the items, and cleaning the area.  (*Id.*)  Ultimately, 7,000 pounds of waste that the ECIs determined posed health and safety risks was removed and discarded.  (*Id.*, p. 101.)  These items included, among other things, 150 pounds of items contaminated with urine, 30 pounds of items contaminated with feces, and 40 pounds of combustible materials.  (*Id.*)  A rat was also found.  (*Id.*).  Six 60-gallon bags of items, including clothing and luggage, were removed, stored, and held for retrieval for 90 days.  (*Id.*, pp. 79, 84.)  The area was then thoroughly cleaned and sanitized.  (*Id.*, p. 79.)  Among the items discarded was a dog cage.  (*Id.*, ¶ 26, Ex. 4 at p. 76.)  The cage was discarded because it was contaminated.  (*Id.*, ¶ 26.)

### B. May 21, 2019 Cleanup (Ashley)

Less than one month after the above-described cleanup was completed, LASAN received another request to address public health concerns on the sidewalk next to the Greenway.  (Wong Decl. ¶ 28, Ex. 8 at p. 137.)  Plaintiff Ashley alleges that two carts he purportedly used to transport his belongings were seized during this cleanup.  (Ashley Decl., Dkt. 38-2, at ¶¶ 12, 14.)  On May 19, 2019, ECIs surveyed the cleanup area at Lomita and McCoy, identified 38 homeless encampments and health and safety risks, and posted notices in the area. (Wong Decl. ¶¶ 28, 29, Exs. 8, 9.)  On May 21, 2019, the cleanup was conducted, again with a sanitation crew of nine people.  (*Id.* ¶ 28, Ex. 8 at p.

137).  The crew inventoried approximately 400 pounds of items (Wong Decl. Ex. 8 at p. 142), which included wet clothing with "small bugs crawling around the area," mattresses, a television contaminated with urine (*id.* at p. 138), suitcases, chairs, shopping carts, remnants of broken furniture (Ex. 10 at p. 194), freight pallets (*id.*, p. 189), rugs (*id.*, p. 188) large cardboard boxes (*id.*, pp. 190-91), and plywood sheets with graffiti (*id.,* pp. 187, 196, 198), to name but a few.  Among the items that were discarded were two trailers.  (Wong Decl. ¶ 30.)  Again, while these trailers may have been "Bulky Items," they were also contaminated and posed health and safety risks.  (*Id.*)

### C. CARE+ Program

Plaintiffs also seek to justify an injunction by contending the City is increasing enforcement, as if to say the City is increasingly violating peoples' rights.  This misstates the evidence.  Indeed, the Comprehensive Cleaning and Rapid Engagement (CARE) program provides public health services, including mobile showers, and connects homeless people to services.  (Wong Decl. ¶ 4; Dkt. 39, p. 40).  Under the CARE program, outreach workers from LAHSA are now embedded with LASAN personnel in the field.  (Dkt. 39, p. 37).  This commitment to providing more and better services can be seen in the money spent by the City:  In just five years, the City has increased funding from $3,000,000 to $38,698,214 to support the CARE program.  (Dkt. 39, p. 39).  CARE teams post notice at least 24 hours in advance, and then give an additional 15 minutes for individuals to remove their property from the public right of way.  (Wong Decl. ¶ 11, Exs. 2, 5; Dkt. 39, p. 38).

## IV.   PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY ARE ENTITLED TO INJUNCTIVE RELIEF

### A.  Plaintiffs Lack Standing To Seek This Injunction

Article III requires each plaintiff to "demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Town of Chester v. Laroe Estate, Inc.*, 137 S. Ct. 1645, 1650 (2017).  When a defendant raises a factual attack to plaintiffs' standing, the plaintiffs must establish jurisdiction with "competent proof under the same

evidentiary standard that governs in the summary judgment context." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2013).

### 1. Diocson and Ashley Lack Standing

As discussed above, the Diocson and Ashley incidents both involved noticed cleanups. (Wong Decl. ¶¶ 23-30, Exs. 4-10.)  Diocson's dog cage[4] and Ashley's trailers were screened, removed, and discarded for identified health and safety hazards.  (*Id.* ¶¶ 24-26, Ex. 4; *Id.* ¶¶ 19-30, Ex. 8.)  Diocson and Ashley have not shown an unconstitutional application of the Bulky Item provision as applied to them, and thus, they lack standing to seek injunctive relief in a facial claim.    The mere existence of a statute is not sufficient to confer standing for prospective or injunctive relief.  *San Diego County Gun Rights Comm. v. Reno,* 98 F.3d 1121, 1126-27 (9th Cir. 1996);  *Stoianoff v. Montana*, 695 F.2d 1214, 1223 (9th Cir. 1983).  Diocson and Ashley may challenge the determinations that the dog cage and trailers removed and discarded during noticed cleanups constituted health and safety hazards, but the requested injunction does not redress this purported injury.

### 2. KFA Lacks Standing to Pursue Injunctive Relief

The Court's Order Granting in Part and Denying in Part the City's Motion to Dismiss for Lack of Subject Matter Jurisdiction (Dkt. No. 37) found, *at the pleading stage*, that KFA alleged sufficient facts to support direct organizational standing.  At the preliminary injunction stage, however, KFA submits no competent evidence establishing organizational standing for injunctive relief.  KFA submits no evidence that the City enforced the bulky item provision against KFA itself.  The Declaration of Phuong Nguyen ("Nguyen Decl.") states that an "unhoused member named Muhammad moved to a new location after a cleanup, which we call a sweep" and told her "that he moved because of

---

[4] Diocson declaration lacks details needed to refute or corroborate the claim that the City destroyed a second kennel "in late 2019, during another cleanup." (Diocson Decl. ¶ 15). However, during the April 24, 2019 noticed cleanup, the City did not identify the dog cage as a bulky item in the cleanup report.  (Wong Decl. ¶ 26, Ex. 4.)

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

the sweep."  (Nguyen Decl. ¶ 5.)  This inadmissible hearsay (F.R.E. 801-803) does not establish that the City caused a "concrete and demonstrable injury to the [KFA's] activities," thereby placing a "drain on the [KFA's] resources."  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992).  Similarly, the Declaration of Rachel Bettaga ("Bettaga Decl."), one of KFA's unhoused members, does not establish that she moved away from the area because of those sweeps. (*See* Bettaga Decl. ¶¶ 1-13.)  KFA does not address "how many volunteer hours and dollars were spent purchasing replacement" property, or how much "it spent more [in] resources than it otherwise would have as a result of the City's action."  (*See* Ngyuen Decl. ¶¶ 6-7, 10-11; Price Decl. ¶ 2-3. Dkt. No. 37 at 9.)  KFA does admit, however, that it has "not directly provided carts or crates" or any other identified bulky item to its members.  (Ngyuen Decl. ¶ 11.)

KFA admits that it refers to all cleanups as "sweeps".  (Nguyen Decl. ¶ 5.)  By conflating all cleanups—both noticed and unnoticed (Wong Decl. ¶¶ 4, 8-21, 34-35, 43-49) as sweeps, KFA attempts to mask the fact that it lacks any admissible evidence to show that it has been harmed by an actual application of the Bulky Item provision that it seeks to enjoin.  *See Willis v. City of Seattle*, 943 F.3d 882, 885 (9th Cir. 2019) (plaintiffs failed to establish commonality based on challenge to defendants' practice of removing or destroying homeless property without adequate notice because broad description of "sweeps" did not show proposed class members experienced the same challenged practices or suffered the same injuries).  "The mere existence of a statute, which may or may not ever by applied to [KFA], is not sufficient to create a case or controversy within the meaning of Article III."  *Stoianoff*, 695 F.2d at 1223,  .

KFA also purports to seek injunctive relief on behalf of one member, Bettaga, and one unhoused resident referred to as "Kahn."  (Price Decl. ¶¶ 3-12; Ngyuen Decl. ¶¶ 12-14.) However, the Court held that "[a]s the Supplemental FAC is currently pled, KFA does not have associational standing to assert claims on behalf of its members."  Dkt. No. 37 at 15.  The Court granted leave to amend, but Plaintiffs did not file a second amended

complaint before filing the Motion for Preliminary Injunction or before the City filed this Opposition.  KFA lacks standing to seek injunctive relief on behalf of its members.  *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

KFA's additional evidence does not alter the analysis under either standing theory.  The February 24, 2020 incident involving a Kahn, who is not a KFA member, also involved a noticed cleanup under CARE+.  (Wong Decl. ¶¶ 31-33, Ex. 11.)  The City posted notices on February 21, 2020, and the mattress and pallet were cross-contaminated with biohazardous materials.  *Id.* 33, Ex. 11.  Bettega declares that the City seized and discarded a bike that had its front wheel detached in early December 2019.  (Bettaga Decl. ¶¶ 6-8).  The City identified two CARE operations involving bike parts in this vicinity.  (Wong Decl. ¶ 36.)  On December 9, 2019, the City conducted a CARE cleanup at 694 South Hobart Boulevard, and the homeless individuals present at the encampment identified a "communal garbage pile" that contained miscellaneous bike parts.  (*Id.* ¶¶ 37-38, Ex. 12.)  On December 16, 2019, the City conducted a CARE operation at the same location, and one bicycle and rusted parts belonging to a Hispanic male in his forties was inspected and the bike was not removed, but rusted parts were removed and discarded for identified hazards.  (*Id.* ¶¶ 39-40, Ex. 13.)   This evidence is insufficient to establish standing under *Hunt.  Assoc. Gen. Contractors of America v. Cal. Dept. of Transp.,* 713 F.3d 1187, 1194 (9th Cir. 2013).

**B.  Plaintiffs Have Not Shown They Are Likely To Succeed On The Merits**

**1.     Fourth Amendment Claim**

Plaintiffs contend they are likely to succeed on the merits of their Fourth Amendment facial challenge to the Bulky Item Provision because it "allows the City to seize and immediately destroy people's belongings, based solely on the size of the item." (Mot. at 3:5-7.)  Specifically, Plaintiffs argue that the Bulky Item Provision must be unreasonable in all instances because "[i]t does not require the City to obtain a warrant, nor does it on its face, meet any of the well-established exceptions to the warrant requirement…" (*id.* at 11:5-8).  Neither the law nor the record supports Plaintiffs' claims.

### a. The Bulky Item Provision

As an initial matter, the Bulky Item Provision does not authorize seizures of items based *solely* on their size—it authorizes seizures based on (1) the size of the item, *and* (2) the fact that those items *are stored in the public right of way*.  LAMC 56.11(3)(i). The significance of the "public right of way" qualifier cannot be understated.  First, the Bulky Item Provision regulates *conduct*—in public (not private) spaces—not property.  It is the storage of the Bulky Items in public, not the Bulky Items themselves that are prohibited.  It is entirely reasonable to limit the size of items that a person can store in a finite public space, and indeed, it is the City's obligation to do so.  A small piece of luggage can be brought onto a flight as a carry-on, but the same does not apply to a bedroom set; a sidewalk may be able to reasonably accommodate sleeping bags and small personal belongings but not canoes. (Guerrero Decl. ¶ 3, Ex. 18, p. 84).

The limitation is even more reasonable when the finite space at issue is not intended for storage at all.  Public sidewalks began as private property of a group of individuals (adjoining landowners) who subjugated their rights to that property to the City on the condition that the City would safeguard that area for its intended public use. Individual rights "[are] not absolute, but relative and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order." *HAGUE v. Comm. For Indus. Org.,* 307 U.S. 496, 515-16 (1939).  Indeed, the City has both the right and the obligation to regulate these public spaces for the benefit all users. *See* Cal. Gov. Code, § 37359 ("the legislative body having control of any property owned or controlled by the city may at any time withdraw…or limit the access or use in area or time or in any other reasonable manner deemed necessary"); § 38775 ("legislative body may prohibit and prevent encroachments upon or obstruction in or to any sidewalk, street, alley, lane, court, park, or other public place and provide for the removal of such encroachment or obstruction"); *Schneider v. State,* 308 U.S. 147, 160-61 (1939) (cities have "the duty to keep their communities' streets open and available for movement of people and property"); *Laura Vincent Co. v. City of Selma,* 43 Cal.App.2d 473 (1941)

("A city council has broad general powers with respect to maintaining streets and sidewalks for the use of the public, prohibiting and preventing encroachments upon or obstructions in or to such sidewalks and streets, and providing for the removal of any such obstructions.")  Even the adjoining landowners, who continue to own the sidewalks in fee, are not permitted to store items on them.  *See Cty. of Santa Barbara v. More*, 175 Cal. 6, 12 (1917) (both owner of land adjacent to sidewalk and public have "a limited, not an unlimited, right of property" in the public space); *Vanderhurst* v. *Tholcke*, 113 Cal. 147, 150-51 (1896) (landowner's large trees "necessitate the public travel passing along the narrow edges or spaces left on either side thereof, instead of having the enjoyment of the entire width and surface of the walks to which it is entitled").

Second, as discussed more below, the "in the public right of way" qualifier is a critical factor in conducting a Fourth Amendment analysis, which requires the Court to balance the competing interests.  Plaintiffs' argument exclusively focuses on one side of the scale—the individual's right to property—and entirely ignores the other side of the scale—the public's interest in using that public space.  But the public's right to use sidewalks for purposes other than storage cannot be ignored in this analysis.

### b.  Removal of Bulky Items

Plaintiffs' position is that the City cannot constitutionally remove a Bulky Item unless the City obtains a warrant, or can point to—on an individualized basis—a recognized exception to the warrant requirement to justify its removal.  (See Mot. at 11-12.)  Plaintiffs place no significance on the fact that an accumulation of Bulky Items has adversely impacted an adjacent environmental project voted on and paid for by City residents, or that the circumstances created by that accumulation infringed on the public's free use and enjoyment of the public right of way.  The Fourth Amendment cannot reasonably be interpreted to demand a warrant, or the specific and individualized justifications that Plaintiffs advance, for seizures of items that, by their very nature, infringe on the rights of all other in using the public space.  As the record shows, it was not necessarily Diocson's dog cage or Ashley's carts, or any one of the dozens of Bulky

1   Items left in the noticed cleanup area that forced the Greenway to close, or impacted

2   other pedestrians' use and enjoyment of that walkway.  It was the accumulation of these

3   items in the aggregate that justified their removal from the public right of way.

4          Indeed, the Fourth Amendment does *not* require a warrant or the individualized

5   warrant-exception justification that Plaintiffs advance in this case.  (Mot. at 10.)  The

6   Supreme Court has expressly rejected that traditional formulation in a variety of contexts,

7   particularly where, as here, "a Fourth Amendment intrusion serves special governmental

8   needs beyond the normal need for law enforcement" and "it is impractical to require a

9   warrant or some level of individualized suspicion in the particular context." *Mich. Dep't*

10  *of State Police v. Sitz*, 496 U.S. 444, 449-50 (1990).  In such cases, the Court does not ask

11  whether a warrant or exception applies but instead evaluates the totality of circumstances

12  and weighs, on a macro level, the "nature and quality" of the affected individuals' Fourth

13  Amendment interests against the gravity of the countervailing interests of the government

14  and the public.  *Id.*; *see also e.g., New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985); *Nat'l*

15  *Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989).

16         The Supreme Court decisions involving stops of drivers at checkpoints are

17  instructive.  In *United States v. Martinez-Fuerte*, 428 U.S. 523, 555 (1976), the Court

18  considered whether Border Patrol stops of motorists at permanent checkpoints, made

19  without any individualized justification for any particular stop, violated the Fourth

20  Amendment.  The Ninth Circuit had held that such stops can be constitutional "only if the

21  Border Patrol reasonably suspects the presence of illegal aliens on the basis of articulable

22  facts." *Id.* at 549.  The Supreme Court reversed.  In addressing the proper test to be used,

23  the Court stressed (1) the "substantiality of the public interest" in limiting immigration

24  because "many more aliens than can be accommodated…seek illegally to enter or to

25  remain in the United States" (*id.* at 552); and (2) the "formidable law enforcement

26  problems" of patrolling the border—"[a]pproximately 10 million cars pass the checkpoint

27  location each year" and "the flow of traffic tends to be too heavy to allow the

28  particularized study" of each car passing though the checkpoint (*id.* at 557).  The Court

concluded that although motorists had a valid constitutional interest in traveling in their vehicles and checkpoint stops were "seizures" under the Fourth Amendment, the proper inquiry was *not* whether a warrant or exception applied (*id.* at 556); rather it centered on "reasonableness," which required balancing of the countervailing interests under the totality of circumstances.  *Id.*; *see also Lavan v. City of L.A.*, 693 F.3d 1022, 1031 (9th Cir. 2012) (framing inquiry as whether City "acted reasonably under the Fourth Amendment.").  Applying the balancing test, the Court held that the warrantless stops were constitutional even though the individuals were detained solely because they happen to be traveling through a particular location and no individualized justification supported the detention, because "[w]hile the need to make routine checkpoint stops is great, the consequent intrusion on Fourth Amendment interests is quite limited."  *Id.* at 557.

*Martinez-Fuentes* and similar cases instruct that (1) the existence of a constitutionally protected interest does not mean that the Fourth Amendment requires a warrant, warrant exception, or even an individualized justification in every instance; and (2) the gravity of the public interest, viewed at the macro-level, can outweigh an individual's constitutionally protected interest such that a seizure is reasonable.  Here, Plaintiffs have not established that the personal interest in keeping Bulky Items on the sidewalk—for example, an unused remnant of a wooden cabinet in front a Greenway environmental project on a path utilized by elementary school children—is weightier than the countervailing public interest in having that item removed from that public space.

The flaw in Plaintiffs' argument—the failure to acknowledge valid countervailing public interests to their right to store Bulky Items in public spaces—is borne out by the record.  Consider the Greenway cleanups that Plaintiffs Diocson and Ashley rely on as purported examples of the unreasonableness of the Bulky Item Provision.  The Greenway was a $24 million project that was designed for laudable public purposes: to improve the City's water quality, reinvigorate the environment, and create outdoor recreational opportunities in an otherwise park-poor industrialized area.  Haines Decl. ¶ 6.  Within months of the Greenway's grand opening, individuals appropriated the Greenway and

surrounding sidewalks, not only to sleep or congregate on, but as a public storage facility on which to amass countless Bulky Items.  The photo at CTY001985, for example, depicts not only tarps and tents used for shelter but also several mattresses propped up on their sides, bicycles and bicycle parts, empty plastic tubs, large suitcases stacked on a pile of other miscellaneous items, and remnants of an unidentifiable piece of furniture (also propped on its side and apparently not being utilized)—all intermingled with smaller personal items, food waste, unknown fluids, and miscellaneous debris.  (Wong Decl. ¶ 25, Ex. 5 at p. 111.)  Not only has such use subverted the Greenway project, it has affected the overall health and safety of all other users of that sidewalk, including children and parents who use that sidewalk to get to and from the nearby elementary school.  (Medina Decl. ¶ 6.)  The photo depicts that the 14-foot sidewalk is technically ADA accessible in most areas, and arguably no one Bulky Item is necessarily blocking access or posing an immediate health and safety risk, but considered in the aggregate, the condition of the sidewalk plainly impacts all other individuals' use and enjoyment of both the sidewalk and the Greenway. Plaintiffs do not acknowledge the impact of their, and others, use of this area on the overall public interest of using the same area.

Instead, even though Plaintiffs admit, and it is documented, that both Greenway cleanups were preceded by written notice, Plaintiffs argue that the City's removal of their items from the area was unconstitutional because no warrant was obtained and the City cannot articulate an established warrant exception as to any specific Bulky Item.  (Mot. at 11-12.)  But the Fourth Amendment does not require the City to obtain a warrant for each and every Bulky Item depicted in these photos (and the other photos described below). Even if it was technically feasible to catalog each of the items and obtain warrants to remove them—and that is no small feat as it took nine sanitation employees four hours to inspect and catalog items seized during each noticed cleanup (Wong Decl. ¶ 24, Ex. 4 at p.74; ¶ 28, Ex. 8 at p. 137)—many of the items likely would be gone by the time LASAN returned to the site (which, incidentally, would not have removed the intrusion into the public's right to access public areas, but merely would have relocated those items to

1    impact other members of the community elsewhere).

2    It must be noted that Plaintiffs seek to enjoin a provision that applies to both
3    "Attended" and "Unattended" items.  (LAMC 56.11(3)(i); (2)(r).)  But they provide no
4    examples, nor any analysis, of the unconstitutionality of removing Unattended Bulky
5    Items.  As the Court noted, if an item is abandoned, it is reasonable for the City to
6    remove it.  (MTD Order at 9.)  And the record shows the complexity associated with
7    making ownership determinations given the vast variety of circumstances under which
8    Bulky Items are found.  Consider, for example, the large recliner in the foreground of the
9    third picture in Ex. 2 to the Rankin Decl.  If not an immediate threat to public health and
10   safety, it is unclear how the City should handle the chair.  It could be associated with a
11   homeless person or encampment, as it is close to, though not immediately next to, other
12   items stored in the public space (seen in the background); and it is not blocking access on
13   the sidewalk nor City operations.  In that case, the City would be prohibited from seizing
14   or destroying the chair if it is enjoined from enforcing the Bulky Item Provision.  Or,
15   based on the very same picture, the chair could have been dumped, meaning the City
16   could seize and destroy the chair under its anti-dumping ordinance.  The effect of the
17   injunction sought by Plaintiffs would be to enjoin the City from seizing the chair under
18   both scenarios, as the line between an unattended Bulky Item and a dumped item that
19   exceeds 60-gallons is amorphous, at best.  (Wong Decl. ¶ 48.)  But the armchair and
20   similar Bulky Items routinely encountered on sidewalks adversely impact the public's
21   right to the use and enjoyment of those spaces.  Many more examples of such
22   circumstances abound.  (*See,* Rankin Decl., Ex. 2 at p. 10; Ramirez Decl., Ex. 7 at p. 26;
23   Pereida Decl., Ex. 1 at p. 7; Guerrero Decl., Ex. 4 at p. 22, Ex. 6 at p. 34).  At minimum,
24   Plaintiffs have not met their burden to show that they are likely to prove that the property
25   rights in all Bulky Items left on sidewalks, attended and unattended, outweigh the
26   public's competing interests in the use and enjoyment of those same public spaces.

27                       **c.  Disposal of Bulky Items**

28   Although Plaintiffs speak of "seizure and destruction" as one concept, the Court

                                    15

has made it clear that those two events must be analyzed separately, (*United States v. Jacobsen*, 466 U.S. 109, 118 (1984)), and the Bulky Item Provision treats them as distinct (LAMC 56.11(3)(i) ("the City *may* remove and *may* discard…") (emphasis added)). Also, the Ordinance contains a severability provision.  (LAMC 56.11(12).)  Thus, the Court should evaluate the constitutionality of "may remove" and "may discard" separately.  *See Vivid Entm't, LLC v. Fielding*, 774 F.3d 566, 577 (9th Cir. 2014).

Plaintiffs contend that destruction of a Bulky Item is per se unreasonable because it is a seizure done without a warrant or exception to the warrant requirement.  (Mot. at 12:8-10) (*citing* MTD Order at 11.)  For the reasons described above, the appropriate constitutional test in this case is not the traditional "warrant or recognized exception test" but rather, a balancing-of-interests test to determine reasonableness.  This test applies equally to seizures involving destruction.  *Jacobsen*, 466 U.S. at 124).  Thus, the question is whether Plaintiffs are likely to succeed in showing that under no set of circumstances could the destruction of a Bulky Item found in the public right of way—whether Attended or Unattended—is reasonable.

Plaintiffs have not made this showing and the record reveals they are unlikely to do so.  Consider again the Greenway cleanups.  Under Plaintiffs' view, because there had been encampments in the area, the City must assume that each and every Bulky Item in the area was unabandoned personal property.  Moreover, under Plaintiffs' view, every one of those items, and indeed *all* Bulky Items, carry identical weight on the reasonableness scale and *always* outweigh the countervailing interests.  Thus, under Plaintiffs' interpretation of the Fourth Amendment, unless a person expressly disclaimed ownership or the City could show that the item posed an immediate health and safety risk, the City cannot dispose of an item stored in the public space.  Prior litigation demonstrates that Plaintiffs' position is flawed.  In *Mitchell et al. v. City of Los Angeles*, Central District Case No. 2:16-cv-01750-SJO-JPR (Dkt. No. 119), the Court entered a stipulated dismissal order in which a number of Bulky Items were permitted to be removed without notice and not stored (i.e. destroyed), including: "couches, mattresses,

dressers, or other similarly-sized or larger furniture; wooden pallets; refrigerators or other similarly-sized or larger appliances, or barbeques or other open-flame cooking devices having fuel containers with a water capacity greater than 2.5 pounds." To underscore the unreasonableness of Plaintiffs' argument, consider the alternatives.

One alternative to disposal is for the City to provide 60-day storage for all Bulky Items. As the record reveals, as a practical matter, this option is unachievable. (Wong Decl. ¶ 52). It would mean that after the April 24, 2019 cleanup alone, unless the City identified an immediate health and safety risk associated with each item, the City would need to store the coffee table, wooden cabinet, and mattresses in CTY002030; the oversized armchairs in CTY002141; and the wooden pallets and mattresses in CTY002177. (Wong Decl. ¶ 25, Ex. 6 at pp. 119, 122, 124.) Then, after the May 2019 cleanup of the same Greenway area (while some or all of the items from the April cleanup are likely to still be in storage), the City would need to add to that storage all the other Bulky Items that were left in the area. These include but are not limited to: the freight pallets and remnants of pallets in CTY001645; the rugs, mattresses, and chairs in CTY001640; the headboard in CTY001814; the window screens in CTY001563; the metal pipes that look to be twice the length of a shopping cart in CTY001522; the barbeque in CTY001754, the large wooden objects that appear to be parts of a cabinet in CTY001672; and the chairs and the plywood sheets with graffiti art on them in CTY001705 and CTY001711. (Wong Decl. ¶ 29, Ex. 10 at pp. 185-86, 188-89, 199.) This list represents only two cleanups on one City block, less than one month apart. The City conducted an average of 3,024 bulky item service requests per day from January 1, 2019 to March 9, 2020. (Wong Decl. ¶ 52.) The number of Bulky Items found all over the City on any given day is staggering. *See, e.g.,* Rankin Decl. ¶ 3, Exs. 1-6, Ramirez Decl. ¶ 3 Exs. 1-7, Guerrero Decl. ¶ 3, Exs. 1-18, Pereida Decl. ¶ 3, Exs. 1-9. And as evidenced by the Greenway cleanups, within days of a cleanup, new items replace the ones that were taken. (Haines Decl. ¶ 15; Wong Decl. ¶ 27, Ex. 7.) Moreover, the record shows that less than 15% of items that the City does store are ever retrieved. (Wong Decl.

1   ¶¶ 22, 51, Ex. 3.)  This is particularly probative given that the items the City stores

2   pursuant to the Ordinance are the kinds of items one would expect to constitute

3   necessities of life, such as tents, blankets, clothes and medications.  (LAMC

4   56.11(2)(j),(f); 3(a)-(b.).)  *See Lavan*, 693 F.3d at 1025.[5]

5          The City currently has six involuntary storage facilities (Wong Decl. ¶ 20) and it

6   has chosen to allocate its resources such that those facilities are used to store items that

7   are more likely to be considered necessities of life, namely: (1) tents, bicycles, and

8   wheelchairs (which are excluded from the definition of "Bulky Items" and must generally

9   be stored) and (2) smaller items of personal property such as sleeping bags, pillows,

10  blankets, backpacks, clothes, shoes, medications, and similar items.  (LAMC 56.11(3)(a)-

11  (f); (5).)  Obviously, the more freight pallets, furniture remnants, mattresses, armchairs,

12  pipes, and plywood sheets the City stores, the less room there is for storing tents,

13  wheelchairs and other personal items.  Moreover, it is hard to imagine how building more

14  storage space (particularly since the vast majority of individuals never retrieve the items

15  that are placed in storage) is a better use of its resources than using that space for shelters

16  or other facilities to provide services and address the humanitarian crisis facing the City.

17  *See Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 453 (1990) ("[The Fourth

18  Amendment] was not meant to transfer from politically accountable officials to the courts

19  the decision as to which among reasonable alternative law enforcement techniques should

20  be employed to deal with a serious public danger").

21         Besides storage, the other theoretical alternative is for the City to temporarily move

22  and later replace onto the sidewalk the Bulky Items it finds after the cleaning.  There are

23  photos in the record that depict examples of what that might look like.  For example, the

24  photos at CTY001640 and CTY001645 show the May 2019 Greenway cleanup after the

25  majority of the smaller items and debris have been removed and mostly only Bulky Items

26  remain.  (Wong Decl. ¶ 29, Ex. 10 at pp. 188-89.)  As these photos demonstrate, the

27

28

---

[5] And this is despite the fact that the City has provided for the items to be delivered to the individuals claiming ownership.  (*See* Wong Decl. ¶ 21.)

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

remove-and-replace option would mean that, after a cleaning, the City would leave on the sidewalk adjacent to its $24 million Greenway environmental project several freight pallets and rugs, some electronic equipment, a large wooden frame that appears to be the remnant of a freight pallet, a chair and a mattress.  It is far from clear that the property interest a person may have in the remnant of a pallet, for instance (Wong Decl. Ex. 10 at p. 189), will outweigh the larger compelling interest of the public.  *See Jacobsen,* 466 U.S. at 125-26 (destruction of powder substance was constitutional because initial seizure was reasonable, governmental interest in testing the substance was significant, and property interest was *de minimus*).

### 2. Procedural Due Process

To succeed on a procedural due process claim, plaintiffs must show that the Bulky Item Provision cannot, under any set of conceivable circumstances, adequately safeguard an individual's property interest.  *United States v. Salerno*, 481 U.S. 739, 745 (1987). Plaintiffs argue that they are likely to succeed in making this showing because "[a]t no point is a person given the opportunity to contest the determination that the item is bulky and can be immediately destroyed."  (Mot. at 14:12-13.)  This is insufficient to show a likelihood of success.  The Ordinance itself provides notice and an opportunity to avoid deprivation of their property interest: it states that Bulky Items are prohibited in the public right of way and unambiguously defines Bulky Items by reference to objective criteria.  *See Texaco, Inc. v. Short*, 454 U.S. 516, 537 (1982).

"Consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action."  *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895 (1961). In analyzing procedural due process claims, three factors are considered: the nature of the private interest affected, the risk of erroneous deprivation and the probable value of additional or substitute safeguards, and the government's interest including the function involved and the fiscal and administrative burdens that the additional or substitute

procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1975). Here, Plaintiffs make no attempt to analyze the Bulky Item Provision under these factors.

The private interest in storing a Bulky Item on a sidewalk will not always be identical and will not always outweigh any and all countervailing interests. The interest in, for example, having a tent or shelter (both of which are protected by additional safeguards in the Ordinance) will likely be far more significant than the interest in keeping a deconstructed piece of furniture or a pallet in a public right of way. *Lawton v. Steele*, 152 U.S. 133, 139-40 (1894) (upholding summary disposal of illegal fishing nets because "[t]he value of the nets in question was but $15 apiece. The cost of condemning one . . . by judicial proceedings, would largely exceed the value of the net, and doubtless the State would, in many cases, be deterred from executing the law by the expense"). It is improper for Plaintiffs to assume that all conceivable property interests, regardless of the nature of the items at issue or the context in which the right to property arises, are entitled to identical weight for purposes of procedural due process. *Lone Star Sec. & Video, Inc. v. City of L.A.*, 584 F.3d 1232, 1237 (9th Cir. 2009) (although "[t]he uninterrupted use of one's vehicle is a significant and substantial private interest," when it is used for advertising instead of driving "such a use creates a lesser interest in the trailers than had they served as a means of transportation"); *Clement v. City of Glendale*, 518 F.3d 1090, 1094 (9th Cir. 2008) ("owner's normal interest in continued use of his vehicle--as a means of getting from place to place--has no force" where "the car just sat in the parking lot, unused"). Indeed, if property interests always outweighed all other factors, there would be no utility to the *Matthews* balancing test.

Plaintiffs fail to acknowledge that the interest associated with an Unattended Bulky Item is often speculative. Implicitly, Plaintiffs urge the Court to adopt the assumption that every Unattended Bulky Item found in the public right of way is entitled to the same constitutional protections as all other personal property. But this ignores both the real-world circumstances and the law. As described above, in many instances, it is far from clear whether an item is abandoned or not. (*See* Wong Decl. ¶ 48.) And the law does not

20

afford speculative property interests the same protections as clearly established interests. As the Ninth Circuit has instructed:  "[t]o require…that the government provide for actual notice to reasonably ascertainable interested persons is one thing.  To require…that the government provide for actual notice to such individuals prior to every proceeding that *might* affect their interests is quite another thing, a hopelessly burdensome standard with which an active agency [] could not hope to comply." *Covelo Indian Cmty. v. Fed. Energy Regulatory Com,* 895 F.2d 581, 588 (9th Cir. 1990) (emphasis in original).

Second, the risk of erroneous deprivation is low because the only determinations that must be made are whether the item fits into a 60-gallon container and is located on a public right of way.  There would be little utility in holding a hearing on whether a mattress located on a public street is a "Bulky Item" in the public right of way.  *See Rise v. Oregon*, 59 F.3d 1556, 1562-63 (9th Cir. 1995) (rejecting procedural due process claim for taking of blood samples without an opportunity for a hearing because where "the only criterion under [the regulation] for extracting blood is a conviction for a predicate offense, there would be little of substance to contest at any provided hearing.")  For example, although Plaintiff Ashley contends that he "was not given an opportunity to challenge the Bulky Item determination," it is clear from the photos that the carts were too large to fit into a 60-gallon container.  (Wong Decl. ¶ 29, Ex. 10, p. 184).  Furthermore, if an item is removed or discarded that did not satisfy the dimensions of a "Bulky Item," or if it was found in a location other than a public right of way, that would constitute an unauthorized application of the Bulky Item Provision and thus, would not support a procedural due process claim.  *Hudson v. Palmer*, 468 U.S. 517, 533 (1984).  To the extent Plaintiffs seek to argue that they should be entitled to store Bulky Items in the public right of way, that argument sounds in a violation of substantive (not procedural) due process, which Plaintiffs have not asserted.  Even if they had, there is no constitutional right to store belongings on such property contrary to City ordinance.

Finally, the fiscal and administrative burdens on the City to provide a hearing before seizing or discarding the many thousands of Bulky Items left in the public right of

21

way would be monumental.  LASAN responded to an over 3,000 bulky item service requests *per day* from January 1, 2019 to March 9, 2020.  (Wong Decl. ¶ 52.)  To require individualized notice and hearing requirements for each Bulky Item left on a sidewalk would utterly stifle the City's ability to take Bulky Items of the street and render it impossible for the City to protect the public's right to use and enjoy the public rights of way to which it is entitled.  *See Ingraham v. Wright*, 430 U.S. 651 (1977).

In evaluating administrative burdens, courts also consider the continuing and recurring nature of the issues that are the subject of:  "Of paramount importance here is the fact that the violations sought to be controlled are of a *continuing* nature and the impound provisions are necessary to render effective enforcement.  By reason of the *continuing* nature of any violations to require the full panoply of due process requirements in the classic sense would, as a practical matter, render an important aspect of the enforcement provisions ineffectual.  *Gluck v. Cty. of L.A.*, 93 Cal. App. 3d 121, 147 (1979) (emphasis in original); *see also Williams v. Mukasey*, 531 F.3d 1040, 1042-43 (9th Cir. 2008) ("We recognize the practical difficulties and costs that would be attendant on frequent investigations[…] into the status of great numbers of beneficiaries[…] and we have no doubt that such impracticable and extended searches are not required in the name of due process.[. . .] These are practical matters in which we should be reluctant to disturb the judgment of the state authorities.").  Here, the record demonstrates the repeated and continuing nature of the problem.

"The existence of any debate or doubts on the record as to the merits of the claim or the power of the court to act will ordinarily bar the granting of a preliminary injunction." *Sid Berk, Inc. v. Uniroyal, Inc.*, 425 F. Supp. 22, 29 (C.D. Cal. 1977). Plaintiffs have neither shown that the Bulky Item provision was enforced against them, nor have they demonstrated that the application of the *Matthews* test will weigh in their favor.  On this record, they cannot show that a preliminary injunction is warranted.

### C.  Plaintiffs Have Not Shown They Are Likely To Suffer Irreparable Harm

"To support injunctive relief, harm must not only be irreparable, it must be

imminent; establishing a threat of irreparable harm in the indefinite future is not enough. Rather, 'a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief.'" *Amylin Pharmaceuticals, Inc. v. Eli Lilly and Co.*, 456 F. App'x 676, 679 (9th Cir. 2011) (quoting *Caribbean Marine Services Co., Inc. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988)).  Conclusory allegations and affidavits are insufficient to show irreparable harm.  See e.g. *American Passage Media Corp. v. Cass Communications, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985). Here, Plaintiffs have failed to sufficiently demonstrate imminent, irreparable harm.[6]

As discussed in the Standing section, *supra*, Plaintiffs have not shown that they have suffered any harm from the enforcement of the Bulky Item Provision—*i.e.,* the unnoticed removal and/or destruction of Bulky Items solely on the basis that they are Bulky and on the public right of way.  Plaintiffs' evidence does not establish that the City engages in a widespread or persistent pattern of destroying Bulky Items without notice; indeed, each of the Plaintiffs' incidents was preceded by notice.

In addition, the City's announcement of its intent under the CARE operations to provide increased services through LAHSA and to enforce LAMC 56.11 does not establish an imminent threat of irreparable injury.  Plaintiffs misrepresent that CARE teams were instructed to "fully enforce" the Bulky Item Provision by seizing and discarding all property consistent with the ordinance.  (Mot. at 2.)  In fact, the document states that the City will enforce the Bulky Item provision in compliance with the law and its policies.  Plaintiffs' RJN, Ex. 4.  The Protocols make clear that the ECIs take extensive measures to protect individuals' property interests and safeguard Bulky Items that appear to be someone's property.  (Wong Decl. ¶ 8, Ex. 1 at pp. 40-41).)  Thus, Plaintiffs have not met their burden to show an imminent threat of injury based on the enforcement of the Bulky Item provision.

---

[6] Plaintiffs did not move for an injunction until many years after the Ordinance's enactment and over seven months after filing their complaint. *Garcia v. Google, Inc.,* 786 F.3d 733, 746 (9th Cir. 2015).

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

### D.  The Balance of Equities Weighs In Favor of the City

In determining whether to issue a preliminary injunction, particularly one that will affect individuals beyond the parties, a court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Amoco Production Co. v. Gambell*, 480 U.S. 531 542 (1987).  Here, the injunction Plaintiffs seek would essentially enshrine Bulky Items in constitutional protection and prevent them from being removed from public areas in the City.  This would have a dramatic and monumentally detrimental impact on all users of the public right of way, *including* Plaintiffs and other unhoused residents.  Moreover, because it is often far from clear whether an item has been illegally dumped or has simply been left unattended, and in light of the magnitude of the homeless crisis that has resulted in 50,000 people dwelling and storing personal belongings in public spaces, to avoid violating such an injunction, the City would need to obtain warrants, articulate an exception on item-by-item basis, *and* give notice and hearing opportunities before collecting any Bulky Item.  Again, that is simply not realistically feasible, nor does the Constitution demand such herculean efforts.

Even if the injunction allowed the City to collect Bulky Items under different provisions, this would not be sufficient to protect the public interest.  Anti-dumping provisions of the LAMC and state laws do not authorize property removal.  See RJN Ex. 1-6; Cal. Penal Code § 374.3.  For example, the Ordinance permits the City to seize and destroy items that pose an "immediate threat to the health or safety of the public."  LAMC 56.11(3)(g).  But many items pose a health and safety threat that it is not necessarily "immediate."  For example, a metal Bulky Item may not be an immediate threat to health and safety, yet may still be capable of spreading infectious diseases such as the coronavirus.  (Wong Decl. ¶ 53; Diaz Decl. ¶ 4, Ex. 1).  The injunction sought by Plaintiffs would prevent the removal of that item.

"An additional consideration affecting the Court's determination to grant injunctive relief is whether or not the terms of the injunction can be stated with sufficient clarity to permit the injunction to be fairly enforced." *Joyce v. City and*

*County of San Francisco*, 846 F. Supp. 843, 850 (1994) (denying unhoused persons' request for a preliminary injunction because the injunction sought was not sufficiently specific to be enforceable and, if granted, would have rendered the city powerless to enforce its laws; *see* Fed. R. Civ. P. 65(d)(B)-(C).  This mandate is designed "to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).   Here, the injunction Plaintiffs seek would not provide sufficient clarity for the City to understand what justifications would be sufficient to remove a Bulky Item.  For example, the Court noted that the City could be justified in removing Bulky Items that impede City Operations and cited an impacted bus stop as an example of such an operation.  (MTD Order at 10 (citing LAMC 56.11(3)(c)).)  On that basis, it could be argued that the Bulky Items that were continually being amassed in front of the Greenway impeded the City's operation of its Greenway project.  But it is unclear if Plaintiffs—or this Court—would read Plaintiffs' intended injunction to allow such seizures.

A preliminary injunction would effectively convert City sidewalks into a storage facility.  Nothing in the law mandates this result.  The City's health, safety, and welfare interest in the enforcement of the Bulky Item provision is substantial and legitimate.  The health and safety risks affect the rights of all persons, housed and unhoused alike, who seek to use public areas for their own reasonable and legitimate purposes.  On balance, the public interest in maintaining clean and safe public areas that are open for the use and enjoyment of all members of the public outweighs the benefits to Plaintiffs in being allowed to store their Bulky Items in public spaces.

## V.   CONCLUSION

For all these reasons, Plaintiffs' motion for preliminary injunction must be denied.

Dated:  March 9, 2020          MICHAEL N. FEUER, City Attorney
                               By:   /s/ A. Patricia Ursea
                               A. PATRICIA URSEA, Deputy City Attorney
                               Attorneys for Defendant CITY OF LOS ANGELES