Name  Gabriel S. Dermer

Address  City Hall East, 200 N. Main St., 6th Floor

City, State, Zip  Los Angeles, CA 90012

Phone  (213) 978-7558

Fax  (213) 978-7011

E-Mail  Gabriel.Dermer@lacity.org

☐ FPD   ☐ Appointed   ☐ CJA   ☐ Pro Per   ☒ Retained

**PRELIMINARY INJUNCTION APPEAL**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

JANET GARCIA, et al.

PLAINTIFF(S),

v.

CITY OF LOS ANGELES, et al.

DEFENDANT(S).

CASE NUMBER:

2:19-cv-06182-DSF-PLA

**NOTICE OF APPEAL**

NOTICE IS HEREBY GIVEN that _____ the City of Los Angeles _____ hereby appeals to
*Name of Appellant*

the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

**Civil Matter**

☒ Order (specify):
   Granting Pls.' Mot. for a Prelim. Inj.

☐ Judgment (specify):

☐ Other (specify):

Imposed or Filed on _____ April 13, 2020 _____ . Entered on the docket in this action on _April 13, 2020_____ .

A copy of said judgment or order is attached hereto.

5/12/2020

Date

s/ Gabriel S. Dermer

Signature

☐ Appellant/ProSe   ☒ Counsel for Appellant   ☐ Deputy Clerk

**Note:**   The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the
attorneys for each party.  Also, if not electronically filed in a criminal case,  the Clerk shall be furnished a sufficient number
of copies of the Notice of  Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

JANET GARCIA, et al.,
    Plaintiffs,

            v.

CITY OF LOS ANGELES, et al.,
    Defendants.

CV 19-6182 DSF (PLAx)

Order GRANTING Plaintiffs'
Motion for a Preliminary
Injunction (Dkt. 38)

    Plaintiffs Pete Diocson Jr., Marquis Ashley, and Ktown for All
(KFA) move for an order enjoining Defendant City of Los Angeles (the
City) from enforcing Los Angeles Municipal Code (LAMC) Sections
56.11(3)(i) and 56.11(10)(d).  Dkt. 38 (Mot.).[1]  The City opposes.  Dkt. 42

---

[1] After the Motion was filed, Plaintiffs filed a Second Amended Complaint
(SAC).  Dkt. 43.  Plaintiff contends the SAC did not change the allegations
relevant to this Motion, and therefore the Court can consider the Motion.  See
Dkt. 50 (Pls.' SAC Statement) at 2.  The City argues that the filing of the
SAC moots the Motion.  Dkt. 51 (Def.'s SAC Statement) at 4.  Specifically, the
City notes that the relevant amended causes of action (the First and Fourth
Causes of Action) now include the allegation that Plaintiffs "are entitled to an
injunction, enjoining the City from continuing to enforce this unconstitutional
law."  SAC ¶¶ 248, 258.  Although Plaintiffs' inclusion of this allegation is
helpful in clarifying their allegations, it does not affect the relief requested.
The First Amended Complaint (FAC) specifically sought "an order enjoining
and restraining Defendants from engaging in the policies, practices, and
conduct complained of herein, including an order enjoining and restraining
the City from enforcing the challenged provisions of Los Angeles Municipal
Code Section 56.11."  Dkt. 20 (FAC), Prayer for Relief ¶ 3.  Therefore, the
City has not shown how the amendment has a material effect on the relief

(Opp'n).  The Court deems this matter appropriate for decision without oral argument.  See Fed. R. Civ. P. 78; Local Rule 7-15.

# I. FACTUAL BACKGROUND[2]

## A.    The Challenged Ordinance

LAMC Section 56.11 (the Ordinance) regulates the storage of personal property in public areas.  Its stated purpose is to "balance the needs of the residents and public at large to access clean and sanitary public areas . . . with the needs of the individuals, who have no other alternatives for the storage of personal property, to retain access to a limited amount of personal property in public areas."  LAMC § 56.11(1).  In most situations, the City is authorized to impound personal property in a public area so long as the City provides pre-removal and post-removal notice.  See, e.g., LAMC § 56.11(3)(a)-(b).  In other situations, including where the property obstructs City operations or interferes with the City's compliance with the Americans with Disabilities Act of 1990 (ADA), only post-removal notice is required to impound personal property.  See, e.g., id. § 56.11(3)(c)-(f).  There are also limited situations where the City can immediately destroy personal property

_____

requested.  For example, in La Jolla Cove Inv'rs, Inc. v. GoConnect Ltd., No. 11CV1907 JLS (JMA), 2012 WL 1580995 (S.D. Cal. May 4, 2012), cited by the City, the amended complaint eliminated the claims forming the basis of the motion for preliminary injunction.  Id. at *2 (denying application for preliminary injunction "because the SAC contains no request for injunctive relief or for the issuance of shares").  In the other two cases cited by the City, the preliminary injunction was denied as moot when the complaint was dismissed.  Because the allegations forming the basis for this Motion have not materially changed, the Court will consider the Motion.

[2] Each party made objections to the other's evidence.  Dkts. 42-13, 47, 52.  However, it is well established that district courts may "consider hearsay in deciding whether to issue a preliminary injunction."  See Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir. 2009).  Therefore, the Court has independently considered the evidence and has given the appropriate weight to facts that may be based on inadmissible evidence.  The Court has not considered facts that are irrelevant.

without notice, including when the property "poses an immediate threat to the health or safety of the public," id. § 56.11(3)(g), "constitutes evidence of a crime or contraband," id. §56.11(3)(h), or is a "Bulky Item" that is not "designed to be used as a shelter," id. §56.11(3)(i) (Bulky Item Provision). A Bulky Item is "any item, with the exception of a constructed Tent, operational bicycle or operational walker, crutch or wheelchair, that is too large to fit into a 60-gallon container with the lid closed," but not "a container with a volume of no more than 60 gallons used by an individual to hold his or her Personal Property." Id. § 56.11(2)(c). The Ordinance also makes it unlawful for any person to "willfully resist, delay or obstruct a City employee from removing or discarding a Bulky Item." Id. § 56.11(10)(d).

The City enforces the Ordinance through the Bureau of Sanitation (Sanitation) and the Los Angeles Police Department (LAPD), which conduct noticed cleanups and random rapid responses where personal property that does not comply with the Ordinance is seized or destroyed. See id. § 56.11(11); Dkt. 42-1 (Guerrero Decl.) ¶¶ 1-2; Dkt. 42-5 (Pereida Decl.) ¶¶ 1-2; Dkt. 42-6 (Wong Decl.) ¶¶ 4-21. According to Inter-Departmental Correspondence sent by the Sanitation Director, "[b]eginning on January 21, 2020, the CARE program[3] will fully implement the following program adjustments citywide[:] . . . Every CARE and CARE+ team will fully enforce LAMC 56.11 at every location they visit. Compliance means that . . . prohibited Items, such as bulky items . . . will be impounded and disposed of according to law and policy." Dkt. 39 (RJN) Ex. 4, at 2.[4]

---

[3] CARE and CARE+ are acronyms for the City's Comprehensive Cleaning and Rapid Engagement Program. Wong Decl. ¶ 2. CARE teams "clean the public right-of-way and address enforcement and emergency-response to mitigate illegal dumping and/or items stored in the public right-of-way" while CARE+ teams "provides public health services to encampments." Id. ¶ 4.

[4] The Court GRANTS Plaintiff's unopposed request for judicial notice of the official government reports prepared by Sanitation. Fed. R. Evid. 201(b).

**B.     Enforcement of the Ordinance Against Individual Plaintiffs**

**1.     Diocson**

Diocson is 51 years old and has lived in the Harbor City area of Los Angeles for the past four or five years.  Dkt. 38-5 (Diocson Decl.) ¶ 2.  Until 2018, Diocson lived near the Harbor City Greenway around Lomita Boulevard.  Id. ¶¶ 3-4.  Diocson later moved to an encampment near Lomita and McCoy, where he lives with his dog Bella.  Id. ¶¶ 5-6.

On the morning of April 24, 2019, LAPD and Sanitation came to the area for a noticed sweep.  Id. ¶ 8; see also Wong Decl. ¶ 23.  Diocson had moved Bella out of the area prior to the sweep.  Diocson Decl. ¶ 9.  As Diocson was about the leave the area with his belongings, an LAPD officer told Diocson he would have to leave Bella's kennel behind because it was a Bulky Item.  Id. ¶¶ 11-12.  The City "prepared a report [about the April 24 cleanup] documenting the posting, cleanup, and health hazard assessments as part of their regular duties."  Wong Decl. ¶ 24 & Ex. 4.  The report identifies a pet cage as contaminated and did not "identify the pet cage as a bulky item."  Id. ¶ 26 & Ex. 4, at 76, 90.[5]

Diocson was able to get a new dog kennel, but it was also destroyed by Sanitation in late 2019 as part of a clean-up.  Diocson Decl. ¶¶ 14-15.  Diocson has not tried to get a third kennel because he believes the City will just take it again.  Id. ¶ 16.

Diocson also has a storage bin that he is worried the City will consider a Bulky Item and destroy because City workers have

---

[5] It is not clear that this pet cage belonged to Diocson.  The identified pet cage was listed as "unattended," Wong Decl. Ex. 4, at 76, even though Diocson declares he was present at the time of the cleanup and that his other belongings were stacked on top of the kennel as he was about to carry them out of the area.  Diocson Decl. ¶¶ 10-12.  And unlike the picture authenticated by Ashley, the picture authenticated by Diocson, see Wong Decl. Ex. 6, at 120-21; Diocson Decl. ¶ 12 & Ex. A, does not have any description tying it to one of the locations in the report.

destroyed other bins that were the same size.  Id. ¶ 17.  When the City destroyed his prior bin (and other items of similar size), the City told him that "they are bulky items and that's why they are taking them and throwing them away."  Id.

### 2.   Ashley

Ashley is 29 years old and has been homeless for years.  Dkt. 38-2 (Ashley Decl.) ¶ 2.  In his spare time, he makes carts out of bicycle and wheelchair wheels so that he can move his (and other's) belongings from place to place and carry groceries and other supplies from the stores to where he is staying.  Id. ¶¶ 3, 5-6.

On May 21, 2019, while he was staying at a large encampment on Lomita and McCoy in the Harbor City area of Los Angeles, Sanitation conducted a noticed cleanup.  Id. ¶ 8; see also Wong Decl. ¶ 23.  During the cleanup, a sanitation worker told Ashley that his two carts and some bedding were "Bulky Items" that he could not take from the cleanup area.  Ashley Decl. ¶ 11.  An LAPD officer told Ashley that "if [he] did not want to go jail, [he] would have to hurry up and move from the area," so he complied.  Id. ¶ 12.  He was not given any documentation about the items he was forced to leave behind, or any written explanation of why they were taken.  Id.  The City, however, prepared a report of the cleanup.  Wong Decl. ¶ 28 & Ex. 8.[6]  The report describes an encampment containing a "[m]etal cart and mattress," but does not state that those items were discarded.  Id. at 140-141.  The report includes a picture of those items with a caption identifying the cart and mattress as "Location 7 bulky item."  Id. at 149.  The

---

[6] The City appears unsure about which encampment was Ashley's.  See Wong Decl. ¶ 30 (describing the items found at location 6 and 7).  From the Court's review of the report, it seems clear that Ashley was living at location 7.  First, the report states that location 6 was "unattended," id. Ex. 8, at 140, but Ashley declared he was there during the cleanup, Ashley Decl. ¶¶ 9-11.  Second, the picture the report identifies as "Figure 7.a. Location 7 bulky item," Wong Decl. Ex. 8, at 149, was authenticated by Ashley as containing his property, Ashley Decl. ¶ 10 & Ex. A.

corresponding Health Hazard Checklist does not address the cart.  Id. at 167.

Ashley thereafter got a new cart that he uses when he goes to the Lomita and McCoy encampment.  Ashley Decl. ¶ 17.  However, because Sanitation comes to that location a "lot,"[7] he worries that Sanitation will determine that his cart is a Bulky Item and throw it away.  Id.

### 3.   KFA

KFA "was founded in 2018 to support the construction of the Bridge Home shelter in Koreatown" and "to support unhoused residents, to form connections between housed and unhoused residents of Koreatown, and to advocate for housing and shelters and other services in the Koreatown community."  Dkt. 38-6 (Nguyen Decl.) ¶ 3. It is "integral" to KFA's mission to "have unhoused persons included in our meetings and participating in advocacy."  Id. ¶ 4.  KFA spends time monitoring cleanups and providing replacement items to people whose belongings have been seized and destroyed pursuant to the Ordinance, which "takes time and resources away from these other advocacy activities."  Id. ¶¶ 6, 10-11.  Specifically, KFA has bought or would buy tents, cots, mattresses, brooms, socks, sleeping bags, blankets, underwear, and warm clothes to replace destroyed property.  Id. ¶¶ 11, 14.  KFA additionally facilitates requests for replacement items by posting on social media so "community members can buy and replace things for our unhoused neighbors," including "a small cart and a cooler" and then a KFA member delivers the items to the unhoused resident who needs it.  Id.  If KFA did not spend time monitoring cleanups and providing replacement items, unhoused members would have a more difficult time "advocat[ing] for themselves, organiz[ing] with [KFA], and ultimately get[ting] into housing."  Id. ¶ 7.

On February 24, 2020, KFA members had planned to attend a meeting about the Bridge Home shelter.  Id. ¶ 8; see also Dkt. 38-3

---

[7] Plaintiffs submit evidence that a cleanup was scheduled to occur in this area on February 13, 2020.  Dkt. 38-1 (Riskin Decl.) Ex. A, at 8.

(Price Decl.) ¶ 3.  However, on their way to the meeting, one member was informed that a cleanup was occurring at 4th and Vermont where Kahn, an unhoused resident served by KFA, lived.  Price Decl. ¶ 3.[8] The KFA members then went to monitor the cleanup, instead of the meeting.  Id. ¶ 5.  They also helped Kahn, who is in a wheelchair, pack up and move his belongings.  Id. ¶¶ 4, 6.  However, once Sanitation and LAPD arrived, they were told to leave.  Id. ¶¶ 7-8.  LAPD Officer Lucero told them that some of Kahn's items, including pallets, were Bulky Items that could not be taken out of the area.  Id. ¶ 9.  A Sanitation worker also stated that "some of Kahn's belongings were bulky items that would not fit in a 60 gallon container," including "the pallets and a foam cushion that Kahn uses to sleep on."  Id. ¶ 10.  The items identified by LAPD and Sanitation as Bulky Items were thrown away.  Id. ¶ 11.

## II. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as a matter of right."  Winter v. Natural Res. Def. Council, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Id. at 20.  Although a plaintiff seeking a preliminary injunction must make a showing on each factor, the Ninth Circuit employs a "version of the sliding scale" approach where "a stronger showing of one element may offset a weaker showing of another."  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-35 (9th Cir. 2011).  Under this approach, a court may issue a preliminary

---

[8] The City appears to interpret the inclusion of this evidence as KFA seeking injunctive relief on behalf of its members or other unhoused residents.  Opp'n at 8.  Nothing in Plaintiffs' Motion leads the Court to that conclusion.  Rather, inclusion of this evidence tends to support KFA's organizational standing by providing a recent example where KFA had to divert time and resources based on an application of the Bulky Item Provision.  The same is true for the Bettega Declaration.

injunction where there are "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff . . . , so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Id. at 1135 (internal quotation marks omitted). "When the government is a party, the last two factors (equities and public interest) merge." E. Bay Sanctuary Covenant v. Trump, 950 F.3d 1242, 1271 (9th Cir. 2020).

## III. DISCUSSION

### A.   Standing

"To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009).

#### 1.   Individual Plaintiffs

Diocson and Ashley both declared that when the City took and destroyed their property, City employees told them they were doing so because those belongings constituted Bulky Items. Diocson Decl. ¶ 12; Ashley Decl. ¶ 11. Further, both individuals declared that they now possess items the City is likely to deem Bulky Items and that they live in an area with frequent cleanups.[9] See Diocson Decl. ¶¶ 15, 17, 19; Ashley Decl. ¶¶ 4-5, 17. And the City has stated its intention to enforce the Bulky Item Provision until the Court orders otherwise. See RJN Ex. 4, at 2 ("Every CARE and CARE+ team will fully enforce LAMC

---

[9] It does not matter whether the cleanups are noticed cleanups or rapid response cleanups; the City relies on the Bulky Item Provision in both situations to seize and destroy property. See, e.g., Wong Decl. ¶ 45 ("[B]ulky [I]tems are addressed as part of CARE+ posted cleanups or CARE enforcement and response to immediate threats to the health and safety of the public.").

56.11 at every location they visit.  Compliance means that . . .
prohibited Items, such as bulky items . . . will be impounded and
disposed of according to law and policy."); see also Dkt. 48-1 (Suppl.
Myers Decl.) ¶ 23 & Ex. E.  This is sufficient to establish standing.

The City contends Diocson and Ashley do not have standing
because they have not submitted conclusive evidence that their
property has been destroyed pursuant to an application of the Bulky
Item Provision.  See Opp'n at 7; Dkt. 55 (Objs. to Tentative)[10] at 1.
However, Plaintiffs need not conclusively establish that they have been
harmed by an application of the Bulky Item Provision in the past, so
long as it is sufficiently likely that they will be harmed in the imminent
future.  See Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158
(2014) ("An allegation of future injury may suffice if the threatened
injury is 'certainly impending,' or there is a '"substantial risk" that the
harm will occur.'").  Plaintiffs have sufficiently made that showing by
submitting evidence that they possess Bulky Items and live near areas
subject to frequent cleanups and the City has stated its intention to
"fully enforce LAMC 56.11 at every location they visit" including
"impound[ing] and dispos[ing] of [Bulky Items] according to law and
policy."  RJN Ex. 4, at 2.

In any event, Plaintiffs have submitted evidence that the Bulky
Item Provision was applied to them in the past.  The City argues that
the reports prepared by its employees stated that the destroyed items
belonging to Ashley and Diocson were health and safety hazards, not
Bulky Items, and therefore were not seized and destroyed pursuant to
the Bulky Item Provision.  See Opp'n at 7 (citing Wong Decl. ¶¶ 24-30
& Exs. 4, 8).  This is simply untrue for Ashley's carts.  See Wong Decl.
Ex. 8, at 140, 167.  Further, the City has not adequately demonstrated

---

[10]  The Court notes that the City filed its objections five hours after the
deadline set by the Court.  See Dkt. 53 ("The City may submit objections to
the tentative ruling (not to exceed five pages) no later than noon on April 6.").
Although the Court warned the City that "[i]f no timely objections are filed,
the tentative order will be the final order," id., the Court will exercise its
discretion to consider the City's objections.

that the pet cage referred to in the cited report was Diocson's property, nor does it sufficiently show that the pet cage was destroyed because it was a health and safety hazard.  The mere listing of a pet cage as "contaminated," Wong Decl. Ex. 4, at 90, does not clearly indicate that the item was destroyed because it was a health hazard and not a Bulky Item, and the identification of urine and aerosols in the area is not tied to the pet cage.  Mr. Wong's conclusion that "[t]he pet cage was discarded because of health and safety hazards identified in the Report," Wong Decl. ¶ 26, lacks foundation.  Mr. Wong does not declare that he was present at the clean-up or spoke with the Environmental Compliance Inspectors or other City employees who were present at the clean-up and threw away the pet cage.  Mr. Wong's conclusion appears to be based on his reading of the report, which is inconclusive. Diocson and Ashley have standing.[11]

### 2.   KFA

The City contends that although the Court found KFA to have sufficiently alleged standing at the pleading stage, it must submit "competent evidence establishing organizational standing" at the

---

[11] The City objects to this conclusion, asserting that it "submitted sworn testimony that the items at issue were destroyed for health and safety reasons."  Objs. to Tentative at 5.  The Court disagrees for the reasons discussed above: Mr. Wong lacks foundation to make such a statement and the reports authenticated by Mr. Wong do not establish that Plaintiffs' property was destroyed for health and safety reasons.  Additionally, the City's objections do not address the Court's conclusion that the report most likely tied to Ashley does not state that his cart and bedding were destroyed for health and safety reasons.  Dkt. 54 (Tentative Order) at 5-6 & n.6. Further, the reports are not necessarily "inconsistent with Plaintiffs' declarations."  Objs. to Tentative at 2.  Assuming that the City could locate additional evidence tying the portions of the reports cited by the City to Plaintiffs, it is possible both that City employees initially seized Plaintiffs' items because they were Bulky Items and that it later discovered that the items were contaminated and made a notation reflecting that fact before destroying them.

preliminary injunction phase and has failed to do so. Opp'n at 7. The
City cites no cases in support of this additional burden and, in any
event, is incorrect. KFA's co-founder Jane Nguyen declared that KFA's
mission is to "to support unhoused residents, to form connections
between housed and unhoused residents of Koreatown, and to advocate
for housing and shelters and other services in the Koreatown
community," that it is "integral" to KFA's mission to "have unhoused
persons included in our meetings and participating in advocacy," that
the cleanups have caused unhoused residents to lose contact with KFA
and discouraged them from going to appointments and KFA meetings
for fear that all of their belongings will be thrown away while they are
gone, and that KFA has had to spend time monitoring cleanups and
providing replacement items to people whose belongings have been
seized and destroyed pursuant to the Ordinance, which "takes time and
resources away from these other advocacy activities." Nguyen Decl.
¶¶ 3-7, 10-11. Nguyen also declared that she coordinated the
replacement of "a small cart and a cooler" and provided a cot to an
unhoused member of KFA and that mattresses destroyed by cleanups
are "the type of thing Ktown for All would pay to replace." Id. ¶¶ 11,
14.[12] And KFA members spent time monitoring a cleanup where
alleged Bulky Items were taken and thrown away. Price Decl. ¶¶ 9-11;
see also Dkt. 38-4 (Emmons Decl.) Ex. A. This is sufficient under La
Asociacion de Trabajadores de Lake Forest v. City of Lake Forest, 624
F.3d 1083 (9th Cir. 2010).[13]

---

[12] Although Nguyen has declared that KFA has not "directly provided carts or
crates," Nguyen Decl. ¶ 11, the items it does provide are often needed because
of the destruction of a Bulky Item. For example, one homeless individual and
KFA member, Rachelle Bettega, had storage bins containing two phones,
cleaning supplies, and clothes that were seized and destroyed as Bulky Items.
Dkt. 38-7 (Bettega Decl.) ¶ 11. Bettega then had to keep her remaining
clothes in a garbage bag, which does not protect the clothes from getting wet
when it rains. Id. ¶ 12. After her clothes got wet, KFA bought new clothes
for Bettega. Id.

[13] The City raises a number of arguments, Opp'n at 7-8, that were explicitly
considered and rejected in the Court's prior order, see Dkt. 37 (12(b)(1) Order)

The City also objects to Plaintiffs' standing "to obtain an injunction enjoining enforcement of the [Bulky Item] Provision, not only as to them, but citywide."  Objs. to Tentative at 1.  However, "if the arguments and evidence show that a statutory provision is unconstitutional on its face," as the Court concludes Plaintiffs have a likelihood of success in establishing here, "an injunction prohibiting its enforcement is 'proper.'"  See Whole Woman's Health v. Hellerstedt, 136 S. Ct. 2292, 2307 (2016), as revised (June 27, 2016).  Moreover, the Ninth Circuit has held that "an injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit-even if it is not a class action-*if such breadth is necessary to give prevailing parties the relief to which they are entitled.*"  Easyriders Freedom F.I.G.H.T. v. Hannigan, 92 F.3d 1486, 1501-02 (9th Cir. 1996) (quoting Bresgal v. Brock, 843 F.2d 1163, 1170-71 (9th Cir.1987)).  In Easyriders, where plaintiffs challenged a California Highway Patrol policy permitting stops of motorcyclists for wearing certain helmets, the court noted that "it is unlikely that law enforcement officials who were not restricted by an injunction governing their treatment of all motorcyclists would inquire before citation into whether a motorcyclist was among the named plaintiffs" and therefore "the plaintiffs would not receive the complete relief to which they are entitled without statewide application of the injunction."  Id. at 1502.  Similarly, here it is unlikely that City employees would inquire before seizing property whether a homeless person was a plaintiff in this action.  Other district courts considering

---

at 7-10.  Moreover, the Ninth Circuit has since made even clearer that 1) organizations "are not required to demonstrate some threshold magnitude of their injuries; one less client that they may have had but-for the Rule's issuance is enough" and 2) a "'legally protected interest' need not be a statutorily created interest" and "an interest can support standing even if it is not protected by law."  E. Bay Sanctuary Covenant, 950 F.3d at 1266-67 (internal citations and footnote omitted).  The City also complains that KFA does not differentiate between noticed and unnoticed cleanups.  Opp'n at 8.  However, the City does not explain how this is relevant to standing to challenge the Bulky Item Provision, which applies in both situations.

similar issues have reached the same conclusion.  See, e.g., Justin v. City of Los Angeles, No. CV0012352LGBAIJX, 2000 WL 1808426, at *3 (C.D. Cal. Dec. 5, 2000) (Homeless plaintiffs alleging harassment by City employees, including illegal searches and seizures "will not receive the complete relief to which they are entitled if the applicability of the injunction is narrowed to the named Plaintiffs").

## B.   Likelihood of Success on the Merits

### 1.   Unreasonable Seizures

Plaintiffs are likely to succeed on the merits of their claim that the Bulky Item Provision authorizes unreasonable seizures in violation of the Fourth Amendment by permitting the seizure and immediate destruction of Bulky Items without a warrant or pursuant to a warrant exception or in a way otherwise consistent with the Supreme Court's precedents.  See Dkt. 36 (12(b)(6) Order) at 6-12 (analyzing whether Plaintiffs had sufficiently alleged a facial challenge to the Bulky Item Provision under the Fourth Amendment).  The City makes a number of arguments in the hope that the Court will reach a different conclusion. Each argument fails.

First, the City argues that "the Bulky Item Provision regulates conduct—in public (not private) spaces—not property" by prohibiting "the storage of the Bulky Items in public" not—"the Bulky Items themselves." Opp'n at 10.  This ignores the plain language of the Provision, which authorizes the City to "remove and . . . discard any Bulky Item."  LAMC 56.11(3)(i).  If the provision merely prohibited the storage of Bulky Items in public spaces, the City would not be authorized to destroy property that was stored in violation of the provision.  Lavan v. City of Los Angeles, 693 F.3d 1022, 1029 (9th Cir. 2012) ("Violation of a City ordinance does not vitiate the Fourth Amendment's protection of one's property").[14]  As the court in Lavan

---

[14] The City clearly understands this; later in its brief it acknowledges that the California anti-dumping statute, California Penal Code § 374.3, which

noted, "[w]ere it otherwise, the government could seize and destroy any illegally parked car or unlawfully unattended dog without implicating the Fourth Amendment."  Id.  The question here is not whether the City can "limit the size of items that a person can store in a finite public space," Opp'n at 10, but whether it can seize and destroy items because they are of a particular size.[15]  Plaintiffs have shown they are likely to succeed in answering that question in the negative.

Next, the City argues that there need not be a warrant or applicable warrant exception before seizing and destroying Bulky Items because it is reasonable to do so when "balanc[ing] the competing interests," such as "the public's interest in using that public space." Opp'n at 11.  The City acknowledges that it is not necessarily one particular Bulky Item that negatively affects the public's interests, but rather "the accumulation of these items in the aggregate that justifie[s] their removal from the public right of way."  Id. at 11-12.  As a general principal, the City is correct that "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 665 (1989). And as the City indicates, the Supreme Court has established random checkpoints and drug testing as situations where individualized suspicion is not necessary.  See Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 449-51 (1990) (sobriety checkpoints do not violate the Fourth Amendment because the "magnitude of the drunken driving problem [and] the States' interest in eradicating it" outweighs the "slight" "intrusion on motorists stopped briefly at sobriety checkpoints"); United States v. Martinez-Fuerte, 428 U.S. 543, 557 (1976) (border checkpoints do not violate the Fourth Amendment

_____

makes it unlawful to dump waste, "do[es] not authorize property removal," Opp'n at 24.

[15] To that end, the City's example is illustrative.  Assuming the Fourth Amendment applied to the cited airline, while the airline might be able to limit the size of carry-on bags, it would not be able to take and throw away carry-on bags that exceeded the size limit.

because "the need to make routine checkpoint stops is great" and "the consequent intrusion on Fourth Amendment interests is quite limited"); Von Raab, 489 U.S. at 677  (drug testing by government employer does not violate Fourth Amendment where employees "seek to be promoted to positions that directly involve the interdiction of illegal drugs or that require the incumbent to carry a firearm").  But these limited exceptions carved out by the Supreme Court do not support the proposition that a reasonableness balancing test has in every situation replaced the warrant or exception standard.[16]  Rather, as Plaintiffs point out, the Ninth Circuit has explicitly "decline[d] to establish a general exception to the Fourth Amendment's warrant requirement for conduct that, absent special needs consistent with the Supreme Court's precedents, is asserted to be 'reasonable.'"  Menotti v. City of Seattle, 409 F.3d 1113, 1154 (9th Cir. 2005); see also City of Los Angeles, Calif.

---

[16] In any event, the reasoning behind these cases is distinguishable.  Unlike the temporary stop in Michigan Department and Martinez-Fuerte, or the "trace amount of cocaine" destroyed in Jacobsen, homeless individuals' interest in their property, including Bulky Items, is anything but "slight," "limited," or "unnoticed."  See Lavan, 693 F.3d at 1032 ("For many of us, the loss of our personal effects may pose a minor inconvenience.  However, . . . the loss can be devastating for the homeless" (alteration in original) (quoting Pottinger, 810 F. Supp. at 1559)).  Plaintiffs have demonstrated the importance of these items to the people who own them.  See, e.g., Ashley Decl. ¶ 5 (uses cart "to pick up groceries and supplies I need to survive"); Diocson Decl. ¶¶ 7, 17 (dog cage "gave [him] peace of mind and made it possible to keep [his dog] with [him] while [he] was sleeping in [his] tent" and storage bins "use[d] to store [his] belongings and to keep them dry"); Price Decl. ¶ 10 (pallets and a foam cushion that homeless individual uses to sleep on); Bettega Decl. ¶¶ 6, 9, 11 (bicycle necessary to get to her job, "crates to make herself a bed so that she could stay off the wet ground," and bins to keep her belongings dry).  The City mischaracterizes this footnote as improperly "concluding that all Bulky Items are life necessities."  Objs. to Tentative Order at 2.  The Court provides these examples only to demonstrate that homeless individuals' interests in their property are not "slight," "limited," or "unnoticed."  It asserts no conclusions about "all Bulky Items."

v. Patel, 576 U.S. 409 (2015) (noting that the Supreme Court has established warrant exceptions, such as the administrative search exception, "where special needs . . . make the warrant and probable-cause requirement impracticable . . . and where the 'primary purpose' of the searches is '[d]istinguishable from the general interest in crime control'" (internal citations and quotation marks omitted) (first and third alteration in original)).

The only Supreme Court case cited by the City applying a balancing test to the permanent seizure of property, United States v. Jacobsen, 466 U.S. 109, 125 (1984), has been limited by the Ninth Circuit to situations where the seized property was entirely contraband. See United States v. Young, 573 F.3d 711, 720-21 (9th Cir. 2009) (declining "to expand Jacobsen's decision to warrantless searches of private residences" and distinguishing Jacobsen on the grounds that "neither the hotel room nor the backpack contained only contraband"). The City contends that the Ninth Circuit in Lavan "fram[ed] [the] inquiry as whether City 'acted reasonably under the Fourth Amendment.'" Opp'n at 13; see also Objs. to Tentative at 3 n.5 (The Ninth Circuit "applied a 'reasonableness' (not warrant-or-exception) standard to the seizure of property of persons experiencing homelessness."). However, the only issue necessarily decided by the Ninth Circuit was that "the unattended property of homeless persons is [not] uniquely beyond the reach of the Constitution, so that the government may seize and destroy with impunity the worldly possessions of a vulnerable group in our society." Lavan, 693 F.3d at 1033. Nevertheless, the Court acknowledges that the Ninth Circuit noted its approval of the district court's balancing of the "possessory interests in [homeless plaintiffs'] personal belongings against the City's reasons for taking the property to conclude that [plaintiffs] demonstrated a strong likelihood of success on the merits of their claim that by collecting and destroying [plaintiffs'] property on the spot, the City acted unreasonably in violation of the Fourth Amendment." Id. at 1030. In Lavan, the district court held that the seizures of homeless individuals' unattended property violated the Fourth Amendment because the City's interest in keeping the City clean and safe was not

sufficient to render reasonable the deprivation of plaintiffs' property. Lavan v. City of Los Angeles, 797 F. Supp. 2d 1005, 1015 (C.D. Cal. 2011). It noted that at least four other district court cases that "considered the issue . . . found that similar conduct, even by the same defendant in this case, violated the Fourth Amendment despite an inherent interest in keeping public areas clean and prosperous." Id. (collecting cases). In any event, whether the Court requires a warrant or an exception or employs a reasonableness balancing test, the result is the same – Plaintiffs are likely to succeed on their Fourth Amendment claim.

The City contends that the Court "hardly references the countervailing evidence submitted by Defendants, consisting of 12 declarations and hundreds of pages" and "dismissed [some of the City's evidence] out-of-hand on the basis that it appears inconsistent with Plaintiffs' declarations." Objs. to Tentative at 2. But the Court did not disregard the City's evidence because it was "countervailing" or "inconsistent," but rather because the City failed to show why its evidence was relevant. For example, four of the declarations and nearly two hundred pages are dedicated solely to authenticating pictures of homeless encampments with items stored in public areas. See Guerrero Decl.; Pereida Decl.; Dkt. 42-11 (Ramirez Decl.); Dkt. 42-12 (Rankin Decl.). That a large number of items are stored in public places by homeless residents is undisputed, but the City does not sufficiently address how this fact renders seizures pursuant to the Bulky Item Provision constitutional. Another declaration describes the Harbor City Greenway project that was purportedly derailed because of vandalism, theft, and illegal activities in the area. Dkt. 42-4 (Haines Decl.). Although that was certainly unfortunate, the City again fails to adequately address how the increase in crime and presence of homeless people, some of whom may be participating in illegal activity, provides justification for seizing and throwing away Bulky Items. The Bulky Item Provision has no bearing on the City's power to prosecute individuals who commit crimes such as vandalism or theft. Five other declarations describe the personal experience of City employees who receive complaints from residents about, and frequently encounter,

Bulky Items.  Dkt. 42-3 (Medina Decl.); Dkt. 42-7 (Rodriguez Decl.);
Dkt. 42-8 (Banks Decl.); Dkt. 42-9 (Bernal Decl.); Dkt. 42-10 (Diaz
Decl.).  The declarations describe problems relating to the accumulation
of "large items in the public right of way that are larger than could fit
in a 60-gallon container with the lid closed," but they 1) describe
scenarios that could be addressed without with Bulky Item Provision or
2) do not clarify whether the described Bulky Items appear to be
someone's property or the result of dumping.[17]  <u>See, e.g.</u>, Medina Decl.
¶ 4 (describing Bulky Items that "block[] access for individuals with
disabilities, . . . impede sidewalks, driveways, access to alleys, and
parking spaces."); <u>id.</u> ¶ 6 ("[T]he chronic and recurring presence of
these large items on the sidewalk . . . poses a danger to children when
they are forced to walk into the street"); <u>id.</u> ¶ 7 ("[T]he accumulation of
such items makes it difficult for trash collection and emergency
vehicles to access this area"); Rodriguez Decl. ¶ 3 (describing "children
walking to school [that] are accompanied by a parent with a younger
child in a stroller, or an elderly grandparent, and they are all forced to
walk along the street curb or next to parked cars in the street to
navigate around large items obstructing the sidewalks"); <u>id.</u> ¶ 4 ("The
accumulation of such large items [near homeless encampments] can
make it difficult to pass through these alleys, and can make it more
onerous for trash collectors to service the trash bins in those alleys");
Banks Decl. ¶ 7 (describing constituent complaint about "a man using a
wheelchair [who] had trouble traversing the sidewalk due to the
presence of the structure").  Taken together, the City's evidence
identifies varied and widespread problems relating to homeless people,
including increased crime and accumulation of items on sidewalks, but
does not explain why those issues cannot be addressed by other
provisions of the Ordinance (or other ordinances or statutes) or how the

---

[17] The City refers to items that are clearly dumped or abandoned, such as
"mattresses, couches, doors, carpet, toilets, electrical waste and other
furniture and large items" that were collected from "residential and multi-
family residential buildings," as Bulky Items.  <u>See</u> Wong Decl. ¶¶ 41-42.
When City employees refer to Bulky Items, therefore, it is not clear that they
are referring to items for which Fourth Amendment protections apply.

existence of those problems justifies the Bulky Item Provision as the solution.  The City's evidence, when balanced against homeless residents' interests in not having their property seized and destroyed, would not make seizures pursuant to the Bulky Item Provision reasonable.

Next, the City contends that Plaintiffs have failed to analyze the constitutionality of the part of the Bulky Item Provision that applies to unattended items.  Opp'n at 15.  As noted in the 12(b)(6) Order, LAMC § 56.11(3)(a) permits the City, with pre- and post-removal notice, to impound any unattended property regardless of size.  Id. at 10.[18] Therefore, the only work the Bulky Item Provision does as to unattended items is to permit the immediate destruction of unattended items over a certain size without having to provide any notice.  As the Court previously held, and consistent with Ninth Circuit precedent, this is unreasonable.  See Lavan, 693 F.3d at 1030 ("[E]ven if the seizure of the property would have been deemed reasonable had the City held it for return to its owner instead of immediately destroying it, the City's destruction of the property rendered the seizure unreasonable.").  For these reasons and the reasons stated in the 12(b)(6) Order, the seizure and immediate destruction of Bulky Items only because they are Bulky Items is unreasonable.

To the extent the City contends that it is too complex to determine whether an item is attended, unattended, or abandoned, that is not a reason to keep the Bulky Item Provision in place.  The City must already determine whether items are abandoned or unattended in enforcing each of the Ordinance's provisions, as well as various other statutes and ordinances.  See, e.g., Cal. Civ. Code § 2080 et seq.  The Bulky Item Provision relieves the City from making this determination for items of a certain size, which surely makes it easier to clean up sidewalks.  But a rule that permitted deprivation of property by the government whenever it simply made its job easier would eviscerate

---

[18] Plaintiffs have not sought – and the Court has not imposed – an injunction as to LAMC § 56.11(3)(a).

the Fourth Amendment.[19]  And just because the City may on occasion
incorrectly determine that unattended property is abandoned does not
justify seizing and destroying property that the City knows or
reasonably believes is unattended but not abandoned.  The Court
agrees with the district court in <u>Lavan</u> that it is sufficient if the City
employee has "an objectively reasonable belief that it is abandoned."
797 F. Supp. 2d at 1020.  Moreover, it is unclear why the City continues
to attack "Plaintiffs' view" that all items in an area with encampments
must be treated as either attended or unattended personal property.
Opp'n at 16.  To be clear, Plaintiffs do not make this argument.  To the
contrary, Plaintiffs explicitly acknowledge that items near
encampments can constitute trash (because there are not enough trash
cans near encampments) or abandoned property from individuals not
living at the encampments.  <u>See, e.g.</u>, Diocson Decl. ¶ 5 ("Sometimes
people also dump their trash in the area"); Dkt. 48-3 (Flowers Decl.) ¶ 5
("There is a lot of illegal dumping that happens on the street where I
stay. . . . When people dump their stuff, the trash just sits there.  There
are no trashcans anywhere around, so the trash just piles up.").  The
City must make a reasonable determination as to whether items are
unattended, abandoned, or trash.  The City's focus on "what the Court
would consider to be 'trash' in the case of Bulky Items on public
sidewalks," Objs. to Tentative at 3, is misplaced.  The preliminary
injunction does not apply to items that the City reasonably determines
are abandoned property or trash.  Finally, to the extent the City
contends that unattended property is deserving of less protection than
attended property, that proposition has already been rejected by the
Ninth Circuit.  <u>Lavan</u>, 693 F.3d at 1024 ("[T]he Fourth and Fourteenth
Amendments protect homeless persons from government seizure and
summary destruction of their unabandoned, but momentarily
unattended, personal property").

---

[19] The City faults the Court for "dismiss[ing] as irrelevant the complexity of
making such determinations," Objs. to Tentative at 3, but does not provide a
convincing or coherent argument explaining why it would be relevant.

The City again raises the practical concerns of having to store all Bulky Items for a limited period of time.  Opp'n at 17-18.  This was previously rejected by the Court, 12(b)(6) Order at 11, and remains unconvincing.  Accepting the City's position would mean that once City storage facilities, or lost and found boxes, or evidence lockers were full, any property seized thereafter by the government could be summarily destroyed.  That does not comport with the Fourth Amendment.[20]

There is certainly no dispute that homelessness is a significant issue affecting Los Angeles (and other cities around the country) and nothing in this Order prevents the City from using its resources to create "shelters or other facilities to provide services and address the humanitarian crisis facing the City."  Opp'n at 18.[21]  However, even in passing LAMC 56.11, the City recognized that some Los Angles citizens will not be able to obtain housing or have other places to store their belongings.  Id. (acknowledging the "needs of the individuals[] who have no other alternatives for the storage of personal property").  Although the City would understandably prefer homeless residents not "appropriate[]" public areas, particularly areas that the City spent millions of dollars revitalizing, see Opp'n at 13, the Bulky Item Provision cannot be the solution to that problem.[22]

---

[20] In support of this argument, the City submits evidence that "less than 15% of items that the City does store are ever retrieved."  Opp'n at 17 (citing Wong Decl. ¶¶ 22, 51, Ex. 3).  However, that evidence could just as easily support the inference that the City is not doing enough to inform homeless individuals how and where to get their property back as whatever the City intends the Court to infer.

[21] The Court doubts that the only two options to balance the needs of the homeless and the cleanliness of the streets are the ones the City identifies in its Opposition.  Opp'n at 17-19.

[22] Nor has it been.  Given that the Bulky Item Provision was in place at all relevant times, it is clear that the presence of the Bulky Item Provision did not avoid the unfortunate outcome described by the City.

Plaintiffs are likely to succeed on their claim that the Bulky Item Provision violates the Fourth Amendment's prohibition on illegal seizures on its face.

### 2.   Due Process

Because the Bulky Item Provision permits the City to remove and permanently destroy Bulky Items without any procedural safeguards whatever, Plaintiffs are likely to succeed on the merits of their due process claim under both the Fourteenth Amendment and the California Constitution.[23]  See 12(b)(6) Order at 12-16 (analyzing whether Plaintiffs had sufficiently alleged a facial challenge to the Bulky Item Provision under the Fourteenth Amendment).  The City's focus on what process is due, Opp'n at 19-22, is misplaced.  The challenged provision provides no process at all.[24]  Therefore, whatever process is due, the Bulky Item Provision does not provide it.[25]

---

[23] "The language of Article I § 7 of the California Constitution is virtually identical to the Due Process Clause of the United States Constitution, with the caveat that California courts place a higher significance on the dignitary interest inherent in providing proper procedure."  Nozzi v. Hous. Auth. of City of Los Angeles, 806 F.3d 1178, 1190 n.15 (9th Cir. 2015) (internal quotation marks and citations omitted), as amended on denial of reh'g and reh'g en banc (Jan. 29, 2016).  The Court will address Plaintiffs' federal and state due process claims together, as it is unnecessary to take the additional factor into account here.

[24] The City's argument that the statute itself constitutes sufficient process, Opp'n at 19 (citing Texaco, Inc. v. Short, 454 U.S. 516, 537 (1982)), has no merit.  In Texaco, the statute was self-executing based on the inaction of the property owner and the Court noted that even then, before the deprivation of property becomes permanent, "the full procedural protections of the Due Process Clause—including notice reasonably calculated to reach all interested parties and a prior opportunity to be heard—must be provided." 454 U.S. at 534.

[25] The City seems to assume that individualized pre-deprivation notice and a hearing would be required.  Opp'n at 21-22.  This Order should not be read to impose such a requirement.  As noted in the 12(b)(6) Order, the Court's

The Court additionally notes that the City's analysis of the risk of erroneous deprivation, Opp'n at 21, glosses over crucial details. City employees apparently do not measure items and determine their volume before summarily seizing and destroying them, compounding the risks of erroneous deprivation because the items no longer exist to be measured. And as Plaintiffs note, the Bulky Item Provision contains certain exceptions that require City employees to exercise additional discretion, such as whether a bike is "operational" or a tent is "constructed." Dkt. 48 (Reply) at 8. Moreover, the City contends that if a mistake was made, that would not be an erroneous deprivation, but rather "an unauthorized application." Opp'n at 21 (citing <u>Hudson v. Palmer</u>, 468 U.S. 517, 533 (1984)). If this were true, there could never be an erroneous deprivation, because each such deprivation could be reframed as an unauthorized application. <u>Hudson</u> does not address the risk of erroneous deprivation standard; it merely holds that due process does not require pre-deprivation process where the deprivation occurred due to a government employee's intentional and unauthorized action so long as meaningful post-deprivation process is available. <u>Id.</u> at 533.[26] The Bulky Item Provision provides for no post-deprivation process at all.

## C.   Irreparable Harm

The Ninth Circuit does "not require a strong showing of irreparable harm for constitutional injuries." <u>Cuviello v. City of</u>

---

conclusion that by providing no process at all the procedural due process clause is violated does not dictate what process is due. The City apparently seeks guidance from the Court as to what process would suffice. Objs. to Tentative at 1 n.3. But the Court may not issue an advisory opinion; it may adjudicate only "concrete legal issues, presented in actual cases, not abstractions." <u>Montana Envtl. Info. Ctr. v. Stone-Manning</u>, 766 F.3d 1184, 1188 (9th Cir. 2014) (quoting <u>Colwell v. Dep't of Health & Human Servs.</u>, 558 F.3d 1112, 1123 (9th Cir. 2009)).

[26] In addition, <u>Hudson</u> applies only to situations where the deprivation was unpredictable, <u>Zimmerman v. City of Oakland</u>, 255 F.3d 734, 738-39 (9th Cir. 2001), which is certainly not the case with the Bulky Item Provision.

<u>Vallejo</u>, 944 F.3d 816, 833 (9th Cir. 2019).  Nevertheless, Plaintiffs have made a strong showing here.

Plaintiffs provide evidence that Ashley and Diocson "are frequently subjected to City sweeps, and every time they are subjected to a sweep, they are at risk of having their constitutional rights violated by the enforcement of the Bulky Item Provision."  Mot. at 15. Further, "the irreparable harm . . . is compounded by the fact that the constitutional violations result[] in the actual and permanent deprivation of their belongings."  <u>Id.</u>  The City does not dispute that such harm is irreparable, but contends that it is not imminent.  Opp'n at 22-23.  The City's argument rests on its position rejected above that Plaintiffs have not "shown that they have suffered any harm from the enforcement of the Bulky Item Provision."  <u>Id.</u> at 23.  But as explained in the Court's prior Order, that the Bulky Item Provision may be enforced during a noticed cleanup does not ameliorate its failure to provide due process.  12(b)(6) Order at 13 n.13.  It is clear from both Plaintiffs' and the City's evidence that the Bulky Item Provision is likely to be enforced imminently against Ashley and Diocson, leading to the permanent destruction of their belongings.  <u>See, e.g.</u>, RJN Ex. 4, at 2; Diocson Decl. ¶¶ 17, 19; Ashley Decl. ¶17; Wong Decl. ¶¶ 23, 45 & Ex. 2; Ramirez Decl. ¶ 4; Rankin Decl. ¶ 4; Medina Decl. ¶ 5.

The City's additional contention that its announcement of its intent to enforce LAMC 56.11 (and therefore the Bulky Item Provision) does not establish an imminent threat of irreparable injury because the Protocols provide adequate protection falls flat.  From the declarations of a small handful of homeless individuals and KFA members, it is clear that the City does not take "extensive measures to . . . safeguard Bulky Items that appear to be someone's property" in accordance with the Protocols.  Opp'n at 23.  Despite the Protocol stating that Sanitation will "work with the individual(s) to allow for the removal of" Attended Bulky Items, including providing additional accommodations for physically or mentally-impaired individuals, Wong Decl. Ex. 1, at 40, the City has routinely seized and destroyed Attended Bulky Items that were in the process of being removed, <u>see</u> Ashley Decl. ¶ 11 ("As I was attempting to comply with LA Sanitation's instructions to remove

my belongings from the area, a sanitation worker stopped me and told me that the carts and bedding were Bulky Items, and therefore I could not take them with me out of the cleanup area"); Diocson Decl. ¶¶ 11-12 ("I was getting ready to move my belongings from the area when . . . Officer Lopez told me that I could not take Bella's kennel with me" because "it was a bulky item and it was too big, so I wasn't allowed to keep it."); Price Decl. ¶ 9 ("The neighbor then asked if he could move some of Kahn's items out of the area, and Nic asked if he could carry the pallets out of the area.  The Sanitation workers said no, that Kahn's items were bulky items and they couldn't take them.").[27]

Plaintiffs contend that KFA is also in imminent danger of irreparable harm because the Bulky Item Provision constitutes "ongoing harms to [its] organizational missions."  Mot. at 16-17 (quoting S.A. v. Trump, No. 18-CV-03539-LB, 2019 WL 990680, at *9 (N.D. Cal. Mar. 1, 2019)).  As explained in detail above, enforcement of the Bulky Item Provision harms KFA's mission and causes KFA to divert resources from advancing its mission in order to help homeless individuals against whom the Bulky Item Provision is being enforced. When KFA spends its limited resources on monitoring cleanups or finding or buying replacement items, it cannot spend those resources on advocating for housing, shelters, and other services for the homeless pursuant to its mission.  The harm caused by not engaging in such activities is intangible and not compensable.  This intangible injury constitutes irreparable harm.  See E. Bay Sanctuary Covenant, 950

---

[27]  The City contends that this paragraph "creates ambiguity for enforcement" because the City provided "at least 24-hour notice" for the clean-ups described by Plaintiffs and therefore the City is "uncertain whether the notices were deficient as to the removal or disposal of items, or both."  Objs. to Tentative at 1 n.3.  But this paragraph has nothing to do with clean-up notices.  It addresses the City's argument that the Protocols provide additional protections absent from the Bulky Item Provision.  And this Order draws no conclusions as to whether specific pre-seizure notices were deficient. That is not an issue properly before the Court because the Bulky Item Provision provides for no process at all.

F.3d at 1280 (Intangible injuries, such as "suffer[ing] a significant change in their programs" constitutes irreparable harm); Valle del Sol Inc. v. Whiting, 732 F.3d 1006, 1029 (9th Cir. 2013) (sufficient showing of irreparable harm where "the organizational plaintiffs have shown ongoing harms to their organizational missions as a result of the statute").

The City also contends, in a footnote, that the harm cannot be imminent because Plaintiffs did not file this Motion until seven months after filing their complaint. Opp'n at 23 n.6. The Court believes that delay is not unreasonable, particularly where Plaintiffs sought expedited discovery in order to determine whether to seek a preliminary injunction. See Dkt. 29.

The City further contends it was "prejudiced by the Court declining to consider changes to the City's enforcement procedures as a result of COVID-19, which are relevant to the analysis of Plaintiffs' alleged imminent harm and other elements of the PI motion." Objs. to Tentative at 4 (citing Dkt. 52 at 4). This significantly misstates the facts. On March 30, 2020, the City filed objections to some of the evidence Plaintiffs submitted in support of their reply brief. Dkt. 52 (Def.'s Objs. to Pls.' Reply). Within that filing, the City stated "[i]f the Court considers Plaintiffs' new reply evidence, then the City should be afforded an opportunity to respond, including submission of evidence regarding the City's emergency orders, compliance with the 'Safer at Home' emergency orders, the Los Angeles County Department of Public Health and CDC guidelines, and changes to the City's operations as a result of COVID-19." Id. at 4 (footnote omitted). The City did not request leave to file a supplemental brief describing changes to the City's enforcement procedures or the impact of COVID-19 on the issues relevant to this Order.[28] Rather, buried within objections to evidence,

---

[28] In any event, even if the "new policies" suspended enforcement of the Bulky Item Provision, that would not impact this order given that the City could start enforcing the Bulky Item Provision again at any time. See F.T.C. v. Affordable Media, 179 F.3d 1228, 1237 (9th Cir. 1999) ("[I]t is actually well-settled 'that an action for an injunction does not become moot merely because

the City conditioned its request on the Court's consideration of certain "new" evidence raised by Plaintiffs in reply.  Because the Court did not consider the reply evidence related to COVID-19, the City's request was moot.  Had the City believed it had new evidence relevant to this Motion, it should have filed a request for leave to file a supplemental brief as soon as practicable.  For whatever reason, the City did not do so.  It cannot now claim it was prejudiced.

## D.   Balance of Equities and Public Interest

Plaintiffs contend that "the public interest is best served by enjoining [sic] unconstitutional or unlawful ordinance[s]."  Mot. at 20 (citing Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012)).  Plaintiffs further note that the Bulky Item Provision is likely to be enforced not just against Plaintiffs, but also against "the more than 9000 people who are compelled to live on the streets in Los Angeles," which further supports the conclusion that enjoining enforcement of the Bulky Item Provision is in the public interest.  Id. (citing Klein v. City of San Clemente, 584 F.3d 1196, 1208 (9th Cir. 2009)).  The City contends that it has a "substantial and legitimate" "health, safety, and welfare interest in the enforcement of the Bulky Item provision."  Opp'n at 25.  However, as Plaintiffs point out, and the City does not address, the City (or the public) can have no interest in the enforcement of a

---

the conduct complained of was terminated, *if there is a possibility of recurrence,* since otherwise the defendant[]s would be free to return to [their] old ways'" (second alteration in original) (quoting F.T.C. v. Am. Standard Credit Sys., Inc., 874 F. Supp. 1080, 1087 (C.D. Cal. 1994)); see also Disney Enters., Inc. v. Redbox Automated Retail, LLC, 336 F. Supp. 3d 1146, 1158 (C.D. Cal. 2018) ("[Defendant's] voluntary decision not to sell certain Codes up to this point in time does not demonstrate a lack of irreparable harm"); Nestle USA, Inc. v. Gunther Grant, Inc., No. CV-13-6754 MMM (ASX), 2014 WL 12558008, at *18 n.77 (C.D. Cal. May 13, 2014) (concluding that plaintiff demonstrated it will suffer irreparable harm absent entry of an injunction even though defendant voluntarily stopped infringing Plaintiff's trademarks because that voluntary decision "does not convince the court that they are not likely to infringe [plaintiff's] marks in the future").

provision that is likely to be found unconstitutional.  See Lavan v. City of Los Angeles, No. CV 11-2874 PSG (AJWx), 2011 WL 1533070, at *6 (C.D. Cal. Apr. 22, 2011) ("[T]he public interest is served by issuance of a TRO in that the City will still be able to *lawfully* seize and detain property, as opposed to unlawfully seizing and immediately destroying property").  Moreover, as other courts have held, the constitutional rights of homeless individuals outweigh the potential hurdles the injunction might pose to the City's efforts to keep the sidewalks clean.  See, e.g., id. at *5 ("[T]he City's interest in having clean parks is outweighed by the more immediate interest of the plaintiffs in not having their personal belongings destroyed." (quoting Pottinger v. City of Miami, 810 F.Supp. 1551, 1573 (S.D. Fla. 1992))); Justin, 2000 WL 1808426, at *11 (risk of violation of constitutional rights outweighs risk that injunction may slow city's efforts to keep the city clean and safe and may disturb the city's "new initiative to revitalize and uplift communities, to improve the streets and sidewalks, and to diminish the crime rate").  The balance of the equities and the public interest tip sharply in Plaintiffs' favor.

The City contends that the requested injunction would "essentially enshrine Bulky Items in constitutional protection and prevent them from being removed from public areas in the City."  Opp'n at 24.  This is obviously untrue.  The requested injunction would merely require the City to treat Bulky Items like every other item stored in public areas, permitting removal in a number of circumstances, including when items are unattended, blocking the sidewalk, or a threat to health and safety.  Similarly, nothing in the requested injunction would hinder the determinations the City presumably makes on a daily basis as to whether items are unattended or abandoned.  Nor would it require the City "to obtain warrants, articulate an exception on item-by-item basis, *and* give notice and hearing opportunities before collecting any Bulky Item."  Id.

Next, the City appears to contend that it has no other authority to remove and throw away trash and other abandoned or dumped items.  Id.  This cannot possibly be true.  If it were, the City would not currently be able to remove or throw away anything too small to

constitute a Bulky Item or anything excluded from the definition of a Bulky Item. That proposition is absurd.

Finally, the City contends that "the injunction Plaintiffs seek would not provide sufficient clarity for the City to understand what justifications would be sufficient to remove a Bulky Item." Id. at 25. Again, the City's argument has no merit. An injunction enjoining enforcement of a specific provision of a specific ordinance could not be clearer.[29] The injunction sought in the case cited by the City was nothing like the injunction sought here. In that case, homeless plaintiffs sought to enjoin enforcement of various unlisted statutes and ordinances only against homeless plaintiffs and only "for life-sustaining activities such as sleeping, sitting or remaining in a public place." Joyce v. City & Cty. of San Francisco, 846 F. Supp. 843, 851 (N.D. Cal. 1994). The district court noted that the phrase "such as" was "malleable" and therefore the proposed injunction was "fundamentally uncertain as to what conduct would be immunized from governmental prohibition." Id. Here, there is no malleable phraseology. The City simply may not enforce two provisions of the Ordinance. Given that the City has repeatedly pointed out that the Ordinance has a severability provision, Dkt. 22 (12(b)(6) Mot.) at 7 n.7; Opp'n at 16, the City can certainly comprehend how to enforce the Ordinance if ordered not to enforce certain of its provisions.

The City also appears concerned with what this Order may mean for the constitutionality of the other provisions in the Ordinance. See Objs. to Tentative at 2 ("As a practical matter, when the Order is considered in light of the reasoning that underpins it, it is unclear when the City may or may not remove items that exceed 60 gallons in the public right of way"); id. at 3 (City expressing concern that requiring a warrant or warrant exception "cannot be reconciled" with

---

[29] The City's contention that it is unclear whether certain items can be removed under other provisions of the Ordinance, Opp'n at 25, is wrong. The injunction obviously applies only to the two specified provisions and not any other provision.

other provisions governing items that are unattended, blocking the sidewalk, or a threat to health and safety"); id. at 4-5 (City expressing confusion as to whether certain applications of the health and safety provision of the Ordinance would be constitutional).  But the other provisions of the Ordinance are not before the Court and the preliminary injunction issued here does not enjoin any conduct other than what is explicitly identified below, *i.e.*, enforcement of the Bulky Item Provision and the related penalty provision.  The Court does not opine on the constitutionality of other provisions of the Ordinance; only the provisions explicitly listed below are the subject of the preliminary injunction issued here.

For the foregoing reasons, **IT IS ORDERED** that the request for a preliminary injunction is **GRANTED** as follows:

## IV. PRELIMINARY INJUNCTION

The City of Los Angeles, and its agents and employees, are enjoined from doing any of the following:

1.  Enforcing Section 56.11(3)(i) of the Los Angeles Municipal Code;

2.  Enforcing Section 56.11(10)(d) of the Los Angeles Municipal Code;

3.  Posting signs, notices, or other public information stating that the City will enforce Sections 56.11(3)(i) or 56.11(10)(d) of the Los Angeles Municipal Code.

## V. Bond

Plaintiffs contend that no bond should be required, and the City does not argue otherwise.  The Ninth Circuit has held that Federal Rule of Civil Procedure 65(c) invests "the district court with discretion as to the amount of security required, if any."  Barahona-Gomez v. Reno, 167 F.3d 1228, 1237 (9th Cir. 1999), supplemented, 236 F.3d 1115 (9th Cir. 2001).  Plaintiffs presumably have minimal financial

means and the City has not stated it would suffer any financial harm; therefore, the Court will not require a bond.

IT IS SO ORDERED.

Date: April 13, 2020

Dale S. Fischer
United States District Judge

ACCO,(PLAx),DISCOVERY,MANADR,RELATED-G

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
# CIVIL DOCKET FOR CASE #: 2:19-cv-06182-DSF-PLA

Janet Garcia et al v. City of Los Angeles et al        Date Filed: 07/18/2019
Assigned to: Judge Dale S. Fischer                     Jury Demand: Plaintiff
Referred to: Magistrate Judge Paul L. Abrams           Nature of Suit: 440 Civil Rights: Other
Related Case: 2:18-cv-07670-CAS-PLA                    Jurisdiction: Federal Question
Cause: 42:1983 Civil Rights Act

**Plaintiff**

**Janet Garcia**                    represented by    **Catherine Elizabeth Sweetser**
                                                      Schonbrun Seplow Harris and Hoffman
                                                      LLP
                                                      11543 West Olympic Boulevard
                                                      Los Angeles, CA 90064
                                                      310-396-0731
                                                      Fax: 310-399-7040
                                                      Email: csweetser@sshhlaw.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Kristina A Harootun**
                                                      Schonbrun Seplow Harris and Hoffman
                                                      LLP
                                                      11543 West Olympic Boulevard
                                                      Los Angeles, CA 90064
                                                      310-396-0731
                                                      Fax: 310-399-7040
                                                      Email: kharootun@sshhlaw.com
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Gladys Zepeda**                   represented by    **Kristina A Harootun**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Shayla Renee Myers**
                                                      Legal Aid Foundation of Los Angeles
                                                      7000 S Broadway
                                                      Los Angeles, CA 90003
                                                      213-640-3983
                                                      Fax: 213-640-3988
                                                      Email: smyers@lafla.org
                                                      *ATTORNEY TO BE NOTICED*

Catherine Elizabeth Sweetser
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Miriam Zamora**                  represented by   **Kristina A Harootun**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Romy Colleen Ganschow**
Legal Aid Foundation of Los Angeles
7000 South Broadway
Los Angeles, CA 90003
213-640-3980
Fax: 213-640-3988
Email: rganschow@lafla.org
*ATTORNEY TO BE NOTICED*

**Shayla Renee Myers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Catherine Elizabeth Sweetser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ali El-Bey**                     represented by   **Kristina A Harootun**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Romy Colleen Ganschow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shayla Renee Myers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Catherine Elizabeth Sweetser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Peter Diocson Jr.**              represented by   **Kristina A Harootun**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Romy Colleen Ganschow**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Shayla Renee Myers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Catherine Elizabeth Sweetser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marquis Ashley**                    represented by   **Kristina A Harootun**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Romy Colleen Ganschow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shayla Renee Myers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Catherine Elizabeth Sweetser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Haugabrook**                   represented by   **Kristina A Harootun**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Romy Colleen Ganschow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shayla Renee Myers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Catherine Elizabeth Sweetser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ktown for All**                       represented by   **Benjamin A Herbert**
*an unincorporated association*                          Kirkland & Ellis LLP
333 South Hope Street 30th Floor
Los Angeles, CA 90071
213-680-8577

Fax: 213-680-8500
Email: benjamin.herbert@kirkland.com
*ATTORNEY TO BE NOTICED*

**Kristina A Harootun**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Romy Colleen Ganschow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shayla Renee Myers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William L Smith**
Kirkland and Ellis LLP
333 South Hope Street 29th Floor
Los Angeles, CA 90071
213-680-8273
Fax: 213-680-8500
Email: william.smith@kirkland.com
*ATTORNEY TO BE NOTICED*

**Catherine Elizabeth Sweetser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Association for Responsible and Equitable Public Spending**
*an unincorporated association*

represented by

**Kristina A Harootun**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Catherine Elizabeth Sweetser**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**City of Los Angeles**
*a municipal entity*

**Defendant**

**Does**
*1-50*