1
2
3
4
5
6
7
8
9
10

Shayla Myers (SBN 264054)
Mallory Andrews (SBN 312209)
Alex Flores (SBN 303552)
LEGAL AID FOUNDATION OF LOS ANGELES
7000 South Broadway
Los Angeles, CA  90003
Telephone:  (213) 640-3983
Email:  smyers@lafla.org
        mbandrews@lafla.org
        aeflores@lafla.org

*Attorneys for Gladys Zepeda, Miriam Zamora,
Ali El-Bey, James Haugabrook, Pete Diocson Jr.,
Marquis Ashley, and Ktown for All*

*Additional Attorneys on Next Page*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANET GARCIA et al. | CASE NO. 2:19-cv-06182-DSF-PLA |
| Plaintiffs, | |
| v. | **REQUEST FOR JUDICIAL NOTICE OF GOVERNMENT DOCUMENTS AND COURT RECORDS** |
| CITY OF LOS ANGELES, a municipal entity, | |
| Defendants. | Complaint Filed Date:  July 18, 2019 |
| | Judge:          Hon. Dale S. Fischer |
| | Hearing Date:  September 14, 2020 |
| | Time:            1:30 p.m. |
| | Courtroom:    7D |

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR OSC RE CIVIL CONTEMPT AND SANCTIONS**

Catherine Sweetser (SBN 271142)
Kristina Harootun (SBN 308718)
John Washington (SBN 315991)
SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP
11543 West Olympic Blvd.
Los Angeles, CA 90064
Telephone: (310) 396-0731
Email: csweetser@sshhlaw.com
        kharootun@sshhlaw.com
        jwashington@sshhlaw.com

*Attorneys for Plaintiffs*

Benjamin Allan Herbert (SBN 277356)
William L. Smith (SBN 324235)
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone: (213) 680 8400
Email: benjamin.herbert@kirkland.com
        william.smith@kirkland.com

Michael Onufer (SBN: 300903)
KIRKLAND & ELLIS LLP
2049 Century Park East,
Los Angeles, CA 90067
Telephone: (213) 680-8400
Email: michael.onufer@kirkland.com

*Attorneys for Plaintiffs Ktown for All, Janet Garcia,*
*Peter Diocson Jr., Marquis Ashley, and Ali El-Bey*

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF**
**MOTION FOR OSC RE: CIVIL CONTEMPT AND SANCTIONS**

**TO THE COURT, DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

Pursuant to Rule 201 of the Federal Rules of Evidence, Plaintiffs respectfully request that the Court take judicial notice of the following documents and files:

1.  Los Angeles Municipal Code Section 56.11, attached as Exhibit 1.

2.  Los Angeles Municipal Code 56.11 Standard Operating Protocols, amended as of September 2018, attached as Exhibit 2.

3.  Proceedings at Los Angeles City Council hearing on July 1, 2020, Communication Access Real-Time Translation ("CART") transcript attached as Exhibit 3 and video of proceedings lodged with Plaintiffs' Notice of Lodging as Exhibit 4.

4.  Proceedings at Los Angeles City Council hearing on July 29, 2020, CART transcript attached as Exhibit 5 and video of proceedings lodged with Plaintiffs' Notice of Lodging as Exhibit 6.

5.  Official action of the Los Angeles City Council file no., 20-0147, attached as Exhibit 7.

6.  Adopted Los Angeles City Council motions 72-P and 72-P-A, file no., 20-0147, attached as Exhibit 8.

7.  Adopted Los Angeles City Council motion, file no., 20-0147, attached as Exhibit 9.

8.  Excerpts from the City of Los Angeles FY 2020-21 detail of departmental programs supplement to the 2020-21 adopted budget, volumes I & II, attached as Exhibit 10.

9.  Appellant's opening brief, *Janet Garcia, et al., v. City of Los Angeles*, No. 20-55522, (9th Cir.) filed June 26, 2020, attached as Exhibit 11.

10. Los Angeles Mayor Garcetti's March 4, 2020 COVID-19 emergency declaration, attached as Exhibit 12.

Federal Rule of Evidence ("Fed. R. Evid.") 201 permits a Court to take judicial notice of a "fact that is not subject to reasonable dispute because it (1) is generally known with the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably be questioned". Fed. R. Evid. 201(b).

Request 1 is a municipal ordinance and request 2 is the standard operating procedures adopted by LA Sanitation related to the enforcement of LAMC 56.11. This

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF APPLICATION FOR CONTEMPT**

Court has previously granted both Plaintiffs' and Defendants' Requests for Judicial Notice of each of these items.  *E.g.*, Dkt. 36 at 1-3 nn. 2-3.

Requests 3-7 are records from official proceedings of the Los Angeles City Council.  Such materials are the proper subject for judicial notice because they are official government materials prepared by a government entity, the Los Angeles City Council. *See DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 n.5 (9th Cir. 2018) (taking judicial notice of government documents); *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012) (reports of administrative bodies). These materials are part of the official record of proceedings before the Los Angeles City Council and available on the website of the Los Angeles City Council.  *See Democratic Nat'l Comm. v. Reagan*, 904 F.3d 686, 710 n.13 (9th Cir. 2018) (taking judicial notice of report publicly available on the website of the U.S. Election Assistance Commission).

Request 8 is properly the subject of judicial notice because it is excerpts from two volumes from the official adopted budget for the City of Los Angeles prepared by the City Administrative Officer for the Mayor of Los Angeles.  *See DeHoog*, 899 F.3d at 763 n.5; *Anderson*, 673 F.3d at 1094 n.1. These documents are part of the official budget and financial record for the City of Los Angeles and are publicly available on the website of the City Administrative Officer. *See Democratic Nat'l Comm.*, 904 F.3d at 710 n.13.

Request 9 is the City of Los Angeles' opening brief in its appeal to the United States Court of Appeals for the 9th Circuit of this Court's preliminary injunction, which the City filed on June 26, 2020.  It is the proper subject of judicial notice as "[i]t is well established that [a court] may take judicial notice of judicial proceedings in other courts. *See Rosales-Martinez v. Palmer*, 753 F.3d 890, 894 (9th Cir. 2014) (citation omitted).

 Request 10 is properly the subject of judicial notice because it the Mayor of Los Angeles's official deceleration of local emergency regarding COVID-19.  *See DeHoog*, 899 F.3d at 763 n.5; *Anderson*, 673 F.3d at 1094 n.1 (9th Cir. 2012) (reports of administrative bodies). This declaration is an official document of the Mayor of the

City of Los Angeles and is publicly available on the website for the Mayor's office. *See Democratic Nat'l Comm.*, 904 F.3d at 710 n.13.

Plaintiffs therefore request this Court take judicial note of foregoing, which are attached as Exhibits 1-12.

Dated: August 17, 2020

Respectfully submitted,
LEGAL AID FOUNDATION OF LOS ANGELES

SCHONBRUN SEPLOW
HARRIS & HOFFMAN LLP

KIRKLAND & ELLIS LLP

/s/ *Shayla Myers*

By: Shayla Myers
*Attorneys for Plaintiffs.*

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF APPLICATION FOR CONTEMPT**

EXHIBIT 1

Print

Los Angeles Municipal Code

## SEC. 56.11.  STORAGE OF PERSONAL PROPERTY.
(Amended by Ord. No. 184,182, Eff. 4/11/16.)

   1.   **Declaration of Legislative Intent - Purpose.**  The City enacts this section to balance the needs of the residents and public at large to access clean and sanitary public areas consistent with the intended uses for the public areas with the needs of the individuals, who have no other alternatives for the storage of personal property, to retain access to a limited amount of personal property in public areas.  On the one hand, the unauthorized use of public areas for the storage of unlimited amounts of personal property interferes with the rights of other members of the public to use public areas for their intended purposes and can create a public health or safety hazard that adversely affects those who use public areas.  On the other hand, the City's large and vulnerable homeless population needs access to a manageable amount of essential property for their personal use and well-being.  This section attempts to balance the needs of all of the City's residents.

   2.   **Definitions.**  The definitions contained in this subsection shall govern the construction, meaning and application of words and phrases used in this section.

      (a)   **"Alley"** means any Highway having a Roadway not exceeding 25 feet in width which is primarily for access to the rear or side entrances of abutting property.

      (b)   **"Bikeway"** means all facilities that provide primarily for, and promote, bicycle travel.

      (c)   **"Bulky Item"** means any item, with the exception of a constructed Tent, operational bicycle or operational walker, crutch or wheelchair, that is too large to fit into a 60-gallon container with the lid closed, including, but not limited to, a shed, structure, mattress, couch, chair, other furniture or appliance.  A container with a volume of no more than 60 gallons used by an individual to hold his or her Personal Property shall not in itself be considered a Bulky Item.

      (d)   **"City Employee"** means any full or part-time employee of the City of Los Angeles or a contractor retained by the City for the purpose of implementing this Section.

      (e)   **"Essential Personal Property"** means any and all Personal Property that cumulatively is less than two cubic feet in volume, which, by way of example, is the amount of property capable of being carried within a backpack.

      (f)   **"Excess Personal Property"** means any and all Personal Property that cumulatively exceeds the amount of property that could fit in a 60-gallon container with the lid closed.

      (g)   **"Highway"** means a way or place of whatever nature, publicly maintained and open to the use of the public for purposes of vehicular travel.

      (h)   **"Parkway"** means the area of the Street between the back of the curb and the Sidewalk that typically is planted and landscaped.

(i)   **"Person"** means any individual.

(j)   **"Personal Property"** means any tangible property, and includes, but is not limited to, goods, materials, merchandise, Tents, tarpaulins, bedding, sleeping bags, hammocks, personal items such as household items, luggage, backpacks, clothing, documents and medication.

(k)   **"Public Area"** or **"Public Areas"** means all property that is owned, managed or maintained by the City, except property under the jurisdiction of the Department of Recreation and Parks which is governed by Los Angeles Municipal Code Section 63.44, and shall include, but not be limited to, any Street, medial strip, space, ground, building or structure.

(l)   **"Roadway"** means that portion of a Highway improved, designed or ordinarily used for vehicular travel.

(m)   **"Sidewalk"** means that portion of a Highway, other than the Roadway, set apart by curbs, barriers, markings or other delineation, for pedestrian travel.

(n)   **"Storage Facility"** means any facility, whether operated by a public, non-profit or private provider, which allows and has capacity for voluntary storage, free of charge, for a homeless person to store Personal Property up to the equivalent of the amount of property that would fit into a single 60-gallon container with the lid closed.

(o)   **"Store"**, **"Stored"**, **"Storing"** or **"Storage"** means to put Personal Property aside or accumulate for use when needed, to put for safekeeping, and/or to place or leave in a Public Area.  Moving Personal Property to another location in a Public Area or returning Personal Property to the same block on a daily or regular basis shall be considered Storing and shall not be considered to be removing the Personal Property from a Public Area.  This definition shall not include any Personal Property that, pursuant to statute, ordinance, permit, regulation or other authorization by the City or state, is Stored with the permission of the City or state on real property that is owned or controlled by the City.

(p)   **"Street"** includes every Highway, avenue, lane, Alley, court, place, square, Sidewalk, Parkway, curbs, Bikeway or other public way in this City which has been or may hereafter be dedicated and open to public use, or such other public property so designated in any law of this state.

(q)   **"Tent"** means a collapsible shelter made of fabric such as nylon or canvas or a tarp stretched and sustained by supports, which is not open on all sides and which hinders an unobstructed view behind or into the area surrounded by the fabric.  In order to qualify as a Tent for purposes of this subsection, a Tent, when deconstructed, must be able to fit within a 60-gallon container with the lid closed.

(r)   **"Unattended"** means no Person is present with the Personal Property who asserts or claims ownership over the Personal Property.  Conversely, property is considered **"Attended"** if a Person is present with the Personal Property and the Person claims ownership over the Personal Property.

3.   **Regulation and Impoundment of Stored Personal Property; Discard of Certain Stored Personal Property.**

(a)   No Person shall Store any Unattended Personal Property in a Public Area.  With pre-removal notice as specified in Subsection 4.(a), the City may impound any Unattended Personal Property in a Public Area, regardless of volume.  Post-removal notice shall be provided as set forth in Subsection 4.(b), below.

(b)   No Person shall Store any Attended Excess Personal Property in a Public Area.  With pre-removal notice as specified in Subsection 4.(a), the City may impound any Attended Excess Personal Property Stored in a Public Area.  Post-removal notice shall be provided as set forth in Subsection 4.(b), below.

(c)   No Person shall Store any Personal Property in a Public Area in such a manner as to obstruct City operations, including a Street or Sidewalk maintenance or cleaning.  Without prior notice, the City may temporarily move Personal Property, whether Attended or Unattended, which is obstructing City operations in a Public Area, including a Street or Sidewalk maintenance or cleaning, during the time necessary to conduct the City operations.  The City also may impound Personal Property that is obstructing City operations in a Public Area, pursuant to Subsection 3.(a) or 3.(b).

(d)   No Person shall Store any Personal Property in a Public Area in such a manner that it does not allow for passage as required by the Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 328 (1990), as amended from time to time (ADA).  Without prior notice, the City may move and may immediately impound any Personal Property, whether Attended or Unattended, Stored in a Public Area in such a manner that it does not allow for passage as required by the ADA.  Post-removal notice shall be provided as set forth in Subsection 4.(b), below.

(e)   No Person shall Store any Personal Property within ten feet of any operational and utilizable entrance, exit, driveway or loading dock.  Without prior notice, the City may move and may immediately impound any Personal Property, whether Attended or Unattended, Stored in a Public Area within ten feet of any operational and utilizable entrance, exit, driveway or loading dock.  Post-removal notice shall be provided as set forth in Subsection 4.(b), below.

(f)   No Person shall Store in a Public Area that has a clearly posted closure time any Personal Property after the posted closure time.  Without prior notice, the City may remove and impound Personal Property, whether Attended or Unattended, Stored in a Public Area that has a clearly posted closure time, provided the Personal Property is removed and impounded after the posted closure time.  Post-removal notice shall be provided as set forth in Subsection 4.(b), below.

(g)   No Person shall Store any Personal Property in a Public Area if the Personal Property, whether Attended or Unattended, constitutes an immediate threat to the health or safety of the public.  Without prior notice, the City may remove and may discard any Personal Property Stored in a Public Area if the Personal Property poses an immediate threat to the health or safety of the public.

(h)   No Person shall Store any Personal Property in a Public Area if the Personal Property,

whether Attended or Unattended, constitutes an evidence of a crime or contraband. Without prior notice, the City may remove and may discard any Personal Property that constitutes evidence of a crime or contraband, as permissible by law.

(i)   No Person shall Store any Bulky Item in a Public Area. Without prior notice, the City may remove and may discard any Bulky Item, whether Attended or Unattended, Stored in a Public Area unless the Bulky Item is designed to be used as a shelter. For any Bulky Item that is designed to be used as a shelter but does not constitute a Tent as defined in Subsection 2.(q), with pre-removal notice as specified in Subsection 4.(a), the City may remove and discard the Bulky Item, whether Attended or Unattended. If the Bulky Item violates Subsection 3.(d)-(h) herein, even if it is designed to be used as a shelter, without prior notice, the City may remove and discard the Bulky Item, whether Attended or Unattended.

(j)   Upon the creation of any new Storage Facility, increased capacity at an Existing Storage Facility or subsidized transportation assistance to a Storage Facility, the Chief Administrative Officer shall report to the Council to inform the Council's consideration of whether to prohibit a Person from Storing more than Essential Personal Property in a Public Area in a specified radius from a Storage Facility, based upon the amount of the additional storage capacity and the accessibility thereto. In consideration of the CAO's report, the Council may, by resolution, prohibit a Person within a specified radius of a Storage Facility from Storing more than Essential Personal Property in a Public Area.

4.  **Notice.**

(a)   **Pre-Removal Notice.** Pre-removal notice shall be deemed provided if a written notice is provided to the Person who is Storing or claims ownership of the Personal Property, or is posted conspicuously on or near the Personal Property and the actual removal commences no more than 72 hours after the pre-removal notice is posted. The written notice shall contain the following:

(1)   A general description of the Personal Property to be removed.

(2)   The location from which the Personal Property will be removed.

(3)   The date and time the notice was posted.

(4)   A statement that the Personal Property has been stored in violation of Section 56.11, Subsection 3.

(5)   A statement that the Personal Property may be impounded if not removed from Public Areas within 24 hours.

(6)   A statement that moving Personal Property to another location in a Public Area shall not be considered removal of Personal Property from a Public Area.

(7)   The address where the removed Public Property will be located, including a telephone number and the internet website of the City through which a Person may receive information as to impounded Personal Property as well as information as to voluntary storage location(s).

(8)   A statement that impounded Personal Property may be discarded if not claimed within 90 days after impoundment.

(b)   **Post-Removal Notice.**  Upon removal of Stored Personal Property, written notice shall be conspicuously posted in the area from which the Personal Property was removed.  The written notice shall contain the following:

(1)   A general description of the Personal Property removed.

(2)   The date and approximate time the Personal Property was removed.

(3)   A statement that the Personal Property was stored in a Public Area in violation of Section 56.11, Subsection 3.

(4)   The address where the removed Personal Property will be located, including a telephone number and internet website of the City through which a Person may receive information as to impounded Personal Property.

(5)   A statement that impounded Personal Property may be discarded if not claimed within 90 days after impoundment.

5.   **Storage and Disposal.**
(a)   Except as specified herein, the City shall move Personal Property to a place of storage.

(b)   Except as specified herein, the City shall store impounded Personal Property for 90 days, after which time, if not claimed, it may be discarded.  The City shall not be required to undertake any search for, or return, any impounded Personal Property stored for longer than 90 days.

(c)   The City shall maintain a record of the date any impounded Personal Property was discarded.

6.   **Repossession.**  The owner of impounded Personal Property may repossess the Personal Property prior to its disposal upon submitting satisfactory proof of ownership.  A Person may establish satisfactory proof of ownership by, among other methods, describing the location from and date when the Personal Property was impounded from a Public Area, and providing a reasonably specific and detailed description of the Personal Property.  Valid, government-issued identification is not required to claim impounded Personal Property.

7.   **Ban on Erection of Tent during Certain Daytime Hours.**  No Person shall erect, configure or construct a Tent in any Public Area from 6:00 a.m. to 9:00 p.m. (except during rainfall or when the temperature is below 50 degrees Fahrenheit).  A Person must take down, fold, deconstruct or put away any Tent erected, configured or constructed in any Public Area between the hours of 6:00 a.m. and 9:00 p.m. (except during rainfall or when the temperature is below 50 degrees Fahrenheit).  Without prior notice, the City may deconstruct and may impound any Tent, whether Attended or Unattended, located in any Public Area in violation of this subsection or in violation of Subsections 3.(c)-(h) hereof.  The City shall provide post-removal notice for any impounded Tent, as set forth in Subsection 4.(b), herein.

8.   **Ban on Attachments to Public and Private Property.**

   (a)   **Public Property.**  No Person shall erect any barrier against or lay string or join any wires, ropes, chains or otherwise attach any Personal Property to any public property, including but not limited to, a building or portion or protrusion thereof, fence, bus shelter, trash can, mail box, pole, bench, news rack, sign, tree, bush, shrub or plant, without the City's prior written consent.

   (b)   **Private Property.**  No Person shall erect any barrier against or lay string or join any wires, ropes, chains or otherwise attach any Personal Property to any private property in such a manner as to create an obstruction on or across any Street or area where the public may travel.

   (c)   **Removal.**  Without prior notice, the City may remove any barrier, string, wires, ropes, chains or other attachment of Personal Property, whether Attended or Unattended, to any public property, or to any private property which creates an obstruction to any Street or area where the public may travel.

9.   **Illegal Dumping.**  Nothing herein precludes the enforcement of any law prohibiting illegal dumping, including but not limited to California Penal Code Section 374.3, and Los Angeles Municipal Code Sections 41.14, 63.44 B.13. or 190.02, or any successor statutes proscribing Illegal dumping.

10.   **Unlawful Conduct.**  Los Angeles Municipal Code Section 11.00 shall not apply to violations of this section except as follows:

   (a)   No Person shall willfully resist, delay or obstruct a City employee from moving, removing, impounding or discarding Personal Property Stored in a Public Area in violation of Subsections 3.(a)-(h).

   (b)   No Person shall refuse to take down, fold, deconstruct or otherwise put away any Tent erected or configured between the hours of 6:00 a.m. and 9:00 p.m., in violation of Subsection 7., or willfully resist, delay or obstruct a City employee from taking down, folding, deconstructing, putting away, moving, removing, impounding or discarding the Tent, including by refusing to vacate or retreat from the Tent.

   (c)   No Person shall refuse to remove any barrier, string, wire, rope, chain or other attachment that violates Subsection 8., or willfully resist, delay or obstruct a City employee from deconstructing, taking down, moving, removing, impounding or discarding the barrier, string, wire, rope, chain or other attachment, including by refusing to vacate or retreat from an obscured area created by the attachment.

   (d)   No Person shall willfully resist, delay or obstruct a City employee from removing or discarding a Bulky Item Stored in violation of Subsection 3.(i), including by refusing to vacate or retreat from within the Bulky Item or from an obscured area created by the Bulky Item.

   (e)   If Subsection 3.(j) becomes operative by resolution in any area of the City, no Person shall willfully resist, delay or obstruct a City employee from removing or impounding any Personal Property that exceeds the limit on Essential Personal Property.

   (f)   A violation of Subsection 9. prohibiting illegal dumping.

11.  **Designated Administrative Agency.**  The City's Department of Public Works, Bureau of Sanitation, is hereby charged with serving as the Designated Administrative Agency (DAA), for the purposes of this ordinance.  The DAA shall promulgate rules, protocols and procedures for the implementation and enforcement of this ordinance, consistent with the provisions herein.

12.  **Severability.**  If any subsection, sentence, clause or phrase of this article is for any reason held to be invalid or unconstitutional by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this ordinance.  The City Council hereby declares that it would have adopted this section, and each and every subsection, sentence, clause and phrase thereof not declared invalid or unconstitutional, without regard to whether any portion of the ordinance would be subsequently declared invalid or unconstitutional.

EXHIBIT 2



# LOS ANGELES MUNICIPAL CODE 56.11 STANDARD OPERATING PROTOCOLS

*Amended*
*September 2018*

## DESIGNATED ADMINISTRATIVE AGENCY ("DAA") LOS ANGELES SANITATION



# LOS ANGELES MUNICIPAL CODE 56.11

# STANDARD OPERATING PROTOCOLS

## Designated Administrative Agency ("DAA")

# LOS ANGELES SANITATION

ENRIQUE C. ZALDIVAR,
Director, LA Sanitation

By _____

Date _____4/7/16_____

# Table of Contents

METHODOLOGY & PROCEDURES ................................................................................................ 3

**PROCEDURE #1 – Referrals and Service Requests** .................................................. 3

**PROCEDURE #2 – Homeless Encampment Clean-up Authorization** ............................ 4

**PROCEDURE #3 – Public Area Cleaning** ................................................................ 6

**PROCEDURE #4 – Personal Property Obstructing City Operations** .......................... 10

**PROCEDURE #5 – Personal Property Obstructing ingress/egress, and/or ADA Passage** ........................................................................................................... 11

**PROCEDURE #6 – Individuals Storing Personal Property in Public Areas with a Posted Closure Time or otherwise Trespassing in Posted Public Property** ................. 14

**PROCEDURE #7– Health & Safety Hazards** ............................................................ 17

**PROCEDURE #8– Evidence of a Crime or Contraband** ............................................ 19

**PROCEDURE #9A – Bulky Items (non-shelter)** ...................................................... 20

**PROCEDURE #9B – Bulky Items (structures)** ........................................................ 22

**PROCEDURE #10 – Tents and Attachments** .......................................................... 24

TERMINOLOGY ....................................................................................................... 28

APPENDIX 1 – Major Cleaning Notice ....................................................................... 30

APPENDIX 2 – Bulky Item Structure Postings ........................................................... 32

APPENDIX 3 – Health Hazard Sheet ......................................................................... 35

APPENDIX 4 – Non-Infectious Certificate ................................................................. 38

APPENDIX 5 – Post-Removal Notice ......................................................................... 40

**INTRODUCTION**

The City of Los Angeles is responsible for the maintenance of sidewalks and other public areas owned, managed or maintained by the City. These public areas must remain safe, clean, sanitary and accessible for public use by all individuals. To promote general public health and safety of all public areas, while balancing the needs of the City's population, at all levels, the City recently made amendments to the City of Los Angeles Municipal Code (LAMC) 56.11 to regulate any personal property disposed, left or stored in public areas.

These protocols outline the operating guidelines, designation of tasks, and scope of work for regulating the storage of personal property in public areas and the allowance for the impoundment of such property, after the provision of notice, as provided for in LAMC 56.11.

**BACKGROUND**

LAMC 56.11 regulates storage of property on the City's public right-of-way, defined by LAMC 56.11 as including sidewalks, alleys, and streets. The Ordinance's Declaration of Legislative Intent states, in part, that the unauthorized use of public areas for the storage of personal property interferes with the rights of other members of the public to use public areas for their intended purposes and can create a public health or safety hazard that adversely affects residential and commercial areas. The purpose of LAMC 56.11 is to maintain public areas in clean, sanitary and accessible condition for all.

**DESIGNATED ADMINISTRATIVE AGENCY, LAMC 56.11.11**

Los Angeles Sanitation (LASAN) serves as the Designated Administrative Agency ("DAA") under the ordinance. The DAA shall promulgate rules, protocols and procedures for the implementation and enforcement of this ordinance, consistent with the provisions herein. The DAA is authorized to make administrative and ministerial revisions to these protocols, and/or forms and posting notices as needed to address unanticipated scenarios or any amendments to LAMC 56.11 or applicable codes or statutes.

**CITY ATTORNEY REVIEW**

The City Attorney's Office has reviewed the following LAMC 56.11 protocols for conformity with the Ordinance and subsequent amendments.

# METHODOLOGY & PROCEDURES

## PROCEDURE #1 – Referrals and Service Requests

Los Angeles Sanitation (LASAN), Customer Care Center receives referrals and service requests to remove illegal dumping and address sanitary conditions of public areas involving discarded personal property throughout the City. Referrals may be submitted to LASAN by Council Offices, the Mayor's Office, LAPD, Neighborhood Councils, 311 Call Center, governmental agencies, businesses, business improvement districts, and the general public.

**LEAD DEPARTMENT**: LASAN
**PRIMARY SUPPORT**: LAPD
**SECONDRY SUPPORT**: BSS, GSD, LADOT, RAP

*Illegal Dumping Service Request Protocol*
　　*Step #1a* – Reports of illegal dumping involving a suspected responsible party shall be referred to LASAN Environmental Compliance Officers for investigation.

　　*Step #1b* – Reports of illegal dumping with an unidentified responsible party shall be immediately directed to LASAN for scheduled removal. If hazardous materials are involved, the report will be referred to an Environmental Compliance Officer.

　　*Step#2* – Illegally dumped items in public areas shall be removed by LASAN.

*Homeless Encampment Referral Protocol*
　　For requests of Homeless Encampments clean-ups, see Procedure #2.

**PROCEDURE #2 – Homeless Encampment Clean-up Authorization**
Upon data entry, a Homeless Encampment clean-up authorization number is created and assigned to the designated location. The following process must be completed in order for full approval of the authorization to commence the clean-up operation.

**LEAD DEPARTMENT**: LASAN
**PRIMARY SUPPORT**: LAHSA or OHSP
**SECONDARY SUPPORT**: LAPD, BSS, GSD, LADOT, RAP

*Homeless Encampment Clean-up Authorization Protocol*
*Step #1* – **REFERRAL:** LASAN will initiate the Homeless Encampment clean-up authorization process by verifying the encampment and its location including City owned, managed, or maintained property, and by taking photographic evidence of the location. LASAN will then submit the information into a Homeless Encampment data management system. The required information fields consist of, but are not limited to the following:

1. Address and/or cross street locations of the homeless encampment (or closest address);
2. Description of the encampment(s), including photographs of the encampment;
3. Additional location description (i.e. alley, under bridge, on overpass, etc.),
4. Date location visited /assessed.

*Step #2* – **LAHSA AUTHORIZATION**: Outreach to the homeless individuals in the area will be conducted by the Los Angeles Homeless Services Authority (LAHSA) or Other Homeless Service Provider (OHSP) to inform the homeless residents of the upcoming clean-up efforts and the requirement to relocate both themselves and their possessions from the clean-up areas prior to the clean-up date/time. During these visits, LAHSA or the OHSP shall offer available assistance and social services to the homeless in the designated area. Upon completion of the visits, LAHSA will sign off on the authorization.

*Step #3* – **LASAN – CHIEF ECO Authorization**: Once LAHSA or OHSP has signed off, the authorization shall be reviewed and approved by the LASAN ─Chief Environmental Officer, or his/her designee.

*Step #4* – **BOARD OF PUBLIC WORKS AUTHORIZATION**: The President of the Board of Public Works or designated commissioner shall review and approve the clean-up. The authorization is valid for up to 90 days from BPW approval or through completion of the clean-up at the location, whichever comes first.

*Step #5* – **HOMELESS ENCAMPMENT CLEAN-UP SCHEDULING**: LASAN shall program and schedule encampment clean-ups.

*Step #6* – **NOTICING**: As required in Procedure #3, a notice will be posted at the clean-up location a minimum of 24 hours in advance of the clean-up date/time (See Appendix 1). The posted notice shall be photographed by LASAN to document the notification of the pending clean-up. The Notice shall be valid for only 72 hours from posting. If the encampment clean-up cannot commence within 72 hours from posting, then a new posting must re-occur before the clean-up may commence.

*Step #7* – **DOCUMENTATION**: The Designated LASAN Employee overseeing the clean-up shall document the clean-up, health hazard assessments and impounded property.

## PROCEDURE #3 – Public Area Cleaning

A public area clean-up is a cleaning performed when an area is identified as having unsafe or poor health conditions. If there is a Homeless Encampment in the area, the following protocol will be followed, after authorization is approved in accordance with **Procedure #2**.

**LEAD DEPARTMENT**: LASAN
**PRIMARY SUPPORT**: LAPD
**SECONDARY SUPPORT**: LAHSA or OHSP, BSS, GSD, LADOT, LAFD, RAP

*Public Area Cleaning Protocol:*

*Step #1* – The LASAN Coordinator shall verify the Homeless Encampment Clean-Up Authorization is approved. Once approved the LASAN Coordinator shall coordinate the notice postings and clean-up date/time.

*Step #2* – The Designated LASAN Employee, shall post the notice (See Appendix 1) at the clean-up location a minimum of 24 hours in advance of the official clean-up date/time and the clean-up shall commence no later than 72 hours after posting. The notice should be photographed as documentation.

*Step #3* – Prior to commencing the clean-up, if LASAN is made aware that there is no available capacity for involuntary storage, LASAN will not proceed with the removal of personal property.

*Step #4* – At the time of arrival, if it is raining and/or the temperature is below 50 degrees Fahrenheit, LASAN shall consider whether to postpone the clean-up after consultation with LASAN Management.

*Step #5* - City crews from LASAN and LAPD shall meet at each clean-up location and conduct a safety meeting. LASAN shall be the lead agency for the clean-ups, including closing that portion of the sidewalk and adjoining street necessary to effectuate the clean-up.  LAPD may provide site security and traffic control for the clean-up teams. All individuals in the clean-up area will be given up to **15 minutes** to take their Personal Property and vacate the area. If the person(s) is physically or mentally-impaired and incapable of effectuating the removal of their personal property, LAHSA or OHSP will be contacted to assist.

*Step #6* – A Designated LASAN Employee shall inspect all property left in the clean-up area for health and safety hazards. Health and safety hazards, shall be documented, removed, and transported to an authorized disposal facility by LASAN in accordance with Procedure #7. LAPD will remove any weapons, ammunition, and explosives. The health and safety hazards shall be documented on the Hazard Determination sheets by LASAN staff (See Appendix #3).

*Step #7* - A Designated LASAN Employee may remove Unattended Personal Property in the clean-up area only if it complies with the following procedure:

1) Pre-Removal Notice was posted as required by LAMC Section 56.11;

2) The removal shall occur no less than 24 hours after the posting of the pre-removal notice, and no more than 72 hours after the posting of pre-removal notice;

3) Written or photographic evidence shall be prepared which documents the general description and location of the Personal Property;

4) The Personal Property shall be bagged and tagged for identification purposes;

5) The Personal Property shall be delivered to a 90 day storage facility; and

6) A Post-Removal Notice shall be left at the place from which the Personal Property was removed.

*Step #8* – A Designated LASAN Employee may remove Attended Personal Property in the clean-up area only if it complies with the following procedure:

1) Pre-Removal Notice was posted as required by LAMC Section 56.11;

2) The removal shall occur no less than 24 hours after the posting of the Pre-Removal Notice, and no more than 72 hours after posting of Pre-Removal Notice;

3)   Individuals can voluntary dispose of any items with LASAN;

4)   LASAN may provide a bag or other container capable of containing 60 gallons worth of Personal Property to the owner of the Personal Property;

5)   LASAN shall direct the owner that he or she will have up to 15 minutes to place into the bag or container up to 60 gallons worth of Personal Property;

6)   If the owner refuses to or does not place Personal Property into the container within the 15 minute period, LASAN shall remove all property as excess personal property.

7)   For Excess Personal Property, LASAN shall prepare written or photographic evidence which documents the general description and location of the Excess Personal Property;

8)   The Excess Personal Property shall be bagged and tagged for identification purposes;

9)   The Excess Personal Property shall be delivered to a 90 day storage facility; and

10)  A Post-Removal Notice shall be left at the place from which the Excess Personal Property was removed or given to the owner.

*Step #9* - If an individual fails to comply with a Designated LASAN Employee's directive, or willfully resists, delays or obstructs a Designated LASAN Employee from moving, removing, or impounding  Personal Property, the Designated LASAN Employee shall request support from law enforcement and law enforcement will proceed within their established Departmental protocols.

*Step #10* - If an individual is physically impaired and the impairment limits compliance with a Designated LASAN Employee directives regarding LAMC Section 56.11, LASAN may assist the individual with compliance or may contact LAHSA or OHSP to assist.

If an individual is mentally impaired and the impairment makes incomprehensible compliance with instructions from a Designated LASAN Employee regarding LAMC Section 56.11, LASAN shall contact LAHSA or OHSP for assistance.

*Step # 11* – If at any time, a City Employee believes that an individual poses a danger to himself, herself or another, including a danger to the City Employee, the City Employee shall request law enforcement assistance.

*Step #12* - (**If required**) LASAN Vactor Truck may pressure-wash the sidewalks, parkways, street gutters, and inlets of storm drain catch basins. The generated water shall be recovered and disposed of to the sanitary sewer.

*Step #13*- (**If required**) LASAN (or designated contractor) may disinfect the washed areas with a sprayed solution of bleach and water that meets Center for Disease Control standards for disinfection.

*Step #14* – A Designated LASAN Employee shall document and photograph clean-up activities. Any human waste removal and disposal by LASAN will require the completion and signature of a non-infectious certification form by a Designated LASAN Employee (See Appendix #4).

## PROCEDURE #4 – Personal Property Obstructing City Operations
At any time in which City operations for maintenance or construction are obstructed by personal property in a public area. A City Employee may temporarily move the personal property.

**LEAD DEPARTMENT**: **ALL CITY DEPARTMENTS**
**PRIMARY SUPPORT**: LAPD, LASAN
**SECONDARY SUPPORT**: LAHSA or OHSP, BSS, GSD, LADOT, LADWP, LAFD, RAP

**ENFORCEMENT AUTHORITY:**
LAMC 56.11.3(c) property obstructing City operations

*Property Obstructing City Operations Protocol:*
*Step #1a* – When personal property is unattended, the City Employee may temporarily move the obstructing property. If there are issues, please proceed to *Step #3* in the process.

*Step #1b* – When the obstructing property is attended, the City Employee shall direct the individual(s) to move the property as to not obstruct City operations, maintenance and clean ups. All individuals will be given up to **15 minutes** to vacate the area. If the person(s) is physically or mentally-impaired and incapable of effectuating the removal of their personal property, LAHSA or OHSP will be contacted to assist.

*Step #2* - If the individual fails to comply with a City Employee's directive, or willfully resists, delays or obstructs a City Employee from moving, removing, move the obstructing property, they will be deemed as "non-compliant". The City Employee shall contact the LAPD for assistance.

*Step #3* - In situations where there is no feasible place to temporarily place obstructing property or the amount of personal property is in excess of the volume of a 60-gallon container with the lid closed, the City Employee shall contact LASAN for assistance. A Post-Removal notice shall be provided for all personal property taken to a 90-day storage facility pursuant to LAMC 56.11.4.(b).

*Step #4* - For any obstructing property that was temporarily moved for City operations or maintenance, the City Employee shall return the property to the original location after the completion of the work.

## PROCEDURE #5 – Personal Property Obstructing ingress/egress, and/or ADA Passage

Without Pre-Removal Notice, a Designated LASAN Employee may move, and when necessary, remove Personal Property in a Public Area that is a) Stored within ten feet of any operational and utilizable entrance, exit, driveway or loading dock; or b) Stored in a manner that does not allow for passage required by the Americans With Disabilities Act, which generally requires clearance of at least 36 inches on the sidewalk.

**LEAD DEPARTMENT**: LAPD
**PRIMARY SUPPORT:** LASAN
**SECONDARY SUPPORT**: LAHSA or OHSP, BSS, GSD, LADOT, LADWP, LAFD, RAP

**ENFORCEMENT AUTHORITY:**
LAMC 56.11.3(e) person(s) are prohibited from storing property within ten feet of an operational and utilizable entrance, exit, driveway or loading dock
LAMC 56.11.3(d) property blocking passage as required by ADA
LAMC 41.18(a) person(s) blocking streets, sidewalks, or other public ways

*Obstructing Personal Property Protocol:*

*Step #1* – Obstructing Personal Property, Unattended or Attended, may be checked for health and safety hazards, in accordance with Procedure #7.

*Step #2* - A Designated LASAN Employee may remove Unattended Personal Property that is stored within ten feet of an operational and utilizable entrance, exit, driveway or loading dock and/or is impacting ADA compliance pursuant to the following procedure:

1) Pre-Removal Notice is not required to move obstructing Personal Property described above;

2) Written or photographic evidence shall be prepared which documents the general description and location of the removed Personal Property;

3) The removed Personal Property shall be bagged and tagged for identification purposes; and

4)      The removed Personal Property shall be delivered to a 90 day storage facility; and

*Step #3* - A Designated LASAN Employee may remove Attended Personal Property that is stored within ten feet of an operational and utilizable entrance, exit, driveway or loading dock and/or is impacting ADA compliance pursuant to the following procedure:

1)   Upon being directed, the owner of the Personal Property will have up to 15 minutes to move the Personal Property so not to a) obstruct an area within ten feet of any operational and utilizable entrance, exit, driveway or loading dock; or b) obstruct the clearance of at least 36 inches for safe passage;

2)   If the owner refuses to or does not move the Personal Property as requested, the Designated LASAN Employee may remove the Personal Property;

3)   If an individual fails to comply with a directive, or willfully resists, delays or obstructs a Designated LASAN Employee from moving, removing, or impounding Personal Property, the Designated LASAN Employee shall request support from law enforcement and law enforcement will proceed within their established Departmental protocols.

4)   If an individual is physically impaired LASAN shall assist the individual with compliance or may contact LAHSA or OHSP to assist.

If an individual is mentally impaired and the impairment makes incomprehensible compliance with instructions from a City Employee regarding LAMC Section 56.11, LASAN shall contact LAHSA or OHSP for assistance.

5)   If at any time, a City Employee believes that an individual poses a danger to himself, herself or another, including a danger to the City Employee, the City Employee shall request law enforcement assistance.

6)   If the Personal Property cannot feasibly be moved by the owner to another part of the block on which it was located without

alleviating the obstruction, the Personal Property may be removed;

7) Written or photographic evidence shall be prepared which documents the general description and location of any removed Personal Property;

8) The removed Personal Property shall be bagged and tagged for identification purposes;

9) The removed Personal Property shall be delivered to a 90 day storage facility; and

10) A Post-Removal Notice shall be left at the place from which the Personal Property was removed or given to the owner.

## PROCEDURE #6 – Individuals Storing Personal Property in Public Areas with a Posted Closure Time or otherwise Trespassing in Posted Public Property

LAMC 56.11.3.(f) provides that no person shall Store Personal Property in a Public Area that has a clearly posted closure time, after the posted closure time. Without prior notice, the City may remove and impound personal property, whether Attended or Unattended, provided the property may not be removed until after the posted closure time or unauthorized location.

**LEAD DEPARTMENT**: City Departments overseeing impacted property
**PRIMARY SUPPORT**: LAPD, LASAN
**SECONDARY SUPPORT**: LAHSA or OHSP, BSS, GSD, LADOT, LADWP, LAFD, RAP

**ENFORCEMENT AUTHORITY** (In addition to local & State codes)
LAMC 56.11.3.(f) No Person shall Store in a Public Area that has a clearly posted closure time.
LAMC 61.07.(i) No person shall fail to comply with any valid order issued by a public officer.

*Personal Property Stored in a Public Areas after a Posted Closure Time or unauthorized location Protocol*

*Step #1* – If Attended the responsible City Department shall direct the individual to move from the closed area. The Law Enforcement Officer may then call LASAN for health hazard assessment assistance, if necessary.

*Step #2* – As to both Unattended and Attended Personal Property, a City Employee shall contact LASAN to proceed to remove the Personal Property for storage. After the property is checked for health and safety hazards, the property may be removed and stored in accordance with Procedure #7.

*Step #3* - A Designated LASAN Employee may remove Unattended Personal Property in a Public Area subject to a specified closing time by complying with the following procedure:

   1)   The City Employee confirms that a notice containing the closing time is clearly posted in the area where the Personal

Property is stored and the impoundment begins after the posted closing time;

2)    Written or photographic evidence shall be prepared which documents the general description and location of the Personal Property;

3)    The Personal Property shall be bagged and tagged for identification purposes;

4)    The Personal Property shall be delivered to a 90 day storage facility; and

5)    A Post-Removal Notice shall be left at the place from which the Personal Property was removed.

*Step # 4*- A Designated LASAN Employee may remove Attended Personal Property in a Public Area subject to a specified closing time or unauthorized location by complying with the following procedure:

1)     The Designated LASAN Employee confirms that a notice containing the closing time is clearly posted in the area where the Personal Property is stored and impoundment begins after the posted closing time;

2)    The Designated LASAN Employee shall provide a bag or other container capable of containing 60 gallons worth of Personal Property to the owner of the Personal Property;

3)    The Designated LASAN Employee shall direct the owner that the Public Area is closed or is about to be closed and that he or she has up to 15 minutes to place into the container up to 60 gallons worth of Personal Property and leave the Public Area with the container;

5)    If the owner refuses to or does not place Personal Property into the container within the 15 minute period, the Designated LASAN Employee may remove the Personal Property;

6)      The Designated LASAN Employee shall prepare written or photographic evidence which documents the general description and location of the Personal Property;

7)      The Personal Property shall be bagged and tagged for identification purposes;

8)      The Personal Property shall be delivered to a 90 day storage facility; and

9)      A Post-Removal Notice shall be left at the place from which the Personal Property was removed or given to the owner.

*Step* #5 - If an individual fails to comply with a Designated LASAN Employee directive, or willfully resists, delays or obstructs a Designated LASAN Employee from moving, removing, or impounding  Personal Property, the Designated LASAN Employee shall request support from law enforcement and law enforcement will proceed within their established Departmental protocols.


*Step* #6 - If an individual is physically impaired and the impairment limits compliance with a Designated LASAN Employee's directives regarding LAMC Section 56.11, the Designated LASAN Employee shall offer to assist the individual with compliance or may contact LAHSA or OHSP to assist.

If an individual is mentally impaired and the impairment makes incomprehensible compliance with instructions from a Designated LASAN Employee regarding LAMC Section 56.11, the Designated LASAN Employee shall contact LAHSA or OHSP for assistance, and shall continue with the clearing the area.

*Step* #7 – If at any time, a City Employee believes that an individual poses a danger to himself, herself or another, including a danger to the City Employee, then the City Employee shall request law enforcement assistance.

**PROCEDURE #7– Health & Safety Hazards**

The purpose of this protocol is to document the protocols and procedures for the field staff of the LASAN Environmental Enforcement & Emergency Response Unit field staff. The protocol outlines how LASAN Environmental Compliance Officers determine the health hazard potential of the personal property, item(s) or substance(s) found in the public right-of-way. The Compliance Officer will ultimately determine if the property, item or substance poses any potential health risk(s) and requires removal and disposal.

**LEAD DEPARTMENT**: LASAN
**PRIMARY SUPPORT**: LAPD
**SECONDARY SUPPORT**: LAHSA or OHSP, LAPD, BSS, GSD, LAFD, LADOT, RAP

**ENFORCEMENT AUTHORITY**
LAMC 56.11.3.(f) immediate threat to health or safety of the public
LAMC 64.70.05.A. authority to inspect
LAMC 64.70.05.B.6 to abate, correct or prevent pollutants from entering storm drain

Materials are considered to be health hazards when there is statistically significant evidence based on at least one study conducted in accordance with established scientific principles that acute or chronic health effects may occur in exposed persons. Health and safety hazards shall be removed immediately. Notice posting (informing the public of the violation) is not required. If a person refuses to relinquish substances or materials deemed health or safety hazards, law enforcement will proceed with their established protocol. Health or safety hazards shall be documented and removed by LASAN and transported to an authorized disposal facility immediately.

*Health Hazard Assessment Protocol*
*Step #1* – The Designated LASAN Employee shall walk sidewalks, streets, parkways and other public right-of-ways to visually identify items which may pose a health hazard.

*Step #2* - LASAN Environmental Compliance Officers shall visually identify flammable, toxic, reactive, and corrosive substances.

*Step #3* - Utilizing the Field Checklist in Appendix 3, the Environmental Compliance Officer will determine the health hazard potential of the item or substance as well as whether the item or substance poses any potential health risk. The Environmental Compliance Officer can use the back of the form "List of Hazardous Materials/Waste and Potentially Hazardous Materials" as reference for health hazard assessments. If any item or substance meets any of the descriptions on the list, then the item or substance may be deemed hazardous (see Appendix #3).

*Step #4* - If the item is a health hazard or a potential health hazard and is made of fabric, wood, or other permeable substances, the item shall be removed by LASAN (or designated contractor) for disposal. LASAN (or designated contractor) shall also remove all biohazard items (e.g., contaminated with blood, human waste, etc.). LASAN Solid Resources shall place the item on a vehicle and transport to an authorized disposal facility.

*Step #5* - If the item is a health hazard or potential health hazard and is made of metal, glass, or any other non-permeable substance, the object may be disinfected.

*Step #6* - If the item is a sharp, the Environmental Compliance Officer will use the appropriate equipment and tools to remove the sharps and place them in a sharps container for disposal.

*Step #7* - LASAN Environmental Compliance Officers shall document on the Health Hazard Determination form each of the hazardous item(s) or substance(s), check off the applicable box(es) on the sheet, and fill in the date, time, and location information. The Environmental Compliance Officer shall sign the form and photograph the item(s) to be destroyed.

*Step #8* – If those instances when the hazardous materials are Attended, to the extent appropriate, LASAN will work with the individual to remove the hazardous materials. If the individual fails to comply with LASAN directives, or willfully resists, delays, or obstructs a Designated LASAN Employee from removing the hazardous materials, the Designated LASAN Employee shall request support from law enforcement and law enforcement will proceed within their established Departmental protocols and LASAN will proceed with the cleanup and removal of the items.

## PROCEDURE #8– Evidence of a Crime or Contraband

Evidence of a crime or contraband may be immediately removed without notice posting. LAPD may take possession of the evidence or contraband in accordance with established Departmental procedures and the law.

**LEAD DEPARTMENT**: LAPD OR OTHER LAW ENFORCEMENT
**PRIMARY SUPPORT**: LASAN
**SECONDARY SUPPORT**: BSS, GSD, LADOT, LAFD, RAP,

**ENFORCEMENT AUTHORITY**
LAMC 56.11.3.(h) no person shall Store any Personal Property in a Public Area if the Personal Property constitutes an evidence of a crime or contraband.

*Evidence of a Crime or Contraband Protocol*
*Step #1* - Whenever a City Employee comes into contact with property that may be evidence of a crime or is criminal contraband, whether Unattended or Attended, the City Employee shall contact LAPD or other Law Enforcement agency.

*Step #2* - The City Employee shall then step away and wait for Law Enforcement resources to arrive.

*Step #3* - Law enforcement will proceed with their established departmental protocols.

## PROCEDURE #9A – Bulky Items (non-shelter)

In accordance with LAMC 56.11, Bulky items are placed into one of two categories and treated distinctly;

### A.  LAMC 56.11.3.(i) Bulky Items (non-shelter) placed in Public Areas

Bulky items are defined as any item possessing size and/or shape which will not allow the item to fit into a 60-gallon receptacle with the container lid closed. Bulky items generally include but are not limited to mattresses, appliances, furniture, shed, structures, non-operational bicycles, and construction materials. An exception has been established for Tents, wheelchairs, walkers, containers of a volume not exceeding 60 gallons, crutches, and bicycle if operational.

**LEAD DEPARTMENT**: LASAN
**PRIMARY SUPPORT**: LAPD
**SECONDARY SUPPORT**: LAHSA or OHSP, BSS, GSD, LADOT, LAFD, RAP

*Bulky Item Protocol A. (non-structures)*
*Step #1* – Identification or referral of an LAMC 56.11 defined Bulky Item. *Note: LAMC 56.11.3.(i) allows immediate removal of bulky items without notice posting. Non-electronic Bulky items may be disposed as trash or rubbish. Electronic bulky items which fall under the classification of E-waste (a universal waste) shall be specifically disposed of in accordance with 40 CFR.*

*Step #2a* - Unattended bulky items placed in public areas may be removed immediately by LASAN or City Employee in accordance with LAMC 56.11.3.(i).

*Step #2b* – For the removal of the items(s) or Attended bulky items, LASAN will work with the individual(s) to allow for the removal of the items. If the person(s) is physically or mentally-impaired and incapable of effectuating the removal of the item(s), LAHSA or OHSP will be contacted to assist.

*Step #2c* - Bulky Items that are Attended or associated with other personal property in public areas, shall be assessed by a Designated LASAN Employee prior to removal. If the bulky item is not picked up based on the assessment, the Designated LASAN Employee or City Employee shall follow Procedure #3 for Public Area Cleaning.

## PROCEDURE #9B – Bulky Items (structures)

Bulky items which are designed to be used as shelters (i.e. structures), but do not constitute a tent, on public property are prohibited and may be removed after the structure has been posted a minimum of 24 hours in advance. (See Appendix 2 for approved 24-hour Pre-Removal posting notice). The notice shall be attached by LASAN to the bulky item (structure). Photographs shall be taken of each posting and structure. After the 24-hour posting period, the structures shall be disassembled and removed for immediate disposal by LASAN.

**LEAD DEPARTMENT**: LASAN
**PRIMARY SUPPORT**: LAPD
**SECONDARY SUPPORT**: LAHSA or OHSP, BSS, GSD, LADOT, LAFD, RAP

*Bulky Item Protocol B. (structures)*
*Step #1* - If a Bulky Item Stored in a Public Area is designed to be used as a shelter but does not constitute a Tent, a Designated LASAN Employee may only remove and discard the Bulky Item if it complies with the following:

1) A Pre-Removal Notice shall be posted conspicuously on or near the Bulky Item (shelter).  The posted Pre-Removal Notice should be photographed by a Designated LASAN Employee;

2) The Bulky Item (shelter) may be removed no less than 24 hours but no more than 72 hours after the posting of the Pre-Removal Notice;

3) If the Bulky Item (shelter) is occupied, a Designated LASAN Employee shall direct any occupant to vacate the Bulky Item (shelter);

4) If any occupant refuses to vacate the Bulky Item (shelter), the Designated LASAN Employee should contact law enforcement for assistance and law enforcement shall proceed within their established Departmental protocols;

5) If any and all occupants of the Bulky Item (shelter) vacate at the direction of a Designated LASAN Employee, LASAN may provide a 60-gallon bag or other container and direct the individual that he or she has up to 15 minutes to place 60 gallons of Personal Property into the bag or container;

6) All Personal Property may be removed, after compliance with Procedure #7 (Health and Safety Hazards);

7) Written or photographic evidence shall be prepared which documents the general description and location of the Excess Personal;

8) The Excess Personal Property shall be bagged and tagged for identification purposes;

9) The Excess Personal Property shall be delivered to a 90 day storage facility; and

10) Post-Removal Notice as to the Personal Property removed from the Bulky Item (shelter), shall be provided pursuant to 56.11.4(b).

*Step #2* - If an individual fails to comply with a Designated LASAN Employee directive, or willfully resists, delays or obstructs a Designated LASAN Employee from moving, removing, or impounding Personal Property, the Designated LASAN Employee shall request support from law enforcement and law enforcement will proceed within their established Departmental protocols.

*Step #3* - If an individual is physically impaired and the impairment limits compliance with a Designated LASAN Employee's directives regarding LAMC Section 56.11, the Designated LASAN Employee shall offer to assist the individual with compliance or may contact LAHSA or OHSP to assist.

If an individual is mentally impaired and the impairment makes incomprehensible compliance with instructions from a Designated LASAN Employee regarding LAMC Section 56.11, the Designated LASAN Employee shall contact LAHSA or other OHSP for assistance, and proceed with the cleanup.

*Step # 4* - If at any time, a City Employee believes that an individual poses a danger to himself, herself or another, including a danger to the City Employee, the City Employee shall request law enforcement assistance.

*Step #5* - Animals in the Bulky Item (shelter) may be removed by Animal Control.

**PROCEDURE #10 – Tents and Attachments**

Pursuant to LAMC 56.11.8(a), no person shall attach any Personal Property to any public property without consent.  Pursuant to 56.11.8(b), no person shall attach any Personal Property to any private property if the Attachment creates an obstruction on or across any street or pedestrian walkway, including a sidewalk. In addition, pursuant to LAMC 56.11.7, no person shall erect a Tent in any Public Area from 6 a.m. to 9 p.m., except when raining and/or the temperature is below 50 degrees Fahrenheit.  LAPD shall enforce the immediate disassembly, deconstruction, folding, and removal of Tents during those hours, without the necessity of posting notices (informing the public of the violation). If a person refuses to comply with a legal order from a peace officer, law enforcement will proceed within their established protocols.

**LEAD DEPARTMENT**: LAPD
**PRIMARY SUPPORT**: LASAN
**SECONDARY SUPPORT**: LAHSA or OHSP, BSS, GSD LADOT, LAFD, RAP

In accordance with LAMC 56.11.7, no Tents shall be erected, configured or constructed in Public Areas between the hours of 6 a.m. and 9 p.m., unless it is raining and/or the temperature is below 50 degrees Fahrenheit. Any Tent must be taken down, folded, deconstructed and put away by 6 a.m. of each day. A folded/deconstructed tent can be placed to the side of the sidewalk without obstructing safe passage and access.

*Tent Protocol*
*Step #1* - At the time of arrival, if it is raining and/or the temperature is below 50 degrees Fahrenheit, the Designated City Employee shall postpone action.

Step #2 - A Designated City Employee may deconstruct any Attended Tent erected during the hours of 6 a.m. to 9:00 p.m. (unless it is raining or the temperature is below 50 degrees Fahrenheit) if the Designated City Employee complies with the following;

   1)   If the Tent is occupied, the Designated City Employee shall direct any occupant to vacate the Tent;

   2)   If any and all occupants vacate the Tent, the Designated City Employee shall advise the owner that he or she will have up to 15 minutes to deconstruct the Tent;

3)      If any occupant of the Tent refuses to vacate the Tent, the Designated City Employee should contact law enforcement for assistance and law enforcement shall proceed within their established Departmental protocols;

*Step #3* - If an individual fails to comply with the directive, or willfully resists, delays or obstructs a Designated City Employee from taking down or deconstructing a Tent, the Designated City Employee shall request support from law enforcement and law enforcement will proceed within their established Departmental protocols.

*Step #4* - If an individual is physically impaired and the impairment limits compliance with a Designated City Employee's directives regarding LAMC Section 56.11, the Designated City Employee shall offer to assist the individual with compliance or may contact LAHSA or OHSP to assist.

If an individual is mentally impaired and the impairment makes incomprehensible compliance with instructions from a Designated City Employee regarding LAMC Section 56.11, the Designated City Employee shall contact LAHSA or OHSP for assistance, and shall continue with the clean-up.

*Step #5* – If at any time, a City Employee believes that an individual poses a danger to himself, herself or another, including a danger to the City Employee, the City Employee shall request law enforcement assistance.

*Step #6* - Without notice, a Designated City Employee may deconstruct any erected Unattended Tent during the hours of 6:00 a.m. and 9:00 p.m. unless it is raining and/or the temperature is below 50 degrees Fahrenheit. Once deconstructed, the Tent shall be removed, bagged, tagged, and stored, unless it is a health hazard. If a health hazard, LASAN shall remove the Tent in conformance with Procedure #7. The personal property in the Tent shall be removed following proper personal property protocols. A post removal notice shall be posted.

Step #7 – The personal property around the Tent shall not be removed unless they are a health hazard or violate ADA safe passage or access to property. If removed, proper personal property protocols will be followed.

<u>*Attachment Protocol*</u>
In accordance with Los Angeles Municipal Code 56.11.8, no Attachment shall be erected on public property, and no Attachment shall be erected on private property in such a manner as to create an obstruction on or across any Street or area where the public may travel.

*Step #1* - A Designated City Employee may remove any <u>Attended Attachment to public property</u> only as set forth below:

1)     The Designated City Employee shall direct the owner that he or she has up to 15 minutes to remove the Attachment;

2)     If the owner refuses to or does not remove the Attachment, a Designated City Employee may remove the Attachment; and

3)     Any Personal Property contained around the Attachment shall not be removed unless they are a health hazard or violate ADA safe passage or access to property. If removed, proper personal property protocols will be followed.

*Step #2* - A Designated City Employee may remove any <u>Attended Attachment to private property that creates an obstruction on or across any street or pedestrian walkway, including a sidewalk</u> only as set forth below:

1)     The Designated City Employee shall advise the owner of the Attachment that he or she will have 15 minutes to remove the Attachment;

2)     If the owner refuses to or does not remove the Attachment, the Designated City Employee may remove the Attachment; and

3)     Any Personal Property contained around the Attachment shall not be removed unless they are a health hazard or violate ADA safe passage or access to property. If removed, proper personal property protocols will be followed.

*Step* #3 - If an individual fails to comply with a Designated City Employee directive, or willfully  resists, delays or obstructs a Designated City Employee from removing the Attachment(s), the Designated City Employee shall request support from law enforcement and law enforcement will proceed within their established Departmental protocols.

*Step #4* - If an individual is physically impaired and the impairment limits compliance with a Designated City Employee's directives regarding LAMC Section 56.11, the Designated City Employee shall offer to assist the individual with compliance or may contact LAHSA or OHSP to assist.

If an individual is mentally impaired and the impairment makes incomprehensible compliance with instructions from a Designated City Employee regarding LAMC Section 56.11, the Designated City Employee shall contact LAHSA or OHSP for assistance.

*Step #5* – If at any time a City Employee believes that an individual poses a danger to himself, herself or another, including a danger to the City Employee, the City Employee shall request law enforcement assistance.

*Step #6* - A Designated City Employee may remove any <u>Unattended Attachment to public property</u> unless the Attachment was erected pursuant to written permission from the City. Personal Property around the Unattended Attachment shall not be removed unless they are a health hazard or violate ADA safe passage or access to property. If removed, proper personal property protocols will be followed.

Step #7 - A Designated City Employee may remove any <u>Unattended Attachment to private property if the Attachment creates an obstruction on or across any street or pedestrian walkway</u>, including a sidewalk. Personal Property around the Unattended Attachment shall not be removed unless they are a health hazard or violate ADA safe passage or access to property. If removed, proper personal property protocols will be followed.

# TERMINONOLGY

**BSS** – Bureau of Street Services

**BULKY ITEM** – Defined in Los Angeles Municipal Code 56.11as; any item, with exception of a constructed Tent, operational bicycle or operational walker, crutch or wheelchair, that is too large to fit into a 60-gallon container with the lid closed, including, but not limited to, a shed, structure, mattress, couch, chair, other furniture or appliance. A container with a volume of no more than 60 gallons used by an individual to hold his or her Personal Property shall not in itself be considered a Bulky Item.

**CSLA** – Clean Streets Los Angeles also known as the Clean Streets Initiative (CSI)

**DESIGNATED CITY EMPLOYEE –** LAPD or Designated LASAN Employee.

**DESIGNATED LASAN EMPLOYEE** – means the Director of the Bureau of Sanitation of the Department of Public Works of the City of Los Angeles or the duly authorized representatives designated to administer, implement and enforce the provisions of this Protocol (i.e. LASAN Environmental Compliance Officer).

**HOMELESS ENCAMPMENT –** are locations where one or more homeless people live or store personal property in an unsheltered area. (CalEPA, CalRecycle Defined).

**GSD** – Department of General Services

**LADWP** – Los Angeles Department of Water & Power

**LAFD** – Los Angeles Fire Department

**LAHSA** – Los Angeles Homeless Services Authority

**LAPD** – Los Angeles Police Department

**LASAN** – Los Angeles Sanitation

**LAW ENFORCEMENT OFFICER** – Any appointed governmental employee with Peace Officer arrest authority listed under California Penal Code Section 830.

**OHS** – Operation Healthy Streets

**OHSP** - Other Homeless Services Provider

**PERSONAL PROPERTY** – Defined in Los Angeles Municipal Code 56.11, means any tangible property, and includes but is not limited to, goods, materials, merchandise, Tents, tarpaulins, bedding, sleeping bags, hammocks, personal items such as household items, luggage, backpacks, clothing, documents and medication.

**PUBLIC AREA(S)** - Defined in Los Angeles Municipal Code 56.11, means all property that is owned, managed or maintained by the City, except property under the jurisdiction of the Department of Recreation & Parks which is governed by Los Angeles Municipal Code 63.44, and shall include, but is not limited to, any street, medial strip, space, ground, building or structure.

**RAP** – Department of Recreation & Parks

**UNATTENDED** – Defined in Los Angeles Municipal Code 56.11 means no Person is present with Personal Property who asserts or claims ownership over the Personal Property. Conversely, property is considered **"Attended"** if a Person is present with the Personal Property and the Person claims ownership over the Personal Property.

**APPENDIX 1 – Major Cleaning Notice**

 

# NOTICE: MAJOR CLEANING

## INCLUDES SIDEWALKS, ALLEYS, PARKS, BEACH, PARKING LOTS, AND OTHER PUBLIC ACCESS AREAS

### AN AREA CLEANING WILL COMMENCE AT THIS LOCATION ON:

### Thursday, March XX, 2015 at 07:00 a.m.

### PLEASE REMOVE ALL PERSONAL BELONGINGS, INCLUDING BULKY ITEMS BY
### Thursday, March XX, 2015 by 06:00 a.m.

This effort is designed to clean, improve and maintain a safe environment for the general public. The City may use power wash and street cleaning equipment to clean and disinfect the sidewalks, alleys, parks and other public access areas.

Please remove all personal belongings, including bulky items from sidewalks, alleys, parks, and public access areas. All property remaining will be removed by the City. Property left behind, except for items that pose an immediate threat to public health or safety, trash, and evidence of a crime or contraband, will be collected by the City and kept in a secure location for a period of 90 days during which time it may be retrieved by its rightful owner.

**Items collected by the City may be retrieved at:**

**507 Towne Avenue**
**Los Angeles, CA 90013**
**Monday - Friday**
**(9:30 a.m. – 12:30 p.m. and 1:00 p.m. – 4:00 p.m.)**
**213-806-6355**

The City of Los Angeles greatly appreciates your cooperation as we initiate necessary measures to ensure that your communities are safe and healthy.

**APPENDIX 2 – Bulky Item Structure Postings**



# NOTICE

## STORAGE OF BULKY ITEMS IN THE PUBLIC RIGHT-OF-WAY OR ANOTHER PUBLIC AREA IS

## PROHIBITED

PER SECTION 56.11.(3)(i). Failure to remove this bulky item within 24 hours will subject it to immediate removal and discard. Bulky items moved to another public area can be removed and discarded without notice. Absent an immediate threat to public health or safety, personal property removed from within the bulky item will be maintained in a secured location for 90 days. The rightful owner of items found inside a bulky item may retrieve the personal property at:

### 507 S. TOWNE AVE., LOS ANGELES, CA 90013

For Information, Please Call:

### 1-213-806-6355

POSTING LOCATION_____

POSTING DATE _____,TIME_____,SAN/WPD CASE#_____

Form 56.11(rev 02/208)



# AVISO

## ALMACENAMIENTO DE OBJECTOS VOLUMINOSOS EN LA FORMA CORRECTA DE PASO PÚBLICO O EN OTRA ÁREA PÚBLICA ES

# PROHIBIDO

Según la Sección 56.11.(3)(i). Si no se retira este artículo voluminoso dentro de las 24 horas se someta a la eliminación inmediata y descarte. Los artículos voluminosos se trasladaron a otro público se puede sacar y desechar sin previo aviso. En ausencia de una amenaza inmediata para la salud o la seguridad pública, la propiedad personal retirado desde el interior del elementos voluminosos se mantendrá en un lugar seguro durante 90 días. El propietario legítimo de artículos encontrados dentro de un elemento voluminoso puede recuperar la propiedad personal en:

### 507 S. TOWNE AVENUE, LOS ANGELES, CA 90013

Para información, llame al:
### 1-213-806-6355

POSTING LOCATION_____

POSTING DATE _____,TIME_____,SAN/WPD CASE#_____

Form 56.11 (rev 02/206)

**APPENDIX 3 – Health Hazard Sheet**

CITY OF LOS ANGELES
WATERSHED PROTECTION DIVISION
## HEALTH HAZARD CHECKLIST

Date: _____   Time: _____ Case Number: _____

**Location Description:** _____

**Item Description:** _____

**Health Hazard Determination :( check all that apply)**

☐  Toxin / poison_____

☐  Flammable_____

☐  Corrosive_____

☐  Reactive_____

☐  Highly-compressed gas or liquid_____

☐  Motor oil or other petroleum oil_____

☐  Substances listed in Title 22_____

☐  Substances, wastes, or materials which may have come in contact with a hazardous substance, Health Hazard or infectious agent._____

☐  Biohazard / infectious / sharp / infested material_____

☐  Contaminated items (see table below)

| Contaminated items that were disposed of | | | | |
|---|---|---|---|---|
| Clothing | Tent | Perishables | Book/toiletries | Others |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**Comments:** _____

_____

_____

**WPD Officer Name (Print):**_____ **Signature:** _____

1/4/2016 - Revision 3.0 - draft

## HEALTH AND SAFETY CLEAN-UP OPERATION

## LIST OF HAZARDOUS MATERIALS/WASTE AND POTENTIALLY HAZARDOUS MATERIALS

1. Biohazards / infectious such as human sanitary waste including excrement and urine, human blood, other human body fluids, human parts, materials contaminated with human fluids, syringes, syringe needles, razor blades, other medical or laboratory "sharps", drug paraphernalia, materials potentially-infested with lice, fleas, bedbugs, bacteria, or viruses, materials potentially in contact with vectors such as rodents and birds, and materials or substances which may potentially harbor infectious agents.

2. Toxins / poisons such as pesticides, mercury-containing bulbs, asbestos materials, e-waste, etc.

3. Flammables such as gasoline, propane, butane, lighter fluid, oil-based paints, mineral spirits, paint thinner, acetone, petroleum-based solvents, oxygen tanks, and other materials with flashpoints under 141 degrees F

4. Corrosives such as batteries, muriatic acid (swimming pool acid), acids equal to less than pH 2.0, caustic degreasers/cleaners, bases equal to or greater than 12.5.

5. Reactives such as chlorine, oxidizers, peroxides, hydrogen peroxide, explosives, radioactive, ammunition, etc.

6. Highly-compressed gases or liquids

7. Motor oil

8. Any substances listed in Title 22 of the California Health and Safety Code

**APPENDIX 4 – Non-Infectious Certificate**



**ENVIRONMENTAL SERVICES, INC.**

## Non-Infectious Certification

| To: | Clean Harbors Environmental Services, Inc. |
|---|---|

I hereby certify that the waste material being shipped to Clean Harbors under Profile # _____ has been rendered non-infectious and is neither infectious nor does it contain any organisms known to be a threat to human health. *(this also includes materials which contain or have come into contact with tissue or body fluids derived from human or animal source)*

This certification is based upon my knowledge of the material and:

_____The waste was never exposed to potentially infectious materials.
_____The following method of disinfection was employed:

Chemical Sterilization* _____
Other: _____

| *Common Disinfectants | Check |
|---|---|
| Bleach Solutions[1] | |
| Formaldehyde | |
| Gluteraldehyde | |
| Phenol | |
| Other / Cleaners: (please specify)_____ | |

**THIS IS TO CERTIFY that the above is an accurate description of the methods used and all contents are specified and known.**

Authorized signature: _____     Date: _____
Generator Name: _____     Address: _____

_____

[1] The Department of Labor (DOL) has acknowledged, and in agreement with the recommendations of the U.S. Public Health Service Centers for Disease Control, that a solution of 5.25% sodium hypochlorite diluted 1:10 with water is effective for disinfecting. Therefore, this is an acceptable method of disinfecting/sterilizing possibly contaminated waste

**APPENDIX 5 – Post-Removal Notice**



# POSTED

## PROPERTY CAN BE RECOVERED AT

### 507 Towne Avenue
### LOS ANGELES, CA 90013

<u>MONDAY – FRIDAY</u>
9:30 am – 12:30 pm and 1:00 pm – 4:00 pm

Property left behind at/or near _____ was removed by the City.  <u>Absent an immediate threat to public health or safety,</u> removed items will be maintained in a secure location for a period of 90 days for the rightful owner to retrieve.

If you left property and you believe that it was removed, you may be able to retrieve it at 432 E. Temple Street, Los Angeles CA 90012.  Please be prepared to describe the property, its location and the date you believe it was removed. You will have your photograph taken and be required to sign an affidavit to declare ownership.

### DATE:_____
For Assistance or Information Please Call:

## 213-806-6355

## PROCEDURE #11
## SPECIAL ENFORCEMENT ZONES FOR BULKY ITEMS

Certain areas of the City are subject to heavy human and vehicular congestion, exacerbating the potential public safety hazards caused by Bulky Items in Public Areas.

To protect the public health and safety, a discrete area that is subject to heavy human and vehicular congestion exacerbating the potential public safety hazards can be designated a Special Enforcement Zone for Bulky Items. To the extent resources are available; the following protocol will be used for the enforcement of Bulky Items in the Special Enforcement Zone.

Bulky Item: In accordance with LAMC 56.11-3(i) a Bulky Item in a Public Area is defined as any item possessing size and/or shape which will not allow the item to fit into a 60 gallon receptacle with the container lid closed. Bulky Items generally include, but are not limited to, mattresses, appliances, furniture, shed, structures, non-operational bicycles and construction materials. Bulky Items do not include Tents, wheelchairs, and a container of a volume not exceeding 60 gallons, crutches and bicycles, if operational.

For purposes of this procedure, Bulky Items include, but not limited to, food and vending carts or tables.

**LEAD DEPARTMENT(S):** BSS, LASAN
**PRIMARY SUPPORT:** LAPD
**SECONDARY SUPPORT:** LASAN, BSS

Protocol for Bulky Items in a Special Enforcement Zone.

*Step #1* - Prior to enforcement of LAMC 56.11 in any area declared to be a Special Enforcement Zone, signs will be posted at entrances to the Special Enforcement Zone consistent with the sign attached as Exhibit A.

*Step #2* - For four (4) days prior to the first enforcement in the Special Enforcement Zone, paper notice will be distributed during normal business hours. The notice will be consistent with the sign attached as Exhibit B.

*Step #3a* - For an Unattended Bulky Item Stored in a Special Enforcement Zone, the Bulky Item may be removed by LASAN or a City Employee in accordance with LAMC 56.11-3(i), and will be stored by LASAN for 90 days before the Bulky Item will be discarded. BSS or LASAN will document the unattended bulky items including details and location.

*Step #3b* - The posted signs will notify the Owner of the address and hours of operation where the Bulky Item will be stored for 90 days, after which, if the owner does not retrieve the Bulky Item, LASAN will discard the Bulky Item.

LAMC 56.11 Protocols                Protocol No. 11                Effective 7/2/2018

*Step #4a* - For an Attended Bulky Item Stored in a Special Enforcement Zone Area, LAPD, BSS, or LASAN will ask the Owner of the Bulky Item to remove the Bulky Item from the Public Area and will allow 30 minutes for the Owner to remove the Bulky Item from the Public Area.

*Step #4b* – For Attended Bulky Items, if the Owner does not remove the Bulky Item from the Public Area within 30 minutes after the request from LAPD, BSS, or LASAN or a City Employee will remove the Bulky Item and BSS or LASAN will provide a Post-Removal Notice to the Owner, notifying the Owner of the address and hours of operation where the Bulky Item will be stored for 90 days, after which, if the owner does not retrieve the Bulky Item, LASAN will discard the Bulky Item.

This protocol will be amended to LAMC 56.11 Protocols singed on April 7, 2016 and will be effective on July 2, 2018.


Approved on ____ 6/28/18


Enrique C. Zaldivar, P.E.
Director and General Manager
LA Sanitation and Environment

2

EXHIBIT A



# BULKY ITEM SPECIAL ENFORCEMENT ZONE

**ALL ITEMS LOCATED ON THE PUBLIC RIGHT-OF-WAY WHICH DO NOT FIT INSIDE A 60-GALLON CONTAINER WITH THE LID CLOSED WILL BE REMOVED BY THE BUREAU OF SANITATION AND STORED FOR A PERIOD OF 90 DAYS DURING WHICH TIME IT MAY BE RETRIEVED BY THE OWNER**

**Items collected by the City may be retrieved by contacting:**

**BUREAU OF STREET SERVICES**
**1149 S. Broadway, 3rd Floor, Los Angeles, CA 90015**
**Monday – Friday (7:00 a.m. – 3:30 p.m.)**
**(213) 847-6000**
**LOS ANGELES MUNICIPAL CODE (LAMC) 56.11.3.(i)**

EXHIBIT B





# NOTICE

## SPECIAL ENFORCEMENT ZONES FOR BULKY ITEMS

Certain areas of the City are subject to heavy human and vehicular congestion, exacerbating the potential public safety hazards caused by Bulky Items placed, stored, or illegally dumped in Public Areas. In accordance with LAMC 56.11-3(i), a Bulky Item in a Public Area is defined as any item possessing size and/or shape which will not allow the item to fit into a 60-gallon receptacle with the lid closed. Bulky Items generally include but are not limited to, mattresses, appliances, furniture, shed structures, non-operational bicycles, and **vending carts**.

On April 18, 2018, the Los Angeles City Council passed motion, Council File No. 13-1493 to establish "**Special Enforcement Zones**" in which vending carts are prohibited on the public right-of-way. Under LAMC 56.11, it is illegal to store "bulky items" such as vending carts on City property. Any vending cart which is deemed in non-compliance of LAMC 56.11 will be removed by the City and placed into storage for 90 days.  All perishables, trash, and hazardous materials associated with the vending cart will be disposed.  The owner(s) of the vending cart can reclaim the cart by contacting the Los Angeles Bureau of Street Services at counter at 1149 S. Broadway, M-F from 7 a.m. to 3:30 p.m.  If the vending cart remains unclaimed during the 90-day storage period, the vending cart will be discarded. For additional information, please call (213) 847-6000.

**PROCEDURE #12**
**Special Enforcement Zones around Temporary Homeless Shelters**

In April 2018, the Mayor and the City Council declared an emergency shelter crisis and included funding in the City's FY 2018-19 budget to support the construction of emergency shelters Citywide as part of a program called A Bridge Home (ABH). As part of ABH, once a shelter is opened and placed in service, in collaboration with the Council Offices, enhanced cleaning will be implemented by LASAN in the defined zone around the shelter and the area where the homeless population for the shelter was housed.

City residents may be reluctant to embrace the opening of a temporary homeless shelter (THS) in their neighborhood due to the fear of spill-over encampments and sidewalk blockages in the area adjacent to a THS. To encourage the placement of a THS in an area of need in the City, discrete areas surrounding a newly sited THS may receive special enforcement priority under Los Angeles Municipal Code (LAMC) Section 56.11. At the written request of the Mayor's Office or a Council Office, declaring any discrete area to be a THS Special Enforcement Zone ("THS Zone"), the following protocol will be used for the enforcement of Section 56.11 in the THS Zone.

**LEAD DEPARTMENT**: LASAN
**PRIMARY SUPPORT**: LAHSA, LAPD

Before the opening of a new THS, the City will post permanent signs in the designated area surrounding the THS, providing notice of the enhanced enforcement protocols for the THS Zone. The City also will post temporary signs disclosing when the enhanced enforcement of Section 56.11 will commence. In addition, prior to the opening of the THS, the surrounding area will receive more outreach to homeless persons in the area from the Los Angeles Homeless Services Authority (LAHSA) or other homeless service providers.

Further, commencing 90days prior to the opening of the shelter and continuing for 30 days after the opening of the shelter and in collaboration with LAHSA's outreach team and other city partners, LASAN will limit the comprehensive cleaning that requires the relocation of the homeless population to those activities related to addressing health hazards and any access and Americans with Disabilities Act (ADA) compliance. 30 days after the opening of a THS, LASAN will implement enhanced cleaning and compliance with LAMC 56.11 within the designated and affected zone five days a week. Compliance and rapid response as part of the Homeless Outreach and Proactive Engagement (HOPE) program will be conducted four days a week. Comprehensive cleaning will be conducted once every week. The schedule will vary by location and will be posted in the THS Zone. The standards for this effort will be documented as part of Protocol No. 12 of the LAMC 56.11 protocols that will be adopted by LASAN as the Designated Administrative Agent.

Protocols for THS Enforcement Zones.

*Step #1* - After the siting of a THS but before the opening of a THS, the City will post permanent signs in the designated area surrounding the THS, providing notice of the

enhanced LAMC Section 56.11 enforcement protocols for the THS Zone. The permanent signage will be consistent with Appendix 6.

*Step #2* – Prior to the opening of a THS, the City will post temporary signs in the designated area surrounding the THS, providing notice of the date on which the City will begin enhanced enforcement of L.A.M.C. 56.11 in any area declared to be a Special Enforcement Zone. The temporary signage will consistent with the sign attached as Appendix 6.

*Step #3* – Prior to the opening of a THS, the City will facilitate through LAHSA or another homeless service provider outreach to homeless persons in the designated THS Zone.

*Step #4* – Commencing 90 days prior to and continuing for 30 days after the opening of the THS, LASAN will collaborate with LAHSA to limit all cleanings to those related to public health and safety along with access and ADA restrictions. Cleaning will be done without relocating the unsheltered homeless population unless necessary. Any necessary cleaning that requires the relocation of the unsheltered homeless will be coordinated with the LAHSA.

*Step #5* – Beginning 30 days after the opening of a THS, the THS Zone will be comprehensively cleaned once a week, following Procedures # 2, 5, 7, 8, 9 and 10. HOPE Operations will be conducted four days per week.

Step #6 – Beginning 30-days after the opening of a THS, the provisions of LAMC 56.11 will be strictly enforced in the THS Zone, including without limitation:
- Removing and storing of Excess Personal Property (more than 60 gallons per person) (LAMC Section 56.11-3(a)-(b));
- Ensuring adequate clearance on public sidewalks to comply with the ADA (LAMC Section 56.11-3(c));
- Ensuring the accessibility of entrances, exits, driveways and loading docks (LAMC Section 56.11-3(e));
- Removing and disposing of items that constitute a threat to public health or safety (LAMC Section 56.11-3(g));
- Removing and disposing of Bulky Items (LAMC Section 56.11-3(i)); and
- Requiring the deconstruction of tents between 6:00 a.m. to 9:00 p.m., weather permitting (LAMC 56.11-7).

This Protocol will be coordinated through the City's Unified Homeless Response Center (UHRC).

This protocol will be amended to LAMC 56.11 Protocols signed on April 7, 2016 and will be effective on August 6, 2018.

Approved on August 6, 2018

Enrique C. Zaldivar, P.E.
Director and General Manager
LA Sanitation and Environment

2



# SPECIAL ENFORCEMENT & CLEANING ZONE

The City of Los Angeles will be conducting enhanced cleaning and trash removal in compliance with L.A.M.C. 56.11.3.(i) and other relevant laws in this ZONE.

**No Tents Shall Be Erected Between 6:00am – 9:00pm**

**No Bulky Items Shall Be Stored in Public Areas**

**No Blocking of the Sidewalk, Exits/Entrances, Driveways or Loading Docks**

**WAS YOUR PROPERTY IMPOUNDED? CALL (213) 806-6355 or (844) 475-1244**

**Or retrieve your belongings at: The Bin, 507 Towne Ave., LA 90013**

 

# ZONA ESPECIAL DE APLICACIÓN Y LIMPIEZA

**La Ciudad de Los Ángeles estará realizando una mejorada limpieza y retiro de basura en cumplimiento con L.A.M.C. 56.11.3.(i) y otras leyes relevantes en esta ZONA.**

**No se armará ninguna carpa entre 6:00am – 9:00pm**

**No se almacenará artículos voluminosos en áreas públicas**

**No bloquear la acera, salidas/entradas, vías de acceso o muelles de carga**

**¿CONFISCARON SU PROPIEDAD? LLAME AL (213) 806-6355 o AL (844) 475-1244**

**O recoja sus pertenencias en: The Bin, 507 Towne Ave., LA 90013**

EXHIBIT 3

# City Council Meeting - Wednesday

july 1, 2020

please stand by for city of los

angeles, city council meeting.

good morning and welcome to the los angeles city council. I'm nury martinez the President Of the city council. Madam Clerk please call the roll. >> blumenfield. >> blumenfield, present. Good morning. >> good morning. Bonin? >> bonin, present. >> buscaino? >> here.

>> cedillo?

>> cedillo, good morning, rise and shine everybody. >> thank you.

Harris-dawson? >> present. >> koretz?

>> present.

>> krekorian? >> here. >> lee? >> present. >> martinez? >> present. >> o'farrell? >> present. >> price?

>> present. >> rodriguez? >> here. >> ryu? >> present. >> wesson?

>> wesson, here.

>> 14 members Madam President and a quorum.

first

order of business, can somebody mute themselves, please.

>> krekorian?

hold on for just a second.

One of you is not on mute, we're getting a lost feedback. Thank you. Let's try this one more time. First order of business.

>> approval of business.

Mr. O'farrell moves and Mr. Ryu seconds.

Next.

>> commendatory resolutions of approval.

without objection, that will be the order.

>> there is request to refer number 68 to finance committee.

without

objection, that will be the order. >> item 1 is notice public

hearing.

Item 2 through 37 are items held.

And the rules election sxz inter governmental relations committee for

items 3 through 6, 9 troughs 21, 34

through 40 and 43 through 46 have been submitted and posted in the respective

files.

For item 36 relative to

amending a permit.

For item 37 there is a technical

construction to switch civilian

overtime, 45,,000 and sworn overtime should be $1,772,00.

And moving on to the continuation jend,

item number 94 is an item for which public hearing has been held.

Item 95 is an item for which public

hearing has not been held. And item 89 is an item scheduled foreclosed session.

those items are now before us, without objection. If you wish to call any of
these items special or have an amending motion.

Ms. Rodriguez?

>> thank you, Madam President, I have

an amending motion on item 70.

okay, go ahead. 70, go ahead and read that into the record.

>> okay, I move that the matter of the reappropriation and transfer of funds

relative to the fourth year and

financial status report for fiscal year

2019-20 item number 70 on today's

agenda, be amended to authorize the

reprogramming of 120,000 from the city's 2019-to 2020 general fund

contract with the los angeles

homeless services authority contract number c-133697ces navigation centers to
the

city state homeless emergency aid

program contract with lasa

contract

number c-13135 transfer

$120,000 to account to fund 06-p.Instruct the

manager or designee to execute the necessary documents to adjust the above

two contracts to reflect the above reprogramming.

>> second.

second by Mr. Buscaino. Any others. >> that is it, thank you.

>> Mr. Ryu?

>>er I would like to hold 84

for

comments.

84 for special

comments for Mr. Ryu.

Thank you Mr. O'farrell, Mr. O'farrell, please unmute yourself.

>> thank you, Madam President. Item 79 for amendment and clarification.

go ahead.

>> whether we approve the item, dated

June 4, 2020 recommending

approval of

general plan zone change and incentive as to open space step backs and side
requirements.

Specific amendment and environmental clearance, the sustainability

environment assessment with its mitigation monitoring program and mitigation
measures for the

construction, use and maintenance of 454

permits supported housing units. 23 restrict today extremely low

income. 50 restricted to very low income.

376 units restrict today low households

and 5 market rate managers units on a 94623 square foot site.

For the project located at 317

through

345 north madison avenue, 312

through 328 north June?Nd nita avenue and modified conditions of approval and

findings all contained as part of 20-0287.

is there

a second? >> second. >> thank you.

second by Mr. Buscaino. Any others Mr. O'farrell? >> no, thank you Madam.

okay, Mr. Koretz?

>> yes, would I like to call 2 and 6 special.

2 and 6 specials, do you have any amending motions or you just want to speak on them. ?I. Just want to speak on them.

okay, any others? Okay, Madam Clerk, oh I'm sorry, mr. buscaino. >> 94 special, please.

That's it.

any others, do you have any amending motions or you just

want to speak. >> that's it, Madam President, thank you.

Mr. Blumenfield.

>> I would like to call 83 for a friendly amendment.

83 for Mr. Blumenfield g.Ahead and introduce your friendly amendment.

>> sure, it's to ask instruct cao to recommendations funding sources within 30 use to determine the best

use of the

property located at 21433 canoga owned by the knights of columbus.

I will accept your friendly, Mr. Blumenfield.

Any others? >> no, I don't, thank you for that.

Mr. Koretz. >> thank you, Madam President, I also like to call item 3 special for

questions as well.

all right, any others. Okay, seeing none. Madam Clerk, why don't we go ahead and we're going to begin public comment.

Why don't you read out the call in

information and then turn it to city

attorney so he can explain the speaking

rules. >> members should call

669-254-5252 and use meeting id number, 1605358466 and

press pound.

Press pound again when prompted for participant id. Once admitted press pound 9 to

speak.

Again call 669-254-5252 and use meet particular id number 1605358466 and

press pound.

Press pound again when prompted for

participant id once admitted press star 9 to request to speak.

>> so I'll explain the speaking rules, Madam President. For members from the public calling n please state what agenda items would you like to speak on.

You have one minute per item up to three

minutes total and if you wish one minute for public comment. We will tell you when your time

is up. When speaking on the agenda items you

must be on topic, our goal is to get

through as many speakers as we can. If we cannot tell whether you're speaking on topic, you'll get a brief warning from me or the

President, if you don't get back on toing, you will be cut off and you will forfeit the rest of your speaking time and we'll move on to the next speaker. We'll take 40 minutes total of public comment.

Finally, when you hear somebody address you, you are live on the meeting.

If you're linsing on another dwiesz,

please turn down the other devices immediately, there is a time delays and you will get very confused if you

continue to listen on your devices. Thank you, Madam President.

okay, let's go ahead and take the first speaker. >> please state your name and the item

would you like to speak on. >> hello, me?

Hello.

>> yes.

what item would you like to speak on.

>> I would like to speak on

item 8 and 7. >> and I also wanted additional comment.

so two minutes for your two items and then general public comment.

>> my name I'm steve I'm a social equity applicant.

I'm in favor of guarding all application in the dispensary licenseas previously mentioned business herb wesson

on a previous letter. As the rules largest cannabis market all eyes are on us. Aside from the system being unfair,

there is a reason why we should process all applicant.

Mayor garcetti has said that unemployment has risen to more than 24% now. Our homeless community has risen to

66,000 plus which is a 12.7% increase

during this epidemic.

Bring thousands of jobs to our fellow angelinos, not to mention the revenue for our city. The majority of the applicant that I

have spoken to have plans to

help sick children, and elderly abuse and/or fan

risk. We the social equity applicant are los angeles.

This is the time to step up.

All we need is two minutes, one for one councilmember to mention the proposal

and the rest to vote yes.

At least offer additional 226 license to

see cover what is made bit city and the

soft fair for a total of 326 and the

rest distribution. The thousands of alcohol licenses which

makes this seem very very unfair, that

they just leave the market with the black market, the black market will naturally decrease. I yield my time.

Thank you. >> thank you, next speaker. >> please state your name and the item

you would like to speak on.

>> hi, is that me? >> yes, please state your name and what

item you would like to speak on.

>> hi, my name is rebecca and I would

like to speak 29, 30 and 31. And it's going to be brief because

they're all pretty similar. Is am really concerned about these items because I do not think that the police

should be able to accept donations in relation to the funding that

they receive and that's not only because the police budget is over funded but additionally, it's concerning from an ethics perspective, because there is a lack of transparency and where the

donation right side coming from and

where it's influence being exerted from somebody who wants favor from the police department or local government.

Sxl considering the fact that jose huizar that was criminal indicted. And I bet many of you including john lee

and et cetera are about to get indicted.

I don't want there to be any loopholes

where the funding is coming from.

I think it, you know, we're taxed enough.

The tax dollars are regulated and passed through a budget. And we should be defunding the police.

Thank you. >> please state your name and the item

you would like to speak on. Please state your name and the item you

would like to speak on.

>> my name is meryl, and I'm calling

easement [Indiscernable] >> speaker, we're having trouble hearing

you.

>> my name is meryl and I'm here with the state 8700 for a quick claim of the easement.

>> okay.

>> I don't know if I have to be here or

I don't need to be here.

>> thank you, speaker. >> please state your name and the item

that you would like to speak on. >> all items please and general public comment. >> so you have three minutes and one minute for general.

Please begin.

>> okay, thank you, sir.

I follow and agree totally with the

previous speaker before last

that is, on

items regarding police lapd

donations. It is just uncon consciousable that this

continues to happen. Unlimited donations to the lapd. Lapd should be funded by the people and we should know exactly how much is

funded and period. Not any other outside groups funding the police.

It's just it's as bad as monica

rodriguez accepting $100,000 from the L.A. Police protective league for her run.

11 of the members of the takes L.A. Ppo

contributions, martinez and o'farrell

left 24-hour lapd security at their homes.

It's all the same thing.

All a police state that the people pay for. Sxl outside money should not be included

in there. We want things to change.

Question want -- we want police control for our people. you people don't understand.

You go on break if you want but we will

be at your homes.

You have item number 45, 100 billion dollars that you're allocating for emergency rental.

Just make sure that you use the money

properly.

Item 83, $100 billion, some going to staff and consultant. We want change in this city and you

people don't get it. We want total complete change in this

city. Item number 26, appointmento by the

mayor they should be thrown out. He shouldn't be appointing anybody

because of huizar's an ticks. Can I go to public comment, please.

>> sure. >> thank you, yesterday Mr. Is he did I

yo, item number 73 motion to preserve

the affordability of the brand plaza

housing complex to make it permanently

affordable.

By contrast, marqueece dawson known as sleazy marqueecy dawson.

He wants to throw out 206 households,

that's almost 1,000 people becoming homeless. What good does this homeless money do when dawson is throwing people in the

streets so he can raise luxury units

with pools and spas and swimming pools, this is extremely low income rent

control units.

And he and -- he's a terrorist. Marqueece dawson, is a terrorist. >> thank you very much.

Please state your name and the item you would like to speak on.

>> hi, my name is tom and I'm making a general public comment. >> sure, you have a minute please go ahead. >> okay. The existing proposed cuts by city

council and the mayor are far

too small.

And we need cuts to the lapd budget in

communities and non lapd and unarmed

alternatives to the police. Where members from black lives matter, full power and the organizations shared

a de tailed proposal.

And conclusive survey finding.

And the findings of the surveys were

overwhelmingly display demand to defund

the police to community services that keep communities safe and help them grow.

Nouz they're ignoring the calls of over

300 staff members in the city, they're calling on the adoption of the people's

budget L.A. I personally promise to work as hard as

I can to unseat each and everyone one of who stood against the necessary change in the city. Thank you, I yield the rest of my time.

>> thank you, speaker. >> please state your name and the item

you would like to speak on.

>> good morning, Mr. Cedillo.

All items please.

>> you have three minutes.

>> okay, so let's talk about

the tefla

hearing on behalf of cd14, we fully

support that item. I'm trying to find out what the number

is.

Oh number 93.

And also bonin, you have such a cute

little white hat.

Now getting to 92,

[Indiscernable]

On 701 avenue, I support it.

Because bob blumenfield was working with

the along reseda, thank you.

City Council Meeting 08/19/20

Number 91 medical services I support because it's good stealing,

good for you.

Number 90, the mayor we don't want to

give the mayor anymore money to

spael. I'm against number 90 and 89 as

well.

I don't want those mother

fuckers nobody

does.

97, another wait a minute, wait a minute, that's the cannabis regulation.

Yeah, I support that because that's the

little thing that you agree

with the fbi.

Please do not invite parker.

I love her tie, she's such a cute little

guy.

And called the sepulveda basin.

Thank you Mr. Koretz, better moan as

[Indiscernible] Covid-19 stealing, full support. I've been telling you when you
do a good

job on I'm the first to say so and when

you steal the covid-19 funds, it does my

heart well.

80, I support.

82 I support that also.

>> your minute of general.

>> thank you, good bye. Please state your name and the item you

would like to speak on.

>> I thought.

>> okay, you have three minutes please.

>> I council thank you for Mr. Wesson

for our people korea town, yes support support. I go to general comment. >>
sure, please you have a minute.

>> thank you for Mr. Wesson, you do good for community I vote for you for
supervisor.

Okay, I yield time, thank you, God bless.

>> thank you, sir. >> please state your name and the item

you would like to speak on.

>> herb wesson is a criminal.

>> please state your name and the item

you liker.

>> hello. >> please state your name and the item

would you like to speak on. >> this is katie calling from bonin's

district. Calling on 80-81 and general public comment.

>> you have two minutes and one for general public comment.

>> so items 30 and 31 I want to echo

what the previous caller said, where are the mysterious donation coming from,
you're already under investigation for

the shady things that you're doing. Making a bad situation worse and for the
benefit of more propaganda.

Please listen to us. Moving on to general public

comment. Totally appreciate the first steps that

have been taken to start the defunding of lapd.

More needs to happen. I get that you're taking a month off. I want to promise
you, we will be here

when you come back to make the same

calls what you have allowed to happen so far, is morally and ethickly wrong.

And also you need to cancel them, bottom line.

We already have a massive homeless

crisis that is about to get so much worse.

It's really really wrong. Even the lapd budget -- enjoy your vacation.

I yield my time. >> please state your name and the item

you would like to speak on. >> yeah, I'm jessica craven.

I would like to make public comment on items 29 through 32 and also general
public comment. May I combine the two. >> you have three minutes for items and

one more general public comment.

>> okay, well so the items 29 through 32

I would like to say again, that I support wholely defunding the police.

I want to thank you for the 150

budget cuts that you're going to undertake. That's a great start but we

need to do.

No popsicles for the police, no grants for chief moore, none of that is

appropriate after we're going through this entire wide grieving process and
outrage process.

Take that money please and take it

toward rent freezers because as the last

speaker said, we're about to have an

enormous rent cries. Personally it's a pretty awful time to take a vacation.

Do what you need to do.

But, you know, the biggest crisis our

city has faced and it May be a good time

to cut vacation short.

And my biggest thing is the corruption that we're seeing right now.

We know that one of you just

got charged for racketeering. And it's impossible that the rest didn't know what
was going. You make all your decisions behind closed doors and you're telling us
that

one of you was accepting boxes of cash

in bathrooms to payoff sexual

harassment, and none of you? If it's true, you're not aware of your

surrounding.

What makes you different from lapd,

another organization that protects their

own even when crime is being committed. I want you to ask yourself whether

you're in this job for a reason.

You don't make this money to

detray your constituence.

We want it to happen now. Don't say black lives matter now because it's trending
on twitter and then take cash from developer when you think we've moved on. >>
thank you, speaker.

>> money that is pouring into lapd. >> thank you. >> thank you.

>> thank you. Please state your name and what ite you would like to speak on.

>> my name is jess Mcbride and I'm speak on item 94 and general public comment.

>> you have one minute for each. Please begin speaker.

>> thank you.

Hi I'm jess Mcbride I'm a cosigner of the letter of concerned L.A. Workers

that I think all of your officers received as well as your chief

of staff.

I'm finding, a former employee and long time volunteer of the city.

You know that the work that people's

budget L.A. Did for you to provide those findings, from what your taxpayers want their money spent on is such a gift.

And you know, as an urban planner, finding them the information like that

is so valuable and I feel like you guys largely ignored it.

And given it lip service.

And now over 300 of current and former city employees people on your team have

organized to stand in solidarity with this work.

Sxl it has also gotten largely ignored in the past few council

meetings. I urge you to review our letter. Take seriously the work that

L.A. Budget has done and be courageous and take this moment to make a valuable change in your city. This will moment will not come a long again.

I think for a while.

And I urge you to not Miss This moment from your constituence.

I yield my time, thank you.

>> please state your name and what item you would like to speak on. >> speaker, are you there?

>> hi.

Yes, [Indiscernible]

I would like to speak on 29 and public

comment. >> we had a trouble hearing, can you

repeat the items again.

>> yes, 29, 30, 31 and general comment please. >> okay, thank you.

You have three minutes for the items and one minute for general public comment. Please begin.

>> thank you. Item 29 regulation of grand work close

to lapd.

We should be asking you want to give

them -- [Indiscernible]

Stop giving to lapd they're the most

extremely well funded, also try

to make. Terror donation for lapd hiring, again what the fuck.

If so defund the police and

also donate

to the police and diversity

hiring after

months, lapd has been bragging about

how -- [Indiscernible]

Defund, demilitarize the police.

For my general, proposed cuts goes to about 18 days no money, that's

it.

I'm not sure what the lapped has been

threatening you with.

It's not going to be good from the lapd black lives matter. You don't care about the

homeless report.

We didn't forget about 2002.

I yield my time for victims of police

brutality.

>> thank you, speaker. >> please state your name and what item

you would like to speak on. >> hi, I would like to speak on general comment.

>> you have one minute.

>> hi I'm one of the seven volunteers

who was terminate beside the severe

animal abuse and criminal activity running rampant through the animal

shelters.

This has always been no-kill, while

taking 314,000 a year. And that's more than governor newsom

makes.

Animals are sleeping in concrete, 24-

never getting walked.

Instead of spending on money on beds,

she spends it on travel. Now clears the north shelter and none of

you questioned her about it.

Last month, they took in over 1600

animals where are they now. 74% why because she's not

allowing intakes. We've been writing you for 11 months, and you've been silent.

You need to launch an investigation into L.A. Animal services.

>> thank you.

Please state your name and what item you

would like to speak on.

>> I'm maybe a girl pro nound she and her.

And I would like to comment on 16, 94 and also make a general public comment.

>> you have three minutes for

items and one for general public.

>> I'm also an elect odd filler serving

on the siler lake council. I believe these are worthy

causes that will contribute to alleviating homelessness in L.A. In both our city

and county. Homelessness is up 14.6% and this is

based out of a point census conducted in January prior to the covid-19

crisis. 20-19 likewise saw an increase in homelessness. We need you to take bold
and progressive action if you want a solution for

homelessness.

This means canceling rents. Today's July first and today should have

been the day that you adopted L.A.

Yet you ignored the angelinos calling on you to defund lapd.

If I ignore the calls of tens of my constituents to even put this on the agenda,
I would not be expect to be reelected and neither should any of you.

You are in charge of the cities and you have the power to do this.

I encourage to you a agenda eyes on adopting the people's budget

L.A.

Furthermore, cops do not deserve

popsicles right now. Black lives matter. I yield my time.

>> thank you, speaker.

>> please state your name and what item

you would like speak on.

>> I'm sam from cd5 I would like to speak on 29 and general public comment. >> sure you have one minute for each, go ahead.

>> all right, I'll be quick.

No popsicles for piggies, no more

donations for pigs, we want them to have a reduced impact only the communities that he terrorize. Along those lines I'll switch to public comment.

You need to divest from the police, 133, 150 million is not enough. If you think so, you're mistaken.

We will not take a recess, you should not either.

But we wouldn't, we will continue to make our voices heard. Fuck you paul koretz. >> please state your name and what item

you would like to speak on. >> good morning, armando flores, speaking on item 81.

>> you have one minute.

>> armando flores with the vica we would

like to support for item 81. Healthcare providers are business owners who provide service to the

community.

They work with a piece of mind, and

their trained environment and play a

role in foster to help children get a great start in life.

In L.A., we have an early childhood,

crisis which has been exacerbated by covid-19.

The city can begin to support this. Thank you for your time.

>> thank you, speaker.

>> please state your name and what item

you would like to speak on.

>> yes, previn and I would like to speak

on all items today only the agenda which is especially 93 and yesterday there were 83 and I was not admitted through. So I'll begin now. >> we'll give you three minutes for the items and one minute for

general public comment.

>> all right. One concern with eileen decker with the

police commission, we were all surprised by her recently.

As a former U.S. Attorney and former

mayor deputy, she is far too

close to the individuals who are being investigated to the fbi. So to appoint her to that role is just a terrible mistake. And I think misunderstand all of this course of voices that you've been

hearing saying that we need to have a

paradigm shift.

I also look at the sean burton and nick roxborough to the board of airport

commission.

These guys are caucasians, this

one is

three-while men and two latino and one

asian women, and one black man.

It's an interesting question, why are we

reappointing two white men when

so many employees cut across all aspects of our community.

I will say that each of the members of the committee, the commission the board

of airport commissioners come from cd11

bonin's district and cd5 paul koretz district, if you stick huizar's district

in there amount to the most well off districts. So it's just tapping into a group that

feeds on the big money that comes through tourism which has been decimated with covid.

I would also like to say that I know the aids health air care

foundation, came up quickly.

And I also know that john brody is once again broughting in for 30,000 for the L.A. Pd again. It's a weird pain.

And I echo speakers who talk about

donations to the lapd as being inappropriately.

It's completely inappropriate.

and I want to study on twitter later, of millions of dollars flooding into the lapd. When I say millions, says five or four or six million dollars. And coming from all over the place, from people who are obviously

interested in contracts, so it's so, appalling that

they allow this to continue. And we call it out.

I also want to shine a light on the safe parking. We're the lowest rolled out

plans.

We do 8502 and tow people around and

ruin their lives, which I know

we put on

slight hold recently although no thanks to starting the sweeping program. >>
please take your general comment Mr. Previn. >> I'm going to shift to my general
public comment. Okay.

>> yes, please. >> you ready.

So the general public comment, and fauble, I'll name you here.

We need to do a better job at running the meeting.

At the beginning there was a confusion

of penetrating the calls.

What is problematic is the lack of transparency. i'm glad to hear fresh new
speakers. The possibility of getting into speak should not be difficult and if
you need

to take more comments to make that

possible, I would direct you to not

canceling friday's meeting.

So what can I tell you, stuffing these

agenda full foreheading off for the 4th of July is appalling. It's a tenier to
what the people in los angeles have been experiencing and the expectation that's
we have for you. And I'll close this by saying that nury

martinez through one of her inter --

>> thank you Mr. Previn.

>> our next speaker? >> please state your name and what item

would you like to speak on.

>> hi, can you hear me? >> yes, please go ahead. What would you like to speak
on.

>> I'm eric and I'm speaking on items

29, 30, 31 and giving general comment. >> okay, three minutes for your items and
one minute for general public comment. Gl ahead.

>> great.

No mysterious donation for the lapd no popsicles and horses for cops.

And while I'm at it, cancel rent.

We're at a due or die moment with this

new surge in covid cases, sending

angelinos back to the meat grinder.

Thousands more will fall on the homelessness and preventable deaths.

Cancel rent. Instead of defunding police, in this budget and investing in the healthcare

and food security for the

people, you

offer this bullshit like 300 k for

diversity hiring. And 150 million divestation is not enough.

The fact that you're enter tating to

give 50% of our fund to the murdererous is shameful.

I'm calling to support not only further

defunding but its total dismantling.

Care not cops.

This police department exist to protect

property and white supremacy. Require more police militaryization and more collaboration with law enforcement

agencies. Especially the 2028 olympic games.

They have estimated that 30% increase in lapd necessary to provide

security for

the olympics not to mention, the authority to coordinate with law

enforcement for the next decade. This is completely unacceptable.

We need to call off for the mega events

both private and public as L.A.

Reimagined what the idea of L.A. Means. You have no material ways, the eyes of

the world are on you now.

Dol your fucken job.

And john lee, that's the sound of walls

closing in.

You'll be joining your friend jose huizar very soon.

>> thank you, speaker. >> can we get the next speaker please. >> please state your name and what item you would like to speak on.

>> yeah, hi.

Daniel gus, I want to speak in all items in general.

>> you have three minutes for items and

one for general public comment.

>> I'm applauding you for the rental

assistance idea.

However for the renterers in los angeles, $1,000 is not going to cover anything, it's just going to put them

less in the hole.

A greater allotment but make sure that the eligibility is for restricted.

Also you need to be clear that some elected official right side renters, I'm not going to name them, you need to

state that they're not eligible that there are income restrictions, you

should also be very clear in stating that criminal penalty that you will

prosecutor for anything illegal or dishonestly getting that

benefit but

it's a good idea.

You have to make sure that these are vetted. You get the contract issue but never vet whether or not they're connected to the

politicians or chief of staff and any of the huizar-type of chaos going

on right

now.

Regarding joan roady, you're severely

over paying this person for this work.

Multi million dollars proposals for

ander on and kpng and 30,000 for 40,000 is a wildly overpaid.

And you should find out why

she's

getting such way above market for those services.

I did it it's not work, that but that

over.

Eileen has no place to be in

the -- Ms. Decker's qualification are reverses,

soufp on law enforcement.

I'm going to also, number 1 1, cedillo

that is a great idea. Safe parking that's what you

should be doing. Number 11 is a good idea.

That's good for cedillo. On that note I'm going to go to general

public comment.

Best friends, you're subsidizing an extremely wealthy organization.

They're a wealthy organization, so you're cutting services to us and

closing our shelters and subsidizing, you're squaundering money at a

pound we should not be subsidizing best friends.

And why did it take just now to start

doing anti corruption thing.

The timing is very dubious.

You should get up and make sure that

those, that the penalty for corruption

include very explicit of a forfeiture of healthcare benefits and pension if
you're convicted on any of the stuff.

You guys to need the door on the olympics, I don't know if you have to pay
money.

We don't need that, it's a destruction. Best friends, why are we subsidizing
them.

Thank you, have a good one.

>> thank you, Mr. Gus.

okay, members that concludes public comment for

today's meeting. Madam Clerk, let's vote on a couple of items. Let's take up
item number 94. Please call the roll.

>> councilmember blumenfield?

>> plume field, aye. >> bonin. >> bonin, aye. >> buscaino? >> buscaino, no.

>> cedillo?

Councilmember cedillo?

Mr. Cedillo, can

you unmute yourself, please.

Mr. Cedillo?

>> yes, Madam Chair.

item number 94, can you vote please. >> can you come back to me please.

sure.

Continue Madam Clerk. >> councilmember harris-dawson? >> yes. >> koretz? >> aye.
>> krekorian? >> aye.

>> lee?

>> no. >> for clarification? No? >> no. >> thank you. Martinez? >> aye. >>
o'farrell? >> aye. >> price? >> aye. >> rodriguez?

>> aye. >> ryu?

>> aye. >> wesson? >> wesson, aye. >> and back to councilmember

cedillo? >> cedillo, aye.

thanks.

>> that's 12 ayes and 2 nos. This item is adopted.

let's

vote on 1

through 2, 4 through 69, 71 through 77,

80 through 82 and 85 through 93.

Please call the roll.

Let me repeat this, 1 through 2.

4 through 69, 71 through 77,

items 80 through 82 and 85 through 93. Please call the roll. >> thank you.

Councilmember blumenfield? >> blumenfield, aye. >> bonin? >> bonin, aye. >>
buscaino? >> buscaino, aye. >> cedillo? >> cedillo, aye. >> harris-dawson? >>
yes.

>> koretz?

>> councilmember koretz?

>> aye. >> krekorian? >> aye. >> lee? >> aye. >> martinez? >>

aye. >> o'farrell. >> aye. >> price. >> aye.

>> rodriguez? >> aye. >> ryu? >> aye. >> wesson?

>> wesson, aye. >> 14 ayes, those items are adopted. >>

let's move on to item number 3 called special by Mr.

Koretz.

>> thank you, Madam President.

I would like to first congratulate our

new G.M.

And note that you're taking this position at a challenging time in lawa's

history.

Obviously, with the difficulty with

covid, et cetera.

Couple questions I have, one is as you

probably know, I have made one of my

focus the city wide on climate change and sustainability, which I chair with the
mayor.

So I have some questions about that,

particularly I know you're working on

conrad, the rental car facility with southern california being one of the

hottest markets for electric vehicles

and car rental companies going through a transition, we proposed that conrac be

equip withed a generous number of charging station sxz we're still awaiting a
report back.

Can you give us an idea when we may

expect that report back and what lawa is doing about that.

Mr. Courts, we're going to let Mr. Erbacci into the meeting so he can answer the
questions.

>> I'm here.

great, do you want to answer Mr. Koretz.

>> thank you, Mr. Koretz. You'll be getting a response in the next

couple of days.

Our team is finalizing the document.

But just to give you an overview, the

conrac is being built to

support significant electronic vehicle infrastructure, specifically designed to

allow for the institution of each

electric capacity to support up

to 2500

level 2 charger for rental car companies including about 725 chargers for conrac

and airport employees as well

as visitors.

Then approximately 2500 level 2 chargers would support an estimated 15,000
rental

vehicles on a peak day.

So we're taking questions and putting an

infrastructure in the conrac project to

support the ev infrastructure. You'll get a full report in the next couple of
days.

>> terrific.

Also, we've inquired about the use of toxic herbicides surf as roundup and we're
awaiting a response on that. >> yes.

>> do you know when that could be expected? >> yes, we'll be providing that also
within the next few days.

I can say that we're not using roundup anymore.

We have not been using it since February. But again, we will follow-up in the
next couple of days with a letter confirming that.

>> great.

And also we proposed that lax like many other publicly accessible facilities in

L.A., make sure that food vendors provide at least one vegan option on

their menu. And we've got a gratifying level of

support from many entities on this idea

without our even having to make it a requirement yet. And the same goes for the
food

policy.

When do we expect lawa's report on doing

the vegan option and implementing a good food policy at lax.

>> councilmember, we'll have that response with you within the week.

I can tell you that as of late 2019

before the covid crisis, vegan protein

options were available in all of our lax terminals.

Concession, at lax offer

approximately 55 vegan protein options at 43 different sites. That will was
before covid. But we, it's a good start but we are

trying to do better. And we are committed to trying

to work with our concessioners to promote the use and offering of the vegan
protein options.

So we'll be writing that letter would you within the next couple of days. >>
great, that sounds like a lot of progress. I appreciate it.

One last que, the city's environmentally preferred purchase policy that many

departments including the port and dwp complying with.

We asked for a report on how lawa's complying and hope we can get that

report soon as well.

>> yes, we are in compliance and

submitting annual report to the bureau of sanitation but we'll provide a further
response specifically to our progress on that.

>> thank you, and thank you for your

good work and all of these arenas. And look forward to continuing to work

with you in this more permanent position.

>> likewise, thank you.

Mr. Bonin?

>> thank you, Madam President.

I just wanted to speak very briefly

because I had not had an opportunity to personally congratulate justin on the
appointment.

I'm happy that the mayor has made this choice, I'm obviously going to be
supporting it.

Jus inand I had a shotgun marriage a

month ago, when he was pushed into this role and we found ourselves working very
closely.

And man, you have been there in most difficult and trying circumstances and I

have appreciated your partnership.

You know, as you know, I've had

a couple

of other predecessors able to repeat the

montra of world class airport. >> world class air world, first class neighbor.
>> thank you.

>> we discussed this a lot lately.

A first class employer and a first class landlord who uses that to be a first

class employer as well.

We have a real big opportunity to do a

lot of good at that airport as we modernize it and good things are coming.

And it's not going to be pretty getting

through but I just want to thank you and

voice my support. And I certainly move approval.

>> thank you very much, councilmember bonin, I look forwarding to continue close collaboration.

Ms. Rodriguez. >> thank you, Madam President. Justin I just wanted to congratulate you

on a very well deserved nomination to

lead our world class airport.

And I'm just, you know, I know just

based on the amount of time that we

spent, looking and reviewing on the innovations of other international

airports and just your depth of knowledge was incredibly impressive.

So I'm looking forward to you bringing

our airport to that same 21st' century

standard that we had to review. Congratulations to you, well deserved

and I look forward to seeing the benefits of your leadership in this role.

Congratulations. >> thank you very much councilmember.

Mr.

Cedillo?

>> yes, Madam President.

Let me add my voice to the chorus here

on our new general manager.

I want to congratulate him.

And I want to congratulate the mayor, to see people come through the

process and

be promoted to bring thoughtful

leadership that swift here in the L.A. Family. It's a really important signal at this moment as we go through changes that

will be forced upon us by covid-19 that

we have that type of leadership.

I know justin is very focused on

inclusivity, he's a thoughtful leader and great challenges ahead of him.

The challenges of airport are

extraordinary given the impact on the

economy and tourism, the decline in

flights et cetera. I look forward to working with him and a

plowed him and thank him for stepping forward and meeting the

challenge of

leadership.

>> Mr. Buscaino?

>> in our t-3 committee, we heard Mr.

Erbacci vision moving forward including these times, these unprecedented times

in the pandemic.

I see commissioner burton and

commissioner roxborough who we appointed today earlier, smacker schwartz and the
incredible that Mr. Erbacci is

surrounded by. Mr. Krekorian raised some questions on how the airport is moving
forward in

response to the pandemic.

Just know colleague that in the coming weeks, we'll be asking both the airport
and the port to come back to this body

to respond to some of these covid-19

concerns as it relates in our economy. And these are two economies

that we rely on. In both the tourism travel and trade

spaces.

So with that, Mr. Erbacci congratulations. It seems unanimous support.

And we need you more than ever in these critical times. Thank you for saying yes
and thank you for your commitment to our great city and our surrounding
communities. >> thank you, councilmember.

all right, thank

you very much. And again congratulations mr. erbacci. Thank you for hanging in
there. Congratulations. All right members, let's move on to item, I'm sorry,
let's go ahead and call the roll.

>> blumenfield? >> blumenfield, aye.

>> bonin? >> bonin, aye. >> buscaino? >> buscaino, aye.

>> cedillo? >> cedillo, aye. >> harris-dawson? >> yes. >> koretz? >> aye. >>
krekorian? >> aye. >> lee? >> aye. >> martinez? >> aye. >> o'farrell? >> aye. >>
price?

>> aye. >> rodriguez? >> aye. >> ryu? >> aye. >> wesson?

>> wesson, aye.

>> 14 ayes, this item is adopted.

okay members, we

need to reconsider item number 7. Mr. Price needs to recuse himself from this vote. So let's vote on reconsideration.

Please call the roll.

Let's take off Mr. Price. Go ahead and call the roll? >> blumenfield? >> blumenfield, aye. >> bonin? >> bonin, aye. >> buscaino? >> buscaino, aye. >> cedillo? >> cedillo, aye.

>> harris-dawson? >> yes. >> koretz? >> aye. >> krekorian? >> aye. >> lee? >> aye. >> martinez? >> aye. >> o'farrell?

>> aye. >> price recused. Rodriguez? >> aye. >> ryu? >> aye. >> wesson?

>> wesson, aye. >> 13 ayes, this item is now before council.

all right, let's vote on the item. Make sure Mr. Price has been removed. Please call the roll. >> blumenfield? >> blumenfield, aye. >> bonin?

>> bonin, aye.

>> buscaino? >> buscaino aye. >> cedillo? >> aye. >> harris-dawson? >> yes. >> koretz? >> aye. >> krekorian? >> aye. >> lee? >> aye. >> martinez? >> aye. >> o'farrell? >> aye. >> price recused. Rodriguez? >> aye. >> ryu? >> aye. >> wesson?

>> wesson, aye.

>> 13 ayes, this item is adopted.

okay, let's move

on to item 78. This item, Mr. Krekorian needs to be recused from this vote. Go ahead and call the roll.

>> blumenfield? On item 78, councilmember

blumenfield? >> aye. >> bonin? >> aye. >> buscaino? >> aye. >> cedillo? >> aye. >> harris-dawson? >> yes. >> koretz?

>> aye. >> krekorian recused. Lee? >> aye. >> martinez? >> aye. >> o'farrell? >> aye. >> price.

>> aye. >> rodriguez? >> aye. >> ryu? >> aye. >> wesson?

>> wesson, aye. >> 13 ayes, this item is adopted.

okay, members we're going to prepare to go

into closed session. Never mind our city attorney is not here yet.

We were going to go into closed session

for item 96.

This was an amending motion by

Ms. Rodriguez. Go ahead and open the role. >> blumenfield. >> aye. >> bonin? >> aye. >> buscaino >> >> buscaino, aye. >> cedillo.

>> cedillo aye. >> harris-dawson? >> yes. >> koretz. >> aye.

>> krekorian? Mr. Krekorian, on item 70. Lee? >> aye.

>> aye. >> krekorian, aye.

>> thank you. And lee is aye, martinez. >> aye. >> o'farrell? >> aye. >> price? >> aye. >> rodriguez? >> aye. >> ryu? >> aye. >> wesson?

>> wesson, aye.

>> 14 ayes, this item is adopted as amended.

let's vote on number 79 as amended by Mr. O'farrell. Let's open the roll. >> plume field. >> blumenfield, aye. >> bonin? >> bonin, aye. >> buscaino? >> buscaino, aye. >> cedillo? >> cedillo, aye. >> harris-dawson? >> yes.

>> koretz? >> aye. >> krekorian? >> aye. >> lee? >> aye. >> martinez? >> aye. >> o'farrell? >> aye. >> price. >> aye. >> rodriguez? >> aye. >> ryu? >> aye. >> wesson?

>> wesson, aye. >> 14 ayes, this item is adopted as amended.

let's move on to item 83.

This is let's vote on this item as amend open the roll. >> blumenfield? >> blumenfield, aye. >> bonin? >> bonin, aye.

>> buscaino? >> yes.

>> cedillo? >> cedillo, aye. >> harris-dawson? >> yes.

>> koretz? >> aye. >> krekorian? >> aye. >> lee? >> aye.

>> martinez? >> aye. >> o'farrell? >> aye. >> price? >> aye. >> rodriguez? >> aye. >> ryu? >> aye.

>> wesson?

>> wesson, aye.

>> 14 ayes this item is adopted as amended.

let's move on to item number 84, this was called special

by Mr. Ryu.

>> thank you, Madam Chair. And colleagues, los angeles is home to

thousands of artist and small arts organizations and this pandemic has shut

their doors and put them at risk of perm

nal closure.

Sxl I don't want to see los angeles lose

its creative heart.

Which is why I ask to move my

development fund into an artist relief

program creating our first rent program

for virtual public art.

i also ask the department of culture affairs to ask others to join the program.

And I'm so happy that so many of you answered the call, councilmember is he

did I yo, wes upon and beauce ca knoxer has added another 320,000 to

the program. With Councilman Krekorian adding another

amount to district.

We're putting over a million dollars for

small organization sxz artist.

It's because art is need now more than ever and artists need our help now more
than ever. We need ways for people to connect to our city and want another
another while staying safer at home.

I want to give a big thanks for the department of culture affairs for all of
their work. Now let's get this money off the door to the artist that need it.
Thank you Madam Chair. >> okay, let's prepare to vote on this item. Please call
the roll.

>> blumenfield? >> blumenfield, aye. >> aye. -- bonin? >> bonin aye. >>
buscaino. >> buscaino aye. >> cedillo? >> cedillo aye. >> harris-dawson? >> yes.
>> koretz? >> aye. >> krekorian? >> aye.

>> lee? >> aye. >> martinez? >> aye. >> o'farrell? >> aye. >> price. >> aye.

>> rodriguez? >> aye. >> ryu? >> aye. >> wesson?

>> wesson, aye. >> 14 ayes, this item is adopted.

okay members we're

going to prepare the room for closed

session for item 96.

Ita please prepare the room.

[Council in closed session]

12 medicals and a quorum Madam President.

we have two specials. We're going to Mr. O facial to

make the findings. >> thank you, Madam President, this is a

rule 23.

L.A. Dot announced that full parking

will resume on July 6.

L.A. Has received the large record numbers of cases for the second

day. Highest one-day infection rate at nearly

3000. Unemployment remains at levels not seen since the great depression of

the 19 30s.

Los angeles is a county hot is a spot of coronavirus known across the

nation.

The state of california and L.A. County scaled back the reopening by closing
bars.

More people are at home now than ever.

And we don't even know what the next

day, two or three or five days will bring much less what will happen next

week when the parking enforcement

resumes its regular functions. So colleagues, therefore because of the

hardship and because I have been hearing just like an avalanche today, since
this

morning, from constituents in distress

over the renewal of park ing

enforcement on July 6.

On March 16, 2020 mayor garcetti announced relaxed parking enforce amount as
part of the covid-19 spobs.

Response.

Well that is meant for

residents not to feel overburden while we're still dealing with the impacts of
the

pandemic.

They announced it would start procedures on July 6 largely ending protection to

residents. Council will be on recess until the end of July unable to act.

While the safer at home orders are still

in affect and with one in five angelinos

facing unemployment. It's necessary to delay enforcement of this plan until at
least council is in session to assist the public as needed.

You therefore move that the council

determine as provided in section

4954.2b2 of the government code and pursuant to rule 23 of the city council,
there is need to take immediate action on this matter. And that the need for
action come to the attention of the city council subsequent

to the posting of the agenda for today's council meeting.

I further move the city council instruct the department of transportation to

continue for the month of July the temporary suspension of the following
enforcement categories as they

currently exist. Residential street sweeping, peak rush hour and gridlock zone

restrictions, a bond ond vehicles, the four hour

rule.

Expired registrations and loading zone resume the 10-minute grace period that currently exist. I further move that the council

authorized the department to wave all parking citations issued in the month of

July with respect to the categories above, above mentioned that May be issued in the month of July. >> second.

>> thank you.

it's been seconded business Mr. Cedillo. Thank you Mr. O'farrell.

We're going to move on to Mr. Buscaino

who introduced a special too for

findings. I'm sorry, Mr. Buscaino, Mr. Buscaino. Sorry, I skipped a step.

We need to vote on the findings for special 1.

>> okay.

let's go ahead and open the role. >> this is on the findings for special 1.

Councilmember blumenfield? >> blumenfield, aye. >> bonin? >> bonin, aye. >> buscaino? >> buscaino, aye. >> cedillo? >> cedillo aye. >> harris-dawson? >> yes. >> koretz? >> koretz, aye. >> krekorian? >> no.

>> lee? >> aye. >> martinez? >> aye. >> o'farrell? >> aye. >> price? >> aye.

>> rodriguez? >> aye. >> ryu? >> aye. >> wesson?

>> wesson, aye.

>> 13 ayes and 1 no, the findings are adopted.

thank you, let's

move on to Mr. Beauce ca who introduced a special 2.

Let's go to you sir to you can make the

findings, go ahead.

>> on today's agenda for the second

consecutive time the city of california

reported the largest cases, it's the

second time that the state

recorded more

than 8,000 in a single day.

And it's been said that it's in low income communities. We know several bridge home shelters will be opening.

And in order to mitigate the outbreak within the bridge shelter, it's critical

that this council a meaned this previous action taken in the early days of the

coronavirus emergency to resume comprehensive care plus clean ups in the

special cleaning zones established around the bridge homes sietsz

only. Sanitation is only conducting spot cleaning around tents and I've been alarming reports from field staff about

the state of the area surrounding our

bridge sites. Immediate action is necessary to begin

out reach and education in order to resume the more comprehensive care plus

clean up that have involved applying bleach solution to disinfect sidewalk. I therefore move that the council action

of March 17, 2020 council file 20-147 as

amended by motion number 72-p and 72-p-a, relatively to suspending

relatively care plus clean up be

authorized to resume care plus

clean ups within the special cleaning zones

established around a bridge home shelter only.

okay, is there a second for his findings?

>> second.

Mr. Lee, Mr. Bonin?

>> thank you, Madam President.

I need to rise and object to the

findings on this. There is absolutely absolutely

unquestionable no credible needs that meets the findings.

We knew that there was a covid-19 crisis in california. We knew that this item was approved in

March as a matter of health policy by this council.

We knew there were bridge housing shelters open.

We knew there were bridge shelter

housing that were going to open.

There is no new information that came to

us subsequent to the question of the agenda of this meeting. This is a big policy discussion that

should be one that the public is heavily

engaged in. This totally short circuits the public.

But on the merits of the findings there is no credible need that this meets the

find anding it would be illegal for to

us take this one up.

Mr. Buscaino? >> thank you, I respectfully disagree with Mr. Bonin.

Keep in mind when we first made the decision to suspend comprehensive clean ups,
there were no findings

then.

Keep in mind, we suspended clean ups during covid-19 people are in place.

But now we have ten bridge home opening, the original logic no longer aplies
because at the time they had no place to go. But now individuals around the
bridge

home sites have a place to go now that

these sites are opening. And it's extremely attorney that we move now more than
ever. And in addition it was the commitment

made by the mayor and this body for those neighboring communities.

We said yes to a bridge homesite.

Yes to solutions, we will promise

comprehensive clean ups and around the bridge home shelters.

>> I think we should ask the city attorney the merits of the motion not

the merits of the findings. And I would like to ask the city

attorney whether or not there is

anything in this that meets the rule 23 criteria that allows us to hear it
without public notice to the public.

>> as you know I don't apine on this

unless you ask.

So here's my finding, I don't think it can be made due.

>> objection, 8,000 cases. >> read the council rules, rule 23.

>> more cases in a single day. >> unbelievable. I object.

any other questions members before we vote on the special one?

>> I ask for a aye vote members.

Mr. Koretz, did

you have a question? >> yes.

So I didn't have a question. I just had a comment.

I think the urgency of this

situation is reflected by Mr. Buscaino absolutely

justifies the vote today.

any other questions?

Comments?

>> okay, let's Mr. Krekorian?

>> thank you, Madam President.

As I have on almost the vas majority of

rule 23 motions that we've made over the

last ten years, I'm going to be voting no on the findings.

And as we go forward on this, rather than getting in arguments among members based on whether or not they think the

substance of the policy is important or

not, let's remember there are two distinct votes under rule 23.

One is on the findings one is on the merits.

And it's been the practice of this

council to routinely overlook the

fienldings because we think something is

particular attorney to voteon. That's not a good enough reason under rule 23.

And we should not make that distinction based on whether or not we agree on the policy. If this moves forward, I'm going to move

in support of buscaino, but against the findings.

But if it's the rule of the majority, I

will vote yes on the substance because it's important policy.

But we need to be consistent in applying

rule 23 in the emergency situations that

is suppose to apply to, otherwise we're

essentially stricken by public participation in important issues that the public should be participating.

So I'm going to vote no on the findings. >> any other members? Okay, seeing none. Let's prepare to vote on the findings. Please call the roll.

>> yes, and this is on the findings for special motion 2.

Councilmember blumenfield?

>> I agree on the substance but i cannot support the findings. No vote.

>> bonin? >> bonin, no? >> buscaino? >> yes. >> cedillo? >> yes. >> harris-dawson? >> no. >> koretz? >> yes.

>> krekorian? >> no. >> lee? >> yes. >> martinez? >> no. >> o'farrell? >> no. >> price?

>> yes. >> rodriguez? >> yes. >> ryu? >> no.

>> wesson?

>> wesson, no.

>> 6 ayes and 8 NOs, this the findings

fail.

let's go ahead and open up public comment for

special one.

Can you please read the call in information.

And I also have the city attorney to speak on our rules for speaking during public comment. Gl ahead.

>> thank you, Madam President. As indicated on the agenda, members of

the public wish to go offer public

comment on special motion 114 call

669-254-5252 and use meeting id number,

1605358466 and press pound. Press pound again when prompted for participate id. Once admitted into the meeting, press

star 9 to request to speak.

Again call 669-254-5252 and use meeting id number, 1605358466 and press

pound. Press pound again when prompted for participate id.

Once admitted into the meeting, please press star 9 to request to speak. >> and I'll read off the speaking rules. When it's your turn, please state while there is only one agenda item, special 1, you want to speak on.

You have one minute to speak.

This is for special number 1 only.

It is not for comment on any other items or for general public comment. Sol when it's your turn to speak, you have to be on topic. If you're not on topic, you're going to get a brief warning from me or the President. If you don't get back on topic

immediately and clearly stay on topic,

you will be cut off and forfeit the remainder of your time. We're going to take 30 minutes total on

special 1. And finally people calling in to speak, when you hear somebody address you, you're live on the meeting.

Sol if you're listening to other devices

such as channel 5 and computer, please turn down the devices and because there

is a lot of time delay, and it will

cause a lot of confusion if you continue to listen to the devices while you're

live on the meeting.

before we open up

the phone lines, let's go to Mr. Buscaino. Mr. Buscaino. >> I'm sorry, that was a mistake, Madam President.

thank you, let's

take the first caller.

>> please state your name and item you would like to speak on.

>> I'll try tho say my name I'm eric

previn and I'm going to speak on special 1 and special 2.

there is no special 2, there is only

special 1.

>> discussion about special 2 that failed. >> the findings were not made so the

motion is not in front of council. the only item before council is special

1 which is Mr. O'farrell's item which is enforcing the parking rules

during the

recess.

>> I'm aware of what we are talking b

but I'll comply and speak only

on Mr. O'farrell relaxation of the parking

penalties and such as a courtesy.

But it's very very fishy that there

should be interesting discussion. >> okay, I'm getting back on.

Getting back onto the o'farrell motion,

houbl this is a good idea to relax this

and it is great example of this

application of the resources of crisis within a crisis within now a

surging crisis.

So good work.

The question is why did paul krekorian raise his crooked little finger and say no, so the public is interested.

And I think because he wants to maintain some fiscal responsibility in the base of debacle for the city of los angeles.

But these fly by so quickly and with your incoherent process of public meeting.

thank you, mr. previn. Thank you very much.

Next caller?

>> please state your name and what item

would you like to speak on.

>> rob kwan, I would like to speak on the only item that I'm able to find.

>> I don't think there is findings for rule 23.

You should note that the only person

that was vote against this was your

budget and finance.

He and mike bonin are the only people

that appreciate how things are exploded and things have really hit the sand with

our budget. Is support the enforcement, but you need

to pay for it.

So let's see more cuts to lapd. One more thing, councilmember buscaino, wants to talk about brown and black in your district. Why don't you deal with that.

Thank you, have a good one. >> please state your name and what item

you would like to speak on. >> speaker? >> please state your name and what item

you would like to speak on.

>> I would like to speak on special item 1, the only item before us, please. >> please, go ahead.

>> thank you, sir.

First of all, it's a big thing, parking

enforcement is like the reap accounts, you're raping the accounts the status

quo is raping the people. And postponing the enforcement is a good thing. Any relief that people can have is a

good thing. Covid-19 is just reeking havoc in the

country in general. And this is just one other burden that

the people should not have to put up with with with criminals itself and

going on vacation at this time, is more criminality, please stick with the item

Mr. Moses.

>> I said what I had to say. Have a nice vacation.

>> thank you, Mr. Moses.

>> please state your name.

>> yes, I would like to speak on the one special item. >> go ahead.

>> is agree with that it's a good idea

to relax parking enforcement. Sxl krekorian like somebody elsing if you're worried where that money is

coming from, maybe you can listen to the

thousands on the streets are on your

phone lines and defund the lapd, and defund lapd.

Defund lapd.

Before you go on recess, defund lapd. >> thank you, speaker.

>> please state your name. Hi, please state your name.

>> hi, can you hear me? >> yes, you're speaking on special 1,

please state your name.

>> yes, this is vivicd4.

>> go ahead.

>> definitely needs to be suspended, with how could vid is, it

should be worse.

We should not be going out. Dangerous, with people need to go stay

home.

Suspended going, fully, joe buscaino,

lapd bri, fuck you bitch. Please state your name, you're speaking

on especially one.

>> hi I'm danlia, to add to opposition

parking enforcement.

I don't think it's bad to add that to people's burden right now.

We have mass on unemployment. We have coronavirus cases

spiking in a

an area that has no parking.

So yeah, no parking enforcement. Extend that shit, indefinitely.

Please.

>> please state your name, you're speaking on special 1.

>> I'm linsay and I want to say that

suspending parking enforcement is the only logical thing to be doing

right now. >> I have been saying, there is no parking in L.A.

that is the whole thing. If you need money to try to figure out

how to do this, I remedy funding the police, defunding the police, defunding

the police. Defund the police.

I yield my time, fuck you. >> you're speaking on special one.

1, please state your name.

>> are you there, speaker? >> so we've exhausted the speakers that

have called in.

we're going to close the public comments on special 1. Please call the roll. >>
blumenfield. >> blumenfield aye. >> bonin?

>> bonin, aye. >> buscaino?

>> councilmember buscaino? >> yes. >> thank you. >> cedillo?

>> is he diz yo, aye. Cedillo, aye. >> harris-dawson? >> yes. >> koretz? >> aye.
>> krekorian? >> aye. >> lee? >> aye. >> martinez? >> aye. >> o'farrell?

>> aye. >> price? >> aye. >> rodriguez? >> aye. >> ryu? >> aye. >> wesson?

>> wesson, aye. >> 14 ayes, special 1 is

adopted.

okay, members

let's move on to verbal motions, Madam

Clerk, how many do you have?

>> go ahead, we're going to

finish, in

the sunshine, overtime to use the fund

in the community district 12.

>> transfer to the public works fund to

fund additional graffiti provided by

valley alliance.

>> seconded by Mr. Blumenfield.

>> next. >> special events prepared by the office

of c la that attached to the council

file. >> and that was seconded by? >> Mr. Bonin.

>> thank you.

>> a rule 16 motion has been presented

by councilmember ryu.

To mend council action of

December 16, 2016 regarding the arts development fee and expenditure report to change the

category proposed use of one cd4 to be determined to mural. And a seconder?

>> second. >> seconded by Mr. Blumenfield.

>> thank you.

>> to the climate change and

adjustis committee. It's to amend the prior action of July 8, 2018 to provide the city attorney

with the assistance of the c la be requested to prepare an ordinance

relative to the commission including the commission appointment and functions. Is there a second?

>> second. >> second by Mr. Blumenfield.

Next.

>> the next motion was

introduced by councilmember paul koretz to inter

governmental committee to provide

opposition to the sb25 to the

legislative which will dissolve district board of directors and require

the water to act as its receiver.

Is there a second?

>> second.

>> second by Ms. Rodriguez.

>> the second business councilmember ryu

>> it is to provide support for ab33

gable in the 2019 school employees, is there a second.

>> second.

>> second by Mr. Blumenfield.

Inter governmental committee to provide

support for sb1399 in the 1920

legislative program which would provide

protections okay contractors to share legal responsibility for their workers is there a second?

>> second.

>> governmental committee, it's to

provide support of sb1120

radkins in the

19 20 state legislative program approval

of housing development containing two residential, units and parcel map

dividing a map into two equal parts for residential use.

Is there a second?

>> second. >> second by Mr. Koretz? >> sxlt that was seconded by Mr.

Blumenfield, thank you.

okay, we're going to go to members, Mr. Bonin.

>> thank you.

In coordination with hcid to utilize up

to 585,000 plus 100,000 for staffing cost in cares funding available

for the

city to implement home program in the

penmarch area using a combination of

leasing model.

Further move direct lasa to coordinate

with dmh to develop such a pilot program

and further being able to identify funds that including hhap for covid-19 to
fund the program beyond the 2020

cares act. >> harris-dawson, second. >> any others? >> that's all, thank you. >>
Mr. Buscaino?

>> thank you, Madam President.

Not giving up on the need to disinfect

our sidewalks moving forward. So Madam President, I would like to introduce this
motion as a rule 16.

So I move that the council action of

March 16, 2020 as amended by motion 72-p

and p-a relative to suspending comprehensive clean up be amend today

authorize a bureau of sanitation to resume care plus clean ups within the

special cleaning zones established around abridge home shelters only. >> second.

>> thank you.

>> I'm sorry that was seconded business?

by Mr.

Krekorian. Mr. Buscaino, any others?

>> that's it, ma'am, thank you.

Mr.

Koretz?

>> thank you Madam President, I think

this could have been a rule 23, but I'll introduce it.

Where as assembly ruled introduced by

chad mire maze working to amend section

of the game code related to endangered

species that would undermine the nature

of cesa protection of southern california alliance and numerous others species,
now therefore be it resolved with the concurrent of the mayor that by adoption
of this resolution, the city of

los angeles include in their 19-20

program opposition or any other actions

to amend state law and cover endangered species act and numerous other a farrell
species. >> second it.

>> second by Mr. Ryu. Any others, Mr. Koretz? >> no, that's it. >> thank you,
Madam President. >> Mr. Ryu.

>> thank you, Madam President.

I have two resolutions. The first, there be it resolved that the

concurrent of the mayor by the adoption of this resolution, the resolution find

in their 19 2020, support for any legislation or administrative action

that would extend the deadline for housing element emissions by at least 6

months for the cycle covering October 20-21 to 2029 and housing community

development to extend application for

grant application to January 1, 2021 and I believe joe buscaino, wants to
second. >> second.

your second resolution, Mr. Ryu.

>> yes, my second resolution, I would

like to honor fits coalman and I know we

know fritz for the 39 years of outstanding public service and

commitment to our city.

Fritz has announced that he's retiring

from nbc 4 and he'll be greatly missed.

Everybody knows him as weather man for

nbc 4 and enjoyed lots of success.

Sxl as part fritz joined nbc 4 in 1992 and quickly became known in los angeles

for his sense of humor and infectious optimism and his weather reports.

He has been honored by our city as a

treasure of L.A. And honored with a congressional award with his fundraising efforts with red cross. Fritz is a los angeles icon with four

emmies to his name.

Also an actor, comedian, and most

importantly, in honorary mayor of taluca

lake in cd4, he has brightened our day

for 39 years.

Sxif a special get, and if I you would indulge me, I would like to bring up Mr. Fritz. >> can we get a second for Mr. Ryu's resolution? >> second.

>> second.

Ms.

Rodriguez, second.

Hi fritz how are you?

>> what if they didn't second it, would

I not get my proclamation.

you look way too

young to retire.

>> I'm honored to get this notification from councilmember ryu.

I did most of my fundraising work, I reside as Mr. Krekorian knows in the second council district and for years, I've been telling him

in-person, that I

have a pothole the size of a jacuzzi, yet he looks at me.

>> we're working on it.

>> all right, I'm just very

honored.

I have been the recipient of the

greatest luck in showbiz since that

women discovered slobs pharmacy.

I thank you for indulging me and keep up the good work in keeping us safe and
you're doing a wonderful time. Thank you for your time.

it's so great to see you.

Congratulations.

>> I needed him for that rule 23. >> I therefore be it resolved that by

adoption of this resolution the city of

los angeles, here by declares July 1, as fritz coleman day and xhends him for
his achievement.

And on behalf of the people of the city,

we extend our best wishes to fritz.

?O. May I second that, so he'll layoff me

about that pothole.

you can second

with Ms. Rodriguez. We've got people on the queue that would like to comment.

Mr. Cedillo?

Gilbert? >> hit the unmute button.

There you go.

>> Madam President, I have an award that

I received almost ten years to the date,

July 22, and I received this from fritz coleman and I want today share this with
you everybody, it's pretty aus

om.

I want today thank fritz

because he's a multi dimensional man, comedian, broad

caster, incredible human being,

extremely generous, deeply intellectual and it's been a joy to know him, get to

go know him as we prepare for this big

event but also to enjoy him as all of us do nightly.

But this was really special to me and my

family.

If you remember, I brought my mom she was tick told meet you. >> well we

appreciate all of your

efforts on behalf of homeless which is, the sole purpose. The whole council has been really supportive. Thank you so much councilmember is he did I yo, I appreciate it. >> thank you, God bless. Enjoy.

>> thank you.

Mr. Krekorian?

>> thank you very much, Madam President.

And fritz dmraitions.

Congratulations and best wishes on your retirement. But even more important, you've been somebody that the people of los angeles

have all thought of as more than just a news personality, people of los angeles have thought of you as a friend, a

member of the family, somebody that whether we've known you personally or not, people have felt that way

about you. And a lot of people are well-known in

the city.

But, not everyone uses their celebrity for purposes of helping others the way

you have throughout your career.

You have been one of those people who doesn't seek recognition, doesn't seek

the limelight for this, but just about every important cause in the east

valley, every important cause in our neighboring city of burbank, you're a

part of that.

And in, my district, the work that you've done for new directions for youth

in particular, in helping to lift up

families that are in great distress,

give young people on opportunity to

change their lives, and to go to productive future for themselves. You will, perhaps never know how many

lives you've impacted and how many

future generations of their families you've impacted permanently and for the better.

All of us are so grateful.

Not only for that optimistic humor that

you bring on our tv sets but also the work that you've done in our neighborhoods and in our streets to

change lives.

I guess I should not mention streets get off the platform.

It's been a pleasure to have

you on my

constituents and friends.

>> your words mean a lot, I appreciate

it.

Ms. Rodriguez?

>> thank you, Madam President.

Fritz, you know, you were in a

lot of households in mine growing up, fritz and fred were the combination that
so many

of us grew up getting used to that was

the regular voice in the house.

So it's just been an honor to watch you

over the worse of your career and congratulations on a well earned retirement.

You know, you have been a trusted source of weather.

You know when a lot of people like to

bag on the weather man for getting it wrong, we want to thank you for getting it
right. For all the good deeds that you do

outside of your day-to-day job.

Thank you for the job well done. >> my community out reach is the most
important.

And I'm not retiring from tha. I'll expand my work in that.

But I always say in the personal satisfaction universe, community out

reach non prove I can is more satisfying than being inaccurate of weather four
or five weeks.

Thank you very very much.

>> I have watched you for 30 years,

weather forecast.

when I watch you on television, predicting the weather, I sewn forget, and don't
even care what the forecast is.

>> perfect. >> you offer joy, and that's key to your allure and you probably
have a big fan base out there. And you just lighten every moment as you give a
very professional weather report.

So I think that's your success.

So thank you Mr. Ryu for bringing Mr. Coleman in.

Sxl to Mr. Krekorian, we should do

another rule 23, because we've ever never ever named a pothole. >> that would
make my life. >> second.

>> you got a second already. >> with the plaque that would be better.

>> we can make the findings right now,

create history on the spot for fritz coleman. >> thank you very much. That would
be fan advertise tick.

>> there is no basis for the findings he has been explaining about it for ten
years.

I was just going to say that the first time we vote for findings.

Mr. Koretz?

>> yes, I think we all enjoyed growing

up with you in our living rooms and enjoyed your broadcast and humor.

And as noted, probably better known

among many of us for your all your work and your out reach.

I will tell you, I will forgive you for

one of them.

You were the mc for my being roasted for the american diabetes association.

I was an easy target because I was

wearing a poorly suited cat suit and it

was rather embarrassing. I appreciate your good humor then and as now. We all
look forward to working with you

in the years to come on many good causes

wiz which I know you will throw yourself into more than you have. >> I
appreciate it.

Mr. Lee? >> Mr. Coleman, I want to thank you for your years of service.

I've been a city staffer one way or another for 20 years, and I've been to a lot
of charity functions. And it seems like you more than any other person in city
of los angeles,

were the host of those events. And I think, I think we always called

upon you to be that person. everyone in the room already feels like they know
you.

I want to thank you so much for

everything that you've done for

our city. But especially your charitable work and I'm so happy that it will
continue. >> thank you very much, Mr. Lee.

Mr. Buscaino. >> thank you.

Let me add to the chorus, I always wanted to be a weather forecaster. Always
wanted to be a weather man. >> you're over qualified.

>> in fourth grade in elementary years,

I watched you and I knew -- >> oh that hurts.

That really hurts. Oh man.

[Laughter]

>> every time, my friends at school,

said what's the like.

And I told them what the weather was like, and I said because fred would be.

And I met you a camp ronald Mcdonald for

camp charity trip, for kids for cancer.

That showed how much you gave to our non profits and kids struggling with
cancer.

That's just embodied who you were as a

person first and not the fritz that we know on tv. And on that boat trirntion i
shared with you my interest of being a weather man. And then you said why don't
you come watch I broadcast. And I took you up on that, remember?

>> no, of course I don't. I would like to think I'm part of your success. >>
thanks.

And I was in the milled of a 11 broadcast watching you do your work.

You took the time to open your doors,

open your heart and we are truly going to Miss You.

And I'm going to be applying

for your job.

>> you were quite a performer, because

diabetes association function where Mr. Koretz was decimated, you should have a

purple heart for that.

You were really very funny in your little recorded piece at the L.A. Zoo that
was funny.

>> and I'll end with this, 7-day forecast with coastal eddie front with a

high front coming in so the next 7-day

forecast is going to be amazing site here in the southland and back to you in

the studio.

>> bring him back!

joe, you missed

your calling there. >> listen, I don't want to take anymore of your time, I
appreciate your comments so much. And I made friends out of many of you over the
years and I really, this is a big day for me. Thank you very very much. See you
guys later. >> cheers.

thank you.

Tuz Mr. Ryu.

-- thank you Mr. Ryu.

Mr. Harris-dawson?

>> I have a motion that I want to submit today of which the movement clause I

move the city council authorize the

economic department with the assistance

of city attorney with the economic

corporation with the turn ending

December 31, 2020 for purpose of

conducting economic -- with the

scope of specified in council file, 1-1955. >> second. >> second.

second by Mr. O'farrell.

Do you have any others Mr. Harris-dawson? >> I'm done, thank you.

Mr. Price?

>> thank you, Madam President.

The moving clause is I hereby move that

the police department, that the L.A.

police department expected to request

the california deal office to

conduct an

independent review of shooting of daniel

hernandez on April the 22, 2020.

>> second.

seconded by Ms.

Rodriguez. Any others Mr. Price? >> no Madam President.

any other verbal motions? Okay, seeing none, Madam Clerk

what is next. >> council has motioned for posting and relevanteder.

post asked relevanteder, any announcements?

Mr. O'farrell? >> thank you, Madam President, I have an adjourning motion.

So I'll wait.

if there are any announcements. >> I have an announcement.

Mr. Buscaino, go ahead.

>> on behalf of this body, recognize your leadership, nury.

It's been a pressing 3 or 4 months, and

consistency, you've guided us and lead

us, you've physically been in

council in chambers along by your team, lead by alexis and ana and lacly, trying times i know.

You lead us through rule 16s and rule 23s a court proceeding on homelessness in the future of how we're going to deal with homelessness in our city,

in our

country, dealt with clearly a corruption

case has shed some light on

this and

tarnished the city hall reputation.

You lead us through toilet paper

shortage in our city. But nonetheless I want to thank you for your guidance and your leadership and I

know, there is a lot of patience over the course of the last three months or so.

And I just want to thank you on behalf

of this entire body for your leadership in these unprecedented times.

thank you, and

thank you for acknowledging my staff who has been amazing. Who have not had one day off since we

start today shut down. Not only our city halle building but the

rest of the building. Particularly these two amazing

staff that staft city council, alexis and ana,

who are mothers of young children but nevertheless they come into this building and do the good work for the people of los angeles.

I also want to thank our a mazing city

clerk staff, you have all been amazing

to work with, our ita here supporting us, our cla, thank you sharon for all you do.

This could not be done alone.

We have a small army of people, but we

try to do our best.

And members those who sent messages,

called me trying to get to the past couple of months, I appreciate

it.

Strefan thank you for keeping us in the leading path.

And the last thing I want to say, joe, thank you for the caring

messages. My mother has been ill soy look forward to seeing her and helping her.
I appreciate your thoughts and certainly your prayers.

So thank you for those kind

words. If there are anymore announcements, I would like to go to adjourning

motions. >> thank you, Madam President, and thank

you Mr. Buscaino for your

sentiments and remarks. The district heard some devastating news

the passing of eric swing.

john was the executive director

of sepa, we would like to adjourn today's meet

ining honor of john. John swing was a greatly

respect asked

passionate community advocate.

Swing had worked for filipino

americans.

He most recently managed sepa's program and multiple volunteer service projects,

never ever did I see john without a

smile on his beautiful face.

Swing was previously appoint

approximated director for

filipino arts and management for filipino inc., as

well as the asian pacific health foundation and help free san diego.

He served on the board for coalition of filipino chamber of commerce and my new
hope foundation.

A veteran of the united states marine

corps, and avid world traveler, swing

was try lingual, fluid in tagalan filipino and spanish and

english as a fourth. Earlier this year, the sepa

board of

directors unanimous lea proved swing's promotion to director after con

concluding a search to fill all the

vacancy of the top position.

He was just getting started in

this role.

the leadership, sepa's staff had -- to

provide on going uninterrupted assistance for small businesses, youth

and families during the covid-19 pandemic. In April, swing lead a food delivery projects for seniors and minority families in a filipino town with support

from the office of california state

senator, ming ling chang.

Honored sepa for early efforts during

the pandemic for the early recognition of unswung heroes.

In mid-June, swing had tested positive

for covid-19 and due to several complications was admitted to the hospital.

Eventually, lead to go his untimely passing this past sunday June 28.

He was 48 years old.

The sepa board approved a

motion to name

a small center in swing honor.

The future's face will be part of sepa's

soon to be redesigned headquarters.

Swing is survived by his wife ellen, his

four children, zachary, joshua, chloe and Mckenzie.

Two step children, sasha and niko, his parents, sister karen and brother pj.

He'll be repeated as a beloved leader,

colleague and friend and has

left an indelable impression on everybody who knew him including me. May he rest in peace. Thank you.

thank you Mr. O'farrell. Mr. Krekorian?

>> thank you very much Madam President.

Colleagues I would ask that we adjourn

this meeting of the los angeles city

council in memory of greg

leader bottom who recently passed away prematurely

after many decades of service to the

public, I had served the last

six years

with greg as a fellow director of

metrolink.

Greg served for 27 years in the orange county transportation agency board of directors.

And he was a disabled veteran a veteran

of the vietnam war, and throughout his

life, he was a fearless advocate for the disabled population, elderly, for

veterans and for public transit.

As a member of those cta's board, dial a

lyft which was their program to provide a portal to portal transportation with people living with disabilities and our

metro lane, one of his great legacies

will be metrolinks that are a D.A. Compliant.

So any disabled boarding a metrolink

train in the five counties of southern california will have greg winterbottom

to thank for the excess ability of that. He gave sofm of his life not

only to our country but to regional transit and to

as I said, people who are

living with disabilities and greg left a great legacy and he'll be dearly missed.

He is is survived by his son steven and daughter-in-law mitchell, May he rest in

piece.

any other

adjourning motions. Madam Clerk, our meeting is adjourned. Members, go serve

your districts.

EXHIBIT 5

Case 2:19-cv-06182-DSF-PLA    Document 83    Filed 08/18/20    Page 126 of 358    Page ID #:2784

# City Council Meeting - Wednesday

from becoming homeless, stop punishing these people because this city council has failed them. What a shit show.

People have been calling and

protesting for months price and

rodriguez, what is wrong with y'all? We said what we want and we

made that very clear. You're hearing us but you're

not listening to us.

Stop not protecting those.

While you get paid to take a

fucken vacation.

We're the majority, stop ignoring us or we'll make it

impossible.

Stop letting stops, kill us,

stop letting cops kill us.

Stop letting cops kill us. >> please stop being repetitive, either continue with your comments or we're

going to cut you off. >> stop fucking interrupted me.

Thank you I'm done.

>> so Madam, President. Our broadcast has gone down.

I suggest we take a short recess to figure this out.

We need the broadcast.

we'll take a recess and update you when we figure out the situation. Let's take a 15-minute recess

to figure out what is happening with our broadcast.

Thanks.

Ed

we're back, members.

Let's take a quick roll call.

>> councilmember blumenfield? Mr. Blumenfield? >> blumenfield, present. >> thank you. Bonin? >> bonin, present. >> buscaino? >> here. >> cedillo? >> here.

>> harris-dawson?

>> here.

>>

>> for et cetera? -- koretz? >> koretz, present. >> krekorian? >> here. >> lee? >> present. >> martinez? >> present. >> o'farrell? >> present. >> price? >> present.

>> rodriguez? >> here. >> ryu? >> present. >> wesson? >> wesson, here.

>> 14 members and a quorum,

Madam President.

okay Mr.

City attorney why don't you

read that substitute motion.

>> this was the same that Mr. Price read out for 44.

I'm not sure if he read it out

when we were having glitches as

lawyers like to reread it. 7.23, the council find that due to the immediate need to complies with the agreement

with the county of los angeles to house homeless individuals

who's health is at risk from both covid-19 and living near

freeways under passes and ramps and a bidding concerning 525

figueroa.

The public interest requires a

long term ground lease for

properties. to south L.A. Impact without

advisement for the bids for the purpose of housing for homeless.

I further move that the city

administrative officer with the assistance of chief analyst,

city attorney and any other

relevant department be prepared

and directed all documents to affectuate.

And the name of the bill is so

loud impact.

So it's S.O.L.A. Impact.

okay, let's go back to the public

comment. And resume with our next speaker. >> please state your name and what item
would you like to speak on?

>> hi, my name is add lien, I would like to speak on item number 46.

go ahead,

you have one minute.

>> greetings, I work for united

coalition on skid row, a program centered on enhancing

community safely.

On behalf of concern and those

who advocate with people

experiencing homelessness, we

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 129 of 358   Page ID #:2787

expect our opposition to item 46, council file, connecting our unhoused neighbors with support that they need are

critical at this time. Keeping people out of area does

not work.

The related enforcement leads

to criminalization and negative unforcement.

Bridge home shelters would impact the vulnerable and

increase the risk during this

coronavirus pandemic.

We must continue to think about

the cleaning emphasis.

Our commitment to change environment to discourage

alcohol and other drug related problems and enhance positive interaction. >> thank you, speaker. >> please state your name and what item would you like to

speak on.

>> hi there I'm jed on street watch and I would like to speak on item 46 and general public comment.

you have

one minute for each.

I want to echo what a lot of

people are saying, folks are

not against trash pickup and sanitation, but that's what

care plus is at all.

It's all about displacing and harassing homeless people out

of areas marked in the special

enforcement map or in quote unquote breakup zones.

To vote on this is an actual

threat to what sweeps are. And so, it's, disgusting to

hear even just a few weeks ago,

joe buscaino and mayor garcetti, equallyto shelter our care plus sweeps to erase

people.

Equally fucken important.

Do any of you agree with that?

Do any of you agree with that

and to get them help like my

friend rosie who lived in el

pueblo and you force her to

move out once a week.

Do any of you know, can you

talk to folks who live in there? No, you don't because you don't

talk to people who live on the

streets you talk to cops.

This is disgusting. If you don't vote know, you're

going to see us on the streets

we're going to be the ones protecting public health and

safety. you're the ones violating cdc

guidelines. Fuck you, joe buscaino, I yield my time.

next speaker. >> please state your name and

what item you would like to speak on.

>> hi, my name is elizabeth

hall and I'm taulg on item 46.

I live and I don't believe it

should be subject to sweep or

clean ups.

More aggressive criminalization will not solve the homeless nels cries.

We need to do more than punish

the homeless, it forces them to relocate and lose the little they own.

I encourage to you please vote no on number 46.

Thank you. Please state your name and what

item you would like to speak on.

>> I would like to speak on item 46.

>> great you have a minute.

>> I think to call the sweeps

cleaning is misleading and

displaces human beings with garbage in zones where tents are the only solution while we

try to get more housing and not just cosmetic efforts with these shelters that don't have the capacity for the real

numbers that we're dealing with.

I also urge to you remove

because when you have law enforcement with these under

served populations it would be

a sanitation issue to clean

around and not disturb the

please eliminate models that serve only the private interest. Does not really represent the people.

>> thank you. >> next speaker. >> please state your name and what item would you like to speak on. >> yes, I'm adam and I would

like to speak on item 46 and give a general public comment.

you have one minute for each. Go ahead.

>> what I don't understand is

it's been well established that these so-called sweeps don't have sanitation. So I'm confused as to why this is being pushed more during a pandemic. And you have to understand that

we know this is a criminal act,

homelessness is not

criminalizing itself. Our unhoused neighbors are just as many angelinos as you are here.

And on the public comment, I

hope you understand.

We need to defund the police. Endorsed by chief moore who is a criminal. We know it's not getting what it deserves. I yield the rest of my time. Thank you.

>> thank you, speaker. >> please state your name and what item would you like to

speak on.

>> hi, my name is kelly, and I would like to speak on 46.

>> you have a minl, please begin.

>> I think it's pretty ridiculous to continue to waste

money on moving people around

and destroying their property. When we talk about not having money to house the homeless, I

think we need to contextize that. And it's unsulting to think of the city budget as small.

We have the money, we're not a poor money, we have the money to house every person.

We're choosing not to do it and I don't understand why, if it's corporate interest.

We need to take a hard look at

your self and think about

humanity and understand that you're taking from people and

it's only going to get worse. Thanks, I yield my time.

>> thank you, speaker. >> please state your name and what item you would like to speak on.

>> hi, yeah, can you hear me.

And I'm from the echo park

council I'm speaking on item 46

and we passed a cis about it. I understand I get some extra time.

hold on

for just a second. >> you have five minutes to speak on the community.

>> I'm one of the co-chairs of the homelessness and committee

at the echo park council.

So I'm, I'm going to speak opposed to item 46.

I'm going to read on a letter.

So just the idea of these.

We're at the height of the

pandemic, at the point where

it's.

Simply find survive near by if

you don't have available.

And angelinos to constantly

uproot and punishment is traumatizing and counter productive.

Make it harder for their case

manager to get for them. This does infact brit

incredible amount of pain.

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 134 of 358   Page ID
#:2792

This money is much better spent

finding homeless housing.

We've heard the reddick that suggest that special

enforcement zones are important to secure the community.

We would like to make it clear that we welcome bridge homes in

our community. Don't harm our unhoused angelinos for being poor.

Thank you.

>> thank you.

okay,

let's take the next speaker. >> please state your name and what item you would like to

speak on. >> hi, can you hear me? >> yes, we can. What items would you like to

speak on?

>> I wish to speak to item 46.

>> sure, you have one minute.

>> I work in san pedro, cd5 15

and I would like to speak specifically to the harm agenda

item number 46 will create. I oppose the authorization of

the bureau of sanitation to

resume care plus clean ups within the special cleaning zones established around bridge

home shelters. The special cleaning zone, I wish to speak to the situation

in san pedro would severely affect the unhoused community

located near the post office between 8th and 9th street.

Despite the opening of a bridge

home sherlt at 5:15, now filled

to capacity, there are currently 63 tents surrounding

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 135 of 358   Page ID
#:2793

the post office.

Public health and covid are

being used to justify the new sweeps but resuming care plus

sweeps now would be in

violation of the cdc guidelines

during the pandemic which recommends that unhoused people shelter in place.

thank you. >> please state your name and

what item you would like to speak on.

>> I'm debbie and I would like

to speak one minute on public

comment and also on item 46. >> okay, you have two minutes for each. Go ahead. >> thank you. First I would like to speak on public comment.

I serve as a commissioner on

the board of neighborhood commissioners for the central area. And within that capacity, there

are a number of bridge housing

units that have been accepted by these communities, the essential area covers

everything from the hollywood

hills down to downtown to los

angeles where we know we have

skid row. And within that capacity,

although the board of neighbor commissioners does not, we do

not seek information on bridge housing, we do receive

information on the general

consensus that there is the

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 136 of 358   Page ID #:2794

interest so there will be clean ups.

Just for general information. >> please ahead with your

general public comment. >> please state your name and what item you would like to speak on. Please state your name and what

item you would like to speak on.

>> I'm diego demarco I'm with street watch L.A. I would like

to speak on 46 and general public comment.

you have

one minute for each.

>> vote no on 46.

care plus sweeps go against cdc guidelines and put unhoused

angelinos at higher risk. Considering that black people in L.A. Experience homelessness

more than the white people

here, direct attack on

struggling black angelinos and encourage police harassment

against our unhoused neighbors.

Meanwhile our youth in L.A.,

identify as lgbtq plus, we the

queer people demand that you defund police.

And give it inside to the vie land gang that is lapd.

We need services not sweeps.

Even though hhh and mayor

garcetti promised to overcome homelessness, we have empty

shelters and instead of helping

these citizens, the city polices them 24-7.

do you want to move on to your general

public comment.

And as we've seen over the

protest, the city's police are

a violent gang who escalate and with great pleasure.

So police do not protect and

unserve unhoused people.

>> speaker are you there? >> and encouraging is

negligence.

Renters are in danger of

homeless unless you cancel the

rents so those families will

soon be subject to the violence

that lapd already has created. So defund police not sweeps. I yield my time.

>> thank you, speaker. >> please state your name name and what item you would like to

speak on. >> hello. >> what items would you like to speak on? >> can you hear me? >> what items would you like to speak on. >> I would like to speak on 37 and 46.

you have two minutes, go ahead.

>> sorry, about that, I was

going to call and my cat jumped on me.

I don't want to take up too much time to reemphasize what

everybody said.

I heard another speaker talk

about 37 and 39 and it's dis

heartening.

What seemed to a positive

reforming.

Sorry many any others.

Please vote no, I think it's a

moral outrage to attempt to enforce draconian policies

against angelinos that is only

going to harm the greater community by increasing the

possibility that people who are

already unstable in their

housing and health. And resources and keep themselves safe and keep all of

us safe. >> thank you very much.

Next speaker?

>> please state your name and what item you would like to

speak on.

>> hi, is this me? >> yes, which items would you

like to speak on?

>> I would like to speak on

items 24, 37, 39 through 41, 46 and give general public comment.

you have three minutes for all of your items and one minute for general public comment.
Go ahead.

>> thank you.

Greetings.

Council if there is anyone on

this council that refuses to

acknowledge. Al fresco is still okay out

here. >> can I ask what item you're speaking on. Speaker can you please get

clearly on topic.

350,000 donation to the cops

from the cops to conduct an

investigation of the cops, by the cops, is that seriously

what is being suggested here? I sincerely, indiscernible] And

take blumenfield with you.

Items 39 through 41 are a slap

in the fucken face.

>> what item are you speaking

on now?

>> to increase laughable.

Fuck your police, fuck your

corporate entrance.

Fuck your film propaganda.

Fuck you all. >> please state your name and what item you would like to speak on.

>> hi, can you hear me?

yes, what items would you like to speak on? >> I would like to speak on 46 and general public comment. >>

okay, you have one minute for each.

Go ahead.

>> hi I'm karen clamsy I'm a resident of echo park. I would like you to vote no on item 46.

The sweeps are traumatizing and they invite more unnecessary interactions with law enforcement.

And you know, instead of treating these unhoused people

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 140 of 358   Page ID
#:2798

which are our house neighbors like garbage, like a previous

speaker said, we should be providing them with resources

at the air at the very least with trash cans and bathrooms. And then for general public

comment.

, I would say that this issue

is about to get much much worse like other speakers said. Many many thousands are at risk

of eviction and we will not be

able to sweep away all of these

people that were evicted. I recommend that you cancel

rent and take advantage of the empty hotel rooms. We need to get creative here.

And we all know how hard it is,

hopefully we know how hard it

is to know where it's there.

>> thank you speaker.

>> I believe we are end of our allotted time, we actually

extended because of the glitch.

But we have to open public comment.

>> so if we clear the phone

lines and reopen them for only

2 and 3 items. They're hearing regarding the establishment on business

improvement districts. And we're required to hear from

all members of the public who

wish to speak after the items. So after reopening the lines,

we're going to take any other speakers who have not had an opportunity to speak but want

to speak on items 2 and 3 only. Those are the only things that are open for public
document. And just so it's clear,

regarding the establishment of the encino commons property

business improvement district

and item 3 the establishment of

old granada business district.

So I suggest while the lines

are being cleared and reopened,

that the clerk reread the call in information for anyone interested on speaking on items 2
and 3 only.

Madam Clerk, go ahead.

>> and as indicated on the agenda, members on the public wish to go offer public
comment

on items 2 and 3 only, should

call 669-254-5252 and use meeting id number, 560-5358686

and press pound.

Press pound again when prompted

into participant id.

Again, call 669-254-5252 and use meeting id number,

160-538-8466 and press pound.

Press pound again when prompted for participant id.

Once admitted into the meeting,

press star 9 to request to

speak.

>> okay, let's go ahead and start public comment for items 2 and 3 only. >> please state
your name and what item you would like to speak on.

>> hi, this is mimi. Thank you so much for continue to go interrupt me. I'm so sick of you

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 142 of 358   Page ID
#:2800

doing this.

You are interrupting me.

>> so speaker, are you speaking

on items on either of the

business improvement business

items?

>> public comment should be

longer since you cut everybody

off.

>> I suggest we cut speaker off she is not speaking on 2 or 3

and let's move on to the next speaker. >> please state your name and what item you would like to

speak on. Please state your name and what

item you would like to speak on. >> okay, we appear to have nobody on that line.

>> please state your name and what item you would like to speak on. >> hello.

>> yes, hello.

Do you wish to speak on either of the business improvement district items. >> yes, I do. >> which ones would you like to speak on.

>> both of them, actually. >> okay, you have two minutes.

Please stay on topic. >> I have how many minutes?

>> you have two minutes to

speak on cumulatively on two

items.

>> I oppose both of these

business districts all there

are ways for these organizations to take money out

of the general fund of los

angeles and give it to this

elite group who bashes policing in the bids.

The city should do away with

bids, there should be no more

bids developed and especially

do away with the east hollywood bid.

As far as granada hills bid,

that's a total mistake.

And the what you did in encino, all it does, they're both racist.

All they want to do is there is these business right there that want to keep black people
out of their neighborhoods and what

they do is set up of these

enforcement zones to waste for racist policing of their

so-called neighborhoods.

And I would just like to say

it's an outrage that our money is wasted on these corrupt organizations. Thank you.

>> thank you, speaker. >> please state your name and

item you would like to speak on.

>> public comment bitch.

>> on speaking on either of the two items?

>> [Speaking spanish]

I would like to

call about the explosion that does not and --

the

speaker is on topic of the item.

>> [Speaking spanish]

thank you. >> please state your name and what item you would like to speak on.

>> hi, yes.

This is richie sirjinxo. Welcome back everybody, hope you had a nice swaix. -- vacation.

I would like to speak on 2 and 3.

I think it's great that you're

back in-house and talking about

being like encino commons property. You have not done anything.

get back on topic. >> you need to stick to the items.

>> okay, streffan.

You don't get to make the rules.

>> let's cut the speaker off. He's not on topic.

I would like to emphasize we're

trying to get through the speakers efficiently, you must

be on topic all the time.

Next speaker. >> please state your name and what item you would like to speak on.

>> hello? >> yes, which of the bid items

would you like to speak on?

>> csp is a sham another way to disguise. >> you're off topic.

thank you. >> so she is off topic. I suggest we move on to the next speaker. >> please state your name and

what item you would like to speak on. >> all right, rob kwan, I would like to speak on items 2 and 3. >> you have two minutes.

go ahead.

>> I said this before, these district business are -- it's a

tra if heser item. That we don't have voting that is tied to property. But that's actually a rich

history in america.

Just really sad to see when the

see continues on to this. Especially when bids are

fundamentally distracted.

It's sad to see blumenfield to

offer dialogue but he's forced

to offer it late.

>> can you get back on topic.

>> no, that's all I've got.

I yield my time, fuck you. >> please state your name and what item you would like to speak on. >> I would like to speak on items 2 and 3.

>> go ahead.

>> undemo cratic, violence against poor black and brown

folks. That's the explicitly to go

with them. To get rid of poor people, tie the security guards.

No no, we have to defund the

police in the city.

We need to a bolish them.

You're not getting a bid in echo park, not happening.

I yield my time, fuck you.

>> please state your name and what item you would like to

speak on.

>> hi I'm lena, I would like to speak on item 1 and general

public comment.

>> so we're only doing 2 and 3 on some of the bid items. >> sure, I'll speak on item 2 and 3. >> I don't know what is wrong

with you guys, I don't see if you just don't want to be successful at your job. >> please get on topic,

immediately.

>> [Indiscernible]

>> please state your name and item you would like to speak on.

>> speaker? Apparently there is no one on that line. >> please state your name and what item would you like to

speak on. >> this is eric slepran item 2 and 3. >> go ahead. >> first I want to say to the

attorney, you're vial. The way you're interrupting. >> please get on topic.

>> no no no. >> the speaker is off topic, let's cut him off. Next speaker.

>> please state your name and what item you would like to

speak on. Please state your name and what

item you would like to speak on.

>> hi I'm sarahi, I would like

to speak on 2 and 3.

>> go ahead. >> hello.

>> please, go ahead.

>> hi, can you hear me? >> please.

>> I just want to say, fuck you, I'm interrupting you the

way you're interrupting you. >> please get on topic. >> fuck you. >> no.

Next speaker. >> please state your name and

what item wows like to speak on. >> I would like to speak on 2 and 3.

>> go ahead.

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 147 of 358   Page ID
#:2805

>> bids are your attempt to jentrify.

>> can we get on topic, or are

you done? She has mong up.

-- hung up.

>> please state your name and

let us know to speak on 2 and 3.

>> my name is eric previn and these remarks are constitutional protected. This is set up through

businesses who pay a small

assessment and pull taxpayer money to focus on specific

needs as many as the callers

have said that are in line with gentrification.

And when people call about the services not calling, the role

of the lawyer is not to interrupt those speakers and

during that hearing.

In fact that hearing with john

lee.

That's why various activist

have brought reminders in the cease and assist. And they comply, because they have to follow the law.

We like it when they follow the law.

We also like when limiting

resources. [Indiscernible] >> please state your name and the item that you would like to

speak on.

>> michael, item 2 and 3. >> please go ahead.

Case 2:19-cv-06182-DSF-PLA    Document 83    Filed 08/18/20    Page 148 of 358    Page ID
#:2806

>> I have a homeowner in

historic sunset square.

I am white, I would be

considered affluent.

All the initiative that bids

are suppose to benefit people like me.

I lived here for more than 30 years.

They are harmful to the

unhoused to working people, to

primarily people of color.

And they are particularly

permission because they have

the veneer and appearance of

doing something positive and

good when in fact, they are

doing the work of destruction

and ruining our neighborhood.

This council, elected by people

like me, by your constituents,

have shown a willingness to be allied with the business

community and the real estate developing community voting usually unanimously to approve

these things.

We have observed in our sunset

square neighborhood, the real

down side of these kinds of initiatives.

When you set up special enforcement claims.

>> thank you, speaker.

>> please state your name and what item you would like to

speak on.

I would like to speak on items

2 and 3 speaker are you there? >> can you hear me >> please continue, we couldn't

hear you for a second. This improvement districts are

fundamentally.

Into the hands of the few, small businesses who fall below

the levee and are not liable to

pay out of the levee because

they increase rental values

where they're able to absorb

particularly multiple stores.

I cannot live anywhere where I work. i don't want poor people to

work here and serve people, but

we need to work here.

I can't cook for you if I drive

here from rancho cucamonga, it

does not make sense.

Are you thinking that you're

going to populate the city when

with the district.

I've seen, the results in business improvement districts

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 150 of 358   Page ID #:2808

where police come in and blue

light people, I don't see why

the city council would support

something to undemocratic. >> thank you. >> please state your name and what item you would like to speak on. >> I want to speak on item 2 and 3.

>> go ahead.

>> I'm dana, calling earlier, I

took off of my job today, I

know you don't know about a job

because you don't know about a job you take a vacation every

week.

I took my job off today so

speak on 46.

>> you're not on topic. >> you're still not on topic. >> let us know how we feel

about it. >> please state your name and

what items you would like to speak on.

>> items 2 and 3 and general public comment. >> there is no general public comment but you can speak on 2 and 3, please begin.

>> I want to echo the sentiment

of people who called regarding

the role of real estate

development and real estate LLCs in the decision-making of

the council itself.

And speaking specifically with

mitch o'farrell who is my councilman. And the conflicts of interest.

>> so speaker, I don't know how

this is on 2 and 3.

>> this is on topic, because

development constitutes 30%.

>> I'm sorry, you're off topic.

>> let me just finish,

development constitutes 30% of fossil fuel usage. >> no, you have not connected this up. Let's move on to the next

speaker. >> please state your name and what item you would like to speak on. >> please state your name and what item. >> hello. Hello.

>> yes.

>> oh, okay, hi. Two and three, I would like to speak on two and three.

>> go ahead.

>> I'm peggy kennedy, and I

live next to a big that was jerry mander to go after unhoused people.

And you know the bids are

inherently, and it's sad that

they police want with bids that

protect properties and violates the rights of human beings.

It's not progressive at all. It's wrong and you should vote

against these. That these young people are

hired and I mean, I feel for

them.

They're usually of color and

they need a job, and they can't go near these bids.

And they have a clean team and they pay you enough to maybe

register the vehicle you live in. So the bids, they're going

around, the police are are

telling them what to do.

It's the craziest.

These bids are bad, B.A.D. And you should really think the

city you live in if you have to go around creating private security and some solution to our problems.

Maybe we need to come up with positive solutions like

programs, and housing and not

these criminal acting bids that go after poor people and people of color.

We should be ashamed of your selves for continually doing

these types of things.

And I yield my time.

F-u. >> please state your name and what item you would like to speak on.

>> I'm joanna, and I would like

to speak on 2 and 3, please. >> go ahead. >> hi.

So I'm an organizer with street

watch L.A.

In the potential of two forbids

in the city is horrific. And I know I didn't point, you're not concerned with the

optics of what you're doing.

Bt much like lapd it's a

trojan horse of white vigilantly.

I had some friends that had

their housed by fires and anti

black harassment, of an unindividual and food developers and cops. I watched the same treatment

pushed out of their dam

communities by bids which by

the way are our property tax dollars from every business in the district even if it's not a

part of the bids.

We need you to abolish these bids. i'll never forget the trauma

and harassment that you talk

to, you don't talk to people, you want another law enforcement, we're kidnapping

people illegally.

Yeah, we need to get more dead

beats downtown in south park

where there are literally ten unhoused living.

I cannot believe the level of

sociopath today at the meeting.

You should be ashamed of yourself estrefan for silencing a woman.

>> I would like to speak on items 2 and 3.

>> please go ahead.

>> I live in downtown and we

have nine families in our area,

spending millions of dollars a

year on private forces, task and pepper spray and encouraging enforcement of

small crime and it's in their contract to enforce ideas like

broken window policing which

has been discredited. These are the sorts of things that if you want to act on all the things

that you've been talking about, in the last

month, if you want to actually, action, these are the moment sxz decisions that you need to make. Especially even in downtown,

we've seen bid support, you know, for corrupt projects from jose huizar.

We've seen them going to planning meeting, cheerleading

these projects.

We saw it with city market,

that was cheer leaded by a bid

in L.A., they showed up and they were cheerleading that project.

The developers did tens of

thousands of dollars to jose huizar. You're voting on this, item 19 today.

The bids are funded by the property developer, it's only property owner who pay into that.

The same people are then

developing these properties

sending the bids as some sort

of idea of public support when

they're non representative. And they're sending to cheer their own market, like city market L.A. Which is on the

agenda number 19 today.

You need to go much further

than such sustaining the mayor's [Indiscernible]

>> please state your name and what item would you like to

speak on. >> item 2 and 3.

>> go ahead.

>> business districts are anti proveeter when business improvement districts are

approved, then all the people

who are not business owners are

criminalized by business owners

who are only interested in

increasing the property values.

And that's fundamentally anti

poverty, it's anti homeless and

it also encourages developers to use these bids, the correct

projects through.

The housing 8 housing has been

closed for too long. I've worked in hotels downtown and they've had to close down

some of the restaurants because they didn't attract enough business so. A developer is

very good of selling the item

of these places as neighborhoods, economic centers and community centers.

But in reality, that's not how people live yet or probably ever will.

If it's in new york, you cannot

put this into something that

it's not, because developers

make nice presentation with

really cool visualization.

And then these buildings will

become blight in our city they

have already made all the money, made you look like

idiots and that we have all of these hotels that don't serve the people who live here. You're trying to attract the

peple who don't live here.

I've seen even on the metro.

members we're going to table items 2

and 3 for later in the meeting.

Let's vote on a couple of

items, Madam Clerk? Let's vote on 1 through 4. >> and if we're going to hold

the public comment for 2 and 3,

we should at this time just

vote on 1 and 4.

correct.

>> so if we would like to vote on all items that have public comment and have not been

called special, that would be

1, 4, 6 through 9, 12, 15

through 28, 30 through 41, 43, 45, 47 and 48. >> go ahead and call the roll on these items.

>> blumenfield? >> blumenfield, aye. >> bonin? >> bonin, aye. >> buscaino? >> buscaino, yes.

>> cedillo? >> cedillo, aye.

>> harris-dawson? >> harris-dawson, yes. >> koretz?

>> koretz, aye. >> krekorian? >> aye. >> lee? >> aye. >> martinez? >> aye. >> o'farrell? >> aye. >> price? >> aye. >> rodriguez? >> aye. >> ryu? >> aye. >> wesson?

>> wesson, aye. >> 14 ayes these items are approved.

let's

move on to item number 10 which

was called special by Mr.

Koretz.

>> item 10, sir.

>> yes, I just wanted to add some additional informal instructions to staff as we

move this item forward to consult with the task force,

streets L.A. And zoo and others

to consider how we create a circle.

Whether we can compost our massive amendments of food

waste to be used as fertilizer

in our organic parts.

Or whether we can use our

compost in the medians, the

ultimate goal is act of

withdrawing carbon out of the atmosphere and to create healthy oil.

So if we can do that, using our food waste, we should consider that as we move this item

forward. >> thank you for your comments Mr. Koretz.

>> let's go ahead and call the

roll on this item.

>> for item 10, blumenfield. >> >> blumenfield, aye. >> bo anybody? -- bonin? >> bonin, aye. >> buscaino. >> buscaino, aye. >> cedillo? >> cedillo, aye.

>> harris-dawson? >> harris-dawson aye. >> koretz? >> aye. >> krekorian? >> aye. >> lee? >> aye. >> martinez? >> aye. >> o'farrell? >> aye. >> price? >> aye. >> rodriguez?

>> aye. >> ryu? >> aye. >> wesson?

>> wesson, aye.

>> 14 ayes, this item is adopted.

let's

move on to item number 11 which was called special by Mr. Koretz.

>> yes, I just wanted to try

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 158 of 358   Page ID #:2816

this for the council.

We've been tracking a very

concerning condition called

pediatric syndrome, that is

affecting children, I believe

there is 100 cases in U.S. And

now up to 400 and at least 15

cases in L.A.

This is a variation of covid and it hits children's system

very hard. No deaths in L.A. But serious

enough to track it and get a report back.

And as we've seen with covid, things can change dramatically. especially as we're looking at

some school districts going

back to school and lausd

debating when they go back to school. This could dramatically

increase the spread of the particular disease and should

be taken into account.

>> okay, thank you Mr. Koretz. Let's vote on the item. Please call the roll.

>> blumenfield. >> aye. >> bonin? >> aye. >> buscaino? >> buscaino, yes. >> cedillo? >> cedillo, aye. >> harris-dawson? >> harris-dawson, yes. >> koretz? >> aye. >> krekorian? >> aye. >> lee? >> aye. >> martinez? >> aye. >> o'farrell? >> aye. >> price? >> aye. >> rodriguez? >> aye. >> ryu? >> aye. >> wesson?

>> wesson, aye. >> 14, ayes this item is adopted.

>> okay, let's move on to item

number 29 called special by Mr. O'farrell.

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 159 of 358   Page ID
#:2817

>> thank you, Madam President.

So item 29 is a motion I

introduced back in April.

When it was becoming apparent very quickly that masks like

the one I'm holding up and

plastic gloves were starting to

be seen in the gutters in several neighborhoods including

my own.

And that has continued with covid-19 and protective

equipment. Traditionally, a lot of these materials were used and

continue to be used in the

medical field and long been managed and regulated

accordingly. Covid-19 has changed that

because many people are using

the same grade used in hospital

to prevent covid-19 and

everyone should wear a mask go outside.

A resent study estimate that's

globally 129 billion with a b

face masks and 65 billion

gloves are being used widely.

This council has done a lot of

action in relation to plastic

in the ocean and plastic straws.

Pior to covid, it was estimated that plastic get

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 160 of 358   Page ID
#:2818

added to the ocean.

Not accounting for the 150 million metric tons already in

our ocean.

And of course the pacific ocean

is by plastic waste.

Ppe items will further damage

and raise a serious healthy risk.

This would make the issue of

plastic straws in our ocean and other plastic materials pale in comparison to dealing with the

public waste.

And if my little small corner,

every day then imagine what is

multiplied across the city of

159 square miles.

We must act as one of the largest cities, millions of

people in los angeles are wearing single use ppe and we

want to encourage them to do so but there is a serious threat

to our oceans.

And we must pickup ppe that is

left on our sidewalks and roads.

So my office is working closely

with sanitation on how to deal

with this and what special

measures we must take to collect this material to

protect the environment and

save the environment. For example many people don't

know that ppe cannot be recycled at conventional recycling facilities because it

can infect workers. Education prevents additional pollution to the river and

beaches and oceans.

Education is key to the change.

People must be aware and

importance of ppe where disposal is in order for enforcement and fines to be considered.

I would really argue that we

discuss a citations first before we start fining folks.

I think education is key here and that should be the approach

that we make. And then facilitating this type

of waste so that it's available to folks out in public who

discard it.

So I'm recommending that we

create an education plan in coordination with hospitals, clinics and other medical

providers and really, any

retail outlet online or

otherwise that our marking these ppe amenities.

I look forward to seeing the

los angeles sanitation report

on the medical waste city wide

and thanks sanitation for being present just in case any questions.

And we don't need to take off our eyes off of our environment

as we work to slow or stop the spread of coronavirus. This is not a strayed off that we have to make. We can do both. I ask for your aye vote.

thank you Mr. O'farrell.

Mr. Koretz? Thank you Madam President and thank you Mr. O'farrell for bringing this forward.

I think we're seeing a lot of

this problem and as you said, we cannot take our eye off the

ball in terms of this environmental and health

impacts.

I had a as we're having this

discussion and nothing formal, I would ask that sanitation and

others take a look at the fact that supermarkets and the oil

industry have used this as an

opportunity and an excuse to

bring back plastic bags by the hundreds of millions in los

angeles.

And so despite the fact that we

have had our law in place

changing this, there are now supermarkets which have used

unproved science to state that

reuseable bags cannot be brought into supermarkets and

used safely and that they must

use plastic bags. So almost every supermarket has gone in this direction.

And I would like to ask sanitation to look at this as well.

As we go forward.

>> thank you, Mr. Koretz?

Mr. O'farrell? >> thank you, Mr. Koretz,

that's a good point. i know that some markets, including my neighborhood target will allow you to bring your own bags if you bag your

purposes yourself.

I want constituents to know that. Talk to the store managers

where you shop so that we can

counter that false argument

that the plastics and oil

industry are making so that plastic waste can proliferate

our city and all of these uses once again.

We dont want to take a giant

step backward bases on false pretense that we're being

marketed by the oil and plastic industry. So in other words, this is a

way of saying that every day that people can get involved

right now with making the case,

it's a pretty trade off to say,

I'll bag it myself but I want to use my reasonable bags.

Thank you for your comments Mr. Koretz.

>> seeing no other members on

the queue, Madam Clerk, go ahead and call the roll on this item. Item 29. >> blumenfield. >> blumenfield aye. >> bonin? >> bonin, aye. >> buscaino? >> buscaino, aye. >> cedillo? >> is he did I yo, aye.

>> harris-dawson? >> yes. >> koretz? >> yes. >> krekorian? >> aye.

>> lee? >> aye. >> martinez? >> aye. >> o'farrell? >> aye. >> price? >> aye.

>> rodriguez? >> aye. >> ryu? >> aye.

>> wesson?

>> wesson, aye.

>> 14 ayes this item is adopted. Okay, let's move on to item number 42. >> blumenfield? >> blumenfield, aye. >> bonin? >> bonin, aye. >> buscaino? >> buscaino, aye. >> cedillo? >> aye.

>> cedillo, aye. >> harris-dawson? >> harris-dawson, yes. >> koretz?

>> aye. >> krekorian? >> aye. >> lee?

>> aye.

>> part necessary? -- martinez? >> aye. >> o'farrell? >> aye.

>> price. >> rodriguez? >> aye. >> ryu? >> aye. >> wesson?

>> wesson, aye.

>> 14 ayes, this item is

adopted as amended.

>> let's move on to item number 44. We're going to have two votes whether to substitute.

let's call the roll. >> yes thank you Madam President and this first role is whether to substitute. >> blumenfield? >> aye. >> bonin? >> aye. >> buscaino? >> aye.

>> is he dpi I don't? Cedillo? >> aye. >> harris-dawson? >> aye. >> koretz? >> aye. >> krekorian? >> aye. >> lee?

>> aye. >> martinez? >> aye. >> o'farrell?

>> aye.

>> aye.

>> wesson?

>> wesson, aye.

>> how much to hope the role. >> harris-dawson? >> aye. >> krekorian? >> aye. >> lee? >> aye. >> martinez? >> aye. >> o'farrell? >> aye. >> price? >> aye.

>> rodriguez? >> aye.

>> ryu?

>> aye. >> wesson?

>> wesson, aye. >> 14 ayes, substitute motion is adopted.

>> okay, let's move on to item number 46.

This was called special by Mr. Buscaino and amended by Mr. Blumenfield. Let's go ahead and start with Mr. Buscaino. >> thank you, Madam President

and members.

This council adopted a motion

72-p-a which among other actions directed sanization to

suspend.

City employees and contractors

to temporarily. They have two deployment

models, first one is care which

is a smaller team that performs spot cleaning and care plus

which is a larger at least

24-72 hours in advance. And to further complication matters, if you recall two

weeks after the council acted,

a federal judge ordered a preliminary injunction from

ceasing and disposing a bulky

items without prior notice.

Now prior notice is divided

with clean up whiches were suspended by council action on

March 17th.

And resulted on massive amounts.

I would like to ask ita to show

some of the photos of one of

the major clean ups in my

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 166 of 358   Page ID #:2824

district looked like after a

basic care team clean up.

Keep in mind, this was a clean

up on the photo you see before you, were taken after a basic

care team clean up.

You have residents that abut

these encampments in this area.

The majority of what we're talking about is not personal

property numbers.

The parks, and frames, scrap

wood and scrap metal and more

that has been building up in

the past 134 days. it's clearly junk plain and simple.

And what happens when you have

piles of flammable junk

together, you get hones for

rats that carry diseases like

typhus. Now colleagues, this clearly is

not sustainable.

Furthermore, I want to chair

with you that we're misinterpreting the guidance

which states as follows. If individual housing option

right side available, allow

people who are living unsheltered on in encampments

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 167 of 358   Page ID
#:2825

to remain where they are, clearing encampments can

disburse community this

increases the potential for

infectious disease spread, end quote.

Clean ups, do not clear encampments, they remove trash

like used needles and they

sanitize sidewalks with dis in

infectant. Required totem po rarely leave the clean up zone and after

being provided with postal

notice and a 30-minute grace

period to gather belongings and

move to the next block.

Similar to street sweeping, we

asked the public to

temporarily leave. Permanently clearing and

causing replacement as cdc and

public health caution against, versus briefly requiring those experiencing homelessness to

move from a single block so

that heavy equipment can be

safely use today remove track, and add disinfectant to streets

and sidewalks.

Le individuals leaving

encampments can return just as cars with return after a street

sweeper as well.

Now, if you heard from the

callers we're not asking lapd

to arrest or ticket anyone.

We're just asking to resume

care plus cleaning around a

bridge home shelter only.

Now over the July recess

rather, thankfully, there is

been several more bridge home shelters that are opened and some more scheduled to come

online and in total we'll have 24 sites city wide.

As we know there was a lot of skepticism about abridge home

shelters. Neighborhood surrounding

abridge home shelters would receive comprehensive care plus clean ups.

We need to follow through on

that commitment members and we

do so by demonstrating 100% compassion, caring humane

approach all while following

compliance with cdc guidelines.

We have 40 members, and wong from water shed protection division.

They are here before us.

If I can ask you to bring them

via zoom.

they're not here in council chambers, so we'll have to bring them in

zoom.

Let me verify that.

We've got two staff members from sanitation, identify yourself and Mr. Buscaino, do you have questions?

>> yes, if I can, before I ask

for a aye vote, I want to ask the representative from

sanitation to walk us through

on how sanitation moves forward on their care plus protocols and what is the difference between a care plus and a care

team that goes out on the spot

cleaning?

>> good afternoon, gabe miranda

with sanitation.

Care and care plus prior to the pandemic and the instruction from council.

The care plus provide a 24-posting notice.

The care plus teams have a

larger footprint to address a

larger product encampment and

includes sanitation of the public right away and one-day service to the abridge homes.

So since March, the care plus

teams have continued to meet

their need but follows the recommendation frz council and cdc.

So the care plus teams are responsible for illegal dumping

city wide.

The compare teams which one one is dedicate today council

district and one focus on the

L.A. River, they provide four

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 170 of 358   Page ID #:2828

day and gain compliance for adc. The care teams are also responsible for the trash

collection.

We deployed over 400 street receptickles and they manage those as well.

>> thank you for that. I ask for an aye vote. Thank you Madam President.

thank

you, Mr. Bonin?

>> thank you, Madam President.

I'm glad that we did not

consider this as a rule 23

before council recess because I

think it needed some proper input and it needed some

deliberation.

My first issue with the motion

before us is that what it states is on inaccurate.

The motion states that the

council action of March 17 relative to suspending

comprehensive care bus clean up

be amended and then the instruction.

That's not what the council did

on March 17th.

I have the instruction in front

of me.

The provision of tents to come down during daytime hours with

a number of exceptions that

this body asked for, a dc, access that not within 10 feet

of operable driveway.

So the motion is asking for

Miss Represents what the motion was. It's trying to reverse something that this council
did not do.

It's also promised on the idea

that the care and care plus efforts have helped it.

They haven't.

And there are regular on social

media cpra postings of where the clean ups are happening in ech of our districts.

So we're not only does this call for us to reverse

something that we didn't do,

it's asking for something to be done, that is continuing to happen.

It is not happening right, I

mean, the care and care plus teams are not what they're

suppose to be, they had a splash conference.

That has not happened. That has been largely reversed,

despite efforts to try to keep

it to its initial promise.

And the cooperative approach

towards cleaning up, has not to my perspective, happened sufficiently well.

When this item was before us in March, there were a number of speakers.

And I believe this was the last time we were together in-person

in chambers.

There were a number that said, we want the trash can clean.

Come and pickup the trash.

Case 2:19-cv-06182-DSF-PLA    Document 83    Filed 08/18/20    Page 172 of 358    Page ID
#:2830

I still, my impressions is we

still have not created a system

where we say, let's make this easy.

Let's give you additional and

then we can combine and we

don't have to fight and get into negotiation over a piece

of property.

If the issue is, a concern that

bulky items or junk, as Mr. Buscaino says, not getting

picked up up.

The issue is our 5611 bulky item rules. That's not something that is

going to change by this discussion or attempt to reverse something that we did

not do.

I also say that, when we heard this in March as well, there were people who said, please,

we would like you to clean the

sidewalks and many people will

voluntarily move their tents if

the sidewalk was cleaned. What they complained about is

that the city would post that

they would be cleaning their

sidewalk and people would move

their stuff and then the city

would not clean the sidewalk

again and again which started

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 173 of 358   Page ID
#:2831

to cause a refusal to move

their stuff because lucy had pulled the football away from

them, too many times.

It was a broken system.

I also say, I would dispute the idea that the intention of some

of the clean ups, not all. Some are genuine efforts to get

trash out of the way to keep,

what is their home for the

moment, that is safe and clean. The idea behind the bridge was

to do the clean ups sufficiently frequently that it would discourage people from

being in that area. So it is, actually according to

the bridge vision which is not on the under court divisions

what was to move people.

I would point out that there is a big difference between street sweeping and this.

There is a difference between cars and people.

And it's also worth noting that the suspended of street

sweeping for the time being

during this pandemic.

And what I think the council

did right in March, we voted to

listen to the public health and cdc and follow that advise

until the end of the emergency order.

At which point we would then consult on what the right approach would be.

It continues to be a right approach.

It's a difficult one because it

has along with the perfect

storm of circumstances, created

a diger encampments and lots of

bulky items that May be yes or no encampments to dumping.

That has occur.

I'm still confused on what

we're being asked to do.

They're calling for a

suspension of the caysser -- cares cleaning was asked to

do in March which we didn't do. So again, I remain confused.

thank you Mr. Bonin. Mr. O'farrell? >> this is a good conversation to have.

And you know, Mr. Bonin, we're still getting requests from

people who called in today, I

heard a few folks saying, we don't mind cleaning up.

We need to take a deep breath

and realize that all of us, and

even the majority of the callers, want the same thing.

And certainly the folks living

in the encampments who are experiencing homelessness that

I've spoken with, are welcoming

of interacting and having offer

services and having sanitation crews come through and sanitize the area.

So I think sometimes we put obstacles in front of ourselves

with some of the points of

conversation that we engage in.

When in reality, I think most folks want the same thing. Nobody wants to criminal lies

the homeless. We want to make sure that every

touch we make, there are somebody there offering

services and/or opening up a

case to get them additional assistance whether it's a shelter. Under the coronavirus and emergency order everything has changed.

But there is not the impression

in my district that the cares plus team is operating everywhere.

It's my experience that we have

to work directly with

sanitation to come with an area

and sanitize it without disturbing the person experiencing homelessness.

I'm wondering for the sake of

conversation if sanitation can address this.

If we can engage this this conversation, number one, we

don't want to cause displacement. That's one of their big

complaint. We don't want any of their

items destroyed.

We have not heard any claims of that, in resent times. But we know it happens, and

that's something that we should absolutely take great care of

that it does not happen.

We can even go so far as to

when we approach a clean up,

and I do mean a clean up and

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 176 of 358   Page ID #:2834

sanitation effort at an

encampment that does not

require a person to leave the

area but it takes the area

safer and the general public.

We can add other components, we can redefine what care plus

means for itself in this

reality of a greater awareness for, a more humane compassionate approach in general on all things homelessness. Those don't have to strayed one

for the other. It's also an opportunity if we

can do, some sort of weekly

posted attention to areas that

are indicative of the photos that Mr. Buscaino showed us,

that we can absolutely have

lasa caseworkers there as well

where currently they're not. Offering another pathway to wellness.

Along with if a tent is

contaminated and we see contamination that lasa offers

replacement tents.

Furthermore, just luke a renter

if they invoke covid as a reason that they cannot pay rent, if we follow the guidelines and that's do not

disturb them, we don't have to

make them move anywhere.

We can take care great of sanitizing the area around them

without having them to comply

to relocate in another block.

In other words, we can do this

more carefully and sensitively and more humanely by helping those folks who are not getting

the regular officer now. So those are some of the things I want to put out there.

And also when we go out there

and when we see this health crisis facing us, where is

county health? On they are on some of the

calls and out reach.

In my experience they're not, unless we twist arms and push real haseder. -- hards. There are lots of factors and

it's not just about the sites

to me where the bridge home shelters are, although's what is before us for the moment.

But we know that in encampments

people around them need special attention and that is supportive attention and not the attention that causes trauma and displacement. I think that's the language that everybody is talking about here.

So I would like to have the

space for that conversation.

>> is that a friendly amendment?

>> well Mr. Cedillo, I'm

putting that out there, I think what happens is sometimes we

get stuck that there is one

absolute way forward when we're

a council what our care plus

folks do so the folks that are

in concerned that we heard

calling in today, we can make

sure that those activities that we're being claimed are not happening. I want to open that for the sake of discussion.

And I would love to continue this, it's a discussion that we

need to have. We're not serving those with neglect and we're not servicing

anyone else who needs to use the public right away either.

We're in the business of not serving anyone with our current approach.

And I think that's what motivated Mr. Buscaino to bring

this forward. I wanted to put that out there

and see if we can come up with a solution. >> thank you, Mr. O'farrell. Mr. Harris-dawson?

>> thank you.

Madam Chair and Mr. Buscaino

for raising this issue.

We get calls even during the

pandemic because folks are more concerned about encampments near their house because of the

health concern.

I'm, I want to request from

sanitation some if you can rescue me from some of my confusion. So you started off by saying,

we're doing this care and care

plus clean ups before March 17th.

In March, on March 17th we took a vote that said we were going

to suspend the idea that we

cleared encampments so we

cleared out both the debris and

cleared things to move. My understanding, is we're going to stop having people move. I didn't understand that we were going to stop cleaning.

So I just want to get clear

from you, what is your understanding and what actually

what happened?

>> Mr. Harris-dawson, who are

you asking that question of,

staff or Mr. Buscaino?

>> representative of sanitation. >> Council President: sanitation can you please respond.

>> councilmember, so as of

March 17th, it was instructed

to temporarily suspend not

enforcing the tents, having to

do a comprehensive clean up in which the individuals would leave the area.

However the clean ups have not stopped, we're still doing clean up operations of trash

and debris and then the

accessibility issues that I referenced.

>> so how, what is proposed to date, change what you're doing.

Is it the fact that people

would take down their tents while you're cleaning or browder? >> it's the operation which

would allow us to do a

comprehensive clean up on the

right away which includes the sanitizing, where individuals would leave the area while we

perform the clean up.

>> hold on. >> one more question Mr.

Buscaino. >> momentarily what does that

mean in terms of time.

>> it varies depending on the

number of encampments it can

vary on time based on the area. >> what is the longest it can last?

>> on average, if I was putting

in an average two to three

hours is a care plus operation.

>> thank you for the average. so I'm asking you the longest. >> the longest can be the entire day.

>> okay. That concludes my questions.

thank you Mr. Dawson. Ms. Rodriguez.

>> thank you Mr. Harris-dawson

that's the line of questioning

that I wanted to ask sanitation reps.

How many care plus clean ups

have taken place since March 17

and around sites.

>> they're still on going just

with the restrictions of doing comprehensive, we're enforcing

any tefk.

>> so it would be a care type clean up than a care type plus. >> correct.

>> the difference between the

two is the level of comprehensive nature of the clean up. So it does make a difference.

I don't want to mix the two. I want to be clear about what we're doing and we're not

talking about the level of

sanitized clean up efforts that

are associated with care plus.

And I want to Mr. Harris-dawson.

When we cleared up packson and bradley which had 67

individuals, as as a result of relocating them to the project

room key locations, it took a

full week of clean up at that

location, tagging, we worked

very closely with sanitation, even enrique went out to the

site so we can work closely with lasa and managing everything and how we noticed it and
how we worked at the site.

I just want to be clear. You know, since March 17th, we have not had care plus.

And it was only with respect to encampments where individuals were being relocated. As
part of project room key

that they were able to facilitate a comprehensive clean up, is that correct?

>> that's correct.

So I just want to be clear. The comprehensive sanitizing of

the area is still very important for our unhoused angelinos. And you know, that is not
happening. So let's be really clear about what is and what is not happening.

And the only way that it is happening, is when it's

associated with the project

room key, effort. So I just want to be clear for

everyone.

I was getting confused as well

about what is happening where

and I don't want to, mix apples and oranges with the levels of clean ups that we're talking about and what was adopted

March 17th and the instructions

of how sanitation is actually

proceeding with respect to our directives from that date.

So I just want to be clear on that.

That said, I just opened awe -- a

bridge homesite and when he

talk about the levels of clean

up for the purposes of maintaining safety and security

of the areas given the covid-19 that, those disinfectants of that area, I think is important

for everyone.

It's why we went through the laborious of hand washing.

I think all the those things are important. i just don't want us to lose

sight and the importance with

that with respect to the

locations in and around where we're providing bridge housing. So thank you, gabe.

>> thank you Ms. Rodriguez.

Mr. Ryu?

>> thank you, Madam Chair.

And I really appreciate the conversation. I think my previous colleagues clarified what I was going to

say. Yes, as councilmember rodriguez, care plus is not happening.

I don't know what we're going to call these things, but care

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 183 of 358   Page ID #:2841

plus is not happening.

However, I do know, whether we

call it care or spot clean ups

and as I think as councilmember

o'farrell stated, both the community and both encampments

everyone is agreable with

picking up trash around

encampments which is still happening.

It happened on my district.

And this is why I also support

port-a-potties to make sure that our neighbors stay sanitary and what not.

But however, when it comes to

this issue, I know this is a very contentious issue but it's

very quite simple. Public health experts has made

it clear, absolutely clear that

encampment sweeps during a pandemic are a bad idea.

And I think it was iterated by bonin. Moving our neighbors around while they're trying to stay home at home, is unsafe for

tem and the community.

I think this is a public health directive about moving

encampments or if we want to say moving tents, that's not what is going to help them or the community during this pandemic.

What we donough, what keeps people safe and stops

homelessness are homes.

I want to focus less money on sweeps, on comprehensive sweeps

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 184 of 358   Page ID
#:2842

but rather building the housing and resources that solve this problem.

So I will not go against the

guidance of our experts so I

will not be voting to reintate the special enforcement.

>> Mr. Price?

>> thank you, Madam Chair. I appreciate the conversation

and comments by all.

I'm inclined however to support the motion, that we resume

these clean ups.

During bridge housing, say parking, community creating sanitary stations and even

considering some pellet housing

as a path for housing our homes, homeless neighbors.

But we also have to put some voters on clean up.

And I think the cares is that,

we have to be able to remove

trash and mull being' items. I'm not talking about leaving

folks away from the encampments, they don't now

they're going to stay en camed but they take out tables and trash for clean up.

We've got to do that. We've got to prioritize through

the health and sanitation.

Not only at the encampment but surrounding neighbors.

It's difficult, but I think, it

has had some success.

We need pushed the programs, the bridge programs for

promises to clean ups.

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 185 of 358   Page ID #:2843

We ought to resume those, and

we ought to be positively aggressive in doing it.

As I said, creating a safer environment not just those

homes but also in the residents

of proximity. I support the motion by

councilmember buscaino.

thank you Mr. Price. Mr. Blumenfield?

>> thank you.

I hear what everyone here is

making good argument.

And I think there is a way to land this plane so to speak. I don't think we're talking

about one of my colleagues was talking about encampments sweeps.

That's different than care plus. We're not talking about sweeps

and moving people out. We're trying to get enhanced clean up.

And you know, at the end of the day, the most important thing is we need to get people housed and off the streets and into housing. And the question is, how do we do that?

One of the best way iss by creating bridge homes and shelters and other places for

people to go.

But when we created the last

set, we made promise to see

those communities that the

areas would not be magnets for the buildup of items and trash.

We know that is happening. It's happening at project room

key sites. It's happening at other places. That's a promise that we made

with the community so we'll be

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 186 of 358   Page ID #:2844

able to get less resistance as

we try to build more housing and bridge homes and more shelters, shelter beds.

But I get it in terms of the health and safety issues because you don't want to be moving people around when we're

in the middle of a pandemic.

So that's why I put that amendment forward.

Because I think that one way to

kind of thread this needle is

to say, okay, we need to do these care plus clean ups which are not sweeps they're a little

bit more of a clean up.

And they require somebody to

leave for an hour, three hours. When is it okay.

Well when you look at the

stages, when we get to stage 3

which is is the higher work risk places, people are dining

indoors and going to the gyms,

doing all sorts of things. A lot more intensive than being

asked to walk down the block.

If we amend this to resume care

only when we get to stage

three, then I think we're honoring any sort of health risk because when you look at stage three.

A lot of stage 3 activities are

a lot more risky than walking

down the block while you're

area is clean and hopefully the

cleaning is a health issue. I get it.

But if we link it to a real

healthcare marker, you know, then to me it makes more sense to resume the care plus

activities. And I know Mr. Bonin, I think

you said you think they're

already going on.

If they are going on, then there is no sense to oppose this.

but I think they're going on. The idea is to -- that they're

asked people to move for a

couple of hours to do a comprehensive cleaning.

And when we get to stage 3, it's clear. That's why I put that forward and I ask for your support of the amendment, thank you.

okay, Mr.

Bonin? >> thank you, Madam President. There is a question about whether or not care plus is still going on.

And the department has said

that, it is, it's clear that

the number of members of the council don't think of care

plus as they want it to be is happening. Each of us has a different expectations of what we want care plus to be.

I would like care plus to be

what I wanted it to be. Even when we took L.A. Out of

it and make it a more cooperative approach, suppose to be public health driven.

When we are, we have a motion

before us, that says, reinstate

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 188 of 358   Page ID #:2846

care plus, that does not mean anything given that we all have a different understanding. If there is a motion or amendment that says, this is precisely what we would like to have happened, that is not happening now and it's not

relative of department of guidelines, that's a reasonable conversation to have.

I would love to have a conversation about actually

getting out of lapd out of it and doing the health approach

as we said we were going to do.

But right now, the motion before us, which exist right now, they will not tell us what we're asking the department to

do.

And I don't think we can vote affirmative on something that

is so vague.

It's almost a place holder or

opportunity to do 14 or 15 black op operations where we

all do something a little bit

different.

I would like to see the motion

simply state what it wants to

do.

>> thank you.

>>

>> mud in the water a little

bit further if could.

And point out, number one I

agree with the concept as

articulated by Mr. Buscaino. My sense when we started to

talk about this and placing them around bridge housing

locations, was that the attention be sort of

informally, at least in the

thought process of some.

But if you kept cleaning her up

that it would be a nuisance and some of these encampments might leave. That May have been a goal quite a while ago. `right now, I think we have the

opposite goal.

How can we clean these encampments up without having

anybody feel compelled to leave.

I'm not sure if there is a way to differentiate those two approaches.

I do know that along the way

when we clean up encampments not all the folks either returned to their space but they found they were getting too much attention and just moved to other locations.

we clearly don't want that. That's bad health policy.

So how we do this in a way,

that results in the least possible displacement, is I

think one of the things we're looking at and we should be looking at.

How do we keep them as clean and sanitary as possible but not lose track of the homeless

that we are trying to work with

and get into service and not

have them move into different

encampments.

thank you prosecute koretz. Mr. O'farrell? >> let's not leave this without a solution. And whatever that is going to

take because everyone is right. Everyone who has spoken is right. With exception of a few

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 190 of 358   Page ID #:2848

comments, everyone is on the same page.

And for that matter, the

callers also have a real

concern as it results to the term sweeps.

So I would like to get some assurances from sanitation,

assurances that as per the

council decision way back in

March, that we removed the lapd from the scheduled clean up

that that is and will be followed.

And in terms of the claims

about sweeps, I've got to the

clean up before covid and have

never witnessed a sweep.

I witnessed very very

compassionate approaches with

lasa while where everything is explained in terms of what is

going to happen next.

So I would like to hear

sanitation on that term.

sweeps versus clean ups. We don't need to live in this

world where we fight about

semantics.

There were calls from the people about people's elements

getting lost.

Case 2:19-cv-06182-DSF-PLA    Document 83    Filed 08/18/20    Page 191 of 358    Page ID #:2849

That needs to be addressed.

We need to earn the trust of

the folks that we don't do

sweeps but we sanitize.

So to gabe in sanitation, can you address clean ups versus sweeps? >> thank you, councilmember o'farrell.

I'm going to turn it over to our chief inspect or, howard wong.

>> yes, thank you. Again sanitation is not

operating under sweeps or that notion.

Prior to covid we had posted

clean ups.

A very minimum of 24 hours.

We do standard protocols that

identify our steps what needs

to take or encampment clean up, we work with lasa and L.A.

Family housing.

During the clean up operation,

yes we have hazards out there.

Anything that needs to be,

excuse me, bagged and as far as

personal care and care plus

clean up. One dynamic is compliance. Folks, sure I'll move down the street, while you do what you

need to do and we appreciate it.

You have other dynamics,

especially with covid where

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 192 of 358   Page ID
#:2850

it's cdc guidelines, we May

need to condition some of the

hosted clean ups in relation to

folks who declare a need to

stay put if they feel some sort

of threat based on you know, threat of covid-19 whatever it may be.

How do we incorporate those concerns and can something like that can be accommodated when

we do a post it clean up day of

action.

Can we do covid testing onsite?

Again I ask where is the county?

Can we involve the fire

department we're going to offer

real assistance and services. >> yes, councilmember o'farrell.

One of the things that we're

doing is synchronizing resources.

This includes bringing our

mobile hygiene unit to the for

front and providing the showers and lafd who is doing mobile

covid testing.

So those are great points.

>> colleagues, I feel that we

can get anonymity if we can

have this very basic list of

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 193 of 358   Page ID #:2851

conditions during covid to we can continue operations that

focus on health, well being and sanitizing areas and hauling away items that need to be hauled away.

The pictures of Mr. Buscaino

are real, we all experience

that in our districts. Let's deal with this in a

compassion at way.

It does not have be the way we announced last summer. It's a new world, it's

different thinking.

And I see alignment from all

sides, folks who called and

gave in passion comments and the other side as well. We want to do this in the most

humane approach.

We want to keep people well but

we do not nor should we try to purposely displace somebody in

this era that we're living in when we can offer them services

and get them on a pathway to

housing and wellness.

So Mr. Buscaino, I guess to just my final comment is, if we can, I don't know if we can do this now.

If we can take a moment. Whether it's at the next

council meeting again next week.

But make some definitions on

what care and care plus means

as it relates to the shelters

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 194 of 358   Page ID #:2852

are, based on the elements of this discussion. And the concerns that we've all

aired in this discussion.

Mr.

Buscaino?

>> thank you, Madam President. We need to leave with a sense

of urgency.

Although I respect Mr.

Blumenfield's amendment, I cannot support it.

We cannot wait until phase 3 comes.

Colleagues yesterday's news

from studio city, three

overdosed people under the

bridge.

Fire crews were dispatched

beneath the 170 freeway.

They performed cfc with adults

overdosed with an unknown drug, they were not breathing and they had no pulse when they

took them to the hospital. Firefighters searched the area

including tents at a near by

encampment for more victims.

Bottom line is, our sanitation

are not given the necessary

tools to pick up bulky items in and around those encampments colleagues. More homeless are dying.

We're doing a disservice if we don't pickup these bulky items

in and around these encampments.

We're doing a disservice to the homeless individual, to our businesses and disservice to our residents.

all I'm asking is to simply

clean up our streets. Why is that not acceptable? I just want to clean our streets.

That's all I'm asking.

So I encourage this up and down

vote to move on this.

These are not sweeps, it's irresponsible to say they're sweeps.

Just talk to the sanitation workers who are out tl. I've

been out there myself.

When they sort buckets of feces

and urine with the soiled mattresses, especially and around bridge home sites.

This is what we promised. If you say yes to a solution,

we will clean our streets and sidewalks. We're not enforcing anybody

right now.

In fact the city attorney has

only moved on six sitization, 8, that's it! That's all I'm asking colleagues.

I ask for an aye vote.

Ms.

Rodriguez?

>> thank you Madam President.

You know, again I just want to

reiterate with the lines of

question that I had with

sanitation that indicated that

they're not conducting comprehensive disinfecting

efforts that was presented with

the cares act model that is not occurring.

I know it occur in the bradley.

But that was an with removal

where 100% of those living in

that encampments were placed in

a project room key site. that said, to underscore these are not sweeps.

That's not happening.

And to allow anyone to misrepresent what is actually

occurring as part of an effort

to keep these areas clean and disinfected for unhoused

populations which is just as

important as those of us that

are practicing the effort to

sanitize wearing masks we have hand sanitizer and all of those things.

And frankly the idea that is

everyone else is allowed to

roam free in their city. Why can't we, treat everyone

equal in this process to make sure that we're keeping

everybody safe and in out of harm's way with respect to covid-19. I think the disinfectant practices are important right now.

We're not intent on disturbing

these encampments but we have a

responsibility for public health and safety to really keep these areas as clean as we

can. And so, you know, if I think it's important for us to have this conversation.

I think specifically, in and around these bridge home

locations, bridge home sites

which we unveiled 24.

You know, that's, it's important I think that we maintain the integrity of the

what the commitment was but to also maintain the cleanliness

of these areas.

And so, I just, you know, I

want to be clear, because I think it's really easy to labor the others, to labor the work

and calling it, what it's not.

and what I saw, even with

respect to an encampment that was noticed for sometime that

had not just months but over a

year of out reach efforts when

we were engaged with the members of that encampment consistently in order to

facilitate them to go into

project room key.

The amount of care and diligence.

Let's not forget, it was not

that long ago that the bureau

of sanitation were afraid to

pick up smft bulky items out of fear of being personally charged.

Sol there is not an effort to go beyond the scope with our

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 198 of 358   Page ID #:2856

sanitation workers.

So I actually, you know, I stand in support of Mr. Buscaino's motion. And I think it's the responsible thing to do.

Mr.

Koretz?

>> yes, I just wanted to point out something that nobody has addressed and I don't know

whether you're hearing about it elsewhere.

And I only heard about this

because I have a large

encampment about three quarters

of a black from my home house.

But there was a sanitation

truck week or two ago to try to

do a care clean up and they were chased away from the

homeless and they were not able to attend that clean up. So we May think that

eliminating the lapd from the process is perfect, but we May

need to come up with some sort

of a hybrid where if we're not

able to at all clean up the encampments because the

homeless are pushing back too

forward and too violently, we

May need some lapd back up in

some of these instances. Unless we're just willing to

concede that we're not willing

to clean up the ones where the homeless fight back. We May want to address them as

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 199 of 358   Page ID
#:2857

part of this process as well.

Mr. Ryu? >> thank you, Madam President. I think there is some confusion

here. You know, we heard from sanitation and I want to ask

this question as well.

Because trash clean up and

sanitizing is happening in the city.

I even worked with caltrans to

pick up our trash on the

freeway entrance sxz exits.

It's maybe to degree that we all want.

I'm sure that we can use more

and port a-a-potties but this

was an issue before this

pandemic. If this motion happens today

what would be the difference? What you're able to do now and tomorrow? If this passes?

>> thank you, sir.

If we were to change the motion

today to revert back to prior

to March 2020, we will be

conducting close to clean up. Even though we're under a restriction, our care teams are

still going out every day to each one of your districts to

ensure that the trash and

debris is picked up, and health hazard and environmental issues

that you can see, is addressed

by the bureau of sanitation. Regarding sanitation of areas,

you make an assessment of that. we will conduct sanitizing with

our cares them every day now.

Our customer groups worked with

the council district reps and prioritize locations. >> thank you, so basically what you're saying is you're doing

all the clean ups right now, but the only thing, that you'll

be able to do is you can

actually remove the tent and unhoused neighborhood and move

them to another area.

That is the -- there is a lot of background noise.

That is the only difference.

And it is clear again, public

health department and the cdc

has said please do not do that.

I don't know if public health

county from the county, I would

like for them to comment themselves but since they're

not here, that's what they told our office and city council and

the city.

And I want to comment on one

more thing that my colleague

said. Removing bulky items or displacing individuals is not

what is going to prevent a drug

overdose or a death.

What caused a death overdose is

the issue of homelessness and nothing solves homelessness like a home.

We need to go back to our care

plus what it was suppose to

provide servicele erosion.

Just doing a clean up to push them out to another

neighborhood is not going to

solve this crisis and they're advocating against it and this

is not going to help them from

overdosing on drugs. I understand the frustrations,

I'm equally as frustrated.

We need to divert more

resources so we can tackle this

problem holistickly.

But going back to the old

version, to move from my neighborhood to another council

district it's not going to

solve this problem but it will create a ping-pong affect. Thank you.

Mr.

Blumenfield?

>> thank you.

I agree that clean ups are not going to solve homelessness.

This is not the way to solve

homelessness or a health crisis.

But having some form of clean

up will make it easier for

community to accept bridge

homes and to hazards.

The only question is, from in my mind, we already said that

we want to do care plus clean ups around bridge homes.

We're not doing them because of covid.

And the question is is that too broad?

What does, what does the covid,

why are we stopping because of covid? We're stopping because of covid because,
especially at the beginning of the crisis, we

told everybody to stay at home except for essential workers. And I think it makes sense
that

we don't do these clean ups during stage one.

Now we're in stage 2, according

to the governor and county and

at stage 2, it's a little of a wobbler. We're not allowing indoor

dining so it's still a lot of

restrictions how people move

about and whether it's the

danger of that movement so I

think it's a wobbler is now the

appropriate time while we're in

stage 2 to resume the care plus clean ups.

I think kernl when we get to stage 3 and people are dining

and there is a lot more per missable activities and all of that stuff, it's hard to argue that
it's too dangerous for

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 203 of 358   Page ID
#:2861

somebody to move down the block

for a couple of hours, not to be pushed from one community to the other.

I don't think the intention is

to move it from one

neighborhood to another.

I'm glad that caltrans is

cleaning up trash in your district, but they're not

cleaning it in mine. They said they're not touching

it. If other folks are getting that

service, that's good for your constituence, it's not

happening where I am. So anyway, people I wanted to

speak again people are asking

me, a couple of asked me to clarify what this amendment does.

I want to be clear, it does

authorize the care plus clean

ups but only once we get to

that next phase unless determined by the governor, health determination.

Once we get to that phase where

we're starting to put these

hiring work places in place. Right there, it's clear that

it's not that extra risk.

That's a long time from now. Because the reality is, this, even when people start to go

back to restaurants or gak

going back to work.

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 204 of 358   Page ID
#:2862

It's launched to the ability of

getting this money back so you can be talking another year or

more.

so if you're saying, it can

wait until then, it can be a

legit conversation and you'll have to have that conversation around bridge homes and shelter housed and around anywhere in our city what do we want those clean ups to look like. And I think Mr. O'farrell

touched on that, that's a

legitimate thing, and we should

talk about that, that it's as

humane as possible.

So with that, that's why I put

that amendment because I think

we're in a wobbler stage.

It's a lot more clear when we

get stage 3.

So that's why where we're at.

It's directly linked to the health risks that we're facing.

Thank you.

Mr. Bonin?

>> thank you Madam President.

A question for city attorney,

the motion is that we rescind a

motion we took in March but

it's not a motion that we took

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 205 of 358   Page ID #:2863

in March, is that even an order?

>> I'm not sure if we have taken the action or not.

>> did not. >> I do know this.

>> that if you vote to stop.

>> I do know that if we didn't

take the action and we rescinded, we don't do nothing.

It's a point of debate what actually occured.

>> well I think it's a matter of written record that it's

very easy for anybody to see

but I'll leave it that. Colleagues, I'm still unclear

on what the hell it is that we're asking to be done. I've asked and the answer was,

we want to clean up the streets.

What does that maeb?

-- mean.

the history for years of the

city handling of homeless

encampments that's been littered with controversy and

litigation.

And the we have been guided by consistent direction. For this body to say that we

want the streets to be cleaned,

go ahead and do it.

That does not give proper guidance to frontline workers

and gives no guidance to those

living on the street and those living in neighborhood where

there is a lot of encampments.

And adding more detail or more volume to what we define

problem to be, does not put anymore details on what the proposed solution is.

So if this is about doing more bulky item pickup.

Let's see a proposal about how

we can do compliance and do

more bulk item pickup.

If this is something about doing preventing drug overdoses, then maybe we need

to be doing more of what ryu

said and providing healthcare

service sxz getting people off

the street and provide services

and help them from getting addicted.

If this is about dying, why are we focusing on new bridge housing. If we're doing
something that saves people from dying, you

should be trying to do it everywhere. What I was suggest colleagues,

because saying we want to

restore care plus, we can say

on one hand in the course of this conversation, we want to

do care plus but we dont want

to violate the cdc guidelines.

On the other hand when asked by

the number of this council what

they interpret this to be we were going back to thungz the

ways we were doing which is

taking down the tents which

against cdc guidelines again

public health and us substituting professional

health advise for consideration.

It's not how we should be

asking during a pandemic.

I would welcome seeing a motion

that talked about better

protocol in sanitizing areas

and cleaning sfraoets at

encampments and left them in unhealthy situations.

I would like to see that and

have comments on that, by the

city attorneys that are dealing

with the bulky people filing

lawsuits and I by the people unhoused and people doing the

work on the frontlines and by our county health officials.

We can do a lot better on in what this motion is seeking to

do but we need to be smart

about it and we need to make sure that everybody impacted

weighs in so we don't kind up

making people sick and kinding

up in another litany of lawsuits.

I would enter a no vote.

seeing no

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 208 of 358   Page ID
#:2866

other members on the queue. Madam Clerk, let's prepare to

vote on the item. Let's first vote on Mr. Blumenfield's amendment.

Go ahead. >> again --

hold on. Mr. O'farrell did you want to

want to add anything else.

>> I thought I had my hand up and then it vanished. Thank you for calling on me.

>> so I think that we can land

this plane as Mr. Blumenfield

mentioned, and I think we can do so with some amendments.

And I would like to condition

my vote on the following that

when we when we renew the care

plus clean ups resume them

rather, as it relates to the

bridge home sites and the zones

that are specified there in, that there be a process.

First of all, we should agree right now, that cdc guidelines

must be followed. That should be something that

we agree to right now.

But furthermore, I, I would

base my vote contingent upon a verification system that includes the following.

And there is not enough time to

verify if this is duplicatve.

Number one, every day of

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 209 of 358   Page ID
#:2867

service that verifies adequate

service out reach.

Also, verification that cd

guidelines were complies.

Meaning if somebody invokes

that they're self isolate because of covid that they

accommodate that need. That's not everyone

experiencing homelessness.

Furthermore that the inspect or

verify and determine that the

guidelines on all of these days of service were followed with a

signature.

Furthermore that lasa also

verify that out reach cdc

guidelines, and service out

reach was conducted in relation

to the encampments and that compliance was voluntarily gained by experiencing
homelessness. If we continue to just looking the other way, nothing is going

to get involved.

Sol, we need vair verification that guidelines will be

followed. And lasa can also verify, and

this is where a big piece of confusion comes through, that

sanitation determines that a

site has contamination, that lasa can verify that that issue

was dealt with on the day off in an adequate and acceptable

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 210 of 358   Page ID
#:2868

manner.

So in other words, these

amendment to see hear all of

these requirement sxz report back.

In other words, we need to update the protocols for care

and care plus so we can address

everything that we've been talking about. No displacement of people

experiencing displacement. Lots of voluntary tare' compliance every time there is

a care plus.

That cdc guidelines are

followed sxl that the compliance spector now include

the protocols and that lasa also report and that they're

participating in all of these

actions and in concert with

sanitation as it relates to findings of contamination. That's always been a real issue

as well.

And I think that sanitation has

felt that their hands have been tied because of interpretations

that they can and cannot do as they come across an issue of

contamination.

And I know, in other words, Mr.

Buscaino, I'll support this if

we can make she's guarantees

based on the values that we as

it relates to our approach, at

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 211 of 358   Page ID
#:2869

these days of service clean ups where people are experiencing homelessness.

>> Mr. Buscaino?

>>

>> Madam President, I would

like to call the question.

okay, did

you want to accept any recommendations presented by Mr. O'farrell before I call the vote.
>> again I encourage an up or

down vote.

okay Mr. Buscaino has called the question.

>> it's a report back, as they

begin renewing and was care plus.

It's a report back, it's not,

that will get my vote. We just need to report back on these guarantees. >> that's fine.

We have 46 pages of protocols

and we can go through those protocols if that gets an aye

vote so we can get back to cleaning and disinfecting the

sidewalk, I will support that.

And to Mr. Blumenfield's

amendment if we're allowing

outdoor dining in phase 2 why can't we allow clean ups.

Mr. Buscaino, you called the question.

Go ahead and call the roll.

>> for clarification on the members this, item 46 the blumenfield amendment.
Councilmember blumenfield? >> aye.

>> bonin? >> bonin, no. >> buscaino? >> no. >> cedillo? >> cedillo, no.

>> harris-dawson?

>> yes.

>> koretz?

>> aye. >> krekorian? >> no. >> lee?

>> no. >> martinez? >> no. >> o'farrell? >> no. >> price?

>> no.

>> rodriguez?

>> yes. >> ryu? >> no. >> wesson?

>> wesson, no.

>> 5 ayes and 9 NOs, this amendment fails.

okay, let's move on to the item. Call the roll.

>> this is item 46 as amended

with the o'farrell buscaino

motion on the report back and it will be one vote.

Councilmember blumenfield? >> blumenfield, aye. >> bonin? >> bonin, no. >> buscaino? >> buscaino, aye. >> cedillo? >> cedillo, aye.

>> harris-dawson? >> harris-dawson, no. >> koretz?

>> aye. >> krekorian?

>> aye. >> lee? >> aye. >> martinez? >> aye. >> o'farrell? >> aye. >> price? >> aye. >> rodriguez? >> aye.

>> ryu?

>> no. >> wesson?

>> wesson, no.

>> 10 ayes and 4 NOs.

This item is adopted as amended. >> okay, members we're going to

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 213 of 358   Page ID #:2871

go back to items 2 and 3.

>> Madam President, let me read out the call in information

really quickly.

And then press pound again when

prompted to the participant id

once admitted press 9. 669-254-5252  and 160935 for id

meeting.

Press pound and then when

prompted to the participant id and once admitted press star 9

to request to speak.

We'll give it it a short time in case people are dialing in

right now.

>> please state your name and what item you would like to speak on.

>> I would like to speak on items 2 and 3. >> you have two minutes please

go ahead.

>> so I think that both of you

guys took a good example of

really bad undemocratic form.

As previously mentioned the

business district, and

stakeholders to criminalize and to demonized the homeless

community.

It does not mean that, they have the same rights that people have.

So I urge all of you to please

vote against this, although I

have no say because you are all

heartless mother fuckers, you

cannot take us to [Screaming]

>> you're off topic, thank you speaker. >> please state your name and what item you would like to speak on. >> shane. Shane.

Shane. >> item items do you want to

speak on.

Okay, so the speaker is off

topic, I suggest we move on to the next caller.

>> please state your name and

item you would like to speak on. >> speaker, what items do you

want to speak on? Okay, I suggest we move on to the next speaker. >> please state your name and what item you would like to

speak on. >> I'm from los angeles times calling on 2 and 3.

>> please go ahead.

>> it's unconsiderable that we're talking about these items right now.

I don't really have a lot to

say because I waited on two and

a half hours to give comments

on other items that you didn't

let us speak on, city council

is a disaster and we have an apocalypse on the horizon. >> thank you, speaker. >> please state your name and what item would you like to

speak on.

>> I'm calling on items 2 and 3.

>> please go ahead.

>> so I grew up in granada

hills, my dad grew up in granada hills, he had a chicken

farm and everything.

I urge you to look at the

report [Line breaking] And center, affective -- >> speaker you're breaking up a bit. >> sorry, can you hear me.

>> yes, go ahead.

>> okay, I strongly encourage the council before

consideration anymore b IDs to

read a research paper published

by uc berkeley.

>> okay, the speaker is breaking up to the point we cannot understand her. I think we have to move on to

the next speaker. >> please state your name and what item you would like to

speak on.

>> hi, I'm mimi, I would like

to talk on item 2 and 3 please.

>> please go ahead. >> the bids, I'm against the

bids, you need to abolish them.

You do not have to house people.

This would not help them. And it's just blatantly racist and anti black.

We know that los angeles is more likely to be homeless.

>> so speaker, I'm not sure what you're speaking either on the two bid.

Can you connect it up clearly.

This is on 2 and 3.

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 216 of 358   Page ID
#:2874

>> about the encino property bid and old granada cd12

property bid. If you're speaking on those I don't understand how that was the case.

Tie things up so it's clear. >> no.

>> okay, thank you. >> please state your name and what item you would like to

speak on.

>> I would like to speak on behalf of granada hills item. >> go ahead, please.

You have a minute for granada hills item.

>> yes.

There are five businesses in this property.

Everyone is closed. They shut down all the businesses. The parking lot is completely
empty.

In the front there is homeless

people and we cannot possibly

afford another tax on top of the tax that we're paying already. So I'm voting against it.

>> thank you, speaker.

>> thank you.

>> please state your name and what item you would like to

speak on.

>> speaker are you there? Apparently there is no one on the line.

Let's move on to the next one. >> please state your name and what item you would like to
speak on.

>> hi, I was a speaker earlier, we were breaking up, I hope you

can hear me now. >> we'll give you a minute.

You got in a fair amount.

>> so to give you the full

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 217 of 358   Page ID
#:2875

citation, the article from uc

berkeley research center that

you need to read about big and

policing impact officers

-- published recently in 2018.

And the first author is jeffery

and I suggest that you read into the harms that they do.

>> thank you very much speaker. >> please state yaer name and

what item you would like to speak on.

>> hi, my name is sarah from state watch, I would like to speak on item 2 and 3. >> please go ahead.

>> I would like to echo the sentiment of the other callers and opposition and what is

being proposed.

There needs to be completely abolish on housing people.

And I don't think this council realizes that forcing people

outside of the district, and taking their belongings and

everything that they own is not

solving the housing crisis.

I heard the housing members talked about housing room key.

It is impossible to get a project room key, you're not doing that.

>> so we're moving on to the

bid items, can you stick to the

bid items please.

>> like the previous caller

mentioned, do nothing to

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 218 of 358   Page ID #:2876

improve sanitation. Trash cans and sanitation stations and maintaining them

and you know, they do not deserve our taxpayer's money.

>> thank you, speaker. >> blews state your name and the items would you like to

speak on.

>> small businesses that can't

afford to pay improvement districts are priced out of the

districts.

That the district put away.

It's to be able to afford to

operate in the city and improvement districts take away the opportunity away from them,

not to mention that they do

nothing for street vendors, street vendors should be

included. >> thank you, speaker. >> please state your name and what item you would like to

speak on. >> eric. >> go ahead.

>> I just want to say that I'm opposed to bid.

I used to live in south park a

restaurant and I would regularly see the private

security forces harassing and terrorizing mostly brown and black unhoused people.

I just want to say city

attorney when you interrupt

people, when they say, power

black, and you tell them

they're off topic, this is

unconstitutional.

When mayor garcetti said this

is the good council, he was

lying.

So these bids, yeah, they're

anti black.

They're crimers for the 2028 olympics that's why they're

being put in place. >> genocidal term. Cleaning the streets. Think about what that means.

They're cleaning people.

Genocidal language. I yield my time, fuck all of you. >> please state your name and what item you would like to

speak on.

>> dq, street watch L.A. I'm calling in about items 2 and 3. >> please go ahead.

>> thank you.

>> I just want to plug the

website michael coalhouse.Org.

Everyone on the call that has

not been there besinger get radicalized. They're empowered to have

citizen arrest.

They're.

The only reason you bid is to put fear into us.

It's a scare tactics.

You want the police and bid to

follow the rules and they start to chuck people's personal

items.

I saw somebody take a --

>> speaker, we cannot hear you. Please speak to us yourself.

>> I'm speaking to you.

>> speaker we cannot understand

what that recording is saying.

Maybe you can summarize it.

>> I'm speaking to you, be

quiet.

So they started to chuck, they put port-a-potties and don't service them.

They try to get information to get them serviced.

They have to find people who

are contracted.

And good job reinforcing the sweeps.

>> I think you're off topic,

speaker.

>> this is still topic, look up

intersection ality. Not everything is on topic, go

on to the next speaker.

>> hello I'm name is iseal and

I would like to speak on 2 and 3.

>> I just want to say that

everything I'm saying is on topic when you completely cut off people. >> please get on topic.

>> I'm on topic, 2 and 3,

fauble you're a piece of shit,

2 and 3, you got to see what shit sticks.

>> move on to the next speaker,

please.

>> please state.

>>

>> Mr. Herman, you called in before and we cut you off

before. >> please state your name and

the item uz -- you would like to

speak on. >> sorry, I meant to say spindler.

We've exhausted our speakers.

that has concluded the speakers for this

item. Please call the roll.

>> the public hearing is now

closed for item 2 and 3 and

tabulation will take place in room 223 immediately and

tabulation will be announced on tuesday, August 4th.

And I'll continue with the roll call, councilmember blumenfield? >> blumenfield, aye. >> bonin? >> bonin, aye.

>> buscaino? >> aye. >> cedillo? >> aye.

>> harris-dawson? >> yes. >> koretz? >> aye.

>> krekorian?

>> councilmember krekorian? Lee? >> aye.

>> martinez? >> aye. >> o'farrell? >> aye. >> price?

>> aye.

>> rodriguez?

>> aye. >> ryu? >> aye. >> wesson?

Case 2:19-cv-06182-DSF-PLA    Document 83    Filed 08/18/20    Page 222 of 358    Page ID
#:2880

>> wesson, aye.

>> 13 ayes, these items are

adopted.

>> what is before us Madam

Clerk, now? >> Madam President verbal motions have been introduced by members.

why don't

we go ahead and start with those. How many do you have? >> we have ten.

go ahead. >> the first verbal motion to

be referred to the housing committee, has been presented

by councilmember cedillo.

This is to instruct the housing

community investment to report

in the feasable of using unused airbnb for housing. And a seconder?

>> second. >> Mr. Buscaino. Next. >> the next verbal motion has

been presented by councilmember

cedillo to be referred to the ad hoc covid committee and this

is to request the recreation

and parks to create a pilot program to designate social

distancing areas in parks so

that parks May safely reopen while following distancing guidelines.

>> second.

>> second by Ms. Rodriguez. >> Mr. Buscaino, did you have anything to add.

>> sorry. >> just mute yourself.

>> next. >> next verbal motion is being presented by councilmember

cedillo.

Case 2:19-cv-06182-DSF-PLA    Document 83    Filed 08/18/20    Page 223 of 358    Page ID
#:2881

This requires an ordinance.

That requires applicant. And entitle cd7 covid-19 programming. >> second.

>> second.

>> second by Mr. Cedillo, next.

>>

>> the next motion was by

councilmember monica rodriguez to be placed in the next agenda.

Motion offering a reward of

50,000 leading for information

to the identification and for

the shooting death of michael kelly on February 15, 2020. Is there a second.

>> second.

>> seconded by councilmember

blumenfield.

>> next.

>> offering reward of $50,000 personals responsible for omar medina.

Is there a second.

seconded

by Mr. Cedillo.

>> next motion was copresented by harris-dawson, krekorian and

koretz to be placed in the next

council agenda, it is to direct all city departments with assistance from the personnel
department and the city administrator officer to report

to the council with a request to new targeted position authorities that were not

included in the budget for fiscal year, 20-21. >> wesson, seconds.

Mr. Wesson.

>> next.

>> the next verbal motion is introduced by bob blumenfield

to be ruled to the rules elections and inter

governmental.

In the legislative program,

action against a person that

makes a 9-1-1 based on race and

religious and any other class. Is there a second.

>> Mr. Wesson wanted to be a copresenter.

who was the second.

Was that Mr. Buscaino. >> Mr. Wesson and Mr. Price.

>> yes.

hold on,

Mr. Blumed field.

-- so Mr. Blumenfield, your

copresenters are Mr. Price and

wesson.

second.

>> and final introduced by bob blumenfield to be recovered by

the ad hoc committee and direct the lapd to street service to

see report to the council with

an update on their enforcement

of the mayor's safer L.A. Order with respectful to mandatory face coverings in public.

Case 2:19-cv-06182-DSF-PLA    Document 83    Filed 08/18/20    Page 225 of 358    Page ID
#:2883

Is there a second. >> cedillo, second.

Mr. Cedillo seconds.

Who was the maker of the verbal motion. >> councilmember bob blumenfield.

thank

you, next.

>> and a verbal resolution has

been introduced by councilmember blumenfield to prohibit the parking of

vehicles in access of 22 feet

and 7 feet of height along

burbank boulevard between wood lake avenue and sedan avenue

and this is to be referred to transportation committee. And a seconder?

>> second by Mr. Cedillo?

>> those are all the verbal

motions that we're aware of. >> members, any other verbal motions? That have not been submitted writtenly.

Mr. Koretz?

>> thank you, Madam President.

The first one with Mr.

Blumenfield as a second, moving clauses I therefore move that the city attorney be requested

to prepare and present an ordinance with urgency clause that would require payment of a

fine of $100 for the first

violation $250 for second violation and $500 for the

third and subsequent.

For failure to comply with the safer L.A. Emergency to wear a

mask outside the home to be enforced by any city of los angeles agencies with authority

to do so in order to mitigate

the spread of covid-19.

okay, do you have any others.

>> yes.

I have another one with presumed second prosecute cd8,

I therefore move that the

department of civil on human rights and any department as needed determine a feasible of

establishing a civil and human rights impact assessment

program for applications to

department al city council and mayoral actions and decision

making and report back to the

city council within 60 days on

program scope and issue areas that could be addressed and program would fit into the

city's procedures.

any others?

>> yes.

I have a third one, to be

copresented by Mr. Bonin and seconded by Mr. Ryu, now

therefore be it resolved with

the concurance of the mayor,

support for ab345 emergency which would protect children

and families and communities across los angeles and across

california from the health and

safety hazards associated with

oil and gas extraction. And a last resolution.

so this is the fourth one?

>> yes, fourth and last.

To be seconded by Mr. Blumenfield, now therefore be

be resolved with the con cure

ans by the mayor, support for

sb1175 stern to strengthen

state wide protections against zoootic diseases. >> okay, Mr. Koretz?

Mr. Buscaino?

>> yes, thank you Madam President.

I move that the chief legislative analyst with

assistance of city attorney prepare and execute all necessary documents and take all necessary actions to grant ten million dollars in

coronavirus relief funds known

as crf to be L.A. Tourism and

convention board subject to the

cif as determined by the city's

administrative officer for the

purpose of operations in

response to the covid-19 pandemic.

stl a

second? >> please, anyone.

>> second.

Mr. Blumenfield. Any others?

>> no, thank you.

Mr.

Blumenfield.

>> I have one that did not get

picked up.

I therefore move that the

public and safety in

consultation to obtain a permit

for signs that are temporarily

fixed for buildings and fences as defined by municipal code

and rescind the 14th order to

comply citations for

temporarily signs violations

issued from March 20, 2020 to

July 5, 2020 as to the sunset date.

I further move that the council instruct the departmnt of

building and safety on which codes present life safety

concerns and should continue to be enforced during the covid

state of emergency and this is presented by Mr. Krekorian.

>> second.

seconded

by Mr. Koretz? Any others Mr. Blumenfield?

>> that's it.

Mr. Price?

>> thank you, Madam President.

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 229 of 358   Page ID
#:2887

On behalf of paul krekorian who is having some technical

difficulties, I therefore move that provide reports through the budget and finance

committee on the status of

city's finances and updates on revenue, expenditure and place in which employees are

describing to the separation

and uncensor program and

another pertinent detail that

impacts finances and its

meetings on August 24, October 26 and December 14.

>> second.

Mr. Buscaino seconds that. Any others Mr. Price?

>> no, nothing further thank you. >> Mr. Ryu?

>> thank you, Madam President. I'm also introducing something for councilmember krekorian.

I therefore move that the council instruct the chief cla in consultation with department

of recreation and parks and the

city library to the report back

in 30 days to the appropriation

of staffing and supervision sxz

supplemental programs to provide learning while distance

is associated. Federal cares funding for fed

val care responded as well as you know appropriate balance

reserve for preservation of city services reinvestment in

disadvantage communities and

communities of color and service delivery.

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 230 of 358   Page ID
#:2888

I further move that the council instruct the library

departments.

On wi-fi an each site would be

able to service students.

And I was going to second this.

Mr. Ryu,

I introduced this before the recess and how to utilize our

parks to do so. >> thank you Madam President.

This is from councilmember

krekorian, I was reading it in from him.

is there a second? >> I was going to second myself.

thank

you, any others? Seeing none.

Madam Clerk?

>> council has motioned for

posting and referral.

posted and referred.

Members any announcements? We have several adjourning motions this afternoon.

Let's start with Mr. Lee.

>> thank you Madam President.

It's with a heavy heart that I

make this adjourning, hal burnson.

He grew up in boyle heights and. Councilmember burnson was then

reelected to city council five

times until he retired in 2030.

Case 2:19-cv-06182-DSF-PLA    Document 83    Filed 08/18/20    Page 231 of 358    Page ID
#:2889

I want to talk about what he's

well-known for and that was

attention to safely. Which has saved countless of

lives here in our city.

Early in his career, he wrote

los angeles which required the restructure reenforcement of 800.

And by the time of the 94

northridge earthquake, and not

a single one of those buildings collapsed in the quake.

He was a respected leader and transportation, chaired the

committee and metro board and the southern california

regional rail authority. Councilmember burnson was a

master in planning and land use.

Despite being unpopular at the

time, he proved plans that lead to today's vibrant community of

porter ranch.

That over the years he has

raided millions to help disadvantage youth go to summer

camps. And open space for generations to enjoy.

I just want to share a couple

of personal stories about councilmember burnson as you know.

He was a fighter and one of the first times I met with him, I

got a good sense of this when I was work withing on

Councilman's first campaign. I saw him and yelled at me to

jump in the car with him. And we immediately drove off. And when I asked where we were going, he told me that he

reeived a call that somebody

was stealing our lawn signs and I said okay, what is the plan what are we going to do.

And he looked at me and said,

we're going to kick some ass.

And I tried to explain the most

of us, did not make the biggest

duo, but he just looked at me,

well we can try. He once accused of stealing me,

but told me that if I returned

the item that no questions

would be asked. He obviously found that item

but it became a joke.

Councilman Burnson was our patriarch.

I moved to councilmember

district in 1968, he was my

Councilman And always be my Councilman.

He set the standard that

everyone who followed him, has strived for. Everyone who lived in this community and city, has

benefited by his service.

He will always be a fixture of

council district 12 and missed

by me and our entire community.

He is survived by his wife

robin, daughter and he was unfortunately preceded in death

by his daughter.

In lieu of flowers, you can

donate to the north valley ymca. May Councilman Al burnson rest

in peace.

Thank you, Madam President.

thank you

Mr. Lee, if I May ask that you

add all members to the motion.

>> Madam President, I just want

to add to Mr. Lee's really well

stated adjourning motion.

Hal was a no-nonsense man.

Also noted his incredible sense

of humor and ability to write

which has become famous in cd12

some famous letters drafted.

>> letters that we cannot write today. >> letters that we cannot write today.

I think most recently when were

honoring nicole burnson and her departure from council, I got

to see him.

I was a 20-year-old intern when

I started when I had my first introduction to city hall and

hal was a member of the council.

And I remember him so well.

But it was in his visit to

council chambers again when nicole was leaving council

district 12 and moving on to

the office of finance, his

legacy continues and her example and her honorable service to our city.

I know how proud he was of her

work and you know, hal was

just, he was genuine in his support of the north valley

ymca which was I was privileged

to serve on.

It's, it's a tragic loss and a

reminder of how quickly time has passed.

But you know, my thanks to you for that beautiful adjournment

and my love to robin and sarah

and my dear friend nicole on

this tragic loss for the city.

May he rest in peace.

thank you Ms. Rodriguez.

Mr. O'farrell.

>> thank you Madam President.

I have two adjourning motions.

The first is a great friend to echo park a friend to me as

well.

And that's the passing of

Case 2:19-cv-06182-DSF-PLA    Document 83    Filed 08/18/20    Page 235 of 358    Page ID
#:2893

michael o'brien who passed way

on June 16th.

Mike at discovered his love for landscape architecture at ucla

extension where he received his professional designation inland

escape architecture in 1983.

In 86 after working in several architecture, he started his 20-year employment in the city

of los angeles as a landscape

assistance with a bureau of engineering.

The next year he was engaged

with the department of cutting policies and programs from landscape to design and
zoning regulations.

Michael was also very involved in community events and programs in neighborhoods
where

he lived over the past 36 years including echo park and silver lake. Michael was an active
member of

the stirring committee for the

citizens to save the he lesion park.

And collaborator. He originated public walking

tours throughout the community with the echo park historical

society as well and that is, it's through those

organizations that I met him

back in 2003.

Michael was committed to a cultural landmarks, including buildings and land scales and
involved for historic status

for the echo park lake with the city affairs department, another project I worked with

him on the nomination for the

wwi memorial grove, that we have been restoring over the

past few weeks.

Sxl historic monument for the mid-century jr and schindler desgn in silver lake where he

lived for 15 years in the 80s and the 90s until he moved and spent the rest of his life

living in echo life.

My other adjourning motion is

for gabriela o'donnell who was

a medical assistance and mother

of our friend robert garcia, I

would like to adjourn known as gabby.

Gabrielle a emigrated to U.S. With five-year-old robert.

She and her son could not speak

english when she settled

561,000 miles away in south

L.A. Where she cleaned houses. And became a medical assistance

in city of hope for 28 years.

She earned citizenship after

President Ronald regan signed

an amnesty bill in 1986, yes,

that actually happened signed

by regan.

It still took roughly 12 years

to become a citizen which the

mayor did at the age of 21.

Mayor robert garcia said in a statement, she came from peru in search of the american

dream and she found it.

She loved to help people and lived a joyous life.

She will always be the guiding light at the center of our lives.

My brother and I want to thank

the team at the white memorial

who took care of our mom for

the last days.

Hi step father greg is still in

hospital and on a ventilator.

We pray and hope for a recovery.

And mayor garcia, we will all

join you for step father.

Gabby passed away due to

complications from covid-19 and

survived by her husband pastor greg and her two sons. May she rest in peace.

Thank you.

Mr. O'farrell, if I can ask that

all members be added to the

motion of Ms. O'donnell and our

condolences to our dear friend

mayor garcia, thank you.

>> Ms. Rodriguez.

>> thank you, Madam President. I tragically have two adjourning motions. At a moment
when all of our first responders and so many

city workers are on the frontlines combating and

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 238 of 358   Page ID
#:2896

servicing our community in

response to the covid-19

pandemic, we tragically lost two of our beloved first

responders one in our L.A. City

department and one in our los angeles police department.

first I would like to adjourn

in the memory of firefighters paramedic, jose m-perez who passed away due to

complications on saturday July 25.

Jose began his career on

December 8, 2003 and assigned to fire station, 39, 59 and 23

and for the last few years,

fire station 21. He displayed generosity and compassion and I am paktd

everyone here whether it was his fellow crewmembers or

patients that he treated.

Many stories have been shared that demonstrate his kindness.

And I want to share one.

Several years back after

learning that a fellow

firefighters was experiencing financial distress, jose bought him disneyland passed.

He then proceeded to accompany

that family with him and his family and purchased all the

meals on that day as well as

souvenirs for the kids to take home.

It's indicative of who he was.

He was born at martin luther king hospital and grew up in lakewood.

Case 2:19-cv-06182-DSF-PLA    Document 83    Filed 08/18/20    Page 239 of 358    Page ID
#:2897

He lived in is cer itos with

his wife and three children.

Also survived by his mother

maria who lived in fontana.

The first member of our fire

family to lose battle to

covid-19 virus.

Jose honored and served and the city and fire department and it's in sadness that we adjourn

in his honor.

May he rest in peace. And colleagues, I again ask

that we adjourn today in memory

of police officer too,

valentine, val, martinez. officer martinez, fought a two-month long battle with

covid-19 and passed away a day

before jose on friday July

24th, to 20.

Val was born on February 22,

1975 in zacatecas, mexico. He served the people of los

angeles for 13 years.

Officer martinez was assigned to mission area division in 2008 and spent the remainder of 12 years there because he loved the mission division and the

community it served. He was a dedicated officer and

friend who can be counted on

when anybody else needed help.

A partner to meghan and soon to be father to twin boys who are due in November.

And survived by his mother and

father and sister diana and brothers ricardo junior, and

lavor and juan. It's with great sadness that we adjourn in memory of val

martinez.

The first sworn officer in our

los angeles police department

to succumb to covid-19 complicated. Our condolences to his family and colleagues.

May he rest in peace.

and if we

can please ask that all members

be added to both adjourning

motions and our condolences to families.

>> Mr. Buscaino.

>> a brother and grandfather and proud 50-year resident of

wilmington.

Francisco was born in

zacatecas, mexico.

He was a migrant worker in united states.

He married and created a

beautiful family with his wife

of 55 years, maria.

They migrated to america and

knew it would provide a great

opportunity for his family.

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 241 of 358   Page ID
#:2899

Proud member of the car penters union.

Sxl in his spare time he

enjoyed gardening and cooking

and he loved to swim and

workout six times a week.

He was a parishioner of St.

Paul for 28 years and served as

an usher at the 9:30 am mass for over ten years.

He was a man of strong faith and nothing was more than important than spending time

with his family.

When asked about his greatest

accomplishment, he responded my grandchildren and becoming a

U.S. Citizen.

He is survived by his wife and

children and grandchildren.

Three great grandchildren and

siblings.

He's proceeded in death by his

fathers, brother thomas and 20

great grandchildren.

Francisco May he rest in peace.

And secondly, members I would

like to adjourn in memory of

steven with great sympathy that

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 242 of 358   Page ID
#:2900

we adjourn in his memory.

He's the owner of barber shop.

Steven was a proud father of 12

and grandfather and a barber

who put God and his community

first.

Steven truly exemplified the in

watts communities.

Became a staple to every families's fade.

Steven made it his mission to continue reinvesting in the watts community by supporting

youth and careers in his shop,

donating what he could to locate at businesses providing free hair cuts and day-to-day

items to families in need.

Steven's loss has left the

community mourning a man who provided a safe space for those

who needed a community and

sense of belonging. May he rest in peace.

thank you.

Mr. Ryu?

>> thank you, Madam President. I want to adjourn today's

meeting in the memory of

marjory plat.

Was knowner to family and

friends as margely.

And her grandson reminded that

Case 2:19-cv-06182-DSF-PLA   Document 83   Filed 08/18/20   Page 243 of 358   Page ID #:2901

she was matriarch. Margie and her family moved to

los angeles when she was six

years old.

Started her career at macy in

wilshire.

It was over a broken juke box

that she met her husband and

began a 60-year partnership.

Married and 1925 and lead one

of the most well-known families.

Her father founded temple and

both fern and margie expanded

its size and breath.

O marge and herman also

committed their lives in supporting institutions of

faith education and healing including seeds ar cyanide,

ucla and others. They threw themselves into

serving others and our city. Marjory and gallery. But above all, marjory was devoted to her family and

children.

Raised them with her other children. Margely became the matriarch

that included five children, 16 grandchildren and 27 great grandchildren.

Each of one of them should love

with their unique charm.

on July 11 of this year, margie

Case 2:19-cv-06182-DSF-PLA    Document 83    Filed 08/18/20    Page 244 of 358    Page ID
#:2902

passed away in covid-19 and joined her husband in eternal

peace. >> thank you Mr. Ryu? >> Mr. Blumenfield?

>> thank you.

Colleagues on monday June 30th,

we lost the prolific and

hilarious cal, he chose our

mission, he chose los angeles during his 7 decade career.

He was born in the bronx in jewish immigrants.

When he was a teenager, he took advantage of the program progress administration and

attended his first acting class with miz whipmore. The program changed the

direction of his life.

Took pleasure in creating one

funest twitter accounts. With all the recognition

including grammy and the mark

twaine.

Thank you for the laughs and

making an imprint on our lives. May he rest in peace.

thank you Mr. Blumenfield, any other

adjourning motions. Okay, seeing none, our meeting is adjourned.

EXHIBIT 7

HOLLY L. WOLCOTT
CITY CLERK

PETTY F. SANTOS
EXECUTIVE OFFICER

When making inquiries relative to
this matter, please refer to the
Council File No.: 20-0147

City of Los Angeles
CALIFORNIA



Eric Garcetti
MAYOR

OFFICE OF THE
CITY CLERK

Council and Public Services Division
200 N. SPRING STREET, ROOM 395
LOS ANGELES, CA 90012
GENERAL INFORMATION - (213) 978-1133
FAX: (213) 978-1040

PATRICE Y. LATTIMORE
DIVISION MANAGER

CLERK.LACITY.ORG

# OFFICIAL ACTION OF THE LOS ANGELES CITY COUNCIL

July 31, 2020

**Council File No.:**       20-0147

**Council Meeting Date:**   July 29, 2020

**Agenda Item No.:**        46

**Agenda Description:**     MOTION (BUSCAINO - KREKORIAN) relative to amending Council action of
March 17, 2020 to resume comprehensive CARE+ cleanups.

**Council Action:**        MOTION (BUSCAINO - KREKORIAN) ADOPTED AS AMENDED
FORTHWITH BY MOTION (O'FARRELL - BUSCAINO)

**Council Vote:**

| | |
|---|---|
| YES | BOB BLUMENFIELD |
| NO | MIKE BONIN |
| YES | JOE BUSCAINO |
| YES | GILBERT A. CEDILLO |
| NO | MARQUEECE HARRIS-DAWSON |
| YES | PAUL KORETZ |
| YES | PAUL KREKORIAN |
| YES | JOHN LEE |
| YES | NURY MARTINEZ |
| YES | MITCH O'FARRELL |
| YES | CURREN D. PRICE |
| YES | MONICA RODRIGUEZ |
| NO | DAVID RYU |
| ABSENT | VACANT VACANT |
| NO | HERB WESSON |

HOLLY L. WOLCOTT
CITY CLERK

Adopted Report(s)

| Title | Date |
|---|---|
| Amending Motion | 07/29/2020 |
| Motion | 07/01/2020 |

EXHIBIT 8

72-P

# MOTION

In the City of Los Angeles, tens of thousands of people live in encampments on our streets. It is a public health crisis that is ongoing, continuing, and worsening. That crisis is made exponentially worse by the spread of COVID-19, a deadly virus that has prompted health officials to advise people to stay indoors, avoid contact with other people, and wash their hands frequently. That is advice that most unhoused people cannot physically follow. When tens of thousands of people cannot comply with public health directives in the face of a highly communicable disease, that threatens the health and safety of everyone in Los Angeles. Moreover, some emergency measures to slow the spread of the coronavirus have made it more difficult for unhoused people to follow basic hygienic advice, such as the closure of libraries, which has drastically reduced the availability of public restrooms, and the closure of gyms, which has eliminated the access many unhoused people have to showers.

The ideal solution is provide housing and shelter and allow people to move out encampments and come indoors. State and county officials are moving to expand and expedite such efforts during this state of emergency, but in the meantime, people remain on our streets, in tents and underneath tarps. Multiple, urgent efforts must be undertaken to the public health issues from and in encampments.

In the City of Los Angeles, through the coordinated efforts of our Unified Homelessness Response Center (UHRC) and our Bureau of Sanitation (LASAN), the City operates CARE and CARE+ teams. These teams have a dual function - to provide sanitation services and to enforce city codes about keeping sidewalks clean and passable. Supporters of the programs characterize them as helpful "clean-ups," necessary to protect public health through the removal of trash and hazardous materials, and the cleaning of sidewalks. Critics decry them as punitive "sweeps," which force people to take down and move tents, displace people and push them further from services, cause stress and trauma, and frequently result in the seizure and loss of vital personal possessions, including medications.

Over the past two years, the City of Los Angeles has begun to provide mobile bathrooms, mobile showers and trash cans at some encampments. In the past week, the City of Los Angeles has begun installing portable hand-washing stations at many other encampments. Yet most encampments lack any hygiene services, and many that do have services only have them part-time. Generally, unhoused residents still lack regular access to basic hygiene services.

MAR 1 7 2020



(SEE COUNCIL FILE NO. 20-0147-S21)

Los Angeles' uneven provision of hygiene services and largely unsuccessful efforts to address the issue of encampments has been guided by a number of factors: fiscal constraints, complaints and community feedback, and political considerations. Los Angeles must urgently re-evaluate its current practices and protocols regarding homeless encampments. *It is imperative that we answer this public health crisis with a public health response, as directed by public health professionals.*

**I THEREFORE MOVE** that the City of Los Angeles formally request that the California Department of Public Health and the Los Angeles Department of Public Health provide the City of Los Angeles with guidance and suggested protocols to protect the public health of people living in encampments, people living near encampments, and government and social service workers visiting or serving encampments.

**I FURTHER MOVE** that the City Council urge Governor Gavin Newsom to use his full emergency executive powers to use hotel and motel rooms to *immediately* provide shelter for unhoused Angelenos.

**I FURTHER MOVE** that the CIty Council instruct the Chief Legislative Analyst to work with the Department of General Services, the Department of Recreation & Parks, the various bureaus and agencies within the Board of Works, and other agencies as appropriate, to produce of list of vacant or under-used city properties that can be used for emergency housing, and vacant or under-used parking lots and other spaces that could be established as "Emergency Safe Camping Zones," where unhoused residents could camp at a minimum of six feet apart, and be provided with hygiene services.

**I FURTHER MOVE** that the City Council take the following steps to make it easier for unhoused individuals living in encampments to comply with public health advice and directives regarding hygiene and social distancing:

- Instruct LASAN and other relevant agencies to suspend enforcement of the provision of 56.11 that require tents to come down during daytime hours, provided that the location of the tent does not impede ADA access, or is not within 10 feet of an operable driveway. Enforcement of that provision effectively prohibits people from self-quarantining and maintaining social distance.

- Instruct LASAN and other relevant agencies to suspend seizure and confiscation of materials in excess of 60 gallons unless those materials meet the definition of hazardous materials.

- Instruct LASAN, Department of General Services, and other relevant agencies to provide for the installation and servicing of the following at all major encampments: round-the-clock port-a-potties; dumpsters and vermin-proof trash cans; weekly shower service; hand-washing stations with soap and water.

- Instruct the Department of General Services, the Department of Recreation & Parks, the Library Department, and other agencies as appropriate to immediately accommodate 24-hour access to restrooms, with attendants as appropriate, at parks, libraries and other government buildings.

**I FURTHER MOVE** that the CIty Council direct the City Administrative Officer to identify city, county, state or federal emergency and public health funds, or recommend interdepartmental transfers, sufficient to provide for the costs associated with the above items.

PRESENTED BY:

**MIKE BONIN**
*Councilmember, 11th District*

**MARQUEECE HARRIS-DAWSON**
*Councilmember, 8th District*

**GIL CEDILLO**
*Councilmember, 1st District*

SECONDED BY:

72-P-A

## MOTION

I MOVE that Motion #72P (Bonin/Harris-Dawson/Cedillo), relative to directing various departments and agencies to take actions in response to the Coronavirus pandemic, be AMENDED as follows, with all other actions remaining unchanged:

INSTRUCT LASAN and other relevant agencies to suspend enforcement, **during the emergency declaration,** of the provision of 56.11 that requires tents to come down during daytime hours, provided that the location of the tent does not impede ADA access, or is not within 10 feet of an operable driveway. Enforcement of that provision effectively prohibits people from self-quarantining and maintaining social distance.

~~INSTRUCT LASAN and other relevant agencies to suspend seizure and confiscation in excess of 60 gallons unless those materials meet the definition of hazardous materials.~~

INSTRUCT LASAN, Department of General Services and other relevant agencies to **report on the feasibility and costs associated with** providing for the installation and services of the following at all major encampments: round-the-clock port-a-potties, dumpsters and vermin-proof trash cans; weekly shower service; hand-washing stations with soap and water

INSTRUCT the Department of General Services, the Department of Recreation and Parks, the Library Department and other agencies as appropriate to ~~immediately accommodate~~ **report on the feasibility and costs associated with providing** 24-hour access to restrooms, with attendants as appropriate, at parks libraries and other government buildings.

PRESENTED BY: _____

JOE BUSCAINO
Councilmember, 15th District

SECONDED BY: _____

MAR 1 7 2020

## AMENDING MOTION

I HEREBY MOVE that Council AMEND the Motion 72P-A (Buscaino – Price) to read as follows:

INSTRUCT LASAN and other relevant agencies to suspend enforcement, **during the emergency declaration,** of the provision of 56.11 that requires tents to come down during daytime hours, provided that the location of the tent does not impede ADA access, or is not within 10 feet of an operable driveway. Enforcement of that provision effectively prohibits people from self-quarantining and maintaining social distance. **At the end of the emergency declaration, seek the advice of (LA County) Public Health and provide recommendations as to whether to continue or revise the ordinance.**

~~INSTRUCT LASAN and other relevant agencies to suspend seizure and confiscation in excess of 60 gallons unless those materials meet the definition of hazardous materials.~~

INSTRUCT LASAN, Department of General Services and other relevant agencies **to do as much as possible within the next week to** provide for the installation and services of the following at all major encampments: round-the-clock port-a-potties, dumpsters and vermin-proof trash cans; weekly shower service; hand-washing stations with soap and water, and to **report back in seven days on the feasibility and costs.**

INSTRUCT the Department of General Services, the Department of Recreation and Parks, the Library Department and other agencies as appropriate to **do as much as possible within the next week to accommodate** 24-hour access to restrooms, with attendants as appropriate, at parks, libraries and other government buildings, and to **report back in seven days on the feasibility and costs.**

PRESENTED BY _____

JOE BUSCAINO
Councilmember, 15th District

SECONDED BY _____

NURY MARTINEZ
Councilmember, 6th District

March 17, 2020

CF 20-0147

EXHIBIT 9



CITY OF LOS ANGELES

# Detail of Department Programs

## Supplement to the 2020–21 Adopted Budget

### Volume I



2020-21

Prepared by the City Administrative Officer – July 2020

**THIS PAGE INTENTIONALLY LEFT BLANK**

## SUMMARY OF CHANGES IN APPROPRIATIONS

| | |
|---|---:|
| 2020-21 Adopted Budget | $10,531,278,041 |
| 2019-20 Adopted Budget | $10,710,077,843 |
| Net Change | ($178,799,802) |
| | |
| Percentage Change | (1.7)% |

The net change of $-178,799,802 is accounted for as follows:

| | | |
|---|---:|---:|
| **Obligatory Changes** | | $235,418,236 |
| Current Year Employee Compensation Adjustment | 156,350,306 | |
| Proposed Employee Compensation Adjustment | 73,090,563 | |
| Salary Step and Turnover Effect | (28,600,621) | |
| Change in Number of Working Days | (12,920,889) | |
| Full Funding for Partially Financed Positions | 47,498,877 | |
| **Total** | 235,418,236 | |
| **Deletion of One-Time Services** | | ($486,253,228) |
| Deletion of Funding for Resolution Authorities | (236,635,989) | |
| Deletion of One-Time Expense/Salaries Funding | (232,510,781) | |
| Deletion of One-Time Equipment Funding | (8,022,662) | |
| Deletion of One-Time Special Funding | (9,083,796) | |
| **Total** | (486,253,228) | |
| **Continuation of Services** | | $492,431,758 |
| Aging | 528,390 | |
| Animal Services | 1,023,653 | |
| Building and Safety | 15,785,073 | |
| Cannabis Regulation | 2,939,115 | |
| City Administrative Officer | 571,809 | |
| City Attorney | 10,985,797 | |
| City Clerk | 92,756 | |
| City Planning | 14,948,765 | |
| Controller | 1,306,552 | |
| Cultural Affairs | 790,293 | |
| Disability | 671,353 | |
| Economic and Workforce Development | 11,968,595 | |
| El Pueblo de Los Angeles | 109,223 | |
| Emergency Management | 956,059 | |
| Ethics Commission | 62,383 | |
| Finance | 2,435,088 | |
| Fire | 34,629,554 | |
| General Services | 7,142,494 | |
| Housing and Community Investment | 24,739,653 | |
| Information Technology Agency | 15,342,408 | |
| Neighborhood Empowerment | 390,360 | |

**Continuation of Services**

| | |
|---|---:|
| Personnel | 8,724,140 |
| Police | 123,768,343 |
| Public Accountability | 258,620 |
| Board of Public Works | 1,157,853 |
| Bureau of Contract Administration | 18,284,369 |
| Bureau of Engineering | 24,536,658 |
| Bureau of Sanitation | 44,192,417 |
| Bureau of Street Lighting | 20,211,465 |
| Bureau of Street Services | 55,759,771 |
| Transportation | 47,217,879 |
| Zoo | 900,870 |
| **Total** | 492,431,758 |

**Increased Services**                                                           $28,374,008

| | |
|---|---:|
| Animal Services | 308,686 |
| Building and Safety | 2,325,409 |
| City Attorney | 430,706 |
| City Clerk | 162,000 |
| City Planning | 402,235 |
| Controller | 474,558 |
| Cultural Affairs | 343,753 |
| Disability | 92,500 |
| Economic and Workforce Development | 55,139 |
| Emergency Management | 10,791 |
| Finance | 116,135 |
| Fire | 1,400,000 |
| General Services | 2,238,038 |
| Housing and Community Investment | 3,742,994 |
| Information Technology Agency | 273,000 |
| Personnel | 638,113 |
| Police | 2,424,918 |
| Bureau of Contract Administration | 182,918 |
| Bureau of Sanitation | 2,328,023 |
| Bureau of Street Lighting | 2,114,456 |
| Bureau of Street Services | 442,450 |
| Transportation | 7,867,186 |
| **Total** | 28,374,008 |

**Restoration of Services**                                                       $16,567,223

| | |
|---|---:|
| Animal Services | 84,151 |
| City Administrative Officer | 190,000 |
| Fire | 5,350,000 |
| Police | 2,000,000 |
| Bureau of Engineering | 347,893 |
| Bureau of Street Services | 7,809,529 |
| Transportation | 785,650 |
| **Total** | 16,567,223 |

**New Services** $7,799,045

| | |
|---|---:|
| City Attorney | 178,635 |
| City Planning | 470,286 |
| Civil and Human Rights Commission | 456,558 |
| Cultural Affairs | 100,000 |
| Disability | 20,000 |
| El Pueblo de Los Angeles | 50,000 |
| Ethics Commission | 73,966 |
| Finance | 15,544 |
| Housing and Community Investment | 1,263,748 |
| Information Technology Agency | 120,550 |
| Neighborhood Empowerment | 192,110 |
| Police | 1,951,903 |
| Bureau of Contract Administration | 224,456 |
| Bureau of Engineering | 1,659,096 |
| Bureau of Sanitation | 1,022,193 |
| **Total** | 7,799,045 |

**Efficiencies to Services** ($100,785,456)

| | |
|---|---:|
| Aging | (141,326) |
| Animal Services | (1,627,554) |
| Building and Safety | (1,281,194) |
| Cannabis Regulation | (14,003) |
| City Administrative Officer | (934,625) |
| City Attorney | (7,052,053) |
| City Clerk | (563,827) |
| City Planning | (2,807,840) |
| Controller | (2,140,179) |
| Cultural Affairs | (425,645) |
| Economic and Workforce Development | (413,211) |
| Emergency Management | (141,656) |
| Finance | (3,126,719) |
| Fire | (5,551,928) |
| General Services | (8,014,942) |
| Housing and Community Investment | (1,892,293) |
| Information Technology Agency | (4,251,319) |
| Neighborhood Empowerment | (166,686) |
| Personnel | (4,087,728) |
| Police | (25,177,733) |
| Board of Public Works | (1,002,660) |
| Bureau of Contract Administration | (2,726,411) |
| Bureau of Engineering | (2,848,543) |
| Bureau of Sanitation | (1,309,643) |
| Bureau of Street Lighting | (1,148,509) |
| Bureau of Street Services | (16,000,832) |
| Transportation | (5,217,129) |
| Zoo | (719,268) |
| **Total** | (100,785,456) |

**Reduced Services** ($133,366,948)

| | |
|---|---:|
| Aging | (434,703) |
| Animal Services | (2,306,740) |
| Cannabis Regulation | (341,759) |
| City Administrative Officer | (1,630,560) |
| City Attorney | (14,281,550) |
| City Clerk | (1,071,210) |
| City Planning | (4,493,595) |
| Civil and Human Rights Commission | (39,004) |
| Controller | (1,711,319) |
| Convention and Tourism Development | (167,006) |
| Council | (1,863,502) |
| Cultural Affairs | (686,553) |
| Disability | (284,769) |
| Economic and Workforce Development | (1,633,272) |
| El Pueblo de Los Angeles | (100,866) |
| Emergency Management | (339,382) |
| Employee Relations Board | (32,031) |
| Ethics Commission | (344,137) |
| Finance | (3,217,021) |
| Fire | (3,728,149) |
| General Services | (11,255,280) |
| Housing and Community Investment | (7,210,788) |
| Information Technology Agency | (4,815,745) |
| Mayor | (704,759) |
| Neighborhood Empowerment | (282,362) |
| Personnel | (4,970,428) |
| Police | (22,244,084) |
| Public Accountability | (158,429) |
| Board of Public Works | (988,005) |
| Bureau of Contract Administration | (4,060,906) |
| Bureau of Engineering | (9,550,227) |
| Bureau of Street Lighting | (2,950,151) |
| Bureau of Street Services | (9,387,660) |
| Transportation | (14,288,145) |
| Zoo | (1,792,851) |
| **Total** | (133,366,948) |

**Other Changes or Adjustments - Departmental** ($7,627,369)

| | |
|---|---:|
| Animal Services | (246,477) |
| City Planning | (27,922) |
| Controller | (406,575) |
| Emergency Management | (901) |
| Finance | (62,415) |
| Housing and Community Investment | (440,775) |
| Information Technology Agency | (21,166) |
| Bureau of Engineering | 28,863 |
| Bureau of Street Services | (23,998,110) |
| Transportation | (52,684) |
| Appropriations to City Employees' Retirement | (4,210,457) |
| Appropriations to Library Fund | 13,403,277 |
| Appropriations to Recreation and Parks Fund | 8,407,973 |
| **Total** | (7,627,369) |

**Other Changes or Adjustments - Non-Departmental** ($231,357,071)

| | |
|---|---:|
| Bond Redemption and Interest | (9,883,324) |
| Capital Finance Administration | (15,246,514) |
| Capital Improvement Expenditure Program | (97,849,776) |
| General City Purposes | (4,692,044) |
| Human Resources Benefits | 57,029,592 |
| Judgment Obligation Bonds Debt Service Fund | (6,494,500) |
| Liability Claims | (2,604,000) |
| Proposition A Local Transit Assistance Fund | (86,440,039) |
| Proposition C Anti-Gridlock Transit Improvement Fund | 7,048,976 |
| Special Parking Revenue Fund | (2,147,637) |
| Tax and Revenue Anticipation Notes | 21,239,442 |
| Unappropriated Balance | (25,450,084) |
| Wastewater Special Purpose Fund | (20,031,830) |
| Water and Electricity | 3,657,834 |
| Other Special Purpose Funds | (49,493,167) |
| **Total** | (231,357,071) |

**TOTAL APPROPRIATIONS CHANGE** ($178,799,802)



**CITY OF LOS ANGELES**

# Detail of Department Programs

## Supplement to the 2020–21 Adopted Budget

### Volume II

**2020-21**

Prepared by the City Administrative Officer – July 2020

**THIS PAGE INTENTIONALLY LEFT BLANK**

# BUREAU OF SANITATION

**2020-21 Adopted Budget**

### FIVE YEAR HISTORY OF BUDGET AND POSITION AUTHORITIES



### SUMMARY OF 2020-21 ADOPTED BUDGET CHANGES

| | Total Budget | | | General Fund | | | | Special Fund | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Regular | Resolution | | | Regular | Resolution | | | Regular | Resolution |
| **2019-20 Adopted** | $317,126,900 | 3,086 | 276 | $25,371,441 | 8.0% | 110 | 104 | $291,755,459 | 92.0% | 2,976 | 172 |
| **2020-21 Adopted** | $334,252,009 | 3,141 | 281 | $41,995,724 | 12.6% | 110 | 165 | $292,256,285 | 87.4% | 3,031 | 116 |
| **Change from Prior Year** | **$17,125,109** | **55** | **5** | **$16,624,283** | - | | **61** | **$500,826** | | **55** | **(56)** |

### 2020-21 FUNDING DISTRIBUTION BY PROGRAM



### MAIN BUDGET ITEMS

| | | Funding | Positions |
|---|---|---|---|
| * | Comprehensive Cleaning and Rapid Engagement Plus | $11,281,143 | - |
| * | Comprehensive Cleaning and Rapid Engagement | $10,335,022 | - |
| * | Mobile Hygiene Centers Program | $5,771,502 | - |

Bureau of Sanitation

## Recapitulation of Changes

|  | Adopted Budget 2019-20 | Total Budget Changes | Total Budget 2020-21 |
|---|---|---|---|
| **EXPENDITURES AND APPROPRIATIONS** | | | |
| **Salaries** | | | |
| Salaries General | 283,158,336 | 6,545,330 | 289,703,666 |
| Salaries, As-Needed | 1,341,650 | - | 1,341,650 |
| Overtime General | 8,171,756 | 1,479,491 | 9,651,247 |
| Hiring Hall Salaries | 977,025 | - | 977,025 |
| Benefits Hiring Hall | 338,203 | - | 338,203 |
| Total Salaries | 293,986,970 | 8,024,821 | 302,011,791 |
| **Expense** | | | |
| Printing and Binding | 605,518 | - | 605,518 |
| Travel | 5,000 | - | 5,000 |
| Construction Expense | 111,994 | - | 111,994 |
| Contractual Services | 14,542,481 | 7,256,000 | 21,798,481 |
| Field Equipment Expense | 1,743,345 | 928,000 | 2,671,345 |
| Transportation | 250,612 | - | 250,612 |
| Water and Electricity | - | 98,000 | 98,000 |
| Uniforms | 598,661 | 49,967 | 648,628 |
| Office and Administrative | 674,102 | 177,820 | 851,922 |
| Operating Supplies | 4,473,217 | 725,501 | 5,198,718 |
| Total Expense | 23,004,930 | 9,235,288 | 32,240,218 |
| **Equipment** | | | |
| Other Operating Equipment | 135,000 | (135,000) | - |
| Total Equipment | 135,000 | (135,000) | - |
| **Total Bureau of Sanitation** | **317,126,900** | **17,125,109** | **334,252,009** |

# HOMELESS BUDGET

## BASIS FOR THE ADOPTED BUDGET

The 2020-21 Adopted Budget for homeless-related expenditures relates to prior year funding as follows:

|  | General Fund | Special Funds | Total | % Change |
|---|---|---|---|---|
| 2019-20 Adopted Budget (revised) | $ 106,395,876 | $ 322,146,586 | $ 428,542,462 | |
| 2020-21 Adopted Budget | $ 113,322,893 | $ 286,364,069 | $ 399,686,962 | |
| Change from 2019-20 Budget | $      6,927,017 | $  (35,782,518) | $ (28,855,500) | (6.7)% |

The Homeless Budget describes funding included in the Budget for the provision of housing and services to homeless individuals and families in the City.  Items included as part of the Homeless Budget are funded within the individual budgets for the Los Angeles Homeless Services Authority (LAHSA), City departments, the General City Purposes (GCP) budget, and the Unappropriated Balance (UB).

Proposition HHH (Prop HHH), approved by voters in November 2016, authorizes the City to issue up to $1.2 billion in General Obligation (GO) bonds to finance the development of permanent supportive housing, affordable housing, and facilities.  Permanent Supportive Housing (PSH) units house chronically homeless and homeless households.  PSH is housing combined with services, which may include mental and health services, drug and alcohol treatment, and education and job training.  GO bond proceeds may also fund facilities that provide services to the homeless, such as service centers, health centers, shelters, storage, and shower facilities.  Bond proceeds may only be used for capital, not operations or services.  The 2020-21 Special Fund amount includes the total amount of Prop HHH funding proposed for PSH projects in the 2020-21 Prop HHH Project Expenditure Plan (PEP).  Only housing projects that are projected to execute loan agreements and start construction in 2020-21 are included in the PEP.  Prop HHH bond issuances require Mayor and Council approval.

In addition to General Fund and Special Fund allocations included within the Budget, the State of California awarded the City of Los Angeles two grants under the Homeless Emergency Aid Program (HEAP) and the Homeless Housing, Assistance and Prevention Program (HHAP).

The City's $85,013,607 HEAP allocation received in October 2018 provides one-time funds to address emergency homeless needs. These funds are supporting construction and operations costs for A Bridge Home sites, outreach teams, hygiene facilities, and other services throughout the City. 100 percent of these must be expended by June 30, 2021.  The City has expended $43,494,342 of these funds and is on track to meet the expenditure deadline.

The City was awarded a HHAP grant of $117,562,500 in March 2020.  The HHAP is a one-time formula grant to provide immediate assistance to people experiencing homelessness.  These funds will be used to support A Bridge Home (interim housing) construction and operations, prevention and diversion, rapid rehousing, outreach, hygiene facilities, and other services. 50 percent of these funds must be obligated by May 31, 2023; and 100 percent expended by June 30, 2025. Although HHAP is a five-year grant, the City anticipates expending 100 percent of the funds within two years.

# LOS ANGELES HOMELESS SERVICES AUTHORITY

The Los Angeles Homeless Services Authority (LAHSA) is a Joint Powers Authority created and designated by the City and County of Los Angeles to act on behalf of both entities to address homelessness.  LAHSA is a direct administrator of publicly-funded homeless programs throughout the Los Angeles region.  LAHSA advises and participates in the framing of major public programs that affect people experiencing homelessness.

| Los Angeles Homeless Services Authority | 2019-20 Adopted Budget | 2020-21 Adopted Budget |
|---|---|---|
| ● **Administration and Operations** - In addition to managing and administering the programs noted below, the proposed funding will support LAHSA's capacity to manage over $37 million in U.S. Department of Housing and Urban Development McKinney-Vento program funding for the City's Continuum of Care. The proposed increase reflects incremental administrative costs for all new budget requests including a three percent cost of living adjustment. | 3,224,664 | 3,687,387 |
| ● **Annual Homeless Point-in-Time Count** – The U.S. Department of Housing and Urban Development requires an annual census of those experiencing homelessness during the last 10 days of January for local jurisdictions to receive McKinney-Vento Homeless Assistance Grant funding. The census is a community-wide effort, funded equally by the City and County, and made possible with the support of over 8,100 volunteers. | 750,000 | 750,000 |
| ● **C3 Partnership - Skid Row** – C3 (City+County+Community) is a partnership designed to systematically engage people and help them regain health and housing stability. This request includes funding for the Street Based Engagement Director at the Community Partner agencies and continue the contract with Los Angeles County Department of Health Services. | 325,000 | 325,000 |
| ● **Centralized Training Academy** – The Centralized Training Academy (CTA) is a countywide training and education resource that provides consistent access to training opportunities through different learning tracks relevant to staff working in roles that provide both direct and indirect services to individuals and families experiencing homelessness. Users include LAHSA staff, subcontractors, and government agencies. Funding provided for Trauma Informed Care to support the training of City employees has been included in this expanded program. | 25,000 | 25,000 |
| ● **Continuum of Care Coordinated Assessment Match** – This match funds the City's portion of U.S. Department of Housing and Urban Development grant-funded administrative oversight, operation, and ongoing improvements to coordinated entry systems. An equal amount of funding is provided by the County of Los Angeles. | 59,883 | 59,883 |
| ● **Continuum of Care Planning Program Grant Match** – This match leverages U.S. Department of Housing and Urban Development grant funds and continues implementation of local strategic planning initiatives. An equal amount of funding is provided by the County of Los Angeles. | 156,250 | 156,250 |
| ● **Coordinated Entry System (CES) Crisis and Bridge Housing for Families, Singles, and Youth and Rapid Re-Housing for Families** – This program funds basic emergency shelter and case management services to offer a safe and secure shelter to families, men, women, and transition-age youth (18-24) who need shelter and access to showers and meals for a brief period (usually less than 30 days) before resolving the issues that caused their homeless episode. In addition to crisis and bridge housing, it also provides rapid re-housing for families. CES identifies the most appropriate intervention based on each client's needs and prescribes pathways to those interventions across all components of the homeless services system. | 10,726,609 | 10,726,609 |

Homeless Budget

| Los Angeles Homeless Services Authority | 2019-20 Adopted Budget | 2020-21 Adopted Budget |
|---|---|---|
| ● **Coordinated Entry System Navigation Centers** – Full year funding is provided to operate three navigation centers in Council District 2, 8, and 15. These City-sponsored Proposition HHH-funded facilities were completed in 2019-20 and provide access to hygiene facilities (restrooms, showers, laundry), storage options, and case management services for individuals and families experiencing or at risk of homelessness. These programs were partially funded in 2019-20, while facilities were under construction. The proposed increase reflects the required full year funding in 2020-21. | 1,600,000 | 2,156,000 |
| ● **Coordinated Entry System (CES) Regional Coordination** – Regional coordination across the CES ensures that individuals and families experiencing homelessness throughout the system receive assessments and access to housing and services, to rapidly connect them to the most appropriate housing and service intervention(s). CES oversees and coordinates engagement, assessment, and interim support of those experiencing homelessness. | 700,000 | 700,000 |
| ● **Homeless Engagement Teams (HETs)** – HETs conduct direct outreach to unsheltered homeless individuals. This outreach facilitates better access to City and County homeless resources, including the Coordinated Entry System. These teams support the Bureau of Sanitation's Comprehensive Cleaning and Rapid Engagement (CARE and CARE+) Teams. The proposed increase reflects a cost of living adjustment for HETs. | 5,451,376 | 5,537,267 |
| ● **Homeless Engagement Teams (HETs) - Comprehensive Cleaning and Rapid Engagement (CARE and CARE+) Teams** – HETs conduct direct outreach, in conjunction with Los Angeles Police Department CARE and CARE+ teams formerly known as Homeless Outreach and Partnership Endeavor (HOPE) teams, to homeless individuals who typically do not seek shelter or service programs of their own initiative. This outreach facilitates better access to City and County homeless resources, including the Coordinated Entry System. The increased funding will support the 13 existing teams at full-year funding. The proposed increase reflects a cost of living adjustment. | 2,530,996 | 2,570,874 |
| ● **Homeless Engagement Teams (HETs) - Unified Homelessness Response Center (UHRC) Dedicated Manager** – Funding is provided for a dedicated HET manager at the City's UHRC, which brings together all critical City departments to respond in a collaborative and coordinated fashion to issues related to homeless encampments and individuals experiencing homelessness, protecting the public health and safety of all Angelenos. The UHRC provides a space for a more timely and effective response to homelessness, leading with services grounded in a unified incident command structure. The proposed increase reflects a cost of living adjustment. | 132,744 | 134,835 |
| ● **Homeless Management Information System (HMIS) Cash Match** - To receive over $37 million annually in McKinney-Vento Homeless Act funds through U.S. Department of Housing and Urban Development, the Los Angeles Continuum of Care (CoC) is required to implement and operate a HMIS that tracks homeless population demographics, services, and outcomes for all homeless service providers in the CoC. The proposed increase supports increased use of the system and additional user licenses and features. An equal amount of funding is provided by the County of Los Angeles. The proposed increase will leverage an additional $400,000 in Federal Funding for the Los Angeles CoC. | 405,888 | 455,888 |

| Los Angeles Homeless Services Authority | 2019-20 Adopted Budget | 2020-21 Adopted Budget |
|---|---|---|
| ● **Operation Healthy Streets (OHS)** – This program provides outreach services, restroom and bathing facilities, temporary storage, and mandatory 90-day storage for homeless individuals to meet public health requirements for clean streets. Funding is also included for the operation of the ReFresh Spot on Crocker Street. The proposed increase reflects reallocated funds from Public Right-of-Way Storage Program which includes leasing costs associated with program expansion, as well as cost of living adjustment. | 5,254,102 | 5,634,785 |
| ● **Public Right-of-Way Storage Program** – This funding ensures the availability and adequacy of regional storage capacity for personal property collected to public right-of-way cleanups. Funds are used to support the Clean Streets LA operations and expand the regional storage capacity. The proposed decrease reflects contract cost savings identified for the additional voluntary storage added in 2018-19. The proposed decrease reflects fund reallocation to Operation Healthy Streets. | 754,000 | 467,212 |
| ● **Safe Parking** – Funding is provided to continue five Safe Parking Programs for families and individuals experiencing homelessness who are reliant on their vehicles for shelter. Programs provide a safe parking location and related services. Partial funding was provided for new sites in 2019-20. Additional funding is provided in 2020-21 to fund full year operations in all sites. | 1,618,073 | 2,266,650 |
| ● **Shelter Program** – The Shelter Program leverages over $2 million from U.S. Department of Housing and Urban Development Emergency Solutions Grant funding to increase emergency shelter bed capacity in the City by over 800 additional emergency shelter beds from November through March of each year. This safety net program assists unsheltered individuals experiencing homelessness during cold winter months. During a typical period of operation, over 80,000 emergency shelter bed nights are provided within the city limits of Los Angeles. The proposed increase reflects extended operations by opening shelters one month earlier, in November 2020. | 1,756,722 | 2,097,762 |
| **LAHSA Subtotal** | $      35,471,307 | $      37,751,402 |

# CITY DEPARTMENTS

City departments complement the work of the Los Angeles Homeless Services Authority (LAHSA) to help design, implement, and coordinate the efficient provision of services to individuals and families in the City to ultimately end homelessness.

| | 2019-20 Adopted Budget | 2020-21 Adopetd Budget |
|---|---|---|
| **Aging** | | |
| • **Older Workers Employment Program** – Funding is provided for part-time, work-based training opportunities at local community service agencies for older unemployed individuals who have poor employment prospects and for departmental staff to support this program. Full year funding is provided for four positions consisting of two Administrative Clerks, one Social Worker I, and one Management Analyst to support this program. | 608,631 | 728,017 |
| **Animal Services** | | |
| • **Homeless Services Support/Pet Resource Centers** – Funding is included in the base budget for one Animal Control Officer to provide departmental liaison services to the homeless community. | 58,897 | 64,444 |
| **City Administrative Officer** | | |
| • **Citywide Homeless Initiative** – Funding is provided for one Chief Administrative Analyst, one Senior Administrative Analyst I, and one Administrative Analyst to address and manage homelessness issues as directed in the Comprehensive Homeless Strategy (C.F. 15-1138-S1). The proposed increase reflects full year funding for the positions. | 313,744 | 438,102 |
| • **Proposition HHH Facilities Bond Program** – Funding is provided for one Administrative Analyst II for the Proposition HHH Program. | 93,190 | 101,660 |
| **City Attorney** | | |
| • **Proposition HHH Legal Support** – Funding is provided for three positions consisting of two Deputy City Attorney IIs and one Paralegal I to provide legal support for the Proposition HHH Program. | 295,347 | 350,537 |
| **City Planning** | | |
| • **Housing Unit** – The unit provides case management services for entitlement cases with housing development activities. Funding is included in the base budget for nine positions to provide expertise in housing development and coordinate with other City agencies to help resolve issues related to affordable housing/permanent supportive housing development throughout the project entitlement and permitting process. The total amount is comprised of General Fund ($481,710) and special funds ($416,111). The proposed increase reflects full year funding. | 559,982 | 897,821 |
| **Disability** | | |
| • **HIV and Homelessness Pilot Program** – Funding is continued on an one-time basis in the Contractual Services Account for the HIV and Homelessness Pilot Program and other HIV prevention services. | 200,000 | 200,000 |
| • **Syringe Exchange** – Funding is included in the base budget and is continued to provide syringe exchange to homeless individuals with HIV/AIDS. | 30,000 | 30,000 |
| • **Unified Homeless Response Center Staff Enhancement** – Funding is provided for one Community Program Assistant II to act as a liaison between the Department and the Mayor's Unified Homeless Response Center, and the City's Comprehensive Homeless Strategy stakeholders. Nine-months funding was provided in 2019-20 for one Community Program Assistant. The increased funding reflects full year funding and upgrading the position to one Community Program Assistant II. | 44,805 | 72,515 |

| | 2019-20 Adopted Budget | 2020-21 Adopetd Budget |
|---|---|---|
| *Economic and Workforce Development Department (EWDD)* | | |
| ● **LA RISE** – Funding is continued for the Los Angeles Regional Initiative for Social Enterprise (LA RISE) that provides job development activities for homeless individuals and for participants at A Bridge Home sites. These activities include subsidized employment for individuals with a history of homelessness, supportive case management designed to help prepare participants for continued employment, and training in both hard and soft skills. The program services are implemented through EWDD's existing network of 17 WorkSource Centers throughout the City. | 3,000,000 | 3,000,000 |
| *Fire* | | |
| ● **Advanced Provider Response Unit (APRU)** – Funding and resolution authority is provided for three positions consisting of one EMS Advanced Provider and one Firefighter III/Paramedic to provide emergency medical assistance, respond to non-urgent, low acuity-level call requests, and provide intervention services to 9-1-1 "super user" patients in Skid Row and surrounding areas. | 226,073 | 252,622 |
| ● **Fast Response Vehicle** – Funding is provided in the base budget for six Firefighter IIIs to staff a Fast Response Vehicle (FRV) operating as a mobile triage unit at Fire Station 9 in the Skid Row area. Funding is also included in the Sworn Bonuses and Overtime, Constant Staffing accounts. The increase reflects full-year funding for four Firefighter IIIs that were partially funded in 2019-20. | 702,888 | 854,709 |
| ● **SOBER Unit** – Funding is provided for one Firefighter III/Paramedic to continue support of the SOBER Unit deployment. Six months funding for this position was provided in 2019-20; the proposed increase reflects full year funding. | 57,597 | 123,457 |
| *General Services Department* | | |
| ● **Hepatitis A Prevention and Custodial Service Increases** – Funding is provided for three Custodians to address Hepatitis A concerns at the Central Library. Funding in the base budget includes costs for contracted employees and vendor supplies at various branch libraries. Funding will be reimbursed by the Library Department. | 413,453 | 441,347 |
| ● **Comprehensive Homeless Strategy** – Funding is provided to perform appraisals, title reports, and review of City-owned property in support of the Comprehensive Homeless Strategy, including Proposition HHH and A Bridge Home. | 100,000 | 100,000 |
| ● **Custodial Services for the Los Angeles City Mall** – Funding is provided for monthly pest control ($200,000) and pressure washing ($100,000) services at the LA City Mall and surrounding municipal buildings. | 300,000 | 300,000 |
| ● **Sale of City-Owned Property** – Funding is included in the base budget for one Senior Real Estate Officer to assist with the disposition of properties connected to the Comprehensive Homeless Strategy. | 122,120 | 128,445 |
| *Housing and Community Investment Department* | | |
| ● **Domestic Violence Shelter Operations Support** – Funding is provided for the Domestic Violence Shelter Operations Program to maintain the current level of services. Funding is provided for two Management Analysts and contractual services funding. Partial funding is provided by the Community Development Trust Fund ($50,146). | 1,750,629 | 1,782,018 |

Homeless Budget

| | 2019-20 Adopted Budget | 2020-21 Adopetd Budget |
|---|---|---|
| ● **Expansion of Domestic Violence Shelter Operations** – Funding is provided for one Senior Project Coordinator and related expenses to provide additional support to the Domestic Violence Shelter Operations Program. Funding is provided by the Community Development Trust Fund ($112,147) and the Community Services Grant Trust Fund ($12,461). | - | 124,608 |
| ● **Human Trafficking Shelter Pilot Program** – Funding is continued for the Human Trafficking Shelter Pilot Program to continue to offer safe, conditional housing through two 24-hour shelters. | 800,000 | 800,000 |
| ● **Construction Services for Proposition HHH** – Funding is provided for two Rehabilitation Construction Specialist Is to review and approve documents and reports for Proposition HHH Program projects in construction. | - | 195,870 |
| ● **Occupancy Monitoring Contract for Proposition HHH** – Funding is provided for occupancy monitoring services for affordable housing units funded by Proposition HHH. | - | 35,904 |
| ● **Oversight and Reporting of LAHSA's Homeless Services** – Funding is provided for four positions consisting of one Project Coordinator, one Senior Project Coordinator, and two Management Analysts to provide oversight of the Los Angeles Homeless Services Authority's homeless services programs. These positions were previously authorized under several service delivery and program management services funded by various federal, state, and local grants. Partial funding is provided by the Community Development Trust Fund ($134,495) and the Federal Emergency Solutions Grant Fund ($85,087). | 422,140 | 436,924 |
| ● **Prevailing Wage Monitoring for Proposition HHH** – Funding is provided for one Management Analyst to assist in monitoring prevailing wages during the construction of Proposition HHH Program projects. | - | 87,210 |
| ● **Proposition HHH Contracts** – Funding is provided in the Contractual Services Account for estimating ($80,000) and prevailing wage compliance ($150,000) services to provide additional support to the Proposition HHH Program. | 230,000 | 230,000 |
| ● **Proposition HHH Occupancy Monitoring Staff** – Funding is provided for one Management Analyst to monitor tenant occupancy requirements in Proposition HHH Program units. | - | 65,407 |
| ● **Proposition HHH Program Staff** – Funding is provided for 13 positions consisting of five Finance Development Officer Is, two Finance Development Officer IIs, one Community Housing Program Manager, three Management Analysts, and two Management Assistants to provide underwriting support for the Proposition HHH Program. Nine-months funding was provided in 2019-20 for these positions; the proposed increase reflects full-year funding in the base budget. | 1,481,265 | 1,426,214 |
| ● **Supportive Housing Services** – Funding is provided for one Assistant Chief Grants Administrator to oversee Supportive Housing Services, which consist of the Los Angeles Homeless Services Authority and Housing Opportunities for Persons with Aids programs. Funding is provided by the Community Development Trust Fund. | - | 178,111 |

Homeless Budget

| | 2019-20 Adopted Budget | 2020-21 Adopetd Budget |
|---|---|---|
| *Mayor* | | |
| ● **Homelessness Policy and Implementation Support** – Funding is provided for the Mayor's Office to support initiatives to address homelessness within the City of Los Angeles which is provided for the creation of the Office of Citywide Homelessness Initiatives that oversees the development and execution of street-level coordination around homeless encampments, bridge housing projects, Skid Row interventions, and affordable/permanent supportive housing production. | 860,000 | 860,000 |
| *Police Department* | | |
| ● **A Bridge Home Sites** – Funding is provided for sworn overtime to patrol the vicinity of Bridge Housing sites. The increase reflects $5.0 million that was included in the Unappropriated Balance in 2019-20, being included in the Police Department budget in 2020-21. | 3,462,156 | 8,400,000 |
| ● **Homeless Coordinator Resources** – Funding is included in the base budget for two positions consisting of one Police Sergeant II and one Secretary for the Office of Operations' Homeless Coordinator. This Office coordinates the Department's response to crime and quality of life issues for residents, business owners, and visitors to the City and ensures the Department's alignment with the Mayor and Council's homelessness policies and priorities. Six-months funding for one Secretary and one Police Sergeant II was provided in 2019-20; the proposed increase reflects full year funding. | 79,248 | 216,482 |
| ● **Proactive Engagement Staff/Support for Public Right-of-Way Clean Up** – Funding is included in the base budget for the redeployment of resources to support the implementation of expanded public right-of-way clean up and related outreach services (CARE and CARE+ Teams) by LAHSA and the Bureau of Sanitation. Funding supports four Sergeants and 40 Police Officers that comprise the CARE and CARE+ Teams. | 4,706,400 | 4,875,830 |
| ● **Resource Enhancement Services and Enforcement Team** – Funding is included in the base budget for two positions consisting of one Police Lieutenant I and one Police Officer III for the Central Bureau Citywide Homelessness Coordinator's Office, which coordinates the Department's response to crime and quality of life issues for residents, business owners, and visitors to the City and ensures the Department's alignment with the Mayor and Council's homelessness policies and priorities. | 248,748 | 257,703 |
| ● **Unified Homeless Response Center** – Funding is included in the base budget for five positions consisting of three Police Officer IIs and one Police Officer III to staff the Unified Homeless Response Center. These officers will ensure coordination of City services relative to homelessness, including the City's Clean Street Los Angeles, Operation Healthy Streets, and the Skid Row Americans with Disabilities "Right of Way" Compliance teams. | 418,905 | 434,000 |
| *Public Works, Bureau of Engineering* | | |
| ● **A Bridge Home Program Support –** Funding was provided in 2019-20 for two positions consisting of one Civil Engineer and one Civil Engineering Associate III to support the A Bridge Home project. 2020-21 funding will be provided through the State Homeless Housing, Assistance and Prevention Program (HHAP) grant. | 1,000,000 | - |
| ● **City Homeless Facilities Services** – Six-months funding is provided for one Senior Architect to provide design and project management for capital projects involving new City facilities that provide services to the City's homeless population. Funding for eligible costs will be provided through interim appropriations from Proposition HHH. | - | 78,113 |

| | 2019-20 Adopted Budget | 2020-21 Adopetd Budget |
|---|---|---|
| **Public Works, Bureau of Sanitation** | | |
| ● **Comprehensive Cleaning and Rapid Engagement (CARE)** – Funding is provided for 78 positions to staff 17 CARE Teams and overtime and related expenses. These positions consist of two Chief Environmental Compliance Inspector Is, seven Senior Environmental Compliance Inspectors, 34 Environmental Compliance Inspectors, 17 Refuse Collection Truck Operator IIs, 17 Maintenance Laborers, and one Public Relations Specialist II. These positions are responsible for keeping the City's sidewalks and other public areas safe, clean, sanitary, and accessible for public use by all individuals in accordance with the provisions of Los Angeles Municipal Code Section 56.11. One team is deployed to each of the four Los Angeles Police Department Bureaus, another team is deployed to the Los Angeles River, and the remaining teams are deployed to the highest need areas of the City. The CARE teams were previously known as Homeless Outreach Proactive Engagement Teams (HOPE). The proposed increase reflects an additional 31 positions to increase the number of CARE teams from 10 to 17 and the partial funding of $6,468,000 that was set aside in the Unappropriated Balance for this item in 2019-20. | 5,985,704 | 11,222,556 |
| ● **Comprehensive Cleaning and Rapid Engagement Plus (CARE+)** – Funding is provided for 128 positions to staff 13 CARE+ Teams and overtime and related expenses. These positions consist of one Sanitation Solid Resources Manager II, one Sanitation Solid Resources Manager I, one Wastewater Collection Supervisor, one Chief Environmental Compliance Inspector II, two Refuse Collection Superintendents, 10 Refuse Collection Supervisors, three Senior Environmental Compliance Inspectors, 24 Environmental Compliance Inspectors, 36 Refuse Collection Truck Operators, 46 Maintenance Laborers, one Management Analyst, and two Administrative Clerks. These teams are responsible for removing abandoned waste from the public right-of-way and cleaning homeless encampments. These teams are deployed to the highest need areas of the City. The CARE+ teams were previously known as Clean Street Los Angeles Teams. The proposed increase reflects an additional 16 positions to increase the number of CARE+ teams from 10 to 13 and the partial funding of $6,468,000 that was set aside in the Unappropriated Balance for this item in 2019-20. | 14,247,151 | 16,513,823 |
| ● **Clean Streets Related Costs** – The Clean Streets Program addresses illegal dumping, alleyway cleanups, and homeless encampments. Funding for the Clean Streets Program is provided directly in the Bureau of Sanitation's operating budget. Funds are provided in the General City Purposes Budget to reimburse the Solid Waste Resources Revenue Fund for indirect costs for the Clean Streets Program including vehicle fuel, vehicle depreciation, and fleet maintenance expenses. This request supports homeless encampment clean-ups in addition to other waste removal operations in the public right-of-way. The increase supports positions added for 2020-21. | 1,617,762 | 1,800,000 |
| ● **Clean Streets Safety and Training Program** – Funding is included in the base budget for one Refuse Crew Field Instructor to conduct training on the proper and safe operation of refuse collection vehicles and equipment. In addition, this position will proactively identify and correct work hazards and train employees on proper work techniques and field practices to prevent injuries. Nine-months funding for this position was provided in 2019-20; the proposed increase reflects full year funding. | 61,062 | 87,862 |
| ● **Mobile Hygiene Centers Program** – Funding is included for 13 Maintenance Laborers and overtime salaries. This team provides hygiene facilities for homeless individuals. | - | 5,854,304 |

|  | 2019-20 Adopted Budget | 2020-21 Adopetd Budget |
|---|---|---|
| ● **Operation Healthy Streets (OHS)** – Funding is included in the base budget for 11 positions consisting of four Environmental Compliance Inspectors, three Wastewater Collection Worker IIs, one Senior Environmental Compliance Inspector, one Refuse Collection Truck Operator II, and one Maintenance Laborer. This team provides comprehensive cleanups and hazardous waste removal in the downtown Los Angeles and Venice Skid Row areas. | 2,188,057 | 2,252,074 |
| *Recreation and Parks* | | |
| ● **24-Hour Public Restroom Access (Venice)** – Funding is included in the base budget to allow year-round 24-hour access to one public restroom (ten stalls) at Venice Beach. | 222,164 | 235,502 |
| ● **Bulky Item Illegal Dumping Crew** – Funding is included in the base budget and is provided for seven positions consisting of three Gardener Caretakers, one Equipment Operator, one Park Ranger, one Electrician, and one Plumber to staff a dedicated Bulky Item Illegal Dumping Crew. | 508,562 | 542,127 |
| ● **Gladys Park Maintenance Program** – Funding is included in the base budget to provide ground maintenance and security services at Gladys Park located in Skid Row. | 158,000 | 161,630 |
| ● **Homeless Encampment Cleanup** - Funding is included in the base budget and is provided for regular authorities of eight positions, consisting of four Gardener Caretakers, one Equipment Operator, one Park Ranger, one Electrician, and one Plumber to comprise one additional Bulky Item Illegal Dumping (BIID) Crew to assist with homeless encampment cleanups. Nine-months funding for these positions was provided in 2019-20; the proposed increase reflects full year funding. | 926,465 | 1,235,287 |
| ● **Park Restroom Enhancement Program** – Funding is included in the base budget to continue the increased frequency of restroom cleaning by one additional cleaning per day at 50 heavily-used park locations and also expand bathroom operating hours at various park locations to meet the needs of park patrons. | 2,444,278 | 2,569,401 |
| *Transportation* | | |
| ● **Community Assistance Parking Program** – Funding is provided for twelve months funding for one Management Assistant and nine-months funding for one Senior Administrative Clerk. These positions will support the Community Assistance Parking Program (CAPP), which allows individuals experiencing homelessness with open and unpaid parking citations to pay them by providing community service. The CAPP was approved as a pilot program by Council in 2017-18 (C.F. 15-1450-S1). The proposed increase reflects nine months funding for one Senior Administrative Clerk. | 49,382 | 107,777 |
| **City Departments Subtotal** | $     50,994,805 | $     71,150,413 |
| *Non-Departmental Appropriations* | | |
| ● **Additional Homeless Services (formerly Crisis and Bridge Housing Fund)** – Continued funding for homeless services is provided in the budget to fund gaps in the City's effort to address the homeless crisis. | 9,000,000 | 10,000,000 |
| ● **Clinica Romero** – Funding for Clinica Romero is provided for quality affordable health care services that target underserved communities within the Greater Los Angeles area. | 100,000 | 100,000 |

| | 2019-20 Adopted Budget | 2020-21 Adopetd Budget |
|---|---|---|
| ● **Midnight Stroll Transgender Café** – Funding is provided to support a safe haven for unsheltered transgender individuals in Hollywood between the hours of 9:00 pm and 7:00 am. | 100,000 | 100,000 |
| ● **Mobile Laundry Truck** – Funding is provided to offer individuals and families experiencing homelessness a place to wash clothes. Funding includes the Mobile Laundry Truck. | 67,600 | 67,600 |
| ● **Proposition HHH Project Expenditures** – Reflects proposed Proposition HHH Permanent Supportive Housing Program costs in the 2020-21 Proposition HHH Project Expenditure Plan (PEP), pending Council and Mayor approval. All project costs are directly tied to project construction. | 281,340,750 | 179,033,312 |
| ● **Homeless Emergency Aid Program (HEAP)** – HEAP is one-time State grant for emergency homeless needs. These funds support the construction and operations of a A Bridge Home sites, outreach teams, hygiene facilities, and other services throughout the City. All interest proceeds from its HEAP allocation be used for HEAP-eligible activities. | 36,000,000 | 41,519,265 |
| ● **Homeless Housing, Assistance and Prevention Program (HHAP)** – HHAP is a one-time State grant to address immediate homeless needs. These funds will be used to support A Bridge Home sites (interim housing) construction and operations, prevention and diversion, rapid rehousing, outreach, hygiene facilities, and other services. Funding is set aside for nine positions consisting of<br>• City Administartive Officer – one Administrative Analyst,<br>• City Attorney – one Deputy City Attorney III,<br>• General Services – one Senior Real Estate Officer,<br>• Mayor – one Director of Interim Housing Strategies, one Senior Project Manager for A Bridge Home, one Senior Operations Manager for the United Homelessness Response Center,<br>• Public Works, Bureau of Engineering – one Civil Engineer, one Civil Engineer Associate III, and one Senior Management Analyst II<br>to provide administrative support for HHAP Program grant. Funding for these positions will be provided through interim appropriations pending Mayor and Council Approval. | - | 59,964,970 |
| **Non-Departmental Subtotal** | $    326,608,350 | $    290,785,147 |
| ***Unappropriated Balance (UB)*** | | |
| ● **Police Department Sworn Overtime - Homelessness Initiatives** – Funding for the Police Department to provide patrol services surrounding 12 A Bridge Home sites and the vicinity of the El Puente, Schrader, and Paloma Bridge Housing sites were set aside in 2019-20 in the Unappropriated Balance. 2020-21 funding is provided in the Police Department budget, above. | 5,000,000 | - |
| ● **Comprehensive Cleaning and Rapid Engagement (CARE)/ CARE+ Team** – Funding for the Bureau of Sanitation to deploy 11 four-person crews and associated expenses were set aside in 2019-20 in the Unappropriated Balance. These crews' duties include keeping the City sidewalks and other public areas safe, clean, sanitary, and accessible, removing abandoned waste from the public right-of-way, and cleaning homeless encampments. 2020-21 funding is provided in the Public Works, Bureau of Sanitation budget, above. The CARE and CARE+ teams are previously known as Homeless Outreach Proactive Engagement (HOPE) and Clean Streets LA teams respectively. | 6,468,000 | - |

Homeless Budget

| | 2019-20 Adopted Budget | 2020-21 Adopetd Budget |
|---|---|---|
| ● **Eviction Prevention and Homeless Prevention Services**  – Combined with the Consolidated Plan allocation for Right to Counsel, a total of $3 million funding for eviction prevention and homeless prevention services was set aside in 2019-20 in the Unappropriated Balance. | 2,000,000 | - |
| ● **Homelessness Services**  – 2018-19 savings ($2 million) within the Los Angeles Homeless Services Authority was set aside in 2019-20 in the Unappropriated Balance to support showers, toilets, shared housing facilities, and Safe Parking program costs for homeless individuals. | 2,000,000 | - |
| **Unappropriated Balance Subtotal** | $      15,468,000 | $                    - |
| **Total LAHSA, City Departments, Non-Departmental, and UB** | $      428,542,462 | $      399,686,962 |

EXHIBIT 10

No. 20-55522

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

**JANET GARCIA, et al.,**
Plaintiffs and Appellees,

v.

**CITY OF LOS ANGELES**
Defendant and Appellant.

_____

Appeal from the United States District Court
for the Central District of California
Case No. 2:19-cv-06182-DSF-PLA
Hon. Dale S. Fischer

_____

## APPELLANT'S OPENING BRIEF

_____

**MICHAEL N. FEUER,** City Attorney (SBN 111529)
**KATHLEEN A. KENEALY,** Chief Assistant City Attorney (SBN 212289)
**SCOTT MARCUS,** Chief, Civil Litigation Branch (SBN 184980)
**BLITHE S. BOCK,** Assistant City Attorney (SBN 163567)
**JONATHAN H. EISENMAN,** Deputy City Attorney (SBN 279291)
200 North Main Street, CHE 7th Floor
Los Angeles, California 90012
(213) 978-2212 | Jonathan.Eisenman@lacity.org

*Attorneys for Defendant and Appellant*
CITY OF LOS ANGELES

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ 4

INTRODUCTION ...................................................................................... 9

JURISDICTIONAL STATEMENT ......................................................... 13

STATEMENT OF THE CASE ................................................................. 14

    A.    As the accumulation of personal property overwhelms its public areas, the City of Los Angeles's Municipal Code Section 56.11 limits the amount and type of personal property that can be stored in those areas. .......................... 14

    B.    Several unhoused Angelenos, an organization that advocates on behalf of the homeless, and a group of disgruntled taxpayers sue the City for damages and to enjoin its enforcement of various parts of Section 56.11. ..................... 18

    C.    Plaintiffs move to enjoin the City from enforcing Section 56.11(3)(i), which directs that the City "may remove" and "may discard" Bulky Items stored in public places. ............. 21

    D.    Despite the City's repeated contention that Section 56.11(3)(i)'s "may remove" language should be analyzed separately from its "may discard" language, the district court analyzes them together and enjoins the City from enforcing Section 56.11(3)(i) in its entirety. ......................... 24

ISSUES ON APPEAL ............................................................................. 28

STANDARD OF REVIEW ....................................................................... 29

SUMMARY OF ARGUMENT ................................................................. 30

ARGUMENT ......................................................................... 32

I.   Plaintiffs are unlikely to prevail on a facial Fourth Amendment
     challenge to the City's ability to remove Bulky Items from public
     areas. ......................................................................... 32

     A.   The Fourth Amendment doesn't require officials to get
          warrants before performing the community caretaking
          function of removing private property from public places
          where it isn't supposed to be. ............................... 32

     B.   Section 56.11(3)(i), to the extent it allows City officials to
          remove large items stored in public areas, does not violate
          the Fourth Amendment on its face. ....................... 36

II.  Plaintiffs are unlikely prevail on a facial Fourteenth Amendment
     due process challenge to the City's ability to remove Bulky Items
     from public areas. ....................................................... 43

     A.   The Fourteenth Amendment's Due Process Clause generally
          doesn't require notice before performing community
          caretaking functions. ......................................... 43

     B.   The removal of Bulky Items under Section 56.11(3)(i) does
          not, on its face, violate the Fourteenth Amendment's Due
          Process Clause. ................................................ 47

III. A presumption in favor of severability meant that the district
     court should have considered the portion of Section 56.11(3)(i) that
     allows the City *to remove* Bulky Items separately from that which
     allows the City *to discard* those items. ........................ 54

IV.  Plaintiffs did not satisfy the first prerequisite for getting the
     injunction that they got.  The district court abused its discretion in
     entering it. ................................................................ 58

CONCLUSION ................................................................... 60

CERTIFICATE OF COMPLIANCE ....................................... 61

ADDENDUM (L.A. Municipal Code Sections) ...................... 62

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ayotte v. Planned Parenthood,*
546 U.S. 320 (2000)................................................................55

*Birchfield v. North Dakota,*
136 S. Ct. 2160 (2016)...........................................................32

*Brewster v. Beck,*
859 F.3d 1194 (9th Cir. 2017)..............................................42

*Cady v. Dombrowski,*
413 U.S. 433 (1973)..........................................34, 35, 40, 41

*Caniglia v. Strom,*
953 F.3d 112 (1st Cir. 2020) ................................................34

*Carter v. Kirk,*
422 F. App'x 752 (10th Cir. 2011)........................................35

*City of Indianapolis v. Edmond,*
531 U.S. 32 (2000)................................................................38

*City of Los Angeles v. David,*
538 U.S. 715 (2003)..............................................................45

*City of Los Angeles v. Patel,*
135 S. Ct. 2443 (2015)..........................................................39

*City of W. Covina v. Perkins,*
525 U.S. 234 (1999)..............................................................50

*Clement v. City of Glendale,*
518 F.3d 1090 (9th Cir. 2008)........................................45, 48

*Draper v. Coombs,*
792 F.2d 915 (9th Cir. 1986).................................................46

*Fuentes v. Shevin*,
407 U.S. 67 (1972) ............................................................... 46

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) (en banc) ..................................... *passim*

*Gilbert v. Homar*,
520 U.S. 924 (1997) .............................................................. 51

*Illinois v. McArthur*,
531 U.S. 326 (2001) ................................................. 32, 33, 38

*Jessop v. City of Fresno*,
936 F.3d 937 (9th Cir. 2019) ................................................ 42

*Lavan v. City of L.A.*,
693 F.3d 1022 (9th Cir. 2012) ......................................... 37, 46

*Lawton v. Steele*,
152 U.S. 133 (1894) .............................................................. 45

*Logan v. Zimmerman Brush Co.*,
455 U.S. 422 (1982) .............................................................. 47

*Lone Star Sec. & Video v. City of L.A.*,
584 F.3d 1232 (9th Cir. 2009) ................................... 49, 50, 51

*Mastro v. Rigby*,
764 F.3d 1090 (9th Cir. 2014) ............................................ 29

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ................................................. 44, 47, 48

*Mich. Dep't of State Police v. Sitz*,
496 U.S. 444 (1990) ..................................................... 33, 38

*Miranda v. City of Cornelius*,
429 F.3d 858 (9th Cir. 2005) ......................................... 34, 46

*Morrissey v. Brewer*,
408 U.S. 471 (1972) .............................................................. 44

*Mullane v. Cent. Hanover Bank & Trust Co.*,
 339 U.S. 306 (1950) ............................................................... 44

*Recchia v. City of L.A. Dep't of Animal Servs.*,
 889 F.3d 553 (9th Cir. 2018) ................................................ 33

*Rodriguez v. City of San Jose*,
 930 F.3d 1123 (9th Cir. 2019) .............................................. 34

*Sackman v. City of L.A.*,
 677 F. App'x 365 (9th Cir. 2017) .......................................... 49

*Sam Francis Found. v. Christies, Inc.*,
 784 F.3d 1320 (9th Cir. 2015) (en banc) ........................ 54, 55, 56, 57

*Sandoval v. Cnty. of Sonoma*,
 912 F.3d 509 (9th Cir. 2018) ............................................ 32, 33, 42

*Schneider v. Cnty. of San Diego*,
 28 F.3d 89 (9th Cir. 1994) ..................................................... 47

*Schneider v. State*,
 308 U.S. 147 (1939) .............................................................. 37

*Scofield v. City of Hillsborough*,
 862 F.2d 759 (9th Cir. 1988) ........................................... 45, 51

*Soffer v. City of Costa Mesa*,
 798 F.2d 361 (9th Cir. 1986) ................................................ 45

*South Dakota v. Opperman*,
 428 U.S. 364 (1976) ...................................................... *passim*

*St. Louis v. Western Union Tel. Co.*,
 148 U.S. 92 (1893) ............................................................... 37

*Stypmann v. City & Cnty. of S.F.*,
 557 F.2d 1338 (9th Cir. 1977) ............................................. 44

*Sutton v. City of Milwaukee*,
 672 F.2d 644 (7th Cir. 1982) ........................................ 45, 46, 51

*Thompson v. Whitman,*
  85 U.S. (18 Wall.) 457 (1873) ............................................................. 41

*United States v. Hinkson,*
  585 F.3d 1247 (9th Cir. 2009) (en banc) ........................................... 29

*United States v. Locke,*
  471 U.S. 84 (1985) ............................................................................... 49

*United States v. Miller,*
  589 F.2d 1117 (1st Cir. 1978) ............................................................. 35

*United States v. Salerno,*
  481 U.S. 739 (1987) ....................................................................... 48, 52

*Vargas v. City of Philadelphia,*
  783 F.3d 962 (3d Cir. 2015) ............................................................... 34

*Vivid Entm't, LLC v. Fielding,*
  774 F.3d 566 (9th Cir. 2014) ........................................................ 55, 58

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ................................................................... 23, 29, 59

*Zinermon v. Burch,*
  494 U.S. 113 (1990) ............................................................................ 46

## Statutes, Ordinances and Rules

28 U.S.C. § 1292 ...................................................................................... 13

28 U.S.C. § 1343 ...................................................................................... 13

28 U.S.C. § 1367 ...................................................................................... 13

42 U.S.C. § 1983 ...................................................................................... 13

Fed. R. App. P. 4 ...................................................................................... 13

Los Angeles Municipal Code § 56.08(a) .............................................. 37

Los Angeles Municipal Code § 56.11(1) ................................................ 14

Los Angeles Municipal Code § 56.11(2)(c) ........................... 16, 48, 36, 51

Los Angeles Municipal Code § 56.11(2)(k) ........................................... 36

Los Angeles Municipal Code § 56.11(2)(o) ........................................... 36

Los Angeles Municipal Code § 56.11(3)(a) ........................................... 15

Los Angeles Municipal Code § 56.11(3)(b) ........................................... 15

Los Angeles Municipal Code § 56.11(3)(d) ........................................... 15

Los Angeles Municipal Code § 56.11(3)(e) ...................................... 15, 53

Los Angeles Municipal Code § 56.11(3)(i) ................................... *passim*

Los Angeles Municipal Code § 56.11(5) ................................................ 15

Los Angeles Municipal Code § 56.11(10) .............................................. 18

Los Angeles Municipal Code § 56.11(11) .............................................. 17

Los Angeles Municipal Code § 56.11(12) ................................. 18, 55, 57

Los Angeles Municipal Code § 66.48(A) ............................................... 17

Los Angeles Municipal Code § 80.77(a) ................................................ 36

Pasadena Municipal Code § 10.40.250 ................................................. 38

Portland City Code § 16.20.170 ........................................................... 38

Portland City Code § 16.30.210(A)(11) ................................................ 38

San Francisco Transportation Code § 8.1(a)(11) .................................. 35

Seattle Municipal Code § 11.14.268 ..................................................... 38

Seattle Municipal Code § 11.30.040(A)(8) ........................................... 38

Seattle Municipal Code § 16.36.010(E) ................................................ 35

# INTRODUCTION

There are thousands of unhoused people for whom sidewalks and other public spaces in the City of Los Angeles have become living spaces of last resort. Unhoused people do not forfeit their right to own personal property because they've lost their homes. But the City's public areas cannot simultaneously accommodate the needs of the public at large *and* function as storage spaces for all sizes, types, or amounts of personal property that people may want to keep in them.

No one disputes that the City can regulate what a person may store in its public areas. So—subject to exceptions for things like tents, wheelchairs, and operable bicycles—the City prohibits the storage in public areas of items that are too large to fit in a 60-gallon container with the lid closed. Los Angeles Municipal Code Section 56.11(3)(i) prohibits anyone from using its public areas to store such "Bulky Items," which the City removes from those spaces when it encounters them. Several unhoused Angelenos and advocacy organizations sued the City over its enforcement of that prohibition, claiming (in relevant part) that it violates both the Fourth Amendment's warrant requirement and the Fourteenth Amendment's Due Process Clause on

9

its face.  The district court agreed, and preliminarily enjoined the City

from enforcing Section 56.11(3)(i) in its entirety.  The City then brought

this appeal.

Let there be no confusion:  The problem of homelessness in Los

Angeles is a tragedy of historic proportions.  No one relishes the notion

of taking things from people who have very little to begin with.  And

while it would be difficult to disagree that large items accumulating on

the City's streets are a problem—they *are* a problem—people can

certainly disagree in good faith about whether the policy embodied by

Section 56.11(3)(i) is the best way to solve that problem.

But disagreement about whether Section 56.11(3)(i) is good policy

is one thing; disagreement about whether it is constitutional is another.

The City violates neither the Fourth Amendment's warrant

requirement nor the Fourteenth Amendment's Due Process Clause by

removing a Bulky Item from a public area where someone has stored it.

The district court was wrong to conclude otherwise.

First, as a matter of law, it cannot be that the Fourth Amendment

requires the City to get a warrant before removing a Bulky Item from a

sidewalk any more than the Fourth Amendment requires (for example)

10

a municipality to get a warrant before towing a car that someone leaves parked on the same sidewalk. The Fourth Amendment imposes no such requirement in either case, because in both cases the government is functioning as a community caretaker, not a criminal investigator.

Nor does the Fourteenth Amendment's Due Process Clause require the City to give a Bulky Item's owner any more notice before removing a Bulky Item than the owner of the sidewalk-parked car gets before his or her car is towed away. And even if due process requires more notice before removing a Bulky Item from a public area in *some* circumstances, it does not require more notice in *all* circumstances. Yet it is the latter proposition that must be true in order to find, as the district court did, that Section 56.11(3)(i) violates the Fourteenth Amendment on its face.

Admittedly, what the City does with Bulky Items after seizing them presents a different question. After removing Bulky Items from its public areas, Section 56.11(3)(i) allows the City summarily to discard them. Due process, however, generally requires that the owner of property of more than de minimis value must have a chance to be heard before being deprived permanently of that property. That is why

11

municipalities cannot summarily destroy the cars they tow. Section 56.11(3)(i) thus might provide insufficient process before the destruction of Bulky Items. The district court found as much, at any rate.

There is no need to address that finding now, though, because regardless whether the district court was right to enjoin the City from summarily disposing of Bulky Items, it was wrong to enjoin the City from seizing Bulky Items. The district court declined even to analyze those two functions separately, which casts its error into even sharper relief—because Section 56.11 contains a severability clause. If Section 56.11(3)(i)'s language allowing for the summary destruction of Bulky Items is constitutionally dubious, the severability clause obliged the district court to excise it—while preserving the constitutionally sound language permitting the removal of Bulky Items. It was a mistake of law for the district court not to do so.

This Court should fix the error. It should vacate the injunction and remand with instructions for the district court enter to an order recognizing that the Constitution allows the City to enforce Section 56.11(3)(i) to remove Bulky Items from public areas, even if it may not summarily discard those items.

12

## JURISDICTIONAL STATEMENT

Because this action includes federal claims made under 42 U.S.C. § 1983, the district court had subject-matter jurisdiction over it pursuant to 28 U.S.C. § 1343(a)(3) and 28 U.S.C. § 1367(a). The district court entered a preliminary injunction against the City of Los Angeles on April 13, 2020. The City filed a timely notice of appeal on May 12, 2020. Fed. R. App. P. 4(a)(1). This Court has jurisdiction over the City's appeal pursuant to 28 U.S.C. § 1292(a)(1).

# STATEMENT OF THE CASE

> ## A. As the accumulation of personal property overwhelms its public areas, the City of Los Angeles's Municipal Code Section 56.11 limits the amount and type of personal property that can be stored in those areas.

The deplorable reality is that there are a great many Angelenos who have been forced to live on the streets by circumstances that are well beyond the scope of this litigation. With the people living in the City's public areas goes their personal property. (*E.g.*, 2 ER 194.) So the City enacted an ordinance "to balance the needs of the public at large to access clean and sanitary public areas" with "the needs of the individuals, who have no other alternatives for the storage of personal property, to retain access to a limited amount of personal property in public areas." L.A. Mun. Code § 56.11(1).

In line with its purpose, Section 56.11 simultaneously does two things: (1) it permits the storage of certain types and quantities of personal property in public areas, and (2) it prohibits the storage of other types or quantities of personal property in public areas.[1]

---

[1] Section 56.11 defines many terms, including e.g., "Personal Property." To avoid excessive capitalization in the text, this brief capitalizes terms only when reference to a defined term is particularly critical.

14

So, for example, a person cannot store personal property,
unattended, in a public area—someone must be around to assert
ownership over it.  *Id.* § 56.11(3)(a).  With between 24- and 72-hours'
advance warning, the City will remove any such property that it
encounters, and leave notice of where it can be claimed.  *Id.*  (Stored
items may be discarded if unclaimed for 90 days.  *Id.* § 56.11(5).)
Likewise, a person cannot store in a public area more private property
than would fit in a 60-gallon container with the lid closed, whether or
not he or she is around to assert ownership of that property.  *Id.*
§ 56.11(3)(b).  The City removes and stores that property, too, subject to
the same notice provisions as is unattended property.  *Id.*

Then there are things that the City removes and stores without
any advance notice.  For example, no notice is required to remove
property that causes a violation of the Americans with Disabilities Act
by obstructing a public area, *id.* § 56.11(3)(d), or property stored "within
ten feet of any operational and utilizable entrance, exit, driveway, or
loading dock," *id.* § 56.11(3)(e).  There are also some things that the
City removes and discards immediately, including items that pose an
"immediate threat to the health or safety of the public."  *Id.*

15

§ 56.11(3)(g). That includes, for example, things contaminated with urine and feces, or combustible materials. (*See, e.g.*, 3 ER 372 [hazardous items removed by quantity].)

And—critically for this case—Section 56.11 also directs that "[w]ithout prior notice, the City may remove and may discard any Bulky Item," regardless of whether it's attended or not, unless the Bulky Item is designed to be used as a shelter. *Id.* § 56.11(3)(i). If it is designed to be used as a shelter, the Bulky Item will not be removed without 24- to 72-hours' notice, though the ordinance still empowers the City immediately to discard it upon removal. *Id.*

What is a Bulky Item? Section 56.11 defines it as "any item, with the exception of a constructed Tent, operational bicycle, or operational walker, crutch or wheelchair, that is too large to fit into a 60-gallon container with the lid closed, including, but not limited to, a shed, structure, mattress, couch, chair, other furniture or appliance." *Id.* § 56.11(2)(c). The definition excludes "[a] container with a volume of no more than 60 gallons used by an individual to hold his or her Personal Property." *Id.*

16

Why measure a Bulky Item's size against a 60-gallon container with a lid?  One reason is that facilities in the City in which homeless people can store personal property hold that property in 60-gallon containers with lids.  (Req. for Judicial Notice at 11–12.)[2]  Another reason is that when items are removed from the City's public areas, it is the City's Bureau of Sanitation does it.  L.A. Mun. Code § 56.11(11).  In Sanitation's argot—and as defined by both federal and state regulations—bulky items are "large items of solid waste such as household appliances, furniture, large auto parts, trees, branches, stumps, and other oversize wastes whose large size precludes or complicates their handling by normal solid wastes collection, processing, or disposal methods."  (3 ER 212 ¶ 41.)  A normal household solid waste container is also a 60-gallon container with a lid.  L.A. Mun. Code § 66.48(A).  Something that doesn't fit in such a container thus "complicates" normal handling, and is therefore bulky.

For all of the conduct that it prohibits, Section 56.11 prescribes no criminal punishment for storing things where they cannot be.  The only

---

[2] The City filed a request for judicial notice along with this brief.

17

criminal penalties it carries apply to someone who interferes with the City's attempts to enforce the ordinance's various prohibitions. *Id.* § 56.11(10).

In addition to its substantive provisions, and also critically for the purposes of this case, Section 56.11 has a severability clause. It provides that "[i]f any subsection, sentence, clause or phrase of this article is for any reason held to be invalid or unconstitutional by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this ordinance." *Id.* § 56.11(12). Further, the City Council "would have adopted this section, and each and every subsection, sentence, clause and phrase thereof not declared invalid or unconstitutional, without regard to whether any portion of the ordinance would be subsequently declared invalid or unconstitutional." *Id.*

### B. Several unhoused Angelenos, an organization that advocates on behalf of the homeless, and a group of disgruntled taxpayers sue the City for damages and to enjoin its enforcement of various parts of Section 56.11.

A group of several unhoused Angelenos sued the City to enjoin enforcement of various parts of Section 56.11. (Second Am. Compl.

18

[Doc. No. 43] ¶¶ 23, 27, 29, 31, 34, 36.) They were joined in the suit by Ktown for All—"an unincorporated membership organization" created "to form connections between housed and unhoused residents of Koreatown"—and the Association for Responsible and Equitable Spending—"a membership organization comprised of taxpayers in Los Angeles that was founded to ensure that their tax dollars are used to promote responsible public spending." (*Id.* ¶¶ 38, 44.)[3]

The individual Plaintiffs in the case each alleged various injuries caused by the City's enforcement of Section 56.11. The allegations ranged from having cleaning supplies removed and discarded as a health and safety hazard (*id.* ¶ 132) to having chairs removed and discarded as Bulky Items (*id.* ¶ 200) to having tents and blankets discarded (*id.* ¶ 163).

---

[3] Citations are to the Second Amended Complaint rather than to the pleadings that were at issue when Plaintiffs moved for a preliminary injunction. Plaintiffs amended their pleadings while their motion was pending, but the district court found that the amendment did not affect the motion. (1 ER 3–4 n.1.) After the City appealed, the district court dismissed the Second Amended Complaint in part, and directed Plaintiffs to file a Third Amended Complaint. (*See* 4 ER 514.) There is an ongoing dispute in the district court over the two associational Plaintiffs' standing to sue.

19

Ktown for All alleged both that its unhoused members were

harmed by the enforcement of Section 56.11 and that it was harmed,

itself, because it had to devote resources "that it could have spent on

advocating for shelters and connecting with neighbors" on instead

"identifying and counteracting the City's practices." (*Id.* ¶ 41.)  The

Association for Responsible and Equitable Spending alleged simply that

its members advocate "against the use of their dollars to enforce illegal

laws that harm vulnerable residents of the City;" the Association

apparently believes that Section 56.11 is such an "illegal law." (*Id.*

¶ 44.)

These allegations purportedly give rise to five federal and two

state law claims for relief.  The two claims relevant to this appeal are

the first—that on its face, Section 56.11(3)(i) violates the Fourth

Amendment to the United States Constitution by allowing the

warrantless seizure and destruction of Bulky Items—and the fourth—

that on its face, Section 56.11(3)(i) violates the Fourteenth

Amendment's Due Process Clause by failing to provide adequate process

before a Bulky Item is seized and destroyed.  (Second Am. Comp. ¶¶

232–38, 255–58.)  The individual Plaintiffs sought damages for their

20

claims; all Plaintiffs sought declaratory and injunctive relief barring the City from enforcing various portions of Section 56.11. (*Id.* at 60.)

**C.**   **Plaintiffs move to enjoin the City from enforcing Section 56.11(3)(i), which directs that the City "may remove" and "may discard" Bulky Items stored in public places.**

Plaintiffs then moved to enjoin the City from enforcing Section 56.11(3)(i). (Prelim. Inj. Mot. [Doc. No. 38].) They supported their motion for a preliminary injunction with declarations:

Two homemade carts belonging to Plaintiff Marquis Ashley were seized and discarded as Bulky Items in Mr. Ashley's presence—and he is concerned that a new cart will also be seized and discarded. (4 ER 467–68 ¶¶ 10–11; 4 ER 471–72.) Plaintiff Pete Diocson Jr. had one dog kennel, and then another, removed and discarded as Bulky Items. (4 ER 487 ¶¶ 7, 12–15; 4 ER 491, 493.) Rachelle Bettega, an unhoused member of Plaintiff Ktown for All, had a bicycle that was missing a wheel discarded as a Bulky Item. (4 ER 504–05 ¶¶ 2, 6–7.) She is concerned that the City will seize and discard a stackable plastic stand in which she keeps various items. (4 ER 506 ¶ 13.) And various Ktown for All organizers witnessed the City's seizure and removal of Bulky

21

Items during a clean-up, of which they made a video recording. (4 ER 477–79; 4 ER 482; 4 ER 499 ¶¶ 8–9.) One of them noted that monitoring clean-ups, and replacing items that the City removes and discards during those clean-ups, taxes the organization's time and resources. (4 ER 500 ¶ 10.)

Based on that evidence, Plaintiffs argued that they had standing to seek an injunction that would prevent the City from enforcing Section 56.11(3)(i) as violating, on its face, both the Fourth Amendment's warrant requirement and the Fourteenth Amendment's Due Process Clause.[4]

As to the Fourth Amendment, Plaintiffs contended that they were likely to succeed on the merits of their claim because Section 56.11(3)(i) allows for the seizure of Bulky Items with no warrant, rendering it per se unconstitutional *unless*—according to Plaintiffs—"the seizure and summary destruction of property, solely based on the size of the item, is

---

[4] Plaintiffs also raised a procedural due process claim under the California Constitution, but both Plaintiffs (Prelim. Inj. Mot. at 12 n.8) and the district court (1 ER 24 n.23) left Plaintiffs' due process argument to stand or fall based on Fourteenth Amendment case law alone.

22

reasonable." (Prelim. Inj. Mot. at 11.) They then asserted that "[t]he City cannot identify a warrant exception or constitutional principle that allows it to seize and immediately destroy property solely based on its size," and that the immediate destruction of a Bulky Item is therefore facially unreasonable. (*Id.* at 11–12.)

As to the Fourteenth Amendment, Plaintiffs pointed to authority that some form of hearing is required before a person's property interest is destroyed, and argued that Section 56.11(3)(i) allows the combined removal and destruction of Bulky Items stored in public areas without that procedural requisite. (*Id.* at 13.) Plaintiffs claimed that was tantamount to failing to provide any process whatsoever, and consequently that Section 56.11(3)(i) violates the Fourteenth Amendment on its face. (*Id.* at 14.)[5]

---

[5] Only the first *Winter* factor—Plaintiffs' likelihood of success on the merits—is really at issue in this appeal. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). If this Court agrees that the district court got the law wrong in deciding Plaintiffs' likelihood of success on the merits, then the district court abused its discretion and its analysis of the other three factors is largely irrelevant. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). For that reason, this brief does not summarize the district court filings' approach to the remaining *Winter* factors.

**D.    Despite the City's repeated contention that Section 56.11(3)(i)'s "may remove" language should be analyzed separately from its "may discard" language, the district court analyzes them together and enjoins the City from enforcing Section 56.11(3)(i) in its entirety.**

The City opposed Plaintiffs' motion.  In doing so, it observed that while "Plaintiffs speak of 'seizure and destruction' as one concept," they are actually "two events" that "must be analyzed separately."  (Prelim. Inj. Opp'n [Doc. No. 42] at 15–16.)  The City then stated, explicitly, that "the Court should evaluate the constitutionality of [Section 56.11(3)(i)'s] 'may remove' and 'may discard' separately."  (*Id.* at 16.)

The City argued, as to the Fourth Amendment, that no warrant or individualized exception to the warrant requirement is necessary before it removes Bulky Items stored in public areas.  (*Id.* at 12.)  In fact, the City observed, "[t]he Supreme Court has expressly rejected that traditional formulation in a variety of contexts, particularly where, as here, 'a Fourth Amendment intrusion serves special governmental needs beyond the normal need for law enforcement' and 'it is impractical to require a warrant or some level of individualized suspicion in the particular context.'"  (*Id.*)

24

Responding to Plaintiffs' Fourteenth Amendment argument, the
City pointed out that it was Plaintiffs' burden to show that Section
56.11(3)(i) does not "adequately safeguard an individual's property
interest" under "any set of conceivable circumstances." (*Id*. at 19.) The
City then observed that due process is a flexible, circumstance-
dependent concept, and that the type of process due could depend on the
nature of the seized Bulky Item. (*Id*. at 20.) It also noted that the risk
of erroneously depriving someone of something that isn't actually a
Bulky Item is low, because the only factors that go in to that decision
are whether the item fits in a 60-gallon container with the lid closed
and whether it is in a public area. (*Id*. at 21.) And, it added, the
administrative burden on the City of providing additional process would
be significant. (*Id*. at 21–22.)

The district court issued a tentative order that effectively adopted
Plaintiffs' positions across the board. (Tentative Order [Doc. No. 54].)
Despite the City's argument that the removal and destruction of Bulky
Items needed to be analyzed separately, the district court began its
analysis with the statement that "Plaintiffs are likely to succeed on the
merits of their claim that [Section 56.11(3)(i)] authorizes unreasonable

25

seizures in violation of the Fourth Amendment by permitting the seizure *and* immediate destruction of Bulky Items." (*Id.* at 10, italics added.) Throughout its tentative order, the district court continued to treat the removal and destruction of Bulky Items as a single question, which it answered repeatedly in Plaintiffs' favor.

For instance, in deciding whether the Section 56.11(3)(i) violates the Fourth Amendment on its face: "The question here is not whether the City can 'limit the size of items that a person can store in a finite public space,' but whether it can seize *and* destroy items because they are of a particular size. The answer to that question is no." (*Id.* at 11, italics added.) Or in deciding whether the ordinance violates the Fourteenth Amendment's Due Process Clause, again, on its face: "Because [Section 56.11(3)(i)] permits the City to remove *and* permanently destroy Bulky Items without any procedural safeguards whatever, Plaintiffs are likely to succeed on the merits of their due process claim." (*Id.* at 15, italics added.)

The district court did not, however, decide whether *either* the removal *or* the destruction of Bulky Items would violate the Fourth or Fourteenth Amendments. Because whether something can be removed

26

and whether it can be discarded are two different questions, the City objected in writing to the district court's order on (in part) the grounds that it "focuses on the destruction, rather than the removal, of Bulky Items." (Def.'s Objections to Tentative Order [Doc. No. 55] at 5.) The City argued, again and explicitly, that "removal and destruction are distinct concepts in the ordinance and the law," and, moreover, that Section 56.11 has a severability clause that requires the two be treated separately in analyzing Section 56.11(3)(i). (*Id.*) The district court's tentative order, however, only "notes that the ordinance contains a severance provision;" it "does not address whether both removal and destruction are unconstitutional in all circumstances, and if not, whether severance of the offending clause may be appropriate." (*Id.*)

The district court did not address this objection in its final order, which adopted its tentative order materially unchanged. The City appealed. (2 ER 36.)

27

# ISSUES ON APPEAL

I.     Does the Fourth Amendment's warrant requirement render Section 56.11(3)(i) unconstitutional on its face, or can the City remove Bulky Items stored in public areas pursuant to its function as a community caretaker?

II.    Does the Fourteenth Amendment's Due Process Clause likewise or alternatively render Section 56.11(3)(i) unconstitutional on its face, or are there are least some cases in which the ordinance provides sufficient process for the City to remove Bulky Items stored in public areas?

III.   Was the district court required by Section 56.11's severability clause to sever and analyze separately Section 56.11(3)(i)'s "may remove" language and its "may discard" language?

IV.    Based on Plaintiffs' evidence and argument, did the district court abuse its discretion by issuing as broad an injunction as it did?

# STANDARD OF REVIEW

A district court's decision to enter a preliminary injunction is reviewed for an abuse of discretion. *Garcia v. Google, Inc.*, 786 F.3d 733, 739 (9th Cir. 2015) (en banc). That means its legal reasoning is reviewed de novo; a legal error is a per se abuse of discretion. *Mastro v. Rigby*, 764 F.3d 1090, 1097 (9th Cir. 2014); *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). The district court's application of the law to the facts is then reviewed deferentially, and is subject to reversal only if it "was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Hinkson*, 585 F.3d at 1262 (internal quotation marks omitted).

A party seeking a preliminary injunction must have demonstrated four things: (1) a likelihood of success on the merits; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of equities tips in the moving party's favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The first factor is the most important; a failure to demonstrate a likelihood of success on the merits makes any showing on the remaining three factors irrelevant. *Google*, 786 F.3d at 740.

29

## SUMMARY OF ARGUMENT

Both this Court's jurisprudence and the severability clause in Section 56.11 required the district court to consider separately the questions (1) whether it is unconstitutional to remove Bulky Items stored in public areas and (2) whether it is unconstitutional to summarily destroy Bulky Items stored in public areas. Those are two very different questions, and they probably have different answers.

The district court didn't treat them that way, leading it conclude that Plaintiffs have a likelihood of success on the merits under circumstances when they almost certainly do *not*—and thereby to issue an overbroad injunction.

For example, if the question is whether Section 56.11(3)(i) facially violates the Fourth Amendment's warrant requirement by allowing the City to remove Bulky Items from public areas, the answer is almost certainly "no:" The City's community caretaking function must allow the City, under at least some circumstances, to remove Bulky Items stored in public areas—just as the same function would permit the City to tow an illegally parked car without getting a warrant first.

30

Likewise, if the question is whether Section 56.11(3)(i) facially violates the Fourteenth Amendment's Due Process Clause by allowing the City to remove Bulky Items from public areas, the answer again is almost certainly "no:" The process due before a temporary deprivation of personal property is different than that due before its destruction, and likely varies depending on the nature of the property. It is exceedingly unlikely that Section 56.11(3)(i) provides insufficient process in *every* instance of removal, as was Plaintiffs' burden to demonstrate in bringing a facial challenge.

Consequently, whatever the constitutionality of summarily destroying Bulky Items, the district court was required at least to sever and preserve the portions of Section 56.11(3)(i) dealing with the removal of Bulky Items. Any resulting injunction should have been fashioned accordingly. The district court's failure to do that was reversible error. This Court should vacate the injunction and return it to the district court to fashion properly, anew.

31

# ARGUMENT

## I. Plaintiffs are unlikely to prevail on a facial Fourth Amendment challenge to the City's ability to remove Bulky Items from public areas.

### A. The Fourth Amendment doesn't require officials to get warrants before performing the community caretaking function of removing private property from public places where it isn't supposed to be.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. That means the Fourth Amendment permits *reasonable* searches and seizures; indeed, "reasonableness is always the touchstone of Fourth Amendment analysis." *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2186 (2016). As a matter of shorthand, it's sometimes said that this amounts to the imposition of a warrant requirement—because whether a seizure is reasonable is *almost* always gauged by whether the officials conducting it have a warrant to do so. *Illinois v. McArthur*, 531 U.S. 326, 330 (2001); *Sandoval v. Cnty. of Sonoma*, 912 F.3d 509, 515 (9th Cir. 2018).

Almost always. A warrant functions to vouchsafe the reasonableness of the seizure, but it's the reasonableness, not the

warrant, that's actually required. *McArthur*, 531 U.S. at 330; *Sandoval*, 912 F.3d at 515. Thus, "[w]hen faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." *McArthur*, 531 U.S. at 330.

For example, stopping cars briefly at a sobriety checkpoint is a seizure, but it isn't one that requires the officers manning the checkpoint to get a warrant. *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 450, 455 (1990). Or, if "animal workers in an urban setting confront an obviously diseased or ill animal living in foul conditions that may be causing or compounding the animal's suffering, whether a bird or a dog or a cat, those workers have the right to seize the animal without getting a warrant." *Recchia v. City of L.A. Dep't of Animal Servs.*, 889 F.3d 553, 559 (9th Cir. 2018).

And, as more than a few drivers learn, the police don't need to get a warrant to tow a car that's parked somewhere it shouldn't be. Their authority "to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge."

33

*South Dakota v. Opperman*, 428 U.S. 364, 369 (1976). Police officers— or other government officials—do things like this in discharging a community caretaking function. *Miranda v. City of Cornelius*, 429 F.3d 858, 864 (9th Cir. 2005). They regularly seize things for reasons "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).

This Court's community-caretaking jurisprudence has dealt almost totally with the impoundment of vehicles. *Rodriguez v. City of San Jose*, 930 F.3d 1123, 1137–38 (9th Cir. 2019). That, however, is a function of the cases in which the community caretaking exception to the Fourth Amendment's warrant requirement is frequently asserted. It is not, in and of itself, a limitation on the exception's scope.

Nothing in law or logic limits the non-investigatory function of "[r]emoving" things that "impede[] traffic or threaten[] public safety and convenience" to removing cars from streets. *Opperman*, 428 U.S. at 369; *see, e.g.*, *Caniglia v. Strom*, 953 F.3d 112, 122, 130–33 (1st Cir. 2020) (without relying on either an exigent circumstances or emergency aid exception, seizing firearms from a house); *Vargas v. City*

34

*of Philadelphia*, 783 F.3d 962, 972 (3d Cir. 2015) (briefly seizing people "for a non-investigatory purpose and to protect" them "or the community at large"); *United States v. Miller*, 589 F.2d 1117, 1125 (1st Cir. 1978) (boarding an improperly moored, and seemingly abandoned, boat); *see also Carter v. Kirk*, 422 F. App'x 752, 752 (10th Cir. 2011) (seizing cattle with "a demonstrated propensity" for wandering). It would be strange to suggest, for example, that the Fourth Amendment distinguishes between the obstruction caused by construction materials left on the street for days and a car likewise left on the street for days. Or between a car obstructing automobile traffic by blocking the street and a car obstructing bicycle traffic by blocking a bicycle path.

Even a bicycle blocking pedestrian traffic could be removed in an act of community caretaking. S.F. Transp. Code § 8.1(a)(11); *see also* Seattle Mun. Code § 16.36.010(E) (police may immediately remove boats moored after expiration of a permit). Each of those things "impede[s] . . . public safety and convenience," *Opperman*, 428 U.S. at 369, and in no case would their removal be in the course of the "detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," *Cady*, 413 U.S. at 441.

35

**B.    Section 56.11(3)(i), to the extent it allows City officials
to remove large items stored in public areas, does not
violate the Fourth Amendment on its face.**

There is no question that the City can, consistently with the

Fourth Amendment, tow away cars left parked on its highways, streets,

or alleyways for a long period of time.  L.A. Mun. Code, § 80.77(a).  So,

too, can the City remove from its public areas items that (1) are being

stored there, and (2) are "too large to fit into a 60-gallon container with

the lid closed."  L.A. Mun. Code §§ 56.11(2)(c), (2)(k), (2)(o), (3)(i).  The

district court erred in concluding that the City violates the Fourth

Amendment when it does so.

It isn't difficult to explain the City's decision to enact a policy of

removing Bulky Items stored in public areas, regardless of whether one

agrees with it:  Large things left in public areas tend to obstruct

passage through those areas, or to monopolize space that is meant to be

shared by the public as a whole.  That's especially true as those things

accumulate.  (*E.g.*, 2 ER 42; 2 ER 64 ¶ 6; 2 ER 68; 2 ER 76; 2 ER 103;

2 ER 128, 131, 134, 139, 148, 154, 159, 169, 189, 191, 193, 196.)  Faced

with that problem, "[m]unicipal authorities, as trustees for the public,

have the duty to keep their communities' streets open and available for

36

movement of people and property." *Schneider v. State*, 308 U.S. 147, 160 (1939). They may therefore prevent uses of their public areas that are "different in kind and extent from that enjoyed by the general public," and that "dispossess[] the general public" of those public areas. *St. Louis v. Western Union Tel. Co.*, 148 U.S. 92, 98–99 (1893); *see, e.g.*, L.A. Mun. Code § 56.08(a) (unlawful to allow a tree to obstruct a street or sidewalk); *id.* § 58.08(e)(1) (unlawful to maintain any obstacle that obstructs a street or sidewalk); *id.* § 56.12(1) (unlawful to place anything obstructive on a sidewalk without a permit).

While no one has a right to store private property in public areas, *Lavan v. City of L.A.*, 693 F.3d 1022, 1033 (9th Cir. 2012), the City nevertheless—and in recognition of a lamentable reality—allows for some items to be stored on its streets and sidewalks. But the City places limits on, among other things, the size of those items. When items exceeding those limits are stored in public areas, the City removes them. Just like the City's ability to tow cars parked where they shouldn't be, its ability to remove Bulky Items under Section 56.11(3)(i) is a straightforward exercise of the community caretaking function. *Opperman*, 428 U.S. at 369.

It is true that not every Bulky Item will, at any given moment, be obstructive. It is also true (for example) that not every long-dormant car will actually obstruct anything. Nonetheless, municipalities regularly enact ordinances that provide for towing those cars because of their tendency to cause obstructions. *E.g.*, Pasadena Mun. Code § 10.40.250; Portland City Code §§ 16.20.170, 16.30.210(A)(11); *see* Seattle Mun. Code §§ 11.14.268, 11.30.040(A)(8) (length of time a car is parked is an element that can, in conjunction with other factors like the car's state of repair, lead to towing). For the Fourth Amendment's sake, it doesn't matter whether *every* Bulky Item will *always* cause an obstruction. That is because "general . . . circumstances" can render an entire program of seizures reasonable (or not) for the Fourth Amendment's purposes. *McArthur*, 531 U.S. at 330; *see, e.g.*, *Sitz*, 496 U.S. at 450–55 (general circumstances render DUI checkpoints constitutional); *see generally City of Indianapolis v. Edmond*, 531 U.S. 32, 45–46 (2000) ("programmatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme without individualized suspicion").

38

Against that backdrop, it is difficult to see how the district court
concluded that Section 56.11(3)(i) likely violates the Fourth Amendment
*on its face* by allowing for the removal of Bulky Items stored in public
areas: The district court found that there are *no* circumstances under
which the Fourth Amendment would allow the City constitutionally to
rely on Section 56.11(3)(i) to remove Bulky Items. *City of Los Angeles v.
Patel*, 135 S. Ct. 2443, 2450–51 (2015). That cannot possibly be correct.
If it were, the City could not rely on Section 56.11(3)(i) to remove even a
Bulky Item that is indisputably obstructing—not just tending to
obstruct—the use of a public area.

This error can't be patched over simply by claiming a different
provision of Section 56.11 will do the same job in a pinch. It doesn't
solve the problem to say, for instance, that Section 56.11(3)(d)—which
allows for the removal of items that obstruct access in violation of the
Americans with Disabilities Act, and which Plaintiffs haven't
challenged—will allow the City to remove any actual obstructions.
There is, after all, no reason to assume that everything obstructive
causes an ADA violation. Nor is there a reason to assume that the ADA
is, or should be, the sole measure by which the City is allowed to decide

39

whether something placed in a public area is so large as to interfere with the public's use and enjoyment of that area.

Maybe the district court made the error that it did because it wasn't presented with *Cady* and *Opperman*, or told specifically that removing Bulky Items from public areas falls squarely within the City's community caretaking function. But the principle underlying those cases and the community caretaking function certainly *was* raised in the district court: The City argued that no warrant or individualized exception is necessary "where, as here, 'a Fourth Amendment intrusion serves special government needs beyond the normal need for law enforcement,'" and "'it is impractical to require a warrant or some individualized level of suspicion in the particular context.'" (Prelim. Inj. Opp'n at 12.) For that matter, the City's argument below was correct. Because whether it's by an exercise of the community caretaking function or a general application of the Fourth Amendment's rule of reasonableness, a program of removing private property from the public right of way—a place where a person has no right to store it—is not per se unconstitutional, as the district court concluded.

40

That said, it's unclear whether the district court *would* have ruled differently, even if presented squarely with *Cady* and *Opperman*. It essentially said that there were no circumstances under which its Fourth Amendment analysis would differ, writing that "whether the Court requires a warrant or an exception or employs a reasonableness balancing test, the result is the same—Plaintiffs are likely to succeed on their Fourth Amendment claim." (1 ER 19.)

Why was the district court so definite in that answer? Perhaps because it combined two separate questions, insisting on analyzing together whether the Fourth Amendment "permit[s] the seizure *and* immediate destruction of Bulky Items without a warrant or pursuant to a warrant exception or in a way otherwise consistent with the Supreme Court's precedents." (1 ER 15, emphasis added.) The community caretaking function—or maybe even the Fourth Amendment, generally—has nothing to do with the disposition of something after it's seized. *See Thompson v. Whitman*, 85 U.S. (18 Wall.) 457, 471 (1873) ("A seizure is a single act, not a continuous fact"). The community caretaking function bears only on the seizure itself. Asking, in one question, about the Fourth Amendment viability of both the seizure of a

41

Bulky Item and of its subsequent destruction was therefore bound to yield an error.

Which is why this Court has lately observed with some frequency that whether an item may be seized and what may be done with it afterwards are two distinct constitutional questions that must be analyzed separately. *See Brewster v. Beck*, 859 F.3d 1194, 1196–97 (9th Cir. 2017) (initial seizure and subsequent impoundment analyzed separately); *see also Jessop v. City of Fresno*, 936 F.3d 937, 943–44 (9th Cir. 2019) (M. Smith, J., specially concurring) (Fourth Amendment analysis should apply only to the initial seizure of property); *Sandoval*, 912 F.3d at 521–22 (Watford, J., concurring) (distinguishing the initial seizure of a car from its subsequent treatment). For that matter, the district court's own marginalia suggest that it realized it would reach a different conclusion if it separately analyzed (1) the seizure of Bulky Items and (2) the destruction of Bulky Items. (1 ER 16 n.15.) It just did not take the next step of actually performing those separate analyses.

Whatever the Constitution ultimately says of the City's ability to destroy Bulky Items stored in its public areas, it seems nigh-impossible to contend that the Fourth Amendment prohibits the City—under *every*

circumstance—from removing Bulky Items from public areas. Correspondingly, Plaintiffs did not show that they were likely to succeed on the merits of a facial Fourth Amendment challenge to the City's authority to remove Bulky Items from in public areas, and so were not entitled to a preliminary injunction on that basis. *Google*, 786 F.3d at 739.

## II. Plaintiffs are unlikely prevail on a facial Fourteenth Amendment due process challenge to the City's ability to remove Bulky Items from public areas.

### A. The Fourteenth Amendment's Due Process Clause generally doesn't require notice before performing community caretaking functions.

The Fourteenth Amendment's Due Process Clause also has something to say about a government's ability to seize property. To determine whether the property's owner received due process in a seizure, a court considers: (1) "the private interest that will be affected by" the seizure; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) the government's interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural

43

requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The typical, though not the only, formula by which a government addresses these due process concerns is to provide the property's owner with notice of the seizure and an opportunity to contest it. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950); *see Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("due process is flexible and calls for such procedural protections as the particular situation demands").

Consider, again, the familiar example of towing a car—because it is, in important respects, like removing a Bulky Item stored in a public area. Cars are ordinarily seen as valuable things; "[a] person's ability to make a living and his access to both the necessities and amenities of life may depend upon the availability of an automobile when needed." *Stypmann v. City & Cnty. of S.F.*, 557 F.2d 1338, 1342–43 (9th Cir. 1977). Unsurprisingly, "due process protections apply to the detention of private automobiles." *Id.* at 1342. But that leaves the question of "the particular process that is due" when a car is towed. *Id.*

Given the circumstances under which cars are ordinarily towed, due process doesn't require the procedural protection of a hearing

44

beforehand.  *City of Los Angeles v. David*, 538 U.S. 715, 719 (2003); *Soffer v. City of Costa Mesa*, 798 F.2d 361, 363 (9th Cir. 1986).  Nor does due process necessarily require notice to be given before towing a car. *Scofield v. City of Hillsborough*, 862 F.2d 759, 762–764 (9th Cir. 1988) (citing *Sutton v. City of Milwaukee*, 672 F.2d 644 (7th Cir. 1982)).  That is because the relative cost to a government of providing notice sometimes outweighs the incremental benefit of an additional procedural safeguard.  *See, e.g.*, *Lawton v. Steele*, 152 U.S. 133, 141 (1894) (no judicial proceedings necessary before allowing any person who finds an unlawful $15-fishing net to destroy it; the proceedings would cost more than a net's value).

For example, though it's a "close" call, notice is required before towing a car from the parking lot of a hotel where its owner lives—if the problem with the car is that it's parked in a public place but registered as non-operational.  *Clement v. City of Glendale*, 518 F.3d 1090, 1094, 1095–96 (9th Cir. 2008).  The burden to the government of providing pre-towing notice to the owner in those circumstances is modest.  *Id.* at 1095.

But notice is generally *not* required when officials exercise the community caretaking function to tow a car, as the circumstances that justify community caretaking also usually make it impractical to give pre-towing notice: The entire point is to remove an obstruction or potential obstruction expeditiously from the public right of way. *Miranda*, 429 F.3d at 867; *see Sutton*, 672 F.2d at 646 (recognizing that the particular illegal-parking circumstances that warrant a tow are best decided by state and local officials). Even where notice isn't required before a car's seizure, though, due process entitles the owner of the towed car to a post-seizure hearing to contest the tow. *Draper v. Coombs*, 792 F.2d 915, 923 (9th Cir. 1986); *see Zinermon v. Burch*, 494 U.S. 113, 128 (1990) ("In some circumstances . . . a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process").

The same basic framework applies not just to cars, but to any property with more than de minimis value—regardless of whose property it is. *Fuentes v. Shevin*, 407 U.S. 67, 90 n.21 (1972); *Lavan*, 693 F.3d at 1032.

46

**B.** **The removal of Bulky Items under Section 56.11(3)(i) does not, on its face, violate the Fourteenth Amendment's Due Process Clause.**

The district court made the same mistake in applying the

*Mathews* framework that it did in conducting its Fourth Amendment

analysis: It failed to distinguish between the removal of property and

its disposal, effectively asking only whether the City provided sufficient

process before "permanently destroy[ing]" a Bulky Item. (1 ER 24.)

But, again, moving something is different from destroying that thing.

*See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982) (nature of

requisite process depends on "the length of finality of the deprivation");

*Schneider v. Cnty. of San Diego*, 28 F.3d 89, 92 (9th Cir. 1994) (due

process principles apply "with particular force" when a "deprivation is

permanent"). It is doubtful that anyone would contend otherwise.

Thus, whatever might ultimately be said of the process due before

the City can discard a Bulky Item that is stored in its public areas, it is

not the same as the process due before the City can remove such an

item. The district court did not apply the well-worn *Mathews* criteria to

analyze the removal of a Bulky Item from a public area, never mind to

determine whether Section 56.11(3)(i) *always* provides insufficient

47

process before a Bulky Item is removed. *United States v. Salerno*, 481 U.S. 739, 751–52 (1987). If the district court had applied the *Mathews* factors, it would have had to consider the following:

First, there is the nature of the private interest that would be affected by a Bulky Item's removal. That depends on the nature of the Bulky Item, but Section 56.11 removes from its ambit certain large items that are likely to prove essential, i.e., constructed tents, operational bicycles or walkers, and crutches or wheelchairs. L.A. Mun. Code § 56.11(2)(c). For while any seizure of property warrants due process protections—so long as the property has greater than a de minimis value—there is a difference between removing someone's shelter, on the one hand, and removing a broken decorative umbrella (2 ER 185–87), a pile of dismantled bicycles (2 ER 193), large couches (2 ER 127–28), a sidewalk-bound canoe (2 ER 192), or a jacuzzi (2 ER 105 ¶ 3), on the other hand. *See* L.A. Mun. Code § 56.11(3)(i) (additional notice is provided before removing a Bulky Item used as a shelter); *compare Clement*, 518 F.3d at 1094 ("close call" whether towing a car that is registered as non-operational car requires notice, given the diminished property interest in a car that cannot be driven publicly)

48

*with Lone Star Sec. & Video v. City of L.A.*, 584 F.3d 1232, 1238–39 (9th Cir. 2009) (no notice required before towing trailers that are both frequently illegally parked and used for advertising, rather than transportation).

Second, as far as notice is concerned, all Angelenos have notice that they cannot store in public areas items that exceed the size of a 60-gallon container with its lid closed. The ordinance itself tells them that much, just as the existence of a 72-hour parking limit provides the requisite notice that a car can't be left in one place for more than three days. *United States v. Locke*, 471 U.S. 84, 108 (1985); *Lone Star Sec. & Video*, 584 F.3d at 1237; *see, e.g.*, *Sackman v. City of L.A.*, 677 F. App'x 365, 366 (9th Cir. 2017) (ordinance itself provides requisite notice of 72-hour parking limit before towing).

Additionally, there are signs posted permanently in some parts of the City to give further notice, (3 ER 213 ¶ 45; *e.g.*, 3 ER 461), and the City regularly provides advance notice with temporary signs before it cleans up a public area (*e.g.*, 3 ER 250, 266, 306, 378, 379). On top of that, if the owners of Bulky Items are present when their items are seized, the owners' presence gives them notice of the City's action: They

49

know what was taken and by whom, and can ask for an explanation of why (*e.g.*, 4 ER 487 ¶ 12). *See City of W. Covina v. Perkins*, 525 U.S. 234, 241 (1999) (notice of seizure provided so that the property's owner has a "means of ascertaining who was responsible for the loss"); *see, e.g.*, *Lone Star Sec. & Video*, 584 F.3d at 1239 (no need for notice; "[w]hen a trailer disappears, Lone Star knows that it has been towed").

Every seizure at issue in these preliminary injunction proceedings was of an attended item—and most were made during street clean-ups of which notice was posted well in advance. (*See* 4 ER 467 ¶¶ 8–9 [Mr. Ashley was present for clean-up, but "did not see" notices]; 3 ER 208 ¶¶ 28–29 [notice posted two days in advance of the clean-up Mr. Ashley referenced]; 3 ER 379 [a notice posted before the same clean-up]; 4 ER 487 ¶ 8 [Mr. Diocson was present for the clean-up, and had seen posted notices in advance]; 4 ER 504–05 ¶¶ 5–7 [Ms. Bettega present for the clean-up].) Consequently, assuming for argument's sake that Section 56.11(3)(i) itself doesn't provide everyone with adequate notice that Bulky Items will be removed from public areas, at least some Bulky Item owners have notice when their items are removed. *Cf. Lone Star*

50

*Sec. & Video*, 584 F.3d at 1239 (owner of seized property may be on sufficient notice even if not given individualized, pre-removal notice).

Third, there is the question what would be gained by additional procedural protections, and at what cost to the City. Additional protections typically justify themselves, and add value in excess of their cost, when there is a high risk that an ordinance will be applied erroneously without them. *Scofield*, 862 F.2d at 764; *Sutton*, 672 F.2d at 646. There is little risk of erroneous deprivation here, because the City must ascertain only (1) whether an item is being stored in a public area; and (2) whether the item would fit in a 60-gallon container with the lid closed. Section 56.11 even lists examples of common Bulky Items, like mattresses, couches, and chairs. L.A. Mun. Code § 56.11(2)(c). And if the analysis is only of the risk of erroneous removal, rather than the risk of erroneous destruction, the balance tips further against requiring additional pre-removal process. *Cf. Gilbert v. Homar*, 520 U.S. 924, 932–34 (1997) (distinguishing between suspended from a job and being fired from it in deciding what pre-deprivation process is due).

51

This was how the district court should have treated the due
process question in the first instance.  Plaintiffs should have given it
the evidence and argument necessary to do so.  Instead, Plaintiffs
treated the seizure and destruction of Bulky Items together (Prelim. Inj.
Mot. at 13–14), argued that the destruction was accomplished without
any process at all (*id.*), and then—when the City pointed out the
constitutional difference between seizure and destruction—Plaintiffs
devoted all of a footnote to shifting the burden improperly to the City to
"articulate[] a constitutionally permissible justification for either
seizing *or* destroying items based solely on their size" (Prelim. Inj. Reply
[Doc. No. 48] at 6 n.8).

No.  To demonstrate the required likelihood of success on the
merits, the burden was Plaintiffs' to show that:  (1) in *every* instance (2)
Section 56.11(3)(i) does *not* provide the requisite procedural
safeguards—this is not a substantive due process challenge—for either
(3) seizing or (4) subsequently destroying Bulky Items.  *See Salerno*, 481
U.S. at 745 (burden is on the party bringing a facial challenge to show
"that no set of circumstances exists under which" the challenged
measure would be constitutional); *Google*, 786 F.3d at 740 (burden is

52

always on the party seeking a preliminary injunction to prove likelihood of success on the merits).

Meanwhile, the district court appeared at least to recognize that removing and discarding an item are two different things, requiring different quanta of process. But it subsequently declined, again, to perform the separate analyses. That is, the district court implicitly recognized a distinction between the removal and destruction of items when it observed that various unchallenged provisions of Section 56.11 allow for the no-notice removal of items stored in public areas. (1 ER 30.) For instance, there has been no challenge to the City's ability to remove items stored "within ten feet of any operational and utilizable entrance, exit, driveway or loading dock." L.A. Mun. Code § 56.11(3)(e). The district court then stated that by enjoining the City from applying the Bulky Items provision *in its entirety*, it was "merely requir[ing] the City to treat Bulky Items like every other item stored in public areas, permitting removal in a number of circumstances, including when items are unattended, blocking the sidewalk, or a threat to health and safety." (1 ER 30.)

The district court did not accurately describe its own order, which certainly does not require the City "to treat Bulky Items like every other item stored in public areas." An injunction requiring the City to treat Bulky Items like items blocking a loading dock, for example, would not bar the City from removing Bulky Items without notice—as the district court's injunction does. Such an injunction would instead allow the City to remove, but prevent the City from destroying, Bulky Items without providing further process. *That* is the outcome a separate analysis of removal and destruction might have yielded. And if the district court intended to do as it said, and to conform the City's ability to handle Bulky Items to its ability to handle other kinds of obstructive items, *that* is the injunction it should have entered.

III. **A presumption in favor of severability meant that the district court should have considered the portion of Section 56.11(3)(i) that allows the City *to remove* Bulky Items separately from that which allows the City *to discard* those items.**

The district court's error in failing to evaluate the constitutionality of the seizure of Bulky Items separately from their summary destruction is compounded by the fact that Section 56.11's severability clause commanded those separate analyses. *Sam Francis*

54

*Found. v. Christies, Inc.*, 784 F.3d 1320, 1327 (9th Cir. 2015) (en banc);

*see Ayotte v. Planned Parenthood*, 546 U.S. 320, 328 (2000) ("when

confronting a constitutional flaw in a statute, we try to limit the

solution to the problem"). "[C]ourts must respect the laws made by

legislatures and, therefore, should avoid nullifying an entire statute

when only a portion is"—arguably—"invalid." *Vivid Entm't, LLC v.

Fielding*, 774 F.3d 566, 573–74 (9th Cir. 2014). "The need for deference

and restraint in severing a state or local enactment is all the more acute

because of our respect for federalism and local control." *Id.* at 574.

In deciding whether to sever one provision from another, the

district court should have looked first for a severability clause; if one

exists, there is a presumption that an ordinance's terms are severable.

*Sam Francis Found.*, 784 F.3d at 1326. Section 56.11 has a severability

clause. L.A. Mun. Code § 56.11(12). That provision allows a court to

sever not just "any subsection," of the ordinance, but also "any sentence,

clause or phrase" that is "for any reason held to be invalid or

unconstitutional." L.A. Mun. Code § 56.11(12). The City Council thus

expressly indicated that a court could strike from Section 56.11(3)(i) the

phrases "and may discard" or "may discard" while retaining the phrase "may remove."

Moreover, if a court struck the "discard" phrases from Section 56.11(3)(i), the ordinance would still make sense—"grammatically, functionally, and volitionally." *Sam Francis Found.*, 784 F.3d at 1325 (internal quotation marks omitted).  With the "discard" phrases excised, Section 56.11(3)(i) still works grammatically:  "Without prior notice, the City may remove . . . any Bulky Item . . . .  For any Bulky Item that is designed to be used as a shelter . . . with pre-removal notice . . . the City may remove . . . the Bulky Item . . . .  If the Bulky Item violates subsection 3.(d)-(h) herein, even if it is designed to be used as a shelter, without prior notice, the City may remove . . . the Bulky Item."  L.A. Mun. Code § 56.11(3)(i).[6]

Likewise, the provision is still functional.  It "has a reduced scope, of course," but "it is complete, has coherent functionality, and does not

---

[6] Removing the "discard" phrase from the last sentence of Section 56.11(3)(i) doesn't prevent the City from discarding Bulky Items that are both used as shelters *and* are either health and safety hazards *or* contraband; Sections 56.11(3)(g) and (h) themselves do the work of allowing those items to be discarded summarily.

conflict with any of the [Section's] other provisions." *Sam Francis Found.*, 784 F.3d at 1326.

And it is still volitionally sensible, too—that is to say, the City Council likely would have adopted Section 56.11(3)(i) even without the "discard" phrases.  The best evidence of whether the City Council would have done so is that the ordinance's severability provision says as much: "The City Council hereby declares that it would have adopted this section, and each sentence, clause and phrase thereof not declared invalid or unconstitutional, without regard to whether any portion of the ordinance would be subsequently declared invalid or unconstitutional."  L.A. Mun. Code § 56.11(12); *see Sam Francis Found.*, 784 F.3d at 1327 (that a legislature said "expressly" that it would have enacted a measure without a severed provision is "perhaps" the "most telling[]" evidence it would have done so).

The only countervailing evidence of whether Section 56.11(3)(i) would make sense volitionally without the "discard" phrases is the fact that the City lacks capacity to store Bulky Items.  (3 ER 215 ¶ 50.)  This means that the City will likely be forced, at least temporarily, to cease removing Bulky Items qua Bulky Items—even under a properly drawn,

narrower injunction. But there is a difference between having to stop enforcing a statutory provision as a matter of resource allocation, which can change based on all kinds of circumstances, and having to stop enforcing it as a matter of the provision's constitutionality.

With every factor thus supporting the presumption of severability, it is a mystery that the district court did not appear even to consider severing the ordinance's "discard" phrases. It was also an error of law.

## IV. Plaintiffs did not satisfy the first prerequisite for getting the injunction that they got. The district court abused its discretion in entering it.

Federal courts should be especially cautious about the breadth of injunctions they enter against government entities seeking to enforce duly enacted laws. *Vivid Entm't*, 774 F.3d at 574. To get an injunction barring the City both from removing and from discarding Bulky Items stored in public areas, Plaintiffs were required first to demonstrate a likelihood of success on their claims that *both* removing *and* summarily destroying those items *always* violates either the Fourth or Fourteenth Amendment (or both). Whatever Plaintiffs demonstrated as to the summary destruction of Bulky Items, it should by now be clear that they failed to demonstrate a likelihood of success on their facial

58

challenges to the constitutionality of removing Bulky Items from public areas.

Plaintiffs' failure to meet this, the first *Winter* factor, is by itself sufficient to show that issuing such a broad injunction was an abuse of the district court's discretion. *Google*, 786 F.3d at 740. It also suggests other problems with the district court's analysis of the other *Winter* factors. For instance, there is—or should be—a significant difference in the balance of equities supporting the injunction (or not supporting the injunction) depending on whether the harm to Plaintiffs is the removal of Bulky Items or the summary destruction of Bulky Items. (*See* 1 ER 26, 30 [framing and balancing the harm to Plaintiffs in the context of permanent deprivation of belongings].) That is true of harm both to the individual Plaintiffs and to Ktown for All—since it is "the *destruction* of people's belongings" that resulted in it having to devote organizational resources "to replace more items for their neighbors than they would otherwise have to replace." (Prelim. Inj. Mot. at 17, italics added.)

In the end, had the district court separately considered the two constitutional questions at issue here, it could have made a narrower

constitutional ruling and crafted a narrower injunction—one addressing only the summary destruction of Bulky Items.  The broad injunction that the district court entered instead should be vacated with instructions to issue an order that preserves the City's ability to seize Bulky Items under Section 56.11(3)(i).

## CONCLUSION

This Court should vacate the district court's injunction and remand with instructions that it enjoin the City at most from summarily destroying (1) Bulky Items of (2) greater than de minimis value that (3) are seized pursuant to Section 56.11(3)(i).  The remainder of the district court's injunction, addressing the ordinance's interference-with-enforcement provision and the City's ability to post notices of the ordinance's applicability, should be modified accordingly.

Respectfully submitted,

Dated:  June 26, 2020                CITY OF LOS ANGELES

Michael N. Feuer
Kathleen A. Kenealy
Scott Marcus
Blithe S. Bock
Jonathan H. Eisenman

s/ Jonathan H. Eisenman
Jonathan H. Eisenman

Case 20-55522, 06/26/2020, ID: 11735681, DktEntry: 14, Page 61 of 57

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 20-55522

I am the attorney or self-represented party.

**This brief contains** | 10,246 | **words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(•) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ( ) it is a joint brief submitted by separately represented parties;

    ( ) a party or parties are filing a single brief in response to multiple briefs; or

    ( ) a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [            ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Jonathan H. Eisenman | **Date** | 6/26/2020

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/2018*

**ADDENDUM**

**L.A. Municipal Code Sections**

Official City of Los Angeles Municipal Code (TM)

## SEC. 56.08.  SIDEWALKS – STREETS – OBSTRUCTIONS.

(a)    No person owning, leasing, occupying, having charge or control of any lot or premises, shall allow, keep or maintain any tree, bush or vegetation growing upon any lot or premises abutting any street or sidewalk or upon any street or sidewalk so that the limbs, twigs, leaves or parts of such tree, bush or vegetation interfere with or obstruct the free passage of pedestrians or vehicles along or upon said streets or sidewalks.

(b)    Trees or bushes greater than fifteen feet in height growing in or upon any premises or sidewalk shall be deemed to interfere with and obstruct the free passage of pedestrians or vehicles upon said streets and sidewalks within the meaning of this section unless the lower limbs, twigs or leaves of such trees or bushes are kept removed at all times so as to have a minimum clearance of:

1.    13 feet 6 inches over that portion of State highways and major streets improved, designed or ordinarily used for vehicular traffic;

2.    11 feet over that portion of local streets improved, designed, or ordinarily used for vehicular traffic;

3.    9 feet over the sidewalk and parkway area of all streets.  **(Amended by Ord. No. 106,987, Eff. 3/24/56.)**

(c)    No person having charge or control of any lot or premises shall allow any soil, rubbish, trash, garden refuse, tree trimmings, ashes, tin cans or other waste or refuse to remain upon any sidewalk, parkway, or in or upon any street abutting on or adjacent to such lot or premises, or which will interfere with or obstruct the free passage of pedestrians or vehicles along any such street, sidewalk or parkway.  **(Amended by Ord. No. 123,979, Eff. 4/20/63.)**

(d)    No person having charge or control of any lot, building, or premises, shall clean or sweep any dirt, rubbish or refuse from any sidewalk into the street; provided that nothing contained in this section shall prevent such person from cleaning or sweeping any dirt, rubbish, or refuse from any sidewalk and disposing of the same on or in said lot, building or premises, where such disposition does not create a nuisance and is not prohibited by any other ordinance. **(Amended by Ord. No. 148,466, Eff. 7/29/76.)**

(e)    **(Amended by Ord. No. 128,577, Eff. 11/14/64.)**

1.    No person having charge or control of any lot or premises, either as owner, lessee, tenant, builder, contractor, housemover, or otherwise, shall construct,

American Legal Publishing Corp.                                                  1

Official City of Los Angeles Municipal Code (TM)

deposit or maintain any structure, building, rock, brick, broken concrete, stepping stones, sprinkler heads or any obstacle of any nature whatsoever in or upon any street, sidewalk or parkway abutting on or adjacent to such lot or premises or which will interfere with the free passage of pedestrians or vehicles along such street, sidewalk or parkway.

      2.    The provisions of this section shall not apply to sprinkler heads or bricks in tree wells which are properly maintained on grade with the surface of the sidewalk or parkway in which they are located.

      3.    The Board of Public Works may grant deviations or modifications of this subsection, upon written application therefor, so as to permit the installation and maintenance of bricks, stepping stones and similar walking surfaces in parkways, on grade with the surface thereof, whenever it is determined that the following conditions exist:

         a.    That the deviation or modification requested arises from unusual or extraordinary physical conditions, and is necessary to permit the proper and lawful development and use of the applicant's property;

         b.    That the granting of the deviation or modification requested will not be contrary to the public safety, convenience, and general welfare;

         c.    That the granting of the deviation or modification will not adversely affect the rights of adjacent property owners or tenants.

      (f)    No person shall excavate on any land sufficiently close to the property line to endanger any adjoining street, sidewalk, alley, or other public property, without supporting and protecting such street, sidewalk, alley, or other public property from settling, cracking, or other damage which might result from such excavation.

      (g)    Any person having charge or control of any lot or premises who violates the provisions of Subsections (a) or (c) shall be subject to administrative penalties as set forth in Subsection (h).  **(Added by Ord. No. 182,778, Eff. 12/16/13.)**

      (h)    The first violation of Subsections (a) or (c) in a calendar year is subject to a warning or an administrative monetary penalty not to exceed $50.00.  Subsequent violations in the same calendar year will result in a second penalty not to exceed $100.00 for the second violation after receiving the initial $50.00 penalty.  The penalty for the third administrative violation in a calendar year is $150.00.  More than three administrative fines in one calendar year shall result in the violation being prosecuted as a misdemeanor and the violator shall be subject

Official City of Los Angeles Municipal Code (TM)

to all penalties applicable to criminal violations.  The Bureau of Street Services is authorized to assess a processing fee established by the Board of Public Works for all citations with an administrative monetary penalty.  All non-criminal enforcement actions are subject to the administrative hearing process as mandated by California Government Code Section 53069.4.  **(Added by Ord. No. 182,778, Eff. 12/16/13.)**

(i)  Any person who receives a written notice or administrative monetary penalty pursuant to this section may request an administrative review of the accuracy of the determination or the propriety of any fine issued by filing a written notice of appeal with the Board of Public Works no later than 30 days after receipt of a written notice or fine, as applicable.  The notice of appeal must include all facts supporting the appeal and any supporting documentation, including copies of all photos, statements and other documents that the appellant wishes to be considered in connection with the appeal.  The appeal shall be heard by the Board of Public Works.  The Board of Public Works shall conduct a publicly noticed hearing concerning the appeal within 45 days from the date that the notice of appeal is filed, or on a later date if agreed upon by the appellant and the Board of Public Works, and shall give the appellant at least 10 days prior written notice of the date of the hearing.  The Board of Public Works may sustain, rescind, or modify the written notice or fine, as applicable.  The Board of Public Works shall have the power to waive any portion of the fine in a manner consistent with its decision. The decision of the Board of Public Works shall be final and effective on the date the decision is rendered.  **(Added by Ord. No. 182,778, Eff. 12/16/13.)**

An Ordinance prohibiting obstruction of streets or sidewalks is valid.
*In re Bodkin* (1948), 86 Cal. App. 2d 208.

The public is entitled to free and unobstructed use of entire streets and sidewalks for purposes of travel subject only to reasonable and proper control of the municipality.
*People v. Amdur* (1954) 123 Cal. App. 2d Supp. 951.


## SEC. 56.11.  STORAGE OF PERSONAL PROPERTY.
### (Amended by Ord. No. 184,182, Eff. 4/11/16.)

1.  **Declaration of Legislative Intent - Purpose.**  The City enacts this section to balance the needs of the residents and public at large to access clean and sanitary public areas consistent with the intended uses for the public areas with the needs of the individuals, who have no other alternatives for the storage of personal property, to retain access to a limited amount of personal property in public areas.  On the one hand, the unauthorized use of public areas for the storage of unlimited amounts of personal property interferes with the rights of other members of the public to use public areas for their intended purposes and can create a public health or safety

Official City of Los Angeles Municipal Code (TM)

hazard that adversely affects those who use public areas.  On the other hand, the City's large and vulnerable homeless population needs access to a manageable amount of essential property for their personal use and well-being.  This section attempts to balance the needs of all of the City's residents.

2.      **Definitions.**   The definitions contained in this subsection shall govern the construction, meaning and application of words and phrases used in this section.

(a)      "**Alley**" means any Highway having a Roadway not exceeding 25 feet in width which is primarily for access to the rear or side entrances of abutting property.

(b)      "**Bikeway**" means all facilities that provide primarily for, and promote, bicycle travel.

(c)      "**Bulky Item**" means any item, with the exception of a constructed Tent, operational bicycle or operational walker, crutch or wheelchair, that is too large to fit into a 60-gallon container with the lid closed, including, but not limited to, a shed, structure, mattress, couch, chair, other furniture or appliance.  A container with a volume of no more than 60 gallons used by an individual to hold his or her Personal Property shall not in itself be considered a Bulky Item.

(d)      "**City Employee**" means any full or part-time employee of the City of Los Angeles or a contractor retained by the City for the purpose of implementing this Section.

(e)      "**Essential Personal Property**" means any and all Personal Property that cumulatively is less than two cubic feet in volume, which, by way of example, is the amount of property capable of being carried within a backpack.

(f)      "**Excess Personal Property**" means any and all Personal Property that cumulatively exceeds the amount of property that could fit in a 60-gallon container with the lid closed.

(g)      "**Highway**" means a way or place of whatever nature, publicly maintained and open to the use of the public for purposes of vehicular travel.

(h)      "**Parkway**" means the area of the Street between the back of the curb and the Sidewalk that typically is planted and landscaped.

(i)      "**Person**" means any individual.

American Legal Publishing Corp.                                    4

Official City of Los Angeles Municipal Code (TM)

(j)        "**Personal Property**" means any tangible property, and includes, but is not limited to, goods, materials, merchandise, Tents, tarpaulins, bedding, sleeping bags, hammocks, personal items such as household items, luggage, backpacks, clothing, documents and medication.

(k)        "**Public Area**" or "**Public Areas**" means all property that is owned, managed or maintained by the City, except property under the jurisdiction of the Department of Recreation and Parks which is governed by Los Angeles Municipal Code Section 63.44, and shall include, but not be limited to, any Street, medial strip, space, ground, building or structure.

(l)        "**Roadway**" means that portion of a Highway improved, designed or ordinarily used for vehicular travel.

(m)        "**Sidewalk**" means that portion of a Highway, other than the Roadway, set apart by curbs, barriers, markings or other delineation, for pedestrian travel.

(n)        "**Storage Facility**" means any facility, whether operated by a public, non-profit or private provider, which allows and has capacity for voluntary storage, free of charge, for a homeless person to store Personal Property up to the equivalent of the amount of property that would fit into a single 60-gallon container with the lid closed.

(o)        "**Store**", "**Stored**", "**Storing**" or "**Storage**" means to put Personal Property aside or accumulate for use when needed, to put for safekeeping, and/or to place or leave in a Public Area.  Moving Personal Property to another location in a Public Area or returning Personal Property to the same block on a daily or regular basis shall be considered Storing and shall not be considered to be removing the Personal Property from a Public Area.  This definition shall not include any Personal Property that, pursuant to statute, ordinance, permit, regulation or other authorization by the City or state, is Stored with the permission of the City or state on real property that is owned or controlled by the City.

(p)        "**Street**" includes every Highway, avenue, lane, Alley, court, place, square, Sidewalk, Parkway, curbs, Bikeway or other public way in this City which has been or may hereafter be dedicated and open to public use, or such other public property so designated in any law of this state.

(q)        "**Tent**" means a collapsible shelter made of fabric such as nylon or canvas or a tarp stretched and sustained by supports, which is not open on all sides and which hinders an unobstructed view behind or into the area surrounded by the fabric.  In order

Official City of Los Angeles Municipal Code (TM)

to qualify as a Tent for purposes of this subsection, a Tent, when deconstructed, must be able to fit within a 60-gallon container with the lid closed.

(r)  "**Unattended**" means no Person is present with the Personal Property who asserts or claims ownership over the Personal Property.  Conversely, property is considered "**Attended**" if a Person is present with the Personal Property and the Person claims ownership over the Personal Property.

3.  **Regulation and Impoundment of Stored Personal Property; Discard of Certain Stored Personal Property.**

(a)  No Person shall Store any Unattended Personal Property in a Public Area.  With pre-removal notice as specified in Subsection 4.(a), the City may impound any Unattended Personal Property in a Public Area, regardless of volume.  Post-removal notice shall be provided as set forth in Subsection 4.(b), below.

(b)  No Person shall Store any Attended Excess Personal Property in a Public Area.  With pre-removal notice as specified in Subsection 4.(a), the City may impound any Attended Excess Personal Property Stored in a Public Area.  Post-removal notice shall be provided as set forth in Subsection 4.(b), below.

(c)  No Person shall Store any Personal Property in a Public Area in such a manner as to obstruct City operations, including a Street or Sidewalk maintenance or cleaning.  Without prior notice, the City may temporarily move Personal Property, whether Attended or Unattended, which is obstructing City operations in a Public Area, including a Street or Sidewalk maintenance or cleaning, during the time necessary to conduct the City operations.  The City also may impound Personal Property that is obstructing City operations in a Public Area, pursuant to Subsection 3.(a) or 3.(b).

(d)  No Person shall Store any Personal Property in a Public Area in such a manner that it does not allow for passage as required by the Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 328 (1990), as amended from time to time (ADA).  Without prior notice, the City may move and may immediately impound any Personal Property, whether Attended or Unattended, Stored in a Public Area in such a manner that it does not allow for passage as required by the ADA.  Post-removal notice shall be provided as set forth in Subsection 4.(b), below.

(e)  No Person shall Store any Personal Property within ten feet of any operational and utilizable entrance, exit, driveway or loading dock.  Without prior notice, the City may move and may immediately impound any Personal Property, whether

Official City of Los Angeles Municipal Code (TM)

Attended or Unattended, Stored in a Public Area within ten feet of any operational and utilizable entrance, exit, driveway or loading dock.  Post-removal notice shall be provided as set forth in Subsection 4.(b), below.

(f)     No Person shall Store in a Public Area that has a clearly posted closure time any Personal Property after the posted closure time.  Without prior notice, the City may remove and impound Personal Property, whether Attended or Unattended, Stored in a Public Area that has a clearly posted closure time, provided the Personal Property is removed and impounded after the posted closure time.  Post-removal notice shall be provided as set forth in Subsection 4.(b), below.

(g)     No Person shall Store any Personal Property in a Public Area if the Personal Property, whether Attended or Unattended, constitutes an immediate threat to the health or safety of the public.  Without prior notice, the City may remove and may discard any Personal Property Stored in a Public Area if the Personal Property poses an immediate threat to the health or safety of the public.

(h)     No Person shall Store any Personal Property in a Public Area if the Personal Property, whether Attended or Unattended, constitutes an evidence of a crime or contraband.  Without prior notice, the City may remove and may discard any Personal Property that constitutes evidence of a crime or contraband, as permissible by law.

(i)     No Person shall Store any Bulky Item in a Public Area.  Without prior notice, the City may remove and may discard any Bulky Item, whether Attended or Unattended, Stored in a Public Area unless the Bulky Item is designed to be used as a shelter.  For any Bulky Item that is designed to be used as a shelter but does not constitute a Tent as defined in Subsection 2.(q), with pre-removal notice as specified in Subsection 4.(a), the City may remove and discard the Bulky Item, whether Attended or Unattended.  If the Bulky Item violates Subsection 3.(d)-(h) herein, even if it is designed to be used as a shelter, without prior notice, the City may remove and discard the Bulky Item, whether Attended or Unattended.

(j)     Upon the creation of any new Storage Facility, increased capacity at an Existing Storage Facility or subsidized transportation assistance to a Storage Facility, the Chief Administrative Officer shall report to the Council to inform the Council's consideration of whether to prohibit a Person from Storing more than Essential Personal Property in a Public Area in a specified radius from a Storage Facility, based upon the amount of the additional storage capacity and the accessibility thereto.  In consideration of the CAO's report, the Council may, by resolution, prohibit a Person within a specified radius of a Storage Facility from Storing more than Essential Personal Property in a

Official City of Los Angeles Municipal Code (TM)

Public Area.

4. **Notice.**

(a) **Pre-Removal Notice.** Pre-removal notice shall be deemed provided if a written notice is provided to the Person who is Storing or claims ownership of the Personal Property, or is posted conspicuously on or near the Personal Property and the actual removal commences no more than 72 hours after the pre-removal notice is posted. The written notice shall contain the following:

(1) A general description of the Personal Property to be removed.

(2) The location from which the Personal Property will be removed.

(3) The date and time the notice was posted.

(4) A statement that the Personal Property has been stored in violation of Section 56.11, Subsection 3.

(5) A statement that the Personal Property may be impounded if not removed from Public Areas within 24 hours.

(6) A statement that moving Personal Property to another location in a Public Area shall not be considered removal of Personal Property from a Public Area.

(7) The address where the removed Public Property will be located, including a telephone number and the internet website of the City through which a Person may receive information as to impounded Personal Property as well as information as to voluntary storage location(s).

(8) A statement that impounded Personal Property may be discarded if not claimed within 90 days after impoundment.

(b) **Post-Removal Notice.** Upon removal of Stored Personal Property, written notice shall be conspicuously posted in the area from which the Personal Property was removed. The written notice shall contain the following:

(1) A general description of the Personal Property removed.

Official City of Los Angeles Municipal Code (TM)

(2)     The date and approximate time the Personal Property was removed.

(3)     A statement that the Personal Property was stored in a Public Area in violation of Section 56.11, Subsection 3.

(4)     The address where the removed Personal Property will be located, including a telephone number and internet website of the City through which a Person may receive information as to impounded Personal Property.

(5)     A statement that impounded Personal Property may be discarded if not claimed within 90 days after impoundment.

5.     **Storage and Disposal.**

(a)     Except as specified herein, the City shall move Personal Property to a place of storage.

(b)     Except as specified herein, the City shall store impounded Personal Property for 90 days, after which time, if not claimed, it may be discarded.  The City shall not be required to undertake any search for, or return, any impounded Personal Property stored for longer than 90 days.

(c)     The City shall maintain a record of the date any impounded Personal Property was discarded.

6.     **Repossession.**  The owner of impounded Personal Property may repossess the Personal Property prior to its disposal upon submitting satisfactory proof of ownership.  A Person may establish satisfactory proof of ownership by, among other methods, describing the location from and date when the Personal Property was impounded from a Public Area, and providing a reasonably specific and detailed description of the Personal Property.  Valid, government-issued identification is not required to claim impounded Personal Property.

7.     **Ban on Erection of Tent during Certain Daytime Hours.**  No Person shall erect, configure or construct a Tent in any Public Area from 6:00 a.m. to 9:00 p.m. (except during rainfall or when the temperature is below 50 degrees Fahrenheit).  A Person must take down, fold, deconstruct or put away any Tent erected, configured or constructed in any Public Area between the hours of 6:00 a.m. and 9:00 p.m. (except during rainfall or when the temperature is below 50 degrees Fahrenheit).  Without prior notice, the City may deconstruct and may impound any Tent, whether Attended or Unattended, located in any Public Area in violation

Official City of Los Angeles Municipal Code (TM)

of this subsection or in violation of Subsections 3.(c)-(h) hereof. The City shall provide post-removal notice for any impounded Tent, as set forth in Subsection 4.(b), herein.

      8.    **Ban on Attachments to Public and Private Property.**

      (a)    **Public Property.**  No Person shall erect any barrier against or lay string or join any wires, ropes, chains or otherwise attach any Personal Property to any public property, including but not limited to, a building or portion or protrusion thereof, fence, bus shelter, trash can, mail box, pole, bench, news rack, sign, tree, bush, shrub or plant, without the City's prior written consent.

      (b)    **Private Property.**  No Person shall erect any barrier against or lay string or join any wires, ropes, chains or otherwise attach any Personal Property to any private property in such a manner as to create an obstruction on or across any Street or area where the public may travel.

      (c)    **Removal.**  Without prior notice, the City may remove any barrier, string, wires, ropes, chains or other attachment of Personal Property, whether Attended or Unattended, to any public property, or to any private property which creates an obstruction to any Street or area where the public may travel.

      9.    **Illegal Dumping.**  Nothing herein precludes the enforcement of any law prohibiting illegal dumping, including but not limited to California Penal Code Section 374.3, and Los Angeles Municipal Code Sections 41.14, 63.44 B.13. or 190.02, or any successor statutes proscribing Illegal dumping.

      10.    **Unlawful Conduct.**  Los Angeles Municipal Code Section 11.00 shall not apply to violations of this section except as follows:

      (a)    No Person shall willfully resist, delay or obstruct a City employee from moving, removing, impounding or discarding Personal Property Stored in a Public Area in violation of Subsections 3.(a)-(h).

      (b)    No Person shall refuse to take down, fold, deconstruct or otherwise put away any Tent erected or configured between the hours of 6:00 a.m. and 9:00 p.m., in violation of Subsection 7., or willfully resist, delay or obstruct a City employee from taking down, folding, deconstructing, putting away, moving, removing, impounding or discarding the Tent, including by refusing to vacate or retreat from the Tent.

      (c)    No Person shall refuse to remove any barrier, string, wire, rope, chain or

Official City of Los Angeles Municipal Code (TM)

other attachment that violates Subsection 8., or willfully resist, delay or obstruct a City employee from deconstructing, taking down, moving, removing, impounding or discarding the barrier, string, wire, rope, chain or other attachment, including by refusing to vacate or retreat from an obscured area created by the attachment.

(d)     No Person shall willfully resist, delay or obstruct a City employee from removing or discarding a Bulky Item Stored in violation of Subsection 3.(i), including by refusing to vacate or retreat from within the Bulky Item or from an obscured area created by the Bulky Item.

(e)     If Subsection 3.(j) becomes operative by resolution in any area of the City, no Person shall willfully resist, delay or obstruct a City employee from removing or impounding any Personal Property that exceeds the limit on Essential Personal Property.

(f)     A violation of Subsection 9. prohibiting illegal dumping.

11.     **Designated Administrative Agency.**  The City's Department of Public Works, Bureau of Sanitation, is hereby charged with serving as the Designated Administrative Agency (DAA), for the purposes of this ordinance.  The DAA shall promulgate rules, protocols and procedures for the implementation and enforcement of this ordinance, consistent with the provisions herein.

12.     **Severability.**  If any subsection, sentence, clause or phrase of this article is for any reason held to be invalid or unconstitutional by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this ordinance.  The City Council hereby declares that it would have adopted this section, and each and every subsection, sentence, clause and phrase thereof not declared invalid or unconstitutional, without regard to whether any portion of the ordinance would be subsequently declared invalid or unconstitutional.


**SEC. 66.48.  EXTRA CAPACITY REFUSE COLLECTION FEE.**
        **(Added by Ord. No. 170,868, Eff. 2/19/96.)**

A.     **DECLARATION OF POLICY.**  It is hereby declared that in order for the City of Los Angeles to be prepared to respond to the needs of its citizens for adequate solid waste disposal alternatives in the future, it is necessary to recognize that there is currently limited landfill capacity for solid waste disposal within the greater Los Angeles area, that new landfills are difficult to site and permit, and that the State has imposed recycling and waste reduction requirements in order to reduce the total amount of solid waste going to landfill by 25% and 50% by 1995 and 2000, respectively.  Therefore, the City must establish a clear policy to provide an

Official City of Los Angeles Municipal Code (TM)

incentive for residents to reduce and to recycle the quantity of solid waste they generate. To accomplish this end, the City has developed a standard allowance for collection and management of refuse, yard trimmings, and horse manure which the City deems adequate to meet the requirements of the average dwelling unit as defined in Section 66.40. The City hereby declares that the standard allowance for a parcel with one dwelling unit shall be one 60-gallon black container for refuse and one 90-gallon green container for yard trimmings. The standard allowance for a parcel with more than one dwelling unit is one 60-gallon black container per dwelling unit and one 90-gallon green container for yard trimmings for the parcel. Additional capacity above and beyond this standard allowance may be made available for various fees as described in this Code. **(Amended by Ord. No. 174,699, Eff. 8/22/02.)**

### B. CONTINUOUS EXTRA CAPACITY.

1. A $5.00 per month fee will be charged for each 30-gallon increment of extra refuse capacity made available to a dwelling unit by replacing the standard allowance 60-gallon black container with a single larger, 90-gallon black container or issuing additional 30, 60 or 90-gallon black containers.

Residents who qualify for the lifeline requirements as set forth in LAMC Section 21.1.12 shall receive the first 30 gallons of extra refuse capacity at no charge and additional capacity beyond the first 30 gallons at 50 % of the extra refuse capacity fee.

High Density Households who qualify under the Department of Water and Power (DWP) water rate program shall receive the first 30 gallons of extra capacity without charge if their household has 7 to 10 residents and shall receive the first 60 gallons of extra capacity without charge if their household has over 11 residents. Additional increments beyond those increments shall be charge at the regular fee.

2. A $5.00 per month fee will be charged for each 30-gallon increment of horse manure capacity requested by a resident for a dwelling unit. The City will issue specially marked 30, 60 or 90 gallon green containers for the limited purpose of horse manure pickup.

3. A $2.50 per month fee will be charged for each 30-gallon increment of extra yard trimmings capacity made available to a dwelling unit by replacing the standard allowance 60-gallon green container with a larger, 90-gallon green container or issuing additional 30, 60, or 90-gallon green containers. However, if a single-family dwelling unit is built on two or more residential lots, the dwelling unit shall be entitled to one additional 60-gallon green container at no extra charge from the City. In the event that a second dwelling unit is built on the site, each dwelling unit shall only be entitled to one

Official City of Los Angeles Municipal Code (TM)

60-gallon green container at no charge and any additional capacity requested by either dwelling unit will be charged as set forth above. Yard trimmings shall be defined as wood waste, brush, grass clippings, plant and tree trimmings, leaves, Christmas trees and other organic material all of which must be free from inorganic material and food waste.

      4.    The fees described in Subdivisions 1, 2 and 3 of this section will be billed through the  DWP bill on the line item generally titled Sanitation Equipment Charge where it will be added to the existing charges found thereon and deposited to the Sanitation Equipment Charge Special Revenue Fund. Larger, or extra containers, will be delivered to a dwelling unit at a resident's request, and will be recorded through the container serial number to the name of the person appearing on the DWP bill, or their designated agent, for each respective dwelling unit. The fee imposed by this article shall be a joint and several charge against the occupants and the owner of each dwelling unit subject to the charge. Residents may use this extra capacity once per week on their regular collection day. Failure to use all of the requested extra capacity will not relieve the resident from paying the monthly extra capacity fee. The fees will be collected as described in LAMC Sections 66.43, 66.44, 66.45, 66.46 and 66.47.

    **C.**    **INTERMITTENT EXTRA CAPACITY.**  Residents of all dwelling units shall have the ability to purchase the right to have additional refuse, horse manure or yard trimmings collected by the City on a collection day to collection day basis. The resident requiring this additional intermittent capacity shall purchase from the City, at a cost of $2.00 per 30 gallons of additional capacity, a special tag to be placed on the additional materials for collection. The tags must be purchased in advance, in person at various locations throughout the City, or through the mail, and can be utilized only on the regular collection day. Each tag may be used only one time. **(Amended by Ord. No. 178,875, Eff. 7/23/07.)**

    **D.**    **IMPLEMENTATION.**

      1.    The Board shall have the power and duty, and is hereby directed to enforce all of the provisions of this article, except as otherwise set forth herein, and shall provide such rules and regulations as are consistent with the provisions of this article and as may be necessary or desirable to aid in the administration, including adjustments and enforcement of the extra capacity charge.

      2.    The Board or any of its authorized representative may make such inspections or investigations as said Board deems necessary at any reasonable time on any premises or lot for the purpose of determining the number, size, and type of automated collection containers.

Official City of Los Angeles Municipal Code (TM)

**E.    EFFECTIVE DATE.**  The fees described in Subsections B and C will become effective starting 30 days after DWP notifies the Office of Finance **(Amended by Ord. No. 173,587, Eff. 12/7/00.)** that its billing system has been modified to include the Extra Capacity Fees.

**F.    FEE ADJUSTMENTS.**  The fees described herein shall be reviewed on a yearly basis to determine if any adjustments need to be made to cover changes in operating cost.

## SEC. 80.77.  REMOVAL OF PARKED CARS.
### (Amended by Ord. No 151,833, Eff. 2/10/79, Oper. 2/25/79.)

(a)    Police Officers and civilian employees of the Department of Transportation designated as Traffic Officers for purposes of this section are hereby authorized to remove from highways, streets or alleys within the City of Los Angeles to the nearest garage or other place of safety designated or maintained by the Police Department, any vehicle which has been parked or left standing on such highway, street or alley for 72 or more consecutive hours.

(b)    Whenever a Police Officer or Traffic Officer removes a vehicle from a street or highway as authorized in this section and the officer knows or is able to ascertain from the registration records in the vehicle or from the registration records of the California Department of Motor Vehicles the name and address of the owner thereof, such Police Officer or Traffic Officer shall immediately give or cause to be given notice in writing to such owner of the fact of such removal, the grounds thereof and of the place to which such vehicle has been removed. In the event any such vehicle is stored in a public garage, a copy of such notice shall be given to the proprietor of such garage.

(c)    Whenever a Police Officer or Traffic Officer removing a vehicle from a street or highway under this section does not know and is not able to ascertain the name of the owner or for any other reason is unable to give the notice to the owner as hereinbefore provided, and in the event the vehicle is not returned to the owner within a period of 120 hours, then and in that event the Police Officer or Traffic Officer shall immediately send or cause to be sent written report of such removal by mail to the Department of Motor Vehicles at Sacramento and shall file a copy of such notice with the proprietor of any public garage in which the vehicle may be stored. Such report shall be made on a form furnished by such department and shall include a complete description of the vehicle the date, time and place from which removed, the grounds for such removal and the name of the garage or place where the vehicle is stored.

(d)    Police Officers and Traffic Officers are hereby authorized to remove from streets

Official City of Los Angeles Municipal Code (TM)

or highways within the City of Los Angeles to the nearest garage or other place of safety, or to a garage or other place of safety designated or maintained by the Police Department, any vehicle which has been parked or left standing in violation of an official sign prohibiting the stopping or parking of vehicles and giving notice that such vehicle may be removed.

(e)     Whenever a vehicle is removed from the streets of the City and stored as authorized by Subsection (d) above, or is stored as permitted and provided for in California Vehicle Code Section 22852, the provisions for a post–storage hearing as set forth in said Vehicle Code section shall be implemented. **(Added by Ord. No. 164,041, Eff. 10/21/88.)**

EXHIBIT 11

# DECLARATION OF LOCAL EMERGENCY

**WHEREAS,** Los Angeles Administrative Code Section 8.27 provides that the Mayor of the City of Los Angeles may declare the existence of a local emergency during incidents that exceed or are likely to exceed normal services, personnel, equipment, and facilities of the regularly constituted branches and departments of City government; and

**WHEREAS**, conditions of disaster or of extreme peril to the safety of persons and property have arisen both Internationally and within the United States as a result of the introduction of the novel coronavirus (COVID-19), a novel communicable disease, which was first detected in Wuhan City, Hubei Province, China in December 2019; and

**WHEREAS** COVID-19 has spread globally to over 70 countries, infecting more than 92,800 persons and killing more than 3,160 individuals worldwide.  Due to the expanding list of countries with widespread transmission of COVID-19, and increasing travel alerts and warnings for countries experiencing sustained or uncontrolled community transmission issued by the Centers for Disease Control and Prevention (CDC), COVID-19 has created conditions that are likely to be beyond the control of local resources and require the combined forces of other political subdivisions to combat; and

**WHEREAS**, on February 26, 2020, the CDC confirmed the first case of local person-to-person transmission of COVID-19 in the United States and this case raises the possibility of community transmission occurring in the general public, the Health Officer of Los Angeles County has determined that there is an imminent threat to the public health from the introduction of COVID-19 in the City of Los Angeles, and has declared a Local Health Emergency and the Los Angeles County Board of Supervisors has proclaimed the existence of a local emergency for the County of Los Angeles; and

**WHEREAS**, the City's ability to mobilize local resources, coordinate interagency response, accelerate procurement of vital supplies, use mutual aid, and seek future reimbursement by the State and Federal governments will be critical to successfully responding to COVID-19; and

**WHEREAS**, these conditions warrant and necessitate that the City of Los Angeles declare the existence of a local emergency.

**NOW THEREFORE**, I hereby declare the existence of a local emergency and direct the Emergency Operations Organization (EOO) to take the necessary steps for the protection of life, health and safety in the City of Los Angeles.

**IT IS FURTHER ORDERED AND DECLARED,** that during the existence of said local emergency the powers, functions, and duties of the Emergency Operations Organization of the City shall be those prescribed by state law, by ordinances, and resolutions of the City; and

**I FURTHER DIRECT,** that all City Departments shall review and revise their Continuity of Operations Plans (COOP) to address the risks COVID-19 poses to their critical functions in coordination with the Emergency Management Department (EMD) and shall coordinate all crisis communications to employees and the public with EMD; and

**I FURTHER DIRECT,** that all City Departments shall track costs for staffing, supplies, and equipment related to COVID-19 preparation and prevention and forward that information to the Office of the City Administrative Officer (CAO); and

**I FURTHER DIRECT,** that EMD shall coordinate Citywide planning, preparedness and response efforts regarding COVID-19 with the Los Angeles County Department of Public Health (LACODPH) and the Los Angeles County Office of Emergency Management (LACOOEM).

**I THEREFORE DIRECT,** that the Declaration of Local Emergency shall take effect immediately and that widespread publicity and notice shall be given said Declaration through the most feasible and adequate means of disseminating such notice throughout the City.

**IT IS FURTHER DECLARED AND ORDERED,** that a copy of this Declaration be forwarded to the Los Angeles County Office of Emergency Management to be forwarded to the Director of the California Governor's Office of Emergency Services requesting that the Director find it acceptable in accordance with State law; that the Governor of California pursuant to the Emergency Services Act, issue a proclamation declaring an emergency in Los Angeles County; that the Governor waive regulations that may hinder response and recovery efforts; that response and recovery assistance be made available under the California Disaster Assistance Act; and that the State expedite access to State and Federal resources and any other appropriate federal disaster relief programs.

**Dated at Los Angeles, California**
**March 4, 2020**
**Time:**

**Filed with the City Clerk**                                   **Signed**
Date: March 4, 2020
Time: 10:21 am
Initials:                                                        **ERIC GARCETTI**
                                                                Mayor