Shayla Myers (SBN 264054)
Mallory Andrews (312209)
LEGAL AID FOUNDATION OF LOS ANGELES
7000 South Broadway
Los Angeles, CA  90003
Telephone:  (213) 640-3983
Email:smyers@lafla.org
mbandrews@lafla.org

*Attorneys for Gladys Zepeda, Miriam Zamora,*
*Ali El-Bey, James Haugabrook, Pete Diocson Jr.,*
*Marquis Ashley, and Ktown for All*

*Additional Attorneys on Next Page*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANET GARCIA, *ET AL*, | CASE NO. 2:19-cv-06182-DSF-PLA |
| Plaintiffs, | **DISCOVERY MATTER** |
| v. | **JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT CITY OF LOS ANGELES'S RESPONSES TO PLAINTIFF ALI EL BEY'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)** |
| CITY OF LOS ANGELES, A MUNICIPAL ENTITY, | |
| Defendants. | |

Hearing Date:     April 28, 2021
Time:                  10:00 a.m.

Complaint Filed:    July 18, 2019
Discovery Cut-off:  July 26, 2021
Pretrial Conf.:        Feb. 14, 2022
Trial:                       March 15, 2022

1  Catherine Sweetser (SBN 271142)
2  Kristina Harootun (SBN 308718)
   SCHONBRUN SEPLOW HARRIS
3  & HOFFMAN LLP
   11543 West Olympic Blvd.
4  Los Angeles, CA 90064
   Telephone: (310) 396-0731
5  Email:csweetser@sshhlaw.com
   kharootun@sshhlaw.com

6  *Attorneys for Plaintiffs*

7  Benjamin Allan Herbert (SBN 277356)
   William L. Smith (SBN 324235)
8  KIRKLAND & ELLIS LLP
   555 South Flower Street
9  Los Angeles, CA 90071
   Telephone: (213) 680 8400
10 Email:benjamin.herbert@kirkland.com
   william.smith@kirkland.com
11
12 Michael Onufer (SBN 300903)
   KIRKLAND & ELLIS LLP
13 2049 Century Park East
   Los Angeles, CA 90067
14 Telephone: (310) 552-4200
   Email:  michael.onufer@kirkland.com

15 *Attorneys for Plaintiffs Ktown for All, Janet Garcia,*
   *Peter Diocson Jr., Marquis Ashley, Ali El-Bey, and*
16 *Association for Responsible and Equitable Public*
   *Spending*
17

18 MICHAEL N. FEUER, City Attorney
   KATHLEEN A. KENEALY, Chief Deputy City Attorney
19 SCOTT MARCUS, Senior Assistant City Attorney
   GABRIEL S. DERMER, Assistant City Attorney (SBN 229424)
20 FELIX LEBRON, Deputy City Atty (SBN 232984)
   A. PATRICIA URSEA, Deputy City Atty (SBN 221637)
21 200 N. Main Street, City Hall East, Room 675
   Los Angeles, CA 90012
22 Telephone (213) 978-7569
   Facsimile (213) 978-7011
23 Felix.Lebron@lacity.org
   Patricia.Ursea@lacity.org
24
   *Attorneys for Defendant,* CITY OF LOS ANGELES
25

26
27
28

# TABLE OF CONTENTS

**Page**

**I.    INTRODUCTORY STATEMENT**..................................................................1
    a.        Plaintiffs' Introductory Statement ...........................1
    b.        Defendant's Introductory Statement ........................4

**II.   MEET AND CONFER EFFORTS** ............................................................7
    a.        Plaintiffs' Summary of Meet and Confer Efforts ....................7
    b.        Defendant's Summary of Meet And Confer Efforts..............17

**III.  SPECIFIC REQUESTS** ..........................................................................17
REQUEST FOR PRODUCTION NO. 1:...........................................17
RESPONSE TO REQUEST FOR PRODUCTION NO. 1: .......................17
AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO.
    1:.................................................................18
PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
    NO. 1:.............................................................20
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION
    NO. 1:.............................................................29
REQUEST FOR PRODUCTION NO. 2:...........................................33
RESPONSE TO REQUEST FOR PRODUCTION NO. 2: .......................34
AMENDED RESPONSE TO REQUEST FOR PRODUCTION
    NO. 2:.............................................................37
PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
    NO. 2:.............................................................40
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION
    NO. 2:.............................................................61
REQUEST FOR PRODUCTION NO. 11:..........................................78
RESPONSE TO REQUEST FOR PRODUCTION NO. 11: ......................79
AMENDED RESPONSE TO REQUEST FOR PRODUCTION
    NO. 11:............................................................79
PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
    NO. 11:............................................................80
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION
    NO. 11:............................................................91
REQUEST FOR PRODUCTION NO. 12:..........................................94
RESPONSE TO REQUEST FOR PRODUCTION NO. 12: ......................94
AMENDED RESPONSE TO REQUEST FOR PRODUCTION
    NO. 12:............................................................94

PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 12:........................................................................95
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 12:........................................................................100
REQUEST FOR PRODUCTION NO. 13:...................................................102
RESPONSE TO REQUEST FOR PRODUCTION NO. 13: ......................102
AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 13:........................................................................102
PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 13:........................................................................103
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 13:........................................................................108
REQUEST FOR PRODUCTION NO. 14:...................................................111
RESPONSE TO REQUEST FOR PRODUCTION NO. 14: ......................111
AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 14:........................................................................112
PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 14:........................................................................112
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 14:........................................................................117
REQUEST FOR PRODUCTION NO. 15:...................................................118
RESPONSE TO REQUEST FOR PRODUCTION NO. 15: ......................118
AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 15:........................................................................119
PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 15:........................................................................119
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 15:........................................................................124
REQUEST FOR PRODUCTION NO. 16:...................................................125
RESPONSE TO REQUEST FOR PRODUCTION NO. 16: ......................126
AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 16:........................................................................129
PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 16:........................................................................133
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 16:........................................................................145
REQUEST FOR PRODUCTION NO. 17:...................................................149
RESPONSE TO REQUEST FOR PRODUCTION NO. 17: ......................149
AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 17:........................................................................153

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 17:.................................................................157

DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 17:.................................................................159

REQUEST FOR PRODUCTION NO. 18:....................................161

RESPONSE TO REQUEST FOR PRODUCTION NO. 18: ......................161

AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 18:.................................................................165

PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 18:.................................................................169

DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 18:.................................................................172

REQUEST FOR PRODUCTION NO. 19:....................................173

RESPONSE TO REQUEST FOR PRODUCTION NO. 19: ......................174

AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 19:.................................................................177

PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 19:.................................................................181

DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 19:.................................................................184

REQUEST FOR PRODUCTION NO. 23:....................................186

RESPONSE TO REQUEST FOR PRODUCTION NO. 23: ......................186

AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 23:.................................................................190

PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 23:.................................................................193

DEFENDANT'S ARGUMENT RE REQUEST FOR PRODUCTION NO. 23:.................................................................200

REQUEST FOR PRODUCTION NO. 26:....................................205

RESPONSE TO REQUEST FOR PRODUCTION NO. 26: ......................205

AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 26:.................................................................208

PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 26:.................................................................212

DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 26:.................................................................218

REQUEST FOR PRODUCTION NO. 29:....................................219

RESPONSE TO REQUEST FOR PRODUCTION NO. 29: ......................219

AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 29:.................................................................224

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 29:........................................................................228
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 29:........................................................................233
REQUEST FOR PRODUCTION NO. 30:........................................234
RESPONSE TO REQUEST FOR PRODUCTION NO. 30: .....................234
AMENDED RESPONSE TO REQUEST FOR PRODUCTION
NO. 30:........................................................................237
PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 30:........................................................................240
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 30:........................................................................248
REQUEST FOR PRODUCTION NO. 33:........................................254
RESPONSE TO REQUEST FOR PRODUCTION NO. 33: .....................254
AMENDED RESPONSE TO REQUEST FOR PRODUCTION
NO. 33:........................................................................257
PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 33:........................................................................260
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 33:........................................................................269
REQUEST FOR PRODUCTION NO. 34:........................................275
RESPONSE TO REQUEST FOR PRODUCTION NO. 34: .....................275
AMENDED RESPONSE TO REQUEST FOR PRODUCTION
NO. 34:........................................................................278
PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 34:........................................................................282
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 34:........................................................................282
REQUEST FOR PRODUCTION NO. 35:........................................282
RESPONSE TO REQUEST FOR PRODUCTION NO. 35: .....................282
AMENDED RESPONSE TO REQUEST FOR PRODUCTION
NO. 35:........................................................................285
PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 35:........................................................................289
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 35:........................................................................295
REQUEST FOR PRODUCTION NO. 36:........................................296
RESPONSE TO REQUEST FOR PRODUCTION NO. 36: .....................296
AMENDED RESPONSE TO REQUEST FOR PRODUCTION
NO. 36:........................................................................299

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 36:.................................................................................303
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 36:.................................................................................308
REQUEST FOR PRODUCTION NO. 38:.................................................309
RESPONSE TO REQUEST FOR PRODUCTION NO. 38:.....................309
AMENDED RESPONSE TO REQUEST FOR PRODUCTION
NO. 38:.................................................................................311
PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 38:.................................................................................313
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 38:.................................................................................321
REQUEST FOR PRODUCTION NO. 39:.................................................324
RESPONSE TO REQUEST FOR PRODUCTION NO. 39:.....................324
AMENDED RESPONSE TO REQUEST FOR PRODUCTION
NO. 39:.................................................................................327
PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 39:.................................................................................330
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 39:.................................................................................338
REQUEST FOR PRODUCTION NO. 43:.................................................341
RESPONSE TO REQUEST FOR PRODUCTION NO. 43:.....................341
AMENDED RESPONSE TO REQUEST FOR PRODUCTION
NO. 43:.................................................................................344
PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 43:.................................................................................348
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 43:.................................................................................355
REQUEST FOR PRODUCTION NO. 44:.................................................357
RESPONSE TO REQUEST FOR PRODUCTION NO. 44:.....................357
AMENDED RESPONSE TO REQUEST FOR PRODUCTION
NO. 44:.................................................................................361
PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 44:.................................................................................364
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 44:.................................................................................371
REQUEST FOR PRODUCTION NO. 45:.................................................372
RESPONSE TO REQUEST FOR PRODUCTION NO. 45:.....................372
AMENDED RESPONSE TO REQUEST FOR PRODUCTION
NO. 45:.................................................................................373

PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
            NO. 45:.................................................................................375
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION
            NO. 45:.................................................................................381
REQUEST FOR PRODUCTION NO. 47:.................................................381
RESPONSE TO REQUEST FOR PRODUCTION NO. 47: ....................381
AMENDED RESPONSE TO REQUEST FOR PRODUCTION
            NO. 47:.................................................................................383
PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
            NO. 47:.................................................................................384
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION
            NO. 47:.................................................................................389
REQUEST FOR PRODUCTION NO. 48:.................................................389
RESPONSE TO REQUEST FOR PRODUCTION NO. 48: ....................389
AMENDED RESPONSE TO REQUEST FOR PRODUCTION
            NO. 48:.................................................................................390
PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
            NO. 48:.................................................................................392
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION
            NO. 48:.................................................................................397
REQUEST FOR PRODUCTION NO. 49:.................................................398
RESPONSE TO REQUEST FOR PRODUCTION NO. 49: ....................398
AMENDED RESPONSE TO REQUEST FOR PRODUCTION
            NO. 49:.................................................................................399
PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
            NO. 49:.................................................................................401
DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION
            NO. 49:.................................................................................404

IV.   **PLAINTIFFS' REQUEST FOR ATTORNEYS' FEES .........................405**
      a.       Plaintiffs' Position on Attorneys' Fees..................................405
      b.       Defendant's Position on Attorneys' Fees ...............................407

## I.   INTRODUCTORY STATEMENT

### a.   Plaintiffs' Introductory Statement

Plaintiffs, seven unhoused residents from neighborhoods throughout Los Angeles, and two organizations, brought this case in July 2019 to put a stop to the City's customs, policies, and practices of unconstitutionally seizing and destroying unhoused people's belongings, which Plaintiffs allege violate their rights under the Fourth and Fourteenth Amendments to the U.S. Constitution and Article 1, Sections 7 and 13 of the California Constitution. They challenge the constitutionality of Los Angeles Municipal Code Section 56.11 ("LAMC 56.11"), which the City amended in 2016 to allow it to impound and often immediately destroy unhoused people's property. And they challenge the City's policies, customs, and practices related to the enforcement of that ordinance, which is done primarily through two types of encampment cleanups: comprehensive cleanups which are noticed and require individuals to vacate the area during the cleanups, and rapid response enforcement actions, which are not noticed. These allegations are spelled out in a lengthy Second Amended Complaint ("SAC"), Dkt. 43, which describes not only the ordinance and written policies, but also unconstitutional customs and practices (which are necessarily unwritten). *See e.g.* SAC ¶¶ 65-123.

The Plaintiffs seek prospective relief under both 42 U.S.C. Section 1983 and the Declaratory Judgments Act, 28 U.S.C. §§ 2201, 2202.  Although the individual Plaintiffs each bring damages claims, the District Court noted that "the allegations of the Supplemental FAC make clear that [the individual plaintiffs'] claims for injunctive and declaratory relief are significant and potentially more consequential than their request for damages."  *See* Order Granting in Part and Denying in Part Defendant's Motion to Dismiss (Dkt. 36), Declaration of Shayla Myers ("Myers Decl."), Exh. I ("February Order") at n. 20.  And Plaintiff Ktown for All (KFA), including on behalf of its members, seeks only prospective relief related to the

City's customs, practices, and policies.  *See* Order granting in Part and Dismissing in Part Defendant's Motion to Dismiss (Dkt. 65), Myers Decl., Exh. L ("June Order") at 8.

With that relief in mind, Plaintiffs propounded 49 RFPs to Defendant in October 2019, which were deemed served in July 2020.  Each of the RFPs is time-limited and seeks discovery on a discrete topic germane to this case[1]:

- Documentation of/about cleanups specifically enumerated in the SAC ("the Specific Incidents,") and other cleanups Plaintiffs experienced or that occurred in locations where they have lived (RFP 2);
- Documents showing organizational structure of relevant City departments (RFPs 3-10);
- Written policies and procedures related to encampment cleanups, LAMC 56.11 enforcement, and other discrete, related topics (RFPs 11-15);
- Trainings about the same topics (RFPs 16-20);
- Exemplars and instructions related to forms and notices used in the commission of cleanups and enforcement of LAMC 56.11 (RFPs 20-29);
- Documentary evidence of the City's customs, practices, and application of polices, including documentation of cleanups and disposition of property (30-34, 37, 42-45); summaries, reports, analysis and data compilations (35-36, 47-49); and complaints (38-41).

Consistent with the mandate of proportionality under Rule 26, the amount of documentary evidence Plaintiffs seek to prove customs and practices is calculated to balance Plaintiffs' need to establish the existence of unconstitutional customs, practices, and policies, with the City's purported burden. To that end, they seek 1) all documentation for cleanups that impacted or likely impacted Plaintiffs, going back only to January 1, 2018; 2) only discrete types of documents for other cleanups conducted the year before the Specific Incidents and to the present; and 3) data captured in the City's databases, which is easily and frequently exported, for cleanups from April 2016 to the present.

The City has objected since the beginning of this case that almost none of this documentation is even relevant to Plaintiffs' claims.  It ignores the significant

---

[1]   In fact, many requests seek a only a specific type of document. *See e.g.,* RFPs 3-8 (job descriptions, organizational charts); RFPs 30-34 (specific forms); RFPs 35-36 (reports, statistics, and analysis).

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

constitutional issues at stake and frames this case as a low dollar damages case. The City has done its level best to limit the case—filing multiple Motions to Dismiss and then a Motion for Judgment on the Pleadings. But each Court ruling has confirmed and even clarified that this case aims to end the City's widespread and longstanding unconstitutional customs, practices, and policies.

Even after all of these Court rulings and a City-wide Preliminary Injunction enjoining parts of LAMC 56.11 on its face, *see* Dkt. 58, the City continues to contend this case is just about the Specific Incidents.[2] It has barely budged on its relevance objections.  Because it maintains this discovery is not relevant, any burden required to produce discovery is not proportionate to the needs of the case.

The City's untenable yet unwavering position has infected every aspect of its participation in discovery, even when the City has agreed to produce documents. As described in detail below, Plaintiffs have identified countless documents the City has withheld, including whole categories of documents and most egregiously, documents related to the Plaintiffs' Specific Incidents. The City has refused to provide written responses that comply with Rule 34, so Plaintiffs have no way of knowing whether the failure to produce responsive documents is because of the pages of impermissible and vague objections, its failure to conduct reasonable searches, its indefinite, interminable, and impermissible "rolling production," or for some other reason.

Plaintiffs are entitled and in fact need this discovery to prove its case. The City cannot meet its burden of demonstrating otherwise, and its conduct to date has demonstrated that Plaintiffs need an Order from this Court to obtain it.

---

[2]    Even if the case were solely about the Specific Incidents, Plaintiffs would still be required to prove the violations were the result of widespread and longstanding policies, customs or practices to establish *Monell* liability, for which the requested discovery would be both relevant and proportional. *See e.g. Pitkin v. Corizon Health, Inc.*, No. 3:16-cv-02235-AA, 2017 WL 6496565, at *2 (D. Or. Dec. 18, 2017).

### b.      Defendant's Introductory Statement

The Parties fundamentally disagree about the scope of the discovery needed for this case.  The SAC alleges that in 2019, the City unlawfully seized and/or destroyed Plaintiffs' property during several encampment cleanups.  As discussed below, there is no dispute that the City conducted such cleanups pursuant to an ordinance it adopted, codified in LAMC 56.11, which authorizes removal and/or disposal of items stored in the public right of way.  Yet, Plaintiffs insist that the case is about "whether the City has a widespread practice and custom of destroying people's belongings in violation of the Fourth and Fourteenth Amendment." Plaintiffs seek all documents dating back 2016 to the present on a vast array of topics wholly unrelated to the specific incidents that form the basis of their complaint.  These include, for example, records relating to arrests, though no Plaintiffs alleges they were arrested, all documents related to over 40,000 encampment cleanups conducted since 2016; and all documents (including presenters' notes, calendar invitations, and communications) related to all trainings conducted since 2016 on a variety of topics, including ones that are peripheral to encampment cleanups such as storage and illegal dumping.

Plaintiffs argue that this broad discovery is relevant to *Monell* liability and their claim for declaratory relief.  Both arguments fail.  First, Plaintiffs do not need discovery to establish the existence of some unwritten policy or practice.  The SAC unambiguously alleges that: "LAMC 56.11 codifies the City's longstanding policy of seizing and destroying homeless people's belongings."  *See* Declaration of Felix Lebron ("Lebron Decl.") ¶2, Ex. 27 (SAC) at ¶58.  Moreover, the facts relevant to *Monell* are **not in dispute**.  In its Answer, the City has conceded that it: (1) promulgated LAMC 56.11 and related Protocols; (2) conducts encampment cleanups pursuant to LAMC 56.11, during which it removes and/or discards items on the public right of way, including items that may belong to homeless persons;

(3) does not obtain a warrant before removing and/or discarding items pursuant to LAMC 56.11; (4) provides notice (or not) in connection with removing and/or discarding items, as specified in LAMC 56.11; and (5) has enforced LAMC 56.11 since 2016 and continues to enforce it to this day.  *See* Lebron Decl. ¶3, Ex. 28 (Answer to SAC) at ¶¶16, 20, 21, 56, 68, 102, 114.  In fact, the City has offered to stipulate to *Monell* liability to streamline discovery and trial—an offer that Plaintiffs refused.  Declaration of A. Patricia Ursea ("Ursea Decl.") at ¶¶2-4, Exh. 1, 2.  Against this background, Plaintiffs' contention that the documents are needed to show *Monell* liability is simply false.  *See Gonzalez v. City of Schenectady*, No. 1:09-CV-1434, 2011 U.S. Dist. LEXIS 137290, at *13 (N.D.N.Y. Nov. 30, 2011) ("discovery related to strip searches is unnecessary as it is undisputed that the search was conducted pursuant to the City's written policy, which had been in effect since 1999").

Plaintiffs' argument that they need all documents showing what the City has done with respect to encampment cleanups from 2016 forward to prove entitlement to declaratory relief likewise fails.  A declaratory judgment provides prospective relief to address future or continuing violations, not past harms.  Thus, Plaintiffs' request for prospective relief depends on the City's *existing* policies and practices—which are not in dispute and in any event could not be proven by historical documents.

The only discovery relevant to proving an issue in this case relates to the circumstances under which Plaintiffs allege their property was seized and/or destroyed by the City.  Specifically, the parties are entitled to discovery relevant to show: (1) whether Plaintiffs' property was in fact seized and/or destroyed by the City; (2) whether any such seizure and/or destruction was unreasonable under the Fourth Amendment; (3) whether Plaintiffs received notice and opportunity to be

5

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

heard sufficient to satisfy due process; and (4) whether any destroyed property was the type that should have been stored under California Civil Code § 2080 *et seq*.

Even if Plaintiffs could establish some marginal relevance for their fishing expeditions, Plaintiffs' demand that the City find, collect, review and produce "all" documents responsive to each request is not proportional to the needs of the case. As described below, the requests are overbroad by any standard—each seeks documents dating back several years on topics that have little or nothing to do with Plaintiffs' claims.  Nevertheless, the City has reasonably compromised on Plaintiffs' requests, including producing database information about tens of thousands of cleanups spanning three years and collecting emails from 30 custodians, in several City departments, using the search terms proposed by Plaintiffs.  As a result of these compromises, to date, the City has produced 26,271 documents (totaling 92,000 pages) directly responsive to each and every one of Plaintiffs' overbroad requests.  The productions reflect what the City has repeatedly told Plaintiffs—that while it will not agree to undertake a massive expedition for historical documents that may or may not exist, nor find each and every flyer for every training conducted since 2016, to the extent it identifies non-privileged responsive documents in its reasonable investigation and the agreed-upon email review, it will not withhold them.

The City collected over 500,000 emails using the Plaintiffs' requested custodians and search terms.  The City's e-discovery vendor recently loaded a data set of 475,000 emails.  While the parties had initially agreed to meet and confer regarding this data set, Plaintiffs served this stipulation while the City was in the process of producing documents from the first 70,000 emails. Ursea Decl. ¶¶37-42. The discovery Plaintiffs seek to compel is unnecessary to resolve the issues in this case and the burden imposed on the City far outweighs Plaintiffs' unsubstantiated

need for such discovery.  Plaintiffs' demand that the City produce *all* documents, within 21 days, is an abuse of the discovery process.  The motion should be denied.

## II.    MEET AND CONFER EFFORTS

### a.    Plaintiffs' Summary of Meet and Confer Efforts

As summarized below and documented more thoroughly in the attached declaration, Plaintiffs have attempted since October 2019 to work with Defendant City of Los Angeles to obtain highly relevant discovery in this case, largely without success.  Although quantitatively, the City has produced approximately 11,000 documents in the course of discovery, the City still refuses to produce the vast majority of highly relevant documents sought by Plaintiffs in response to these requests.  It continues to assert relevance and proportionality objections to nearly every single one of Plaintiffs' requests.  The City also refuses to provide written responses to the requests that comply with Rule 34 of the Federal Rules of Civil Procedure or even provide a date certain when the City will complete production of responsive documents.

Plaintiffs first sought to begin discovery and provided the Requests for Production of Documents to Defendant, City of Los Angeles – Set One ("RFP Request – Set One") at issue here on October 16, 2019, three months after the case was filed, in an attempt to work with Defendants to obtain discovery in an efficient manner, knowing that the City continued to engage in unconstitutional practices against unhoused residents of the City, including the Plaintiffs.

Defendants declined to begin discovery, but after Plaintiffs indicated their intention to move for an order compelling early discovery, Defendant stated that they were "willing to now provide you with documents relating to all 2019 incidents alleged in the Supplemental Complaint" (hereinafter "Specific Incidents").  *See* Myers Decl., ¶ 4, Exh. D.  On November 9, 2019 and December 10, 2019, the City produced some of the City's documentation related to some of

the Specific Incidents alleged in the complaint.  Although counsel for the City had represented that the documents were related to "all 2019 incidents" enumerated in the Complaint, the City failed to provide any documentation related to Plaintiff James Haugabrooks' specific incidents or the incidents enumerated by Plaintiffs Miriam Zamora and Gladys Zepeda on March 21 and June 11, 2019.[3] *Id*. ¶ 8.

On November 26, Plaintiffs raised to the City the issue of a lack of documentation related to the cleanups impacting Mr. Haugabrook. *Id.* ¶ 9.  In response, counsel for the City stated unequivocally that the City had no records related to Mr. Haugabrook's allegations, that the cleanup "either did not occur or, if it did, the incident occurred at a different location, on a different date, or both." Counsel indicated that the City was assessing "what appears to be a failure to investigate the basis of Mr. Haugabrook's claims before filing suit."  *Id*. ¶ 11, Exh. F at 3.  Counsel stated their intention to produce "the reports of all cleanups conducted in South LA in March 2019 for the purposes of expediting Haugabrook's dismissal."  *Id.*  On January 10, 2020, the City produced records of 22 cleanups, which the City represented took place in "South Los Angeles" during March 2019.  *Id.* ¶ 16.

On January 15, 2020, Plaintiffs filed a Motion for Expedited Discovery, which this Court denied on January 29.  *See* Myers Decl. ¶ 15, Exh. H.  In its portion of the Joint Stipulation, counsel for the City represented, both in the motion and in the corresponding declaration under penalty of perjury that the City had produced "all records for all cleanups in South Los Angeles in March 2019."  *Id.*, Exh H at 27; *see also* Declaration of Patricia Ursea, Myers Decl., Exh. H.

---

[3]   The City produced documentation for a number of cleanups around where Ms. Zamora and Ms. Zepeda were living on July 11, 2019, the City failed to produce any documentation related to the cleanup at their specific location.  With regards to the March 21, 2019 cleanup, the City produced documentation for a cleanup the next block over, but not where Ms. Zepeda and Ms. Zamora were residing at the time. Myers Decl., ¶ 8.

On February 15, 2020, the District Court ruled on the motions to dismiss, denying the Rule 12(b)(6) claims as to nearly all Plaintiffs' claims. Myers Decl., Exh. I., February Order. The Court granted in part the City's 12(b)(1) motion as to AREPS and ordered Plaintiffs to amend to clarify Ktown for All's claims for relief. The Court also denied the City's Rule 8 motion against Mr. Haugabrook, finding that his allegations regarding numerous cleanups over three months were sufficient to put Defendant on notice about his claims. *Id.* Thereafter, Plaintiffs filed an amended complaint making only minor amendments to the remedies section, as ordered by the Court.

On February 26, 2020, Plaintiffs filed a motion for a preliminary injunction, to enjoin the enforcement of two provisions of LAMC 56.11, which the District Court granted. *See* Plaintiffs' Motion for a Preliminary Injunction, Dkt. 38; Order Granting Motion for Preliminary Injunction, Dkt. 58. As a result, these provisions were enjoined City-wide. The City filed another motion to dismiss, this time challenging Ktown for All's standing to bring Section 1983 claims and again challenging AREPS' standing. *See* Defendant's Motion to Dismiss, Dkt 57. The motion was denied as to Ktown for All and granted as to AREPS on June 2, 2020. Myers Decl., Exh. L, June Order. The Court issued a scheduling order for August 3, 2020. On the last day to meet and confer before the scheduling conference, the City finally agreed to conduct the Rule 26 conference, and Plaintiffs' RFPs were deemed served on July 13, 2020. Myers Decl., ¶ 2.

At the Rule 26 conference of counsel, Plaintiffs attempted to address the City's concerns about burden and proportionality, but with no success. *Id*., ¶ 25-26. After the parties submitted their Rule 26 report, Plaintiffs again sought to meet and confer with the City regarding the discovery plan and issues Plaintiffs had raised and about which the parties had not reached agreement. *Id.,* ¶¶ 27-28 & Exh. N.

The City refused to meet until after the City submitted its responses to Plaintiffs' discovery responses. *Id.,* Exh. O.

On July 30, 2020, after further discussions between the parties related to the City's intended Motion for Judgment on the Pleadings, which the City intended to file to attack Plaintiff Ktown for All's Section 1983 claims, Plaintiffs sent a letter specifically outlining Plaintiffs' claims for prospective relief, including addressing a proposal by the City to bifurcate the trial (and discovery) to first address the Specific Incidents and then address remedies, if necessary. *Id.,* ¶¶ 26, 29 & Exh. P. Plaintiffs once again reiterated that focusing only on the Specific Incidents ignored Ktown for All's claims entirely, and all of the Plaintiffs' claims under the Declaratory Judgments Act, which were not based on the Specific Incidents, but instead, were based on allegations that the City has customs, practices and policies that violate the Constitution.  Plaintiffs offered to meet and confer about this issue. The City did not respond to the letter.  *Id.*, ¶ 29.  The City filed a Motion for Judgment on the Pleadings to dismiss Ktown for All's Section 1983 claims, which the Court denied on September 15, 2020.  *See* Order Denying Defendant's Motion for Judgment on the Pleadings (Dkt. 103).

The City responded to Plaintiffs' RFPs on August 12, 2020.  *See* Myers Decl., ¶30 & Exh. B.  The City objected to almost every single request on relevance and proportionality grounds, suggesting that discovery was relevant only as to the facts that occurred in the Specific Incidents.  Defendant refused to produce any documents responsive to 14 of Plaintiffs' requests and severely limited the documents it would produce in response to at least 21 other requests. *See id.*, ¶32 & Exh. Q. The City produced documents along with the written responses; as with all past productions, the documents were produced as massive PDFs, without delineation of the individual documents and without any metadata.

Plaintiffs sent a request to meet and confer with the City regarding its responses, as required by Local Rule 37. *See id.*  In response, Counsel for the City indicated his intention to seek a protective order and likewise requested a corresponding Rule 37 meeting.  The parties exchanged letters in advance of the meeting, with the hopes of making the discussion as productive as possible. *Id.*, ¶¶ 32-33 & Exhs. Q,  R.

On August 25, 2020 the parties met and conferred to discuss the City's responses to Plaintiffs' requests. *Id.* ¶ 34. Over the course of two and a half hours, Plaintiffs' counsel articulated the relevance of each and every discovery request; after doing so, the City refused to concede that any of the requests were relevant. *Id.* Plaintiffs reiterated their request for further information about the City's purported burden in producing responsive documents, in order to address their proportionality concerns, but the City was unwilling or unable to do so.  *Id.*

Although the parties disagreed as to relevance, Plaintiffs suggested a number of  compromises to reduce the purported burdens to the City and thereby eliminate its objections: 1) eliminate parameters on the production of different types of documents, so that the City does not have to conduct extensive searches and instead can simply produce all documents in certain categories – doing so would shift any potential burden of overproduction and review to the Plaintiffs; 2) conduct queries and sampling, to limit the number of documents that had to be reviewed; 3) to the extent that documents were not stored together, such that volume of documents is largely irrelevant to burden, Plaintiffs agreed to limit the timeframe for requests to January 1, 2018 to the present, and 4) discuss any other proposals the City had to reduce the burden of production.  Myers Decl. ¶35 & Exh. S.  Plaintiffs also identified significant documents the City had failed to produce, including most importantly, a large number of job descriptions and organizational charts, which Plaintiffs needed to identify custodians. *Id.*  The City

agreed to produce additional documents and to consider some of these proposals
and would get back to Plaintiffs, *id*. ¶36; however, the City did not do so, *id*. ¶43.

On September 15, 2020, the District Court denied Defendant's latest attempt
to dismiss Ktown for All from the litigation. *See* Dkt. 203.

On September 25, Defendant responded to Plaintiffs' September 14, 2020
letter. Myers Decl. ¶38 & Exh. U. Although the City had repeatedly asserted that a
ruling on Ktown for All's standing would affect the scope of discovery in this case,
the City did not concede that the Court's denial of the City's Motion for Judgment
on the Pleadings had any effect on discovery whatsoever, and instead, indicated
that it was not willing to make any concessions. *Id*. The City largely stood by its
broad objections to Plaintiffs' RFP Request – Set One on the ground that the
information sought was not relevant nor proportionate to the City's articulated
view of the case. *See id*. With regards to the deficient written responses,
Defendant responded that "[t]he City is still in the process of producing documents
responsive to the RFPs and will revisit the issue of providing amended responses
and objections after the City completes its document production." *Id.*

Defendant served Defendant City of Los Angeles' Amended Responses and
Objections to Plaintiffs' Requests for Production of Documents – Set One
("Amended Written Responses") on October 9, 2020. Myers Decl. ¶ 40 & Exh. C.
The City did not address any of the deficiencies identified by Plaintiffs and largely
reiterated its existing objections, including those that Plaintiffs had attempted to
address during the meet and confer process. *See* Myers Decl. ¶ 46 & Exh. Z.

In November, the parties met and conferred further about the City's
amended responses. *See* Myers Decl. ¶¶ 42-45. Although the City explicitly
refused to concede that any of the requested information was relevant or
proportionate to the needs of the case, Defendant now agreed to produce some
additional documents responsive to Plaintiffs' requests. Defense counsel informed

Plaintiffs for the first time that the City was now discussing the feasibility of exporting and producing all responsive raw data from databases the City identified that are used by LA Sanitation to store data related to encampment cleanups: WPIMS, AMS, and MyLA (311 requests). *Id.* Counsel indicated that they did not have enough information yet to commit to the production, but expected to provide an update by November 19, 2020. *Id*.

On November 19, the City agreed to export data from the three databases it had identified as containing LA Sanitation data related to cleanups and agreed to produce date from January 1, 2018 to the present by December 18, 2020. *Id*. ¶ 47 & Exh. AA. The City also committed to looking into a number of other issues and indicated it would follow up on these issues.  *Id*.

Three weeks later, after not receiving any further updates, Plaintiffs sent the City a follow up letter regarding a number of the outstanding issues related to the production of documents, including the need for a privilege log and written responses that complied with Rule 34. Myers Decl. ¶ 52 & Exh. AF. Plaintiffs reiterated the request for a date certain for the completion of the City's production and responses that complied with Rule 34.  *Id*.  The next day, December 11, the City provided an update regarding some of outstanding issues, but again refused to provide a date certain for the completion of any of the outstanding tasks, instead stating only that "we continue to work on these and the handful of other issues identified in your letter and will update you on a rolling basis as we learn additional information."  Myers Decl. ¶ 54 & Exh. AH.

On December 16 and 18, the City produced a total of 693 additional documents—the vast majority of which (more than 550, totaling more than 4000 pages) consisted of black and white PDFs of weekly reports to the Mayor and City Council related to LA Sanitation metrics, including aggregate "tonnage reports" and some statistics related to homeless encampments.  Myers Decl. ¶ 55. The City

produced data from 2018 and 2019 on December 18, and after Plaintiffs raised the issue of the City's failure to provide 2020 data, produced that data on December 29. *Id.* ¶ 55.

On December 29, 2020, Counsel for the City provided a substantive response to some of the issues raised by Plaintiffs on December 9, but left a number of issues outstanding, stating only that "we are still working on the other categories of documents Plaintiffs requested, including police complaints, RFCs, and email communications, and will get back to you on these as soon as we can." Myers Decl. ¶ 56 & Exh. AJ.

This was the last correspondence from the City related to any of these issues, with the exception of emails, which is discussed below.

### i.      Plaintiffs' efforts to meet and confer regarding the production of emails responsive to these requests

The City objected initially to the production of any emails responsive to any of Plaintiffs' requests. Consistent with Rule 26, Plaintiffs attempted for months to engage with the City to identify a reasonable process of obtaining emails responsive to Plaintiffs' requests, including through the Rule 26 conference and the Rule 37 meet and confer process.  The City agreed only to review a list of search terms and custodians provided by the Plaintiffs, but because the City objected that any email production was not proportionate to the needs of the case, the City did not identify any custodians or appropriate search terms.  The City also failed to provide any technical information about the City's search capabilities, agree to any process for obtaining responsive emails such as sampling or producing initial hit reports, or even provide Plaintiffs with any time frame for the production of responsive emails.

Unaided by the City, Plaintiffs provided the City with a list of initial search terms and custodians in November 2020, along with a proposed method for

obtaining responsive documents, an offer to meet and confer about the terms, a request of the City to supplement with any missing terms and custodians, including Council District staff who were unknown to Plaintiffs at that time, and a request to provide Plaintiffs with a timeline for obtaining results of the searches. Myers Decl. ¶¶ 45, 48 & Exh. AB.

The City responded ten days later, stating only that it would run the search terms provided by Plaintiffs and would address the issues in the letter separately. *Id.* ¶¶ 45, 47 & Exh. AB.  Three days later, the City responded with technical concerns about two of Plaintiffs' search terms. *Id.* ¶ 47 & Exh. AC. The City offered to run a search of the original terms and proposed limited terms, in order to address the technical issue, to which Plaintiffs agreed.  *Id.* ¶ 50 Exh. AD at 2-3. Plaintiffs immediately provided alternative terms and offered to meet and confer about those terms. *Id.*  Plaintiffs also expressed concern about the length of time it was taking to move the discovery forward and yet again, requested an estimated timeline from the City regarding the responses to the search terms. *Id.* ¶ 50, Exh. AD at 2.

In response, counsel for the City indicated that, contrary to her earlier email, she had actually intended to meet and confer about the proposed search terms.  But because of Plaintiffs' "allegations of delay," she was no longer willing to do so, and instead would simply run the search terms as requested and then meet and confer later.  *Id.* She also identified a number of additional issues with the proposed custodians, to which Plaintiffs offered to meet and confer. *Id.* Thereafter, the City simply did not respond.

On December 11, the City indicated that it had received responsive emails from the LAPD and stated that "once we get a better understanding of the document numbers and hit rate, we will let you know to what extent we believe the universe of documents for review should be limited."  The City again refused to

provide any update regarding the production of City emails, stating only that "we have put in the request to IT for LASAN and UHRC documents but do not have an estimated time of completion yet."  The City also stated that "we have made some progress identifying Council District staff but we do not have a list of staff members that might be appropriate custodians.  We are diligently working on this and will get back to you in the next week or so with an update."  Myers Decl., ¶ 54, Exh. AH.

Almost three weeks later, on December 29, 2020, within a broader update on the outstanding discovery, the City responded only that "we are still working on the other categories of documents Plaintiffs requested, including . . . email communications, and will get back to you on these as soon as we can." Myers Decl., Exh. AJ.  This was the last communication from the City on this issue for over 45 days.  The City never provided Plaintiffs with the hit reports regarding the alternative search terms Plaintiffs had agreed to, nor did the City follow up to address any the concerns it identified in its earlier emails.

On February 16, Plaintiffs requested the City provide an update on the email production, including the custodians the City used to search for City Council emails, and indicated their concern that the production was taking too long.  Myers Decl., ¶ 57, Exh. AK.  Fourteen days later, counsel for the City responded, stating that it was in the process of reviewing the LAPD emails and would be "producing responsive emails over the next few weeks as quickly as possible."  *Id.,* ¶ 58, Exh. AL. The City did not address the parties' prior agreement to run alternative searches to reduce the number of false hits.  The next day, the City produced approximately 1748 LAPD emails, the vast majority of which are mass emails that are sent daily to various members of the LAPD and City staff. *Id.*, ¶ 59.  The City has not produced any additional emails since then.

With regards to the City emails, the City informed Plaintiffs that the results of the initial search was completed on February 18, but because of technical issues, the City was still not yet able to provide further information.  The City also did not address which council staff it had identified as custodians.[4]  Myers Decl., ¶ 58, Exh. AL.

Most problematic, the City yet again failed to provide any timeline for the completion of even this initial step, let alone the production of responsive documents.  Instead, the Counsel for the City stated only that the parties would still need to meet and confer about ways to make the review manageable and proportional to the needs of the case.

**b.   Defendant's Summary of Meet And Confer Efforts**

The City objects to, and requests that the Court strike, Plaintiffs' ten-page "Summary of Meet and Confer Efforts" on the ground that it violates L.R. 37-2.1, which limits the parties to an introductory statement of no more than three pages. The City refers the Court to the declarations of A. Patricia Ursea and Felix Lebron for a summary of the Parties' meet-and-confer history.

**III.   SPECIFIC REQUESTS**

**REQUEST FOR PRODUCTION NO. 1:**

All DOCUMENTS that refer to or relate to any of the individual plaintiffs in this action.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiff El-Bey's specific claims alleged in the Second Amended Complaint

---

[4]   Because the City failed to respond to Plaintiffs' inquiry, it is unclear whether the City has simply chosen to run searches for emails based on its own list of City Council staff custodians, or whether it simply has not yet even begun to search for emails.

(Dkt. No. 42, "SAC") for incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western insofar as the Request seeks documents relating to other individual plaintiffs. Defendant objects that the Request is overbroad to the extent that it seeks documents relating to any individual plaintiff other than Plaintiff El-Bey. Defendant objects to the Request to the extent it calls for production of confidential information, such as criminal records, referencing third parties or involving other individual plaintiffs. Defendant objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013. Defendant objects that the Request is not proportional to the needs of the case, insofar as the burden or expense of searching for and producing any such proposed discovery outweighs the benefit of such information for Plaintiff El Bey's specific claims alleged in the SAC. Subject to and without waiving these objections, Defendant responds as follows: Defendant previously produced non-privileged documents responsive to this Request and will produce additional non-privileged, responsive documents, if any, relating to Plaintiff El-Bey in Defendant's possession, custody or control.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiffs' specific claims alleged in the Second Amended Complaint (Dkt. No. 42, "SAC"). Plaintiff El-Bey alleges claims for specific incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western; Plaintiff Garcia alleges claims for specific

incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone Avenue, on or around April 29, 2019 at Aetna Street and Van Nuys Boulevard, and on or around August 14, 2019 at Calvert and Bessemer; Plaintiffs Zamora and Zepeda allege claims for specific incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard; Plaintiff Haugabrook alleges claims for incidents occurring sometime in March 2019 and a month later by Figueroa Street and 53rd Street and 52nd Place; Plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019 at Lomita and McCoy; and Plaintiff Ashley alleges claims for a specific incident occurring on or around May 21, 2019 at Lomita and McCoy. Defendant objects to the Request to the extent it calls for production of confidential information, such as criminal records, referencing third parties or involving other individual plaintiffs. Defendant objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013). Defendant objects that the Request is not proportional to the needs of the case, insofar as the burden or expense of searching for and producing any such proposed discovery outweighs the benefit of such information for individual Plaintiffs' specific claims alleged in the SAC. Subject to and without waiving these objections, Defendant responds as follows: Defendant previously produced non-privileged documents responsive to this Request and will produce additional non-privileged, responsive documents, if any, relating to individual Plaintiffs in Defendant's possession, custody or control.

**PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 1:**

Plaintiffs seek documents in the City's possession, custody, or control that relate to the individual Plaintiffs in this case.  The City has produced some documents responsive to this request, including documents submitted by Plaintiffs as part of this litigation (e.g., Government Tort Claims filed by Plaintiffs) and some police records related to Plaintiffs.  Despite its myriad of general and specific documents, Defendant states it "will produce additional non-privileged, responsive documents, if any, relating to individual Plaintiffs in Defendant's possession, custody or control."  Plaintiffs interpret this response to mean the City is withholding documents only on the basis of privilege and intends to otherwise produce any other documents in its possession, custody or control.  However as discussed below, Defendant's written response is still insufficient, and Plaintiffs have identified documents the City has inexplicably failed to produce.

**a.     Legal Standard**

Under the Federal Rules of Civil Procedure, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).  If a party fails to provide discovery materials covered by the broad scope of Rule 26, the party requesting those materials may move under Rule 37 "for an order compelling [their] disclosure or discovery." Fed. R. Civ. P. 37(a)(1). "Upon a motion to compel discovery, the movant has the initial burden of demonstrating relevance." *United States v. McGraw–Hill Cos*., No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at

1   \*8 (C.D. Cal. Apr. 15, 2014) (citations and internal quotation marks omitted).

2   "Once the minimal showing or relevance is made, '[t]he party who resists

3   discovery has the burden to show that discovery should not be allowed, and has the

4   burden of clarifying, explaining, and supporting its objections.'" *Christian v. Cnty.*

5   *of Los Angeles*, No. 2:18-cv-05792-CJC (JDEx), 2020 WL 4820006, at \*2 (C.D.

6   Cal. Jan. 28, 2020) quoting *DIRECTV, Inc. v. Trone*, 209 F.R.D. 455, 458 (C.D.

7   Cal. 2002); *see also Pitkin,* 2017 WL 6496565, at \*2 (citing *Blankenship v. Hearst*

8   *Corp*., 519 F.2d 418, 429 (9th Cir. 1975)).

9   **b.    Relevance of Plaintiffs' Request**

10   Discovery pursuant to Rule 26 "encompass[es] any matter that bears on, or

11   that reasonably could lead to other matter[s] that could bear on, any issue that is or

12   may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351

13   (1978).  *See also Pitkin,* 2017 WL 6496565, at \*2.  Rule 26 is "meant to be broadly

14   construed" and relevance to be liberally applied.  *Id*.  *Accord In re: Am. Med. Sys.,*

15   *Inc.*, MDL No. 2325, 2016 WL 3077904, at \*4 (S.D. W.Va. May 31, 2016) ("it

16   remains true that relevancy in discovery is broader than relevancy for purposes of

17   admissibility at trial," and, "notwithstanding Rule 26(b)(1)'s recent amendment

18   placing an emphasis on the proportionality of discovery, the discovery rules,

19   including Rule 26, are still to be accorded broad and liberal construction").

20   Therefore, evidence that is relevant to any party's claim or defense is discoverable,

21   unless it is unreasonably cumulative or duplicative, burdensome, or expensive.

22   Fed. R. Civ. P. 26(b)(2)(C)(i).

23   Here, Plaintiffs seek documents the City has related to the individual

24   Plaintiffs, which includes, for example, Plaintiffs' interactions with Defendant.

25   This includes interactions with LA Sanitation and LAPD related to the

26   enforcement of LAMC 56.11. As such, documents responsive to this request would

27   include Field Investigation (FI) cards, citation or arrest records, and

28

21

communications about or related to the individual Plaintiff.  It would also include,
for example, communications within City Council offices responsible for
scheduling encampment cleanups, if those offices have knowledge of or discussed
the individual Plaintiffs prior to conducting cleanups.  Those discussions would be
relevant to the City's decision to conduct specific cleanups.  Moreover,
Defendant's interactions with Plaintiffs are relevant to Plaintiffs' claims and
Defendant's defenses, including for example, its defense of "unclean hands."
Def's Answer to Plaintiffs SAC at p. 58.

### c.    Defendant's Written Response is Insufficient

Rule 34 requires that "[f]or each item or category, the response must either
state that inspection and related activities will be permitted as requested or state
with specificity the grounds for objecting to the request, including the reasons."
Fed. R. Civ. P. 34(b)(2)(B). "An objection must state whether any responsive
materials are being withheld on the basis of that objection," and "[a]n objection to
part of a request must specify the part and permit inspection of the rest." Fed. R.
Civ. P. 34(b)(2)(C); *Olmos v. Ryan*, No. CV-17-3665-PHX-GMS (JFM), 2020
U.S. Dist. LEXIS 67701 at 38 (D. Ariz. Apr. 17, 2020); *Rivera v. Solofill LLC (In
re Rivera)*, No. CV 16-4676 JAK (SSx), 2017 U.S. Dist. LEXIS 229538, at *8
(C.D. Cal. Apr. 14, 2017) (stating that a motion to compel may be granted where
plaintiff can identify a specific document that has been withheld). "An evasive or
incomplete disclosure, answer, or response must be treated as a failure to disclose,
answer, or respond." *See* Fed. R. Civ. Pro. 34, 37; *Louen v. Twedt*, 236 F.R.D. 502,
505 (E.D. Cal. 2006); *Advanced Visual Image Design, LLC v. Exist, Inc.,* No. 14-
2525-JGB (KKx), 2015 WL 4934178, at *3 (C.D. Cal. Aug. 18, 2015); *see also
Duran v. Cisco Systems, Inc.,* 258 F.R.D. 375, 379-80 (C.D. Cal. 2009); *Fulfillium,
Inc. v. Reshape Medical Inc*., No. CV 17-8419-RGH (PLAx), 2018 WL 6118433 at
*3 (C.D. Cal. May 24, 2018) (noting that a party's failure to comply with Rule 34

requirements in its written response is a sufficient basis to grant a motion to compel).

The City's written response fails to comply with Rule 34 for a number of reasons. First, in its amended responses, the City states that "Defendant previously produced non-privileged documents responsive to this Request and will produce addition non-privileged, responsive documents, if any, relating to individual Plaintiffs in Defendant's possession, custody or control." While the "if any" language added to the response could be interpreted as an unequivocal statement of its intention to produce all responsive documents in its possession, custody, or control, the City has in fact not produced all such documents. Below are examples of documents Plaintiffs have been able to identify, which are relevant to this case and responsive to this RFP but inexplicably have not been produced by Defendant:

- Documents related to arrests of at least two Plaintiffs (Janet Garcia and Pete Diocson) for violations of LAMC 56.11 in 2017 and 2018. In December 2020, the City produced a spreadsheet of arrests for violations of LAMC 56.11 which included the names of the individuals who were arrested. A simple search of the spreadsheet revealed that Janet Garcia was arrested for violations of LAMC 56.11 in 2017. Likewise, Pete Diocson was arrested for a violation of LAMC 56.11 in 2018. Myers Decl. ¶ 75. The City failed to produce any documents related to to these arrests, including, for example, the Notices to Appear issued to the Plaintiffs or other documents related to the arrests, even though these documents are both highly relevant and of the same type of document produced by the City in response to this request.

- **Field Investigation Cards for Marquis Ashley related to 56.11 enforcement in May 2018**. When the LAPD conducts field interviews with individuals, the officer routinely fills out an FI card, which includes

details about the individual.  On March 5, 2021, Defendant produced a spreadsheet capturing the interactions of HOPE team officers from the Harbor Division with unhoused individuals in 2018.  Mr. Ashley is listed twice on the spreadsheet, and the document indicates that the LAPD officers filled out an FI card in both instances.  Neither FI card has been produced, even though the City produced other LAPD documents and a simple search of a spreadsheet indicates that these documents exist.[5]
Myers Decl. ¶ 77.

The City's failure to produce these documents or even identify their existence to Plaintiffs is untenable, especially because the documents are similar to the documents produced by Defendant in this case and are directly related to the City's enforcement of LAMC 56.11, and it is another sufficient basis to grant this motion to compel.  *See In re: Rivera*, 2017 U.S. Dist. LEXIS 229538, at *8 (motion to compel may be granted where plaintiff can identify a specific document that has been withheld).

Because the City failed to provide a compliant written response, it is impossible for Plaintiffs to know why the City has failed to produce these documents.  *DeSilva v. Allergan USA*, *Inc*., No. 8:19-cv-01606-JLS (JDEx), 2020 WL 5947827, at *7 (C.D. Cal. Sep 01, 2020) (compelling production of documents and responses compliant with Rule 34 and noting that vague responses that "leave [the propounding party] in the dark" . . .  is precisely the situation Rule 34(b)(2) is designed to prevent."); *see also* 2015 Amendment Adv. Comm. Note to Fed. R. Civ. P. 34. (amendment to Rule 34(b)(2)(C) was added to "end the confusion that frequently arises when a producing party states several objections and still produces information.").

---

[5]   The City did not produce similar spreadsheets for the other LAPD divisions where many of the other Plaintiffs reside; as such, Plaintiffs cannot search to see if the other plaintiffs are also listed.

Even after the parties met and conferred about the sufficiency of the City's written responses, the City produced amended responses which again failed to "state[s] whether any responsive materials are being withheld on the basis of" any of the City's objections. *See* Fed. R. Civ. P. 34(b)(2)(B) – (C). In doing so, the City fails to provide sufficient information to "alert other parties to the fact that documents have been withheld and thereby facilitate an informed discussion of the objection." 2015 Amendment Adv. Comm. Note to Fed. R. Civ. P. 34. *D.C. v. Cty. Of San Diego*, No. 3:15-cv-01868-MMA(NLS), 2016 U.S. Dist. LEXIS 197240, at *5. (S.D. Cal. Oct. 07, 2016).

The City has also failed to identify whether it limited its search for responsive documents in any way based on the objections, for example, to specific City departments, custodians, etc. *See Advanced Visual Image Design, LLC,* 2015 WL 4934178, at *3 (finding that a party responding to a request for production "has a duty to make a reasonable inquiry to locate responsive documents and then to provide a complete, explicit response").

Finally, the City has failed to provide Plaintiffs a reasonable date certain by which it will complete its production of documents.  In fact, it has refused to provide any timeline at all.  This is not allowed under Rule 34(b)(2)(B), which requires the City to specifically identify a "reasonable time" it will produce responsive documents.  Fed. R. Civ. Pro. 34(b)(2)(B); *see also* 2015 Amendment Adv. Comm. Note to Fed. R. Civ. P. 34 ("the production must be completed either by the time for inspection specified in the request or by another reasonable time specifically identified in the response.  When it is necessary to make the production in stages the response should specify the beginning and end dates of the production.").  Plaintiffs have repeatedly requested a date certain under Rule 34 for the completion of production, in an attempt to avoid this motion practice, but Defendant has simply ignored this request.  Instead, the City continues to engage in

an interminable rolling production of documents, even though the requests were propounded in July 2020 (and provided to Defendant in October 2019).  This is unacceptable under Rule 34.  *Maiorano v. Home Depot USA, Inc.*, No. 16cv2862-BEN-MDD, 2017 WL 4792380, at *2 (S.D. Cal. Oct. 24, 2017) (granting request to compel production of responsive documents within 21 days, based on the responding party's failure to provide any more detail other than a statement that it would produce "additional responsive documents"); *Fischer v. Forrest*, 14 Civ. 1304 (PAE) (AJP), 14 Civ. 1307 (PAE)(AJP), 2017 WL 773694, at *3 (S.D.N.Y. Feb. 28, 2017) (responses were deficient because they did not indicate when documents and ESI that defendants are producing will be produced).  At this point, the City's delay in producing documents responsive to this request is inexplicable, especially since Defendant had this request since October 2019.

Despite repeated requests since July 2020 and an opportunity to amend its responses following a lengthy meet and confer process, the City utterly failed to provide responses that comply with Rule 34.  "For this basis alone, [Plaintiffs'] motion to compel further responses should be granted."  *Fulfillium*, 2018 WL 6118433, at *3.  *See also Louen*, 236 F.R.D.  at 505.

### d.     None of the City's other Objections Have Merit
#### i.     Claims of privilege

The City indicates in its response that it intends to produce "non-privileged" documents, but here too, the City has utterly failed to provide any further details of whether and to what extent it is withholding documents on the basis of privilege.

Parties withholding documents under a claim of privilege must identify and describe the documents in sufficient detail to "enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5).  *See also DeSilva,* 2020 WL 5947827, at *7.  The most common way of satisfying this requirement is to serve a privilege log that numbers and describes each document or communication (or categories of such)

and clarifies which privilege is claimed on what basis. *See* 2015 Amendment Adv. Comm. Note to Fed. R. Civ. P. 26(b); *Friends of Hope Valley v. Frederick Co.*, 268 F.R.D. 643, 650-651 (E.D. Cal. 2010) ("The requisite detail for inclusion in a privilege log consists of [1] a description of responsive material withheld, [2] the identity and position of its author, [3] the date it was written, [4] the identity and position of all addressees and recipients, [5] the material's present location, [6] and specific reasons for its being withheld, including the privilege invoked and the grounds thereof").

Defendant has failed to comply with its obligations under Rule 26(b) and 34(b)(2)(c).  Other than asserting that the request calls for confidential or privileged documents, Defendant provides no additional information about whether and to what extent it is withholding documents on the basis of any claim of privilege.  "Boilerplate objections or blanket refusals inserted into a response to a Rule 34 request for production of documents are insufficient to assert a privilege." *Burlington Northern & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2005)*; see also DeSilva,* 2020 WL 5947827, at *2 (citing *Sanchez v. Cty. of Sacramento Sheriff's Dep't*, No. 2:19-cv-01545 MCE AC, 2020 WL 3542328, at *2 (E.D. Cal. June 30, 2020); *Loop AI Labs Inc. v. Gatti*, No. 15-cv-00798-HSG(DMR), 2016 WL 2908415, at *3 (N.D. Cal. May 13, 2016)).

Defendant objected to this request on the basis of privilege six months ago and provided amended responses four months ago. At no time has the City provided any further details about what documents, if any, it is withholding on the basis of privilege, despite numerous and repeated requests from Plaintiffs to do so. The City has simply ignored this request.  This leaves Plaintiffs unable to assess even whether the City is withholding any documents on the basis of privilege, let alone the legitimacy of such a claim.  Under *Burlington Northern & Santa Fe Ry.*

*Co.*, 48 F.3d at 1149, the City has long since waived these objections and should be compelled to produce all documents responsive to this request.

### ii.    General objections

In addition to objecting on the basis of privilege, the City objects on the basis of proportionality and incorporates by reference three pages of boilerplate general objections.  The City inserts these general objections into every single one of its responses, without providing any basis for the specific objection or even an assessment of whether the objection specifically applies to the request.  The use of boilerplate objections in this way is inappropriate and an abuse of the discovery process.  *Polaris Innovations, Ltd. v. Kingston Tech. Co*., No. CV 16-00300 CJC (RAOx), 2017 U.S. Dist. LEXIS 222261, at *14-17 (C.D. Cal. Feb. 14, 2017).  See also *United States v. Eisenhower Med. Ctr*., No. EDCV 18-2667-RGK (KKx), 2020 U.S. Dist. LEXIS 218716, at *9 (C.D. Cal. Nov. 20, 2020) (citing *A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186, 188 (C.D. Cal. 2006)  (faulting defendant for making "boilerplate objections to almost every single request for production, including broad relevancy objections, objections of 'overly burdensome and harassing,' 'assumes facts not in evidence,' privacy, and attorney-client privilege/work product protection")).

In fact, the City's boilerplate objections do not apply to this specific Request for Production (and further illustrate the extent to which this request is narrow and tailored to the needs of this case).  General objections include, for example, objections "insofar as it seeks identification of all persons having knowledge of the information requested in the demand or the facts referred to in the response" and "insofar as it seeks identification of all writings which support the facts provided in responses to that demand."  In fact, some of the objections do not even apply to this litigation.  One of the general objections states that "Defendant has made available for inspection and copying, the project files relating to the contract which

is the subject of this litigation." Of course, this litigation is not a contract dispute and there are no project files to be made available to Plaintiffs.

And even if they did apply, the City's failure to identify which objection applies to this request, let alone the facts necessary to support its application, waives the objection. "Most of defendants' objections are too general to merit consideration and are therefore waived." *Ramirez v. County of Los Angeles*, 231 F.R.D. 407, 409 (C.D. Cal. 2005). *See also, Bosley v. Valasco*, No. 1:14-cv-00049-MJS (PC), 2016 WL 1704159, at *5, n. 3 (E.D. Cal. April 28, 2016) (Defendant waived blanket objections by failing to provide details of the objections as required by Rule 34(b)(2)(B)).

### e.    Relief Requested

Plaintiffs are entitled to an order compelling the City to produce all documents responsive to RFP No. 1 within 21 days. Plaintiffs also request the City provide a sworn affidavit attesting to the extent to which the City has searched for responsive documents and a complete, explicit response as to the finality of their production.

### DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 1:

The City produced documents in response to this Request, including Government Claims (CTY004316-4358) and LAPD criminal records, arrest reports, booking and identification records, Automated Field Data Reports, and printouts of search results conducted by first and last name (CTY006828-6962). Lebron Decl. ¶¶ 17, 21. Plaintiffs identify two RFC citations for violation issued in 2017 and 2018 and to Plaintiffs Garcia and Diocson and a 2018 Field Investigation Card for Plaintiff Ashley. Plaintiffs raised these documents for the first time in this Stipulation. Lebron Decl. ¶ 27. The City will collect and produce these documents before the hearing.

Plaintiffs' contention that these documents are relevant and warrant a motion to compel is misplaced.  No Plaintiff alleges that they were arrested or cited for violations of LAMC 56.11.   Lebron Decl. ¶ 2, **Ex. 27**, SAC ¶¶ 173-231.  Nor did Plaintiffs identify any such instances in response to interrogatories propounded by the City.  Ursea Decl. ¶ 6-7, Exs. 5-6 (Pltfs' Interrogatory Responses).  Plaintiffs are in the best position to identify their *own* arrests and citations.  Moreover, Plaintiffs have not explained how these documents are relevant to their alleged claims.  Lebron Decl.¶ 2, **Ex. 27**, SAC ¶¶ 173-231; *Carrera v. First Am. Home Buyers Prot. Co.*, Case No. 13cv1585 H (WMc), 2014 U.S. Dist. LEXIS 190451, at *7-8 (S.D. Cal. Jan. 29, 2014) (the purpose behind Rule 26(b)(1), which limits the scope of discoverable information to those matters relevant to a "claim or defense", is to "signal[] to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings.").

Plaintiffs also contend that the City's response to RFP. No. 1 is deficient because the City has not stated whether it produced all responsive documents or produced a privilege log.  During the meet-and-confer process, the City informed Plaintiffs that the City was still producing documents in response to the RFPs and would amend its responses after it completed its production to confirm whether all documents had been produced and whether any were withheld based on privilege.  Lebron Decl. ¶ 12, **Ex. 37** (City's 9/25/20 M&C Letter) at p.11.  This response was necessary because Plaintiffs demanded that the City's document production include any City emails that referenced any of the individual Plaintiffs' names.  *Id.*  The City objected to this request, but agreed to meet and confer with Plaintiffs regarding document custodians and search terms.  *Id.*

The City first agreed to meet and confer with Plaintiffs on custodians and search terms for emails during the Parties Rule 26(f) conference conducted on July 13, 2020.  Lebron Decl. ¶ 16.  On July 27, 2020, the Parties filed their Rule 26

Joint Report, in which the City stated "Defendant has agreed to meet-and-confer regarding custodians and search terms regarding email communications, subject to Defendant's objections regarding the scope, relevance, proportionality of Plaintiffs' request and Defendant's undue burden of production for such requested email communications." Lebron Decl. ¶ 6, **Ex. 31**, (Rule 26(f) Joint Report, Dkt. No. 76) at p.14. On August 25, 2020, the Parties conducted a meet-and-confer call regarding the Plaintiffs' RFPs and the City's anticipated motion for a protective order. Lebron Decl. ¶ 19. During that call, the City agreed, again, to meet and confer with Plaintiffs regarding their proposed list of custodians and search terms, notwithstanding the City's relevance, proportionality and burden objections addressed in detail in the City's August 24, 2020 Meet-and-Confer Letter. *Id.,* Lebron Decl. ¶ 11; **Ex. 36** (City's 8/24/20 M&C Letter). On September 25, 2020, the City produced additional documents and organization charts (CTY006828-7472), including additional organization charts that Plaintiffs claimed they needed for their proposed custodian list. Lebron Decl. ¶ 12; **Ex. 37** (City's 9/25/20 M&C Letter) at p.10-11.

On November 24, 2020, Plaintiffs sent their proposed custodian and search terms to the City. Ursea Decl. ¶ 13. The Parties conducted additional meet-and-confer discussions regarding Plaintiffs' requested search terms. *See* Ursea Decl. ¶¶ 14-19. For example, Plaintiffs proposed search terms like "hope" and "care" that are common in emails (e.g., "I hope you are well" or "take care"). *Id.* The City's email searches conducted using Plaintiffs' requested search terms and custodian list resulted in the collection of approximately 282 GB of raw data. Ursea Decl. ¶¶ 32, 34. This resulted in a total of over 500,000 emails/documents (approximately 70,000 from LAPD custodians and 475,000 from non-LAPD custodians) *after* deduplication. Ursea Decl. ¶¶ 42-43. The City's e-discovery vendor uploaded

approximately 475,000 non-LAPD custodian/search results on March 30, 2021. Ursea Decl. ¶ 43.

The City asserted objections based on attorney-client privilege to preserve its rights relating to these documents because, until the search was conducted and documents reviewed, the City would not know whether or not the search results yielded any responsive or privileged communications.  The City has not withheld any documents on the basis of privilege for the documents responsive to RFP No. 1, which includes Government Claims and LAPD criminal records.  Plaintiffs' argument that the City waived attorney-client privilege because it did not produce a privilege log on over half a million documents that that the City has not reviewed (and were just recently uploaded by the City's e-discovery vendor) is unreasonable given the volume of documents and meet-and-confer history discussed above. Moreover, during meet-and-confer discussions with Plaintiffs' counsel regarding Plaintiffs' discovery responses to the City, the Parties discussed producing privilege logs after document productions concluded.  Ursea Decl. ¶ 6.

Similarly, the City cannot provide amended responses confirming whether all documents have been produced or if any were withheld when Plaintiffs continue to demand such overly broad discovery.  For this reason, the City informed Plaintiffs that the City would revisit amending the City's objections and responses after it completed its document production.  Lebron Decl. ¶ 12, **Ex. 37,** at p.11 (City's 9/25/20 M&C Letter).

Nor are Plaintiffs entitled to a declaration regarding the City's search efforts. *Travelers Indem. Co. v. Trumpet, Inc.*, Case No. 8:19-cv-01036-PSG (JDEx), 2020 U.S. Dist. LEXIS 166187, at *45 (C.D. Cal. May 8, 2020) (denying plaintiffs' motion to compel defendant "to explain what it did to respond to these discovery requests" because "[n]either Rule 33 nor Rule 34 requires a party explain the steps

it took to search for or inquire about relevant, responsive documents or
information.").

   [Plaintiffs' demand for email communications is not proportionate to the
discovery needs of this case.  Plaintiffs contend that there might be an email from
City Council offices responsible for scheduling cleanups that discuss the individual
Plaintiffs.   Plaintiffs fail to explain how such an email (even if it existed) is
relevant to the Plaintiffs' alleged claims.  Moreover, the burden and expense
imposed on the City by this discovery demand significantly outweighs the benefit
of such information in resolving the alleged claims and vastly exceeds Plaintiffs'
alleged damages. *See Hoffman v. Cnty. of Los Angeles*, Case No. CV-15-03724-
FMO (ASx), 2016 U.S. Dist. LEXIS 123515 * (C.D. Cal. Jan. 5, 2016).   Plaintiffs'
Rule 26(a)(1) Initial Disclosures state that the individual Plaintiffs claim $10,000
in damages and Plaintiff El-Bey seeks statutory damages.  Lebron Decl. ¶ 8, **Ex. 33**
(Pltf's Rule 26(a) Initial Disclosures). *See Welch v. Stratton*, Case No. 2:17-cv-
0517 MCE KJN P, 2018 U.S. Dist. LEXIS 109389, at *11-12 (E.D. Cal. June 28,
2018) ("Plaintiff may not use discovery requests to engage in a fishing expedition
in the hopes that he may turn up some relevant or useful information.") (citing
*Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1072 (9th Cir. 2004).  The Court should
deny the motion to compel further responses to this request.


   **REQUEST FOR PRODUCTION NO. 2:**

   All DOCUMENTS that refer or relate to ENCAMPMENT CLEANUPS
conducted in the following areas between January 1, 2018 and the present:

   (a)   Between 8th St. and 5th St. to the North and South, and Mariposa and
         Hobart, to the East and West;

   (b)   Aetna St., between Van Nuys Blvd. and Hazeltine Ave.;

   (c)   Between Aetna and Delano St. to the North and South, and Kester

Ave., and Van Nuys Blvd to the East and West;

(d)    Figueroa, between 51st and 55th St.;

(e)    Lomita Blvd. between Figueroa and Vermont, and McCoy S

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiff El-Bey's specific claims alleged in the SAC relating to incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western. Defendant further objects that the Request seeks documents that are not relevant to any named-plaintiffs' claims as alleged in the SAC. The Court struck Plaintiff Ktown for All's ("KFA") claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking documents regarding encampment cleanups dating back two years and eight months that are unrelated, and not relevant, to Plaintiff El Bey's specific claims alleged in the SAC. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers*

34

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

*U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing any such proposed discovery outweighs the benefit of such information for Plaintiff El Bey's claims and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would need to search the City's Bureau of Sanitation ("LASAN") Watershed Protection Information Management System ("WPIMS") to identify all incidents constituting "encampment cleanups" as defined in the Request. Defendant identified 32,730 incidents within WPIMS constituting "encampment cleanups" as defined in the Request for the period from January 1, 2018 to July 31, 2020. Defendant would have to conduct a query and search parameters within WPIMS to generate a report identifying all 32,730 incidents by the address listed for the encampment cleanup, date, and incident/case number. Defendant would then have to manually review the addresses identified within the report to confirm which addresses fall within the location areas identified in subsections (a)-(e) of the Request. Defendant would then need to identify each incident/case number falling within these geographical locations to collect documents relating to each identified encampment cleanup. For each identified incident number, Defendant would need to generate reports within WPIMS for the encampment cleanup, and collect associated health hazard checklists. Defendant would then have to conduct additional searches for encampment cleanup pictures and media files by incident number that are not stored on WPIMS. The number of pictures associated with an encampment cleanup could exceed over 700 pictures

for one incident report. Defendant would also have to manually search for, collect, and assemble related documents by incident number, including any posting surveys, hazardous-waste disposal records, non-hazardous waste disposal records, and cleanup authorizations maintained in LASAN's Authorization Management System ("AMS"). In addition, upon identifying specified incident/case numbers for responsive encampment cleanups, Defendant would then have to conduct searches for potentially responsive LAPD records for any incidents involving LAPD HOPE officers by corresponding date, location, and LAPD Bureau, including searches for LAPD Daily Field Activity Reports (DFAR), Watch Commander Daily Reports, Sergeant's Daily Reports, and LAPD Computer Aided Dispatch (CAD) Reports. In addition, Defendant would have to search for LAPD body worn video that may exist for identified incidents involving LAPD HOPE Officers and review such video for responsiveness to the Request. Defendant previously conducted a search for and produced such incident-specific documents for the named individual plaintiffs' specific incidents at CITY00001-2677.

Defendant would also need to search for potentially responsive documents or information for encampment cleanups as defined in the Request that may be maintained within LASAN's Customer Service Group's MyLA database for service requests. Defendant would have to conduct a search parameter for service requests relating to encampment cleanups as defined in the Request for the period from January 1, 2018 to the present and generate a report identifying service requests for defined encampment cleanups by location address and date range. Defendant would then need an analyst to manually review MyLA data and cross-reference incident/case numbers, addresses, and dates identified by Defendant's WPIMS query to determine potentially corresponding service requests for identified encampment cleanups. Defendant would then have to prepare a separate report containing identified service requests within the MyLA database

corresponding to identified WPIMS incident/case numbers for encampment cleanups. In addition, for cleanups occurring after October 2019, Defendant would have to conduct searches for potentially responsive documents within the City's daily schedules issued for CARE and CARE+ operations by reviewing schedules and cross referencing the schedules with identified incident/case numbers, dates, and locations. Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents responsive to this Request for the reasons described above. Without waiving any, and based on these, objections, no documents will be produced in response to this Request.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiffs' specific claims alleged in the Second Amended Complaint (Dkt. No. 42, "SAC"). Plaintiff El-Bey alleges claims for specific incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western; Plaintiff Garcia alleges claims for specific incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone Avenue, on or around April 29, 2019 at Aetna Street and Van Nuys Boulevard, and on or around August 14, 2019 at Calvert and Bessemer; Plaintiffs Zamora and Zepeda allege claims for specific incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard; Plaintiff Haugabrook alleges claims for incidents occurring sometime in March 2019 and a month later by Figueroa Street and 53rd Street and 52nd Place; Plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019 at Lomita and McCoy; and Plaintiff Ashley alleges claims for a specific incident occurring on or around May 21, 2019 at Lomita and McCoy. Defendant further

objects that the Request seeks documents that are not relevant to any named-plaintiffs' claims as alleged in the SAC. The Court struck Plaintiff Ktown for All's ("KFA") claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking documents regarding encampment cleanups dating back two years and eight months that are unrelated, and not relevant, to Plaintiffs' specific claims alleged in the SAC. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would need to search the City's Bureau of Sanitation ("LASAN") Watershed Protection Information Management System ("WPIMS") to identify all incidents constituting "encampment cleanups" as defined in the Request. Defendant identified 32,730 incidents within WPIMS constituting "encampment cleanups" as defined in the Request for the period from January 1, 2018 to July 31, 2020. Defendant would have to conduct a query and search parameters within WPIMS to generate a report identifying all 32,730 incidents by

the address listed for the encampment cleanup, date, and incident/case number. Defendant would then have to manually review the addresses identified within the report to confirm which addresses fall within the location areas identified in subsections (a)-(e) of the Request. Defendant would then need to identify each incident/case number falling within these geographical locations to collect documents relating to each identified encampment cleanup. For each identified incident number, Defendant would need to generate reports within WPIMS for the encampment cleanup, and collect associated health hazard checklists. Defendant would then have to conduct additional searches for encampment cleanup pictures and media files by incident number that are not stored on WPIMS. The number of pictures associated with an encampment cleanup could exceed over 700 pictures for one incident report. Defendant would also have to manually search for, collect, and assemble related documents by incident number, including any posting surveys, hazardous-waste disposal records, non-hazardous waste disposal records, and cleanup authorizations maintained in LASAN's Authorization Management System ("AMS"). In addition, upon identifying specified incident/case numbers for responsive encampment cleanups, Defendant would then have to conduct searches for potentially responsive LAPD records for any incidents involving LAPD HOPE officers by corresponding date, location, and LAPD Bureau, including searches for LAPD Daily Field Activity Reports (DFAR), Watch Commander Daily Reports, Sergeant's Daily Reports, and LAPD Computer Aided Dispatch (CAD) Reports. In addition, Defendant would have to search for LAPD body worn video that may exist for identified incidents involving LAPD HOPE Officers and review such video for responsiveness to the Request. Defendant previously conducted a search for and produced such incident-specific documents for the named individual plaintiffs' specific incidents at CITY00001-2677.

Defendant would also need to search for potentially responsive documents or information for encampment cleanups as defined in the Request that may be maintained within LASAN's Customer Service Group's MyLA database for service requests. Defendant would have to conduct a search parameter for service requests relating to encampment cleanups as defined in the Request for the period from January 1, 2018 to the present and generate a report identifying service requests for defined encampment cleanups by location address and date range. Defendant would then need an analyst to manually review MyLA data and cross-reference incident/case numbers, addresses, and dates identified by Defendant's WPIMS query to determine potentially corresponding service requests for identified encampment cleanups. Defendant would then have to prepare a separate report containing identified service requests within the MyLA database corresponding to identified WPIMS incident/case numbers for encampment cleanups. In addition, for cleanups occurring after October 2019, Defendant would have to conduct searches for potentially responsive documents within the City's daily schedules issued for CARE and CARE+ operations by reviewing schedules and cross referencing the schedules with identified incident/case numbers, dates, and locations. Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents responsive to this Request for the reasons described above. Without waiving any, and based on these, objections, no documents will be produced in response to this Request.

**PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 2:**

Plaintiffs seek documents related to Encampment Cleanups conducted in the specific areas where the individual Plaintiffs were living, beginning just one year prior to the Specific Incidents, and continuing through to the present. This request

includes both documents related to the Specific Incidents, as well as other cleanups that occurred where Plaintiffs were living.[6]  Because the City does not track Cleanups or even the impounding of property by the names of the individuals whose belongings are seized and/or destroyed, the only way to obtain evidence of the other cleanups Plaintiffs have experienced is by location of the cleanup.

Although the City has agreed that documents related to the Specific Incidents must be produced, the City has put forth a convoluted set of objections and a misleading written response to this request.  It has also withheld critically important documents, even after representing to Plaintiffs and this Court that the documents had been produced.  The City's misrepresentations and failure to produce even these basic documents is untenable.

### a.      The Documents Sought Are Highly Relevant To This Case

Plaintiffs seek documentation of the cleanups that have occurred at the specific locations where the individual Plaintiffs have been residing.  This includes all documents related to the Specific Incidents enumerated and described in the complaint, as well as other cleanups that occurred at the locations where Plaintiffs resided.  These documents are both highly relevant to establish that Plaintiffs' constitutional rights were violated as well as to establish the existence of customs, practices, and policies for *Monell* liability and for prospective relief.

First, the individual plaintiffs in this case allege they were each subjected to cleanup that resulted in the violation of their constitutional rights on numerous occasions.  This includes both the Specific Incidents enumerated in the complaint

---

[6]     Documents Plaintiffs seek include 1) health hazard assessment reports and checklists; 2) photographs; 3) posting surveys, which document when notices were posted related to these cleanups as well as how the encampments looked prior to the cleanups; 4) Encampment Online Authorization forms for scheduled Comprehensive Cleanups; 6) communications regarding the cleanups; and 7) LAPD documents related to the cleanups. All of these documents are created by Defendant for each of the cleanups it conducts and each contains highly relevant evidence of what occurs during an encampment cleanup.

as well as other occasions.  *See, e.g.*, SAC ¶¶ 28, 30, 32, 42, 147, 184 (Dkt. 43). Plaintiffs are seeking discovery to help identify the dates of those other incidents. Plaintiffs also allege that the cleanups are ongoing and the City continues to enforce LAMC 56.11, which as a result, continues to result in the deprivation of their constitutional rights.  To the extent they and in the case of Ktown for All, their members, remain subject to these cleanups, they remain an imminent threat of further harm.  This is spelled out explicitly in the complaint. These allegations form the basis for Plaintiffs' request for prospective relief and support its *Monell* claims.  The allegation of other past cleanups and the prospect of future cleanups also support the individual Plaintiffs' claims for damages.

Second, as discussed above, documentary evidence of other cleanups is unquestionably relevant to the issue of whether the City has customs, policies, and practices that violate the U.S. and California Constitution, which is necessary both for Plaintiffs' claims for prospective relief under the Declaratory Judgments Act and to establish a custom, pattern, or practice, for purposes of *Monell* liability.  *See e.g., Pitkin v. Corizon Health, Inc.*, 2017 U.S. Dist. LEXIS 208058, *14-15. *See also* Myers Decl., Exh. L, June Order at 8 (Ktown for All may rely on other cleanups as evidence of the City's customs, practices, and policies).

Even though evidence of other constitutional violations is exactly the type of evidence frequently relied on to establish a widespread and longstanding custom or practice, Defendant has steadfastly maintained a legally indefensible position that "the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC." To defend this indefensible position, Defendant takes wholly out of context a single statement in which Plaintiff KFA states matter-of-factly that "a lawsuit raising a single incident may be used to hold the City liable under *Monell* if the incident is part of an official pattern, practice or policy." Myers Decl., Exh. K.  This is unquestionably true—most claims under Section

1983 arise from only a single incident experienced by the Plaintiff.  But this says nothing about the use of other instances of similar violations as *evidence* to prove the existence of that "pattern, practice or policy," which is what Plaintiffs seek here.  In fact, the next paragraph of Plaintiffs' brief makes that exact point: "The City's argument regarding the necessity of Ktown for All members' participation conflates their role as parties and the role of some members as evidentiary witnesses." *Id.* (*citing e.g.*, *Ass'n of Am.  Physicians  &  Surgeons, Inc. v. Texas Med. B*d., 627 F.3d 547, 552 (5th Cir. 2010) (organization had standing to bring claim on behalf of members, even though complaint alleged individual abuses, since, if practiced systemically, they could establish constitutional violation and noting that "proof of misdeeds could establish a pattern with evidence from the Board's witnesses and files and from a small but significant sample of physicians"); *Nebraska Beef Producers Committee v. Nebraska Brand Committee,* 287 F.Supp.3d 740, 750 (D. Neb. 2018) ("Were this case to proceed, it might be necessary for individual members of the Beef Producers to participate as witnesses, but it would not be necessary for them to participate as parties—and that is all that associational standing requires")).  And this point is also made by the District Court, which notes that "KFA may permissibly rely on participation of some members to establish the existence of a certain policy or practice without running afoul of the third *Hunt* prong."  Myers Dec., Exh. L, June Order at 8; 5 (*citing Hospital Council of W. Pennsylvania v. City of Pittsburgh*, 949 F.2d 83, 89-90).

    Finally, evidence of other cleanups is relevant for impeachment purposes. *Estate of Ernesto Flores v. Cty. Of San Bernardino*, No. EDCV 15-2202-GW(KKx), WL 3297507, at *6 (C.D. Cal. Aug. 2, 2017) (granting plaintiff's motion to compel because the production of the documents could lead to admissible impeachment evidence); *Paulsen v. Case Corp*., 168 F.R.D. 285, 289 (C.D. Cal. 1996) ("Apart from whether the documents may be admissible at trial as

part of the plaintiff's case-in-chief, they certainly may be used for impeachment purposes . . . . [T]here is no merit to defendant corporation's relevancy objection.")

**b.** **The City Continues to Withhold Documentation Related To The Specific Incidents**

Despite the City's blanket objection and stated refusal to produce documents responsive to this request, the City has long agreed to produce documents related to the Specific Incidents.  In fact, the City agreed to produce these documents months before the start of formal discovery.  These documents were purportedly produced by the City in October 2019, and in February 2020, Defendant represented to Plaintiffs and this Court that it had produced documentation related to all of the Specific Incidents.

In fact, as described below, the City has withheld a significant number of documents related to the Specific Incidents, including documents the City explicitly informed this Court it had produced.  The City's incomplete production evidences a total disregard for the City's obligation to search for and produce unquestionably relevant documents.  *See In re Citimortgage, Inc. Home Affordable Modification Program Litigation*, No. MDL 11-2274-DSF (PLAx), 2012 WL 10450139 at *4 (C.D. Cal. June 07, 2012) (outlining what generally constitutes a "reasonable inquiry").

**i.** **Documents related to Mr. Haugabrook's Specific Incidents**

Plaintiff James Haugabrook alleges that his property was taken in violation of his constitutional rights on at least four occasions in 2019, including in March and April 2019.  *See* SAC ¶¶ 192-208 (Dkt. 43).  *See also* Myers Decl., Exh. L, February Order at 31 (finding that Mr. Haugabrook alleged "[t]hat the four cleanups occurred over a three-month period in a specific area provides sufficient notice for the City to investigate the allegations.").  He also alleges that his neighbor's property was taken in June 2019 as a result of the City's practices.

SAC, Dkt. 58 at ¶ 207.  Yet the City has not produced any documentation related to Mr. Haugabrook's claims.  Instead, the City represented to this Court that no such documents exist.  As outlined below, the City's own records show that this is false.

In October 2019, the City produced documents related to the other Specific Incidents but failed to produce any documents related to Mr. Haugabrook.  Instead, the City moved to dismiss Mr. Haughabrook's claims under Rule 8.  When Plaintiffs raised the City's failure to produce responsive documents related to Mr. Haugabrook's allegations, Counsel for Defendant responded that there were no records that the cleanups occurred and went so far as to suggest that "the City is assessing this absence of evidence and what appears to be a failure to investigate the basis of Mr. Haugabrook's claims before filing suit."

Shortly thereafter, the City produced documents for 22 cleanups, which counsel for the City represented were reports for every cleanup that occurred in "South Los Angeles" in March 2019.  Myers Decl., Exh. F.  According to the City, these documents were produced "so Plaintiffs can reassess Haugabrook's claim, which the City has moved to dismiss" and that the documents were produced to "expedite Mr. Haughabrook's dismissal."  *Id.*  The City provided no explanation why it was focusing only on March 2019 instead of the other dates in the complaint, and it failed to identify what it considered "South Los Angeles" or how it identified these specific cleanups.  The documents it produced covered a roughly 30 square mile area of the City (excluding two of the cleanups which did not occur anywhere near any area of the City that could be considered South LA at all).  *See* Myers Decl. ¶ 66, Exh. AP.  None of the reports were for cleanups that occurred even remotely close to Mr. Haugabrook.  The closest location was almost a mile away; the furthest was nearly 10 miles away.  *Id.,* ¶ 67.

In January 2020, Plaintiffs moved to compel early discovery.  In opposition to the motion, Defendant represented to this Court that the reports it had produced constituted "reports by the Sanitation Bureau for **all** cleanups conducted in South LA in March 2019."   Myers Decl., Exh. G; *see also* Declaration of Patricia Ursea, *Id.* According to the City, it produced these documents because "it was unable to locate any incident specific documents corresponding to Plaintiff Haugabrook's vague allegation that his belongings were seized and destroyed in 'March 2019' at or around 'Figueroa St., between 53rd St. and 52nd Place.'" *Id.* (quoting Dkt. 20 at 44:1-2-3; 10-11.)  According to Defense Counsel, these 22 reports constituted "*all* reports for *all* cleanups in the surrounding area (South Los Angeles)." *Id.* (emphasis added).

This is patently untrue.  In fact, according to the City's own documentation, which it finally produced to Plaintiffs in December 2020, after months of delay, there were actually more than 50 cleanups conducted in March 2019 in Council District 9,[7] which the City failed to identify, let alone produce responsive documents.  *See* Myers Decl. ¶ 69.

And most troubling, despite the City's representation to Plaintiffs that "the incident [alleged by Mr. Haugabrook] either did not occur or, if it did, the incident occurred at a different location, on a different date, or both," Myers Decl. ¶11, Exh. F, the City's own evidence shows that the City did in fact conduct cleanups in March 2019 at the precise location where Mr. Haugabrook stated the cleanups occurred.  *See* Myers Decl., ¶ 70. According to data the the City had for months refused to produce,[8] there were 30 cleanups at this location in March 2019. *Id.* This

---

[7]   The 22 reports produced by the City in October 2019 included reports from five council districts:  Districts 8, 9, 10 14, and 15.

[8]   Plaintiffs requested this data as part of this set of RFPs.  Defendant initially refused to produce this data on the ground that it was not relevant to Plaintiffs' claims and was too burdensome to produce.  The City inexplicably agreed to

was confirmed by the City in its amended response to Plaintiffs' Interrogatories, in which the City admitted that cleanups occurred at 52nd Place on March 21, 2019, as alleged by Mr. Haugabrook.  *See* Myers Decl., ¶ 61, Exh. AN.

Not a single one of these reports has been produced to Plaintiffs, and none were produced to Plaintiffs before attorneys for the City represented to this Court in a sworn declaration that they had produced "***all*** reports for ***all*** cleanups in the surrounding area (South Los Angeles)." Myers Decl., Exh. H. In fact, even after the City identified the March 21, 2019 cleanups at 52nd Place in response to Plaintiffs' interrogatories, Set One, the City has failed to produce these documents.

And this is only with regards to one of Mr. Haugabrook's specific allegations.  The City has inexplicably limited its production of documents to March 2019, even though Mr. Haugabrook clearly alleged that his property was taken on other occasions after March 2019.  *See e.g.*, SAC ¶¶ 195, 199, 203, and 207 (Dkt. 43).  In fact, the District Court specifically noted that "Haugabrook alleges that he was subject to cleanups '[o]n or about March 2019,' '[a]bout a month later,' '[o]n yet another occasion,' and '[o]n or about June 24, 2019.'" Myers Decl., Exh. I, February Order at 31.  The Court therefore ruled "[t]hat the four cleanups occurred over a three-month period in a specific area provides sufficient notice for the City to investigate the allegations." *Id.* Despite this ruling from the District Court, the City has still refused to produce any further documents related to Mr. Haugabrook's allegations.

There is simply no excuse for the City's material misrepresentations to this Court and to Plaintiffs and the withholding of documentation for more than fifteen months.  The City has denied the existence of that documentation, and even went so far as to suggest Plaintiffs' counsel had committed a sanctionable offense, in an attempt to force Mr. Haugabrook to dismiss his claims.  Yet all the while, the City

---

produce this data in November 2020 and finally produced a spreadsheet on December 18, 2020.

has been withholding evidence that specifically shows that cleanups occurred exactly when and where Mr. Haugabrook said they occurred.

### ii. Documents related to Miriam Zamora and Gladys Zepeda's Specific Incidents

This conduct is not limited to Mr. Haugabrook's allegations.  Plaintiffs Jane Zepeda and Miriam Zamora allege that their property was taken on numerous occasions, including on March 21, 2019 and June 11, 2019 from their locations first at 6th and Ardmore and then at 5th and Harvard in the Koreatown neighborhood of Los Angeles.

In October 2019, when the City produced documentation for other Specific Incidents, the City produced documentation for a number of discrete cleanups that occurred on June 11, 2019 in the vicinity of Fifth and Harvard.  Yet they did not produce a single document for a cleanup that corresponded to the one alleged in the complaint.  Likewise, the City produced documentation for a cleanup that occurred at 6th and Kingsley on March 21, 2019, but none for a cleanup that corresponded to Plaintiffs' allegations.  Again, they represented to this Court and to Plaintiffs that they were producing documentation of all of the Specific Incidents alleged in the complaint. *See* Myers Decl., ¶ 7 & Exh. D; ¶ 17 & Exh. H.

In December 2020, Defendants finally produced data from the City's databases, which shows that the City has records of a cleanup occurring on June 11, 2019, exactly as Plaintiffs alleged.

Then, in February 2021, eighteen months after the case was filed and sixteen months after representing to this Court that the City had produced all documents for all Specific Incidents alleged in the complaint, the City simply produced, without comment, a Health Hazard Assessment form and more than 100 photos of the cleanup on June 11, 2019 at the location alleged in the complaint.  The City has provided no explanation for its failure to produce these documents earlier.  And the

City still has not produced, for example, LAPD documents related to this specific cleanup.

### iii.    Missing categories of documents for all cleanups

The City has also failed to identify, let alone produce, whole categories of documents the City creates for each cleanup. The City creates Encampment Online Authorization forms for noticed cleanups. *See* Riskin Decl. ¶ 5, Exh. A. The documentation includes crucial information, including the names of the City officials who authorized the cleanup and when, the "polygon" of the cleanup (which is the area covered by the cleanup), and before photos of the area.

Despite the relevance and the responsiveness of this document, the City has failed to produce the documents for any of the Specific Incidents. In fact, the City failed to even identify the existence of this document in response to Plaintiffs' request for an exemplar of each of the forms used by the City related to encampment cleanups. *See* RFP 21 (requesting one copy of each form used by the CITY or any of its contractors or subcontractors, including Chrysalis, LAHSA, and Clean Harbors, related to ENCAMPMENT CLEANUPS).  This document is of the same kind as other documents the City did produce, both as exemplars and as documents specifically related to the individual incidents.  Yet the City failed to identify its existence, let alone produce the discrete forms for each of the cleanups. In fact, Plaintiffs are aware this document exists only because the City produced it to a third party in response to a Public Records Act request.[9]  Plaintiffs have

---

[9]    The City also withheld "Operations/Daily Assignment sheets" for the Specific Incidents until December 2020.  This document contains highly relevant information about the cleanups, but the City failed to disclose them along with the rest of the forms and reports it produced, either as an exemplar in response to RFPs 23 along with the documents produced related to the Specific Incident documents. Myers Decl. ¶ 73.  Plaintiffs were able to identify the existence of this document only because the City produced the document along with the documentation of the South LA cleanups. *Id.* When Plaintiffs alerted Defendant that they were aware this document existed and raised concerns that it had not been produced for even the Specific Incidents, the City refused to provide any explanation why it produced the document for the South LA cleanups but not the Specific Incidents, or why it

49

repeatedly asked about these documents, but the City has simply failed to produce them.  Myers Decl., ¶ 43.

Although Plaintiffs have repeatedly informed the City of its failure to produce these documents, the City has simply not responded to Plaintiffs' inquiries about these responsive documents.

The City has also produced only a handful of scheduling documents for the Specific Incidents.  At the time these incidents occurred, the City created daily "Rapid Response" schedules for each day, as well as HE/ID ("Homeless encampment/Illegally Dumping") confirmation sheets.  These documents contain valuable information about the cleanups, including the other encampment cleanups that were conducted on the same day, the projected length of each cleanup, an assessment of the cleanup, and the status of authorizations for each cleanup.  Again, the City has not disclosed the existence of these documents, let alone produced the documents related to all of the Specific Incidents.  As with the Online Authorization documents, the City has produced these documents to a third party pursuant to the California Public Records Act, Cal. Gov't Code § 6250 et seq. ("CPRA"); *see* Riskin Decl. ¶ 5, Exh. A, and now because the City has begun producing the documents as part of its production of LAPD emails.

### c.   Plaintiffs' Request for All Documents Related to Additional Cleanups in These Specific Locations is Proportional to the Needs of the Case

The City objects that producing documents related to cleanups that were conducted where Plaintiffs were residing but are not specifically enumerated in the complaint is burdensome and not proportional to the needs of this case.  There is

---

failed to provide this document along with the other forms responsive to RFPs 23. Myers Decl. ¶ 43.  Instead, in December 2020 the City simply produced the documents for the dates of eight of the nine Specific Incidents, as well as produced duplicates of the eight copies the City had already produced for the South LA Cleanups.  Myers Decl. ¶ 73. Had the City not produced these documents as part of its South LA Cleanup production, Plaintiffs would have had no way of knowing the documents even existed, which raises serious questions about the City's production of responsive documents. *See Maiorano,* 2017 WL 4792380, at *2.

no merit to this objection.  While discovery must be proportional, "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. Pro. 26(b)(1), this request is both temporally and geographically limited and tailored to the needs of the case.  As such, the factors weigh heavily in favor of Plaintiffs.

<strong>i.      Importance of the issues at stake in the action</strong>

Plaintiffs brought this civil rights lawsuit to put an end to the City's longstanding and widespread practice of seizing and destroying the belongings that unhoused people use to survive on the streets, in violation of their fundamental rights under the United States and California Constitutions.  Plaintiffs allege that these violations are part of a widespread and longstanding practice of the City of Los Angeles to violate unhoused people's constitutional rights.  By the City's own admission, the activities Plaintiffs allege violate the Constitution continue to occur numerous times every day.

To diminish the impact of this case (and therefore, its potential discovery obligations), the City has consistently and willfully misrepresented the issues at stake in this case as well as the importance of those issues.  The City attempts to relegate this case to a low dollar damages case based on past harms.  First, to the extent the individual Plaintiffs do bring damages claims based on past incidents, the City underestimates the significance of Plaintiffs' allegations and of those harms to Plaintiffs.  This case is not simply about the loss of property, but instead, about the violation of Plaintiffs' constitutional rights.  "Subversion of the protections afforded citizens by the Constitution is always an important issue and should never be taken lightly." *Hoffman v. Cnty. Of L.A.,* No. CV 15-03724-FMO (ASx), 2016 U.S. Dist. LEXIS 123515, *15 (C.D. Cal. Jan. 5, 2016) (in balancing

proportionality factors, the court found that the importance of the issues at stake in the litigation weighed in favor of Plaintiff who was suing the county for an illegal arrest).

Moreover, Plaintiffs' case is not solely about the Specific Incidents outlined in this case.  As spelled out explicitly in the SAC, Plaintiffs allege that the City continues to violate Plaintiffs' constitutional rights and that these practices are widespread, longstanding, and ongoing.  Plaintiffs allege not only that the City has violated the constitutional rights of the seven individual plaintiffs on numerous specific occasions outlined in the complaint—a matter of significant importance on its own—but also that the City has ongoing policies and practices that continue to violate their constitutional rights.  They bring this case to obtain prospective relief from the City's unconstitutional practices which Plaintiffs seek to show are widespread, longstanding, and ongoing.  *See* SAC at 60. In addition, Plaintiff KFA also brings this case on behalf of its members only to obtain declaratory and injunctive relief regarding the City's ongoing customs and practices.  *See* Myers Decl., Exh. L at 8 (KFA is seeking a ruling that "the policies and practices are unconstitutional); *see also* SAC at 60.  Collectively, Plaintiffs are challenging Defendant's customs, practices, and policies under the Fourth Amendment's prohibition against illegal seizures and as a violation of due process rights under the Fourteenth Amendment and the California Constitution.

Notwithstanding the City's unwavering insistence on framing this as a straightforward damages case involving discrete incidents, the scope of this litigation and the issues at stake here are not hypothetical, nor are they up for debate. Repeated attempts by the City to limit the scope of this litigation have been unsuccessful; the Second Amended Complaint is explicit, and the District Court has affirmed Plaintiffs' legal position repeatedly. *See* Myers Decl., Exh. I at 22, n. 20 (noting that the allegations of the Supplemental FAC make clear that their

52

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

claims for injunctive and declaratory relief are significant and potentially more consequential than their request for damages).  The District Court has already issued a Preliminary Injunction, enjoining the enforcement of two provisions of LAMC 56.11 city-wide, on the ground that it was unconstitutional on its face.  *See* Order Granting Plaintiffs' Motion for Preliminary Injunction (Dkt. 58). As the Court noted, vindicating Plaintiffs' rights will not only affect them, but would vindicate the constitutional rights of all other unhoused people who are subjected to these policies. *See* Dkt 58 at 27.  And in August 2020, the Court found the City in Contempt for violating the Preliminary Injunction on numerous occasions city-wide.  *See* Order Granting in Part Plaintiffs' Motion for Order to Show Cause re: Civil Contempt and Sanctions, Dkt. 106.

Viewing this as a damages-only case based on past incidents completely ignores Plaintiff KFA's claims, which do not seek money damages at all, but instead seek prospective relief to put a stop to the City's practices.  It ignores all of the Plaintiffs' claims under the Declaratory Judgements Act, which is not based on past harms, but rather, based on ongoing violations and provides only for prospective relief to stop Defendant's constitutional violations City-wide.  All of these issues are of constitutional proportions, and as such, this factor weighs heavily in favor of Plaintiffs.  *See Dao v. Liberty Life Assurance Co.,* No. 14-cv-04749-SI (EDL), 2016 U.S. Dist. LEXIS 28268 *13-14 (N.D. Cal. Feb. 23, 2016) (factor more heavily favors cases raising public rights on a broad scale, like in a civil rights or First Amendment claim, as opposed to a simple damages claim).

### ii.      Amount in controversy

The amount of damages sought in this case is relatively small (although not to the individual Plaintiffs, who are extremely low income and homeless, many of whom lost all of their belongings as a result of these practices).  As discussed above, Plaintiffs also seek injunctive relief which would prevent future damages,

not only for Plaintiffs, but also for Ktown for All members and for any other unhoused person that would otherwise be subject to the City's unconstitutional practices.  The amount of future damages that would be prevented would therefore be significant.

But as noted above, Plaintiffs do not bring this case primarily for compensatory damages.  Instead, as the District Court noted in its order denying Defendant's motion to dismiss, the Complaint "make[s] clear that [Plaintiffs'] claims for injunctive and declaratory relief are significant and potentially more consequential than their request for damages." *See* Myers Decl., Exh. I at n. 20.  In fact, Ktown for All seeks only declaratory and injunctive relief, and prospective relief is the only remedy available to all of the Plaintiffs for their claims under the Declaratory Judgments Act. Since this case is primarily about prospective relief, the question of the amount in controversy is largely irrelevant.

### iii.    The parties' resources

The City of Los Angeles is the second largest city in the United States with an operating budget of more than ten billion dollars.  It spends more than $30 million dollars per year alone conducting the cleanups and enforcing the laws that are challenged in this litigation and also devote significant resources to documenting these Encampment Cleanups.  On the other hand, the individuals in this case are all extremely low income and have very few financial resources or even physical possessions.  Similarly, Ktown for All is an all-volunteer organization whose resources are committed to replacing items seized and destroyed by the City of Los Angeles.  The balance of the parties' resources weighs heavily in Plaintiffs' favor.

### iv.    The parties' relative access to relevant information

Defendant should comply with discovery requests where Plaintiff has no alternative source for critical information. *Lamon v. Adams*, No. 1:09-cv-00205-

LJO-SKO PC, 2010 U.S. Dist. LEXIS 122479, *7-8 (E.D. Cal. Nov. 1, 2010)
(compelling production of documents, despite burden to Defendant because
Plaintiff has no other source of this information).  In this case, there is nearly
complete asymmetry of access to information.  Defendant has multiple
departments that document, track, and analyze every Encampment Cleanup it
conducts, from the date of a request for a cleanup through to the completion of the
cleanup.  The City maintains photos, videos, narrative descriptions, and qualitative
metrics about each of the cleanups and keeps specific "before and after"
documentation that it can use as it sees fit.  All of that documentation, planning,
and processing is, however, kept internal to the City.  The *only* public information
about when Encampment Cleanups are conducted are the use of physical notices
that are posted in advance of noticed cleanups (although as discussed below,
cleanups frequently do not occur at the times the notices are posted).  For Rapid
Response enforcement actions taken by the City, there is not even the paper notice
provided.

On the other hand, Plaintiffs are unhoused individuals and a volunteer
organization with unhoused members, who allege that they are frequently and
consistently subject to constitutional violations that result in the loss of all of their
belongings.  They have very little access to bathrooms, running water, and
electricity, let alone working phones, the internet, or even paper to keep track of
the dates and times of those violations.  And of course, the constitutional violations
they allege actually make it even harder for them to track, for example, the dates
and times they were subjected to those violations because the Encampment
Cleanups frequently result in the loss of the tools necessary to keep track of that
information (like phones and written documentation).

Finally, the City does not collect or track the names of people whose
encampments are cleaned up, even when individuals' belongings are impounded

(or even when, for example, a person is present with their belongings when they are seized or destroyed).Plaintiffs have no way, other than by location, of requesting information about cleanups they were subjected to.

### v.    Importance of the discovery in resolving the issues

These specific documents relate directly to Plaintiffs' claims.  This request focuses on documentation of cleanups that occurred specifically where the Plaintiffs in this case have resided.  As noted above, there is no other way to request documentation about cleanups that affected Plaintiffs, other than by requesting cleanup information related to the locations where Plaintiffs are living, which is what they have done here.  The documents requested here are related to allegations in the complaint, including, for example, documentation related to Mr. Haugabrook's Specific Incidents, which still have not been produced by Defendant.  The importance of those documents is unquestionable:  these specific documents bear on the ultimate issues in the case, from the individual damages claims to liability under Section 1983 itself, as well as *Monell* liability and Plaintiffs' claims for prospective relief.

### vi.    Whether the burden or expense of the proposed discovery outweighs its likely benefit

As discussed above, the benefit of these documents is significant.  On the other hand, the City has not shown that there is any significant burden or expense to the production of these documents, other than the ordinary burden or expense of discovery.  *See In re: Citimortgage Inc.,* 2012 WL 10450139, at *4) ("the mere fact that responding to a discovery request will require the objecting party to expend considerable time, effort and expense consulting, reviewing and analyzing huge volumes of documents and information is an insufficient basis to object to a relevant discovery request").  In fact, here, the volume of documents sought is not overwhelming, and by the City's own account, the burden of production is not significant.

Plaintiffs seek documents that are readily identifiable and easily obtainable.
The City keeps detailed records of its cleanups in databases that are still in use.
The City represented that it would be extremely burdensome to identify cleanups
based on the locations provided by Plaintiffs, yet it represented it did so for "all of
South LA." As the City itself recognized in its response to an interrogatory, the
City routinely runs searches in response to CPRAs for "all requests of a particular
nature made on a particular day or in a particular geographical location."  Myers
Decl., ¶ 61, Exh. AN, Interrogatory 14.  Nor is there any merit to the City's
objection that producing these specific documents would be particularly
burdensome.  The very documents Plaintiffs seek here are routinely produced by
the City in response to public records act requests.  *See* Myers Decl., ¶¶ 79-82.
Because Plaintiffs are seeking a discrete set of documents, the only burden is the
effort it takes to collect those documents from known locations.  *See Sung Gon*
*Kang v. Credit Bureau Connection, Inc.*, No. 1:18-cv-01359-AWI-SKO, 2020 WL
1689708, at *5 (E.D. Cal. April 07, 2020) (finding that requested documents were
reasonably accessible and not burdensome where "accessing the [documents] and
their content is easily achievable but compiling the [documents] may prove
somewhat time consuming"); *In re: Citimortgage*, 2012 WL 10450139, at *4.

And to the extent there is a burden associated with identifying responsive
documents by location, Plaintiffs offered to shoulder that burden by receiving
documents from all cleanups conducted City-wide during the relevant time period,
which the City declined. [10]

On the other hand, as discussed above, because Defendant does not keep
track of cleanups by the names of individuals whose belongings are taken (even if,

---

[10]  In fact, the City declined all offers of Plaintiffs to meet and confer to identify
ways to mitigate the City's alleged burden. *See* Myers Decl., ¶ 38, Exh. U at p. 7
("The City acknowledges that Plaintiffs offered" various proposals including
queries and samples"). Instead, it simply refused to produce any additional
responsive documents.

for example, the person is present when their belongings are taken), Plaintiffs have no other way to obtain documents related to cleanups that impacted Plaintiffs, other than to seek documents by location.  And because these cleanups directly impact Plaintiffs and therefore, go directly to the issue of liability and damages, Plaintiffs seek more documents about these cleanups at these specific locations than, for example, cleanups conducted elsewhere around the City.  *Compare* RFP 2 (seeking all documents related to cleanups conducted where Plaintiffs have been residing) and RFPs 30, 33, and 34 (seeking specific, easily accessible documents related to a broader subset of Encampment Cleanups).  Doing so properly balances the burden to Defendant to retrieve these documents with the needs of the case.

### d.    The Requested Information is Reasonably Accessible

Defendant objects that the documents sought are not "reasonable accessible, based on the undue burden and costs associated with searching for and producing documents and electronically stored information responsive to this Request."  To the extent the City intends this objection to refer to the special limitation for ESI under Rule 26(b)(2)(B), the objection misses the mark.

Under Rule 26(b)(2)(B), "A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost."  Fed. Rule Civ. Pro. 26(b)(2)(B).  The burden for demonstrating that ESI is stored in sources that are not "reasonably accessible" rests on the party objecting to the discovery, and then the burden shifts to the party seeking discovery to demonstrate good cause.  *Id.* Defendant cannot meet the burden here.  As an initial matter, the Rule 26(b)(2)(B) applies only to ESI, not to other forms of documents.  Even with ESI, the City's own explanation of the process for obtaining responsive documents proves why the documents are in fact "readily accessible" under Rule 26(b)(2)(B).

In *U.S. ex rel. Carter v. Bridgepoint Educ., Inc*., 305 F.R.D. 225, 240 (S.D. Cal. 2015), the Court articulated the well-established distinction between "readily accessible" documents which are subject to the standard Rule 34 analysis and "inaccessible" ESI, which is subject to the Rule 26 limitation.  In general, inaccessible ESI "is not readily useable and must be restored to an accessible state before the data is usable," such as archival backup tapes or backups of data stored for emergency restoration.  *Id. But see U.S. Exh. Rel. Guardiola v. Renown Health*, No. 3:12-cv-00295-LRH-VPC, 2015 WL 5056726, at *3-4 (D. Nev. Aug. 25, 2015) (even some backup documents may be deemed readily accessible if the backups can be restored and finding the $136,000 cost of restoration reasonable); *Sung Gon Kang*, 2020 WL 1689708, at *5 (even sources of documents that are encrypted and not searchable were still "readily accessibly" under Rule 26(b)(2)(B).  On the other hand, "[a]ctive ESI sources—e.g., active computer files or e-mail records—proceeds in the same manner as would discovery from paper sources.... No special request must be made, and no special standards apply." *Tyler v. City of San Diego*, No. 14-cv-01179-GPC-JLB, 2015 WL 1955049, at *1 (S.D. Cal. April 29, 2015) (citation omitted).

The documents Plaintiffs seek come from precisely these kinds of "active ESI." As the City's objection spelling out the process for obtaining the documents indicates, the relevant records are included in active databases and servers or potentially in paper copy.  No restoration of any kind is necessary.  The only step the City identifies as burdensome is downloading the data from the cloud, but "[m]oving active and easily accessible ESI from one storage medium to another does not, by itself, render it inaccessible." *Al Otro Lado, Inc., v. Nielsen,* 328 F.R.D. 408, 421 (S.D.Cal. 2018).  Any burden the City identifies is not in accessing the documents, but instead in compiling them for production.  That does not make the documents "inaccessible" under Rule 26(b)(2)(B). *See Sung Gon*

*Kang*, 2020 WL 1689708, at *5 (finding that requested documents were reasonably accessible and not burdensome where "accessing the [documents][and their content is easily achievable but compiling the [documents] may prove somewhat time consuming").

### e.   The City Has Waived its Other Objections

#### i.   Claims of privilege

The City objects that "to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines;" however, the City has failed to provide any additional information about what, if anything it is withholding on the basis of this objection or a privilege log.  Defendant has waived any objections it might have had that these documents were privileged by failing to provide any additional information regarding these claims.  *DeSilva,* 2020 WL 5947827, at *7 (citing *Sanchez*, 2020 WL 3542328, at *2).

#### ii.   Other boilerplate general objections

As with all of its requests, the City incorporates three pages of boilerplate objections but failed to provide any basis for the specific objection or even an assessment of whether the objection specifically applies to the request.  The use of boilerplate objections here is also inappropriate and an abuse of the discovery process.  *Polaris*, 2017 U.S. Dist. LEXIS 222261, at *14-17.  *See also Eisenhower Med. Ctr*., 2020 U.S. Dist. LEXIS 218716, at *9.

The City's boilerplate objections do not apply to this specific Request for Production.  The City refused to clarify which of the objections (if any) applied to this request, let alone the facts necessary to support its application, even after months of requests by Plaintiffs for the City to do so as required by Rule 34.  The City has therefore waived the objection.  *See e.g., Bosley*, 2016 WL 1704159, at

*5(Defendant waived blanket objections by failing to provide details of the objections as required by Rule 34(b)(2)(B)).

### f.     Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce all documents responsive to RFP No. 2 within 21 days.  Plaintiffs also request the City provide a sworn affidavit attesting to the extent to which the City has searched for responsive documents and a complete, explicit response as to the finality of their production.

### DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 2:

Plaintiffs' arguments conflate two separate issues.  First, Plaintiffs challenge the City's production of incident-specific documents for the individual Plaintiffs' specific alleged claims in the SAC.  Second, Plaintiffs seek to compel production of all documents relating to other encampment cleanups at various locations dating back to January 1, 2018, none of which are alleged in the SAC.  These issues must be addressed separately.  The City produced incident-specific discovery and agrees that this discovery is relevant, but objects to producing all documents relating to *unalleged* encampment cleanups.  RFP No. 2 is subset of Plaintiffs' substantially broader requests at issue in **RFP Nos. 30 and 33-34**, which requests all documents relating to over 41,000 encampment cleanups, including posting surveys, encampment cleanup reports, and health hazard reports and documentations for *all* encampment cleanups conducted Citywide dating back to April 2016.  The City's arguments opposing production of all documents regarding *unalleged* encampment cleanup dating back to January 1, 2018 apply to the City's arguments raised in response to RFP No. 30 and 33-34, except that the City's burdens and costs are significant higher.  *See* Declaration of Howard Wong ("Wong Decl.") ¶¶ 16-29.

### A. City's Production of Incident-Specific Documents

In response to Plaintiffs' demands for early discovery, the City produced documents relating to the individual Plaintiffs' specific alleged incidents and included, among other documents, encampment cleanup reports, Health Hazard Checklists, posting surveys (for posted comprehensive cleanups); incident/case pictures during cleanups, and hazardous and non-hazardous waste records from the City's Bureau of Sanitation ("LASAN").  The incident-specific documents included LAPD reports, including Watch Commander Reports, Sergeant's Daily Reports, Daily Field Activity Reports, and Computer Aided Dispatch Reports. These documents were produced on November 9, 2019 on (CITY00001-2212) and December 10, 2019 (CTY002213-2677).  Lebron Decl. ¶15.   On January 10, 2020, the City produced reports for encampment cleanups conducted in March 2019 in South Los Angeles (CTY003240-4085).  *Id*.

As an initial matter, Plaintiffs do not challenge the sufficiency of the City production incident-specific information for Plaintiff Garcia's three alleged incidents (SAC ¶¶ 124-150), El-Bey's two alleged incidents (SAC ¶¶173-191), Diocson's one alleged incident (SAC ¶¶ 210-218), or Ashley's one-alleged incident (SAC 219-231).  Plaintiffs' dispute concerns only the City's incident-specific document production for the two Zamora and Zepeda alleged incidents (SAC ¶¶ 151-172) and the Haugabrook incidents (SAC ¶¶ 151-172).

During the Parties Rule 26(f) conference conducted on July 13, 2020, the Parties agreed that the City would produce LAPD body-worn video ("BWV") on a hard drive supplied by Plaintiffs, which the Parties addressed in their Rule 26(f) Joint Report.  Lebron Decl. ¶¶ 6, 16, **Ex. 31** (Rule 26(f) Joint Report, Dkt. No. 76) at p.14.  The City also addressed its production of documents in PDF format in the Joint Report.  *Id.*

On July 27, 2020, the City served its Rule 26(a)(i) Initial Disclosures, which identified the City's production of incident-specific documents, including by bates

numbers, dates, incident/case number of the report, and corresponding Plaintiff. Lebron Decl. ¶ 7, **Ex. 32** (City's Rule 26(a)(i) Initial Disclosures).

On August 25, 2020, the Parties conducted a meet-and-confer call regarding the Plaintiffs' RFPs and the City's anticipated motion for a protective order. Lebron Decl. ¶¶ 11, 18-19; **Ex. 36** (City's 8/24/20 M&C Letter).  During that call, the Parties discussed the City's production of documents in PDF format and Plaintiffs' demands for production of documents in Tiff format with metadata. Lebron Decl. ¶ 19.  The City explained during the call that it did not have the software or capability to produce documents in native format and the City produced documents in the form the documents are kept in the normal course.  *Id.* In response to Plaintiffs' concerns that the City did not several large PDFs of the document production, rather than individual PDFs for each file, the City agreed to provide an index of its past document productions, produce future document productions in individual PDF files, and inquire into the possibility to use an e-discovery vendor.  *Id.*

On September 25, 2020, the City sent a meet-and-confer letter to Plaintiffs containing the document index, including references to incident-specific documents by bates number and Plaintiff, and informing Plaintiffs in response to RFP No. 2 that the City remained willing to meet-and-confer regarding other specific incident reports, including if Plaintiffs had any additional information regarding the incidents.  Lebron Decl. ¶¶ 12, 20, **Ex. 37** (City's 9/25/20 M&C Letter) at p.7-9, 11.  On September 25, 2020, the City also produced additional documents (CTY006828-7472) including requested organization charts, notices, LSD forms, job descriptions, and other documents.  Lebron Decl. ¶ 21. The City also informed Plaintiffs that the City obtained access to an e-discovery vendor for future document productions, and was producing individual PDF files for documents produced that day as CTY006828-7472.  Lebron Decl. ¶¶ 20-21.

On September 30, 2020, the Plaintiffs provided hard drives to the City for the production of BWV and, on October 8, 2020, the City produced the incident-specific BWV.  Lebron Decl. ¶ 22.

On November 19, 2020, in an effort to address Plaintiffs' discovery demands, the City agreed to produce certain electronically exportable information from WPIMS, AMS, and the LASAN's MYLA311 database.  Ursea Decl. ¶ 12. The City produced electronically exportable information from LASAN's Watershed Protection Information Management ("WPIMS") for encampment cleanups conducted in 2018 and 2019 (CTY020222) on December 18, 2020 and for cleanups conducted in 2020 (CTY020331) on December 29, 2020.  Ursea Decl. ¶ 27, **Ex. 19** (Exemplar screenshots of WPIMS spreadsheet).  The City's verified Interrogatory Responses explains that the WPIMS database contains basic information about encampment cleanups, including the dates and addresses of cleanups, names of LASAN responders, resolution codes, and some Council District information.  Lebron Decl. ¶ 14, **Ex. 39** (City's Amended Rog Responses), Response 13(c).  The City's Amended Responses to Zamora Interrogatory No. 13(b) addresses the WPIMS excel sheet and explains that the excel contains basic data about encampment cleanups, including WPIMS incident/case numbers, dates and addresses of cleanups, LASAN responders, resolution codes, and some information on Council Districts.

On January 21, 2021, Plaintiffs sent the City a meet-and-confer letter regarding the City's responses to the Zamora interrogatories in which Plaintiffs raised for the first time that the City had not produced incident-specific reports for Zamora and Zepeda.  Lebron Decl. ¶ 24.  Documents were produced in November 2019 – over a year earlier – and identified in reference to bates and Plaintiff several times as discussed above.  Lebron Decl. ¶¶ 7, 12, 15, 20, **Ex. 32** (City's Rule 26(a)(i) Initial Disclosures); **Ex. 37** (City's 9/25/20 M&C Letter).

On February 3, 2021, the Parties conducted a meet-and-confer regarding the City's responses to the Zamora interrogatories.  Lebron Decl. ¶ 25.  During that call, the City raised the issue why Plaintiffs waited over a year to raise the issue and noted that the March 21, 2019 incident report (case no. 53162) occurred on the same date and time one 6th Street and Kingsley, one block from the SAC's alleged location near the northeast corner of 6th Street and Ardmore.  *Id.*  Plaintiffs' counsel responded that it was clearly not the correct report because the SAC alleges Ardmore and not Kingsley.  *Id.*  Plaintiffs are in the best position to know whether or not pictures or BWV reflects their clients and raise any such issues with the City.

On February 16, 2021, the City sent Plaintiffs a meet-and-confer letter addressing the City's production of an additional report for WPIMS Incident/Case No. 53162 in the City's document production (CTY020332-20441).  Lebron Decl. ¶ 13, 26, **Ex. 38** (City 2/16/21 M&C Letter) at 9; Ursea Decl. ¶ 33.  Plaintiffs state in the Stipulation that this report reflects Zamora's June 11, 2019 incident.  The City will request available BWV and meet-and-confer with Plaintiffs regarding the production of BWV.  The City's verified amended Interrogatory Responses identified cleanups conducted on March 21, 2019 in specified Council Districts and referenced WPIMS incident/case numbers contained in WPIMS spreadsheet CTY020222.  Lebron Decl. ¶ 14, **Ex. 39** (City's Amended Rog Responses), Response Nos. 6-9.  To the extent that Plaintiffs believe additional information reflects Zamora's March 21, 2019 incident, the City will meet-and-confer regarding WPIMS incident/case numbers and production of reports.

Similarly, for Plaintiff Haugabrook, Plaintiffs did not meet and confer or raise the issue regarding additional encampment cleanups based on the WPIMS excel spreadsheet or the City's interrogatory responses.  Lebron Decl. ¶ 27.  Haugabrook alleges incidents occurring sometime in March 2019 and about a

month later on Figueroa Street and 53rd Street and 52nd Place.  SAC ¶¶ 192-209.
Haugabrook's Responses to the City's Interrogatories provided little additional
information and stated "on or about March 2019, the City of Los Angeles took and
destroyed Plaintiff's belongings, including his backpack and all of its contents,
including a phone and chargers.  On or about April 2019, LA Sanitation workers
threw out other items, including Plaintiff's plastic lawn chair and a dining room
chair, each of which cost approximately $20 to $40. On yet another occasion, LA
Sanitation threw out Plaintiff's tent and other items necessary for survival,
including a sleeping cot which Plaintiff estimates was worth approximately $50."
Ursea Decl. ¶ 7, **Ex. 5** (Haugabrook Responses to City's Interrogatories) at p.9.

On December 11, 2020, the City sent a meet-and-confer email to Plaintiffs
addressing various discovery issues, including the City's production of South LA
reports (CTY003240-4085).  Ursea Decl. ¶ 22(a), Ex. 17 (City 12/11/20 M&C
Email).  The City stated that "Plaintiffs have not informed us whether any of the
cleanups in [the South LA] production form the basis of Mr. Haugabrook's claim."
*Id.*  Plaintiffs responded on December 18, 2020 stating "this is the first time that
you have inquired whether any of the documents produced by the City relate to
Haugabrook's claims.  From our perspective is it clear that the documents
produced by the City do not relate to his claims[.]"  *See* Ursea Decl. ¶ 26, Ex. 18
(Pltf's 12/18/20 M&C Email).

The City informed Plaintiffs during prior meet-and-confer discussions and
correspondence that the City would address incident-specific discovery if Plaintiffs
raised new issues or information.  Lebron Decl. ¶¶ 12, 20, **Ex. 37** (City's 9/25/20
M&C Letter) at p.11.  The parties have a collective responsibility to address
discovery disputes under Rule 26(b)(1).  Plaintiffs state that they identified
additional incidents that they believe reflect Haugabrook's claims based on the
WPIMS excel spreadsheet.  If so, Plaintiffs have an obligation to raise the issue

before moving to compel so that the City can meet and confer regarding Plaintiffs' identified WPIMS incident/case reports.  Instead, Plaintiffs raise it for the first time in this Stipulation and then attempt to use that argument as a springboard to justify production of all reports dating back to January 1, 2018.  *See Moore v. Superway Logistics, Inc*., No. 1:17-cv-01480-DAD-BAM, 2019 U.S. Dist. LEXIS 90111, at *10 (E.D. Cal. May 28, 2019) ("Counsel should strive to be cooperative, practical and sensible, and should seek judicial intervention only in extraordinary situations that implicate truly significant interests.")  Indeed, nearly all of Plaintiffs' meet-and-confer communications focused entirely on production of information from entire databases, emails, and requests for all encampment reports, forms, storage records, complaints, and LAPD records dating back several years (discussed in subsection 2 below).

Similar to RFP No. 1, the City raised privilege objections based on Plaintiffs' broad demand for all email communications relating to various topics. The City has not withheld any documents on the basis of privilege for incident-specific documents produced.  The argument that the City waived privilege because it did not produce a privilege log on over half a million documents that that the City has not reviewed fails for the same reasons discussed in the City's Response to RFP No. 1.  Nor are Plaintiffs entitled to a declaration regarding the City's search efforts.  *Travelers Indem. Co. v. Trumpet, Inc.*, Case No. 8:19-cv-01036-PSG (JDEx), 2020 U.S. Dist. LEXIS 166187, at *45 (C.D. Cal. May 8, 2020) (denying plaintiffs' motion to compel defendant "to explain what it did to respond to these discovery requests" because "[n]either Rule 33 nor Rule 34 requires a party explain the steps it took to search for or inquire about relevant, responsive documents or information.").

## B. Request for All Documents Re Unalleged Encampment Cleanups

1. Scope of Permissible Discovery.

Rule 26(b)(1) addresses the standard for the scope of discovery: "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." F.R.Civ.P. 26(b)(1). Under the amended Rule 26, relevancy is no longer sufficient to obtain discovery; the request must also be proportional to the needs of the case. *In re Bard IVC Filters Prods. Liab. Litig.*, 317 F.R.D. 562, 564 (D. Az. 2016).

Rule 26(b)(2) imposes further limitations on the scope of the discovery. A court "must limit the frequency or extent of discovery allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained through some other source that is more convenient, less burdensome, or less expensive; … (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." F.R.Civ.P. 26(b)(2)(C). "Courts, thus, have a duty to pare down overbroad discovery requests under Rule 26(b)(2)." *Caballero v. Bodega Latina Corp.*, Case No. 2:17cv-00236-JAD-VCF, 2017 U.S. Dist. LEXIS 116869, at * 8 (D. Nev. Jul. 25, 2017).

2. Plaintiffs' SAC and Alleged Claims

The operative SAC alleges claims on behalf of seven individual unhoused individuals and organization Ktown for All ("KFA"). Lebron Decl. ¶ 2, **Ex. 27** (SAC). The SAC unambiguously alleges that: "LAMC 56.11 codifies the City's longstanding policy of seizing and destroying homeless people's belongings." SAC ¶ 58. Plaintiffs allege facial and as-applied claims for unreasonable seizures in violation of the Fourth Amendment, Article I, § 13 of the California Constitution, and destruction of personal property in violation of the Due Process

Clause and Article I, § 7, of the California Constitution.  SAC ¶¶ 232-247, 255-265.  Plaintiffs' facial claims challenge the constitutionality of the "Bulky Item" provision under LAMC 56.11(3)(i) and 56.11(10)(d).  SAC ¶¶ 232-238, 255-258.  Plaintiffs' as-applied claims allege that the City wrongfully seized and destroyed personal property without notice or due process during encampment cleanups conducted under LAMC 56.11.  SAC ¶¶ 239-247, 259-265.  The individual Plaintiffs also allege a claim for violation of a mandatory statutory duty under Government Code § 815.6 and California Civil Code § 2080 *et seq.*  SAC ¶¶ 272-275.  Plaintiff El-Bey only asserts a claim for violation of the Bane Act (California Civil Code § 52.1.  SAC ¶¶ 266-271.

Specifically, Plaintiff El-Bey alleges that his rights were violated during two specific incidents that occurred on January 10, 2019 at an area near 6th Street and Alexandria, and on June 4, 2019 at an area near Western Ave. and Oakwood.  SAC ¶¶ 173-191.  Plaintiff Garcia alleges claims for three specific incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone Avenue, on or around April 29, 2019 at Aetna Street and Van Nuys Boulevard, and on or around August 14, 2019 at Calvert and Bessemer.  SAC ¶¶ 124-150.  Plaintiffs Zamora and Zepeda allege claims for two specific incidents occurring on or around March 21, 2019 at 6th Street and Ardmore, and on or around June 11, 2019 at 5th Street and Harvard.  SAC ¶¶ 151-172.  Plaintiff Haugabrook alleges claims for incidents occurring sometime in March 2019 and about a month later on Figueroa Street and 53rd Street and 52nd Place.  SAC ¶¶ 192-209.  Plaintiff Diocson alleges claims for one specific incident occurring on or around April 24, 2019 at Lomita and McCoy.  SAC ¶¶ 210-218.  Plaintiff Ashley alleges claims for one specific incident occurring on or around May 21, 2019 at Lomita and McCoy.  SAC ¶¶ 219-231.

Plaintiff KFA, in turn, alleges that is an "unincorporated membership organization in the Koreatown neighborhood in Los Angeles" "founded in 2018 to

form connections between housed and unhoused residents of Koreatown and to advocate for housing and shelters in Koreatown."  SAC ¶ 38.  KFA alleges that it had to divert resources and its unhoused members have suffered harm as a result of the City's enforcement of LAMC 56.11.  SAC ¶¶ 40-43.

On June 2, 2020, the Court issued an order granting in part and denying in part the City's Motion to Dismiss.  Lebron Decl. ¶ 4, **Ex. 29** (6/2/20 Order Granting in Part and Denying in Part Def.'s MTD, Dkt. No. 65).  The Court's Order stated that KFA "asserts that it need only 'rais[e] a single incident . . . to hold the City liable under Monell'… Accepting this clarification, the Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional." *Id.* (Dkt. No. 65) at 7.  The Court ruled that to "the extent KFA does seek a declaration that the City has unconstitutionally applied the Ordinance or related policies or practices to each of its members, the Court STRIKES that request."  Dkt. No. 65 at 7, n.4.  On June 29, 2020, Plaintiffs filed a notice electing not to file an amended complaint. Lebron Decl. ¶ 5, **Ex. 30** (Pltf's Notice Electing Not to File an Amended Complaint, Dkt. No. 72).

### 3. The Requested Discovery that Is Not Relevant to Plaintiffs' Claims

As discussed above, Plaintiffs allege that their property was unlawfully seized and destroyed during specific incidents.  The parties are entitled to discovery relevant to show: (1) whether Plaintiffs' property was in fact seized and/or destroyed by the City; (2) whether any such seizure and/or destruction was unreasonable under the Fourth Amendment; (3) whether Plaintiffs received notice and opportunity to be heard sufficient to satisfy due process; and (4) whether any destroyed property was the type that should have been stored under California Civil Code § 2080 et seq.  The issue of whether the individual plaintiffs' property

was unreasonable seized or destroyed without notice or due process is fact specific to their respective alleged incidents.

Plaintiffs, however, demand that the City produce all documents and reports for all encampment cleanup conducted dating back to January 1, 2018 for various locations, all information contained in City databases, all communications regarding forms or notices, all complaints, grievances, and investigation files. Plaintiffs' other Requests demand these documents for all encampment cleanups conducted Citywide dating back to April 1, 2016.  These documents are not relevant on their face in establishing Plaintiffs' specific alleged constitutional violations or claims for relief. *See Valenzuela v. City of Calexico*, Case No. 14-cv-481-BAS-PCL, 2015 U.S. Dist. LEXIS 26566, at * 9 (S.D. Cal. Mar. 4, 2015) ("The fact that plaintiff alleged no constitutional violation occurred on May 23, 2014 makes that encounter significantly less relevant to a Monell claim.").

Plaintiff acknowledge the cleanup reports do not identify individuals by name, yet argue that they these reports are relevant so Plaintiffs' counsel can figure out if Plaintiffs' rights were violated in the past.  This argument is also flawed. *See Valenzuela v. City of Calexico*, Case No. 14-cv-481-BAS-PCL, 2015 U.S. Dist. LEXIS 26566, at * 3 (S.D. Cal. Mar. 4, 2015) ("[A] litigant may not file suit in order to use discovery as the sole means of finding out whether [plaintiffs have] a case.") (quotations omitted); *Carrera v. First Am. Home Buyers Prot. Co.*, Case No. 13cv1585 H (WMc), 2014 U.S. Dist. LEXIS 190451, at *7-8 (S.D. Cal. Jan. 29, 2014) (the purpose behind Rule 26(b)(1) . . . is to "signal[] to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings").

### (a) Monell Discovery

The facts relevant to Monell are not in dispute.  In its Answer, the City has conceded that it: (1) promulgated LAMC 56.11 and related Protocols; (2) conducts

encampment cleanups pursuant to LAMC 56.11, during which it removes and/or discards items on the public right of way, including items that may belong to homeless persons; (3) does not obtain a warrant before removing and/or discarding items pursuant to LAMC 56.11; (4) provides notice (or not) in connection with removing and/or discarding items, as specified in LAMC 56.11; and (5) has enforced LAMC 56.11 since 2016 and continues to enforce it to this day.  See Lebron Decl. ¶ 3, **Ex. 28** (City's Answer to SAC, Dkt. No. 75) at ¶¶ 16, 20, 21, 56, 68, 102, 114.  LAMC 56.11 designated LASAN as the administrative agency for promulgating rules, protocols, and procedures for implementing and enforcing the ordinance.  LAMC 56.11(11).  LASAN adopted the "Los Angeles Municipal Code 56.11 Standard Operating Protocols ("SOPs") addressing the procedures for encampment cleanups and enforcement operations.  Wong Decl. ¶ 8.

"A rule or regulation promulgated, adopted, or ratified by a local governmental entity's legislative body ***unquestionably*** satisfies *Monell's* policy requirements." *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989) (emphasis added), *overruled on other grounds by Bull v. City & Cty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010) (emphasis added).  In *Monell*, the Supreme Court confirmed that the City may be liable for alleged actions of its employees if the action alleged to be unconstitutional "implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers[.]"  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-691 (1978).

Here, the application of Monell liability is straightforward.  The City even offered to stipulate on Monell issues to streamline discovery.  Ursea Decl. ¶ 4, **Ex. 1** (City's 07/17/20 Proposed Monell Stipulation).  Plaintiffs rejected this reasonable proposal.  Ursea Decl. ¶ 5, **Ex. 3** (Pltf's 7/30/20 Letter); *see also Gonzalez v. City of Schenectady*, Case No. 1:09-CV-1434, 2011 U.S. Dist. LEXIS

137290, at *13 (N.D.N.Y. Nov. 30, 2011) ("additional discovery related to strip searches is unnecessary as it is undisputed that the search was conducted pursuant to the City's written policy, which had been in effect since 1999").

Moreover, Plaintiffs argued successfully to the Court that Plaintiffs "need only raise a single incident to hold the City liable under Monell" in response to the City's motion to dismiss. Lebron Decl. ¶ 4, **Ex. 29** (6/2/20 Order re City's MTD), Dkt. No. 65 at 7. In contrast, Plaintiffs argue in discovery that all encampment cleanups, reports, forms, notices, storage data and other documents are necessary to establish Monell liability.

Plaintiffs also contend that expansive discovery is needed to establish liability under Monell for *unwritten* policies and customs. The City requested during the meet-and-confer process that Plaintiffs identify the specific unwritten policies and customs necessitating such broad discovery. Lebron Decl. ¶¶ 12-13, 19-20 **Ex. 37** (City's 9/25/20 M&C Letter) at p.13; **Ex. 38** (City's 2/16/21 M&C Letter) at p.6. The City noted that identifying the specific unwritten policies or practices would enable the Parties to address their disputes regarding relevance and proportionality or, alternatively, lead to a stipulation regarding the alleged unwritten policies or customs. *Id.* Plaintiffs referred the City to the Plaintiffs' 60-page SAC, but did not identify the *unwritten* policies and customs. *Id.*

Even if Plaintiffs identified a specific *unwritten* policy, they still need to allege that this *unwritten* policy subjected Plaintiffs to a deprivation of constitutional rights under the Fourth Amendment and Due Process Clause. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404-405 (1997); *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) ("Monell must be taken to require . . . that a particular violation was 'caused' by the municipal 'policy.'"). Here, the SAC contains no such allegations for the Plaintiffs' specific incidents. Lebron Decl. ¶ 2, **Ex. 27** SAC ¶¶ 124-231; *see also Centeno v. City of Fresno*, Case No. 1:16-cv-00653-

DAD-SAB, 2016 U.S. Dist. LEXIS 180013, at * 23 (E.D. Cal. Dec. 29, 2016) ([T]he mere existence of a policy is not sufficient to trigger liability under Section 1983, the policy of the department has to be the moving force behind the constitutional violation."). The existence of an *unwritten* policy that caused no constitutional injury to the Plaintiffs is irrelevant. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that department regulations might have authorized the use of constitutionally excessive force is quite besides the point.").

Plaintiffs alternatively argued that expansive discovery is needed to establish Monell liability under a failure-to-train theory. *Monell* does not provide a separate cause of action for the failure by the government to train its employees." *Arrington v. Clark Cty. Dep't of Family Servs.*, Case No. 2:13-cv-622-JAD-NJK, 2014 U.S. Dist. LEXIS 132629, at *8 (D. Nev. Sep. 22, 2014) (quoting *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006)). Rather, *Monell* "extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Id*. And Monell liability under a failure-to-train theory must also still be related to a violation of Plaintiffs' constitutional rights. *Long v. City & Cnty. of Honolulu*, 511 F.3d 901, 907 (9th Cir. 2007). Plaintiffs allege no such claims. Lebron Decl. ¶ 2, **Ex. 27**, SAC ¶¶ 151-172; *see also Connick v. Thompson*, 563 U.S. 51, 61-62 (2011) (addressing failure to train requirements under *Monell*).

### *(b) Declaratory Judgment Act and Prospective Relief*

Plaintiffs' contention that expansive discovery is needed because Plaintiffs seek prospective relief, including declaratory relief, is also misplaced. The Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201(a), "does not create new substantive rights, but merely expands the remedies available in federal courts."

*Shell Gulf of Mexico, Inc. v. Ctr. For Biological Diversity., Inc.*, 771 F.3d 632, 635
(9th Cir. 2014).  The DJA is a procedural statute that "merely offers an additional
remedy to litigants."  *Team Enterprises, LLC v. Western Inv. Real Estate Trust*,
721 F. Supp. 2d 898, 911 (E.D. Cal. 2010) (citations omitted).  "A declaratory
judgment is not a theory of recovery."  *Id.*  Nor is a request for declaratory relief an
independent cause of action, but rather a remedy that is derivative of the
underlying claims.  *Gilliam v. Bank of Am., N.A.*, Case No. SA CV 17-1296-DOC
(JPRx), 2018 U.S. Dist. LEXIS 227706, at *48 (C.D. Cal. June 22, 2018).

Plaintiffs' contention that substantial discovery regarding past, unrelated
cleanups is needed for declaratory relief ignores the fact that prospective relief
addresses the City's existing – policies and practices.  A declaratory judgment
provides prospective relief to address future or continuing violations.  *See Bayer v.
Nieman Marcus Group, Inc.*, 861 F.3d 853, 868 (9th Cir. 2017).  Declaratory relief
is not available to adjudicate past constitutional violations.  *Id.; see also C.F.C. v.
Miami Dade Cnty.*, 349 F. Supp. 3d 1236, 1254 (S.D. Fla. 2018) ("A declaration
that that the challenged statute as applied in the past to these plaintiffs is
unconstitutional would be nothing more than a gratuitous comment without any
force or effect.").   Moreover, the Court previously ruled that Plaintiff KFA cannot
seek declaratory relief relating to alleged past constitutional violations of its
members.  Lebron Decl. ¶ 4, **Ex. 29** (6/2/20 Order re City's MTD) at 7.

4.  Plaintiffs' Requests are not Proportional to the Case.

The "parties and the court have a collective responsibility to consider the
proportionality of all discovery and consider it in resolving discovery disputes."  *In
re Bard IVC Filters Prods. Liab. Litig.*, 317 F.R.D. 562, 564 (D. Az. 2016).
Proportionality is determined by assessing the importance of the issues at stake in
the action, the amount in controversy, the parties' relative access to relevant
information, the parties' resources, the importance of the discovery in resolving the

issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. F.R.Civ.P. 26(b)(1).

The Wong Declaration and the City's Amended Interrogatory Responses support the City's objections regarding the burdens imposed on the City in responding to Plaintiffs' request. *See* Wong Decl. ¶¶ 16-29.   In August 2020, the City identified approximately 41,734 incidents/cases constituting encampment cleanups as defined by Plaintiffs for the period from April 1, 2016 to July 31, 2020, and approximately 32,730 incidents/cases for the period from January 1, 2018 to July 31, 2020.  Wong Decl. ¶ 24.  Environmental compliance inspectors ("ECIs") in LASAN's Livability Services Division ("LSD") prepare reports and metrics documenting encampment cleanups using WPIMS.  Wong Decl. ¶ 16.

During the meet-and-confer process, the City agreed to produce additional information extracted from WPIMS and other databases.  Ursea Decl. ¶12. WPIMS excel spreadsheet CTY020222 contains additional data regarding encampment cleanups conducted in 2018 and 2019 and WPIMS spreadsheet CTY020331 contains this information for 2020.  Lebron Decl. ¶ 14, **Ex. 39** (City's Amended Rog Responses), Response 13(c); Wong Decl. ¶ 25; Ursea Decl. ¶ 27, **Ex. 19** (Exemplar screenshots of WPIMS excel spreadsheet).

WPIMS is an older technology that provides access to forms used to generate reports for various operations, including encampment cleanups and stormwater pollution cases, among others.  Wong Decl. ¶ 17.  ECIs can attach documents to the forms saved on WPIMS, such as Health Hazard Checklist, posting surveys or waste manifests.  *Id.* ¶ 19.  ECIs take pictures during encampment cleanups or compliance and a single incident/case could have hundreds of pictures.  Reports contained in WPIMS generally contain several or more pictures of the cleanup, but WPIMS does not store all pictures associated with an encampment cleanup.  *Id.* ¶ 20.

LSD uses the incident/case number to identify reports and documents saved on WPIMS.  Wong Decl. ¶ 21.  There is no automated method for exporting documents and reports saved on WPIMS.  Wong Decl. ¶ 21; Lebron Decl. ¶ 14, **Ex. 39** (City's Amended Rog Responses), Response 13(c).  In order to obtain a document or report saved on WPIMS, and ECI must manually download one document or report at a time.  *Id.*  Other documents not stored on WPIMS are also identified by the incident/case number and must also be collected.  Wong Decl. ¶ 21.  Other documents could include hazardous and non-hazardous waste disposal records maintained by LASAN's Solids Division and authorizations for posted comprehensive cleanups maintained in LASAN's Authorization Management System ("AMS").  Wong Decl. ¶ 21.

In order to search for and produce all of the requested documents regarding encampment cleanups, an ECI would need to reference a spreadsheet identifying all of incident/case numbers, the address listed for the encampment cleanup, the date and type of cleanup (posted comprehensive cleanup or compliance action), manually download reports and documents in WPIMS, conduct additional searches by incident/case number for pictures and media files not saved on WPIMS, and manually collect and assemble by incident/case number any waste disposal records or cleanup authorizations.  Wong Decl. ¶ 26.  LSD is currently short staffed with 12 ECI positions currently vacant as a result of budget cuts or ECI's promoting or transferring to other positions.  Wong Decl. ¶ 27.  This process is extremely time-consuming and expensive.  *See* Wong Decl. ¶¶ 28-29.

The expense and burden imposed on the City significantly exceeds Plaintiffs' alleged damages, as disclosed in Plaintiffs' Rule 26(a) Initial Disclosures.  Lebron Decl. ¶ 8, **Ex. 33** (Pltf's Rule 26(a)(1) Initial Disclosures).  Plaintiffs' discovery demands are not proportional to the discovery the needs of this case.  *See Goodwin v. City of Glendora*, Case No. CV-17-3537-FMO (PLAx),

2017 U.S. Dist. LEXIS 224122, * 15-16 (C.D. Cal. Dec. 13, 2017) (rejecting argument that discovery regarding every house in the City of Glendora that has been entered without a warrant in the past ten years … [was] relevant and proportional to plaintiff's Monell claim where plaintiff alleged his house was entered without exigent circumstances or probable cause supporting a warrant.); *Hoffman v. Cnty. of Los Angeles*, Case No. CV-15-03724-FMO (ASx), 2016 U.S. Dist. LEXIS 123515 * (C.D. Cal. Jan. 5, 2016) (RFP requests for all arrest reports and records over a five period not relevant to plaintiff's Monell claim for alleged Fourth Amendment violation and not proportional to needs of case; production in response to request required "a considerable amount of time and manpower" and imposed under burden and expense relative to the minimal relevance to Monell); *Saunders v. City of Chicago*, Case No. 12-cv-9158, 2017 U.S. Dist. LEXIS 509, * 31-32 (N.D. Ill. Jan. 4, 2017) (seeking discovery of entire law enforcement database is not proportional to plaintiff's claims or discovery needs); *Crawford v. Cnty. of Orange*, Case No. SA-CV-160503—DOC (DFMx), 2017 U.S. Dist. LEXIS 224164 (C.D. Cal. Oct. 13, 2017) (interrogatory seeking Monell discovery and information regarding resistance offenses over a 10-year period was not proportional and relevance of the discovery was minimal).  The motion to compel production of all documents regarding these unalleged encampment cleanups dating back to January 1, 2018 should be denied.

### REQUEST FOR PRODUCTION NO. 11:

All policies, procedures, directives, manuals, bulletins, and special orders, related to conducting ENCAMPMENT CLEANUPS, including but not limited to the seizure or destruction of property belonging to homeless people.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request is overbroad in seeking documents dating back to April 2016, three years before Plaintiff El-Bey's specific incidents occurred as alleged in the SAC. Defendant objects that the Request is not proportional to the needs of the case, insofar as the burden or expense of searching for and producing documents dating back to April 2016, three years before the specific alleged incidents occurred, outweighs the benefit of such discovery to Plaintiff El Bey's specific claims alleged in the SAC. Subject to and without waiving these objections, Defendant responds as follows: Defendant previously produced documents responsive to this Request and will produce additional responsive documents in Defendant's possession, custody or control.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request is overbroad in seeking documents dating back to April 2016, three years before Plaintiffs' specific incidents occurred as alleged in the SAC. Defendant objects that the Request is not proportional to the needs of the case, insofar as the burden or expense of searching for and producing documents dating back to April 2016, three years before the specific alleged incidents occurred, outweighs the benefit of such discovery to Plaintiffs' specific claims alleged in the SAC. Subject to and without waiving these objections, Defendant responds as follows: Defendant previously produced documents responsive to this Request and will produce additional responsive documents in Defendant's possession, custody or control.

**PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 11:**

Plaintiffs seek the production of policies and procedures related to Encampment Cleanups.  These documents are highly relevant to the central issue of this case and are relevant both for establishing *Monell* liability as well as establishing the City's practices for purposes of prospective relief under the Declaratory Judgments Act. In both instances, Plaintiffs seek to show that the City has had a longstanding and persistent practice of depriving homeless individuals of their constitutional rights.  Those violations have occurred not only because the now-enjoined "bulky item provision" of LAMC 56.11 is unconstitutional on its face, but also because the City has applied the ordinance in unconstitutional ways, through the application of widespread and longstanding policies, customs and practices. Plaintiffs therefore seek the written policies and procedures related to Encampment Cleanups, which Plaintiffs allege is primarily the mechanism by which the City enforces LAMC 56.11.  *See* SAC ¶ 69.

Plaintiffs request documents going back to April 2016 (which is only three years prior to the date this litigation was filed and only three and a half years prior to the date Plaintiffs provided Defendant with these RFPs).  The request encompasses all policies and procedures currently in effect, any policies that were in effect at the time of the Specific Incidents referenced in the SAC, and policies that have been in effect since LAMC 56.11 was amended in April 2016.  Current policies are relevant for purposes of prospective relief; policies that were in place at the time the discrete incidents in the complaint occurred are relevant for purposes of establishing *Monell* liability; and policies that were in place prior to the individual incidents show whether and to what extent the City amended its policies in response to prior complaints, which is also relevant for *Monell* liability. *Henry v. Cty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997), opinion amended on

denial of reh'g, 137 F.3d 1372 (9th Cir. 1998) (*Monell claim* supported by "almost identical incident as that complained of" which put Defendant on notice as to future abuses); *Los Angeles Cty. v. Humphries*, 562 U.S. 29, 31(2010) (*Monell* requirement applies to prospective relief (both declaratory and injunctive) as well as damages claims).

Defendant does not specifically object to the request on the basis of relevance, and nor can it; written policies and procedures are the type of discovery always requested and used in any *Monell* or prospective relief case against a government entity. *See e.g., Medora v. City and Cnty of San Francisco,* No. C 06-0558 EDL, 2007 WL 9810901, at *8 (N.D. Cal. June 8, 2007) (granting Plaintiff's motion to compel the production of policies and procedures to prove *Monell* liability, because "a 5-year time limitation adequately serves Plaintiff's interests in obtaining relevant documents while avoiding the imposition of undue burden and expense on Defendants").

Instead, the City objects that the request is overbroad and not proportionate to the needs of the case.  While maintaining its objections, Defendant has produced a patchwork of internal policies, procedures, manuals, bulletins, and directives since October 2019 and responded to the request by stating "Defendant previously produced documents responsive to this Request and will produce additional responsive documents in Defendant's possession, custody or control."

### g.      Defendant's Written Response Does Not Comply With Rule 34

The City's Amended Response to this RFP also does not comply in any way with Federal Rule of Civil Procedure Rule 34(b)(2). *See DeSilva,* 2020 WL 5947827, at *9 (compelling production of documents and responses compliant with Rule 34 and noting that vague responses that "leave [the propounding party] in the dark" . . .  is precisely the situation Rule 34(b)(2) is designed to prevent." *See also* 2015 Amendment Adv. Comm. Note to Fed. R. Civ. P. Rule 34(b)(2)(C)

81

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

(amendment was added to "end the confusion that frequently arises when a producing party states several objections and still produces information.").[11]

First, the City refuses to state that it is producing *all* documents in its possession, custody or control.  Second, Defendant has maintained its objections, including myriad general objections, without identifying whether and to what extent it is withholding documents responsive to the request. Neither are allowable under Rule 34(b)(2).  Even after the parties met and conferred about the sufficiency of the City's written responses, the City produced amended responses which again failed to "state[s] whether any responsive materials are being withheld on the basis of" any of the City's objections. *See* Fed. R. Civ. P. 34(b)(2)(B) – (C). In doing so, the City fails to provide sufficient information to "alert other parties to the fact that documents have been withheld and thereby facilitate an informed discussion of the objection." 2015 Amendment Adv. Comm. Note to Fed. R. Civ. P. 34., *D.C.*, 2016 U.S. Dist. LEXIS 197240, at *5. The City has also failed to identify whether it limited its search for responsive documents in any way based on the objections, for example, to specific City departments, custodians, etc.  *See Advanced Visual Image Design, LLC.*, 2015 WL 4934178, at *3 (finding that a party responding to a request for production "has a duty to make a reasonable inquiry to locate responsive documents and then to provide a complete, explicit response").

---

[11]   The vagueness ambiguity of Defendant's response to this RFP is clear when juxtaposed with its responses to other RFPs, for example, RFPs 21-22, 24-25, and 27-28.  Those requests seek exemplars of forms and notices (RFPs 21, 24, and 27) and training and policy documents related to the use of those forms and notices (RFPs 22, 25, and 28).  In the Amended Responses to these RFPs, the City states explicitly that "Defendant previously produced [documents] and will produce additional [documents] responsive to this Request, *if any*, in Defendant's possession, custody or control." (emphasis added). Plaintiffs interpret the inclusion of the phrase "if any" to indicate the City's intention to produce all documents in its possession, custody, and control that are responsive to those requests.  The City does not include that language in this response.

The lack of specificity in its response makes it impossible for Plaintiffs to know what documents it is producing and whether or to what extent it is withholding responsive documents, which is exactly what the requirement of Rule 34 aims to prevent. *See DeSilva,* 2020 WL 5947827, at *9. *See also* 2015 Amendment Adv. Comm. Note to Fed. R. Civ. P. 34(b)(2)(C).

As with other requests, Plaintiffs' concern about the sufficiency of its written responses and Defendant's production is not merely speculative.  First, over a year ago, the City represented to Plaintiffs and this Court that it had produced "Policy Related Documents" including "policies, procedures, directives, manuals, and special orders related to LAMC 56.11 and ENCAMPMENT CLEANUPS, including but not limited to the seizure, storage or destruction of people's belongings pursuant to LAMC 56.11."   Myers Decl., ¶¶14-16.  Similar to the City's refusal to state that it is producing *all* responsive documents, Defendant stated only that it was producing "policy documents."  Plaintiffs requested the City confirm it was producing *all* policy documents in its possession, custody or control, and conditioned an extension of the City's time to respond to the motion to compel on the City's agreement that it would do so.  The City accepted the extension and thereafter, produced policy documents that included: 1) the publicly-available council file for LAMC 56.11, as well as ten other city council motions the City cherry-picked based on undisclosed criteria on topics as diverse as the passage of a new ordinance related to storage of property in parks,[12] the City's Administrative Citation Program, and an ordinance that severely restricted living in vehicles; 2) LAPD policies and directives; and 3) a printout of the publicly available version of Los Angeles Municipal Code Article 6, which includes LAMC

---

[12]   Notably, the City did not produce the Standard Operating Protocols related to the implementation of this ordinance at the time it produced the publicly-available council file for the ordinance.  The City has since produced this document, ostensibly in response to this RFP.

56.11.  *Id.*  The City did not produce any internal policies, procedures, manuals, or other policy documents from LA Sanitation. *Id.*

Eight months later, after discovery formally commenced, the City produced a large number of LA Sanitation policies and procedures related to Encampment cleanups and the enforcement of LAMC 56.11 that it had previously not produced, making it clear that the City had not, in fact, produced all responsive documents in January 2020.  Now, similar to its ambiguous statement in January, the City again refuses to state explicitly that it is producing *all* responsive documents in its possession, custody or control, or whether it is withholding any documents based on its objections.

In fact, Plaintiffs are aware of at least some additional documents Defendant has inexplicably still failed to produce.  For example, in one of the trainings conducted by LA Sanitation on LAMC 56.11, the ordinance at issue in this litigation, the City identifies three laws/orders related to LAMC 56.11: the Ordinance itself, the 56.11 protocols, and an Executive Directive #16, which provides the "mandate for HOPE/PUBLIC Right-of-Way Enforcement Teams."  *See* Myers Decl., ¶ 65, Exh. AO.  [slides of trainings] While Defendant has now produced multiple copies of the first two documents, it has not produced any document that constitutes Executive Directive #16, even though by the City's admission, it is a "directive" related to Encampment Cleanups and therefore fits squarely within the request.  *See also id.*  (additional training documents similarly referencing Executive Directive #8).  *See In re: Rivera*, 2017 U.S. Dist. LEXIS 229538, at *8 (motion to compel may be granted where plaintiff can identify a specific document that has been withheld).

To the extent the City asserts that it has not finished its production of responsive documents, this itself is a violation of Rule 34(b)(2)(B), which requires the City to specifically identify a "reasonable time" it will produce responsive

documents.  Fed. R. Civ. P. 34(b)(2)(B); *see also* 2015 Amendment Adv. Comm. Note to Fed. R. Civ. P. 34(b)(2)(B) ("the production must be completed either by the time for inspection specified in the request or by another reasonable time specifically identified in the response.  When it is necessary to make the production in stages the response should specify the beginning and end dates of the production.").  Plaintiffs have repeatedly requested a date certain under Rule 34 for the completion of production, in an attempt to avoid this motion practice.  Defendant has simply ignored this request and continues to engage in an interminable rolling production of documents.  At this point, Defendant has far exceeded a "reasonable time" to produce responsive documents, since the City first produced policy documents in January 2020, these requests were formally propounded in July 2020 (after being provided to Defendant in October 2019).  *See Maiorano,* 2017 WL 4792380, at *2.

> ### h.   Plaintiffs' Request is Not Overbroad

Although Defendant has not stated whether it is withholding documents on the basis of objection, Defendant has maintained its objection that the request is overbroad because it seeks documents going back to April 2016, when LAMC 56.11 was amended.  Defendant bears the burden of showing that this request should be denied on the basis of overbreadth, which it cannot do here.  *See Thomas v. Cate,* 715 F. Supp. 2d. 1012, 1032 (E.D. Cal. 2010).  As described above, three years of policy documents is more than reasonable for purposes of *Monell* discovery. *See Medora,* 2007 WL 9810901 at *8 (granting five years of policy documents as part of *Monell* discovery).  This is especially true in the context of this case, given that the violation of Plaintiffs' constitutional rights is only the latest in a long line of other claims against the City for similar violations.  *See* SAC at ¶¶ 17-19 (Dkt. 43) (describing the history of claims against the City for similar violations to the ones raised by Plaintiffs). It is highly relevant whether and to what

extent the City amended its policies in response to those prior complaints. *See Thomas*, 715 F. Supp. 2d at 1032 (granting a request for information going back nearly thirty years, where "in the context of th[e] action," the requested information was "necessary to conduct a comparative analysis of the operation" at issue in the litigation and such analysis was "clearly relevant to Petitioner's claims").

### i.    Plaintiffs' Narrow Request is Proportional to the Needs of the Case

To the extent Defendant is withholding any documents on the basis that the request is not proportional to the needs of this case, Defendant's objection and subsequent meet and confer efforts provided no information "clarifying, explaining, and supporting its objection" that the production of policy documents related to City activities was not proportional to the needs of the case, based on the factors outlined in Rule 26. *Duran,* 258 F.R.D. at 378.

But even if the City had articulated a basis for asserting that the production of these documents was burdensome, the request would still be proportional to the needs of the case.  As discussed in detail above, the issues at stake in this litigation are of constitutional significance; the amount of controversy is largely irrelevant given that Plaintiffs primarily seek prospective relief to put an end to the City's unconstitutional practices; and the City of Los Angeles has far more resources than the seven unhoused individuals whose belongings were seized and the volunteer organization whose resources go to replacing those belongings.  *See supra,* Plaintiffs' Argument re: Request No. 2.  The other factors also weigh heavily in Plaintiffs' favor.  *See* Fed. R. Civ. Pro. 26(b)(1).

### i.    Parties' relative access to relevant information

Defendant should comply with discovery requests where Plaintiff has no alternative source for critical information. *Lamon*, 2010 U.S. Dist. LEXIS 122479, *7-8 (compelling production of documents, despite burden to Defendant because

Plaintiff has no other source of this information). Here, the City is the custodian of its own internal policies and procedures. Without the City's cooperation, Plaintiffs have no access to these documents to which they are entitled.[13]

### ii.    Importance of the discovery in resolving the issues

The documents requested go directly to the central issues in this case. Plaintiffs seek to enjoin the City's unconstitutional customs, policies and practices related to practices of seizing and destroying people's belongings, primarily during encampment cleanups. *See* Myers Decl., Exh. I, February Order. Therefore, the City's written policies and procedures related to those cleanups could ultimately be dispositive of one of the main issues in the case: whether the policies as written, violate the Constitution. Similarly, the City's written policies and procedures around encampment cleanups could establish *Monell* liability, which is required for Plaintiffs' claims under Section 1983. Under *Monell*, a city can be held liable for depriving individuals of their constitutional rights only if the deprivation occurred pursuant to a governmental policy, practice or custom. 436 U.S. at 690-691. This can be based on an official policy, practice or custom, or when a policy, practice or custom is so widespread that it has been unofficially adopted. *Id*. As such, the written policies and procedures go directly to this central issue in this case.

### iii.   Whether the burden or expense of the proposed discovery outweighs its likely benefit

Defendant objects that the burden of producing documents responsive to Plaintiffs' request is too high because the documents sought date back "three years before the specific alleged incidents occurred" and "outweighs the benefit of such discovery to" specific claims as alleged in the SAC. Yet it fails to provide any

---

[13]  Notably, in January 2020, nearly every policy document related to LA Sanitation that was produced by the City was publicly available through the City Clerk's website. *See* Myers Decl. The policy documents it withheld originally and produced only months later were the ones to which Plaintiffs had no other access. *Id.*

explanation why the production of policy documents that dictate how the City conducts cleanups — which by the City's own admission, it performs thousands of each year — is burdensome, let alone why the purported burden or expense outweighs the benefit of these critical documents.  It should not be burdensome to produce all policies that dictate how those cleanups are currently conducted. Nor should it be burdensome to produce policy documents going back only three years prior to the date of the incident (and only three and a half years prior to the date Plaintiffs provided Defendant with RFPs requesting responsive documents). *See In re Citimortgage,* 2012 WL 10450139 at *4 (quoting *Herring v. Clark*, No. 1:05-cv-0079-LJO-SMS-PC, 2011 WL 2433672, at *9 (E.D. Cal. June 14, 2011)) ("[L]arge corporations and institutions are expected to have the means for locating documents requested in legal matters.").  This is especially true here, since the City has been involved in active litigation about these issues since 2011.  In fact, the City already produced some policy documents that were written in 2012 and even the documents produced by the City in January 2020 included documents from earlier than 2016.

The fact that discovery may be burdensome is not sufficient grounds for objection when the information requested is essential to the case.  *See Gutierrez v. Mora*, No. CV 18-781-KS, 2019 WL 8060079, at *9 (C.D. Cal. Dec. 9, 2019) (Benefit outweighs burden where the information sought regarding Defendant's K-9 policies and procedures is essential to Plaintiff's *Monell* claims and Defendant provides no evidence of burden or expense). The burdensome argument additionally fails when each request is narrowly tailored with temporal limitations. *See Fulfillium,* 2018 WL 6118433, at *5 (Defendant's objections that requests were overbroad and caused undue burden are overruled because each request "was limited to a discrete, time-limited topic.").

Moreover, Defendant offers nothing more than a boilerplate objection to Plaintiffs' request, providing no substantial evidence of burden or expense. Boilerplate objections that discovery is burdensome are insufficient. *Leibovitz v. City of N.Y.,* No. 15 Civ. 546 (LGS)(HBP), 2017 U.S. Dist. LEXIS 15662, at *4 (S.D.N.Y. Feb. 3, 2017) (citing *A. Farber & Partners, Inc*, 234 F.R.D. at 188 ("[G]eneral or boilerplate objections such as 'overly burdensome and harassing' are improper -- especially when a party fails to submit any evidentiary declarations supporting such objections."); *See also Paulsen*, 168 F.R.D. at 289; *Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1559 (11th Cir. 1985) (conclusory recitations of expense and burdensomeness are not sufficiently specific to demonstrate why requested discovery is objectionable). As discussed above, these basic documents are essential to Plaintiffs' case and are therefore proportionate to the needs of the case, irrespective of the City's unsupported assertion of burden.

### j.     There is No Merit to the City's Other Objections

#### i.     Claims of privilege

The City incorporates a general objection into the request "insofar as said Request seeks the disclosure of communications or information protected by the attorney-client privilege, the attorney work product doctrine, the official information privilege, or any other privilege." *See* page 2 of Amended Written Responses. As discussed above, despite numerous requests Defendants have not produced a privilege log.  "Boilerplate objections or blanket refusals inserted into a response to a Rule 34 request for production of documents are insufficient to assert a privilege." *Burlington Northern & Santa Fe Ry. Co.*, 408 F.3d at 1149*; see also DeSilva*, 2020 WL 5947827, at *2 (citing *Sanchez*, 2020 WL 3542328, at *2 ). Defendant has therefore waived this objection.  *Burlington Northern & Santa Fe Ry. Co.*, 408 F.3d at 1149.

### ii.    Other boilerplate general objections

In addition to the specific objections to relevance and proportionality, the City provides three pages of general boilerplate objections.  The City simply incorporates these objections by reference into each of the requests for production, without providing any basis for the specific objection or even an assessment of whether the objection specifically applies to the request.  The use of boilerplate objections in this way is inappropriate and an abuse of the discovery process.  *Polaris*, 2017 U.S. Dist. LEXIS 222261, at *14-17.  *See also Eisenhower Med. Ctr.*, 2020 U.S. Dist. LEXIS 218716, at *9 (citing *A. Farber & Partners, Inc.*, 234 F.R.D. at 188 (faulting defendant for making "boilerplate objections to almost every single request for production, including broad relevancy objections, objections of 'overly burdensome and harassing,' 'assumes facts not in evidence,' privacy, and attorney-client privilege/work product protection"). The City's boilerplate general objections do not apply to this specific Request for Production (and further illustrate the extent to which this request is narrow and tailored to the needs of this case).  And even if they did apply, the City refused to clarify which of the objections (if any) applied to this request, let alone the facts necessary to support its application, even after months of requests by Plaintiffs for the City to do so as required by Rule 34.  The City has therefore waived the objection.  *See e.g., Bosley*, 2016 WL 1704159, at *5, (Defendant waived blanket objections by failing to provide details of the objections as required by Rule 34(b)(2)(B)).

### k.    Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce all documents responsive to RFP No. 11 within 21 days or, if the City asserts it has produced all documents responsive to the request, compelling Defendant to provide a complete, explicit response as to the search conducted to identify and

produce responsive documents and to attest to the finality of their production, as required by Rule 34.

**DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 11:**

RFP11 seeks: "All policies, procedures, directives, manuals, bulletins, and special orders, related to conducting ENCAMPMENT CLEANUPS, including but not limited to the seizure or destruction of property belonging to homeless people [from 2016 to present]." (Emphasis added).   Plaintiffs argue that the documents are relevant both for establishing *Monell* liability as well as establishing the City's practices for purposes of prospective relief under the Declaratory Judgments Act. Plaintiffs attempt to justify requesting documents from 2016 to the present on a similar basis: "Current policies are relevant for purposes of prospective relief; policies that were in place at the time the discrete incidents in the complaint occurred are relevant for purposes of establishing *Monell* liability; and policies that were in place prior to the individual incidents show whether and to what extent the City amended its policies in response to prior complaints, which is also relevant for *Monell* liability."

Plaintiffs' arguments fail.  First, *Monell* cannot serve as the relevance theory because the facts related to *Monell* are not in dispute and in fact, the City has offered to stipulate to *Monell* liability.  *See Gonzalez v. City of Schenectady*, No. 1:09-CV-1434, 2011 U.S. Dist. LEXIS 137290, at *13 (N.D.N.Y. Nov. 30, 2011) ("additional discovery related to strip searches is unnecessary as it is undisputed that the search was conducted pursuant to the City's written policy, which had been in effect since 1999"); Ursea Decl. ¶¶2-4; Ex. 1, 2.

Second, declaratory relief cannot serve as a valid relevance theory because only current policies and practices are relevant for prospective relief—but the current pratices are not in dispute and in any event, historical documents would

not be probative of current policies and practices.  *See Bayer v. Nieman Marcus Group, Inc.*, 861 F.3d 853, 868 (9th Cir. 2017).   Because the law and analysis as to relevance based on *Monell* and declaratory relief are equally applicable here, Defendant incorporates by reference its argument as to RFP 2.

        The documents are also not proportional to the needs of the case.  To be clear, Plaintiffs are ***not*** contending that the City failed to produce documents responsive this request.  As Plaintiffs concede, "the City produced a large number of LA Sanitation policies and procedures related to Encampment cleanups and the enforcement of LAMC 56.11..."  In fact, the City has done far more than that in response to this RFP.  Not only did the City produce LASAN policies, it also produced similar documents from other City departments, including LAPD.  *See* Ursea Decl. ¶42.  In addition to conducting a reasonable investigation to find responsive documents, the City agreed to collect email communications from LAPD, LASAN, UHRC, and the City Attorney's Office—using the 30 custodians and broad search terms proposed by Plaintiffs.  Ursea Decl. ¶¶19, 23, 32, 34, 37, 43.  Furthermore, the City has repeatedly told Plaintiffs that it has not withheld non-privileged responsive documents that were uncovered during its investigation, even if the documents pre-dated the Plaintiffs' incidents.  Ursea Decl. ¶¶8, 21(d).  As Plaintiffs acknowledge: "[T]he City already produced some policy documents that were written in 2012 and even the documents produced by the City in January 2020 included documents from earlier than 2016."  Nevertheless, Plaintiffs move to compel on the basis that the City should unequivocally state in its response to this RFP that it has produced "all" responsive documents.  But given that the relevance of policies and procedures other than LAMC 56.11 and the Protocols is, at best, minimal, it is not proportional to the needs of this case to require the City to identify each and every policy, manual etc.

        The example of the "missing" policy document that Plaintiffs identify

1    underscores the overbreadth of the request and from a proportionality perspective,

2    and the unreasonableness of the demand that the City unequivocally state that it

3    has produced "all" responsive documents.  Specifically, Plaintiffs contend that the

4    City failed to produce "Executive Directive No. 16," which Plaintiffs saw

5    referenced in a presentation produced by the City.   Ursea Decl. ¶46; Ex. 26.  But

6    Executive Directive No. 16 is document from 2016 that does not even mention

7    encampment cleanups, LAMC 56.11, or seizure or destruction of homeless

8    persons' belongings.  It is entitled "Implementation of the Comprehensive

9    Homeless Strategy" and discusses how the City plans to address homelessness.  *Id.*

10   The majority of the document discusses a "housing first" approach and the City's

11   desire to decriminalize homelessness.  *Id.*  Even under the most expansive and

12   charitable reading of RFP 11, the closest Executive Directive No. 16 comes to

13   arguably being "responsive" is one fleeting reference to the City's desire to

14   "implement a street-based plan that protects public health and public safety along

15   with the civil rights of people experiencing homelessness."  *Id.*  It appears that

16   Plaintiffs read this as being "related to" encampment cleanups—but that is

17   interpretation is speculative at best, and certainly far from obvious.

18        Because the law and analysis as to proportionality are equally applicable

19   here, Defendant incorporates by reference its argument as to RFP 2.

20        Given the overbreadth of the RFP on its face, as well as Plaintiffs'

21   apparent—even broader—expectation of what constitutes a responsive document,

22   it would not be proportional to compel the City to locate, review, and produce "all"

23   responsive documents to this RFP.   As to Plaintiffs' argument that the City has

24   "waived" privilege, the City incorpates by reference its argument on that issue with

25   respect to RFP 1.

26

27

28

**REQUEST FOR PRODUCTION NO. 12:**

All policies, procedures, directives, manuals, bulletins, and special orders related to LAMC 56.11, including but not limited to the handling of people's belongings pursuant to LAMC 56.11

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request is overbroad in seeking documents dating back to April 2016, three years before Plaintiff El-Bey's specific incidents occurred as alleged in the SAC. Defendant objects that the Request is not proportional to the needs of the case, insofar as the burden or expense of searching for and producing documents dating back to April 2016, three years before the specific alleged incidents occurred, outweighs the benefit of such discovery to Plaintiff El Bey's specific claims alleged in the SAC. Subject to and without waiving these objections, Defendant responds as follows: Defendant previously produced documents responsive to this Request and will produce additional responsive documents in Defendant's possession, custody or control.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request is overbroad in seeking documents dating back to April 2016, three years before Plaintiffs' specific incidents occurred as alleged in the SAC. Defendant objects that the Request is not proportional to the needs of the case, insofar as the burden or expense of searching for and producing documents dating back to April 2016, three years before the specific alleged incidents occurred, outweighs the benefit of such discovery to Plaintiffs' specific claims alleged in the SAC. Subject to and without waiving these objections, Defendant responds as follows: Defendant previously produced documents

responsive to this Request and will produce additional responsive documents in
Defendant's possession, custody or control.

### PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 12:

Plaintiffs seek the production of policies and procedures related to Los
Angeles Municipal Code 56.11.  As with RFP 11, these documents are highly
relevant to the central issue of this case and are relevant both for establishing
*Monell* liability as well as establishing the City's practices for purposes of
prospective relief under the Declaratory Judgments Act. In both instances, in
addition to showing that the City's seizure and destruction of property is
unconstitutional, Plaintiffs also challenge the constitutionality of LAMC 56.11.
Plaintiffs allege that the ordinance is unconstitutional, not only on its face, as with
the now-enjoined "bulky item provision," but also that the ordinance is
unconstitutional, as applied.  Plaintiffs therefore seek the written policies and
procedures related to the application of the ordinance.

Plaintiffs request documents going back to April 2016 when the current
version of the ordinance was passed.  This is less than two years prior to the date
this litigation was filed and only three and a half years prior to the date Plaintiffs
provided Defendant with these RFPs.  The request encompasses all policies and
procedures currently in effect, any policies that were in effect at the time of the
Specific Incidents referenced in the SAC, and policies that have been in effect
since LAMC 56.11 was amended.  Current policies are relevant for purposes of
prospective relief; policies that were in place at the time the discrete incidents in
the complaint occurred are relevant for purposes of establishing *Monell* liability;
and policies that were in place prior to the individual incidents show whether and
to what extent the City amended its policies in response to prior complaints, which
is also relevant for *Monell* liability.  *Monell*, 436 U.S. at 690-691; *See also Henry*,

132 F.3d at 519 (*Monell* claim supported by "almost identical incident as that complained of" which put Defendant on notice as to future abuses);*Humphries*, 562 U.S. at 31 (*Monell* requirement applies to prospective relief (both declaratory and injunctive) as well as damages claims).

Defendant does not specifically object to the request on the basis of relevance, nor can it; written policies and procedures are the type of discovery always requested and used in any *Monell* or prospective relief case against a government entity.  *See e.g., Medora,* 2007 WL 9810901, at *8 (granting Plaintiff's motion to compel the production of policies and procedures to prove *Monell* liability, because "a 5-year time limitation adequately serves Plaintiff's interests in obtaining relevant documents while avoiding the imposition of undue burden and expense on Defendants").

Instead, the City objects that the request is overbroad and not proportionate to the needs of the case.  While maintaining its objections, Defendant has produced a patchwork of internal policies, procedures, manuals, bulletins, and directives since October 2019 and responded to the request by stating "Defendant previously produced documents responsive to this Request and will produce additional responsive documents in Defendant's possession, custody or control."

### a.    Defendant's Written Response Does Not Comply With Rule 34

As with RFP 11, this written response does not comply in any way with Federal Rule of Civil Procedure Rule 34(b)(2).  Defendant has maintained its objections, including myriad general objections, without identifying whether and to what extent it is withholding documents responsive to the request. It has also refused to state that it will produce all documents in its possession, custody, and control.  Neither are allowable under Rule 34(b)(2).  *See DeSilva,* 2020 WL 5947827, at *9.  Finally, Defendant has also refused to state when it will complete its production of documents, even though Rule 34(b)(2)(B) requires the City to

specifically identify a "reasonable time" it will produce responsive documents. Fed. R. Civ. Pro. 34(b)(2)(B); *see also Maiorano,* 2017 WL 4792380, at *2 (granting request to compel production of responsive documents within 14 days, based on the responding party's failure to provide any more detail other than a statement that it would produce "additional responsive documents").

Plaintiffs' concern about the sufficiency of its written responses and Defendant's production articulated in its arguments related to RFP 11 apply with equal force here. The documents identified by Plaintiffs responsive to RFP 11 would also have been responsive to RFP 12. Because the City's written responses are deficient, Plaintiffs have no way of knowing whether other documents have been withheld or have not yet been produced (or why these discrete policy documents have not been produced). Despite repeated requests since July 2020 and an amendment to the written responses following a lengthy meet and confer process, the City has failed to provide Plaintiffs with written responses that comply with Rule 34. As such, the Court should order Defendants to produce the documents and provide a statement, under penalty of perjury, attesting to the completeness of the production.

### b. Plaintiffs' Request is Not Overbroad

Although Defendant has not stated whether it is withholding documents on the basis of this objection, Defendant has maintained its objection that the request is overbroad because it seeks documents going back to April 2016, when LAMC 56.11 was amended. Defendant bears the burden of showing that this request should be denied on the basis of overbreadth, which it cannot do here. *See Thomas,* 715 F. Supp. 2d. at 1032. As described above, three years of policy documents is more than reasonable for purposes of *Monell* discovery. *See Medora,* 2007 WL 9810901, at *8 (granting five years of policy documents as part of *Monell* discovery). This is especially true in the context of this case, given that the

violation of Plaintiffs' constitutional rights is only the latest in a long line of other claims against the City for similar violations.  *See* SAC at ¶¶ 17-19 (Dkt. 43) (describing the history of claims against the City for similar violations to the ones raised by Plaintiffs). It is highly relevant whether and to what extent the City amended its policies in response to those prior complaints. *See Thomas*, 715 F. Supp. 2d at 1032 (granting a request for information going back nearly thirty years, where "in the context of th[e] action," the requested information was "necessary to conduct a comparative analysis of the operation" at issue in the litigation and such analysis was "clearly relevant to Petitioner's claims").  This request is limited to both a discrete subject and subject to significant temporal restrictions.  Therefore, it is not overbroad. *See Fulfillium*, 2018 WL 6118433, at *5 (Defendant's objections that requests were overbroad and caused undue burden are overruled because each request "was limited in to a discrete, time-limited topic.").

### c. Plaintiffs' Narrow Request is Proportional to the Needs of the Case

To the extent Defendant is withholding any documents on the basis that the request is not proportional to the needs of this case, Defendant's objection and subsequent meet and confer efforts provided no information "clarifying, explaining, and supporting its objection" that the production of policy documents related to City activities was not proportional to the needs of the case, based on the factors outlined in Rule 26. *Duran*, 258 F.R.D. at 378. But even if the City had provided a basis for asserting that the production of these documents was burdensome, the request would still be proportional to the needs of the case.  As discussed in detail above, the issues at stake in this litigation are of constitutional significance; the amount of controversy is largely irrelevant given that Plaintiffs primarily seek prospective relief to put an end to the City's unconstitutional practices; the City of Los Angeles has far more resources than the seven unhoused individuals whose belongings were seized and the volunteer organization whose

resources go to replacing those belongings, and access to its own internal policies. *See supra,* Plaintiffs' Argument re: Request No. 2.  The other factors also weigh heavily in Plaintiffs' favor.  *See* Fed. R. Civ. P. 26(b)(1).

### i.     Importance of the discovery in resolving the issues

The documents requested go directly to the central issues in this case. Plaintiffs bring an as-applied challenge to LAMC 56.11; therefore, the question of how it is applied, which may be answered in part by the City's policies and procedures, is central to this case.  The City's written policies and procedures related to the enforcement of LAMC 56.11 could establish *Monell* liability, which is required for Plaintiffs' claims under Section 1983.  *Monell*, 436 U.S. at 690-691. As such, written policies and procedures may prove critical in resolving a central issue in this case.

### ii.    Whether the burden or expense of the proposed discovery outweighs its likely benefit

Defendant objects that the burden of producing documents responsive to Plaintiffs' request is too high because the documents sought date back "three years before the specific alleged incidents occurred" and "outweighs the benefit of such discovery to" specific claims as alleged in the SAC.  As explained more fully in response to RFP 11, boilerplate objections that discovery is burdensome are insufficient.  *Leibovitz,* 2017 U.S. Dist. LEXIS 15662, at *4.  And the fact that discovery may be burdensome is not sufficient grounds for objection when the information requested is essential to the case. *Gutierrez*, 2019 WL 8060079, at *9 (Benefit outweighs burden where the information sought regarding Defendant's K-9 policies and procedures is essential to Plaintiff's *Monell* claims and Defendant provides no evidence of burden or expense). Moreover, Plaintiffs' request is narrowly tailored to a discrete topic and with significant temporal limitations. *See Fulfillium,* 2018 WL 6118433, at *5.  It is therefore proportionate to the needs of the case.

### d.     There is No Merit to the City's Other Objections

#### i.     Claims of privilege

The City incorporates a general objection into the request "insofar as said Request seeks the disclosure of communications or information protected by the attorney-client privilege, the attorney work product doctrine, the official information privilege or any other privilege." Myers Decl., ¶ 3, Exh. C.  As discussed above, despite numerous requests Defendants have not produced a privilege log.   Defendant has therefore waived this objection.  *Burlington Northern & Santa Fe Ry. Co.* at 1149. *See also DeSilva,* 2020 WL 5947827, at \*2.

#### ii.     Other boilerplate general objections

In addition to the specific objections to relevance and proportionality, the City provides three pages of general boilerplate objections.  The City simply incorporates these objections by reference into each of the requests for production, without providing any basis for the specific objection or even an assessment of whether the objection specifically applies to the request.  To the extent any of them even applied to this RFP, Defendant therefore waived these objections.  *See e.g., Bosley*, 2016 WL 1704159, at \*5.

### e.     Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce all documents responsive to RFP No. 12 within 21 days or, if the City asserts it has produced all documents responsive to the request, compelling Defendant to provide a complete, explicit response as to the search conducted to identify and produce responsive documents and to attest to the finality of their production, as required by Rule 34.

### DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 12:

Similar to RFP 11, RFP 12 seeks "<u>All</u> policies, procedures, directives, manuals, bulletins, and special orders <u>related to</u> LAMC 56.11, including but not

limited to the handling of people's belongings pursuant to LAMC 56.11 [from 2016 to the present]." (Emphasis added).  Plaintiffs argue that the documents are relevant both for establishing *Monell* liability as well as establishing the City's practices for purposes of prospective relief under the Declaratory Judgments Act. Plaintiffs' arguments fail.

First, *Monell* cannot serve as the relevance theory because the facts related to *Monell* are not in dispute and in fact, the City has offered to stipulate to *Monell* liability.  *See Gonzalez v. City of Schenectady*, No. 1:09-CV-1434, 2011 U.S. Dist. LEXIS 137290, at *13 (N.D.N.Y. Nov. 30, 2011) ("additional discovery related to strip searches is unnecessary as it is undisputed that the search was conducted pursuant to the City's written policy, which had been in effect since 1999"); Ursea Decl. ¶¶2-4; Ex. 1, 2.

Second, declaratory relief cannot serve as a relevance theory because only current policies and practices are relevant for prospective relief—but the current pratices are not in dispute and in any event, historical documents would not be probative of current policies and practices.  *See Bayer v. Nieman Marcus Group, Inc.*, 861 F.3d 853, 868 (9th Cir. 2017).   Because the law and analysis as to relevance based on *Monell* and declaratory relief are equally applicable here, Defendant incorporates by reference its argument as to RFP 2.

The documents are also not proportional to the needs of the case for the same reasons discussed in the City's response to RFP 11.  To be clear, Plaintiffs are ***not*** contending that the City failed to produce documents responsive this request.  Rather, Plaintiffs argue that the City should unequivocally state in its response to this RFP that it has produced "all" responsive documents.  But given that the relevance of policies and procedures other than LAMC 56.11 and the Protocols is, at best, minimal, it is not proportional to the needs of this case to require the City to identify each and every policy, manual etc. Because the law and

analysis as to relevance and proportionality are equally applicable here, Defendant
incorporates by reference its argument as to RFPs 2 and 11.  As to Plaintiffs'
argument that the City has "waived" privilege, the City incorpates by reference its
argument on that issue with respect to RFP 1.

**REQUEST FOR PRODUCTION NO. 13:**

All policies, procedures, directives, manuals, bulletins, and special orders,
related to storage of property pursuant to LAMC 56.11.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

Defendant incorporates the General Objections as though fully set forth here.
Defendant objects that the Request is overbroad in seeking documents dating back
to April 2016, three years before Plaintiff El-Bey's specific incidents occurred as
alleged in the SAC. Defendant objects that the Request is not proportional to the
needs of the case, insofar as the burden or expense of searching for and producing
documents dating back to April 2016, three years before the specific alleged
incidents occurred, outweighs the benefit of such discovery to Plaintiff El Bey's
specific claims alleged in the SAC. Subject to and without waiving these
objections, Defendant responds as follows: Defendant previously produced
documents responsive to this Request and will produce additional responsive
documents in Defendant's possession, custody or control.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

Defendant incorporates the General Objections as though fully set forth here.
Defendant objects that the Request is overbroad in seeking documents dating back
to April 2016, three years before Plaintiffs' specific incidents occurred as alleged
in the SAC. Defendant objects that the Request is not proportional to the needs of
the case, insofar as the burden or expense of searching for and producing
documents dating back to April 2016, three years before the specific alleged

incidents occurred, outweighs the benefit of such discovery to Plaintiffs' specific claims alleged in the SAC. Subject to and without waiving these objections, Defendant responds as follows: Defendant previously produced documents responsive to this Request and will produce additional responsive documents in Defendant's possession, custody or control.

**PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 13:**

Plaintiffs seek the production of policies and procedures related to the storage of property seized pursuant to LAMC 56.11.  Like the rest of the RFPs related to policy documents (i.e., RFPs 11-15), the documents sought are relevant both for establishing *Monell* liability as well as establishing the City's practices for purposes of prospective relief under the Declaratory Judgments Act. The City's procedures related to the storage of property is relevant to the issues of: whether the City provides sufficient due process when it seizes property; the extent to which the City could provide more process; the City's assertion that storing property, particularly bulky items, is too burdensome; and the City's compliance with the State's impound statute, Civil Code  Section 2080.1.  Finally, some of the plaintiffs specifically allege that they had difficulty obtaining property that was impounded pursuant to LAMC 56.11. As with all the policy requests, the requested time period is relevant to the individual claims, Plaintiffs' burden under *Monell*, and Plaintiffs' claims for prospective relief.  *Monell*, 436 U.S. at 690-691.

Defendant again does not specifically object to the request on the basis of relevance, nor can it; written policies and procedures about issues germane to the underlying allegations are the type of discovery always requested and used in any *Monell* or prospective relief case against a government entity.  *See e.g., Medora,* 2007 WL 9810901 at *8.  Instead, the City objects that the request is overbroad and not proportionate to the needs of the case.  While maintaining its objections,

Defendant has produced a patchwork of internal policies, procedures, manuals, bulletins, and directives since October 2019 and responded to the request by stating "Defendant previously produced documents responsive to this Request and will produce additional responsive documents in Defendant's possession, custody or control."

### a.     Defendant's Written Response Does Not Comply With Rule 34

As with the other Policy RFPs, this written response also does not comply in any way with Federal Rule of Civil Procedure Rule 34(b)(2).  Defendant has maintained its objections, including myriad general objections, without identifying whether and to what extent it is withholding documents responsive to the request. It has also refused to state that it will produce all documents in its possession, custody, and control.  Neither are allowable under Rule 34(b)(2).  *See DeSilva,* 2020 WL 5947827, at *9.  Finally, Defendant has also refused to state when it will complete its production of documents, even though Rule 34(b)(2)(B) requires the City to specifically identify a "reasonable time" it will produce responsive documents.  Fed. R. Civ. Pro. 34(b)(2)(B); *see also Maiorano,* 2017 WL 4792380, at *2 (granting request to compel production of responsive documents within 14 days, based on the responding party's failure to provide any more detail other than a statement that it would produce "additional responsive documents").

Because the City's written responses are deficient, Plaintiffs have no way of knowing whether other documents have been withheld or have not yet been produced (or why these discrete policy documents have not been produced).  Despite repeated requests since July 2020 and an amendment to the written responses following a lengthy meet and confer process, the City has failed to provide Plaintiffs with written responses that comply with Rule 34.  As such, the Court should order Defendants to produce the documents and provide a statement, under penalty of perjury, attesting to the completeness of the production.

### b.   Plaintiffs' Request is Not Overbroad

As with the rest of the policy requests, the request is "limited to a discrete, time-limited topic" that is germane to critical issues in this case. *Fulfillium,* 2018 WL 6118433, at *5. Five years of policy documents is not overbroad for a case in which Plaintiffs are required to establish *Monell* liability, *see e.g., Medora,* 2007 WL 9810901 at *8) and particularly here, given that the violation of Plaintiffs' constitutional rights is only the latest in a long line of other claims against the City for similar violations. *See* SAC at ¶¶ 17-19 (Dkt. 43) (describing the history of claims against the City for similar violations to the ones raised by Plaintiffs)).

### c.   Plaintiffs' Narrow Request is Proportional to the Needs of the Case

To the extent Defendant is withholding any documents on the basis that the request is not proportional to the needs of this case, Defendant's objection and subsequent meet and confer efforts provided no information "clarifying, explaining, and supporting its objection" that the production of policy documents related to City activities was not proportional to the needs of the case, based on the factors outlined in Rule 26. *Duran*, 258 F.R.D. at 378. But even if the City had provided a basis for asserting that the production of these documents was burdensome, the request would still be proportional to the needs of the case. As discussed in detail above, the issues at stake in this litigation are of constitutional significance; the amount of controversy is largely irrelevant given that Plaintiffs primarily seek prospective relief to put an end to the City's unconstitutional practices; and the City of Los Angeles has far more resources than the seven unhoused individuals whose belongings were seized and the volunteer organization whose resources go to replacing those belongings. *See s See supra,* Plaintiffs' Argument re: Request No. 2. The other factors also weigh heavily in Plaintiffs' favor. *See* Fed. R. Civ. P. 26(b)(1).

### i.     Parties' relative access to relevant information

Defendant should comply with discovery requests where Plaintiff has no
alternative source for critical information. *Lamon*, 2010 U.S. Dist. LEXIS 122479,
*7-8 (compelling production of documents, despite burden to Defendant because
Plaintiff has no other source of this information). Here, the City is the custodian of
its own internal policies and procedures. Without the City's cooperation, Plaintiffs
have no access to these documents to which they are entitled.  To the extent the
City asserts that Plaintiffs have sought these records from Chrysalis, which is
contracted to provide storage, this is irrelevant.  First, the City may have additional
policies and procedures that dictate its practices, including when it turns property
over to Chrysalis.  Likewise, the fact that a third party may have documents does
not absolve the City of its obligation to produce the same documents in its
possession and control.

### ii.     Importance of the discovery in resolving the issues

The documents requested go directly to the central issues in this case.
Plaintiffs bring an as-applied challenge to LAMC 56.11; therefore, the question of
how it is applied, which may be answered in part by the City's policies and
procedures, is central to this case.  The City's written policies and procedures
related to the enforcement of LAMC 56.11 could establish *Monell* liability, which
is required for Plaintiffs' claims under Section 1983. *Monell*, 436 U.S. at 690-691.
As such, written policies and procedures may prove critical in resolving a central
issue in this case.

### iii.     Whether the burden or expense of the proposed discovery outweighs its likely benefit

Defendant objects that the burden of producing documents responsive to
Plaintiffs' request is too high because the documents sought date back "three years
before the specific alleged incidents occurred" and "outweighs the benefit of such
discovery to" specific claims as alleged in the SAC.  As explained more fully in

response to RFP 11, boilerplate objections that discovery is burdensome are insufficient. *Leibovitz,* 2017 U.S. Dist. LEXIS 15662, at \*4.  And the fact that discovery may be burdensome is not sufficient grounds for objection when the information requested is essential to the case. *Gutierrez*, 2019 WL 8060079, at \*9 (Benefit outweighs burden where the information sought regarding Defendant's K-9 policies and procedures is essential to Plaintiff's *Monell* claims and Defendant provides no evidence of burden or expense). Moreover, Plaintiffs' request is narrowly tailored to a discrete topic and with significant temporal limitations. *See Fulfillium,* 2018 WL 6118433, at \*5.  It is therefore proportionate to the needs of the case.

### d.     There is No Merit to the City's Other Objections

#### i.     Claims of Privilege

The City incorporates a general objection into the request "insofar as said Request seeks the disclosure of communications or information protected by the attorney-client privilege, the attorney work product doctrine, the official information privilege or any other privilege." *See* page 2 of Amended Written Responses. As discussed above, despite numerous requests Defendants have not produced a privilege log.  Defendant has therefore waived this objection. *Burlington Northern & Santa Fe Ry. Co.* at 1149. *See also DeSilva,* 2020 WL 5947827, at \*2.

#### ii.     Other boilerplate general objections

In addition to the specific objections to relevance and proportionality, the City provides three pages of general boilerplate objections.  The City simply incorporates these objections by reference into each of the requests for production, without providing any basis for the specific objection or even an assessment of whether the objection specifically applies to the request.  To the extent any of them

even applied to this RFP, Defendant therefore waived these objections.  *See e.g., Bosley*, 2016 WL 1704159, at *5.

### e.    Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce all documents responsive to RFP No. 13 within 21 days or, if the City asserts it has produced all documents responsive to the request, compelling Defendant to provide a complete, explicit response as to the search conducted to identify and produce responsive documents and to attest to the finality of their production, as required by Rule 34.

### DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 13:

RFP 13 seeks "<u>All</u> policies, procedures, directives, manuals, bulletins, and special orders, <u>related to storage</u> of property pursuant to LAMC 56.11 [since 2016]."  (Emphasis added).

Plaintiffs argue that the documents are relevant both for establishing *Monell* liability as well as establishing the City's practices for purposes of prospective relief under the Declaratory Judgments Act.  Plaintiffs' arguments fail.

First, *Monell* cannot serve as the relevance theory because the facts related to *Monell* are not in dispute and in fact, the City has offered to stipulate to *Monell* liability.  *See Gonzalez v. City of Schenectady*, No. 1:09-CV-1434, 2011 U.S. Dist. LEXIS 137290, at *13 (N.D.N.Y. Nov. 30, 2011) ("additional discovery related to strip searches is unnecessary as it is undisputed that the search was conducted pursuant to the City's written policy, which had been in effect since 1999"); Ursea Decl. ¶¶2-4; Ex. 1, 2.

Second, declaratory relief cannot serve as a relevance theory because only current policies and practices are relevant for prospective relief—but the current pratices are not in dispute and in any event, historical documents would not be probative of

current policies and practices.  *See Bayer v. Nieman Marcus Group, Inc.*, 861 F.3d 853, 868 (9th Cir. 2017).   Because the law and analysis as to relevance based on *Monell* and declaratory relief are equally applicable here, Defendant incorporates by reference its argument as to RFP 2.

Beyond *Monell* and declaratory relief, Plaintiffs advance five additional relevance theories.  All fail.

First, Plaintiffs argue that the documents are relevant to show "whether the City provides sufficient due process when it seizes property."  But Plaintiffs do not explain how policies related to storage of property, particularly policies that predate Plaintiffs' alleged incidents by three years, will help the trier of fact determine whether Plaintiffs received sufficient due process when their items were seized during the specific incidents alleged in 2019.

Second, Plaintiffs argue that the documents are relevant to show "the extent to which the City could provide more process."  Again, Plaintiffs do not explain this conclusory statement.  And again, it is far from obvious how policies related to storage of property, particularly policies that predate Plaintiffs' alleged incidents by three years, will help the trier of fact determine whether the City could have provided more process to Plaintiffs when their items were seized during the specific incidents alleged in 2019.

Third, Plaintiffs argue that the documents are relevant to "the City's assertion that storing property, particularly bulky items, is too burdensome."  This again is a bald conclusory statement, not an explanation of relevance.  Furthermore, while it is true that the City has argued that it does not have the ability to store all the bulky items it routinely collects from public rights of way, the Court has concluded that the City's storage capacity is—as a matter of law— not relevant to determining the constitutionality of LAMC 56.11.  Lebron Decl. ¶9, Ex. 34 (Dkt. No. 36) at p.11; ¶10, Ex. 35 (Dkt. No. 58) at p. 21.

Fourth, Plaintiffs argue that the documents are relevant to "the City's compliance with the State's impound statute, Civil Code Section 2080.1." But again, Plaintiffs fail to explain how policies regarding storage, particularly ones that predate Plaintiffs' alleged incidents, has any bearing on whether the belongings Plaintiffs allege were destroyed in 2019 should have been stored.

Fifth, Plaintiffs note that the "some of the plaintiffs specifically allege that they had difficulty obtaining property that was impounded pursuant to LAMC 56.11." It is unclear what claim or defense this allegation is intended to support and Plaintiff does not explain how policies, manuals, bulletins, etc., particularly ones from 2016 forward, have any bearing on whether Plaintiffs' property was seized in violation of the Fourth Amendment and/or procedural due process.

Even if Plaintiffs had articulated a valid relevance theory, this request is not properly directed toward the City and not proportional to the needs of the case. Because the law and analysis as to proportionality are equally applicable here, Defendant incorporates by reference its argument as to RFP 2. The primary facility at which items removed during cleanups are stored is the Bin. The Bin is operated by Chrysalis, an independent contractor that provides involuntary and voluntary storage for homeless individuals under an agreement with LAHSA. Wong Decl. at ¶14. ECIs deliver non-hazardous property to storage and complete a chain of custody form transferring custody of property at the storage facility to Chrysalis. *Id.* Following the transfer, Chrysalis handles the storage, return and disposition of the property and maintains its own storage records. *Id.* LSD does not track that information following the transfer of custody at the storage facility. *Id.*

On December 8, 2020, Plaintiffs served a subpoena on Chrysalis requesting similar information requested by this RFP. Ursea Decl. ¶44, Ex. 24. Chrysalis responded and produced documents on February 15, 2021. Ursea Decl. ¶45, Ex.

26.  *See* Fed. R. Civ. Proc. 26(b)(2) (A court "must limit the frequency or extent of discovery allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained through some other source that is more convenient, less burdensome, or less expensive; …); *Caballero v. Bodega Latina Corp.*, Case No. 2:17cv-00236-JAD-VCF, 2017 U.S. Dist. LEXIS 116869, at * 8 (D. Nev. Jul. 25, 2017) ("Courts, thus, have a duty to pare down overbroad discovery requests under Rule 26(b)(2)."). In light of these facts, there is no valid basis on which to compel the City to search for and produce any and all policies from 2016 that "relate to" storage.

Because the law and analysis as to relevance and proportionality are equally applicable here, Defendant incorporates by reference its argument as to RFPs 2 and 11. As to Plaintiffs' argument that the City has "waived" privilege, the City incorpates by reference its argument on that issue with respect to RFP 1.

### REQUEST FOR PRODUCTION NO. 14:

All policies, procedures, directives, manuals, bulletins, and special orders, related to HOPE Teams.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 14:

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request is overbroad in seeking documents dating back to April 2016, three years before Plaintiff El-Bey's specific incidents occurred as alleged in the SAC. Defendant objects that the Request is not proportional to the needs of the case, insofar as the burden or expense of searching for and producing documents dating back to April 2016, three years before the specific alleged incidents occurred, outweighs the benefit of such discovery to Plaintiff El Bey's specific claims alleged in the SAC. Subject to and without waiving these objections, Defendant responds as follows: Defendant previously produced

documents responsive to this Request and will produce additional responsive
documents in Defendant's possession, custody or control.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

Defendant incorporates the General Objections as though fully set forth here.
Defendant objects that the Request is overbroad in seeking documents dating back
to April 2016, three years before Plaintiffs' specific incidents occurred as alleged
in the SAC. Defendant objects that the Request is not proportional to the needs of
the case, insofar as the burden or expense of searching for and producing
documents dating back to April 2016, three years before the specific alleged
incidents occurred, outweighs the benefit of such discovery to Plaintiffs' specific
claims alleged in the SAC. Subject to and without waiving these objections,
Defendant responds as follows: Defendant previously produced documents
responsive to this Request and will produce additional responsive documents in
Defendant's possession, custody or control.

**PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 14:**

Plaintiffs seek the production of policies and procedures related to HOPE
Teams.  Like the rest of the RFPs related to policy documents (i.e., RFPs 11-15),
the documents sought are relevant both for establishing *Monell* liability as well as
establishing the City's practices for purposes of prospective relief under the
Declaratory Judgments Act.  The HOPE Teams are a specialized detail made up of
LAPD officers and LA Sanitation employees specifically tasked with enforcement
of LAMC 56.11 in "rapid response" actions during which property is seized and
destroyed..  It is clear that HOPE teams are present at the clean ups, but it is not
transparent which HOPE teams are tasked with what jurisdiction, or how the
HOPE teams are trained or instructed to carry out their work.  In addition to the
fact that these are central issues of the case, these documents would be extremely

helpful to Plaintiffs in figuring out who to depose Plaintiffs need these documents in order to effectively question these witnesses.  Therefore, as with all the policy requests, the requested time period is relevant to the individual claims, Plaintiffs' burden under *Monell*, and Plaintiffs' claims for prospective relief.  *Monell*, 436 U.S. at 690-691.

Defendant again does not specifically object to the request on the basis of relevance, and nor can it; written policies and procedures about issues germane to the underlying allegations are the type of discovery always requested and used in any *Monell* or prospective relief case against a government entity.  *See e.g., Medora,* 2007 WL 9810901, at *8.  Instead, the City objects that the request is overbroad and not proportionate to the needs of the case.  While maintaining its objections, Defendant has produced a patchwork of internal policies, procedures, manuals, bulletins, and directives since October 2019 and responded to the request by stating "Defendant previously produced documents responsive to this Request and will produce additional responsive documents in Defendant's possession, custody or control."

### a.     Defendant's Written Response Does Not Comply With Rule 34

As with the other Policy RFPs, this written response also does not comply in any way with Federal Rule of Civil Procedure Rule 34(b)(2).  Defendant has maintained its objections, including myriad general objections, without identifying whether and to what extent it is withholding documents responsive to the request. It has also refused to state that it will produce all documents in its possession, custody, and control.  Neither are allowable under Rule 34(b)(2).  *See DeSilva,* 2020 WL 5947827, at *9. Finally, Defendant has also refused to state when it will complete its production of documents, even though Rule 34(b)(2)(B) requires the City to specifically identify a "reasonable time" it will produce responsive documents.  Fed. R. Civ. Pro. 34(b)(2)(B); *see also Maiorano,* 2017 WL 4792380,

at *2(granting request to compel production of responsive documents within 14 days, based on the responding party's failure to provide any more detail other than a statement that it would produce "additional responsive documents").

Because the City's written responses are deficient, Plaintiffs have no way of knowing whether other documents have been withheld or have not yet been produced (or why these discrete policy documents have not been produced).  Despite repeated requests since July 2020 and an amendment to the written responses following a lengthy meet and confer process, the City has failed to provide Plaintiffs with written responses that comply with Rule 34.  As such, the Court should order Defendants to produce the documents and provide a statement, under penalty of perjury, attesting to the completeness of the production.

### b.    Plaintiffs' Request is Not Overbroad

As with the rest of the policy requests, the request is "limited to a discrete, time-limited topic" that is germane to critical issues in this case.  *Fulfillium,* 2018 WL 6118433, at *5.  Five years of policy documents is not overbroad for a case in which Plaintiffs are required to establish *Monell* liability, *see e.g., Medora,* 2007 WL 9810901 at *8.  This is particularly true here, since the HOPE teams were created in 2016, largely to enforce the ordinance at the center of this case.

### c.    Plaintiffs' Narrow Request is Proportional to the Needs of the Case

To the extent Defendant is withholding any documents on the basis that the request is not proportional to the needs of this case, Defendant's objection and subsequent meet and confer efforts provided no information "clarifying, explaining, and supporting its objection" that the production of policy documents related to City activities was not proportional to the needs of the case, based on the factors outlined in Rule 26.  *Duran v. Cisco Sys., Inc.*, 258 F.R.D. 375, 378 (C.D. Cal. 2009).But even if the City had provided a basis for asserting that the production of these documents were burdensome, the request would still be

proportional to the needs of the case.  As discussed in detail above, the issues at stake in this litigation are of constitutional significance; the amount of controversy is largely irrelevant given that Plaintiffs primarily seek prospective relief to put an end to the City's unconstitutional practices; and the City of Los Angeles has far more resources than the seven unhoused individuals whose belongings were seized and the volunteer organization whose resources go to replacing those belongings.; and Plaintiffs have no access to the City's internal policies and procedures, while the City has complete access to that information.  *See supra,* Plaintiffs' Argument re: Request No. 2.  The other factors also weigh heavily in Plaintiffs' favor.  *See* F.R.C.P. 26(b)(1).

### i.    Importance of the discovery in resolving the issues

The documents requested go directly to the central issues in this case. Plaintiffs bring an as-applied challenge to LAMC 56.11; therefore, the question of how the team tasked with enforcing the ordinance is central to the case.  Moreover, the policies and procedures related to the teams that enforced the ordinance against the Plaintiffs in this case could establish *Monell* liability, which is required for Plaintiffs' claims under Section 1983. *See Gutierrez,* 2019 WL 8060079, at *9(ordering production of policies and procedures related to the K-9 unit, which is the unit alleged to have violated Plaintiff's constitutional rights).

### ii.    Whether the burden or expense of the proposed discovery outweighs its likely benefit

Defendant objects that the burden of producing documents responsive to Plaintiffs' request is too high because the documents sought date back "three years before the specific alleged incidents occurred" and "outweighs the benefit of such discovery to" specific claims as alleged in the SAC.  As explained more fully in response to RFP 11, boilerplate objections that discovery is burdensome are insufficient.  *Leibovitz,* U.S. Dist. LEXIS 15662, at *4.  And the fact that discovery may be burdensome is not sufficient grounds for objection when the information

requested is essential to the case. *Gutierrez*, 2019 WL 8060079, at *9(Benefit outweighs burden where the information sought regarding Defendant's K-9 policies and procedures is essential to Plaintiff's *Monell* claims and Defendant provides no evidence of burden or expense). Moreover, Plaintiffs' request is narrowly tailored to a discrete topic and with significant temporal locations. Additionally, Defendant's objection fails when each request is narrowly tailored with temporal limitations. *See Fulfillium,* 2018 WL 6118433, at *5.  It is therefore proportionate to the needs of the case.

### d.  There is No Merit to the City's Other Objections

#### i.  Claims of Privilege

The City incorporates a general objection into the request "insofar as said Request seeks the disclosure of communications or information protected by the attorney-client privilege, the attorney work product doctrine, the official information privilege or any other privilege." *See* page 2 of Amended Written Responses. As discussed above, despite numerous requests Defendants have not produced a privilege log.   Defendant has therefore waived this objection. *Burlington Northern & Santa Fe Ry. Co.* at 1149. *See also DeSilva,* 2020 WL 5947827, at *2.

#### ii.  Other boilerplate general objections

In addition to the specific objections to relevance and proportionality, the City provides three pages of general boilerplate objections.  The City simply incorporates these objections by reference into each of the requests for production, without providing any basis for the specific objection or even an assessment of whether the objection specifically applies to the request.  To the extent any of them even applied to this RFP, Defendant therefore waived these objections.  *See e.g., Bosley,* 2016 WL 1704159, at *5.

### e.   Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce
all documents responsive to RFP No. 14 within 21 days or, if the City asserts it has
produced all documents responsive to the request, compelling Defendant to
provide a complete, explicit response as to the search conducted to identify and
produce responsive documents and to attest to the finality of their production, as
required by Rule 34.

### DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 14:

RFP 14 seeks "<u>All</u> policies, procedures, directives, manuals, bulletins, and
special orders, <u>related to HOPE Teams</u> (<u>2016 to the present</u>). (Emphasis added).

Plaintiffs argue that the documents are relevant both for establishing *Monell*
liability as well as establishing the City's practices for purposes of prospective
relief under the Declaratory Judgments Act.  Plaintiffs' arguments fail.

First, *Monell* cannot serve as the relevance theory because the facts related
to *Monell* are not in dispute and in fact, the City has offered to stipulate to *Monell*
liability.  *See Gonzalez v. City of Schenectady*, No. 1:09-CV-1434, 2011 U.S. Dist.
LEXIS 137290, at *13 (N.D.N.Y. Nov. 30, 2011) ("additional discovery related to
strip searches is unnecessary as it is undisputed that the search was conducted
pursuant to the City's written policy, which had been in effect since 1999"); Ursea
Decl. ¶¶2-4; Ex. 1, 2.

Second, declaratory relief cannot serve as a relevance theory because only
current policies and practices are relevant for prospective relief—but the current
pratices are not in dispute and in any event, historical documents would not be
probative of current policies and practices.  *See Bayer v. Nieman Marcus Group,
Inc.*, 861 F.3d 853, 868 (9th Cir. 2017).   Because the law and analysis as to
relevance based on *Monell* and declaratory relief are equally applicable here,
Defendant incorporates by reference its argument as to RFP 2.

Plaintiff also contends that "[i]t is clear that HOPE teams are present at the clean ups, but it is not transparent which HOPE teams are tasked with what jurisdiction, or how the HOPE teams are trained or instructed to carry out their work." According to Plaintiffs, "these are central issues in the case." But Plaintiffs do not explain why the jurisdiction of HOPE teams, or their training or instruction, particularly in the abstract and wholly untethered to Plaintiffs' alleged incidents, from 2016 forward, are "central" issues to the case.

Even if Plaintiffs had articulated a valid relevance theory, this request is not proportional to the needs of the case.   Because the law and analysis as to relevance and proportionality are equally applicable here, Defendant incorporates by reference its argument as to RFPs 2 and 11.   As to Plaintiffs' argument that the City has "waived" privilege, the City incorpates by reference its argument on that issue with respect to RFP 1.

**REQUEST FOR PRODUCTION NO. 15:**

All policies, procedures, directives, manuals, bulletins, and special orders, related to the seizure or destruction of property because it constitutes an "immediate threat to the health and safety of the public."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request is overbroad in seeking documents dating back to April 2016, three years before Plaintiff El-Bey's specific incidents occurred as alleged in the SAC. Defendant objects that the Request is not proportional to the needs of the case, insofar as the burden or expense of searching for and producing documents dating back to April 2016, three years before the specific alleged incidents occurred, outweighs the benefit of such discovery to Plaintiff El Bey's specific claims alleged in the SAC. Subject to and without waiving these

objections, Defendant responds as follows: Defendant previously produced documents responsive to this Request and will produce additional responsive documents in Defendant's possession, custody or control.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request is overbroad in seeking documents dating back to April 2016, three years before Plaintiffs' specific incidents occurred as alleged in the SAC. Defendant objects that the Request is not proportional to the needs of the case, insofar as the burden or expense of searching for and producing documents dating back to April 2016, three years before the specific alleged incidents occurred, outweighs the benefit of such discovery to Plaintiffs' specific claims alleged in the SAC. Subject to and without waiving these objections, Defendant responds as follows: Defendant previously produced documents responsive to this Request and will produce additional responsive documents in Defendant's possession, custody or control.

**PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 15:**

Policy documents related to the destruction of property that constitutes an immediate threat to public health and safety is relevant to the central issue in this case, namely whether and to what extent the City destroys property that is, in fact, an immediate threat to health and safety.  This request seeks documents not just related to the enforcement of LAMC 56.11(g), which purports to allow the City to seize property from unhoused people that constitutes an immediate threat to public health and safety, see LAMC 56.11(g), but also any policies that apply more generally outside the context of LAMC 56.11.  These documents are directly relevant to the issue of when and to what extent the City seizes and destroys

property and whether the destruction of property is in fact done because it is an immediate threat to public health and safety.

Defendant again does not specifically object to the request on the basis of relevance, and nor can it; written policies and procedures about issues germane to the underlying allegations are the type of discovery always requested and used in any *Monell* or prospective relief case against a government entity. *See e.g., Medora,* 2007 WL 9810901, at *8. Instead, the City objects that the request is overbroad and not proportionate to the needs of the case. While maintaining its objections, Defendant has produced a patchwork of internal policies, procedures, manuals, bulletins, and directives since October 2019 and responded to the request by stating "Defendant previously produced documents responsive to this Request and will produce additional responsive documents in Defendant's possession, custody or control."

### a.     Defendant's Written Response Does Not Comply With Rule 34

As with the other Policy RFPs, this written response also does not comply in any way with Federal Rule of Civil Procedure Rule 34(b)(2). Defendant has maintained its objections, including myriad general objections, without identifying whether and to what extent it is withholding documents responsive to the request. It has also refused to state that it will produce all documents in its possession, custody, and control. Neither are allowable under Rule 34(b)(2). *See DeSilva,* 2020 WL 5947827, at *9. Finally, Defendant has also refused to state when it will complete its production of documents, even though Rule 34(b)(2)(B) requires the City to specifically identify a "reasonable time" it will produce responsive documents. Fed. R. Civ. Pro. 34(b)(2)(B); *see also Maiorano,* 2017 WL 4792380, at *2 (granting request to compel production of responsive documents within 14 days, based on the responding party's failure to provide any more detail other than a statement that it would produce "additional responsive documents").

120

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

Because the City's written responses are deficient, Plaintiffs have no way of knowing whether other documents have been withheld or have not yet been produced (or why these discrete policy documents have not been produced).  Despite repeated requests since July 2020 and an amendment to the written responses following a lengthy meet and confer process, the City has failed to provide Plaintiffs with written responses that comply with Rule 34.  As such, the Court should order Defendants to produce the documents and provide a statement, under penalty of perjury, attesting to the completeness of the production.

### b.    Plaintiffs' Request is Not Overbroad

As with the rest of the policy requests, the request is "limited to a discrete, time-limited topic" that is germane to critical issues in this case.  *Fulfillium,* 2018 WL 6118433, at *5.  Five years of policy documents is not overbroad for a case in which Plaintiffs are required to establish *Monell* liability, *see e.g., Medora,* 2007 WL 9810901, at *8.  This is particularly true here, since the HOPE teams were created in 2016, largely to enforce the ordinance at the center of this case.

### i.    Plaintiffs' Narrow Request is Proportional to the Needs of the Case

To the extent Defendant is withholding any documents on the basis that the request is not proportional to the needs of this case, Defendant's objection and subsequent meet and confer efforts provided no information "clarifying, explaining, and supporting its objection" that the production of policy documents related to City activities was not proportional to the needs of the case, based on the factors outlined in Rule 26.  *Duran*, 258 F.R.D. at 378. But even if the City had provided a basis for asserting that the production of these documents was burdensome, the request would still be proportional to the needs of the case.  As discussed in detail above, the issues at stake in this litigation are of constitutional significance; the amount in controversy is largely irrelevant given that Plaintiffs primarily seek prospective relief to put an end to the City's unconstitutional

practices; and the City of Los Angeles has far more resources than the seven unhoused individuals whose belongings were seized and the volunteer organization whose resources go to replacing those belongings.; and Plaintiffs have no access to the City's internal policies and procedures, while the City has complete access to that information. *See supra,* Plaintiffs' Argument re: Request No. 2. The other factors also weigh heavily in Plaintiffs' favor. *See* F.R.C.P. 26(b)(1).

### ii. Importance of the discovery in resolving the issues

The documents requested go directly to the central issues in this case—whether the City has a widespread practice and custom of destroying people's belongings in violation of the Fourth and Fourteenth Amendment. The City concedes that it destroys property that constitutes an immediate threat to public health and safety. The question of how that practice is carried out is at the center of Plaintiffs' allegations. Documents spelling out in more detail the City's practices, both related to homeless encampment cleanups and more generally, could be dispositive in this case.

### iii. Whether the burden or expense of the proposed discovery outweighs its likely benefit

Defendant objects that the burden of producing documents responsive to Plaintiffs' request is too high because the documents sought date back "three years before the specific alleged incidents occurred" and "outweighs the benefit of such discovery to" specific claims as alleged in the SAC. As explained more fully in response to RFP 11, boilerplate objections that discovery is burdensome are insufficient. *Leibovitz,* 2017 U.S. Dist. LEXIS 15662, at *4. And the fact that discovery may be burdensome is not sufficient grounds for objection when the information requested is essential to the case. *Gutierrez*, 2019 WL 8060079, at *9 (Benefit outweighs burden where the information sought regarding Defendant's K-9 policies and procedures is essential to Plaintiff's *Monell* claims and Defendant provides no evidence of burden or expense). Moreover, Plaintiffs' request is

narrowly tailored to a discrete topic and with significant temporal limitations.  *See Fulfillium,* 2018 WL 6118433, at *5.  It is therefore proportionate to the needs of the case.

### c.    There is No Merit to the City's Other Objections

#### i.    Claims of privilege

The City incorporates a general objection into the request "insofar as said Request seeks the disclosure of communications or information protected by the attorney-client privilege, the attorney work product doctrine, the official information privilege, or any other privilege." *See* page 2 of Amended Written Responses. As discussed above, despite numerous requests Defendants have not produced a privilege log.   Defendant has therefore waived this objection. *Burlington Northern & Santa Fe Ry. Co.* at 1149. *See also DeSilva,* 2020 WL 5947827, at *2.

#### ii.    Other boilerplate general objections

In addition to the specific objections to relevance and proportionality, the City provides three pages of general boilerplate objections.  The City simply incorporates these objections by reference into each of the requests for production, without providing any basis for the specific objection or even an assessment of whether the objection specifically applies to the request.  To the extent any of them even applied to this RFP, Defendant therefore waived these objections.  *See e.g., Bosley*, 2016 WL 1704159, at *5.

### d.    Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce all documents responsive to RFP No. 15 within 14 days or, if the City asserts it has produced all documents responsive to the request, compelling Defendant to provide a complete, explicit response as to the search conducted to identify and

123

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

produce responsive documents and to attest to the finality of their production, as required by Rule 34.

**DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 15:**

RFP 15 seeks: "<u>All</u> policies, procedures, directives, manuals, bulletins, and special orders, related to the seizure or destruction of property because it constitutes an "immediate threat to the health and safety of the public [2016 to the present]." (Emphasis added).

Plaintiffs argue that the documents are relevant both for establishing *Monell* liability as well as establishing the City's practices for purposes of prospective relief under the Declaratory Judgments Act. Plaintiffs' arguments fail. First, *Monell* cannot serve as the relevance theory because the facts related to *Monell* are not in dispute and in fact, the City has offered to stipulate to *Monell* liability. *See Gonzalez v. City of Schenectady*, No. 1:09-CV-1434, 2011 U.S. Dist. LEXIS 137290, at *13 (N.D.N.Y. Nov. 30, 2011) ("additional discovery related to strip searches is unnecessary as it is undisputed that the search was conducted pursuant to the City's written policy, which had been in effect since 1999"); Ursea Decl. ¶¶2-4; Ex. 1, 2.

Second, declaratory relief cannot serve as a relevance theory because only current policies and practices are relevant for prospective relief—but the current pratices are not in dispute and in any event, historical documents would not be probative of current policies and practices. *See Bayer v. Nieman Marcus Group, Inc.*, 861 F.3d 853, 868 (9th Cir. 2017). Because the law and analysis as to relevance based on *Monell* and declaratory relief are equally applicable here, Defendant incorporates by reference its argument as to RFP 2.

Plaintiffs also contend that "[p]olicy documents related to the destruction of property that constitutes an immediate threat to public health and safety is relevant

to the central issue in this case, namely whether and to what extent the City destroys property that is, in fact, an immediate threat to health and safety." But the City does not dispute that LAMC 56.11 permits it to remove and discard such health and safety hazards without notice. Likewise, the City does not dispute that it removes and discards such hazards without notice, including during encampment cleanups. Thus, the relevant issue is not whether the City had such a policy but whether the items it allegedly destroyed in 2019 were in fact health and safety hazards. Plaintiffs fail to explain how policies and manuals, particularly those dating back to 2016, would have any bearing on whether the allegedly destroyed property in fact posed an immediate threat to health and safety.

Even if Plaintiffs had articulated a valid relevance theory, this request is not proportional to the needs of the case. As Plaintiffs readily concede, the City has produced many documents responsive to this request. And the City has repeatedly stated that it will not withhold any such document it identifies in its investigation or agreed upon email review except on the basis of privilege. There is no valid basis Plaintiff's motion to compel. Because the law and analysis as to relevance and proportionality are equally applicable here, Defendant incorporates by reference its argument as to RFPs 2 and 11. As to Plaintiffs' argument that the City has "waived" privilege, the City incorpates by reference its argument on that issue with respect to RFP 1.

**REQUEST FOR PRODUCTION NO. 16:**

All DOCUMENTS related to trainings conducted by or for CITY employees, agents, or contractors regarding LAMC 56.11, including but not limited to the seizure, destruction, or storage of property pursuant to LAMC 56.11. Requested materials include but are not limited to any flyers, email communications promoting, announcing or otherwise describing the trainings; calendar invitations for any trainings; attendance or sign-in sheets for any and all

trainings; training materials, including but not limited to presentations, handouts, and manuals; presenter's notes; and notes taken by participants.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 16:

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request is overbroad and burdensome in seeking all documents regarding trainings, including all email communications, calendar invites, and notes taken by participants or presenters, all sign in sheets, and flyers relating to training dating back to April 2016, three years before Plaintiff El-Bey's specific incidents occurred as alleged in the SAC. Defendant objects that the Request seeks documents that are not relevant to Plaintiff El-Bey's specific claims alleged in the SAC relating to incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western. Defendant further objects that the Request seeks documents that are not relevant to any named-plaintiffs' claims as alleged in the SAC. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D.

Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all documents regarding trainings, including all email communications, calendar invites, and notes taken by participants or presenters, sign-in sheets, and flyers relating to training dating back to April 2016 outweighs the benefit of such information for Plaintiff El Bey's claims, and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would have to first search for all trainings and determine when such trainings occurred over a four-year period. Defendant would then have to investigate the identity of the instructor for each training and whether such training included a sign-in sheet, a list of participants, the identify of participants and instructor(s) for each training to conduct follow up searches regarding available notes and materials, and conduct searches for calendar invites and promotional emails or flyers for each training.

Defendant uses an email system known as CityMail that is based on an implementation of Google Apps Premier Edition and is used by nearly every City entity, including 40 different departments. Defendant's CityMail system uses the Google Vault system for archiving emails. Google Vault is a cloud-based data storage system; rather than being stored on locally managed servers, the archived email data is stored on remote servers that are managed by Google, Inc. and are only accessible to Defendant's office via the internet. In order to search the email archives, Defendant's Information Technology Agency ("ITA") must formulate a search query utilizing the search terms and restrictions provided by the requester.

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

Depending on the number and complexity of search terms, the number of email accounts or document custodians, and the breadth of the search, ITA may need to formulate more than one search query and scan the stored data multiple times. When the search completes, Google Vault provides preliminary information regarding the email data gathered by the search. In order to access the actual emails, however, the entire store of data must first be exported from the cloud-servers to a different "download" server to which ITA can connect via the internet and from which we can then download the data. Depending on the size of the data, the download process the most time-consuming part of gathering the email data. Even when ITA allocates multiple personnel to conduct search queries in order to speed up the archived email search and collection process, ITA is still limited by the speeds at which the data can be transferred from the download server to Defendant's local data storage devices. As downloads of batches of data become available, ITA begins the process of identifying the email addresses that accompany the data against the list of individuals identified in the data request and thereafter segregates the email stores of matching individuals. ITA would also identify and screen emails of City Attorneys begin the process of identifying and screening-out the emails of city attorneys and may need to conduct subsequent queries to screen out attorneys for purposes of compiling a list of excluded emails for a privilege log.

In addition, Defendant would need to determine whether a City department utilizes systems-based network servers that may include network folders used to store or maintain documents within a particular division or department section. In order to retrieve systems-based server folders for review, Defendant would require a technology professional who has administrator privileges to make a copy of the drive(s), which can range in size by terabytes of data. In order to search certain folders on system-based network drives, a technology professional who has

administrator privileges, would use the Microsoft Windows File Explorer search function, the limited search function available by default on Windows. The limited search capabilities of the Windows File Explorer search tool may not be able to accommodate full searches within documents or Boolean searches. The resulting hits might include systems files, applications, downloads, or media which may or may not be viewable. After Defendant has conducted searches for electronically stored information, Defendant would require the use of an e-discovery software and platform for Defendant's counsel to review, search, and tag documents and electronically stored information for responsiveness or privilege.

Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents and electronically stored information responsive to this Request for the reasons described above. Defendant also objects that discovery regarding the training of particular individuals involved in Plaintiff El-Bey's specific incidents can be obtained through other means that are less burdensome, less costly, and more convenient. Without waiving any, and based on these objections, Defendant responds that it conducted a search for accessible documents in response to this Request and will produce non-privileged LAMC 56.11 documents relating to training materials in the form maintained in the Defendant's ordinary course.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request is overbroad and burdensome in seeking all documents regarding trainings, including all email communications, calendar invites, and notes taken by participants or presenters, all sign in sheets, and flyers relating to training dating back to April 2016, three years before Plaintiffs' specific incidents occurred as alleged in the SAC. Defendant objects that the Request seeks

129

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

documents that are not relevant to Plaintiffs' specific claims alleged in the Second Amended Complaint (Dkt. No. 42, "SAC"). Plaintiff El-Bey alleges claims for specific incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western; Plaintiff Garcia alleges claims for specific incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone Avenue, on or around April 29, 2019 at Aetna Street and Van Nuys Boulevard, and on or around August 14, 2019 at Calvert and Bessemer; Plaintiffs Zamora and Zepeda allege claims for specific incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard; Plaintiff Haugabrook alleges claims for incidents occurring sometime in March 2019 and a month later by Figueroa Street and 53rd Street and 52nd Place; Plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019 at Lomita and McCoy; and Plaintiff Ashley alleges claims for a specific incident occurring on or around May 21, 2019 at Lomita and McCoy. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case

No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all documents regarding trainings, including all email communications, calendar invites, and notes taken by participants or presenters, sign-in sheets, and flyers relating to training dating back to April 2016 outweighs the benefit of such information for Plaintiffs' claims, and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiffs' alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would have to first search for all trainings and determine when such trainings occurred over a four-year period. Defendant would then have to investigate the identity of the instructor for each training and whether such training included a sign-in sheet, a list of participants, the identify of participants and instructor(s) for each training to conduct follow up searches regarding available notes and materials, and conduct searches for calendar invites and promotional emails or flyers for each training.

Defendant uses an email system known as CityMail that is based on an implementation of Google Apps Premier Edition and is used by nearly every City entity, including 40 different departments. Defendant's CityMail system uses the Google Vault system for archiving emails. Google Vault is a cloud-based data storage system; rather than being stored on locally managed servers, the archived email data is stored on remote servers that are managed by Google, Inc. and are only accessible to Defendant's office via the internet. In order to search the email archives, Defendant's Information Technology Agency ("ITA") must formulate a search query utilizing the search terms and restrictions provided by the requester.

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

Depending on the number and complexity of search terms, the number of email
accounts or document custodians, and the breadth of the search, ITA may need to
formulate more than one search query and scan the stored data multiple times.
When the search completes, Google Vault provides preliminary information
regarding the email data gathered by the search. In order to access the actual
emails, however, the entire store of data must first be exported from the cloud-
servers to a different "download" server to which ITA can connect via the internet
and from which we can then download the data. Depending on the size of the data,
the download process the most time-consuming part of gathering the email data.
Even when ITA allocates multiple personnel to conduct search queries in order to
speed up the archived email search and collection process, ITA is still limited by
the speeds at which the data can be transferred from the download server to
Defendant's local data storage devices. As downloads of batches of data become
available, ITA begins the process of identifying the email addresses that
accompany the data against the list of individuals identified in the data request and
thereafter segregates the email stores of matching individuals. ITA would also
identify and screen emails of City Attorneys begin the process of identifying and
screening-out the emails of city attorneys and may need to conduct subsequent
queries to screen out attorneys for purposes of compiling a list of excluded emails
for a privilege log.

In addition, Defendant would need to determine whether a City department
utilizes systems-based network servers that may include network folders used to
store or maintain documents within a particular division or department section. In
order to retrieve systems-based server folders for review, Defendant would require
a technology professional who has administrator privileges to make a copy of the
drive(s), which can range in size by terabytes of data. In order to search certain
folders on system-based network drives, a technology professional who has

administrator privileges, would use the Microsoft Windows File Explorer search function, the limited search function available by default on Windows. The limited search capabilities of the Windows File Explorer search tool may not be able to accommodate full searches within documents or Boolean searches. The resulting hits might include systems files, applications, downloads, or media which may or may not be viewable. After Defendant has conducted searches for electronically stored information, Defendant would require the use of an e-discovery software and platform for Defendant's counsel to review, search, and tag documents and electronically stored information for responsiveness or privilege.

Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents and electronically stored information responsive to this Request for the reasons described above. Defendant also objects that discovery regarding the training of particular individuals involved in Plaintiffs' specific incidents can be obtained through other means that are less burdensome, less costly, and more convenient. Without waiving any, and based on these objections, Defendant produced training documents relating to LAMC 56.11 and will produce additional training documents on a rolling basis.

### PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 16:

Plaintiffs seek the production of training materials related to enforcement of 56.11. The City objects on the basis of relevance, proportionality, and privilege. While maintaining its objections, Defendant has actually produced a patchwork of presentation agendas, sign-in sheets and PowerPoint slides going back to 2012.  It has not (with some exceptions), provided presenter or participant notes, calendar invitations and emails discussing the trainings.  Defendant has also refused to provide written responses that comply with Rule 34.  As such, Plaintiffs have no

way of knowing whether and to what extent the City is withholding responsive documents or even if it still has documents it intends to produce on a "rolling basis."

### a.   The Documents are Relevant to Plaintiffs' Claims

Although Defendant has produced some responsive documents, it has steadfastly maintained its objection on the basis of relevance.  There is no basis for this objection: documents related to trainings about the enforcement of LAMC 56.11 are unquestionably relevant because they pertain to one of the most central issues in this case, namely the way in which various City agencies enforce LAMC 56.11.  As discussed in detail above, Plaintiffs seek to show the City had a longstanding and persistent practice of depriving homeless individuals of their constitutional rights, not only through official policies like the now-enjoined "bulky item provision," but also through widespread customs and practices. Documents that show how employees were trained to enforce LAMC 56.11 may identify specific otherwise unwritten customs and practices that are not articulated in, for example, the ordinance or even the Standard Operating Protocols themselves.  This includes, for example, what constitutes an "inoperable" bicycle or how ECIs are trained to determine if any item is "bulky."

Training documents are also of course relevant to establishing the City's liability under *Monell* based on its failure to train its ECIs,[14] and Defendant's objection to the contrary is nonsensical.[15]  "If a concededly valid policy is

---

[14]  Although Defendant does not raise it here, in subsequent discussions about Plaintiffs' interrogatories related to trainings, the City objected that Plaintiffs have not sufficiently pled *Monell* lability based on a "failure to train" theory.  To the extent Defendant is tempted to also raise it here, it has no merit because "discovery is not limited to the issues raised by the pleadings" or "to the merits of the case." *U.S. ex rel. Carter*, 305 F.R.D. at 236 (quoting *Henderson v. Holiday CVS, L.L.C.*, 269 F.R.D. 682, 685 (S.D. Fla.2010) and relying on *Oppenheimer Fund, Inc.,* 437 U.S. at 352).

[15]  Defendant raises the same objection to relevance based on *Monell* liability here as it does in response to RFP 2.  There is also no basis for the objection here,

unconstitutionally applied by a municipal employee, the city is liable if the employee has not been adequately trained and the constitutional wrong has been caused by that failure to train." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989). Plaintiffs therefore seek LAMC 56.11-related training documents used by the City of Los Angeles, in order to determine whether the trainings given to the City employees across multiples agencies was adequate to prevent the constitutional harms alleged in this case. Training materials in use prior to the Specific Incidents are relevant to show how the trainings have changed over the course of implementing LAMC 56.11.  This is relevant to the question of whether and to what extent the City's training and policies, customs and practices regarding the enforcement of LAMC 56.11 changed in response to allegations that ECIs were violating individuals' constitutional rights. *See Connick v. Thompson*, 563 U.S. 51, 63 (2011). And of course, many of the ECIs, including the Chief ECI, Howard Wong, have been in the position of enforcing LAMC 56.11 since long before April 2016, and therefore, trainings they received would be relevant to their current conduct.

And finally, training documents may contain impeachment evidence. *Estate of Ernesto Flores,* 2017 WL 3297507, at *6; *Paulsen*, 168 F.R.D. at 289.

### b.    Defendant's Written Response Does Not Comply With Rule 34

As with the Policy RFPs (11-15), Defendant's written response here also does not comply in any way with Rule 34(b)(2).  In its initial response, Defendant stated that it "conducted a search for accessible documents in response to this Request and will produce non-privileged LAMC 56.11 documents related to training materials in the form maintained in the Defendant's ordinary course."  It

---

and in fact, the objection makes even less sense, since in the failure to train context, it is actually possible, although difficult, to assert a *Monell* claim based solely on evidence of a "single incident."  *See e.g., Connick*, 563 U.S. at 63 (explaining that hypothetically there could be a finding of liability based on evidence of a "single incident" but noting that this exception is "rare" and "narrow").

then handed over a few documents responsive to this request.[16]  In its amended response in October, Defendant continues to assert a number of objections but then agrees to "produce additional training documents on a rolling basis."

Months later, the City produced a very large number of additional documents directly responsive to this request and highly relevant to the case (including, for example, training documents stating the City's enforcement posture related to LAMC 56.11).  The City provided no explanation for its failure to produce these documents in its earlier production and still refused to state whether it is producing *all* documents in its possession, custody, and control.  It has also steadfastly maintained its objections to this request without identifying whether and to what extent it is withholding documents responsive to the request.  For example, even though Defendant objects to producing documents "three years before the alleged individual incidents occurred," the City still produced documents as far back as 2005. As a result, Plaintiffs have no way of verifying that Defendant is producing all documents responsive to its requests, or simply cherry-picking documents that support its claims, to the exclusion of other documents responsive to this request.

And finally, although Defendant has had Plaintiffs' requests for documents since October 2019, it still refuses to state when it will complete its production of documents responsive to this request.  *See Maiorano,* 2017 WL 4792380, at *2. None of this is allowed under Rule 34.

Because the written responses fail to provide the requisite information, the Court should treat this as a "failure to disclose, answer, or respond." *See* Fed. R. Civ. Pro. 34; 37 ("[f]or purposes of this subdivision (a), an evasive or incomplete

---

[16]  Despite the City's representation that it would produce the documents as kept in the ordinary course, the City produced the documents as a single combined PDF, with no metadata.  After months of refusing to produce the documents in the form in which the documents were kept, the City finally produced some, but not all, of the documents as individual PowerPoint presentations.

disclosure, answer, or response must be treated as a failure to disclose, answer, or respond"); *Louen*, 236 F.R.D. 502, at 505; *Advanced Visual Image Design, LLC.*, 2015 WL 4934178, at *3; *see also Duran,* 258 F.R.D. at 379-80).

### c.    Plaintiffs' Request is Not Overbroad

Plaintiffs seek documents related to any training the City has conducted related to LAMC 56.11 since April 2016, when the City amended the ordinance and began enforcing it. Defendant objects to this request as overbroad because the documents date back two years and eight months before the Specific Incidents occurred.  There is no merit to this objection.  As described above, reviewing training materials prior to the individual incidents is appropriate to assess, amongst other issues: 1) the substance of the trainings and the customs, policies and practices articulated in the trainings; 2) how the training materials may have changed over the course of enforcing 56.11 and why they have or have not changed; and 3) who has attended these trainings and thus may have subsequently trained others. Importantly, this is just two years and eight months prior to the first Specific Incident alleged in the complaint.  In fact, given the history of allegations related to the seizure and destruction of unhoused people's belongings which preceded this case, two years and eight months is a more than reasonable time period to review training documents leading up to the first individual incident. As with the rest of Plaintiffs' requests, this request is "limited to a discrete, time-limited topic" that is germane to critical issues in this case.  *Fulfillium,* 2018 WL 6118433, at *5.  Five years of training documents is not overbroad for a case in which Plaintiffs are required to establish *Monell* liability. *See, e.g.*, *Medora,* 2007 WL 9810901, at *8.

### d.    Plaintiffs' Narrow Request is Proportional to the Needs of the Case

Because Defendant disagrees that these documents are relevant, let alone important to the case, Defendant likewise argues that any burden, even the routine

137

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

burden of discovery is not proportionate to the needs of the case.  But this objection is without merit.  As discussed in detail above, the issues at stake in this litigation are of constitutional significance, the amount in controversy is largely irrelevant given that Plaintiffs primarily seek prospective relief to put an end to the City's unconstitutional practices, the City of Los Angeles has far more resources than the seven unhoused individuals whose belongings were seized and the volunteer organization whose resources go to replacing those belongings; and Plaintiffs have no access to the City's internal policies and procedures, while the City has complete access to that information.  *See supra,* Plaintiffs' Argument re: Request No. 2.  The other factors also weigh heavily in Plaintiffs' favor.  *See* Fed. R. Civ. P. 26(b)(1).

### i.      Importance of the discovery in resolving the issues

As with policy documents, training documents go directly to a central issue in this litigation, namely the City's policies and practices related to the enforcement of LAMC 56.11.  Evidence about how the individuals who enforce LAMC 56.11 are trained may answer questions about the existence of unconstitutional customs, policies, and practices and the question of whether those customs, policies, and practices are widespread and longstanding.  This issue is key to both *Monell* liability and to the individual plaintiffs' and KFA's claims for prospective relief.

Moreover, training documents are critical to the issue of *Monell* liability under a failure to train theory of liability, which provides that Plaintiffs can show the City acted with deliberate indifference towards the rights of its citizens, even where written policies appear to be facially constitutional. *Harris*, 489 U.S. at 392. Relevant factors include the adequacy of the training program(s), whether an inadequate training program represents a city policy, and whether that deficiency is related to Plaintiffs' injuries. *Id*. at 389-390. To that end, training documents are

critical to these issues,[17] and the documents sought (attendance lists, slides and training materials, and presenter notes) are necessary to fill in the types of details particularly relevant to this case.  Absent recordings of the trainings, presenter and participant notes often provide clarification and instruction about unwritten policies and customs that do not appear on the slides themselves.  Similarly, calendar invitations can provide details about why specific trainings are being conducted.

### ii.   Whether the burden or expense of the proposed discovery outweighs its likely benefit

Defendant argues that it would be too burdensome to produce documents responsive to this request.  As an initial matter, the fact that discovery may be burdensome is not sufficient grounds for objection when the information requested is essential to the case. *Gutierrez*, 2019 WL 8060079, at *9 (benefit outweighs burden where the information sought regarding Defendant's K-9 policies and procedures is essential to Plaintiff's *Monell* claims and Defendant provides no evidence of burden or expense).  It is especially insufficient where, as here, Plaintiffs' request is narrowly tailored to a discrete topic with significant temporal limitations.  *See Fulfillium,* 2018 WL 6118433, at *5.

In fact, the burden articulated by the City is nothing more than the burden associated with responding to any discovery at all.  The City spends nearly two pages laying out what are, in essence nothing more than the routine obligation of a party to identify responsive discovery:  1) identifying custodians; 2) formulating searches; 3) running those searches; 4) exporting data; and 5) screening for

---

[17]   In subsequent discussions about Plaintiffs' interrogatories related to trainings, the City raises for the first time the objection that Plaintiffs have not pled "failure to train."  While Defendant did not make that objection related to these RFPs, to the extent they raise it here, it has no merit.  Plaintiffs have sufficiently pled *Monell* liability and more to the point, "[d]iscovery is not limited to the issues raised by the pleadings" or "to the merits of the case."*U.S. ex rel. Carter*, 305 F.R.D. at 236 (quoting *Henderson,* 269 F.R.D. at 685 and relying on *Oppenheimer Fund, Inc.,* 437 U.S. at 352).

privilege.  The burden articulated by the City applies only to ESI, not to paper documents the City may have that are responsive to these requests, but even as to ESI, including emails, the steps laid out by the City are "common in litigation," *Sung Gon Kang,* 2020 WL 1689708, at *5.

"[L]arge corporations and institutions are expected to have the means for locating documents requested in legal matters." *Id.* (quoting Herring, 2011 WL 2433672, at *9). Defendant is the City of Los Angeles, one of the largest cities in the world, which prides itself on having "world-class IT infrastructure and applications that provide our citizens, businesses, and visitors with the digital services they expect from a leading global city."[18]  The City has a substantial Information Technology Agency and is represented by the City Attorney's office in tens if not hundreds of pending cases.  In fact, the City has been in active litigation about these specific issues since 2011.  It is untenable to suggest that it is burdensome for Defendant to, for example, "determine whether a City department utilizes systems-based network servers."  This information should be readily available, as it would be implicated in every single discovery request ever made to the City (to say nothing of the City's obligation to produce documents responsive to the CPRA).  The same is true for the steps necessary to search for documents responsive to such a discrete and time-limited request.

"A recipient that is a large or complex organization or that has received a lengthy or complex document request should be able to demonstrate a procedure for systemic compliance with the document request." *In re Citimortgage,* 2012 WL 10450139, at *4 (quoting *Meeks v. Parsons*, No. 1:03-cv-6700-LJO-GSA, 2009 WL 3003718, at 4 (E.D. Cal. Sept 18, 2009) (describing the steps that would

---

[18]   Information Technology Agency, City of Los Angeles, "About ITA," available at ita.lacity.org/about-ita.

constitute a "reasonable inquiry" in response to routine discovery).  Here, the City refuses to conduct even this "reasonable inquiry" to identify responsive documents.

Finally, the City objects to the production of emails related to this request (and all requests) on the ground that it is too burdensome.  There is simply no merit to this argument.  There is nothing in Rule 34 that distinguishes responsive emails from any other type of data or that "requires a requesting party to identify custodians or search terms." *NuVasive, Inc. v. Alphatec Holdings*, Inc., 2019 WL 4934477, at *2 (S.D. Cal. 2019). Instead, "Plaintiff must request information, regardless of how or where it is maintained by Defendants, which Defendants must address as required by Rule 34. That is discovery: a party requests information and the burden is on the producing party to locate and produce it or object legitimately to production." *Id*.  The City routinely produces emails responsive to CPRAs. *See* Riskin Decl., ¶¶ 8-9.  And the City has already produced some emails in response to RFPs focusing on the City's violation of the Preliminary Injunction.  Myers Decl., ¶ 42.

Plaintiffs attempted to address the City's burden argument by providing custodians and search terms, but while the City has agreed to search for emails, Plaintiffs provided an initial list in November, and the City has failed to provide even an estimated time when Plaintiffs will receive the documents, let alone the vast majority of the documents themselves.  Over 100 days has passed since providing the City with that information.  The City's latest email, indicating the City's intention to meet and confer about the proportionality of the request at some date in the future underscores the need for court intervention.  Plaintiffs have repeatedly offered to meet and confer about the production of emails, but Defendant still refuses to concede that Plaintiffs are entitled to the production of emails, based on its willful misrepresentation about the scope of this litigation and its untenable position that the requested documents are not relevant. This is

indefensible. The City is taking an unreasonable amount of time to produce responsive documents, which is causing significant delay.

Plaintiffs' request for documents related to trainings are relevant and proportional to the needs of the case, and there is no support for the City's contrary position.  The City cannot "show grounds for failing to provide the requested discovery," which the City must do to prevail here. *In re: Citimortgage*, 2012 WL 10450139, at *4.

### e. The Documents are "Reasonably Accessible" under Rule 26(b)(2)(B)

Defendant objects that the documents sought are not "reasonably accessible, based on the undue burden and costs associated with searching for and producing documents responsive to this Request. . . ."  To the extent the City intends this objection to refer to the special limitation for ESI under Rule 26(b)(2)(B), the objection misses the mark.

Under Rule 26(b)(2)(B), "A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost."  Fed. Rule Civ. Pro. 26 (b)(2)(B).  The burden for demonstrating that ESI is stored in sources that are not "reasonably accessible" rests on the party objecting to the discovery, and then the burden shifts to the party seeking discovery to demonstrate good cause.  *Id.* Defendant cannot meet the burden here.  As an initial matter, Rule 26(b)(2)(B) applies only to ESI, not other documents, and these documents exist in both paper and electronic form.  But even with ESI, the City's own explanation of the process for obtaining responsive documents prove why the documents are in fact "readily accessible" under Rule 26(b)(2)(B).

In *U.S. ex rel. Carter*, the Court articulated the well-established distinction between "readily accessible" documents which are subject to the standard Rule 34 analysis and "inaccessible" ESI, which is subject to the Rule 26 limitation.  In

general, inaccessible ESI "is not readily useable and must be restored to an accessible state before the data is usable," such as archival backup tapes or backups of data stored for emergency restoration. 305 F.R.D. at 238. *But see U.S. ex. rel. Guardiola*, 2015 WL 5056726, at *3-4 (even some backup documents may be deemed readily accessible if the backups can be easily restored and finding the $136,000 cost of restoration reasonable); *Sung Gon Kang*, 2020 WL 1689708, at *5 (even sources of documents that are encrypted and not searchable were still "readily accessible" under Rule 26(b)(2)(B)).  On the other hand, "[a]ctive ESI sources—e.g., active computer files or e-mail records—proceeds in the same manner as would discovery from paper sources.... No special request must be made, and no special standards apply." *Tyler,* 2015 WL 1955049, at *1 (citation omitted).

Defendants have not identified, as is its burden, what sources of data are not "readily accessible" so the parties can address the burden. *Id*. at 2.  But the City does not do so.  In fact, the City's objection spelling out the process for obtaining the documents makes clear that the relevant records are stored in active servers (and in paper copy).  No restoration of any kind is necessary.  The only step the City identifies as burdensome is downloading the data from the cloud, but "[m]oving active and easily accessible ESI from one storage medium to another does not, by itself, render it inaccessible." *Al Otra Lado v. Nielson*, 328 F.R.D. 408, 421 (S.D. Cal. 2018).  Any burden the City identifies is not in accessing the documents, but instead in compiling them for production.  That does not make the documents "inaccessible" under Rule 26(b)(2)(B).  *See Sung Gon Kang,* 2020 WL 1689708, at *5 (finding that requested documents were reasonably accessible and not burdensome where "accessing the [documents[ and their content is easily achievable but compiling the [documents] may prove somewhat time consuming").  And it is no basis for withholding the documents.  *See Carter*, 305 F.R.D. at 238

143

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

("It cannot be argued that a party should ever be relieved of its obligation to produce accessible data merely because it may take time and effort to find what is necessary.").

### f.   There is No Merit to the City's Other Objections

#### i.   Claims of privilege

The City incorporates a general objection into the request "insofar as said Request seeks the disclosure of communications or information protected by the attorney-client privilege, the attorney work product doctrine, the official information privilege or any other privilege." *See* page 2 of Amended Written Responses. As discussed above, despite numerous requests Defendants have not produced a privilege log or any other details to substantiate its boilerplate objection.  Defendant has therefore waived this objection.  *Burlington Northern & Santa Fe Ry. Co*, 408 F.3d. at 1149. *See also DeSilva,* 2020 WL 5947827, at *2.

#### ii.   Other boilerplate general objections

In addition to the specific objections to relevance and proportionality, the City provides three pages of general boilerplate objections.  The City simply incorporates these objections by reference into each of the requests for production, without providing any basis for the specific objection or even an assessment of whether the objection specifically applies to the request.  To the extent any of them even applied to this RFP, Defendant therefore waived these objections.  *See, e.g.*, *Bosley*, 2016 WL 1704159, at *5, n. 3.

### g.   Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce all documents responsive to RFP No. 16 within 21 days or, if the City asserts it has produced all documents responsive to the request, compelling Defendant to provide a complete, explicit response as to the search conducted to identify and

produce responsive documents and attesting to the finality of their production, as required by Rule 34.

**DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 16:**

RFP 16 seeks: "All DOCUMENTS related to trainings conducted by or for CITY employees, agents, or contractors regarding LAMC 56.11, including but not limited to the seizure, destruction, or storage of property pursuant to LAMC 56.11 [2016 to the present]." (Emphasis added).  "Requested materials include but are not limited to any flyers, email communications promoting, announcing or otherwise describing the trainings; calendar invitations for any trainings; attendance or sign-in sheets for any and all trainings; training materials, including but not limited to presentations, handouts, and manuals; presenter's notes; and notes taken by participants."

Plaintiffs argue that the documents are relevant both for establishing *Monell* liability as well as establishing the City's practices for purposes of prospective relief under the Declaratory Judgments Act.  Plaintiffs' arguments fail.

First, *Monell* cannot serve as the relevance theory because the facts related to *Monell* are not in dispute and in fact, the City has offered to stipulate to *Monell* liability.  *See Gonzalez v. City of Schenectady*, No. 1:09-CV-1434, 2011 U.S. Dist. LEXIS 137290, at *13 (N.D.N.Y. Nov. 30, 2011) ("additional discovery related to strip searches is unnecessary as it is undisputed that the search was conducted pursuant to the City's written policy, which had been in effect since 1999"); Ursea Decl. ¶¶2-4; Ex. 1, 2.

Second, declaratory relief cannot serve as a relevance theory because only current policies and practices are relevant for prospective relief—but the current pratices are not in dispute and in any event, historical documents would not be probative of current policies and practices.  *See Bayer v. Nieman Marcus Group,*

*Inc.*, 861 F.3d 853, 868 (9th Cir. 2017).   Because the law and analysis as to

relevance based on *Monell* and declaratory relief are equally applicable here,

Defendant incorporates by reference its argument as to RFP 2.

Plaintiffs also argue that "documents related to trainings about the

enforcement of LAMC 56.11 are unquestionably relevant because they pertain to

one of the most central issues in this case, namely the way in which various City

agencies enforce LAMC 56.11."   But the central issue in the case is not how the

City enforces LAMC 56.11 in the abstract, or even how it trains its employees to

enforce LAMC 56.11; it is whether Plaintiffs' belongings were seized in violation

of the Fourth Amendment and/or due process.   Plaintiffs do not explain how any

training documents, much less the specific documents they seek to compel—

presenter or participant notes, calendar invitations and emails discussing the

trainings, all dating from 2016 to present —would have any bearing on whether

their rights were violated during the alleged cleanups.

Plaintiffs also argue that "[t]raining materials in use prior to the Specific

Incidents are relevant to show how the trainings have changed over the course of

implementing LAMC 56.11…in response to allegations that ECIs were violating

individuals' constitutional rights."  Even if the documents showed that the City

changed its trainings after its practices were challenged, Plaintiffs do not explain

how that would have any bearing on whether their rights were violated during the

cleanup operations they allege.

Plaintiffs also contend that "many of the ECIs, including the Chief ECI,

Howard Wong, have been in the position of enforcing LAMC 56.11 since long

before April 2016, and therefore, trainings they received would be relevant to their

current conduct."  Again, the fact that ECIs received training years before

Plaintiffs' belongings were allegedly seized has no obvious relevance to the claims

or defenses in this case. Either the City violated Plaintiffs Fourth Amendment

and/or due process rights when it enforced LAMC 56.11 and seized Plaintiffs'
property during the alleged cleanups, or the seizures were reasonable and Plaintiffs
were provided sufficient due process.  What training Howard Wong or any other
ECI may have received three years before the cleanups, or at any time, is
irrelevant.  Moreover, Plaintiffs do not explain how any training documents, much
less the specific documents they seek to compel—presenter or participant notes,
calendar invitations and emails discussing the trainings, all dating from 2016 to
present —would have any bearing on whether their rights were violated during the
alleged cleanups.

Finally, Plaintiffs contend that training documents may contain
impeachment evidence.  *Estate of Ernesto Flores,* 2017 WL 3297507, at *6;
*Paulsen*, 168 F.R.D. at 289.  This conclusory statement, devoid of any explanation
or support, does not satisfy Plaintiffs' burden to prove the relevance of  all training
materials, as specifically, presenter or participant notes, calendar invitations and
emails discussing the trainings, from 2016 to present.

The request for all such documents is also not proportional to the needs of
the case.  To be clear, Plaintiffs are ***not*** contending that the City failed to produce
documents responsive this request.  Plaintiffs state that "Defendant has actually
produced a patchwork of presentation agendas, sign-in sheets and PowerPoint
slides going back to 2012."  In fact, Plaintiffs concede that "the City produced a
very large number of additional documents directly responsive to this request and
highly relevant to the case (including, for example, training documents stating the
City's enforcement posture related to LAMC 56.11)."  In addition, in response to
Plaintiffs' interrogatories regarding training, the City identified by title, bates
number, and department over 65 training-related documents the City has produced
responsive to Plaintiffs' RFPs.  Lebron Decl. ¶14, Ex. 39 (City's Amended

Objection and Responses to Plaintiff Zamora's Special Interrogatories Set One) at
pp. 7-17.

In addition to conducting a reasonable investigation to find responsive
documents, the City agreed to collect email communications from LAPD, LASAN,
UHRC, and the City Attorney's Office—using the 30 custodians and broad search
terms proposed by Plaintiffs.  Ursea Decl. ¶¶19, 23, 32, 34, 37, 43.  The City
collected over 500,000 emails using the Plaintiffs' requested custodians and search
terms.  The City's e-discovery vendor recently loaded a data set of 475,000 emails.
While the parties had initially agreed to meet and confer regarding this data set,
Plaintiffs served this stipulation while the City was in the process of producing
documents from the first 70,000 emails.  Ursea Decl. ¶¶37-42.  Furthermore, the
City has repeatedly told Plaintiffs that it has not withheld non-privileged
responsive documents that were uncovered during its investigation, even if the
documents pre-dated the Plaintiffs' incidents.  Ursea Decl. ¶¶8, 21(d).

Despite these compromises, Plaintiffs seek to compel the City to also locate,
review and produce *all* documents including "presenter or participant notes,
calendar invitations and emails discussing the trainings," and then unequivocally
state that it has produced "all" relevant documents responsive to this request.  This
imposes an enormous burden on the City as there is not a centralized database or
repository containing all LAMC 56.11 or encampment cleanup training materials
or records.  Wong Decl. ¶7.   The City has produced training materials it has
located and will produce any other training materials it locates during its
investigation and review of agreed-upon emails.  But this discovery is unnecessary
to resolve the issues in this case and the burden imposed on the City outweighs the
benefit of finding and producing *all* training documents from 2016 to the present,
including presenter notes or calendar invitations, might contain potentially relevant
information.

Because the law and analysis as to relevance and proportionality are equally applicable here, Defendant incorporates by reference its argument as to RFPs 2 and 11.  As to Plaintiffs' argument that the City has "waived" privilege, the City incorpates by reference its argument on that issue with respect to RFP 1.

**REQUEST FOR PRODUCTION NO. 17:**

All DOCUMENTS related to trainings conducted by or for CITY employees, agents, or contractors regarding ENCAMPMENT CLEANUPS, including but not limited to the seizure, destruction, or storage of property. Requested materials include but are not limited to any flyers, email communications promoting, announcing or otherwise describing the trainings; calendar invitations for the trainings; attendance or sign-in sheets for any and all trainings; training materials, including but not limited to presentations, handouts, and manuals; presenter's notes; and notes taken by participants.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request is overbroad and burdensome in seeking all documents regarding trainings, including all email communications, calendar invites, and notes taken by participants or presenters, all sign in sheets, and flyers relating to training dating back to April 2016, three years before Plaintiff El-Bey's specific incidents occurred as alleged in the SAC. Defendant objects that the Request seeks documents that are not relevant to Plaintiff El-Bey's specific claims alleged in the SAC relating to incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western. Defendant further objects that the Request seeks documents that are not relevant to any named-plaintiffs' claims as alleged in the SAC. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied

LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all documents regarding trainings, including all email communications, calendar invites, and notes taken by participants or presenters, sign-in sheets, and flyers relating to training dating back to April 2016 outweighs the benefit of such information for Plaintiff El Bey's claims, and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would have to first search for all trainings and determine when such trainings occurred over a four-year period. Defendant would then have to investigate the identity of the instructor for each training and whether such training included a sign-in sheet, a list of participants, the identify of participants and instructor(s) for each training to conduct follow up searches regarding available

notes and materials, and conduct searches for calendar invites and promotional emails or flyers for each training.

Defendant uses an email system known as CityMail that is based on an implementation of Google Apps Premier Edition and is used by nearly every City entity, including 40 different departments. Defendant's CityMail system uses the Google Vault system for archiving emails. Google Vault is a cloud-based data storage system; rather than being stored on locally managed servers, the archived email data is stored on remote servers that are managed by Google, Inc. and are only accessible to Defendant's office via the internet. In order to search the email archives, Defendant's ITA must formulate a search query utilizing the search terms and restrictions provided by the requester. Depending on the number and complexity of search terms, the number of email accounts or document custodians, and the breadth of the search, ITA may need to formulate more than one search query and scan the stored data multiple times. When the search completes, Google Vault provides preliminary information regarding the email data gathered by the search. In order to access the actual emails, however, the entire store of data must first be exported from the cloud-servers to a different "download" server to which ITA can connect via the internet and from which we can then download the data. Depending on the size of the data, the download process the most time-consuming part of gathering the email data. Even when ITA allocates multiple personnel to conduct search queries in order to speed up the archived email search and collection process, ITA is still limited by the speeds at which the data can be transferred from the download server to Defendant's local data storage devices. As downloads of batches of data become available, ITA begins the process of identifying the email addresses that accompany the data against the list of individuals identified in the data request and thereafter segregates the email stores of matching individuals. ITA would also identify and screen emails of City

Attorneys begin the process of identifying and screening-out the emails of city attorneys and may need to conduct subsequent queries to screen out attorneys for purposes of compiling a list of excluded emails for a privilege log.

In addition, Defendant would need to determine whether a City department utilizes systems-based network servers that may include network folders used to store or maintain documents within a particular division or department section. In order to retrieve systems-based server folders for review, Defendant would require a technology professional who has administrator privileges to make a copy of the drive(s), which can range in size by terabytes of data. In order to search certain folders on system-based network drives, a technology professional who has administrator privileges, would use the Microsoft Windows File Explorer search function, the limited search function available by default on Windows. The limited search capabilities of the Windows File Explorer search tool may not be able to accommodate full searches within documents or Boolean searches. The resulting hits might include systems files, applications, downloads, or media which may or may not be viewable. After Defendant has conducted searches for electronically stored information, Defendant would require the use of an e-discovery software and platform for Defendant's counsel to review, search, and tag documents and electronically stored information for responsiveness or privilege.

Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents and electronically stored information responsive to this Request for the reasons described above. Defendant also objects that discovery regarding the training of particular individuals involved in Plaintiff El-Bey's specific incidents can be obtained through other means that are less burdensome, less costly, and more convenient. Without waiving any, and based on these objections, Defendant responds that it conducted a search for accessible documents

in response to this Request and will produce non-privileged documents relating to encampment cleanup training materials in the form maintained in the Defendant's ordinary course.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request is overbroad and burdensome in seeking all documents regarding trainings, including all email communications, calendar invites, and notes taken by participants or presenters, all sign in sheets, and flyers relating to training dating back to April 2016, three years before Plaintiffs' specific incidents occurred as alleged in the SAC. Defendant objects that the Request seeks documents that are not relevant to Plaintiffs' specific claims alleged in the Second Amended Complaint (Dkt. No. 42, "SAC"). Plaintiff El-Bey alleges claims for specific incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western; Plaintiff Garcia alleges claims for specific incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone Avenue, on or around April 29, 2019 at Aetna Street and Van Nuys Boulevard, and on or around August 14, 2019 at Calvert and Bessemer; Plaintiffs Zamora and Zepeda allege claims for specific incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard; Plaintiff Haugabrook alleges claims for incidents occurring sometime in March 2019 and a month later by Figueroa Street and 53rd Street and 52nd Place; Plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019 at Lomita and McCoy; and Plaintiff Ashley alleges claims for a specific incident occurring on or around May 21, 2019 at Lomita and McCoy. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets

KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all documents regarding trainings, including all email communications, calendar invites, and notes taken by participants or presenters, sign-in sheets, and flyers relating to training dating back to April 2016 outweighs the benefit of such information for Plaintiffs' specific claims, and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would have to first search for all trainings and determine when such trainings occurred over a four-year period. Defendant would then have to investigate the identity of the instructor for each training and whether such training included a sign-in sheet, a list of participants, the identify of participants and instructor(s) for each training to conduct follow up searches regarding available

notes and materials, and conduct searches for calendar invites and promotional emails or flyers for each training.

Defendant uses an email system known as CityMail that is based on an implementation of Google Apps Premier Edition and is used by nearly every City entity, including 40 different departments. Defendant's CityMail system uses the Google Vault system for archiving emails. Google Vault is a cloud-based data storage system; rather than being stored on locally managed servers, the archived email data is stored on remote servers that are managed by Google, Inc. and are only accessible to Defendant's office via the internet. In order to search the email archives, Defendant's ITA must formulate a search query utilizing the search terms and restrictions provided by the requester. Depending on the number and complexity of search terms, the number of email accounts or document custodians, and the breadth of the search, ITA may need to formulate more than one search query and scan the stored data multiple times. When the search completes, Google Vault provides preliminary information regarding the email data gathered by the search. In order to access the actual emails, however, the entire store of data must first be exported from the cloud-servers to a different "download" server to which ITA can connect via the internet and from which we can then download the data. Depending on the size of the data, the download process the most time-consuming part of gathering the email data. Even when ITA allocates multiple personnel to conduct search queries in order to speed up the archived email search and collection process, ITA is still limited by the speeds at which the data can be transferred from the download server to Defendant's local data storage devices. As downloads of batches of data become available, ITA begins the process of identifying the email addresses that accompany the data against the list of individuals identified in the data request and thereafter segregates the email stores of matching individuals. ITA would also identify and screen emails of City

Attorneys begin the process of identifying and screening-out the emails of city attorneys and may need to conduct subsequent queries to screen out attorneys for purposes of compiling a list of excluded emails for a privilege log.

In addition, Defendant would need to determine whether a City department utilizes systems-based network servers that may include network folders used to store or maintain documents within a particular division or department section. In order to retrieve systems-based server folders for review, Defendant would require a technology professional who has administrator privileges to make a copy of the drive(s), which can range in size by terabytes of data. In order to search certain folders on system-based network drives, a technology professional who has administrator privileges, would use the Microsoft Windows File Explorer search function, the limited search function available by default on Windows. The limited search capabilities of the Windows File Explorer search tool may not be able to accommodate full searches within documents or Boolean searches. The resulting hits might include systems files, applications, downloads, or media which may or may not be viewable. After Defendant has conducted searches for electronically stored information, Defendant would require the use of an e-discovery software and platform for Defendant's counsel to review, search, and tag documents and electronically stored information for responsiveness or privilege.

Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents and electronically stored information responsive to this Request for the reasons described above. Defendant also objects that discovery regarding the training of particular individuals involved in Plaintiffs' specific incidents can be obtained through other means that are less burdensome, less costly, and more convenient. Without waiving any, and based on these objections,

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

Defendant produced training documents relating to encampment cleanups and will produce additional training documents on a rolling basis.

**PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 17:**

Plaintiffs seek the production of training materials related to Encampment Cleanups.  The City puts forth the same three pages it put forth in response to RFP 16 in response to this request.  The City continues to object that the documents are not relevant, overbroad and burdensome, and not proportionate to the needs of the case.  As with RFP 16, the City has maintained its objections while still producing a patchwork of presentation agendas, sign-in sheets and slides. The City has not, however, provided nearly any presenter or participant notes, calendar invitations, or email discussions about the training.  And as with RFP 16, Defendant has also refused to provide written responses that comply with Rule 34.  As such, Plaintiffs have no way of knowing whether and to what extent the City is withholding responsive documents or even if it still has documents it intends to produce on a "rolling basis."

Because the City's response to RFP 17 is identical to RFP 16, and many of the arguments are the same (which is true for all of the training RFPs), except as noted below, Plaintiffs incorporate by reference the arguments regarding RFP 16 here.

**a.      The Requested Documents are Relevant**

Although Defendant has produced some responsive documents, it continues to maintain that these documents are not relevant.  There is simply no basis for this objection: documents related to trainings about Encampment Cleanups are unquestionably relevant to the question of how the City conducts Encampment Cleanups, which are at the center of this litigation.  Training documents are also of course relevant to establishing the City's liability under *Monell* based on its failure

to train its ECIs. For the same reasons this objection to RFP 16 was wholly without merit, it is also meritless here.

### b.    Defendant's Written Response Does Not Comply With Rule 34

The written response to RFP 17 is, to a word, identical to its response to RFP 16, and for the same reasons the response to RFP 16 is insufficient, the response here is also insufficient.

### c.    The Request is Not Overbroad

Likewise, RFP 17 covers the same timeframe as RFP 16.  Notably, because the City has conducted Encampment Cleanups prior to April 2016 when LAMC 56.11 was amended, there are likely relevant documents that date much farther back than 2016. n seeking only a limited time frame that was consistent across all the RFPs, Plaintiffs specifically attempted to balance Defendant's objections with the needs of this case.  And as with the rest of the training requests, Plaintiffs seek trainings that cover only a discrete topic.  Therefore, the requests are not overbroad.  *See Fulfillium,* 2018 WL 6118433, at *5.

### d.    Plaintiffs' Narrow Request is Proportional to the Needs of the Case

As with training documents related to enforcement of LAMC 56.11, training documents related to how the City conducts Encampment Cleanups are likewise critical to core issues in this case:  1) how the City conducted the cleanups that led to the violation of the individual Plaintiffs' rights; 2) the existence of customs, practices, and policies related to those cleanups; 3) the extent to which those customs, practices and policies violate the U.S. and California Constitutions; and 4) the extent to which the City trained individuals conducting the cleanups.  As discussed in detail in response to RFP 16, these requests are proportionate to the needs of the case, given the Rule 26(b)(1) factors.

### e.    There is No Merit to Defendant's Other Objections

As with RFP 16, the City fails to provide any information to support the rest
of its objections.  It fails to identify any storage that is not reasonably accessible.
Nor does it provide any support for the application of the general objections to the
RFP.  Finally, the City has failed to produce any information whatsoever, let alone
a privilege log, to even indicate whether it is withholding documents on the basis
of privilege, let alone that the privilege is warranted. As such, and for the reasons
spelled out in the response to RFP 16, the rest of Defendant's objections are
waived. *See, e.g.*, *Burlington Northern & Santa Fe Ry. Co.* at 1149; *Bosley,* 2016
WL 1704159, at *5.

### f.    Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce
all documents responsive to RFP No. 17 within 21 days or, if the City asserts it has
produced all documents responsive to the request, compelling Defendant to
provide a complete, explicit response as to the search conducted to identify and
produce responsive documents and attesting to the finality of their production, as
required by Rule 34.

### DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 17:

Similar to RFP 16, RFP 17 seeks: "<u>All</u> DOCUMENTS <u>related to trainings</u>
conducted by or for CITY employees, agents, or contractors <u>regarding</u>
<u>ENCAMPMENT CLEANUPS</u>, including but not limited to the seizure,
destruction, or storage of property [<u>April 2016 to the present</u>]."  (Emphasis added).
"<u>Requested materials include but are not limited to</u> any flyers, email
communications promoting, announcing or otherwise describing the trainings;
calendar invitations for the trainings; attendance or sign-in sheets for any and all
trainings; training materials, including but not limited to presentations, handouts,

159

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO
REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

1   and manuals; presenter's notes; and notes taken by participants." (Emphasis
2   added).

3       Plaintiffs argue that the documents are relevant both for establishing *Monell*
4   liability as well as establishing the City's practices for purposes of prospective
5   relief under the Declaratory Judgments Act.

6       Plaintiffs' arguments fail.  First, *Monell* cannot serve as the relevance theory
7   because the facts related to Monell are not in dispute and in fact, the City has
8   offered to stipulate to Monell liability.  *See Gonzalez v. City of Schenectady*, No.
9   1:09-CV-1434, 2011 U.S. Dist. LEXIS 137290, at *13 (N.D.N.Y. Nov. 30, 2011)
10  ("additional discovery related to strip searches is unnecessary as it is undisputed
11  that the search was conducted pursuant to the City's written policy, which had been
12  in effect since 1999"); Ursea Decl. ¶¶2-4; Ex. 1, 2.

13      Second, declaratory relief cannot serve as a relevance theory because only
14  current policies and practices are relevant for prospective relief—but the current
15  pratices are not in dispute and in any event, historical documents would not be
16  probative of current policies and practices.  *See Bayer v. Nieman Marcus Group,*
17  *Inc.*, 861 F.3d 853, 868 (9th Cir. 2017).   Because the law and analysis as to
18  relevance based on *Monell* and declaratory relief are equally applicable here,
19  Defendant incorporates by reference its argument as to RFP 2.

20      Again, Plaintiffs do not allege that the City failed to produce responsive
21  documents but that it is entitled to all responsive documents, regardless the burden
22  associated with locating all such documents and despite the fact that Plaintiffs have
23  not articulated a valid relevance theory for such documents.  Plaintiffs incorporate
24  by reference their arguments as to RFP 16 based on the similarities of the requests
25  and issues.  The City likewise incorporates by reference its arguments as to RFP
26  16.  Also, because the law and analysis as to relevance and proportionality are
27  equally applicable here, Defendant incorporates by reference its argument as to

28

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO
REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

RFPs 2 and 11.  As to Plaintiffs' argument that the City has "waived" privilege, the City incorpates by reference its argument on that issue with respect to RFP 1.

### REQUEST FOR PRODUCTION NO. 18:

All DOCUMENTS related to trainings conducted by or for CITY employees, agents, or contractors regarding illegal dumping. Requested materials include but are not limited to any flyers, email communications promoting, announcing or otherwise describing the trainings; calendar invitations for the trainings; attendance or sign-in sheets for any and all trainings; training materials, including but not limited to presentations, handouts, and manuals; presenter's notes; notes taken by participants.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 18:

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request is overbroad and burdensome in seeking all documents regarding trainings, including all email communications, calendar invites, and notes taken by participants or presenters, all sign in sheets, and flyers relating to training dating back to April 2016, three years before Plaintiff El-Bey's specific incidents occurred as alleged in the SAC. Defendant objects that the Request seeks documents that are not relevant to Plaintiff El-Bey's specific claims alleged in the SAC relating to incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western. Defendant further objects that the Request seeks documents that are not relevant to any named-plaintiffs' claims as alleged in the SAC. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was

161

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all documents regarding trainings, including all email communications, calendar invites, and notes taken by participants or presenters, sign-in sheets, and flyers relating to training dating back to April 2016 outweighs the benefit of such information for Plaintiff El Bey's claims, and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would have to first search for all trainings and determine when such trainings occurred over a four-year period. Defendant would then have to investigate the identity of the instructor for each training and whether such training included a sign-in sheet, a list of participants, the identify of participants and instructor(s) for each training to conduct follow up searches regarding available notes and materials, and conduct searches for calendar invites and promotional emails or flyers for each training.

Defendant uses an email system known as CityMail that is based on an implementation of Google Apps Premier Edition and is used by nearly every City

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

entity, including 40 different departments. Defendant's CityMail system uses the
Google Vault system for archiving emails. Google Vault is a cloud-based data
storage system; rather than being stored on locally managed servers, the archived
email data is stored on remote servers that are managed by Google, Inc. and are
only accessible to Defendant's office via the internet. In order to search the email
archives, Defendant's ITA must formulate a search query utilizing the search terms
and restrictions provided by the requester. Depending on the number and
complexity of search terms, the number of email accounts or document custodians,
and the breadth of the search, ITA may need to formulate more than one search
query and scan the stored data multiple times. When the search completes, Google
Vault provides preliminary information regarding the email data gathered by the
search. In order to access the actual emails, however, the entire store of data must
first be exported from the cloud-servers to a different "download" server to which
ITA can connect via the internet and from which we can then download the data.
Depending on the size of the data, the download process the most time-consuming
part of gathering the email data. Even when ITA allocates multiple personnel to
conduct search queries in order to speed up the archived email search and
collection process, ITA is still limited by the speeds at which the data can be
transferred from the download server to Defendant's local data storage devices. As
downloads of batches of data become available, ITA begins the process of
identifying the email addresses that accompany the data against the list of
individuals identified in the data request and thereafter segregates the email stores
of matching individuals. ITA would also identify and screen emails of City
Attorneys begin the process of identifying and screening-out the emails of city
attorneys and may need to conduct subsequent queries to screen out attorneys for
purposes of compiling a list of excluded emails for a privilege log.

In addition, Defendant would need to determine whether a City department utilizes systems-based network servers that may include network folders used to store or maintain documents within a particular division or department section. In order to retrieve systems-based server folders for review, Defendant would require a technology professional who has administrator privileges to make a copy of the drive(s), which can range in size by terabytes of data. In order to search certain folders on system-based network drives, a technology professional who has administrator privileges, would use the Microsoft Windows File Explorer search function, the limited search function available by default on Windows. The limited search capabilities of the Windows File Explorer search tool may not be able to accommodate full searches within documents or Boolean searches. The resulting hits might include systems files, applications, downloads, or media which may or may not be viewable. After Defendant has conducted searches for electronically stored information, Defendant would require the use of an e-discovery software and platform for Defendant's counsel to review, search, and tag documents and electronically stored information for responsiveness or privilege.

Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents and electronically stored information responsive to this Request for the reasons described above. Defendant also objects that discovery regarding the training of particular individuals involved in Plaintiff El-Bey's specific incidents can be obtained through other means that are less burdensome, less costly, and more convenient. Without waiving any, and based on these objections, Defendant responds that it conducted a search for accessible documents in response to this Request and will produce non-privileged documents relating to illegal dumping training materials in the form maintained in the Defendant's ordinary course.

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

Defendant incorporates the General Objections as though fully set forth here.

Defendant objects that the Request is overbroad and burdensome in seeking all

documents regarding trainings, including all email communications, calendar

invites, and notes taken by participants or presenters, all sign in sheets, and flyers

relating to training dating back to April 2016, three years before Plaintiffs'

incidents occurred as alleged in the SAC. Defendant objects that the Request seeks

documents that are not relevant to Plaintiffs' specific claims alleged in the Second

Amended Complaint (Dkt. No. 42, "SAC"). Plaintiff El-Bey alleges claims for

specific incidents occurring on or around January 10, 2019 at 6th Street and

Alexandria and on or around June 4, 2019 at Oakwood and Western; Plaintiff

Garcia alleges claims for specific incidents occurring on or around January 29,

2019 at Aetna Street and Tyrone Avenue, on or around April 29, 2019 at Aetna

Street and Van Nuys Boulevard, and on or around August 14, 2019 at Calvert and

Bessemer; Plaintiffs Zamora and Zepeda allege claims for specific incidents

occurring on or around March 21, 2019 at 6th Street and Ardmore and on or

around June 11, 2019 at 5th Street and Harvard; Plaintiff Haugabrook alleges

claims for incidents occurring sometime in March 2019 and a month later by

Figueroa Street and 53rd Street and 52nd Place; Plaintiff Diocson alleges claims

for a specific incident on or around April 24, 2019 at Lomita and McCoy; and

Plaintiff Ashley alleges claims for a specific incident occurring on or around May

21, 2019 at Lomita and McCoy. The Court struck Plaintiff KFA's claims seeking

any declaration that the City unconstitutionally applied LAMC 56.11 or the City's

policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets

KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies

and practices are unconstitutional and not that each past application of those

policies and practices to its members was unconstitutional."). Defendant also

objects that the proposed discovery is not relevant to establishing *Monell* liability

for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument

that "it need only raise a single incident … to hold the City liable under *Monell*.").

Defendant also objects to the Request to the extent the Request seeks information

protected from disclosure by the attorney-client privilege and or attorney work

product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,*

219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case

No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal.

Sep. 9, 2013).

     Defendant further objects that the Request is burdensome and not

proportional to the needs of the case, insofar as the burden of searching for and

producing all documents regarding trainings, including all email communications,

calendar invites, and notes taken by participants or presenters, sign-in sheets, and

flyers relating to training dating back to April 2016 outweighs the benefit of such

information for Plaintiffs' claims, and Defendant's costs or expense in conducting

the search and producing documents greatly exceeds the amount in controversy for

Plaintiff's alleged damages.

     Specifically, in order to search for and obtain documents responsive to the

Request, Defendant would have to first search for all trainings and determine when

such trainings occurred over a four-year period. Defendant would then have to

investigate the identity of the instructor for each training and whether such training

included a sign-in sheet, a list of participants, the identify of participants and

instructor(s) for each training to conduct follow up searches regarding available

notes and materials, and conduct searches for calendar invites and promotional

emails or flyers for each training.

     Defendant uses an email system known as CityMail that is based on an

implementation of Google Apps Premier Edition and is used by nearly every City

entity, including 40 different departments. Defendant's CityMail system uses the
Google Vault system for archiving emails. Google Vault is a cloud-based data
storage system; rather than being stored on locally managed servers, the archived
email data is stored on remote servers that are managed by Google, Inc. and are
only accessible to Defendant's office via the internet. In order to search the email
archives, Defendant's ITA must formulate a search query utilizing the search terms
and restrictions provided by the requester. Depending on the number and
complexity of search terms, the number of email accounts or document custodians,
and the breadth of the search, ITA may need to formulate more than one search
query and scan the stored data multiple times. When the search completes, Google
Vault provides preliminary information regarding the email data gathered by the
search. In order to access the actual emails, however, the entire store of data must
first be exported from the cloud-servers to a different "download" server to which
ITA can connect via the internet and from which we can then download the data.
Depending on the size of the data, the download process the most time-consuming
part of gathering the email data. Even when ITA allocates multiple personnel to
conduct search queries in order to speed up the archived email search and
collection process, ITA is still limited by the speeds at which the data can be
transferred from the download server to Defendant's local data storage devices. As
downloads of batches of data become available, ITA begins the process of
identifying the email addresses that accompany the data against the list of
individuals identified in the data request and thereafter segregates the email stores
of matching individuals. ITA would also identify and screen emails of City
Attorneys begin the process of identifying and screening-out the emails of city
attorneys and may need to conduct subsequent queries to screen out attorneys for
purposes of compiling a list of excluded emails for a privilege log.

In addition, Defendant would need to determine whether a City department utilizes systems-based network servers that may include network folders used to store or maintain documents within a particular division or department section. In order to retrieve systems-based server folders for review, Defendant would require a technology professional who has administrator privileges to make a copy of the drive(s), which can range in size by terabytes of data. In order to search certain folders on system-based network drives, a technology professional who has administrator privileges, would use the Microsoft Windows File Explorer search function, the limited search function available by default on Windows. The limited search capabilities of the Windows File Explorer search tool may not be able to accommodate full searches within documents or Boolean searches. The resulting hits might include systems files, applications, downloads, or media which may or may not be viewable. After Defendant has conducted searches for electronically stored information, Defendant would require the use of an e-discovery software and platform for Defendant's counsel to review, search, and tag documents and electronically stored information for responsiveness or privilege.

Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents and electronically stored information responsive to this Request for the reasons described above. Defendant also objects that discovery regarding the training of particular individuals involved in Plaintiff El-Bey's specific incidents can be obtained through other means that are less burdensome, less costly, and more convenient. Without waiving any, and based on these objections, Defendant produced training documents relating to illegal dumping and will produce additional training documents on a rolling basis.

**PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 18:**

Plaintiffs seek the production of training materials related to illegal
dumping.  The City puts forth the same three pages of objections it put forth in
response to RFP 16 (and the rest of the Training RFPs).  The City continues to
object that the documents are not relevant, overbroad and burdensome, and not
proportionate to the needs of the case.  As with RFP 16, the City has maintained its
objections, while still asserting that it has produced "training documents related to
illegal dumping and will produce additional training documents on a rolling basis."
In fact, the City has produced few, if any, documents responsive to this request.
Unlike RFPs 16 and 17 — where the City produced at least a handful of slides,
training materials, etc. that can be inferred are responsive to those requests — here
Plaintiffs have been unable to identify any documents that relate specifically to
illegal dumping and not, for example, Encampment Cleanups or enforcement of
LAMC 56.11, even though they would be directly responsive to this request.
Because Defendant has provided an identical written response here and to the other
Training RFPs, Plaintiffs have no way of knowing whether and to what extent the
City is withholding responsive documents.

Because the City's response to RFP 18 s identical to RFP 16, and many of
the arguments are the same (which is true for all of the training RFPs), except as
noted below, Plaintiffs incorporate by reference the arguments regarding RFP 16
here.

### a.    The Requested Documents are Relevant

Defendant continues to maintain that these documents are not relevant.
There is simply no basis for this objection: Documents related to trainings about
illegal dumping are relevant to the question of how Defendant identifies what is an
Encampment, which is subject to one set of protocols, and illegal dumping, which

is subject to another set of protocols. In fact, Defendant specifically raised the issue of illegal dumping in its opposition to the Preliminary Injunction (confusingly arguing both that the City has the authority and does not have the authority to remove a chair under its anti-dumping ordinance). *Compare e.g.*, Def's Opposition to Preliminary Injunction (Dkt. 42) at 15 (the City "could seize and destroy the chair under its anti-dumping ordinance"); 18 ("Anti-dumping provisions of the LAMC and state law do not authorize property removal"). The evidence is therefore also relevant for impeachment purposes. *Estate of Ernesto Flores,* 2017 WL 3297507, at *6; *Paulsen*, 168 F.R.D. at 289.

### b.  Defendant's Written Response Does Not Comply With Rule 34

The written response to RFP 18 is, almost to a word, identical to its response to RFP 16, and for the same reasons the response to RFP 16 is insufficient, the response here is also insufficient.

### c.  The Request is Not Overbroad

Likewise, RFP 18 covers the same timeframe as RFP 16.  Notably, because the City likely cleaned up encampments pursuant to its "illegal dumping" authority prior to April 2016 when LAMC 56.11 was amended, there are likely relevant documents that date much farther back than 2016; in seeking only a limited time frame that was consistent across all the RFPs, Plaintiffs specifically attempted to balance Defendant's objections with the needs of this case.  And as with the rest of the training requests, Plaintiffs seek trainings that cover only this discrete topic. Therefore, the requests are not overbroad. *See Fulfillium,* 2018 WL 6118433, at *5.

### d.  Plaintiffs' Narrow Request is Proportional to the Needs of the Case

As with training documents related to enforcement of LAMC 56.11, training documents related to how the City trains its officers and employees to address illegal dumping is likewise critical to core issues in this case:  how the City seizes and destroys items in the City's public rights of way; and the extent to which the

170

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

City trained individuals addressing illegal dumping.  The City puts forth no specific objections to the request for illegal dumping, and searching for documents responsive to this request is no more burdensome than searching for other training documents (presumably it would have done so at the same time).  As discussed in detail in response to RFP 16, these requests are proportionate to the needs of the case, given the Rule 26(b)(1) factors.

### e.    There is No Merit to Defendant's Other Objections

As with RFP 16, the City fails to provide any information to support the rest of its objections.  It fails to identify any storage that is not reasonably accessible.  Nor does it provide any support for the application of the general objections to the RFP.  Finally, the City has failed to produce any information whatsoever to even indicate whether it is withholding documents on the basis of privilege, let alone that the privilege is warranted. As such, and for the reasons spelled out in the response to RFP 16, the rest of Defendant's objections are waived. *See, e.g.*, *Burlington Northern & Santa Fe Ry. Co.* at 1149; *Bosley,* 2016 WL 1704159, at *5.

### f.    Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce all documents responsive to RFP No. 18 within 21 days or, if the City asserts it has produced all documents responsive to the request, compelling Defendant to provide a complete, explicit response as to the search conducted to identify and produce responsive documents and attesting to the finality of their production, as required by Rule 34.

**DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 18:**

RFP 18 seeks: "<u>All</u> DOCUMENTS <u>related to trainings</u> conducted by or for CITY employees, agents, or contractors <u>regarding illegal dumping</u> [<u>2016 to the present</u>.] (Emphasis added).

Plaintiffs argue that the documents are relevant both for establishing *Monell* liability as well as establishing the City's practices for purposes of prospective relief under the Declaratory Judgments Act.

Plaintiffs' arguments fail.  First, *Monell* cannot serve as the relevance theory because the facts related to *Monell* are not in dispute and in fact, the City has offered to stipulate to *Monell* liability.  *See Gonzalez v. City of Schenectady*, No. 1:09-CV-1434, 2011 U.S. Dist. LEXIS 137290, at *13 (N.D.N.Y. Nov. 30, 2011) ("additional discovery related to strip searches is unnecessary as it is undisputed that the search was conducted pursuant to the City's written policy, which had been in effect since 1999"); Ursea Decl. ¶¶2-4; Ex. 1, 2.

Second, declaratory relief cannot serve as a relevance theory because only current policies and practices are relevant for prospective relief—but the current pratices are not in dispute and in any event, historical documents would not be probative of current policies and practices.  *See Bayer v. Nieman Marcus Group, Inc.*, 861 F.3d 853, 868 (9th Cir. 2017).   Because the law and analysis as to relevance based on *Monell* and declaratory relief are equally applicable here, Defendant incorporates by reference its argument as to RFP 2.

Plaintiffs also argue that "[d]ocuments related to trainings about illegal dumping are relevant to the question of how Defendant identifies what is an Encampment, which is subject to one set of protocols, and illegal dumping, which is subject to another set of protocols."  Given that Plaintiffs concede that illegal dumping is subject to "another set of protocols," it is far from clear how training

materials about illegal dumping, and particularly notes, calendar invitations about such trainings dating back to 2016, are relevant to whether Plaintiffs' rights were infringed during encampment cleanups in 2019.

Again, Plaintiffs do not allege that the City failed to produce responsive documents.  Instead, Plaintiffs contend that they "have been unable to identify any documents that relate specifically to illegal dumping and not, for example, Encampment Cleanups or enforcement of LAMC 56.11…".  But Plaintiffs do not explain why training materials that discuss *only* illegal dumping, and not encampment cleanups, would have any relevance whatsoever to this case. Plaintiffs incorporate by reference their arguments as to RFP 16 based on the similarities of the requests and issues.  The City likewise incorporates by reference its arguments as to RFP 16.  Also, because the law and analysis as to relevance and proportionality are equally applicable here, Defendant incorporates by reference its argument as to RFPs 2 and 11.  As to Plaintiffs' argument that the City has "waived" privilege, the City incorpates by reference its argument on that issue with respect to RFP 1.

**REQUEST FOR PRODUCTION NO. 19:**

All DOCUMENTS related to trainings conducted by or for CITY employees, agents, or contractors at any time since January 1, 2012 regarding what constitutes "an immediate threat to public health and safety," including but not limited to the seizure, destruction, or storage or property on this basis. Requested materials include but are not limited to any flyers, email communications promoting, announcing or otherwise describing the trainings; calendar invitations for any trainings; attendance or sign-in sheets for any and all trainings; training materials, including but not limited to presentations, handouts, and manuals; presenter's notes; and notes taken by participants.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request is overbroad and burdensome in seeking all documents regarding trainings, including all email communications, calendar invites, and notes taken by participants or presenters, all sign in sheets, and flyers relating to training dating back to January 1, 2012, seven years before Plaintiff El-Bey's specific incidents occurred as alleged in the SAC. Defendant objects that the Request seeks documents that are not relevant to Plaintiff El-Bey's specific claims alleged in the SAC relating to incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western. Defendant further objects that the Request seeks documents that are not relevant to any named-plaintiffs' claims as alleged in the SAC. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

174

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

Defendant further objects that the Request is burdensome and not
proportional to the needs of the case, insofar as the burden of searching for and
producing all documents regarding trainings, including all email communications,
calendar invites, and notes taken by participants or presenters, sign-in sheets, and
flyers relating to training dating back over seven years to January 1, 2012
outweighs the benefit of such information for Plaintiff El Bey's claims, and
Defendant's costs or expense in conducting the search and producing documents
greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, in order to search for and obtain documents responsive to the
Request, Defendant would have to first search for all trainings and determine when
such trainings occurred over a seven-year period. Defendant would then have to
investigate the identity of the instructor for each training and whether such training
included a sign-in sheet, a list of participants, the identify of participants and
instructor(s) for each training to conduct follow up searches regarding available
notes and materials, and conduct searches for calendar invites and promotional
emails or flyers for each training.

Defendant uses an email system known as CityMail that is based on an
implementation of Google Apps Premier Edition and is used by nearly every City
entity, including 40 different departments. Defendant's CityMail system uses the
Google Vault system for archiving emails. Google Vault is a cloud-based data
storage system; rather than being stored on locally managed servers, the archived
email data is stored on remote servers that are managed by Google, Inc. and are
only accessible to Defendant's office via the internet. In order to search the email
archives, Defendant's ITA must formulate a search query utilizing the search terms
and restrictions provided by the requester. Depending on the number and
complexity of search terms, the number of email accounts or document custodians,
and the breadth of the search, ITA may need to formulate more than one search

query and scan the stored data multiple times. When the search completes, Google Vault provides preliminary information regarding the email data gathered by the search. In order to access the actual emails, however, the entire store of data must first be exported from the cloud-servers to a different "download" server to which ITA can connect via the internet and from which we can then download the data. Depending on the size of the data, the download process the most time-consuming part of gathering the email data. Even when ITA allocates multiple personnel to conduct search queries in order to speed up the archived email search and collection process, ITA is still limited by the speeds at which the data can be transferred from the download server to Defendant's local data storage devices. As downloads of batches of data become available, ITA begins the process of identifying the email addresses that accompany the data against the list of individuals identified in the data request and thereafter segregates the email stores of matching individuals. ITA would also identify and screen emails of City Attorneys begin the process of identifying and screening-out the emails of city attorneys and may need to conduct subsequent queries to screen out attorneys for purposes of compiling a list of excluded emails for a privilege log.

In addition, Defendant would need to determine whether a City department utilizes systems-based network servers that may include network folders used to store or maintain documents within a particular division or department section. In order to retrieve systems-based server folders for review, Defendant would require a technology professional who has administrator privileges to make a copy of the drive(s), which can range in size by terabytes of data. In order to search certain folders on system-based network drives, a technology professional who has administrator privileges, would use the Microsoft Windows File Explorer search function, the limited search function available by default on Windows. The limited search capabilities of the Windows File Explorer search tool may not be able to

accommodate full searches within documents or Boolean searches. The resulting hits might include systems files, applications, downloads, or media which may or may not be viewable. After Defendant has conducted searches for electronically stored information, Defendant would require the use of an e-discovery software and platform for Defendant's counsel to review, search, and tag documents and electronically stored information for responsiveness or privilege.

Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents and electronically stored information responsive to this Request for the reasons described above. Defendant also objects that discovery regarding the training of particular individuals involved in Plaintiff El-Bey's specific incidents can be obtained through other means that are less burdensome, less costly, and more convenient. Without waiving any, and based on these objections, Defendant responds that it conducted a search for accessible documents in response to this Request and will produce non-privileged documents relating to encampment cleanup training materials in the form maintained in the Defendant's ordinary course.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request is overbroad and burdensome in seeking all documents regarding trainings, including all email communications, calendar invites, and notes taken by participants or presenters, all sign in sheets, and flyers relating to training dating back to January 1, 2012, seven years before Plaintiffs specific incidents occurred as alleged in the SAC. Defendant objects that the Request seeks documents that are not relevant to Plaintiffs' specific claims alleged in the Second Amended Complaint (Dkt. No. 42, "SAC"). Plaintiff El-Bey alleges claims for specific incidents occurring on or around January 10, 2019 at 6th Street

and Alexandria and on or around June 4, 2019 at Oakwood and Western; Plaintiff Garcia alleges claims for specific incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone Avenue, on or around April 29, 2019 at Aetna Street and Van Nuys Boulevard, and on or around August 14, 2019 at Calvert and Bessemer; Plaintiffs Zamora and Zepeda allege claims for specific incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard; Plaintiff Haugabrook alleges claims for incidents occurring sometime in March 2019 and a month later by Figueroa Street and 53rd Street and 52nd Place; Plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019 at Lomita and McCoy; and Plaintiff Ashley alleges claims for a specific incident occurring on or around May 21, 2019 at Lomita and McCoy. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all documents regarding trainings, including all email communications, calendar invites, and notes taken by participants or presenters, sign-in sheets, and flyers relating to training dating back over seven years to January 1, 2012 outweighs the benefit of such information for Plaintiffs' claims, and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiffs' alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would have to first search for all trainings and determine when such trainings occurred over a seven-year period. Defendant would then have to investigate the identity of the instructor for each training and whether such training included a sign-in sheet, a list of participants, the identify of participants and instructor(s) for each training to conduct follow up searches regarding available notes and materials, and conduct searches for calendar invites and promotional emails or flyers for each training.

Defendant uses an email system known as CityMail that is based on an implementation of Google Apps Premier Edition and is used by nearly every City entity, including 40 different departments. Defendant's CityMail system uses the Google Vault system for archiving emails. Google Vault is a cloud-based data storage system; rather than being stored on locally managed servers, the archived email data is stored on remote servers that are managed by Google, Inc. and are only accessible to Defendant's office via the internet. In order to search the email archives, Defendant's ITA must formulate a search query utilizing the search terms and restrictions provided by the requester. Depending on the number and complexity of search terms, the number of email accounts or document custodians, and the breadth of the search, ITA may need to formulate more than one search

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

query and scan the stored data multiple times. When the search completes, Google Vault provides preliminary information regarding the email data gathered by the search. In order to access the actual emails, however, the entire store of data must first be exported from the cloud-servers to a different "download" server to which ITA can connect via the internet and from which we can then download the data. Depending on the size of the data, the download process the most time-consuming part of gathering the email data. Even when ITA allocates multiple personnel to conduct search queries in order to speed up the archived email search and collection process, ITA is still limited by the speeds at which the data can be transferred from the download server to Defendant's local data storage devices. As downloads of batches of data become available, ITA begins the process of identifying the email addresses that accompany the data against the list of individuals identified in the data request and thereafter segregates the email stores of matching individuals. ITA would also identify and screen emails of City Attorneys begin the process of identifying and screening-out the emails of city attorneys and may need to conduct subsequent queries to screen out attorneys for purposes of compiling a list of excluded emails for a privilege log.

In addition, Defendant would need to determine whether a City department utilizes systems-based network servers that may include network folders used to store or maintain documents within a particular division or department section. In order to retrieve systems-based server folders for review, Defendant would require a technology professional who has administrator privileges to make a copy of the drive(s), which can range in size by terabytes of data. In order to search certain folders on system-based network drives, a technology professional who has administrator privileges, would use the Microsoft Windows File Explorer search function, the limited search function available by default on Windows. The limited search capabilities of the Windows File Explorer search tool may not be able to

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO
REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

accommodate full searches within documents or Boolean searches. The resulting

hits might include systems files, applications, downloads, or media which may or

may not be viewable. After Defendant has conducted searches for electronically

stored information, Defendant would require the use of an e-discovery software

and platform for Defendant's counsel to review, search, and tag documents and

electronically stored information for responsiveness or privilege.

Defendant objects that the Request seeks documents that are not reasonably

accessible based on the undue burden and costs associated with searching for and

producing documents and electronically stored information responsive to this

Request for the reasons described above. Defendant also objects that discovery

regarding the training of particular individuals involved in Plaintiffs' specific

incidents can be obtained through other means that are less burdensome, less

costly, and more convenient. Without waiving any, and based on these objections,

Defendant produced training documents relating to hazardous materials and

immediate threats to public health and safety and will produce additional training

documents on a rolling basis.

**PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 19:**

Plaintiffs seek the production of training materials related to what constitutes

"an immediate threat to public health and safety" going back to January 1, 2012.

The City puts forth the same three pages of it put forth in response to RFP 16 to

this request.  The City continues to object that the documents are not relevant,

overbroad and burdensome, and not proportionate to the needs of the case.  As

with RFP 16, the City has maintained it objections while still producing a

patchwork of presentation agendas, sign-in sheets and slides. The City has not,

however, provided nearly any presenter or participant notes, calendar invitations,

or email discussions about the training.  As with RFP 16, Defendant has also

refused to provide written responses that comply with Rule 34. As such, Plaintiffs have no way of knowing whether and to what extent the City is withholding responsive documents or even if it still has documents it intends to produce on a "rolling basis."

Because the City's response to RFP 18 is identical to RFP 16, and many of the arguments are the same (which is true for all of the training RFPs), except as noted below, Plaintiffs incorporate by reference the arguments regarding RFP 16 here.

### a. The Requested Documents are Relevant

Although Defendant has produced some responsive documents, it continues to maintain that these documents are not relevant. There is simply no basis for this objection. The identification of items as "an immediate threat to public health and safety" is the primary basis upon which the City destroys, rather than impounds people's belongings, including the Plaintiffs in this case. It is a central issue in this case, and therefore, trainings on these topics are highly relevant. Defendant's continued insistence that these documents are not relevant is simply indefensible and an abuse of the discovery process.

### b. Defendant's Written Response Does Not Comply With Rule 34

The written response to RFP 19 is, almost to a word, identical to its response to RFP 16, and for the same reasons the response to RFP 16 is insufficient, the response here is also insufficient.

### c. The Request is Not Overbroad

Because of the centrality of the issue to this litigation, RFP 19 covers a broader timeframe than any other RFP. Specifically, Plaintiffs seek documents going back to 2012, which is related to the upholding of the Preliminary Injunction in *Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005 (C.D. Cal. 2011) *affirmed* 693 F.3d 1022 (9th Cir. 2012). In that injunction, the District Court prohibited the

City from seizing and destroying property "unless it is an immediate threat to public health and safety."  797 F. Supp. 2d at 1022.  This language is the origin for the provision in LAMC 56.11, which the City relies on to seize and destroy people's belongings, including the Plaintiffs'.  *See* LAMC 56.11(g) ("Without prior notice, the City may remove and may discard any Personal Property….[that] poses an immediate threat to the health or safety of the public.").  As such, Plaintiffs seek trainings that go back to the origin of the use of the term, and the trainings that were conducted as a result of these rulings and going forward.  The request is therefore appropriately time-limited, and as with the rest of the training requests, Plaintiffs seek trainings that cover only a discrete topic.  Therefore, the requests are not overbroad.  *See Fulfillium,* 2018 WL 6118433, at *5.

### d.  Plaintiffs' Narrow Request is Proportional to the Needs of the Case

As with training documents related to enforcement of LAMC 56.11, training documents related to how the City identifies what constitutes an immediate threat to public health and safety are likewise critical to core issues in this case:  whether and to what extent the City's immediate destruction of property is reasonable and the extent to which the City could provide more due process prior to that destruction.  There are few issues more central to this case.  Because, as discussed in the response to RFP 16, the only burden identified by Defendant is the burden that comes simply from conducting discovery, the requests are proportionate to the needs of the case, given the Rule 26(b)(1) factors.

### e.  There is No Merit to Defendant's Other Objections

As with RFP 16, the City fails to provide any information to support the rest of its objections.  It fails to identify any storage that is not "reasonably accessible."  Nor does it provide any support for the application of the general objections to the RFP.  Finally, the City has failed to produce any information whatsoever to even indicate whether it is withholding documents on the basis of privilege, let alone

that the privilege is warranted. As such, and for the reasons spelled out in the response to RFP 16, the rest of Defendant's objections are waived.  *See, e.g.*, *Burlington Northern & Santa Fe Ry. Co.* at 1149;  *Bosley,* 2016 WL 1704159, at *5.

### f.    Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce all documents responsive to RFP No. 19 within 21 days or, if the City asserts it has produced all documents responsive to the request, compelling Defendant to provide a complete, explicit response as to the search conducted to identify and produce responsive documents and attesting to the finality of their production, as required by Rule 34.

## DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 19:

RFP 19 seeks: "All DOCUMENTS related to trainings conducted by or for CITY employees, agents, or contractors at any time since January 1, 2012 regarding what constitutes "an immediate threat to public health and safety," including but not limited to the seizure, destruction, or storage or property on this basis."  (Emphasis added).  "Requested materials include but are not limited to any flyers, email communications promoting, announcing or otherwise describing the trainings; calendar invitations for any trainings; attendance or sign-in sheets for any and all trainings; training materials, including but not limited to presentations, handouts, and manuals; presenter's notes; and notes taken by participants."  (Emphasis added).

Plaintiffs argue that the documents are relevant both for establishing *Monell* liability as well as establishing the City's practices for purposes of prospective relief under the Declaratory Judgments Act.  Plaintiffs' arguments fail.

First, *Monell* cannot serve as the relevance theory because the facts related to *Monell* are not in dispute and in fact, the City has offered to stipulate to *Monell* liability. *See Gonzalez v. City of Schenectady*, No. 1:09-CV-1434, 2011 U.S. Dist. LEXIS 137290, at *13 (N.D.N.Y. Nov. 30, 2011) ("additional discovery related to strip searches is unnecessary as it is undisputed that the search was conducted pursuant to the City's written policy, which had been in effect since 1999"); Ursea Decl. ¶¶2-4; Ex. 1, 2.

Second, declaratory relief cannot serve as a relevance theory because only current policies and practices are relevant for prospective relief—but the current pratices are not in dispute and in any event, historical documents would not be probative of current policies and practices. *See Bayer v. Nieman Marcus Group, Inc.*, 861 F.3d 853, 868 (9th Cir. 2017).  Because the law and analysis as to relevance based on *Monell* and declaratory relief are equally applicable here, Defendant incorporates by reference its argument as to RFP 2.

Plaintiffs also contend that documents going back to 2012 are relevant because that date relates to the upholding of the Preliminary Injunction in *Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005 (C.D. Cal. 2011) *affirmed* 693 F.3d 1022 (9th Cir. 2012), in which "the District Court prohibited the City from seizing and destroying property 'unless it is an immediate threat to public health and safety.' 797 F. Supp. 2d at 1022.  Plaintiffs further contend that "[t]his language is the origin for the provision in LAMC 56.11, which the City relies on to seize and destroy people's belongings, including the Plaintiffs'.  As such, Plaintiffs seek trainings that go back to the origin of the use of the term, and the trainings that were conducted as a result of these rulings and going forward."  Plaintiffs' argument fails to establish the relevance of this RFP.  Plaintiffs fail to explain how the City's interpretation of the term "immediate threat to public health and safety" in 2012 has any bearing on how that term is interpreted now.  In any event, the

question is not how the City interprets the term "immediate threat to public health and safety" in the abstract but rather whether the property Plaintiffs alleged was destroyed in 2019 did in fact pose an immediate threat to public health and safety.

As with all the training-related RFPs, Plaintiffs concede that the City has produced responsive documents; Plaintiffs' motion seeks to compel the production of *all* such documents, this time dating back to seven years before the alleged incidents giving rise to this case occurred.  Plaintiffs' motion has no merit. Plaintiffs incorporate by reference their arguments as to RFP 16 based on the similarities of the requests and issues.  The City likewise incorporates by reference their arguments as to RFP 16.  Also, because the law and analysis as to relevance and proportionality are equally applicable here, Defendant incorporates by reference its argument as to RFPs 2 and 11.  As to Plaintiffs' argument that the City has "waived" privilege, the City incorpates by reference its argument on that issue with respect to RFP 1.

**REQUEST FOR PRODUCTION NO. 23:**

All COMMUNICATIONS related to the use of forms used by the CITY or any of its contractors or subcontractors, including Chrysalis, LAHSA, and Clean Harbors, that are related to ENCAMPMENT CLEANUPS, including but not limited to any email instructions or clarifications related to the use of the forms.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiff El-Bey's specific claims alleged in the SAC relating to incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western. Defendant further objects that the Request seeks documents that are not relevant to any named-plaintiffs' claims as alleged in the

SAC.  The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident ... to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking all communications, including emails, regarding the use of forms by Defendant, LAHSA, Chrysalis, and Clean Harbors dating back to April 2016, three years before Plaintiff El-Bey's specific incidents occurred as alleged in the SAC.  Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all communications, including emails, regarding the use of forms by Defendant, LAHSA, Chrysalis, and Clean Harbors dating back to April 2016 outweighs the benefit of such information for Plaintiff El Bey's claims, and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would have to investigate the identify of all potential

custodians who may have sent or received an email regarding the use of form for an encampment cleanup over a four-year period, including personnel from LASAN, UHRC, LAPD, the City Attorney's Office, and possibly other City departments.  Defendant would then have to conduct search parameters for all communications over a four-year period involving all identified custodians from different City departments.

Defendant uses an email system known as City Mail that is based on an implementation of Google Apps Premier Edition and is used by nearly every City entity, including 40 different departments. Defendant's City Mail system uses the Google Vault system for archiving emails. Google Vault is a cloud-based data storage system; rather than being stored on locally managed servers, the archived email data is stored on remote servers that are managed by Google, Inc. and are only accessible to Defendant's office via the internet. In order to search the email archives, Defendant's ITA must formulate a search query utilizing the search terms and restrictions provided by the requester.  Depending on the number and complexity of search terms, the number of email accounts or document custodians, and the breadth of the search, ITA may need to formulate more than one search query and scan the stored data multiple times.  When the search completes, Google Vault provides preliminary information regarding the email data gathered by the search.  In order to access the actual emails, however, the entire store of data must first be exported from the cloud-servers to a different "download" server to which ITA can connect via the internet and from which we can then download the data. Depending on the size of the data, the download process the most time-consuming part of gathering the email data.  Even when ITA allocates multiple personnel to conduct search queries in order to speed up the archived email search and collection process, ITA is still limited by the speeds at which the data can be transferred from the download server to Defendant's local data storage devices. As

downloads of batches of data become available, ITA begins the process of identifying the email addresses that accompany the data against the list of individuals identified in the data request and thereafter segregates the email stores of matching individuals. ITA would also identify and screen emails of City Attorneys begin the process of identifying and screening-out the emails of city attorneys and may need to conduct subsequent queries to screen out attorneys for purposes of compiling a list of excluded emails for a privilege log.

In addition, Defendant would need to determine whether a City department utilizes systems-based network servers that may include network folders used to store or maintain communications within a particular division or department section.  In order to retrieve systems-based server folders for review, Defendant would require a technology professional who has administrator privileges to make a copy of the drive(s), which can range in size by terabytes of data.  In order to search certain folders on system-based network drives, a technology professional who has administrator privileges, would use the Microsoft Windows File Explorer search function, the limited search function available by default on Windows.  The limited search capabilities of the Windows File Explorer search tool may not be able to accommodate full searches within documents or Boolean searches.  The resulting hits might include systems files, applications, downloads, or media which may or may not be viewable. After Defendant has conducted searches for electronically stored information, Defendant would require the use of an e-discovery software and platform for Defendant's counsel to review, search, and tag documents and electronically stored information for responsiveness or privilege.

Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents and electronically stored information responsive to this

Request for the reasons described above. Without waiving any, and based on these objections, no documents will be produced in response to this Request.

### AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 23:

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiffs' specific claims alleged in the Second Amended Complaint (Dkt. No. 42, "SAC").  Plaintiff El-Bey alleges claims for specific incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western; Plaintiff Garcia alleges claims for specific incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone Avenue, on or around April 29, 2019 at Aetna Street and Van Nuys Boulevard, and on or around August 14, 2019 at Calvert and Bessemer; Plaintiffs Zamora and Zepeda allege claims for specific incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard; Plaintiff Haugabrook alleges claims for incidents occurring sometime in March 2019 and a month later by Figueroa Street and 53rd Street and 52nd Place; Plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019 at Lomita and McCoy; and Plaintiff Ashley alleges claims for a specific incident occurring on or around May 21, 2019 at Lomita and McCoy. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident ...

190

to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking all communications, including emails, regarding the use of forms by Defendant, LAHSA, Chrysalis, and Clean Harbors dating back to April 2016, three years before Plaintiffs' specific incidents occurred as alleged in the SAC.  Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all communications, including emails, regarding the use of forms by Defendant, LAHSA, Chrysalis, and Clean Harbors dating back to April 2016 outweighs the benefit of such information for Plaintiffs 'claims, and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would have to investigate the identify of all potential custodians who may have sent or received an email regarding the use of form for an encampment cleanup over a four-year period, including personnel from LASAN, UHRC, LAPD, the City Attorney's Office, and possibly other City departments.  Defendant would then have to conduct search parameters for all communications over a four-year period involving all identified custodians from different City departments.

Defendant uses an email system known as City Mail that is based on an implementation of Google Apps Premier Edition and is used by nearly every City

entity, including 40 different departments. Defendant's City Mail system uses the Google Vault system for archiving emails. Google Vault is a cloud-based data storage system; rather than being stored on locally managed servers, the archived email data is stored on remote servers that are managed by Google, Inc. and are only accessible to Defendant's office via the internet. In order to search the email archives, Defendant's ITA must formulate a search query utilizing the search terms and restrictions provided by the requester.  Depending on the number and complexity of search terms, the number of email accounts or document custodians, and the breadth of the search, ITA may need to formulate more than one search query and scan the stored data multiple times.  When the search completes, Google Vault provides preliminary information regarding the email data gathered by the search.  In order to access the actual emails, however, the entire store of data must first be exported from the cloud-servers to a different "download" server to which ITA can connect via the internet and from which we can then download the data. Depending on the size of the data, the download process the most time-consuming part of gathering the email data.  Even when ITA allocates multiple personnel to conduct search queries in order to speed up the archived email search and collection process, ITA is still limited by the speeds at which the data can be transferred from the download server to Defendant's local data storage devices. As downloads of batches of data become available, ITA begins the process of identifying the email addresses that accompany the data against the list of individuals identified in the data request and thereafter segregates the email stores of matching individuals. ITA would also identify and screen emails of City Attorneys begin the process of identifying and screening-out the emails of city attorneys and may need to conduct subsequent queries to screen out attorneys for purposes of compiling a list of excluded emails for a privilege log.

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

In addition, Defendant would need to determine whether a City department utilizes systems-based network servers that may include network folders used to store or maintain communications within a particular division or department section.  In order to retrieve systems-based server folders for review, Defendant would require a technology professional who has administrator privileges to make a copy of the drive(s), which can range in size by terabytes of data.  In order to search certain folders on system-based network drives, a technology professional who has administrator privileges, would use the Microsoft Windows File Explorer search function, the limited search function available by default on Windows.  The limited search capabilities of the Windows File Explorer search tool may not be able to accommodate full searches within documents or Boolean searches.  The resulting hits might include systems files, applications, downloads, or media which may or may not be viewable. After Defendant has conducted searches for electronically stored information, Defendant would require the use of an e-discovery software and platform for Defendant's counsel to review, search, and tag documents and electronically stored information for responsiveness or privilege.

Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents and electronically stored information responsive to this Request for the reasons described above. Subject to and without waiving these objections, Defendant previously produced certain documents responsive to this Request, including LASAN interdepartmental memoranda and instructions regarding the use of forms for encampment cleanups.

### PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 23:

RFPs 21-23 seek documents related to the forms used by the City and its contractors and subcontractors.  RFP 21 seeks the forms itself.  RFP 22 seeks

instructions, training materials and policies related to the use of these forms. RFP 23 seeks communications related to the use of these forms, including any email communications related to the use of these forms. The City has produced documents responsive to the first two requests, and further agrees to produce additional documents, if any, in its possession, custody or control. With regards to this request, the City objects to the production of any documents responsive to this request.  Other than the past production of "interdepartmental memoranda and instructions regarding the use of forms for encampment cleanups," which would be responsive to RFP 22, the City did not agree to produce any records responsive to this request.  Since then, the City agreed to produce emails responsive to Plaintiffs' request, yet despite the fact that Plaintiffs provided the City with an initial list of search terms and custodians more than 100 days ago, the City has not provided any emails responsive to this request, nor has it provided any information regarding the use of search terms or even answered any of Plaintiffs' repeated requests for a timeline related to the production of documents, or identified a date certain by which the City will produce emails.  The City has refused to meet and confer about any of the issues it has asserted would cause delay, and as of March 3, 2021, continued to assert that the production of emails is neither relevant nor proportional to the needs of the case.

At this point, the City's failure to produce responsive documents or respond to Plaintiffs' repeated requests for a date certain by which the documents will be produced amounts to a refusal to produce documents, and Plaintiffs seek an order compelling production of these documents.

### a.    The Documents are Relevant

Communications related to the use of forms documenting encampment cleanups are relevant for a number of reasons.  As discussed in detail above, the City itself contends that the documentation of Encampment Cleanups is important,

not only as evidence of cleanups, but also to guide the cleanups themselves.  *See, e.g.*, Myers Decl., Exh. J at ¶ 52 (describing items as "determined to be contaminated material under the Health Hazzard Checklist").  *See also* Order Granting Plaintiffs' Motion for Preliminary Injunction (Dkt. 58).  As Mr. Wong and the District Court noted, hazards are documented on the Health Hazards checklist and guided by the categories that are listed on the checklist.  *See, e.g.*, Myers Decl., Exh. J at ¶ 16 "([The Livability Services Division] added vectors on its health hazard checklist specifically because of the prevalence of this hazard in encampments.").  Therefore, communications about the forms are relevant to the core issues in this case.

Second, the City has attempted to enter the documents into evidence as a business record.  *See id.*, ¶¶ 24-40.  *See also* Fed. Rule Evid. 803(b).  Therefore, communications related to the use of the forms are relevant to the question of whether and to what extent the records qualify as business records.  *See, e.g.*, *U.S. v. Miller*, 771 F.2d 1219, 1237 (9th Cir. 1985) (discussing the admissibility of business records and noting that "record will not be admissible, however, if the source of information or the method or circumstances of preparation indicate a lack of trustworthiness").

Third, as discussed in detail in response to RFPs 2 and 33 and 34, the documentation of encampments that is created by LA Sanitation and its contractors are narrative accounts of what occur during the cleanups and may be important evidence of what occurs at cleanups.  Therefore, communications about how individuals are instructed to fill out these forms is relevant for impeachment purposes. *Estate of Ernesto Flores,* 2017 WL 3297507, at *6; *Paulsen*, 168 F.R.D. at 289.

### b.  The Request is not Overbroad

Plaintiffs' requests going back just two years and eight months. Notably, because the City has conducted Encampment Cleanups prior to April 2016 when LAMC 56.11 was amended, there are likely relevant documents that date much farther back than 2016. In seeking only a limited time frame that was consistent across all of the RFPs, Plaintiffs specifically attempted to balance Defendant's objections with the needs of this case.  And as with the rest of the training requests, Plaintiffs seek trainings that cover only a discrete topic.  Therefore, the requests are not overbroad.  *See Fulfillium,* 2018 WL 6118433, at *5.

### c.  Plaintiffs' Narrow Request is Proportional to the Needs of the Case

Because Defendant disagrees that these documents are relevant, let alone important to the case, Defendant likewise argues that any burden, even the routine burden of discovery, is not proportionate to the needs of the case.  But this objection is without merit.  As discussed in detail above, the issues at stake in this litigation are of constitutional significance, the amount in controversy is largely irrelevant given that Plaintiffs primarily seek prospective relief to put an end to the City's unconstitutional practices, and the City of Los Angeles has far more resources than the seven unhoused individuals whose belongings were seized and the volunteer organization whose resources go to replacing those belongings. *See supra,* Plaintiffs' Argument re: Request No. 2.  The other factors also weigh heavily in Plaintiffs' favor.  *See* Fed. R. Civ. P. 26(b)(1).

### d.  Parties' Relative Access to Information

As discussed in detail above, Plaintiffs have little to no information about cleanups. The City has already relied heavily on the Encampment Cleanup documents, and attempts to put the documents forward as business records.  The authenticity and trustworthiness of these documents is therefore incredibly important, but because of the nature of cleanups, the City controls the information

that feeds into the reports.  Therefore, access to the City's internal discussions about the forms are important, but without discovery on this issue, Plaintiffs would have no other access to that information.

### e.    Importance of the Discovery in Resolving the Issues

As discussed above, these documents are central to the main issue in this case:  the existence of policies, customs, and practices related to Encampment Cleanups.  As the City demonstrated by relying explicitly on the Encampment Cleanup reports, these documents are central to the implementation of the City's customs, policies and practices, and therefore, communications related to the use of forms is likewise important to that issue, which is at the center of Plaintiffs' *Monell* claims and claims for injunctive relief.

In addition, this discovery is important to the individual Plaintiffs' claims.  Even when the issue before the Court was the facial validity of an ordinance, the City still relied on the forms in an attempt to undermine Plaintiffs' credibility.  Plaintiffs likewise should be able to challenge the credibility of those documents.

### f.    Whether the Burden or Expense of the Proposed Discovery Outweighs its Likely Benefit

Defendant argues that it would be too burdensome to produce documents responsive to this request, but the City lays out what is, in essence nothing more than the routine burden associated with identifying responsive emails:  1) identifying custodians; 2) formulating searches; 3) running those searches; 4) exporting data; and 5) screening for privilege.  Accepting this burden analysis would be tantamount to accepting the City's argument that the production of email itself is too burdensome, regardless of how relevant and dispositive the emails are to the case.

There is simply no merit to this argument.  There is nothing in Rule 34 that distinguishes responsive emails from any other type of data nor that "requires a requesting party to identify custodians or search terms." *NuVasive, Inc.* 2019 WL

4934477, at *2. Instead, "Plaintiff must request information, regardless of how or where it is maintained by Defendants, which Defendants must address as required by Rule 34. That is discovery: a party requests information and the burden is on the producing party to locate and produce it or object legitimately to production." *Id*.

Plaintiffs attempted to address the City's burden argument by providing custodians and search terms, but while the City has agreed to search for emails, Plaintiffs provided an initial list over 100 days ago, and the City has failed to provide even an estimated time when Plaintiffs will receive the documents, let alone the documents themselves.  The City's latest email, indicating the City's intention to meet and confer about the proportionality of the request at some date in the future, underscores the need for court intervention.  While Plaintiffs have repeatedly offered to meet and confer about the production of emails, Defendant still refuses to concede that Plaintiffs are entitled to the production of emails, based on its willful misrepresentation about the scope of this litigation and its untenable position that the requested documents are not relevant. This is indefensible. The City is taking an unreasonable amount of time to produce responsive documents, which is causing significant delay.  Plaintiffs' requests for responsive documents are relevant and proportional to the needs of the case, and there no support for the City's contrary position.  The City cannot "show grounds for failing to provide the requested discovery," which the City must do to prevail here. *In re: Citimortgage*, 2012 WL 10450139, at *4.

### g.   The Documents are "Reasonably Accessible" under Rule 26(b)(2)(B)

Defendant objects that the documents sought are not "reasonably accessible, based on the undue burden and costs associated with searching for and producing documents responsive to this Request. . . ."  To the extent the City intends this objection to refer to the special limitation for ESI under Rule 26(b)(2)(B), Defendants have not identified, as is its burden, what sources of data are not

"readily accessible" so the parties can address the burden.  *Id*. at 2.  The City's objection spelling out the process for obtaining the documents makes clear that the relevant records are stored in active servers (and paper copy).  No restoration of any kind is necessary.  The only step the City identifies as burdensome is downloading the data from the cloud, but "[m]oving active and easily accessible ESI from one storage medium to another does not, by itself, render it inaccessible." *Al Otra Lado,* 328 F.R.D. at 421.  *See also Sung Gon Kang,* 2020 WL 1689708, at *5.  And it is not a basis for such an interminable delay in the production of these documents.

### h.    There is No Merit to the City's Other Objections
#### i.    Claims of privilege

The City objects insofar as there are documents protected by attorney-privilege and work product.  As discussed above, despite numerous requests Defendants have not produced a privilege log or any other details to substantiate its boilerplate objection.  Defendant has therefore waived this objection.  *Burlington Northern & Santa Fe Ry. Co*, 408 F.3d. at 1149. *See also DeSilva,* 2020 WL 5947827, at *2.

#### ii.    Other boilerplate general objections

In addition to the specific objections to relevance and proportionality, the City provides three pages of general boilerplate objections.  The City simply incorporates these objections by reference into each of the requests for production, without providing any basis for the specific objection or even an assessment of whether the objection specifically applies to the request.  To the extent any of them even applied to this RFP, Defendant therefore waived these objections.  *See e.g., Bosley*, 2016 WL 1704159, at *5, n. 3.

### i.    Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce all documents responsive to RFP No. 23 within 21 days.

### DEFENDANT'S ARGUMENT RE REQUEST FOR PRODUCTION NO. 23:

RFP 23 seeks: "All COMMUNICATIONS related to the use of forms used by the CITY or any of its contractors or subcontractors, including Chrysalis, LAHSA, and Clean Harbors, that are related to ENCAMPMENT CLEANUPS, including but not limited to any email instructions or clarifications related to the use of the forms [2016 to the present]." (Emphasis added).

Plaintiffs concede that the City has produced the actual forms related to encampment cleanups, as well as training materials related to those forms: "RFPs 21-23 seek documents related to the forms used by the City and its contractors and subcontractors.  RFP 21 seeks the forms itself.  RFP 22 seeks instructions, training materials and policies related to the use of these forms. RFP 23 seeks communications related to the use of these forms, including any email communications related to the use of these forms. The City has produced documents responsive to the first two requests, and further agrees to produce additional documents, if any, in its possession, custody or control." (Emphasis added)."  Plaintiffs also acknowledge that the City has "agreed to produce emails responsive to Plaintiffs' request."  Given those concessions, Plaintiffs motion to compel has no merit.

As a threshold matter, Plaintiffs have not established the relevance of communications about "the use of forms...related to encampment cleanups." Plaintiffs advance three relevance theories.  All fail.

First, Plaintiffs argue that "documentation of Encampment Cleanups is important, not only as evidence of cleanups, but also to guide the cleanups themselves," but do not explain how communications about forms related to that

documentation has any bearing on their claims.  The argument is particularly weak given Plaintiffs' admission that the City has produced both the forms and trainings related to such forms.

Second, Plaintiffs argue that "the City has attempted to enter the documents into evidence as a business record."  But again, Plaintiffs fail to explain why communications about the use of forms in some abstract way untethered from any allegations in the SAC would be relevant for this purpose.

Third, Plaintiffs argue that "communications about how individuals are instructed to fill out these forms is relevant for impeachment purposes."  But again, Plaintiffs fail to explain why communications about the use of forms in some abstract way untethered from any allegations in the SAC would be relevant for this purpose.

Even if Plaintiffs could establish relevance, their demand is not proportional to the needs of this case.  Not only has the City produced the forms Plaintiffs requested, it has produced training materials concerning those forms.  It has also agreed to produce certain emails and has in fact produced over 20,000 such emails. In fact, the City was in the process of producing the agreed-upon emails when Plaintiffs served their portion of this stipulation.  Ursea Decl. ¶¶19, 23, 34, 36-43.

It appears that the basis for moving on this RFP is Plaintiffs' belief that the City has not produced the emails quickly enough.  Plaintiffs contend that they "provided the City with an initial list of search terms and custodians more than 100 days ago, [but] the City has not provided any emails responsive to this request, nor has it provided any information regarding the use of search terms or even answered any of Plaintiffs' repeated requests for a timeline related to the production of documents, or identified a date certain by which the City will produce emails."

But Plaintiffs' representation does not accurately reflect the parties' negotiations concerning email collections and productions.

The City agreed to meet and confer about custodians and search terms on August 24, 2020.  Lebron Decl. ¶11, Ex. 36.  When Plaintiffs failed to propose any custodians or search terms, the City reiterated its agreement to meet and confer in a letter dated September 25, 2020.  Lebron Decl. ¶12, Ex. 37.  Yet, Plaintiffs did not provide a proposed "initial" list of custodians and search term until November 24, 2020—three months after the City first invited them to do so.  Ursea Decl. ¶13, Ex. 8.

Plaintiffs' November 24, 2020 proposal included 20 specific custodians from four different departments—LAPD, LASAN, UHRC, and the City Attorneys' Office—plus "all Council staff," and "City witnessed identified in the Rule 26 [disclosure] [sic]."  Ursea Decl. ¶13, Ex. 8.  The search terms Plaintiffs proposed were broad, including:  56.11, bulky, hazard, storage, notice, trash bags, toilet, HOPE, and CARE.  Ursea Decl. ¶¶23, 34.   Because the City's search capabilities do not permit case-sensitive searches, and the terms "hope" and "care" are common, the City sought to meet and confer about the terms before the searches were run to limit the likelihood of false hits such as "I **hope** you are well" and "take **care**" and proposed alternative searches.   Ursea Decl. ¶¶15-17.

In response, Plaintiffs' counsel counter-proposed alternative searches on December 7, 2020 but accused the City of unreasonably delaying running the search terms Plaintiffs initially proposed.  Ursea Decl. ¶18.  The City reiterated the cumbersome and time-consuming nature of searching for emails, which it had explained to Plaintiffs in prior meet-and-confer letters and also detailed in its RFP responses.  *See* Ursea Decl. ¶19.  Also, rather than pursuing further custodian and search-term negotiations at the outset and being accused of further delay, the City agreed to have the respective ITA departments run Plaintiffs' proposed custodians and search terms, with the agreement that after the results came back, the parties would likely need to meet and confer to reasonably limit the dataset.  *Id.*

As to Plaintiffs' request for emails of "all council staff," the City explained that a preliminary inquiry indicated that this would require searching emails for over 60 employees, not including former employees. *Id.* As a compromise, the City said it would work on identifying the employees in each Council District that were/are most likely to communicate about cleanups, 56.11, and related authorizations 2018 to the present and that it would propose a subset of custodians from those Council Districts once we have completed our inquiry. *Id.* The City also invited Plaintiffs to provide names of council staff members. *Id.*

Between December 14 and 17, 2020, the ITA department for LAPD ran searches for emails 2018 to 2020 of the 12 LAPD custodians Plaintiffs proposed using the search terms Plaintiffs proposed. Ursea Decl. ¶23. This resulted in 32GB of raw data, which was subsequently uploaded by the City's e-discovery vendor. Ursea Decl. ¶32. The uploading of all data was completed on January 6, 2021; after de-duplication, this resulted in 70,623 documents. *Id.*

On February 17, 2021, ITA completed collecting emails 2018 to 2020 from the 27 LASAN custodians and two UHRC custodians Plaintiffs proposed using Plaintiffs' search terms. Ursea Decl. ¶32. These searches resulted in approximately 250 GB of raw data. *Id.* This data significantly exceeded the storage space available under the City's agreement with its e-discovery vendor. *Id.* To house the data, the City had to negotiate a new agreement with the vendor for the purchase of additional storage space. Ursea Decl. ¶32.

The new agreement between the City and its e-discovery vendor for additional storage space became effective on March 1, 2021. Ursea Decl. ¶35. On March 2, 2020, the City sent an email notifying Plaintiffs of the 250GB dataset and new contract for storage space, and stated that the parties would need to meet and confer to limit the dataset. Ursea Decl. ¶37. Plaintiffs never responded to the email and the parties never met and conferred about the dataset. Ursea Decl. ¶38.

1    On March 5, 2021, the City produced 4,650 documents from the LAPD
2    dataset [CTY020442 - CTY029531], which included emails about specific cleanup
3    locations, 2020 UHRC Deployment Confirmation CARE and CARE+ sheets,
4    Daily Activities and Information from UHRC dating back to 2018, metrics related
5    to homelessness, and descriptions on trainings and policy group meetings.  Ursea
6    Decl. ¶39.  On March 18, 2021, Plaintiffs served their portion of the joint
7    stipulation to compel production of documents that is the subject of the present
8    motion.  Ursea Decl. ¶41.  Plaintiffs did not notify the City that they intended to
9    serve the joint stipulation nor the grounds upon which their motion to compel
10   would be based.  *Id.*  Plaintiffs also did not notify the City before serving the joint
11   stipulation as to any of the Plaintiff-specific or policy-related documents Plaintiffs
12   allege to be "missing" from the City's production.  *Id.*  On March 24, 2021, the
13   City produced 19,068 documents from the LAPD dataset of 70,623 documents
14   [CTY029532 - CTY092976].  This production included quarterly reports on
15   homelessness, emails discussing training and policies/procedures related to
16   encampment cleanups, complaints regarding homeless encampments and cleanups,
17   and "Daily UHRC Activities and Information," which summarize daily activities
18   related to posted clean-ups, illegal dumping, and HOPE Rapid Response locations.
19   Many of the produced emails attach HE/ID Confirmation Sheets, which is one of
20   the categories of documents Plaintiffs contend the City has "withheld."  Ursea
21   Decl. ¶42.

22   On or about March 30, 2021, the City's e-discovery vendor completed
23   uploading the 250GB data.  Ursea Decl. ¶44.  After deduplication, the search
24   resulted in approximately 475,000 documents.  *Id.*

25   Against this background, Plaintiffs' accusations of the City's unreasonable
26   delay, failures to meet and confer, and "withholding" of documents, plainly have
27   no merit.  And their demand that all such communications be produced, and be

28

produced within 21 days, is not proportional to the needs of the case.  Because the
law and analysis as relevance, proportionality, and the contended "waiver" of
privilege are equally applicable here, Defendant incorporates by reference its
arguments as to RFPs 1 and 2.

**REQUEST FOR PRODUCTION NO. 26:**

All COMMUNICATIONS related to the use of forms used by the CITY or
any of its contractors or subcontractors, including Chrysalis, LAHSA, and Clean
Harbors, that are related to i[sic]that is related to the storage of personal property
taken, seized, or otherwise obtained by the City, including but not limited to any
email instructions or clarifications related to the use of the forms.[notices]

**RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

Defendant incorporates the General Objections as though fully set forth here.
Defendant objects that the Request seeks documents that are not relevant to
Plaintiff El-Bey's specific claims alleged in the SAC relating to incidents occurring
on or around January 10, 2019 at 6th Street and Alexandria and on or around June
4, 2019 at Oakwood and Western. Defendant further objects that the Request seeks
documents that are not relevant to any named-plaintiffs' claims as alleged in the
SAC.  The Court struck Plaintiff KFA's claims seeking any declaration that the
City unconstitutionally applied LAMC 56.11 or the City's policies or practices to
KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the
SAC as seeking only to obtain a ruling that the City's policies and practices are
unconstitutional and not that each past application of those policies and practices to
its members was unconstitutional."). Defendant also objects that the proposed
discovery is not relevant to establishing *Monell* liability for the claims alleged in
the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a
single incident ... to hold the City liable under *Monell*."). Defendant objects that
the Request is overbroad and burdensome in seeking all communications,

including emails, regarding the use of forms by Defendant, LAHSA, Chrysalis, and Clean Harbors dating back to April 2016, three years before Plaintiff El-Bey's specific incidents occurred as alleged in the SAC.  Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all communications, including emails, regarding the use of forms by Defendant, LAHSA, Chrysalis, and Clean Harbors dating back to April 2016 outweighs the benefit of such information for Plaintiff El Bey's claims, and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would have to investigate the identify of all potential custodians who may have sent or received an email regarding the use of form for an encampment cleanup over a four-year period, including personnel from LASAN, UHRC, LAPD, the City Attorney's Office, and possibly other City departments.  Defendant would then have to conduct search parameters for all communications over a four-year period involving all identified custodians from different City departments.

Defendant uses an email system known as City Mail that is based on an implementation of Google Apps Premier Edition and is used by nearly every City entity, including 40 different departments. Defendant's City Mail system uses the Google Vault system for archiving emails. Google Vault is a cloud-based data

206

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

storage system; rather than being stored on locally managed servers, the archived email data is stored on remote servers that are managed by Google, Inc. and are only accessible to Defendant's office via the internet. In order to search the email archives, Defendant's ITA must formulate a search query utilizing the search terms and restrictions provided by the requester.  Depending on the number and complexity of search terms, the number of email accounts or document custodians, and the breadth of the search, ITA may need to formulate more than one search query and scan the stored data multiple times.  When the search completes, Google Vault provides preliminary information regarding the email data gathered by the search.  In order to access the actual emails, however, the entire store of data must first be exported from the cloud-servers to a different "download" server to which ITA can connect via the internet and from which we can then download the data. Depending on the size of the data, the download process the most time-consuming part of gathering the email data.  Even when ITA allocates multiple personnel to conduct search queries in order to speed up the archived email search and collection process, ITA is still limited by the speeds at which the data can be transferred from the download server to Defendant's local data storage devices. As downloads of batches of data become available, ITA begins the process of identifying the email addresses that accompany the data against the list of individuals identified in the data request and thereafter segregates the email stores of matching individuals. ITA would also identify and screen emails of City Attorneys begin the process of identifying and screening-out the emails of city attorneys and may need to conduct subsequent queries to screen out attorneys for purposes of compiling a list of excluded emails for a privilege log.

In addition, Defendant would need to determine whether a City department utilizes systems-based network servers that may include network folders used to store or maintain communications within a particular division or department

section.  In order to retrieve systems-based server folders for review, Defendant would require a technology professional who has administrator privileges to make a copy of the drive(s), which can range in size by terabytes of data.  In order to search certain folders on system-based network drives, a technology professional who has administrator privileges, would use the Microsoft Windows File Explorer search function, the limited search function available by default on Windows.  The limited search capabilities of the Windows File Explorer search tool may not be able to accommodate full searches within documents or Boolean searches.  The resulting hits might include systems files, applications, downloads, or media which may or may not be viewable. After Defendant has conducted searches for electronically stored information, Defendant would require the use of an e-discovery software and platform for Defendant's counsel to review, search, and tag documents and electronically stored information for responsiveness or privilege.

Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents and electronically stored information responsive to this Request for the reasons described above. Without waiving any, and based on these objections, no documents will be produced in response to this Request.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiffs' specific claims alleged in the Second Amended Complaint (Dkt. No. 42, "SAC").  Plaintiff El-Bey alleges claims for specific incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western; Plaintiff Garcia alleges claims for specific incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone Avenue, on or around April  29, 2019 at Aetna Street and Van Nuys Boulevard,

and on or around August 14, 2019 at Calvert and Bessemer; Plaintiffs Zamora and Zepeda allege claims for specific incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard; Plaintiff Haugabrook alleges claims for incidents occurring sometime in March 2019 and a month later by Figueroa Street and 53rd Street and 52nd Place; Plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019 at Lomita and McCoy; and Plaintiff Ashley alleges claims for a specific incident occurring on or around May 21, 2019 at Lomita and McCoy. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident ... to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking all communications, including emails, regarding the use of forms by Defendant, LAHSA, Chrysalis, and Clean Harbors dating back to April 2016, three years before Plaintiffs 'specific incidents occurred as alleged in the SAC. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003*); Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not
proportional to the needs of the case, insofar as the burden of searching for and
producing all communications, including emails, regarding the use of forms by
Defendant, LAHSA, Chrysalis, and Clean Harbors dating back to April 2016
outweighs the benefit of such information for Plaintiffs' claims ,and Defendant's
costs or expense in conducting the search and producing documents greatly
exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, in order to search for and obtain documents responsive to the
Request, Defendant would have to investigate the identify of all potential
custodians who may have sent or received an email regarding the use of form for
an encampment cleanup over a four-year period, including personnel from
LASAN, UHRC, LAPD, the City Attorney's Office, and possibly other City
departments.  Defendant would then have to conduct search parameters for all
communications over a four-year period involving all identified custodians from
different City departments.

Defendant uses an email system known as City Mail that is based on an
implementation of Google Apps Premier Edition and is used by nearly every City
entity, including 40 different departments. Defendant's City Mail system uses the
Google Vault system for archiving emails. Google Vault is a cloud-based data
storage system; rather than being stored on locally managed servers, the archived
email data is stored on remote servers that are managed by Google, Inc. and are
only accessible to Defendant's office via the internet. In order to search the email
archives, Defendant's ITA must formulate a search query utilizing the search terms
and restrictions provided by the requester.  Depending on the number and
complexity of search terms, the number of email accounts or document custodians,
and the breadth of the search, ITA may need to formulate more than one search
query and scan the stored data multiple times.  When the search completes, Google

Vault provides preliminary information regarding the email data gathered by the search.  In order to access the actual emails, however, the entire store of data must first be exported from the cloud-servers to a different "download" server to which ITA can connect via the internet and from which we can then download the data. Depending on the size of the data, the download process the most time-consuming part of gathering the email data.  Even when ITA allocates multiple personnel to conduct search queries in order to speed up the archived email search and collection process, ITA is still limited by the speeds at which the data can be transferred from the download server to Defendant's local data storage devices. As downloads of batches of data become available, ITA begins the process of identifying the email addresses that accompany the data against the list of individuals identified in the data request and thereafter segregates the email stores of matching individuals. ITA would also identify and screen emails of City Attorneys begin the process of identifying and screening-out the emails of city attorneys and may need to conduct subsequent queries to screen out attorneys for purposes of compiling a list of excluded emails for a privilege log.

In addition, Defendant would need to determine whether a City department utilizes systems-based network servers that may include network folders used to store or maintain communications within a particular division or department section.  In order to retrieve systems-based server folders for review, Defendant would require a technology professional who has administrator privileges to make a copy of the drive(s), which can range in size by terabytes of data.  In order to search certain folders on system-based network drives, a technology professional who has administrator privileges, would use the Microsoft Windows File Explorer search function, the limited search function available by default on Windows.  The limited search capabilities of the Windows File Explorer search tool may not be able to accommodate full searches within documents or Boolean searches.  The

resulting hits might include systems files, applications, downloads, or media which may or may not be viewable. After Defendant has conducted searches for electronically stored information, Defendant would require the use of an e-discovery software and platform for Defendant's counsel to review, search, and tag documents and electronically stored information for responsiveness or privilege.

Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents and electronically stored information responsive to this Request for the reasons described above. Subject to and without waiving these objections, Defendant previously produced certain documents responsive to this Request, including LASAN interdepartmental memoranda and instructions regarding the use of forms for storage of property.

**PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 26:**

Similar to RFPs 21-23, RFPs 24-26 seek documents related to the forms used by the City and its contractors and subcontractors related to the storage of property seized by the City.  RFP 24 seeks the forms itself.  RFP 25 seeks instructions, training materials and policies related to the use of these forms. RFP 26 seeks communications related to the use of these forms, including any email communications related to the use of these forms. The City has produced documents responsive to the first two requests, and further agrees to produce additional documents, if any, in its possession, custody or control. With regards to this request, the City objects to the production of any documents responsive to this request.  Other than the past production of "interdepartmental memoranda and instructions regarding the use of forms for the storage of property," which would be responsive to RFP 25, the City did not agree to produce any records responsive to this request.

Since then, the City agreed to produce emails responsive to Plaintiffs' request, yet despite the fact that Plaintiffs provided the City with an initial list of search terms and custodians more than 100 days ago, the City has not provided any emails responsive to this request, nor has it provided any information regarding the use of search terms or even answered any of Plaintiffs' repeated requests for a timeline related to the production of documents, identified a date certain by which the City will produce emails.  The City has refused to meet and confer about any of the issues it has asserted would cause delay, and as of March 3, 2021, continued to assert that the production of emails is neither relevant nor proportional to the needs of the case.

At this point, the City's failure to produce responsive documents or respond to Plaintiffs' repeated requests for a date certain by which the documents will be produced amounts to a refusal to produce documents, and Plaintiffs seek an order compelling production of these documents.

a.      **The Documents are Relevant**

The use of forms related to the storage of property is relevant for a number of reasons.  As discussed in detail above, the documents themselves are relevant to determine how the tracking of property works and to test the accuracy of these forms.  And as with the forms related to Encampment Cleanups, the forms are the only source of documentation about what the City impounds.  The process by which an entity seizes and stores property, including the way it documents that property is of critical importance to Plaintiffs' claims under the Fourth Amendment.  *See e.g., United States v. Torres,* 828 F.3d 1113 (2016) (impounding of property must be done pursuant to set standards and procedures related to inventory).  It is also relevant to the question of due process, since the City argues that it provides sufficient process when property is seized, and relies on the documents in support of this claim.  Finally, the use of forms is relevant to

Plaintiffs' claims under Civil Code 2080.1.  The use of those forms is relevant to the question of whether and to what extent the City has unwritten, but widespread and longstanding customs and practices related to seizure of property.  Therefore, communications related to these uses of the forms are of course relevant.  And finally, these documents are relevant for impeachment purposes. *Estate of Ernesto Flores,* 2017 WL 3297507, at *6; *Paulsen*, 168 F.R.D. at 289.

> ### b.      The Request is not Overbroad

Plaintiffs' requests going back just two years and eight months. Notably, because the City has conducted Encampment Cleanups prior to April 2016 when LAMC 56.11 was amended, there are likely relevant documents that date much farther back than 2016. In seeking only a limited time frame that was consistent across all the RFPs, Plaintiffs specifically attempted to balance Defendant's objections with the needs of this case.  And as with the rest of the training requests, Plaintiffs seek trainings that cover only a discrete topic.  Therefore, the requests are not overbroad.  *See Fulfillium,* 2018 WL 6118433, at *5.

> ### c.      Plaintiffs' Narrow Request is Proportional to the Needs of the Case

Because Defendant disagrees that these documents are relevant, let alone important to the case, Defendant likewise argues that any burden, even the routine burden of discovery is not proportionate to the needs of the case.  But this objection is without merit:  as discussed in detail above, the issues at stake in this litigation are of constitutional significance; the amount in controversy is largely irrelevant given that Plaintiffs primarily seek prospective relief to put an end to the City's unconstitutional practices; and the City of Los Angeles has far more resources than the seven unhoused individuals whose belongings were seized and the volunteer organization whose resources go to replacing those belongings. *See supra,* Plaintiffs' Argument re: Request No. 2.  The other factors also weigh heavily in Plaintiffs' favor.  *See* Fed. R. Civ. P. 26(b)(1).

### d.    Parties' Relative Access to Information

As discussed in detail above, Plaintiffs have little to no information about the storage of property.  Notably, although Plaintiffs have sought a third party subpoena from Chrysalis, they have informed Plaintiffs that they do not have any communications with the City of Los Angeles.  Therefore, to the extent these communications exist, Plaintiffs have no way of obtaining them from any source other than the City.

### e.    Importance of the Discovery in Resolving the Issues

As discussed above, these documents are central to the main issue in this case:  the existence of policies, customs, and practices related to the storage of property.  Therefore, communications related to the use of forms is likewise important to that issue, which is at the center of Plaintiffs' *Monell* claims and claims for prospective relief.

### f.    Whether the Burden or Expense of the Proposed Discovery Outweighs its Likely Benefit

Defendant argues that it would be too burdensome to produce documents responsive to this request, but the City lays out what is, in essence nothing more than the routine burden associated with identifying responsive emails:  1) identifying custodians; 2) formulating searches; 3) running those searches; 4) exporting data; and 5) screening for privilege.  Accepting this burden analysis would be tantamount to accepting the City's argument that the production of email itself is too burdensome, regardless of how relevant and dispositive the emails are to the case.

There is simply no merit to this argument.  There is nothing in Rule 34 that distinguishes responsive emails from any other type of data nor that "requires a requesting party to identify custodians or search terms." *NuVasive, Inc.* 2019 WL 4934477, at *2. Instead, "Plaintiff must request information, regardless of how or where it is maintained by Defendants, which Defendants must address as required

by Rule 34. That is discovery: a party requests information and the burden is on the producing party to locate and produce it or object legitimately to production." *Id*.

Plaintiffs attempted to address the City's burden argument by providing custodians and search terms, but while the City has agreed to search for emails, Plaintiffs provided an initial list over 100 days ago, and the City has failed to provide even an estimated time when Plaintiffs will receive the documents, let alone the documents themselves.  The City's latest email, indicating the City's intention to meet and confer about the proportionality of the request at some date in the future underscores the need for court intervention.  While Plaintiffs have repeatedly offered to meet and confer about the production of emails, Defendant still refuses to concede that Plaintiffs are entitled to the production of emails, based on its willful misrepresentation about the scope of this litigation and its untenable position that the requested documents are not relevant. This is indefensible. The City is taking an unreasonable amount of time to produce responsive documents, which is causing significant delay.

Plaintiffs' requests for responsive documents are relevant and proportional to the needs of the case, and there is no support for the City's contrary position. The City cannot "show grounds for failing to provide the requested discovery," which the City must do to prevail here. *In re: Citimortgage*, 2012 WL 10450139, at *4.

### g. The Documents are "Reasonably Accessible" under Rule 26(b)(2)(B)

Defendant objects that the documents sought are not "reasonably accessible, based on the undue burden and costs associated with searching for and producing documents responsive to this Request. . . ."  To the extent the City intends this objection to refer to the special limitation for ESI under Rule 26(b)(2)(B), Defendants have not identified, as is its burden, what sources of data are not "readily accessible" so the parties can address the burden.  *Id*. at 2.  The City's

objection spelling out the process for obtaining the documents makes clear that the relevant records are stored in active servers (and paper copy).  No restoration of any kind is necessary.  The only step the City identifies as burdensome is downloading the data from the cloud, but "[m]oving active and easily accessible ESI from one storage medium to another does not, by itself, render it inaccessible." *Al Otra Lado,* 328 F.R.D. at 421. *See also Sung Gon Kang,* 2020 WL 1689708, at *5.  And it is not a basis for such an interminable delay in the production of these documents.

### h.     There is No Merit to the City's Other Objections

#### i.     Claims of Privilege

The City objects insofar as there are documents protected by attorney-privilege and work product.  As discussed above, despite numerous requests Defendants have not produced a privilege log or any other details to substantiate its boilerplate objection.  Defendant has therefore waived this objection. *Burlington Northern & Santa Fe Ry. Co*, 408 F.3d. at 1149. *See also DeSilva,* 2020 WL 5947827, at *2.

#### i.     Other boilerplate general objections

In addition to the specific objections to relevance and proportionality, the City provides three pages of general boilerplate objections.  The City simply incorporates these objections by reference into each of the requests for production, without providing any basis for the specific objection or even an assessment of whether the objection specifically applies to the request.  To the extent any of them even applied to this RFP, Defendant therefore waived these objections. *See, e.g.*, *Bosley*, 2016 WL 1704159, at *5, n. 3.

### j.     Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce all documents responsive to RFP No. 26 within 21 days.

**DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 26:**

RFP 26 asks for "All COMMUNICATIONS related to the use of forms used by the CITY or any of its contractors or subcontractors, including Chrysalis, LAHSA, and Clean Harbors, that are related to i[sic]that is related to the storage of personal property taken, seized, or otherwise obtained by the City, including but not limited to any email instructions or clarifications related to the use of the forms [2016-present]."  (Emphasis added).

This request is virtually identical to RFP 23 except that it is far broader in that it does not even tie the forms to encampment cleanups or 56.11 (much less to Plaintiffs' incidents) but instead asks for communications related to the use of form related to storage of property "taken, seized, *or otherwise obtained*."

Plaintiffs advance five relevance theories: (1) "the documents themselves are relevant to determine how the tracking of property works and to test the accuracy of these forms," (2) "the process by which an entity seizes and stores property, including the way it documents that property is of critical importance to Plaintiffs' claims under the Fourth Amendment," and (3) "[i]t is also relevant to the question of due process, since the City argues that it provides sufficient process when property is seized, and relies on the documents in support of this claim"; and (4) the use of those forms is relevant to the question of whether and to what extent the City has unwritten, but widespread and longstanding customs and practices related to seizure of property," and (5) "finally, these documents are relevant for impeachment purposes."

None of these arguments establishes the relevance of communications about forms related to the storage of any and all property the City removes under any and all circumstances dating back to 2016.  As with RFP 26, the arguments are particularly weak given that Plaintiffs admit that the City has produced the actual

forms and trainings about them, and has futher agreed to produce responsive emails it locates in reviewing the agreed upon universe of emails it has collected. And for the reasons previously discussed, *Monell* cannot serve as the relevance theory because the facts related to *Monell* are not in dispute and in fact, the City has offered to stipulate to *Monell* liability. *See Gonzalez v. City of Schenectady*, No. 1:09-CV-1434, 2011 U.S. Dist. LEXIS 137290, at *13 (N.D.N.Y. Nov. 30, 2011) ("additional discovery related to strip searches is unnecessary as it is undisputed that the search was conducted pursuant to the City's written policy, which had been in effect since 1999"); Ursea Decl. ¶¶2-4; Ex. 1, 2.

Even if the communications had some minimal probative value, the request for all such communications, from 2016 to present, is not proportional to the needs of this case. And as described above there is no merit to Plaintiffs' contention that the City has unreasonably delayed producing emails nor that the City has waived privilege. The City incorporates by reference its responses to RFPs 1, 2 16, and 23, which apply with equal force here.

**REQUEST FOR PRODUCTION NO. 29:**

All COMMUNICATIONS related to the use of notices used by the CITY or any of its contractors or subcontractors, including Chrysalis, LAHSA, and Clean Harbors, that are related to ENCAMPMENT CLEANUPS, including but not limited to any email instructions or clarifications related to the use of the notices.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 29:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiff El-Bey's specific claims alleged in the SAC relating claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident ... to hold the City liable under *Monell*.").Defendant objects that the

Request is overbroad and burdensome in seeking all communications, including emails, regarding the use of forms by Defendant, LAHSA, Chrysalis, and Clean Harbors dating back to April 2016, three years before Plaintiffs 'specific incidents occurred as alleged in the SAC.  Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003);*Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all communications, including emails, regarding the use of forms by Defendant, LAHSA, Chrysalis, and Clean Harbors dating back to April 2016 outweighs the benefit of such information for Plaintiffs' claims, and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would have to investigate the identify of all potential custodians who may have sent or received an email regarding the use of form for an encampment cleanup over a four-year period, including personnel from LASAN, UHRC, LAPD, the City Attorney's Office, and possibly other City departments.  Defendant would then have to conduct search parameters for all communications over a four-year period involving all identified custodians from different City departments.

Defendant uses an email system known as City Mail that is based on an implementation of Google Apps Premier Edition and is used by nearly every City entity, including 40 different departments. Defendant's City Mail system uses the

Google Vault system for archiving emails. Google Vault is a cloud-based data storage system; rather to incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western. Defendant further objects that the Request seeks documents that are not relevant to any named-plaintiffs' claims as alleged in the SAC.  The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional.").Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident ... to hold the City liable under *Monell*.").Defendant objects that the Request is overbroad and burdensome in seeking all communications, including emails, regarding the use of notices by Defendant, LAHSA, Chrysalis, and Clean Harbors dating back to April 2016, three years before Plaintiff El-Bey's specific incidents occurred as alleged in the SAC.  Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all communications, including emails, regarding the use of notices by Defendant, LAHSA, Chrysalis, and Clean Harbors dating back to April 2016

outweighs the benefit of such information for Plaintiff El Bey's claims, and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would have to investigate the identify of all potential custodians who may have sent or received an email regarding the use of notice for an encampment cleanup over a four-year period, including personnel from LASAN, UHRC, LAPD, the City Attorney's Office, and possibly other City departments.  Defendant would then have to conduct search parameters for all communications over a four-year period involving all identified custodians from different City departments.

Defendant uses an email system known as City Mail that is based on an implementation of Google Apps Premier Edition and is used by nearly every City entity, including 40 different departments. Defendant's City Mail system uses the Google Vault system for archiving emails. Google Vault is a cloud-based data storage system; rather than being stored on locally managed servers, the archived email data is stored on remote servers that are managed by Google, Inc. and are only accessible to Defendant's office via the internet. In order to search the email archives, Defendant's ITA must formulate a search query utilizing the search terms and restrictions provided by the requester.  Depending on the number and complexity of search terms, the number of email accounts or document custodians, and the breadth of the search, ITA may need to formulate more than one search query and scan the stored data multiple times.  When the search completes, Google Vault provides preliminary information regarding the email data gathered by the search.  In order to access the actual emails, however, the entire store of data must first be exported from the cloud-servers to a different "download" server to which ITA can connect via the internet and from which we can then download the data.

Depending on the size of the data, the download process the most time-consuming
part of gathering the email data.  Even when ITA allocates multiple personnel to
conduct search queries in order to speed up the archived email search and
collection process, ITA is still limited by the speeds at which the data can be
transferred from the download server to Defendant's local data storage devices. As
downloads of batches of data become available, ITA begins the process of
identifying the email addresses that accompany the data against the list of
individuals identified in the data request and thereafter segregates the email stores
of matching individuals. ITA would also identify and screen emails of City
Attorneys begin the process of identifying and screening-out the emails of city
attorneys and may need to conduct subsequent queries to screen out attorneys for
purposes of compiling a list of excluded emails for a privilege log.

In addition, Defendant would need to determine whether a City department
utilizes systems-based network servers that may include network folders used to
store or maintain communications regarding the use of notices within a particular
division or department section.  In order to retrieve systems-based server folders
for review, Defendant would require a technology professional who has
administrator privileges to make a copy of the drive(s), which can range in size by
terabytes of data.  In order to search certain folders on system-based network
drives, a technology professional who has administrator privileges, would use the
Microsoft Windows File Explorer search function, the limited search function
available by default on Windows.  The limited search capabilities of the Windows
File Explorer search tool may not be able to accommodate full searches within
documents or Boolean searches.  The resulting hits might include systems files,
applications, downloads, or media which may or may not be viewable. After
Defendant has conducted searches for electronically stored information, Defendant
would require the use of an e-discovery software and platform for Defendant's

counsel to review, search, and tag documents and electronically stored information for responsiveness or privilege.

Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents and electronically stored information responsive to this Request for the reasons described above. Without waiving any, and based on these objections, no documents will be produced in response to this Request.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 29:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiffs' specific claims alleged in the Second Amended Complaint (Dkt. No. 42, "SAC"). Plaintiff El-Bey alleges claims for specific incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western; Plaintiff Garcia alleges claims for specific incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone Avenue, on or around April 29, 2019 at Aetna Street and Van Nuys Boulevard, and on or around August 14, 2019 at Calvert and Bessemer; Plaintiffs Zamora and Zepeda allege claims for specific incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard; Plaintiff Haugabrook alleges claims for incidents occurring sometime in March 2019 and a month later by Figueroa Street and 53rd Street and 52nd Place; Plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019 at Lomita and McCoy; and Plaintiff Ashley alleges claims for a specific incident occurring on or around May 21, 2019 at Lomita and McCoy. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to

224

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

obtain a ruling that the City's policies and practices are unconstitutional and not
that each past application of those policies and practices to its members was
unconstitutional."). Defendant also objects that the proposed discovery is not
relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No.
65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident ...
to hold the City liable under *Monell*."). Defendant objects that the Request is
overbroad and burdensome in seeking all communications, including emails,
regarding the use of notices by Defendant, LAHSA, Chrysalis, and Clean Harbors
dating back to April 2016, three years before Plaintiffs' specific incidents occurred
as alleged in the SAC.  Defendant also objects to the Request to the extent the
Request seeks information protected from disclosure by the attorney-client
privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B);
*Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v.
Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis
200627, * 15-17 (C.D. Cal. Sep. 9, 2013).Defendant further objects that the
Request is burdensome and not proportional to the needs of the case, insofar as the
burden of searching for and producing all communications, including emails,
regarding the use of notices by Defendant, LAHSA, Chrysalis, and Clean Harbors
dating back to April 2016 outweighs the benefit of such information for Plaintiffs'
claims, and Defendant's costs or expense in conducting the search and producing
documents greatly exceeds the amount in controversy for Plaintiffs' alleged
damages.

   Specifically, in order to search for and obtain documents responsive to the
Request, Defendant would have to investigate the identify of all potential
custodians who may have sent or received an email regarding the use of notice for
an encampment cleanup over a four-year period, including personnel from
LASAN, UHRC, LAPD, the City Attorney's Office, and possibly other City

departments.  Defendant would then have to conduct search parameters for all communications over a four-year period involving all identified custodians from different City departments.

Defendant uses an email system known as City Mail that is based on an implementation of Google Apps Premier Edition and is used by nearly every City entity, including 40 different departments. Defendant's City Mail system uses the Google Vault system for archiving emails. Google Vault is a cloud-based data storage system; rather than being stored on locally managed servers, the archived email data is stored on remote servers that are managed by Google, Inc. and are only accessible to Defendant's office via the internet. In order to search the email archives, Defendant's ITA must formulate a search query utilizing the search terms and restrictions provided by the requester.  Depending on the number and complexity of search terms, the number of email accounts or document custodians, and the breadth of the search, ITA may need to formulate more than one search query and scan the stored data multiple times.  When the search completes, Google Vault provides preliminary information regarding the email data gathered by the search.  In order to access the actual emails, however, the entire store of data must first be exported from the cloud-servers to a different "download" server to which ITA can connect via the internet and from which we can then download the data. Depending on the size of the data, the download process the most time-consuming part of gathering the email data.  Even when ITA allocates multiple personnel to conduct search queries in order to speed up the archived email search and collection process, ITA is still limited by the speeds at which the data can be transferred from the download server to Defendant's local data storage devices. As downloads of batches of data become available, ITA begins the process of identifying the email addresses that accompany the data against the list of individuals identified in the data request and thereafter segregates the email stores

of matching individuals. ITA would also identify and screen emails of City

Attorneys begin the process of identifying and screening-out the emails of city

attorneys and may need to conduct subsequent queries to screen out attorneys for

purposes of compiling a list of excluded emails for a privilege log.

In addition, Defendant would need to determine whether a City department

utilizes systems-based network servers that may include network folders used to

store or maintain communications regarding the use of notices within a particular

division or department section.  In order to retrieve systems-based server folders

for review, Defendant would require a technology professional who has

administrator privileges to make a copy of the drive(s), which can range in size by

terabytes of data.  In order to search certain folders on system-based network

drives, a technology professional who has administrator privileges, would use the

Microsoft Windows File Explorer search function, the limited search function

available by default on Windows.  The limited search capabilities of the Windows

File Explorer search tool may not be able to accommodate full searches within

documents or Boolean searches.  The resulting hits might include systems files,

applications, downloads, or media which may or may not be viewable. After

Defendant has conducted searches for electronically stored information, Defendant

would require the use of an e-discovery software and platform for Defendant's

counsel to review, search, and tag documents and electronically stored information

for responsiveness or privilege.

Defendant objects that the Request seeks documents that are not reasonably

accessible based on the undue burden and costs associated with searching for and

producing documents and electronically stored information responsive to this

Request for the reasons described above. Subject to and without waiving these

objections, Defendant previously produced certain documents responsive to this

Request, including LASAN interdepartmental memoranda and instructions regarding the use of notices for encampment cleanups.

**PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 29:**

RFPs 27-29 seek documents related to the notices used by the City and its contractors and subcontractors.  RFP 27 seeks the notices themselves.  RFP 28 seeks instructions, training materials and policies related to the use of these forms.  RFP 29 seeks communications related to the use of these notices, including any email communications related to the use of these notices. The City has produced documents responsive to the first two requests, and further agrees to produce additional documents, if any, in its possession, custody or control.

With regards to this request, the City objects to the production of any documents responsive to this request.  Other than the past production of "interdepartmental memoranda and instructions regarding the use of notices for encampment cleanups," which would be responsive to RFP 28, the City did not agree to produce any records responsive to this request.  Since then, the City agreed to produce emails responsive to Plaintiffs' request, yet despite the fact that Plaintiffs provided the City with an initial list of search terms and custodians more than 100 days ago, the City has not provided any emails responsive to this request, nor has it provided any information regarding the use of search terms or even answered any of Plaintiffs' repeated requests for a timeline related to the production of documents, or identified a date certain by which the City will produce emails.  The City has refused to meet and confer about any of the issues it has asserted would cause delay, and as of March 3, 2021, continued to assert that the production of emails is neither relevant nor proportional to the needs of the case.

At this point, the City's failure to produce responsive documents or respond to Plaintiffs' repeated requests for a date certain by which the documents will be produced amounts to a refusal to produce documents, and Plaintiffs seek an order compelling production of these documents.

### a.    The Documents are Relevant

The use of notices related to Encampment Cleanups is one of the most central issues in this case, both regards to Plaintiffs' claims under the Fourteenth Amendment Due Process clause, and Defendant's defense against those claims. Specifically, Plaintiffs claim that the City violates due process by failing to provide sufficient notice of cleanups. The City on the other hand argues that its current notices are sufficient.  As such, communications about the use of the notices is unquestionably relevant to the parties' claims and defenses. For example, a conversation about whether the City's notices are sufficient to let people know about the cleanups or whether the City is going to respond to public claims that cleanups are happening without notice would unquestionably be relevant to Plaintiffs' claims, including their *Monell* claims and claims that the City has a custom, practice or policy that violates Due Process.  The City's objection, which it copies from every single one of its other responses, is patently absurd and wholly without merit.

### b.    The Request is not Overbroad

Plaintiffs' requests going back just two years and eight months. Notably, because the City has conducted Encampment Cleanups prior to April 2016 when LAMC 56.11 was amended, there are likely relevant documents that date much farther back than 2016. In seeking only a limited time frame that was consistent across all the RFPs, Plaintiffs specifically attempted to balance Defendant's objections with the needs of this case.  And as with the rest of the requests,

Plaintiffs seek communications that cover only a discrete topic.  Therefore, the requests are not overbroad.  *See Fulfillium,* 2018 WL 6118433, at *5.

### c.  Plaintiffs' Narrow Request is Proportional to the Needs of the Case

Because Defendant disagrees that these documents are relevant, let alone important to the case, Defendant likewise argues that any burden, even the routine burden of discovery is not proportionate to the needs of the case.  But this objection is without merit.  As discussed in detail above, the issues at stake in this litigation are of constitutional significance, the amount in controversy is largely irrelevant given that Plaintiffs primarily seek prospective relief to put an end to the City's unconstitutional practices, and the City of Los Angeles has far more resources than the seven unhoused individuals whose belongings were seized and the volunteer organization whose resources go to replacing those belongings, and Plaintiffs have no access to this information outside of discovery.  *See supra,* Plaintiffs' Argument re: Request No. 2.  The other factors also weigh heavily in Plaintiffs' favor.  *See* Fed. R. Civ. P. 26(b)(1).

### d.  Importance of the Discovery in Resolving the Issue

As discussed above, the use of notices is one of the most central issues in this case.  Communications about the use of those notices may evidence the existence of customs, policies and practices related to the use of those notices.  Therefore, discovery of this topic is incredibly important.

### e.  Whether the Burden or Expense of the Proposed Discovery Outweighs its Likely Benefit

Defendant argues that it would be too burdensome to produce documents responsive to this request, but the City lays out what is, in essence nothing more than the routine burden associated with identifying responsive emails:  1) identifying custodians; 2) formulating searches; 3) running those searches; 4) exporting data; and 5) screening for privilege.  Accepting this burden analysis

would be tantamount to accepting the City's argument that the production of email itself is too burdensome, regardless of how relevant and dispositive the emails are to the case.

There is simply no merit to this argument.  There is nothing in Rule 34 that distinguishes responsive emails from any other type of data nor that "requires a requesting party to identify custodians or search terms." *NuVasive, Inc.* 2019 WL 4934477, at *2. Instead, "Plaintiff must request information, regardless of how or where it is maintained by Defendants, which Defendants must address as required by Rule 34. That is discovery: a party requests information and the burden is on the producing party to locate and produce it or object legitimately to production."  *Id*.

Plaintiffs attempted to address the City's burden argument by providing custodians and search terms, but while the City has agreed to search for emails, Plaintiffs provided an initial list over 100 days ago, and the City has failed to provide even an estimated time when Plaintiffs will receive the documents, let alone the documents themselves.  The City's latest email, indicating the City's intention to meet and confer about the proportionality of the request at some date in the future underscores the need for court intervention.  While Plaintiffs have repeatedly offered to meet and confer about the production of emails, Defendant still refuses to concede that Plaintiffs are entitled to the production of emails, based on its willful misrepresentation about the scope of this litigation and its untenable position that the requested documents are not relevant. This is indefensible. The City is taking an unreasonable amount of time to produce responsive documents, which is causing significant delay.

Plaintiffs' requests for responsive documents are relevant and proportional to the needs of the case, and there is no support for the City's contrary position. The City cannot "show grounds for failing to provide the requested discovery,"

which the City must do to prevail here. *In re: Citimortgage*, 2012 WL 10450139, at *4.

### f.   The Documents are "Reasonably Accessible" under Rule 26(b)(2)(B)

Defendant objects that the documents sought are not "reasonably accessible, based on the undue burden and costs associated with searching for and producing documents responsive to this Request. . . ." To the extent the City intends this objection to refer to the special limitation for ESI under Rule 26(b)(2)(B), Defendants have not identified, as is its burden, what sources of data are not "readily accessible" so the parties can address the burden. *Id.* at 2. The City's objection spelling out the process for obtaining the documents makes clear that the relevant records are stored in active servers (and paper copy). No restoration of any kind is necessary. The only step the City identifies as burdensome is downloading the data from the cloud, but "[m]oving active and easily accessible ESI from one storage medium to another does not, by itself, render it inaccessible." *Al Otra Lado,* 328 F.R.D. at 421. *See also Sung Gon Kang,* 2020 WL 1689708, at *5. And it is not a basis for such an interminable delay in the production of these documents.

### g.   There is No Merit to the City's Other Objections

#### i.   Claims of Privilege

The City objects insofar as there are documents protected by attorney-privilege and work product. As discussed above, despite numerous requests Defendants have not produced a privilege log or any other details to substantiate its boilerplate objection. Defendant has therefore waived this objection. *Burlington Northern & Santa Fe Ry. Co*, 408 F.3d. at 1149. *See also DeSilva,* 2020 WL 5947827, at *2.

### ii.    Other boilerplate general objections

In addition to the specific objections to relevance and proportionality, the City provides three pages of general boilerplate objections.  The City simply incorporates these objections by reference into each of the requests for production, without providing any basis for the specific objection or even an assessment of whether the objection specifically applies to the request.  To the extent any of them even applied to this RFP, Defendant therefore waived these objections.  *See, e.g.*, *Bosley*, 2016 WL 1704159, at *5, n. 3.

### h.    Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce all documents responsive to RFP No. 29 within 21 days.

## DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 29:

RFP 29 asks for "<u>All</u> COMMUNICATIONS <u>related to the use of notices</u> used by the CITY or any of its contractors or subcontractors, including Chrysalis, LAHSA, and Clean Harbors, that are <u>related to ENCAMPMENT CLEANUPS</u>, including but not limited to any email instructions or clarifications related to the use of the notices [<u>2016-present</u>]." (Emphasis added).

The only relevance theory Plaintiffs advance as to RFP 29 is that communications about notices is relevant to *Monell*.  For all the reasons previously discussed, that is not a valid relevance theory.  Even if the communications had some minimal probative value, the request for all such communications, from 2016 to present, is not proportional to the needs of this case.  RFP 29 suffers from the same flaws as RFPs 23 and 26.  Just as with those RFPs, Plaintiffs admit that the City has produced the notices themselves, along with training documents, and has agreed to produce agreed-upon emails.  Plaintiffs have not established a need, much less a propotional need, for additional documents.  And as described above there is no merit to Plaintiffs' contention that the City has unreasonably delayed

producing emails nor that the City has waived privilege.  The City incorporates by reference its responses to RFPs 1, 2, 16, 23, and 26, which apply with equal force here.

**REQUEST FOR PRODUCTION NO. 30:**

All records documenting the posting of notices for ENCAMPMENT CLEANUPS, including but not limited to "survey/postings" records created by LA Sanitation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiff El-Bey's specific claims alleged in the SAC relating to incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western. Defendant further objects that the Request seeks documents that are not relevant to any named-plaintiffs' claims as alleged in the SAC. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking all records documenting encampment cleanups dating back over four years to April 2016 that are unrelated, and not relevant, to Plaintiff El Bey's specific claims alleged in the SAC. Defendant also objects to the Request to the extent the Request seeks information

protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all records documenting posting of notices for encampment cleanups outweighs the benefit of such information for Plaintiff El Bey's claims, and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would need to search the LASAN's WPIMS database to identify all incidents constituting "encampment cleanups" as defined in the Request. Defendant identified 41,734 incidents within WPIMS constituting "encampment cleanups" as defined in the Request for the period from April 1, 2016 to July 31, 2020. Defendant would have to conduct a query and search parameters within WPIMS to generate a report identifying all 41,734 incidents by the address listed for the encampment cleanup, date, incident/case number, and form of encampment cleanup. Defendant identified 22,089 incidents involving posted cleanups. For each identified incident number, Defendant would need to generate reports within WPIMS for the encampment cleanup, and collect associated posting surveys for each cleanup. Defendant would then have to conduct additional searches for encampment cleanup pictures and media files by incident number that are not stored on WPIMS. The number of pictures associated with an encampment cleanup could exceed over 700 pictures for one incident report. Defendant would also have to manually search for, collect, and assemble

related documents by incident number, including cleanup authorizations for each incident within LASAN's AMS.

Defendant would also need to search for potentially responsive documents or information for encampment cleanups as defined in the Request that may be maintained within LASAN's Customer Service Group's MyLA database for service requests. Defendant would have to conduct a search parameter for service requests relating to encampment cleanups as defined in the Request for the period from April 1, 2016 to the present and generate a report identifying service requests for defined encampment cleanups by location address and date range. Defendant would then need an analyst to manually review MyLA data and cross-reference incident/case numbers, addresses, and dates identified by Defendant's WPIMS query to determine potentially corresponding service requests for identified encampment cleanups involving posted notices. Defendant would then have to prepare a separate report containing identified service requests within the MyLA database corresponding to identified WPIMS incident/case numbers for encampment cleanups involving posted notices. In addition, for cleanups occurring after October 2019, Defendant would have to conduct searches for potentially responsive documents within the City's daily schedules issued for CARE and CARE+ operations by reviewing schedules and cross referencing the schedules with identified incident/case numbers, dates, and locations. Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents responsive to this Request for the reasons described above. Without waiving any, and based on these, objections, no documents will be produced in response to this Request.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 30:**

Defendant incorporates the General Objections as though fully set forth here.

Defendant objects that the Request seeks documents that are not relevant to

Plaintiffs' specific claims alleged in the Second Amended Complaint (Dkt. No. 42,

"SAC"). Plaintiff El-Bey alleges claims for specific incidents occurring on or

around January 10, 2019 at 6th Street and Alexandria and on or around June 4,

2019 at Oakwood and Western; Plaintiff Garcia alleges claims for specific

incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone

Avenue, on or around April 29, 2019 at Aetna Street and Van Nuys Boulevard, and

on or around August 14, 2019 at Calvert and Bessemer; Plaintiffs Zamora and

Zepeda allege claims for specific incidents occurring on or around March 21, 2019

at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and

Harvard; Plaintiff Haugabrook alleges claims for incidents occurring sometime in

March 2019 and a month later by Figueroa Street and 53rd Street and 52nd Place;

Plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019

at Lomita and McCoy; and Plaintiff Ashley alleges claims for a specific incident

occurring on or around May 21, 2019 at Lomita and McCoy. The Court struck

Plaintiff KFA's claims seeking any declaration that the City unconstitutionally

applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt.

No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to

obtain a ruling that the City's policies and practices are unconstitutional and not

that each past application of those policies and practices to its members was

unconstitutional."). Defendant also objects that the proposed discovery is not

relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No.

65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident …

to hold the City liable under *Monell*."). Defendant objects that the Request is

overbroad and burdensome in seeking all records documenting encampment

cleanups dating back over four years to April 2016 that are unrelated, and not relevant, to Plaintiffs' specific claims alleged in the SAC. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all records documenting posting of notices for encampment cleanups outweighs the benefit of such information for Plaintiffs' claims, and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would need to search the LASAN's WPIMS database to identify all incidents constituting "encampment cleanups" as defined in the Request. Defendant identified 41,734 incidents within WPIMS constituting "encampment cleanups" as defined in the Request for the period from April 1, 2016 to July 31, 2020. Defendant would have to conduct a query and search parameters within WPIMS to generate a report identifying all 41,734 incidents by the address listed for the encampment cleanup, date, incident/case number, and form of encampment cleanup. Defendant identified 22,089 incidents involving posted cleanups. For each identified incident number, Defendant would need to generate reports within WPIMS for the encampment cleanup, and collect associated posting surveys for each cleanup. Defendant would then have to conduct additional searches for encampment cleanup pictures and media files by incident number that are not stored on WPIMS. The number of pictures associated

with an encampment cleanup could exceed over 700 pictures for one incident report. Defendant would also have to manually search for, collect, and assemble related documents by incident number, including cleanup authorizations for each incident within LASAN's AMS.

Defendant would also need to search for potentially responsive documents or information for encampment cleanups as defined in the Request that may be maintained within LASAN's Customer Service Group's MyLA database for service requests. Defendant would have to conduct a search parameter for service requests relating to encampment cleanups as defined in the Request for the period from April 1, 2016 to the present and generate a report identifying service requests for defined encampment cleanups by location address and date range. Defendant would then need an analyst to manually review MyLA data and cross-reference incident/case numbers, addresses, and dates identified by Defendant's WPIMS query to determine potentially corresponding service requests for identified encampment cleanups involving posted notices. Defendant would then have to prepare a separate report containing identified service requests within the MyLA database corresponding to identified WPIMS incident/case numbers for encampment cleanups involving posted notices. In addition, for cleanups occurring after October 2019, Defendant would have to conduct searches for potentially responsive documents within the City's daily schedules issued for CARE and CARE+ operations by reviewing schedules and cross referencing the schedules with identified incident/case numbers, dates, and locations. Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents responsive to this Request for the reasons described above. Without waiving any, and based on these, objections, Defendant responds that Defendant produced LASAN posting surveys responsive to this Request for the individual Plaintiffs'

specific alleged incidents at CTY000001-2677, but Defendant objects to further production of documents responsive to this Request.

### PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 30:

Plaintiffs seek records that document the posting of notices related to encampment cleanups, including primarily "posting surveys," which are created by LA Sanitation to document the City's initial review of a homeless encampment prior to conducting a cleanup.  *See* Myers Decl., Exh. AU (including an exemplar of a posting survey).  Plaintiffs originally requested all posting surveys going back to April 2016.  The City has objected primarily based on purported burden and proportionality. However, the three pages of objections are duplicative of other objections and do not specifically address any burden associated with producing the "postings/surveys" themselves.  In an attempt to address the City's concerns, Plaintiffs revised its request to seek only those documents going back to January 1, 2018 and offered to meet and confer about ways to mitigate the burden asserted by the City.  *See* Myers Decl. ¶ 34. The City refused to provide any information about how these specific documents are stored or to otherwise discuss ways to mitigate its concerns, and instead, has simply refused to produce any additional posting surveys other than the posting notices related to the Specific Incidents.

### a.    Relevance of the Posting Surveys

The information contained in the "posting/survey" is directly relevant to the core issues in Plaintiffs' claims that the City has widespread and longstanding practices of seizing and destroying unhoused people's belongings in violation of the U.S. and California Constitutions.  First, taken together with the City's documentation about the cleanups themselves, they contribute to a "before" and "after" view of encampments, which is relevant to the question of what the City seizes and destroys.  The notices also contain highly relevant information about

how the cleanups are conducted (noting where encampments are, the factors the
City considers in determining how much time and what equipment is needed, and
what is known to the City about property ownership before the cleanup is
conducted).  The notices are also relevant to identifying witnesses whose property
was taken during cleanups—the photos show encampments as they existed before
the cleanups, which makes it possible for individuals to recognize their belongings.

The only objection Defendant raises to the relevance of these notices is
based on its willful misrepresentation of the scope of Plaintiffs' case and its total
disregard for both Plaintiffs' *Monell* claims and their claims for prospective relief.
There is no merit to this objection. Just as the individual "postings/surveys" notices
are relevant to the question of whether the City violated the individual Plaintiffs'
rights during the Specific Incidents, notices of other cleanups are relevant to
whether the City has a widespread custom or practice of constitutional violations.

## b.    Proportionality

The request for posting notices, which now goes back only a year prior to
the Specific Incidents and continuing through to the present, are proportional to the
needs of the case.  As discussed in detail above, the issues at stake in this litigation
are of constitutional significance; the amount in controversy is largely irrelevant
given that Plaintiffs primarily seek prospective relief to put an end to the City's
unconstitutional practices; and the City of Los Angeles has far more resources than
the seven unhoused individuals whose belongings were seized and the volunteer
organization whose resources go to replacing those belongings.  *See supra*,
Plaintiffs' Argument re: Response No. 2.  The other factors also weigh heavily in
Plaintiffs' favor.

### i.    Parties' relative access to relevant information

As with all documentation of cleanups, there is near total asymmetry of
access to relevant information. Defendant has all of the relevant information and

plaintiffs have almost none.[19]  This allows the City to cherry-pick documents it wishes to use from its database of thousands of cleanups, while refusing to produce the same documents that support Plaintiffs' case.  The implications of this asymmetry were on full display in response to Plaintiffs' motion to enjoin a provision of LAMC 56.11 on the ground that it is unconstitutional on its face. Even when the only issue before the Court was whether provisions of the ordinance were *facially* unconstitutional, the City still cherry-picked documents related to other cleanups to bolster its defense.  *See* Myers Decl., Exh. J. The documents it relied on are of the kind Plaintiffs seek here, but which the City has refused to produce.

### ii.     Importance of the discovery in resolving the issues

The parties in this case disagree about the City's practices in seizing and destroying unhoused people's belongings.  *See id.* at ¶ 47 (disputing Plaintiffs' allegation that it is the City's practice to deem "a bicycle with all of its parts and a detached front wheel present at a site" inoperable and therefore discard it). Evidence that relates to the existence of unconstitutional customs, policies, and practices and the question of whether those customs, policies, and practices are widespread and longstanding, is key to the question of both *Monell* liability and to the individual plaintiffs' and KFA's claims for prospective relief.

The City has kept documentation of its cleanups, which is the best evidence available of the extent to which these policies and customs exist.  For example, the

---

[19]   Plaintiffs have been able to gain access to some records from third parties who in turn have obtained City records through public records requests to the City. *See e.g.*, Riskin Decl., ¶¶ 3-9, Exh. A-C; Myers Decl., ¶¶ 78-83. Access to these documents from third parties who also obtained them from the City does not militate against production in discovery, because the information is still solely the City's information.  Moreover, Plaintiffs cannot ensure that all documents have been produced to the third parties, nor can they seek court intervention, as they are forced to do here, if the production is incomplete. The fact that the documents have been produced to third parties simply underscores the accessibility of these documents and the relative ease with which the City has been able to produce this information in the past.

posting/surveys are the best available evidence of the City's practices and customs of posting notices before conducting comprehensive cleanups, including, for example, the question of whether and to what extent the City posts notices of cleanups it does not conduct.  The use of these notices is also critical to the claims that the City violates unhoused people's due process rights.  In fact, the City's defense against those claims centers around the use of these notices.  *See e.g.*, Opposition to Plaintiffs' Motion for a Preliminary Injunction (Dkt. 42).  Evidence of the City's practices related to the posting of notices also goes directly to Plaintiffs' claim that the City's practice of posting notices and then failing to conduct cleanups undermines the sufficiency of these notices and renders seizures and destruction unreasonable. Finally, the notices also show what encampments look like prior to the cleanups, which goes directly to the question of what and how much property the City seizes and destroys.

### iii. Whether the burden or expense of the proposed discovery outweighs its likely benefit

Although the City puts forth two pages of explanation about the steps it asserts are necessary to identify and produce responsive documents, the steps spelled out by Defendant do not appear necessary or relevant to this request or answer any questions about how the documents are stored, such that producing a large volume of documents would create a burden for the City that outweighs its likely benefit.

First, the main burden the City raises to produce responsive documents is the time and expense of sorting through a large volume of documents to identify specific documents responsive to Plaintiffs' requests. For example, the City suggests that it must generate "a report identifying all cleanups, and then collect associated posting surveys for each cleanup."  But Defendant provides no explanation whatsoever, despite numerous requests from Plaintiffs for it to do so, about how these documents are stored.  Plaintiffs' request does not require the City

to search for any specific documents.  In an attempt to mitigate any purported burden to Defendant, Plaintiffs request *all* posting surveys, which eliminates the expense of identifying specific documents responsive to Plaintiffs' requests.  The City can simply produce all of the documents in its possession, custody or control.  The same is true for all requests for the City's documentation of cleanups.  As long as the City produces metadata of the documentation of individual incidents and retains the file structure of the stored documents, Plaintiffs will take on any burden of sorting through the documents that have been produced.

Second, although the number of documents responsive to this request may be voluminous (although not as many as the City alleges, because Posting surveys are issued per day, not per cleanup), the number of documents responsive to a request is not relevant to the question of burden, *In re Citibank Mortgage*, 2012 WL 10450139, at *4, nor is it dispositive of the question of whether the burden outweighs the benefit. *See Gutierrez,* 2019 WL 8060079, at *9.  Here, Defendant has refused to provide any information about how the documents are stored or what would be required to actually produce the documents.  Plaintiffs repeatedly requested the City provide Plaintiffs with this information in order to allow the parties to discuss the potential burden and ways to minimize that burden, but the City refused.  Because the City failed to provide any information about how the documents are stored or what would be required to produce these specific documents, it cannot support its claim that that the production of these documents is burdensome.

And finally, these documents are public records, which undermines the City's argument that the production of the documents would be burdensome, both because there is no corresponding privacy interest at stake, and because the City has routinely produced these documents in response to CPRAs.  A burden analysis often assumes that information subject to disclosure would otherwise be private

and but for Rule 26, would not otherwise available to the opposing party (e.g.,
financial information of private parties, arrest and personnel records).  Therefore, a
component of the burden analysis assumes limitations to prevent requests that
unnecessarily invade a party's privacy interests.  *See e.g., In re: Citimortgage*,
2012 WL 10450139 at *3 (Court balanced defendant's right to confidentiality
against the relevance of the information being sought by plaintiffs in ordering
production); *Ragge v. MCA/Universal Studios*, 165 F.R.D. 601, 605 (C.D. Cal.
1995).  That analysis does not apply to these records, however because the City of
Los Angeles is subject to the CPRA.  The documents Plaintiffs seek in this request
are unquestionably public documents subject to disclosure under the CPRA.  In
fact, the City has routinely produced these exact documents in response to public
records act requests.  *See* Riskin Decl., ¶ 3, Myers Decl., ¶¶ 79-82.   There is no
privacy interest at stake in overproducing documents in response to a request the
City considers "overbroad."  The only factor at issue then is the burden of the
actual production of documents, which here is minimal.

       c.    **Objection that the Discovery Sought is not "Reasonably Accessible"**

Defendant objects that the documents sought are not "reasonably accessible,
based on the undue burden and costs associated with searching for and producing
documents responsive to this Request. . . ."  To the extent the City intends this
objection to refer to the special limitation for ESI under Rule 26(b)(2)(B), the
objection misses the mark.

Under Rule 26(b)(2)(B), "A party need not provide discovery of
electronically stored information from sources that the party identifies as not
reasonably accessible because of undue burden or cost."  Fed. Rule Civ. Pro. 26(b
)(2)(B).  The burden for demonstrating that ESI is stored in sources that are not
"reasonably accessible" rests on the party objecting to the discovery, and then the
burden shifts to the party seeking discovery to demonstrate good cause.  *Id.*

Defendant cannot meet the burden here.  As an initial matter, the Rule 26(b)(2)(B) applies only to ESI, not other documents, and these documents exist in both paper and electronic form.  But even with ESI, the City's own explanation of the process for obtaining responsive documents prove why the documents are in fact "readily accessible" under Rule 26(b)(2)(B).

In *U.S. ex rel. Carter*, 305 F.R.D. at 240, the Court articulated the well-established distinction between "readily accessible" documents which are subject to the standard Rule 34 analysis and "inaccessible" ESI, which is subject to the Rule 26 limitation.  In general, inaccessible ESI "is not readily useable and must be restored to an accessible state before the data is usable," such as archival backup tapes or backups of data stored for emergency restoration.  *Id. But see U.S. Exh. Rel. Guardiola*, 2015 WL 5056726, at *3-4 (even some backup documents may be deemed readily accessible if the backups can be easily restored and finding the $136,000 cost of restoration reasonable); *Sung Gon Kang*, 2020 WL 1689708, at *5 (even sources of documents that are encrypted and not searchable were still "readily accessibly" under Rule 26(b)(2)(B)).  On the other hand, "[a]ctive ESI sources—e.g., active computer files or e-mail records—proceeds in the same manner as would discovery from paper sources.... No special request must be made, and no special standards apply."  *Tyler*, 2015 WL 1955049, at *1 (citation omitted).

The documents Plaintiffs seek come from precisely these kinds of "active ESI." As the City's objection spelling out the process for obtaining the documents makes clear, the relevant records are included in active databases and servers.  No restoration of any kind is necessary.  The only step the City identifies as burdensome is downloading the data from the cloud, but "[m]oving active and easily accessible ESI from one storage medium to another does not, by itself, render it inaccessible." *Al Otro Lado, Inc.,* 328 F.R.D. at 421.  Any burden the City

identifies is not in accessing the documents, but instead in compiling them for production. That does not make the documents "inaccessible" under Rule 26(b)(2)(B). *See Sung Gon Kang,* 2020 WL 1689708, at *5 (finding that requested documents were reasonably accessible and not burdensome where "accessing the [documents] and their content is easily achievable but compiling the [documents] may prove somewhat time consuming").

### d. The City Waived its Other Objections

The City objects that "to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines." The City has refused to provide any information about any documents it is withholding on the basis of this objection, or even how the objection would apply to this category of documents. The use of this boilerplate objection here is patently absurd and an abuse of the discovery process. *See Polaris,* 2017 U.S. Dist. LEXIS 222261, at *14-17. Defendant has waived any objections it might have had that these documents were privileged by failing to provide any additional information regarding these claims. *See DeSilva,* 2020 WL 5947827, at *7.

The City has also waived its general objections, which as with all of its requests, the City incorporates into this response. But here as well, the City failed to provide any basis for the specific objection or even an assessment of whether the objection specifically applies to the request, let alone whether any documents are being withheld on the basis of any of these objections. The use of boilerplate objections here is also inappropriate and an abuse of the discovery process. *Polaris*, 2017 U.S. Dist. LEXIS 222261, at *14-17; *Eisenhower Med. Ctr.*, 2020 U.S. Dist. LEXIS 218716, at *9.

The City's boilerplate objections do not apply to this specific Request for Production. The City refused to clarify which of the objections (if any) applied to this request, let alone the facts necessary to support its application, even after

months of requests by Plaintiffs for the City to do so as required by Rule 34.  The City has therefore waived the objection.  *See, e.g.*, *Bosley*, 2016 WL 1704159, at *5  (Defendant waived blanket objections by failing to provide details of the objections as required by Rule 34(b)(2)(B)).

### DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 30:

Posting surveys are a subset of the encampment cleanup documents requested in RFP Nos. 2 and 33. The City's Response to RFP No. 2 addresses in detail the City's summary of Plaintiffs' alleged claims in the SAC, and arguments regarding relevance, Monell, the DJA, proportionality, burden and expense.  *See* City Response to RFP No. 2, *supra*.  Rather than restate the City's detailed responses to those issues here, the City refers the Court to those arguments and addresses several additional issues specific to RFP No. 30.

### A.  City's Additional Arguments Re Relevance

As an initial matter, LSD prepares posting surveys for posted comprehensive cleanups.  Wong Decl. ¶¶ 8-9.  ECIs survey cleaning areas and written notices of major cleanup location a minimum of 24 hours and no more than 72 hours before the official start time for the cleanup under the SOPs.  Wong Decl. ¶ 9.  ECIs take pictures of the written notices posted at the cleanup location and prepare the posting survey.  *Id.*  LSD also conducts unposted compliance and response to immediate threats to public health and safety that may be conducted the same day or in less than 24 hours that fall under CARE and were previously referred to as Rapid-Response cleanups.  Wong Decl. ¶ 15.

Plaintiffs moved to compel further production of incident-specific documents for Plaintiffs Zamora and Zepeda and Plaintiff Haugabrook under RFP No. 2, but those incidents allege unposted Rapid-Response cleanups.  Lebron Decl. ¶ 2, **Ex. 27**, SAC ¶¶ 156, 170 (Zamora and Zepeda); ¶ 195 (Haugabrook).  The

248

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

City produced incident-specific documents, including posting surveys, included within document productions made on November 9, 2019 on (CITY00001-2212) and December 10, 2019 (CTY002213-2677).  Lebron Decl. ¶ 15.  Plaintiffs do not challenge the sufficiency of the City's production of posting surveys in the incident-specific discovery.

Similar to RFP No. 2, the City raised privilege objections based on Plaintiffs' broad demand for all email communications relating to various topics. The City has not withheld any documents on the basis of privilege for incident-specific documents produced in response to this request.  The argument that the City waived privilege because it did not produce a privilege log on over half a million documents that that the City has not reviewed fails for the same reasons discussed in the City's Response to RFP No. 1.  *See* City's Response to RFP No. 1, *supra*.  Similarly, Plaintiffs are not entitled to a declaration regarding the City's search efforts.  *Travelers Indem. Co. v. Trumpet, Inc.*, Case No. 8:19-cv-01036-PSG (JDEx), 2020 U.S. Dist. LEXIS 166187, at *45 (C.D. Cal. May 8, 2020).

Plaintiffs argue that posting surveys are relevant to allow individuals to determine whether they recognize property in any pictures included in the posting survey.  This discovery is admittedly not related to the Plaintiffs' specific alleged claims, but an attempt to conduct discovery on unalleged claims or efforts to search for potential new plaintiffs, both of which are outside the scope of Rule 26(b)(1).  *Valenzuela v. City of Calexico*, Case No. 14-cv-481-BAS-PCL, 2015 U.S. Dist. LEXIS 26566, at * 3 (S.D. Cal. Mar. 4, 2015) ("[A] litigant may not file suit in order to use discovery as the sole means of finding out whether [plaintiffs have] a case.") (quotations omitted); *Carrera v. First Am. Home Buyers Prot. Co.*, Case No. 13cv1585 H (WMc), 2014 U.S. Dist. LEXIS 190451, at *7-8 (S.D. Cal. Jan. 29, 2014) (the purpose behind Rule 26(b)(1) . . . is to "signal[] to the parties

that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings").

Plaintiffs also argue that posting surveys are relevant to identifying witnesses whose property was taken during the cleanups or for showing before and after pictures of a cleanup area.  As noted above, posting surveys document the area survey and posting of written notices of a major comprehensive cleanup and include pictures taken of the written notices posted in the cleanup area between 24-72 hours before scheduled start time.  Wong Decl. ¶ 9.  Between the posting of the notice and start of the cleanup operation, individuals may have vacated the cleanup area before the start time, property in the cleanup area may have been removed by the owner before the cleanup starts, or property may have been removed and stored or discarded during cleanup operation.  Plaintiffs' argument that this information is relevant to identify witness or property is entirely speculative.  *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1072 (9th Cir. 2004) ("District courts need not condone the use of discovery to engage in fishing expeditions.") (quotations omitted).

Plaintiffs claim that the posting surveys may reflect a practice of posting notices but then cancelling a cleanup operation.  Assuming, *arguendo*, that such a policy existed, Plaintiffs do not explain how posting a notice, but not conducting a cleanup, violates the Fourth Amendment or Due Process Clause, or constitutes a moving force behind the alleged violation of Plaintiffs' constitutional rights. *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985); *Centeno v. City of Fresno*, Case No. 1:16-cv-00653-DAD-SAB, 2016 U.S. Dist. LEXIS 180013, at * 23 (E.D. Cal. Dec. 29, 2016) ([T]he mere existence of a policy is not sufficient to trigger liability under Section 1983, the policy of the department has to be the moving force behind the constitutional violation.").  Plaintiffs cite no authority supporting the contention that cancelling a cleanup violates constitution.  A policy that causes

no constitutional violation is irrelevant. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

### B.  City's Additional Arguments Re Proportionality and Burden

Plaintiffs contend that the City did not meet and confer regarding the burdens imposed on the City by the discovery request.  Not so.  On August 24, 2020, the City raised its concerns regarding burden and proportionality in a meet-and-confer letter.  Lebron Decl. ¶ 11, 18-19, **Ex. 36** (City 8/24/20 M&C Letter) at p.8-9.  The City identified over 41,000 encampment cleanups dating back to April 2016, and explained that LASAN would need to generate a report of all encampment cleanups, determine which cleanups were posted comprehensive cleanups, identify those cleanups by the WPIMS incident/case number, and then manually search for and collect the posting surveys by the WPIMS incident/case number. Lebron Decl. ¶ 11, Ex. 36.  On August 25, 2020, the Parties conducted a meet-and-confer call, during which the City addressed the burdens with the production of these documents.  Lebron Decl. ¶ 19.

On September 25, 2020, the City responded to Plaintiffs' September 14, 2020 meet-and-confer letter, in which Plaintiffs proposed that the City produce all documents dating back to January 1, 2018 (instead of April 1, 2016), and offering to accept all information contained in the City's databases without limitation or parameters. Lebron Decl. ¶ 12, **Ex. 37** (City 9/25/20 M&C Letter) at p.7.  In response to RFP Nos. 30-34, the City explained that it identified over 32,000 encampment cleanups dating back to January 1, 2018, and that Plaintiffs' proposals did not address the burdens imposed on collecting the documents described in detail in the City's August 24, 2020 meet-and-confer letter. *Id.* at p.13.

During the meet-and-confer process, the City attempted to address Plaintiffs' expansive demands by agreeing to produce certain electronically exportable information (but not documents) from WPIMS, AMS, and MYLA311 database.

Ursea Decl. ¶¶ 12, 27.  WPIMS excel spreadsheet CTY020222 contains additional
data regarding encampment cleanups conducted in 2018 and 2019 and WPIMS
spreadsheet CTY020331 contains this information for 2020.  Lebron Decl. ¶ 13,
**Ex. 39** (City's Amended Rog Responses), Response 13(c); Wong Decl. ¶ 25; Ursea
Decl. ¶ 27, **Ex. 19** (Exemplar screenshots of WPIMS excel spreadsheet).

The Wong Declaration and the City's Amended Interrogatory Responses
support the City's objections regarding the burdens imposed on the City in
responding to Plaintiffs' request.  *See* Wong Decl. ¶¶ 16-29.   In August 2020, the
City identified approximately 32,730 incidents/cases for the period from January 1,
2018 to July 31, 2020.  Wong Decl. ¶ 24.  LSD uses the incident/case number to
identify reports and documents saved on WPIMS.  Wong Decl. ¶ 21.  There is no
automated method for exporting documents and reports saved on WPIMS, and the
reports and related documents must be identified by WPIMS incident/case number
and downloaded manually.  Wong Decl. ¶¶ 21, 26; Lebron Decl. ¶ 14, **Ex. 39**
(City's Amended Rog Responses), Response 13(c).  In order to obtain a document,
like a posting survey, on WPIMS, an ECI must manually download one document
or report at a time.  Wong Decl. 21.  In order to collect all posting surveys, an ECI
would need to reference a spreadsheet identifying all WPIMS incident/case
numbers, the date and type of cleanup (posted comprehensive cleanup or
compliance action), manually download posting surveys saved in WPIMS, conduct
additional searches by incident/case number for documents not saved on WPIMS.
Wong Decl. ¶ 26.

The City would assign one or more ECIs to collect documents relating to
encampment cleanups, including posting surveys.  Wong Decl. ¶ 27.  LSD is
currently short staffed with 12 ECI positions currently vacant as a result of budget
cuts or ECI's promoting or transferring to other positions.  *Id.*  The work required

to collect encampment cleanup reports and related documents, like posting survey, would strain LSD's existing resources.  *Id.*

The City estimates that it would cost approximately $270,000 to collect all encampment cleanup documents and posting surveys dating back to January 1, 2018.  Wong Decl. ¶ 29.  The estimated of the amount of time to collect approximately 32,730 encampment cleanup reports and related documents (including posting surveys) is approximately 6,546 hours.  Wong Decl. ¶ 28.  This is based on a conservative time estimate of 12 minutes to obtain documents by WPIMS incident/case numbers.  *Id.*  Assuming it would take an ECI 6,546 hours to complete the document collection, **the total estimated cost to the City is over $270,000**.  Wong Decl. ¶ 29.  This is based on an average ECI rate of $41.27 per hour.  *Id.*  The cost and burden imposed on the City's resources is substantial.  For this and reasons discussed in more detail in the City's Response to RFP No. 2, Plaintiffs' discovery demands are not proportional to the needs of this case.  *See* City Response to RFP No 2, *supra*; *Hoffman v. Cnty. of Los Angeles*, Case No. CV-15-03724-FMO (ASx), 2016 U.S. Dist. LEXIS 123515 * (C.D. Cal. Jan. 5, 2016); *Goodwin v. City of Glendora*, Case No. CV-17-3537-FMO (PLAx), 2017 U.S. Dist. LEXIS 224122, * 15-16 (C.D. Cal. Dec. 13, 2017); *Saunders v. City of Chicago*, Case No. 12-cv-9158, 2017 U.S. Dist. LEXIS 509, * 31-32 (N.D. Ill. Jan. 4, 2017); *Crawford v. Cnty. of Orange*, Case No. SA-CV-160503—DOC (DFMx), 2017 U.S. Dist. LEXIS 224164 (C.D. Cal. Oct. 13, 2017).  The motion to compel production of all posting surveys for encampment cleanups conducted since January 1, 2018 should be denied.

**REQUEST FOR PRODUCTION NO. 33:**

All HOPE/Rapid Response 56.11 Enforcement Reports and related DOCUMENTS. This request includes related Health Hazard checklists, HOPE Metrics sheets, photographs, and other DOCUMENTS related to these reports.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 33:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiff El-Bey's specific claims alleged in the SAC relating to incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western. Defendant further objects that the Request seeks documents that are not relevant to any named-plaintiffs' claims as alleged in the SAC. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking documents regarding encampment cleanups dating back over four years to April 1, 2016 that are unrelated, and not relevant, to Plaintiff El Bey's specific claims alleged in the SAC. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers*

*U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing any such proposed discovery outweighs the benefit of such information for Plaintiff El Bey's claims and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would need to search LASAN's WPIMS database to identify all incidents constituting "encampment cleanups" as defined in the Request. Defendant identified 41,734 incidents within WPIMS constituting "encampment cleanups" as defined in the Request for the period from April 1, 2016 to July 31, 2020. Defendant would have to conduct a query and search parameters within WPIMS to generate a report identifying all 41,734 incidents by the address listed for the encampment cleanup, date, incident/case number, and form of encampment cleanup. For each identified incident number, Defendant would need to generate reports within WPIMS for the encampment cleanup, and collect associated health hazard checklists by incident number.

For each identified incident number, Defendant would need to generate reports within WPIMS for the encampment cleanup, and collect associated health hazard checklists. Defendant would then have to conduct additional searches for encampment cleanup pictures and media files by incident number that are not stored on WPIMS. The number of pictures associated with an encampment cleanup could exceed over 700 pictures for one incident report. Defendant would also have to manually search for, collect, and assemble related documents by incident number, including any posting surveys, hazardous-waste disposal records, non-

hazardous waste disposal records, and cleanup authorizations maintained in
LASAN's AMS. In addition, upon identifying specified incident/case numbers for
responsive encampment cleanups, Defendant would then have to conduct searches
for potentially responsive LAPD records for any incidents involving LAPD HOPE
officers by corresponding date, location, and LAPD Bureau, including searches for
LAPD Daily Field Activity Reports (DFAR), Watch Commander Daily Reports,
Sergeant's Daily Reports, and LAPD Computer Aided Dispatch (CAD) Reports. In
addition, Defendant would have to search for LAPD body worn video that may
exist for identified incidents involving LAPD HOPE Officers and review such
video for responsiveness to the Request. Defendant previously conducted a search
for and produced such incident-specific documents for the named individual
plaintiffs' specific incidents at CITY00001-2677.

Defendant would also need to search for potentially responsive documents
or information for encampment cleanups as defined in the Request that may be
maintained within LASAN's Customer Service Group's MyLA database for
service requests. Defendant would have to conduct a search parameter for service
requests relating to encampment cleanups as defined in the Request for the period
from April 1, 2016 to the present and generate a report identifying service requests
for defined encampment cleanups by location address and date range. Defendant
would then need an analyst to manually review MyLA data and cross-reference
incident/case numbers, addresses, and dates identified by Defendant's WPIMS
query to determine potentially corresponding service requests for identified
encampment cleanups. Defendant would then have to prepare a separate report
containing identified service requests within the MyLA database corresponding to
identified WPIMS incident/case numbers for encampment cleanups. In addition,
for cleanups occurring after October 2019, Defendant would have to conduct
searches for potentially responsive documents within the City's daily schedules

issued for CARE and CARE+ operations by reviewing schedules and cross
referencing the schedules with identified incident/case numbers, dates, and
locations. Defendant objects that the Request seeks documents that are not
reasonably accessible based on the undue burden and costs associated with
searching for and producing documents responsive to this Request for the reasons
described above. Without waiving any, and based on these, objections, no
documents will be produced in response to this Request.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 33:**

Defendant incorporates the General Objections as though fully set forth here.
Defendant objects that the Request seeks documents that are not relevant to
Plaintiff El-Bey's specific claims alleged in the SAC relating to incidents occurring
on or around January 10, 2019 at 6th Street and Alexandria and on or around June
4, 2019 at Oakwood and Western. Defendant further objects that the Request seeks
documents that are not relevant to any named-plaintiffs' claims as alleged in the
SAC. The Court struck Plaintiff KFA's claims seeking any declaration that the
City unconstitutionally applied LAMC 56.11 or the City's policies or practices to
KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the
SAC as seeking only to obtain a ruling that the City's policies and practices are
unconstitutional and not that each past application of those policies and practices to
its members was unconstitutional."). Defendant also objects that the proposed
discovery is not relevant to establishing *Monell* liability for the claims alleged in
the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a
single incident … to hold the City liable under *Monell*."). Defendant objects that
the Request is overbroad and burdensome in seeking documents regarding
encampment cleanups dating back over four years to April 1, 2016 that are
unrelated, and not relevant, to Plaintiff El Bey's specific claims alleged in the
SAC. Defendant also objects to the Request to the extent the Request seeks

information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing any such proposed discovery outweighs the benefit of such information for Plaintiff El Bey's claims and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would need to search LASAN's WPIMS database to identify all incidents constituting "encampment cleanups" as defined in the Request. Defendant identified 41,734 incidents within WPIMS constituting "encampment cleanups" as defined in the Request for the period from April 1, 2016 to July 31, 2020. Defendant would have to conduct a query and search parameters within WPIMS to generate a report identifying all 41,734 incidents by the address listed for the encampment cleanup, date, incident/case number, and form of encampment cleanup. For each identified incident number, Defendant would need to generate reports within WPIMS for the encampment cleanup, and collect associated health hazard checklists by incident number.

For each identified incident number, Defendant would need to generate reports within WPIMS for the encampment cleanup, and collect associated health hazard checklists. Defendant would then have to conduct additional searches for encampment cleanup pictures and media files by incident number that are not stored on WPIMS. The number of pictures associated with an encampment cleanup

could exceed over 700 pictures for one incident report. Defendant would also have to manually search for, collect, and assemble related documents by incident number, including any posting surveys, hazardous-waste disposal records, non-hazardous waste disposal records, and cleanup authorizations maintained in LASAN's AMS. In addition, upon identifying specified incident/case numbers for responsive encampment cleanups, Defendant would then have to conduct searches for potentially responsive LAPD records for any incidents involving LAPD HOPE officers by corresponding date, location, and LAPD Bureau, including searches for LAPD Daily Field Activity Reports (DFAR), Watch Commander Daily Reports, Sergeant's Daily Reports, and LAPD Computer Aided Dispatch (CAD) Reports. In addition, Defendant would have to search for LAPD body worn video that may exist for identified incidents involving LAPD HOPE Officers and review such video for responsiveness to the Request. Defendant previously conducted a search for and produced such incident-specific documents for the named individual plaintiffs' specific incidents at CITY00001-2677.

Defendant would also need to search for potentially responsive documents or information for encampment cleanups as defined in the Request that may be maintained within LASAN's Customer Service Group's MyLA database for service requests. Defendant would have to conduct a search parameter for service requests relating to encampment cleanups as defined in the Request for the period from April 1, 2016 to the present and generate a report identifying service requests for defined encampment cleanups by location address and date range. Defendant would then need an analyst to manually review MyLA data and cross-reference incident/case numbers, addresses, and dates identified by Defendant's WPIMS query to determine potentially corresponding service requests for identified encampment cleanups. Defendant would then have to prepare a separate report containing identified service requests within the MyLA database corresponding to

**JOINT STIPULATION REGARDING PLAINTIFFS' MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

identified WPIMS incident/case numbers for encampment cleanups. In addition, for cleanups occurring after October 2019, Defendant would have to conduct searches for potentially responsive documents within the City's daily schedules issued for CARE and CARE+ operations by reviewing schedules and cross referencing the schedules with identified incident/case numbers, dates, and locations. Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents responsive to this Request for the reasons described above. Without waiving any, and based on these, objections, Defendant responds that Defendant produced LAPD HOPE and LASAN 56.11 enforcement reports responsive to this Request for the individual Plaintiffs' specific alleged incidents at CTY000001-2677, but Defendant objects to further production of documents responsive to this Request.

### PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 33:

Plaintiffs seek the HOPE/Rapid Response Enforcement Reports and related documentations for encampment cleanups. *See* Myers Decl., ¶ 81, Exh. AU. Plaintiffs originally requested these documents going back to April 2016, based in part on the City's willingness to produce these very documents in response to third party CPRAs. *See* Myers Decl., ¶¶ 79-82.  In response to Plaintiffs' request, however, the City refused to produce any of these documents (including the ones previously produced pursuant to the CPRA), arguing now that the requests were not relevant to Plaintiffs' claims and not proportionate to the needs of the case. The City's objections however do not relate to the actual burden associated with the case—the three pages of objections are duplicative of other objections and do not specifically address any burden associated with producing these specific documents. In an attempt to address the City's concerns, Plaintiffs revised its

request to seek only those documents going back to January 1, 2018 and clarified
that Plaintiffs did not intend the request to include all of the documents described
by Defendant (including LAPD documents, etc.).  Plaintiffs again requested
information about how the specific documents were stored, offered other options
such as sampling, and again offered to meet and confer about ways to mitigate the
burden asserted by the City.  *See* Myers Decl., ¶38, Exh. U.  The City refused to
provide any information about how these specific documents are stored or even
how many reports actually exist,[20] and instead, has refused to produce any
additional Health Hazard reports than the ones related to the Specific Incidents it
had previously produced.

### a.    Relevance of the Reports

The information contained in the HOPE/Rapid Response reports and Health
Hazard Assessment checklists are directly relevant to the core issues in Plaintiffs'
claims that the City has widespread and longstanding practices of seizing and
destroying unhoused people's belongings in violation of the US and California
Constitutions.  These reports document the City's implementation of the very
policies that are at issue in this litigation, not for Plaintiffs' *Monell* claims, but also
for its claims for prospective relief.

The reports contain the City's descriptions of how it conducts the cleanups,
including qualitative descriptions of how it identifies property to seize and destroy.
In fact, these documents are the only records the City keeps of items it impounds
and subsequently destroys. *See* Myers Decl., ¶ 81, Exh. AU.  Alongside the

---

[20] The City contends that there are more than 41,000 "encampment cleanups"
identified in the WPIMS database from April 2016 to the present, but the City does
not state whether there are Health Hazard Assessments and checklists for each
entry.  In the WPIMS database produced to Plaintiff for 2018-2019 (CTY020222)
there were 17,106 entries, and of those, more than 10,000 of the entries did not
contain any data related to "solid waste-lbs collected," suggesting that the cleanup
did not occur. And even when a Rapid Response enforcement action does occur,
the City does not necessarily appear to create a report. *See* Myers Decl. ¶ 82.

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO
REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

Posting/Surveys, the documents contribute to a "before" and "after" view of encampments, which is relevant to the question of what property the City seizes and destroys.  And in some instances, the documents identify the names of witnesses whose property was also taken pursuant to these policies.  Therefore, these reports are directly relevant to the question of what the City's policies, customs and practices are when it conducts these cleanups, which is the core issue in this case.

As with all of its other only objections, Defendant's objection to the relevance of these notices is based on its willful misrepresentation of the scope of Plaintiffs' case and its total disregard for both Plaintiffs' *Monell* claims and their claims for prospective relief.  Just as the individual reports and health hazard checklist are relevant to the question of whether the City violated the individual Plaintiffs' rights during the Specific Incidents, reports of the City's conduct when conducting other cleanups are relevant to whether the City has widespread customs or practices that violate the Constitution. Finally, the documents are relevant for impeachment purposes.

### b. Proportionality

The request for Enforcement Reports, Health Hazard checklists, and photographs, which now goes back only a year prior to the Specific Incidents and continuing through to the present, is proportional to the needs of the case.  As discussed in detail above, the issues at stake in this litigation are of constitutional significance; the amount in controversy is largely irrelevant given that Plaintiffs primarily seek prospective relief to put an end to the City's unconstitutional practices; and the City of Los Angeles has far more resources than the seven unhoused individuals whose belongings were seized and the volunteer organization whose resources go to replacing those belongings. *See supra*, Plaintiffs Argument re: Request No. 2.  The other factors also weigh heavily in Plaintiffs' favor.

### i.     Parties' relative access to relevant information

As with all documentation of cleanups, there is near total asymmetry of access to relevant information. Defendant has all of the relevant information and plaintiffs have almost none. This limits Plaintiffs' ability to marshal evidence in support of its claims of widespread and longstanding customs and practices, while allowing the City to cherry-pick documents it wishes to use from its database of thousands of cleanups, while refusing to produce the same documents that support Plaintiffs' case.

The impact of this is magnified by the parties' relative access to resources. As discussed above, *see infra*, Plaintiffs Arguent re: RFP No. 2, Plaintiffs and witnesses in this case are unhoused residents who allege they are frequently and consistently subject to constitutional violations that result in the loss of all of their belongings.  They have difficulty keeping track of dates and times when these violations occur, given their lack of access to working phones, the internet, or even paper to keep track of the dates and times of those violations.  And of course, the constitutional violations they allege actually make it even harder for them to track, for example, the dates and times they were subjected to those violations because the Encampment Cleanups frequently result in the loss of the tools necessary to keep track of that information.  On the other hand, the City devotes thousands of hours to documenting these cleanups in the reports Plaintiffs now seek.

Already in this case, Defendant has attempted to take full advantage of Plaintiffs' lack of documentation and uncertainty around specific dates and times to undermine Plaintiffs and witnesses.  From the beginning of this case, the City sought to undermine Plaintiffs James Haugabrook, Miriam Zamora and Gladys Zepeda's claims by selectively producing some documents and withholding others. *See* Myers Decl., ¶¶ 69-73.  The City attempted to pressure Plaintiffs to dismiss these claims based on their representations that the cleanups alleged in the Complaint did not occur.  The City went so far as to selectively produce 22 reports

of cleanups and represented to Plaintiffs and this Court that it was producing "all reports of all cleanups in South LA," when this was demonstrably false.  *See infra,* Plaintiffs' Argument re: Request No. 2; Myers Decl., ¶¶ 69-72.  Similarly, Defendant produced documentation from five cleanups on June 11, 2019, but withheld for 18 months the documents actually related to the cleanup that forms the basis of Ms. Zamora and Ms. Zepeda's claims. And for the March 21, 2019 allegations, the City likewise produced documents for a cleanup at an entirely different location.  *Id.*

Similarly, in response to declarations from KFA members in support of the motion for a Preliminary Injunction, Defendants selectively used reports from other cleanups in an attempt to undermine their credibility.  *See* Myers Decl., ¶ 20, Exh. K.  Even when the only issue before the Court was whether provisions of the ordinance were *facially* unconstitutional, the City still cherry-picked the very documents sought by Plaintiffs here in order to bolster its defense.

The total asymmetry of access to information would allow the City to continue to cherry-pick reports and selectively produce and then use as evidence only those reports that support its defenses, while withholding documents that support Plaintiffs' claims.

### ii.   Importance of the discovery in resolving the issues

The parties in this case disagree about the City's practices in seizing and destroying unhoused people's belongings—the City contends it only destroys property that it constitutes an immediate threat to public health and safety, while Plaintiffs allege that in fact, the City destroys property that is not.  The parties disagree on a number of other points about the City's customs and practices.  *See e.g.,* Myers Decl., ¶ 38, Exh. K at ¶ 47 (disputing Plaintiffs' allegation that it is the City's practice to deem "a bicycle with all of its parts and a detached front wheel present at a site" inoperable and therefore discard it).  Evidence that relates to the

existence of unconstitutional customs, policies, and practices and the question of whether those customs, policies, and practices are widespread and longstanding, is key to the question of both *Monell* liability and to the individual plaintiffs' and KFA's claims for prospective relief.  The City has kept documentation of how it conducts its cleanups, which is some of the best evidence available of the extent to which the policies exist, including, for example, the question of whether and to what extent the City posts notices of cleanups it does not conduct.

In fact, these reports and related photos appear to be on the only documentation kept by the City about what it actually seizes and destroys, The rest of the City's qualitative data, which the City has now produced, is related to the total amount of "trash" that has been disposed of and property that has been sent to storage.  This data, therefore is crucial to resolving the key issues in this case.

### iii.  Whether the burden or expense of the proposed discovery outweighs its likely benefit

Defendant has refused to produce any additional documentation of the City's Encampment Cleanups, other than the ones related to the Specific Incidents and the ones it has cherry-picked to produce, because it asserts that producing more would be too burdensome.  As with the other documentation related to cleanups, the documents Plaintiffs seek are public records which the City has frequently produced in response to public records act requests.  In fact, the City provided these exact documents in response to CPRA requests in 2018 and 2019.  Myers Decl., ¶¶ 79-82.  Defendant did not assert an objection on the basis of burden then, and instead simply produced the documents.  *Id*.

Here on the other hand, the City does assert a burden. There is no merit to this argument.  Defendant lays out two pages of steps to produce the documents responsive to this request, but in reality, the majority of the steps spelled out by Defendant are not necessary.  In fact, according to Defendant, all that is required of Defendant to produce these documents is to 1) run a search in WPIMS for

265

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

encampment cleanups (which it has already done); 2) generate the reports; and 3) collect the Health Hazard Checklists and photographs.  None of the other steps identified by Defendant are applicable to this request.  And as with the posting surveys, Plaintiffs' request for *all* documents eliminates the burden of, for example, generating "a report identifying all cleanups, and then collect associated health hazard checklists by incident number."  The City can simply conduct a reasonable search for all Health Hazard checklists and produce the documents in its possession, custody or control.  The same is true for all requests for the City's documentation of cleanups.  Because these are public records, there are no privacy interests that weigh against overproduction, when doing so actually reduces the burden to Defendant (and in this case, shifts it to the requesting party).  The steps Defendant identifies are simply the tasks required to produce any document responsive to any request, "common in litigation." *Sung Gon Kang,* 2020 WL 1689708, at *5 (finding that, even decryption and filtering processes are not "unduly burdensome or costly" and instead, are common in litigation).

And although the number of documents responsive to this request may be voluminous, *but see* FN 20, the number of documents responsive to a request is simply not dispositive of the question of burden.  The "mere fact that responding to a discovery request will require the objecting party to expend considerable time, effort and expense consulting, reviewing and analyzing huge volumes of documents and information is an insufficient basis to object to a relevant discovery request." *In re Citibank Mortgage*, 2012 WL 10450139, at *4.  Here, the burden is not even in reviewing and analyzing the documents, because Plaintiffs have shifted the burden to themselves.  Instead, the burden comes solely from collecting the documents and producing them. *See Sung Gon Kang*, 2020 WL 1689708, at *5 (finding that requested documents were reasonably accessible and not burdensome where "accessing the [documents] and their content is easily achievable but

compiling the [documents] may prove somewhat time consuming").  And here, the

burden is even less.  The documents are all the same type of document, which must

simply be generated from a database

And of course, even this burden is not dispositive of the question of whether

the burden outweighs the benefit. *See Gutierrez v. Mora*, No. CV 18-781-KS, 2019

WL 8060079, at *9 (C.D. Cal. Dec. 9, 2019) (benefit outweighs burden where the

information sought regarding Defendant's K-9 policies and procedures is essential

to Plaintiff's *Monell* claims and Defendant provides no evidence of burden or

expense). As discussed above, the documents Plaintiffs seek are highly relevant to

this case.  Plaintiffs bear the burden of establishing *Monell* liability, which can be

done by showing a widespread and longstanding custom or practice. *See, e.g.*,

*Pitkin,* 2017 U.S. Dist. LEXIS 208058, *14-15.  The existence of such policies and

practice is the entirety of KFA's case and all of the plaintiffs' claims for

prospective relief, and these records are critical to one of Plaintiffs' main theories

of the case—that the City has a widespread custom and practice of destroying

property that is not an immediate threat to public health and safety.  *See Thomas*,

715 F. Supp. 2d at 1032 (granting a request for information going back nearly

thirty years, where "in the context of th[e] action," the requested information was

"necessary to conduct a comparative analysis of the operation" at issue in the

litigation and such analysis was "clearly relevant to Petitioner's claims").

Finally, Defendant is responsible for the methods it collects and stores these

documents.  To the extent the production is burdensome, that is largely a choice of

Defendant.  This is particularly relevant here because the data is stored in a way

that supports its case (listing quantitative amounts of "trash" collected at a cleanup,

without separating out property that is impounded) and is in an easily accessible

format.  The other data, which is relevant to what property is actually impounded

and then destroyed, is stored only in narrative form and in handwritten checklists,

which the City now refuses to produce based on burden.  The City's choice to keep records of the documents that support its case in a form that is less burdensome to produce than other documents, does not form the basis for the City to withhold the other documents.  *Id.*

Because the City maintains that the documents are not relevant, it has refused to concede that any amount of burden in producing these documents would be proportionate to the needs of the case.  It has rejected any of Plaintiffs' myriad attempts to address Defendants' concerns or otherwise limit the universe of responsive documents, and it asserts that running searches to identify responsive documents creates significant burden.  Plaintiffs already significantly reduced the temporal scope of this request from 2016 to 2018.  These documents are critically important to this case, and the request is therefore proportionate to the needs of the case.

    **c.**    **Objection That the Discovery Sought is not "Reasonably Accessible"**

Defendant objects that the documents sought are not "reasonably accessible, based on the undue burden and costs associated with searching for and producing documents responsive to this Request. . . ."  But as the City explains in its objections, the documents Plaintiffs are seeking are stored in active databases and servers.[21]  Therefore, for purposes of Rule 26, there is no argument that the documents are not "reasonably accessible."  *See Sung Gon Kang*, 2020 WL 1689708, at *5 (finding that requested documents were reasonably accessible and not burdensome where "accessing the [documents] and their content is easily achievable but compiling the [documents] may prove somewhat time consuming").

---

[21]  The City goes on to describe additional searches that would be required to identify, for example, LAPD documentation.  Plaintiffs clarified during the meet and confer process that for purposes of this request, Plaintiffs are seeking only the Health Hazard reports, health hazard checklists, and photographs.  They reserve the right to seek other documentation collected by the City for specific encampment cleanups after reviewing these reports.

### d.    The City Waived its Other Objections

As with almost all other requests, the City objects "to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines."  The City has refused to provide a privilege log or even an explanation of how the documents could possibly be privileged.  As noted above, the City has produced many of these documents in response to CPRAs, without objecting on the basis of privilege, and a review of the documents demonstrates that they are in in fact not privileged.  The use of this boilerplate objection here is patently absurd and an abuse of the discovery process.  *See Polaris,* 2017 U.S. Dist. LEXIS 222261, at *14-17.  And Defendant has waived any objections it might have had that these documents were privileged by failing to provide any additional information regarding these claims.  *See DeSilva,* 2020 WL 5947827, at *7.

Likewise, the City has failed to provide any basis for the general objections or even an assessment of whether any objection specifically applies to the request, let alone disclosing whether any documents are being withheld on the basis of any of these objections. The use of boilerplate objections here is also inappropriate and an abuse of the discovery process.  *See Polaris*, 2017 U.S. Dist. LEXIS 222261, at *14-17.  *See also Eisenhower Med. Ctr.*, 2020 U.S. Dist. LEXIS 218716, at *9. Even after months of meeting and conferring about the City's insufficient responses, the City failed to clarify which of the objections (if any) applied to this request.  The City has therefore waived these objections.  *See e.g., Bosley,* 2016 WL 1704159, at *5.

### DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 33:

RFP No. 2 is a subset of RFP Nos. 33-34, which Plaintiffs acknowledge. RFP No. 33 is significantly broader and seeks all reports, Health Hazard Checklists, photographs, metric sheets, and other documents relating encampment

cleanups for CARE and Rapid-Response operations conducted Citywide dating back to April 1, 2016.  The City's Response to RFP No. 2 addresses in detail the City's summary of Plaintiffs' alleged claims in the SAC, and arguments regarding relevance, Monell, the DJA, proportionality, burden and expense.  *See* City Response to RFP No. 2, *supra*.  In addition, the City's Response to RFP No. 30 addressed Plaintiffs' additional arguments regarding relevance, proportionality, cost and burden.  *See* City Response to RFP No. 2, *supra*.  Rather than restate the City's detailed responses on those issues here, the City refers the Court to those arguments, but address several additional issues.  Plaintiffs incorporated their response to RFP No. 33 into RFP No. 34 for efficiency.  The City will do the same and address any issues for both herein.

First, Plaintiffs argue that the WPIMS spreadsheet containing encampment cleanup data for 2018 and 2019 (CTY020222) had "more than 10,000 entries" that "did not contain any data related to 'solid waste-lbs collected', suggesting that the cleanup did not occur."   The City's verified amended Interrogatory Responses (served on February 16, 2021), explained that WPIMS did not start collecting itemized data on waste collections until 2019.  Lebron Decl. ¶ 14, **Ex. 39** (City's Amended Rog Responses), Response 13(c).  Specifically, the City described the information contained in the WPIMS spreadsheets CTY020222 (2018-2019 WPIMS data export) and CTY020331 (2019-2020 WPIMS data export) and stated "[s]tarting in 2019, WPIMS also includes itemized data collection, which provides estimates of how much, e.g., pounds of waste and urine feces, number of sharps, drug paraphernalia, reactive and ignitable compounds, were collected."  *Id.; see also* Wong Decl. ¶ 18.  This information was not tracked in WPIMS before 2019. Wong Decl. ¶ 18.  None of the 2018 encampment cleanups listed within WPIMS CTY020222 contain data related to "solid waste-lbs collected" because WPIMS did not start tracking that information until 2019.  According to Plaintiffs, no

encampment cleanups occurred in 2018.  Plaintiffs' argument may not have been intentionally misleading, but it is wrong and the mistake was clearly avoidable had Plaintiffs reviewed the City's Interrogatory Responses (that are the subject of a second motion to compel) or bothered to meet and confer regarding this issue before moving to compel.

Second, the Plaintiffs argue that the City produced the same documents demanded here in response to CPRA requests, citing to paragraphs 79-82 of the Myers Declaration.  However, the Myers Declaration states that "the majority of this documentation consisted of Metrics sheets, not full Health Hazard Assessment reports."  *See* Myers Decl. ¶ 82.

Third, similar to other requests, the City has not withheld documents responsive to RFP No. 33 (or 34) on the basis of privilege.  However, the City pulled over a half a million emails communications and documents based on Plaintiffs' proposed custodian and search terms and approximately 475,000 of those documents were uploaded by the City's e-discovery vendor on March 30, 2021.  Ursea Decl. ¶ 43.  The City generally agrees that encampment cleanups reports or related documents are not privileged, but it is possible, for example, that privileged communications between LASAN custodians and the City Attorney's Office attaching or discussing a Rapid-Response or CARE report for purposes of litigation or seeking attorney-client privileged advice.  Similar to other requests, the City cannot provide a privilege log when half a million documents demanded by Plaintiffs were just recently uploaded and have not been reviewed.

The City Response to RFP Nos. 2 and 30 addressed Plaintiffs' contention that the City did not meet and confer regarding proportionality and the burdens imposed on the City in producing these documents.  *See* City's Response to RFP Nos. 2, 30, *supra*.  Based on Plaintiffs' misleading statement that WPIMS spreadsheet (CTY020222) suggested that there were over 10,000 cleanups that did

not occur, the City will respond here again regarding certain proportionality, burden and cost arguments.

The Wong Declaration and the City's Amended Interrogatory Responses support the City's objections regarding the burdens imposed on the City in responding to Plaintiffs' request. *See* Wong Decl. ¶¶ 16-29.   In August 2020, the City identified approximately 41,734 incidents/cases within WPIMS constituting encampment cleanups for the period from April 1, 2016 to July 31, 2020.  Wong Decl. ¶ 24.  The City identified 32,730 incidents/cases for the period from January 1, 2018 to July 31, 2020. *Id.*

WPIMS is an older technology that provides access to forms used to generate reports for various operations, including encampment cleanups and stormwater pollution cases, among others.  Wong Decl. ¶ 17.  ECIs can attach documents to the forms saved on WPIMS, such as Health Hazard Checklist, posting surveys or waste manifests.  Wong Decl. ¶ 19.  ECIs take pictures during encampment cleanups or compliance and a single incident/case could have hundreds of pictures.  Reports contained in WPIMS generally contain several or more pictures of the cleanup, but WPIMS does not store all pictures associated with an encampment cleanup.  Wong Decl. ¶ 20.

LSD uses the WPIMS incident/case number to identify reports and documents saved on WPIMS.  Wong Decl. ¶ 21.  There is no automated method for exporting documents and reports saved on WPIMS, and the reports and related documents must be identified by WPIMS incident/case number and downloaded manually.  Wong Decl. ¶¶ 21, 26; Lebron Decl. ¶ 14, **Ex. 39** (City's Amended Rog Responses), Response 13(c).  In order to obtain a document or report saved on WPIMS, and ECI must manually download one document or report at a time. *Id.* Other documents not stored on WPIMS are also identified by the incident/case number and must also be collected.  Wong Decl. ¶ 21.  Other documents could

include hazardous and non-hazardous waste disposal records maintained by LASAN's Solids Division.  Wong Decl. ¶ 21.

In order to search for and produce all of the requested documents regarding encampment cleanups, an ECI would need to reference a spreadsheet identifying all of incident/case numbers, the address listed for the encampment cleanup, the date and type of cleanup (posted comprehensive cleanup or compliance action), manually download reports and documents in WPIMS, conduct additional searches by incident/case number for pictures and media files not saved on WPIMS, and manually collect and assemble by incident/case number any waste disposal records or cleanup authorizations.  Wong Decl. ¶ 26.

The City would assign one or more ECIs to collect documents relating to encampment cleanups, including posting surveys.  Wong Decl. ¶ 27.  LSD is currently short staffed with 12 ECI positions currently vacant as a result of budget cuts or ECI's promoting or transferring to other positions.  *Id.*  The work required to collect encampment cleanup reports and related documents would further strain LSD's existing resources.  *Id.*

RFP Nos. 33-34 combined seek production of all encampment cleanup reports and related documents. The estimated of the amount of time to collect approximately 41,734 reports and related documents for encampment cleanups dating back to April 1, 2016 is 8,347 hours based on a conservative time estimate of 12 minutes to obtain documents by WPIMS incident/case numbers. Wong Decl. ¶ 28.  Assuming it would take an ECI 8,347 hours to complete the document collection, **the total estimated cost to the City is approximately $433,000**. Wong Decl. ¶ 29.  This is based on an average ECI rate of $41.27 per hour.  *Id.*

Plaintiffs' proposal to seek all documents dating back to January 1, 2018 reduces the City's estimated cost to approximately $270,000.  The estimated of the amount of time to collect approximately 32,730 encampment cleanup reports and

related documents is approximately 6,546 hours based on the same time estimate and average ECI rate.  Wong Decl. ¶¶ 28-29.  The cost and burden imposed on the City's resources is substantial even under Plaintiffs' lesser demand.

The expense and burden imposed on the City significantly exceeds Plaintiffs' alleged damages, as disclosed in Plaintiffs' Rule 26(a) Initial Disclosures.  Lebron Decl. ¶ 8, **Ex. 33** (Pltf's Rule 26(a)(1) Initial Disclosures). Plaintiffs' discovery demands are not proportional to the discovery the needs of this case.  *See Hoffman v. Cnty. of Los Angeles*, Case No. CV-15-03724-FMO (ASx), 2016 U.S. Dist. LEXIS 123515 * (C.D. Cal. Jan. 5, 2016) (RFP requests for all arrest reports and records over a five period not relevant to plaintiff's Monell claim for alleged Fourth Amendment violation and not proportional to needs of case; production in response to request required "a considerable amount of time and manpower" and imposed under burden and expense relative to the minimal relevance to Monell); *Goodwin v. City of Glendora*, Case No. CV-17-3537-FMO (PLAx), 2017 U.S. Dist. LEXIS 224122, * 15-16 (C.D. Cal. Dec. 13, 2017) (rejecting argument that discovery regarding every house in the City of Glendora that has been entered without a warrant in the past ten years … [was] relevant and proportional to plaintiff's Monell claim where plaintiff alleged his house was entered without exigent circumstances or probable cause supporting a warrant.); *Saunders v. City of Chicago*, Case No. 12-cv-9158, 2017 U.S. Dist. LEXIS 509, * 31-32 (N.D. Ill. Jan. 4, 2017) (seeking discovery of entire law enforcement database is not proportional to plaintiff's claims or discovery needs); *Crawford v. Cnty. of Orange*, Case No. SA-CV-160503—DOC (DFMx), 2017 U.S. Dist. LEXIS 224164 (C.D. Cal. Oct. 13, 2017) (interrogatory seeking Monell discovery and information regarding resistance offenses over a 10-year period was not proportional and relevance of the discovery was minimal).  The motion to compel

production of all documents regarding all encampment cleanups conducted Citywide should be denied.

## REQUEST FOR PRODUCTION NO. 34:

All Health Hazard Assessment Reports and related documents created by LA Sanitation to document ENCAMPMENT CLEANUPS. This includes but is not limited to Health Hazard checklists, Metrics sheets, photographs, and other DOCUMENTS related to these reports.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 34:

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiff El-Bey's specific claims alleged in the SAC relating to incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western. Defendant further objects that the Request seeks documents that are not relevant to any named-plaintiffs' claims as alleged in the SAC. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking documents regarding encampment cleanups dating back over four years to April 1, 2016 that are unrelated, and not relevant, to Plaintiff El Bey's specific claims alleged in the

SAC. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing any such proposed discovery outweighs the benefit of such information for Plaintiff El Bey's claims and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would need to search LASAN's WPIMS database to identify all incidents constituting "encampment cleanups" as defined in the Request. Defendant identified 41,734 incidents within WPIMS constituting "encampment cleanups" as defined in the Request for the period from April 1, 2016 to July 31, 2020. Defendant would have to conduct a query and search parameters within WPIMS to generate a report identifying all 41,734 incidents by the address listed for the encampment cleanup, date, incident/case number, and form of encampment cleanup. For each identified incident number, Defendant would need to generate reports within WPIMS for the encampment cleanup and collect associated health hazard checklists by incident number.

For each identified incident number, Defendant would need to generate reports within WPIMS for the encampment cleanup, and collect associated health hazard checklists. Defendant would then have to conduct additional searches for encampment cleanup pictures and media files by incident number that are not

stored on WPIMS. The number of pictures associated with an encampment cleanup could exceed over 700 pictures for one incident report. Defendant would also have to manually search for, collect, and assemble related documents by incident number, including any posting surveys, hazardous-waste disposal records, non-hazardous waste disposal records, and cleanup authorizations maintained in LASAN's AMS. In addition, upon identifying specified incident/case numbers for responsive encampment cleanups, Defendant would then have to conduct searches for potentially responsive LAPD records for any incidents involving LAPD HOPE officers by corresponding date, location, and LAPD Bureau, including searches for LAPD Daily Field Activity Reports (DFAR), Watch Commander Daily Reports, Sergeant's Daily Reports, and LAPD Computer Aided Dispatch (CAD) Reports. In addition, Defendant would have to search for LAPD body worn video that may exist for identified incidents involving LAPD HOPE Officers and review such video for responsiveness to the Request. Defendant previously conducted a search for and produced such incident-specific documents for the named individual plaintiffs' specific incidents at CITY00001-2677.

Defendant would also need to search for potentially responsive documents or information for encampment cleanups as defined in the Request that may be maintained within LASAN's Customer Service Group's MyLA database for service requests. Defendant would have to conduct a search parameter for service requests relating to encampment cleanups as defined in the Request for the period from April 1, 2016 to the present and generate a report identifying service requests for defined encampment cleanups by location address and date range. Defendant would then need an analyst to manually review MyLA data and cross-reference incident/case numbers, addresses, and dates identified by Defendant's WPIMS query to determine potentially corresponding service requests for identified encampment cleanups. Defendant would then have to prepare a separate report

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

containing identified service requests within the MyLA database corresponding to identified WPIMS incident/case numbers for encampment cleanups. In addition, for cleanups occurring after October 2019, Defendant would have to conduct searches for potentially responsive documents within the City's daily schedules issued for CARE and CARE+ operations by reviewing schedules and cross referencing the schedules with identified incident/case numbers, dates, and locations. Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents responsive to this Request for the reasons described above. Without waiving any, and based on these, objections, no documents will be produced in response to this Request.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 34:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiffs' specific claims alleged in the Second Amended Complaint (Dkt. No. 42, "SAC"). Plaintiff El-Bey alleges claims for specific incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western; Plaintiff Garcia alleges claims for specific incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone Avenue, on or around April 29, 2019 at Aetna Street and Van Nuys Boulevard, and on or around August 14, 2019 at Calvert and Bessemer; Plaintiffs Zamora and Zepeda allege claims for specific incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard; Plaintiff Haugabrook alleges claims for incidents occurring sometime in March 2019 and a month later by Figueroa Street and 53rd Street and 52nd Place; Plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019 at Lomita and McCoy; and Plaintiff Ashley alleges claims for a specific incident

occurring on or around May 21, 2019 at Lomita and McCoy. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking documents regarding encampment cleanups dating back over four years to April 1, 2016 that are unrelated, and not relevant, to Plaintiffs' specific claims alleged in the SAC. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

   Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing any such proposed discovery outweighs the benefit of such information for Plaintiffs' claims and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

   Specifically, in order to search for and obtain documents responsive to the Request, Defendant would need to search LASAN's WPIMS database to identify all incidents constituting "encampment cleanups" as defined in the Request.

Defendant identified 41,734 incidents within WPIMS constituting "encampment cleanups" as defined in the Request for the period from April 1, 2016 to July 31, 2020. Defendant would have to conduct a query and search parameters within WPIMS to generate a report identifying all 41,734 incidents by the address listed for the encampment cleanup, date, incident/case number, and form of encampment cleanup. For each identified incident number, Defendant would need to generate reports within WPIMS for the encampment cleanup, and collect associated health hazard checklists by incident number.

For each identified incident number, Defendant would need to generate reports within WPIMS for the encampment cleanup, and collect associated health hazard checklists. Defendant would then have to conduct additional searches for encampment cleanup pictures and media files by incident number that are not stored on WPIMS. The number of pictures associated with an encampment cleanup could exceed over 700 pictures for one incident report. Defendant would also have to manually search for, collect, and assemble related documents by incident number, including any posting surveys, hazardous-waste disposal records, non-hazardous waste disposal records, and cleanup authorizations maintained in LASAN's AMS. In addition, upon identifying specified incident/case numbers for responsive encampment cleanups, Defendant would then have to conduct searches for potentially responsive LAPD records for any incidents involving LAPD HOPE officers by corresponding date, location, and LAPD Bureau, including searches for LAPD Daily Field Activity Reports (DFAR), Watch Commander Daily Reports, Sergeant's Daily Reports, and LAPD Computer Aided Dispatch (CAD) Reports. In addition, Defendant would have to search for LAPD body worn video that may exist for identified incidents involving LAPD HOPE Officers and review such video for responsiveness to the Request. Defendant previously conducted a search

1  for and produced such incident-specific documents for the named individual

2  plaintiffs' specific incidents at CITY00001-2677.

3       Defendant would also need to search for potentially responsive documents

4  or information for encampment cleanups as defined in the Request that may be

5  maintained within LASAN's Customer Service Group's MyLA database for

6  service requests. Defendant would have to conduct a search parameter for service

7  requests relating to encampment cleanups as defined in the Request for the period

8  from April 1, 2016 to the present and generate a report identifying service requests

9  for defined encampment cleanups by location address and date range. Defendant

10  would then need an analyst to manually review MyLA data and cross-reference

11  incident/case numbers, addresses, and dates identified by Defendant's WPIMS

12  query to determine potentially corresponding service requests for identified

13  encampment cleanups. Defendant would then have to prepare a separate report

14  containing identified service requests within the MyLA database corresponding to

15  identified WPIMS incident/case numbers for encampment cleanups. In addition,

16  for cleanups occurring after October 2019, Defendant would have to conduct

17  searches for potentially responsive documents within the City's daily schedules

18  issued for CARE and CARE+ operations by reviewing schedules and cross

19  referencing the schedules with identified incident/case numbers, dates, and

20  locations. Defendant objects that the Request seeks documents that are not

21  reasonably accessible based on the undue burden and costs associated with

22  searching for and producing documents responsive to this Request for the reasons

23  described above. Without waiving any, and based on these, objections, Defendant

24  responds that Defendant produced LASAN health hazard assessments,

25  encampment cleanup reports, photographs and documents responsive to this

26  Request for the individual Plaintiffs' specific alleged incidents at CTY000001-

27

28

2677, but Defendant objects to further production of documents responsive to this Request.

### PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 34:

The documents sought in RFP 34 are the same documents as those requested in RFP 33, but are intended to capture reports for noticed, Comprehensive Cleanups. For the sake of efficiency, Plaintiffs incorporate by reference the arguments from RFP 33 here.

### DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 34:

Plaintiffs' Response to RFP No. 34 incorporated by reference Plaintiffs' Response to RFP No. 33.  The City does the same and incorporates by reference the City's Response to RFP No. 33 in its entirety.

### REQUEST FOR PRODUCTION NO. 35:

All reports, summaries, statistics, analysis or data compilations related to ENCAMPMENT CLEANUPS.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 35:

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiff El-Bey's specific claims alleged in the SAC relating to incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western. Defendant further objects that the Request seeks documents that are not relevant to any named-plaintiffs' claims as alleged in the SAC. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the

282

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking documents regarding encampment cleanups dating back over four years to April 1, 2016 that are unrelated, and not relevant, to Plaintiff El Bey's specific claims alleged in the SAC. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, *15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing any such proposed discovery outweighs the benefit of such information for Plaintiff El Bey's claims and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would need to search LASAN's WPIMS database to identify all incidents constituting "encampment cleanups" as defined in the Request. Defendant identified 41,734 incidents within WPIMS constituting "encampment cleanups" as defined in the Request for the period from April 1, 2016 to July 31, 2020. Defendant would have to conduct a query and search parameters within

WPIMS to generate a report identifying all 41,734 incidents by the address listed for the encampment cleanup, date, incident/case number, and form of encampment cleanup. For each identified incident number, Defendant would need to generate reports within WPIMS for the encampment cleanup, and collect associated health hazard checklists by incident number.

For each identified incident number, Defendant would need to generate reports within WPIMS for the encampment cleanup, and collect associated health hazard checklists. Defendant would then have to conduct additional searches for encampment cleanup pictures and media files by incident number that are not stored on WPIMS. The number of pictures associated with an encampment cleanup could exceed over 700 pictures for one incident report. Defendant would also have to manually search for, collect, and assemble related documents by incident number, including any posting surveys, hazardous-waste disposal records, non-hazardous waste disposal records, and cleanup authorizations maintained in LASAN's AMS. In addition, upon identifying specified incident/case numbers for responsive encampment cleanups, Defendant would then have to conduct searches for potentially responsive LAPD records for any incidents involving LAPD HOPE officers by corresponding date, location, and LAPD Bureau, including searches for LAPD Daily Field Activity Reports (DFAR), Watch Commander Daily Reports, Sergeant's Daily Reports, and LAPD Computer Aided Dispatch (CAD) Reports. In addition, Defendant would have to search for LAPD body worn video that may exist for identified incidents involving LAPD HOPE Officers and review such video for responsiveness to the Request. Defendant previously conducted a search for and produced such incident-specific documents for the named individual plaintiffs' specific incidents at CITY00001-2677.

Defendant would also need to search for potentially responsive documents or information for encampment cleanups as defined in the Request that may be

284

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

maintained within LASAN's Customer Service Group's MyLA database for service requests. Defendant would have to conduct a search parameter for service requests relating to encampment cleanups as defined in the Request for the period from April 1, 2016 to the present and generate a report identifying service requests for defined encampment cleanups by location address and date range. Defendant would then need an analyst to manually review MyLA data and cross-reference incident/case numbers, addresses, and dates identified by Defendant's WPIMS query to determine potentially corresponding service requests for identified encampment cleanups. Defendant would then have to prepare a separate report containing identified service requests within the MyLA database corresponding to identified WPIMS incident/case numbers for encampment cleanups.

In addition, Defendant would have to search for all statistical analysis or data compilations relating to encampment cleanups dating back to April 1, 2016. Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents responsive to this Request for the reasons described above. Without waiving any, and based on these, objections, no documents will be produced in response to this Request.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 35:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiffs' specific claims alleged in the Second Amended Complaint (Dkt. No. 42, "SAC"). Plaintiff El-Bey alleges claims for specific incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western; Plaintiff Garcia alleges claims for specific incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone Avenue, on or around April 29, 2019 at Aetna Street and Van Nuys Boulevard, and

on or around August 14, 2019 at Calvert and Bessemer; Plaintiffs Zamora and Zepeda allege claims for specific incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard; Plaintiff Haugabrook alleges claims for incidents occurring sometime in March 2019 and a month later by Figueroa Street and 53rd Street and 52nd Place; Plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019 at Lomita and McCoy; and Plaintiff Ashley alleges claims for a specific incident occurring on or around May 21, 2019 at Lomita and McCoy. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking documents regarding encampment cleanups dating back over four years to April 1, 2016 that are unrelated, and not relevant, to Plaintiffs' specific claims alleged in the SAC. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and

producing any such proposed discovery outweighs the benefit of such information
for Plaintiffs' claims and Defendant's costs or expense in conducting the search
and producing documents greatly exceeds the amount in controversy for Plaintiff's
alleged damages.

Specifically, in order to search for and obtain documents responsive to the
Request, Defendant would need to search LASAN's WPIMS database to identify
all incidents constituting "encampment cleanups" as defined in the Request.
Defendant identified 41,734 incidents within WPIMS constituting "encampment
cleanups" as defined in the Request for the period from April 1, 2016 to July 31,
2020. Defendant would have to conduct a query and search parameters within
WPIMS to generate a report identifying all 41,734 incidents by the address listed
for the encampment cleanup, date, incident/case number, and form of encampment
cleanup. For each identified incident number, Defendant would need to generate
reports within WPIMS for the encampment cleanup, and collect associated health
hazard checklists by incident number.

For each identified incident number, Defendant would need to generate
reports within WPIMS for the encampment cleanup, and collect associated health
hazard checklists. Defendant would then have to conduct additional searches for
encampment cleanup pictures and media files by incident number that are not
stored on WPIMS. The number of pictures associated with an encampment cleanup
could exceed over 700 pictures for one incident report. Defendant would also have
to manually search for, collect, and assemble related documents by incident
number, including any posting surveys, hazardous-waste disposal records, non-
hazardous waste disposal records, and cleanup authorizations maintained in
LASAN's AMS. In addition, upon identifying specified incident/case numbers for
responsive encampment cleanups, Defendant would then have to conduct searches
for potentially responsive LAPD records for any incidents involving LAPD HOPE

officers by corresponding date, location, and LAPD Bureau, including searches for LAPD Daily Field Activity Reports (DFAR), Watch Commander Daily Reports, Sergeant's Daily Reports, and LAPD Computer Aided Dispatch (CAD) Reports. In addition, Defendant would have to search for LAPD body worn video that may exist for identified incidents involving LAPD HOPE Officers and review such video for responsiveness to the Request. Defendant previously conducted a search for and produced such incident-specific documents for the named individual plaintiffs' specific incidents at CITY00001-2677.

Defendant would also need to search for potentially responsive documents or information for encampment cleanups as defined in the Request that may be maintained within LASAN's Customer Service Group's MyLA database for service requests. Defendant would have to conduct a search parameter for service requests relating to encampment cleanups as defined in the Request for the period from April 1, 2016 to the present and generate a report identifying service requests for defined encampment cleanups by location address and date range. Defendant would then need an analyst to manually review MyLA data and cross-reference incident/case numbers, addresses, and dates identified by Defendant's WPIMS query to determine potentially corresponding service requests for identified encampment cleanups. Defendant would then have to prepare a separate report containing identified service requests within the MyLA database corresponding to identified WPIMS incident/case numbers for encampment cleanups.

In addition, Defendant would have to search for all statistical analysis or data compilations relating to encampment cleanups dating back to April 1, 2016. Defendant would have to search for weekly service request reports regarding encampment cleanups over a four-year period, quarterly reports to the CAO over a four-year period, LAPD reports over a four-year period, and any UHRC reports over dating back to 2018. Defendant objects that the Request seeks documents that

are not reasonably accessible based on the undue burden and costs associated with
searching for and producing documents responsive to this Request for the reasons
described above. Without waiving any, and based on these, objections, the
Defendant objected to producing documents responsive to this Request but remains
willing to conduct a further meet-and-confer discussion with Plaintiffs regarding a
narrowed request for specific reports or data compilations.

### PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 35:

Plaintiffs seek reports, statistics, analysis, and other documents related to
Encampment Cleanups.  This would include, for example, any reports analyzing
the effectiveness of the cleanups, and statistics generated about how often cleanups
are conducted.  As with all other requests, the City initially objected that the
documents sought are neither relevant nor proportionate to the needs of the case.[22]
Even after meeting and conferring, Defendant refused to produce any documents
responsive to the request.  A month later, the City indicated its willingness to meet
and confer about "a narrowed request for specific reports or data compilations."  In
October, the City produced Amended responses, which maintained the same
burden objections, in spite of Plaintiffs' clarification of the scope of the request.
When the parties met and conferred, Defendant indicated it was willing to provide
raw data from January 1, 2018 to November 2020 from the three databases it
represented it used to collect LA Sanitation data.  It otherwise did not agree to
produce any additional responsive documents.

---

[22]   In its initial responses, Defendant interpreted the request to call for the
production of documentation of individual cleanups, such as those reports
requested in RFPs 33 and 34.  Plaintiffs clarified that the request did not include
these documents, but instead was intended to apply to reports and analysis about
Encampment Cleanups more generally.  The City still refused to provide
responsive documents.  In its amended response, it continued to maintain its
proportionality objection primarily based on the purported burden of producing
these documents.

In December, Defendant inexplicably produced approximately 550 black and white PDFs (totaling approximately 4000 pages) of "Data Center reports" created by LA Sanitation, compiling information about, among other data, Encampment Cleanups.  The City did not provide an amended response to this request, nor did it provide any explanation why it was producing these specific documents, what criteria it used to identify these documents, or whether it was withholding any other documents in its possession, custody, or control that were responsive to this request.

### a. Reports and Analysis Regarding the City's Encampment Cleanup Program are Relevant

How the City conducts Encampment Cleanups is clearly relevant.  As discussed in detail above, one of the main issues in this case is the way the City conducts encampment cleanups.  Reports and analysis conducted about these Cleanups include information about, for example, the existence of customs, policies, and practices; Plaintiffs' claims that the City fails to provide sufficient due process and the City's claim that no additional process is feasible; and theories of *Monell* liability.  Defendant's objection to this request, on the basis of relevance is without any legal support. Myers Decl. ¶ 4 & Exh. C at 73-77.

### b. Defendant's Written Response Does Not Comply With Rule 34

The City's Amended Response to this RFP does not comply in any way with Federal Rule of Civil Procedure Rule 34(b)(2).  In its Amended Response, Defendant states only that "Defendant objected to producing documents responsive to this Request but remains willing to conduct a further meet-and-confer discussion with Plaintiffs regarding a narrowed request for specific reports or data compilations."

Although the parties did meet and confer about the City's willingness to produce data in response to Plaintiffs' requests, the City stated only generally that it was willing to produce data from three databases, WPIMS, AMS and My311.

Thereafter, defense counsel indicated that they had "identified and reviewed additional documents responsive to Plaintiffs' requests, including organizational charts, job descriptions, tonnage reports, cleanup reports to the Mayor's Office and powerpoints. [They were] continuing [their] investigation into what ha[d] been collected and whatever may be left to collect; [and they would] continue to review and produce as soon as possible on a rolling basis." Myers Decl. ¶ 54 & Exh. AH.

Despite Plaintiffs' request for clarification, the City simply produced approximately 550 black and white PDFs of weekly reports (totaling approximately 4000 pages of documents). The City failed to provide any explanation why it was producing these specific documents or whether it was withholding any other documents in its possession, custody, or control that were responsive to this request. In fact, the City failed to provide any further clarifying information at all. Myers Decl., ¶ 55. This is clearly impermissible under Rule 34.

Under Rule 34, "even if the discovery requested was overbroad, [the City] had an obligation at a minimum to respond to the requests to the extent that they sought non-objectionable information or documents." *In re Rivera*, 2017 U.S. Dist. LEXIS 229538, at *17. It also requires the objecting party to "state whether any responsive materials are being withheld on the basis of [an asserted] objection," and to comply with the requirement that "[a]n objection to part of a request must specify the part and permit inspection of the rest." Fed. R. Civ. P. 34(b)(2)(C).

The City has done neither. In this case, although the City has produced some documents likely responsive to this request, it has provided no information about why it was producing these documents and whether and to what extent it is withholding documents on the basis of its objections. As such, Plaintiffs have been "[left] . . . in the dark", which "is precisely the situation Rule 34(b)(2) is designed to prevent." *DeSilva,* 2020 WL 5947827, at *9 (compelling production of

documents and responses compliant with Rule 34); *see also* Rule 34, Advisory Committee's Note to 2015 Amendment (Rule 34(b)(2)(C) (amendment was added to "end the confusion that frequently arises when a producing party states several objections and still produces information").  It is not enough for Defendant to state what it is producing; it must provide sufficient information to "alert other parties to the fact that documents have been withheld and thereby facilitate an informed discussion of the objection." 2015 Amendment Adv. Comm. Note to Fed. R. Civ. P. 34.  *D.C*, 2016 U.S. Dist. LEXIS 197240, at *5.  Likewise, the City has continued to state that it will produce documents on a "rolling basis," which is also impermissible under Rule 34(b)(2)(B).  *See Maiorano,* 2017 WL 4792380, at *2.

As with other requests, Plaintiffs' concern about the sufficiency of Defendant's written responses and production is not merely speculative.  For example, although the City appeared in a subsequent interrogatory response to indicate that the Data Center reports are the only monthly reports pulled from the databases, Plaintiffs have since received additional monthly "tonnage reports" generated by LA Sanitation and provided to the Council offices that were never identified by Defendants, let alone produced in response to this RFP.  *See* Riskin Decl., ¶ 6 & Exh. B.

Plaintiffs have also identified, for example, a 2018 report from LA Sanitation that analyzes Encampment Cleanups and the enforcement of LAMC 56.11.  The document was not produced to Plaintiffs, even though the City produced similar reports, and the document is clearly responsive to Plaintiffs' request.  *See* Myers Decl., ¶ 73 & Exh. AQ; s*ee also* Myers Decl., Exh. 83 & Exh. AT (reports produced by the City in response to CPRAs that were not produced here, but are relevant and responsive to these requests).  As with numerous other requests, Plaintiffs have no way of knowing why the City chose to produce the documents it produced and not others.  The failure to provide a written response

consistent with Rule 34 and the failure to produce documents responsive to the request is sufficient basis to grant Plaintiffs' motion to compel production of all documents responsive to this request.

### c.   Plaintiffs' Request is Not Overbroad

Defendant asserts that the request is overbroad "in seeking documents regarding encampment cleanups dating back over four years to April 1, 2016 that are unrelated, and not relevant, to Plaintiff El Bey's specific claims alleged in the SAC."   As discussed in detail, two years and eight months prior to the Specific Incidents is reasonable, given that the date corresponds to when LAMC 56.11 was amended, and it is especially reasonable given the extent to which the City's Encampment Cleanups have been subject to judicial scrutiny.  *See* SAC at ¶¶ 17-19, Dkt. 43, (describing the history of claims against the City for similar violations to the ones raised by Plaintiffs); *see also Thomas*, 715 F. Supp. 2d at 1032 (granting a request for information going back nearly thirty years, where "in the context of th[e] action," the requested information was "necessary to conduct a comparative analysis of the operation" at issue in the litigation and such analysis was "clearly relevant to Petitioner's claims").  The request not only identifies a discrete topic and is time-limited, but also relates to a specific type of document related to the discrete topic.  As such, the request is narrow, and there is no basis for the City's refusal to produce responsive documents.

### d.   Plaintiffs' Narrow Request is Proportional to the Needs of the Case

To the extent Defendant is withholding any documents on the basis that the request is not proportional to the needs of this case, Defendant's objection and subsequent meet and confer efforts provided no information "clarifying, explaining, and supporting its objection" that it is not proportional to the needs of the case, based on the factors outlined in Rule 26.  *Duran*, 258 F.R.D. at 378.  Applying these factors and the appropriate scope of this litigation, the request is

proportional to the needs of the case.  As discussed in detail above, the issues at stake in this litigation are of constitutional significance; the amount in controversy is largely irrelevant given that Plaintiffs primarily seek prospective relief to put an end to the City's unconstitutional practices; the City of Los Angeles has far more resources than the seven unhoused individuals whose belongings were seized and the volunteer organization whose resources go to replacing those belongings; and Defendant has access to information not publicly available, such as internal analysis and reports *See supra,* Plaintiffs' Argument re: RFP No. 2.  The other factors also weigh heavily in Plaintiffs' favor.  *See* Fed. R. Civ. P. 26(b)(1).

### i.      Importance of the discovery in resolving the issues

The documents sought by Plaintiffs are related to one of the matters that is most central to this case:  how the City conducts Encampment Cleanups.  Reports and analysis related to those issues could provide critical evidence about, for example, the existence of customs, policies or practices or the City's awareness about and failure to address the issues raised in this case.  Those issues are critical to *Monell* liability and Plaintiffs' claims for prospective relief, which as noted above, are at the center of this case.

### ii.      Whether the burden or expense of the proposed discovery outweighs its likely benefit

Defendant objects that the burden of producing documents responsive to Plaintiffs' request is too high, yet the only burden the City identifies in producing documents Plaintiffs have clarified are responsive to this request is literally the burden that comes from searching for documents responsive to any request.  As the City concedes, the normal discovery steps necessary to conduct a "reasonable inquiry" should be sufficient to identify reports and analysis related to this request, especially since the request goes back only four years and the responsive documents would likely be contained within a few discrete departments within the City.  *See In re Citimortgage*, 2012 WL 10450139, at *4; *see also* Plaintiffs'

Argument re: RFP 16.  Yet because the City continues to object to the relevance of these documents, it refuses to concede that any burden is proportionate to the needs of this case. The City's refusal to conduct even a reasonable inquiry to identify responsive documents is not defensible.

### e.    The City has Waived its Other Objections

The City includes a boilerplate objection on the basis of attorney-client privilege and work product doctrines, but fails to identify in any way whether or to what extent it is actually withholding any documents on the basis of privilege. In the seven months since the City produced responsive documents, the City has refused to produce a privilege log, despite repeated requests.  It has therefore waived any privilege.  *Burlington Northern & Santa Fe Ry. Co.,* 408 F.3d at 1149.

Likewise, the City provides no information here or anywhere to clarify why or even whether any of its other general objections apply.  As such, it has waived them here.  *See e.g., Bosley*, 2016 WL 1704159, at *5.

### f.    Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce all documents responsive to RFP No. 35 within 21 days or, if the City asserts it has produced all documents responsive to the request, compelling Defendant to provide a complete, explicit response as to the search conducted to identify and produce responsive documents and to attest to the finality of its production, as required by Rule 34.

### DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 35:

For the reasons set forth in the City's arguments as to RFPs 1, 30 and 33, the documents Plaintiffs seek are not relevant and the request is not proportional to the needs of this case.  The City incorporates by reference the City's Response to RFPs 1, 30 and 33 in their entirety.

**REQUEST FOR PRODUCTION NO. 36:**

All reports, summaries, statistics, analysis or data compilations related to enforcement of LAMC 56.11.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 36:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiff El-Bey's specific claims alleged in the SAC relating to incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western. Defendant further objects that the Request seeks documents that are not relevant to any named-plaintiffs' claims as alleged in the SAC. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking documents regarding encampment cleanups involving LAMC 56.11 enforcement actions dating back over four years to April 1, 2016 that are unrelated, and not relevant, to Plaintiff El-Bey's specific claims alleged in the SAC. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal.

2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing any such proposed discovery outweighs the benefit of such information for Plaintiff El Bey's claims and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would need to search LASAN's WPIMS database to identify all incidents constituting "encampment cleanups" as defined in the Request. Defendant identified 41,734 incidents within WPIMS constituting "encampment cleanups" as defined in the Request for the period from April 1, 2016 to July 31, 2020. Defendant would have to conduct a query and search parameters within WPIMS to generate a report identifying all 41,734 incidents by the address listed for the encampment cleanup, date, incident/case number, and form of encampment cleanup. For each identified incident number, Defendant would need to generate reports within WPIMS for the encampment cleanup involving LAMC 56.11 enforcement actions, and collect associated health hazard checklists by incident number.

For each identified incident number, Defendant would need to generate reports within WPIMS for the encampment cleanup, and collect associated health hazard checklists. Defendant would then have to conduct additional searches for encampment cleanup pictures and media files by incident number that are not stored on WPIMS. The number of pictures associated with an encampment cleanup could exceed over 700 pictures for one incident report. Defendant would also have to manually search for, collect, and assemble related documents by incident

number, including any posting surveys, hazardous-waste disposal records, non-hazardous waste disposal records, and cleanup authorizations maintained in LASAN's AMS. In addition, upon identifying specified incident/case numbers for responsive encampment cleanups, Defendant would then have to conduct searches for potentially responsive LAPD records for any incidents involving LAPD HOPE officers by corresponding date, location, and LAPD Bureau, including searches for LAPD Daily Field Activity Reports (DFAR), Watch Commander Daily Reports, Sergeant's Daily Reports, and LAPD Computer Aided Dispatch (CAD) Reports. In addition, Defendant would have to search for LAPD body worn video that may exist for identified incidents involving LAPD HOPE Officers and review such video for responsiveness to the Request. Defendant previously conducted a search for and produced such incident-specific documents for the named individual plaintiffs' specific incidents at CITY00001-2677.

Defendant would also need to search for potentially responsive documents or information for encampment cleanups involving LAMC 56.11 enforcement actions as defined in the Request that may be maintained within LASAN's Customer Service Group's MyLA database for service requests. Defendant would have to conduct a search parameter for service requests relating to encampment cleanups as defined in the Request for the period from April 1, 2016 to the present and generate a report identifying service requests for defined encampment cleanups by location address and date range. Defendant would then need an analyst to manually review MyLA data and cross-reference incident/case numbers, addresses, and dates identified by Defendant's WPIMS query to determine potentially corresponding service requests for identified encampment cleanups. Defendant would then have to prepare a separate report containing identified service requests within the MyLA database corresponding to identified WPIMS incident/case numbers for encampment cleanups.

In addition, Defendant would have to search for all statistical, analysis or
data compilations relating to encampment cleanups dating back to April 1, 2016.
Defendant would have to search for weekly service request reports regarding
encampment cleanups over a four-year period, quarterly reports to CAO over a
four-year period, LAPD reports over a four-year period, and any UHRC reports
over dating back to 2018. Defendant objects that the Request seeks documents that
are not reasonably accessible based on the undue burden and costs associated with
searching for and producing documents responsive to this Request for the reasons
described above. Without waiving any, and based on these, objections, no
documents will be produced in response to this Request.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 36:**

Defendant incorporates the General Objections as though fully set forth here.
Defendant objects that the Request seeks documents that are not relevant to
Plaintiffs' specific claims alleged in the Second Amended Complaint (Dkt. No. 42,
"SAC"). Plaintiff El-Bey alleges claims for specific incidents occurring on or
around January 10, 2019 at 6th Street and Alexandria and on or around June 4,
2019 at Oakwood and Western; Plaintiff Garcia alleges claims for specific
incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone
Avenue, on or around April 29, 2019 at Aetna Street and Van Nuys Boulevard, and
on or around August 14, 2019 at Calvert and Bessemer; Plaintiffs Zamora and
Zepeda allege claims for specific incidents occurring on or around March 21, 2019
at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and
Harvard; Plaintiff Haugabrook alleges claims for incidents occurring sometime in
March 2019 and a month later by Figueroa Street and 53rd Street and 52nd Place;
Plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019
at Lomita and McCoy; and Plaintiff Ashley alleges claims for a specific incident
occurring on or around May 21, 2019 at Lomita and McCoy. The Court struck

Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking documents regarding encampment cleanups involving LAMC 56.11 enforcement actions dating back over four years to April 1, 2016 that are unrelated, and not relevant, to Plaintiffs' specific claims alleged in the SAC. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing any such proposed discovery outweighs the benefit of such information for Plaintiffs' claims and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would need to search LASAN's WPIMS database to identify all incidents constituting "encampment cleanups" as defined in the Request.

Defendant identified 41,734 incidents within WPIMS constituting "encampment cleanups" as defined in the Request for the period from April 1, 2016 to July 31, 2020. Defendant would have to conduct a query and search parameters within WPIMS to generate a report identifying all 41,734 incidents by the address listed for the encampment cleanup, date, incident/case number, and form of encampment cleanup. For each identified incident number, Defendant would need to generate reports within WPIMS for the encampment cleanup involving LAMC 56.11 enforcement actions, and collect associated health hazard checklists by incident number.

For each identified incident number, Defendant would need to generate reports within WPIMS for the encampment cleanup, and collect associated health hazard checklists. Defendant would then have to conduct additional searches for encampment cleanup pictures and media files by incident number that are not stored on WPIMS. The number of pictures associated with an encampment cleanup could exceed over 700 pictures for one incident report. Defendant would also have to manually search for, collect, and assemble related documents by incident number, including any posting surveys, hazardous-waste disposal records, non-hazardous waste disposal records, and cleanup authorizations maintained in LASAN's AMS. In addition, upon identifying specified incident/case numbers for responsive encampment cleanups, Defendant would then have to conduct searches for potentially responsive LAPD records for any incidents involving LAPD HOPE officers by corresponding date, location, and LAPD Bureau, including searches for LAPD Daily Field Activity Reports (DFAR), Watch Commander Daily Reports, Sergeant's Daily Reports, and LAPD Computer Aided Dispatch (CAD) Reports. In addition, Defendant would have to search for LAPD body worn video that may exist for identified incidents involving LAPD HOPE Officers and review such video for responsiveness to the Request. Defendant previously conducted a search

for and produced such incident-specific documents for the named individual plaintiffs' specific incidents at CITY00001-2677.

Defendant would also need to search for potentially responsive documents or information for encampment cleanups involving LAMC 56.11 enforcement actions as defined in the Request that may be maintained within LASAN's Customer Service Group's MyLA database for service requests. Defendant would have to conduct a search parameter for service requests relating to encampment cleanups as defined in the Request for the period from April 1, 2016 to the present and generate a report identifying service requests for defined encampment cleanups by location address and date range. Defendant would then need an analyst to manually review MyLA data and cross-reference incident/case numbers, addresses, and dates identified by Defendant's WPIMS query to determine potentially corresponding service requests for identified encampment cleanups. Defendant would then have to prepare a separate report containing identified service requests within the MyLA database corresponding to identified WPIMS incident/case numbers for encampment cleanups.

In addition, Defendant would have to search for all statistical, analysis or data compilations relating to encampment cleanups dating back to April 1, 2016. Defendant would have to search for weekly service request reports regarding encampment cleanups over a four-year period, quarterly reports to CAO over a four-year period, LAPD reports over a four-year period, and any UHRC reports over dating back to 2018. Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents responsive to this Request for the reasons described above. Without waiving any, and based on these, objections, the Defendant objected to producing documents responsive to this Request but remains

willing to conduct a further meet-and-confer discussion with Plaintiffs regarding a narrowed request for specific reports or data compilations.

### PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 36:

Similarly to RFP 35, Plaintiffs seek reports, statistics, analysis, and other documents related to the enforcement of LAMC 56.11.  This would include, for example, any reports analyzing the enforcement of various provisions of the ordinance, statistics generated about how often the ordinance is enforced, and any issues with enforcement.  It could also include, for example, any analysis or reports that discuss the need to adjust or change the City's enforcement of the ordinance. As with all other requests, the City initially objected that the documents sought are neither relevant nor proportionate to the needs of the case.[23]  Even after meeting and conferring, Defendant refused to produce any documents responsive to the request.  A month later, the City indicated its willingness to meet and confer about "a narrowed request for specific reports or data compilations."  In October, the City produced Amended responses, which maintained the same burden objections, in spite of Plaintiffs' clarification of the scope of the request.  When the parties met and conferred about the production of documents, Defendant indicated it was willing to provide raw data from January 1, 2018 to November 2020 from an LAPD database that tracks arrests.  Although this leaves out a significant number of clearly relevant documents, the City has not agreed to produce any additional responsive documents.

---

[23]  In its initial responses, Defendant initially interpreted the request to call for the production of documentation of individual cleanups, such as those reports requested in RFPs 33 and 34, as it had done with RFP 35.  Plaintiffs clarified that the request did not include these documents, but instead was intended to apply to reports and analysis about the enforcement of 56.11 more generally.  The City still refused to provide responsive documents. In its amended responses, it maintained its proportionality objection was primarily based on the purported burden of producing the documentation related to encampment cleanups.

### a.   Reports and Analysis Regarding the City's Enforcement of LAMC 56.11 are Relevant

How the City enforces LAMC 56.11 is clearly relevant.  Plaintiffs bring an as-applied challenge to LAMC 56.11; thus, how the City enforces the ordinance is at the center of this case.  As such, reports and analysis conducted about the City's enforcement practices are highly relevant and in fact, critically important to core issues in the case.  The suggestion otherwise is utterly lacking in legal support.

### b.   Defendant's Written Response Does Not Comply With Rule 34

The City's Amended Response to this RFP does not comply in any way with Federal Rule of Civil Procedure Rule 34(b)(2).  In its Amended Response, Defendant states only that "Defendant objected to producing documents responsive to this Request but remains willing to conduct a further meet-and-confer discussion with Plaintiffs regarding a narrowed request for specific reports or data compilations."

When Plaintiffs attempted to meet and confer, the City was willing to produce only raw data from the City's database about the City's issuance of Release from Custody citations (RFCs) for violations of LAMC 56.11, which the City purported to produce in December 2020.  Myers Decl., ¶ 47, Ex. AA. But even this limited production was incomplete.  Although the City did not indicate it was withholding any of the data collected on RFCs, the spreadsheet produced to Plaintiffs excludes critical columns of data, including the citation numbers for the RFC, which is used in court filings and is therefore a vital piece of information. The City did not disclose that it was withholding data.  Notably, the City has produced this column of data in response to CPRA requests to third parties.  *See* Myers Decl., ¶ 74 Exh. AR.  Similarly, the database includes only those RFCs in which the top-line charge is LAMC 56.11 (i.e., the first charge on the citation), but excludes those instances in which 56.11 was an additional charge.  Again,

Plaintiffs are aware of the deficiency of this data only because this data was produced to a third party pursuant to the CPRA and then provided to Plaintiffs. *Id.*

This is clearly not allowed under Rule 34, which requires the objecting party to "state whether any responsive materials are being withheld on the basis of [an asserted] objection." *In re Rivera*, 2017 U.S. Dist. LEXIS 229538, at *6. It is not enough for Defendant to state what it is producing; it must provide sufficient information to "alert other parties to the fact that documents have been withheld and thereby facilitate an informed discussion of the objection." 2015 Amendment Adv. Comm. Note to Fed. R. Civ. P. 34; *see D.C.,*, 2016 U.S. Dist. LEXIS 197240, at *5. The City failed to provide any information to Plaintiffs that it was withholding data or any information about why it was withholding data. As such, Plaintiffs have been "[left] . . . in the dark," which "is precisely the situation Rule 34(b)(2) is designed to prevent." *DeSilva,* 2020 WL 5947827, at *9 (compelling production of documents and responses compliant with Rule 34); *see also* Rule 34, Advisory Committee's Note to 2015 Amendment (Rule 34(b)(2)(C) (amendment was added to "end the confusion that frequently arises when a producing party states several objections and still produces information").

### c.    **Plaintiffs' Request is Not Overbroad**

Plaintiffs' request is not overbroad.  The request not only identifies a discrete topic that is at the center of this litigation and is time-limited, but also relates to a specific type of document related to the discrete topic.  As such, the request is narrow, and there is no basis for the City's refusal to produce responsive documents.

The City's objection to this request is focused on the timeframe for requests. As discussed in detail, two years and eight months prior to the Specific Incidents is reasonable, given that the date corresponds to when LAMC 56.11 was amended, and it is especially reasonable given the extent to which the City's Encampment

Cleanups have been subject to judicial scrutiny.  *See* SAC at ¶¶ 17-19 (describing the history of claims against the City for similar violations to the ones raised by Plaintiffs). *See also Thomas*, 715 F. Supp. 2d at 1032 (granting a request for information going back nearly thirty years, where "in the context of th[e] action," the requested information was "necessary to conduct a comparative analysis of the operation" at issue in the litigation and such analysis was "clearly relevant to Petitioner's claims").

But the City refuses to produce any reports, analysis, or other requested documents that have been conducted at any time, not just reports going back prior to the Specific Incidents.  Under Rule 34, "[a]n objection to part of a request must specify the part and permit inspection of the rest." Fed. R. Civ. P. 34(b)(2)(C). Even if the discovery requested was overbroad, [the City] had an obligation at a minimum to respond to the requests to the extent that they sought non-objectionable information or documents."  *In re Rivera*, 2017 U.S. Dist. LEXIS 229538, at *6.  The City has simply refused to do this, and instead, withheld all documents responsive to the request, except the raw data discussed above.

**d.   Plaintiffs' Narrow Request is Proportional to the Needs of the Case**

To the extent Defendant is withholding any documents on the basis that the request is not proportional to the needs of this case, Defendant's objection and subsequent meet and confer efforts provided no information "clarifying, explaining, and supporting its objection" that it is not proportional to the needs of the case, based on the factors outlined in Rule 26.  *Duran v. Cisco Sys., Inc.*, 258 F.R.D. 375, 378 (C.D. Cal. 2009).Applying these factors and the appropriate scope of this litigation, the request is proportional to the needs of the case.  As discussed in detail above, the issues at stake in this litigation are of constitutional significance; the amount of controversy is largely irrelevant given that Plaintiffs primarily seek prospective relief to put an end to the City's unconstitutional

practices; the City of Los Angeles has far more resources than the seven unhoused
individuals whose belongings were seized and the volunteer organization whose
resources go to replacing those belongings; and Defendant has access to
information not publicly available, such as internal analysis and reports.  *See
supra,* Plaintiffs' Argument re: Request No. 2.  The other factors also weigh
heavily in Plaintiffs' favor.  *See* Fed. R. Civ. P. 26(b)(1).

### i.        Importance of the discovery in resolving the issues

The documents sought by Plaintiffs are related to one of the matters that is
most central to this case:  how the City conducts Encampment Cleanups.  Reports
and analysis related to those issues could provide critical evidence about, for
example, the existence of customs, policies or practices or the City's awareness of
and failure to address the issues raised in this case.  Those issues are critical to
*Monell* liability and Plaintiffs' claims for prospective relief, which as noted above,
are at the center of this case.

### ii.       Whether the burden or expense of the proposed discovery outweighs its likely benefit

Defendant objects that the burden of producing documents responsive to
Plaintiffs' request is too high, yet the only burden the City identifies in producing
documents Plaintiffs have clarified are responsive to this request is literally the
burden that comes from searching for documents responsive to any request.  As the
City concedes, the normal discovery steps necessary to conduct a "reasonable
inquiry" should be sufficient to identify reports and analysis related to this request,
especially since the request goes back only four years and the responsive
documents would likely be contained within a few discrete departments within the
City.  *See In re: Citimortgage*, 2012 WL 10450139, at *4; *see also* Plaintiffs'
Argument re: RFP 16.  Yet because the City continues to object to the relevance of
these documents, it refuses to concede that any burden is proportionate to the needs

of this case. The City's refusal to conduct even a reasonable inquiry to identify responsive documents is not defensible.

### e.      The City has Waived its Other Objections

The City includes a boilerplate objection on the basis of attorney-client privilege and work product doctrines, but fails to identify in any way whether or to what extent it is actually withholding any documents on the basis of privilege. In the seven months since the City produced responsive documents, the City has refused to produce a privilege log, despite repeated requests.  It has therefore waived any privilege.  *Burlington Northern & Santa Fe Ry. Co.* at 1149.

Likewise, the City provides no information here or anywhere to clarify why or even whether any of its other general objections apply.  As such, it has waived them here.  *See e.g., Bosley*, 2016 WL 1704159, at *5.

### f.      Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce all documents responsive to RFP No. 36 within 21 days or, if the City asserts it has produced all documents responsive to the request, compelling Defendant to provide a complete, explicit response as to the search conducted to identify and produce responsive documents and to attest to the finality of its production, as required by Rule 34.

### DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 36:

For the reasons set forth in the City's arguments as to RFPs 1, 30 and 33, the documents Plaintiffs seek are not relevant and the request is not proportional to the needs of this case.  The City incorporates by reference the City's Response to RFPs 1, 30 and 33 in their entirety.

**REQUEST FOR PRODUCTION NO. 38:**

All Government Tort Claims filed against the CITY related to the seizure and/or destruction of homeless people's belongings.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 38:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiff El-Bey's specific claims alleged in the SAC relating to incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western. Defendant further objects that the Request seeks documents that are not relevant to any named-plaintiffs' claims as alleged in the SAC. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking all government tort claims filed against the City dating back four years to April 1, 2016 that are unrelated, and not relevant, to Plaintiff El Bey's specific claims alleged in the SAC. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No.

CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing any such proposed discovery outweighs the benefit of such information for Plaintiff El Bey's claims and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, during the period from April 1, 2016 to July 30, 2020, a total of 26,775 government tort claims were filed against the City. In order to search for and produce documents responsive to this Request, Defendant would need to create search parameters to query Defendant's City Attorney's Office Citylaw database to search government claims filed during this period; however, there are no fields to identify or segregate claims filed relating to the seizure or destruction of homeless people's belongings and such claims could be input into the database by different causes relating to civil rights, property, miscellaneous, and input as claims against different departments, such as LASAN, LAPD, or the City. Defendant would have to run multiple queries to identify potentially responsive government claims out of these 26,775 claims by claim number. Defendant would then need to assign an administrative clerk to manually pull and review identified government claims by claim number to determine responsiveness. In addition, Defendant objects that there are likely government tort claims not stored within Citylaw, which would require a further search of hard copy files of government claims stored offsite that would need to be recalled from storage and manually searched for responsive documents. Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents responsive to this Request

for the reasons described above. Without waiving any, and based on these
objections, Defendant will produce the government claim filed by Plaintiff El-Bey
and the other individual plaintiffs in this action, but no other documents will be
produced in response to this Request.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 38:**

Defendant incorporates the General Objections as though fully set forth here.
Defendant objects that the Request seeks documents that are not relevant to
Plaintiffs' specific claims alleged in the Second Amended Complaint (Dkt. No. 42,
"SAC"). Plaintiff El-Bey alleges claims for specific incidents occurring on or
around January 10, 2019 at 6th Street and Alexandria and on or around June 4,
2019 at Oakwood and Western; Plaintiff Garcia alleges claims for specific
incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone
Avenue, on or around April 29, 2019 at Aetna Street and Van Nuys Boulevard, and
on or around August 14, 2019 at Calvert and Bessemer; Plaintiffs Zamora and
Zepeda allege claims for specific incidents occurring on or around March 21, 2019
at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and
Harvard; Plaintiff Haugabrook alleges claims for incidents occurring sometime in
March 2019 and a month later by Figueroa Street and 53rd Street and 52nd Place;
Plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019
at Lomita and McCoy; and Plaintiff Ashley alleges claims for a specific incident
occurring on or around May 21, 2019 at Lomita and McCoy. The Court struck
Plaintiff KFA's claims seeking any declaration that the City unconstitutionally
applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt.
No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to
obtain a ruling that the City's policies and practices are unconstitutional and not
that each past application of those policies and practices to its members was
unconstitutional."). Defendant also objects that the proposed discovery is not

relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking all government tort claims filed against the City dating back four years to April 1, 2016 that are unrelated, and not relevant, to Plaintiffs' specific claims alleged in the SAC. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing any such proposed discovery outweighs the benefit of such information for Plaintiffs' claims and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

Specifically, during the period from April 1, 2016 to July 30, 2020, a total of 26,775 government tort claims were filed against the City. In order to search for and produce documents responsive to this Request, Defendant would need to create search parameters to query Defendant's City Attorney's Office Citylaw database to search government claims filed during this period; however, there are no fields to identify or segregate claims filed relating to the seizure or destruction of homeless people's belongings and such claims could be input into the database by different causes relating to civil rights, property, miscellaneous, and input as claims against different departments, such as LASAN, LAPD, or the City. Defendant would have to run multiple queries to identify potentially responsive

government claims out of these 26,775 claims by claim number. Defendant would then need to assign an administrative clerk to manually pull and review identified government claims by claim number to determine responsiveness. In addition, Defendant objects that there are likely government tort claims not stored within Citylaw, which would require a further search of hard copy files of government claims stored offsite that would need to be recalled from storage and manually searched for responsive documents. Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents responsive to this Request for the reasons described above. Without waiving any, and based on these objections, Defendant produced the government claims filed by individual Plaintiffs at CTY004316-4358, but objects to further production of documents in response to this Request.

**PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 38:**

Plaintiffs seek Government Tort Claims filed with the City by other unhoused individuals regarding the seizure and destruction of their belongings, from two years and eight months prior to the Specific Incidents and through the present. Initially and in its Amended responses, Defendant objected to the production of any documents responsive to this request other than the individual Plaintiffs' claims (which of course, Plaintiffs have produced to the City as part of their initial disclosures). Plaintiffs requested that the City provide more details about the storage of these documents; the City refused to meet and confer and instead, amended its answer to the RFP in October 2020 by adding additional details but none of the information requested by Plaintiffs.

In November and December 2020, the City inexplicably reversed course. While standing by its objections, the City agreed to produce Government Tort

Claims it could search for electronically using search terms, which limited the searches to only those claims that were actually filed electronically and that were then catalogued in the City's case management system.[24] By the City's own account, the City's ability to identify responsive documents by this method is extremely limited: the majority of documents responsive to the request appear not to be stored in this database and the use of this method excluded all Government Tort Claims that were submitted in paper form or uploaded as PDF attachments. *See* 12/29/2020 email from Ursea. In response to this limited search of claims filed online, the City identified and turned over 35 Government Tort Claims submitted by 20 individuals.

As discussed below, the City's search and production are inadequate. Not only is the search likely to leave out claims submitted by unhoused residents, but Plaintiffs can also show that the City has withheld documents responsive to this request. Because the documents are highly relevant, Plaintiffs are entitled to an order compelling production of all documents responsive to the request.

### a. The Documents are Relevant to Plaintiffs' Claims

As set out in Plaintiffs' complaint and *supra,* Plaintiffs are entitled to discovery about the City's unconstitutional customs and practices, beyond just the Specific Incidents. Complaints raised by other unhoused individuals, alleging the same constitutional violations as those alleged in the SAC, are unquestionably relevant to the questions of whether the City has a widespread custom and practice of engaging in these violations and whether the City was on notice of the practices and did not address the issues about which individuals complained. *See Henry v. Cty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997), *opinion amended on denial of*

---

[24] Government Tort Claims can be filed with the City of Los Angeles by using the City's Government Tort Claim form and submitting it via mail or in person, or by using the City's government tort claim portal. *See* Mike Feuer, Los Angeles City Attorney, "Claims," available at https://www.lacityattorney.org/claims.

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

*reh'g*, 137 F.3d 1372 (9th Cir. 1998) (*Monell* claim supported by "almost identical incident as that complained of" which put Defendant on notice as to future abuses); *Larez v. City of Los Angeles*, 946 F. 2d 630, 646 (9th Cir. 1991) (grounding "policy or custom" liability on grounds of similar complaints and the lack of sustaining them); *Lawman v. City & Cty. of San Francisco*, 159 F. Supp. 3d 1130, 1144 (N.D. Cal. 2016) (same). These documents could also lead to the discovery of other relevant documents and witnesses. *In re: Am. Med. Sys., Inc.*, 2016 WL 3077904, at *4 ("it remains true that relevancy in discovery is broader than relevancy for purposes of admissibility at trial,"). And the Claims may contain impeachment evidence. *Estate of Ernesto Flores,* 2017 WL 3297507, at *6; *Paulsen*, 168 F.R.D. at 289.

### b.    Requests are Not Overbroad

Plaintiffs seek Government Tort Claims that have been filed since April 2016, when the City amended LAMC 56.11 and began enforcing the ordinance. Importantly, this is just two years and eight months prior to the first Specific Incident alleged in the complaint. Evidence of *prior* conduct is necessary to establish municipal liability under some theories of *Monell* liability. *See e.g., Connick v. Thompson*, 563 U.S. 51, 63 (2011) (quotation omitted) (Under a failure to train theory, "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the cit[y] and the opportunity to conform to constitutional dictates . . . ."). As such, evidence of prior conduct alleged in the complaint is relevant and necessary, and courts routinely order the production of complaints going back much longer than two years and eight months. *Medora*, 2007 WL 9810901, at *4 ("a 5-year time limitation adequately serves Plaintiff's interests in obtaining relevant documents while avoiding the imposition of undue burden and expense on Defendants."). In fact, given the history of allegations related to the seizure and destruction of unhoused people's belongings which

preceded this case, *see* SAC ¶¶ 17-19, two years and eight months is a more than reasonable time period for tort claims related to this conduct. And of course, discovery regarding cleanups that have happened since the Specific Incidents occurred is necessary for Plaintiffs' claims of prospective relief.

### c.     The Request is Proportionate to the Needs of the Case

As discussed in detail above, the issues at stake in this litigation are of constitutional significance; the amount of controversy is largely irrelevant given that Plaintiffs primarily seek prospective relief to put an end to the City's unconstitutional practices; the City of Los Angeles has far more resources than the seven unhoused individuals whose belongings were seized and the volunteer organization whose resources go to replacing those belongings. *See infra.* The other factors also weigh heavily in Plaintiffs' favor. *See* Fed. R. Civ. P. 26(b)(1).

### i.     Parties' relative access to relevant information

As with the other requests, the City controls access to this information. Plaintiffs have no practical way, other than through discovery, of determining whether other claims have been filed against the City for these practices. In addition, this discovery is also important to identify witnesses who had similar experiences as the Plaintiffs, which goes to the issue of whether the City has widespread and longstanding policies and practices that violate unhoused people's constitutional rights; this is at issue both for *Monell* liability and for Plaintiffs' claims for prospective relief. Although the City heavily documents the seizure and destruction of property, those documents almost never contain any information about the names of individuals whose property was destroyed. As discussed above (and noted by the district court), unhoused residents may, for a variety of reasons, have difficulty providing precise dates and times when their belongings were taken, which makes it difficult for Plaintiffs to identify witnesses and corresponding documentation from the City regarding these incidents. The

Government Tort Claims are some of the only documents maintained by the City
that contains that witness information.

ii.     **Importance of the discovery in resolving the issues**

*Monell* liability is a central issue in this case, especially because Plaintiffs
did not bring claims against individual LA Sanitation workers or LAPD officers
and primarily seek injunctive relief.  And as discussed above, past complaints by
individuals of conduct that gives rise to subsequent litigation is critical to the issue
of *Monell* liability.  The fact that a city has received numerous complaints is
important evidence to show that the city was on notice of this alleged activity and
failed to take steps to address the abuse. *See Henry* 132 F.3d at 519; *Larez,* 946
F.2d at 646 (finding "policy or custom" liability based on similar complaints and
the City's lack of sustaining them); *Lawman*, 159 F. Supp. 3d at 1144 (same).

As discussed above, this discovery is also important to identify witnesses
who had similar experiences as the Plaintiffs, which goes to the question of the
existence of unconstitutional customs, policies, and practices and whether those
customs, policies, and practices are widespread and longstanding, which is
incredibly important both for establishing *Monell* liability and the scope of
prospective relief.  The claims the City did produce demonstrate why these
documents are important: they contain the names of individuals who bring similar
allegations against the City and provide details about the incidents from the
perspective of the individuals who experienced the violations.  This is notable,
since the vast majority of the discovery Plaintiffs seek from the City is evidence
created by the City employees who engaged in the seizure and destruction of
property. *See, e.g.*, RFPs 30, 33-34.  Therefore, the documents may contain
important impeachment evidence. *Estate of Ernesto,* 2017 WL 3297507, at *6;
*Paulsen,* 168 F.R.D. at 2289 ("Apart from whether the documents may be
admissible at trial as part of the plaintiff's case-in-chief, they certainly may be used

for impeachment purposes . . . . [T]here is no merit to defendant corporation's relevancy objection.").

  **iii.** **Whether the burden or expense of the proposed discovery outweighs its likely benefit**

  This discovery is highly relevant and important to Plaintiffs' case.  Tort claims filed against the City represent only a very small subset of instances in which the City engaged in activities that Plaintiffs allege violated unhoused people's constitutional rights, but they represent an important subset—instances in which unhoused people were able to pull together their resources and submit a tort claim to the city, whether online, by mail, or by delivering it to the clerk.  Or they represent facts egregious enough that the unhoused person was able to retain a lawyer.  And as noted above, the claims include statements from unhoused residents about their experiences, rather than simply containing the City's view of these incidents.

  The City has not indicated how many forms were left unreviewed but there is no basis to assume that the forms that were not searched are any less relevant or important to Plaintiffs' case than the forms that were searched. In reality, it may be more likely that claims for these kinds of violations are filed using the City's Government Tort Claim form, rather than the City's online portal. Many unhoused people often do not have access to a computer or the internet and individuals are routinely referred to the City Clerk's office to file a tort claim in person.  Lawyers may also choose to PDF or submit tort claims by paper, rather than use the online form, so that they can retain a copy after it is submitted.[25]

  The burden to the City to search for responsive documents submitted in paper or PDF form does not outweigh the benefit to Plaintiffs.  The identified

---

[25] Plaintiffs' Government Tort Claims were submitted in hard copy rather than through the City's online portal and so ostensibly would not have been identified in the City's search.

burden is simply the burden that comes from keeping responsive documents in a
form that is not searchable.  "The fact that a responding party maintains records in
different locations utilizes a filing system that does not directly correspond to the
[discovery request] or that responsive documents might be voluminous does not
suffice to sustain a claim of undue burden." *Thomas v. Cate*, 715 F. Supp. 2d at
1033 (quoting *Greystone Constr. Inc., v. Nat'l Fire & Marine Ins. Co*., No. 07-cv-
00066-MSK-CBS, 2008 WL 795815, at *6 (D. Colo. March 21, 2008) and
collecting cases).  And the fact that the City is unable to use electronic search
terms to identify additional responsive documents does not obviate the City's need
to search for and produce those additional documents." Rule 34 does not draw a
distinction between documents stored electronically and documents stored in
paper." *NuVasive, Inc.* 2019 WL 4934477, at *2.  Instead, "Plaintiff must request
information, regardless of how or where it is maintained by Defendants, which
Defendants must address as required by Rule 34. That is discovery: a party
requests information and the burden is on the producing party to locate and
produce it or object legitimately to production." *Id.* (declining to rule on the
sufficiency of the use of search terms and custodians).

     As discussed above, Government Tort Claims are highly relevant to the
question of *Monell* liability, which is at issue in every Section 1983 case brought
against the City of Los Angeles. Therefore, it is highly likely the City would
frequently face discovery requests for these documents, and yet, the City has
chosen to maintain a significant portion of the documents (apparently all
documents filed using the City's Government Tort Claim form) in a way that is not
readily searchable.  This is a burden of the City's own making and does not
outweigh the benefit of these highly relevant documents.  *See U.S. ex rel
Guardiola*, 2015 WL 5056726, at *5(organizations should give "thought to the risk
of litigation and corresponding obligations" when considering how to store their

documents); *see also Toranto v. Jaffurs*, No. 16cv1709-JAH (NLS), 2018 WL 4613149, at *3 (S.D. Cal. Sep. 26, 2018) (refusing to entertain an objection on the burden of producing data "that it should have reasonably foreseen would be discoverable material at a time when it should have anticipated litigation").

As with other RFPs, Plaintiffs' concern about the sufficiency of the search is not simply hypothetical:  the City's searches unquestionably failed to identify highly relevant Government Tort Claims—for example, the claims that formed the basis of two lawsuits filed against the City of Los Angeles, which was defended by the City and raise nearly identical factual allegations to the individual plaintiffs in this case. *See, e,g,*, *Schellenberg v City of Los Angeles*, 2:18-cv-07670-CAS-PLA; *Cooley v. City of Los Angeles*, 2:18-cv-09053-CAS-PLA (Dkt. 16 at 15-16).  In fact, in both of those cases, the issue of the sufficiency of the Government Tort Claim was actively litigated (by the City Attorneys who are also counsel of record in this case). There is no excuse for the City's failure to produce these responsive documents, and the fact that Defendants' search did not uncover these two cases, which allege factually similar claims against the City, demonstrate that the City's search method was not sufficient to identify documents responsive to Plaintiffs' request.

### d.    The City's Other Objections are without Merit
#### i.    Claims of privilege

In addition to objecting to proportionality and relevance, the City specifically objects "to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines."  The use of this boilerplate objection here is patently absurd and an abuse of the discovery process.  *See Polaris,* 2017 U.S. Dist. LEXIS 222261, at *14-17. Government tort claims are, as a matter of law, public records.  *See Poway Unified Sch. Dist. v. Superior Court (Copley Press)*, 62 Cal. App. 4th 1496, 1507

(1998).  The claims are also drafted by outside parties and sent to the City.  Finally, Defendant has waived any objections it might have had that these documents were privileged.  *See DeSilva,* 2020 WL 5947827, at *7.

### ii.    Other boilerplate general objections

As with all of its requests, the City incorporates three pages of boilerplate objections but failed to provide any basis for the specific objection or even an assessment of whether the objection specifically applies to the request.  The use of boilerplate objections here is also inappropriate and an abuse of the discovery process.  *Polaris,* 2017 U.S. Dist. LEXIS 222261, at *14-17.  *See also  Eisenhower Med. Ctr.*, 2020 U.S. Dist. LEXIS 218716, at *9.

The City's boilerplate objections do not apply to this specific Request for Production.  The City refused to clarify which of the objections (if any) applied to this request, let alone the facts necessary to support their application, even after months of requests by Plaintiffs for the City to do so as required by Rule 34.  The City has therefore waived the objection.  *See e.g., Bosley*, 2016 WL 1704159, at *5 (Defendant waived blanket objections by failing to provide details of the objections as required by Rule 34(b)(2)(B)).

### e.    Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce all documents responsive to RFP No. 38 within 21 days or where applicable, to compel Defendant to provide a complete, explicit response as to the finality of their production with respect to specific individual Plaintiffs, as required by Rule 34.

### DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 38:

RFP 38 seeks: All Government Tort Claims filed against the CITY related to the seizure and/or destruction of homeless people's belongings [since 2016].

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

Plaintiffs have not established the relevance of these claims.  Plaintiffs argue that Government Tort Claims are relevant for (1) Monell liability; (2) could also lead to the discovery of other relevant documents and witnesses; and (3) may contain impeachment evidence.  For the reasons previously discussed, *Monell* is not a valid relevance theory in this case.  Furthermore, Plaintiffs do not explain how Government Tort Claims, including claims that pre-date Plaintiffs' incidents by several years, are likely to contain any "relevant documents" or "witnesses," or how they are likely to serve as "impeachment evidence."

Even if Plaintiffs' conclusory allegations were enough to meet their burden to establish relevance, a request for all Government Tort Claims from 2016 to present is not proportional to the needs of the case.  As Plaintiffs concede, the City has produced claims responsive to this request based on electronic searches in the City's Government Claims.  The database does not permit boolean, proximity, or similar searches.  Ursea Decl. ¶9.  The system permits up to three "and" search terms to be entered at a time but it functions best if one search term is entered at a time.  *Id.*  Claims that have been submitted in paper form or uploaded as PDF attachments for any other reason are not searchable electronically.  *Id.*  Thus, to identify responsive documents, each such claim in the database would need to be downloaded manually and reviewed for responsiveness.  *Id.* The system allows restriction parameters to be set -- in relevant part, date of claim, type of claim, and department -- but none of those restrictions were used in conducting these searches so that the widest possible search net was cast.  *Id.* The City used the following search terms—each one input separately because of the system's limitations:

a. cleanup

b. clean-up

c. cleaning

d. sweep

e.  homeless

f.  unhoused

g.  sanitation

h.  LASAN

i.  bulky

j.  56.11

k.  destroy

l.  destruction

m. encampment

n.  dump

o.  couch

p.  pallet

q.  cart

r.  care+

s.  hope

t.  tent

u.  trash

v.  care

The searches of the Government Claims database using the above search terms resulted in approximately 1200 claims.  Those claims were then reviewed and 30 responsive claims were identified.  Ursea Decl. ¶10.  Although the City had previously agreed only to produce a spreadsheet of electronically searchable information from the database, the City took the extra step to manually download each of the claims identified, which the City produced to Plaintiffs on December 18, 2020.  Ursea Decl. ¶24.  Given the (at best) questionable relevance of such claims, the City's reasonable compromise and production of documents, and the burden associated with manually searching well over a thousand claims for potentially responsive documents, Plaintiffs request is not proportional to the needs

of the case.  The City incorporates by reference its response to RFP 2, which
applies with equal force here.

**REQUEST FOR PRODUCTION NO. 39:**

All complaints or grievances filed against the CITY, including the LAPD,
related to the seizure and/or destruction of homeless people's belongings.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 39:**

Defendant incorporates the General Objections as though fully set forth here.
Defendant objects that the Request seeks documents that are not relevant to
Plaintiff El-Bey's specific claims alleged in the SAC relating to incidents occurring
on or around January 10, 2019 at 6th Street and Alexandria and on or around June
4, 2019 at Oakwood and Western. Defendant further objects that the Request seeks
documents that are not relevant to any named-plaintiffs' claims as alleged in the
SAC. The Court struck Plaintiff KFA's claims seeking any declaration that the
City unconstitutionally applied LAMC 56.11 or the City's policies or practices to
KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the
SAC as seeking only to obtain a ruling that the City's policies and practices are
unconstitutional and not that each past application of those policies and practices to
its members was unconstitutional."). Defendant also objects that the proposed
discovery is not relevant to establishing *Monell* liability for the claims alleged in
the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a
single incident … to hold the City liable under *Monell*."). Defendant objects that
the Request is overbroad and burdensome in seeking all claims or grievances filed
against the City and LAPD relating to seizure or destruction of homeless property
dating back four years to April 1, 2016 that are unrelated, and not relevant, to
Plaintiff El Bey's specific claims alleged in the SAC. Defendant also objects to the
Request to the extent the Request seeks information protected from disclosure by

1   the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P.

2   Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D.

3   Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx),

4   2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

5       Defendant further objects that the Request is burdensome and not

6   proportional to the needs of the case, insofar as the burden of searching for and

7   producing any such proposed discovery outweighs the benefit of such information

8   for Plaintiff El Bey's claims and Defendant's costs or expense in conducting the

9   search and producing documents greatly exceeds the amount in controversy for

10  Plaintiff's alleged damages.

11      Specifically, in order to search for and obtain documents responsive to the

12  Request, Defendant would need to conduct a search within LAPD's Complaint

13  Management System ("CMS"). LAPD logged over 12,000 complaints within CMS

14  over the four-period dating back to April 2016. Each complaint is logged into the

15  system and maintained by a separate complaint-file (CF) number and categorized

16  using codes for allegation type, such as conduct unbecoming, misconduct, or bias.

17  CMS does not contain search field for allegation types based on seizure or

18  destruction of property. Defendant would have to assign an LAPD analyst to

19  conduct queries of search terms through digitized copies of over 12,000 complaints

20  to locate potentially responsive documents to the Request. A complete and closed

21  complaint file contains approximately 100-250 pages, including forms for initial

22  intake, field reports, investigative reports, medical information, other legal

23  documentation, and other administrative reports or decisions. After running the

24  search query, an analyst would have to identify complaint files by CF number and

25  manually review each complaint file to determine responsiveness and the existence

26  of confidential information, including medical information, that may require

27

28

redaction. The average time required to collect, review, and redact a complaint file is approximately four hours.

In addition, Defendant would need to create search parameters to query Defendant's City Attorney's Office Citylaw database to search government claims filed against the City from April 1, 2016 to the present. A total of 26,775 government tort claims were filed against the City during the period from April 1, 2016 to July 30, 2020. Defendant's Citylaw database does not contain search fields to identify or segregate claims filed relating to the seizure or destruction of homeless people's belongings and such claims could be input into the database by different causes relating to civil rights, property, miscellaneous, and input as claims against different departments, such as LASAN, LAPD, or the City. Defendant would have to run multiple queries to identify potentially responsive claims out of these 26,775 claims by claim number. Defendant would then need to assign an administrative clerk to manually pull and review identified government claims by claim number to determine responsiveness. In addition, Defendant objects that there are likely government tort claims not stored within Citylaw, which would require a further search of hard copy files of government claims stored offsite that would need to be recalled from storage and manually searched for responsive documents.

Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents responsive to this Request for the reasons described above. Without waiving any, and based on these objections, Defendant will produce the LAPD's complaint file for claims filed by the individual plaintiffs, and the individual plaintiffs' government tort claims filed with the City, but no other documents will be produced in response to this Request.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 39:**

Defendant incorporates the General Objections as though fully set forth here.
Defendant objects that the Request seeks documents that are not relevant to
Plaintiffs' specific claims alleged in the Second Amended Complaint (Dkt. No. 42,
"SAC"). Plaintiff El-Bey alleges claims for specific incidents occurring on or
around January 10, 2019 at 6th Street and Alexandria and on or around June 4,
2019 at Oakwood and Western; Plaintiff Garcia alleges claims for specific
incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone
Avenue, on or around April 29, 2019 at Aetna Street and Van Nuys Boulevard, and
on or around August 14, 2019 at Calvert and Bessemer; Plaintiffs Zamora and
Zepeda allege claims for specific incidents occurring on or around March 21, 2019
at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and
Harvard; Plaintiff Haugabrook alleges claims for incidents occurring sometime in
March 2019 and a month later by Figueroa Street and 53rd Street and 52nd Place;
Plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019
at Lomita and McCoy; and Plaintiff Ashley alleges claims for a specific incident
occurring on or around May 21, 2019 at Lomita and McCoy. The Court struck
Plaintiff KFA's claims seeking any declaration that the City unconstitutionally
applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt.
No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to
obtain a ruling that the City's policies and practices are unconstitutional and not
that each past application of those policies and practices to its members was
unconstitutional."). Defendant also objects that the proposed discovery is not
relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No.
65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident …
to hold the City liable under *Monell*."). Defendant objects that the Request is
overbroad and burdensome in seeking all claims or grievances filed against the

City and LAPD relating to seizure or destruction of homeless property dating back four years to April 1, 2016 that are unrelated, and not relevant, to Plaintiffs' specific claims alleged in the SAC. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing any such proposed discovery outweighs the benefit of such information for Plaintiffs' claims and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiffs' alleged damages.

Specifically, in order to search for and obtain documents responsive to the Request, Defendant would need to conduct a search within LAPD's Complaint Management System ("CMS"). LAPD logged over 12,000 complaints within CMS over the four-period dating back to April 2016. Each complaint is logged into the system and maintained by a separate complaint-file (CF) number and categorized using codes for allegation type, such as conduct unbecoming, misconduct, or bias. CMS does not contain search field for allegation types based on seizure or destruction of property. Defendant would have to assign an LAPD analyst to conduct queries of search terms through digitized copies of over 12,000 complaints to locate potentially responsive documents to the Request. A complete and closed complaint file contains approximately 100-250 pages, including forms for initial intake, field reports, investigative reports, medical information, other legal documentation, and other administrative reports or decisions. After running the

search query, an analyst would have to identify complaint files by CF number and manually review each complaint file to determine responsiveness and the existence of confidential information, including medical information, that may require redaction. The average time required to collect, review, and redact a complaint file is approximately four hours.

In addition, Defendant would need to create search parameters to query Defendant's City Attorney's Office Citylaw database to search government claims filed against the City from April 1, 2016 to the present. A total of 26,775 government tort claims were filed against the City during the period from April 1, 2016 to July 30, 2020. Defendant's Citylaw database does not contain search fields to identify or segregate claims filed relating to the seizure or destruction of homeless people's belongings and such claims could be input into the database by different causes relating to civil rights, property, miscellaneous, and input as claims against different departments, such as LASAN, LAPD, or the City. Defendant would have to run multiple queries to identify potentially responsive claims out of these 26,775 claims by claim number. Defendant would then need to assign an administrative clerk to manually pull and review identified government claims by claim number to determine responsiveness. In addition, Defendant objects that there are likely government tort claims not stored within Citylaw, which would require a further search of hard copy files of government claims stored offsite that would need to be recalled from storage and manually searched for responsive documents.

Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing documents responsive to this Request for the reasons described above. Without waiving any, and based on these objections, Defendant produced the

LAPD complaints filed by individual Plaintiffs at CTY004511-4626, but objects to further production of documents in response to this Request.

### PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 39:

Plaintiffs seek complaints and grievances filed against the City by other unhoused individuals regarding the seizure and destruction of their belongings, going back two years and eight months prior to the Specific Incidents through the present. This includes not only Government Tort Claims, which are filed only when an individual is claiming they are owed money by the City, but also complaints and grievances submitted by individuals to the various departments participating in cleanups, including but not limited to the Los Angeles Police Department. This includes, for example, LA Sanitation, the Unified Homeless Response Center, the Mayor's office, and the various city council offices. It would also include any complaints filed in state or federal court, alleging the City seized and destroyed unhoused people's belongings.

As with the Government Tort Claims, Defendant initially objected to the production of any documents responsive to this request other than documents generated by the filing of Plaintiffs' lawsuit and the complaint itself. On November 19, the City inexplicably reversed course. While standing by all of its objections, it agreed to search for complaints to LAPD and to export the intake summaries that relate to the seizure or destruction of unhoused person's belongings. The City did not agree to provide any other forms of complaints or grievances that may have been submitted to, for example, any other department such as LA Sanitation, the Mayor's office, etc. The City agreed to produce a spreadsheet containing the LAPD complaints by December 18, 2020, but it did not do so. Myers Decl., ¶ 47, Exh. AA. On December 29, counsel for the City sent a further update, stating "we are still working on the other categories of documents plaintiffs requested,

including police complaints  . . . and will get back to you on these as soon as we
can." Myers Decl., ¶ 56, Exh. AH.  The City has not communicated with Plaintiffs
about this request since.

As discussed below, the City's delay in producing the limited documents it
has agreed to produce is inexcusable. Moreover, the City's agreement to produce
only complaints filed with the LAPD is insufficient.  Plaintiffs can again show the
City has withheld documents responsive to this request. Because the documents are
highly relevant, Plaintiffs are entitled to an order compelling production of all
documents responsive to the request within 21 days.

### a.    The Documents are Relevant to Plaintiffs' Claims

As set out in Plaintiffs' complaint and *supra,* Plaintiffs are entitled to
discovery about the City's unconstitutional customs and practices, beyond just the
Specific Incidents.  Complaints raised by other unhoused individuals, alleging the
same constitutional violations as those alleged in the SAC, are unquestionably
relevant to the questions of whether the City has a widespread custom and practice
of engaging in these violations and whether the City was on notice of the practices
and did not address the issues about which individuals complained.  *See Henry v.
Cty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997), *opinion amended on denial of
reh'g,* 137 F.3d 1372 (9th Cir. 1998) (*Monell* claim supported by "almost identical
incident as that complained of" which put Defendant on notice as to future abuses);
*Larez v. City of Los Angeles*, 946 F. 2d 630, 646 (9th Cir. 1991) (grounding
"policy or custom" liability on grounds of similar complaints and the lack of
sustaining them); *Lawman v. City & Cty. of San Francisco*, 159 F. Supp. 3d 1130,
1144 (N.D. Cal. 2016) (same). These documents could also lead to the discovery of
other relevant documents and witnesses. *In re: Am. Med. Sys., Inc.*, 2016 WL
3077904, at *4 ("it remains true that relevancy in discovery is broader than
relevancy for purposes of admissibility at trial.").

### b.    The City's Continued Delay is Inexcusable

Plaintiffs propounded these RFPs in July 2020 (and provided them to Defendant in October 2019).  The City delayed three months after filing written responses, and then agreed to produce responsive documents after a delay of another month.  The date the City itself chose to produce this document came and went, and two months later, the City still did not produce the requested documents. The City's use of a "rolling production" is not allowed under Rule 34, and there is absolutely no justification for the City's more than six month delay in producing these documents. *See* Rule 34(b)(2); *Maiorano,* 2017 WL 4792380, at *2; *Fischer*, 2017 WL 773694, at *3.

### c.    Request is not  Overbroad

Plaintiffs seek Government Tort Claims that have been filed against the City since April 2016, when the City amended LAMC 56.11 and began enforcing the ordinance.  Importantly, this is just two years and eight months prior to the first Specific Incident alleged in the complaint. Evidence of *prior* conduct is necessary to establish municipal liability under some theories of *Monell* liability.  *See e.g., Connick v. Thompson*, 563 U.S. 51, 63 (2011) (quotation omitted) (Under a failure to train theory, "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the cit[y] and the opportunity to conform to constitutional dictates . . . .").  As such, evidence of prior conduct alleged in the complaint is relevant and necessary, and Courts routinely order the production of complaints going back much longer than two years and eight months. *Medora* 2007 WL 9810901, at *4 ("a 5-year time limitation adequately serves Plaintiff's interests in obtaining relevant documents while avoiding the imposition of undue burden and expense on Defendants."). In fact, given the history of allegations related to the seizure and destruction of unhoused people's belongings which preceded this case, *see* SAC ¶¶ 17-19, two years and eight months is a more than reasonable time period for tort claims related to this conduct. And of course,

332

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

discovery regarding cleanups that have happened since the Specific Incidents occurred are necessary for Plaintiffs' claims of prospective relief

### d.      The Request is Proportionate to the Needs of the Case

As discussed in detail above, the issues at stake in this litigation are of constitutional significance; the amount of controversy is largely irrelevant given that Plaintiffs primarily seek prospective relief to put an end to the City's unconstitutional practices; and the City of Los Angeles has far more resources than the seven unhoused individuals whose belongings were seized and the volunteer organization whose resources go to replacing those belongings. *See infra.* The other factors also weigh heavily in Plaintiffs' favor. *See* F.R.C.P. 26(b)(1).

### i.      Parties' relative access to relevant information

As with the other requests, the City controls access to this information. Plaintiffs have no practical way, other than through discovery, of determining whether other individuals have complained to the City about its practices.  In addition, this discovery is also important to identify witnesses who had similar experiences as the Plaintiffs, which goes to the issue of whether the City has widespread and longstanding policies and practices that violate unhoused people's constitutional rights.  This is at issue both for *Monell* liability and for Plaintiffs' claims for prospective relief.  Although the City heavily documents the seizure and destruction of property, those documents almost never contain any information about the names of individuals whose property was destroyed.  As discussed above (and noted by the District Court, *see* February Order), unhoused residents may have difficulty providing precise dates and times when their belongings were taken, which makes it difficult for Plaintiffs to identify witnesses and corresponding documentation from the City regarding these incidents.  Complaints and grievances submitted by unhoused people who experienced these violations

are likely some of the only documents maintained by the City that contain witness information, and Plaintiffs do not have practical access to that information.

### ii.     Importance of the discovery in resolving the issues

The parties in this case disagree about the City's practices in seizing and destroying unhoused people's belongings. *See e.g.*, Declaration of Howard Wong, Dkt. 42-6 at ¶ 47 (disputing Plaintiffs' allegation that it is the City's practice to deem "a bicycle with all of its parts and a detached front wheel present at a site" inoperable and therefore discard it). Evidence that relates to the existence of unconstitutional customs, policies, and practices and the question of whether those customs, policies, and practices are widespread and longstanding, is key to the question of both *Monell* liability and to the individual plaintiffs' and KFA's claims for prospective relief. As such, evidence of the City's actual practices is one of the most central issue in this case. To that end, these documents contain narratives from others affected by these policies as well as witness information of individuals who had similar experiences as the Plaintiffs. The tort claims the City did produce confirm that these documents are important: they contain the names of individuals who bring similar allegations against the City and details about the incidents, from the perspective of the individuals who experienced the violations. This is notable, since the vast majority of the discovery Plaintiffs seek from the City is evidence created by the City employees who engage in the seizure and destruction of property. *See e.g.,* RFPs 30, 33-34 (all containing narratives from city employees).

Past complaints by individuals of conduct that gives rise to subsequent litigation is also critical to the issue of *Monell* liability for another reason: the fact that a city has received numerous complaints is important evidence to show that the city was on notice of this alleged activity and failed to take steps to address the abuse. *See Henry* 132 F.3d at 519; *Larez v. City of Los Angeles*, 946 F.2d at 646 (finding "policy or custom" liability based on similar complaints and the City's

lack of sustaining them); *Lawman v. City & Cty. of San Francisco*, 159 F. Supp. 3d at 1144 (same).

### iii.   Whether the burden or expense of the proposed discovery outweighs its likely benefit

As discussed above, the benefit of these documents is significant.  On the other hand, the City has not shown that there is any significant burden or expense, other than the ordinary burden or expense of discovery.  First, the City has agreed to produce intakes for LAPD complaints, but has simply failed to do so.  Moreover, there is no merit to the City's objection based on burden that the City previously raised--the description described by the City is simply the process required to identify any responsive documents (identifying search terms and manually reviewing documents for responsiveness).  *See In re: Citymortgage Inc.* 2012 WL 10450139, at *4.

The only burden the City identifies is searching for responsive documents within the LAPD and the City Attorney's office; it does not object to the rest of the request—namely responsive documents from other entities within the City.  Any objection on that basis is therefore waived.  But even if not waived, there would be no basis for such an objection.  The City's failure to operate or centralize a formal grievance or complaint process for unhoused people to complain about their property being taken or destroyed does not justify refusing to conduct a reasonable search for these highly relevant and responsive documents.  "The fact that a responding party maintains records in different locations utilizes a filing system that does not directly correspond to the [discovery request] or that responsive documents might be voluminous does not suffice to sustain a claim of undue burden." *Thomas,* 715 F. Supp. 2d at 1033 (quoting *Greystone Constr. Inc,* 2008 WL 795815, at *6 and collecting cases).  Any investigation into this case should have already identified custodians in the relevant departments who would have responsive documents.

As with other RFPs, Plaintiffs' concern about the sufficiency of the search and production of responsive documents is not simply hypothetical:  the City failed to produce the complaints for two lawsuits filed against the City of Los Angeles in the year preceding this case that raise nearly identical factual allegations to the individual plaintiffs in this case. *See, e,g,*, *Schellenberg v City of Los Angeles*, 2:18-cv-07670-CAS-PLA, *Cooley v. City of Los Angeles*, 2:18-cv-09053-CAS-PLA (Dkt. 16 at 15-16).[26]

### e.   The City Waived Any Objection to Withhold Complaints of Current Investigations

On November 19, 2020, the City agreed to produce a spreadsheet containing intake information for closed LAPD complaints.  The City stated that the spreadsheet would "only include investigations that have been closed as ongoing investigations are privileged."  Nov. 19, 2020 email.  This was the first time the City asserted any kind of "privilege" for ongoing investigations and provided no further explanation.  The time to assert such a privilege had long passed.  The City raised the objection for the first time months after initially responding to Plaintiffs' requests and even after subsequently amending its written responses to the RFPs in October 2020.  "[A] party who fails to file timely objections to a discovery request waives those objections."  *DeSilva*, 2020 WL 5947827, at *7 (failure to raise an objection of privilege at the time of providing responses to discovery waives that objection).And the bare assertion that information is "privileged" is not even remotely sufficient under Rule 34 to preserve the privilege.  *See id.*, *Burlington N. & Santa Fe Ry. Co.*, 408 F.3d at 1149.  As such, Defendant has waived whatever

---

[26]   Even a cursory review of Mr. Schellenberg's allegations in his complaint confirm why this is highly relevant and exactly the type of evidence to which Plaintiffs are entitled: Mr. Schellenberg alleged that his bicycle was seized and destroyed by LA Sanitation in 2018 simply because the tire had been removed— the exact practice the City's Chief Environmental Compliance Inspector disputes exists.  *Compare* Myers Decl., ¶ 20, Exh. K at ¶ 47 with *Schellenberg v. City of Los Angeles*, 2:18-cv-07670-CAS-PLA, Dkt. 1 at ¶ 20.

privilege it asserts exists regarding complaints that have not yet been closed and
should be ordered to produce all responsive LAPD complaints.

### f.      The Other Objections Do Not Have Merit

The City did object that "to the extent the Request seeks information
protected from disclosure by the attorney-client privilege and or attorney work
product doctrines."  The use of this boilerplate objection here is patently absurd
and an abuse of the discovery process.  *See Polaris,* 2017 U.S. Dist. LEXIS
222261, at *14-17.  The claims are drafted by outside parties and sent to the City.
They are therefore neither attorney-client communications nor work product.
Defendant has waived any objections it might have had that these documents were
privileged by failing to provide any additional information regarding these claims.
*See DeSilva*, 2020 WL 5947827, at *7.

### i.      Other boilerplate general objections

As with all of its requests, the City incorporates three pages of boilerplate
objections but failed to provide any basis for the specific objection or even an
assessment of whether the objection specifically applies to the request.  The use of
boilerplate objections here is also inappropriate and an abuse of the discovery
process.  *See Polaris,* 2017 U.S. Dist. LEXIS 222261, at *14-17.  *See also
Eisenhower Med. Ctr.*, 2020 U.S. Dist. LEXIS 218716, at *9.

The City's boilerplate objections do not apply to this specific Request for
Production.  The City refused to clarify which of the objections (if any) applied to
this request, let alone the facts necessary to support its application, even after
months of requests by Plaintiffs for the City to do so as required by Rule 34.  The
City has therefore waived the objection.  *See e.g., Bosley*, 2016 WL 1704159, at *5
(Defendant waived blanket objections by failing to provide details of the objections
as required by Rule 34(b)(2)(B)).

### g.    Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce all documents responsive to RFP No. 39 within 21 days or where applicable, to compel Defendant to provide a complete, explicit response as to the finality of their production with respect to specific individual Plaintiffs, as required by Rule 34.

### DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 39:

RFP 39 asks for "All complaints or grievances filed against the CITY, including the LAPD, related to the seizure and/or destruction of homeless people's belongings [2016 to present]."

Plaintiffs argue that complaints about seizure/destruction of homeless persons' belongings from 2016 to the present are relevant "to the questions of whether the City has a widespread custom and practice of engaging in these violations and whether the City was on notice of the practices and did not address the issues about which individuals complained."  As previously discussed, *Monell* is not a valid relevance theory in this case.  Relatedly, given the City's admissions that it promulgated and enforces LAMC 56.11, including during homeless encampment cleanups, there is no dispute as to whether the City was "on notice" about its policies and practices.  There is no need for Plaintiffs to conduct extensive discovery to establish that individuals have complained about LAMC 56.11 and its enforcement.  As Plaintiffs catalog in the SAC, this is not the first lawsuit challenging LAMC 56.11 and its enforcement.  Lebron Decl. ¶ 2, Ex. 27, SAC at pp.6-7 ("as a result of these practices, the City has faced almost a dozen lawsuits in the last 30 years, brought by unhoused residents who allege that the City has violated their constitutional rights by seizing and destroying their tents, medications, documents, and other items they need to survive on the streets" and

listing cases).  Plaintiffs cannot manufacture a factual dispute where none exists to justify overbroad and onerous discovery requests.

That Plaintiffs do not actually "need" this discovery is underscored by the example Plaintiffs use to demonstrate the City's purported failure to meet its discovery obligations.  Plaintiffs contend that "the City failed to produce the complaints for two lawsuits filed against the City of Los Angeles in the year preceding this case that raise nearly identical factual allegations to the individual plaintiffs in this case. *See, e,g,*, *Schellenberg v City of Los Angeles*, 2:18-cv-07670-CAS-PLA, *Cooley v. City of Los Angeles*, 2:18-cv-09053-CAS-PLA (Dkt. 16 at 15-16) and argue that these lawsuits are "highly relevant and exactly the type of evidence to which Plaintiffs are entitled."  But not only are these lawsuits a matter of public record, they are the first two suits in a list of many that Plaintiffs include in their SAC.  Lebron Decl. ¶ 2, Ex. 27, SAC at p.6 fn 8.

Furthermore, the burden associated with locating, reviewing and producing "all" such complaints far outweighs any hypothetical probative value of such documents.

Complaints received by LAPD are logged in the Complaint Management System ("CMS").  Declaration of Miguel Munoz, III ("Munoz Decl.) ¶1.  CMS is a voluminous database containing over 140,000 complaints.  *Id.*  Each complaint is maintained in CMS with a separate complaint file number, and is categorized using titles for allegation type, such as, but not limited to, conduct unbecoming, misconduct, or bias.  *Id.*  CMS does not contain search fields for allegation types based on seizure or destruction of property as it relates to homelessness.  *Id.*  A total of 486 complaints resulted from searching CMS for complaints between April 1, 2016 and December 15, 2020using the following search terms:  Clean-Ups; Homeless; 1942 Transient; Rapid Response; Health Hazard; Bulky Items; Los Angeles Sanitation; LASA; Operation Healthy Streets; OHS; Clean Street Los

1  Angeles; CSLA; Resource Enhancement Services Enforcement Team; and RESET.

2  Munoz Decl. ¶4.  LAPD complaints and related materials often contain

3  confidential information such as victims' names and investigation files can vary in

4  size and could include 250 pages of documents.  Munoz Decl. ¶¶5-6.  To review

5  and redact the 486 complaints identified would require approximately 1,994 hours

6  of work and would amount to a cost of approximately $82,736.64. Munoz Decl.

7  ¶¶5-6.

8      The "Release From Custody Records" (RFC's) that Plaintiffs seek are

9  similarly burdensome to identify, review, and produce.  LAPD stores the original

10  RFCs in hard copies and maintains a database called the Consolidated Crime

11  Analysis Database (CCAD) that contains the digital format of this information.

12  Declaration of Therea Carter ("Carter Decl.") ¶2.   For the time period 2016 to the

13  present, LAPD has approximately 120,622 RFCs that would need to be located and

14  hand searched to identify the approximately 3,808 RFCs related to LAMC 56.11.

15  Carter Decl. ¶¶3-4.  Assuming it would take a Senior Administrative Clerk

16  approximately 1 minute to hand search each of the 120,622 RFCs and cross

17  reference them against the list of 3,808 RFCs relating to LAMC 56.11, with an

18  additional 3 minutes to separate and copy each RFC, that would take 132,046

19  minutes, and an additional 4,800 minutes (80 hours) to locate, receive, and return

20  boxes from storage, for a total of 136,846 minutes (or approximately 95 days).

21  Carter Decl. ¶5.  This translates into some 285 days of staff working an 8 hour shift

22  to hand search 120,622 RFCs to locate and copy the requested 3,808 RFCs relating

23  to LAMC 56.11.  *Id.*  The approximate cost of this, for one Senior Administrative

24  Clerk, is $117,550.  *Id.*

25      As Plaintiffs concede, the City has offered to compromise and produce

26  electronically exportable information.  Requiring the City to also perform manual

27  searches is not proportional to the needs of the case.

28

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO
REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

1     The City incorporates by reference its argument as to RFP 2 as it applies
2  with equal force here.

3

4     **REQUEST FOR PRODUCTION NO. 43:**

5     All DOCUMENTS that identify the CITY's capacity to store property seized
6  pursuant to LAMC 56.11 or as part of an ENCAMPMENT CLEANUP, including
7  but not limited to any documents that discuss the number of storage
8  spaces/bins/containers available to store property, or the need for additional
9  capacity.

10    **RESPONSE TO REQUEST FOR PRODUCTION NO. 43:**

11    Defendant incorporates the General Objections as though fully set forth here.
12 Defendant objects that the Request seeks documents that are not relevant to
13 Plaintiff El- Bey's specific claims alleged in the SAC relating to incidents
14 occurring on or around January 10, 2019 at 6th Street and Alexandria and on or
15 around June 4, 2019 at Oakwood and Western. Defendant further objects that the
16 Request seeks documents that are not relevant to any named-plaintiffs' claims as
17 alleged in the SAC. The Court struck Plaintiff KFA's claims seeking any
18 declaration that the City unconstitutionally applied LAMC 56.11 or the City's
19 policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets
20 KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies
21 and practices are unconstitutional and not that each past application of those
22 policies and practices to its members was unconstitutional."). Defendant also
23 objects that the proposed discovery is not relevant to establishing *Monell* liability
24 for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument
25 that "it need only raise a single incident ... to hold the City liable under *Monell*.").
26 Defendant objects that the Request is overbroad and burdensome in seeking all
27 documents that discuss the City's storage capacity or the need to obtain additional

28

capacity dating back to April 2016, three years before Plaintiff El-Bey's specific incidents occurred as alleged in the SAC. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all documents identifying the City's storage capacity and the need to obtain additional storage capacity of any storage facility dating back to April 2016 outweighs the benefit of such information for Plaintiff El Bey's specific claims and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

In order to obtain all documents discussing the City's storage capacity or the need to obtain additional storage capacity, Defendant would have to investigate the identity of all potential custodians who may have sent or received communications regarding the City's storage capacity or the need to obtain additional storage capacity dating back to April 1, 2016. Defendant would then have to conduct search parameters for all communications over a four-year period involving all identified custodians from different City departments.

Defendant uses an email system known as CityMail that is based on an implementation of Google Apps Premier Edition and is used by nearly every City entity, including 40 different departments. Defendant's CityMail system uses the Google Vault system for archiving emails. Google Vault is a cloud-based data storage system; rather than being stored on locally managed servers, the archived email data is stored on remote servers that are managed by Google, Inc. and are

only accessible to Defendant's office via the internet. In order to search the email

archives, Defendant's ITA must formulate a search query utilizing the search terms

and restrictions provided by the requester. Depending on the number and

complexity of search terms, the number of email accounts or document custodians,

and the breadth of the search, ITA may need to formulate more than one search

query and scan the stored data multiple times. When the search completes, Google

Vault provides preliminary information regarding the email data gathered by the

search. In order to access the actual emails, however, the entire store of data must

first be exported from the cloud-servers to a different "download" server to which

ITA can connect via the internet and from which we can then download the data.

Depending on the size of the data, the download process the most time-consuming

part of gathering the email data. Even when ITA allocates multiple personnel to

conduct search queries in order to speed up the archived email search and

collection process, ITA is still limited by the speeds at which the data can be

transferred from the download server to Defendant's local data storage devices. As

downloads of batches of data become available, ITA begins the process of

identifying the email addresses that accompany the data against the list of

individuals identified in the data request and thereafter segregates the email stores

of matching individuals. ITA would also identify and screen emails of City

Attorneys begin the process of identifying and screening-out the emails of city

attorneys and may need to conduct subsequent queries to screen out attorneys for

purposes of compiling a list of excluded emails for a privilege log.

  In addition, Defendant would need to determine whether a City department

utilizes systems-based network servers that may include network folders used to

store or maintain communications within a particular division or department

section. In order to retrieve systems-based server folders for review, Defendant

would require a technology professional who has administrator privileges to make

a copy of the drive(s), which can range in size by terabytes of data. In order to search certain folders on system-based network drives, a technology professional who has administrator privileges, would use the Microsoft Windows File Explorer search function, the limited search function available by default on Windows. The limited search capabilities of the Windows File Explorer search tool may not be able to accommodate full searches within documents or Boolean searches. The resulting hits might include systems files, applications, downloads, or media which may or may not be viewable. After Defendant has conducted searches for electronically stored information, Defendant would require the use of an e-discovery software and platform for Defendant's counsel to review, search, and tag documents and electronically stored information for responsiveness or privilege.

Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing all communications responsive to this Request for the reasons described above. Defendant also objects that the proposed discovery is unreasonably cumulative and can be obtained through less burdensome and less expensive means to determine the capacity of the City's storage facilities. Without waiving any, and based on these objections, Defendant will produce documents sufficient to identify the City's storage capacity, including the number of storage bins for storage facilities used for storage of homeless people's belongings since January 1, 2019, but no additional documents will be produced in response to this Request.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 43:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiffs' specific claims alleged in the Second Amended Complaint (Dkt. No. 42, "SAC"). Plaintiff El-Bey alleges claims for specific incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4,

2019 at Oakwood and Western; Plaintiff Garcia alleges claims for specific incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone Avenue, on or around April 29, 2019 at Aetna Street and Van Nuys Boulevard, and on or around August 14, 2019 at Calvert and Bessemer; Plaintiffs Zamora and Zepeda allege claims for specific incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard; Plaintiff Haugabrook alleges claims for incidents occurring sometime in March 2019 and a month later by Figueroa Street and 53rd Street and 52nd Place; Plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019 at Lomita and McCoy; and Plaintiff Ashley alleges claims for a specific incident occurring on or around May 21, 2019 at Lomita and McCoy. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident ... to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking all documents that discuss the City's storage capacity or the need to obtain additional capacity dating back to April 2016, three years before Plaintiffs' specific incidents occurred as alleged in the SAC. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case

345

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal.
Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not
proportional to the needs of the case, insofar as the burden of searching for and
producing all documents identifying the City's storage capacity and the need to
obtain additional storage capacity of any storage facility dating back to April 2016
outweighs the benefit of such information for Plaintiffs' specific claims and
Defendant's costs or expense in conducting the search and producing documents
greatly exceeds the amount in controversy for Plaintiffs' alleged damages.

In order to obtain all documents discussing the City's storage capacity or the
need to obtain additional storage capacity, Defendant would have to investigate the
identity of all potential custodians who may have sent or received communications
regarding the City's storage capacity or the need to obtain additional storage
capacity dating back to April 1, 2016. Defendant would then have to conduct
search parameters for all communications over a four-year period involving all
identified custodians from different City departments.

Defendant uses an email system known as CityMail that is based on an
implementation of Google Apps Premier Edition and is used by nearly every City
entity, including 40 different departments. Defendant's CityMail system uses the
Google Vault system for archiving emails. Google Vault is a cloud-based data
storage system; rather than being stored on locally managed servers, the archived
email data is stored on remote servers that are managed by Google, Inc. and are
only accessible to Defendant's office via the internet. In order to search the email
archives, Defendant's ITA must formulate a search query utilizing the search terms
and restrictions provided by the requester. Depending on the number and
complexity of search terms, the number of email accounts or document custodians,
and the breadth of the search, ITA may need to formulate more than one search

query and scan the stored data multiple times. When the search completes, Google Vault provides preliminary information regarding the email data gathered by the search. In order to access the actual emails, however, the entire store of data must first be exported from the cloud-servers to a different "download" server to which ITA can connect via the internet and from which we can then download the data. Depending on the size of the data, the download process the most time-consuming part of gathering the email data. Even when ITA allocates multiple personnel to conduct search queries in order to speed up the archived email search and collection process, ITA is still limited by the speeds at which the data can be transferred from the download server to Defendant's local data storage devices. As downloads of batches of data become available, ITA begins the process of identifying the email addresses that accompany the data against the list of individuals identified in the data request and thereafter segregates the email stores of matching individuals. ITA would also identify and screen emails of City Attorneys begin the process of identifying and screening-out the emails of city attorneys and may need to conduct subsequent queries to screen out attorneys for purposes of compiling a list of excluded emails for a privilege log.

In addition, Defendant would need to determine whether a City department utilizes systems-based network servers that may include network folders used to store or maintain communications within a particular division or department section. In order to retrieve systems-based server folders for review, Defendant would require a technology professional who has administrator privileges to make a copy of the drive(s), which can range in size by terabytes of data. In order to search certain folders on system-based network drives, a technology professional who has administrator privileges, would use the Microsoft Windows File Explorer search function, the limited search function available by default on Windows. The limited search capabilities of the Windows File Explorer search tool may not be

able to accommodate full searches within documents or Boolean searches. The resulting hits might include systems files, applications, downloads, or media which may or may not be viewable. After Defendant has conducted searches for electronically stored information, Defendant would require the use of an e-discovery software and platform for Defendant's counsel to review, search, and tag documents and electronically stored information for responsiveness or privilege.

Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing all communications responsive to this Request for the reasons described above. Defendant also objects that the proposed discovery is unreasonably cumulative and can be obtained through less burdensome and less expensive means to determine the capacity of the City's storage facilities. Without waiving any, and based on these objections, Defendant produced documents at CTY004627- 4851 and CTY007476-7477 addressing the City's storage and capacity.

**PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 43:**

Plaintiffs seek the production of documents identifying the City's capacity to store property seized pursuant to LAMC 56.11 or as part of an encampment cleanup, and includes any documents that discuss the need for capacity.  This includes, for example, communications, memoranda or other policy documents that discuss the need for storage.  In response to this request, the City identified as responsive to this request, CTY004627- 4851 and CTY007476-7477, but refused to produce additional documents. This is wholly inadequate.  The City only produced one document, CTY004842, that relates to the capacity of storage facilities where the City takes seized property.  This single document, which is undated and lists measurements in terms of "bags", is insufficient. Nor do Plaintiffs have an alternative source for this information.  While Plaintiffs received

some documents in response to a Third Party Subpoena to Chrysalis, which
operates the City's storage facility, Chrysalis has represented to Plaintiffs that they
have not retained emails with the City regarding capacity, and the databases they
have provided document only the date retrieved or the date destroyed of
property—they do not identify how much property is stored on a given date.[27]

### a.    The Documents are Relevant

Documents about the City's capacity to store property seized pursuant to
LAMC 56.11 is relevant to the question of whether and to what extent the City
actually stores the property it impounds or whether it in fact simply destroys it all,
as Plaintiffs allege.  In fact, despite the fact that the City argued to this Court that
the issue of storage is irrelevant to this case and then objected on this ground in its
responses to the RFPs, the City itself has the City's storage capacity at issue.
Defendant raised the City's capacity to store property, and even used the very
documents Plaintiffs seek here, to oppose Plaintiffs' motion for a Preliminary
Injunction.  *See* Myers Decl., ¶ 20, Exh. K.  In its opposition, the City relied on
contentions that it does not have enough capacity to store all the property it wants
to seize.  *Id.* (Declaration of Howard Wong at ¶ 50).And the City relied on
evidence about the amount of property stored to support other arguments. Plaintiffs
are entitled to whatever evidence the City has on these issues.

### b.    The City Refuses to State a Date Certain for the Completion of its Production

As with the rest of the City's written responses addressed here, the City's
response to this request is not consistent with Rule 34. Specifically here, the City
refuses to provide a "reasonable time" by which it will complete production, and

---

[27]   The documents Chrysalis provided pursuant to the Third Party Subpoena,
namely records of when property was discarded, do not include the storage date of
the property; they include only the discard date and the time the discard was
entered in the computer system. As far as Plaintiffs can tell, there is not a way to
extrapolate from the chart of discards the total capacity on a given date.

instead, is engaged in an interminable "rolling production," based on an investigation that has been ongoing for almost two years.  In February 2021, in response to an interrogatory that sought specific, discrete information about the City's storage facility, the City appears to have agreed to produce documents responsive to this request, stating that "to the extent the City has in its possession chain of custody forms or other storage related information, it has produced such documents and intends to procure any additional such document if they are identified in its investigation or provided to the City by Chrysalis."  The City goes on to state that it "does not intend to withhold any storage-related documents it identifies during its investigation."   City's Amended Response to Interrogatory No. 4.

This is untenable.  Rule 34 requires the City to have identified a start and end time for the production of documents.  The City cannot fail to complete the production of documents because it has not yet completed an investigation into a case that was filed almost two years ago.  Rule 34 requires the production of all documents in a "reasonable time" that must be identified at the time of the responses, which in this case was seven months ago.  Moreover, this case was actually filed 19 months ago, and Defendant has had these requests in its possession since October 2019.A rolling production that drags on for more than six months, with no end in sight, is simply not allowed under Rule 34.  *See* Fed. Rule Civ. Pro. 34(b)(2)(B); *see also Maiorano*, 2017 WL 4792380, at *2; *Fulfillium*, 2018 WL 6118433, at *3.

### c.   The Requests are Not Overbroad or Burdensome

Defendant asserts that the request is overbroad "in seeking all documents that discuss the City's storage capacity or the need to obtain additional capacity dating back to April 2016, three years before Plaintiffs' specific incidents occurred as alleged in the SAC."   As discussed in detail, two years and eight months prior

to the Specific Incidents is reasonable, given that the date corresponds to when the City adopted the provisions of LAMC 56.11 that require the impounding of property.  This is necessary to do an analysis of the extent to which the City's expansion of storage space has kept pace with the City's increased enforcement of LAMC 56.11.  *See Thomas*, 715 F.Supp.2d at 1032 (granting a request for information going back nearly thirty years, where "in the context of th[e] action," the requested information was "necessary to conduct a comparative analysis of the operation" at issue in the litigation and such analysis was "clearly relevant to Petitioner's claims").  The request identifies a discrete topic and is time-limited. The City has produced documents such as spreadsheets summarizing Chrysalis' storage work for 2018 (CTY 4841) and 2019 (CTY 19492), but not for 2016, 2017, and 2020 and not for the main Towne Street location where property was stored. And as discussed above, the City has produced claim forms for part of 2018 and part of 2019, but not the rest of the relevant time period.  Plaintiff requests that this Court set a date certain for production of the documents.

### d.    The Request is Proportionate to the Needs of the Case

Given the City's interrogatory response, it appears the City is no longer challenging the proportionality of this request; to the extent that it does, Plaintiff reminds the court of the significance of the issues, discussed above, and the inability of the Plaintiffs to access the City's policies, emails, forms, and storage receipts in any other way.

### i.    Importance of the discovery in resolving the issues

The question of whether and to what extent the City stores property it seizes pursuant to the impound statute is a central issue in this case, both in terms of the constitutional claims, and Plaintiffs' claims that the City violates Civil Code Section 2080, which is a state law that requires the storage of any property the City takes into its possession.  The District Court already ruled that the Civil Code is

applicable to Plaintiffs claims, and denied Defendant's motion to dismiss this claim.  *See* Myers Decl., Exh. I, February Order.  The City's capacity to store property is therefore critical to resolving this claim.

Moreover, *Monell* liability is also a central issue, especially because Plaintiffs did not bring claims against individual LA Sanitation workers or LAPD officers and primarily seek injunctive relief. And as discussed above, the City itself raised the issue of storage and specifically, the City's capacity to store property in defending against Plaintiffs' facial challenge.  The documents may contain important impeachment evidence, related to the City's contention that, for example, it seizes property only when there is storage available, or that the City stores property it impounds.  *See Estate of Ernesto Flores*, 2017 WL 3297507, at *6; *Paulsen,* 168 F.R.D. at 289.

### ii.    Whether the burden or expense of the proposed discovery outweighs its likely benefit

Defendant argues that it would be burdensome to produce documents responsive to this request.  Yet this document request is very straightforward, seeking very specific documents related to a discrete topic that is highly relevant to this case.  The City has no excuse for what it articulates is a burden to respond to this request:  "[L]arge corporations and institutions are expected to have the means for locating documents requested in legal matters." *In re Citimortgage,* 2012 WL 10450139, at *4 (quoting *Herring*, 2011 WL 2433672, at *9).

In fact, the process the City describes is no more burdensome than the burden associated with producing any documents at all.  The City spends nearly two pages laying out what is, in essence nothing more than the routine obligation of a party to identify responsive discovery:  1) identifying custodians; 2) formulating searches; 3) running those searches; 4) exporting data; and 5) screening for privilege.  This objection applies only to ESI, not to paper documents the City may have that are responsive to these requests, but even as to ESI, the

steps laid out by the City are "common in litigation," *Sung Gon Kang,* 2020 WL 1689708, at *5.

It is simply untenable for the City to suggest these steps render this request burdensome.  For example, one of the steps Defendant would need to take is to "determine whether a City department utilizes systems-based network servers." This is the City of Los Angeles, which has a substantial Information Technology Department, and moreover, is represented by the City Attorney's office in all of the cases.  This information should be readily available, as it would be implicated in every single discovery request ever made to the City (to say nothing of the City's obligation to produce documents responsive to the California Public Records Act). "A recipient that is a large or complex organization or that has received a lengthy or complex document request should be able to demonstrate a procedure for systemic compliance with the document request."  *In re Citimortgage,* 2012 WL 10450139, at *4 (quoting *Meeks v. Parsons,* 2009 WL 3003718 at 4 (describing the steps that would constitute a "reasonable inquiry" in response to routine discovery)).

Here, the City refuses to conduct even this "reasonable inquiry" to identify responsive documents.  There is no basis for this refusal and as such, the City cannot "show grounds for failing to provide the requested discovery," which the City must do to prevail here. *In re: Citymortgage*, 2012 WL 10450139, at *4.

### e.    The Request is not Cumulative

Defendant objects that "the proposed discovery is unreasonably cumulative and can be obtained through less burdensome and less expensive means to determine the capacity of the City's storage facilities."  However, in response to the meet and confer efforts, the City failed to clarify what the request was "cumulative" of or what "less burdensome" and "less expensive means" Plaintiffs could use to obtain the capacity of the storage facility.  In fact, Plaintiffs did

propound an interrogatory asking for that specific information and the City refused to respond to the question.  Instead, it pointed Plaintiffs back to its RFP responses. And the request seeks documents that contain more information than simply the capacity of the storage facilities; it also seeks documents that discuss the City's capacity and the need for any additional capacity.  The City has provided no explanation for its objection that the request is cumulative or how Plaintiffs can otherwise obtain this information, which itself is not a basis for refusing to respond to this request.

### f.     The City has Waived its Other Objections

The City objects "to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines" but provides no further details about whether and to what extent the City is withholding documents on the basis of this privilege.  The City fails to provide a privilege log, and has refused to produce one in the six months since the City produced written responses and then amended responses.  As such, Defendant has waived any objections it might have had that any documents responsive to this request were privileged.  *See DeSilva*, 2020 WL 5947827, at *7; *see also Burlington Northern & Santa Fe Ry. Co.*, 408 F.3d at 1149.

Similarly, the City has refused to clarify which of the objections (if any) applied to this request, let alone the facts necessary to support its application, even after months of requests by Plaintiffs for the City to do so as required by Rule 34.  The City has therefore waived the objection.  *See e.g., Bosley*, 2016 WL 1704159, at *5  (Defendant waived blanket objections by failing to provide details of the objections as required by Rule 34(b)(2)(B)).

### g.     Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce all documents responsive to RFP No. 43 within 21 days, or if applicable, to compel

Defendant to provide a complete, explicit response as to the finality of their production with respect to specific individual Plaintiffs, as required by Rule 34.

### DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 43:

RFP 43 asks for "All DOCUMENTS that identify the CITY's capacity to store property seized pursuant to LAMC 56.11 or as part of an ENCAMPMENT CLEANUP, including but not limited to any documents that discuss the number of storage spaces/bins/containers available to store property, or the need for additional capacity [2016 to present].  (Emphasis added).

Plaintiffs have not met their burden to show the relevance of the requested documents.  Plaintiffs argue that "documents about the City's capacity to store property seized pursuant to LAMC 56.11 is relevant to the question of whether and to what extent the City actually stores the property it impounds or whether it in fact simply destroys it all, as Plaintiffs allege."  The City's capacity to store, in the abstract, dating from 2016, has no bearing on whether Plaintiffs' rights were violated.  And even if documents discussing the City's storage capacity in the abstract were relevant, they would not be probative of "whether and to what extent the City actually stores the property it impounds."  In addition, the Court held that as a matter of law, the City's capacity to store is not relevant to the constitutional analysis in this case.

Even if Plaintiffs had articulated a valid relevance theory, this request is not properly directed toward the City and not proportional to the needs of the case.  Because the law and analysis as to proportionality are equally applicable here, Defendant incorporates by reference its argument as to RFP 2.  The primary facility at which items removed during cleanups are stored is the Bin.  The Bin is operated by Chrysalis, an independent contractor that provides involuntary and voluntary storage for homeless individuals under an agreement with LAHSA.

Wong Decl. at ¶14.  ECIs deliver non-hazardous property to storage and complete a chain of custody form transferring custody of property at the storage facility to Chrysalis.  *Id.*  Following the transfer, Chrysalis handles the storage, return and disposition of the property and maintains its own storage records.  *Id.*  LSD does not track that information following the transfer of custody at the storage facility. *Id.*

On December 8, 2020, Plaintiffs served a subpoena on Chrysalis requesting similar information requested by this RFP.  Ursea Decl. ¶44, Ex. 24.  Chrysalis responded and produced documents on February 15, 2021.  Ursea Decl. ¶45, Ex. 26.  *See* Fed. R. Civ. Proc. 26(b)(2) (A court "must limit the frequency or extent of discovery allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained through some other source that is more convenient, less burdensome, or less expensive; …); *Caballero v. Bodega Latina Corp*., Case No. 2:17cv-00236-JAD-VCF, 2017 U.S. Dist. LEXIS 116869, at * 8 (D. Nev. Jul. 25, 2017) ("Courts, thus, have a duty to pare down overbroad discovery requests under Rule 26(b)(2).").

Moreover, despite the fact that the relevance of storage capacity in the abstract since 2016 is far from clear, storage of items removed during encampment cleanups is not tracked by the City, and the City has reasonably compromised on storage-related discovery requests.  Before Plaintiffs issued the subpoena to Chrysalis, the City agreed to work with Chrysalis to obtain responsive documents. Ursea Decl. ¶12(d).  The City also agreed to search emails for custodians identified by Plaintiffs using search terms proposed by Plaintiffs, including Chrysalis, the Bin, and storage.  Ursea Decl. ¶¶19, 23, 32, 34, 37, 43.  The City collected over 500,000 emails using the Plaintiffs' requested custodians and search terms.  The City's e-discovery vendor recently loaded a data set of 475,000 emails.  While the parties had initially agreed to meet and confer regarding this data set, Plaintiffs

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO
REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

served this stipulation while the City was in the process of producing documents from the first 70,000 emails.  Ursea Decl. ¶¶37-42.  Furthermore, the City has repeatedly told Plaintiffs that it has not withheld non-privileged responsive documents that were uncovered during its investigation, even if the documents pre-dated the Plaintiffs' incidents.  Ursea Decl. ¶¶8, 21(d).

Even if abstract storage capacity documents had some minimal probative value, the request for all such documents, from 2016 to present, is not proportional to the needs of this case.  The City incorporates by reference its responses to RFP 2 and RFP 16, which apply with equal force here.

### REQUEST FOR PRODUCTION NO. 44:

All DOCUMENTS that identify or discuss any change in the CITY's capacity to store property seized pursuant to LAMC 56.11 or as part of ENCAMPMENT CLEANUPS, including but not limited to any documents that discuss any increase/decrease in the number of STORAGE FACILITIES or change in capacity of existing STORAGE FACILITIES.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 44:

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiff El-Bey's specific claims alleged in the SAC relating to incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western. Defendant further objects that the Request seeks documents that are not relevant to any named-plaintiffs' claims as alleged in the SAC. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are

unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking all documents that discuss the City's storage capacity or changes to the storage capacity dating back to April 2016, three years before Plaintiff El-Bey's specific incidents occurred as alleged in the SAC. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all documents identifying the City's storage capacity and storage capacity or changes in the storage capacity dating back to April 2016 outweighs the benefit of such information for Plaintiff El Bey's specific claims and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.\

In order to obtain all documents discussing the City's storage capacity storage capacity or changes to the storage capacity, Defendant would have to investigate the identity of all potential custodians who may have sent or received communications regarding the City's storage capacity or changes to the storage capacity dating back to April 1, 2016. Defendant would then have to conduct

search parameters for all communications over a four-year period involving all identified custodians from different City departments.

Defendant uses an email system known as CityMail that is based on an implementation of Google Apps Premier Edition and is used by nearly every City entity, including 40 different departments. Defendant's CityMail system uses the Google Vault system for archiving emails. Google Vault is a cloud-based data storage system; rather than being stored on locally managed servers, the archived email data is stored on remote servers that are managed by Google, Inc. and are only accessible to Defendant's office via the internet. In order to search the email archives, Defendant's ITA must formulate a search query utilizing the search terms and restrictions provided by the requester. Depending on the number and complexity of search terms, the number of email accounts or document custodians, and the breadth of the search, ITA may need to formulate more than one search query and scan the stored data multiple times. When the search completes, Google Vault provides preliminary information regarding the email data gathered by the search. In order to access the actual emails, however, the entire store of data must first be exported from the cloud-servers to a different "download" server to which ITA can connect via the internet and from which we can then download the data. Depending on the size of the data, the download process the most time-consuming part of gathering the email data. Even when ITA allocates multiple personnel to conduct search queries in order to speed up the archived email search and collection process, ITA is still limited by the speeds at which the data can be transferred from the download server to Defendant's local data storage devices. As downloads of batches of data become available, ITA begins the process of identifying the email addresses that accompany the data against the list of individuals identified in the data request and thereafter segregates the email stores of matching individuals. ITA would also identify and screen emails of City

Attorneys begin the process of identifying and screening-out the emails of city attorneys and may need to conduct subsequent queries to screen out attorneys for purposes of compiling a list of excluded emails for a privilege log.

In addition, Defendant would need to determine whether a City department utilizes systems-based network servers that may include network folders used to store or maintain communications within a particular division or department section. In order to retrieve systems-based server folders for review, Defendant would require a technology professional who has administrator privileges to make a copy of the drive(s), which can range in size by terabytes of data. In order to search certain folders on system-based network drives, a technology professional who has administrator privileges, would use the Microsoft Windows File Explorer search function, the limited search function available by default on Windows. The limited search capabilities of the Windows File Explorer search tool may not be able to accommodate full searches within documents or Boolean searches. The resulting hits might include systems files, applications, downloads, or media which may or may not be viewable. After Defendant has conducted searches for electronically stored information, Defendant would require the use of an e-discovery software and platform for Defendant's counsel to review, search, and tag documents and electronically stored information for responsiveness or privilege.

Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing all communications responsive to this Request for the reasons described above. Defendant also objects that the proposed discovery is unreasonably cumulative and can be obtained through less burdensome and less expensive means to determine changes to the City's storage capacity. Without waiving any, and based on these objections, Defendant will produce documents sufficient to identify the City's storage capacity, including the number of storage bins for storage

facilities used for storage of homeless people's belongings since January 1, 2019, but no additional documents will be produced in response to this Request.

## AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 44:

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiffs' specific claims alleged in the Second Amended Complaint (Dkt. No. 42, "SAC"). Plaintiff El-Bey alleges claims for specific incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western; Plaintiff Garcia alleges claims for specific incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone Avenue, on or around April 29, 2019 at Aetna Street and Van Nuys Boulevard, and on or around August 14, 2019 at Calvert and Bessemer; Plaintiffs Zamora and Zepeda allege claims for specific incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard; Plaintiff Haugabrook alleges claims for incidents occurring sometime in March 2019 and a month later by Figueroa Street and 53rd Street and 52nd Place; Plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019 at Lomita and McCoy; and Plaintiff Ashley alleges claims for a specific incident occurring on or around May 21, 2019 at Lomita and McCoy. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident …

to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking all documents that discuss the City's storage capacity or changes to the storage capacity dating back to April 2016, three years before Plaintiffs' specific incidents occurred as alleged in the SAC. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all documents identifying the City's storage capacity and storage capacity or changes in the storage capacity dating back to April 2016 outweighs the benefit of such information for Plaintiffs' specific claims and Defendant's costs or expense in conducting the search and producing documents greatly exceeds the amount in controversy for Plaintiff's alleged damages.

In order to obtain all documents discussing the City's storage capacity storage capacity or changes to the storage capacity, Defendant would have to investigate the identity of all potential custodians who may have sent or received communications regarding the City's storage capacity or changes to the storage capacity dating back to April 1, 2016. Defendant would then have to conduct search parameters for all communications over a four-year period involving all identified custodians from different City departments.

Defendant uses an email system known as CityMail that is based on an implementation of Google Apps Premier Edition and is used by nearly every City entity, including 40 different departments. Defendant's CityMail system uses the Google Vault system for archiving emails. Google Vault is a cloud-based data

storage system; rather than being stored on locally managed servers, the archived email data is stored on remote servers that are managed by Google, Inc. and are only accessible to Defendant's office via the internet. In order to search the email archives, Defendant's ITA must formulate a search query utilizing the search terms and restrictions provided by the requester. Depending on the number and complexity of search terms, the number of email accounts or document custodians, and the breadth of the search, ITA may need to formulate more than one search query and scan the stored data multiple times. When the search completes, Google Vault provides preliminary information regarding the email data gathered by the search. In order to access the actual emails, however, the entire store of data must first be exported from the cloud-servers to a different "download" server to which ITA can connect via the internet and from which we can then download the data. Depending on the size of the data, the download process the most time-consuming part of gathering the email data. Even when ITA allocates multiple personnel to conduct search queries in order to speed up the archived email search and collection process, ITA is still limited by the speeds at which the data can be transferred from the download server to Defendant's local data storage devices. As downloads of batches of data become available, ITA begins the process of identifying the email addresses that accompany the data against the list of individuals identified in the data request and thereafter segregates the email stores of matching individuals. ITA would also identify and screen emails of City Attorneys begin the process of identifying and screening-out the emails of city attorneys and may need to conduct subsequent queries to screen out attorneys for purposes of compiling a list of excluded emails for a privilege log.

In addition, Defendant would need to determine whether a City department utilizes systems-based network servers that may include network folders used to store or maintain communications within a particular division or department

section. In order to retrieve systems-based server folders for review, Defendant
would require a technology professional who has administrator privileges to make
a copy of the drive(s), which can range in size by terabytes of data. In order to
search certain folders on system-based network drives, a technology professional
who has administrator privileges, would use the Microsoft Windows File Explorer
search function, the limited search function available by default on Windows. The
limited search capabilities of the Windows File Explorer search tool may not be
able to accommodate full searches within documents or Boolean searches. The
resulting hits might include systems files, applications, downloads, or media which
may or may not be viewable. After Defendant has conducted searches for
electronically stored information, Defendant would require the use of an e-
discovery software and platform for Defendant's counsel to review, search, and tag
documents and electronically stored information for responsiveness or privilege.

Defendant objects that the Request seeks documents that are not reasonably
accessible based on the undue burden and costs associated with searching for and
producing all communications responsive to this Request for the reasons described
above. Defendant also objects that the proposed discovery is unreasonably
cumulative and can be obtained through less burdensome and less expensive means
to determine changes to the City's storage capacity. Without waiving any, and
based on these objections, Defendant produced documents at CTY004627- 4851
and CTY007476-7477 addressing the City's storage and capacity.

**PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 44:**

Plaintiffs seek the production of communications and other policy
documents regarding any increase in the City's capacity to store property seized
pursuant to LAMC 56.11 or as part of an encampment cleanup.  These documents
are highly relevant because they pertain to one of the central issues in the case

against the City, namely the City's ability to adequately store seized property, and what City officials knew about the storage capacity that was available.Defendants have stated in response to later interrogatories that they are not withholding any storage-related documents that they have found, and that they are producing all documents related to capacity.  But they have not transmitted, or withheld as privileged, any emails discussing the City's capacity or any policy reports or documents that identify the City's capacity.  Plaintiffs are seeking information about when changes in capacity were made, relative to decisions to increase enforcement of LAMC 56.11.

The documents the City has produced in response to date are wholly inadequate.  Nor do Plaintiffs have an alternative source for this information. While Plaintiffs received some documents from the storage operator, Chrysalis, Chrysalis has represented to Plaintiffs that they have not retained emails with the City regarding capacity, and the databases they have provided are all either of picked up property or of destroyed property—they do not identify how much property is stored on a given date.  But the City has relied on contentions that it does not have enough capacity to store all the property it wants to seize.  *See See e.g.,* Myers Decl., ¶ 20, Exh. K at ¶ 47.

The issue of emails is addressed above in, *inter alia*, RFPs 16, 23, 26, and 29, and is incorporated here. Communications that discuss the City's increase in capacity for storage and those showing the City's storage capacity are relevant for the same reasons as the other documents such as storage receipts and data underlying the assertion by the City's personnel that it would be impossible to store bulky items and allegedly hazardous items.

### a.     The Documents are Relevant

The City itself concedes that the capacity and storage documents are relevant, as it relied upon them previously in this case.  In its opposition to

Plaintiff's preliminary injunction, the City included quantitative summaries of data. *See e.g.,* Myers Decl., ¶ 20, Exh. K at ¶ 53.  At a conference call on November 16, 2020, to meet and confer, Plaintiffs requested that the City produce the raw data that was used to create the spreadsheets used by the City and filed with the Court. *See* Fed. Rule Evid. 1006 (requiring a party using a summary to produce the underlying data). The City indicated it was unaware of the source of the data used by the City in its opposition and would reach out to Chrysalis, the likely custodian of this data. The City indicated it would be willing to track down and gather the location of all such responsive qualitative and quantitative data for production to Plaintiffs. To date, the City has failed to produce the requested information.

      **b.**    **The City Refuses to State a Date Certain for the Completion of its Production**

As with the rest of the City's written responses addressed here, the City's response to this request is not consistent with Rule 34. *See* Plaintiffs' Argument re: RFP No. 2. Specifically, here, the City refuses to provide a "reasonable time" by which it will complete production, and instead, is engaged in an interminable "rolling production," based on an investigation that has been ongoing for almost two years.  In February 2021, in response to an interrogatory that sought specific, discrete information about the City's storage facility, the City appears to have agreed to produce documents responsive to this request, stating that "to the extent the City has in its possession chain of custody forms or other storage related information, it has produced such documents and intends to procure any additional such document if they are identified in its investigation or provided to the City by Chrysalis."  The City goes on to state that it "does not intend to withhold any storage-related documents it identifies during its investigation."  *See* Myers Decl., Exh. AN.

This is untenable.  Rule 34 requires the City to have identified a start and end time for the production of documents.  The City cannot fail to complete the

production of documents because it has not yet completed an investigation into a
case that was filed almost two years ago.  Rule 34 requires the production of all
documents in a "reasonable time" that must be identified at the time of the
responses, which in this case was seven months ago.  Moreover, this case was
actually filed 19 months ago, and Defendant has had these requests in its
possession since October 2019.A rolling production that drags on for more than six
months, with no end in sight, is simply not allowed under Rule 34.  *See* Fed. R.
Civ. P. 34(b)(2)(B); *see also Maiorano*, 2017 WL 4792380, at *2; *Fulfillium*, 2018
WL 6118433, at *3.

### c.     The Requests are Not Overbroad or Burdensome

Defendant asserts that the request is overbroad "in seeking all documents
that discuss the City's storage capacity or changes to the storage capacity dating
back to April 2016, three years before Plaintiffs' specific incidents occurred as
alleged in the SAC."   As discussed in detail, two years and eight months prior to
the Specific Incidents is reasonable, given that the date corresponds to when the
City adopted the provisions of LAMC 56.11 that require the impounding of
property.  This is necessary to do an analysis of the extent to which the City's
expansion of storage space has kept pace with the City's increased enforcement of
LAMC 56.11.  *See Thomas*, 715 F. Supp. 2d at 1032 (granting a request for
information going back nearly thirty years, where "in the context of th[e] action,"
the requested information was "necessary to conduct a comparative analysis of the
operation" at issue in the litigation and such analysis was "clearly relevant to
Petitioner's claims").  The request identifies a discrete topic and is time-limited.
The City has produced documents such as spreadsheets summarizing Chrysalis'
storage work for 2018 (CTY 4841) and 2019 (CTY 19492), but not for 2016, 2017,
and 2020 and not for the main Towne Street location where property was stored.
And as discussed above, the City has produced claim forms for part of 2018 and

part of 2019, but not the rest of the relevant time period.  Plaintiff requests that this Court set a date certain for production of the documents.

### d.      The Request is Proportionate to the Needs of the Case

As discussed in detail above, the issues at stake in this litigation are of constitutional significance; the amount of controversy is largely irrelevant given that Plaintiffs primarily seek prospective relief to put an end to the City's unconstitutional practices; the City of Los Angeles has far more resources than the seven unhoused individuals whose belongings were seized and the volunteer organization whose resources go to replacing those belongings, and the City controls access to this information.  *See supra* Plaintiffs' Argument re: RFP No. 2. The other factors also weigh heavily in Plaintiffs' favor.  *See* Fed. R. Civ. P. 26(b)(1).   As the City intends to use these documents to support its own position, there is no question that it is proportional to provide the documents to Plaintiffs.

### i.      Importance of the discovery in resolving the issues

The question of whether and to what extent the City stores property it seizes pursuant to the impound statute is a central issue in this case. It is important both in terms of the constitutional claims and Plaintiffs' claims that the City violates Civil Code Section 2080, which is a state law that requires the storage of any property the City takes into its possession, and which the District Court already ruled is at issue in this case. *See* Myers Decl., Exh. I, February Order at 29-30.

Moreover, *Monell* liability is also a central issue, especially because Plaintiffs did not bring claims against individual LA Sanitation workers or LAPD officers and primarily seek injunctive relief. And as discussed above, the City itself raised the issue of storage and specifically, the City's capacity to store property in defending against Plaintiffs' facial challenge.  The documents may contain important impeachment evidence, related to the City's contention that, for example, it seizes property only when there is storage available, or that the City

stores property it impounds. *See Estate of Ernesto Flores*, 2017 WL 3297507, at *6; *Paulsen,*168 F.R.D. at 289.

### ii. Whether the burden or expense of the proposed discovery outweighs its likely benefit

Defendant argues that it would be burdensome to produce documents responsive to this request.  Yet this document request is very straightforward, seeking very specific documents related to a discrete topic that is highly relevant to this case.  The City has no excuse for what it articulates is a burden to respond to this request: "[L]arge corporations and institutions are expected to have the means for locating documents requested in legal matters." *In re Citimortgage,* 2012 WL 10450139, at *4 (quoting *Herring*, 2011 WL 2433672, at *9).

In fact, the process the City describes is no more burdensome than the burden associated with producing any documents at all.  The City spends nearly two pages laying out what are, in essence nothing more than the routine obligation of a party to identify responsive discovery:  1) identifying custodians; 2) formulating searches; 3) running those searches; 4) exporting data; and 5) screening for privilege.  This objection applies only to ESI, not to paper documents the City may have that are responsive to these requests, but even as to ESI, the steps laid out by the City are "common in litigation," *Sung Gon Kang,* 2020 WL 1689708, at *5.

It is simply untenable for the City to suggest these steps render this request burdensome.  For example, one of the steps Defendant would need to take is to "determine whether a City department utilizes systems-based network servers." This is the City of Los Angeles, which has a substantial Information Technology Department, and moreover, is represented by the City Attorney's office in all of the cases.  This information should be readily available, as it would be implicated in every single discovery request ever made to the City (to say nothing of the City's obligation to produce documents responsive to the California Public Records Act).

369

"A recipient that is a large or complex organization or that has received a lengthy or complex document request should be able to demonstrate a procedure for systemic compliance with the document request." *In re Citimortgage,* 2012 WL 10450139, at *4 (quoting *Meeks v. Parsons*, 2009 WL 3003718 at 4 (describing the steps that would constitute a "reasonable inquiry" in response to routine discovery)).

Here, the City refuses to conduct even this "reasonable inquiry" to identify responsive documents.  There is no basis for this refusal and as such, the City cannot "show grounds for failing to provide the requested discovery," which the City must do to prevail here. *In re: Citymortgage*, 2012 WL 10450139, at *4.

### e.    The Request is not Cumulative

Defendant objects that "the proposed discovery is unreasonably cumulative and can be obtained through less burdensome and less expensive means to determine the capacity of the City's storage facilities."  However, in response to the meet and confer efforts, the City failed to clarify what the request was "cumulative" of or what "less burdensome" and "less expensive means" Plaintiffs could use to obtain the capacity of the storage facility.  In fact, Plaintiffs did propound an interrogatory asking for that specific information and the City refused to respond to the question.  Instead, it pointed Plaintiffs back to its RFP responses. And the request seeks documents that contain more information than simply the capacity of the storage facilities; it also seeks documents that discuss the City's capacity and the need for any additional capacity.  The City has provided no explanation for its objection that the request is cumulative or how Plaintiffs can otherwise obtain this information, which itself is not a basis for refusing to respond to this request.

### f.    The City has Waived its Other Objections

The City objects "to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines" but provides no further details about whether and to what extent the City is withholding documents on the basis of this privilege.  The City fails to provide a privilege log, and has refused to produce one in the six months since the City produced written responses and then amended responses.  As such, Defendant has waived any objections it might have had that any documents responsive to this request were privileged.  *See DeSilva*, 2020 WL 5947827, at *7; *see also Burlington Northern & Santa Fe Ry. Co.*, 48 F.3d at 1149.

Similarly, with the City's boilerplate general objections, the City has refused to clarify which of the objections (if any) applied to this request, let alone the facts necessary to support its application, even after months of requests by Plaintiffs for the City to do so as required by Rule 34.  The City has therefore waived the objection.  *See e.g., Bosley*, 2016 WL 1704159, at *5, n. 3 (Defendant waived blanket objections by failing to provide details of the objections as required by Rule 34(b)(2)(B)).

### g.    Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce all documents responsive to RFP No. 44 within 21 days or where applicable, to compel Defendant to provide a complete, explicit response as to the finality of their production with respect to specific individual Plaintiffs, as required by Rule 34.

### DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 44:

RFP 44 asks for "<u>All</u> DOCUMENTS <u>that identify or discuss any change in the CITY's capacity to store property</u> seized pursuant to LAMC 56.11 or <u>as part of ENCAMPMENT CLEANUPS</u>, including but not limited to any documents that

discuss any increase/decrease in the number of STORAGE FACILITIES or change in capacity of existing STORAGE FACILITIES [2016 to present]."  (Emphasis added).

As with RFP 43, which seeks documents related to abstract storage capacity, Plaintiffs have not articulated the relevance of such documents, and even if they did, the request is not proportional to the needs of the case.  Plaintiffs make the same arguments as they did for RFP 43.  The City incorporates by reference its responses to RFP 2, RFP 16, and RFP 43.

### REQUEST FOR PRODUCTION NO. 45:

All statistics, reports, analysis, or data compilations related to the use or capacity of STORAGE FACILITIES.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 45:

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiff El-Bey's specific claims alleged in the SAC relating to incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western. Defendant further objects that the Request seeks documents that are not relevant to any named-plaintiffs' claims as alleged in the SAC. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant objects that

the Request is overbroad and burdensome in seeking all statistics, reports, analysis, or data compilations relate to the use of storage capacity dating back to April 2016, three years before Plaintiff El-Bey's specific incidents occurred as alleged in the SAC. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all statistics, reports, analysis, or data compilations relate to the use of storage capacity dating back to April 2016 outweighs the benefit of such information for Plaintiff El Bey's specific claims. Defendant also objects that the proposed discovery is unreasonably cumulative and can be obtained through less burdensome and less expensive means to determine the use or capacity of storage facilities. Without waiving any, and based on these objections, Defendant will produce documents sufficient to show the use or capacity of storage facilities used for homeless people's belongings since January 1, 2019, but no additional documents will be produced in response to this Request.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 45:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiffs' specific claims alleged in the Second Amended Complaint (Dkt. No. 42, "SAC"). Plaintiff El-Bey alleges claims for specific incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western; Plaintiff Garcia alleges claims for specific

incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone
Avenue, on or around April 29, 2019 at Aetna Street and Van Nuys Boulevard, and
on or around August 14, 2019 at Calvert and Bessemer; Plaintiffs Zamora and
Zepeda allege claims for specific incidents occurring on or around March 21, 2019
at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and
Harvard; Plaintiff Haugabrook alleges claims for incidents occurring sometime in
March 2019 and a month later by Figueroa Street and 53rd Street and 52nd Place;
Plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019
at Lomita and McCoy; and Plaintiff Ashley alleges claims for a specific incident
occurring on or around May 21, 2019 at Lomita and McCoy. The Court struck
Plaintiff KFA's claims seeking any declaration that the City unconstitutionally
applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt.
No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to
obtain a ruling that the City's policies and practices are unconstitutional and not
that each past application of those policies and practices to its members was
unconstitutional."). Defendant also objects that the proposed discovery is not
relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No.
65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident …
to hold the City liable under *Monell*."). Defendant objects that the Request is
overbroad and burdensome in seeking all statistics, reports, analysis, or data
compilations relate to the use of storage capacity dating back to April 2016, three
years before Plaintiffs' specific incidents occurred as alleged in the SAC.
Defendant also objects to the Request to the extent the Request seeks information
protected from disclosure by the attorney-client privilege and or attorney work
product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,*
219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case

No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal.
Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not
proportional to the needs of the case, insofar as the burden of searching for and
producing all statistics, reports, analysis, or data compilations relate to the use of
storage capacity dating back to April 2016 outweighs the benefit of such
information for Plaintiffs' specific claims. Defendant also objects that the proposed
discovery is unreasonably cumulative and can be obtained through less
burdensome and less expensive means to determine the use or capacity of storage
facilities. Without waiving any, and based on these objections, Defendant produced
summaries of total amounts of property removed, stored, recovered or discarded
for 2019 and 2020 at CTY004627- 4851 and is willing to conduct additional meet-
and-confer with Plaintiffs regarding their request for underlying storage data.

**PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 45:**

Similar to RFPs 35 and 36, Plaintiffs seek reports, statistics, analysis, and
other documents related to the use or capacity of the storage facilities used to store
property impounded under LAMC 56.11.  This would include, for example, any
reports analyzing the sufficiency of the capacity of the City's storage facilities, any
utilization rates of the facility, and any reports documenting the need to expand the
City's capacity for storage consistent with its increased enforcement of LAMC
56.11.  As with all other requests, the City initially objected that the documents
sought are neither relevant nor proportionate to the needs of the case.  Even after
meeting and conferring, Defendant refused to produce any documents responsive
to the request.  In its Amended Response, Defendant states only that "Defendant
produced summaries of total amounts of property removed, stored, recovered or
discarded for 2019 and 2020 at CTY004627- 4851 and is willing to conduct

additional meet-and-confer with Plaintiffs regarding their request for underlying storage data." Since then, Defendant has produced additional documents but has not provided a response that complies with Rule 34. In response to interrogatories, the City has essentially withdrawn its objections, stating categorically that it is not withholding any storage-related documents and will produce them pending an investigation. *See* Myers Decl., ¶ 61, Exh. AN. But the City has not set a date for the conclusion of its investigation, and what it has produced is quite obviously piecemeal and incomplete. Plaintiffs are entitled to a date certain for the production of the rest of the documents.

### a.   Reports and Analysis Regarding the City's Encampment Cleanup Program are Relevant

Although the City has long objected to the relevance of the City's storage facilities, the City itself conceded its relevance when it argued that the City's storage capacity was relevant to its defense of Plaintiffs' motion for a preliminary injunction. And in fact, the City used documents it had previously refused to produce, in support of that defense. The City cannot cherry-pick which documents it will use in its defense and produce only those documents in response to Plaintiff' discovery requests. That is anathema to the discovery process, and a clear example of why the City's indefensibly narrow view of what is relevant to this case is wholly without merit.

### b.   Defendant's Written Response Does Not Comply With Rule 34

The City's Amended Response to this RFP does not comply in any way with Federal Rule of Civil Procedure Rule 34(b)(2). In its Amended Response, Defendant states only that "Defendant produced summaries of total amounts of property removed, stored, recovered or discarded for 2019 and 2020 at CTY004627- 4851 and is willing to conduct additional meet-and-confer with Plaintiffs regarding their request for underlying storage data."

1    As an initial matter, the documents produced by the City at CTY004627-

2    4851, with a two page exception, are not responsive to this request.  These

3    documents include contracts between the city and Chrysalis, chain of custody

4    forms, and receipts. Only one document, CTY004841, can be described as a

5    summary of removed and stored property from 2019, and CTY004842 concerns

6    the number of locations of the storage.  The page range identified by the City does

7    not contain 2020 data.

8    Second, although the parties met and conferred, the City did not agree to

9    provide a written response that adheres to the mandates of Rule 34. In February

10   2021, in response to an interrogatory that sought specific, discrete information

11   about the City's storage facility, the City stated that it "does not intend to withhold

12   any storage-related documents it identifies during its investigation."  But it has not

13   stated when the investigation will conclude or the scope of that investigation, and

14   instead has engaged in piecemeal production.

15   This is insufficient.  Plaintiffs are entitled to an unambiguous statement that

16   the City is producing all responsive documents in its possession, custody and

17   control. And the City cannot simply engage in a never ending rolling production

18   and "produce any additional such documents if they are identified in its

19   investigation."  Myers Decl., ¶ 61, Exh. AN.  Rule 34 requires the production of all

20   documents in a "reasonable time" that must be identified at the time of the

21   responses, which in this case was seven months ago.  Moreover, this case was

22   actually filed 19 months ago, and Defendant has had these requests in its

23   possession since October 2019.A rolling production that drags on for more than six

24   months, with no end in sight, is simply not allowed under Rule 34.  *See* Fed. R.

25   Civ. P. 34(b)(2)(B); *see also Maiorano,* 2017 WL 4792380, at *2

26

27

28

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO
REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

### c.      Plaintiffs' Request is Not Overbroad

Defendant asserts that the request is overbroad "in seeking all statistics, reports, analysis, or data compilations relate to the use of storage capacity dating back to April 2016, three years before Plaintiffs' specific incidents occurred as alleged in the SAC."   As discussed in detail, two years and eight months prior to the Specific Incidents is reasonable, given that the date corresponds to when the City adopted the provisions of LAMC 56.11 that require the impounding of property.  This is necessary to do an analysis of the extent to which the City's expansion of storage space has kept pace with the City's increased enforcement of LAMC 56.11.  *See Thomas*, 715 F.Supp.2d at 1032 (granting a request for information going back nearly thirty years, where "in the context of th[e] action," the requested information was "necessary to conduct a comparative analysis of the operation" at issue in the litigation and such analysis was "clearly relevant to Petitioner's claims").  The request not only identifies a discrete topic and is time-limited, but also relates to a specific type of document related to the discrete topic.  As such, the request is narrow, and there is no basis for the City's refusal to produce responsive documents.

### d.      Plaintiffs' Narrow Request is Proportional to the Needs of the Case

To the extent Defendant is withholding any documents on the basis that the request is not proportional to the needs of this case, Defendant's objection and subsequent meet and confer efforts provided no information "clarifying, explaining, and supporting its objection" that it is not proportional to the needs of the case, based on the factors outlined in Rule 26.  *Duran v. Cisco Sys., Inc.*, 258 F.R.D. 375, 378 (C.D. Cal. 2009).Applying these factors and the appropriate scope of this litigation, the request is proportional to the needs of the case.  As discussed in detail above, the issues at stake in this litigation are of constitutional significance; the amount of controversy is largely irrelevant given that Plaintiffs

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

primarily seek prospective relief to put an end to the City's unconstitutional practices; the City of Los Angeles has far more resources than the seven unhoused individuals whose belongings were seized and the volunteer organization whose resources go to replacing those belongings; and Defendant has access to information not publicly available, such as internal analysis and reports. *See supra,* Plaintiffs' Argument re: RFP No. 2. The other factors also weigh heavily in Plaintiffs' favor. *See* Fed. R. Civ. P. 26(b)(1).

### i. Importance of the discovery in resolving the issues

The documents sought by Plaintiffs are related to one of the matters that is most central to this case: the extent to which the City stores property it seizes pursuant to LAMC 56.11. Reports and analysis related to those issues could provide critical evidence about, for example, the existence of customs, policies or practices or the City's awareness about and failure to address the issues raised in this case. Those issues are critical to *Monell* liability and Plaintiffs' claims for prospective relief, which as noted above, are at the center of this case.

### ii. Whether the burden or expense of the proposed discovery outweighs its likely benefit

Defendant objects that the burden of producing documents responsive to Plaintiffs' request is too high, yet fails to provide any details whatsoever about why such a search for responsive documents would be burdensome. As such, the City has waived the argument that producing documents would be burdensome. Even if the request was not waived, any burden associated with this request would simply be the burden that comes from conducting any "reasonable inquiry" for responsive documents. *See* Plaintiffs' Argument re: RFP No. 16.

### e. There is No Merit to the City's Other Objections

### i. Claims of privilege

The City incorporates a general objection into the request "insofar as said Request seeks the disclosure of communications or information protected by the

1  attorney-client privilege, the attorney work product doctrine, the official

2  information privilege or any other privilege." *See* page 2 of Amended

3  Responses. As discussed above, despite numerous requests Defendants have not

4  produced a privilege log.  "Boilerplate objections or blanket refusals inserted into a

5  response to a Rule 34 request for production of documents are insufficient to assert

6  a privilege." *Burlington Northern & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist.*

7  *of Mont*., 408 F.3d 1142, 1149 (9th Cir. 2005)*; see also DeSilva*, 2020 WL

8  5947827, at *7.  Defendant has therefore waived this objection.  *Burlington*

9  *Northern & Santa Fe Ry. Co.* at 1149.

### ii.    Other boilerplate general objections

11        In addition to the specific objections to relevance and proportionality, the

12  City provides three pages of general boilerplate objections.  The City simply

13  incorporates these objections by reference into each of the requests for production,

14  without providing any basis for the specific objection or even an assessment of

15  whether the objection specifically applies to the request.  The use of boilerplate

16  objections in this way is inappropriate and an abuse of the discovery process.  *See*

17  *Polaris*, 2017 U.S. Dist. LEXIS 222261, at *14-17; *see also Eisenhower Med. Ctr*.,

18  2020 U.S. Dist. LEXIS 218716, at *9.  The City refused to clarify which of the

19  objections (if any) applied to this request, let alone the facts necessary to

20  support its application, even after months of requests by Plaintiffs for the City to

21  do so as required by Rule 34.  The City has therefore waived the objection.  *See*

22  *e.g., Bosley*, 2016 WL 1704159, at *5 (Defendant waived blanket objections by

23  failing to provide details of the objections as required by Rule 34(b)(2)(B)).

24        Plaintiffs are entitled to an order compelling the City to produce

25  all documents responsive to RFP No. 45 within 21 days or, if the City asserts it has

26  produced all documents responsive to the request, compelling Defendant to

27  provide a complete, explicit response as to the search conducted to identify and

28

produce responsive documents and to attest to the finality of their production, as required by Rule 34.

### DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 45:

RFP 45 asks for "All statistics, reports, analysis, or data compilations related to the use or capacity of STORAGE FACILITIES [2016-present]."

As with RFPs 43 and 44, which seek documents related to abstract storage capacity, Plaintiffs have not articulated the relevance of such documents, and even if they did, the request is not proportional to the needs of the case.  Plaintiffs make the same arguments as they did for RFPs 43 and 44.  The City incorporates by reference its responses to RFP 2, RFP 16, and RFP 43.

### REQUEST FOR PRODUCTION NO. 47:

All DOCUMENTS that track or document when, where, what, and/or how much property is taken or seized by the CITY pursuant to LAMC 56.11.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 47:

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiff El-Bey's specific claims alleged in the SAC relating to incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western. Defendant further objects that the Request seeks documents that are not relevant to any named-plaintiffs' claims as alleged in the SAC. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to

its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking all documents that show how much property was seized as part of encampment cleanups conducted since April 1 2016. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all documents that show all details for how much property was seized for all encampment cleanups conducted since April 1, 2016 outweighs the benefit of such information for Plaintiff El Bey's specific claims. Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing all documents relating to storage records for 41,734 encampment cleanups conducted since April 1, 2016. Defendant also objects that the proposed discovery is unreasonably cumulative and can be obtained through less burdensome and less expensive means to determine the use or capacity of storage facilities. Without waiving any, and based on these objections, Defendant will produce documents sufficient to show total amounts of property removed and discarded or stored as part of encampment cleanups dating back to January 1, 2019, but no additional documents will be produced in response to this Request.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 47:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiffs' specific claims alleged in the Second Amended Complaint (Dkt. No. 42, "SAC"). Plaintiff El-Bey alleges claims for specific incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western; Plaintiff Garcia alleges claims for specific incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone Avenue, on or around April 29, 2019 at Aetna Street and Van Nuys Boulevard, and on or around August 14, 2019 at Calvert and Bessemer; Plaintiffs Zamora and Zepeda allege claims for specific incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard; Plaintiff Haugabrook alleges claims for incidents occurring sometime in March 2019 and a month later by Figueroa Street and 53rd Street and 52nd Place; Plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019 at Lomita and McCoy; and Plaintiff Ashley alleges claims for a specific incident occurring on or around May 21, 2019 at Lomita and McCoy. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking all documents that show how much property

was seized as part of encampment cleanups conducted since April 1 2016. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all documents that show all details for how much property was seized for all encampment cleanups conducted since April 1, 2016 outweighs the benefit of such information for Plaintiffs' specific claims. Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing all documents relating to storage records for 41,734 encampment cleanups conducted since April 1, 2016. Defendant also objects that the proposed discovery is unreasonably cumulative and can be obtained through less burdensome and less expensive means to determine the use or capacity of storage facilities. Without waiving any, and based on these objections, Defendant produced summaries of total amounts of property removed, stored, recovered or discarded for 2019 and 2020 at CTY004627-4851 and is willing to conduct additional meet-and-confer with Plaintiffs regarding their request for underlying storage data.

**PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 47:**

Plaintiff seeks documents from the City that track the City's seizure of property pursuant to LAMC 56.11.  The data related to the City's Encampment

Cleanups is highly relevant:  it shows, among other items, when cleanups were conducted, and what property was taken.

Although the City initially refused to produce any documents responsive to this request or even to meet and confer, the City later agreed to meet and confer. In November, the City represented that it would export raw data from the three databases it identified as being used to collect Encampment Cleanup data, in satisfaction of the requests for data related to Encampment Cleanups.  Myers Decl., ¶ 47, Exh. AA.  Specifically, the City represented that for the three databases at issue:

- My311 Database:  all data related to encampment cleanups from 1/1/18 to the present will be exported into an Excel spreadsheet and produced.

- WPIMS database: all data related to encampment cleanups from 1/1/18 to the present will be exported into an Excel spreadsheet and produced.

- AMS: To the extent there is data in AMS that is not stored in MyLA, that data will be produced.

*Id.* Despite the City's explicit representations that it would produce this data, and that these were the only databases used to collect encampment cleanup data, neither are in fact true.

### a. The City has withheld Critical Data from the AMS database

Counsel for the City represented to Plaintiffs that it intended to produce all data contained in the AMS database related to encampment cleanups, and on December 19 and 29 produced two spreadsheets that purportedly contained all relevant data.  In fact, the City withheld highly relevant fields of data, without ever indicating it was doing so.  Specifically, the City did not produce at least 12 columns of data that contain the names of each of the individuals that authorized the specific encampment cleanups and the dates of those authorizations.  See Riskin Decl., ¶ 7, Exh C; Myers Decl., ¶ 78, Exh. AS. This information is highly relevant to even the Specific Incidents, because the data withheld contains the

names of the government officials who approved the comprehensive cleanups that led to the violations of Plaintiffs' constitutional rights.[28]  This is relevant to *Monell* liability and for other reasons.

The City's failure to produce the data here is made even more egregious because the withheld data is some of the same data that populates the "online authorization forms," which the City has never produced to Plaintiffs.  *See* Plaintiffs' Argument re: RFP 2.

Plaintiffs were able to determine this data was withheld only because they received a different exported spreadsheet from the AMS database from a third party that obtained this data through a CPRA. *See* Riskin Decl., ¶ 7. A comparison of the databases indicated that the data produced to Plaintiffs by the City does not contain this data.

### b. The City Failed to Identify, Let Alone Produce Data From the Collection Information System, Which is a Fourth Database Used By LA Sanitation

Although the City repeatedly represented that LA Sanitation uses only three databases to store Encampment Cleanup data, the City in fact uses a fourth database, the Collection Information System.  The City withheld the existence of this database for months, while the parties were meeting and conferring about data responsive to these requests, and to date, has not produced any data from the database.

On December 7, 2020, Plaintiffs propounded an interrogatory requesting the City identify all databases or enterprise systems used by the City to compile data or to document any aspect of any Encampment Cleanup…."  Myers Decl., ¶ 61, Exh. AN.  On January 20, 2021, the City responded to Plaintiff's interrogatories, again identifying only these three databases.

---

[28]  This is also the evidence that appears on the Online Encampment Authorizations, discussed *supra,* Plaintiffs Argument re: Request No. 2, which the City has simply failed to produce in this case.  *See* Riskin Decl., ¶ 5 & Exh. A.

On February 16, 2021, the City supplied Amended Interrogatory Responses, and in response to Interrogatory 13, the City identified for the first time an additional database, the Collection Information System.  *Id.*  Plaintiff is specifically seeking this database for the information it contains concerning the discarding of property.  This database is used to produce the City's tonnage reports, which the City has identified as responsive to Plaintiffs' requests and produced reports relying on this data.  Moreover, this data may be more complete than other data produced by the City, because it shows which cleanups were actually conducted (as opposed to WPIMS and AMS, which may not be clear about if a scheduled or authorized cleanup took place).  Plaintiff intends to use the underlying data to contest and analyze the City's patterns of removal of property. The City has not made any offer to produce any spreadsheets from this database; Plaintiffs are entitled to access this data in order to contest the summaries put forth by the City and to determine patterns of property seizure and disposal.

### c.     None of the City's Objections to Withholding Data has Merit

#### i.     Data going back to 2016 is relevant

Defendant unilaterally decided to produce data going back only to January 1, 2018 instead of the requested start date of April 2016.  That date, when the City amended LAMC 56.11, provides data that is relevant to analysis related to the City's expansion of enforcement, trends related to the seizure and destruction of property, whether and to what extent the destruction of property is ratified by official policy makers or whether the City adjusted its practices in response to complaints.  All of that data is relevant to *Monell* liability.

#### ii.     The request is proportionate to the needs of the case

The City has put forth no justification for withholding data going back to the requested April 2016.  When Plaintiffs raised this issue with Defendant, counsel for the City responded by stating that "the data at issue is not as straightforward to

export and prepare for production as Plaintiffs imagine."  She provided no further details about any alleged burden and instead, simply stated that "beginning the production on January 1, 2018 is more than reasonable."  Myers Decl., Exh. AF.

Because the City failed to provide any details about any burden associated with the production of this additional data, there is simply no argument that the request is not proportionate.  Given the dramatic increase in the number of cleanups that occurred after January 1, 2018, the burden of producing an additional year and eight months prior to that date is almost certainly minimal.  And the City has recently conceded in response to an interrogatory, that it routinely performs searches and exports data from these databases (in fact, the production of reports is so frequent that "it is not possible to identify all the variants of such reports."  *See* Myers Decl., ¶ 61, Exh. AN.

### d.     The City has Waived its Other Objections

The City includes a boilerplate objection on the basis of attorney-client privilege and work product doctrine, but fails to identify in any way whether or to what extent it is actually withholding any documents on the basis of privilege. In the seven months since the City produced responsive documents, the City has refused to produce a privilege log, despite repeated requests.  It has therefore waived any privilege.  *Burlington Northern & Santa Fe Ry. Co.* at 1149.

Likewise, the City provides no information here or anywhere to clarify why or even whether any of its other general objections apply.  As such, it has waived them here.  *See e.g., Bosley*, 2016 WL 1704159, at *5.

### e.     Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce new spreadsheets with all data contained within any databases identified by Defendant as containing data related to encampment cleanups from April 2016 to the present

and a sworn statement, attesting that these are the only databases used by the City to collect data related to Encampment Cleanups.

### DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 47:

The request is not relevant and not proportional to the needs of the case. City incorporates by reference its argument as to RFP 33.

### REQUEST FOR PRODUCTION NO. 48:

All DOCUMENTS that track or document when, where, what, and/or how much property that is taken or seized pursuant to LAMC 56.11 is stored.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 48:

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiff El-Bey's specific claims alleged in the SAC relating to incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western. Defendant further objects that the Request seeks documents that are not relevant to any named-plaintiffs' claims as alleged in the SAC. The Court struck Plaintiff KFA's claims seeking any declaration that the City unconstitutionally applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."). Defendant also objects that the proposed discovery is not relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident … to hold the City liable under *Monell*."). Defendant objects that the Request is overbroad and burdensome in seeking all documents that show how

much property was stored as part of encampment cleanups conducted since April 1, 2016. Defendant also objects to the Request to the extent the Request seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all documents that show all details for how much property was stored for all encampment cleanups conducted since April 1, 2016 outweighs the benefit of such information for Plaintiff El Bey's specific claims. Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing all documents relating to storage records for 41,734 encampment cleanups conducted since April 1, 2016. Defendant also objects that the proposed discovery is unreasonably cumulative and can be obtained through less burdensome and less expensive means to determine the use or capacity of storage facilities. Without waiving any, and based on these objections, Defendant will produce documents sufficient to show total amounts of property removed and discarded or stored as part of encampment cleanups dating back to January 1, 2019, but no additional documents will be produced in response to this Request.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 48:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiffs' specific claims alleged in the Second Amended Complaint (Dkt. No. 42, "SAC"). Plaintiff El-Bey alleges claims for specific incidents occurring on or

around January 10, 2019 at 6th Street and Alexandria and on or around June 4,
2019 at Oakwood and Western; Plaintiff Garcia alleges claims for specific
incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone
Avenue, on or around April 29, 2019 at Aetna Street and Van Nuys Boulevard, and
on or around August 14, 2019 at Calvert and Bessemer; Plaintiffs Zamora and
Zepeda allege claims for specific incidents occurring on or around March 21, 2019
at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and
Harvard; Plaintiff Haugabrook alleges claims for incidents occurring sometime in
March 2019 and a month later by Figueroa Street and 53rd Street and 52nd Place;
Plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019
at Lomita and McCoy; and Plaintiff Ashley alleges claims for a specific incident
occurring on or around May 21, 2019 at Lomita and McCoy. The Court struck
Plaintiff KFA's claims seeking any declaration that the City unconstitutionally
applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt.
No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to
obtain a ruling that the City's policies and practices are unconstitutional and not
that each past application of those policies and practices to its members was
unconstitutional."). Defendant also objects that the proposed discovery is not
relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No.
65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident …
to hold the City liable under *Monell*."). Defendant objects that the Request is
overbroad and burdensome in seeking all documents that show how much property
was stored as part of encampment cleanups conducted since April 1, 2016.
Defendant also objects to the Request to the extent the Request seeks information
protected from disclosure by the attorney-client privilege and or attorney work
product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,*
219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case

No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal.
Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not
proportional to the needs of the case, insofar as the burden of searching for and
producing all documents that show all details for how much property was stored
for all encampment cleanups conducted since April 1, 2016 outweighs the benefit
of such information for Plaintiff El Bey's specific claims. Defendant objects that
the Request seeks documents that are not reasonably accessible based on the undue
burden and costs associated with searching for and producing all documents
relating to storage records for 41,734 encampment cleanups conducted since April
1, 2016. Defendant also objects that the proposed discovery is unreasonably
cumulative and can be obtained through less burdensome and less expensive means
to determine the use or capacity of storage facilities. Without waiving any, and
based on these objections, Defendant produced summaries of total amounts of
property removed, stored, recovered or discarded for 2019 and 2020 at
CTY004627- 4851 and is willing to conduct additional meet-and-confer with
Plaintiffs regarding their request for underlying storage data.

**PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION
NO. 48:**

Plaintiffs seek documents related to the storage of property seized by the
City of Los Angeles pursuant to LAMC 56.11.  In response, the City indicated that
it produced "summaries of the total amounts of property removed, stored,
recovered or discarded for 2019 and 2020" and provided a Bates range of 224
pages.  In fact, no such document was produced by Defendant, within that
document range or otherwise.  The City produced a single page of storage data
from 2019, again in PDF form, which it used in its opposition to Plaintiffs Motion
for Preliminary Injunction. The rest of the PDF consists primarily of contracts

between the Los Angeles Homeless Services Authority and Chrsyalis and individual storage sheets.

Thereafter, the City produced PDFs of 2018 and January through June 2020 totals similar to the 2019 totals it previously produced. In addition, the City produced two spreadsheets that contain data from January through June 2019, July 2018 and June 2019 But the City has refused to identify the source of these data for these charts, despite numerous requests from Plaintiffs to do so.  Counsel for the City indicated on November 19, 2020 that "[t]he City intends to produce data tracked by Chrysalis.  [It is] waiting to hear back from the Chrysalis coordinator, who is new to the position, on the details of the data and anticipated timeframe." Myers Decl., ¶ 47, Exh. AA. As with all of the requests to which the City agreed to produce responsive documents, Ms. Ursea reiterated the City's position that the data sought was "wholly unrelated to Plaintiffs or their belongings."  *Id.*

Since then, the City has not produced any requested data, although as noted regarding RFP 43, the City responded to an interrogatory seeking information about storage that "the City intends to produce any additional such documents if they are identified in its investigation or provided to the City by Chrysalis."  Myers Decl., ¶ 61, Exh. AN.

### a.    The Documents sought are Relevant

Data about what property that is impounded pursuant to LAMC 56.11 is actually stored, is unquestionably relevant to the question of whether and to what extent the City actually stores the property it impounds or whether it in fact simply destroys it all, as Plaintiffs allege.  In fact, despite the fact that the City argued to this Court that the issue of storage is irrelevant to this case and then objected on this ground in its responses to the RFPs, the City itself put the storage of property at issue and even used the very data Plaintiffs seek here, to oppose Plaintiffs' motion for a Preliminary Injunction.  *See* Myers Decl., ¶ 20, Exh. K.  It is

1    indefensible for the City to claim, as it does here, that evidence it has used itself to

2    defend against Plaintiffs' claims, is now not relevant.

3        **b.    The City Refuses to Produce the Data**

4        As with the rest of the City's written responses addressed here, the City's

5    response to this request is not consistent with Rule 34. *See* e.g., Plaintiffs'

6    Argument re: RFP 2.  Specifically here, the City has agreed to produce the data,

7    but has inexplicably failed to do so, and this has been ongoing for over seven

8    months.  The City has refused every request to provide a "reasonable time" by

9    which it will complete production, and instead, is engaged in an interminable

10   "rolling production."  This has been ongoing for almost two years.

11       In February 2021, in response to an interrogatory that sought specific,

12   discrete information about the City's storage facility, the City appears to have

13   agreed to produce documents responsive to this request, stating that "to the extent

14   the City has in its possession chain of custody forms or other storage related

15   information, it has produced such documents and intends to procure any additional

16   such document if they are identified in its investigation or provided to the City by

17   Chrysalis."  The City goes on to state that it "does not intend to withhold any

18   storage-related documents it identifies during its investigation."   Myers Decl., ¶

19   61, Exh. AN.

20       This is untenable.  Rule 34 requires the City to have identified a start and

21   end time for the production of documents.  The City cannot fail to complete the

22   production of documents because it has not yet completed an investigation into a

23   case that was filed almost two years ago.  Rule 34 requires the production of all

24   documents in a "reasonable time" that must be identified at the time of the

25   responses, which in this case was seven months ago.  Moreover, this case was

26   actually filed 19 months ago, and Defendant has had these requests in its

27   possession since October 2019.A rolling production that drags on for more than six

28

months, with no end in sight, is simply not allowed under Rule 34. *See* Fed. R. Civ. P. 34(b)(2)(B); *see also Maiorano*, 2017 WL 4792380, at *2; *Fulfillium*, 2018 WL 6118433, at *3.

### c.     The Requests are Not Overbroad or Burdensome

Defendant asserts that the request is overbroad "in seeking all documents that show how much property was stored as part of encampment cleanups conducted since April 1, 2016."   As discussed in detail, two years and eight months prior to the Specific Incidents is reasonable, given that the date corresponds to when the City adopted the provisions of LAMC 56.11 that require the impounding of property.  This is necessary to do an analysis of the extent to which the City's expansion of storage space has kept pace with the City's increased enforcement of LAMC 56.11.  *See Thomas*, 715 F.Supp.2d at 1032 (granting a request for information going back nearly thirty years, where "in the context of th[e] action," the requested information was "necessary to conduct a comparative analysis of the operation" at issue in the litigation and such analysis was "clearly relevant to Petitioner's claims").  The request identifies a discrete topic and is time-limited, and as such, it is not overbroad. *See Fulfillium*, 2018 WL 6118433, at *5.

### d.     The Request is Proportionate to the Needs of the Case

Given the City's interrogatory response, it appears the City is no longer challenging the proportionality of this request; to the extent that it does, this request is proportional to the needs of the case.

#### i.     Importance of the discovery in resolving the issues

The question of whether and to what extent the City stores property it seizes pursuant to the impound statute is a central issue in this case.  The City alleges it stores property pursuant to LAMC 56.11; Plaintiffs allege they destroy it.  The data about what and how much is stored, is directly relevant to this issue.  Moreover,

the information about what is stored is important to the City's assertion that it cannot store property, and therefore, disposes of it.  The documents may contain important impeachment evidence, related to the City's contention that, for example, it seizes property only when there is storage available, or that the City stores property it impounds.  *See Estate of Ernesto Flores*, 2017 WL 3297507, at *6; *Paulsen,* 168 F.R.D. at 289.

Although Defendant continues to fight Plaintiffs on this issue, as noted above, the question of storage was so important to the City's defense against the Motion to Dismiss, that it used this data in response to Plaintiffs'' Motion for a Preliminary Injunction, seeking to enjoin the enforcement of the ordinance on its face.  Certainly the data is important then, to Plaintiffs' as-applied challenge, which specifically challenges the customs, practices, and policies related to the handling of people's belongings.

### ii.   Whether the burden or expense of the proposed discovery outweighs its likely benefit

Defendant puts forth no explanation why it is burdensome to produce this data.  Absent any explanation for why it is burdensome to export the underlying data that supports the summary data used by the City already in its defense in this case, there is no basis for this objection.

### e.   The Request is not Cumulative

Defendant objects that "the proposed discovery is unreasonably cumulative and can be obtained through less burdensome and less expensive means to determine the capacity of the City's storage facilities."  However, in response to the meet and confer efforts, the City failed to clarify what the request was "cumulative" of or what "less burdensome" and "less expensive means" Plaintiffs could use to obtain the capacity of the storage facility.  In fact, Plaintiffs did propound an interrogatory asking for that specific information and the City refused to respond to the question.  Instead, it pointed Plaintiffs back to its RFP responses.

And the request seeks documents that contain more information than simply the capacity of the storage facilities; it also seeks documents that discuss the City's capacity and the need for any additional capacity. The City has provided no explanation for its objection that the request is cumulative or how Plaintiffs can otherwise obtain this information, which itself is not a basis for refusing to respond to this request.

### f.    The City has Waived its Other Objections

The City includes a boilerplate objection on the basis of attorney-client privilege and work product doctrines, but fails to identify in any way whether or to what extent it is actually withholding any documents on the basis of privilege. In the seven months since the City produced responsive documents, the City has refused to produce a privilege log, despite repeated requests. It has therefore waived any privilege. *Burlington Northern & Santa Fe Ry. Co.* at 1149.

Likewise, the City provides no information here or anywhere to clarify why or even whether any of its other general objections apply. As such, it has waived them here. *See e.g., Bosley*, 2016 WL 1704159, at *5.

### g.    Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce all documents responsive to RFP No. 49 within 21 days or, if the City asserts it has produced all documents responsive to the request, compelling Defendant to provide a complete, explicit response as to the search conducted to identify and produce responsive documents and to attest to the finality of their production, as required by Rule 34.

### DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 48:

Plaintiffs have not articulated the relevance of such documents, and even if they did, the request is not proportional to the needs of the case. The City

incorporates by reference its responses to RFP 2, RFP 16, RFP 33 and RFP 43.  As
to Plaintiffs' argument that the City has "waived" privilege, the City incorpates by
reference its argument on that issue with respect to RFP 1.

### REQUEST FOR PRODUCTION NO. 49:

All DOCUMENTS that track or document when, where, what, how much,
and by whom property is stored in STORAGE FACILITIES has been retrieved or
destroyed.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 49:

Defendant incorporates the General Objections as though fully set forth here.
Defendant objects that the Request seeks documents that are not relevant to
Plaintiff El-Bey's specific claims alleged in the SAC relating to incidents occurring
on or around January 10, 2019 at 6th Street and Alexandria and on or around
June 4, 2019 at Oakwood and Western. Defendant further objects that the Request
seeks documents that are not relevant to any named-plaintiffs' claims as alleged in
the SAC. The Court struck Plaintiff KFA's claims seeking any declaration that the
City unconstitutionally applied LAMC 56.11 or the City's policies or practices to
KFA's members. Dkt. No. 65 at 7 ("[T]he Court interprets KFA's claims in the
SAC as seeking only to obtain a ruling that the City's policies and practices are
unconstitutional and not that each past application of those policies and practices to
its members was unconstitutional."). Defendant also objects that the proposed
discovery is not relevant to establishing *Monell* liability for the claims alleged in
the SAC. Dkt. No. 65 at 7 (accepting plaintiffs' argument that "it need only raise a
single incident … to hold the City liable under *Monell*."). Defendant objects that
the Request is overbroad and burdensome in seeking all documents that show how
much stored property was recovered as part of encampment cleanups conducted
since April 1, 2016. Defendant also objects to the Request to the extent the Request

seeks information protected from disclosure by the attorney-client privilege and or attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all documents that show all details for how much property was stored for all encampment cleanups conducted since April 1, 2016 outweighs the benefit of such information for Plaintiff El Bey's specific claims. Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing all documents relating to storage records for 41,734 encampment cleanups conducted since April 1, 2016. Defendant also objects that the proposed discovery is unreasonably cumulative and can be obtained through less burdensome and less expensive means to determine the amount of recovered property. Without waiving any, and based on these objections, Defendant will produce documents sufficient to show total amounts of property that was removed, stored and recovered or discarded as part of encampment cleanups dating back to January 1, 2019, but no additional documents will be produced in response to this Request.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 49:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the Request seeks documents that are not relevant to Plaintiffs' specific claims alleged in the Second Amended Complaint (Dkt. No. 42, "SAC"). Plaintiff El-Bey alleges claims for specific incidents occurring on or around January 10, 2019 at 6th Street and Alexandria and on or around June 4, 2019 at Oakwood and Western; Plaintiff Garcia alleges claims for specific

incidents occurring on or around January 29, 2019 at Aetna Street and Tyrone
Avenue, on or around April 29, 2019 at Aetna Street and Van Nuys Boulevard, and
on or around August 14, 2019 at Calvert and Bessemer; Plaintiffs Zamora and
Zepeda allege claims for specific incidents occurring on or around March 21, 2019
at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and
Harvard; Plaintiff Haugabrook alleges claims for incidents occurring sometime in
March 2019 and a month later by Figueroa Street and 53rd Street and 52nd Place;
Plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019
at Lomita and McCoy; and Plaintiff Ashley alleges claims for a specific incident
occurring on or around May 21, 2019 at Lomita and McCoy. The Court struck
Plaintiff KFA's claims seeking any declaration that the City unconstitutionally
applied LAMC 56.11 or the City's policies or practices to KFA's members. Dkt.
No. 65 at 7 ("[T]he Court interprets KFA's claims in the SAC as seeking only to
obtain a ruling that the City's policies and practices are unconstitutional and not
that each past application of those policies and practices to its members was
unconstitutional."). Defendant also objects that the proposed discovery is not
relevant to establishing *Monell* liability for the claims alleged in the SAC. Dkt. No.
65 at 7 (accepting plaintiffs' argument that "it need only raise a single incident …
to hold the City liable under *Monell*."). Defendant objects that the Request is
overbroad and burdensome in seeking all documents that show how much stored
property was recovered as part of encampment cleanups conducted since April 1,
2016. Defendant also objects to the Request to the extent the Request seeks
information protected from disclosure by the attorney-client privilege and or
attorney work product doctrines. F.R.Civ.P. Rule 26(b)(3)(A)-(B); *Kintera, Inc. v.
Convio, Inc.,* 219 F.R.D. 503, \*507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers
U.S.A., Inc.,* Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, \*
15-17 (C.D. Cal. Sep. 9, 2013).

Defendant further objects that the Request is burdensome and not proportional to the needs of the case, insofar as the burden of searching for and producing all documents that show all details for how much property was stored for all encampment cleanups conducted since April 1, 2016 outweighs the benefit of such information for Plaintiffs' specific claims. Defendant objects that the Request seeks documents that are not reasonably accessible based on the undue burden and costs associated with searching for and producing all documents relating to storage records for 41,734 encampment cleanups conducted since April 1, 2016. Defendant also objects that the proposed discovery is unreasonably cumulative and can be obtained through less burdensome and less expensive means to determine the amount of recovered property. Without waiving any, and based on these objections, Defendant produced summaries of total amounts of property removed, stored, recovered or discarded for 2019 and 2020 at CTY004627- 4851 and is willing to conduct additional meet-and-confer with Plaintiffs regarding their request for underlying storage data.

**PLAINTIFFS' ARGUMENT RE: REQUEST FOR PRODUCTION NO. 49:**

Plaintiffs seek documents related to the issue of whether property that is seized and taken to a Storage Facility is retrieved or ultimately destroyed by the Storage Facility.  The City puts forth identical objections to the request for storage data in RFP 48.  Because the City's response to RFP 49 is identical to RFP 48, and many of the arguments are the same, except as noted below, Plaintiffs incorporate by reference the arguments regarding RFP 48 here.

### a. The Documents sought are Relevant

Defendant put the issue of the retrieval of property directly at issue in its opposition to Plaintiffs' Motion for Preliminary Injunction, in which the City

argued that the fact that people do not pick up their property indicates that the property is not important.  *See* Myers Decl., ¶ 20, Exh. K at ¶ 52.

The City cannot now contend that this issue is not relevant, which is of course, liberally construed.  *Pitkin,* 2017 WL 6496565, at *2.  The City has raised it as a defense, and Plaintiffs are entitled to discovery on the issue. Fed. R. Civ. Pro. 26.  The specific documents Plaintiffs seek in this request are directly related to Defendant's allegations.

### b.    The City Refuses to Produce the Data

The City has agreed to produce at least some documents responsive to this request, but has failed to do so.  This is untenable.  As discussed in detail in Plaintiffs' Argument re: RFP No. 48, Rule 34 requires the City to have identified a start and end time for the production of documents.  The City cannot fail to complete the production of documents because it has not yet completed an investigation.  Rule 34 requires the production of all documents in a "reasonable time" that must be identified at the time of the responses, which in this case was seven months ago.  Moreover, this case was actually filed 19 months ago, and Defendant has had these requests in its possession since October 2019.A rolling production that drags on for more than six months, with no end in sight, is simply not allowed under Rule 34.  *See* Fed. Rule Civ. Pro. 34(b)(2)(B); *see also Maiorano*, 2017 WL 4792380, at *2; *Fulfillium*, 2018 WL 6118433, at *3.

### c.    The Requests are not Overbroad or Burdensome

Defendant asserts that the request is overbroad "in seeking all documents that show how much stored property was recovered as part of encampment cleanups conducted since April 1, 2016."   As discussed in detail, two years and eight months prior to the Specific Incidents is reasonable, given that the date corresponds to when the City adopted the provisions of LAMC 56.11 that require the impounding of property.  *See Thomas*, 715 F. Supp. 2d at 1032 (granting a

request for information going back nearly thirty years, where "in the context of th[e] action," the requested information was "necessary to conduct a comparative analysis of the operation" at issue in the litigation and such analysis was "clearly relevant to Petitioner's claims").  The request identifies a discrete topic and is time-limited, and as such, it is not overbroad.  *See Fulfillium*, 2018 WL 6118433, at *5.

### i.      The Request is Proportionate to the Needs of the Case

Given the City's interrogatory response, it appears the City is no longer challenging the proportionality of this request; to the extent that it does, this request is proportional to the needs of the case.

### ii.      Importance of the discovery in resolving the issues

The question of whether and to what extent property that is seized is retrieved or ultimately destroyed is important to both the reasonableness of the seizure and the due process afforded to individuals whose property is taken.  The City is aware of the centrality of this issue—it raised the issue in opposition to a challenge to the ordinance on its face, and it used summary data to make this point.  Certainly this issue is important then, to Plaintiffs' as-applied challenge, which specifically challenges the customs, practices, and policies related to the handling of people's belongings.  In addition, the documents Plaintiffs seek may contain important impeachment evidence, related to the City's contention that, for example, it seizes property only when there is storage available, or that the City stores property it impounds.  *See Estate of Ernesto Flores*, 2017 WL 3297507, at *6; *Paulsen,* 168 F.R.D. at 289.

### iii.      Whether the burden or expense of the proposed discovery outweighs its likely benefit

Defendant puts forth no explanation why it is burdensome to produce this data.  The City has already used the summary data in this case; it should not be burdensome to hand over the underlying data to Plaintiffs.

#### d.     The Request is not Cumulative

As discussed in RFP 48, the City failed to clarify what the request was "cumulative" of or what "less burdensome" and "less expensive means" Plaintiffs could use to obtain the capacity of the storage facility.

#### e.     The City has Waived its Other Objections

The City includes a boilerplate objection on the basis of attorney client privilege and work product doctrines, but fails to identify in any way whether or to what extent it is actually withholding any documents on the basis of privilege. In the seven months since the City produced responsive documents, the City has refused to produce a privilege log, despite repeated requests.  It has therefore waived any privilege.  *Burlington Northern & Santa Fe Ry. Co.* at 1149.

Likewise, the City provides no information here or anywhere to clarify why or even whether any of its other general objections apply.  As such, it has waived them here.  *See e.g., Bosley*, 2016 WL 1704159, at *5.

#### f.     Plaintiffs' Request for Relief

Plaintiffs are entitled to an order compelling the City to produce all documents responsive to RFP No. 49 within 21 days or, if the City asserts it has produced all documents responsive to the request, compelling Defendant to provide a complete, explicit response as to the search conducted to identify and produce responsive documents and to attest to the finality of their production, as required by Rule 34.

### DEFENDANT'S ARGUMENT RE: REQUEST FOR PRODUCTION NO. 49:

Plaintiffs have not articulated the relevance of such documents, and even if they did, the request is not proportional to the needs of the case.  The City incorporates by reference its responses to RFP 2, RFP 16, RFP 33 and RFP 43.  As to Plaintiffs' argument that the City has "waived" privilege, the City incorpates by reference its argument on that issue with respect to RFP 1.

## IV.   PLAINTIFFS' REQUEST FOR ATTORNEYS' FEES

### a.   Plaintiffs' Position on Attorneys' Fees

Plaintiffs also seek an award of expenses, including reasonable attorneys' fees, against the City of Los Angeles, pursuant to Federal Rule of Civil Procedure, 37(a)(5)(A), which provides that "the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion ... to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. Pro. 37(a)(5)(A).

Far from resulting from a reasonable dispute in which Defendant was substantially justified in taking the positions it did in its responses, *see Reygo Pac. Corp. v. Johnston Pump Co.*, 680 F.2d 647, 649 (9th Cir. 1982), this motion results from the City's untenable and completely unsupported legal positions and its refusal to participate in the discovery process in good faith.  Despite numerous court rulings debunking the City's limited view of the scope of this case and the Federal Rules of Civil Procedure that require the participation of the parties in good faith, the City has maintained its indefensible legal positions through the course of this litigation, refusing to acknowledge that any discovery is relevant, and as a result, has taken unsupported positions related to burden and proportionality.

Defendant's view of this litigation, which is wholly unsupported in the pleadings or the significant court rulings in this case, has infected the way in which it has participated in discovery.  The City has repeatedly and consistently withheld documents responsive to RFPs, even after agreeing to produce those documents. More than 16 months after stating under penalty of perjury to this Court that the City had produced documents and went so far as to force a Plaintiff to dismiss his claims based on that attestation, the City still has not produced these critical documents.  And Plaintiffs have had to engage in considerable work to obtain

405

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

documents from third party sources, simply to verify that the City's production is
incomplete.

Even after the City abruptly changed course and appeared willing to
participate in the discovery process, the City has engaged in interminable delay.
Over 100 days after Plaintiffs provided the City with search terms and custodians
to identify responsive emails, the City has produced only a small number of emails
from one agency, and none of the responsive emails from the main agencies
implicated in this litigation.  The City refuses to provide any information about
when that production is forthcoming, or even to commit to producing emails.  And
the City has also simply stopped communicating about the promised discovery it
promised Plaintiffs was forthcoming in December.

Finally, the City has provided no written explanations for any of these
deficiencies.  Its initial written responses and then amended responses utterly fail
to provide the information required by Rule 34.  The City has not provided a
privilege log in more than seven months, even as it continues to assert that it is
withholding documents on the basis of privilege.

As a result of the City's deleterious tactics, Plaintiffs have had to expend an
incredible amount of resources, first attempting to meet and confer for months,
then to chase down documents from other sources to uncover the extent to which
the City is withholding responsive, highly relevant documents.  The City has
shifted the burden onto Plaintiffs to identify missing documents, producing only
those documents that Plaintiffs identify, and never attesting to the sufficiency of
the search or the end of its rolling production.

This is not what is required under Rule 26 and Rule 34, and as such, this is
exactly the circumstance in which Plaintiffs are entitled to attorneys fees under
Rule 37.  Plaintiffs request the Court allow Plaintiffs to submit a separate motion
for reasonable attorneys fees, after the Court issues its ruling on this motion.

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO
REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

### b.     Defendant's Position on Attorneys' Fees

Plaintiffs are not entitled to any attorneys fees.  The City's objections on relevance and proportionality are substantially justified.  In contrast, Plaintiffs' position that they need this broad discovery to prove *Monell* liability and entitlement to declaratory relief is specious, given that the policy at issue is written, the City has admitted to adopting and enforcing it, and admits that it continues to enforce it *and* given that Plaintiffs have refused the City's repeated offers to stipulate to *Monell* liability.  Even so, the City reasonably compromised on every single one of Plaintiffs' requests.  The record shows that the City did not unreasonably withhold or fail to respond to any of the overbroad discovery propounded by Plaintiffs.

In addition, Plaintiffs did not properly meet and conferred before filing this motion.  "In order to satisfy their meet and confer obligations, parties must treat the informal negotiation process as a substitute for, and not simply a formalistic prerequisite to, judicial resolution of discovery disputes. *Moore v. Superway Logistics, Inc*., No. 1:17-cv-01480-DAD-BAM, 2019 U.S. Dist. LEXIS 90111, at *10 (E.D. Cal. May 28, 2019) (internal quotations and citations omitted).  Plaintiffs identify specific documents in this stipulation they claim are "missing" from the City's productions but they never brought those documents to the City's attention.  Plaintiffs also moved to compel the production of emails that the City had agreed to produce and was in the process of producing.  In fact, just days after Plaintiffs served their stipulation, the City produced over 19,000 emails, many of which contain the very information Plaintiffs now seek to compel.  "Counsel should strive to be cooperative, practical and sensible, and should seek judicial intervention only in extraordinary situations that implicate truly significant interests." *Id.*  (internal quotations and citations omitted).  Plaintiffs have failed to satisfy those obligations

1  here.  Plaintiffs' motion should be denied, and if any party is entitled to fees, it is

2  the City pursuant to Fed. R. Civ. Pro. 37(a)(5)(B).

3

4

5  Dated: April 7, 2021          Legal Aid Foundation of Los Angeles,
                                 Schonbrun Seplow Harris & Hoffman, LLP
6                                Kirkland & Ellis, LLP

7                                By:   /s/ Shayla Myers
                                       Shayla Myers
8                                      Attorney for Plaintiff, Miriam Zamora

9

10 Dated: April 7, 2021          MICHAEL N. FEUER, City Attorney
                                 KATHLEEN KENEALY, Chief Deputy City
11                               Attorney
                                 SCOTT MARCUS, Chief, Civil Litigation Branch
12                               FELIX LEBRON, Deputy City Attorney
                                 A. PATRICIA URSEA, Deputy City Attorney
13

14                               By:   /s/ Felix Lebron
                                       FELIX LEBRON
15                                     Deputy City Attorney
                                       Attorneys for Defendant
16                                     CITY OF LOS ANGELES

17

18

19

20

21

22

23

24

25

26

27

28

**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO
REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

# FILER'S ATTESTATION

Pursuant to the Central District of California Local Rule 5-4.3.4(a)(2)(i), I attest that the other signatory listed, and on whose behalf this filing is submitted, concurs in the filing content and has authorized this filing.

*/s/ Shayla Myers*

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL DEFENDANT'S RESPONSES TO
REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

# APPENDIX A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JANET GARCIA , et al.

                 Plaintiffs,

       v.

CITY OF LOS ANGELES , et al.

                Defendants.

CASE NO:
2:19−cv−06182−DSF−PLA

**ORDER RE JURY TRIAL**

**I.    DEADLINES**

A.    Motion to Amend Pleadings or Add Parties Cut-off:
    2/1/2021

B.    Discovery Cut−Off:
    1/25/2021

C.    Expert Witness Exchange Deadline:
    Initial: 2/22/2021;
    Rebuttal: 3/22/2021;
    Cut−off: 4/19/2021

D.    Motion Hearing Cut−off:
    6/7/2021

E.    ADR Cut−off:
    6/21/2021

F.    Trial Documents (Set One):
    7/26/2021

G.    Trial Documents (Set Two):
    8/2/2021

H.    Final Pre-Trial Conference:
    8/16/2021 at 03:00 PM

I.    Trial Date:
    9/14/2021 at 08:30 AM

**II.   TRIAL PREPARATION**

**III.  CONDUCT OF ATTORNEYS AND PARTIES**

# DEADLINES

## A.    PARTIES/PLEADINGS

The Court has established a cut−off date for adding parties or amending pleadings. All motions to add parties or to amend the pleadings must be noticed to be <u>heard</u> on or before the cut−off date. All unserved parties will be dismissed at the time of the pretrial conference pursuant to Local Rule 16−8.1.

## B.    DISCOVERY AND DISCOVERY CUT−OFF

1. <u>Discovery Cut−off</u>:  The Court has established a cut−off date for discovery and expert discovery if applicable. This is not the date by which discovery request must be served; it is the date by which all discovery, <u>including all hearing on any related motions,</u> is to be completed. The parties should review carefully any motion requirements of the assigned magistrate judge to ensure that motions are made timely.

2. <u>Discovery Disputes</u>:  Counsel are expected to comply with all Local Rules and the Federal Rules of Civil Procedure concerning discovery. Whenever possible, the Court expects counsel to resolve discovery problems among themselves in a courteous, reasonable, and professional manner. The Court expects that counsel will adhere strictly to the Civility and Professionalism Guidelines, which can be found on the Court's website under "Attorney Information>Attorney Admissions."

3. <u>Discovery Motions</u>:  Any motion challenging the adequacy of discovery responses must be filed, served, and calendared sufficiently in advance of the discovery cut-off date to permit the responses to be obtained before that date if the motion is granted

4. <u>Depositions</u>:  All depositions must commence sufficiently in advance of the discovery cut-off date to permit their completion and to permit the deposing party enough time to bring any discovery motions concerning the deposition

before the cut-off date.

5. <u>Written Discovery</u>:  All interrogatories, requests for production of documents, and requests for admissions must be served sufficiently in advance of the discovery cut-off date to permit the discovering party enough time to challenge (via motion practice) responses deemed to be deficient.

6. <u>Expert Discovery</u>:  All disclosures must be made in writing. The parties should begin expert discovery shortly after the initial designation of experts. The pretrial conference and trial dates will not be continued merely because expert discovery is not completed. Failure to comply with these or any other orders concerning expert discovery may result in the expert being excluded as a witness.

C.    <u>MOTIONS</u>

The Court has established a cuf-off date for the <u>hearing</u> of motions. All motions must be noticed so that the <u>hearing</u> takes places on or mandatory paper Chambers copies of all documents. Chambers copies should not be put in envelopes. Counsel should consult the Court's Standing Order, previously provided, to determine the Court's requirements concerning motions. A copy of the Standing Order is also available on the Court's website at www.cacd.uscourts.gov>Judge's Procedures and Schedules>Hon. Dale S. Fischer.

D.    <u>PRETRIAL CONFERENCE</u>

1.    A pretrial conference date has been set pursuant to Rule 16 of the Federal Rules of Civil Procedure and Local Rule 16-8. Each party appearing in this action must be represented at the pretrial conference by the attorney who is to have charge of the conduct of the trial on behalf of such party, unless excused for good cause. Counsel should not claim to be co-lead trial counsel for the purpose of avoiding this requirement. If counsel purport to be co-lead trial counsel, **both** must attend the pretrial conference. Counsel should be prepared to discuss streamlining the trial, including presentation of testimony by deposition excerpts or summaries, time limits, stipulations to admissions of exhibits and undisputed

facts.

2. STRICT COMPLIANCE WITH LOCAL RULE 16 IS REQUIRED. THIS ORDER SETS FORTH SOME DIFFERENT AND SOME ADDITIONAL REQUIREMENTS. THIS COURT DOES NOT EXEMPT *PRO PER* PARTIES FROM THE REQUIREMENTS OF RULE 16. Carefully prepared memoranda of contentions of fact and law, witness lists, a joint exhibit lists, and a proposed pretrial conference order must be submitted in accordance with the Rules and this Order, and the format of the proposed pretrial conference order must conform to the format set forth in Appendix A to the Local Rules. Failure of documents to comply with these requirements may result in the pretrial conference being taken off-calendar or continued, or in other sanctions.

3. The memoranda of contentions of fact and law, witness lists, and the joint exhibit list must be filed not later than the dates set by the Court.

4. In addition to the requirements of Local Rule 16, the witness lists must include a brief (one or two paragraph) description of the testimony, and a time estimate for both direct and cross-examination (separately stated). If two or more witnesses will testify on the same topics, counsel must explain why more than one witness is necessary. A separate version of the witness list containing only the names of the witnesses and a separate column to insert the dates on which the witness testified, and the joint exhibit list, must be submitted to the Chambers email box in Word format. Mandatory paper chambers copies must also be submitted.

5. Other documents to be filed in preparation for, and issues to be addressed at, the pretrial conference are discussed below.

E. ALTERNATIVE DISPUTE RESOLUTION (ADR)

PROCEDURES/NOTICE OF SETTLEMENT

1. Counsel must complete an ADR proceeding no later than the date set by the Court.

2.  No case will proceed to trial unless all parties, including an officer of all corporate parties (with _full_ authority to settle the case), have appeared personally at an ADR proceeding.

3.  If settlement is reached, it must be reported immediately to the courtroom deputy clerk (CRD) as required by Local Rule 16-15.7 regardless of the day or time settlement is reached. In addition, counsel must immediately send a notification of the settlement to the Chambers email box

4.  In all cases set for jury trial, the parties must notify the Court no later than the Wednesday preceding the Tuesday trial date of any settlement so that the necessary arrangements can be made to schedule a different case for trial or notify the members of the public who would otherwise be reporting for jury duty that their services are not needed on that date.

5.  Failure to comply with these notification requirements will cause counsel/parties to be charged for the costs related to proceeding jurors and may result in the imposition of sanctions on counsel for one or more parties, their clients, or both.

## II

## ADDITIONAL TRIAL PREPARATION

A.    MOTIONS _IN LIMINE_

All motions _in limine_ must be filed by the date established by the Court. Each side is limited to five motions _in limine_ unless the Court orders otherwise for good cause shown. Counsel are to meet and confer to determine whether opposing counsel intends to introduce the disputed evidence, etc. and to attempt to reach an agreement that would obviate the motion. Opposition must be filed by the date established by the Court. The Court generally will rule on motions _in limine_ at the pretrial conference. Motions in _limine_ should address specific issues (i.e., _not_ "to exclude all hearsay," etc.). Motions _in limine_ should not be disguised motions for summary adjudication of issues.

B.  JURY INSTRUCTIONS, SPECIAL VERDICT FORMS, VOIR

DIRE, JURY SELECTION

1.  At least fourteen days before the meeting of counsel required by Local Rule 16−2 (which must occur at least 40 days before the date set for the pretrial conference), plaintiff(s) counsel must serve on defense counsel proposed jury instructions and proposed verdict/special verdict forms. Within 7 days, defense counsel must serve objections, if any, to those instructions and verdict forms, as well as any proposed alternative or additonal instructions and verdict forms. Before or at the Rule 16-2 meeting, counsel must attempt to come to agreement on the proposed jury instructions and verdict forms.

2.  When the Manual of Model Jury Instructions for the Ninth Circuit provide an applicable jury instructions, the parties should submit the most recent versions, modified and supplemented to fit the circumstances of this case. Where language appears in brackets, the appropriate language should be selected. All blanks should be completed. Where California law applies, counsel should use the current edition of California Jury Instructions - - Civil (BAJI or CACI). If neither is applicable, counsel should consult the instructions manuals from other circuits or states, as applicable. When submitting other than Ninth Circuit or California instructions, counsel should be sure that the law on which the instructioins is based is the same as Ninth Circuit law (or California or other state law, if applicable) on the subject. Counsel may submit alternatives to the Ninth Circuit model jury instructions, or BAJI or CACI, only if counsel has a reasoned argument that those instructions do not properly state the law or they are incomplete.

3.  The Court has its own introductory instructions (instructions read before opening statements). Counsel should provide only instructions to be read after the evidence has been submitted or that may be appropropriate during trial.

4.  Each requested instruction must (a) cite the authority or source of the

instructions, (b) be set forth in full, (c) be on a separate page, (d) be numbered, (e) cover only one subject or principle of law, and (f) not repeat principals of law contained in any other requested instructions.

5. By the date set by the Court, counsel must file with the Court and submit (electronically to the Chambers email box and in paper form) a JOINT set of jury instructions on which there is agreement. The Court expects counsel to agree on the substantial majority of jury instructions, particularly when pattern or model instructions provide a statement of applicable law. If one party fails to comply with the provisions of this section, the other party must file a unilateral set of jury instructions, unless that party wishes to waive jury trial.

6. At the same time, each party must file with the Court and submit (electronically to the Chambers email box in paper form) its proposed jury instructions that are objected to by any other party. Each disputed instruction must have attached a short (one or two paragraph) statement, including points and authorities in support of the instructionsas well as brief statement, including points and authorities, in support of any objections. A proposed alternative instruction must be provided, if applicable. If the Court believes there are so many disputed instructions that the trial would be unnecessarily interrupted in order for the Court to resolve disputes, the Court will determine that the matter is not yet ready to be tried, and will order counsel to continue to meet and confer until most of the disputes are resolved.

7. Counsel must provide the documents described in paragraphs 5 and 6 to the Chambers email box in Word format at the time they file their proposed jury instructions.

8. The Court will send one or more copies of the instructions into the jury room for the jury's use during deliberations. Therefore, in addition to the copies described above, the Chambers email versions must contain a "clean" set of jury instructions, containing only the text of the instructions (one per page) with the

caption "Instruction No. [Leave blank] at the top (eliminating table of contents, titles, supporting authority, etc.). This document must have page numbers.

9. Counsel must provide an index of all instructions submitted, which must include the following:

a. The number of the instruction.

b. The title of the instruction;

c. the source of the instruction and any relevant case citations;

d. The page number of the instruction.

For example:

| Number | Title | Source | Page |
|--------|-------|--------|------|
| 1 | Duty of the Jury | 9th Cir. 1.4 | 1 |

10. **FAILURE TO FOLLOW THE PRECEDING PROVISIONS OF THIS SECTION WILL SUBJECT THE NON-COMPLYING PARTY AND ATTORNEY TO SANCTIONS AND WILL BE DEEMED TO CONSTITUTE A WAIVER OF JURY TRIAL.**

11. During the trial and before argument, the Court will meet with counsel and settle the instructions, and counsel will have an opportunity to make a further record concerning their objections.

12. At the time of lodging the proposed pretrial conference order, counsel should file a jointly prepared one or two page statment of the case to be read by the Court to the prospective panel of jurors before commencement of voir dire.

13. The Court will conduct the voir dire. The Court provides a list of basic questions, and may provide a list of additional questions to jurors before voir dire. (This is not a questionnaire to be completed by jurors.) Counsel may, but are not required to, file and submit (electronically to the Chambers email box and in paper form in Word format) a list of proposed case-specific voir dire questions at the time they lodge the proposed pretrial conference order

14.  In most cases the Court will conduct its initial voir dire of 16 prospective jurors who will be seated in the jury box. Generally the Court will select eight jurors.

15.  Each side will have three peremptory challenges. Once all challenges for cause and peremptory challenges are exercised, the eight jurors in the lowest numbered seats will be the jury. If fewer than eight jurors remain, the Court may decide to proceed with six or seven jurors.

C.  <u>GLOSSARY, TRIAL EXHIBITS WITNESS LISTS, ETC.</u>

1.  All counsel are to meet not later than ten days before trial and to stipulate, so far as is possible, to foundation, to waiver of the best evidence rule, and to those exhbits that may be received into evidence at the start of the trial.

2.  At least one week before trial, counsel must send to the Chambers email box in Word format:

a.  A case-specific glossary for the court reporter that includes applicable medical, scientific, or technical terms, slang, the names and spellings of case names likely to be cited, street/city/country names, all parties/entities involved in the case, names of people interviewed/deposed, names of family members, friends, or others who might be mentioned, and other case-specific terminology;

b.  The party's witness list, with a column to add the date on which the witness testified;

c.  The joint exhibit list in the form specified in Local Rule 16-6. An annotated exhibit list identifying the exhibits to be received into evidence at the start of the trial must also be provided.

3.  On the first morning of trial, counsel must submit to the CRD:

a.  All original exhibits (except those to be used for impeachment only), with official exhibit tags attached and bearing the same number shown on the exhibit list. Exhibit tags may be obtained from the receptionist in the Public

Intake Section, located on the 1st floor of the Edward R. Roybal Federal Building at 255 East Temple St., Room 180. Digital exhibit tags are also available on the Court's website under Court forms>General forms>Form G-14A (plaintiff) and G-14B (defendant). Exhibit must be numbered 1, 2, 3, etc., NOT 1.1, 1.2, etc. and in accordance with Local Rule 16-6. The defense exhibit numbers must not duplicate plaintiff's numbers. If a "blow-up" is an enlargement of an existing exhibit, it must be designated with the number of the original exhibit followed by an "A.";

        b. Two sets of the exhibits that can be reproduced (one for the Court and one for witnesses) placed in three-ring binders with divider tabs containing the exhibit numbers. The face and spine of the binders must be marked with the case name and number, the volume number, and the number range of the exhibits in the binder. Each binder must contain an index of the exhibits included in the volume.

    4. A copy of the exhibit list with all admitted exhibits will be given to the jury during deliberations. Counsel must review and approve the exhibit list with the CRD before the list is given to the jury.

    5. Where a significant number of exhibits will be admitted, the Court encourages counsel, preferably by agreement, to consider ways in which testimony about exhibits may be intelligible to the jury while it is being presented. Counsel should consider such devices as jury notebooks for admitted exhibits, or enlargements of important exhibits. The Court has an Elmo and other equipment available for use during trial. Information concerning training on the use of electronic equipment is available. Details are posted on the Court's website. To make reservations for training, call 213-894-3061 The Court does not permit exhibits to be "published" by passing them up and down the jury box. Exhibits may be displayed briefly using the screens in the courtroom, unless the process becomes too time-consuming.

6. Counsel must not attempt to display or use any charts or enlargements of exhibits unless all counsel have agreed to their use or objections have been heard and a ruling has been made.

D. TRIAL

1. On the day of jury selection, trial will begin at 9:00 a.m. Counsel must be prepared to go on the record at 8:30 a.m. Thereafter, trial days are generally Tuesday through Friday, 8:00 a.m. to 2:00 p.m., with three fifteen-minute breaks. When necessary, trials may continue beyond the normal schedule. If counsel contemplate that this schedule will be problematic due to the availability of witnesses, counsel should provide details to the Court at the pretrial conference.

2. On the day of jury selection, the Court reserves the time from 8:30 a.m. to 9:00 a.m. to handle legal and administrative matters. Jury selection will begin promptly at 9:00 a.m. or as soon as jurors are available. Thereafter, legal and adminstrative matters must be addressed between 7:45 a.m. and 8:00 a.m. All counsel are urged to anticipate matters that may need to be addressed outside of the presence of the jury and to raise them during this period or at the end of the day. The Court does not make jurors wait while counsel discuss matters that should have been addressed previously. Counsel are urged to consider any unusual substantive or evidentiary issues that may arise, and to advise the Court of such issues as early as possible. Short briefs addressing such disputed issues are welcome.

3. Before trial begins, the Court will give counsel an opportunity to discuss administrative matters and anticipated procedural or legal issues. Before trial begins, and as soon as the information becomes available to counsel, counsel should advise the court of any concerns or accommodations that are requested for parties or witnesses. During trial, if there are any matters to be discussed outside the presence of the jury, counsel must advise the CRD of the request. The Court discourages sidebars during trial.

4. All orders for transcripts must be ordered through the court reporters, Pat Cuneo, who can be contacted through www.patcuneo.com

### III

### CONDUCT OF ATTORNEYS AND PARTIES

A. OPENING STATEMENTS, EXAMINIG WITNESSES, AND
   SUMMATION

1. Counsel must use the lectern for opening statements, examination of witnesses, and summation.

2. Counsel must not consume time by writing out words, drawing charts or diagrams, etc. Counsel may do so in advance and explain that the item was prepared earlier as ordered by the Court to save time.

3. The Court will establish reasonable time estimates for opening and closing, arguments, examination of witnesses, etc.

B. OBJECTIONS TO QUESTIONS

1. Counsel must not use objectins for the purpose of making a speech, recapitulating testimony, or attempting to guide the witness.

2. When objecting, counsel must rise to state the objection and state only that counsel objects and the legal ground of objection. If counsel wishes to argue an objection further, counsel must ask for permission to do so.

C. GENERAL DECORUM

1. Counsel should not approach the CRD or the witness box without specific permission. If permission is given, counsel should return to the lecturn when the purpose has been accomplished. Counsel should not question a witness at the witness stand.

2. Counsel and parties should rise when adddressing the Court, and when the Court or the jury enters or leaves the courtroom.

3. Counsel should address all remarks to the Court. Counsel are not to address the CRD, the court reporter, persons in the audience, or opposing counsel

while on the record. If counsel wish to speak with opposing counsel, counsel must ask permission to do so. Any requset for the re-reading of questions or answers must be addressed to the Court. Such requests should be limited and are not likely to be granted.

4. Counsel should not address or refer to witnesses or parties by first name alone. Young witnesses (under 14) may, however, be addressed and referred to by first name.

5. Counsel must not offer a stipulation unless counsel has conferred with opposing counsel and has verified that the stipulation will be acceptable.

6. While Court is in session, counsel must not leave counsel table to confer with any personnel or witnesses unless permission has been granted in advance.

7. Counsel should not be facial expression, nodding, or other conduct exhibit any opinion, adverse or favorable, concerning any testimony being given by a witness, statements or arguments by opposing counsel, or rulings by the Court. Counsel should admonish counsel's own clients and witnesses to avoid such conduct.

8. Counsel should not talk to jurors at all, and should not talk to co-counsel, opposing counsel, witnesses, or clients where the conversation can be overheard by jurors. Each counsel should admonish counsel's own clients and witnesses to avoid such conduct.

9. Where a party has more than one lawyers, only one may conduct the direct or cross-examination of a particular witness, or make objections as to that witness.

D. <u>PROMPTNESS OF COUNSEL AND WITNESSES</u>

1. The Court makes every effort to begin proceedins at the time set. Promptness is expected from counsel and witnesses. Once counsel are engaged in trial, the trial is counsel's first priority. The Court will not delay the trial or inconvenience jurors except under extraordinary circumstances. The Court will

advise other courts that counsel are engaged in trial in this Court on request.

2. If a witness was on the stand at a recess or adjournment, counsel must have the witness back on the stand, ready to proceed, when the court session resumes.

3. Counsel must notify the CRD in advance if any witness should be accommodated based on a disability or for other reasons.

4. No presenting party may be without witnesses. If counsel has no more witnesses to call and there is more than a brief delay, the Court may deem that party to have rested.

5. The Court attempts to cooperate with professional witnesses and will, except in extradinary circumstances, accommodate them by permitting them to be called out of sequence. Counsel must anticipate any such possibility and discuss it with opposing counsel. If there is an objection, counsel must confer with the Court in advance.

E. EXHIBITS

1. Each counsel should keep counsel's own list of exhibits and should note when each has been admitted into evidence.

2. Each counsel is responsible for any exhibits that counsel secures from the CRD and must return them before leaving the courtroom at the end of the session.

3. An exhibit not previously marked should, at the time of its first mention, be accompanied by a request that the CRD mark it for identification. To save time, counsel must show a new exhibit to opposing counsel before it is mentioned in court.

4. Counsel are to advise the CRD of any agreements they have with respect to the proposed exhibits and as to those exhibits that may be received so that no further motion to admit need be made.

5. When referring to an exhibit, counsel should refer to its exhibit number

whenever possible. Witnesses should be asked to do the same.

6. Counsel must not ask witnesses to draw charts or diagrams or ask the Court's permission for a witness to do so. If counsel wishes to question a witness in connection with graphic aids, the material must be fully prepared before the court session starts.

F. DEPOSITIONS

1. All depositions to be used at trial, either as evidence or potentially for impeachment, must be lodged with the CRD on the first day of trial or such earlier date as the Court may order. Counsel should verify with the CRD that the relevant deposition is in the CRD's possession.

2. In using depositions of an adverse party for impeachment, either one of the following procedures may be used:

a. If counsel wishes to read the questions and answers as alleged impeachment and ask the witness no further questions on that subject, counsel must first state the page and line where the reading begins and the page and line where the reading ends, and allow time for any objection. Counsel may then read the portions of the deposition into the record.

b. If counsel wishes to ask the witness further questions on the subject matter, the deposition is placed in front of the witness and the witness is told to read silently the pages and lines involved. Counsel may either ask the witness further questions on the matter and then read the quotations, or read the quotations and then ask further questions. Counsel should have an extra copy of the deposition for this purpose.

3. Where a witness is absent and the witness's testimony is offered by deposition, counsel may (a) have a reader occupy the witness chair and read the testimony of the witness while the examining layer asks the questions, or (b) have counsel read both the questions and answers.

G. USING NUMEROUS ANSWERS AND INTERROGATORIES AND

REQUESTS FOR ADMISSIONS

Whenever counsel expects to offer a group of answers to interrogatories or requests for admission extracted from one or more lengthy documents, counsel should prepare a new document listing each question and answer, and identifying the document from which it has been extracted. Copies of this new document should be given to the Court and opposing counsel.

H.  ADVANCE NOTICE OF DIFFICULT OR UNUSUAL ISSUES

If any counsel has reason to anticipate that a difficult question of law or evidence will necessitate legal argument requiring research or briefing, counsel must give the Court advance notice. Counsel are directed to notify the CRD at the day's adjournment if an unexpected legal issue arises. Counsel must also advise the CRD at the end of each trial day of any issues that must be addressed outside the presence of the jury, so that there is no interruption of the trial. THE COURT WILL NOT KEEP JURORS WAITING.

**N.B. "COUNSEL," AS USED IN THIS ORDER, INCLUDES PARTIES APPEARING *IN PROPRIA PERSONA*.**

**IT IS SO ORDERED.**

DATED: July 31, 2020

   /s/ *Dale S. Fischer*
Dale S. Fischer
United States District Judge

1
2
3
4
5
6
7
8 UNITED STATES DISTRICT COURT
9 CENTRAL DISTRICT OF CALIFORNIA
10
11
12
13
14
15
16
17

| | | CASE NO. CV DSF( x) |
| Plaintiff(s), | vs. | **EXHIBIT LIST** |
| Defendant(s). | | *SAMPLE FORMAT* |

18
19
20
21
22
23
24
25

| EX. No. | DESCRIPTION | IDENTIFIED | ADMITTED |
|---------|-------------|------------|----------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

26
27
28

revised as of 06-5-20          17

Case 2:19-cv-06182-DSF-PLA   Document 78   Filed 07/31/20   Page 18 of 18   Page ID #:2303

FINAL JOINT TRIAL WITNESS ESTIMATE FORM

CASE: _____                                   TRIAL DATE: _____

| | WITNESS NAME | PARTY CALLING WITNESS AND ESTIMATE | X-EXAMINER'S ESTIMATE | DESCRIPTION OF TESTIMONY | COMMENTS |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| | TOTAL ESTIMATES THIS PAGE: | | | | |

Instructions:

(1) List witnesses (last name first); (2) For description, be extremely brief, e.g., "eyewitness to accident" or "expert on standard of care;" (3) Use estimates within fractions of an hour, rounded off to closest quarter of an hour, e.g., if you estimate 20 minutes, make it .25. An estimate of one and one-half hours would be 1.5. An estimate of three-quarters of an hour would be .75; (4) Note special factors in "Comments" column, e.g., "Needs interpreter;" (5) Entries may be in handwriting if very neat and legible.

revised as of 06-5-20

18

# APPENDIX B

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JANET GARCIA, et at., | CASE NO. 2:19-cv-06182-DSF-PLA |
| Plaintiff(s), | *Assigned to Honorable Dale S. Fischer* |
| vs. | |
| CITY OF LOS ANGELES, et al., | **ORDER GRANTING THE JOINT STIPULATION TO CONTINUE TRIAL AND ALL OTHER PRETRIAL RELATED DATES** |
| Defendant(s). | |

<u>**ORDER**</u>

**GOOD CAUSE APPEARING**, the Court hereby approves this Joint Stipulation by and between the parties and continues the trial and all requisite pre-trial dates, as set forth in the table below:

| **EVENT** | **CURRENT DATE** | **NEW DATE** |
|---|---|---|
| Motion to Amend Pleadings or Add Parties Cut-Off | February 1, 2021 | Monday, August 2, 2021 |
| Discovery Cut-Off | January 25, 2021 | Monday, July 26, 2021 |
| Expert Witness Exchange Deadline (Initial) | February 22, 2021 | Monday, August 23, 2021 |
| Expert Witness Exchange Deadline (Rebuttal) | March 22, 2021 | Monday, September 20, 2021 |
| Expert Witness Cut-Off | April 19, 2021 | Monday, October 18, 2021 |
| Motion Hearing Cut-Off | June 7, 2021 | Monday, December 6, 2021 |
| ADR Cut-Off: | June 21, 2021 | Monday, December 20, 2021 |
| Trial Documents (Set One) | July 26, 2021 | Monday, January 25, 2022 |
| Trial Documents (Set Two) | August 2, 2021 | Monday, January 31, 2022 |
| Final Pre-trial Conference | August 16, 2021 at 3:00 p.m. | Monday, February 14, 2022 at 3:00 p.m. |
| Trial Date | September 14, 2021 at 8:30 a.m. | Monday, March 15, 2022 at 8:30 a.m. |

IT IS SO ORDERED.

DATED: December 9, 2020

_____
Honorable Dale S. Fischer
UNITED STATES DISTRICT JUDGE