MICHAEL FEUER, City Attorney
KATHLEEN A. KENEALY, Chief Assistant City Attorney
SCOTT MARCUS, Chief, Civil Litigation Branch
GABRIEL DERMER, Assistant City Attorney (SBN 229424)
FELIX LEBRON, Deputy City Attorney (SBN 232984)
A. PATRICIA URSEA, Deputy City Atty (SBN 221637)
200 N. Main Street, City Hall East, Room 675
Los Angeles, CA 90012
Telephone (213) 978-7569
Facsimile (213) 978-7011
Felix.Lebron@lacity.org
Patricia.Ursea@lacity.org

*Attorneys for Defendant,* CITY OF LOS ANGELES

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANET GARCIA, et al.<br><br>              Plaintiffs,<br><br>      v.<br><br>CITY OF LOS ANGELES,<br><br>              Defendant. | Case No.: 2:19-cv-6182-DSF-PLA<br>[Assigned to Judge Dale S. Fischer]<br><br>**DISCOVERY MATTER**<br><br>**DECLARATION OF FELIX LEBRON ISO CITY'S OPPOSITION TO PLAINTIFFS' MOTIONS TO COMPEL DISCOVERY**<br><br>Date:  April 28, 2021<br>Time: 10:00 a.m.<br>Crtm: 780<br><br>Complaint Filed:  July 18, 2019<br>Discovery Cut-Off:  July 26, 2021<br>Pretrial Conference: Feb. 14, 2022<br>Trial Date: March 15, 2022 |

DECLARATION OF FELIX LEBRON

## DECLARATION OF FELIX LEBRON

I, Felix Lebron, hereby declare:

1.      I am an attorney at law duly licensed to practice before all of the courts in the State of California.  I am a Deputy City Attorney in the Office of the Los Angeles City Attorney, attorneys of record for Defendant City of Los Angeles ("City") in the above-captioned action.  I have personal knowledge of the facts contained herein, and if called to testify I could and would do so competently.

## ATTACHED EXHIBITS

2.      Attached as **Exhibit 27** is a true and correct copy of Plaintiffs' Second Amended Complaint ("SAC"), Dkt. No. 43, filed in this action on March 12, 2020.

3.      Attached as **Exhibit 28** is a true and correct copy the City's Answer to the SAC, Dkt. No. 75, filed in this action on July 13, 2020.

4.      Attached as **Exhibit 29** is a true and correct copy of the Court's Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, Dkt. No. 65, entered in this action on June 2, 2020.

5.      Attached as **Exhibit 30** is a true and correct copy of Plaintiffs' Notice Electing Not to File an Amended Complaint, Dkt. No. 72, filed in this action on June 29, 2020.

6.      Attached as **Exhibit 31** is a true and correct copy of the Rule 26(f) Joint Report, Dkt. No. 76, filed in the action on July 27, 2020.

7.      Attached as **Exhibit 32** is a true and correct copy of the Defendant's Rule 26 Initial Disclosures [F.R.Civ.P. 26(a)(1)(A)] served in this action on July 27, 2020.

8.      Attached as **Exhibit 33** is a true and correct copy of Plaintiffs' Rule 26(a)(1) Initial Disclosures served in this action on July 27, 2020.

9.      Attached as **Exhibit 34** is a true and correct copy of the Court's Order Granting in Part and Denying in Part Defendant's Motion to Dismiss for Failure to State a Claim, Dkt. No. 36, entered in this action on February 15, 2020.

10.      Attached as **Exhibit 35** is a true and correct copy of the Court's Order

1

DECLARATION OF FELIX LEBRON

Granting Preliminary Injunction, Dkt. No. 58, entered in this action on April 13, 2020.

11.     Attached as **Exhibit 36** is a true and correct copy of the City's L.R. 37-1 Meet-and-Confer Letter re Plaintiff El-Bey's Request for Production Set One and the City's Motion for Protective Order sent to Plaintiffs' counsel on August 24, 2020.

12.     Attached as **Exhibit 37** is a true and correct copy of the City's L.R. 37-1 Meet-and-Confer Letter re Plaintiff El-Bey's Request for Production Set One sent to Plaintiffs' counsel on September 25, 2020.

13.     Attached as **Exhibit 38** is a true and correct copy of the City's Meet-and-Confer Letter re Plaintiff Zamora's Special Interrogatories sent to Plaintiffs' counsel on February 16, 2021.

14.     Attached as **Exhibit 39** is a true and correct copy of the City's Amended Objection and Responses to Plaintiff Zamora's Special Interrogatories Set One served in this action on February 16, 2021.

### SUMMARY OF MEET-AND-CONFER HISTORY

15.     In response to Plaintiffs' requests for early discovery, the City produced incident-specific documents (CTY000001-2677), including the City Bureau of Sanitation (LASAN) Watershed Protection encampment cleanup reports, including health hazard checklists, postings surveys if available, waste disposal records, incident photographs, LAPD Watch Commander Daily Reports, Sergeant's Daily Reports, Daily Field Activity Reports (DFAR) and Computer Aided Dispatch (CAD) Reports.  These documents were produced on November 9, 2019 (CTY000001-2677) and December 10, 2020 (CITY00001-2212).  On January 10, 2020, the City produced a set of policy-related documents relating to LAMC 56.11 and encampment cleanups (CTY002678-3239) and LASAN Watershed Protection reports for incidents conducted in South Los Angeles in March 2019 (CTY003240-4085) because the City was unable to locate documents corresponding to Plaintiff Haugabrook's allegations in the then-operative complaint.

16.     On July 13, 2020, the Parties conducted the Rule 26(f) conference.  During the conference, the City addressed its concerns regarding the scope, relevance and

DECLARATION OF FELIX LEBRON

proportionality of Plaintiffs' Requests for Production, which sought all documents dating back four or seven years, including production of entire databases across different departments and extensive email communications. Plaintiffs contended during the call that the discovery was relevant to Monell. The City proposed entering into a stipulation on Monell to streamline discovery. The City also proposed seeking an informal discovery conference with the assigned Magistrate Abrams to resolve the larger issues regarding scope and proportionality regarding Plaintiffs' Monell discovery. On email communications, the City agreed to conduct searches using Plaintiffs' proposed custodians and search terms, notwithstanding the City's objections based on relevance and proportionality. The City informed Plaintiffs that it requested production of documents in PDF format and the normal in manner in which the documents are kept. The Parties also discussed and agreed that the City would produce LAPD body-worn video ("BWV") on a hard drive supplied by Plaintiffs. The City addressed these issues and other issues in its portions of the Rule 26(f) Joint Report (**Exhibit 31**).

17.     Plaintiff El Bey's Request for Production were served on July 13, 2020 following the conference. On August 12, 2020, the City served its objections and responses to Plaintiff El-Bey's Request for Production of Documents Set One and a production of documents bates labeled CTY004316-6827. This production of documents included Government Claims filed by individual Plaintiffs (CTY004316-4358), organization charts (CTY004359-4395), City Council files, LAPD and LASAN policies and memoranda (CTY004453-4500), LAPD complaints (CTY004511-4626); storage and Chrysalis documents (CTY004627-4851), LASAN training documents (CTY004852-6439) and LAPD training documents (CTY00440-6827).

18.     On August 24, 2020, the City sent Plaintiffs a L.R. 37 meet-and-confer letter regarding Plaintiff El-Bey's Request for Production and the City's anticipated filing of a motion for protective order (**Exhibit 36**). In its letter, the City identified the specific burdens imposed on the City by the Plaintiffs' document demands and addressed issues regarding the specific alleged claims in the SAC, relevance, Monell discovery, the

DECLARATION OF FELIX LEBRON

Declaratory Judgment Act, and proportionality.  The City also detailed the burdens associated with pulling all documents and reports from different departments and entire City databases, collecting emails through the City ITA, and identified grounds for issuance of a protective order.

19.    On August 25, 2020, the Parties conducted a meet-and-confer call regarding the Plaintiffs' RFPs and the City's anticipated motion for a protective order.  During the call, the Parties continued to dispute the relevance and proportionality of the Requests for Production.  Plaintiffs argued that all of their document demands were relevant to Monell, the City's unwritten policies, and Plaintiffs' claims for prospective declaratory relief.  I asked Plaintiff to identify the unwritten policies that formed the basis of the document demands, but Plaintiffs referred the City to the 60-page SAC.  The City raised its objections regarding relevance and proportionality.   During the call, the City agreed again to conduct email searches using the Plaintiffs' proposed custodians and search terms subject its objections on relevance, scope, proportionality and burden.   The Parties also discussed the City's production of documents in PDF format and Plaintiffs' demands for production of documents in Tiff format with metadata.  The City explained during the call that it did not have the software or capability to produce documents in native format and the City produced documents in the form the documents are kept in the normal course.  In response to Plaintiffs' concerns that the City produced several large PDFs in its prior document productions, rather than individual PDFs for each file, the City agreed to provide an index of its past document productions, produce future document productions in individual PDF files, and inquire into the possibility to use an e-discovery vendor.  During the call, Plaintiffs also requested that the City stipulate that the document requests be served on behalf of all Plaintiffs.  The City had already served its objections and responses on August 12, 2020, but I agreed to consider the stipulation subject to the City amending its objections to address all Plaintiffs and not just El-Bey.  The City agreed to produce certain criminal records on behalf of all individual Plaintiffs and additional organization charts and job descriptions that Plaintiffs requested.

4

DECLARATION OF FELIX LEBRON

20.     On September 25, 2020, the City sent a meet-and-confer letter to Plaintiffs in which the City responded to Plaintiffs September 14, 2020 meet-and-confer letter and as a follow-up to the City's August 24 letter (**Exhibit 37**).  The City provided Plaintiffs a document index, including references to incident-specific documents and past productions broken down by bates number and reference to Plaintiffs where applicable. In response to RFP No. 2, the City remained willing to meet-and-confer regarding other specific incident reports, including if Plaintiffs had any additional information regarding the incidents, but objected to producing over 32,000 encampment cleanup reports dating back to January 1, 2018.  The City also informed Plaintiffs that the City obtained access to an e-discovery vendor for future document productions.  The City agreed to serve amended responses and stipulate that the RFPs were served on behalf of all Plaintiffs. The City informed Plaintiffs that the City was still producing documents in response to the RFPs and would amend its responses after it completed its production to confirm whether all documents had been produced and whether any were withheld based on privilege.

21.     On September 25, 2020, the City also produced additional documents (CTY006828-7472) including LAPD criminal records, arrest reports, booking and identification records, Automated Field Data Reports, and printouts of search results conducted by first and last name (CTY006828-6962), and requested organization charts, notices, LSD forms, job descriptions, and other documents.

22.     On September 30, 2020, the Plaintiffs provided hard drives to the City for the production of BWV and, on October 8, 2020, the City produced the incident-specific BWV.  On October 9, 2020, the City served Amended Objections and Responses to Plaintiffs' Request for Production Set One.

23.     I was out of the office on leave in November and December 2020 and returned in January 2021.

24.     On January 21, 2021, Plaintiffs sent the City a meet-and-confer letter regarding the City's responses to the Zamora interrogatories in which Plaintiffs raised for

DECLARATION OF FELIX LEBRON

the first time that the City had not produced incident-specific reports for Zamora and Zepeda.

25.     On February 3, 2021, the Parties conducted a meet-and-confer regarding the City's responses to the Zamora interrogatories.  During that call, the City asked Plaintiff about the incident-specific documents the City produced in November 2019 and why Plaintiffs waited over a year to raise the issue.   Specifically, I noted that the March 21, 2019 incident report (WPIMS Incident/Case No. 53162) occurred on the same date and time on 6th Street and Kingsley, one block from the SAC's alleged location near the northeast corner of 6th Street and Ardmore.  Plaintiffs' counsel responded that it was clearly not the correct report because the SAC alleges Ardmore and not Kingsley. During the discussion, Plaintiffs raised issues regarding the City's reference to data and documents produced in the original interrogatory responses.  The City agreed to provide additional information and further explanation regarding the data and documents.  The City also agreed to provide additional information regarding cleanups conducted on March 21, 2019 and June 11, 2019, and revisit its other objections in an effort to address Plaintiffs' discovery demands.

26.     On February 16, 2021, the City served verified Amended Objections and Responses to the Zamora interrogatories Set One (**Exhibit 39**) and sent a meet-and-confer letter regarding the City's amended responses (**Exhibit 38**).  The City also addressed the production of an additional report for WPIMS Incident/Case No. 53162 in the City's document production (CTY020332-20441).  The City remained willing to meet and confer with Plaintiffs after they reviewed the amended interrogatory responses, but I also noted that the Parties were likely reaching an impasse on resolving the larger issues of relevance and proportionality based on Plaintiffs' Monell arguments.

27.     On March 18, 2021, Plaintiffs served their portion of L.R. 37-2.1 Joint Stipulation re Plaintiffs Motion to Compel the RFPs Plaintiffs raised several new issues that the parties had not previously discussed, including Plaintiffs' demand for additional LAPD citations and Field Interviews cards or information that Plaintiffs believed

DECLARATION OF FELIX LEBRON

reflected Plaintiff Haugabrook's alleged incidents in March or April 2019.

28.     On March 22, 2020, Plaintiffs served their portion of the L.R. 37-2.1 Joint Stipulation re Plaintiffs' Motion to Compel the Zamora Interrogatories on March 22, 2021.  Plaintiffs had not requested a meet-and-confer regarding the City's amended Objections and Responses to the Interrogatories served on February 16, 2020, before serving their portion of the stipulation.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this Declaration was executed on April 5, 2021, at Los Angeles, California.

*/s/Felix Lebron*

FELIX LEBRON
Deputy City Attorney

7

DECLARATION OF FELIX LEBRON

EXHIBIT 27

Shayla Myers (SBN: 264054)
Mallory B. Andrews (SBN:312209)
LEGAL AID FOUNDATION OF LOS ANGELES
7000 S. Broadway, Los Angeles, CA 90003
Tel.:    (213) 640-3983
E-Mail: smyers@lafla.org
         rganschow@lafla.org

*Attorneys for Gladys Zepeda, Miriam Zamora,
Ali El-Bey, James Haugabrook, Pete Diocson Jr.,
Marquis Ashley, and Ktown for All*

*Additional Attorneys on Next Page*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JANET GARCIA, GLADYS ZEPEDA, MIRIAM ZAMORA, ALI EL-BEY, PETER DIOCSON JR, MARQUIS ASHLEY, JAMES HAUGABROOK, individuals, KTOWN FOR ALL, an unincorporated association; ASSOCIATION FOR RESPONSIBLE AND EQUITABLE PUBLIC SPENDING, an unincorporated association<br><br>              Plaintiff(s),<br><br>vs.<br><br>CITY OF LOS ANGELES, a municipal entity; DOES 1-7,<br>              Defendant(s). | CASE NO. 2:19-cv-06182-DSF-PLA<br><br>**SECOND AMENDED COMPLAINT**<br><br>42 U.S.C. § 1983: Fourth and Fourteenth Amendments, United States Constitution; Cal. Const., Art. I, § 7, 13, Cal. Const.; Cal. Civ. Code § 52.1; Cal. Gov't Code § 815.6; Cal. Civ. Code § 2080 *et seq*.<br><br>**DEMAND FOR JURY TRIAL** |

1   Catherine Sweetser (SBN: 271142)
2   Kristina Harootun (SBN: 308718)
    SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP
3   11543 W. Olympic Blvd.,
    Los Angeles, CA 90064
4   Tel.:   (310) 396-0731
5   Email: csweetser@sshhlaw.com
6           kharootun@sshhlaw.com

7   *Attorneys for Plaintiffs.*

8
    Benjamin Allen Herbert (SBN: 277356)
9   William L. Smith (SBN: 324235)
    KIRKLAND & ELLIS LLP
10  555 S. Flower St, Los Angeles, CA  90071
11  Tel.:  (213) 680-8400
    Email:   benjamin.herbert@kirkland.com
12             william.smith@kirkland.com
13
    Michael Onufer (SBN: 300903)
14  KIRKLAND & ELLIS LLP
15  2049 Century Park East, Los Angeles, CA  90067
    Tel.:  (213) 680-8400
16  Email:   michael.onufer@kirkland.com

17
18  *Attorneys for Plaintiffs, Ktown for All, Janet Garcia,*
    *Pete Diocson Jr., Marquis Ashley, Ali El-Bey, and*
19  *Association for Responsible and Equitable Public Spending.*

20
21
22
23
24
25
26
27
28

SECOND AMENDED COMPLAINT

## **JURISDICTION AND VENUE**

1.     This is an action for injunctive relief and damages pursuant to 42 U.S.C. § 1983 based upon the continuing violations of Plaintiffs' rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.  Jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1343 based on 42 U.S.C. § 1983 and questions of federal constitutional law.  Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as it arises from the same case or controversy as Plaintiffs' federal claims.

2.     Venue is proper in the Central District because all of the events and conduct complained of occurred in the Central District.

## **PRELIMINARY STATEMENT**

3.     By all accounts, Los Angeles is in the midst of a housing crisis and a resulting homelessness crisis. According to the 2019 Homeless Count[1], there are approximately 36,300 people in the city of Los Angeles who lack a fixed, regular, and adequate nighttime residence.

4.     This crisis did not occur overnight.  For decades, the number of people experiencing homelessness in Los Angeles has risen steadily, as housing costs in Los Angeles have soared and wages have remained stagnant.  While city leaders have failed to address this crisis, more and more people have ended up homeless on the streets of Los Angeles.

///

---

[1] The Los Angeles Homeless Count is a point-in-time count conducted each January throughout Los Angeles County by the Los Angeles Homeless Services Authority (LAHSA), a joint powers agency of the City and County of Los Angeles. The point in time count is mandated by the U.S. Department of Housing and Urban Development, which approves the methodology.  The count is conducted by volunteers, and the statistical analysis is done by the University of Southern California.

SECOND AMENDED COMPLAINT

5.      And there has been little progress towards abating the crisis.  Currently, there is a massive shortage of affordable housing units in Los Angeles:  an annual study released in May 2019 found that Los Angeles County needed more than 515,000 additional affordable units to house the area's very low income population.[2]  In 2019, a Los Angeles renter earning minimum wage ($13.25 an hour) would need to work 79 hours per week to afford rent for a one bedroom apartment,[3] and more than 720,000 households in Los Angeles County are severely rent-burdened, meaning that the household spends more than 50% of their household income on rent.[4]

6.      As a result, every month, thousands of people fall into homelessness.  So even as the City of Los Angeles ("the City") has attempted to address this crisis by facilitating, funding, and encouraging the construction of new housing, any progress it has made has not kept pace with the number of new people becoming homeless.  Year after year, this number continues to rise, and in 2019, the number of people who became homeless far outpaced the number of people who are moving into housing.  This imbalance led to a 16% increase in the number of people who are homeless in Los Angeles, one of the largest year-to-year increases in recent years.

7.      In addition to the shortfall in affordable housing, there are insufficient emergency shelter beds in Los Angeles for its homeless residents.  According to an inventory of shelter beds conducted by the Los Angeles Homeless Services Authority (LAHSA) in 2018, Los Angeles needed an additional 23,000 shelter beds to provide even the most basic shelter option for the city's unhoused population.  During the

---

[2] According to the California Housing Partnership Corporation, "Los Angeles County Annual Affordable Housing Outcomes Report," May 2019, the City needs 516,946 additional affordable rental units to affordably house all of the county's very low and extremely low-income residents.

[3] The Federal Home Loan Mortgage Corporation, "Rental Burden by Metropolitan Area," 2019.

[4] Joint Center for Housing Studies of Harvard University, "The State of the Nation's Housing," 2018.

winter months, the City and County add approximately 1,146 additional shelter beds through the Winter Shelter program, but that program runs only from November to March, at which point, the beds are not available again until November, and the individuals who resided in the beds are once again left to sleep on city streets and in other public spaces.

8.     Measures to quickly increase the stock of emergency shelters for people living on the streets have proven inadequate.  In 2018, the City launched A Bridge Home, the promise of which was to construct temporary shelters in each of the City's 15 City Council districts, with a goal of providing 1,500 of the more than 20,000 needed shelter beds.  Even opening these shelters, which were intended to be temporary and available quickly to address the crisis, has proven extremely difficult. To date, only four Bridge Home shelters have opened, providing only about 150 new shelter placements for individuals and families.

9.     As a result of this severe shelter crisis and lack of affordable housing options, when a person loses their housing, there are very few alternatives to them actually ending up on the street. Of the 36,300 people who are homeless in Los Angeles, 75% are unsheltered, living in vehicles, tents, and other makeshift encampments.  This is the largest unsheltered homeless population in the country.[5] According to the 2019 Homeless Count, roughly 8,000 people in the city of Los Angeles have only tents and makeshift encampments to provide any shelter at night.[6] Another untold number don't have even that.

///

---

[5] Dep't of Housing and Urban Dev., "The 2018 Annual Homeless Assessment Report," December 2018.

[6] Los Angeles Homeless Services Authority, "2019 Greater Los Angeles Homeless Count-Vehicles, Tents, and Makeshift Shelters by Geographic Area," at p. 5.

SECOND AMENDED COMPLAINT

Case 2:19-cv-06182-DSF-PLA   Document 122-3   Filed 03/12/20   Page 606 of 764   Page ID
#:7229
Case 2:19-cv-06182-DSF-PLA   Document 122-3   Filed 04/07/21   Page 15 of 409   Page ID

10.     As the number of people living in tents and makeshift encampments on the streets has increased every year for the past decade, the City has not invested in adequate public health infrastructure or basic municipal services to respond to the needs of its residents who are unsheltered.  The City has not provided even the most rudimentary level of municipal services for its thousands of unsheltered residents, such as bathrooms, handwashing stations, showers, storage, or even routine trash pickups.

11.     The need for these services is well-documented: since at least 2012, the Los Angeles County Department of Public Health has repeatedly warned the City that services like toilets, handwashing stations, and routine trash services are necessary to maintain adequate public health in areas with high concentrations of people living in encampments.  In 2017, concerns about Hepatitis A prompted the Department of Public Health to survey select homeless encampments throughout the county and identify locations with insufficient public health infrastructure to support the population of residents living in those areas.  Every location surveyed in the city of Los Angeles was found to be lacking; most locations had no infrastructure for the thousands of people living on the streets.

12.     Following the Department of Public Health's report, the City Administrator's Office conducted its own review and identified 55 locations where people were living in encampments that were more than a quarter of a mile away from any kind of publically-accessible restroom.  The City launched a pilot project to provide portable toilets and handwashing stations to five of the 55 designated areas. Despite the success of this program, the City has provided only five additional stations, bringing the total number of portable toilets and handwashing stations in the City to only 10 outside Skid Row.

13.     Most homeless individuals also have no place to store their belongings, even though the City has long identified this as a critical need for people who are living in encampments.  The City currently funds the BIN, a storage facility for

SECOND AMENDED COMPLAINT

unhoused residents in Skid Row, and a temporary program with 41 storage containers near the City's first A Bridge Home location at El Pueblo.  Other attempts to build storage have stalled or failed.  As a result, most unhoused people throughout Los Angeles have no accessible options to store their belongings, other than with them on the street.

14.     Nor do most unhoused people have places to simply throw out their trash. Even at most large encampments, the City has not provided trash receptacles or even routine trash pickups.  Many residents attempt to minimize the impact of trash by, for example, containing their trash to a single area.  But without routine pickups, this trash piles up on city sidewalks.  These piles then become magnets for illegal dumping—not by residents of the encampments, but by others who take advantage of the City's disinvestment and leave behind their trash and waste.

15.     As the number of people living on the streets has risen, and with woefully insufficient investment in public health infrastructure like bathrooms or basic municipal services like trash pickups, the inevitable and visible impact of homelessness has continued to increase throughout Los Angeles.  And so too have complaints from housed residents and businesses throughout the city.  These complaints have flooded City Council offices and the City's 311 complaint system, which includes "homeless encampments" in its list of nuisance complaints (along with, for example, illegal auto repairs and illegal sign removal).  Housed residents demand that city leaders address the visible signs of homelessness in their neighborhoods by removing encampments.

16.     Rather than investing in solutions like bathrooms, handwashing stations, and trash cans, which would both meet the real and immediate public health needs of the thousands of unhoused residents in the city, and in turn, would also address many

SECOND AMENDED COMPLAINT

residents' complaints, the City has responded instead by seizing and destroying homeless people's belongings.[7]

17.    This is not a new response to unsheltered homelessness in Los Angeles. In fact, for decades, the seizure and destruction of homeless people's belongings has remained a consistent and often singular strategy deployed by the City to erase the visible signs of homelessness in Los Angeles.  And as a result of these practices, the City has faced almost a dozen lawsuits in the last 30 years, brought by unhoused residents who allege that the City has violated their constitutional rights by seizing and destroying their tents, medications, documents, and other items they need to survive on the streets.[8]

---

[7] As discussed *infra* ¶¶ 87-90, in June 2019, after months of meetings with the Mayor's office and political pressure from advocates and organizers, the Mayor announced a plan to address growing concerns that that the City was failing to respond to the needs of people living on the streets.  While the plan purports to focus efforts on addressing the public health needs of the community, the plan fails to call for adequate resources to effectuate this shift.  For example, while acknowledging that routine trash services are of critical importance, the plan calls for just 500 additional trash cans and pickups for the more than 500 square miles in the city of Los Angeles.  Similarly, the new deployment plan discusses the importance of hygiene resources, but fails to provide any increased funding for toilets or handwashing stations.  Meanwhile, as discussed *infra* ¶¶ 87-90, the plan calls for increased funding for encampment cleanups and specifies that LA Sanitation will continue to enforce Los Angeles Municipal Code 56.11, the ordinance under which the City currently seizes and destroys homeless peoples' belongings.

[8] *See Schellenberg v. City of Los Angeles*, CV 18-07670 CAS (C.D. Cal. 2018); *Cooley v. City of Los Angeles*, CV 18-09053 CAS (C.D. Cal. 2018); *Mitchell v. City of Los Angeles*, CV 16-01750 SJO (C.D. Cal. 2016)*; Los Angeles Catholic Worker v. Los Angeles Downtown Industrial District*, CV 14-07344 PSG (C.D. Cal. 2014); *Hanson v. City of Los Angeles*, No. CV 13-02571 (C.D. Cal. 2013); *Lavan v. City of Los Angeles*, No. CV 11-02874 PSG (C.D. Cal. 2011); *Noe v. City of Los Angeles*, No. CV 05-08374 AG (C.D. Cal. 2005); *Justin v. City of Los Angeles*, No. CV 00-12352 LGB (C.D. Cal. Dec. 5, 2000); *Bennion v. City of Los Angeles*, C637718 (L.A. Sup. Ct. Feb. 25, 1987).

18.     In 2011, eight unhoused residents of Skid Row sued the City for unconstitutionally seizing and destroying their belongings, which they left momentarily unattended on the sidewalk.[9]  In its defense, the City took the untenable position that homeless people do not have a constitutionally-protected property interest in those belongings.  First the District Court and then the Ninth Circuit issued a strong rebuke of that position.  The Ninth Circuit "reject[ed] the City's invitation to impose this unprecedented limit on the Fourth Amendment's guarantees"[10]  and noted that due process protections attach to people's belongings, "regardless of whether the property in question is a  . . . Cadillac or a cart."[11]

19.     Despite the explicit judicial condemnation of the City's view of homeless people's property rights and the long history of lawsuits that preceded it, the City has remained steadfast in its position that unhoused people do not enjoy the same constitutionally-protected property interest in their belongings that housed residents enjoy.

20.     In 2016, the City codified this position as part of its municipal code.  The Los Angeles City Council amended Los Angeles Municipal Code Section 56.11 (LAMC 56.11) to allow the City to seize and in many instances, summarily destroy homeless individuals' belongings.  The stated purpose of the amendment to LAMC 56.11 was to "balance the needs of all of the City's residents."  LAMC 56.11(1).  But the ordinance is far from balanced—as written, it fails to provide the constitutional protections the Court found lacking in *Lavan v. City of Los Angeles*.

21.     The City has also constructed a comprehensive strategy to enforce this ordinance. Through comprehensive cleanups, which are noticed, and rapid responses, which are not, the City, through the Department of Public Works, Bureau of Sanitation ("LA Sanitation") and the Los Angeles Police Department ("LAPD"), routinely seize

---

[9] *Lavan v. City of Los Angeles*, No. CV 11-02874 PSG (AJW) (C.D. Cal. 2011).
[10] *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1031 (9th Cir. 2012).
[11] *Id*. at 1032.

1   and destroy tents, sleeping bags, carts, clothing, medication, important documents, and

2   other items that homeless residents need to survive on the streets.  These actions,

3   purportedly justified by the ordinance and couched in regulations and bureaucracy, are

4   remarkably similar to the City's past actions that courts have repeatedly struck down

5   as unconstitutional.

6       22.     LAMC 56.11 and its enforcement evidence the City's longstanding

7   refusal to acknowledge that, although homeless residents may not have a roof over

8   their heads, they are nevertheless entitled to the constitutional protections that every

9   other resident of the City enjoys.  To that end, this ordinance and its enforcement are

10   simply further attempts by the City to legitimize and bureaucratize what courts have

11   repeatedly prohibited the City from doing:  summarily seizing and destroying

12   homeless people's belongings.

13                              **PARTIES**

14   *PLAINTIFFS*

15       23.     **JANET GARCIA** is an unhoused resident of Los Angeles who lives in a

16   tent near the Metro Orange Line station in the Van Nuys area of Los Angeles.  She

17   lost her apartment in Van Nuys in March 2017 and has not been able to find housing

18   she can afford since then.

19       24.     On or about January 29, 2019, an LA Sanitation crew seized and

20   summarily destroyed Ms. Garcia's tent and all of her belongings, including the

21   cleaning supplies she needed for work, when she momentarily stepped away from her

22   belongings to go to the bathroom and get ready for work.  This is not the first or last

23   time that Ms. Garcia's property has been seized and destroyed by the City.  On April

24   29, 2019, during a comprehensive cleanup, LA Sanitation workers took most of Ms.

25   Garcia's belongings while she was watching her neighbors' property so her neighbors

26   could go with outreach workers—to sign up for unemployment benefits and obtain a

27   new identification card.

28   ///

                          SECOND AMENDED COMPLAINT

25. On August 14, 2019, Ms. Garcia's belongings were again seized during a comprehensive cleanup, after she moved them to an area outside the noticed cleanup area and left them for the day to go to work. When she returned, all of her belongings had been seized and thrown away by LA Sanitation.

26. The repeated seizure and destruction of her belongings has made it more difficult for Ms. Garcia to look for new housing or even to just keep working, since each time her belongings are seized and destroyed, she has to replace her cleaning supplies, along with the rest of her belongings.

27. **GLADYS "JANE" ZEPEDA** is a 30-year-old unhoused resident of the Koreatown neighborhood in Los Angeles. She has lived in Los Angeles for most of her life. Ms. Zepeda lives with her girlfriend, **MIRIAM ZAMORA**, a 26-year-old lifelong Los Angeles resident. Ms. Zepeda and Ms. Zamora have been homeless since February 2019, when they were evicted from the apartment where they were staying and have not been able to find another apartment they can afford. They are currently living in in a tent on a parkway in Koreatown.

28. On March 21, 2019, LA Sanitation and LAPD were deployed to their neighborhood and conducted a rapid response at 6th St. and Ardmore, where Ms. Zepeda and Ms. Zamora were staying. LA Sanitation workers seized and destroyed the belongings that Ms. Zepeda and Ms. Zamora could not fit into a single 60-gallon trash bag. Among the items that were destroyed was their tent, which was less than seven weeks old, tarps that were in good condition, clean clothing, and a small chest containing most of their important documents. On other occasions, including as recently as June 11, 2019, Ms. Zepeda and Ms. Zamora have repeatedly lost critical items they need to survive on the street, including tents, blankets, and food. The constant threat of losing their belongings has made it difficult for them to look for work or to get help finding housing.

///

///

29.     **ALI EL-BEY** is a 39-year-old resident of Los Angeles.  He has been homeless for approximately four years.  For the past six months, Mr. El-Bey has been living in various locations in the Koreatown neighborhood of Los Angeles.

30.     On or about January 10, 2019, Mr. El-Bey was living on the corner of 6th Street and Alexandria in Koreatown.  That morning, LAPD and Sanitation conducted a rapid response and instructed Mr. El-Bey that he had approximately 10 minutes to pack up and move.  When he took too long, he was forced to leave the rest of his belongings behind, including his ID, medications, and tent, which LA Sanitation summarily destroyed.  Since then, Mr. El-Bey has lost other belongings to sanitation sweeps, including as recently as June 4, 2019.

31.     **JAMES HAUGABROOK** is a 50-year-old resident of South Los Angeles.  He has lived in South Central for his entire life, and has been homeless there for the past two years.

32.     Over the past six months, Mr. Haugabrook has been subjected to a number of rapid responses and had his belongings destroyed as a result.  In or about March 2019, while Mr. Haugabrook was attempting to respond to LA Sanitation's demand to limit his belongings to only 60 gallons, sanitation workers threw away a number of his belongings, including his backpack and all of its contents, which included medication to treat his diabetes and other important items.  On yet another occasion, Mr. Haugabrook left his belongings for a short period of time, and returned to find that they were all gone.  His neighbors informed him that city workers had come and thrown them all away.  On other occasions, LA Sanitation has conducted "bulky item" pickups and taken chairs, leaving him nowhere to sit while he is guarding his belongings.

33.     Mr. Haugabrook has a Section 8 Voucher, and if he is able to find a landlord that will accept the voucher, he will be able to move off the streets.  But he never knows when LA Sanitation will conduct a rapid response and throw away his belongings, and he has found it incredibly difficult to actually look for an apartment.

Case 2:19-cv-06182-DSF-PLA  Document 122-8  Filed 04/07/21  Page 22 of 409  Page ID
#:7236
Case 2:19-cv-06182-DSF-PLA  Document 43-1  Filed 09/12/20  Page 19 of 34  Page ID #:706

34.     **PETE DIOCSON JR.** is a 50-year-old unhoused resident of the Harbor City neighborhood of Los Angeles.  He was born in Carson, California, which borders Harbor City, and he has lived in the area for much of his life.  He has been homeless in and around the Harbor City area for the past four years.  In April 2019, Mr. Diocson was living in an encampment on the corner of Vermont and Lomita Blvd with Bella, a two-and-a-half-year-old dog who helps him deal with his anxiety and makes him feel safe, less anxious, and less alone.  To keep Bella safe at night, Mr. Diocson kept Bella in a wire kennel that a neighbor donated to him.

35.     On April 24, 2019, LAPD officers and LA Sanitation workers conducted a comprehensive cleanup on Lomita Blvd, and as part of the cleanup operation, seized and destroyed Bella's kennel because they contended it was a "bulky item."  Without a kennel to secure Bella at night, Mr. Diocson has been constantly worried that Bella will escape, which makes it difficult for him to sleep and exacerbates his anxiety.

36.     **MARQUIS ASHLEY** is an unhoused resident of the Harbor City neighborhood of Los Angeles.  He has lived in and around Harbor City for most of his life.  He currently lives at the homeless encampment on Lomita Blvd.

37.     On or about May 21, 2019, as part of a comprehensive cleanup of the Lomita encampment, LA Sanitation seized and destroyed two carts that Mr. Ashley uses to move his belongings.  One of the carts, which he built himself, was attached to his bicycle and at the time the cart was seized, he was using it to transport his belongings from the cleanup area.  The other cart was broken, and he intended to fix it after the cleanup.  Instead, LA Sanitation informed Mr. Ashley that the carts were "bulky items," and he was forced to surrender them to LA Sanitation.  He had to drag the rest of his belongings out of the cleanup area, and then back to the place where he stays when the cleanup was completed.  The carts were summarily destroyed.  After the cleanup, Mr. Ashley built a new cart to replace the ones that were taken, but he worries that this cart will be taken as well.

///

38.  **KTOWN FOR ALL** is an unincorporated membership organization in the Koreatown neighborhood in Los Angeles.  The organization was founded in 2018 to form connections between housed and unhoused residents of Koreatown, and to advocate for housing and shelters in their community.  Its members include housed and unhoused residents in Koreatown.

39.  As part of its mission to support unhoused residents and to build connections between housed and unhoused neighbors, Ktown for All engages in weekly outreach efforts.  Through these outreach efforts, Ktown for All gets to know its unhoused neighbors and provides resources such as food, water, hygiene kits, and other consumable items that their neighbors need.

40.  The City's practice of seizing and destroying unhoused residents' belongings has have perceptibly impaired and frustrated Ktown for All's mission to build these connections.  As a result of the City's practices, homeless residents have been moved around or been displaced from the neighborhood.  This has made it incredibly difficult for Ktown for All to stay in contact with unhoused neighbors.

41.  Because of the City's unlawful practices, Ktown for All has also had to devote significant resources that it could have spent on advocating for shelters and connecting with neighbors, on identifying and counteracting the City's practices.  The resources it has had to divert as a result of the City's practices include expending volunteer hours and scarce financial resources that it would have spent on its advocacy efforts, to replace an increasingly large number of tents, blankets, and other items that were seized and destroyed by the City.  Ktown for all has also had to expend hours assisting unhoused residents track down items that were seized by Defendants and responding to calls from unhoused residents related to sweeps.  The constant seizure and destruction of homeless people's belongings in Koreatown has also forced Ktown for All to divert organizational resources away from outreach and advocacy for the production of affordable housing, to educating members about the policies and advocacy efforts to stop these unlawful practices.

SECOND AMENDED COMPLAINT

42.     Members of Ktown for All who are unhoused have been subjected to the City's customs, policies and practices, including the continued enforcement of LAMC 56.11.  Its members have suffered harm as a result of these customs, policies, and practices, including the loss of property and the deprivation of their constitutional and statutory rights.  Unhoused members of Ktown for All who live in encampments are at imminent risk of continued enforcement of LAMC 56.11, and as a result, the deprivation of their constitutional rights.

43.     Unhoused members of Ktown for All have also had a difficult time participating in Ktown for All's advocacy efforts, because they have to spend time guarding their belongings and replacing items that have been thrown away as a result of the City's policies, customs and practices.

44.     **ASSOCIATION FOR RESPONSIBLE AND EQUITABLE PUBLIC SPENDING ("AREPS")** is a membership organization comprised of taxpayers in Los Angeles that was founded to ensure that their tax dollars are used to promote responsible public spending.  They advocate for spending on public health, housing, and other public infrastructure for all residents of Los Angeles, including its unhoused residents and against the use of their tax dollars to enforce illegal laws that harm vulnerable residents of the City.  This includes the use of tax dollars to pay for the destruction and disposal of those residents' property.  All members of AREPS are residents of the City of Los Angeles and pay one or more municipal taxes to the City of Los Angeles, which provides revenue into the City's general fund.

45.     Kristina Meshelski is a member of AREPS.  She was born in Los Angeles and has continuously resided within the City of Los Angeles for the past eight years.  Ms. Meshelski regularly pays municipal taxes into the general fund of the City of Los Angeles.

46.     James Parriott, IV, is a member of AREPS and a lifelong resident of the City of Los Angeles. Mr. Parriott regularly pays municipal taxes into the general fund of the City of Los Angeles.

SECOND AMENDED COMPLAINT

*DEFENDANTS*

47.    Defendant City of Los Angeles ("the City") is a municipal entity with the capacity to sue and be sued.  It is a Charter City under the laws of the State of California.  The departments of the City include the Los Angeles Police Department and the Los Angeles Department of Public Works and its departments and agencies, including LA Sanitation.  Employees of the City have engaged in the acts complained of herein pursuant to the policies, practices, and customs of the City.

48.    The City's employees and agents participated personally in the unlawful conduct challenged herein and, to the extent that they did not personally participate, they authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and the harm suffered by Plaintiffs.  Each acted in concert with each other.  The challenged acts caused the violation of Plaintiffs' rights.

49.    The identities and capacities of Defendants DOES 1 through 7 are presently unknown to Plaintiffs, and on this basis, Plaintiffs sue these defendants by fictitious names.  Plaintiffs will amend the Complaint to substitute the true names and capacities of the DOE defendants when ascertained.  Plaintiffs are informed, believe, and thereon allege that DOES 1 through 7 are, and were at all times relevant herein, employees and/or agents of the City and are responsible for the acts and omissions complained of herein.  Defendants DOES 1 through 7 are sued in both their official and individual capacities.

///
///
///
///
///
///
///

SECOND AMENDED COMPLAINT

# FACTUAL ALLEGATIONS

## LOS ANGELES MUNICIPAL CODE SECTION 56.11

### History of LAMC 56.11

50.     In 2016, the Los Angeles City Council amended Los Angeles Municipal Code Section 56.11 ("LAMC 56.11") to allow the City to seize and in certain instances, destroy the belongings of individuals who are experiencing homelessness.[12]

51.     Prior to the amendment, LAMC 56.11 provided only that "[n]o person shall leave or permit to remain any merchandise, baggage or any article of personal property upon any parkway or sidewalk."

52.     In 2011, the City of Los Angeles was sued by eight individuals in Skid Row, whose belongings were seized and summarily destroyed by the City after they left them momentarily unattended on the sidewalk where they stayed.  The plaintiffs sued for violation of their Fourth and Fourteenth Amendment rights, as guaranteed by the United States Constitution.  The District Court issued a preliminary injunction against the City, holding that the plaintiffs had established a likelihood of success on the merits of both their Fourth and Fourteenth Amendment claims.  The City was enjoined from:

- Seizing property in Skid Row absent an objectively reasonable belief that it is abandoned, presents an immediate threat to public health or safety, or is evidence of a crime, or contraband; and
- Absent an immediate threat to public health or safety, destruction of said seized property without maintaining it in a secure location for a period of less than 90 days.[13]

53.     The City appealed the injunction to the Ninth Circuit Court of Appeals, arguing that homeless people did not have a property interest in their belongings, such

---

[12] A true and correct copy of LAMC 56.11, as amended, is attached as Exhibit A to this complaint.

[13] 797 F. Supp. 2d 1005, 1020 (C.D. Cal. 2011).

that the seizure and destruction of their belongings did not implicate the Fourth or Fourteenth Amendment.

54.     In 2012, the Ninth Circuit Court of Appeals affirmed the District Court's ruling and upheld the injunction.[14]

55.     In 2015, while *Lavan* was still pending in the District Court, the Los Angeles City Council amended LAMC 56.11, and then amended the ordinance again in 2016.  The current version of LAMC 56.11 went into effect in April 2016.[15]

56.     In addition to revising the ordinance, the City also adopted the Los Angeles Municipal Code 56.11 Standard Operating Protocols (56.11 Protocols).  The protocols were prepared by LA Sanitation, which serves as the Designated Administrative Agency for the implementation and enforcement of the ordinance.

57.      Since the current version of LAMC 56.11 went into effect in 2016, the City has been and is currently enforcing the ordinance against homeless individuals throughout the City, including the individual Plaintiffs.

**Overview of LAMC 56.11**

58.     LAMC 56.11 codifies the City's longstanding policy of seizing and destroying homeless people's belongings.  As with prior versions of LAMC 56.11, individuals are prohibited from "storing"[16] most belongings in public.  Unlike prior

_____

[14] 693 F.3d 1022 (9th Cir. 2012).

[15] After the initial amendment of LAMC 56.11 in 2015, the parties in *Lavan* settled the litigation and the case was dismissed in 2016.

[16] Section 56.11(2)(o) defines "store" broadly to mean:
to put Personal Property aside or accumulate for use when needed, to put for safekeeping, and/or to place or leave in a Public Area.  Moving Personal Property to another location in a Public Area or returning Personal Property to the same block on a daily or regular basis shall be considered Storing and shall not be considered to be removing the Personal Property from a Public Area.  This definition shall not include any Personal Property that, pursuant to statute, ordinance, permit, regulation or other authorization by the City or state,

SECOND AMENDED COMPLAINT

versions, however, the current version removes criminal liability for most violations of the ordinance, and instead, allows the City to simply seize and in many instances, summarily destroy those items the City determines are inconsistent with the ordinance.

59.     Specifically, the current ordinance allows the City to seize and immediately destroy an item it deems 1) "bulky"; 2) an "immediate threat to the health and safety of the public," or 3) evidence of a crime or contraband.  In addition, the ordinance allows the City to immediately seize 1) property that it deems "excess"; 2) tents that are constructed between the hours of 6:00 a.m. and 9:00 p.m.; 3) property that is blocking city sidewalks; 4) property within 10 feet of operational doorways; 5) property that is attached to any public fixture or any private fixture where it interferes with a public right of way; or 6) property that is interfering with city services.[17]

60.     Section 56.11(2)(c) defines a Bulky Item as:

> [A]ny item, with the exception of a constructed Tent, operational bicycle or operational walker, crutch or wheelchair, that is too large to fit into a 60-gallon container with the lid closed, including, but not limited to, a shed, structure, mattress, couch, chair, other furniture or appliance.  A container with a volume of no more than 60 gallons used by an individual to hold his or her Personal Property shall not in itself be considered a Bulky Item.

61.     Despite providing a definition of Bulky Item, the ordinance provides no further information about what "container" is contemplated, nor does the ordinance

---

is Stored with the permission of the City or state on real property that is owned or controlled by the City.
Public Area is defined equally broadly to include "all property that is owned, managed or maintained by the City, except property under the jurisdiction of the Department of Recreation and Parks which is governed by Los Angeles Municipal Code Section 63.44, and shall include, but not be limited to, any Street, medial strip, space, ground, building or structure."  LAMC 56.11(2)(k).

[17] LAMC 56.11(3)(a)-(h); (7); (8)(a)-(c).

define what makes a bicycle, walker, crutch, or wheelchair "operational." Likewise, the ordinance provides no definition of what constitutes a "constructed" tent.

62.     LAMC 56.11(3)(b) allows the City to seize "excess personal property" from homeless individuals, which is defined as "any and all Personal Property[18] that cumulatively exceeds the amount of property that could fit in a 60-gallon container with the lid closed." But as with Bulky Items, the ordinance provides no further guidance about what 60 gallon container the City contemplates as the heuristic to determine whether property is "excess."

63.     Despite the lack of guidance, the consequence of a determination by LA Sanitation that an item is too large or the amount of property is too voluminous is steep:  Section 3(i) provides that "the City may remove and may discard any Bulky Item, whether Attended or Unattended, Stored in a Public Area." Similarly, section 3(b) gives the City the authority to immediately seize any items in excess of "60 gallons." Under the ordinance, the City does not need to obtain a warrant, nor does it need to determine that an exception to the warrant requirement applies, prior to seizing the items, or in the case of Bulky Items, before immediately destroying them. In fact, there is no check of any kind on LA Sanitation's power to seize and destroy items it sees on the street—sanitation workers can simply take what they determine is "bulky" or "in excess" of 60 gallons."

64.     The ordinance also purports to codify some of exceptions the Court in *Lavan* carved out from its injunction against the City's seizure and destruction of property: Section 3(h) allows for the seizure and immediate destruction of property that is contraband or evidence of a crime.  Section 3(g) allows sanitation workers to seize and immediately destroy "any Personal Property Stored in a Public Area if the

---

[18] Personal Property is defined comprehensively to include mean "any tangible property, and includes, but is not limited to, goods, materials, merchandise, Tents, tarpaulins, bedding, sleeping bags, hammocks, personal items such as household items, luggage, backpacks, clothing, documents and medication." LAMC 56.11(2)(j)

Personal Property poses an immediate threat to the health or safety of the public." LAMC 56.11 provides no further information about what constitutes an "immediate threat to the health or safety of the public" and is therefore prohibited. Instead, that term is defined only in the 56.11 Protocols.[19]

65.　Under Section 5 of the ordinance, Personal Property that is seized pursuant to LAMC 56.11 and not immediately destroyed is supposed to be "moved to a place of storage" and held for 90 days.[20] After 90 days, items that are have not been claimed may be discarded, and the City "shall not be required to . . . return" any property stored for longer than 90 days.[21]

66.　Although the ordinance and implementing protocols allow the City to seize and in many instances immediately destroy individuals' belongings, the ordinance provides no process to challenge these actions, much less constitutionally-adequate due process. There is no mechanism to contest LA Sanitation's on-the-spot determination that an item is "bulky," or that a person has more property than will fit within a 60 gallon container with the lid closed. There is no way to challenge whether a bike is "inoperable" or a tent is "constructed." Nor is there is any way to challenge whether an item constitutes an immediate threat to public health and safety. LAMC 56.11 provides absolutely no mechanism to contest any decision by city workers, even though the consequence of those decisions is the immediate and often permanent deprivation of property.

67.　In fact, this is by design. LAMC 56.11 actively prevents individuals from contesting LA Sanitation's on-the-spot decisions about what constitutes a violation of the ordinance. It imposes criminal liability on anyone who interferes in any way with the City's seizure or destruction of property: Sections 10(a), (d) of the ordinance make

---

[19] See 56.11 Protocol No. 7. A true and correct copy of Protocol No. 7 is attached as Exhibit B.
[20] LAMC 56.11(5)(a).
[21] LAMC 56.11(5)(b).

SECOND AMENDED COMPLAINT

it a misdemeanor, punishable by up to 6 months in jail or $1,000 for any individual to "willfully resist, delay, or obstruct a City employee from moving, removing, impounding or discarding Personal Property stored in a Public Area in violation" of the ordinance, including Excess Personal Property, constructed tents, Bulky Items, and property the City determines constitutes an immediate threat to public health or safety or is contraband. This stands in stark contrast to the other violations of the ordinance, which do not lead to the criminal liability that ordinarily attaches to violations of the Municipal Code.[22]

**ENFORCEMENT OF LAMC 56.11**

68.     Since the ordinance was amended in 2016, the City has and continues to enforce LAMC 56.11 throughout Los Angeles.

**<u>Overview of Cleanup Teams</u>**

69.     To enforce LAMC 56.11, the City deploys teams of sanitation workers and LAPD officers to conduct cleanups of homeless encampments. These teams conduct two types of cleanups: noticed cleanups, which are either noticed in advance or in the case of Skid Row and Venice, conducted on a regular schedule, and rapid responses, which are neither noticed nor scheduled. As part of both types of cleanups, City workers routinely seize, destroy and immediately dispose of homeless people's belongings, consistent with LAMC 56.11.

70.     Noticed cleanups of homeless encampments began in 2012 in Skid Row as "Operation Healthy Streets." Comprehensive cleanups were expanded City-wide as part of the Mayor's "Clean Streets LA" program in 2015. Operation Healthy Street cleanups currently occur on a regular schedule in Skid Row and Venice while

---

[22]*See* LAMC 56.11(10). LAMC Section 11(m) provides that "[i]t shall be unlawful for any person to violate any provision or fail to comply with any of the requirements of this Code. Any person violating any of the provisions or failing to comply with any of the mandatory requirements of this Code, shall be guilty of a misdemeanor unless that violation or failure is declared in this Code to be an infraction."

SECOND AMENDED COMPLAINT

comprehensive cleanups are scheduled as needed throughout the rest of the City.  This scheduling is done by the Mayor's office in consultation with City Council offices and with authorizations from a number of agencies, including the Los Angeles Homeless Services Authority, which signs off that outreach has been conducted to the encampment residents.[23]

71.     When LA Sanitation conducts a comprehensive cleanup, it will generally give 24 hours notice of the cleanup, by posting paper notices on trees, buildings, walls, and other fixed structures in the area, indicating a nine-hour window when the cleanup can occur.

72.     The notice, a true and correct copy of which is attached as Exhibit C states in part:

NOTICE:  MAJOR CLEANING
INCLUDES SIDEWALKS, ALLEYS, PARKS, BEACH, PARKING LOTS, AND
OTHER PUBLIC ACCESS AREAS
AN AREA CLEANING WILL COMMENCE AT THIS LOCATION ON:
PLEASE REMOVE ALL PERSONAL BELONGINGS, INCLUDING BULKY
ITEMS BY

73.     The notice goes on to inform individuals to remove belongings from the area, and that property remaining will be removed from the City.

74.     Other than stating that the cleanup will occur "at this location", the notice provides no further information about the area to be cleaned.  At times, LA Sanitation will hand-write a physical address on the notice.  Routinely, the notice provides no further information about the area that will be covered by the cleanup, and from which individuals must move their belonging.

---

[23] As discussed *infra* ¶¶ 87-90, as part of a new deployment strategy, the City has  announced that it is combining Operation Healthy Streets and Clean Streets LA under one name: CARE+ or "Comprehensive Cleaning and Rapid Engagement Plus".

Case 2:19-cv-06182-DSF-PLA Document 132-8 Filed 04/07/21 Page 33 of 409 Page ID
#:7247
Case 2:19-cv-06182-DSF-PLA Document 43 Filed 03/12/20 Page 24 of 64 Page ID #:1727

75.     Other than the notices that are physically posted on trees, posts, and other fixtures, the date, time, and location of cleanups are not made publicly available by the City.

76.     Cleanups are often cancelled after notices are posted.  When this occurs, encampment residents are not provided any further information that the cleanup will not occur that day.

77.     If the cleanup does take place as scheduled, when the cleanup crew arrives on the scene at any time during the window posted on the notice, individuals are generally given 15 minutes to move their belongings from the area LA Sanitation determines is the cleanup area.

78.     Consistent with custom, policy, and practice, sanitation workers and LAPD officers enforce the provisions of LAMC 56.11 and often prohibit individuals from taking more than 60 gallons of belongings or Bulky Items with them.

79.     Individuals are also allowed to remove only their own items from the cleanup area; LA Sanitation and LAPD prohibit individuals from moving their neighbors' belongings or at times, even helping their neighbors remove their belongings from the cleanup area.  When an individual is not present to move his own belongings, the items are seized by LA Sanitation, regardless of whether someone is watching the belongings for another person or is capable of moving them out of the way for their neighbor.

80.     Once the cleanup team determines that individuals have been given enough time to remove their belongings from the cleanup area, LA Sanitation will "close" an area for cleaning.  Items left behind in the cleanup area, including items that individuals were forced to leave behind because they were considered "excess" or "bulky," are seized by LA Sanitation and "processed" according the 56.11 Protocols.[24]

///

---

[24] *See infra* ¶ 103.

SECOND AMENDED COMPLAINT

81.     In addition to these noticed cleanups, the City also conducts rapid responses, the primary purpose of which is to enforce the provisions of LAMC 56.11. Currently, these rapid responses are conducted by specialized enforcement teams, called "Homeless Outreach and Proactive Engagement" teams, or HOPE teams, which are made up of four LA Sanitation workers and six LAPD officers. HOPE Teams were piloted in 2016 and launched city-wide in 2017.[25]

82.     As with noticed cleanups, the location of rapid responses are set based on demands by City Council offices and complaints by residents, mainly through the City's 311 system.  Unlike noticed cleanups, rapid responses are not conducted pursuant to the 56.11 Protocols for encampment cleanups.  On information and belief, a rapid response does not require prior authorization and can happen at any time.

83.     Homeless individuals are not provided notice that a rapid response is happening before LA Sanitation and LAPD arrive.  Instead, sanitation workers and LAPD officers simply arrive at homeless encampments, inform any residents who may be present that they are enforcing LAMC 56.11, and seize and destroy people's belongings.  HOPE teams conduct Bulky Item pickups.  They also routinely seize and destroy property the teams determine constitutes Excess Personal Property and property that is left unattended.

84.     Deployment of teams to conduct comprehensive cleanups and rapid responses occurs on most days in the City of Los Angeles.  In 2018, the City conducted cleanups and enforcement actions at more than 9,000 encampments throughout Los Angeles.

85.     The deployment of LA Sanitation to conduct rapid responses has been increasing steadily over the past year, and these rapid responses now far outnumber the noticed cleanups conducted by the City.  In the fourth quarter of 2018, LA

_____

[25] As part of the City's new deployment plan, discussed *infra* ¶¶ 87-90, HOPE Teams have been renamed CARE teams ("Comprehensive Cleaning and Rapid Engagement").

SECOND AMENDED COMPLAINT

Case 2:19-cv-06182-DSF-PLA Document 122-8 Filed 04/07/21 Page 35 of 409 Page ID
#:7249
Case 2:19-cv-06182-DSF-PLA Document 43-2 Filed 09/12/20 Page 20 of 54 Page ID #:1719

1  Sanitation impounded 2,319 tents through rapid responses, compared to only 783
2  through the City's comprehensive cleanups.

3       86.     The expenditure of tax dollars to enforce LAMC 56.11 through these
4  programs is significant.  In FY 2018-19, the City of Los Angeles spent approximately
5  $10,692,104 to fund rapid responses, including $4.7 million to pay for the LAPD
6  officers assigned to the HOPE teams and $5.22 million to fund LA Sanitation.  The
7  approved budget for FY 2019-20, which began on July 1, 2019, includes the same
8  allocation for LAPD and a $5.98 million allocation for LA Sanitation to continue the
9  rapid responses.  In addition, the FY 2019-20 budget allocates over $18 million to
10  conduct noticed cleanups through Clean Streets LA and Operation Healthy Streets.

11       87.     A portion of the City's budget includes the cost of destroying property
12  that is illegally seized from homeless residents.  LA Sanitation regularly uses trash
13  trucks to conduct bulky item pickups.  When an on-the-spot determination is made
14  that an item is "bulky", that item is thrown into the trash truck, compacted, and
15  transported to a local landfill.  The cost associated with the illegal destruction of items
16  that should not, and would not otherwise, have been seized in the first place, include
17  "tipping fees":  the cost paid by the City of Los Angeles to dispose of items into local
18  landfills.  The cost is calculated per ton and costs upwards of $60.00 per ton.  The
19  amount paid per tipping therefore increases for each item the City disposes of.
20  Therefore, the more items that are unconstitutionally seized and destroyed, the more
21  additional costs there are to the City, and therefore, to taxpayers.

22       88.     In June 2019, the Bureau of Sanitation introduced a new deployment plan
23  for the teams that conduct homeless encampment cleanups. The plan calls for 47
24  additional sanitation workers, paid for with an additional $6.45 million in funding,
25  which is in addition to the $32 million already allocated to these programs in the FY
26  2019-20 budget.  The increased funding for the plan was authorized by the Los
27  Angeles City Council on June 28, 2019 and finally approved on July 3, 2019.
28  ///

SECOND AMENDED COMPLAINT

Case 2:19-cv-06182-DSF-PLA Document 122-8 Filed 04/07/21 Page 36 of 409 Page ID
#:7250
Case 2:19-cv-06182-DSF-PLA Document 43-2 Filed 03/12/20 Page 25 of 64 Page ID #:1720

89.     Under the new plan, the number of CARE teams has increased dramatically, from nine HOPE teams operating in FY 2018-19 to 17 CARE teams funded under the new plan—one for each council district, one for the LA River, and one floating team.  For comprehensive cleanups, the number of teams deployed has been increased from 11 to 13.  Venice and Skid Row continue to have a dedicated cleanup team, and LA Sanitation has added additional dedicated teams to clean up the corridor along the 110 Freeway in South Los Angeles and in downtown Los Angeles.

90.     While the programs have been renamed—from HOPE to CARE and Clean Streets LA and Operation Healthy Streets to CARE+—the newly renamed CARE teams will still conduct rapid responses and CARE+ teams will conduct comprehensive cleanups, although with the promise of a more regular schedule and increased trash collection. Like the HOPE teams and Clean Streets LA, the new CARE and CARE+ teams are explicitly tasked with enforcing LAMC 56.11.

91.     The new deployment is not scheduled to be rolled out until October 2019. In the meantime, on July 3, 2019, City Council approved more than $1 million in funding for overtime, in order to dramatically expand the capacity of HOPE and Clean Streets LA through the summer.

**Enforcement of Specific Provisions**

92.     Through the deployment of these cleanup teams, the City has enforced and will continue to enforce provisions of LAMC 56.11 against unhoused residents living in encampments throughout Los Angeles.

**a.      Bulky Items**

93.     Consistent with City policy, LA Sanitation workers, with the support of the LAPD, routinely seize items from homeless individual that they determine are "bulky" as defined in LAMC 56.11.  When LA Sanitation determines that something is a Bulky Item, it is the City's policy and practice to seize and immediately destroy the item.

///

94.     LA Sanitation crews have no mechanism to measure whether an item meets the definition in LAMC 56.11 of a Bulky Item and is therefore subject to seizure and destruction.  Determinations about what constitutes a Bulky Item and is therefore subject to seizure and destruction, are arbitrary and based solely on the individual sanitation worker's judgement and perception of item's size. As a result, one day, sanitation workers will seize carts and camp chairs from residents.  On another day, at another encampment, they will seize "inoperable" bicycles and pallets. Individuals who are homeless have no way of knowing what LA Sanitation will deem a Bulky Item, which is then subject to immediate seizure and destruction.

95.     As part of its Bulky Item enforcement, the City also enforces a "one operable" bicycle rule against people who are unhoused.  If an individual who is homeless has more than one bicycle, sanitation workers will seize the additional bicycle(s). At times, the bicycles are summarily destroyed.  At other times, the bicycles are taken by LA Sanitation away from the scene.  In addition, sanitation workers will seize bicycle parts, including bicycle frames where the bicycle tire is simply separated from the bicycle.  On information and belief, this is done because the bicycle is deemed "inoperable," and LA Sanitation interprets these items to fall under the Bulky Item provision of LAMC 56.11.  Decisions about whether a bicycle is "inoperable" are, as with all other decisions, made on the spot, and the consequence of this determination is the immediate and permanent deprivation of the item.

96.     Once LA Sanitation determines that an item constitutes a Bulky Item, sanitation workers will demand the item be surrendered or will simply seize the item from among an individual's belongings.  The City will do so regardless of whether an individual is present and asserting ownership over the item, or if they come upon the item and it has been left unattended.  After the Bulky Item is seized, sanitation workers immediately destroy it by throwing it in the back of a trash compactor, crushing the item.  The item is then transported to a landfill for disposal.

///

SECOND AMENDED COMPLAINT

Case 2:19-cv-06182-DSF-PLA Document 132-8 Filed 04/07/21 Page 38 of 409 Page ID
#:7252
Case 2:19-cv-06182-DSF-PLA Document 43-2 Filed 03/12/20 Page 29 of 64 Page ID #:1722

97.     Bulky Items are seized and destroyed solely because LA Sanitation has determined that the items meet the definition of "bulky."  The Bulky Item need not be blocking access to a building, preventing individuals from passing on the sidewalk, or otherwise threatening public safety in any way for it to be seized and immediately destroyed.  And once LA Sanitation has determined that an item is "bulky" there is no way to challenge this determination prior to the item being destroyed.

**b.     Other Limitations on Property**

98.     The City also routinely enforces other provisions of LAMC 56.11 that allow the City to summarily seize individuals' belongings.  To enforce LAMC 56.11's prohibition on Excess Personal Property, which prohibits individuals from having more property than will fit within a 60 gallon container with the lid closed, sanitation workers and LAPD officers pass out trash bags to individuals at encampments and inform them that they can fill up the trash bags with the items they want keep; the rest has to be surrendered to the City.  Homeless residents are allotted only 15 minutes to fit what they can in a trash bag, and then they are required to move from the area, leaving behind anything they did not put in the trash bag.

99.     During this time, if homeless residents attempt to move more than what will fit in the trash bag and the City is enforcing the Excess Personal Property or "60 gallon rule" that day, the individuals are stopped by LA Sanitation or LAPD and informed they cannot take more than what will fit in the trash bag. If individuals attempt to use a commercial shopping cart to move their belongings, the City will seize the cart and require the individual to carry their belongings from the area.  Even if a person has a store-bought or handmade cart, these carts are seized as Bulky Items.

100.     Once an individual fills up their trash bag or LA Sanitation determines that they have been given enough time to choose which belongings to keep, individuals are required to leave behind any items they could not fit in the 60 gallon bags and leave the area.  Anything that is left behind is then seized by LA Sanitation.
///

SECOND AMENDED COMPLAINT

101.    In addition to enforcing the "60 gallon rule," the City also seizes the property of individuals who are violating LAMC 56.11(7) and (8).  Section 7 prevents an individual from having their tent constructed outside the hours of 6:00 a.m. and 9:00 p.m.  Section 8 prevents an individual from attaching barriers against public property or against private property in a way that causes an obstruction on or across streets and sidewalks.  As part of the rapid responses, LA Sanitation teams seize tents, tarps, and other items used to construct makeshift encampments if the tent is constructed during the day or the makeshift encampment is attached to public or private property.  When LA Sanitation has come upon a constructed tent or encampment attached to public or private property, they have seized the entire encampment, not just the tent or the attachment.

102.    The City also routinely seizes individuals' property when it is left unattended.  When rapid response teams come upon an encampment and a resident is not present with their property, the City has a custom, policy, and practice of seizing that property.  It provides no notice before the property is seized, and if the City determines that the property falls into one of the categories that allows it to immediately destroy the items, it will do so without any notice to the owner or opportunity for the owner to contest the destruction.  Whether individuals are gone from their property for a few minutes, a few hours, or the whole day is irrelevant.  Nor is it relevant whether an individual has left their belongings in the care of another person.

103.    On information and belief, because LAMC 56.11 provides that property is "unattended" unless the person who "asserts or claims ownership" over the property is there,[26] LA Sanitation informs individuals that they cannot watch other people's belongings.  As such, another person cannot safeguard a person's belongings when that person goes to the bathroom, goes to a medical appointment, meets with a housing

---

[26] LAMC 56.11(2)(r).

SECOND AMENDED COMPLAINT

counselor, or works an afternoon shift.  If the owner of the property is not with their belongings, the property is unattended, and the City can and does seize these items.

**Processing of Encampments**

104.    Once LA Sanitation seizes property, they search and sort through the items they have seized, which they refer to as "processing" an encampment.  In 2018, LA Sanitation teams processed over 5,000 tents and encampments through rapid responses and almost 4,000 tents and encampments through noticed cleanups.

105.    When LA Sanitation processes a tent or an encampment, sanitation workers take apart the encampment and decide which items will be immediately discarded and which items will be sent to storage.  Although LAMC 56.11 and the 56.11 Protocols state that the City will store the items it seizes, in reality, and consistent with official policy, practice, and custom, the City destroys nearly every item it comes in contact with during the course of "processing" an encampment.

106.    In the fourth quarter of 2018, LA Sanitation teams "processed" 2,283 encampments through rapid responses.  Out of these over 2,000 encampments that were processed by the City, the City sent only 155 bags of property to storage.  In contrast, LA Sanitation collected and disposed of 476 tons of "debris" from these encampments.  For every bag these teams sent to storage, the City threw away nearly three tons of debris.  Included in these 476 tons of debris were tents, blankets, items stored in containers deemed "bulky," and countless other personal items used by individuals to survive on the streets of Los Angeles.

107.    On information and belief, the City justifies the destruction of these belongings on the ground that the items it destroys are either "bulky" or constitute an "immediate threat to the health and safety of the public," either of which, pursuant to LAMC 56.11, results in an item being immediately destroyed.  However, because the City's definitions of what constitutes a Bulky Item or an "immediate threat to the health and safety of the public" are overbroad and vague, when processing an encampment, LA Sanitation exercises unfettered discretion to throw away everything

SECOND AMENDED COMPLAINT

it comes in contact with. Items ranging from household cleaning supplies to batteries are considered "an immediate threat" to public health. This definition is frequently interpreted to include items that are simply dirty, "smelly," or even stained.

108. In fact, the City has a policy, custom, and practice of throwing away any item it determines should not be stored by the City.

109. This includes throwing away any item that is wet, because the City is concerned that these items may become moldy in storage. City workers routinely throw away items that contain food, including closed containers and non-perishable food. They will also dispose of clothing, blankets, tents and other items that have stains, are dirty, or have signs of spills on them, because LA Sanitation alleges these items cannot be stored.

110. LA Sanitation will seize and destroy entire encampments based on the presence of one or two items the City determines are "contaminated," regardless of whether the rest of the items are also "contaminated." If LA Sanitation determines an item is "contaminated," this will cause the entire bag, tent, or even encampment to be thrown away.

111. LA Sanitation also sorts through the property in such a way as to cause the very conditions it uses to justify the destruction of property. In the course of "processing" tents and encampments, LA Sanitation workers will tear or rip tents, break items, or spill containers with liquid, and then justify the destruction of property on the basis of these tears, rips, or spilled liquids.

112. LA Sanitation has a custom and practice of throwing away furniture, regardless of the type of material it is made of or the size of the item. Items that are routinely thrown away include chairs that people use to sit on at their encampments, tables, and other small pieces of furniture.

113. Consistent with LA Sanitation custom and practice, containers are also routinely thrown away, along with bags and other luggage, without the contents being sorted or, often, without the containers even being opened. As a result, LA Sanitation

routinely throws away items like medications, important documents, and identification cards, as well as items individuals need to survive on the streets, such as tents, blankets, clothing, and personal hygiene supplies.

**Due Process**

114.  Individuals who have lost and continue to lose personal items pursuant to these policies and practices are given no notice or opportunity to be heard when their belongings are taken and often, immediately destroyed.  They receive no notice of the rapid responses and no notice of the basis for the seizure or destruction of their belongings or even, the fact of the destruction.  And they are given no opportunity to challenge the determination that their belongings can be seized, let alone the determination that these items can be immediately destroyed.

115.  When LA Sanitation conducts a rapid response and seizes and then processes an encampment, the City provides no notice prior to the seizure of property.

116.  LA Sanitation provides post-deprivation notice only when LA Sanitation actually sends items from that encampment to storage.  When that occurs, the City will leave a notice taped to a wall, fence, or tree, indicating that items have been stored.  The notice provides contradictory information about where the information may be stored, and instructs individuals to call a facility in Skid Row to locate their belongings.

117.  The notice that is provided is intended only to inform an individual that belongings have been stored and that the owner can contact the storage facility about their belongings.  The notice does not provide an inventory of the items that were seized, let alone why they were seized.

118.  When items are summarily destroyed, rather than stored, the City provides absolutely no information about the items it destroyed.

119.  When every item in an encampment is destroyed and nothing is sent to storage, which is a frequent occurrence, the City does not leave any notice that a rapid response has occurred, let alone notice that items were seized and destroyed or why.

120.    As such, individuals routinely return from work, an appointment with a housing provider, a medical appointment, or simply a trip to the bathroom, to discover that everything they own is gone.  If they are lucky, a neighbor may have been present and can tell them that the City seized and destroyed their belongings.  If no one was present for the rapid response, individuals have no way of knowing what happened to their belongings, let alone an opportunity to contest the seizure or destruction.

121.    Even when an individual is present when their encampment is being "processed," there is no mechanism for them to contest the on-the-spot determination by LA Sanitation that their belongings will be seized or destroyed.  Pursuant to LAMC 56.11(10), individuals challenging the seizure of their property and those unwilling to cooperate with the seizure or destruction of their belongings can be fined $1,000.00 or face six months in jail, and LAPD officers are available to arrest anyone who interferes with LA Sanitation.  As a result, individuals are forced to stand and watch as their belongings are sorted and, in almost every instance, compacted in the back of a trash truck.  Those items are then disposed of in a local landfill.

122.    Individuals are left with no recourse whatsoever when this occurs.

123.    These enforcement actions are taken nearly every day in the City of Los Angeles.  As a result of the City's funding allocation in July 2019, the number of enforcement actions taken pursuant to LAMC 56.11 will only increase in the coming months.

## INDIVIDUAL PLAINTIFFS' ALLEGATIONS

**JANET GARCIA**

124.    Ms. Garcia lives near the Metro Orange line in the Van Nuys neighborhood of Los Angeles.  She has lived there for approximately two years, since she was evicted from her apartment just up the street from where she now lives.

125.    At the time the lawsuit was filed in July 2019, Ms. Garcia was staying near the intersection of Aetna Street and Tyrone Avenue, an industrial area bounded on one side by the Orange line bus line and on the other side by a Los Angeles

Department of Water and Power plant. She stays in the area because a number of other people who are experiencing homelessness live in the area, and it is relatively out of the way. Ms. Garcia originally shared a living area with her boyfriend, David, who had a tent directly next to Ms. Garcia's tent.

126. Ms. Garcia works as a domestic cleaner, finding jobs through online postings and word of mouth. Ms. Garcia must maintain her own cleaning supplies to bring with her to her jobs. Ms. Garcia does not have a car and travels to these jobs on her bicycle. David is good at fixing bikes and fixes bikes for people in the neighborhood, so Ms. Garcia and David keep various tools and bike parts to make the necessary repairs to Ms. Garcia's and others' bikes.

127. On the morning of January 29, 2019 at approximately 8:30 a.m., LA Sanitation and LAPD were deployed to the encampment to conduct a rapid response. On information and belief, this rapid response was planned in advance and was part of a multi-day cleanup at the encampment. It was not, however, conducted pursuant to the comprehensive cleanup protocols which would have required notice of the cleanup. Instead, because it was conducted as a rapid response, residents of the encampment were not provided any notice that it would be occurring that day.

128. At the time LA Sanitation and LAPD arrived that morning, Ms. Garcia had stepped away from her tent to get ready for work. At no point prior to leaving that morning had Ms. Garcia received notice that a street cleaning was imminent. There were no notices posted in the nearby area. Rather, on information and belief, two LAPD officers deployed as part of the cleanup crew began knocking on tents that morning, telling individuals that they had only 15 minutes to pack up their belongings. Individuals who happened to be gone in this narrow 15-minute window, like Ms. Garcia, had no opportunity to pack up their belongings.

129. While Ms. Garcia was gone, LA Sanitation workers began "processing" her tent and all of her belongings. David was present with Ms. Garcia's tent and attempted to explain to the LAPD officers that Ms. Garcia would be returning shortly.

He also attempted to move Ms. Garcia's belongings, but he was prevented from doing so.

130.     When Ms. Garcia returned, she found several sanitation workers rummaging through her tent and saw that some of her belongings were loaded into the basket of the garbage truck.  Before she had left to get ready for work, her belongings had been packed in bags and a trunk; when she came back, these items were strewn about and were being thrown into the garbage truck.

131.     Ms. Garcia attempted to tell officers that the tent and belongings were her property and she could remove them, but she was not permitted to take any of her belongings.  She was simply told that her time was up.  Because Ms. Garcia had previously seen officers detain individuals were trying to gather their belongings during the cleanups, she feared she would be arrested if she protested any further. Running late to her job that day and not being able to remove any of her belongings, Ms. Garcia left.  She simply could not watch her belongings being so carelessly thrown away and discarded.

132.     Ms. Garcia lost all of her belongings that day.  She had purchased brand new cleaning supplies the day before, which she needed for the job she had booked. On information and belief, these cleaning supplies were thrown away because, pursuant to the 56.11 Protocols, these items were deemed "hazards" and pursuant to LAMC 56.11, could be summarily destroyed as "an immediate threat to the health and safety of the public."

133.     Among the items that were thrown away that day was a small, portable "Shark" vacuum cleaner, a powerful vacuum Ms. Garcia lovingly referred to as her "baby shark," which she took with her to her various cleaning jobs.  Ms. Garcia also lost other electronics.  David informed LAPD that one of the baskets they had taken and loaded into the garbage truck had a laptop, but he was ignored and the laptop was destroyed.  Moreover, Ms. Garcia lost her clothes, shoes, blankets, bike repair tools, and her tent.  She was not provided any notice about the cleanup before it occurred,

SECOND AMENDED COMPLAINT

1    and after her belongings were destroyed, she received no notice about the destruction,

2    let alone an opportunity to challenge LA Sanitation's determinations about her

3    belongings.

4         134.    After the rapid response on January 29, 2019, Ms. Garcia struggled to

5    replace her belongings, only to lose many of the items again on April 29, 2019.  That

6    time, LA Sanitation and law enforcement returned to the encampment as part of a

7    noticed cleanup.  Ms. Garcia's neighbors had asked her to watch their belongings so

8    they could go with outreach workers—one to sign up for unemployment benefits, and

9    the other to obtain a new identification card.  While they were gone. LA Sanitation

10   came to conduct the cleanup.  Ms. Garcia attempted to move both her belongings and

11   her neighbors' belongings during the allotted time, but was unable to do so, and many

12   of her belongings and her neighbors' belongings were seized and destroyed.

13        135.    Ms. Garcia's belongings were once again taken and destroyed during a

14   comprehensive cleanup by LA Sanitation on August 14, 2019.

15        136.    On August 14, 2019, Ms. Garcia was staying on Cedros St., just north of

16   Bessemer, near where she had previously resided on Aetna St. near Tyrone Ave.

17        137.    On or about August 12, 2019, LA Sanitation posted notices on Bessemer

18   St. and Cedros, indicating that there would be a major cleaning on August 14, 2019.

19   The notices did not indicate the area or address that was to be cleaned; instead, the

20   notices just indicated that a cleanup would occur at that location.

21        138.    On information and belief, the cleanup was scheduled for Cedros and

22   Bessemer. These notices were posted all along Cedros Avenue, between Bessemer and

23   Calvert St., which is the next cross street north of Bessemer.  The notices blanketed

24   Cedros Avenue, but on information and belief, no notices were posted on Calvert

25   Street, east of Cedros.

26        139.    On the morning of August 14, 2019, Ms. Garcia was scheduled to work,

27   so she got up early to pack up her belongings and move them out of the area noticed

28   for the cleanup.  She packed up her belongings before 6:30 AM that morning and

moved them to Calvert, approximately 1,000 feet east of Cedros Avenue. This was a significant distance—roughly an entire city block—from the posted notices for the cleanup.

140. The area where she moved her belongings was clean and free of debris and trash. There were also no unhoused residents or encampments on Calvert Street. Based on past experiences with cleanups, the cleanups were conducted in areas where unhoused residents stayed. As such, Ms. Garcia understood that she had followed the instructions on the notices and moved her belongings outside the cleanup area. She then left for work.

141. While she was gone for the day, LA Sanitation conducted the comprehensive cleanup on Bessemer and Cedros. However, without notice, LA Sanitation extended the area of the comprehensive cleanup to include Calvert, east of Cedros, where Ms. Garcia had moved her belongings. LA Sanitation seized and immediately destroyed all of Ms. Garcia's belongings, including her tent, her clothing, her blankets, and the cleaning supplies that she had not needed to take with her to her cleaning job.

142. LA Sanitation did not leave any posted notices indicating that her belongings had been seized and stored, or that they had been destroyed or why.

143. When Ms. Garcia returned from work after 4 PM, she discovered that all of her belongings were gone. Ms. Garcia had nothing left except her purse and bicycle and the clothes she was wearing that day. The night of the cleanup, Ms. Garcia was forced to sleep on the street with no protection besides a blanket she was able to borrow from a friend. She had difficulty sleeping as it was uncomfortable, and she was exposed to the elements. She felt extremely vulnerable sleeping with just a blanket and no tent.

144. Following the cleanup, Ms. Garcia attempted to contact the City to find out if her items had been stored. Because she returned after 4:00 p.m. on August 14, it was too late to contact the City.

SECOND AMENDED COMPLAINT

145.    On August 15, 2019, she called the telephone number listed on the notice for the cleanup that had been posted on Cedros.  The person she spoke to informed her that any property that had been seized and retained by LA Sanitation during the comprehensive cleanup would not even be logged in for another three or four days. He indicated that he took down her name and number and that he would call her back and let her know if they had stored any property from that location.  To date, he has not called Ms. Garcia back.  She has made other attempts to locate any of her belongings that might have been saved, but they have never returned her call.

146.    After the cleanup, Ms. Garcia spoke to a neighbor who had been present at the cleanup, and he indicated that her belongings had been destroyed by LA Sanitation.

147.    Ms. Garcia has also lost property at the hands of the City on other occasions. Each time Ms. Garcia's encampment is "processed" and her belongings are thrown away, she has to rebuild—find a new tent, blankets, and clothing, replace her ID, and buy new cleaning supplies.

148.    Each time Ms. Garcia loses the process of having to repeatedly replace the items she needs to survive on the streets takes a toll on Ms. Garcia, but she has no way to avoid losing her property at the hands of the City.

149.    Because she works, she cannot stay with her belongings all day long, yet she cannot plan for or anticipate the cleanups.  As a result, Ms. Garcia has lost cleaning jobs because she has had to suddenly move her belongings out of the way of the cleanup.  And when she does leave for a cleaning job, she has no way of knowing whether her property will still be there when she returns from work.  These sweeps leave her feeling that she has an impossible choice:  either lose her job or lose all of her belongings.

150.    Claims were timely filed with the City pursuant to California Government Code Section 910 *et seq* on July 26, 2019 and September 5, 2019.  Therefore, Ms. Garcia has exhausted her administrative remedies.

## JANE ZEPEDA AND MIRIAM ZAMORA

151.    Plaintiffs Jane Zepeda and Miriam Zamora are homeless and live in the Koreatown neighborhood of Los Angeles.

152.    Both Ms. Zepeda and Ms. Zamora have lived in Los Angeles most of their lives and have family here.  Until February 5, 2019, Ms. Zepeda and Ms. Zamora lived in an apartment in Koreatown.  The family was evicted and has been living on the streets of Koreatown near their old apartment ever since.

153.    Currently, Ms. Zepeda and Ms. Zamora stay in a tent on a residential street, and they did so at all times relevant to this complaint.  Since they have become homeless, it has been difficult for Ms. Zepeda and Ms. Zamora to find work.  Without any steady income, Ms. Zepeda and Ms. Zamora have been unable to find an apartment that is affordable anywhere in Los Angeles, so they remain in Koreatown because it is the neighborhood where they have lived for years, and it is close to a support system of friends, family members, and neighbors who help look after them. Ms. Zepeda's uncle also lives in a tent close by, and they are able to visit with him frequently.

154.    Living on the streets, they have limited access to restrooms, and there are no dumpsters or trashcans near where they stay.  Ms. Zepeda and Ms. Zamora attempt to keep their area as clean as possible, including cleaning up trash left on the sidewalk by other people who walk by and dump trash where they are living.  They do laundry at a laundromat one block away to keep their clothing clean.

155.    On March 21, 2019, Ms. Zamora and Ms. Zepeda were living near the northeast corner of 6th and Ardmore, along with other people experiencing homelessness.  There were approximately five other tents on their block, including the tent belonging to Ms. Zepeda's uncle.  They chose that spot because the sidewalk is wide, and it was easy to ensure they were not blocking the sidewalks.  It is also one of the few locations where there is shade in the area.

///

SECOND AMENDED COMPLAINT

156.    On the morning of March 21, 2019, LA Sanitation and LAPD arrived to conduct an unnoticed rapid response.

157.    When LAPD and LA Sanitation arrived, they handed Ms. Zepeda and Ms. Zamora a single clear trash bag.  They were instructed that they could take only what they could fit in the bag.  Anything else would be destroyed.

158.    Ms. Zepeda and Ms. Zamora worked frantically to fit their belongings into the single trash bag in the allotted time.  Because they had only 15 minutes, all they could do was shove what they could grab into the bag, which was quickly filled with two sleeping bags and some blankets.

159.    Among the belongings Ms. Zepeda and Ms. Zamora had with them on the street was a wooden chest that was approximately two feet by three feet by two feet. Inside the chest, they kept personal hygiene items, electronics, and important documents, like their social security cards, birth certificates, Ms. Zepeda's identification card, and documents related to Ms. Zamora's family.  The chest was in good condition, and it kept their personal items safe and clean.

160.    The chest would not have fit in the trash bag with their bedding, and even on its own, it likely would have ripped the bag, so Ms. Zepeda and Ms. Zamora attempted to take out the contents of the chest and move them into the trash bag.  They managed to fit some hygiene items and electronics into the bag, but before they could grab the remaining items from the chest, they were instructed that their time was up. Ms. Zepeda and Ms. Zamora were forced to leave the rest of the contents of the chest and all of their other belongings behind.

161.    Thereafter, LAPD officers put yellow caution tape up around the area.

162.    Ms. Zepeda and Ms. Zamora watched as sanitation workers pulled items from their tent and threw them into the back of a garbage truck.  Among the items that were destroyed was their wooden chest.

163.    A few minutes later, Ms. Zepeda and Ms. Zamora witnessed sanitation workers throw their tent and the rest of their belongings into the back of the garbage

truck, including the chest, tarps they used to protect themselves and their belongings from the rain, their tent, other blankets, and some of their clothing.

164.     All of the items that were thrown away were clean and in good condition. The tent was less than seven weeks old.  The blankets had been regularly laundered, as had their clothing.  Before it was thrown in the back of the trash truck and crushed, the wooden chest was clean and sturdy.

165.     Ms. Zepeda and Ms. Zamora had no warning prior to LA Sanitation's arrival that that such an action would occur.  Upon information and belief, the City gave no advance notice, written or otherwise, to the residents at 6th and Ardmore prior to the March 21, 2019 cleanup.

166.     Nor were Ms. Zepeda and Ms. Zamora provided any notice regarding their belongings after the action was completed.  They were not given an inventory of any of the items that were destroyed or a justification for their destruction.  Instead, after LA Sanitation finished crushing their belongings, LA Sanitation simply drove away.

167.     Because their tent was destroyed, Ms. Zepeda and Ms. Zamora had to share a small tent with Ms. Zepeda's uncle, who also lost his bedding during the same rapid response.  On or about March 28, 2019, a member of Ktown for All provided Ms. Zepeda and Ms. Zamora with a new tent.  Other items like Ms. Zepeda's identification, have been much more difficult to replace.

168.     After a second sweep in the same area a few days later, Ms. Zepeda and Ms. Zamora moved a few blocks away to Fifth Street and Harvard Blvd., where they continued to experience rapid responses by the City.

169.     On or about June 11, 2019, while they were staying on Fifth St. and Harvard, LA Sanitation once again threw Ms. Zepeda and Ms. Zamora's tent and its contents into a garbage truck.

170.     Among the belongings that were thrown away were freshly cleaned clothing and a mirror that LA Sanitation workers broke while processing their tent.  As

SECOND AMENDED COMPLAINT

a part of the June 11 rapid response, LA Sanitation workers also threw out items that Ms. Zepeda and Ms. Zamora kept just outside of their tent including tools they use to repair bikes, hygiene items, canned food, and cleaning supplies and tools that they used to keep their area clean.

171.    As a result of these actions, Ms. Zamora and Ms. Zepeda have had a difficult time leaving the place where they live.  One of them tries to stay with their belongings at all times, but this also means that Ms. Zepeda and Ms. Zamora are exposed to the elements—first the rain in May and now the heat.  This has made it difficult to look for work.  In addition, even if they do find work, they are concerned that they will lose their work uniforms or equipment in the next unannounced cleanup.  All of this makes it difficult for them to even imagine moving out of homelessness.

172.    Claims were timely filed with the City pursuant to California Government Code Section 910 *et seq* on August 23, 2019.  Therefore, Ms. Zepeda and Ms. Zamora have exhausted their administrative remedies.

**ALI EL-BEY**

173.    Ali El-Bey has been homeless for approximately four years and currently stays in the Koreatown neighborhood of Los Angeles.  He does not stay in one particular location for long, because he experiences frequent harassment from neighbors and law enforcement officers.  He also suffers from mental health issues, and does not like to be around other people.  As a result, he moves from location to location, but generally stays within the boundaries of Koreatown.

174.    On or about January 10, 2019, Mr. El-Bey was staying on the corner of 6th and Alexandria.  He has been staying there for approximately four to five days prior to January 10, 2019.  He had a tent, which was wet because he had washed it the day before, and it had not dried, but it was otherwise in good condition and clean, and his belongings were packed inside the tent.

175.    That morning, several LAPD patrol cars began circling the block.  The officers did not make any announcements or provide warnings about an imminent

cleanup in the area.  Nevertheless, the patrol cars were soon followed by an LA Sanitation truck, which parked near Mr. El-Bey.

176.    Two LAPD officers, Defendants Does 1 and 2, approached Mr. El-Bey and instructed him that he would need to pack up his belongings and that he had ten minutes to do so.

177.    The officers did not inform Mr. El-Bey why he needed to move his belongings from their present location or where he was expected to go; they simply instructed him to pack up and move.

178.    Mr. El-Bey struggled to pack up his belongings into a suitcase and a cart, in an attempt to comply with the officers' orders in the allotted time.  A passer-by stopped to help Mr. El-Bey move some of his belongings.

179.    After ten minutes, the officers, Does 1 and 2, informed Mr. El-Bey that his time was up.  Mr. El-Bey was not permitted to pack up his tent or the remainder of the items in the tent, including his medication, government-issued identification card, clothing, and blankets.

180.    When he requested additional time to remove his ID, medication, and his tent, one of the LAPD officers threatened Mr. El-Bey with arrest.

181.    After Mr. El-Bey was informed he could not retrieve his tent or any additional items, sanitation workers (Does 3-7) packed up his tent with the remainder of his belongings inside, and threw it into the back of the garbage truck.

182.    When it was destroyed, Mr. El-Bey's tent was clean and in good condition, but it was wet because he had cleaned it the day before and it had not yet dried.  On information and belief, the tent was destroyed because it was wet and therefore could potentially become moldy if it was stored by the City.  Because it was determined that the tent could not be stored, Mr. El-Bey had to watch LA Sanitation workers throw the tent into a garbage truck.  Neither the LAPD officers nor the sanitation workers offered to store Mr. El-Bey's property; they simply threw all of his belongings into the trash.

183. Along with his tent, Mr. El-Bey lost his state-issued ID, prescription medications for mental health treatment, health services card, social security card, information concerning obtaining welfare benefits, blankets, clothes, and shoes.

184. This is not the first or last time Mr. El-Bey has lost his belongings due to enforcement of LAMC 56.11. On or about June 4, 2019, Mr. El-Bey was staying near the intersection of Oakwood and Western in Koreatown. That morning, he put his tent down and left most of his belongings on the sidewalk while he went across the street to do laundry in a laundromat. While he was doing laundry, Mr. El-Bey saw LA Sanitation workers throwing his belongings into a garbage truck.

185. When Mr. El-Bey saw sanitation workers going through his belongings, he attempted to save some of what remained.

186. Mr. El-Bey was told that his belongings were being taken because they had been left unsupervised and that they had to throw his property away for "safety" reasons. Uniformed police officers were also present during this clean up and were present for this interaction.

187. LA Sanitation ultimately allowed him to keep some of what had not yet been thrown out, but sanitation workers took and destroyed the poles from Mr. El-Bey's tent, several carts and the contents of those carts.

188. Mr. El-Bey used the carts to help him move his belongings from location to location, and the bag that was thrown away contained his medication, shoes, and some blankets.

189. When LA Sanitation seized the items from Mr. El-Bey, they did not measure the items before or after seizing the items, and they did not provide Mr. El-Bey any documentation regarding the items that were taken and destroyed.

190. Plaintiffs do not currently know the identity of the officers and sanitation workers listed above as Does 1-7.

///

///

191.    Claims were timely filed with the City pursuant to California Government Code Section 910 *et seq* on July 9, 2019 and September 13, 2019.  Therefore, Mr. Al-Bey has exhausted his administrative remedies.

**JAMES HAUGABROOK**

192.    James Haugabrook is a 50 year old resident of the South Central neighborhood of Los Angeles, where he grew up and has spent most of his life.  Mr. Haugabrook is a veteran of the United States military.  He has been homeless and lived on the streets for the past two years.

193.    For the past four to six months, Mr. Haugabrook has stayed on Figueroa St., between 53rd St. and 52nd Place, which is approximately a block away from the 110 freeway in South Los Angeles.  He stays in this location because the sidewalk is wide, and he is able to keep his belongings out of the way of pedestrians.  It is also shaded and next to an empty lot owned by the City, and it is quieter than other areas where he has stayed in the past.  Mr. Haugabrook works hard to keep his area neat and clean.

194.    Despite his efforts to keep the area clean and sidewalks passable, Mr. Haugabrook has repeatedly been subjected to a number of rapid responses by LA Sanitation and the LAPD, resulting in the loss of many of his belongings.

195.    On or about March 2019, LA Sanitation and LAPD came to Mr. Haugabrook's tent to conduct a rapid response.

196.    Mr. Haugabrook had no advance notice that they would be conducting the cleanup that day.

197.    When LA Sanitation and LAPD arrived on the scene, they gave Mr. Haugabrook a trash bag and told him he had 15 minutes to pack his belongings and move them out of the way.

198.    While Mr. Haugabrook was still in the process of packing up his belongings, LA Sanitation began processing the encampment and throwing away his belongings.  Among the items that LA Sanitation threw away was a backpack, which contained medication and other items he needed to survive.

199.    About a month later, Mr. Haugabrook was with his belongings when LA Sanitation came to his tent.  This time, they were there to collect Bulky Items.

200.    Mr. Haugabrook had a small plastic lawn chair that he sat in during the day and a second dining room chair in his tent.  LA Sanitation confiscated both chairs as Bulky Items. LA Sanitation workers did not measure the items before or after they seized the items, nor did they provide Mr. Haugabrook any further explanation why the chairs were considered Bulky Items.  At the time the items were confiscated, Mr. Haugabrook was unaware that the items would be considered Bulky Items.

201.    Although Mr. Haugabrook needed the chairs to rest during the day and he did not agree with the determination that the items were "bulky," he did not fight with the sanitation workers because he did not want to get arrested for refusing to cooperate with city workers.

202.    After LA Sanitation seized the chairs, they did not provide Mr. Haugabrook any documentation regarding the seizure of his belongings.  The workers simply threw the items away.

203.    On yet another occasion, Mr. Haugabrook had left his belongings for a short period of time.  When he returned, all of his belongings, including his tent and other items were gone. His neighbors had been present for the cleanup and informed him that city workers threw his belongings in the back of a garbage truck.

204.    Following the sweep, there was a notice posted nearby, indicating that the City had seized and stored some items in a storage facility in downtown Los Angeles, but the notice had no information about what items were stored.

205.    Mr. Haugabrook did not have a reliable phone to call the number to find out if any of the items that had been stored were his, and he did not have reliable way to go to addresses located on the notices to see if his belongings were there, or to bring his belongings back if the City had stored them.  As a result, he was not able to contact the City to determine if any of his belongings were stored, and he lost all of his belongings.

SECOND AMENDED COMPLAINT

206.    Since LA Sanitation took his tent, Mr. Haugabrook has not had a proper tent to use as shelter.  He has only the canvas from another tent that someone gave him, which lacks proper tent poles.  Therefore, he has to tie the canvas to the fence and prop the rest of it up with items he has found on the street.  On at least one occasion, LA Sanitation has seized the items he has used to prop up the tent because the items were "bulky."

207.    The constant threat of rapid responses makes it difficult for Mr. Haugabrook to leave his belongings during the day.  On or about June 24, 2019, LA Sanitation conducted another unannounced rapid response where Mr. Haugabrook lives.  This time, Mr. Haugabrook was present, and LA Sanitation did not seize his belongings.  However, his neighbors were not present, and LA Sanitation seized and destroyed all of their belongings, even though Mr. Haugabrook was present and knew who owned the belongings.

208.    Knowing that he could lose his belongings at any time has made it difficult for Mr. Haugabrook to leave his encampment.  He currently has a Section 8 voucher, issued by the Housing Authority.  Finding a landlord to accept the voucher is already incredibly difficult, but because of the sweeps and the need to stay with his belongings, Mr. Haugabrook has found it even more difficult to search for an apartment that will accept the voucher.  He is constantly concerned that he will leave and return to find that all of his belongings have been taken and destroyed.

209.    Claims were timely filed with the City pursuant to California Government Code Section 910 *et seq* on August 23, 2019.  Therefore, Mr. Haugabrook has exhausted his administrative remedies.

**PETE DIOCSON JR.**

210.    Pete Diocson Jr. was born and raised in Carson, California and at all times relevant to this complaint, lived in the Harbor City area of Los Angeles, where he had been staying for the past four or five years.

///

211.    On April 24, 2019, the City conducted a noticed cleanup of a homeless encampment on Lomita and McCoy in the Harbor City neighborhood of Los Angeles.

212.    That morning, Mr. Diocson was at the encampment and was aware that a cleanup would be taking place that day.  In anticipation of the cleanup, Mr. Diocson had brought his dog Bella to stay with his ex-girlfriend, who does not live in the encampment.  He knew that cleanups could be extremely chaotic, and he was worried that Bella would be scared by all the commotion.

213.    On the morning of the cleanup, Mr. Diocson packed up his belongings to move out of the area, including his tent and other possessions.  Among his belongings was a medium-sized wire kennel for Bella, which he kept in his tent and used to keep her secure at night.

214.    As Mr. Diocson attempted to remove his belongings from the area, including Bella's kennel, he was stopped by LAPD Officer Lopez, who, on information and belief, is a member of the South HOPE team.  Officer Lopez informed Mr. Diocson that Bella's kennel was a Bulky Item, and that he could not take it with him.  He had to leave it behind.

215.    Although Mr. Diocson did not realize that the kennel would be considered a Bulky Item or agree with the determination that it was a Bulky Item, he was afraid to challenge the LAPD officer.  Mr. Diocson had seen other individuals arrested by LAPD officers when they tried to challenge sanitation workers' determinations about what items would be thrown away.  Because he feared arrest, he left the kennel behind.  He moved around the corner with the rest of his neighbors to wait for the cleanup to finish.

216.    Approximately two hours later, the kennel was crushed by an LA Sanitation bulldozer and thrown away.

217.    After Mr. Diocson's kennel for Bella was taken and destroyed, he was constantly worried that Bella would get loose and run into traffic.  He had difficulty sleeping because he did not have the peace of mind he had when Bella was secure in

the kennel at night. A friend helped him get another kennel to replace the one that was taken, but he now he is worried that this one will be taken and destroyed as well.

218. Claims were timely filed with the City pursuant to California Government Code Section 910 *et seq* on August 23, 2019. Therefore, Mr. Dioscon has exhausted his administrative remedies.

**MARQUIS ASHLEY**

219. Marquis Ashley is an unhoused resident of the Harbor City neighborhood of Los Angeles. He has lived in and around Harbor City for most of his life. He currently lives at the homeless encampment on Lomita Boulevard. Mr. Ashley is creative and likes to work with his hands. He is currently going to welding school, and he hopes that this will help him get a job and permanent housing. During his spare time, he often finds items that have been discarded and repurposes them into useful items to use on the street. For example, he has made carts to move his belongings. Mr. Ashley constructed one cart out of old found objects and wheelchair wheels, and he attached it to his bicycle to help him move his belongings.

220. On May 21, 2019, LA Sanitation conducted a noticed cleanup at Lomita and McCoy in Harbor City.

221. Although Mr. Ashley was present at the encampment that morning, he did not see any signs indicating that the cleanup would take place that day, so he was unaware that LA Sanitation would be conducting the cleanup.

222. When LA Sanitation arrived, sanitation workers and LAPD officers gave residents a short window of time to pack up their belongings and move from the area.

223. A sanitation worker gave Mr. Ashley a trash bag for his belongings, which he filled up with his tent and other items he needed to survive. He was instructed to leave the area with his belongings.

224. Mr. Ashley packed up what he could fit in the trash bag and piled it onto his homemade cart. He also had another handmade cart in need of repairs, which he piled on top of his belongings.

225.     As he was attempting comply with LA Sanitation's instructions to remove his belongings from the area, a sanitation worker stopped him and informed him that the cart attached to his bicycle and the second cart were Bulky Items.  He was therefore not allowed to take them with him.

226.     Mr. Ashley was not given any explanation why the carts were considered Bulky Items.  Nor was he provided any opportunity to challenge this determination.

227.     Although Mr. Ashley did not agree that the items were "bulky," and he knew that he relied on the carts to move his belongings, he did not feel he could challenge LA Sanitation's determination.  Indeed, an LAPD officer who was present at the cleanup had informed Mr. Ashley that, if he did not want to go to jail, he would have to hurry up and move from the area.  Because Mr. Ashley did not want to go to jail and did not feel as though he could challenge the LA Sanitation worker's order to surrender the carts, he left the carts behind.  He knew from watching past cleanups that if he left the items behind, they would be destroyed.

228.     Without the cart he used to transport his belongings, Mr. Ashley was forced to drag the rest of his belongings outside of the area that had been cordoned off by LAPD officers.

229.     After LA Sanitation completed the cleanup and the LAPD officers removed the yellow caution tape, Mr. Ashley was able to drag his belongings back to the area where he lives.  His carts were nowhere to be found.

230.     Following the cleanup, Mr. Ashley managed to construct another cart similar to the ones that were seized and destroyed.  Although the cart is incredibly useful, he does not know if the cart would be considered a bulky item and is now concerned it too will be seized and destroyed as a Bulky Item.

231.     Claims were timely filed with the City pursuant to California Government Code Section 910 *et seq*. on August 23, 2019.  Therefore, Mr. Ashley has exhausted his administrative remedies.

///

SECOND AMENDED COMPLAINT

**FIRST CAUSE OF ACTION**
**Right to Be Secure From Unreasonable Seizures**
**42 U.S.C. § 1983**
**Fourth Amendment, United States Constitution**
**Art. I, § 13, California Constitution**
**(Facial Challenge)**
**(All Plaintiffs against the City of Los Angeles)**

232.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth here.

233.    As written, Section 3(h) of LAMC 56.11 permits the City to immediately seize any items the City deems "bulky."  LAMC 56.11 does not require the City to seek a warrant prior to the seizure of an item it determines is "bulky," nor must the City determine that an exception to the warrant requirement applies, such that probable cause exists to seize the item.  As such, LAMC 56.11 as written violates the United States and California Constitutions because the seizure of an item based solely on the size of the item, without a warrant or probable cause, is unreasonable and contrary to the Fourth Amendment of the U.S. Constitution, as applied to the states by the Fourteenth Amendment to the U.S. Constitution; Article 1, Section 13 of the California Constitution, and 42 U.S.C. § 1983.

234.    In addition to allowing the warrantless seizure of Bulky Items, as written, Section 3(h) of LAMC 56.11 explicitly permits the City to immediately destroy any items the City deems "bulky."  LAMC 56.11 does not require the City to seek a warrant prior to the destruction of an item it determines is "bulky," nor must the City determine that an exception to the warrant requirement applies, such that probable cause exists to immediately destroy the item.  As such, LAMC 56.11 as written violates the United States and California Constitutions because the destruction of an item based solely on the size of the item, without a warrant or probable cause, is unreasonable and contrary to the Fourth Amendment of the U.S. Constitution, as applied to the states by the Fourteenth Amendment to the U.S. Constitution; Article 1,

Section 13 of the California Constitution; and 42 U.S.C. § 1983.

235.     Further, as written, LAMC 56.11(10)(d) allows the City and its employees and agents to arrest and prosecute anyone who interferes with the seizure or destruction of an item, even though the seizure or destruction of that item may violate the Fourth Amendment of the U.S. Constitution, as applied to the states by the Fourteenth Amendment to the U.S. Constitution.  This provision, which prohibits an individual from interfering with a constitutionally impermissible seizure, is unconstitutional under the Fourth Amendment of the U.S. Constitution, as applied to the states by the Fourteenth Amendment to the U.S. Constitution; Article 1, Section 13 of the California Constitution; and 42 U.S.C. § 1983.

236.     The City has and will continue to spend municipal taxes paid by Plaintiffs into the General Fund on the enforcement of LAMC 56.11.  The City's unlawful seizure and destruction of individuals' belongings, pursuant to the unlawful provisions of LAMC 56.11, results in the increased expenditure of funds on costs associated with the disposal of these items,  But for the enforcement of this unconstitutional provision, the City would not expend the additional costs to dispose of this property.

237.     As a direct and proximate consequence of the acts of the City's agents and employees, Plaintiffs have suffered and continue to suffer injury and loss. Plaintiffs Garcia, Zepeda, Zamora, Ashley, Diocson, El Bey, and Haugabrook ("Individual Plaintiffs"), are entitled to compensatory damages for the loss of and damage to property and other injuries to their persons that resulted from the violation of their Fourth Amendment and analogous state constitutional rights. AREPS and Ktown for All ("Organizational Plaintiffs") are not seeking damages and move only for prospective relief, including injunctive and declaratory relief.

238.     All Plaintiffs are entitled to an injunction, enjoining the City from continuing to enforce this unconstitutional law.

///

///

---

51

SECOND AMENDED COMPLAINT

**SECOND CAUSE OF ACTION**
**Right to Be Secure From Unreasonable Seizures**
**42 U.S.C. § 1983**
**Fourth Amendment, United States Constitution**
**Art. I, § 13, California Constitution**
**(All Plaintiffs against the City of Los Angeles)**

239.     Plaintiffs re-allege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth here.

240.     Plaintiffs have a vested interest in their property pursuant to the U.S. and California Constitution and statutory law.  The City and its employees and agents violated Plaintiffs' constitutional right to be free from unreasonable seizure of their property by confiscating Plaintiffs' property without a warrant and without probable cause.  The City and its employees and agents further violated Plaintiffs' constitutional right to be free from unreasonable seizure when it summarily destroyed these items, without a warrant and without probable cause.  These unlawful actions were done with the specific intent to deprive Plaintiffs of their constitutional right to be secure in their property.

241.     Plaintiffs are informed and believe that the acts of the City and its employees and agents were intentional in failing to protect and preserve Plaintiffs' property and that, at a minimum, the City and its employees and agents were deliberately indifferent to the likely consequence that the property would destroyed unlawfully, even though the right at issue was well-established at the time of the seizure and destruction.

242.     The City's and its employees' and agents' actions were taken pursuant to the City's policies, patterns, and/or customs of seizing and destroying homeless individuals' property without a valid warrant or probable cause.

243.     These policies, patterns, and/or customs are unreasonable and contrary to the Fourth Amendment of the U.S. Constitution, as applied to the states by the Fourteenth Amendment to the U.S. Constitution; Article 1, Section 13 of the

SECOND AMENDED COMPLAINT

California Constitution; and 42 U.S.C. § 1983.

244.    To the extent the City and its employees and agents' actions were taken pursuant to LAMC 56.11 and the 56.11 Standard Operating Protocols, these policies and practices as applied to Plaintiffs are unreasonable and contrary to the Fourth Amendment of the U.S. Constitution, as applied to the states by the Fourteenth Amendment to the U.S. Constitution; Article 1, Section 13 of the California Constitution; and 42 U.S.C. § 1983.

245.    The City has and will continue to spend municipal taxes paid by Plaintiffs into the General Fund on the enforcement of LAMC 56.11.  The City's unlawful seizure and destruction of individuals' belongings, pursuant to the unlawful provisions of LAMC 56.11, results in the increased expenditure of funds on costs associated with the disposal of these items,  But for the enforcement of this unconstitutional provision, the City would not expend the additional costs to dispose of this property.

246.    As a direct and proximate consequence of the acts of the City and its agents and employees, Plaintiffs have suffered and continue to suffer injury and loss. Individual Plaintiffs are entitled to compensatory damages for the loss of and damage to property and other injuries to their persons that resulted from the violation of their Fourth Amendment rights. Organizational Plaintiffs are not seeking damages and seek only prospective relief, including injunctive and declaratory relief.

247.    The City continues to engage in the customs, policies, and practices that have and continue to cause harm to all Plaintiffs, who are entitled to an injunction, enjoining the City from continuing to engage in these customs, policies, and practices.

///

///

///

///

///

///

SECOND AMENDED COMPLAINT

**THIRD CAUSE OF ACTION**
**Void for Vagueness**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**(All Plaintiffs against the City of Los Angeles)[27]**

248.    Plaintiffs re-allege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth here.

249.    LAMC 56.11 is void for vagueness under the Fourteenth Amendment of the U.S. Constitution because it fails to define the terms Bulky Item with sufficient precession, which encourages and has resulted in arbitrary and discriminatory enforcement by the City against Plaintiffs.  It also fails to provide Plaintiffs with fair notice of whether their individual items are illegal for them to have with them in public spaces.

250.    LAMC 56.11 is also void for vagueness under the Fourteenth Amendment of the U.S. Constitution because the term "immediate threat to public health and safety" is vague, such that it fails to provide Plaintiffs with fair notice of what items Plaintiffs can have with them in public spaces.  The term is also so vague that it encourages and has resulted in arbitrary and discriminatory enforcement by the City against Plaintiffs.  Further, through the 56.11 Protocols, Defendant has defined the term "immediate threat to the health and safety of the public" so broadly as to render the phrase meaningless, leaving officers with unfettered discretion to enforce the ordinance, resulting in arbitrary and discriminatory enforcement by the City against Plaintiffs.  It also fails to provide Plaintiffs with fair notice of what items Plaintiffs cannot legally have with them in public spaces.

---

[27] Plaintiffs understand that the Court dismissed this cause of action without leave to amend.  Dkt. 36 at 20.  As such, this cause of action is no longer part of this litigation.  Nonetheless, Plaintiffs are including this cause of action in the Second Amended Complaint to preserve all rights.

251.    Relying on the vague ordinance, the City has seized Plaintiffs' property and in many instances alleged herein, immediately destroyed their property.

252.    Plaintiffs fear arrest if they interfere or even protest the arbitrary decision-making by the City regarding their personal property, even though these decisions have and will continue to result in the permanent loss of these items.

253.    The City has and will continue to spend municipal taxes paid by Plaintiffs into the General Fund on the enforcement of LAMC 56.11.

254.    As a direct and proximate consequence of the acts of the City and its agents and employees, Plaintiffs have suffered and continue to suffer injury and loss. Plaintiffs are entitled to compensatory damages for the loss of and damage to property and other injuries to their persons that resulted from the violation of their Fourteenth Amendment rights.

**FOURTH CAUSE OF ACTION**
**Right to Due Process of Law**
**42 U.S.C. § 1983**
**Fourteenth Amendment, United States Constitution**
**Art. I, § 7(a), California Constitution**
**(Facial Challenge)**
**(Individual Plaintiffs and Ktown for All against the City of Los Angeles)**

255.    Plaintiffs re-allege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth here.

256.    As written, Section 3(h) of LAMC 56.11 permits the City to immediately seize any items the City deems "bulky."  LAMC 56.11 does not require the City to provide any notice or opportunity to be heard before or after the items are seized.  The provision also allows the City to permanently deprive Plaintiffs of their property by immediately destroying their belongings without any notice or opportunity to be heard.  As such, LAMC 56.11 as written violates the United States Constitution because the seizure and destruction of an item without any due process, including adequate notice and an opportunity to be heard, violates the Fourteenth Amendment to

the U.S. Constitution; Article 1, Sections 1 and 7(a) of the California Constitution; and 42 U.S.C. § 1983.

257.    As a direct and proximate consequence of the acts of the City's agents and employees, Plaintiffs have suffered and continue to suffer injury and loss. Individual Plaintiffs are entitled to compensatory damages for the loss of and damage to property and other injuries to their persons that resulted from the violation of their Fourteenth Amendment rights.   Ktown for All is not seeking damages and moves only for prospective relief, including injunctive and declaratory relief.

258.    Individual Plaintiffs and Ktown for All are entitled to an injunction, enjoining the City from continuing to enforce this unconstitutional law.

## FIFTH CAUSE OF ACTION
### Right to Due Process of Law
### 42 U.S.C. § 1983
### Fourteenth Amendment of the United States Constitution
### Art. I, §§ 1 and 7(a) of the California Constitution
### (Individual Plaintiffs and Ktown for All against the City of Los Angeles)

259.    Plaintiffs re-allege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth here.

260.    Plaintiffs have a vested interest in their property pursuant to the U.S. and California Constitutions and statutory law.  The City and its employees and agents violated Plaintiffs' rights under the U.S. and California Constitutions to due process of law by seizing their property without adequate notice and opportunity to be heard prior to depriving Plaintiffs of their property.  The City and its employees and agents further violated Plaintiffs' constitutional right to due process of law by destroying their property without adequate notice and opportunity to be heard prior to permanently depriving Plaintiffs of their property.  These unlawful actions were done with the specific intent to deprive Plaintiffs of their constitutional right to due process of law. ///

SECOND AMENDED COMPLAINT

261.    Plaintiffs are informed and believe that the acts of the City, and its employees and agents were intentional in failing to protect and preserve Plaintiffs' property and that, at a minimum, the City and its employees and agents were deliberately indifferent to the likely consequence that the property would be seized and destroyed unlawfully, even though the right at issue was well-established at the time.

262.    The City's and its employees' and agents' actions were taken pursuant to the City's policies, patterns and/or customs of seizing and destroying homeless individuals' property without adequate notice and opportunity to be heard prior to being deprived of their property.  These policies, patterns, and/or customs are contrary to the Fourteenth Amendment of the U.S. Constitution; Article 1, Sections 1 and 7(a) of the California Constitution; and 42 U.S.C. § 1983.

263.    To the extent the City's and its employees' and agents' actions were taken pursuant to Los Angeles Municipal Code 56.11 and the 56.11 Standard Operating Protocols, the ordinance, policies and practices, as applied to Plaintiffs, violate the Fourteenth Amendment of the U.S. Constitution; Article 1, Sections 1 and 7(a) of the California Constitution; and 42 U.S.C. § 1983.

264.    As a direct and proximate consequence of the acts of the City and its agents and employees, Plaintiffs have suffered and continue to suffer injury and loss. Individual Plaintiffs are entitled to compensatory damages for the loss of and damage to property and other injuries to their persons that resulted from the violation of their Fourteenth Amendment rights. Ktown for All is not seeking damages and moves only for prospective relief, including injunctive and declaratory relief.

265.    The City continues to engage in the customs, policies, and practices that have caused and continue to cause harm to Ktown for All and the Individual Plaintiffs, who are entitled to an injunction, enjoining the City from continuing to engage in these customs, policies, and practices.

///

Case 3:19-cv-06182-DSF-PLA Document 122-8 Filed 04/07/21 Page 69 of 409 Page ID
Case 2:19-cv-06182-DSF-PLA Document 43-1 Filed 08/12/20 Page 60 of 84 Page ID #:1733
#:7283

# SIXTH CAUSE OF ACTION
## Violation of Bane Civil Rights Act
## Ca. Civ. Code § 52.1
## (Plaintiff Ali El-Bey Against All Defendants)

266.    Plaintiff realleges and incorporates the allegations set forth in the proceeding paragraphs as though fully set forth herein.

267.    The City's agents and employees, including Defendant DOEs, have used arrests, threats of arrest and intimidation to interfere with Plaintiff's right to maintain his personal possessions, Plaintiff's right to be free from unlawful search and seizure of his possessions, and Plaintiff's right to due process as secured by the Constitution of the United States, the Constitution of the State of California (in particular Article I sections 7 and 13), and the statutory laws of the State of California.

268.    The City's agents and employees, including Defendant DOEs, acted with disregard for Plaintiff's rights, with the knowledge that these actions were unreasonable and violated Plaintiff's constitutional rights, and with the intent to violate Plaintiff's rights.

269.    The actions of the City's agents and employees, including Defendant DOEs, were taken within the scope of their employment by the City. As a direct and proximate consequence of the acts of Defendant's agents and employees, including Defendant DOES, Plaintiff has suffered and continues to suffer injury and loss.

270.    The City is liable for these actions, taken by its employees and agents, including Defendant DOEs1-10, during the course of their employment, under California Government Code Section 815.2(a).

271.    Plaintiff is entitled to statutory and compensatory damages for the loss of and damage to property, violation of constitutional and statutory rights, and other injuries to his person that resulted from the violation of his rights.

///

///

**SEVENTH CAUSE OF ACTION**
**Violation of Mandatory Statutory Duty**
**Ca. Gov't Code §815.6; Ca. Civil Code § 2080 *et seq*.**
**(Individual Plaintiffs Against the City of Los Angeles)**

272.     California Government Code Section 815.6 creates a cause of action where a public entity fails to discharge a mandatory duty imposed by an enactment.

273.     Civil Code Section 2080 *et seq*. imposes a mandatory statutory duty on public agencies and employees to maintain unattended property over which they have taken charge, for a minimum of 90 days, and for property that they have obtained from a person for temporary safekeeping, for 60 days.  The Civil Code also imposes a mandatory duty to abide by specific procedures and processes related to the storage and disposition of property.

274.     The City's policies, practices, and conduct challenged herein violated California Civil Code Section 2080 *et seq*.  The City's employees and agents took charge of Plaintiffs' property, which was not abandoned.  Rather than complying with the mandatory duty under Civil Code Section 2080 *et seq*., the City and its employees and agents destroyed the items.  The City's agents and employees failed to protect and preserve Plaintiffs' personal property as required by Civil Code 2080 *et seq*. when it was seized by Defendants from the public sidewalk; failed to provide written notice that the property would be taken and was taken; and failed to track or otherwise store the property so that it could be located on request.

275.     The failure of the City's employees and agents to comply with the mandatory duties outlined in Civil Code Section 2080 *et seq*. proximately caused Plaintiffs harm, including emotional distress, anxiety, and pain and suffering, and they are entitled to compensatory damages for those injuries as permitted by law.

///
///
///

SECOND AMENDED COMPLAINT

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray as follows:

*For Individual Plaintiffs:*

a.      Damages according to proof for the loss of Plaintiffs' property, the violation of their constitutional and statutory rights; and for pain and suffering resulting from the unlawful conduct of Defendants.

*For all Plaintiffs:*

a.      a declaratory judgment that Los Angeles Municipal Code Section 56.11 as written and as applied to Plaintiffs violates the United States and California Constitutions;

b.      a declaratory judgment that the City's policies, practices, and conduct as alleged herein, violate Plaintiffs' rights under the United States and California Constitutions;

c.      an order enjoining and restraining Defendants from engaging in the policies, practices, and conduct complained of herein, including an order enjoining and restraining the City from enforcing the challenged provisions of Los Angeles Municipal Code Section 56.11;

d.  costs of suit and attorney fees as provided by law; and

e.  all such relief as the Court deems just and proper.

Dated:  March 12, 2020                 Respectfully submitted,

LEGAL AID FOUNDATION OF LOS ANGELES


*/s/ Shayla Myers*
_____

By: Shayla Myers
*Attorneys for Plaintiffs, Gladys Zepeda, Miriam Zamora, Ali El-Bey, Pete Diocson Jr., Marquis Ashley, James Haugabrook, and Ktown for All.*

SECOND AMENDED COMPLAINT

SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP

*/s/ Catherine Sweetser*

By: Catherine Sweetser
*Attorneys for All Plaintiffs.*


KIRKLAND & ELLIS LLP


*/s/ Benjamin Allen Herbert*

By: Benjamin Allen Herbert
*Attorneys for Plaintiffs, Ktown for All, Janet Garcia, Pete Diocson Jr., Marquis Ashley, Ali El-Bey, and Association for Responsible and Equitable Public Spending.*

SECOND AMENDED COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby respectfully demand that a trial by jury be conducted with respect to all issues presented herein.

Dated:  September 23, 2019                    Respectfully submitted,

LEGAL AID FOUNDATION OF LOS ANGELES

*/s/ Shayla Myers*
_____

By: Shayla Myers
*Attorneys for Plaintiffs Gladys Zepeda, Miriam Zamora, Ali El-Bey, Pete Diocson Jr., Marquis Ashley, James Haugabrook, and Ktown for All.*

SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP

*/s/ Catherine Sweetser*
_____

By: Catherine Sweetser
*Attorneys for All Plaintiffs.*

KIRKLAND & ELLIS LLP

*/s/ Benjamin Allen Herbert*
_____

By: Benjamin Allen Herbert
*Attorneys for Plaintiffs, Ktown for All, Janet Garcia, Pete Diocson Jr., Marquis Ashley, Ali El-Bey, and Association for Responsible and Equitable Public Spending.*

EXHIBIT 28

1  MICHAEL FEUER, City Attorney
   KATHLEEN A. KENEALY, Chief Assistant City Attorney (SBN 212289)
2  SCOTT MARCUS, Senior Assistant City Attorney (SBN 184980)
   FELIX LEBRON, Deputy City Attorney (SBN 232984)
3  A. PATRICIA URSEA, Deputy City Attorney (SBN 221637)
   JESSICA MARIANI, Deputy City Attorney (SBN 280748)
4  200 N. Main Street, City Hall East, Room 675
   Los Angeles, CA 90012
5  Telephone (213) 978-7569
   Facsimile (213) 978-7011
6  Felix.Lebron@lacity.org
   Patricia.Ursea@lacity.org
7  Jessica.Mariani@lacity.org
   *Attorneys for Defendant,* CITY OF LOS ANGELES

8

9                  **UNITED STATES DISTRICT COURT**

10                 **CENTRAL DISTRICT OF CALIFORNIA**

11  | Janet Garcia, Gladys Zepeda, Miriam Zamora, | Case No.: 2:19-cv-6182-DSF-PLA |
12  | Ali El-Bey, Peter Diocson Jr., Marquis Ashley, | [Assigned to Judge Dale S. Fischer] |
    | James Haugabrook, individuals, KTOWN FOR | **CITY OF LOS ANGELES' ANSWER** |
13  | ALL, an unincorporated association, | **TO PLAINTIFFS' SECOND** |
    | ASSOCIATION FOR RESPONSIBLE AND | **AMENDED COMPLAINT** |
14  | EQUITABLE PUBLIC SPENDING an | |
15  | unincorporated association | Action Filed: July 18, 2019 |
    |              *Plaintiffs*, | SAC Filed: March 12, 2020 |
16  | | |
    |        vs. | |
17  | CITY OF LOS ANGELES, a municipal entity; | **DEMAND FOR JURY TRIAL** |
18  | DOES 1-50, | |
19  |              *Defendant(s)*. | |

20

21

22

23

24

25

26

27

28

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

Case 2:19-cv-06182-DSF-PLA   Document 122-3   Filed 04/07/21   Page 76 of 409   Page ID #:7290
Case 2:19-cv-06182-DSF-PLA   Document 72-2   Filed 07/13/20   Page 295 of 61   Page ID #:2203
#:7290

Defendant City of Los Angeles ("Defendant" or "City") hereby answers Plaintiffs' Second Amended Complaint ("SAC") as follows:

## JURISDICTION AND VENUE

1.      In response to paragraph 1, Defendant admits that this action purports to be one for injunctive relief and damages pursuant to 42 U.S.C. § 1983 based upon alleged violations of Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution.[1]  Defendant admits that this Court has jurisdiction over the federal claims alleged in the SAC pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, 42 U.S.C. § 1983, and because the SAC involves questions of federal law.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

2.      In response to paragraph 2, Defendant admits that venue is proper in the Central District because all of the events and conduct alleged in the SAC occurred in the Central District.

## PRELIMINARY STATEMENT

3.      In response to paragraph 3, Defendant admits that Los Angeles is in the midst of a homelessness crisis.  In response to Footnote 1, Defendant admits that the Los Angeles Homeless Count is a point-in-time count conducted each year throughout Los Angeles County by the Los Angeles Homeless Services Authority, which is a joint powers agency of the City and County of Los Angeles.  Defendant further admits that the point-in-time count is mandated by the U.S. Department of Housing and Urban Development.  Defendant also admits that the point-in-time count is conducted by volunteers, and that the University of Southern California has provided analysis of the point-in-time data.  Defendant states that the results of the 2019 Homeless Count are contained in a document that speaks for itself such that no response is required, and Defendant expressly denies the allegations to the extent that they are inconsistent with

---

[1] While Paragraph 1 also states that this action is based upon a violation of Plaintiffs' rights under the Fifth Amendment to the United States Constitution, the Fifth Amendment is mentioned nowhere else throughout the SAC, and thus Defendant assumes that this action is in no way based upon the Fifth Amendment.

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

1   that document.  Except as expressly admitted herein, Defendant denies each and every

2   remaining allegation.

3        4.     In response to paragraph 4, Defendant admits that the homelessness crisis

4   did not develop overnight, and that the number of people experiencing homelessness in

5   Los Angeles has increased in recent years.  Except as expressly admitted herein,

6   Defendant denies each and every remaining allegation.

7        5.     In response to paragraph 5, Defendant admits that there is a shortage of

8   affordable housing units in Los Angeles.  Defendant states that the results of the studies

9   referenced in paragraph 5, and in footnotes 2-4, are contained in documents that speak

10  for themselves such that no response is required, and Defendant expressly denies the

11  allegations to the extent that they are inconsistent with those documents.  Except as

12  expressly admitted herein, Defendant denies each and every remaining allegation.

13       6.     In response to paragraph 6, Defendant admits that it has attempted to

14  address the homelessness crisis by, among other things, facilitating, funding and

15  encouraging the construction of new housing, but that, despite the City's efforts, more

16  individuals continue to become homeless.  Defendant states that the results of the 2019

17  Homeless Count are contained in a document that speaks for itself such that no response

18  is required, and Defendant expressly denies the allegations to the extent that they are

19  inconsistent with that document.  Except as expressly admitted herein, Defendant denies

20  each and every remaining allegation.

21       7.     In response to paragraph 7, Defendant admits that there are not enough

22  emergency shelter beds in the City for all homeless individuals currently residing in the

23  City.  Defendant further admits that additional shelter beds are provided each year

24  through LAHSA's Winter Shelter program, which typically runs from November to

25  March.  Defendant states that the inventory of shelter beds conducted by LAHSA in

26  2018 is contained in a document that speaks for itself such that no response is required,

27  and Defendant expressly denies the allegations to the extent that they are inconsistent

28  with that document.  Except as expressly admitted herein, Defendant denies each and

every remaining allegation.

8.    In response to paragraph 8, Defendant admits that in 2018, it launched the A Bridge Home program to create interim housing in each of the City's 15 City Council Districts to provide additional interim housing while more permanent housing solutions, which take longer to build, were coming online.  To date, Defendant has opened 16 A Bridge Home facilities, and more are expected to open this year.  Defendant admits that, even though the A Bridge Home program has helped to substantially increase the proportion of the City's homeless population that is sheltered, it cannot currently provide housing for every individual currently experiencing homelessness in the City.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

9.    In response to paragraph 9 and the footnotes contained therein, Defendant states that the results of LAHSA's 2019 point-in-time count, and the Department of Housing and Urban Development's interpretation of those results, are contained in documents that speak for themselves such that no response is required, and Defendant expressly denies the allegations to the extent that they are inconsistent with that document.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

10.    In response to paragraph 10, Defendant admits that the number of people living in tents and makeshift encampments on the streets has increased over the past decade.  Except as expressly admitted herein, Defendant denies each and every allegation contained therein.

11.    In response to paragraph 11, Defendant admits that in 2017, the Los Angeles County Department of Public Health conducted a survey in response to concerns about Hepatitis A.  To the extent the allegations of paragraph 11 seek to characterize that survey, Defendant responds that the results of the survey are contained in a document that speaks for itself such that no response is required, and Defendant expressly denies the allegations to the extent that they are inconsistent with that document.  Defendant lacks knowledge or information sufficient to form a belief as to

3

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

1    the truth of the remaining allegations, and on that basis, denies all such allegations.

2       12.    In response to paragraph 12, Defendant admits that the City's

3    Administrative Officer's Office provided a report to the City Council regarding options

4    to expand public bathroom access for persons experiencing homelessness in response to

5    the Hepatitis A outbreak in Los Angeles County in which it identified 55 encampments

6    without an existing public restroom facility within one-quarter mile.  Defendant admits

7    that the City launched a pilot program known as the Mobile Pit Stop Program to provide

8    portable toilets and handwashing stations to multiple locations in the City.  Defendant

9    admits that it expanded that program, and has continued to add additional portable toilets

10   and handwashing stations.  The City now has a total of 195 portable toilets and 271

11   handwashing stations deployed in the City, with 117 of the portable toilets and 206 of

12   the handwashing stations located outside Skid Row.  Except as expressly admitted

13   herein, Defendant denies each and every remaining allegation.

14      13.    In response to paragraph 13, Defendant admits that it currently funds the

15   Bin, a storage facility located near El Pueblo, that contains 1550 bins for voluntary

16   personal property storage for homeless individuals.  Defendant funds other voluntary

17   personal property storage locations in the City, including at Navigation Centers.  Except

18   as expressly admitted herein, Defendant denies each and every remaining allegation.

19      14.    In response to paragraph 14, Defendant lacks knowledge or information

20   sufficient to form a belief as to the truth of the allegations concerning whether most

21   unhoused people have places to discard their trash and residents' attempt to minimize

22   impact of trash, and on that basis, denies all such allegations.  On information and belief,

23   Defendant admits that accumulation of trash at encampments can be a magnet for illegal

24   dumping.  Except as expressly admitted herein, Defendant denies each and every

25   remaining allegation.

26      15.    In response to paragraph 15, Defendant admits that it receives complaints

27   from housed residents and businesses concerning homelessness and requests to address

28   the visible signs of homelessness in neighborhoods.  Except as expressly admitted

4

Case 2:19-cv-06182-DSF-PLA   Document 122-3   Filed 04/07/21   Page 80 of 409   Page ID
#:7294
Case 2:19-cv-06182-DSF-PLA   Document 75   Filed 07/13/20   Page 80 of 81   Page ID #:2207

1   herein, Defendant denies each and every remaining allegation.

2       16.   In response to paragraph 16, Defendant denies the allegation that it has not

3   invested in solutions like bathrooms, handwashing stations, and trash cans, all of which

4   it has invested in to address the public health needs of unhoused residents.  Defendant

5   admits that it also conducts cleanups to address the public health needs of both unhoused

6   and housed residents, and that those cleanups can include removal of personal property,

7   and in certain instances such as when the property poses an immediate threat to the

8   health or safety of the public, destruction of personal property, consistent with Los

9   Angeles Municipal Code section 56.11 ("LAMC 56.11").  In response to footnote 7,

10  Defendant admits that in June 2019, the Mayor announced a plan to focus efforts on

11  addressing public health needs, including additional trash cans and pickups, as well as

12  encampment cleanups.  Defendant denies the remaining allegations in footnote 7.

13  Except as expressly admitted herein, Defendant denies each and every remaining

14  allegation.

15      17.   In response to paragraph 17, Defendant admits that it has been sued,

16  including the lawsuits listed in footnote 8, by unhoused residents alleging that the City

17  violated their constitutional rights by seizing and destroying items, including tents,

18  medications, documents and other items they claimed were necessary.  Except as

19  expressly admitted herein, Defendant denies each and every remaining allegation.

20      18.   In response to paragraph 18 and the footnotes contained therein, Defendant

21  admits that it was sued by eight unhoused residents of Skid Row in 2011 in a case

22  entitled *Lavan v. City of Los Angeles*, No. CV 11-02874 PSG (AJW) (C.D. Cal. 2011).

23  Defendant also admits that the District Court and the Ninth Circuit issued an opinion in

24  the case that addressed the position taken by the City in its defense.  To the extent the

25  allegations of paragraph 18 seek to characterize or quote from either opinion, Defendant

26  responds that the opinions are found in documents that speak for themselves such that no

27  response is required, and Defendant expressly denies the allegations to the extent that

28  they are inconsistent with those documents. Except as expressly admitted herein,

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

Case 2:19-cv-06182-DSF-PLA   Document 122-3   Filed 04/07/21   Page 81 of 409   Page ID
#:7295
Case 2:19-cv-06182-DSF-PLA   Document 152   Filed 07/13/20   Page 7 of 61   Page ID #:2208

Defendant denies each and every remaining allegation.

19.    In response to paragraph 19, Defendant states that the allegations are legal arguments and/or conclusions to which no response is required, and to the extent a response is deemed necessary, Defendant denies each and every such allegation.

20.    In response to paragraph 20, Defendant admits that in 2016, the Los Angeles City Council amended LAMC 56.11, and that the ordinance, as amended, permits the City to remove and, in certain delineated instances, including when the property poses an immediate threat to the health or safety of the public, discard homeless individuals' belongings.  To the extent the allegations of paragraph 20 seek to quote from the ordinance, Defendant responds that the ordinance is contained in a document that speaks for itself such that no response is required, and Defendant expressly denies the allegations to the extent that they are inconsistent with that document.  To the extent the allegations attempt to characterize the ordinance, they are legal arguments and/or conclusions to which no response is required.  Defendant states that the remaining allegations are legal arguments and/or conclusions to which no response is required, and to the extent a response is deemed necessary, Defendant denies each and every such allegation.

21.    In response to paragraph 21, Defendant admits that it has developed a comprehensive strategy consistent with LAMC 56.11, including both noticed comprehensive cleanups and unnoticed cleanups (which were previously referred to as Rapid Response cleanups) of the public rights-of-way conducted by Bureau of Sanitation workers, with support from the Los Angeles Police Department to secure the area and protect the safety of the workers conducting the cleanup.  Defendant further admits that, pursuant to and subject to the provisions of LAMC 56.11 and the City's policies and practices, certain LASAN employees are authorized to remove, and in some instances discard, items found or left in public spaces and that such items may include items that belong to homeless residents.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

22.     In response to paragraph 22, Defendant states that the allegations are legal arguments and/or conclusions to which no response is required, and to the extent a response is deemed necessary, Defendant denies each and every such allegation.

**PARTIES**

23.     In response to paragraph 23, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and on that basis, denies each and every allegation contained therein.

24.     In response to paragraph 24, Defendant admits that on January 29, 2019, a Los Angeles Sanitation Watershed Protection Division crew conducted a cleanup of the public rights-of-way and access areas in the vicinity of Aetna Street and Tyrone Avenue. Defendant also admits that on April 29, 2019, a Los Angeles Sanitation Watershed Protection Division crew conducted a noticed cleanup of the public rights-of-way and access areas in the vicinity of Aetna Street and Van Nuys Boulevard.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and on that basis, denies each and every remaining allegation contained therein.

25.     In response to paragraph 25, Defendant admits that on August 14, 2019, a Los Angeles Sanitation Watershed Protection Division crew conducted a noticed cleanup of the public rights-of-way and access areas in the vicinity of Cedros Avenue and Bessemer Street.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and on that basis, denies each and every remaining allegation contained therein.

26.     In response to paragraph 26, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and on that basis, denies each and every allegation contained therein.

27.     In response to paragraph 27, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and on that basis, denies each and every allegation contained therein.

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

28.      In response to paragraph 28, Defendant admits that on March 21, 2019, a Homeless Outreach Proactive Engagement ("HOPE") team conducted a rapid response cleanup of the public rights-of-way and access areas in the vicinity of West 6th Street and South Kingsley Drive.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and on that basis, denies each and every remaining allegation contained therein.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and on that basis, denies each and every remaining allegation contained therein.

29.      In response to paragraph 29, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and on that basis, denies each and every allegation contained therein.

30.      In response to paragraph 30, Defendant admits that on January 10, 2019, a HOPE team conducted a rapid response cleanup of the public rights-of-way and access areas in the vicinity of West 6th Street and Alexandria in the Koreatown neighborhood of Los Angeles.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and on that basis, denies each and every remaining allegation contained therein.

31.      In response to paragraph 31, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and on that basis, denies each and every allegation contained therein.

32.      In response to paragraph 32, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and on that basis, denies each and every allegation contained therein.

33.      In response to paragraph 33, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and on that basis, denies each and every allegation contained therein.

34.      In response to paragraph 34, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and on that basis, denies each

8

1 and every allegation contained therein.

2     35.    In response to paragraph 35, Defendant admits that on April 24, 2019, a Los

3 Angeles Sanitation Watershed Protection Division crew conducted a noticed cleanup of

4 the public rights-of-way and access areas in the vicinity of Lomita Boulevard and

5 McCoy Avenue. Defendant admits that a dog cage was removed during this cleanup and

6 subsequently discarded. Defendant lacks knowledge or information sufficient to form a

7 belief as to the truth of the remaining allegations, and on that basis, denies each and

8 every remaining allegation contained therein.

9     36.    In response to paragraph 36, Defendant lacks knowledge or information

10 sufficient to form a belief as to the truth of the allegations, and on that basis, denies each

11 and every allegation contained therein.

12     37.    In response to paragraph 37, Defendant admits that on May 21, 2019, a Los

13 Angeles Sanitation Watershed Protection Division crew conducted a noticed cleanup of

14 the public rights-of-way and access areas in the vicinity of Lomita Boulevard and

15 McCoy Avenue. Defendant admits that two trailers were removed during this cleanup

16 and subsequently discarded. Defendant lacks knowledge or information sufficient to

17 form a belief as to the truth of the remaining allegations, and on that basis, denies each

18 and every remaining allegation contained therein.

19     38.    In response to paragraph 38, Defendant lacks knowledge or information

20 sufficient to form a belief as to the truth of the allegations, and on that basis, denies each

21 and every allegation contained therein.

22     39.    In response to paragraph 39, Defendant lacks knowledge or information

23 sufficient to form a belief as to the truth of the allegations, and on that basis, denies each

24 and every allegation contained therein.

25     40.    In response to paragraph 40, Defendant denies that the City's cleanup

26 operations are the reason homeless residents move around or are "displaced" from

27 neighborhoods. Defendant lacks knowledge or information sufficient to form a belief as

28 to the truth of the remaining allegations in paragraph 40, and on that basis, denies each

1  and every allegation contained therein.

2      41.    In response to paragraph 41, Defendant lacks knowledge or information

3  sufficient to form a belief as to the truth of the allegations concerning how and to what

4  extent Ktown for All has allocated resources, and the reasons for such allocation, and on

5  that basis, denies all such allegations.  Defendant states that the remaining allegations

6  are legal arguments and/or conclusions to which no response is required, and to the

7  extent a response is deemed necessary, Defendant denies each and every such allegation.

8      42.    In response to paragraph 42, Defendant admits that is has enforced LAMC

9  56.11 in Koreatown but denies that such enforcement has deprived individuals of their

10  constitutional and statutory rights.  Defendant lacks knowledge or information sufficient

11  to form a belief as to the truth of the allegations concerning unhoused members of

12  Ktown for All experiencing enforcement of LAMC 56.11, and on that basis, denies all

13  such allegations.  Defendant states that the remaining allegations are legal arguments

14  and/or conclusions to which no response is required, and to the extent a response is

15  deemed necessary, Defendant denies each and every such allegation.

16      43.    In response to paragraph 43, Defendant lacks knowledge or information

17  sufficient to form a belief as to the truth of the allegations, and on that basis, denies each

18  and every allegation contained therein.

19      44.    In response to paragraphs 44-46, Defendant responds that the Court, in its

20  June 2, 2020 Order, dismissed AREPS from the case for failure to adequately plead

21  associational standing, with leave to amend.  6/2/2020 Order Granting In Part and

22  Denying In Part Defendant's Motion to Dismiss [Dkt. No. 65], p. 11.  Defendant further

23  states that AREPS declined to file an amended complaint, and, as such, is no longer a

24  party to this case.  *See* Plaintiff's Notice Electing Not To File An Amended Complaint

25  [Dkt. No. 72].  Accordingly, Defendant need not respond to the allegations concerning

26  AREPS.  To the degree a response is deemed necessary, Defendant lacks knowledge or

27  information sufficient to form a belief as to the truth of the allegations, and on that basis,

28  denies each and every allegation contained therein.

45.     For the reasons stated above in response to paragraph 44, Defendant need not respond to the allegations concerning AREPS.  To the degree a response is deemed necessary, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and on that basis, denies all allegations contained therein.

46.     For the reasons stated above in response to paragraph 44, Defendant need not respond to the allegations concerning AREPS.  To the degree a response is deemed necessary, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and on that basis, denies all allegations contained therein.

47.     In response to paragraph 47, Defendant admits that the City of Los Angeles is a Charter City organized under the laws of the State of California with the capacity to sue and be sued.  Defendant admits that the Los Angeles Police Department and the Department of Public Works are departments of the City.  Defendant also admits that Bureau of Sanitation is a bureau within the Department of Public Works.   Defendant admits that LAMC 56.11 authorizes, in enumerated circumstances, the seizure, and in certain instances destruction, of items located in the public right of way and that certain employees of Defendant are authorized to enforce, and have enforced, LAMC 56.11, including during the cleanup operations that Defendant admits to and describes in this Answer.  Defendant lacks knowledge or information at this time sufficient to form a belief as to whether any of its employees "have engaged in any of the acts complained of" by Plaintiffs.  Defendant states that allegations as to whether any particular alleged act was unconstitutional or unlawful are legal arguments and/or conclusions to which no response is required, and to the extent a response is deemed necessary, Defendant denies each and every such allegation.

48.     In response to paragraph 48, Defendant admits that LAMC 56.11 authorizes, in enumerated circumstances, the seizure, and in certain instances destruction, of items located in the public right of way and that certain employees of Defendant are authorized to enforce, and have enforced, LAMC 56.11, including during the cleanup operations that Defendant admits to and describes in this Answer.

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

Defendant lacks knowledge or information at this time sufficient to form a belief as to whether any of its employees have engaged in the alleged "conduct challenged [in the Second Amended Complaint]." Defendant states that allegations as to whether any particular alleged conduct or act was unconstitutional or unlawful are legal arguments and/or conclusions to which no response is required, and to the extent a response is deemed necessary, Defendant denies each and every such allegation.

49. In response to paragraph 49, Defendant admits that Plaintiffs purport to sue DOES 1 through 7 by fictitious names in both their official and individual capacities. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and on that basis, denies each and every allegation contained therein.

## FACTUAL ALLEGATIONS

50. In response to paragraph 50, Defendant admits that the Los Angeles City Council amended LAMC 56.11 in 2016. Defendant admits that LAMC 56.11 authorizes, in enumerated circumstances, the seizure, and in certain instances destruction of, items located in the public right of way. Defendant denies that the purpose of LAMC 56.11 was "to allow the City to seize and in certain instances, destroy the belongings of individuals who are experiencing homelessness"; in fact, LAMC 56.11 expressly safeguards against removal and discard of many items that homeless individuals may need to survive, including tents, operational bicycles, wheelchairs and personal items like clothing and sleeping bags. In response to footnote 12 contained in paragraph 50, Defendant states that there is no Exhibit A attached to the SAC, as referenced in the footnote. Except as expressly admitted herein, Defendant denies each and every allegation contained in paragraph 50 and the footnote therein.

51. In response to paragraph 51, Defendant responds to the extent the allegations of paragraph 51 seek to quote from an unidentified "prior" version of the ordinance, that the ordinance is contained in a document that speaks for itself such that no response is required, and Defendant expressly denies the allegations to the extent that

they are inconsistent with that document.

52.     In response to paragraph 52 and footnote 13 contained therein, Defendant admits that it was sued by eight unhoused residents of Skid Row in 2011 in a case entitled *Lavan v. City of Los Angeles*, No. CV 11-02874 PSG (AJW) (C.D. Cal. 2011). Defendant also admits that the District Court issued a preliminary injunction against Defendant in that case.  To the extent the allegations of paragraph 52 seek to characterize that order, Defendant responds that the order is a found in a document that speaks for itself such that no response is required, and Defendant expressly denies the allegations to the extent that they are inconsistent with the order.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

53.     In response to paragraph 53, Defendant admits that it appealed the injunction to the Ninth Circuit Court of Appeals.  Defendant denies that it argued that that "homeless people did not have a property interest in their belongings."  To the extent the allegations of paragraph 53 seek to characterize Defendant's arguments on appeal, such arguments are contained within the files and records for that case, which are all documents that speak for themselves such that no response is required, and Defendant expressly denies the allegations to the extent that they are inconsistent with those documents.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

54.     In response to paragraph 54 and footnote 14 contained therein, Defendant admits that in 2012, the Ninth Circuit Court of Appeals issued an opinion in *Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012), which upheld the District Court's injunction.  To the extent the allegations of paragraph 54 seek to further characterize the opinion, Defendant responds that the opinion is a document that speaks for itself such that no response is required, and Defendant expressly denies the allegations to the extent that they are inconsistent with that document.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

55.     In response to paragraph 55, Defendant admits that the Los Angeles City

Council amended LAMC 56.11 in 2015 while the *Lavan* matter was pending in the District Court, and then amended it again in 2016, with the current version taking effect in April 2016.  In response to footnote 15, Defendant admits that the parties agreed to a settlement in *Lavan*, and that the case was subsequently dismissed in 2016.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

56.     In response to paragraph 56, Defendant admits that the Los Angeles Bureau of Sanitation, which is the Designated Administrative Agency for the purposes of LAMC 56.11, promulgated the Los Angeles Municipal Code 56.11 Standard Operating Protocols ("56.11 Protocols").  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

57.     In response to paragraph 57, Defendant admits that it has been enforcing the current version of LAMC 56.11 since it went into effect in 2016 and that the ordinance applies to items located in the public right-of-way, as described further in the ordinance, regardless whether the item was left or stored there by housed or unhoused individuals.  Defendant further admits that it conducted cleanups of the public rights-of-way and access areas in 2019 in the vicinity of encampments where the individual Plaintiffs allege to have been residing at the time of certain of those cleanups.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

58.     In response to paragraph 58, Defendant admits that LAMC 56.11 authorizes, in enumerated circumstances, the seizure, and in certain instances destruction of, items located in the public right of way and that the ordinance applies to items located in the public right of way, as described further in the ordinance, regardless whether the item was left or stored there by housed or unhoused individuals.  Defendant also admits that the current version of LAMC 56.11 removes criminal liability for most violations of the ordinance.  Defendant states that, to the extent the allegations in paragraph 58 and footnote 16 seek to quote from LAMC 56.11, the ordinance is contained in a document that speaks for itself, and any attempt to characterize the ordinance is a legal argument and/or conclusion such that no response is required.  To

14

the extent a response is deemed required, Defendant expressly denies the allegations to the extent that they are inconsistent with that document.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

59.     In response to paragraph 59 and footnote 17 contained therein, Defendant states that, to the extent the allegations seek to characterize or quote LAMC 56.11, the ordinance is contained in a document that speaks for itself, and any attempt to characterize the ordinance is a legal argument and/or conclusion such that no response is required.  To the extent a response is deemed required, Defendant expressly denies the allegations to the extent that they are inconsistent with that document.

60.     In response to paragraph 60, Defendant states that, to the extent the allegations in paragraph 60 seek to quote from LAMC 56.11, the ordinance is contained in a document that speaks for itself, and any attempt to characterize the ordinance is a legal argument and/or conclusion such that no response is required.  To the extent a response is deemed required, Defendant expressly denies the allegations to the extent that they are inconsistent with that document.

61.     In response to paragraph 61, Defendant states that, to the extent the allegations in paragraph 61 seek to characterize or quote LAMC 56.11, the ordinance is contained in a document that speaks for itself, and any attempt to characterize the ordinance is a legal argument and/or conclusion such that no response is required.  To the extent a response is deemed required, Defendant expressly denies the allegations to the extent that they are inconsistent with that document.

62.     In response to paragraph 62 and footnote 18 contained therein, Defendant states that, to the extent the allegations seek to characterize or quote LAMC 56.11, the ordinance is contained in a document that speaks for itself, and any attempt to characterize the ordinance is a legal argument and/or conclusion such that no response is required.  To the extent a response is deemed required, Defendant expressly denies the allegations to the extent that they are inconsistent with that document.

63.     In response to paragraph 63, Defendant states that, to the extent the

15

allegations in paragraph 63 seek to characterize or quote LAMC 56.11, the ordinance is contained in a document that speaks for itself, and any attempt to characterize the ordinance is a legal argument and/or conclusion such that no response is required. To the extent a response is deemed required, Defendant expressly denies the allegations to the extent that they are inconsistent with that document. Defendant states that the remaining allegations in paragraph 63 are legal arguments and/or conclusions to which no response is required. To the extent a response is deemed necessary, Defendant admits that the LAMC 56.11 does not require the City to obtain a warrant prior to seizing items pursuant to the ordinance, and in the case of Bulky Items, before discarding them. To the extent a response is deemed necessary, Defendant denies each and every remaining allegation. Except as expressly admitted herein, Defendant denies each and every remaining allegation.

64. In response to paragraph 64, Defendant states that, to the extent the allegations in paragraph 64 seek to characterize or quote LAMC 56.11 or the 56.11 Protocols, the ordinance and 56.11 Protocols are contained in documents that speak for themselves, and any attempt to characterize the ordinance or Protocols is a legal argument and/or conclusion such that no response is required. To the extent a response is deemed required, Defendant expressly denies the allegations to the extent that they are inconsistent with those documents. In response to footnote 19 contained in paragraph 64, Defendant states that there is no Exhibit B attached to the SAC, as referenced in the footnote. Except as expressly admitted herein, Defendant denies each and every remaining allegation.

65. In response to paragraph 65 and footnotes 20 and 21 contained therein, Defendant states that, to the extent the allegations seek to characterize or quote LAMC 56.11, the ordinance is contained in a document that speaks for itself, and any attempt to characterize the ordinance is a legal argument and/or conclusion such that no response is required. To the extent a response is deemed required, Defendant expressly denies the allegations to the extent that they are inconsistent with that document.

16

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

66.     In response to paragraph 66, Defendant states that, to the extent the allegations in paragraph 66 seek to characterize or quote LAMC 56.11, the ordinance is contained in a document that speaks for itself, and any attempt to characterize the ordinance is a legal argument and/or conclusion such that no response is required. Defendant expressly denies the allegations to the extent that they are inconsistent with that document. Defendant states that the remaining allegations in paragraph 66 are legal arguments and/or conclusions to which no response is required, and to the extent a response is deemed necessary, Defendant denies each and every remaining allegation.

67.     In response to paragraph 67 and footnote 22 contained therein, Defendant states that, to the extent the allegations seek to characterize or quote LAMC 56.11, the ordinance is contained in a document that speaks for itself, and any attempt to characterize the ordinance is a legal argument and/or conclusion such that no response is required. To the extent a response is deemed required, Defendant expressly denies the allegations to the extent that they are inconsistent with that document.

68.     In response to paragraph 68, Defendant admits that it has been enforcing throughout Los Angeles the current version of LAMC 56.11 since it went into effect in 2016. Except as expressly admitted herein, Defendant denies each and every remaining allegation.

69.     In response to paragraph 69, Defendant admits that it deploys Los Angeles Sanitation Watershed Protection Division crews to conduct cleanups of homeless encampments consistent with LAMC 56.11, and that LAPD officers are deployed with those crews to secure the area and protect the safety of the workers conducting the cleanup. Defendant admits that there are two types of cleanups: noticed comprehensive cleanups and unnoticed cleanups (which were previously referred to as Rapid Response cleanups) cleanups of the public rights-of-way. In Skid Row and Venice, noticed cleanups are conducted on a regular schedule. When the Sanitation workers conducting either a noticed or unnoticed cleanup encounter property that, for example, poses an immediate threat to the health or safety of the public, they may remove and may discard

17

such property, consistent with LAMC 56.11.  Except as expressly admitted herein, Defendant denies each and every remaining allegation contained in paragraph 69.

70.     In response to paragraph 70, Defendant admits that it began conducting noticed cleanups of homeless encampments in Skid Row in 2012 as part of a program entitled "Operation Healthy Streets."  Defendant admits that comprehensive cleanups were expanded citywide as part of the Mayor's "Clean Streets LA" program in 2015. Defendant admits that noticed cleanups typically occur on a regular schedule in Skid Row and Venice, and that other noticed cleanups are scheduled as needed, and in coordination with the Mayor's office and City Council offices, throughout the rest of the City.  Defendant also admits that prior to scheduling a noticed cleanup, LAHSA signs off that outreach has been conducted to encampment residents.  In response to footnote 23, Defendant further admits that, on or around October 1, 2019, the City commenced the Comprehensive Cleaning and Rapid Engagement Program (CARE and CARE+) operations throughout the City, with CARE providing resources to clean the public rights-of-way and address enforcement and emergency response to mitigate illegal dumping and/or items stored in the public rights-of-way, and CARE+ providing public health services to encampments, including among other services, mobile showers, delivery of trash bins and regular trash pickup, outreach to connect homeless residents and services, and posted comprehensive cleanups of encampments.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

71.     In response to paragraph 71, Defendant states that it provides at least 24 hours notice prior to a noticed comprehensive cleanup by posting notices in the vicinity of the cleanup on, among other things, walls, light posts, and fences.  The notices provide the time by which property must be removed from the area prior to a cleanup. Except as expressly admitted herein, Defendant denies each and every remaining allegation.

72.     In response to paragraph 72, Defendant states that there is no Exhibit C attached to the SAC, as referenced in paragraph 72.  Defendant admits that notices

18

posted prior to cleanups include information, such as the date and time the cleanup is scheduled to take place; that the cleanup will include sidewalks, alleys, parks, beach, parking lots, and other public access areas; and an instruction to remove all personal belongings prior to the posted time.  Except as expressly admitted herein, Defendant denies each and every allegation contained in paragraph 72.

73.     In response to paragraph 73, Defendant states that there is no Exhibit C attached to the SAC, as referenced in paragraph 72 and 73.  Defendant admits that notices posted prior to cleanups instruct individuals to remove belongings from the area, and that property remaining in the area after the posted time will be removed.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

74.     In response to paragraph 74, Defendant admits that there are occasions on which LASAN has hand-written a physical address on cleanup notices.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

75.     In response to paragraph 75, Defendant admits that LASAN has physically posted notices of cleanup on trees, posts, and other fixtures.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

76.     In response to paragraph 76, Defendant admits that cleanups are, at times, canceled after notice has been posted.  Except as admitted herein, Defendant denies each and every remaining allegation.

77.     In response to paragraph 77, Defendant admits that if individuals remain in the area of the noticed cleanup and have not yet removed their property when a crew arrives at a location to conduct a noticed cleanup at or after the posted time, the crew will generally provide the individuals with additional time – which in certain instances is approximately 15 minutes – beyond the minimum of 24 hours' notice already provided in which to remove their belongings from the area.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

78.     In response to paragraph 78, Defendant admits that its sanitation workers and LAPD officers take actions consistent with the provisions of LAMC 56.11, which

1   can include prohibiting individuals from maintaining more than 60 gallons of

2   belongings, and prior to this Court's issuance of its preliminary injunction in this matter

3   on April 13, 2020, Bulky Items.  Except as expressly admitted herein, Defendant denies

4   each and every remaining allegation.

5       79.     In response to paragraph 79, Defendant admits that in some instances,

6   individuals are allowed only to remove their own items from a cleanup area and that in

7   some instances, when an individual is not present at the time of a cleanup to move items

8   left at the location, the items may be seized pursuant to LAMC 56.11.  Defendant also

9   admits that LAMC 56.11 permits the seizure of unattended items in certain

10  circumstances, e.g., when the item impedes operations or poses an immediate threat to

11  health and safety, regardless whether another person claims they are "watching the

12  belongings for another person or is capable of moving them out for their neighbor."

13  Defendant denies each and every remaining allegation.

14      80.     In response to paragraph 80, Defendant admits that cleanup areas may be

15  closed to public access during the cleaning and that items left in the noticed cleanup area

16  following the notice period, and any additional time provided following LASAN's

17  arrival at the cleanup site at or after the posted time, will be removed and processed by

18  LASAN workers in accordance with the 56.11 Protocols, including items that are

19  "excess" or, prior to this Court's issuance of its preliminary injunction in this matter on

20  April 13, 2020, "bulky," under LAMC 56.11.  Since Footnote 24 contained within

21  paragraph 80 cross-references paragraph 103, Defendant's response to those allegations

22  are contained in Defendant's response to paragraph 103, *infra*.  Except as expressly

23  admitted herein, Defendant denies each and every remaining allegation.

24      81.     In response to paragraph 81, Defendant admits that it conducts unnoticed

25  cleanups in order to address immediate threats to the health or safety of the public.

26  These were formerly referred to as "rapid responses" and were conducted by HOPE

27  teams, which were typically comprised of both LASAN workers and LAPD officers.

28  Defendant admits that the HOPE program was piloted in 2016 and launched citywide in

20

2017.  In response to footnote 25, Defendant admits that the Hope teams' rapid responses now fall under the Comprehensive Cleaning and Rapid Engagement ("CARE") program.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

82.    In response to paragraph 82, Defendant admits that rapid responses take place to respond to immediate threats to the health or safety of the public that are voiced by residents and City Council offices, either through the City's 311 system or other means.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

83.    In response to paragraph 83, Defendant admits that notices are not posted prior to a rapid response to respond to immediate threats to the health or safety of the public.  Items that are determined to pose an immediate threat to the health or safety of the public, including Excess Personal Property, can be removed and immediately discarded, in accordance with LAMC 56.11.  Defendant admits that prior to this Court's issuance of its preliminary injunction in this matter on April 13, 2020, Bulky Items could be removed and discarded.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

84.    In response to paragraph 84, Defendant admits that in 2018, the City conducted cleanups at more than 9,000 encampments.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

85.    In response to paragraph 85, Defendant states that during the fourth quarter of 2018, 2,298 tents were impounded through rapid responses, compared to 825 through comprehensive cleanups.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

86.    In response to paragraph 86, Defendant responds that the City's adopted FY2018-19 and 2019-20 budgets are contained within documents that speak for themselves such that no response is required to the allegations regarding the budgets.  To the extent a response is deemed required, Defendant denies each and every such

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

allegation to the extent inconsistent with the documents containing the budgets. Except as expressly admitted herein, Defendant denies each and every allegation contained therein.

87.    In response to paragraph 87, Defendant admits that bulky items are on occasion removed from public rights-of-way using a trash collection truck. Defendant lacks information sufficient to admit or deny the allegations concerning the cost associated with tipping fees, and on that basis, denies each and every such allegation. Defendant states that the remaining allegations are legal arguments and/or conclusions to which no response is required. To the extent a response is deemed required, Defendant denies each and every allegation contained therein. Except as expressly admitted herein, Defendant denies each and every remaining allegation.

88.    In response to paragraph 88, Defendant admits that in July 2019, the City Council passed a sanitation deployment plan that, among other things, expanded LASAN's workforce by 47 new hires dedicated to improving public health conditions at encampments. Defendant responds that the City's adopted FY 2019-20 budget is contained within a document that speaks for itself such that no response is required to the allegations regarding the budget. To the extent a response is deemed required, Defendant denies each and every such allegation to the extent inconsistent with the document containing the budget. Except as expressly admitted herein, Defendant denies each and every allegation contained in paragraph 88.

89.    In response to paragraph 89, Defendant admits that there were 9 HOPE teams operating in FY 2018-19, and that there are currently 17 CARE teams. Defendant also admits that there are currently 13 CARE+ teams assigned to do comprehensive cleanups, which has increased from 11 under the prior deployment plan. Defendant further admits that there are dedicated CARE+ teams assigned to conduct regular cleanups in the Venice and Skid Row areas, as well as the Grand Corridor and the greater downtown LA area. Except as expressly admitted herein, Defendant denies each and every remaining allegation.

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

90.     In response to paragraph 90, Defendant admits that CARE teams will conduct what used to be referred to as "rapid responses," and CARE+ teams will conduct noticed comprehensive cleanups, along with providing public health services to encampments including, among other services, mobile showers, delivery of trash bins and regular trash pickup, and outreach to connect homeless residents with services. Defendant admits that the teams carrying out CARE and CARE+ programs enforce provisions of LAMC 56.11, as the HOPE and Clean Streets LA teams did.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

91.     In response to paragraph 91, Defendant admits that the CARE and CARE+ program operations were commended on or around October 1, 2019.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

92.     In response to paragraph 92, Defendant admits that it has enforced and continues to enforce provisions of LAMC 56.11 against individuals, including unhoused residents living in encampments in Los Angeles, through cleanups that are conducted consistent with the provisions of LAMC 56.11.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

93.     In response to paragraph 93, Defendant admits that prior to this Court's issuance of its preliminary injunction in this matter on April 13, 2020, LASAN workers conducting cleanups would remove Bulky Items, as defined by LAMC 56.11, that were stored on the public rights-of-way.  Prior to this Court's issuance of its preliminary injunction in this matter on April 13, 2020, LASAN workers were authorized to remove Bulky Items and discard Bulky Items, consistent with the provisions of LAMC 56.11. Except as expressly admitted herein, Defendant denies each and every remaining allegation.

94.     In response to paragraph 94, Defendant admits that pursuant to the 56.11 Protocols, non-operational bicycles are treated as Bulky Items, as defined by LAMC 56.11, and carts, camp chairs, and pallets that cannot fit in a 60-gallon container with the lid closed are by definition Bulky Items under LAMC 56.11 and thus, prior to this

23

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

Court's issuance of its preliminary injunction in this matter on April 13, 2020, could be removed and could be discarded consistent with the ordinance. Defendant admits that determinations of what constitutes a Bulky Item are made are made by trained Environmental Compliance Inspectors during the cleanup, consistent with the provisions of LAMC 56.11. Except as expressly admitted herein, Defendant denies each and every remaining allegation contained therein.

95.     In response to paragraph 95, Defendant admits that, consistent with LAMC 56.11, inoperable bicycles and/or bicycle parts have in some instances been removed and discarded if they posed a risk to health and safety, and in some instances, including where an individual stores multiple bicycles in the public right-of-way, bicycles have been "taken by LA Sanitation away from the scene" and stored, consistent with LAMC 56.11. Except as expressly admitted herein, Defendant denies each and every remaining allegation.

96.     In response to paragraph 96, Defendant admits that prior to issuance of this Court's preliminary injunction in this matter on April 13, 2020, following a determination by an LASAN Environmental Compliance Inspector that an item constitutes a Bulky Item, the Bulky Item could have been removed and discarded, whether or not the item was attended in accordance with LAMC 56.11. Defendant admits that, on occasion, LASAN uses trash compactors during certain cleanup operations, and that items that are not stored pursuant to LAMC 56.11 may be transported to landfills for disposal. Except as expressly admitted herein, Defendant denies each and every remaining allegation.

97.     In response to paragraph 97, Defendant admits that LAMC 56.11 authorizes the removal and the destruction of Bulky Items solely because the item satisfies the definition of a Bulky Item and is stored in the public right of way, as further defined in the ordinance. Defendant further admits that prior to issuance of this Court's preliminary injunction in this matter on April 13, 2020, the Bulky Item provision of LAMC 56.11 was enforced and that LASAN Environmental Compliance Inspectors

1  determined that the items constituted Bulky Items as defined by LAMC 56.11.

2  Defendant admits that LAMC 56.11 does not require Defendant to provide a hearing to

3  challenge the determination that an item is a Bulky Item.  Except as expressly admitted

4  herein, Defendant denies each and every remaining allegation.

5      98.    In response to paragraph 98, Defendant admits that it enforces other

6  provisions of LAMC 56.11 that permit removal of property from the public rights-of-

7  way, including Excess Personal Property defined by LAMC 56.11 as "any and all

8  Personal Property that cumulatively exceeds the amount of property that could fit in a

9  60-gallon container with the lid closed."  Defendant admits that when property remains

10  on the public rights-of-way at the commencement of a cleanup, LASAN workers and

11  LAPD officers will provide 60-gallon trash bags, and additional time beyond the

12  minimum 24-hours' notice already provided prior to the cleanup, to any individuals who

13  also remain in the area of the cleanup in which they can put their belongings to take with

14  them.  Defendant admits that property that will not fit in a 60-gallon container with the

15  lid closed may be removed in accordance with LAMC 56.11 and stored for 90 days at a

16  facility from which the owners may collect their property.  Except as expressly admitted

17  herein, Defendant denies each and every remaining allegation.

18      99.    In response to paragraph 99, Defendant admits that if, after pre-removal

19  notice is provided, an individual does not remove his or her belongings during the notice

20  period prior to the commencement of the cleanup or during additional time provided,

21  LASAN may remove Excess Personal Property remaining in the public rights-of-way

22  that will not fit into a 60-gallon container with the lid on.  Defendant admits that other

23  carts may be removed under LAMC 56.11 if they are Bulky Items that are stored on

24  public rights of way, consistent with LAMC 56.11.  Except as expressly admitted herein,

25  Defendant denies each and every remaining allegation.

26      100.   In response to paragraph 100, Defendant admits that if, after pre-removal

27  notice is provided, an individual does not remove his or her belongings during the notice

28  period prior to the commencement of the cleanup or during additional time provided,

LASAN may remove Excess Personal Property remaining in the public rights-of-way that will not fit into a 60-gallon container with the lid on, consistent with LAMC 56.11. Except as expressly admitted herein, Defendant denies each and every remaining allegation.

101. In response to paragraph 101, Defendant admits that, consistent with LAMC 56.11 and the 56.11 Protocols, an unattended tent erected between 6:00 a.m. and 9:00 p.m. may be removed, without prior notice, if it is not raining and if the temperature is above 50 degrees Fahrenheit. Defendant further admits that, consistent with LAMC 56.11 and the 56.11 Protocols, an attachment to public property, or to private property which creates an obstruction to any street or area where the public may travel, may be removed. Except as expressly admitted herein, Defendant denies each and every remaining allegation.

102. In response to paragraph 102, Defendant admits that LASAN may, in accordance with LAMC 56.11, remove certain unattended items without providing notice, and in certain circumstances, may discard unattended items if, for example, they pose an immediate threat to the health or safety of the public. The length of time the item has been unattended is not necessarily known or considered. Except as expressly admitted herein, Defendant denies each and every remaining allegation.

103. In response to paragraph 103 and footnote 26 contained therein, Defendant admits that with pre-removal notice, it can and does remove from the public rights-of-way personal property that is "unattended," as defined in LAMC 56.11, consistent with LAMC 56.11 and the 56.11 Protocols. Except as expressly admitted herein, Defendant denies each and every remaining allegation.

104. In response to paragraph 104, Defendant admits that LASAN Environmental Compliance Inspectors process encampments during cleanups to inspect and assess each item on the public rights-of-way to identify hazardous items for discard, and to take custody of unattended personal property to send to storage. Defendant admits that 9,148 encampments were processed in 2018, and that 4,064 of those were

26

processed through noticed cleanups while 5,084 were processed through unnoticed cleanups.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

105.   In response to paragraph 105, Defendant admits that LASAN Environmental Compliance Inspectors process encampments during cleanups to inspect and assess each item on the public rights-of-way to identify what items should be stored or discarded consistent with LAMC 56.11 and the 56.11 Protocols.  Defendant admits that many items processed during cleanups are often discarded for a myriad of reasons consistent with Defendant's policy, practice and custom, including because such items are abandoned, pose immediate health and safety risks, or constitute contraband.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

106.   In response to paragraph 106, Defendant states that during the fourth quarter of 2018, 2,298 tents were processed through rapid response operations.  Defendant also admits that 155 bags of property removed during such operations were sent to storage, and that 483 tons of debris encountered during such operations was disposed of.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

107.   In response to paragraph 107, Defendant admits that items that the City may discard items that pose an immediate threat to the health and safety of the public, which in some instances may include cleaning supplies and batteries, and, prior to the Court's issuance of its preliminary injunction in this matter on April 13, 2020, Bulky Items.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

108.   In response to paragraph 108, Defendant admits that certain items removed from public rights-of-way, such as items that pose an immediate threat to the health or safety of the public, may be discarded pursuant to LAMC 56.11 and the 56.11 Protocols.  Defendant further admits that prior to this Court's issuance of its preliminary injunction in this matter on April 13, 2020, LASAN workers were authorized to remove Bulky

1   Items and discard Bulky Items, consistent with the provisions of LAMC 56.11.  Except
2   as expressly admitted herein, Defendant denies each and every remaining allegation.

3       109.   In response to paragraph 109, Defendant admits that items on the public
4   rights-of-way that are contaminated such that they pose an immediate threat to the health
5   or safety of the public may be removed and discarded, instead of stored.  Except as
6   expressly admitted herein, Defendant denies each and every remaining allegation.

7       110.   In response to paragraph 110, Defendant admits that items removed from
8   the public rights-of-way that LASAN Environmental Compliance Inspectors determine
9   to be contaminated such that they constitute an immediate threat to the health and safety
10  of the public may be discarded, consistent with LAMC 56.11 and the 56.11 Protocols.
11  Except as expressly admitted herein, Defendant denies each and every remaining
12  allegation.

13      111.   In response to paragraph 111, Defendant denies each and every allegation.

14      112.   In response to paragraph 112, Defendant admits that certain furniture items
15  stored in the public right-of-way may be, and have been, discarded consistent with
16  LAMC 56.11 and the 56.11 Protocols.  Except as expressly admitted herein, Defendant
17  denies each and every remaining allegation.

18      113.   In response to paragraph 113, Defendant admits that personal items stored
19  in the public right of way may be, and have been, discarded consistent with LAMC
20  56.11 and the 56.11 Protocols if, for example, they pose a health and safety risk or are
21  contraband.  Except as expressly admitted herein, Defendant denies each and every
22  remaining allegation.

23      114.   In response to paragraph 114, Defendant admits that LAMC 56.11 does not
24  require notices to be posted prior to rapid response cleanups that are conducted to
25  respond to immediate threats to the health or safety of the public.  Defendant admits that
26  LAMC 56.11 does not require that an opportunity be provided for a purported owner to
27  challenge the determination that his or her items may be removed or immediately
28  discarded prior to removal.  Except as expressly admitted herein, Defendant denies each

28

and every remaining allegation.

115.   In response to paragraph 115, Defendant admits that LAMC 56.11 does not require notices to be posted prior to rapid response cleanups that are conducted to respond to immediate threats to the health or safety of the public.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

116.   In response to paragraph 116, Defendant admits that LAMC 56.11 requires LASAN to provide post-deprivation notice when LASAN removes personal property from the public rights-of-way and sends it to storage.  The post-deprivation notices, which are posted on places, such as on walls, light posts, and fences, provide information regarding when and where individuals may collected their personal property, as well as a phone number to call regarding retrieving their property.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

117.   In response to paragraph 117, Defendant admits that the post-deprivation notice informs individuals that property has been stored and that owners can contact the storage facility about retrieving their belongings, but does not provide an inventory of the items that were seized and why each was removed and stored.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

118.   In response to paragraph 118, Defendant admits that LAMC 56.11 does not require LASAN to provide post-deprivation notice about items of personal property left on the public rights-of-way are discarded rather than stored.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

119.   In response to paragraph 119, Defendant admits that LAMC 56.11 does not require LASAN to provide post-deprivation notice about items of personal property left on the public rights-of-way that are discarded rather than stored.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

120.   In response to paragraph 120, Defendant denies the allegation that "individuals have no way of knowing what happened to their belongings" in all instances, including circumstances where notice is posted prior to a cleanup in

29

accordance with LAMC 56.11 and outreach workers communicate with individuals about the cleanup in accordance with the 56.11 Protocols. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and on that basis, denies each and every remaining allegation contained therein.

121. In response to paragraph 121, Defendant admits that LAMC 56.11 does not require LASAN to provide an opportunity for a purported owner to challenge the determination that his or her items may be removed or immediately discarded prior to removal. To the extent the allegations of paragraph 121 seek to characterize or quote LAMC 56.11, Defendant responds that the ordinance is contained in a document that speaks for itself, and any attempt to characterize the ordinance is a legal argument and/or conclusion such that no response is required. To the extent a response is deemed required, Defendant expressly denies the allegations to the extent that they are inconsistent with that document. Except as expressly admitted herein, Defendant denies each and every remaining allegation.

122. In response to paragraph 122, Defendant responds that the allegation is a legal argument and/or conclusion such that no response is required. To the extent a response is required, Defendant denies the allegation.

123. In response to paragraph 123, Defendant admits that enforcement of LAMC 56.11 was conducted regularly prior to issuance of Safer At Home Orders in response to the coronavirus pandemic. Except as expressly admitted herein, Defendant denies each and every remaining allegation.

124. In response to paragraph 124, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

125. In response to paragraph 125, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

126. In response to paragraph 126, Defendant lacks knowledge or information

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

1    sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

2    basis, denies each and every allegation contained therein.

3        127.   In response to paragraph 127, Defendant admits that a HOPE team

4    conducted a cleanup of the public rights-of-way and access areas in the vicinity of Aetna

5    Street and Tyrone Avenue.  Defendant admits because this cleanup was conducted as a

6    rapid response to respond to immediate threats to the health or safety of the public,

7    notices were not posted prior to the cleanup.  Except as expressly admitted herein,

8    Defendant denies each and every remaining allegation.

9        128.   In response to paragraph 128, Defendant admits that because this cleanup

10   was conducted as a rapid response to respond to immediate threats to the health or safety

11   of the public, notices were not posted prior to the cleanup.  Defendant lacks knowledge

12   or information sufficient to form a belief as to the truth of the remaining allegations

13   contained in paragraph 128, and on that basis, denies all remaining allegations therein.

14       129.   In response to paragraph 129, Defendant lacks knowledge or information

15   sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

16   basis, denies each and every allegation contained therein.

17       130.   In response to Paragraph 130, Defendant lacks knowledge or information

18   sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

19   basis, denies each and every allegation contained therein.

20       131.   In response to paragraph 131, Defendant lacks knowledge or information

21   sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

22   basis, denies each and every allegation contained therein.

23       132.   In response to paragraph 132, Defendant admits that certain items

24   encountered during the January 29, 2019 cleanup in the area in and around Aetna Street

25   and Tyrone Avenue were determined to be health hazards, including but not limited to

26   flammable substances, corrosive substances, highly compressed gas or liquid, and

27   biohazards.  Health hazards that constitute an immediate threat to the health or safety of

28   the public may be discarded pursuant to LAMC 56.11 and the 56.11 Protocols.

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 132, and on that basis, denies each and every remaining allegation.

133.   In response to paragraph 133, Defendant admits that notices were not posted prior to the January 29, 2019 cleanup in the area in and around Aetna Street and Tyrone Avenue because it was conducted as a rapid response to respond to immediate threats to the health or safety of the public.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in that paragraph, and on that basis, denies each and every remaining allegation.

134.   In response to paragraph 134, Defendant admits that on April 29, 2019, a Los Angeles Sanitation Watershed Protection Division crew was deployed to the same encampment in the vicinity of Aetna Street to conduct a noticed cleanup of the public rights-of-way and access areas in the vicinity of Aetna Street and Van Nuys Boulevard. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in that paragraph, and on that basis, denies each and every remaining allegation.

135.   In response to paragraph 135, Defendant admits a noticed cleanup was conducted in the area in and around Cedros Avenue and Bessemer Street on August 14, 2019.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in that paragraph, and on that basis, denies each and every remaining allegation.

136.   In response to paragraph 136, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

137.   In response to paragraph 137, Defendant admits that on or about August 12, 2019, LA Sanitation posted notices in and around the area of Bessemer Street and Cedros Avenue indicating that there would be a major cleaning of the area on August 14, 2019.  Unless expressly admitted herein, Defendant denies each and every remaining

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

1    allegation.

2        138.    In response to paragraph 138, Defendant admits that notices were posted on

3    or about August 12, 2019 in and around the vicinity of Cedros Avenue and Bessemer

4    Street prior to the cleanup that was conducted on August 14, 2019.  Except as expressly

5    admitted herein, Defendant denies each and every remaining allegation.

6        139.    In response to paragraph 139, Defendant lacks knowledge or information

7    sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

8    basis, denies each and every allegation contained therein.

9        140.    In response to paragraph 140, Defendant lacks knowledge or information

10   sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

11   basis, denies each and every allegation contained therein.

12       141.    In response to paragraph 141, Defendant admits a noticed cleanup was

13   conducted in the area in and around Cedros Avenue and Bessemer Street on August 14,

14   2019.  Defendant lacks knowledge or information sufficient to form a belief as to the

15   truth of the remaining allegations in that paragraph, and on that basis, denies each and

16   every remaining allegation.

17       142.    In response to paragraph 142, Defendant states that post-removal notices

18   were posted in and around the area of Cedros Avenue and Bessemer Street regarding

19   retrieval of property that was removed during the cleanup and sent to a secure storage

20   facility.  Defendant admits that the post-deprivation notice informs individuals that

21   property has been stored and that owners can contact the storage facility about retrieving

22   their belongings, but does not provide an inventory of the items that were seized and

23   why each was removed and stored.  Except as expressly admitted herein, Defendant

24   denies each and every remaining allegation contained therein.

25       143.    In response to paragraph 143, Defendant lacks knowledge or information

26   sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

27   basis, denies each and every allegation contained therein.

28       144.    In response to paragraph 144, Defendant lacks knowledge or information

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

145. In response to paragraph 145, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

146. In response to paragraph 146, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

147. In response to paragraph 147, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

148. In response to paragraph 148, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

149. In response to paragraph 149, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

150. In response to paragraph 150, Defendant admits that claims were submitted to the City on behalf of Janet Garcia on or around July 26, 2019 and September 5, 2019, but denies that these were timely submitted prior to the initiation of the litigation or that Janet Garcia appropriately exhausted her administrative remedies. Except as expressly admitted herein, Defendant denies each and every remaining allegation.

151. In response to paragraph 151, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

152. In response to paragraph 152, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

153.   In response to paragraph 153, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

154.   In response to paragraph 154, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

155.   In response to paragraph 155, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

156.   In response to paragraph 156, Defendant admits that in the morning of March 21, 2019, a HOPE team comprised of both LASAN and LAPD employees arrived at the intersection of West 6th Street and South Kingsley Drive to conduct an unnoticed rapid response cleanup of the public rights-of-way and access areas in the vicinity of that area to respond to immediate threats to the health or safety of the public.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

157.   In response to paragraph 157, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

158.   In response to paragraph 158, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

159.   In response to paragraph 159, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

160.   In response to paragraph 160, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

161.   In response to paragraph 161, Defendant lacks knowledge or information

35

1  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that
2  basis, denies each and every allegation contained therein.

3    162.   In response to paragraph 162, Defendant lacks knowledge or information
4  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that
5  basis, denies each and every allegation contained therein.

6    163.   In response to paragraph 163, Defendant lacks knowledge or information
7  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that
8  basis, denies each and every allegation contained therein.

9    164.   In response to paragraph 164, Defendant denies the allegation that all of the
10 items that were discarded during the March 21, 2019 rapid response cleanup in and
11 around the intersection of West 6th Street and South Kingsley Drive were clean and in
12 good condition.  Defendant lacks knowledge or information sufficient to form a belief as
13 to the truth of the remaining allegations in that paragraph, and on that basis, denies each
14 and every remaining allegation contained therein.

15   165.   In response to paragraph 165, Defendant admits that because the March 21,
16 2019 cleanup in and around West 6th Street and South Kingsley Drive was conducted as
17 a rapid response to respond to immediate threats to the health or safety of the public,
18 written notices were not posted prior to the cleanup.  Defendant lacks knowledge or
19 information sufficient to form a belief as to the truth of the remaining allegations in that
20 paragraph, and on that basis, denies each and every remaining allegation contained
21 therein.

22   166.   In response to paragraph 166, Defendant states that post-removal notices
23 were posted following the cleanup on March 21, 2019 in and around the area of West 6th
24 Street and South Kingsley Drive, which provided information regarding retrieval of
25 property that was removed during the cleanup and sent to a secure storage facility.
26 Defendant admits that the post-deprivation notices inform individuals that property had
27 been stored and that owners could contact the storage facility about retrieving their
28 belongings, but did not provide an inventory of the items that were seized and why each

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

1   was removed and stored.  Except as expressly admitted herein, Defendant denies each

2   and every remaining allegation contained therein.

3       167.   In response to paragraph 167, Defendant lacks knowledge or information

4   sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

5   basis, denies each and every allegation contained therein.

6       168.   In response to paragraph 168, Defendant lacks knowledge or information

7   sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

8   basis, denies each and every allegation contained therein.

9       169.   In response to paragraph 169, Defendant states that on June 11, 2019, a Los

10  Angeles Sanitation Watershed Protection Division crew conducted a noticed cleanup of

11  the public rights-of-way and access areas in the vicinity of West 6th Street and South

12  Berendo Street in Koreatown, which is located less than a mile from where Ms. Zepeda

13  and Ms. Zamora allege they were staying at that time at West 5th Street and Harvard

14  Boulevard.  Defendant states that on June 11, 2019, several rapid response cleanups

15  were also conducted in Koreatown, but records do not reflect a cleanup at the

16  intersection of 5th Street and Harvard Boulevard.  Defendant lacks knowledge or

17  information sufficient to form a belief as to the truth of the remaining allegations in that

18  paragraph, and on that basis, denies each and every allegation contained therein.

19      170.   In response to paragraph 170, Defendant lacks knowledge or information

20  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

21  basis, denies each and every allegation contained therein.

22      171.   In response to paragraph 171, Defendant lacks knowledge or information

23  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

24  basis, denies each and every allegation contained therein.

25      172.   In response to paragraph 172, Defendant admits that claims were submitted

26  to the City on behalf of Gladys Zepeda and Miriam Zamora on or around August 23,

27  2019, but denies that these were timely submitted prior to the initiation of the litigation

28  or that Gladys Zepeda and Miriam Zamora appropriately exhausted their administrative

remedies. Except as expressly admitted herein, Defendant denies each and every remaining allegation.

173. In response to paragraph 173, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

174. In response to paragraph 174, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

175. In response to paragraph 175, Defendant admits several LAPD patrol cars and a Sanitation truck were present at the location of Sixth Street and Alexandria on January 10, 2019. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in that paragraph, and on that basis, denies each and every remaining allegation.

176. In response to paragraph 176, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

177. In response to paragraph 177, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

178. In response to paragraph 178, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

179. In response to paragraph 179, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

180. In response to paragraph 180, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

181.   In response to paragraph 181, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

182.   In response to paragraph 182, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

183.   In response to paragraph 183, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

184.   In response to paragraph 184, Defendant admits that on or about June 4, 2019, a Los Angeles Sanitation Watershed Protection Division crew conducted a cleanup of the public rights-of-way and access areas in and around the intersection of Oakwood Avenue and Western Avenue in Koreatown.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in that paragraph, and on that basis, denies each and every remaining allegation.

185.   In response to paragraph 185, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

186.   In response to paragraph 186, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

187.   In response to paragraph 187, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

188.   In response to paragraph 188, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

189.   In response to paragraph 189, Defendant lacks knowledge or information

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

1  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

2  basis, denies each and every allegation contained therein.

3       190.    In response to paragraph 190, Defendant admits that Plaintiffs purport to

4  sue DOES 1 through 7 by fictitious names.  Defendant lacks knowledge or information

5  sufficient to form a belief as to the truth of the remaining allegations, and on that basis,

6  denies each and every allegation contained therein.

7       191.    In response to paragraph 191, Defendant admits that claims were submitted

8  to the City on behalf of Ali El-Bey on or around July 9, 2019 and September 18, 2019,

9  but denies that these were timely submitted prior to the initiation of the litigation or that

10  Ali El-Bey appropriately exhausted his administrative remedies.  Except as expressly

11  admitted herein, Defendant denies each and every remaining allegation.

12       192.    In response to paragraph 192, Defendant lacks knowledge or information

13  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

14  basis, denies each and every allegation contained therein.

15       193.    In response to paragraph 193, Defendant lacks knowledge or information

16  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

17  basis, denies each and every allegation contained therein.

18       194.    In response to paragraph 194, Defendant lacks knowledge or information

19  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

20  basis, denies each and every allegation contained therein.

21       195.    In response to paragraph 195, Defendant lacks knowledge or information

22  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

23  basis, denies each and every allegation contained therein.

24       196.    In response to paragraph 196, Defendant lacks knowledge or information

25  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

26  basis, denies each and every allegation contained therein.

27       197.    In response to paragraph 197, Defendant lacks knowledge or information

28  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

1   basis, denies each and every allegation contained therein.

2       198.   In response to paragraph 198, Defendant lacks knowledge or information

3   sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

4   basis, denies each and every allegation contained therein.

5       199.   In response to paragraph 199, Defendant lacks knowledge or information

6   sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

7   basis, denies each and every allegation contained therein.

8       200.   In response to paragraph 200, Defendant lacks knowledge or information

9   sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

10  basis, denies each and every allegation contained therein.

11      201.   In response to paragraph 201, Defendant lacks knowledge or information

12  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

13  basis, denies each and every allegation contained therein.

14      202.   In response to paragraph 202, Defendant lacks knowledge or information

15  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

16  basis, denies each and every allegation contained therein.

17      203.   In response to paragraph 203, Defendant lacks knowledge or information

18  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

19  basis, denies each and every allegation contained therein.

20      204.   In response to paragraph 204, Defendant lacks knowledge or information

21  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

22  basis, denies each and every allegation contained therein.

23      205.   In response to paragraph 205, Defendant lacks knowledge or information

24  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

25  basis, denies each and every allegation contained therein.

26      206.   In response to paragraph 206, Defendant lacks knowledge or information

27  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

28  basis, denies each and every allegation contained therein.

207.   In response to paragraph 207, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

208.   In response to paragraph 208, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

209.   In response to paragraph 209, Defendant admits that a claim was submitted to the City on behalf of James Haugabrook on or around August 23, 2019, but denies that these were timely submitted prior to the initiation of the litigation or that James Haugabrook appropriately exhausted his administrative remedies.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

210.   In response to paragraph 210, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

211.   In response to paragraph 211, Defendant admits that on April 24, 2019, the City conducted a noticed cleanup of a homeless encampment on Lomita Boulevard and McCoy Avenue in the Harbor City area of Los Angeles.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

212.   In response to paragraph 212, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

213.   In response to paragraph 213, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

214.   In response to paragraph 214, Defendant admits that records indicate that an Officer Lopez was present at the noticed cleanup conducted on April 24, 2019 in and around the area of Lomita Boulevard and McCoy Avenue.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

that paragraph, and on that basis, denies each and every remaining allegation contained therein.

215.    In response to paragraph 215, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

216.    In response to paragraph 216, Defendant admits that a dog cage was removed during this cleanup and subsequently discarded because it was contaminated such that it posed an immediate threat to the health and safety of the public.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in that paragraph, and on that basis, denies each and every remaining allegation.

217.    In response to paragraph 217, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

218.    In response to paragraph 218, Defendant admits that a claim was submitted to the City on behalf of Pete Diocson, Jr. on or around August 23, 2019, but denies that this claim was timely submitted prior to the initiation of the litigation or that Pete Diocson, Jr. appropriately exhausted his administrative remedies.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

219.    In response to paragraph 219, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

220.    In response to paragraph 220, Defendant admits that on May 21, 2019, a Los Angeles Sanitation Watershed Protection Division crew conducted a noticed cleanup of the public rights-of-way and access areas in the vicinity of Lomita Boulevard and McCoy Avenue in Harbor City.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

221.    In response to paragraph 221, Defendant lacks knowledge or information

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

1  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

2  basis, denies each and every allegation contained therein.

3      222.   In response to paragraph 222, Defendant admits LA Sanitation and LAPD

4  officers were at the location and instructed individuals remaining at the scene after the

5  posted start time for the cleanup to move their belongings from the cleanup area, and

6  provided additional time for them to do so.  Except as expressly admitted herein,

7  Defendant denies each and every remaining allegation.

8      223.   In response to paragraph 223, Defendant admits that LASAN employees

9  were present in and around the area of Lomita Boulevard and McCoy Avenue on May

10  21, 2019 to conduct a noticed cleanup.  Defendant lacks knowledge or information

11  sufficient to form a belief as to the truth of the remaining allegations in that paragraph,

12  and on that basis, denies each and every remaining allegation contained therein.

13      224.   In response to paragraph 224, Defendant lacks knowledge or information

14  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

15  basis, denies each and every allegation contained therein.

16      225.   In response to paragraph 225, Defendant admits that LASAN employees

17  were present in and around the area of Lomita Boulevard and McCoy Avenue on May

18  21, 2019 to conduct a noticed cleanup.  Defendant lacks knowledge or information

19  sufficient to form a belief as to the truth of the remaining allegations in that paragraph,

20  and on that basis, denies each and every remaining allegation contained therein.

21      226.   In response to paragraph 226, Defendant lacks knowledge or information

22  sufficient to form a belief as to the truth of the allegations in that paragraph, and on that

23  basis, denies each and every allegation contained therein.

24      227.   In response to paragraph 227, Defendant admits that LASAN employees

25  and LAPD officers were present in and around the area of Lomita Boulevard and McCoy

26  Avenue on May 21, 2019 during the noticed cleanup.  Defendant lacks knowledge or

27  information sufficient to form a belief as to the truth of the allegations in that paragraph,

28  and on that basis, denies all remaining allegations therein.

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

228.   In response to paragraph 228, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

229.   In response to paragraph 229, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

230.   In response to paragraph 230, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that paragraph, and on that basis, denies each and every allegation contained therein.

231.   In response to paragraph 231, Defendant admits that a claim was submitted to the City on behalf of Marquis Ashley on or around August 23, 2019, but denies that this claim was timely submitted prior to the initiation of the litigation or that Marquis Ashley appropriately exhausted his administrative remedies.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

## FIRST CAUSE OF ACTION

232.   In response to paragraph 232, Defendant realleges and incorporates by reference each of its responses set forth in the preceding paragraphs as though set forth fully herein.

233.   In response to paragraph 233, Defendant responds that to the extent the allegations of the paragraph seek to characterize LAMC 56.11, the ordinance is contained in a document that speaks for itself, and any attempt to characterize the ordinance is a legal argument and/or conclusion such that no response is required.  To the extent a response is deemed required, Defendant expressly denies the allegations to the extent that they are inconsistent with that document.  Defendant states that the remaining allegations are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

234.   In response to paragraph 234, Defendant responds that to the extent the

45

allegations of the paragraph seek to characterize LAMC 56.11, the ordinance is contained in a document that speaks for itself, and any attempt to characterize the ordinance is a legal argument and/or conclusion such that no response is required. To the extent a response is deemed required, Defendant expressly denies the allegations to the extent that they are inconsistent with that document. Defendant states that the remaining allegations are legal arguments and/or conclusions to which no response is required. To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

235.    In response to paragraph 235, Defendant responds that to the extent the allegations of the paragraph seek to characterize LAMC 56.11, the ordinance is contained in a document that speaks for itself, and any attempt to characterize the ordinance is a legal argument and/or conclusion such that no response is required. To the extent a response is deemed required, Defendant expressly denies the allegations to the extent that they are inconsistent with that document. Defendant states that the remaining allegations are legal arguments and/or conclusions to which no response is required. To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

236.    In response to paragraph 236, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning whether Plaintiffs have paid municipal taxes that have been spent on enforcement of LAMC 56.11, and on that basis, denies all such allegations. Defendant states that the remaining allegations are legal arguments and/or conclusions to which no response is required. To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

237.    In response to paragraph 237, Defendant admits that Ktown for All purports to seek prospective relief, including injunctive and declaratory relief, and does not purport to seek damages. AREPS was dismissed from this case for failure to adequately plead associational standing, and since AREPS is no longer a party to this case,

Defendant need not respond to the allegations concerning AREPS.  *See* 6/2/2020 Order Granting In Part and Denying In Part Defendant's Motion to Dismiss [Dkt. No. 65], p. 11; *see also* Plaintiff's Notice Electing Not To File An Amended Complaint [Dkt. No. 72].  Defendant states that the remaining allegations are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

238.   In response to paragraph 238, Defendant states that the allegations therein are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

## SECOND CAUSE OF ACTION

239.   In response to paragraph 239, Defendant realleges and incorporates by reference each of its responses set forth in the preceding paragraphs as though set forth fully herein.

240.   In response to paragraph 240, Defendant states that the allegations therein are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

241.   In response to paragraph 241, Defendant states that the allegations therein are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

242.   In response to paragraph 242, Defendant admits that LAMC 56.11 authorizes, in enumerated circumstances, the removal, and in certain instances, disposal, of items located in the public right-of-way, and that certain employees of Defendant are authorized to enforce, and have enforced, LAMC 56.11, including during the cleanup operations that Defendant admits to and references in this Answer.  Except as expressly admitted herein, Defendant denies each and every remaining allegation.

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

243.   In response to paragraph 243, Defendant states that the allegations therein are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

244.   In response to paragraph 244, Defendant states that the allegations therein are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant admits that LAMC 56.11 authorizes, in enumerated circumstances, the removal, and in certain instances, disposal, of items located in the public right-of-way, and that certain employees of Defendant are authorized to enforce, and have enforced, LAMC 56.11, including during the cleanup operations that Defendant admits to and references in this Answer.  Defendant denies each and every allegation contained therein.

245.   In response to paragraph 245, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning whether Plaintiffs have paid municipal taxes that have been spent on enforcement of LAMC 56.11, and on that basis, denies all such allegations.  Defendant states that the remaining allegations are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

246.   In response to paragraph 246, Defendant admits that Ktown for All purports to seek prospective relief, including injunctive and declaratory relief, and does not purport to seek damages.  AREPS was dismissed from this case for failure to adequately plead associational standing, and since AREPS is no longer a party to this case, Defendant need not respond to the allegations concerning AREPS.  *See* 6/2/2020 Order Granting In Part and Denying In Part Defendant's Motion to Dismiss [Dkt. No. 65], p. 11; *see also* Plaintiff's Notice Electing Not To File An Amended Complaint [Dkt. No. 72].  Defendant states that the remaining allegations are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

required, Defendant denies each and every allegation contained therein.

247.   In response to paragraph 247, admits that LAMC 56.11 authorizes, in enumerated circumstances, the removal, and in certain instances, disposal, of items located in the public right-of-way, and that certain employees of Defendant are authorized to enforce, have enforced, and continue to enforce LAMC 56.11, subject to and consistent with the Court's preliminary injunction order and, during the pandemic, guidance from the Centers for Disease Control and Prevention.  Defendant states that the remaining allegations are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every remaining allegation contained therein.

## THIRD CAUSE OF ACTION

248.   In response to paragraph 248, Defendant realleges and incorporates by reference each of its responses set forth in the preceding paragraphs as though set forth fully herein.

249.   In response to paragraph 249, Defendant responds that the Court dismissed Plaintiffs' Third Cause of Action without leave to amend, and subsequently struck the Third Cause of Action.  *See* 2/15/2020 Order Granting In Part and Denying In Part Defendant's Motion to Dismiss FAC [Dkt. 36], p. 20; *see also* 6/2/2020 Order Granting In Part and Denying In Party Defendant's Motion to Dismiss SAC [Dkt. 65], p. 13. Since this cause of action has been stricken, Defendant need not respond to the allegations contained in paragraph 249.  To the extent a response is deemed required, Defendant denies each and every allegation contained in paragraph 249.

250.   In response to paragraph 250, Defendant responds that the Court dismissed Plaintiffs' Third Cause of Action without leave to amend, and subsequently struck the Third Cause of Action.  *See* 2/15/2020 Order Granting In Part and Denying In Part Defendant's Motion to Dismiss FAC [Dkt. 36], p. 20; *see also* 6/2/2020 Order Granting In Part and Denying In Party Defendant's Motion to Dismiss SAC [Dkt. 65], p. 13. Since this cause of action has been stricken, Defendant need not respond to the

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

allegations contained in paragraph 250.  To the extent a response is deemed required, Defendant denies each and every allegation contained in paragraph 250.

251.  In response to paragraph 251, Defendant responds that the Court dismissed Plaintiffs' Third Cause of Action without leave to amend, and subsequently struck the Third Cause of Action.  *See* 2/15/2020 Order Granting In Part and Denying In Part Defendant's Motion to Dismiss FAC [Dkt. 36], p. 20; *see also* 6/2/2020 Order Granting In Part and Denying In Party Defendant's Motion to Dismiss SAC [Dkt. 65], p. 13. Since this cause of action has been stricken, Defendant need not respond to the allegations contained in paragraph 251.  To the extent a response is deemed required, Defendant denies each and every allegation contained in paragraph 251.

252.  In response to paragraph 252, Defendant responds that the Court dismissed Plaintiffs' Third Cause of Action without leave to amend, and subsequently struck the Third Cause of Action.  *See* 2/15/2020 Order Granting In Part and Denying In Part Defendant's Motion to Dismiss FAC [Dkt. 36], p. 20; *see also* 6/2/2020 Order Granting In Part and Denying In Party Defendant's Motion to Dismiss SAC [Dkt. 65], p. 13. Since this cause of action has been stricken, Defendant need not respond to the allegations contained in paragraph 252.  To the extent a response is deemed required, Defendant denies each and every allegation contained in paragraph 252.

253.  In response to paragraph 253, Defendant responds that the Court dismissed Plaintiffs' Third Cause of Action without leave to amend, and subsequently struck the Third Cause of Action.  *See* 2/15/2020 Order Granting In Part and Denying In Part Defendant's Motion to Dismiss FAC [Dkt. 36], p. 20; *see also* 6/2/2020 Order Granting In Part and Denying In Party Defendant's Motion to Dismiss SAC [Dkt. 65], p. 13. Since this cause of action has been stricken, Defendant need not respond to the allegations contained in paragraph 253.  To the extent a response is deemed required, Defendant denies each and every allegation contained in paragraph 253.

254.  In response to paragraph 254, Defendant responds that the Court dismissed Plaintiffs' Third Cause of Action without leave to amend, and subsequently struck the

50

Third Cause of Action.  *See* 2/15/2020 Order Granting In Part and Denying In Part Defendant's Motion to Dismiss FAC [Dkt. 36], p. 20; *see also* 6/2/2020 Order Granting In Part and Denying In Party Defendant's Motion to Dismiss SAC [Dkt. 65], p. 13. Since this cause of action has been stricken, Defendant need not respond to the allegations contained in paragraph 253.  To the extent a response is deemed required, Defendant denies each and every allegation contained in paragraph 254.

## FOURTH CAUSE OF ACTION

255.    In response to paragraph 255, Defendant realleges and incorporates by reference each of its responses set forth in the preceding paragraphs as though set forth fully herein.

256.    In response to paragraph 256, to the extent the allegations in the paragraph seek to characterize or quote LAMC 56.11, the ordinance is contained in a document that speaks for itself, and any attempt to characterize the ordinance is a legal argument and/or conclusion such that no response is required.  To the extent a response is deemed required, Defendant expressly denies the allegations to the extent that they are inconsistent with that document.  Defendant states that the remaining allegations therein are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

257.    In response to paragraph 257, Defendant admits that Ktown for All purports to seek prospective relief, including injunctive and declaratory relief, and does not purport to seek damages.  Defendant states that the remaining allegations are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

258.    In response to paragraph 258, Defendant states that the allegations therein are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

# **FIFTH CAUSE OF ACTION**

259.   In response to paragraph 259, Defendant realleges and incorporates by reference each of its responses set forth in the preceding paragraphs as though set forth fully herein.

260.   In response to paragraph 260, Defendant states that the allegations therein are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

261.   In response to paragraph 261, Defendant states that the allegations therein are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

262.   In response to paragraph 262, Defendant states that the allegations therein are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant admits that LAMC 56.11 authorizes, in enumerated circumstances, the removal, and in certain instances, disposal, of items located in the public right-of-way, and that certain employees of Defendant are authorized to enforce, and have enforced, LAMC 56.11, including during the cleanup operations that Defendant admits to and references in this Answer.  Defendant denies each and every allegation contained therein.

263.   In response to paragraph 263, Defendant states that the allegations therein are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant admits that LAMC 56.11 authorizes, in enumerated circumstances, the removal, and in certain instances, disposal, of items located in the public right-of-way, and that certain employees of Defendant are authorized to enforce, and have enforced, LAMC 56.11, including during the cleanup operations that Defendant admits to and references in this Answer.  Defendant denies each and every allegation contained therein.

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

264.   In response to paragraph 264, Defendant admits that Ktown for All purports to seek prospective relief, including injunctive and declaratory relief, and does not purport to seek damages.  Defendant states that the remaining allegations are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

265.   In response to paragraph 265, Defendant admits that LAMC 56.11 authorizes, in enumerated circumstances, the removal, and in certain instances, disposal, of items located in the public right-of-way, and that certain employees of Defendant are authorized to enforce, and have enforced, LAMC 56.11, including during the cleanup operations that Defendant admits to and references in this Answer.  Defendant states that the remaining allegations are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every remaining allegation contained therein.

## SIXTH CAUSE OF ACTION

266.   In response to paragraph 266, Defendant realleges and incorporates by reference each of its responses set forth in the preceding paragraphs as though set forth fully herein.

267.   In response to paragraph 267, Defendant states that the allegations therein are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

268.   In response to paragraph 268, Defendant states that the allegations therein are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

269.   In response to paragraph 269, Defendant states that the allegations therein are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained

therein.

270.   In response to paragraph 270, Defendant states that the allegations therein are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

271.   In response to paragraph 271, Defendant states that the allegations therein are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

## SEVENTH CAUSE OF ACTION

272.  In response to paragraph 272, Defendant realleges and incorporates by reference each of its responses set forth in the preceding paragraphs as though set forth fully herein.

273.   In response to paragraph 273, Defendant responds that California Civil Code section 2080 *et seq.* is contained in a document that speaks for itself, and any attempt to characterize the statute is a legal argument and/or conclusion such that no response is required.  To the extent a response is deemed required, Defendant expressly denies the allegations to the extent that they are inconsistent with that document. Defendant states that the remaining allegations are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

274.  In response to paragraph 274, Defendant states that the allegations therein are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained therein.

275.  In response to paragraph 275, Defendant states that the allegations therein are legal arguments and/or conclusions to which no response is required.  To the extent a response is deemed required, Defendant denies each and every allegation contained

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

therein.

## DEFENDANT'S AFFIRMATIVE DEFENSES

Defendant hereby asserts the following as separate and distinct affirmative defenses:

## FIRST AFFIRMATIVE DEFENSE

### (Failure To State A Claim)

The SAC, and all claims asserted therein, is barred in whole or in part because the SAC fails to state facts sufficient to state a claim against Defendant upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

### (Government Immunity)

The SAC, and all claims asserted therein, are barred in whole or in part because Defendant is immune from liability for injury or damages to Plaintiffs, if any, pursuant to immunities, including, without limitation, those set forth in California Government Code sections 815, *et seq.*

## THIRD AFFIRMATIVE DEFENSE

### (Government Immunity – Cal. Gov. Code § 815.6)

The SAC, and all claims asserted therein, are barred in whole or in part because Defendant is immune from liability for injury or damages to Plaintiffs, if any, resulting from failure to discharge any mandatory duties because reasonable diligence was exercised to discharge any such duties. *See* Cal. Gov. Code § 815.6.

## FOURTH AFFIRMATIVE DEFENSE

### (Government Immunity – Cal. Gov. Code § 818.2)

The SAC, and all claims asserted therein, are barred in whole or in part because Defendant is immune from liability for injury or damages to Plaintiffs, if any, resulting from adoption or failure to adopt an enactment or failure to enforce any law. *See* Cal. Gov. Code § 818.2.

### FIFTH AFFIRMATIVE DEFENSE

### (Government Immunity – Cal. Gov. Code § 820.2)

The SAC, and all claims asserted therein, are barred in whole or in part because Defendant is immune from liability for injury or damages to Plaintiffs, if any, resulting from an exercise of discretion vested in a public employee, regardless of whether such discretion was abused. *See* Cal. Gov. Code §§ 815(a), 815.2(b), 820.2.

### SIXTH AFFIRMATIVE DEFENSE

### (Government Immunity – Cal. Gov. Code § 820.4)

The SAC, and all claims asserted therein, are barred in whole or in part because Defendant is immune from liability for any injury or damages to Plaintiffs, if any, resulting from any act or omission in the execution or enforcement of any law while exercising due care.  *See* Cal. Gov. Code §§ 815(a), 815.2(b), 820.4.

### SEVENTH AFFIRMATIVE DEFENSE

### (Government Immunity – Cal. Gov. Code § 820.6)

The SAC, and all claims asserted therein, are barred in whole or in part because Defendant is immune for injury or damages resulting from acts done in good faith and without malice under the apparent authority of an enactment, even though said enactment may be unconstitutional, invalid, or inapplicable.  *See* Cal. Gov. Code §§ 815(a), 815.2(b), 820.6.

### EIGHTH AFFIRMATIVE DEFENSE

### (Separation of Powers)

The SAC, and all claims asserted therein, are barred to the extent the relief Plaintiffs seek would vest the judiciary with the power, right, or ability to expend public funds and/or deprive Defendant's legislative branch of the right to exercise its discretion to expend public funds.

### NINTH AFFIRMATIVE DEFENSE

### (Failure To Comply With Tort Claims Act)

The SAC's state law claims are barred by Plaintiffs' failure to precede the action

with a claim in compliance with the Tort Claims Act, including, without limitation, Government Code Sections 910, 911.2, 945.4, 954.6, and 950.2, and any other applicable procedures relating to the filing of their government claim.

## TENTH AFFIRMATIVE DEFENSE

### (Government Immunity/No Vicarious Liability – Cal. Gov. Code § 815.2)

The SAC, and all claims asserted therein, are barred in whole or in part because Defendant is immune from liability for any injury or damages to Plaintiffs, if any, by way of vicarious liability, respondeat superior, or other doctrine of similar effect, where the public employee whose conduct allegedly caused the injury or damages is not liable or is immune from liability, or Defendant is otherwise not legally responsible for the acts and/or omissions of the employee.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Good Faith)

The SAC, and all claims asserted therein, are barred in whole or in part because all actions by Defendant and its employees or agents were carried out in good faith and with the reasonable belief that such actions were valid, necessary, and constitutionally proper.

## TWELFTH AFFIRMATIVE DEFENSE

### (State Law Provides Remedy)

The SAC is barred in part because state law provides a remedy for the destruction of personal property by a government employee. *See Hudson v. Palmer*, 468 U.S. 517 (1984).

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Action Taken In Public Interest)

The SAC is barred in part because it fails to state a claim for violation of the Fourth or Fourteenth Amendments because Defendant's actions taken to abate a public nuisance resulted in only seizure and/or destruction of property constituting health and safety hazards or threats injurious to the public.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Qualified Immunity)

Defendant is informed and believes, and on that basis alleges, that defendants named in the SAC as DOES 1-10 are immune from liability in this action on the basis of qualified immunity because the actions of the individual DOE defendants did not violate clearly established constitutional or statutory rights of which a reasonable person would have known.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Waiver)

The SAC, and all claims asserted therein, are barred in whole or in part to the extent Plaintiffs waived such claims.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Consent)

The SAC, and all claims asserted therein, are barred in whole or in part by the doctrine of consent.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Estoppel)

The SAC, and all claims asserted therein, are barred in whole or in part by the doctrine of estoppel.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

The SAC, and all claims asserted therein, are barred in whole or in part by the doctrine of unclean hands.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Failure To Exhaust Administrative Remedies)

The SAC, and all claims asserted therein, are barred in whole or in part to the extent Plaintiffs failed to exhaust administrative remedies before filing a federal action.

CITY OF LOS ANGELES' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

Case 2:19-cv-06182-DSF-PLA Document 122-5 Filed 04/07/21 Page 134 of 409 Page ID
Case 2:19-cv-06182-DSF-PLA Document 52 Filed 07/19/20 Page 60 of 61 Page ID #:9221
#:7348

## TWENTIETH AFFIRMATIVE DEFENSE

### (Adequate Legal Remedies)

Plaintiffs are not entitled to any equitable relief to the extent Plaintiffs have adequate legal remedies for alleged injury, if any.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Justification)

The SAC, and all claims asserted therein, are barred in whole or in part to the extent that Defendant and its employees had legal justification for all alleged actions and omissions.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### (Gift of Public Funds)

The SAC, and all claims asserted therein, are barred in whole or in part to the extent that Plaintiffs seek damages that would constitute a gift of public funds for a private purpose in violation of the California Constitution.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

### (Failure to Mitigate Damages)

The SAC, and all claims asserted therein, are barred in whole or in part to the extent that Plaintiffs failure to mitigate their damages.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (Lack of Standing)

The SAC, and all claims asserted therein, are barred in whole or in part to the extent that Plaintiffs lack standing to assert the claims and/or seek the requested relief.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

### (Reservation of Additional Affirmative Defenses)

Defendant lacks sufficient knowledge or information upon which to form a belief as to whether it may have additional affirmative defenses, and Defendant expressly reserves the right to assert in the future additional affirmative defenses that may be supported by information or facts obtained through discovery.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **PRAYER**

WHEREFORE, Defendant prays for judgment as follows:

1.      The Second Amended Complaint be dismissed with prejudice;

2.      Plaintiffs take nothing by way of this action;

3.      Defendant be awarded its costs of suit herein; and

4.      Defendant be awarded such other and further relief as the Court may deem just and appropriate including, but not limited to, an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Local Rule 38-1, Defendant City of Los Angeles hereby demands a trial by jury in this action.

Dated:   July 13, 2020

MICHAEL N. FEUER, City Attorney
KATHLEEN KENEALY, Chief Assistant City Attorney
SCOTT MARCUS, Chief, Civil Litigation Branch
FELIX LEBRON, Deputy City Attorney
A. PATRICIA URSEA, Deputy City Attorney

By:    /s/ Jessica Mariani
JESSICA MARIANI
Deputy City Attorney
Attorneys for Defendant
CITY OF LOS ANGELES

60

EXHIBIT 29

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

JANET GARCIA, et al.,
     Plaintiffs,

          v.

CITY OF LOS ANGELES, et al.,
     Defendants.

CV 19-6182 DSF (PLAx)

Order GRANTING in part and
DENYING in part Defendant's
Motion to Dismiss (Dkt. 57)

     Defendant City of Los Angeles moves to dismiss the First through
Fifth Causes of Action asserted by Plaintiff Ktown for All (KFA), the
First through Third Causes of Action asserted by Plaintiff Association
for Responsible and Equitable Public Spending (AREPS), and the Third
Cause of Action asserted by Plaintiffs Janet Garcia, Gladys Zepeda,
Miriam Zamoa, Ali El-Bey, Peter Diocson Jr., Marquis Ashley, and
James Haugabrook.  Dkt. 57 (Mot.).  Plaintiffs oppose.  Dkt. 59 (Opp'n).
The Court deems this matter appropriate for decision without oral
argument.  <u>See</u> Fed. R. Civ. P. 78; Local Rule 7-15.

## I. FACTUAL BACKGROUND

     In 2016, the Los Angeles City Council amended Los Angeles
Municipal Code (LAMC) § 56.11 (the Ordinance).  Dkt. 43 (SAC) ¶ 20.
The City also adopted the Los Angeles Municipal Code 56.11 Standard
Operating Protocols (the Protocols) regarding the implementation and
enforcement of the Ordinance.[1]  <u>Id.</u> ¶ 56.  The Ordinance regulates the
storage of personal property in public areas.  Its stated purpose is to

---

[1] The Court GRANTS the City's unopposed request judicial notice, Dkt. 57-1
(RJN), of the Ordinance and the Protocols.  Fed. R. Evid. 201(b).

"balance the needs of the residents and public at large to access clean and sanitary public areas . . . with the needs of the individuals, who have no other alternatives for the storage of personal property, to retain access to a limited amount of personal property in public areas." LAMC § 56.11(1).  In most situations, the City is authorized to impound personal property in a public area so long as the City provides pre-removal and post-removal notice.  See, e.g., id. § 56.11(3)(a)-(b).  In other situations, including where the property obstructs City operations or interferes with the City's compliance with the Americans with Disabilities Act of 1990 (ADA), only post-removal notice is required to impound personal property.  See, e.g., id. § 56.11(3)(c)-(f).  There are also limited situations where the City can immediately destroy personal property without notice, including when the property "poses an immediate threat to the health or safety of the public," id. § 56.11(3)(g), "constitutes evidence of a crime or contraband," id. § 56.11(3)(h), or is a "Bulky Item" that is not "designed to be used as a shelter," id. § 56.11(3)(i) (Bulky Item Provision).  A Bulky Item is "any item, with the exception of a constructed Tent, operational bicycle or operational walker, crutch or wheelchair, that is too large to fit into a 60-gallon container with the lid closed," but not "a container with a volume of no more than 60 gallons used by an individual to hold his or her Personal Property."  Id. § 56.11(2)(c).  The Ordinance also makes it unlawful for any person to "willfully resist, delay or obstruct a City employee from removing or discarding a Bulky Item."  Id. § 56.11(10)(d).  The City enforces the Ordinance through the Bureau of Sanitation (Sanitation) and the Los Angeles Police Department (LAPD), which conduct noticed cleanups and random rapid responses where personal property that does not comply with the Ordinance is seized or destroyed.  SAC ¶¶ 21, 69; see also LAMC § 56.11(11).

## II. LEGAL STANDARD

### A.    Rule 12(b)(1) Standard

The plaintiff bears the burden of establishing subject matter jurisdiction.  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  Motions to dismiss for lack of subject matter jurisdiction

2

are governed by Rule 12(b)(1) of the Federal Rules of Civil Procedure. A Rule 12(b)(1) jurisdictional challenge may be facial or factual. <u>Safe Air for Everyone v. Meyer</u>, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial challenge, the moving party asserts that the allegations in the complaint are "insufficient on their face" to establish federal jurisdiction. <u>Id.</u> "Whether subject matter jurisdiction exists therefore does not depend on resolution of a factual dispute, but rather on the allegations in [the] complaint." <u>Wolfe v. Strankman</u>, 392 F.3d 358, 362 (9th Cir. 2004). The court accepts the allegations as true, and the plaintiff need not present evidence outside the pleadings. <u>Id.</u>

## B.    Rule 12(b)(6) Standard

Rule 12(b)(6) allows an attack on the pleadings for failure to state a claim on which relief can be granted. "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (per curiam). However, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 557) (alteration in original) (citation omitted). A complaint must "state a claim to relief that is plausible on its face." <u>Twombly</u>, 550 U.S. at 570. This means that the complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678. There must be "sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively . . . and factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." <u>Starr v. Baca</u>, 652 F.3d 1202, 1216 (9th Cir. 2011).

Ruling on a motion to dismiss will be "a context-specific task that requires the reviewing court to draw on its judicial experience and

common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  <u>Iqbal</u>, 556 U.S. at 679 (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2)).  As a general rule, leave to amend a complaint that has been dismissed should be freely granted.  Fed. R. Civ. P. 15(a).

## III. DISCUSSION

### A.    Associational Standing

In its prior Order, the Court concluded that neither KFA nor AREPS had sufficiently alleged associational standing and granted leave to amend.  Dkt. 37 (12(b)(1) Order) at 18.  The City again contends that the organizations lack associational standing.  Mot. at 21-24.  "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  <u>Hunt v. Washington State Apple Advert. Comm'n</u>, 432 U.S. 333, 343 (1977).

### 1.    KFA

KFA alleges that its unhoused members "have been subjected to the City's customs, policies[,] and practices, including the continued enforcement of LAMC 56.11," "have suffered harm as a result of these customs, policies, and practices, including the loss of property and the deprivation of their constitutional and statutory rights," and "have also had a difficult time participating in [KFA's] advocacy efforts."  SAC ¶¶ 42, 43.  KFA further alleges that those unhoused members "are at imminent risk of continued enforcement of LAMC 56.11, and as a result, the deprivation of their constitutional rights."  <u>Id.</u> ¶ 42.

The City challenges KFA's ability to satisfy <u>Hunt</u>'s third prong. Mot. at 21.[2]  KFA appears to assume that where an organization seeks only injunctive and declaratory relief but not damages, the third <u>Hunt</u> prong is necessarily satisfied.  Opp'n at 7 (KFA has "clarif[ied] it is not seeking damages, and instead, seeks only injunctive and declaratory relief" which "is sufficient to meet the third prong under <u>Hunt</u>").  Some Ninth Circuit cases support that assumption.  <u>See, e.g.</u>, <u>Columbia Basin Apartment Ass'n v. City of Pasco</u>, 268 F.3d 791, 799 (9th Cir. 2001) ("Appellants request only injunctive and declaratory relief. Because these forms of relief do not require individualized proof, the third prong of the <i>Hunt</i> test is satisfied").  However, in <u>Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.</u>, 770 F.3d 1282 (9th Cir. 2014), an association of chiropractors sought declaratory and injunctive relief on behalf of its members for the defendant's allegedly improper practice of refusing to pay for certain therapies, or not paying enough for the therapies.  <u>Id.</u> at 1292.  The Ninth Circuit held that the third <u>Hunt</u> factor was not met because the complaint alleged "variations in payments wrongfully withheld, in the treatments for which payment has been withheld, and in the individual situations of [the organization's] members."  <u>Id.</u> at 1293.  In reconciling these two cases, the Court adopts the sensible position taken by the Third Circuit that so long as participation by each harmed member is not required, then the third prong is satisfied.   <u>Hosp. Council of W. Pennsylvania v. City of Pittsburgh</u>, 949 F.2d 83, 89-90 (3d Cir. 1991) (third <u>Hunt</u> prong satisfied by organization asserting "a challenge to

---

[2] The City also contends that the SAC lacks sufficient details such as "when incidents involving KFA's unhoused members occurred, whether pre-removal or post-removal notice was provided, whether property [was] stored or discarded, if the property discarded was a bulky item, hazardous material, contraband, or other personal property, whether the property was blocking ADA-access or obstructing entrances, etc."  Mot. at 17.  As stated in the Court's prior order, KFA need not allege all of these specific details to sufficiently allege that its unhoused members would have standing at this stage of the proceedings.  12(b)(1) Order at 13.  These questions, to the extent relevant to KFA's claims, can be answered in discovery.

alleged practices," because even though the action might "require that member[s] provide discovery[] and trial testimony," "an association may assert a claim that requires participation by *some* members" so long as it does not require participation of every aggrieved member).

"[A] plaintiff must demonstrate standing for each claim he seeks to press" and "for each form of relief sought." <u>DaimlerChrysler Corp. v. Cuno</u>, 547 U.S. 332, 335 (2006). As to KFA's facial claims, SAC ¶¶ 232-238 (First Cause of Action), ¶¶ 255-258 (Fourth Cause of Action), KFA contends "there is no question" that it can assert these claims because "facial challenges raise pure questions of law." Opp'n at 8. The Court agrees. <u>Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock</u>, 477 U.S. 274, 287 (1986) (third <u>Hunt</u> prong met where "the suit raises a pure question of law"). The City contends that KFA does not have standing to assert facial claims because it has "housed and unhoused members and asserts rights for other unhoused residents." Mot. at 22.[3] But KFA need not establish that all of its members' rights are violated and the Court does not read the SAC as asserting rights of nonmembers, though nonmembers would certainly benefit from the requested relief. KFA has associational standing to assert facial challenges to the Ordinance.

As to the other claims and related requests for relief, <u>see</u> SAC ¶¶ 239-247 (Second Cause of Action), ¶¶ 259-265 (Fifth Cause of Action), Prayer for Relief, the SAC is ambiguous as to the relief sought by KFA. <u>Compare</u> <u>id.</u>, Prayer for Relief (seeking "a declaratory judgment that

---

[3] The City also cites, without analysis, <u>New York State Club Ass'n, Inc. v. City of New York</u>, 487 U.S. 1 (1988), in which the Supreme Court found that an organization's "facial challenge to the Law does not require the participation of individual members, since there is complete identity between the interests of the [organization] and those of its member[s] with respect to the issues raised in this suit, and the necessary proof could be presented 'in a group context.'" <u>Id.</u> at 10 n.4. Contrary to the City's presumed implication, <u>New York State Club</u> did not hold that "complete identity" of "interests" was required to bring a facial challenge, only that it was sufficient in that case to satisfy the third <u>Hunt</u> prong.

[the Ordinance] . . . as applied to Plaintiffs" is unconstitutional and "the City's policies, practices, and conduct . . . violate Plaintiffs' rights"), with id. ¶ 247 (KFA seeks "an injunction[] enjoining the City from continuing to engage in these customs, policies, and practices"), and id. ¶ 258 (KFA is "entitled to an injunction[] enjoining the City from continuing to enforce this unconstitutional law"). KFA clarifies in its brief that the Second and Fifth Causes of Action are based on a challenge to the City's customs, policies, or practices and do not require "participation in the lawsuit of every individual who has ever had those policies and practices applied to them." Opp'n at 8. It asserts that it need only "rais[e] a single incident . . . to hold the City liable under Monell." Id. at 8-9. Accepting this clarification, the Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional.[4] At this stage, this is sufficient to satisfy the third Hunt prong. See Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc., 280 F.3d 278, 286-87 (3d Cir. 2002) (third Hunt prong was satisfied at the motion to dismiss stage where the complaint challenged "the *methods* the [defendants] employ for making decisions," which the plaintiff argued could be "established with sample testimony, which may not involve specific, factually intensive, individual medical care determinations"); Santiago v. City of Los Angeles, No. CV 15-08444-BRO (EX), 2016 WL 7176694, at *6 (C.D. Cal. Nov. 17, 2016) (while "injunctive or declaratory relief as to Defendants' policies" does not require member participation, "individualized inquiries . . . to determine whether the seizure of each individual street vendor's property was unlawful" would); Spinedex Physical Therapy USA, Inc. v. United Healthcare of Arizona, Inc., 661 F. Supp. 2d 1076, 1085 (D. Ariz. 2009), on reconsideration in part, No. CV-08-0457-PHX-ROS, 2009 WL 2710151 (D. Ariz. Aug. 26, 2009) (organization bringing claims for injunctive and declaratory relief satisfies third Hunt prong at motion to

---

[4] To the extent KFA does seek a declaration that the City has unconstitutionally applied the Ordinance or related policies or practices to each of its members, the Court STRIKES that request.

dismiss stage "even if [the organizational plaintiff's] claim required participation of most association members, . . . as long as the participation of *each* member is not required").  In other words, KFA may permissibly rely on participation of some members to establish the existence of a certain policy or practice without running afoul of the third <u>Hunt</u> prong.  However, if it later becomes apparent that KFA will need to rely on the individual participation of each of its members, the Court will reevaluate standing at that time.

KFA has associational standing to assert claims on behalf of its members seeking declarations that certain Ordinance provisions and related practices and customs are unconstitutional and an injunction prohibiting enforcement of those provisions, practices, and customs. The Court DENIES the City's Motion to Dismiss KFA for lack of standing.

### 2.     AREPS

AREPS is an organization "of taxpayers in Los Angeles that was founded to ensure that their tax dollars are used to promote responsible public spending."  SAC ¶ 44.  For example, it advocates for spending on "public health, housing, and other public infrastructure for all residents of Los Angeles, including its unhoused residents[,] and against the use of their tax dollars to enforce illegal laws that harm vulnerable residents of the City."  <u>Id.</u>  AREPS identifies two of its members who were allegedly harmed by the City's actions.  <u>Id.</u> ¶¶ 45-46.  In its prior Order, the Court concluded that AREPS had not sufficiently alleged associational standing based on its members' status as taxpayers. 12(b)(1) Order at 15-18; <u>see also</u> <u>Hunt</u>, 432 U.S. at 343 (association does not have standing if its members do not have standing to sue in their own right).  The City contends AREPS still has not met the first <u>Hunt</u> prong.

As stated in the Court's prior Order, the Ninth Circuit has held that "the standing analysis in a non-establishment clause case" of "a county taxpayer challenging an allegedly illegal act of the county" is the same as the analysis for a state taxpayer; that is, the "taxpayer

8

must allege direct injury, pecuniary or otherwise to have taxpayer standing under Article III." Villa v. Maricopa Cty., 865 F.3d 1224, 1229 (9th Cir. 2017) (quotation marks omitted) (quoting ASARCO Inc. v. Kadish, 490 U.S. 605, 613-14 (1989)).  In Villa, the court of appeals held that allegations that "taxes have been used to finance Maricopa County officials who have 'intercept[ed] communications in violation of Title III,' is an insufficient allegation of direct injury within the meaning of Asarco." Id.  AREPS contends that it now alleges more than the plaintiff in Villa did.  Opp'n at 11.  AREPS alleges that "[a] portion of the City's budget includes the cost of destroying property that is illegally seized from homeless residents." SAC ¶ 87.  Specifically, the City pays "tipping fees" to "dispose of items into local landfills" at a price of $60 per ton.  Id.  Because the items "should not, and would not otherwise, have been seized in the first place . . . the more items that are unconstitutionally seized and destroyed, the more additional costs there are to the City, and therefore, to taxpayers." Id.  AREPS does not contend that the City would not otherwise pay the tipping fees, only that the City would pay lower tipping fees because there would be fewer tons of trash if items were not destroyed pursuant to the Bulky Item Provision.  Accepting these allegations as true, the Court finds AREPS has adequately alleged that the City spent tax dollars solely attributable to the challenged conduct.  See Doremus v. Bd. of Ed. of Borough of Hawthorne, 342 U.S. 429, 434 (1952) (plaintiff must "show[] a measurable appropriation or disbursement of [City] funds occasioned solely by the activities complained of"); Doe v. Madison Sch. Dist. No. 321, 177 F.3d 789, 794 (9th Cir. 1999) (en banc) ("[W]hen a plaintiff has failed to allege that the government spent tax dollars solely on the challenged conduct, we have denied standing").

The City next contends that even if AREPS can show injury, it cannot show that injury will be redressed by the declaratory and injunctive relief sought.  Mot. at 24.  "[T]o find redressability, a court must assume that, were the remedy the taxpayers seek to be allowed, 'legislators will pass along the supposed increased revenue in the form of tax reductions.'" Arizona Christian Sch. Tuition Org. v. Winn, 563 U.S. 125, 136 (2011) (quoting DaimlerChrysler Corp., 547 U.S. at 344).

"It would be 'pure speculation' to conclude that an injunction against a government expenditure or tax benefit 'would result in any actual tax relief' for a taxpayer-plaintiff." Id. (quoting ASARCO, 490 U.S. at 614). Assuming that the challenged Ordinance provisions were declared unconstitutional and enforcement enjoined, whatever savings might result would not necessarily be passed on to taxpayers. Instead, the City might spend the money on the presumably higher storage costs for unattended Bulky Items that can no longer be destroyed, or more frequent sweeps, or any number of other expenditures.

AREPS contends that "[t]axpayers are *not* required to show, as the City argues, that the City would refund them the money." Opp'n at 12 (citing Cammack v. Waihee, 932 F.2d 765, 769 (9th Cir. 1991) and We Are Am./Somos Am., Coal. of Arizona v. Maricopa Cty. Bd. of Supervisors, 809 F. Supp. 2d 1084, 1111 (D. Ariz. 2011)). However, the Ninth Circuit's position in Cammack, 932 F.2d at 769, that a taxpayer is not required to "prove that her tax burden will be lightened by elimination of the questioned expenditure," relies on Hoohuli v. Ariyoshi, 741 F.2d 1169 (9th Cir. 1984), which has since been overruled. Arakaki v. Lingle, 477 F.3d 1048, 1062 (9th Cir. 2007) ("[T]he Supreme Court . . . effectively overrule[d] Hoohuli"). In Arakaki, the Ninth Circuit specifically noted that the Supreme Court's decision in DaimlerChrysler was contrary to the prior Ninth Circuit rule that "did not require that the taxpayer prove that his tax burden would be lightened by the cancellation of the challenged expenditure." Id. at 1062-63. It then applied DaimlerChrysler and found that "any benefit that would accrue to Plaintiffs from an injunction or declaratory judgement is speculative" because "[i]t is not certain that even if all funding for [the challenged expenditure] were terminated, that the Legislature would pass the savings on to the Plaintiffs in the form of tax breaks or refrain from spending the funds on [other] programs . . . ." Id. at 1064.[5] Therefore, under Arakaki, taxpayers are in fact required

---

[5] Additionally, We Are America relied on "the difference between the legal principles governing municipal taxpayer standing and those governing federal and state taxpayers" in reaching its conclusions. 809 F. Supp. 2d at

to show that the City would pass the savings on to AREPS's members. Because AREPS has not adequately alleged that fact, AREPS has not adequately pleaded associational standing and is DISMISSED with leave to amend. The Court will give AREPS one final opportunity to plead standing adequately, though it does not appear likely that it can do so.

## B.   Organizational Standing

In its prior Order, the Court addressed in detail each of the City's arguments against KFA's organizational standing and found that KFA established organizational standing under the <u>Havens</u> test.[6] Dkt. 37 12(b)(1) Order at 6-11. The City now raises the entirely new argument that organizational standing under <u>Havens</u> applies only to "claims under federal statutes" and not claims based on the constitution. Mot. at 19. In support, the City relies on <u>Lexmark Int'l, Inc. v. Static Control Components, Inc.</u>, 572 U.S. 118 (2014) and <u>Bank of America Corp. v. City of Miami, Fla.</u>, 137 S. Ct. 1296 (2017). Both <u>Lexmark</u> and <u>Bank of America</u> involve the "zone-of-interests" test that courts use to determine what class of plaintiffs are authorized to bring statutory causes of action, separate and apart from Article III standing. <u>See Lexmark</u>, 572 U.S. at 127 (zone-of-interests test addresses "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim"); <u>Bank of America</u>, 137 S. Ct. at 1302 (zone-of-interest test answers the question "whether the statute grants the plaintiff the cause of action that he asserts"). Neither opinion addressed whether the <u>Havens</u> test for Article III organizational standing is unavailable

---

1111. However, <u>Villa</u> makes clear that the Ninth Circuit no longer recognizes that distinction. 865 F.3d at 1229. This makes particular sense for the City of Los Angeles, which has a population greater than many states.

[6] Applying <u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363 (1982), the Ninth Circuit has held that "[a]n organization suing on its own behalf can establish an injury when it suffered 'both a diversion of its resources and a frustration of its mission.'" <u>La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest</u>, 624 F.3d 1083, 1088 (9th Cir. 2010) (quoting <u>Fair Hous. of Marin v. Combs</u>, 285 F.3d 899, 905 (9th Cir. 2002)).

Case 2:19-cv-06182-DSF-PLA   Document 122-9   Filed 04/07/21   Page 149 of 409   Page ID
Case 2:19-cv-06182-DSF-PLA   Document 65   Filed 06/02/20   Page 12 of 14   Page ID #:2173
#:7362

for constitutional claims.  And as subsequent Ninth Circuit cases show, the Article III standing analysis under <u>Hunt</u> and <u>Havens</u> is a completely separate inquiry from the zone-of-interests tests.  <u>See</u> <u>E. Bay Sanctuary Covenant v. Trump</u>, 950 F.3d 1242, 1265-66, 1270 (9th Cir. 2020) (first analyzing whether the organizational plaintiffs had associational standing under <u>Hunt</u> or organizational standing under <u>Havens</u> and then separately analyzing the zone-of-interests test under the relevant statute at issue).  KFA's organizational standing to bring constitutional claims under Article III is not limited by <u>Lexmark</u> and <u>Bank of America</u>.

## C.  Organizations' Assertion of Constitutional Claims

The bulk of the City's motion posits that even where an organization satisfies the standing requirements set out by <u>Hunt</u> or <u>Havens</u>, it nevertheless cannot state a claim for constitutional, and specifically Fourth and Fourteenth Amendment, violations where it is the constitutional rights of members or beneficiaries that were allegedly violated, rather than the rights of the organization itself.  Plaintiffs contend the City has waived its ability to challenge the organizations' claims on these substantive grounds because it did not raise these arguments in its prior motion to dismiss.  Opp'n at 20 (citing Fed. R. Civ. P. 12(g)).

Rule 12(g)(2) prohibits successive motions to dismiss that raise arguments that could have been made in a prior motion, but that does not mean that "[a] defendant who omits a defense under Rule 12(b)(6) – failure to state a claim upon which relief can be granted" – waives that defense.  <u>See</u> <u>In re Apple iPhone Antitrust Litig.</u>, 846 F.3d 313, 317-318 (9th Cir. 2017), <u>aff'd sub nom.</u> <u>Apple Inc. v. Pepper</u>, 139 S. Ct. 1514 (2019) ("a defendant who fails to assert a failure-to-state-a-claim defense in a pre-answer Rule 12 motion cannot assert that defense in a later pre-answer motion under Rule 12(b)(6)").   Although the Ninth Circuit is "generally [] forgiving of a district court's ruling on the merits of a late-filed Rule 12(b)(6) motion," and has recognized that "[d]enying late-filed Rule 12(b)(6) motions and relegating defendants to the three procedural avenues specified in Rule 12(h)(2) can produce unnecessary

and costly delays," id. at 318-19, the Court does not believe judicial economy outweighs the policy reasons behind Rule 12(g) in this case. The Court is not persuaded by the City's bare assertion that "it is in the interest of judicial economy to consider the failure-to-state-a-claim arguments at this stage of the litigation." Dkt. 60 (Reply) at 12.  The Court therefore DENIES the City's motion to the extent it raises defenses not raised in its prior 12(b)(6) motion, without prejudice to the City raising those issues again in a manner authorized by Rule 12(h)(2).

## D.    Void for Vagueness (Third Cause of Action)

As both parties acknowledge, Mot. at 18; Opp'n at 22, the Ninth Circuit does not require "claims dismissed with prejudice and without leave to amend" to "be repled in a subsequent amended complaint to preserve them for appeal." Lacey v. Maricopa Cty., 693 F.3d 896, 928 (9th Cir. 2012).  Nevertheless, Plaintiffs decided to include in the SAC the Third Cause of Action, which was previously dismissed with prejudice, "to preserve all rights," but acknowledged that "this cause of action is no longer part of this litigation." SAC at 54 n.27.  This claim should not have been included in the SAC.  The City now requests that the Court "dismiss this claim again with prejudice." Mot. at 18. Plaintiffs' unnecessary inclusion of this claim does not revive it.  The Court strikes the Third Cause of Action.  This claim may not be repled.

## IV. CONCLUSION

The City's motion to dismiss for lack of standing is GRANTED in part and DENIED in part.  The First and Second Causes of Action are DIMISSED as to AREPS with leave to amend.  The Court strikes the Third Cause of Action.  The City's motion to dismiss is otherwise DENIED.

An amended complaint must be filed no later than June 29, 2020. Failure to file by that date will waive the right to do so.  The Court does not grant leave to add new defendants or new claims.  Leave to add new defendants or new claims must be sought by a properly-noticed

motion.  Plaintiffs are ordered not to include any claims that have been dismissed with prejudice.

IT IS SO ORDERED.

Date: June 2, 2020

Dale S. Fischer
United States District Judge

EXHIBIT 30

1   Shayla Myers (SBN 264054)
    Mallory B. Andrews (SBN 312209)
2   Alex Flores (SBN 303552)
    Jonathan Gibson (SBN 300306)
3   LEGAL AID FOUNDATION OF LOS ANGELES
    7000 South Broadway
4   Los Angeles, CA  90003
    Telephone: (213) 640-3983
5   Email:  smyers@lafla.org
           mbandrews@lafla.org
6            aeflores@lafla.org
             jgibson@lafla.org
7

8   *Attorneys for Gladys Zepeda, Miriam Zamora,*
    *Ali El-Bey, James Haugabrook, Pete Diocson Jr.,*
    *Marquis Ashley, and Ktown for All*

9   *Additional Attorneys on Next Page*

10

11   **UNITED STATES DISTRICT COURT**

12   **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

13   JANET GARCIA, GLADYS   )  CASE NO. 2:19-cv-06182-DSF-PLA
    ZEPEDA, MIRIAM ZAMORA, ALI  )
14   EL-BEY, PETER DIOCSON JR,  )  [Assigned to Judge Dale S. Fischer]
    MARQUIS ASHLEY, JAMES    )
15   HAUGABROOK, individuals,   )
    KTOWN FOR ALL, an       )  **PLAINTIFFS' NOTICE**
16   unincorporated association;   )  **ELECTING NOT TO FILE AN**
    ASSOCIATION FOR        )  **AMENDED COMPLAINT**
17   RESPONSIBLE AND EQUITABLE )
    PUBLIC SPENDING, an     )
18   unincorporated association,   )  Complaint Filed Date: July 18, 2019
                      )
19          Plaintiffs,    )
                      )
20        v.          )
                      )
21   CITY OF LOS ANGELES, a   )
    municipal entity; DOES 1-7,   )
22                      )
          Defendants.   )
23                      )

24

25

26

27

28

Catherine Sweetser (SBN 271142)
Kristina Harootun (SBN 308718)
John Washington (SBN 315991)
SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP
11543 West Olympic Blvd.
Los Angeles, CA 90064
Telephone: (310) 396-0731
Email:  csweetser@sshhzlaw.com
        kharootun@sshhzlaw.com
        jwashington@sshhzlaw.com

*Attorneys for Plaintiffs*

Benjamin Allan Herbert (SBN 277356)
William L. Smith (SBN 324235)
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone: (213) 680 8400
Email:  benjamin.herbert@kirkland.com
        william.smith@kirkland.com

Michael Onufer (SBN 300903)
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone: (310) 552-4200
Email:  michael.onufer@kirkland.com

*Attorneys for Plaintiffs Ktown for All, Janet Garcia,*
*Peter Diocson Jr., Marquis Ashley, Ali El-Bey, and*
*Association for Responsible and Equitable Public*
*Spending*

Case 2:19-cv-06182-DSF-PLA   Document 122-8   Filed 04/07/21   Page 154 of 409   Page ID
#:7368
Case 2:19-cv-06182-DSF-PLA   Document 72-8   Filed 06/29/20   Page 3 of 4   Page ID #:2139

Plaintiffs have reviewed this Court's order granting in part and denying in part Defendant's motion to dismiss. Dkt. 65. Accordingly, Plaintiffs hereby inform the Court and Defendants that Plaintiffs will not be filing an amended complaint.

Dated:  June 29, 2020                    Respectfully submitted,
                                         LEGAL AID FOUNDATION OF LOS ANGELES

                                         /s/ *Shayla Myers*
                                         By: Shayla Myers
                                         *Attorneys for Plaintiffs Gladys Zepeda, Miriam*
                                         *Zamora, Ali El-Bey, Pete Diocson Jr., Marquis*
                                         *Ashley, James Haugabrook, and Ktown for All*

                                         SCHONBRUN SEPLOW HARRIS HOFFMAN &
                                         ZELDES LLP
                                         /s/ *Catherine Sweetser*
                                         By: Catherine Sweetser
                                         *Attorneys for All Plaintiffs*

                                         KIRKLAND & ELLIS

                                         LLP /s/ *Benjamin Herbert*
                                         By: Benjamin Allen Herbert
                                         *Attorneys for Plaintiffs Ktown for All, Janet Garcia,*
                                         *Peter Diocson Jr., Marquis Ashley, Ali El-Bey, and*
                                         *Association for Responsible and Equitable Public*
                                         *Spending*


                           Local Rule 5-4.3.4 Attestation

I attest that Plaintiffs' counsel, Shayla Myers and Catherine Sweetser, concurs in this filing's content and has authorized the filing.

DATED: June 29, 2020                     KIRKLAND & ELLIS LLP

                                         By: */s/ Benjamin Herbert*

PLAINTIFFS' NOTICE OF ELECTING NOT TO FILE AMENDED COMPLAINT

EXHIBIT 31

Shayla Myers (SBN 264054)
Mallory B. Andrews (SBN 312209)
Alex Flores (SBN 303552)
Jonathan Gibson (300306)
LEGAL AID FOUNDATION OF LOS ANGELES
7000 South Broadway
Los Angeles, CA 90003
Telephone: (213) 640-3983
Email: smyers@lafla.org
      mbandrews@lafla.org
      aeflores@lafla.org
      jgibson@lafla.org

*Attorneys for Gladys Zepeda, Miriam Zamora,*
*Ali El-Bey, James Haugabrook, Pete Diocson Jr.,*
*Marquis Ashley, and Ktown for All*

*[Additional Attorneys on Next Page]*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANET GARCIA, GLADYS ZEPEDA, MIRIAM ZAMORA, ALI EL-BEY, PETER DIOCSON JR, MARQUIS ASHLEY, JAMES HAUGABROOK, individuals, KTOWN FOR ALL, an unincorporated association; ASSOCIATION FOR RESPONSIBLE AND EQUITABLE PUBLIC SPENDING, an unincorporated association.<br><br>        Plaintiffs,<br><br>   v.<br><br>CITY OF LOS ANGELES, a municipal entity; DOES 1-7,<br><br>        Defendants. | CASE NO. 2:19-cv-06182-DSF-PLA<br><br>**RULE 26(F) JOINT REPORT**<br><br>Complaint Filed Date: July 18, 2019<br><br><br>Judge: Hon. Dale S. Fischer<br>Hearing Date: August 3, 2020<br>Time: 11:00 a.m.<br>Courtroom: 7D |

Catherine Sweetser (SBN 271142)
Kristina Harootun (SBN 308718)
John Washington (SBN 315991)
SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP
11543 West Olympic Blvd.
Los Angeles, CA 90064
Telephone:  (310) 396-0731
Email:  csweetser@sshhzlaw.com
        kharootun@sshhzlaw.com
        jwashington@sshhzlaw.com

*Attorneys for Plaintiffs*

Benjamin Allan Herbert (SBN 277356)
William L. Smith (SBN 324235)
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone:  (213) 680 8400
Email:  benjamin.herbert@kirkland.com
        william.smith@kirkland.com

Michael Onufer (SBN 300903)
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone: (310) 552-4200
Email:  michael.onufer@kirkland.com

*Attorneys for Plaintiffs Ktown for All, Janet Garcia,
Peter Diocson Jr., Marquis Ashley, Ali El-Bey, and
Association for Responsible and Equitable Public
Spending*

RULE 26(F) JOINT REPORT

Pursuant to Federal Rule of Civil Procedure 26(f), Plaintiffs Janet Garcia, Gladys Zepeda, Miriam, Zamora, Ali El-Bey, Peter Diocson Jr., Marquis Ashley, James Haugabrook, and Ktown for All and Defendant City of Los Angeles submit the following Joint Report.

### a.   <u>Statement of the Case</u>

Plaintiffs are seven unhoused individuals and a community-based organization, who bring this action to challenge the City of Los Angeles's longstanding practice of seizing and destroying homeless people's belongings, in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Sections 7 and 13 of the California Constitution and applicable state laws.  They bring this action for declaratory and injunctive relief and for damages and prospective relief under 42 U.S.C. Section 1983 as well as relevant state laws.

Plaintiffs bring facial and as-applied challenges to the constitutionality of Los Angeles Municipal Code Section 56.11, a local ordinance which the City contends allows it to seize and, in some instances, immediately destroy unhoused people's belongings.  Specifically, Plaintiffs' first and fourth causes of action are facial challenges to a constitutionality of Los Angeles Municipal Code Section 56.11(3)(i) and (10)(d).  Plaintiffs' second and fifth causes allege that Defendant's actions violate the  Fourth Amendment of the United States Constitution and Article I, section 13 of the California Constitution and the right to be free from deprivation of their property without due process in violation of the Fourteenth Amendment to the United States Constitution and Article I, Section 7 of the California Constitution.  Plaintiffs allege that Defendant's actions have been and continue to be taken pursuant to its policies, patterns, and/or customs of seizing and destroying homeless individuals' property in violation of the U.S. and California Constitutions.  To the extent these actions are taken pursuant to LAMC 56.11, Plaintiffs bring as-applied challenges to the ordinance.  Defendant denies these allegations and the contention that Defendant violated any of the Plaintiffs' constitutional rights.

Individual Plaintiffs also bring a state law claim, alleging that Defendant's policies, practices, and conduct violated California Government Code section 815.6 and California Civil Code Section 2080 et seq. for failing to maintain individual Plaintiff's property.  Defendant denies these allegations and the contention that Defendant violated any of the Individual Plaintiffs' rights under these state statutes.

Plaintiff Ali El-Bey brings a separate cause of action on the ground that Defendant violated the Bane Civil Rights Act by using arrests, threats of arrest, and intimidation to interfere with his right to be free from unlawful searches and seizure of his possessions, his right to due process, and the statutory rights of the State of California.  Defendant denies these allegations and the contention that Defendant violated Plaintiff El-Bey's rights under the Bane Act.

All Plaintiffs seek a declaration that Defendant's laws and policies, practices, and customs violate the United States and California Constitution and an injunction preventing these practices.  Defendant contends that Plaintiffs are not entitled to prospective injunctive or declaratory relief.  As discussed below, the individual plaintiffs seek damages under 42 U.S.C. Section 1983 and relevant state laws. Defendant contends that it is not liable to the Individual Plaintiffs for any damages.

Defendant did not assert any counterclaims in this case.  Defendant asserts the following 25 affirmative defenses.  These defenses are to all claims unless otherwise stated: (1) failure to state a claim; (2) government immunity under California Government code sections 815, *et seq.*;  (3) government immunity under California Government Code section 815.6; (4) government Immunity under California Government Code section 818.2; (5) government immunity under Government Code section 820.2; (6) government immunity under Government Code section 820.4; (7) government immunity under Government Code section 820.6; (8) separation of powers; (9) failure to comply with tort claim act; (10) government immunity/ no vicarious liability under California Government Code section 815.2; (11) good faith; (12) state law provides remedy for destruction of property; (13) action taken in the

RULE 26(F) JOINT REPORT

public interest (for claims based on Fourth and Fourteenth Amendment); (14) qualified immunity for DOES 1-10; (15) waiver; (16) consent; (17) estoppel; (18) unclean hands; (19) failure to exhaust administrative remedies; (20) adequate legal remedies; (21) justification; (22) gift of public funds; (23) failure to mitigate damages; (24) lack of standing; (25) reservation of additional defenses.

**b.**   **Subject Matter Jurisdiction**

This is an action for declaratory relief and injunctive relief and damages pursuant to 42 U.S.C.§ 1983 based upon the continuing violations of Plaintiffs' rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.  Jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1343 based on 42 U.S.C. § 1983 and questions of federal constitutional law. Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as it arises from the same case or controversy as Plaintiffs' federal claims.

**c.**   **Legal Issues**

The parties agree that this is not a complex case and the Manual for Complex Litigation should not be used.

*Plaintiffs' key legal issues are*:

1. whether LAMC 56.11 violates the United States Constitution, either as written or as applied, in so much as it allows the City to unreasonably seize property in violation of the Fourth Amendment of the United States Constitution and Article I, section 13 of the California Constitution?

2. whether Defendant violated Plaintiffs' right to be secure from unreasonable seizures through its actions, taken pursuant to its policies, patterns and customs?

3. whether LAMC 56.11 violates the United States Constitution, either as written or as applied, in so much as it allows the City to seize property without due process of law, in violation of the Fourteenth Amendment of the

3

United States Constitution and Article I, section 7 of the California Constitution?

4. whether Defendant violated Plaintiffs' right to due process through its actions, taken pursuant to its policies, patterns and customs?

5. Whether Defendant violated the Bane Civil Rights Act by using arrest, threats of arrest, and intimidation to interfere with Plaintiff Ali El Bey's right to be free from unlawful searches and seizures of his possessions, and the statutory rights of the State of California?

6. Whether Defendant's policies, practices, and conduct violated California government Code section 815.6 and California Civil Code Section 2080 et seq. by failing to maintain individual Plaintiffs' property?

*Defendant's key legal issues are*:

1. Did Defendant cause any Plaintiff to suffer a violation of constitutional rights under the Fourth and/or Fourteenth Amendment of the United States Constitution or Article I, Sections 7 and 13 of the California Constitution as alleged in the Second Amended Complaint?

2. Is the Bulky Item Provision under LAMC 56.11(3) facially unconstitutional under the Fourth and/or Fourteenth Amendment of the United States Constitution or Article I, Sections 7 and 13 of the California Constitution as alleged in the Second Amended Complaint?

3. Did Defendant violate the Bane Civil Rights Act as alleged by Plaintiff El-Bey in the Second Amended Complaint?

4. Did Defendant violate a mandatory duty under California Civil Code Section 2080 et seq. as alleged in Second Amended Complaint?

5. Does KFA have standing to pursue claims for prospective relief for violation of its members' personal constitutional rights?

6. What monetary damages, if any, are Individual Plaintiffs entitled?

7. Are Plaintiffs are entitled to permanent injunctive relief? If so, what is

the appropriate nature and scope of any permanent injunctive relief?

    **d.**   **Parties, evidence, etc.**

    The Plaintiffs in this action are Janet Garcia, Gladys Zepeda, Miriam, Zamora, Ali El-Bey, Peter Diocson Jr., Marquis Ashley, James Haugabrook, and Ktown for All.  The Defendants are the City of Los Angeles, a municipal entity, and Does 1-7.

    *Plaintiffs' Key Documents and Percipient Witnesses:*

    Plaintiffs' key documents in this case are:  LAMC 56.11 and implementing policies and procedures; Data, reports, and documentation related to scheduling and conducting cleanups, enforcing LAMC 56.11, and storing and/or destructing of property;  communications related to scheduling and conducting cleanups, enforcement of LAMC 56.11, and storing and/or destroying  property; police body camera footage and other documentary evidence of cleanups and enforcement actions and the seizure and destruction of property; trainings of Los Angeles Sanitation, LAHSA, LAPD, and other city employees, agents, or contractors, regarding cleanups, enforcement of LAMC 56.11, and storing and/or destroying property.

    Plaintiffs identify the following individuals and categories of individuals who may testify as percipient witnesses:

        1. Janet Garcia (plaintiff)

        2. Gladys "Jane" Zepeda (plaintiff)

        3. Miriam Zamora (plaintiff)

        4. Ali El-Bey (plaintiff)

        5. James Haugabrook (plaintiff)

        6. Pete Diocson Jr. (plaintiff)

        7. Marquis Ashley (plaintiff)

        8. Jane Nguyen

        9. Nicholas Price

        10. Nicolas Emmons

        11. Michael Dickerson

12.Rachelle Bettega

13.Kahn

14.Muhammad

15.Jed Parriott

16.Chris Venn

17.Maria Velasquez

18.Mathew Strugar

19.Lisa Merenda

20.David Flores

21.Ivan Nathan

22.Angie

23.Donovan Dale

24.Estuardo Flores

25.Marco Iniquez Nungaray

26.Isai Barrea

27.Kathryna Hancock

28.Manny Mendez

29.Jose "Johnny" Sanchez

30.Juan Rivera

31.Juanito Oscar

32.Juan Lopez

33.LAPD Officer Bermudez

34.LAPD Officer Lucero

35.LAPD Officer Carolina Argueta

36.LAPD Officer Ivan Lucero

37.LAPD Officer Kevin Q. Chung

38.LAPD Officer Marc J. Mahlknech

39.LAPD Officer Lopez

40. LAPD Officer Kim

41. LAPD Officer Lucero

42. LA Sanitation employee Michael Tran

43. LA Sanitation employee Abraham Abrahamian

44. Community organizers, members of the community, and other unhoused individuals with knowledge of defendant's illegal seizure of property and other allegations in the Complaint.

45. City employees including Care team members, Care Plus teams members, Clean Streets LA teams members, Hope team members, LA Sanitation employees, LAPD employees, city council members and their staff;

46. LAHSA outreach workers and employees who have been present at encampment cleanups or enforcement actions, or may have knowledge of the City's customs, policies, or practices related to the allegations in the Complaint;

47. Employees of City or LAHSA contractors, including Clean Harbors and Chyrsalis, who have been present at encampment cleanups or enforcement actions, or may have knowledge of the City's customs, policies, or practices related to the allegations in the Complaint;

48. All individuals identified in Defendant's initial Rule 26 disclosures who may testify regarding matters related to Defendant's illegal seizure of property and other allegations in the Complaint.

*Defendant's Key Documents and Percipient Witnesses:*

Defendant's key documents include the Los Angeles Bureau of Sanitation (LASAN) cleanup and health-hazard reports, posting surveys, and photographs taken during the specific alleged incidents, available LAPD body worn video of the cleanups of the specific alleged incidents, the LASAN LAMC 56.11 standard operating protocols.  In addition to the seven named individual plaintiffs and any designated witness(es) for Ktown for All, Defendant identify the following witnesses: LASAN environmental compliance inspectors: Eric S. Estrada, Daniel C. Truong,

Teodoro C. Salvacion, Michael Hu, Armando Cabrera, Gilberto E. Campos, Arek Arzoumanian, Michael Tran, Abraham Abrahamian, Bernard J. Dancel, Philip A. Pedrosa, Jazmine N. Saucedo, Stephany J. Cruz, Jay J. Kim, and Alyssa E. Mireles; LASAN Chief Environmental Officer Howard Wong; and the following LAPD Officers: Kevin Q. Chung, Marc J. Mahlknecht, Kevin W. Cottle, Won Y. Kim.

### e. <u>Damages</u>

The individual Plaintiffs seek $10,000 each for the loss of their property, the violation of their constitutional and statutory rights, emotional distress, and for pain and suffering resulting from the unlawful conduct of Defendant. Ali El-Bey further seeks statutory damages.

### f. <u>Insurance</u>

Insurance is not an issue in this case.

### g. <u>Motions</u>

Plaintiffs plan to amend the second amended complaint to name the Doe defendants and will likely seek leave to file a supplemental and/or amended complaint. Plaintiffs may seek an additional preliminary injunction to prevent the seizure and destruction of property. Plaintiffs will also likely file a motion for summary judgment/adjudication.

Defendant intends to file a motion for judgment on the pleadings addressing Ktown for All's claims and the arguments raised in the City's second motion to dismiss that the Court denied under Rule 12(g) without prejudice to Defendant raising the issues again in a manner authorized by Rule 12(h)(2). Dkt. No. 65 at 12-13. Defendant also anticipates filing a motion for summary judgment and/or summary adjudication.

### h. <u>Status of Discovery</u>

*Plaintiffs' Summary re Status of Discovery:*

Plaintiffs propounded Requests for Production in October 2019. Beginning in September 2019, Plaintiffs repeatedly requested Defendant conduct the Rule 26

conference and begin discovery, which Defendant refused.  In October 2019, Plaintiffs requested the parties meet and confer pursuant to Local Rule 37 regarding Plaintiffs' proposed motion to compel early discovery.  In response to the threatened motion, Defendant chose to produce some documents related to some of the incidents in the complaint, but otherwise refused to meet and confer about the scope of that production.  Defendant also refused to allow Plaintiffs to propound a third party subpoena to Chrysalis, which stores property seized by LA Sanitation, on the ground that the storage of property was not relevant to Plaintiffs' case, since it related to destruction, rather than storage of property.  Thereafter, Plaintiffs moved for an order compelling early discovery.  The Judge denied the motion on the ground that the documents sought were broader than necessary to "assess whether to file a preliminary injunction motion and to determine additional DOE defendants."  Dkt. 33 at 5.

In January 2020, Defendant produced documents related to a small number of cleanups conducted in March 2019 in "South Los Angeles," which it contends were the only cleanups conducted during the relevant time period. In February 2020, Plaintiffs moved for a Preliminary Injunction, based on their facial challenge to LAMC 56.11.  In its opposition to the Preliminary Injunction, Defendant relied on a number of documents Plaintiffs had sought from Defendant related to the storage of property, but Defendant had previously argued were irrelevant to Plaintiffs' claims.

Following Defendant's use of documents related to the storage of seized property, Plaintiffs again sought Defendant's consent to seek third party discovery from Chrysalis, which Defendant again declined and also declined to participate in the Rule 26 conference.

The Parties conducted the Rule 26 conference on July 13, 2020.  Pursuant to Rule 26(d)(2)(B), the requests were deemed served on that date.  Defendant has not propounded any discovery.

*Defendant's Summary re Status of Discovery:*

Defendant voluntarily produced over 4,000 pages of documents in response to

RULE 26(F) JOINT REPORT

Plaintiffs' demands for early discovery and the requests propounded in October 2019. Defendant produced incident-specific documents on November 9, 2019 (CTY00001-2212) and December 10, 2019 (CTY002213-2677). The incident-specific documents included documents that related to the Individual Plaintiffs' specific alleged incidents and included, among other documents, LASAN cleanup and health-hazard reports, posting surveys, and photographs taken during the cleanups. Incident-specific documents also included LAPD reports, including Watch Commander Reports, Sergeant's Daily Reports, Daily Field Activity Reports, and Computer Aided Dispatch Reports. On January 10, 2020, Defendant also produced policy-related documents (CTY002678-3239) related to LAMC 56.11 and encampment cleanups. On January 10, 2020, Defendant also produced LASAN reports for all cleanups conducted in March 2019 in South Los Angeles (CTY003240-4085), which Defendant produced because it was unable to locate any incident-specific documents corresponding to Plaintiff Haugabrook's alleged incident occurring in "March 2019" at "Figueroa Street, between 53rd Street and 52nd Place." On January 15, 2020, Plaintiffs filed a Motion for Expedited Discovery seeking to require Defendant to produce additional documents or, alternatively, requiring Defendant to attend an early Rule 26 conference (Dkt. No. 29). On January 29, 2020, Magistrate Abrams issued an Order denying Plaintiffs' Motion for Expedited Discovery (Dkt. No. 33). In the order, the Magistrate agreed "with defendant that the requests as written are overbroad and not narrowly tailored to for the purposes stated by plaintiffs[.]" Dkt. No. 33 at 5. On March 11, 2020, Defendant produced additional documents relating to Plaintiffs' Motion for Preliminary Injunction (CTY004086- 4315). To date, Plaintiff has not produced any documents or information to Defendant relating to Plaintiffs' claims.

### i. **Discovery Plan**

Plaintiffs anticipate the use of interrogatories, request for production of documents, requests for admission, depositions, and subpoenas for records, as necessary. The anticipated subject of Plaintiffs' discovery will be the following:

individual cleanups and enforcement actions; the City's policies and procedures related to cleanups and enforcement actions; LAMC 56.11, Clean Streets LA, Hope Teams, Care teams and Care Plus teams; the City's practices related to seizing and storing or destroying property pursuant to LAMC 56.11, including records of cleanups and enforcement actions, and records related to storage of property seized pursuant to LAMC 56.11; training of LA Sanitation, Los Angeles Police Department, and other city personnel and contractors that are present at or responsible for cleanups and enforcement actions, including the seizure, destruction, and storage of property; communications related to cleanups and enforcement actions, including communications related to the scheduling and implementation of cleanups and enforcement actions. Plaintiffs plan to depose the City of Los Angeles pursuant to Rule 30(b)(b); individual witnesses present at or who have knowledge of each incident outlined in the SAC, including but not limited to employees of LA Sanitation, LAPD, and LAHSA. Plaintiffs also plan to depose City policymakers and others with knowledge of the City's customs and practices. The identity of these deponents will be based on responses to initial written discovery. As such, Plaintiffs expects they will need to conduct more depositions than the 10 allowed under Federal Rule of Civil Procedure 30(a)(2)(A).

Defendant anticipates the use of interrogatories, requests for production of documents, requests for admission, and depositions. Defendants anticipates that it will need discovery regarding the individual Plaintiffs' alleged incidents and any documents, communications, pictures, or videos relating to the incidents, the basis for and calculation of Plaintiff's alleged damages, the Individual Plaintiffs' allegations in the complaint, including for example, Janet Garcia's alleged employment and driver's license. Defendant anticipates that it will need discovery from Ktown for All relating to its alleged incidents and injuries, its membership, its finances, diversion of resources, organizational structure and mission. Defendant also anticipates the need to depose percipient witnesses identified in Plaintiffs' Rule 26(a) initial disclosures.

Defendant expects that it will require leave to conduct more than the 10 depositions allowed under Rule 30(a)(2)(A) because there are eight plaintiffs (seven individual plaintiffs and one organizational plaintiff) and Defendant anticipates the need to depose percipient witnesses identified in Plaintiffs' Rule 26(a) initial disclosures.

Plaintiffs' proposed schedule requests that all depositions, and written fact discovery be completed by January 25, 2021 based on a September 14, 2021 trial date.

Defendant's proposed schedule requests that all fact discovery be completed by February 2, 2020 based on a July 27, 2021 trial date.

Rule 26(a) initial disclosures will be made by both parties by July 27, 2020.

At the Rule 26 conference on July 13, 2020, Defendant proposed conducting the trial and discovery in two phases. Specifically, Defendant proposed trying the case in two phases in conjunction with a stipulation by the Defendant regarding *Monell* liability for compensatory damages and, to the extent allowed by the Court, reasonable attorney's fees pursuant to 42 U.S.C. §1988, if the finder of fact finds in that an employee of the City violated a Constitutional right of any Plaintiff. Defendant's proposed Phase I would be a jury trial on the issues of liability and monetary damages and Phase II would be a court trial on equitable relief. Defendant contends that proposal would streamline discovery, avoid protracted disputes regarding the extent and scope of *Monell* discovery, and allow for an earlier trial date.

Plaintiff are concerned that this approach will not eliminate the need for discovery and instead, will lead to more disputes about the scope of the discovery as it relates to the phases. In addition, the proposed approach does not account for Ktown for All's claims for a Declaratory Judgment and Injunctive Relief.

The parties continue to meet and confer about the feasibility of such an approach. If the parties agree that such an approach is appropriate and are able to reach an agreement regarding the specifics of such an approach, they will submit a revised scheduling order to reflect the proposed approach and seek court approval of the new scheduling order.

The parties have discussed preserving discoverable information. Plaintiffs request all documents produced in its electronic native format with preserved ESI, and not in PDF format, unless otherwise stated. Plaintiffs have requested the production of databases that contain responsive data Plaintiffs requested Defendants meet and confer on these issues as contemplated by Rule 26, including identifying how responsive documents are preserved and maintained, the relative burden of producing databased compared to generating reports and exporting documents, and other issues related to the manner and method of production; Defendants declined.

Defendant requests production of documents in portable document format (PDF) and production of videos electronically via MP4 files. Plaintiffs' document requests are extremely overbroad and seek "all" documents and communications relating to a wide variety of topic wholly unrelated to Plaintiffs' alleged incidents, the requests seek documents dating as far back as 2012 – four years before the current version of LAMC 56.11 was adopted – and seek production of entire databases across different departments. Plaintiffs' overbroad requests are neither relevant nor proportional to the discovery needs of this case. The Court held that it interpreted "KFA's claims in the SAC as seeking only to obtain a ruling that the policies and practices are unconstitutional and not that each past application of those practices to its members was unconstitutional." *See* Dkt. No. 65 at 7. Plaintiffs have not identified why production in PDF format is not acceptable or why production of documents in native format is necessary for claims relating to the alleged unlawful destruction of property. Defendant and Plaintiffs met and conferred regarding these issues during the July 13 conference of counsel. Plaintiffs' broad demands for production of all documents and communications in native format with preserved ESI will result in motion practice and Defendant filing a motion for protective order and/or opposing a motion to compel filed by Plaintiffs. Defendant requests that the Court order documents produced in PDF format and that the parties meet-and-confer regarding particular requests for production of a document in a different form.

With regards to the production of email communications, the parties discussed identifying custodians and search terms to identify responsive communications. Plaintiff requests that emails be produced in their TIFF format and not PDF. Defendant has agreed to meet-and-confer regarding custodians and search terms regarding email communications, subject to Defendant's objections regarding the scope, relevance, proportionality of Plaintiffs' request and Defendant's undue burden of production for such requested email communications. Defendant requests that any emails produced be in PDF format for reasons discussed above.

Plaintiffs have requested the production of body camera footage. Plaintiff agreed to supply Defendant with a hard drive to produce available LAPD body worn video. Defendant agreed to production of available LAPD body worn videos of the alleged incidents electronically via MP4 files saved to the hard drive supplied by Plaintiffs.

The parties agree that the procedures under Rule 26(b)(5) shall apply to claims of privilege and protection of trial-preparation materials. The parties have agreed to accept service pursuant to F.R.Civ.P. 5(b)(2)(F) via email addressed to counsel of record for all discovery requests and responses.

Defendant has requested that the parties enter into and file with the Court a stipulated protective order under Rule 26(c) to address, among other discovery, the production and/or use of discovery and evidence regarding City records or personnel files expressly protected under California Penal Code § 832.7, California Evidence Code §§ 1043, 1047, and/or under the federal privilege law. Defendant's proposed protective order would include a process for raising claims relating to privileged materials and/or the claw-back of inadvertently produced privileged material under Federal Rule of Evidence 502. Plaintiffs agree that a protective order is acceptable as long as there is a process to challenge the designation of materials as privileged and the order does not allow the parties to designate as confidential any documents that are otherwise public

Defendant requests that the Court order the parties to conduct an informal discovery conference with the assigned Magistrate before filing a motion to compel pursuant to L.R. 37 or a motion for protective order under Rule 26(c) based on the anticipated discovery disputes and motion practice relating to Plaintiffs' document requests.  Defendant contends that conducting informal discovery conferences with the assigned Magistrate will conserve resources, resolve or narrow any discovery disputes, and expedite the discovery process. Plaintiffs do not object to this process; however, as Plaintiffs indicated during the Meet and Confer, they are unaware of whether Judge Abrams offered such a procedure and contend that Judge Abrams would be the appropriate judge to issue any such order governing his own procedures and rules.

### j.    <u>Discovery Cut-Off</u>

Plaintiffs propose a fact discovery cut-off date of January 25, 2021.

Defendant proposes a fact discovery cut-off date of February 2, 2020 based on a July 27, 2021 trial date.

### k.    <u>Expert Discovery</u>

Plaintiffs propose the following deadlines regarding expert discovery: initial expert disclosures due by February 22, 2021; expert disclosure rebuttal due by March 22, 2021; expert discovery cut-off on April 19, 2021.

Defendant proposes that expert disclosures be due by January 15, 2021; rebuttal disclosures by February 15, 2021; and expert discovery cutoff on March 2, 2021. However, Defendant is willing to extend the expert discovery cutoff until March 15, 2021 to provide 30 days to complete expert discovery following service of rebuttal disclosures.

### l.    <u>Dispositive motions</u>

At this time, Plaintiffs plans to file a motion for summary judgment/adjudication.

Defendant intends to file a motion for judgment on the pleadings addressing

Ktown for All's claims and the arguments raised in the City's second motion to dismiss that the Court denied under Rule 12(g) without prejudice to Defendant raising the issues again in a manner authorized by Rule 12(h)(2). Dkt. No. 65 at 12-13. Defendant also anticipates filing motion(s) for summary judgment and/or summary adjudication. Defendant requests that it be granted leave to file more than one motion for summary judgment/adjudication because of the number of Plaintiffs and to seek early resolution of claims asserted by Plaintiff Haugabrook for absence of evidence and Ktown for All. Alternatively, Defendant requests leave to file over-sized motion for summary judgment because of the number of plaintiffs and alleged incidents that Defendant must address in the motion.

**m.  Settlement/Alternative Dispute Resolution (ADR)**

Plaintiffs remain open to discussing a potential resolution of this case. Plaintiffs propose a private dispute resolution proceeding, at on or before June 21, 2021.

Defendant proposed the Parties conduct ADR before the assigned Magistrate Judge. Plaintiffs expressed concern about using the assigned Magistrate Abrams because of anticipated discovery disputes. Defendant is amenable to conducting ADR before a Magistrate other than Magistrate Abrams. Defendant proposes that ADR be completed on or before May 4, 2021. Defendant contends that early settlement discussions would not be productive at this time because Plaintiffs seek non-monetary prospective relief and the City is involved in other cases addressing homeless issues that may affect any non-monetary relief in this action.

**n.  Trial Estimate**

Plaintiffs and Defendant estimate ten days for trial. Plaintiffs estimate calling at least 15 witnesses. Plaintiffs need ten days because this case involves multiple incidents, the use of expert witnesses, and witnesses with knowledge of Defendant's policies, practices, and trainings. Defendant estimates calling at least 15 witnesses based on the number of plaintiffs and alleged incidents. Defendant contends that its proposal to phase the trial would reduce trial time by reducing the number of

1    witnesses and need to present evidence regarding *Monell* liability in Phase I.

2        **o.**    <u>**Lead Trial Counsel**</u>

3      Plaintiffs' lead trial counsel is Shayla Myers.

4      Defendant's lead trial counsel is Deputy City Attorney Patricia Ursea.

5        **p.**    <u>**Independent Expert or Master**</u>

6      This is not a case where the court should consider appointing a master or

7    independent scientific expert.

8        **q.**    <u>**Timetable**</u>

9      See attached Exhibit A.

10       **r.**    <u>**Magistrate Judge**</u>

11      Plaintiffs do not consent to try this case before a magistrate judge.

12      Defendant is willing to try the case before the assigned Magistrate Abrams.

13       **s.**    <u>**Other Issues**</u>

14      The Parties discussed conducting deposition remotely.  Plaintiffs may consent

15    to the use of remote depositions where feasible and to the extent necessary, given the

16    current public health crisis.  Defendant contends that depositions should be conducted

17    remotely because of the existing COVID-19 pandemic and worsening conditions in

18    Los Angeles County and that conducting in-person depositions would create

19    unnecessary health risks for witnesses and counsel.

20      As discussed above, Defendant's other issues include the following:

21    Defendant's proposed *Monell* stipulation and request to try the case in two phases

22    with a Phase I jury trial on liability and damages and a Phase II bench trial on

23    equitable relief; Defendant's request for an order requiring that the parties conduct an

24    informal discovery conference with Magistrate Abrams before filing any motions to

25    compel or motions for protective orders, Defendant's request for an order regarding

26    the form of Defendant's production of documents in PDF format, and Defendant's

27    request for leave to file more than one motion for summary judgment/adjudication or,

28    alternatively, leave to file an oversized brief.

Dated: July 27, 2020

SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP


By: /s/ Catherine E. Sweetser
    Catherine E. Sweetser
    *Attorney for Plaintiffs.*

Dated:  July 27, 2020

MICHAEL N. FEUER, City Attorney

KATHLEEN KENEALY, Chief Asst. City Attorney
SCOTT MARCUS, Chief, Civil Litigation Branch
FELIX LEBRON, Deputy City Attorney
A. PATRICIA URSEA, Deputy City Attorney


By: /s/
    FELIX LEBRON
    Deputy City Attorney
    Attorneys for Defendant,
    *CITY OF LOS ANGELES*

RULE 26(F) JOINT REPORT

# **LOCAL RULE 5-4.3.4 ATTESTATION**

I attest that Defendant's counsel, Felix Lebron, concurs in this filing's content and has authorized the filing.

Dated: July 27, 2020

SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP

By: _/s/ Catherine E. Sweetser_
Catherine E. Sweetser
*Attorney for Plaintiffs.*

RULE 26(F) JOINT REPORT

Case 2:19-cv-06182-DSF-PLA   Document 76-1   Filed 07/27/20   Page 1 of 2   Page ID #:2264

# EXHIBIT A

## SCHEDULE OF PRETRIAL AND TRIAL DATES

CASE NAME: Janet Garcia, et al. v. City of Los Angeles, et al.
CASE NO: 2:19-cv-06182-DSF-PLA

| Matter | Time | Weeks before trial | Plaintiff(s) Request | Defendant(s) Request | Court Order |
|---|---|---|---|---|---|
| Trial (jury)(court) (length 10 days)  **(Tuesday)** | 8:30 am | | 9/14/21 | 7/27/21 | |
| For Court Trial  Lodge Findings of Fact and Conclusions of Law, LR 52; File Exhibit & Witness Lists, LR 16-5,6; File Status Report Regarding Settlement; Summaries of Direct Testimony (optional) | | 3 | 8/24/21 | | |
| Pretrial Conference, LR 16;  Hearing on Motions in Limine  **(Monday)** | 3:00 pm | 4 | 8/16/21 | 6/28/21 | |
| For Jury Trial  Lodge Pretrial Conference Order, LR 16- File Agreed Set of Jury Instructions and Verdict Forms; Statement Regarding Disputed Instructions, Verdicts, etc.; Oppositions to Motions in Limine | | 6 | 8/2/21 | 6/15/21 | |
| For Jury Trial  File Memo of Contentions of Fact and Law, LR 16-4; Exhibit & Witness Lists, LR 16-5,6; Status Report Regarding Settlement; Motions in Limine (no more than five motions per side may be filed without Court permission) | | 7 | 7/26/21 | 6/8/21 | |
| Last day to conduct ADR Proceeding, LR 16-15 | | 12 | 6/21/21 | 5/4/21 | |
| Last day to hear motions (except motion to amend pleadings or add parties and motions in limine), LR 7 **(Monday)** | | 14 | 6/7/21 | 4/19/21 | |
| Non-expert Discovery Cut-off | | 21+ | 1/25/21 | 2/2/21 | |
| Expert Disclosure (initial) | | | 2/22/21 | 1/15/21 | |
| Expert Disclosure (rebuttal) | | | 3/22/21 | 2/15/21 | |
| Expert Discovery Cut-off | | 21+ | 4/19/21 | 3/2/21 | |
| Last day to hear motion to amend pleadings or add parties **(Monday)** | | 32+ | 2/1/21 | 11/2/20 | |

LR 16-15 ADR Choice:          ☐ 1. USMJ          ☒ 3. Outside ADR

☐ 2. Attorney Settlement Panel

Exhibit A

EXHIBIT 32

MICHAEL N. FEUER, City Attorney
KATHLEEN A. KENEALY, Chief Assistant City Attorney (SBN 212289)
SCOTT MARCUS, Senior Assistant City Attorney (SBN 184980)
GABRIEL S. DERMER, Assistant City Attorney (SBN 229424)
FELIX LEBRON, Deputy City Attorney (SBN 232984)
**A. PATRICIA URSEA, Deputy City Attorney (SBN 221637)**
200 N. Main Street, City Hall East, Room 675
Los Angeles, CA 90012
Telephone (213) 978-7569
Facsimile (213) 978-7011
Felix.Lebron@lacity.org
Patricia.Ursea@lacity.org

*Attorneys for Defendant,* CITY OF LOS ANGELES

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANET GARCIA, GLADYS ZEPEDA, MIRIAM ZAMORA, ALI EL-BEY, PETER DIOCSON JR., MARQUIS ASHLEY, JAMES HAUGABROOK, individuals, KTOWN FOR ALL, an unincorporated association, ASSOCIATION FOR RESPONSIBLE and EQUITABLE PUBLIC SPENDING an unincorporated association, | Case No.:  2:19-cv-6182-DSF-PLA Assigned to Judge Dale S. Fischer |
| | **DEFENDANT'S RULE 26 INITIAL DISCLOSURES [F.R.Civ.P. 26(a)(1)(A)]** |
| *Plaintiffs*, | **Complaint Filed:  July 18, 2019** |
| vs. | |
| CITY OF LOS ANGELES, a municipal entity; DOES 1-50, | |
| *Defendant(s).* | |

Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A), Defendant City of Los Angeles ("Defendant") discloses the following information, discerned after reasonable investigation and inquiry and found to date.  Defendant reserves their right to supplement these disclosures as their investigation continues.

**Rule 26(a)(1)(A)(i)** – The name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment:

1.     Kevin Quyan Chung, Los Angeles Police Department ("LAPD") Officer, contacted through Defendant's counsel of record.  Officer Chung may have discoverable information regarding the following subjects: the January 10, 2019 incident alleged in the Complaint as to Plaintiff Ali El Bey ("El Bey") as well as statements or conduct during that incident, and other interactions involving El Bey and others at the scene that date.

2.     Marc Josef Mahlknecht, LAPD Officer, contacted through Defendant's counsel of record.  Officer Mahlknecht may have discoverable information regarding the following subjects: the January 10, 2019 incident alleged in the Complaint as to Plaintiff El Bey as well as statements or conduct during that incident, and other interactions involving El Bey and others at the scene that date.

3.     Kevin William Cottle, LAPD Officer, contacted through Defendant's counsel of record.  Officer Cottle may have discoverable information regarding the following subjects: the June 4, 2019 incident alleged in the Complaint as to Plaintiff El Bey as well as statements or conduct during that incident, and other interactions involving El Bey and others at the scene that date.

4.     Won Yong Kim, LAPD Officer, contacted through Defendant's counsel of record.  Officer Kim may have discoverable information regarding the following subjects: the June 4, 2019 incident alleged in the Complaint as to Plaintiff El Bey as well as statements or conduct during that incident, and other interactions involving El Bey and others at the scene that date.

5.      Eric S. Estrada, Environmental Compliance Inspector, contacted through Defendant's counsel of record. Mr. Estrada may have discoverable information regarding the following subjects: the January 29, 2019 incident alleged in the Complaint as to Plaintiff Garcia as well as statements or conduct during that incident, and other interactions involving Garcia and others at the scene that date.

6.      Daniel C. Truong, Environmental Compliance Inspector, contacted through Defendant's counsel of record. Mr. Truong may have discoverable information regarding the following subjects: the January 29, 2019 incident alleged in the Complaint as to Plaintiff Garcia as well as statements or conduct during that incident, and other interactions involving Garcia and others at the scene that date. Mr. Truong may also have discoverable information regarding the posting of notices on April 26, 2019, which resulted in the April 29, 2019 incident alleged in the Complaint as to Plaintiff Garcia.

7.      Teodoro C. Salvacion, Environmental Compliance Inspector, contacted through Defendant's counsel of record. Mr. Salvacion may have discoverable information regarding the following subjects: the January 29, 2019 incident alleged in the Complaint as to Plaintiff Garcia as well as statements or conduct during that incident, and other interactions involving Garcia and others at the scene that date. Mr. Salvacion may also have discoverable information regarding the posting of notices on August 12, 2019, which resulted in the August 14, 2019 incident alleged in the Complaint as to Plaintiff Garcia.

8.      Michael Hu (Yuanchien), Environmental Compliance Inspector, contacted through Defendant's counsel of record. Mr. Hu may have discoverable information regarding the following subjects: the April 29, 2019 and August 14, 2019 incidents alleged in the Complaint as to Plaintiff Garcia as well as statements or conduct during those incidents, and other interactions involving Garcia and others at the scene those dates. In addition, Mr. Hu may have discoverable information regarding the April 24, 2019 incident alleged in the Complaint as to Plaintiff Diocson as well as statements or conduct during that incident, and other interactions involving Dicoson and others at the

scene that date.

9.     Armando Cabrera, Environmental Compliance Inspector, contacted through Defendant's counsel of record. Mr. Cabrera may have discoverable information regarding the following subjects: the April 29, 2019 incident alleged in the Complaint as to Plaintiff Garcia as well as statements or conduct during that incident, and other interactions involving Garcia and others at the scene that date.

10.     Gilberto E. Campos, Environmental Compliance Inspector, contacted through Defendant's counsel of record. Mr. Campos may have discoverable information regarding the following subjects: the August 14, 2019 incident alleged in the Complaint as to Plaintiff Garcia as well as statements or conduct during that incident, and other interactions involving Garcia and others at the scene that date.

11.     Arek Arzoumanian, Environmental Compliance Inspector, contacted through Defendant's counsel of record. Mr. Arzoumanian may have discoverable information regarding the posting of notices on August 12, 2019, which resulted in the August 14, 2019 incident alleged in the Complaint as to Plaintiff Garcia.

12.     Michael Tran, Environmental Compliance Inspector, contacted through Defendant's counsel of record. Mr. Tran may have discoverable information regarding the following subjects: the January 10, 2019 incident alleged in the Complaint as to Plaintiff El Bey as well as statements or conduct during that incident, and other interactions involving El Bey and others at the scene that date.

13.     Abraham Abrahamian, Environmental Compliance Inspector, contacted through Defendant's counsel of record. Mr. Abrahamian may have discoverable information regarding the following subjects: the January 10, 2019 and June 4, 2019 incidents alleged in the Complaint as to Plaintiff El Bey as well as statements or conduct during that incidents, and other interactions involving El Bey and others at the scene those dates.

14.     Bernard J. Dancel, Environmental Compliance Inspector, contacted through Defendant's counsel of record. Mr. Dancel may have discoverable information regarding

the following subjects: the June 4, 2019 incident alleged in the Complaint as to Plaintiff El Bey as well as statements or conduct during that incident, and other interactions involving El Bey and others at the scene that date.

15.   Philip A. Pedrosa, Environmental Compliance Inspector, contacted through Defendant's counsel of record. Mr. Pedrosa may have discoverable information regarding the following subjects: the March 21, 2019 incident alleged in the Complaint as to Plaintiffs Zamora and Zepeda as well as statements or conduct during that incident, and other interactions involving Zamora and Zepeda and others at the scene that date.

16.   Jazmine N. Saucedo, Environmental Compliance Inspector, contacted through Defendant's counsel of record. Ms. Saucedo may have discoverable information regarding the following subjects: the March 21, 2019 incident alleged in the Complaint as to Plaintiffs Zamora and Zepeda as well as statements or conduct during that incident, and other interactions involving Zamora and Zepeda and others at the scene that date. Ms. Saucedo may have discoverable information regarding the posting of notices on April 26, 2019 which resulted in the April 29, 2019 incident alleged in the Complaint as to Plaintiff Garcia.

17.   Stephany J. Cruz, Environmental Compliance Inspector, contacted through Defendant's counsel of record. Ms. Cruz may have discoverable information regarding the following subjects: the April 24, 2019 incident alleged in the Complaint as to Plaintiffs Diocson as to the advance posting of the clean up notice only.

18.   Jay J. Kim, Environmental Compliance Inspector, contacted through Defendant's counsel of record. Mr. Kim may have discoverable information regarding the following subjects: the posting of the notice on May 19, 2019 and the May 21, 2019 incident alleged in the Complaint as to Plaintiff Ashley as well as statements or conduct during that incident, and other interactions involving Ashley and others at the scene that date.

19.   Alyssa E. Mireles, Environmental Compliance Inspector, contacted through Defendant's counsel of record. Ms. Mireles may have discoverable information regarding

the following subjects: the May 21, 2019 incident alleged in the Complaint as to Plaintiff Ashley as well as statements or conduct during that incident, and other interactions involving Ashley and others at the scene that date.

20.  Howard Wong, Chief Environmental Officer, contacted through Defendant's counsel of record.  Mr. Wong may have discoverable information relating to the City of Los Angeles' Sanitation Department's enforcement of Los Angeles Municipal Code section 56.11 and the LAMC 56.11 Standard Operating Protocols, including but not limited to posting of notices in connection with cleanup operations, preparation of reports documenting cleanup operations, identification and mitigation of public health and safety hazards, and procedures for removal and storage of personal property.

21.  Gordon Haines, Environmental Specialist III, contacted through Defendant's counsel of record.  Mr. Haines may have discoverable information regarding the Harbor City Greenway, including but not limited to the history and purpose of the greenway project, closure of the greenway, and complaints from residents and stakeholders regarding the conditions at and around the greenway.

**Rule 26(a)(1)(A)(ii)** – A copy – or a description by category and location – of all documents, electronically stored information, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment:  Documents previously produced by Defendant.

| BATES RANGE | RELATED PLAINTIFF | DATE OF INCIDENT | INCIDENT NO. |
|---|---|---|---|
| CTY000001-000041 | Ali El Bey | 01/10/19 | 50729 |
| CTY000042-CTY000078 | Ali El Bey | 06/04/19 | 56504 |
| CTY000079-CTY000167 | Gladys Zepeda/Miriam Zamora | 03/21/19 | 53162 |
| CTY000168-CTY000325 | Gladys Zepeda/Miriam Zamora | 06/11/19 | 56806 |
| CTY000326-CTY000351 | Gladys Zepeda/Miriam Zamora | 06/11/19 | 56906 |
| CTY000352-CTY000408 | Gladys Zepeda/Miriam Zamora | 06/11/19 | 56973 |
| CTY000409-CTY000434 | Gladys Zepeda/Miriam Zamora | 06/11/19 | 56974 |

| BATES RANGE | RELATED PLAINTIFF | DATE OF INCIDENT | INCIDENT NO. |
|---|---|---|---|
| CTY000435-CTY000459 | Gladys Zepeda/Miriam Zamora | 06/11/19 | 56976 |
| CTY000460-CTY000536 | Janet Garcia | 01/29/19 | 51275 |
| CTY000537-CTY001036 | Janet Garcia | 04/29/19 | 54597 |
| CTY001037 | Janet Garcia | 08/14/19 | Notice |
| CTY001038-CTY001043 | Janet Garcia | 08/14/19 | CD6 Posting Survey Re 08/12/19 |
| CTY001044-CTY001105 | Janet Garcia | 08/14/19 | 60403 |
| CTY001106-CTY001235 | Janet Garcia | 08/14/19 | 60404 |
| CTY001236-CTY001940 | Marquis Ashley | 05/19/19 | 55616 |
| CTY001941-CTY002212 | Peter Diocson | 04/24/19 | 54374 |
| CTY002213-CTY002251 | Ali El Bey | 06/04/19 | 56504 (Photos) Reproduced |
| CTY002252-CTY002369 | Janet Garcia | 08/14/19 | 60404 (Photos) Reproduced |
| CTY002370-CTY002394 | LAPD Logs/CAD Report | 01/10/19 | 50729 |
| CTY002395-CTY002423 | LAPD Logs/CAD Report | 06/04/19 | 56504 |
| CTY002424-CTY002447 | LAPD Logs/CAD Report | 03/21/19 | 53162 |
| CTY002448-CTY002464 | LAPD Log | 01/29/19 | 51275 (** log only) Dupe |
| CTY002465-CTY002496 | LAPD Logs/CAD Report | 06/11/19 | All Miriam |
| CTY002497-CTY002529 | LAPD Logs/CAD Report | 01/29/19 | 51275 |
| CTY002530-CTY002555 | LAPD Logs/CAD Report | 04/29/19 | 54597 |
| CTY002556-CTY002624 | LAPD Logs/CAD Report | 08/14/19 | Garcias |
| CTY002625-CTY002656 | LAPD Logs/CAD Report | 05/21/19 | 55616 |
| CTY002657-CTY002677 | LAPD Logs/CAD Report | 04/24/19 | 54374 |
| CTY002678-CTY002755 | Council File 13-0852-S1 | | |
| CTY002756-CTY002789 | Council File 14-0818-S2 | | |
| CTY002790-CTY002795 | Council File 14-1499-S5 | | |
| CTY002796-CTY002849 | Council File 14-1551 | | |

| BATES RANGE | RELATED PLAINTIFF | DATE OF INCIDENT | INCIDENT NO. |
|---|---|---|---|
| CTY002850-CTY002898 | Council File 14-1656 | | |
| CTY002899-CTY003010 | Council File 14-1656-S1 | | |
| CTY003011-CTY003012 | Council File 14-1656-S2 | | |
| CTY003013-CTY003015 | Council File 14-1656-S4 | | |
| CTY003016-CTY003018 | Council File 14-1656-S5 | | |
| CTY003019-CTY003043 | Council File 15-0727 | | |
| CTY003044-CTY003046 | Council File 17-0921 | | |
| CTY003047-CTY003222 | LAPD policies and procedures | | |
| CTY003223-CTY003239 | LAMC Article 6 that includes 56.11 | | |
| CTY003240-CTY004085 | Haugabrook | N/A | Potential March Incidents |
| CTY004086-CTY004104 | Photographs of items reflected in Marco Ramirez declaration | | |
| CTY004105-CTY004120 | Photos accompanying Officer Ryan Rankin declaration | | |
| CTY004121-CTY004142 | Photos accompanying Officer HECTOR PEREIDA declaration | | |
| CTY004143-CTY004208 | Photos accompanying Officer CHRISTIAN GUERRERO Declaration | | |
| CTY004209-CTY004255 | LAMC 56.11 standard operating protocols | N/A | N/A |
| CTY004256 | CARE+ notice | | |
| CTY004257 | summary containing the involuntary storage data for the 2019 calendar year | | |
| CTY004258 | picture containing an example of permanent signage | | |
| CTY004259-CTY004290 | LASAN Posted Cleanup and Health Hazard | | |

| BATES RANGE | RELATED PLAINTIFF | DATE OF INCIDENT | INCIDENT NO. |
|---|---|---|---|
| | Report for the February 24, 2020 Cleanup | | |
| CTY004291-CTY004302 | the LASAN CARE Report for the December 9, 2019 cleanup | | |
| CTY004303-CTY004315 | LASAN CARE Report for the December 16, 2019 cleanup | | |
| Dkt. 42-4, Exhibits to Haines Declaration | | Exhibit 1, photographs of Harbor City Greenway; Exhibit 2, photographs of damaged lighting; Exhibit 3, email chain from representatives of the local chapter of the Palos Verdes/South Bay Audubon Society and California Native Plant Society; Exhibit 4, social media postings; Exhibit 5, photograph Fire Department putting out September 2019 fire. | |

**Rule 26(a)(1)(C)** – A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered:  None.

**Rule 26(a)(1)(D)** – For inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment:  There are no known policies.

Dated:   July 27, 2020

MICHAEL N. FEUER, City Attorney
KATHLEEN KENEALY, Chief Assistant City Attorney
SCOTT MARCUS, Senior Assistant City Attorney
FELIX LEBRON, Deputy City Attorney
A. PATRICIA URSEA, Deputy City Attorney

By: */s/A. Patricia Ursea*
    Attorneys for Defendant
    CITY OF LOS ANGELES

**PROOF OF SERVICE**

I, Gabriel S. Dermer, am employed in the County of Los Angeles, State of
California.  I am over the age of 18 and not a party to the within action; my business
address is 200 North Main Street, Room 675, Los Angeles, CA 90012.

On July 27, 2020, I served a copy of the following document(s) described as:

**DEFENDANT'S RULE 26 INITIAL DISCLOSURES [F.R.Civ.P. 26(a)(1)(A)]**
on the interested parties in this action as follows:

☒   **BY E-MAIL**
By transmitting via electronic mail to the e-mail address(es) set forth below on
this date. I am aware that service is presumed invalid if the email transmission
is returned as undeliverable.

Shayla Myers
LEGAL AID FOUNDATION OF LOS ANGELES
7000 S. Broadway, Los Angeles, CA 90003
Tel.: (213) 640-3983
Email(s): smyers@lafla.org

Catherine Sweetser
SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP
11543 W. Olympic Blvd.,
Los Angeles, CA 90064
Tel.: (310) 396-0731
Email(s): csweetser@sshhlaw.com

Benjamin Allan Herbert
Michael Onufer
KIRKLAND & ELLIS LLP
555 S. Flower St., Los Angeles, CA 90071
Tel.: (213) 680-8400
Email(s): benjamin.herbert@kirkland.com
Email: michael.onufer@kirkland.com

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 27, 2020, at Los Angeles, California.

_/s/ Gabriel S. Dermer_____

Gabriel S. Dermer

DEFENDANTS' RULE 26 INITIAL DISCLOSURES [F.R.Civ.P. 26(a)(1)(A)]

EXHIBIT 33

Shayla Myers (SBN 264054)
Mallory B. Andrews (SBN 312209)
Alex Flores (SBN 303552)
Jonathan Gibson (300306)
LEGAL AID FOUNDATION OF LOS ANGELES
7000 South Broadway
Los Angeles, CA  90003
Telephone:  (213) 640-3983
Email:  smyers@lafla.org
       mbandrews@lafla.org
       aeflores@lafla.org
       jgibson@lafla.org

*Attorneys for Gladys Zepeda, Miriam Zamora,*
*Ali El-Bey, James Haugabrook, Pete Diocson Jr.,*
*Marquis Ashley, and Ktown for All*
*[Additional Attorneys on Next Page]*

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANET GARCIA, GLADYS ZEPEDA, MIRIAM ZAMORA, ALI EL-BEY, PETER DIOCSON JR, MARQUIS ASHLEY, JAMES HAUGABROOK, individuals, KTOWN FOR ALL, an unincorporated association; ASSOCIATION FOR RESPONSIBLE AND EQUITABLE PUBLIC SPENDING, an unincorporated association.<br><br>          Plaintiffs,<br><br>    v.<br><br>CITY OF LOS ANGELES, a municipal entity; DOES 1-7,<br><br>          Defendants. | CASE NO. 2:19-cv-06182-DSF-PLA<br><br>**RULE 26(A)(1) INITIAL DISCLOSURES**<br><br>Complaint Filed Date:  July 18, 2019<br><br><br>Judge:       Hon. Dale S. Fischer<br>Hearing Date:  August 3, 2020<br>Time:       11:00 a.m.<br>Courtroom:  7D |

Catherine Sweetser (SBN 271142)
Kristina Harootun (SBN 308718)
John Washington (SBN 315991)
SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP
11543 West Olympic Blvd.
Los Angeles, CA 90064
Telephone:  (310) 396-0731
Email:   csweetser@sshhzlaw.com
            kharootun@sshhzlaw.com
            jwashington@sshhzlaw.com

*Attorneys for Plaintiffs.*

Benjamin Allan Herbert (SBN 277356)
William L. Smith (SBN 324235)
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone:  (213) 680 8400
Email:  benjamin.herbert@kirkland.com
            william.smith@kirkland.com

Michael Onufer (SBN 300903)
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone: (310) 552-4200
Email:   michael.onufer@kirkland.com

*Attorneys for Plaintiffs Ktown for All, Janet Garcia, Peter Diocson Jr., Marquis Ashley, Ali El-Bey, and Association for Responsible and Equitable Public Spending.*

Pursuant to Federal Rule of Civil Procedure 26, Plaintiffs Janet Garcia, Gladys Zepeda, Miriam Zamora, Ali El-Bey, Peter Diocson Jr., Marquis Ashley, James Haugabrook, and Ktown for All hereby submit the following initial disclosures:

**I.      Rule 26(a) Potential Witnesses**

The following individuals are likely to have discoverable information that Plaintiffs may use to support the claims in their complaint.  This may not constitute an exhaustive list of individuals with responsive information; Plaintiffs anticipate adding additional witnesses as the investigation proceeds and will supplement these disclosures as required under Rule 26.

1. Janet Garcia (plaintiff)
2. Gladys "Jane" Zepeda (plaintiff)
3. Miriam Zamora (plaintiff)
4. Ali El-Bey (plaintiff)
5. James Haugabrook (plaintiff)
6. Pete Diocson Jr. (plaintiff)
7. Marquis Ashley (plaintiff)
8. The following additional individuals are associated with Plaintiff Ktown for All, who may be contacted through Plaintiffs' counsel and who may have information Plaintiffs may use regarding Defendant's liability:
   a. Jane Nguyen
   b. Nicholas Price
   c. Nicolas Emmons
   d. Michael Dickerson
   e. Rachelle Bettega
   f. Muhammad
   g. Kathryna Hancock

9. Community organizers, members of the community, and other unhoused individuals with knowledge of Defendant's illegal seizure of property and other allegations in the Complaint;

10. City employees including Care team members, Care Plus team members, Clean Streets LA team members, Hope team members, LA Sanitation employees, LAPD employees, Los Angeles City Council members and their staff;

11. LAHSA outreach workers and employees who have been present at encampment cleanups or enforcement actions, or may have knowledge of the City's customs, policies, or practices related to the allegations in the Complaint;

12. Employees of the City or LAHSA contractors, including Clean Harbors and Chrysalis, who have been present at encampment cleanups or enforcement actions, or may have knowledge of the City's customs, policies, or practices related to the allegations in the Complaint;

13. All individuals identified in Defendant's initial Rule 26 disclosures who may testify regarding matters related to Defendant's illegal seizure of property and other allegations in the Complaint;

14. Adrian Riskin has information regarding the City's encampment sweep schedule and other City documents related to encampment sweeps and LAMC 56.11. His phone number is (540) 290-9222.

15. Ms. Garcia's friend and her employer may testify as to her damages and whereabouts.
   a. Martin, (747) 755-8190
   b. Moziko Wind, (818) 404-2232

16. The following additional individuals are known to Plaintiffs and may have information related to liability by witnessing specific incidents outlined in the Complaint.  Unless otherwise stated, these individuals do not, to plaintiffs' knowledge, have permanent addresses or their addresses are not known to Plaintiffs.

a. Janet Garcia incidents

    i. Jed Parriott (may be contacted through counsel)

    ii. Lisa Merenda, 5323 Hermitage Ave #3, Valley Village, CA 91607; (818)-850-8261

    iii. David Flores (747) 238-2412

    iv. Ivan Nathan

    v. Angie (unhoused, last name unknown)

    vi. Donovan Dale, 13196 Wheeler Ave., Sylmar CA 91342; (818) 633-9785.

    vii. Estuardo Flores (unhoused)

    viii. Marco Iniquez Nungaray (unhoused)

    ix. Isai Barrea (unhoused)

b. Jane Zepeda and Miriam Zamora incidents

    i. Kathryna Hancock (may be contacted through counsel)

    ii. Manny Mendez (unhoused)

    iii. Jose "Johnny" Sanchez, 1731 Menlo Ave, Los Angeles, CA 90006; (213) 925-3024

    iv. Juan Lopez (unhoused)

    v. Juan Rivera (unhoused)

    vi. Juanito Oscar (unhoused)

    vii. LAPD Officer Bermudez

    viii. LAPD Officer Lucero

c. Ali El-Bey incidents

    i. Mathew Strugar, 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010; (323) 696-2299

    ii. LAPD Officer Carolina Argueta

    iii. LAPD Officer Ivan Lucero

    iv. LAPD Officer Kevin Q. Chung

v.  LAPD Officer Marc J. Mahlknecht

vi.  LA Sanitation employee Michael Tran

vii.  LA Sanitation employee Abraham Abrahamian

d.  Pete Diocson Jr. incidents

i.  Chris Venn (may be contacted through counsel)

ii.  Jed Parriott (may be contacted through counsel)

iii.  Maria Velasquez (unhoused)

iv.  LAPD Officer Lopez

e.  Marquis Ashley incident

i.  No currently known additional witnesses other than Marquis Ashley.

f.  James Haugabrook incidents

i.  No currently known additional witnesses other than James Haugabrook.

g.  Incident involving Ktown for All members

i.  Nicholas Price (may be contacted through counsel)

ii.  Nicolas Emmons (may be contacted through counsel)

iii.  Kahn (unhoused)

iv.  LAPD Officer Kim

v.  LAPD Officer Lucero

II.  **Documents in Plaintiffs' Possession Pursuant to 26(a)(1)**

1.  Individual Plaintiffs' Government Tort Claims.

2.  Videos and photographs of City employees seizing and destroying property from individual Plaintiffs and other unhoused individuals in the City of Los Angeles.

3.  Photos of unhoused individuals' personal property.

4.  Receipts for resources spent by Ktown for All and its members related to sweeps.

5. Legislative history, emails, and other documents related to the City's ordinance and its policies and protocols.

6. Documents produced by the City in response to discovery or CPRAs. Plaintiff incorporates by reference all documents provided by the City to Plaintiffs.

## III.  **Damages**

### A.  Individual Plaintiffs

At least $10,000 for each Plaintiff for the loss of their property, the violation of their constitutional and statutory rights, emotional distress, and for pain and suffering resulting from the unlawful conduct of defendants.  Ali El-Bey seeks statutory damages.

### B.  For All Plaintiffs

Costs of suit and attorney fees as provided by law and all such relief as the Court deems just and proper.

DATED: July 27, 2020          SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP


By: _____
          Catherine E. Sweetser
          *Attorney for Plaintiffs.*

**PROOF OF SERVICE**
**UNITED STATES DISTRICT COURT**

I am a resident of the aforesaid county, State of California; I am over the age of 18 years and not a party to the within action; my business address is 11543 W. Olympic Boulevard, Los Angeles, CA 90064.

On **July 27, 2020,** I caused the service of the foregoing document(s) described as:

**RULE 26(A)(1) INITIAL DISCLOSURES**

on the interested party(ies) in this action addressed as follows:

Michael Feuer, City Att'y
Kathleen A. Kenealy, Chief Asst. City Att'y
Scott Marcus, Chief, Civil Litigation Branch
Gabriel Dermer, Asst. City Att'y
*gabriel.dermer@lacity.org*
Felix Lebron, Deputy City Att'y
*felix.lebron@lacity.org*
Patricia Ursea, Deputy City Att'y
*patricia.ursea@lacity.org*
200 N. Main Street, City Hall East, Room 675
Los Angeles, CA 90012

 **X**　　**[BY MAIL]** I caused such envelope to be deposited in the mail at Los Angeles, California. The envelope was mailed with postage thereof fully paid.

 **X**　　**[BY EMAIL]** I caused the above document to be delivered by email to the above email address(es).

 **X**　　**[FEDERAL]** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **July 27, 2020,** at Los Angeles, California.

_____
Carlos Gallegos

PROOF OF SERVICE

EXHIBIT 34

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JANET GARCIA, et al.,<br>        Plaintiffs,<br><br><br>                    v.<br><br>CITY OF LOS ANGELES, et al.,<br>        Defendants. | CV 19-06182-DSF-PLA<br><br>Order GRANTING in part and<br>DENYING in part Defendant's<br>Motion to Dismiss for Failure to<br>State a Claim (Dkt. 22) |

Defendant City of Los Angeles moves to dismiss the First, Third, Fourth, Sixth, and Seventh Causes of Action of the Supplemental Complaint to the First Amended Complaint (Suppl. FAC).  Dkt. 22 (Mot.).[1]  Plaintiffs Janet Garcia, Gladys Zepeda, Miriam Zamora, Ali El-Bey, Peter Diocson Jr., Marquis Ashley, James Haugabrook, Ktown for All (KFA), and Association for Responsible and Equitable Public Spending (AREPS) oppose.  Dkt. 25 (Opp'n).

## I. FACTUAL BACKGROUND

### A.    The Challenged Ordinance

In 2016, the Los Angeles City Council amended Los Angeles Municipal Code (LAMC) § 56.11 (the Ordinance).[2]  Dkt. 20 (Suppl.

---

[1] The City's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) is addressed in a separate order.

[2] The City requests judicial notice of the Ordinance.  Dkt. 23 (RJN), Ex. 1. Federal Rule of Evidence 201 permits a Court to take judicial notice of a "fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and

FAC).  The Ordinance regulates the storage of personal property in public areas.  Its stated purpose is to "balance the needs of the residents and public at large to access clean and sanitary public areas . . . with the needs of the individuals, who have no other alternatives for the storage of personal property, to retain access to a limited amount of personal property in public areas."  LAMC § 56.11(1).  In most situations, the City is authorized to impound personal property in a public area so long as the City provides pre-removal and post-removal notice.  See, e.g., LAMC § 56.11(3)(a)-(b).  In other situations, including where the property obstructs City operations or interferes with the City's compliance with the Americans with Disabilities Act of 1990 (ADA), only post-removal notice is required to impound personal property.  See, e.g., id. § 56.11(3)(c)-(f).  There are also limited situations where the City can immediately destroy personal property without notice, including if the property "poses an immediate threat to the health or safety of the public," id. § 56.11(3)(g), "constitutes evidence of a crime or contraband," id. §56.11(3)(h), or is a "Bulky Item" that is not "designed to be used as a shelter," id. §56.11(3)(i) (Bulky Item Provision).  A Bulky Item is "any item, with the exception of a constructed Tent, operational bicycle or operational walker, crutch, or wheelchair, that is too large to fit into a 60-gallon container with the lid closed," but not "a container with a volume of no more than 60 gallons used by an individual to hold his or her Personal Property."  Id. § 56.11(2)(c).

To enforce the Ordinance, the City, through the Bureau of Sanitation (Sanitation) and the Los Angeles Police Department (LAPD), conducts noticed cleanups and random rapid responses where personal property that does not comply with the Ordinance is seized or destroyed.  Suppl. FAC ¶¶ 21, 69.

---

readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Municipal ordinances are proper subjects for judicial notice.  See Tollis Inc. v. County of San Diego, 505 F.3d 935, 938 n.1 (9th Cir. 2007).  The Court grants the City's unopposed request for judicial notice of the Ordinance.

Case 2:19-cv-06182-DSF-PLA   Document 122-8   Filed 04/07/21   Page 203 of 409   Page ID
#:7417
Case 2:19-cv-06182-DSF-PLA   Document 96   Filed 02/15/20   Page 3 of 32   Page ID #:4902

The City also adopted the Los Angeles Municipal Code 56.11
Standard Operating Protocols regarding the implementation and
enforcement of the Ordinance.[3]  The Protocols contain detailed
instructions on how Sanitation and LAPD should enforce the
Ordinance.  For example, Procedure 7 explains that items are "health
hazards" if "there is statistically significant evidence based on at least
one study conducted in accordance with established scientific principles
that acute or chronic health effects may occur in exposed persons."
RJN, Ex. 2 at 29.

## B.  Enforcement of the Ordinance Against Individual Plaintiffs

### 1.  Garcia

On or about January 29, 2019, without any prior notice, a
Sanitation crew seized and destroyed Garcia's tent and all of her
belongings, including a vacuum and other cleaning supplies she uses
for her work as a domestic cleaner, while she had momentarily left to
use the bathroom.  Suppl. FAC ¶¶ 24, 125-132.  On April 29, 2019, as
part of a noticed cleanup, another Sanitation crew seized Garcia's
belongings while she was watching her neighbors' property.  Id. ¶¶ 24,
133.  On August 14, 2019, Sanitation workers again seized and
destroyed all of her belongings when she left them to go to work, even
though she had attempted to move them out of the noticed cleanup area
before leaving for work.  Id. ¶¶ 25, 134-145.

### 2.  Zepeda and Zamora

On March 21, 2019, without notice, Sanitation workers seized
and destroyed all of Zepeda's and Zamora's belongings that could not fit
into a single 60-gallon trash bag, including a new tent, tarps, clean
clothing, and a chest containing important documents.  Id. ¶¶ 28, 155-
165.  Shortly thereafter, KFA provided Zepeda and Zamora with a new
tent.  Id. ¶ 166.  On or about June 11, 2019, Sanitation again destroyed

---

[3] The Court grants the City's unopposed request for judicial notice of the
Protocols.  RJN, Ex. 2.

Zepeda's and Zamora's tent, along with the belongings inside of the tent. <u>Id.</u> ¶ 168.

### 3. El-Bey

On January 10, 2019, without notice, Sanitation and LAPD gave El-Bey 10 minutes to pack up his belongings and move. <u>Id.</u> ¶¶ 30, 173-77. When El-Bey required additional time to collect his belongings, one of the LAPD officers threatened him with arrest. <u>Id.</u> ¶ 179. The rest of his belongings, including his ID, medications, and a tent, were destroyed. <u>Id.</u> ¶¶ 30, 178-82. On June 4, 2019, Sanitation workers destroyed his belongings, including his medication, while El-Bey had left to do laundry. <u>Id.</u> ¶¶ 183-87. El-Bey was told that his belongings needed to be destroyed for "safety reasons." <u>Id.</u> ¶ 185.

### 4. Haugabrook

On or about March 2019, without any notice, Sanitation gave Haugabrook 15 minutes to pack up his belongings and move. <u>Id.</u> ¶¶ 193-95. Sanitation then destroyed Haugabrook's backpack and its contents, including medication and other important items. <u>Id.</u> ¶¶ 32, 196. On another occasion, Sanitation took Haugabrook's chairs as part of a Bulky Item pickup. <u>Id.</u> ¶¶ 32, 197-98. On a third occasion, City workers destroyed his tent and other items while he was gone for a short period of time. <u>Id.</u> ¶ 201.

### 5. Diocson

On April 24, 2019, LAPD and Sanitation, pursuant to a noticed cleanup, seized and destroyed as a Bulky Item Diocson's dog kennel, where his dog slept at night. <u>Id.</u> ¶¶ 34-35, 209-214.

### 6. Ashley

On or about May 21, 2019, as part of a noticed cleanup, Sanitation seized and destroyed as Bulky Items two carts that Ashley used to move his belongings. <u>Id.</u> ¶¶ 37, 218-226.

## II. LEGAL STANDARD

Rule 12(b)(6) allows an attack on the pleadings for failure to state a claim on which relief can be granted. "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam). However, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557) (alteration in original) (citation omitted). A complaint must "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. This means that the complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. There must be "sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively . . . and factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

Ruling on a motion to dismiss will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

As a general rule, leave to amend a complaint that has been dismissed should be freely granted. Fed. R. Civ. P. 15(a). However, leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could

not possibly cure the deficiency." <u>Schreiber Distrib. Co. v. Serv-Well Furniture Co.</u>, 806 F.2d 1393, 1401 (9th Cir. 1986).

# III. DISCUSSION

## A.  Facial Challenges

### 1.  Illegal Seizure (First Cause of Action)

Plaintiffs allege that the subsection of the Ordinance permitting the seizure and immediate destruction of Bulky Items, without a warrant or pursuant to a warrant exception, is an unreasonable seizure in violation of the Fourth Amendment and the California Constitution.[4] Suppl. FAC ¶¶ 231-32.  To adequately plead a facial challenge, Plaintiffs must allege sufficient facts to show that the Bulky Item Provision is unconstitutional in all "applications of the statute in which it actually authorizes or prohibits conduct."  <u>City of Los Angeles, Calif. v. Patel</u>, 135 S. Ct. 2443, 2451 (2015); <u>see also</u> <u>Morrison v. Peterson</u>, 809 F.3d 1059, 1064 (9th Cir. 2015) ("[W]hen assessing whether a statute" is unconstitutional in all of its applications, "courts consider only applications of the statute in which it actually authorizes or prohibits conduct."); <u>Isaacson v. Horne</u>, 716 F.3d 1213, 1230 (9th Cir. 2013) (facial challenge is one that challenges "all the situations in which [that statute] would actually be determinative").[5]

---

[4]  Except where "the United States Supreme Court had not yet decided the parallel question under the Fourth Amendment," or where the Supreme Court "later spoke to the question and reached a contrary conclusion," California law "ordinarily resolve[s] questions about the legality of searches and seizures by construing the Fourth Amendment and article I, section 13 in tandem."  <u>People v. Buza</u>, 4 Cal. 5th 658, 686 (2018).  Therefore, the Court analyzes Plaintiff's challenge under Fourth Amendment law.

[5]  The City cites to <u>Lanier v. City of Woodburn</u>, 518 F.3d 1147 (9th Cir. 2008), which held that a city policy requiring prospective employees to pass a drug test was not invalid on its face.  <u>Id.</u> at 1150.  The court based its decision on the fact that the plaintiff made no "serious argument" that no set of circumstances existed under which the policy would be valid, and suggested "no concrete reason why [the city's] policy could not constitutionally be

6

Case 2:19-cv-06182-DSF-PLA   Document 122-8   Filed 04/27/21   Page 207 of 409   Page ID
#:7421
Case 2:19-cv-06182-DSF-PLA   Document 96-1   Filed 02/15/20   Page 9 of 32   Page ID #:990

"A seizure conducted without a warrant is per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.  The burden is on the Government to persuade the district court that a seizure comes under one of a few specifically established exceptions to the warrant requirement."  <u>Miranda v. City of Cornelius</u>, 429 F.3d 858, 862 (9th Cir. 2005).  The City does not assert that any of the specifically established exceptions applies.[6]  Rather, it asserts that "[t]he 'ultimate standard' is 'reasonableness,'" Mot. at 8 (citing <u>Lavan v. City of Los Angeles</u>, 693 F.3d 1022, 1031 (9th Cir. 2012)), and that "reasonableness here cannot be determined in a vacuum," <u>id.</u> at 9.  The City argues that because the "weight" of an individual's property interest depends on the character of the property at issue, <u>see id.</u>, and the countervailing interests of the public are "both significant and varied," <u>id.</u> at 10, "Plaintiffs cannot show that in all circumstances, an individual's right to keep Bulky Items in public places will outweigh any conceivable countervailing interests in using that space," <u>id.</u> at 11.  Therefore, a facial challenge must fail because of the "numerous possible applications of the Bulky Item provision."  <u>Id.</u> at 8; <u>see also id.</u> at 11 ("[T]here is little that can be said about the nature of 'Bulky Items' in the abstract.").

The City compares the Bulky Item Provision to the statute in <u>Sibron v. New York</u>, 392 U.S. 40 (1968), which involved a facial challenge to a statute that permitted a police officer to "stop-and-frisk" any person "whom he reasonably suspects is committing, has

_____

applied to jobs that, for example, require the operation of dangerous equipment."  <u>Id.</u>  The same cannot be said for Plaintiffs' challenge to the Bulky Item Provision.

[6] The Court agrees with the City that the "probable cause" exception is not relevant here.  Opp'n at 8 n.8; <u>see also</u> <u>Miranda</u>, 429 F.3d at 863 ("The standard of probable cause is peculiarly related to criminal investigations, not routine, non-criminal procedures.  The probable-cause approach is unhelpful when analysis centers upon the reasonableness of routine administrative caretaking functions . . . ." (quoting <u>S. Dakota v. Opperman</u>, 428 U.S. 364, 371 n.5 (1976))).

Case 2:19-cv-06182-DSF-PLA   Document 122-8   Filed 04/07/21   Page 209 of 409   Page ID
#:9905
Case 2:19-cv-06182-DSF-PLA   Document 96-2   Filed 02/15/20   Page 9 of 32   Page ID #:7422

committed or is about to commit a felony . . . ." Id. at 43. The Supreme
Court noted that this statute was "susceptible of a wide variety of
interpretations," such as "whether the power to 'stop' granted by the
statute entails a power to 'detain' for investigation or interrogation
upon less than probable cause, or if so what sort of durational
limitations upon such detention are contemplated." Id. at 60 & n.20.
The Supreme Court declined to consider the facial challenge because it
viewed it as an "unproductive exercise of laying the extraordinarily
elastic categories of [the statute] next to the categories of the Fourth
Amendment in an effort to determine whether the two are in some
sense compatible." Id. at 59; see also Patel, 135 S. Ct. at 2450
("[C]laims for facial relief under the Fourth Amendment are unlikely to
succeed when there is substantial ambiguity as to what conduct a
statute authorizes."). The City contrasts the "extraordinarily elastic
categories" it asserts are covered by the Bulky Item Provision with the
challenged ordinance in Patel, which it asserts was "narrow" in that it
only "permitted warrantless searches of hotel guest records" and the
competing interests at issue were "identifiable and unvaried." Mot. at
9. But the Ordinance here is more similar to the ordinance in Patel
than the statute in Sibron.

The Bulky Item Provision permits warrantless seizures of items
larger than a specific volume that are stored in public areas.[7] Unlike in

---

[7] The City claims that "by its express terms, [the Ordinance] applies to *all*
items left by *any* person on sidewalks and other public spaces. Mot. at 2; see
also id. at 4 ("[T]he Ordinance is now, and has always been, a law of general
application."). However, this declaration conflicts with the stated purpose of
the Ordinance: to "balance the needs of the residents and public at large"
with "the needs of the individuals, who have no other alternatives for the
storage of personal property, to retain access to a limited amount of personal
property in public areas." LAMC § 56.11(1). Specifically, this provision
acknowledges that the "City's large and vulnerable homeless population need
access to a manageable amount of essential property for their personal use
and well-being." Id. At the hearing, the City argued that the first section of
the Ordinance was merely a "preamble" acknowledging the increased use of
public areas by homeless people, and therefore it did not limit the application

Sibron where the statute authorized conduct based on what a police officer "reasonably suspects," the Bulky Item Provision authorizes conduct based on an objectively verifiable fact—an item's volume. That many different items may fall into the category of items having the stated volume, such as a dog kennel, a chair, or a homemade cart, does not mean that the category itself is elastic. For example, if instead of authorizing seizures based on reasonable suspicion, the statute in Sibron permitted police officers to stop and frisk people who weighed 300 or more pounds, it could not be said that the categories of conduct authorized are extraordinarily elastic because some people fitting into that category may be 7-foot tall basketball players while others may be 5-foot tall sumo wrestlers. Rather, the statute authorizes conduct based on a rigid category of characteristics: a person's weight. The same is true here.

Plaintiffs assert that the only conduct the Bulky Item Provision "actually authorizes" is a warrantless seizure of property based solely on its size. Opp'n at 7. Bulky Items that are abandoned, illegally dumped, or a threat to public health and safety can be seized or destroyed based on other statutes or ordinances not challenged here. Id.; see also Patel, 135 S. Ct. at 2451 ("If exigency or a warrant justifies an officer's search, the subject of the search must permit it to proceed irrespective of whether it is authorized by statute. Statutes authorizing warrantless searches also do no work where the subject of a search has consented.").[8] The City's example of a ladder left unattended on a sidewalk illustrates this point. The City states it may be reasonable to remove the ladder "[i]f the sidewalk is narrow with high pedestrian use" or "[i]f the sidewalk abuts a school and the ladder

_____

of the Ordinance. However, the paragraph titled "Declaration of Legislative Intent – Purpose" is not merely a preamble; it is section one of the Ordinance.

[8] At the hearing, the City represented that the Ordinance was the City's only mechanism to clean up public rights of way. Although a doubtful proposition, to the extent it is true, it still fails to address the fact that most of the Ordinance remains unchallenged and therefore permits the City to seize Bulky Items in a number of reasonable circumstances.

may be an attractive nuisance to children on their way home" or "[i]f
the owner refuses to move a ladder that is likely to obstruct free
passage by pedestrians."  Mot. at 12.  This may be true, but the City
would not need to rely on the Bulky Item Provision to remove the
ladder.  In other sections of the Ordinance, the City is permitted to
remove any unattended property, LAMC § 56.11(3)(a), property that
obstructs City operations, id. § 56.11(3)(c), property that "does not allow
for passage as required by the" ADA, id. § 56.11(3)(d), property that is
"within ten feet of any operation and utilizable entrance, exit, driveway
or loading dock," id. § 56.11(3)(e), or property that "constitutes an
immediate threat to the health or safety of the public," id. § 56.11(3)(g).
One of these sections, or other valid laws or ordinances (e.g. laws
prohibiting illegal dumping) would apply to each of the scenarios
described by the City.  The same is true for the example the City gave
at the hearing.  If there were Bulky Items blocking an area where
pedestrians usually congregate to wait for a bus, causing them to stand
in the street instead, the City could rely, for example, on LAMC Section
56.11(3)(c) to "temporarily move Personal Property" or "impound
Personal Property" that "is obstructing City operations in a Public
Area."

 The only "work" the Bulky Item Provision does is to permit
seizures of items of a certain size where there is no other valid reason
to remove them.[9]  In the City's example, the ladder or other Bulky
Items can be removed, not because they are too large to fit in a 60-

---

[9] The City argues that "an item too large to fit into a 60-gallon container
carries a greater potential to impede other legitimate uses of sidewalks" and
"there is a greater public interest in the removal of Bulky Items from the
public right of way than smaller items."  Mot. at 11.  The City also argues
that Bulky Items are not "necessities," tents, bicycles, wheelchairs, walkers,
or crutches.  These would be stored, rather than destroyed, if found to be
violating another Ordinance provision.  Id.  Regardless of whether these
assertions are true, a seizure is not reasonable merely because items like it
have a "greater potential" to interfere with the rights of others or are less
likely to be "important."

gallon bag, but because they interfere with "unimpeded movement" of pedestrians or could otherwise be dangerous.  The same is true for the alleged trash piles caused by illegal dumping.  See Mot. at 3.

For similar reasons, the immediate destruction of Bulky Items is unreasonable on its face.  See Lavan, 693 F.3d at 1030 ("[E]ven if the seizure of the property would have been deemed reasonable had the City held it for return to its owner instead of immediately destroying it, the City's destruction of the property rendered the seizure unreasonable.").  The City argues that the immediate destruction of Bulky Items may be necessary if the property cannot be "safely stored." Mot. at 12.  At the hearing, the City gave the example of a wood pallet infected by dry rot.  But another provision of the Ordinance allows the destruction of items that are a risk to public health and safety.  The City also asserts that it "does not have the space to store all Bulky Items it removes from public places," and therefore it must be permitted to destroy them.  Id. at 11.  But the City's lack of storage does not make the immediate destruction of personal property reasonable.[10]

Plaintiffs also argue that LAMC § 56.11(10)(d), which makes it unlawful for any person to "willfully resist, delay or obstruct a City

_____

[10] The City also notes that "not all Bulky Items left in public are someone's property," and that it is sometimes difficult for the City to determine whether certain property is abandoned.  Mot. at 12 n.9.  To the extent the City has difficulty determining whether items left in public areas are abandoned (and therefore entitled to no protections) or merely unattended (which would require pre- and post-removal notice, LAMC § 56.11(3)(a)), it is not clear why this is relevant to the analysis here.  The Bulky Item Provision applies to personal property whether attended or unattended.  As it currently stands, therefore, no determination of ownership need be made before the City removes and destroys Bulky Items.  The City's example of an ordinance that authorizes the seizure of items left on tables in airports, Reply at 5 n.3, also addresses the issue of whether food left on tables is abandoned or unattended, not whether food can be thrown away, regardless of any ownership determination, merely because it was "too much" food.

employee from removing or discarding a Bulky Item," is unconstitutional because it prohibits an individual from interfering with unconstitutional seizures pursuant to the Bulky Item Provision. Suppl. FAC ¶ 233. The City conceded at the hearing that LAMC § 56.11(10)(d) is facially unconstitutional if the Bulky Item Provision is facially unconstitutional. See also Mot. at 13 n.10.

Plaintiffs have sufficiently alleged a facial challenge to the Ordinance as violating the Fourth Amendment's (and the California Constitution's) prohibition on illegal seizures. The Court declines to dismiss the First Cause of Action.

## 2.     Due Process (Fourth Cause of Action)

Plaintiffs claim the seizure or destruction of "Bulky Items" without pre- or post-seizure notice or an opportunity to be heard violates the Fourteenth Amendment, the California Constitution, and 42 U.S.C. § 1983.[11] Supp. FAC ¶ 251. The City argues that Plaintiffs "must show the Bulky Item provision can _never_ be enforced without violating due process." Mot. at 13-14.

To allege a violation of due process, Plaintiffs must allege that "the asserted individual interests are encompassed within the Fourteenth Amendment's protection of 'life, liberty or property'" and that the procedures provided do not "constitute 'due process of law.'" See Lavan, 693 F.3d at 1031. There now can be no dispute that all persons have a protected property interest in personal property stored in public areas. See id. at 1031-32. The City instead argues that it

---

[11] "The language of Article I § 7 of the California Constitution is virtually identical to the Due Process Clause of the United States Constitution, with the caveat that California courts place a higher significance on the dignitary interest inherent in providing proper procedure." Nozzi v. Hous. Auth. of City of Los Angeles, 806 F.3d 1178, 1190 n.15 (9th Cir. 2015) (internal quotation marks and citations omitted), as amended on denial of reh'g and reh'g en banc (Jan. 29, 2016). Therefore, the Court will address Plaintiffs' federal and state due process claims together, as it is unnecessary to take the additional factor into account here.

cannot be determined on a facial challenge what process is due because
"the requirements imposed by the due process clause are flexible and
variable dependent upon the particular situation being examined."
Mot. at 14.[12]   However, the Bulky Item Provision "fail[s] utterly to
provide any meaningful opportunity to be heard before or after [the
City] seize[s] and destroy[s] property belonging to [Los Angeles's]
homeless population."  See Lavan, 693 F.3d at 1033.[13]  Plaintiffs cite to

---

[12] The City argues that the "administrative burdens" of providing notice must
be considered, including that "it is not always readily ascertainable whether
[items] belong to someone or not" and the City cannot be required to "search
for possible owners of every couch, file cabinet, refrigerator, or car part they
encounter in a public space."  Mot. at 15-16.  However, the City already
provides notice for nearly all other types of personal property covered by the
Ordinance, including unattended property.  See id. at 1 ("In most instances,
LASAN must provide written notice before and/or after removing items");
LAMC § 56.11(3)(a) (unattended personal property can be impounded with
both pre- and post-removal notice).  "The fact that [the City] has undertaken
to provide a hearing in some circumstances suggests that it is neither unduly
burdensome nor unduly costly to do so."  Stypmann v. City & Cty. of San
Francisco, 557 F.2d 1338, 1343 (9th Cir. 1977).

[13] The City argues that even though the Bulky Item Provision does not
require prior notice, there are times where "pre-removal notice was
provided."  Mot. at 16.  In those circumstances, the City argues, "it may be
reasonable to dispose of a Bulky Item without providing individualized
notice."  Id.  Without deciding whether that is true, in determining whether
the Ordinance is facially valid, the Court must consider only the process
provided by the Ordinance.  See Coe v. Armour Fertilizer Works, 237 U.S.
413, 424-25 (1915) ("It is not enough that the owners may by chance have
notice, or that they may as a matter of favor have a hearing.  The law must
require notice to them, and give them the right to a hearing and an
opportunity to be heard." (quoting Stuart v. Palmer, 74 N.Y. 183, 188
(1878))); HVT, Inc. v. Port Auth. of New York & New Jersey, No. 15 CIV 5867
(MKB) (VMS), 2018 WL 3134414, at *14 (E.D.N.Y. Feb. 15, 2018), report and
recommendation adopted, No. 15 CV 5867 (MKB) (VMS), 2018 WL 1409821
(E.D.N.Y. Mar. 21, 2018) ("[E]ven the fact that Defendant may have had
internal memoranda outlining impoundment protocols which could be
construed to provide Plaintiff with an opportunity for a hearing still falls

a number of cases that upheld facial challenges where no process was
provided at all.  Opp'n at 12-13.  Moreover, the circumstances under
which permanent deprivation or destruction of property is permissible
without notice or an opportunity to be heard are substantially more
limited.  See Clement v. City of Glendale, 518 F.3d 1090, 1093-94 (9th
Cir. 2008) ("[T]he default rule is advance notice," although there are
"exceptions to this general rule" including "in an emergency, []or if
notice would defeat the entire point of the seizure, []or when the
interest at stake is small relative to the burden that giving notice
would impose."); see also Calero-Toledo v. Pearson Yacht Leasing Co.,
416 U.S. 663, 679 (1974) ("[D]ue process is not denied when
postponement of notice and hearing is necessary to protect the public
from contaminated food, from a bank failure, or from misbranded
drugs, or to aid the collection of taxes, or the war effort" (internal
citations omitted)).  And even in those circumstances, "a principal
rationale has been that a hearing would be provided before the taking
became final."  Arnett v. Kennedy, 416 U.S. 134, 178 (1974).

For example, in N. Am. Cold Storage Co. v. City of Chicago, 211
U.S. 306 (1908), cited by the City, the Supreme Court found that notice
and a hearing were not required before "destruction of unwholesome
food which is unfit for human consumption." Id. at 320.  Here Bulky
Items that are an immediate threat to health and safety can be
destroyed under another provision of the Ordinance and therefore the
Court does not consider that circumstance in deciding whether the
Bulky Item Provision provides sufficient procedural protections on its
face.  A similar issue was addressed by the California Supreme Court
in Kash.  Analyzing federal law, the Court considered an ordinance

---

short of providing constitutionally required due process" (footnotes omitted));
Kash Enters., Inc. v. City of Los Angeles, 19 Cal. 3d 294, 307 n.7 (1977) ("[I]n
judging the constitutionality of the procedure established by the ordinance,
we must look to the procedure dictated by the terms of the ordinance, and not
to informal practices implemented at the discretion of municipal
administrators.").  The Bulky Item Provision does not require that any notice
or hearing be provided.

that "authoriz[ed] the seizure, retention and destruction of newsracks
without affording the owner of the rack either a pre- or post-taking
hearing." Kash, 19 Cal. 3d at 306.  The Court held that the ordinance
violated due process on its face because "it d[id] not accord the owner
the most basic safeguard demanded by the process—an opportunity to
be heard on the merits of the taking, either before or after the taking."
Id. at 309.  This was particularly troublesome because the taking was
not merely temporary; the ordinance authorized the actual destruction
of the confiscated newsrack.  Id. at 308.  The Court noted that striking
down the ordinance did not prevent the city from "provid[ing] for the
immediate seizure, without prior notice or hearing, of any newsrack
that poses a danger to pedestrians or vehicles."  Id. at 313.

As in Kash, the Ordinance permits the City to remove and
permanently destroy Bulky Items without any procedural safeguards
whatever.[14]  As noted by the Ninth Circuit, this is "especially troubling
given the vulnerability of [the City's] homeless residents."  Lavan, 693
F.3d at 1032.  Plaintiffs have sufficiently alleged that the Bulky Item
Provision fails to provide the procedural due process required by the

---

[14] The City argues that "if a Bulky Item was removed in the presence of a
purported owner, that person likewise can avail him or herself of available
state law remedies."  Mot. at 16.  It is not clear what "state law remedies" the
City asserts are available to Plaintiffs, but the ability to file a lawsuit
challenging the deprivation cannot serve as the basis for finding due process.
If it were otherwise, the due process requirement would not really be a
requirement at all.  See Kash, 19 Cal. 3d at 309 ("Not one of the scores of
recent procedural due process decisions, however, suggests that the
availability of a collateral judicial remedy can sustain a seizure procedure
which provides absolutely no hearing whatsoever, either before or after the
taking.  Acceptance of the city's position would in effect read out almost all of
the protections afforded by contemporary procedural due process doctrine,
and would place on the party whose property has been taken the additional
financial burden of instituting an action for the property's return." (internal
citations omitted)).

Case 2:19-cv-06182-DSF-PLA    Document 182-8    Filed 04/27/21    Page 216 of 409    Page ID
Case 2:19-cv-06182-DSF-PLA    Document 162-3    Filed 02/15/20    Page 16 of 32    Page ID #:9917
#:7430

Fourteenth Amendment.[15]  The Court declines to dismiss the Fourth
Cause of Action.

### 3.    Vagueness Challenge (Third Cause of Action)

Plaintiffs also allege that the Ordinance is impermissibly vague
because it fails to define a "Bulky Item" or an "immediate threat to
public health and safety" with sufficient precision.  Id. ¶¶ 245, 245.1.[16]

---

[15] The Court is not dictating what process is due, only that Plaintiffs have
sufficiently alleged a failure to afford any due process before destroying
Bulky Items, which violates the Fourteenth Amendment.

[16] Plaintiffs state that they challenge as impermissibly vague these two
provisions of the Ordinance "both facially and as-applied."  Opp'n at 13
(footnote omitted) (citing Suppl. FAC ¶¶ 60-64, 66, 74-76, 83, 92-96).  Based
on a review of the cited provisions of the Supplemental FAC, it appears that
Plaintiffs are using the term "as applied" to mean that the provisions are
enforced arbitrarily, not that they were vague specifically as enforced against
the individual Plaintiffs.  See Suppl. FAC ¶ 93 ("Determinations about what
constitutes a Bulky Item and is therefore subject to seizure and destruction,
are arbitrary and based solely on the individual sanitation worker's
judgement and perception of item's size. . . . Individuals who are homeless
have no way of knowing what LA Sanitation will deem a Bulky Item, which is
then subject to immediate seizure and destruction"), ¶ 94 ("Decisions about
whether a bicycle is 'inoperable' are, as with all other decisions, made on the
spot, and the consequence of this determination is the immediate and
permanent deprivation of the item").  However, Plaintiffs did give examples
where enforcement of these provisions was vague as applied to the individual
Plaintiffs.  See, e.g., Suppl. FAC ¶ 131 ("On information and belief, these
cleaning supplies were thrown away because, pursuant to the 56.11
Protocols, these items were deemed 'hazards' and pursuant to LAMC 56.11,
could be summarily destroyed as 'an immediate threat to the health and
safety of the public.'"), ¶¶ 212-213 ("Officer Lopez informed Mr. Diocson that
[his dog's] kennel was a Bulky Item, and that he could not take it with him. .
. . Although Mr. Diocson did not realize that the kennel would be considered a
Bulky Item or agree with the determination that it was a Bulky Item, he was
afraid to challenge the LAPD officer.").  The City's assertion that Plaintiffs
have failed to allege that "the law is vague as applied to the facts of the case

A statute is unconstitutionally vague if it 1) fails to provide adequate notice of the conduct it prohibits or 2) authorizes or encourages arbitrary or discriminatory enforcement.  Desertrain v. City of Los Angeles, 754 F.3d 1147, 1155 (9th Cir. 2014) (quoting City of Chicago v. Morales, 527 U.S. 41, 56 (1999)).  A vague provision may be unconstitutional even if "there is some conduct that clearly falls within the provision's grasp."  Johnson v. United States, 135 S. Ct. 2551, 2561 (2015).

### a.    Bulky Item

The Ordinance defines a Bulky Item as "any item, with the exception of a constructed Tent, operational bicycle or operational walker, crutch, or wheelchair, that is too large to fit into a 60-gallon container with the lid closed," and excludes "a container with a volume of no more than 60 gallons used by an individual to hold his or her Personal Property."  LAMC § 56.11(2)(c).  Plaintiffs claim this definition "fails to provide Plaintiffs with fair notice of whether their individual items are illegal" and "encourages and has resulted in arbitrary and discriminatory enforcement."  Suppl. FAC ¶ 245.

The Court finds the definition of Bulky Item provides fair notice of what items are prohibited.[17]  Plaintiffs argue that a 60-gallon

---

at hand," Mot. at 17 (quoting United States v. Johnson, 130 F.3d 1352, 1354 (9th Cir. 1997)), is wrong.  Because these items were destroyed by the City based on its determinations of size or hazard level, the City cannot fault the Plaintiffs for not alleging the exact sizes of these items.

[17] In the Supplemental FAC, Plaintiffs allege that the Bulky Item Provision does not "define what makes a bicycle, walker, crutch, or wheelchair 'operational'" or "what constitutes a 'constructed' tent."  Suppl. FAC ¶ 61.  However, Plaintiffs do not address arguments about the words "operational" and "constructed" in their opposition and therefore waive their vagueness challenge to those terms.  Allen v. Dollar Tree Stores, Inc., 475 F. App'x. 159, 159 (9th Cir. 2012) (affirming district court's dismissal of plaintiff's claims in which plaintiff's "opposition to the motion to dismiss failed to respond to [the

container can have many different dimensions, and those dimensions will "dramatically affect what will fit inside." Opp'n at 16. This is, of course, true. But this is exactly the purpose of identifying the property by volume, rather than dimensions. Property that would fit in *any* shaped 60-gallon container is not a Bulky Item under the statute. That Plaintiffs' property may have been destroyed incorrectly does not make the statute vague. Cf. Hodel v. Virginia Surface Min. & Reclam. Ass'n, Inc., 452 U.S. 264, 302 (1981) (That actions were later overturned does not undermine the adequacy of the statute). Similarly, that LAPD and Sanitation do not confirm the volume of an item before seizing or destroying it or may chose not to seize or destroy items that fit the definition of Bulky Item, does not mean the Bulky Item Provision is unconstitutionally vague.

By comparison, in Kolender v. Lawson, 461 U.S. 352 (1983), a statute permitted police officers to demand "credible and reliable" identification from a person who was stopped based on the police officer's reasonable suspicion of criminal activity. Id. at 355-56. The Supreme Court found that statute unconstitutionally vague because it "contain[ed] no standard for determining what a suspect ha[d] to do in order to satisfy the requirement to provide a 'credible and reliable' identification" and "vest[ed] virtually complete discretion in the hands of the police to determine whether the suspect ha[d] satisfied the statute." Id. at 358. Here, unlike in Kolender, it is clear what qualifies as a Bulky Item: any item with a volume of more than 60 gallons that is being stored in a public place by an individual with no other place to store personal property.[18] The Bulky Item Provision is not unconstitutionally vague.

---

defendant's] argument"); Stichting Pensioenfonds ABP v. Countrywide Fin. Corp., 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) ("[I]n most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue." (internal quotation marks and citations omitted)).

[18] In challenging Plaintiffs' Fourth Amendment claim, the City states that "[t]he Ordinance, by its express terms, applies to *all* items left by *any* person

In an attempt to avoid this conclusion, Plaintiffs claim that the Bulky Item provision could conceivably apply to an illegally parked car, the suitcase of a person waiting for the bus, or a cyclist's broken bicycle. Opp'n at 14-15.  The Court finds that a reasonable person would not understand the Bulky Item Provision to prohibit the property identified by Plaintiffs.  Rather, as noted above, the Ordinance is clear that its provisions apply to the personal property of individuals "who have no other alternatives for the storage of personal property."  LAMC § 56.11(1).

   b. <u>Immediate Threat to Public Health and Safety</u>

Plaintiffs claim that the phrase "immediate threat to public health and safety" does not provide "fair notice of what items Plaintiffs

---

on sidewalks and other public spaces."  Mot. at 2; <u>see also</u> <u>id.</u> at 4 ("[T]he Ordinance is now, and has always been, a law of general application.").  If this were true, the statute would be unconstitutionally vague because it "appears to be applied only to the homeless."  <u>See</u> <u>Desertrain</u>, 754 F.3d at 1156 ("The vagueness doctrine is designed specifically to prevent this type of selective enforcement").  The City cannot have it both ways.  It is clear from the stated purpose of the Ordinance that it is not a law of general application, but rather was enacted to "balance the needs of the residents and public at large" with "the needs of the individuals, who have no other alternatives for the storage of personal property, to retain access to a limited amount of personal property in public areas."  LAMC § 56.11(1).  This provision acknowledges that the "City's large and vulnerable homeless population need access to a manageable amount of essential property for their personal use and well-being."  <u>Id.</u>  The challenged provisions must be viewed in context.  <u>See</u> <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 112 (1972) (considering "the statute's announced purpose that the measure is whether normal school activity has been or is about to be disrupted" in determining that an ordinance was not vague, even though "the prohibited quantum of disturbance is not specified in the ordinance"); <u>Tobe v. City of Santa Ana</u>, 9 Cal. 4th 1069, 1107-08 (1995) (holding that the terms camping, living, and store are not "vague . . . when the purpose clause of the ordinance is considered and the terms are read in that context as they should be.").

can have with them in public spaces" and "encourages and has resulted
in arbitrary and discriminatory enforcement."  Suppl. FAC ¶ 245.1.

The phrase "immediate threat to public health and safety" is not
vague on its face.  Plaintiffs argue, however, that the Protocols "further
define the term and create uncertainty." Opp'n at 17.  Procedure 7 of
the Protocols states that items pose "an immediate threat to the health
or safety of the public" if "there is statistically significant evidence
based on at least one study conducted with established scientific
principles that acute or chronic health effects may occur in exposed
persons."  RJN, Ex. 2 at 29.  The Court agrees that this statement sets
standards that are far from clear (How is one to know what the City
considers "statistically significant evidence" or "established scientific
principals"?) and "bears no resemblance to the judicially-defined
'immediate threat to public health and safety.'"  Opp'n at 17.  However,
Procedure 7 also requires the use of a Field Checklist that lists specific
types of health hazards, including biohazards, toxins, flammables,
corrosives, and reactives, and provides examples of items that would
fall into those categories.  RJN, Ex. 2 at 30, 48-49.  The Court finds
Plaintiffs have failed to allege that the health and safety provision is
unconstitutionally vague when viewed in context of the entire
Procedure, including the checklist.[19]  Plaintiffs are free to challenge the
City's determination that their property was an immediate threat to
public health and safety.  However, as stated above, errors in
implementation do not render the Ordinance unconstitutionally vague
on its face.

Plaintiff's Third Cause of Action is DISMISSED without leave to
amend.

---

[19] In fact, another court in this district specifically praised the City for its
health hazards checklist.  Mitchell v. City of Los Angeles, No. CV 16-01750
SJO (GJSx), 2016 WL 11519288, at *3 (C.D. Cal. Apr. 13, 2016) ("The Court
commends the City for following th[e] protocol" and "compl[ying] with a strict
checklist to determine if immediate health hazards are present in property
owned by homeless individuals.").

Case 2:19-cv-06182-DSF-PLA   Document 182-3   Filed 04/07/21   Page 221 of 409   Page ID
Case 2:19-cv-06182-DSF-PLA   Document 162-2   Filed 02/25/20   Page 21 of 32   Page ID #12
#:7435

## B.   State Law Claims

### 1.   Preliminary Issues

The City contends Plaintiffs' state law claims are barred because
1) written claims were not filed with the government prior to filing this
lawsuit and 2) the City is entitled to immunity.

#### a.   <u>Government Claims Act</u>

The Government Claims Act provides that "all claims for money
or damages against local public entities," subject to certain exceptions
not applicable here, must be presented to those entities, Cal. Gov't
Code § 905, and no suit falling into this category may be brought "until
a written claim therefor has been presented to the public entity and has
been acted upon by the board, or has been deemed to have been rejected
by the board," <u>id.</u> § 945.4.

Plaintiffs concede that, for all but one Plaintiff, claims were not
filed prior to instituting this action.  <u>See</u> Opp'n at 20.  They argue,
however, that 1) their claims were timely filed before the inclusion of
any state law causes of action, and 2) they were not required to comply
with the Government Claims Act because their claims for damages are
ancillary to their equitable claims.  Opp'n at 19-21.

Plaintiffs argue that because the original complaint contained
state law claims brought by El-Bey only, and the remaining plaintiffs
submitted claims before adding state law claims as to them, Plaintiffs
all made timely claims.  Opp'n at 20.  Plaintiffs did not wait the
required 45 days to give the City the opportunity to act on the claims,
<u>see</u> Cal. Gov't Code § 912.4, but courts have refused to dismiss cases
where "the plaintiffs submitted a timely claim but prematurely filed a
complaint . . . because the plaintiffs had substantially complied with
the claim presentation requirement," <u>see</u> <u>State of California v. Superior
Court</u>, 32 Cal. 4th 1234, 1244 (2004).  In <u>Cory v. City of Huntington
Beach</u>, 43 Cal. App. 3d 131 (1974), the plaintiff filed a lawsuit against
the city two days after submitting a claim for damages, although the
city was not served for nearly eight months.  <u>Id.</u> at 133.  The court held

that "the defense of prematurity, if timely raised, merely would have
been a ground for abatement of the action." Id. at 136. The Court of
Appeal reversed the lower court's grant of summary judgment, noting
that "the city could not have been prejudiced by the premature filing of
the action since the complaint was not served until the time period had
run." Id. Similarly, in Taylor v. City of Los Angeles, 180 Cal. App. 2d
255 (1960), the court held that the filing of an action prematurely
"should not result in a disposition of the matter which has no relation
to its merits," particularly where "[a]t the time the answer of the city
was filed, the city had received every benefit which a provision for
rejection prior to suit is intended to serve." Id. at 263. Here, the City
filed its responsive pleading on October 21, 2019, more than 45 days
after all but one of Plaintiffs' claims were filed. See Mot. at 20. And
the City specifically consented to amending the complaint to include
the additional state causes of action and the additional incidents
forming the basis for the later filed claims. See Dkt. 16.

Because the Court finds Plaintiffs substantially complied with
the claims presentation requirement, it need not address Plaintiffs'
"primary relief" argument.[20]

### b.   Discretionary Immunity

"[A] public employee is not liable for an injury resulting from his
act or omission where the act or omission was the result of the exercise
of the discretion vested in him, whether or not such discretion be
abused." Cal. Gov't Code § 820.2. "[I]nstead of interpreting
'discretionary' literally, the focus should be on the policy considerations
underlying the governmental entity's claim of immunity." Steinle v.
City & Cty. of San Francisco, 919 F.3d 1154, 1160-61 (9th Cir. 2019).
Specifically, discretionary functions are those that involve "*basic policy
decisions* which have been expressly committed to coordinate branches

---

[20] The Court notes, however, that the allegations of the Supplemental FAC
make clear that their claims for injunctive and declaratory relief are
significant and potentially more consequential than their request for
damages.

of government." Id. at 1061 (quoting Caldwell v. Montoya, 10 Cal. 4th 972, 981 (1995)). "On the other hand, there is no basis for immunizing lower level decisions that merely implement a basic policy already formulated." Barner v. Leeds, 24 Cal. 4th 676, 685 (2000).

The City argues that "Plaintiffs' claims are premised on discretionary conduct by City employees in implementing policies to enforce LAMC 56.11, determinations regarding whether items pose immediate health and safety risks, decisions whether to give individuals more time to move belongings, and determinations regarding what constitutes a 'bulky item.'" Mot. at 21. Because Plaintiffs' constitutional claims do not fall under the purview of discretionary immunity, see Schooler v. State of California, 85 Cal. App. 4th 1004, 1013 (2000) ("Government Code immunities extend only to tort actions that seek money damages"), the only conduct that could be protected by immunity is 1) the LAPD officer threatening El-Bey with arrest (the Bane Act claim) and 2) LAPD's and Sanitation's decision to throw away Plaintiffs' property rather than store it (the Section 2080 claim).

First, the City argues that "immunity 'has been found to apply to many areas of police work'" and the LAPD officer's alleged threat of arrest "if [El-Bey] failed to move his belongings in the allotted time [] is akin to the actions that courts shield from liability . . . ." Dkt. 26 (Reply) at 10 (citing Conway v. Cty. of Tuolumne, 231 Cal. App. 4th 1005, 1015 (2014)). However, Conway also noted that "[p]olice officers . . . are not immune under *section 820.2* when their acts are ministerial or public policy dictates against immunity," such as "deciding to arrest an individual when there was no probable cause to do so" or "using unreasonable force when making an arrest or overcoming resistance to it." 231 Cal. App. 4th at 1015. In fact, the Ninth Circuit has held as a matter of law that discretionary immunity does not apply "to an officer's decision to detain or arrest a suspect." Sharp v. Cty. of Orange, 871 F.3d 901, 920 (9th Cir. 2017) (quoting Liberal v. Estrada, 632 F.3d 1064, 1084 (9th Cir. 2011)). Nor does discretionary immunity apply to police actions that constitute "operational decision[s] by the police purporting to apply the law." Id.

(alteration in original) (quoting <u>Liberal</u>, 632 F.3d at 1084-85); <u>see also</u> <u>Gillan v. City of San Marino</u>, 147 Cal. App. 4th 1033, 1051 (2007), <u>as modified on denial of reh'g</u> (Feb. 21, 2007) ("The decision to arrest [plaintiff] was not a basic policy decision, but only an operational decision by the police purporting to apply the law.")).  On the face of the Supplemental FAC the Court cannot conclude that the LAPD officer at issue was engaged in a policy decision when he or she allegedly threatened El-Bey with arrest.  <u>See</u> <u>Thomas v. Dillard</u>, 212 F. Supp. 3d 938, 944, 949 (S.D. Cal. 2016) (Section 820.2 does not apply to police officer brandishing taser in the hopes of compelling the plaintiff to submit to a search "because Defendant was not engaged in a 'policy' decision" (internal footnote omitted)).  The City is not entitled to immunity on El-Bey's Bane Act claim at this stage.

Second, the City argues that discretionary immunity can "shield defendants from liability for *alleged* violations of mandatory duties under Section 815.6 where, as here, no mandatory duty in fact exists." Reply at 11 (citing <u>San Mateo Union High Sch. Dist. v. Cty. of San Mateo</u>, 213 Cal. App. 4th 418, 434 (2013)).  However, there is no question that Section 2080.10 imposes a mandatory duty on "a public agency [that] obtains possession of personal property from a person for temporary safekeeping" to "[t]ake responsibility for the storage, documentation, and disposition of the property" for 60 days.  <u>See</u> Cal. Civ. Code § 2080.10.  The City merely disputes whether this provision applies to Plaintiffs' property.  That is a separate question addressed below.  The City is not entitled to immunity on Plaintiffs' Section 2080 claim.

c.   <u>Good Faith Immunity</u>

"If a public employee acts in good faith, without malice, and under the apparent authority of an enactment that is unconstitutional, invalid or inapplicable, he is not liable for an injury caused thereby except to the extent that he would have been liable had the enactment been constitutional, valid and applicable."  Cal. Gov't Code § 820.6.  The City argues that even if the Ordinance is unconstitutional, "there

24

Case 2:19-cv-06182-DSF-PLA   Document 182-3   Filed 04/07/21   Page 225 of 409   Page ID
Case 2:19-cv-06182-DSF-PLA   Document 162-1   Filed 02/15/20   Page 25 of 32   Page ID #9926
#:7439

are no allegations that the City did not act in good faith under the apparent authority of LAMC 56.11." Mot. at 22.

As to the Bane Act claim, Plaintiffs allege that the officer threatened El-Bey with arrest in response to his request for "additional time to remove his ID, medication, and his tent." Suppl. FAC ¶ 179. The Supplemental FAC does not allege that this threat was made pursuant to an unconstitutional, invalid, or inapplicable portion of the Ordinance, or pursuant to the Ordinance at all.  In a provision not challenged here, the Ordinance provides that "[n]o person shall willfully resist, delay or obstruct a City employee from moving, removing, impounding or discarding Personal Property Stored in a Public Area in violation of Subsections 3.(a)-(h)."  LAMC § 56.11(10)(a). It may be that El-Bey's property was not being stored in violation of the Ordinance.  As the City has pointed out, the items El-Bey was attempting to collect (ID, medication, and tent) do not necessarily violate the Ordinance.  See Mot. at 4 ("the Ordinance now expressly permits up to 60-gallons of Personal Property to be stored in such spaces,"); id. at 5 (Bulky Items do "not include constructed tents").  At this stage of the litigation, the Court cannot determine that the City is entitled to good faith immunity for the Bane Act claim.

As to the Section 2080 claim, Plaintiffs have sufficiently alleged that City employees did not act in good faith in destroying property – allegedly pursuant to the Ordinance.  See, e.g., Suppl. FAC ¶ 24 (City employees "seized and summarily destroyed Ms. Garcia's tent and all of her belongings, including the cleaning supplies she needed for work, when she momentarily stepped away from her belongings to go to the bathroom and get ready for work."); id. ¶ 25 ("all of her belongings had been seized and thrown away" even though Ms. Garcia "moved them to an area outside the noticed cleanup area and left them for the day to go to work"); id. ¶ 28 (City employees seized and destroyed a "tent, which was less than seven weeks old, tarps that were in good condition, clean clothing, and a small chest containing most of their important documents"); id. ¶ 30 (ID, medications, and tent were summarily destroyed); id. ¶ 32 ("sanitation workers threw away . . . his backpack and all of its contents, which included medication to treat his diabetes

and other important items"); <u>id.</u> ¶ 93 ("LA Sanitation crews have no
mechanism to measure whether an item meets the definition in LAMC
56.11 of a Bulky Item and is therefore subject to seizure and
destruction.  Determinations about what constitutes a Bulky Item and
is therefore subject to seizure and destruction, are arbitrary and based
solely on the individual sanitation worker's judgement and perception
of item's size."); <u>id.</u> ¶ 104 ("Although LAMC 56.11 and the 56.11
Protocols state that the City will store the items it seizes, in reality,
and consistent with official policy, practice, and custom, the City
destroys nearly every item it comes in contact with during the course of
'processing' an encampment."); <u>id.</u> ¶ 106 ("Items ranging from
household cleaning supplies to batteries are considered 'an immediate
threat' to public health.  This definition is frequently interpreted to
include items that are simply dirty, 'smelly,' or even stained."); <u>id.</u>
¶ 110 ("In the course of 'processing' tents and encampments, LA
Sanitation workers will tear or rip tents, break items, or spill
containers with liquid, and then justify the destruction of property on
the basis of these tears, rips, or spilled liquids."); <u>id.</u> ¶ 112 ("containers
are also routinely thrown away, along with bags and other luggage,
without the contents being sorted or, often, without the containers even
being opened.  As a result, LA Sanitation routinely throws away items
like medications, important documents, and identification cards, as
well as items individuals need to survive on the streets, such as tents,
blankets, clothing, and personal hygiene supplies.").  These allegations
are more than sufficient to preclude a finding in favor of the City at this
stage of the proceedings.

## 2.  Bane Act (Sixth Cause of Action)

"The California Bane Act creates a cause of action against a
person if that person 'interferes by threat, intimidation, or coercion . . .
with the exercise or enjoyment by any individual or individuals of
rights secured by the Constitution or laws of the United States.'"
<u>Sandoval v. Cty. of Sonoma</u>, 912 F.3d 509, 519 (9th Cir. 2018), <u>cert.
denied sub nom.</u> <u>Cty. of Sonoma, California v. Sandoval</u>, 140 S. Ct. 142
(2019) (alteration in original) (quoting Cal. Civ. Code § 52.1).  There are
two avenues for alleging a Bane Act claim.  If a plaintiff alleges a

negligent violation of her constitutional rights, she must also allege "coercion independent from the coercion inherent in the Fourth Amendment violation itself."  Id.  However, if she relies solely on "the coercion inherent in a Fourth Amendment violation" she must also allege that "the coercion occurred with 'specific intent to violate the [plaintiff's] right to freedom from unreasonable seizure.'"  Id. at 519-20 (quoting Reese v. Cty. of Sacramento, 888 F.3d 1030, 1043, 1044 n.5 (9th Cir. 2018)).  El-Bey alleges that the City and Doe Defendants "have used arrests, threats of arrest and intimidation to interfere with" his rights and "acted with disregard for Plaintiff's rights, with the knowledge that these actions were unreasonable and violated Plaintiff's constitutional rights, and with the intent to violate Plaintiff's rights."  Suppl. FAC ¶¶ 262, 263.  Specifically, on or about January 10, 2019, two LAPD officers instructed El-Bey to pack up his belongings in ten minutes.  Id. ¶ 175.  El-Bey "suffers from mental health issues" and "struggled to pack up his belongings into a suitcase and a cart, in an attempt to comply with the officers' orders."  Id. ¶¶ 172, 177.  When he requested additional time to pack up his ID, medication, and tent, one of the officers threatened him with arrest.  Id. ¶ 179.  Sanitation workers then threw El-Bey's belongings into the back of a garbage truck.  Id. ¶ 180.

The City argues that "[s]imply stating (truthfully) that there could be legal consequences for Plaintiff resisting, delaying, or obstructing a City employee in violation of LAMC 56.11(10) – without more – cannot amount to a threat sufficient to support a Bane Act claim."  Mot. at 23.  The City mischaracterizes the Supplemental FAC – El-Bey does not simply allege that City employees stated truthfully that there might be legal consequences for violating LAMC § 56.11(10).  He alleges that while collecting his belongings as quickly as he could, he was threatened with arrest if he did not leave certain crucial property behind.  This is sufficient to allege independent coercion under the first Bane Act avenue.[21]  See Cooley v. City of Los Angeles, No.

---

[21] At the hearing, the City argued that El-Bey has not alleged a Bane Act violation because the officer who allegedly made the threat is not the person

2:18-CV-09053-CAS-PLA, 2019 WL 3766554 at *6 (C.D. Cal. Aug. 5,
2019) (holding plaintiffs had sufficiently stated a Bane Act claim where
"plaintiffs allege[d] that they themselves were told by LAPD officers to
leave the area during the cleaning or be arrested").

The City also argues that El-Bey has not sufficiently alleged that
the LAPD officer who threatened him acted with the requisite intent
for a Bane Act claim.  Mot. at 22.  However, specific intent need not be
shown where, as is the case here, there is a coercion independent from
the seizure itself.[22]

---

who threw El-Bey's property away.  The City does not identify any case law
supporting this argument.  The officer threatened El-Bey with arrest if he did
not leave his property behind to be destroyed, allegedly in violation of the
Fourth Amendment.  That he was not the one who subsequently destroyed
the property is immaterial.

[22] Even if El-Bey were required to allege specific intent, he has done so.  "The
specific intent inquiry for a Bane Act claim is focused on two questions: First,
'[i]s the right at issue clearly delineated and plainly applicable under the
circumstances of the case,' and second, '[d]id the defendant commit the act in
question with the particular purpose of depriving the citizen victim of his
enjoyment of the interests protected by that right?'"  Sandoval, 912 F.3d at
520 (alteration in original) (quoting Cornell v. City & Cty. of San Francisco,
17 Cal. App. 5th 766, 803 (2017), as modified (Nov. 17, 2017)).  "The first is a
purely legal determination" and "then the jury must make the second,
factual, determination."  Cornell, 17 Cal. App. 5th at 803.  After Lavan,
Fourth Amendment protections "clearly" and "plainly" applied to the removal
and destruction of property belonging to unhoused persons.  And, accepting
the facts in the complaint as true, El-Bey has sufficiently alleged that the
officer's purpose in making the threat was to deprive him of his property
interests in the property he would have to leave behind.  See, e.g., Suppl.
FAC ¶ 263 (officer "acted with disregard for Plaintiff's rights, with the
knowledge that these actions were unreasonable and violated Plaintiff's
constitutional rights, and with the intent to violate Plaintiff's rights"); ¶ 179
(El-Bey "requested additional time to remove his ID, medication, and his
tent," which are not permitted to be summarily destroyed under the

### 3.    Violation of Mandatory Statutory Duty (Seventh Cause of Action)

California Government Code Section 815.6 provides a private right of action for injuries caused by a public entity's "failure to discharge [a mandatory] duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."  Plaintiffs allege that the City violated the mandatory duties set out in California Civil Code Section 2080 *et seq*.  Section 2080.10 provides:

> When a public agency obtains possession of personal property from a person for temporary safekeeping, the public agency shall . . . [t]ake responsibility for the storage, documentation, and disposition of the property," [and] "[p]rovide the person from whom the property was taken with a receipt and instructions for the retrieval of the property," including "that the property must be claimed within 60 days after the public agency obtains possession or the property will be disposed of . . . .

The City claims that because the title of the Article in which Section 2080.10 appears is "Lost Money and Goods," each section in that article applies only to "lost" property.  Reply at 12.  "[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text." I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc., 502 U.S. 183, 189 (1991) ("The text's generic reference to 'employment' should be read as a reference to the '*unauthorized* employment' identified in the paragraph's title."); see also Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 439 (2011) (location of section in "subchapter entitled 'Procedure' . . . suggests Congress regarded the 120–day limit as a claim-processing rule" and not a jurisdictional rule).  However, "the title of a statute and the heading of a section cannot limit the plain meaning of the text."  Bhd. of R. R. Trainmen v. Baltimore & O. R. Co., 331 U.S. 519, 528-29 (1947).  "[M]atters in the text which deviate from

---

Ordinance (with limited exceptions), yet that is when he was threatened with arrest).

those falling within the general pattern are frequently unreflected in the headings and titles." Id. at 528.

As Plaintiffs note, unlike the other provisions of Section 2080,[23] Section 2080.10 does not use the word "lost." Opp'n at 24. To the contrary, Section 2080.10 refers to a public agency "obtain[ing] possession of personal property from a person for temporary safekeeping." Cal. Civ. Code § 2080.10(a). It comes after a number of sections describing what a public entity should do if a person delivers lost property to it. See id. §§ 2080-2080.8. Each of these provisions requires the police to hold the property for 90 days before selling, destroying, or otherwise disposing of it. If Section 2080.10 also applied to lost property, the different limit, only 60 days (with the option to extend for 10 months if the owner is in custody), would not make sense. Moreover, it is clear that this section was specifically enacted to apply to property for which there were no then-existing handling requirements, including property of homeless people:

> [M]ost of the items that come into the possession of the property officers belong to arrestees, the homeless and those detained for some type of mental evaluation. Property held for "safekeeping" may be food, soiled clothes, shopping carts and personal belongings. The problem that affects property personnel the most severely is reuniting the property with its owner.

California Bill Analysis, S.B. 1707 Sen., 7/30/1998.

---

[23] The Court rejects Plaintiffs' additional argument that the other provisions of Section 2080 apply to items that are not lost. Suppl. FAC ¶ 268; Opp'n at 24. No reasonable definition of the word lost would include a person's belongings that are purposely stored in an area where that person lives, whether attended or unattended. To hold otherwise would allow anyone to take homeless persons' belongings and charge them reasonable expenses to give them back. And, it would require the City to store all items left in public places in Los Angeles on the off-chance the items might be the property of an unhoused resident.

The Court finds Plaintiffs have sufficiently alleged that the City did not comply with Section 2080.10.

## C.    As-Applied Challenge

The City argues that Haugabrook's as-applied claims fail to provide fair notice because "[b]asic material aspects [of those claims], including the date and location of the alleged incident, lack such specificity that the City is unable to investigate and defend itself against those claims." Mot. at 25.  The Court disagrees.

Haugabrook alleges that he has lived "on Figueroa St., between 53rd St. and 52nd Place, . . . approximately a block away from the 110 freeway in South Los Angeles . . . next to an empty lot owned by the City" since the beginning of 2019.[24]  Suppl. FAC ¶ 191.  Although not explicitly stated, the allegations can be fairly read as stating that this is the location of the complained of sweeps.  Haugabrook alleges that he was subject to cleanups "[o]n or about March 2019," "[a]bout a month later," "[o]n yet another occasion," and "[o]n or about June 24, 2019." Id.  ¶¶ 193, 197, 201, 205.  That the four cleanups occurred over a three-month period in a specific area provides sufficient notice for the City to investigate the allegations.

---

[24] The Supplemental FAC alleges that he lived in that location "[f]or the past four to six months."  Suppl. FAC ¶ 191.  Because the original complaint with similar language was filed on July 18, 2019, Dkt. 1 ¶ 145, the Court interprets this allegation to mean that Haugabrook moved to this area between January and March 2019.

## IV. CONCLUSION

The City's Motion to Dismiss is GRANTED as to the Third Cause of Action and DENIED as to the remaining claims. Plaintiffs' Third Cause of Action is DIMISSED with prejudice.

IT IS SO ORDERED.

Date: February 15, 2020

Dale S. Fischer
United States District Judge

EXHIBIT 35

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANET GARCIA, et al.,<br>        Plaintiffs, | CV 19-6182 DSF (PLAx) |
| v. | Order GRANTING Plaintiffs'<br>Motion for a Preliminary<br>Injunction (Dkt. 38) |
| CITY OF LOS ANGELES, et al.,<br>        Defendants. | |

Plaintiffs Pete Diocson Jr., Marquis Ashley, and Ktown for All (KFA) move for an order enjoining Defendant City of Los Angeles (the City) from enforcing Los Angeles Municipal Code (LAMC) Sections 56.11(3)(i) and 56.11(10)(d).  Dkt. 38 (Mot.).[1]  The City opposes.  Dkt. 42

---

[1] After the Motion was filed, Plaintiffs filed a Second Amended Complaint (SAC).  Dkt. 43.  Plaintiff contends the SAC did not change the allegations relevant to this Motion, and therefore the Court can consider the Motion.  See Dkt. 50 (Pls.' SAC Statement) at 2.  The City argues that the filing of the SAC moots the Motion.  Dkt. 51 (Def.'s SAC Statement) at 4.  Specifically, the City notes that the relevant amended causes of action (the First and Fourth Causes of Action) now include the allegation that Plaintiffs "are entitled to an injunction, enjoining the City from continuing to enforce this unconstitutional law."  SAC ¶¶ 248, 258.  Although Plaintiffs' inclusion of this allegation is helpful in clarifying their allegations, it does not affect the relief requested.  The First Amended Complaint (FAC) specifically sought "an order enjoining and restraining Defendants from engaging in the policies, practices, and conduct complained of herein, including an order enjoining and restraining the City from enforcing the challenged provisions of Los Angeles Municipal Code Section 56.11."  Dkt. 20 (FAC), Prayer for Relief ¶ 3.  Therefore, the City has not shown how the amendment has a material effect on the relief

(Opp'n).  The Court deems this matter appropriate for decision without oral argument.  See Fed. R. Civ. P. 78; Local Rule 7-15.

# I. FACTUAL BACKGROUND[2]

## A.    The Challenged Ordinance

LAMC Section 56.11 (the Ordinance) regulates the storage of personal property in public areas.  Its stated purpose is to "balance the needs of the residents and public at large to access clean and sanitary public areas . . . with the needs of the individuals, who have no other alternatives for the storage of personal property, to retain access to a limited amount of personal property in public areas."  LAMC § 56.11(1).  In most situations, the City is authorized to impound personal property in a public area so long as the City provides pre-removal and post-removal notice.  See, e.g., LAMC § 56.11(3)(a)-(b).  In other situations, including where the property obstructs City operations or interferes with the City's compliance with the Americans with Disabilities Act of 1990 (ADA), only post-removal notice is required to impound personal property.  See, e.g., id. § 56.11(3)(c)-(f).  There are also limited situations where the City can immediately destroy personal property

---

requested.  For example, in La Jolla Cove Inv'rs, Inc. v. GoConnect Ltd., No. 11CV1907 JLS (JMA), 2012 WL 1580995 (S.D. Cal. May 4, 2012), cited by the City, the amended complaint eliminated the claims forming the basis of the motion for preliminary injunction.  Id. at *2 (denying application for preliminary injunction "because the SAC contains no request for injunctive relief or for the issuance of shares").  In the other two cases cited by the City, the preliminary injunction was denied as moot when the complaint was dismissed.  Because the allegations forming the basis for this Motion have not materially changed, the Court will consider the Motion.

[2] Each party made objections to the other's evidence.  Dkts. 42-13, 47, 52.  However, it is well established that district courts may "consider hearsay in deciding whether to issue a preliminary injunction."  See Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir. 2009).  Therefore, the Court has independently considered the evidence and has given the appropriate weight to facts that may be based on inadmissible evidence.  The Court has not considered facts that are irrelevant.

without notice, including when the property "poses an immediate threat to the health or safety of the public," id. § 56.11(3)(g), "constitutes evidence of a crime or contraband," id. §56.11(3)(h), or is a "Bulky Item" that is not "designed to be used as a shelter," id. §56.11(3)(i) (Bulky Item Provision).  A Bulky Item is "any item, with the exception of a constructed Tent, operational bicycle or operational walker, crutch or wheelchair, that is too large to fit into a 60-gallon container with the lid closed," but not "a container with a volume of no more than 60 gallons used by an individual to hold his or her Personal Property."  Id. § 56.11(2)(c).  The Ordinance also makes it unlawful for any person to "willfully resist, delay or obstruct a City employee from removing or discarding a Bulky Item."  Id. § 56.11(10)(d).

The City enforces the Ordinance through the Bureau of Sanitation (Sanitation) and the Los Angeles Police Department (LAPD), which conduct noticed cleanups and random rapid responses where personal property that does not comply with the Ordinance is seized or destroyed.  See id. § 56.11(11); Dkt. 42-1 (Guerrero Decl.) ¶¶ 1-2; Dkt. 42-5 (Pereida Decl.) ¶¶ 1-2; Dkt. 42-6 (Wong Decl.) ¶¶ 4-21.  According to Inter-Departmental Correspondence sent by the Sanitation Director, "[b]eginning on January 21, 2020, the CARE program[3] will fully implement the following program adjustments citywide[:] . . . Every CARE and CARE+ team will fully enforce LAMC 56.11 at every location they visit.  Compliance means that . . . prohibited Items, such as bulky items . . . will be impounded and disposed of according to law and policy."  Dkt. 39 (RJN) Ex. 4, at 2.[4]

---

[3] CARE and CARE+ are acronyms for the City's Comprehensive Cleaning and Rapid Engagement Program.  Wong Decl. ¶ 2.  CARE teams "clean the public right-of-way and address enforcement and emergency-response to mitigate illegal dumping and/or items stored in the public right-of-way" while CARE+ teams "provides public health services to encampments."  Id. ¶ 4.

[4] The Court GRANTS Plaintiff's unopposed request for judicial notice of the official government reports prepared by Sanitation.  Fed. R. Evid. 201(b).

## B.   Enforcement of the Ordinance Against Individual Plaintiffs

### 1.   Diocson

Diocson is 51 years old and has lived in the Harbor City area of Los Angeles for the past four or five years.  Dkt. 38-5 (Diocson Decl.) ¶ 2.  Until 2018, Diocson lived near the Harbor City Greenway around Lomita Boulevard.  Id. ¶¶ 3-4.  Diocson later moved to an encampment near Lomita and McCoy, where he lives with his dog Bella.  Id. ¶¶ 5-6.

On the morning of April 24, 2019, LAPD and Sanitation came to the area for a noticed sweep.  Id. ¶ 8; see also Wong Decl. ¶ 23.  Diocson had moved Bella out of the area prior to the sweep.  Diocson Decl. ¶ 9.  As Diocson was about the leave the area with his belongings, an LAPD officer told Diocson he would have to leave Bella's kennel behind because it was a Bulky Item.  Id. ¶¶ 11-12.  The City "prepared a report [about the April 24 cleanup] documenting the posting, cleanup, and health hazard assessments as part of their regular duties."  Wong Decl. ¶ 24 & Ex. 4.  The report identifies a pet cage as contaminated and did not "identify the pet cage as a bulky item."  Id. ¶ 26 & Ex. 4, at 76, 90.[5]

Diocson was able to get a new dog kennel, but it was also destroyed by Sanitation in late 2019 as part of a clean-up.  Diocson Decl. ¶¶ 14-15.  Diocson has not tried to get a third kennel because he believes the City will just take it again.  Id. ¶ 16.

Diocson also has a storage bin that he is worried the City will consider a Bulky Item and destroy because City workers have

---

[5] It is not clear that this pet cage belonged to Diocson.  The identified pet cage was listed as "unattended," Wong Decl. Ex. 4, at 76, even though Diocson declares he was present at the time of the cleanup and that his other belongings were stacked on top of the kennel as he was about to carry them out of the area.  Diocson Decl. ¶¶ 10-12.  And unlike the picture authenticated by Ashley, the picture authenticated by Diocson, see Wong Decl. Ex. 6, at 120-21; Diocson Decl. ¶ 12 & Ex. A, does not have any description tying it to one of the locations in the report.

4

destroyed other bins that were the same size.  Id. ¶ 17.  When the City destroyed his prior bin (and other items of similar size), the City told him that "they are bulky items and that's why they are taking them and throwing them away."  Id.

### 2. Ashley

Ashley is 29 years old and has been homeless for years.  Dkt. 38-2 (Ashley Decl.) ¶ 2.  In his spare time, he makes carts out of bicycle and wheelchair wheels so that he can move his (and other's) belongings from place to place and carry groceries and other supplies from the stores to where he is staying.  Id. ¶¶ 3, 5-6.

On May 21, 2019, while he was staying at a large encampment on Lomita and McCoy in the Harbor City area of Los Angeles, Sanitation conducted a noticed cleanup.  Id. ¶ 8; see also Wong Decl. ¶ 23.  During the cleanup, a sanitation worker told Ashley that his two carts and some bedding were "Bulky Items" that he could not take from the cleanup area.  Ashley Decl. ¶ 11.  An LAPD officer told Ashley that "if [he] did not want to go jail, [he] would have to hurry up and move from the area," so he complied.  Id. ¶ 12.  He was not given any documentation about the items he was forced to leave behind, or any written explanation of why they were taken.  Id.  The City, however, prepared a report of the cleanup.  Wong Decl. ¶ 28 & Ex. 8.[6]  The report describes an encampment containing a "[m]etal cart and mattress," but does not state that those items were discarded.  Id. at 140-141.  The report includes a picture of those items with a caption identifying the cart and mattress as "Location 7 bulky item."  Id. at 149.  The

---

[6] The City appears unsure about which encampment was Ashley's.  See Wong Decl. ¶ 30 (describing the items found at location 6 and 7).  From the Court's review of the report, it seems clear that Ashley was living at location 7.  First, the report states that location 6 was "unattended," id. Ex. 8, at 140, but Ashley declared he was there during the cleanup, Ashley Decl. ¶¶ 9-11.  Second, the picture the report identifies as "Figure 7.a. Location 7 bulky item," Wong Decl. Ex. 8, at 149, was authenticated by Ashley as containing his property, Ashley Decl. ¶ 10 & Ex. A.

corresponding Health Hazard Checklist does not address the cart.  Id. at 167.

Ashley thereafter got a new cart that he uses when he goes to the Lomita and McCoy encampment.  Ashley Decl. ¶ 17.  However, because Sanitation comes to that location a "lot,"[7] he worries that Sanitation will determine that his cart is a Bulky Item and throw it away.  Id.

### 3.    KFA

KFA "was founded in 2018 to support the construction of the Bridge Home shelter in Koreatown" and "to support unhoused residents, to form connections between housed and unhoused residents of Koreatown, and to advocate for housing and shelters and other services in the Koreatown community."  Dkt. 38-6 (Nguyen Decl.) ¶ 3. It is "integral" to KFA's mission to "have unhoused persons included in our meetings and participating in advocacy."  Id. ¶ 4.  KFA spends time monitoring cleanups and providing replacement items to people whose belongings have been seized and destroyed pursuant to the Ordinance, which "takes time and resources away from these other advocacy activities."  Id. ¶¶ 6, 10-11.  Specifically, KFA has bought or would buy tents, cots, mattresses, brooms, socks, sleeping bags, blankets, underwear, and warm clothes to replace destroyed property.  Id. ¶¶ 11, 14.  KFA additionally facilitates requests for replacement items by posting on social media so "community members can buy and replace things for our unhoused neighbors," including "a small cart and a cooler" and then a KFA member delivers the items to the unhoused resident who needs it.  Id.  If KFA did not spend time monitoring cleanups and providing replacement items, unhoused members would have a more difficult time "advocat[ing] for themselves, organiz[ing] with [KFA], and ultimately get[ting] into housing."  Id. ¶ 7.

On February 24, 2020, KFA members had planned to attend a meeting about the Bridge Home shelter.  Id. ¶ 8; see also Dkt. 38-3

---

[7] Plaintiffs submit evidence that a cleanup was scheduled to occur in this area on February 13, 2020.  Dkt. 38-1 (Riskin Decl.) Ex. A, at 8.

(Price Decl.) ¶ 3.  However, on their way to the meeting, one member was informed that a cleanup was occurring at 4th and Vermont where Kahn, an unhoused resident served by KFA, lived.  Price Decl. ¶ 3.[8] The KFA members then went to monitor the cleanup, instead of the meeting.  Id. ¶ 5.  They also helped Kahn, who is in a wheelchair, pack up and move his belongings.  Id. ¶¶ 4, 6.  However, once Sanitation and LAPD arrived, they were told to leave.  Id. ¶¶ 7-8.  LAPD Officer Lucero told them that some of Kahn's items, including pallets, were Bulky Items that could not be taken out of the area.  Id. ¶ 9.  A Sanitation worker also stated that "some of Kahn's belongings were bulky items that would not fit in a 60 gallon container," including "the pallets and a foam cushion that Kahn uses to sleep on."  Id. ¶ 10.  The items identified by LAPD and Sanitation as Bulky Items were thrown away.  Id. ¶ 11.

## II. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as a matter of right."  Winter v. Natural Res. Def. Council, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Id. at 20.  Although a plaintiff seeking a preliminary injunction must make a showing on each factor, the Ninth Circuit employs a "version of the sliding scale" approach where "a stronger showing of one element may offset a weaker showing of another." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-35 (9th Cir. 2011).  Under this approach, a court may issue a preliminary

---

[8] The City appears to interpret the inclusion of this evidence as KFA seeking injunctive relief on behalf of its members or other unhoused residents.  Opp'n at 8.  Nothing in Plaintiffs' Motion leads the Court to that conclusion. Rather, inclusion of this evidence tends to support KFA's organizational standing by providing a recent example where KFA had to divert time and resources based on an application of the Bulky Item Provision.  The same is true for the Bettega Declaration.

injunction where there are "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff . . , , so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Id. at 1135 (internal quotation marks omitted). "When the government is a party, the last two factors (equities and public interest) merge." E. Bay Sanctuary Covenant v. Trump, 950 F.3d 1242, 1271 (9th Cir. 2020).

## III. DISCUSSION

### A.     Standing

"To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009).

### 1.     Individual Plaintiffs

Diocson and Ashley both declared that when the City took and destroyed their property, City employees told them they were doing so because those belongings constituted Bulky Items. Diocson Decl. ¶ 12; Ashley Decl. ¶ 11. Further, both individuals declared that they now possess items the City is likely to deem Bulky Items and that they live in an area with frequent cleanups.[9] See Diocson Decl. ¶¶ 15, 17, 19; Ashley Decl. ¶¶ 4-5, 17. And the City has stated its intention to enforce the Bulky Item Provision until the Court orders otherwise. See RJN Ex. 4, at 2 ("Every CARE and CARE+ team will fully enforce LAMC

---

[9] It does not matter whether the cleanups are noticed cleanups or rapid response cleanups; the City relies on the Bulky Item Provision in both situations to seize and destroy property. See, e.g., Wong Decl. ¶ 45 ("[B]ulky [I]tems are addressed as part of CARE+ posted cleanups or CARE enforcement and response to immediate threats to the health and safety of the public.").

56.11 at every location they visit.  Compliance means that . . . prohibited Items, such as bulky items . . . will be impounded and disposed of according to law and policy."); see also Dkt. 48-1 (Suppl. Myers Decl.) ¶ 23 & Ex. E.  This is sufficient to establish standing.

The City contends Diocson and Ashley do not have standing because they have not submitted conclusive evidence that their property has been destroyed pursuant to an application of the Bulky Item Provision.  See Opp'n at 7; Dkt. 55 (Objs. to Tentative)[10] at 1. However, Plaintiffs need not conclusively establish that they have been harmed by an application of the Bulky Item Provision in the past, so long as it is sufficiently likely that they will be harmed in the imminent future.  See Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the harm will occur.'").  Plaintiffs have sufficiently made that showing by submitting evidence that they possess Bulky Items and live near areas subject to frequent cleanups and the City has stated its intention to "fully enforce LAMC 56.11 at every location they visit" including "impound[ing] and dispos[ing] of [Bulky Items] according to law and policy."  RJN Ex. 4, at 2.

In any event, Plaintiffs have submitted evidence that the Bulky Item Provision was applied to them in the past.  The City argues that the reports prepared by its employees stated that the destroyed items belonging to Ashley and Diocson were health and safety hazards, not Bulky Items, and therefore were not seized and destroyed pursuant to the Bulky Item Provision.  See Opp'n at 7 (citing Wong Decl. ¶¶ 24-30 & Exs. 4, 8).  This is simply untrue for Ashley's carts.  See Wong Decl. Ex. 8, at 140, 167.  Further, the City has not adequately demonstrated

---

[10]  The Court notes that the City filed its objections five hours after the deadline set by the Court.  See Dkt. 53 ("The City may submit objections to the tentative ruling (not to exceed five pages) no later than noon on April 6."). Although the Court warned the City that "[i]f no timely objections are filed, the tentative order will be the final order," id., the Court will exercise its discretion to consider the City's objections.

Case 2:19-cv-06182-DSF-PLA   Document 122-9   Filed 04/07/21   Page 243 of 409   Page ID
#:7457
Case 2:19-cv-06182-DSF-PLA   Document 54   Filed 04/19/20   Page 10 of 31   Page ID #:2050

that the pet cage referred to in the cited report was Diocson's property,
nor does it sufficiently show that the pet cage was destroyed because it
was a health and safety hazard.  The mere listing of a pet cage as
"contaminated," Wong Decl. Ex. 4, at 90, does not clearly indicate that
the item was destroyed because it was a health hazard and not a Bulky
Item, and the identification of urine and aerosols in the area is not tied
to the pet cage.  Mr. Wong's conclusion that "[t]he pet cage was
discarded because of health and safety hazards identified in the
Report," Wong Decl. ¶ 26, lacks foundation.  Mr. Wong does not declare
that he was present at the clean-up or spoke with the Environmental
Compliance Inspectors or other City employees who were present at the
clean-up and threw away the pet cage.  Mr. Wong's conclusion appears
to be based on his reading of the report, which is inconclusive.
Diocson and Ashley have standing.[11]

    2.    **KFA**

        The City contends that although the Court found KFA to have
sufficiently alleged standing at the pleading stage, it must submit
"competent evidence establishing organizational standing" at the

_____

[11] The City objects to this conclusion, asserting that it "submitted sworn
testimony that the items at issue were destroyed for health and safety
reasons."  Objs. to Tentative at 5.  The Court disagrees for the reasons
discussed above: Mr. Wong lacks foundation to make such a statement and
the reports authenticated by Mr. Wong do not establish that Plaintiffs'
property was destroyed for health and safety reasons.  Additionally, the
City's objections do not address the Court's conclusion that the report most
likely tied to Ashley does not state that his cart and bedding were destroyed
for health and safety reasons.  Dkt. 54 (Tentative Order) at 5-6 & n.6.
Further, the reports are not necessarily "inconsistent with Plaintiffs'
declarations."  Objs. to Tentative at 2.  Assuming that the City could locate
additional evidence tying the portions of the reports cited by the City to
Plaintiffs, it is possible both that City employees initially seized Plaintiffs'
items because they were Bulky Items and that it later discovered that the
items were contaminated and made a notation reflecting that fact before
destroying them.

preliminary injunction phase and has failed to do so. Opp'n at 7. The City cites no cases in support of this additional burden and, in any event, is incorrect. KFA's co-founder Jane Nguyen declared that KFA's mission is to "to support unhoused residents, to form connections between housed and unhoused residents of Koreatown, and to advocate for housing and shelters and other services in the Koreatown community," that it is "integral" to KFA's mission to "have unhoused persons included in our meetings and participating in advocacy," that the cleanups have caused unhoused residents to lose contact with KFA and discouraged them from going to appointments and KFA meetings for fear that all of their belongings will be thrown away while they are gone, and that KFA has had to spend time monitoring cleanups and providing replacement items to people whose belongings have been seized and destroyed pursuant to the Ordinance, which "takes time and resources away from these other advocacy activities." Nguyen Decl. ¶¶ 3-7, 10-11. Nguyen also declared that she coordinated the replacement of "a small cart and a cooler" and provided a cot to an unhoused member of KFA and that mattresses destroyed by cleanups are "the type of thing Ktown for All would pay to replace." Id. ¶¶ 11, 14.[12] And KFA members spent time monitoring a cleanup where alleged Bulky Items were taken and thrown away. Price Decl. ¶¶ 9-11; see also Dkt. 38-4 (Emmons Decl.) Ex. A. This is sufficient under La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest, 624 F.3d 1083 (9th Cir. 2010).[13]

---

[12] Although Nguyen has declared that KFA has not "directly provided carts or crates," Nguyen Decl. ¶ 11, the items it does provide are often needed because of the destruction of a Bulky Item. For example, one homeless individual and KFA member, Rachelle Bettega, had storage bins containing two phones, cleaning supplies, and clothes that were seized and destroyed as Bulky Items. Dkt. 38-7 (Bettega Decl.) ¶ 11. Bettega then had to keep her remaining clothes in a garbage bag, which does not protect the clothes from getting wet when it rains. Id. ¶ 12. After her clothes got wet, KFA bought new clothes for Bettega. Id.

[13] The City raises a number of arguments, Opp'n at 7-8, that were explicitly considered and rejected in the Court's prior order, see Dkt. 37 (12(b)(1) Order)

The City also objects to Plaintiffs' standing "to obtain an injunction enjoining enforcement of the [Bulky Item] Provision, not only as to them, but citywide." Objs. to Tentative at 1. However, "if the arguments and evidence show that a statutory provision is unconstitutional on its face," as the Court concludes Plaintiffs have a likelihood of success in establishing here, "an injunction prohibiting its enforcement is 'proper.'" See Whole Woman's Health v. Hellerstedt, 136 S. Ct. 2292, 2307 (2016), as revised (June 27, 2016). Moreover, the Ninth Circuit has held that "an injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit-even if it is not a class action-*if such breadth is necessary to give prevailing parties the relief to which they are entitled*." Easyriders Freedom F.I.G.H.T. v. Hannigan, 92 F.3d 1486, 1501-02 (9th Cir. 1996) (quoting Bresgal v. Brock, 843 F.2d 1163, 1170-71 (9th Cir.1987)). In Easyriders, where plaintiffs challenged a California Highway Patrol policy permitting stops of motorcyclists for wearing certain helmets, the court noted that "it is unlikely that law enforcement officials who were not restricted by an injunction governing their treatment of all motorcyclists would inquire before citation into whether a motorcyclist was among the named plaintiffs" and therefore "the plaintiffs would not receive the complete relief to which they are entitled without statewide application of the injunction." Id. at 1502. Similarly, here it is unlikely that City employees would inquire before seizing property whether a homeless person was a plaintiff in this action. Other district courts considering

---

at 7-10. Moreover, the Ninth Circuit has since made even clearer that 1) organizations "are not required to demonstrate some threshold magnitude of their injuries; one less client that they may have had but-for the Rule's issuance is enough" and 2) a "'legally protected interest' need not be a statutorily created interest" and "an interest can support standing even if it is not protected by law." E. Bay Sanctuary Covenant, 950 F.3d at 1266-67 (internal citations and footnote omitted). The City also complains that KFA does not differentiate between noticed and unnoticed cleanups. Opp'n at 8. However, the City does not explain how this is relevant to standing to challenge the Bulky Item Provision, which applies in both situations.

similar issues have reached the same conclusion.  See, e.g., Justin v. City of Los Angeles, No. CV0012352LGBAIJX, 2000 WL 1808426, at *3 (C.D. Cal. Dec. 5, 2000) (Homeless plaintiffs alleging harassment by City employees, including illegal searches and seizures "will not receive the complete relief to which they are entitled if the applicability of the injunction is narrowed to the named Plaintiffs").

## B.  Likelihood of Success on the Merits

### 1.  Unreasonable Seizures

Plaintiffs are likely to succeed on the merits of their claim that the Bulky Item Provision authorizes unreasonable seizures in violation of the Fourth Amendment by permitting the seizure and immediate destruction of Bulky Items without a warrant or pursuant to a warrant exception or in a way otherwise consistent with the Supreme Court's precedents.  See Dkt. 36 (12(b)(6) Order) at 6-12 (analyzing whether Plaintiffs had sufficiently alleged a facial challenge to the Bulky Item Provision under the Fourth Amendment).  The City makes a number of arguments in the hope that the Court will reach a different conclusion.  Each argument fails.

First, the City argues that "the Bulky Item Provision regulates conduct—in public (not private) spaces—not property" by prohibiting "the storage of the Bulky Items in public" not—"the Bulky Items themselves." Opp'n at 10.  This ignores the plain language of the Provision, which authorizes the City to "remove and . . . discard any Bulky Item."  LAMC 56.11(3)(i).  If the provision merely prohibited the storage of Bulky Items in public spaces, the City would not be authorized to destroy property that was stored in violation of the provision.  Lavan v. City of Los Angeles, 693 F.3d 1022, 1029 (9th Cir. 2012) ("Violation of a City ordinance does not vitiate the Fourth Amendment's protection of one's property").[14]  As the court in Lavan

---

[14] The City clearly understands this; later in its brief it acknowledges that the California anti-dumping statute, California Penal Code § 374.3, which

noted, "[w]ere it otherwise, the government could seize and destroy any illegally parked car or unlawfully unattended dog without implicating the Fourth Amendment." Id. The question here is not whether the City can "limit the size of items that a person can store in a finite public space," Opp'n at 10, but whether it can seize and destroy items because they are of a particular size.[15] Plaintiffs have shown they are likely to succeed in answering that question in the negative.

Next, the City argues that there need not be a warrant or applicable warrant exception before seizing and destroying Bulky Items because it is reasonable to do so when "balanc[ing] the competing interests," such as "the public's interest in using that public space." Opp'n at 11. The City acknowledges that it is not necessarily one particular Bulky Item that negatively affects the public's interests, but rather "the accumulation of these items in the aggregate that justifie[s] their removal from the public right of way." Id. at 11-12. As a general principal, the City is correct that "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 665 (1989). And as the City indicates, the Supreme Court has established random checkpoints and drug testing as situations where individualized suspicion is not necessary. See Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 449-51 (1990) (sobriety checkpoints do not violate the Fourth Amendment because the "magnitude of the drunken driving problem [and] the States' interest in eradicating it" outweighs the "slight" "intrusion on motorists stopped briefly at sobriety checkpoints"); United States v. Martinez-Fuerte, 428 U.S. 543, 557 (1976) (border checkpoints do not violate the Fourth Amendment

---

makes it unlawful to dump waste, "do[es] not authorize property removal," Opp'n at 24.

[15] To that end, the City's example is illustrative. Assuming the Fourth Amendment applied to the cited airline, while the airline might be able to limit the size of carry-on bags, it would not be able to take and throw away carry-on bags that exceeded the size limit.

Case 2:19-cv-06182-DSF-PLA  Document 122-8  Filed 04/20/21  Page 248 of 409  Page ID
Case 2:19-cv-06182-DSF-PLA  Document 52-2  Filed 04/19/20  Page 15 of 31  Page ID #:2055
#:7462

because "the need to make routine checkpoint stops is great" and "the consequent intrusion on Fourth Amendment interests is quite limited"); Von Raab, 489 U.S. at 677  (drug testing by government employer does not violate Fourth Amendment where employees "seek to be promoted to positions that directly involve the interdiction of illegal drugs or that require the incumbent to carry a firearm").  But these limited exceptions carved out by the Supreme Court do not support the proposition that a reasonableness balancing test has in every situation replaced the warrant or exception standard.[16]  Rather, as Plaintiffs point out, the Ninth Circuit has explicitly "decline[d] to establish a general exception to the Fourth Amendment's warrant requirement for conduct that, absent special needs consistent with the Supreme Court's precedents, is asserted to be 'reasonable.'"  Menotti v. City of Seattle, 409 F.3d 1113, 1154 (9th Cir. 2005); see also City of Los Angeles, Calif.

---

[16] In any event, the reasoning behind these cases is distinguishable.  Unlike the temporary stop in Michigan Department and Martinez-Fuerte, or the "trace amount of cocaine" destroyed in Jacobsen, homeless individuals' interest in their property, including Bulky Items, is anything but "slight," "limited," or "unnoticed."  See Lavan, 693 F.3d at 1032 ("For many of us, the loss of our personal effects may pose a minor inconvenience.  However, . . . the loss can be devastating for the homeless" (alteration in original) (quoting Pottinger, 810 F. Supp. at 1559)).  Plaintiffs have demonstrated the importance of these items to the people who own them.  See, e.g., Ashley Decl. ¶ 5 (uses cart "to pick up groceries and supplies I need to survive"); Diocson Decl. ¶¶ 7, 17 (dog cage "gave [him] peace of mind and made it possible to keep [his dog] with [him] while [he] was sleeping in [his] tent" and storage bins "use[d] to store [his] belongings and to keep them dry"); Price Decl. ¶ 10 (pallets and a foam cushion that homeless individual uses to sleep on); Bettega Decl. ¶¶ 6, 9, 11 (bicycle necessary to get to her job, "crates to make herself a bed so that she could stay off the wet ground," and bins to keep her belongings dry).  The City mischaracterizes this footnote as improperly "concluding that all Bulky Items are life necessities."  Objs. to Tentative Order at 2.  The Court provides these examples only to demonstrate that homeless individuals' interests in their property are not "slight," "limited," or "unnoticed."  It asserts no conclusions about "all Bulky Items."

v. Patel, 576 U.S. 409 (2015) (noting that the Supreme Court has
established warrant exceptions, such as the administrative search
exception, "where special needs . . . make the warrant and probable-
cause requirement impracticable . . . and where the 'primary purpose'
of the searches is '[d]istinguishable from the general interest in crime
control'" (internal citations and quotation marks omitted) (first and
third alteration in original)).

The only Supreme Court case cited by the City applying a
balancing test to the permanent seizure of property, United States v.
Jacobsen, 466 U.S. 109, 125 (1984), has been limited by the Ninth
Circuit to situations where the seized property was entirely
contraband.  See United States v. Young, 573 F.3d 711, 720-21 (9th Cir.
2009) (declining "to expand Jacobsen's decision to warrantless searches
of private residences" and distinguishing Jacobsen on the grounds that
"neither the hotel room nor the backpack contained only contraband").
The City contends that the Ninth Circuit in Lavan "fram[ed] [the]
inquiry as whether City 'acted reasonably under the Fourth
Amendment.'"  Opp'n at 13; see also Objs. to Tentative at 3 n.5 (The
Ninth Circuit "applied a 'reasonableness' (not warrant-or-exception)
standard to the seizure of property of persons experiencing
homelessness.").  However, the only issue necessarily decided by the
Ninth Circuit was that "the unattended property of homeless persons is
[not] uniquely beyond the reach of the Constitution, so that the
government may seize and destroy with impunity the worldly
possessions of a vulnerable group in our society."  Lavan, 693 F.3d at
1033.  Nevertheless, the Court acknowledges that the Ninth Circuit
noted its approval of the district court's balancing of the "possessory
interests in [homeless plaintiffs'] personal belongings against the City's
reasons for taking the property to conclude that [plaintiffs]
demonstrated a strong likelihood of success on the merits of their claim
that by collecting and destroying [plaintiffs'] property on the spot, the
City acted unreasonably in violation of the Fourth Amendment."  Id. at
1030.  In Lavan, the district court held that the seizures of homeless
individuals' unattended property violated the Fourth Amendment
because the City's interest in keeping the City clean and safe was not

sufficient to render reasonable the deprivation of plaintiffs' property.
Lavan v. City of Los Angeles, 797 F. Supp. 2d 1005, 1015 (C.D. Cal.
2011).  It noted that at least four other district court cases that
"considered the issue . . . found that similar conduct, even by the same
defendant in this case, violated the Fourth Amendment despite an
inherent interest in keeping public areas clean and prosperous."  Id.
(collecting cases).  In any event, whether the Court requires a warrant
or an exception or employs a reasonableness balancing test, the result
is the same – Plaintiffs are likely to succeed on their Fourth
Amendment claim.

The City contends that the Court "hardly references the
countervailing evidence submitted by Defendants, consisting of 12
declarations and hundreds of pages" and "dismissed [some of the City's
evidence] out-of-hand on the basis that it appears inconsistent with
Plaintiffs' declarations."  Objs. to Tentative at 2.  But the Court did not
disregard the City's evidence because it was "countervailing" or
"inconsistent," but rather because the City failed to show why its
evidence was relevant.  For example, four of the declarations and
nearly two hundred pages are dedicated solely to authenticating
pictures of homeless encampments with items stored in public areas.
See Guerrero Decl.; Pereida Decl.; Dkt. 42-11 (Ramirez Decl.); Dkt. 42-
12 (Rankin Decl.).  That a large number of items are stored in public
places by homeless residents is undisputed, but the City does not
sufficiently address how this fact renders seizures pursuant to the
Bulky Item Provision constitutional.  Another declaration describes the
Harbor City Greenway project that was purportedly derailed because of
vandalism, theft, and illegal activities in the area.  Dkt. 42-4 (Haines
Decl.).  Although that was certainly unfortunate, the City again fails to
adequately address how the increase in crime and presence of homeless
people, some of whom may be participating in illegal activity, provides
justification for seizing and throwing away Bulky Items.  The Bulky
Item Provision has no bearing on the City's power to prosecute
individuals who commit crimes such as vandalism or theft.  Five other
declarations describe the personal experience of City employees who
receive complaints from residents about, and frequently encounter,

17

Bulky Items.  Dkt. 42-3 (Medina Decl.); Dkt. 42-7 (Rodriguez Decl.); Dkt. 42-8 (Banks Decl.); Dkt. 42-9 (Bernal Decl.); Dkt. 42-10 (Diaz Decl.).  The declarations describe problems relating to the accumulation of "large items in the public right of way that are larger than could fit in a 60-gallon container with the lid closed," but they 1) describe scenarios that could be addressed without with Bulky Item Provision or 2) do not clarify whether the described Bulky Items appear to be someone's property or the result of dumping.[17]  See, e.g., Medina Decl. ¶ 4 (describing Bulky Items that "block[] access for individuals with disabilities, . . . impede sidewalks, driveways, access to alleys, and parking spaces."); id. ¶ 6 ("[T]he chronic and recurring presence of these large items on the sidewalk . . . poses a danger to children when they are forced to walk into the street"); id. ¶ 7 ("[T]he accumulation of such items makes it difficult for trash collection and emergency vehicles to access this area"); Rodriguez Decl. ¶ 3 (describing "children walking to school [that] are accompanied by a parent with a younger child in a stroller, or an elderly grandparent, and they are all forced to walk along the street curb or next to parked cars in the street to navigate around large items obstructing the sidewalks"); id. ¶ 4 ("The accumulation of such large items [near homeless encampments] can make it difficult to pass through these alleys, and can make it more onerous for trash collectors to service the trash bins in those alleys"); Banks Decl. ¶ 7 (describing constituent complaint about "a man using a wheelchair [who] had trouble traversing the sidewalk due to the presence of the structure").  Taken together, the City's evidence identifies varied and widespread problems relating to homeless people, including increased crime and accumulation of items on sidewalks, but does not explain why those issues cannot be addressed by other provisions of the Ordinance (or other ordinances or statutes) or how the

---

[17] The City refers to items that are clearly dumped or abandoned, such as "mattresses, couches, doors, carpet, toilets, electrical waste and other furniture and large items" that were collected from "residential and multi-family residential buildings," as Bulky Items.  See Wong Decl. ¶¶ 41-42.  When City employees refer to Bulky Items, therefore, it is not clear that they are referring to items for which Fourth Amendment protections apply.

Case 2:19-cv-06182-DSF-PLA   Document 122-9   Filed 04/07/21   Page 252 of 409   Page ID
Case 2:19-cv-06182-DSF-PLA   Document 52   Filed 04/13/20   Page 19 of 31   Page ID #:2059
#:7466

existence of those problems justifies the Bulky Item Provision as the solution.  The City's evidence, when balanced against homeless residents' interests in not having their property seized and destroyed, would not make seizures pursuant to the Bulky Item Provision reasonable.

Next, the City contends that Plaintiffs have failed to analyze the constitutionality of the part of the Bulky Item Provision that applies to unattended items.  Opp'n at 15.  As noted in the 12(b)(6) Order, LAMC § 56.11(3)(a) permits the City, with pre- and post-removal notice, to impound any unattended property regardless of size.  Id. at 10.[18] Therefore, the only work the Bulky Item Provision does as to unattended items is to permit the immediate destruction of unattended items over a certain size without having to provide any notice.  As the Court previously held, and consistent with Ninth Circuit precedent, this is unreasonable.  See Lavan, 693 F.3d at 1030 ("[E]ven if the seizure of the property would have been deemed reasonable had the City held it for return to its owner instead of immediately destroying it, the City's destruction of the property rendered the seizure unreasonable.").  For these reasons and the reasons stated in the 12(b)(6) Order, the seizure and immediate destruction of Bulky Items only because they are Bulky Items is unreasonable.

To the extent the City contends that it is too complex to determine whether an item is attended, unattended, or abandoned, that is not a reason to keep the Bulky Item Provision in place.  The City must already determine whether items are abandoned or unattended in enforcing each of the Ordinance's provisions, as well as various other statutes and ordinances.  See, e.g., Cal. Civ. Code § 2080 et seq.  The Bulky Item Provision relieves the City from making this determination for items of a certain size, which surely makes it easier to clean up sidewalks.  But a rule that permitted deprivation of property by the government whenever it simply made its job easier would eviscerate

---

[18] Plaintiffs have not sought – and the Court has not imposed – an injunction as to LAMC § 56.11(3)(a).

Case 2:19-cv-06182-DSF-PLA  Document 122-9  Filed 04/07/21  Page 253 of 409  Page ID
Case 2:19-cv-06182-DSF-PLA  Document 59-2  Filed 04/13/20  Page 20 of 31  Page ID #:2060
#:7467

the Fourth Amendment.[19]  And just because the City may on occasion
incorrectly determine that unattended property is abandoned does not
justify seizing and destroying property that the City knows or
reasonably believes is unattended but not abandoned.  The Court
agrees with the district court in <u>Lavan</u> that it is sufficient if the City
employee has "an objectively reasonable belief that it is abandoned."
797 F. Supp. 2d at 1020.  Moreover, it is unclear why the City continues
to attack "Plaintiffs' view" that all items in an area with encampments
must be treated as either attended or unattended personal property.
Opp'n at 16.  To be clear, Plaintiffs do not make this argument.  To the
contrary, Plaintiffs explicitly acknowledge that items near
encampments can constitute trash (because there are not enough trash
cans near encampments) or abandoned property from individuals not
living at the encampments.  <u>See, e.g.</u>, Diocson Decl. ¶ 5 ("Sometimes
people also dump their trash in the area"); Dkt. 48-3 (Flowers Decl.) ¶ 5
("There is a lot of illegal dumping that happens on the street where I
stay. . . . When people dump their stuff, the trash just sits there.  There
are no trashcans anywhere around, so the trash just piles up.").  The
City must make a reasonable determination as to whether items are
unattended, abandoned, or trash.  The City's focus on "what the Court
would consider to be 'trash' in the case of Bulky Items on public
sidewalks," Objs. to Tentative at 3, is misplaced.  The preliminary
injunction does not apply to items that the City reasonably determines
are abandoned property or trash.  Finally, to the extent the City
contends that unattended property is deserving of less protection than
attended property, that proposition has already been rejected by the
Ninth Circuit.  <u>Lavan</u>, 693 F.3d at 1024 ("[T]he Fourth and Fourteenth
Amendments protect homeless persons from government seizure and
summary destruction of their unabandoned, but momentarily
unattended, personal property").

---

[19] The City faults the Court for "dismiss[ing] as irrelevant the complexity of
making such determinations," Objs. to Tentative at 3, but does not provide a
convincing or coherent argument explaining why it would be relevant.

The City again raises the practical concerns of having to store all Bulky Items for a limited period of time.  Opp'n at 17-18.  This was previously rejected by the Court, 12(b)(6) Order at 11, and remains unconvincing.  Accepting the City's position would mean that once City storage facilities, or lost and found boxes, or evidence lockers were full, any property seized thereafter by the government could be summarily destroyed.  That does not comport with the Fourth Amendment.[20]

There is certainly no dispute that homelessness is a significant issue affecting Los Angeles (and other cities around the country) and nothing in this Order prevents the City from using its resources to create "shelters or other facilities to provide services and address the humanitarian crisis facing the City."  Opp'n at 18.[21]  However, even in passing LAMC 56.11, the City recognized that some Los Angles citizens will not be able to obtain housing or have other places to store their belongings.  Id. (acknowledging the "needs of the individuals[] who have no other alternatives for the storage of personal property").  Although the City would understandably prefer homeless residents not "appropriate[]" public areas, particularly areas that the City spent millions of dollars revitalizing, see Opp'n at 13, the Bulky Item Provision cannot be the solution to that problem.[22]

---

[20] In support of this argument, the City submits evidence that "less than 15% of items that the City does store are ever retrieved."  Opp'n at 17 (citing Wong Decl. ¶¶ 22, 51, Ex. 3).  However, that evidence could just as easily support the inference that the City is not doing enough to inform homeless individuals how and where to get their property back as whatever the City intends the Court to infer.

[21] The Court doubts that the only two options to balance the needs of the homeless and the cleanliness of the streets are the ones the City identifies in its Opposition.  Opp'n at 17-19.

[22] Nor has it been.  Given that the Bulky Item Provision was in place at all relevant times, it is clear that the presence of the Bulky Item Provision did not avoid the unfortunate outcome described by the City.

Case 2:19-cv-06182-DSF-PLA   Document 122-9   Filed 04/07/21   Page 255 of 409   Page ID
#:7469
Case 2:19-cv-06182-DSF-PLA   Document 59   Filed 04/13/20   Page 22 of 31   Page ID #:4202

Plaintiffs are likely to succeed on their claim that the Bulky Item
Provision violates the Fourth Amendment's prohibition on illegal
seizures on its face.

### 2.   Due Process

Because the Bulky Item Provision permits the City to remove and
permanently destroy Bulky Items without any procedural safeguards
whatever, Plaintiffs are likely to succeed on the merits of their due
process claim under both the Fourteenth Amendment and the
California Constitution.[23]  See 12(b)(6) Order at 12-16 (analyzing
whether Plaintiffs had sufficiently alleged a facial challenge to the
Bulky Item Provision under the Fourteenth Amendment).  The City's
focus on what process is due, Opp'n at 19-22, is misplaced.  The
challenged provision provides no process at all.[24]  Therefore, whatever
process is due, the Bulky Item Provision does not provide it.[25]

---

[23] "The language of Article I § 7 of the California Constitution is virtually
identical to the Due Process Clause of the United States Constitution, with
the caveat that California courts place a higher significance on the dignitary
interest inherent in providing proper procedure."  Nozzi v. Hous. Auth. of
City of Los Angeles, 806 F.3d 1178, 1190 n.15 (9th Cir. 2015) (internal
quotation marks and citations omitted), as amended on denial of reh'g and
reh'g en banc (Jan. 29, 2016).  The Court will address Plaintiffs' federal and
state due process claims together, as it is unnecessary to take the additional
factor into account here.

[24] The City's argument that the statute itself constitutes sufficient process,
Opp'n at 19 (citing Texaco, Inc. v. Short, 454 U.S. 516, 537 (1982)), has no
merit.  In Texaco, the statute was self-executing based on the inaction of the
property owner and the Court noted that even then, before the deprivation of
property becomes permanent, "the full procedural protections of the Due
Process Clause—including notice reasonably calculated to reach all
interested parties and a prior opportunity to be heard—must be provided."
454 U.S. at 534.

[25] The City seems to assume that individualized pre-deprivation notice and a
hearing would be required.  Opp'n at 21-22.  This Order should not be read to
impose such a requirement.  As noted in the 12(b)(6) Order, the Court's

Case 2:19-cv-06182-DSF-PLA   Document 122-9   Filed 04/07/21   Page 256 of 409   Page ID
Case 2:19-cv-06182-DSF-PLA   Document 59-2   Filed 04/19/20   Page 23 of 31   Page ID #:2063
#:7470

The Court additionally notes that the City's analysis of the risk of erroneous deprivation, Opp'n at 21, glosses over crucial details.  City employees apparently do not measure items and determine their volume before summarily seizing and destroying them, compounding the risks of erroneous deprivation because the items no longer exist to be measured.  And as Plaintiffs note, the Bulky Item Provision contains certain exceptions that require City employees to exercise additional discretion, such as whether a bike is "operational" or a tent is "constructed."  Dkt. 48 (Reply) at 8.  Moreover, the City contends that if a mistake was made, that would not be an erroneous deprivation, but rather "an unauthorized application."  Opp'n at 21 (citing Hudson v. Palmer, 468 U.S. 517, 533 (1984)).  If this were true, there could never be an erroneous deprivation, because each such deprivation could be reframed as an unauthorized application.  Hudson does not address the risk of erroneous deprivation standard; it merely holds that due process does not require pre-deprivation process where the deprivation occurred due to a government employee's intentional and unauthorized action so long as meaningful post-deprivation process is available.  Id. at 533.[26]  The Bulky Item Provision provides for no post-deprivation process at all.

## C.   Irreparable Harm

The Ninth Circuit does "not require a strong showing of irreparable harm for constitutional injuries."  Cuviello v. City of

conclusion that by providing no process at all the procedural due process clause is violated does not dictate what process is due.  The City apparently seeks guidance from the Court as to what process would suffice.  Objs. to Tentative at 1 n.3.  But the Court may not issue an advisory opinion; it may adjudicate only "concrete legal issues, presented in actual cases, not abstractions."  Montana Envtl. Info. Ctr. v. Stone-Manning, 766 F.3d 1184, 1188 (9th Cir. 2014) (quoting Colwell v. Dep't of Health & Human Servs., 558 F.3d 1112, 1123 (9th Cir. 2009)).

[26] In addition, Hudson applies only to situations where the deprivation was unpredictable, Zimmerman v. City of Oakland, 255 F.3d 734, 738-39 (9th Cir. 2001), which is certainly not the case with the Bulky Item Provision.

Vallejo, 944 F.3d 816, 833 (9th Cir. 2019). Nevertheless, Plaintiffs have made a strong showing here.

Plaintiffs provide evidence that Ashley and Diocson "are frequently subjected to City sweeps, and every time they are subjected to a sweep, they are at risk of having their constitutional rights violated by the enforcement of the Bulky Item Provision." Mot. at 15. Further, "the irreparable harm . . . is compounded by the fact that the constitutional violations result[] in the actual and permanent deprivation of their belongings." Id. The City does not dispute that such harm is irreparable, but contends that it is not imminent. Opp'n at 22-23. The City's argument rests on its position rejected above that Plaintiffs have not "shown that they have suffered any harm from the enforcement of the Bulky Item Provision." Id. at 23. But as explained in the Court's prior Order, that the Bulky Item Provision may be enforced during a noticed cleanup does not ameliorate its failure to provide due process. 12(b)(6) Order at 13 n.13. It is clear from both Plaintiffs' and the City's evidence that the Bulky Item Provision is likely to be enforced imminently against Ashley and Diocson, leading to the permanent destruction of their belongings. See, e.g., RJN Ex. 4, at 2; Diocson Decl. ¶¶ 17, 19; Ashley Decl. ¶17; Wong Decl. ¶¶ 23, 45 & Ex. 2; Ramirez Decl. ¶ 4; Rankin Decl. ¶ 4; Medina Decl. ¶ 5.

The City's additional contention that its announcement of its intent to enforce LAMC 56.11 (and therefore the Bulky Item Provision) does not establish an imminent threat of irreparable injury because the Protocols provide adequate protection falls flat. From the declarations of a small handful of homeless individuals and KFA members, it is clear that the City does not take "extensive measures to . . . safeguard Bulky Items that appear to be someone's property" in accordance with the Protocols. Opp'n at 23. Despite the Protocol stating that Sanitation will "work with the individual(s) to allow for the removal of" Attended Bulky Items, including providing additional accommodations for physically or mentally-impaired individuals, Wong Decl. Ex. 1, at 40, the City has routinely seized and destroyed Attended Bulky Items that were in the process of being removed, see Ashley Decl. ¶ 11 ("As I was attempting to comply with LA Sanitation's instructions to remove

Case 2:19-cv-06182-DSF-PLA   Document 122-9   Filed 04/07/21   Page 258 of 409   Page ID
Case 2:19-cv-06182-DSF-PLA   Document 52   Filed 04/13/20   Page 25 of 31   Page ID #:9205
#:7472

my belongings from the area, a sanitation worker stopped me and told
me that the carts and bedding were Bulky Items, and therefore I could
not take them with me out of the cleanup area"); Diocson Decl. ¶¶ 11-12
("I was getting ready to move my belongings from the area when . . .
Officer Lopez told me that I could not take Bella's kennel with me"
because "it was a bulky item and it was too big, so I wasn't allowed to
keep it."); Price Decl. ¶ 9 ("The neighbor then asked if he could move
some of Kahn's items out of the area, and Nic asked if he could carry
the pallets out of the area.  The Sanitation workers said no, that Kahn's
items were bulky items and they couldn't take them.").[27]

Plaintiffs contend that KFA is also in imminent danger of
irreparable harm because the Bulky Item Provision constitutes
"ongoing harms to [its] organizational missions."  Mot. at 16-17
(quoting S.A. v. Trump, No. 18-CV-03539-LB, 2019 WL 990680, at *9
(N.D. Cal. Mar. 1, 2019)).  As explained in detail above, enforcement of
the Bulky Item Provision harms KFA's mission and causes KFA to
divert resources from advancing its mission in order to help homeless
individuals against whom the Bulky Item Provision is being enforced.
When KFA spends its limited resources on monitoring cleanups or
finding or buying replacement items, it cannot spend those resources on
advocating for housing, shelters, and other services for the homeless
pursuant to its mission.  The harm caused by not engaging in such
activities is intangible and not compensable.  This intangible injury
constitutes irreparable harm.  See E. Bay Sanctuary Covenant, 950

---

[27]  The City contends that this paragraph "creates ambiguity for enforcement"
because the City provided "at least 24-hour notice" for the clean-ups
described by Plaintiffs and therefore the City is "uncertain whether the
notices were deficient as to the removal or disposal of items, or both."  Objs.
to Tentative at 1 n.3.  But this paragraph has nothing to do with clean-up
notices.  It addresses the City's argument that the Protocols provide
additional protections absent from the Bulky Item Provision.  And this Order
draws no conclusions as to whether specific pre-seizure notices were deficient.
That is not an issue properly before the Court because the Bulky Item
Provision provides for no process at all.

Case 2:19-cv-06182-DSF-PLA Document 122-3 Filed 04/07/21 Page 259 of 409 Page ID
Case 2:19-cv-06182-DSF-PLA Document 52-9 Filed 04/13/20 Page 26 of 31 Page ID #92056
#:7473

F.3d at 1280 (Intangible injuries, such as "suffer[ing] a significant
change in their programs" constitutes irreparable harm); Valle del Sol
Inc. v. Whiting, 732 F.3d 1006, 1029 (9th Cir. 2013) (sufficient showing
of irreparable harm where "the organizational plaintiffs have shown
ongoing harms to their organizational missions as a result of the
statute").

The City also contends, in a footnote, that the harm cannot be
imminent because Plaintiffs did not file this Motion until seven months
after filing their complaint. Opp'n at 23 n.6. The Court believes that
delay is not unreasonable, particularly where Plaintiffs sought
expedited discovery in order to determine whether to seek a
preliminary injunction. See Dkt. 29.

The City further contends it was "prejudiced by the Court
declining to consider changes to the City's enforcement procedures as a
result of COVID-19, which are relevant to the analysis of Plaintiffs'
alleged imminent harm and other elements of the PI motion." Objs. to
Tentative at 4 (citing Dkt. 52 at 4). This significantly misstates the
facts. On March 30, 2020, the City filed objections to some of the
evidence Plaintiffs submitted in support of their reply brief. Dkt. 52
(Def.'s Objs. to Pls.' Reply). Within that filing, the City stated "[i]f the
Court considers Plaintiffs' new reply evidence, then the City should be
afforded an opportunity to respond, including submission of evidence
regarding the City's emergency orders, compliance with the 'Safer at
Home' emergency orders, the Los Angeles County Department of Public
Health and CDC guidelines, and changes to the City's operations as a
result of COVID-19." Id. at 4 (footnote omitted). The City did not
request leave to file a supplemental brief describing changes to the
City's enforcement procedures or the impact of COVID-19 on the issues
relevant to this Order.[28] Rather, buried within objections to evidence,

---

[28] In any event, even if the "new policies" suspended enforcement of the Bulky
Item Provision, that would not impact this order given that the City could
start enforcing the Bulky Item Provision again at any time. See F.T.C. v.
Affordable Media, 179 F.3d 1228, 1237 (9th Cir. 1999) ("[I]t is actually well-
settled 'that an action for an injunction does not become moot merely because

the City conditioned its request on the Court's consideration of certain "new" evidence raised by Plaintiffs in reply. Because the Court did not consider the reply evidence related to COVID-19, the City's request was moot. Had the City believed it had new evidence relevant to this Motion, it should have filed a request for leave to file a supplemental brief as soon as practicable. For whatever reason, the City did not do so. It cannot now claim it was prejudiced.

## D.  Balance of Equities and Public Interest

Plaintiffs contend that "the public interest is best served by enjoining [sic] unconstitutional or unlawful ordinance[s]." Mot. at 20 (citing Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012)). Plaintiffs further note that the Bulky Item Provision is likely to be enforced not just against Plaintiffs, but also against "the more than 9000 people who are compelled to live on the streets in Los Angeles," which further supports the conclusion that enjoining enforcement of the Bulky Item Provision is in the public interest. Id. (citing Klein v. City of San Clemente, 584 F.3d 1196, 1208 (9th Cir. 2009)). The City contends that it has a "substantial and legitimate" "health, safety, and welfare interest in the enforcement of the Bulky Item provision." Opp'n at 25. However, as Plaintiffs point out, and the City does not address, the City (or the public) can have no interest in the enforcement of a

---

the conduct complained of was terminated, *if there is a possibility of recurrence,* since otherwise the defendant[]s would be free to return to [their] old ways'" (second alteration in original) (quoting F.T.C. v. Am. Standard Credit Sys., Inc., 874 F. Supp. 1080, 1087 (C.D. Cal. 1994)); see also Disney Enters., Inc. v. Redbox Automated Retail, LLC, 336 F. Supp. 3d 1146, 1158 (C.D. Cal. 2018) ("[Defendant's] voluntary decision not to sell certain Codes up to this point in time does not demonstrate a lack of irreparable harm"); Nestle USA, Inc. v. Gunther Grant, Inc., No. CV-13-6754 MMM (ASX), 2014 WL 12558008, at *18 n.77 (C.D. Cal. May 13, 2014) (concluding that plaintiff demonstrated it will suffer irreparable harm absent entry of an injunction even though defendant voluntarily stopped infringing Plaintiff's trademarks because that voluntary decision "does not convince the court that they are not likely to infringe [plaintiff's] marks in the future").

provision that is likely to be found unconstitutional. <u>See</u> <u>Lavan v. City
of Los Angeles</u>, No. CV 11-2874 PSG (AJWx), 2011 WL 1533070, at *6
(C.D. Cal. Apr. 22, 2011) ("[T]he public interest is served by issuance of
a TRO in that the City will still be able to *lawfully* seize and detain
property, as opposed to unlawfully seizing and immediately destroying
property"). Moreover, as other courts have held, the constitutional
rights of homeless individuals outweigh the potential hurdles the
injunction might pose to the City's efforts to keep the sidewalks clean.
<u>See, e.g.</u>, <u>id.</u> at *5 ("[T]he City's interest in having clean parks is
outweighed by the more immediate interest of the plaintiffs in not
having their personal belongings destroyed." (quoting <u>Pottinger v. City
of Miami</u>, 810 F.Supp. 1551, 1573 (S.D. Fla. 1992))); <u>Justin</u>, 2000 WL
1808426, at *11 (risk of violation of constitutional rights outweighs risk
that injunction may slow city's efforts to keep the city clean and safe
and may disturb the city's "new initiative to revitalize and uplift
communities, to improve the streets and sidewalks, and to diminish the
crime rate"). The balance of the equities and the public interest tip
sharply in Plaintiffs' favor.

The City contends that the requested injunction would
"essentially enshrine Bulky Items in constitutional protection and
prevent them from being removed from public areas in the City." Opp'n
at 24. This is obviously untrue. The requested injunction would
merely require the City to treat Bulky Items like every other item
stored in public areas, permitting removal in a number of
circumstances, including when items are unattended, blocking the
sidewalk, or a threat to health and safety. Similarly, nothing in the
requested injunction would hinder the determinations the City
presumably makes on a daily basis as to whether items are unattended
or abandoned. Nor would it require the City "to obtain warrants,
articulate an exception on item-by-item basis, *and* give notice and
hearing opportunities before collecting any Bulky Item." <u>Id.</u>

Next, the City appears to contend that it has no other authority
to remove and throw away trash and other abandoned or dumped
items. <u>Id.</u> This cannot possibly be true. If it were, the City would not
currently be able to remove or throw away anything too small to

constitute a Bulky Item or anything excluded from the definition of a Bulky Item. That proposition is absurd.

Finally, the City contends that "the injunction Plaintiffs seek would not provide sufficient clarity for the City to understand what justifications would be sufficient to remove a Bulky Item." Id. at 25. Again, the City's argument has no merit. An injunction enjoining enforcement of a specific provision of a specific ordinance could not be clearer.[29] The injunction sought in the case cited by the City was nothing like the injunction sought here. In that case, homeless plaintiffs sought to enjoin enforcement of various unlisted statutes and ordinances only against homeless plaintiffs and only "for life-sustaining activities such as sleeping, sitting or remaining in a public place." Joyce v. City & Cty. of San Francisco, 846 F. Supp. 843, 851 (N.D. Cal. 1994). The district court noted that the phrase "such as" was "malleable" and therefore the proposed injunction was "fundamentally uncertain as to what conduct would be immunized from governmental prohibition." Id. Here, there is no malleable phraseology. The City simply may not enforce two provisions of the Ordinance. Given that the City has repeatedly pointed out that the Ordinance has a severability provision, Dkt. 22 (12(b)(6) Mot.) at 7 n.7; Opp'n at 16, the City can certainly comprehend how to enforce the Ordinance if ordered not to enforce certain of its provisions.

The City also appears concerned with what this Order may mean for the constitutionality of the other provisions in the Ordinance. See Objs. to Tentative at 2 ("As a practical matter, when the Order is considered in light of the reasoning that underpins it, it is unclear when the City may or may not remove items that exceed 60 gallons in the public right of way"); id. at 3 (City expressing concern that requiring a warrant or warrant exception "cannot be reconciled" with

---

[29] The City's contention that it is unclear whether certain items can be removed under other provisions of the Ordinance, Opp'n at 25, is wrong. The injunction obviously applies only to the two specified provisions and not any other provision.

Case 2:19-cv-06182-DSF-PLA  Document 122-9  Filed 04/07/21  Page 263 of 409  Page ID
#:7477
Case 2:19-cv-06182-DSF-PLA  Document 59-2  Filed 04/13/20  Page 30 of 31  Page ID #:2070

other provisions governing items that are unattended, blocking the sidewalk, or a threat to health and safety"); <u>id.</u> at 4-5 (City expressing confusion as to whether certain applications of the health and safety provision of the Ordinance would be constitutional).  But the other provisions of the Ordinance are not before the Court and the preliminary injunction issued here does not enjoin any conduct other than what is explicitly identified below, *i.e.*, enforcement of the Bulky Item Provision and the related penalty provision.  The Court does not opine on the constitutionality of other provisions of the Ordinance; only the provisions explicitly listed below are the subject of the preliminary injunction issued here.

For the foregoing reasons, **IT IS ORDERED** that the request for a preliminary injunction is **GRANTED** as follows:

## IV. PRELIMINARY INJUNCTION

The City of Los Angeles, and its agents and employees, are enjoined from doing any of the following:

1.  Enforcing Section 56.11(3)(i) of the Los Angeles Municipal Code;

2.  Enforcing Section 56.11(10)(d) of the Los Angeles Municipal Code;

3.  Posting signs, notices, or other public information stating that the City will enforce Sections 56.11(3)(i) or 56.11(10)(d) of the Los Angeles Municipal Code.

## V. Bond

Plaintiffs contend that no bond should be required, and the City does not argue otherwise.  The Ninth Circuit has held that Federal Rule of Civil Procedure 65(c) invests "the district court with discretion as to the amount of security required, if any."  <u>Barahona-Gomez v. Reno</u>, 167 F.3d 1228, 1237 (9th Cir. 1999), <u>supplemented,</u> 236 F.3d 1115 (9th Cir. 2001).  Plaintiffs presumably have minimal financial

Case 2:19-cv-06182-DSF-PLA   Document 59   Filed 04/13/20   Page 31 of 31   Page ID #:2071

means and the City has not stated it would suffer any financial harm; therefore, the Court will not require a bond.

    IT IS SO ORDERED.

Date: April 13, 2020

                        Dale S. Fischer
                        United States District Judge

EXHIBIT 36



**MICHAEL N. FEUER**
**CITY ATTORNEY**

August 24, 2020

**VIA EMAIL**

Michael Onufer, Esq.
Benjamin Herbert, Esq.
Kirkland & Ellis LLP
333 S. Hope St.
Los Angeles, CA 90071
michael.onufer@kirkland.com
benjamin.herbert@kirkland.com

Re:    *Garcia et al. v. City of Los Angeles*, No. 2:19-cv-06182-DSF-PLA:  City's L.R. 37-1
       Meet-and-Confer Letter Plaintiff El Bey's Request for Production of Documents
       Set One and the City's Motion for Protective Order

Dear Counsel,

The City writes to meet-and-confer pursuant to Central District Local Rule 37-1
regarding Plaintiff Ali El-Bey's Request for Production of Documents – Set One ("RFP"),
and the City's motion for a protective order to limit the scope of the discovery, specify
terms for further discovery, and/or prescribing alternate methods of discovery.  The
City provides this meet-and-confer letter in advance of our meet-and-confer call
scheduled on August 25, 2020 at 3:00 p.m.

**Relevant Discovery Background and City's Document Productions:**

Plaintiff El-Bey propounded the RFPs in October 2019 and requested that the City
conduct an early Rule 26(f) conference.  The City did not agree to conduct an early Rule
26(f) conference, but voluntarily produced over 4,000 pages of documents in response to
Plaintiffs' demands for early discovery.  The City's early production of documents
included:

August 24, 2020
Page | **2**
City's Meet-and-Confer Letter

- Incident Specific Documents - The incident-specific documents included documents that related to the Individual Plaintiffs' specific alleged incidents and included, among other documents, LASAN cleanup and health-hazard reports, posting surveys, and photographs taken during the cleanups.  Incident-specific documents also included LAPD reports, including Watch Commander Reports, Sergeant's Daily Reports, Daily Field Activity Reports, and Computer Aided Dispatch Reports.  These documents were produced on November 9, 2019 on (CITY00001-2212) and December 10, 2019 (CTY002213-2677).
- Policy-Related Documents - The policy-related documents included documents relating LAMC 56.11 and policies and procedures.  The City produced these documents on January 10, 2020 (CTY002678-3239)
- LASAN March 2019 South LA Reports – The City produced LASAN reports for encampment cleanups conducted in March 2019 in South Los Angeles.  The City produced the documents because it because it was unable to locate any incident-specific documents corresponding to Plaintiff Haugabrook's alleged incident occurring in "March 2019" at "Figueroa Street, between 53rd Street and 52nd Place." The City produced these documents on January 10, 2020 (CTY003240-4085).

On January 15, 2020, Plaintiffs filed a Motion for Expedited Discovery seeking an order compelling the City to produce additional documents or, alternatively, requiring Defendant to attend an early Rule 26 conference (Dkt. No. 29).  On January 29, 2020, Magistrate Judge Abrams issued an Order denying Plaintiffs' Motion for Expedited Discovery (Dkt. No. 33)  In the order, the MJ Abrams agreed "with defendant that the requests as written are overbroad and not narrowly tailored to for the purposes stated by plaintiffs[.]"  Dkt. No. 33 at 5.

The City produced an additional set of documents filed in support of the City's opposition to Plaintiffs' Motion for Preliminary Injunction, which Plaintiffs filed on February 26, 2020.  The City's production included:

- Preliminary Injunction Documents – these documents included additional LASAN cleanup reports for unalleged incidents, LAMC 56.11 SOPs, CARE+ notices and signage, and various photos attached to declarations.  The City produced these documents on March 11, 2020 (CITY004086- 4315).

August 24, 2020

P a g e | **3**

**C**ity's Meet-and-Confer Letter

Plaintiff's RFPs were served on July 13, 2020, after the Parties conducted the Rule 26 conference of counsel, pursuant to Rule 26(d)(2)(B).

On August 12, 2020, the City served its Objections and Responses to the RFPs and produced an additional set of documents.  The City's August 12 document production included: plaintiff-specific claims, LASAN and LAPD organization charts, additional policy-related documents, including LAMC 56.11 documents, LASAN and LAPD policies, orders, memoranda, training materials and related documents, and Chrysalis-related documents, including plaintiff-specific storage records (CTY004316-6827).

The City will be producing additional policy-related documents, including primarily training-related materials.

**Second Amended Complaint and Alleged Claims:**

Plaintiff El-Bey propounded the RFPs back in October 2019.  During the intervening period, however, the scope of the case and pleadings have changed.  The Court dismissed the third cause of action with prejudice (Dkt. No. 26; Dkt. No. 65).  The Court also dismissed AREPS and narrowed the scope of KFA's claims (Dkt. No. 65).  Plaintiffs elected not to file a third amended complaint after the Court issued its Order Granting in Part and Denying in Part the City's Second Motion to Dismiss (Dkt. No. 65).  Thus, the operative complaint is the Second Amended Complaint (Dkt. No. 43) as narrowed by the Court's June 2, 2020 order (Dkt. No. 65).

Plaintiff El-Bey's alleges that his constitutional rights were violated during specific incidents that occurred on January 10, 2019 at an area near 6th Street and Alexandria and June 4, 2019 at an area near Western Ave. and Oakwood.  Dkt. No. 43 at ¶¶ 173-191. El-Bey alleges that the City wrongfully seized and destroyed his personal property without notice or due process.  El Bey alleges claims for unreasonable seizures in violation of the Fourth Amendment, Article I, § 13 of the California Constitution, destruction of personal property in violation of the Due Process Clause and Article I, § 7, of the California Constitution, violation of the Bane Act, Cal. Civil Code § 52.1, and violation of a mandatory statutory duty under Government Code § 815.6 and Cal. Civil Code § 2080 *et seq.*

The other individual plaintiffs in the action also allege specific incidents occurring on or around specific dates occurring between January to August 2019 on or around

particular locations in the City.  SAC ¶¶ 124-150 (Garcia); *id.* ¶¶ 151-172 (Zamora and Zepeda); *id.* ¶¶ 192-209 (Haugabrook); *id.* ¶¶ 210-218 (Diocson); *id.* ¶¶ 219-231 (Ashley).

Plaintiff KFA, in turn, seeks prospective relief on behalf of itself and its members.  The Court's June 2 Order stated that KFA "asserts that it need only 'rais[e] a single incident . . . to hold the City liable under *Monell*'… Accepting this clarification, the Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."  Dkt. No. 65 at 7.  The Court also ruled that to "the extent KFA does seek a declaration that the City has unconstitutionally applied the Ordinance or related policies or practices to each of its members, the Court STRIKES that request."  *Id.* at 7, n.4.  The City currently has a dispositive Motion for Judgment on the Pleadings on file for KFA's remaining claims (Dkt. No. 80) and it unclear whether the narrow claims will remain in the case.

### Summary of RFP Requests:

The RFPs were propounded by El-Bey only, but even assuming that the RFPs were propounded on behalf of all plaintiffs, the RFPs do not reflect the limited scope of the claims asserted by El-Bey (or the other plaintiffs).

As an initial matter, the RFPs seek all documents dating back to April 2016, but the specific incidents occurred in 2019.  RFP No. 19 seeks all documents dating back to January 1, 2012 – seven years before the alleged incidents occurred.

The RFPs then proceed to demand all documents covering this four or seven-year period, including among others the following document requests:

- All Hope/Rapid Response 56.11 enforcement reports, including all health hazard checklists, metrics sheets, photographs and other documents relating to these reports (RFP 33, see also RFP 2);
- All records documenting positing of cleanups, including all posting surveys (RFP 30)
- All data contained within the database used to generate the Health Hazard Assessment reports generated by LASAN (RFP 31)
- All data contained with the online encampment authorization database (RFP 32)

August 24, 2020

Page | **5**

**C**ity's Meet-and-Confer Letter

---

- All reports, summaries, statistics, analysis and date compilations relating to encampment cleanups (RFP 35)
- All reports, summaries, statistical analysis or data compilations relating to enforcement of LAMC 56.11 (RFP 36)
- All communications regarding forms and notices used by the City or any contractor relating to encampment cleanups, storage of property (RFPs 23, 26, 29)
- All personal property chain of custody forms for property seized during encampment cleanups (RFP 37)
- All government claims failed against the City relating to seizure and destruction of homeless individuals' property (RFP 38)
- All complaints or grievances filed against the City, including LAPD relating to seizure and destruction of homeless individuals' belongings (RFP 39)
- All police reports filed regarding seizure or destruction of homeless individuals' belongings (RFP 40)
- All documents relating to any investigations, response or communication regarding any complaint or police report or grievance regarding destruction of homeless people's belongings (RFP 41)
- All documents identifying location of storage facilities (RFP 42)
- All documents identifying the City's capacity change in capacity to store property from encampment cleanups, including all documents that discuss the number of storage bins, spaces, containers and capacity (RFPs 43-44);
- All reports, statistics, data analysis or compilations related to storage facilities (RFP 45);
- All documents the track, document and show when, where, and what property was seized, stored, destroyed, or retrieved at storage facilities (RFPs 46-49)

The RFPs also contain overbroad requests on topics where the City produced some responsive information:

- All training documents including all emails promoting, announcing, or describing the training, all calendar invites for the training, all notes taken by participants, all presenters' notes, all attendance and sign in sheets, and all flyers, relating to LAMC 56.11, encampment cleanups, illegal dumping, threats to public health and safety, and HOPE (RFPs 16-20).

---

---

**Scope of Permissible Discovery under Rule 26:**

Rule 26(b)(1) addresses the standard for the scope of discovery:  "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  F.R.Civ.P. 26(b)(1).

The December 2015 amendment to Rule 26 abrogated cases applying the old discovery standard for "reasonably calculated to lead to the discovery of admissible evidence." *See In re Bard IVC Filters Prods. Liab. Litig.*, 317 F.R.D. 562 (D. Az. 2016).   The test is whether evidence "is relevant to any party's claim or defense."  *Id.*  The 2015 amendments also restored the proportionality factor in defining the scope of discovery and, under the amended Rule 26, relevancy is no longer sufficient to obtain discovery; the request must also be proportional to the needs of the case.  *Centeno v. City of Fresno*, Case No. 1:16-cv-00653-DAD-SAB, 2016 U.S. Dist. LEXIS 180013, * 9 (E.D. Cal. Dec. 29, 2016).

The "parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." *Symantec Corp. v. Zscaler, Inc.*, Case No. 17-cv-04426-JST (MEJ), 2018 U.S. Dist. LEXIS 3973, at *3-4 (N.D. Cal. Jan. 9, 2018).  There is "a shared responsibility on all the parties to consider the factors bearing on proportionality before propounding discovery requests, issuing responses and objections, or raising discovery disputes before the courts."  *Id.*; *Estrada v. City & Cnty. of San Francisco*, Case No. 16-cv-00722-MEJ, 2016 U.S. Dist. LEXIS 173740, *4 (N.D. Cal. Dec. 14, 2016).

Rule 26(b)(2) imposes further limitations on the scope of the discovery.  The Court "must limit the frequency or extent of discovery allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained through some other source that is more convenient, less burdensome, or less expensive; … (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)."  F.R.Civ.P. 26(b)(2)(C); *Mkt. Lofts Cmty. Assoc. v. Nat'l Union*

---

*Fire Ins. Co.*, Case No. CV 15-3093-RGK (SPx), 2016 LEXIS 188073, * 11 (C.D. Cal. Mar. 9, 2016).

**<u>The RFPs seek discovery that is not relevant to Plaintiff's Claims:</u>**

As discussed, the threshold inquiry is to assess whether the RFPs seek discovery that is even relevant to Plaintiff's claims or the City defenses.  El-Bey alleges that his property was unlawfully destroyed on two occasions – January 10, 2019 and June 4, 2019.  The issue of whether El-Bey's property was unreasonably seized and destroyed without notice or due process is fact specific to his incidents.  The City produced incident-specific discovery.  Plaintiff offers no justification for why Plaintiff needs all documents and reports for every encampment cleanup conducted over a four or seven-year period, all information contained in City databases, all communications regarding forms or notices, all complaints, grievances, and investigation files, etc.  Nor are these requests relevant on their face in establishing El-Bey's specific constitutional violations or alleged claims or requests for relief.

During the parties' Rule 26 conference of counsel on July 13, plaintiffs stated that the discovery was relevant to "*Monell*" and then proceeded to demand that the City establish its burden to demonstrate proportionality and accessibility.  Plaintiffs' also sent a July 27, 2020 letter requesting to meet-and-confer regarding ESI and burden in which plaintiffs claimed – without explanation or support - that "Plaintiffs propounded our requests for production in October 2019 to lay out what Plaintiffs felt was relevant and proportional to the case."

Plaintiffs' contention the discovery is relevant and needed to establish *Monell* liability is misplaced.  While there may be some cases arising in other contexts that require evidence of other incidents to establish *Monell* liability, this is not one of them.  Plaintiffs' challenge LAMC 56.11, a duly enacted ordinance, which designates LASAN as the administrative agency for promulgation of the SOPs.   The City does not dispute that its encampment cleanups or enforcement actions implement or execute LAMC 56.11.  "A rule or regulation promulgated, adopted, or ratified by a local governmental entity's legislative body ***unquestionably*** satisfies *Monell's* policy requirements." *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989) (emphasis added), *overruled on other grounds by Bull v. City & Cty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010).  The Supreme Court confirmed in *Monell* that the City may be liable for alleged actions of its employees if the action alleged to be unconstitutional "implements or

executes a policy statement, ***ordinance***, regulation, or decision officially adopted or promulgated by that body's officers[.]"  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-691 (1978) (emphasis added).  Indeed, the City even offered to stipulate on *Monell* issues to streamline discovery and Plaintiffs rejected the reasonable proposal.

Moreover, Plaintiffs' contentions that discovery is somehow relevant to Monell is undercut by Plaintiffs past briefing.  Plaintiffs argued successfully to the Court that Plaintiffs "need only raise a single incident to hold the City liable under *Monell*" in response to the City's motion to dismiss.  Plaintiffs cannot now argue that discovery is needed for all encampment cleanups, all information contained in entire databases, and reports and data regarding cleanups, forms, notices, storage, etc. to establish *Monell* liability.

In sum, Plaintiff has not and cannot establish that the requested document demands are relevant to Plaintiff's claims or the City's defenses.

**Plaintiffs' RFPs are not proportional to the discovery needs of the case:**

Proportionality under Rule 26 is determined by assessing the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  The City's Responses and Objections to the RFPs addressed the burdens imposed by the RFPs, including:

The City identified 41,734 incidents constituting "encampment cleanups" as defined in the RFP for the period from April 1, 2016 to July 31, 2020.  In order to collect documents responsive to requests for all reports, records, and data for encampment cleanups, the City would have to conduct a query and search parameters within LASAN Water Protection Information Management Systems (WPIMS) to generate a report identifying all 41,734 incidents by the address listed for the encampment cleanup, date, incident/case number, and form of encampment cleanup.  WPIMS is used by LASAN's Watershed Protection Division for purposes other the encampment cleanups, including environmental and stormwater pollution cases, among others.  For each identified incident number, the City would need to generate reports within WPIMS for the encampment cleanup, and collect associated health hazard checklists by incident number.  The City uses WPIMS to generate cleanup reports for encampment cleanups, while LASAN's health hazard checklists are standardized forms that are completed

manually by environmental compliance inspectors conducting specified encampment cleanups.  The City would then have to conduct additional searches for encampment cleanup pictures and media files by incident number that are not stored on WPIMS.  The number of pictures associated with an encampment cleanup could exceed over 700 pictures for one incident report.  This City would also have to manually search for, collect, and assemble related documents by incident number, including any posting surveys, hazardous-waste disposal records, non-hazardous waste disposal records, and cleanup authorizations maintained in LASAN's Authorization Management System ("AMS").  The City would also have to manually search for, collect, and assemble related documents by incident number, including hazardous-waste disposal records and non-hazardous waste disposal records for each incident.

The City would also need to search for encampment cleanups as defined in the RFP that may be maintained within LASAN's Customer Service Group's MyLA database for service requests.  The City would have to conduct a search parameter for service requests relating to encampment cleanups as defined in the Request for the period from April 1, 2016 to the present and generate a report identifying service requests for defined encampment cleanups by location address and date range.  The City would then need an analyst to manually review MyLA data and cross-reference incident/case numbers, addresses, and dates identified by the City's WPIMS query to determine potentially corresponding service requests for identified encampment cleanups.  The City would then have to prepare a separate report containing identified service requests within the MyLA database corresponding to identified WPIMS incident/case numbers for encampment cleanups.

In addition, upon identifying specified incident/case numbers for responsive encampment cleanups, the City would then have to conduct searches for potentially responsive LAPD records for any incidents involving LAPD HOPE officers by corresponding date, location, and LAPD Bureau, including searches for LAPD Daily Field Activity Reports (DFAR), Watch Commander Daily Reports, Sergeant's Daily Reports, and LAPD Computer Aided Dispatch (CAD) Reports.  The City would have to assign personnel to search for and collect corresponding files that exist for the 41,734 encampment cleanups.

For cleanups occurring after October 2019, Plaintiff's RFPs would require the City to conduct further searches for potentially responsive documents within the City's daily

schedules issued for CARE and CARE+ operations by reviewing schedules and cross referencing the schedules with identified incident/case numbers, dates, and locations.

During the period from April 1, 2016 to July 30, 2020, a total of 26,775 government claims were filed against the City. In order to search for and produce documents relating to government claims, the City would need to create search parameters to query the City Attorney's Office Citylaw database to search government claims filed during this period; however, there are no fields to identify or segregate claims filed relating to the seizure or destruction of homeless people's belongings and such claims could be input into the database by different causes relating to civil rights, property, miscellaneous, and input as claims against different departments, such as LASAN, LAPD, or the City. The City would have to run multiple queries to identify potentially responsive government claims out of these 26,775 claims by claim number. The City would then need to assign an administrative clerk to manually pull and review identified government claims by claim number to determine responsiveness. In addition, the City would need to conduct further searches of hard copy files of government claims stored offsite for government not stored within Citylaw.

The City would also need to conduct searches within LAPD's Complaint Management System ("CMS"). LAPD logged over 12,000 complaints within CMS over the four-period dating back to April 2016. Each complaint is logged into the system and maintained by a separate complaint-file (CF) number and categorized using codes for allegation type, such as conduct unbecoming, misconduct, or bias. CMS does not contain search field for allegation types based on seizure or destruction of property. Defendant would have to assign an LAPD analyst to conduct queries of search terms through digitized copies of over 12,000 complaints to locate potentially responsive documents to the Request. A complete and closed complaint file contains approximately 100-250 pages, including forms for initial intake, field reports, investigative reports, medical information, other legal documentation, and other administrative reports or decisions. After running the search query, an analyst would have to identify complaint files by CF number and manually review each complaint file to determine responsiveness and the existence of confidential information, including medical information, that may require redaction. The average time required to collect, review, and redact a complaint file is approximately four hours.

The City would also need to identify search parameters to conduct a search within LAPD's Automated Data System to identify Department Report (DR) numbers that may

August 24, 2020

Page | **11**

City's Meet-and-Confer Letter

relate to reports involving homeless individuals.  The City identified over 48,000 DR
numbers potentially relating to homeless individuals and over 3,300 DR numbers
relating to Release from Custody (RFC) citations for violation of LAMC 56.11.  In order
to search for potentially responsive records, the City would need an analyst to create an
excel file extracting date from the query by DR number.  The City would then need to
assign personnel to pull and review records by DR number to determine responsiveness
for over 48,000 DR files.  The City would also need to pull and review RFCs for
violation of LAMC 56.11.  To do so, the City would have to search over 102,000 RFCs to
locate the approximately 3,300 RFCs for violation for LAMC 56.11, and would also need
to locate and retrieve RFC files for storage to conduct the search for RFCs.  The City
estimates that conducting a search just related to the RFCs would require
approximately 1,950 hours for an administrative clerk to locate, obtain and review over
100,000 RFCs and separate and copy over 3,300 RFCs for LAMC 56.11.

The demands for all communications and electronic information also impose additional
burdens.  Specifically, in order to search for and obtain all documents for
communications as requested, the City must investigate the identify of all potential
custodians who may have sent or received an email regarding the forms, notices, data,
reports, training invites, encampment cleanups, storage, etc. over a four-year period,
including personnel from LASAN, UHRC, LAPD, the City Attorney's Office, and
possibly other City departments. The City would then have to conduct search
parameters for all communications over a four-year period involving all identified
custodians from different City departments.

The City uses an email system known as CityMail that is based on an implementation of
Google Apps Premier Edition and is used by nearly every City entity.  The City's
CityMail system uses the Google Vault system for archiving emails.  Google Vault is a
cloud-based data storage system; rather than being stored on locally managed servers,
the archived email data is stored on remote servers that are managed by Google, Inc.
and are only accessible to City's office via the internet.  In order to search the email
archives, the City's ITA must formulate a search query utilizing the search terms and
restrictions provided by the requester.  Depending on the number and complexity of
search terms, the number of email accounts or document custodians, and the breadth of
the search, ITA may need to formulate more than one search query and scan the stored
data multiple times.  When the search completes, Google Vault provides preliminary
information regarding the email data gathered by the search.  In order to access the
actual emails, however, the entire store of data must first be exported from the cloud-

August 24, 2020
Page | **12**
City's Meet-and-Confer Letter

servers to a different "download" server to which ITA can connect via the internet and
from which we can then download the data.  Depending on the size of the data, the
download process the most time-consuming part of gathering the email data.  Even
when ITA allocates multiple personnel to conduct search queries in order to speed up
the archived email search and collection process, ITA is still limited by the speeds at
which the data can be transferred from the download server to Defendant's local data
storage devices.   As downloads of batches of data become available, ITA begins the
process of identifying the email addresses that accompany the data against the list of
individuals identified in the data request and thereafter segregates the email stores of
matching individuals.  ITA would also identify and screen emails of City Attorneys
begin the process of identifying and screening-out the emails of city attorneys and may
need to conduct subsequent queries to screen out attorneys for purposes of compiling a
list of excluded emails for a privilege log.

In addition, the City would need to determine whether a City department utilizes
systems-based network servers that may include network folders used to store or
maintain communications within a particular division or department section.  In order
to retrieve systems-based server folders for review, the City would require a technology
professional who has administrator privileges to make a copy of the drive(s), which can
range in size by terabytes of data.  In order to search certain folders on system-based
network drives, a technology professional who has administrator privileges, would use
the Microsoft Windows File Explorer search function, the limited search function
available by default on Windows.  The limited search capabilities of the Windows File
Explorer search tool may not be able to accommodate full searches within documents or
Boolean searches.  The resulting hits might include systems files, applications,
downloads, or media which may or may not be viewable.  After the City has conducted
searches for electronically stored information, the City would require the use of an e-
discovery software and platform for City's counsel to review, search, and tag
documents and electronically stored information for responsiveness or privilege.

The burdens and costs imposed on the City vastly exceed plaintiffs' damages as
disclosed in Plaintiffs' Rule 26(a) Initial Disclosures, this information has little, if any,
importance to determining the disputed issues.  Moreover, the discovery sought is
unreasonably cumulative and even if a portion of the information sought was relevant,
the information could be obtained through other means that is more convenient, less
burdensome, and substantially less expensive.  And the City's burdens clearly outweigh
the benefit of such discovery in resolving the actual alleged claims.  The proportionality,

accessibility, and burden factors weigh against such discovery based on the facts set forth above. *Hoffman v. Cnty. of Los Angeles*, Case No. CV-15-03724-FMO (ASx), 2016 U.S. Dist. LEXIS 123515 * (C.D. Cal. Jan. 5, 2016) (RFP requests for all arrest reports and records over a five year period not relevant to plaintiff's Fourth Amendment claim and not proportional to needs of case; production in response to request required "a considerable amount of time and manpower" and imposed under burden and expense relative to the minimal relevance to *Monell*); *Saunders v. City of Chicago*, Case No. 12-cv-9158, 2017 U.S. Dist. LEXIS 509, * 31-32 (N.D. Ill. Jan. 4, 2017) (seeking discovery of entire law enforcement database is not proportional to plaintiff's claims or discovery needs); *Mkt. Lofts Cmty. Assoc.* 2016 LEXIS 188073, at * 14-18; *Centeno*, 2016 U.S. Dist. LEXIS 180013, * 11-13.

**Rule 26(c) and Motion for Protective Order:**

The Court may issue a protective order to shield any party from undue burdens arising from discovery. *Symantec Corp.*, 2018 U.S. Dist. LEXIS 3973, at *3-4. Specifically, Rule 26(c) provides: "The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure or discovery; (B) specifying terms, including time and place, for the disclosure or discovery; (C) prescribing a discovery method other than the one selected by the party seeking discovery; (D) forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters[.]" F.R.Civ.P. 26(c).

"Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required . . . [because the] trial court is in the best position to weigh fairly the competing needs and interests of parties affected by discovery." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36, (1984). The Ninth Circuit determined this Rule provides the Court with "extensive control" over the discovery process, and "authoriz[es] courts to make any order which justice requires" to protect the parties. *United States v. Columbia Broadcasting System, Inc.*, 666 F.2d 364, 369 (9th Cir. 1982) (internal quotation marks omitted). "[A] court may be as inventive as the necessities of a particular case require in order to achieve the benign purposes of [this] rule." *Id.* Courts may also limit discovery where, as here, there is a dispositive motion the resolution of which will resolve or determine the scope of permissible discovery. *Chavous v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 201 F.R.D. 1 (D.D.C. 2001) ("It is well settled that discovery is generally considered inappropriate while a motion

that would be thoroughly dispositive of the claims in the Complaint is pending."); *Sai v. Dept. of Homeland Sec.*, 99 F. Supp. 3d. 50, 58 (D.D.C. 2015); Rutter Guide, Fed. Civ. Proc. Before Trial, Ch. 11(III)-A, § 3(c)(2).

Good cause exists for issuance of a protective order here for reasons described above. If necessary, the City will file a motion for a protective order limiting the scope and extent of discovery, conditioning further discovery on specified terms, and prescribing alternative discovery methods.

In order to conduct a meaningful meet-and-confer call, we request that Plaintiffs be prepared to identify their basis for contending that the RFPs are relevant to the existing claims and proportional to the needs of the case.

We look forward to discussing these issues during our call tomorrow and hope that the parties are able to narrow the scope of disputed issues on discovery.

Sincerely,

*/s/Felix Lebron*

Felix Lebron
Deputy City Attorney

cc:     Shayla R. Myers, Esq. (smyers@lafla.org)
        Catherine E. Sweetser, Esq. (csweetser@sshhlaw.com)

EXHIBIT 37



**MICHAEL N. FEUER**
**CITY ATTORNEY**

September 25, 2020

**VIA EMAIL**

| | |
|---|---|
| Michael Onufer, Esq.<br>Kirkland & Ellis LLP<br>333 S. Hope St.<br>Los Angeles, CA 90071<br>michael.onufer@kirkland.com | Shayla Myers, Esq.<br>Legal Aid Foundation of Los Angeles<br>1550 West 8th Street<br>Los Angeles, CA 90017<br>smyers@lafla.org |
| Catherine Sweetser, Esq.<br>Schonbrun Seplow Harris Hoffman and<br>Zeldes LLP<br>11543 West Olympic Boulevard<br>Los Angeles, CA 90064<br>csweetser@sshhzlaw.com | |

Re:     *Garcia et al. v. City of Los Angeles*, No. 2:19-cv-06182-DSF-PLA:  City's Meet-and-
        Confer Letter re Plaintiff El Bey's Request for Production of Documents Set One

Dear Counsel,

We write in response to Plaintiffs' September 14, 2020 meet-and-confer letter and to
follow-up on the Parties' August 25, 2020 meet-and-confer call and the City's August
24, 2020 meet-and-confer letter regarding a motion for protective order.

As an initial matter, the City's August 24 letter addressed in detail the City's objections
to the RFPs and explained specific reasons why the RFPs sought discovery that was not
relevant to Plaintiffs' claims or the City defenses, not proportional to the discovery
needs of the case, and warranted issuance of a protective order under Rule 26(c).
Plaintiffs have not responded to the City's August 24 letter, yet that letter already
responds to many of the issues raised in Plaintiffs' September 14 letter.  While we

respond below to the specific issues raised in Plaintiffs' September 14 letter, please
confirm whether Plaintiffs' intend to respond substantively to the City's August 24
meet-and-confer letter.

### 1. Scope of Litigation and Relevance of Document Requests:

Plaintiffs' September 14 letter contends that expansive discovery is needed in this case
based on (1) the SAC's allegations; (2) Plaintiffs' burden to establish liability under
*Monell*; and (3) the prospective relief sought under the Declaratory Judgment Act and
Section 1983.  We address these issues below.

> SAC's Allegations and Claims:

As discussed in the City's August 24 letter, Plaintiff El-Bey alleges that his
constitutional rights were violated during specific incidents that occurred on January
10, 2019 at an area near 6th Street and Alexandria and June 4, 2019 at an area near
Western Ave. and Oakwood.  Dkt. No. 43 at ¶¶ 173-191.  El-Bey alleges that the City
wrongfully seized and destroyed his personal property without notice or due process.
El Bey alleges claims for unreasonable seizures in violation of the Fourth Amendment,
Article I, § 13 of the California Constitution, destruction of personal property in
violation of the Due Process Clause and Article I, § 7, of the California Constitution,
violation of the Bane Act, Cal. Civil Code § 52.1, and violation of a mandatory statutory
duty under Government Code § 815.6 and Cal. Civil Code § 2080 *et seq.*  Similarly, the
other individual plaintiffs allege specific incidents occurring on or around specific dates
occurring between January to August 2019 on or around particular locations in the City.
SAC ¶¶ 124-150 (Garcia); *id.* ¶¶ 151-172 (Zamora and Zepeda); *id.* ¶¶ 192-209
(Haugabrook); *id.* ¶¶ 210-218 (Diocson); *id.* ¶¶ 219-231 (Ashley).

Plaintiff KFA seeks prospective relief only on behalf of itself and its members.  The
Court's June 2 Order stated that KFA "asserts that it need only 'rais[e] a single incident .
. . to hold the City liable under *Monell*'… Accepting this clarification, the Court
interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's
policies and practices are unconstitutional and not that each past application of those
policies and practices to its members was unconstitutional."  Dkt. No. 65 at 7.  The
Court ruled that to "extent KFA does seek a declaration that the City has
unconstitutionally applied the Ordinance or related policies or practices to each of its
members, the Court STRIKES that request."  *Id.* at 7, n.4.

<u>City's Production of Incident-Specific Documents:</u>

The City produced incident specific documents relating to the individual plaintiffs' specific alleged incidents, including LASAN cleanup and health-hazard reports, posting surveys, and photographs taken during the cleanups.  Incident-specific documents also included LAPD reports, including Watch Commander Reports, Sergeant's Daily Reports, Daily Field Activity Reports, and Computer Aided Dispatch Reports.  These documents were produced on November 9, 2019 on (CTY00001-2212) and December 10, 2019 (CTY002213-2677).  For Haugabrook, the City also produced LASAN reports for encampment cleanups conducted in March 2019 in South Los Angeles because the City was unable to locate any incident-specific documents corresponding to Haugabrook's alleged incident occurring in "March 2019" at "Figueroa Street, between 53rd Street and 52nd Place."  The City produced these documents on January 10, 2020 (CTY003240-4085).

In response to Plaintiffs' contentions regarding production of available LAPD body worn video ("BWV"), during the Parties' Rule 26(f) conference of counsel conducted on July 13, 2020, Plaintiffs requested that the City produce video on an external drive supplied by Plaintiffs and the City agreed.  The Parties indicated the same in the Joint Rule 26 Report.  Plaintiffs never provided an external drive to the City.  Please confirm whether Plaintiffs still intend to provide an external drive or whether Plaintiffs want to discuss an alternative method for production of BWV.

*Monell* Liability:

Plaintiffs argue that substantial discovery is needed for all encampment cleanups, all information contained in entire databases, and reports and data regarding cleanups, forms, notices, storage, etc. to establish *Monell* liability.

As discussed in the City's August 24 letter, Plaintiffs' contention the discovery is relevant and needed to establish *Monell* liability is misplaced.  Plaintiffs' challenge LAMC 56.11, a duly enacted ordinance, which designates LASAN as the administrative agency for promulgation of the SOPs.   The City does not dispute that its encampment cleanups or enforcement actions implement or execute LAMC 56.11.  "A rule or regulation promulgated, adopted, or ratified by a local governmental entity's legislative body **unquestionably** satisfies *Monell's* policy requirements."  *Thompson v. City of Los*

*Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989) (emphasis added), *overruled on other grounds by Bull v. City & Cty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010).  The Supreme Court confirmed in *Monell* that the City may be liable for alleged actions of its employees if the action alleged to be unconstitutional "implements or executes a policy statement, **ordinance**, regulation, or decision officially adopted or promulgated by that body's officers[.]"  *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 690-691 (1978) (emphasis added).  Moreover, the City even offered to stipulate on *Monell* issues to streamline discovery and Plaintiffs rejected the reasonable proposal.

In addition, as noted above, Plaintiffs argued successfully to the Court that Plaintiffs "need only raise a single incident to hold the City liable under *Monell*" in response to the City's motion to dismiss.  The City quoted above the Court's Order verbatim regarding KFA's claims for prospective relief.  Plaintiffs now contend that while they need only a single incident to establish *liability* under *Monell*, they need substantial discovery on all past cleanups to establish a policy or practice.  Specifically, Plaintiffs state that they allege that "the City has unwritten customs and practices" and the substantial discovery requested goes "directly to proving the existence of those policies and practices."  Plaintiffs, however, do not identify the specific unwritten policy or practice for which this discovery is needed or relevant.  Similarly, during the Parties' August 25 meet-and-confer call, Plaintiffs were unable to identify the unwritten policies and practices that demand such broad discovery, yet sought to establish the relevance of Plaintiffs' broad discovery requests on the basis of policies and practices under *Monell*.

The City requests that Plaintiffs identify the specific *unwritten* policies or practices that Plaintiffs contend necessitate Plaintiffs' demands for expansive discovery of all cleanups for further discussion.  Indeed, the City has already offered to stipulate regarding *Monell* issues and is willing to consider whether a stipulation can be reached regarding the alleged "unwritten" policies or practices that Plaintiffs contend necessitate such broad discovery.  Alternatively, Plaintiffs identifying the specific unwritten policies may help the parties address their dispute regarding relevance and proportionality of the RFPs since Plaintiffs' sole argument for claiming the RFPs seeks relevant information is on this basis.

September 25, 2020
Page | **5**
**C**ity's Meet-and-Confer Letter

---

<u>Declaratory Judgment Act and Prospective Relief:</u>

Plaintiffs' contention that expansive discovery is needed because Plaintiffs seek
prospective relief, including declaratory relief, is also misplaced.  The Declaratory
Judgment Act ("DJA"), 28 U.S.C. § 2201(a), "does not create new substantive rights, but
merely expands the remedies available in federal courts." *Shell Gulf of Mexico, Inc. v. Ctr.
For Biological Diversity., Inc.*, 771 F.3d 632, 635 (9th Cir. 2014).  The DJA is a procedural
statute that "merely offers an additional remedy to litigants."  *Team Enterprises, LLC v.
Western Inv. Real Estate Trust*, 721 F. Supp. 2d 898, 911 (E.D. Cal. 2010) (citations
omitted).  "A declaratory judgment is not a theory of recovery."  *Id.*  Nor is a request for
declaratory relief an independent cause of action, but rather a remedy that is derivative
of the underlying claims.  *Gilliam v. Bank of Am., N.A.*, No. SA CV 17-1296-DOC (JPRx),
2018 U.S. Dist. LEXIS 227706, at *48 (C.D. Cal. June 22, 2018); *Canatella v. Reverse Mortg.
Sols., Inc.*, No. 13-cv-05937-HSG, 2016 U.S. Dist. LEXIS 143481, at *19 (N.D. Cal. Oct. 17,
2016) ("where, as here, the plaintiff's underlying claims fail, so too does [plaintiff's]
declaratory relief claim.").

<u>Plaintiffs' RFPs:</u>

The RFPs do not reflect the limited scope of the Plaintiffs' claims and requests for relief
as discussed above.  Plaintiffs' RFPs seek all documents dating back to April 2016.
During the August 25 meet-and-confer call, and in Plaintiffs' September 14, 2020 letter,
Plaintiffs offered to narrow the timeframe dating back to January 1, 2018.  However, all
specific incidents alleged in the SAC occurred in 2019.  The RFPs nonetheless demand
all documents covering this two or four-year period, including among others the
following document requests:

- All Hope/Rapid Response 56.11 enforcement reports, including all health hazard
  checklists, metrics sheets, photographs and other documents relating to these
  reports (RFP 33, see also RFP 2);
- All records documenting positing of cleanups, including all posting surveys (RFP
  30)
- All data contained within the database used to generate the Health Hazard
  Assessment reports generated by LASAN (RFP 31)
- All data contained with the online encampment authorization database (RFP 32)
- All reports, summaries, statistics, analysis and date compilations relating to
  encampment cleanups (RFP 35)

- All reports, summaries, statistical analysis or data compilations relating to enforcement of LAMC 56.11 (RFP 36)
- All communications regarding forms and notices used by the City or any contractor relating to encampment cleanups, storage of property (RFPs 23, 26, 29)
- All personal property chain of custody forms for property seized during encampment cleanups (RFP 37)
- All government claims failed against the City relating to seizure and destruction of homeless individuals' property (RFP 38)
- All complaints or grievances filed against the City, including LAPD relating to seizure and destruction of homeless individuals' belongings (RFP 39)
- All police reports filed regarding seizure or destruction of homeless individuals' belongings (RFP 40)
- All documents relating to any investigations, response or communication regarding any complaint or police report or grievance regarding destruction of homeless people's belongings (RFP 41)
- All documents identifying location of storage facilities (RFP 42)
- All documents identifying the City's capacity change in capacity to store property from encampment cleanups, including all documents that discuss the number of storage bins, spaces, containers and capacity (RFPs 43-44);
- All reports, statistics, data analysis or compilations related to storage facilities (RFP 45);
- All documents the track, document and show when, where, and what property was seized, stored, destroyed, or retrieved at storage facilities (RFPs 46-49)

The RFPs also contain overbroad requests on topics where the City produced some responsive information:

- All training documents including all emails promoting, announcing, or describing the training, all calendar invites for the training, all notes taken by participants, all presenters' notes, all attendance and sign in sheets, and all flyers, relating to LAMC 56.11, encampment cleanups, illegal dumping, threats to public health and safety, and HOPE (RFPs 16-20).

As discussed in the City's August 24 letter, and in more detail below, these requests are neither relevant nor proportional to Plaintiffs' discovery needs in this case.

---

Plaintiffs' Proposals re Proportionality:

Plaintiffs' September 14 letter states that Plaintiffs proposed ways to address proportionality and burden during the parties' August 25 meet-and-confer call.  The City acknowledges that Plaintiffs offered to limit the scope of the timeframe dating back to January 1, 2018, and that Plaintiffs offered to accept production of all documents and information contained in the City's systems without limitation or parameters or whether such information was relevant to the dispute.  We note, however, that the issue of conducting queries and sampling was discussed in the context of a potential result of an informal discovery conference with MJ Abrams.  As you aware, the City contacted MJ Abrams court clerk to inquire about the possibility of conducting an informal discovery conference and the clerk confirmed that MJ Abrams does not conduct such conferences.

**2. Form of Production:**

The City produced documents in portable document format (PDF).  Plaintiffs demand that the City produce in Tiff format with metadata.  As discussed during the August 25 meet-and-confer call, the City does not have the software or capability to produce documents in Tiff format.  The City produced documents in the form the documents are kept in the normal course.  The City has since obtained access to use e-discovery platform Zylab and is in the process of loading documents into Zylab.   The City is willing to conduct a further meet-and-confer call regarding the form of future document productions made through Zylab.

Plaintiffs also complained that the City's prior document productions were produced in pdfs with multiple documents included within the production.  The City is producing another set of documents concurrently with this letter and has produced the documents in individual pdf files.

In addition, during the August 25 conference call, the City agreed to provide an index of the City's past document productions, which is provided below:

| BATES RANGE | DOCUMENTS |
|---|---|
| CTY000001-CTY000078 | El Bey Incidents |
| CTY000079-CTY000459 | Zepeda/Zamora Incidents |
| CTY000460-CTY001235 | Garcia Incidents |
| CTY001236-CTY001940 | Ashley Incident |

September 25, 2020
Page | **8**
City's Meet-and-Confer Letter

| BATES RANGE | DOCUMENTS |
|---|---|
| CTY001941-CTY002212 | Diocson Incident |
| CTY002213-CTY002251 | El Bey Incident |
| CTY002252-CTY002369 | Garcia Incident |
| CTY002370-CTY002677 | LAPD Logs/CAD Reports |
| CTY002678-CTY002755 | Council File 13-0852-S1 |
| CTY002756-CTY002789 | Council File 14-0818-S2 |
| CTY002790-CTY002795 | Council File 14-1499-S5 |
| CTY002796-CTY002849 | Council File 14-1551 |
| CTY002850-CTY002898 | Council File 14-1656 |
| CTY002899-CTY003010 | Council File 14-1656-S1 |
| CTY003011-CTY003012 | Council File 14-1656-S2 |
| CTY003013-CTY003015 | Council File 14-1656-S4 |
| CTY003016-CTY003018 | Council File 14-1656-S5 |
| CTY003019-CTY003043 | Council File 15-0727 |
| CTY003044-CTY003046 | Council File 17-0921 |
| CTY003047-CTY003222 | LAPD Policies and Procedures |
| CTY003223-CTY003239 | LAMC Article 6 |
| CTY003240-CTY004085 | LASAN March 2019 South LA Reports - Haugabrook |
| CTY004086-CTY004104 | Marco Ramirez Declaration Photos |
| CTY004105-CTY004120 | Ryan Rankin Declaration Photos |
| CTY004121-CTY004142 | Hector Pereida Declaration Photos |
| CTY004143-CTY004208 | Christain Guerrero Declaration Photos |
| CTY004209-CTY004255 | LAMC 56.11 SOPs |
| CTY004256 | CARE+ Notice of Major Cleaning |
| CTY004257 | Involuntary Storage Summary Calendar Year 2019 |
| CTY004258 | Sample ABH/SECZ Permanent Signage |
| CTY004259-CTY004290 | LASAN February 24, 2020 CARE+ Report |
| CTY004291-CTY004302 | LASAN December 9, 2019 CARE Report |
| CTY004303-CTY004315 | LASAN December 16, 2019 CARE Report |
| CTY004316-CTY004358 | Plaintiffs' Government Claims |
| CTY004359-CTY004395 | LASAN and LAPD Organization Charts |
| CTY004396-CTY004452 | Council Files for 19-0609 and 20-0307 |
| CTY004453-CTY004510 | LAPD and LASAN Policies and Memos |
| CTY004511-CTY004626 | LAPD Complaint |

City's Meet-and-Confer Letter

| BATES RANGE | DOCUMENTS |
|---|---|
| CTY004627-CTY004839 | Chrysalis Contract and Amendments |
| CTY004840-CTY004851 | Chrysalis Tags and Receipts |
| CTY004852-CTY006439 | LASAN Trainings |
| CTY006440-CTY006827 | LAPD Trainings |

### 3.  Objections Regarding the Scope of Plaintiff El Bey's RFPs and Application to Other Plaintiffs:

Plaintiffs propounded the RFPs on behalf of Plaintiff El Bey only, even though the number of RFPs are not limited under Rule 34.  The City served its responses and objections to the RFPs propounded by El-Bey.  After the City served its objections and responses, Plaintiffs clarified that the RFPs were served on behalf of all Plaintiffs and not just El-Bey.

During the August 25 meet-and-confer call, the City referenced certain LAPD documents pertaining to the other individual plaintiffs.  The City is producing those documents concurrently with this letter.

In addition, the responsive documents that the City has agreed to produce will be produced irrespective of the individual plaintiffs.  The City is also willing to consider a stipulation that the RFPs apply to all Plaintiffs, provided that the City has an opportunity to file an amended set of responses and objections to ensure that the City is not prejudiced by the stipulation in preserving its objections and responses to the document requests.  However, we agree that serving seven additional sets of the same RFPs is not an efficient use of the Parties' resources.

### 4.  Production of Emails:

Plaintiffs reiterate the request for production of all emails across numerous City departments and custodians, which the City contends seeks information that is not relevant or proportional to the discovery needs of the case.  As discussed in the City's August 24 meet-and-confer letter, the demands for all communications and electronic information also impose additional burdens.

Specifically, in order to search for and obtain all documents for communications as requested, the City must investigate the identify of all potential custodians who may

have sent or received an email regarding the forms, notices, data, reports, training invites, encampment cleanups, storage, etc. over a four-year period, including personnel from LASAN, UHRC, LAPD, the City Attorney's Office, and possibly other City departments. The City would then have to conduct search parameters for all communications over a four-year period involving all identified custodians from different City departments.

The City uses an email system known as CityMail that is based on an implementation of Google Apps Premier Edition and is used by nearly every City entity.  The City's CityMail system uses the Google Vault system for archiving emails.  Google Vault is a cloud-based data storage system; rather than being stored on locally managed servers, the archived email data is stored on remote servers that are managed by Google, Inc. and are only accessible to City's office via the internet.  In order to search the email archives, the City's ITA must formulate a search query utilizing the search terms and restrictions provided by the requester.  Depending on the number and complexity of search terms, the number of email accounts or document custodians, and the breadth of the search, ITA may need to formulate more than one search query and scan the stored data multiple times.  When the search completes, Google Vault provides preliminary information regarding the email data gathered by the search.  In order to access the actual emails, however, the entire store of data must first be exported from the cloud-servers to a different "download" server to which ITA can connect via the internet and from which we can then download the data.  Depending on the size of the data, the download process the most time-consuming part of gathering the email data.  Even when ITA allocates multiple personnel to conduct search queries in order to speed up the archived email search and collection process, ITA is still limited by the speeds at which the data can be transferred from the download server to Defendant's local data storage devices.   As downloads of batches of data become available, ITA begins the process of identifying the email addresses that accompany the data against the list of individuals identified in the data request and thereafter segregates the email stores of matching individuals.  ITA would also identify and screen emails of City Attorneys begin the process of identifying and screening-out the emails of city attorneys and may need to conduct subsequent queries to screen out attorneys for purposes of compiling a list of excluded emails for a privilege log.

During the August 25 conference call, the City agreed to meet-and-confer with plaintiffs regarding search terms and custodians, without waiving its objections to these document requests.  On August 12, 2020, the City produced organization charts in

City's Meet-and-Confer Letter

response to Plaintiff's RFPs (CTY004359-4395).  Plaintiffs requested additional organizational charts from the City before conducting a further meet-and-confer call regarding email searches.  The City is producing the additional organization charts concurrently with this letter, along with requested job descriptions.

**5.  The City's Written Responses and Objections to the RFPs:**

Plaintiffs requested that the City review its objections and responses and confirm whether all documents have been produced or are being withheld.  The City is still in the process of producing documents responsive to the RFPs and will revisit the issue of providing amended responses and objections after the City completes its document production.

**6.  Specific RFP Requests:**

➢ **RFP No. 1** – The City is producing concurrently with this letter the additional LAPD documents referencing individual plaintiffs as discussed above and during the August 25 meet-and-confer call.  As noted above, the City maintains its objections regarding email searches but has agreed to meet and confer regarding search terms and custodians.

➢ **RFP No. 2** – The City has produced documents relating to the individual plaintiffs' specific alleged incidents.  Plaintiffs contend that RFP No. 2 relates to areas where individual plaintiffs may have resided, yet have not alleged additional incidents in these areas or provided further information on when and where individual plaintiffs allegedly experienced other incidents involving the City.  The City's objections addressed the 32,730 incidents identified constituting "encampment cleanups" as defined in the Request for the period from January 1, 2018 to July 31, 2020 and detailed the process that the City would have to conduct to search for and produce documents responsive to the request.  Plaintiffs' proposal to produce all 32,730 reports and related documents is not a reasonable resolution to the issues and objections the City raised.  The City remains willing to meet and confer with Plaintiffs regarding additional incident reports if Plaintiffs provide additional information regarding the date and location when individual plaintiffs allege that they had other incidents involving the City in these locations.

➢ **RFP Nos. 3-4** – The City is producing job descriptions responsive to the requests concurrently with this letter and will produce additional, responsive job descriptions that may exist.

➢ **RFP Nos. 5-7** – The City produced organization charts for LASAN and LAPD (CTY004359-4395). The City is producing the additional requested organization charts concurrently with this letter.

➢ **RFP No. 8** – The City is producing UHRC information concurrently with this letter and will meet and confer if Plaintiffs seek additional information in response to this request.

➢ **RFP Nos. 9-10** - The City previously produced the Chrysalis contracts and amendments (CTY004627-4839). Following the August 25 meet-and-confer call, the City has agreed to produce concurrently with this letter the requested Clean Harbor contract and related amendment.

➢ **RFP Nos. 11-15** - The City has produced and continues to produce documents responsive to these requests. The City will confirm when it believes all documents responsive to these requests have been produced.

➢ **RFP Nos. 16-20** - The City has produced and continues to produce documents responsive to these requests seeking training materials. The City will be producing additional training materials in a future production through Zylab, including training materials dating before January 1, 2019. As discussed in the City's August 24 meet-and-confer letter, the City maintains objections to requests that seek all emails promoting, announcing, or describing the training, all calendar invites for the training, all notes taken by participants, all presenters' notes, all attendance and sign in sheets, and all flyers, relating to LAMC 56.11, encampment cleanups, illegal dumping, threats to public health and safety, and HOPE.

➢ **RFP Nos. 21-29** - The City has produced documents responsive to these requests and is producing concurrently with this letter additional documents regarding current and prior versions of notices and forms used by the City. As discussed in the City's August 24 meet-and-confer letter, the City maintains its objections to requests for all communications regarding forms and notices used by the City or any contractor relating to encampment cleanups, storage of property.

➤ **RFP Nos. 30-34** - The City maintains its objections to Plaintiffs' demands for all documents, reports, data, and information contained in entire databases. As discussed in the City's August 24 meet-and-confer letter, these requests seek discovery that is not relevant or proportional to the discovery needs of the case. As discussed above, the City remains willing to meet and confer with Plaintiffs regarding specific *unwritten* policies or practices identified by Plaintiffs and whether Plaintiffs demand can be addressed through other means. Plaintiffs' proposal to narrow the scope of the request back to January 1, 2018 does not meaningfully narrow the scope of the requests. The City identified 32,730 incidents constituting "encampment cleanups" as defined in the requests for the period from January 1, 2018 to July 31, 2020. The City's August 24 meet-and-confer letter addressed in detail the process to conduct the search for and produce documents responsive to the requests that apply to these 32,730 incidents.

➤ **RFP Nos. 35-36** - The City maintained its objections to these requests as discussed in the City's August 24 meet-and-confer letter. The City remains willing to meet and confer regarding a narrowed request for specific reports or data compilations.

➤ **RFP Nos. 38-41** - The City maintains its objections to the requests as further discussed in the City's August 24 meet-and-confer letter. As discussed above, the City remains willing to meet and confer with Plaintiffs regarding specific *unwritten* policies or practices identified by Plaintiffs and whether Plaintiffs demand can be addressed through other means. In addition, during the August 25 meet-and-confer call, the City does not recall Plaintiffs proposing that the City produce a spreadsheet of all RFCs for future meet-and-confer discussions. The City is willing to meet-and-confer with Plaintiffs regarding this proposal and assess how long it would take the City to produce the requested spreadsheet. In addition, while reserving its objections, the City is willing to meet and confer call with Plaintiffs regarding search terms to narrow these requests.

➤ **RFP No. 42** – The City will meet and confer with Plaintiffs if they have outstanding concerns regarding this request after receiving the City's document productions.

> ➢ **RFP Nos. 43-49** – The City has produced summary data regarding the total
> amounts of property removed, stored, recovered or discarded.  In response to
> Plaintiffs' concerns regarding underlying data, the City is assessing Plaintiffs
> request for documents and is willing to meet and confer with Plaintiffs
> regarding these requests without waiving its objections as addressed further in
> the City's August 24 meet-and-confer letter.

**7. City's Production of Documents:**

As discussed above, the City is producing concurrently with this letter an additional set
of documents bates labeled **CTY006828-7472**.

**Conclusion:**

We suggest that the parties schedule another meet-and-confer call to further discuss
discovery issues.  To that end, we request that Plaintiffs respond to the issues raised in
the City's August 24 meet-and-confer letter before the call so that the parties can
conduct a meaningful discussion on whether the parties can further resolve or narrow
outstanding discovery disputes or, alternatively, confirm whether the parties are at an
impasse on certain requests.

We appreciate Plaintiffs' cooperation in working with the City to resolve or narrow the
disputed discovery issues.

Sincerely,

*/s/Felix Lebron*

Felix Lebron
Deputy City Attorney

EXHIBIT 38



**MICHAEL N. FEUER**
**CITY ATTORNEY**

February 16, 2021

**VIA EMAIL**

| | |
|---|---|
| Michael Onufer, Esq.<br>Kirkland & Ellis LLP<br>333 S. Hope St.<br>Los Angeles, CA 90071<br>michael.onufer@kirkland.com | Shayla Myers, Esq.<br>Legal Aid Foundation of Los Angeles<br>1550 West 8th Street<br>Los Angeles, CA 90017<br>smyers@lafla.org |
| Catherine Sweetser, Esq.<br>Schonbrun Seplow Harris Hoffman and<br>Zeldes LLP<br>11543 West Olympic Boulevard<br>Los Angeles, CA 90064<br>csweetser@sshhzlaw.com | |

Re:     *Garcia et al. v. City of Los Angeles*, No. 2:19-cv-06182-DSF-PLA:  City's Meet-and-Confer Letter re Plaintiff Zamora's Interrogatories Set One

Dear Counsel,

We write in response to Plaintiffs' January 21, 2021 and February 8, 2021 meet-and-confer correspondence and as a follow up on the Parties' February 2, 2021 meet-and-confer call regarding the City's objections and responses to Plaintiff Miriam Zamora's special interrogatories set one.  The City's amended responses and objections to the Zamora interrogatories are being served concurrently with this letter.

**Scope of Litigation and Zamora's Interrogatories:**

SAC's Allegations and Claims

Plaintiff Zamora alleges that her constitutional rights were violated during two specific incidents that occurred on March 21, 2019 at an area near the northeast corner of 6th Street and Ardmore, and on June 11, 2019 at an area near the 5th Street and Harvard. Dkt. No. 43 at ¶¶ 151-172.  Specifically, Zamora alleges that the City wrongfully seized and destroyed her personal property without notice or due process during rapid response cleanups that occurred on March 21, 2019 and June 11, 2019.  *Id.*  Zamora alleges claims for unreasonable seizures in violation of the Fourth Amendment, Article I, § 13 of the California Constitution, destruction of personal property in violation of the Due Process Clause and Article I, § 7, of the California Constitution, and violation of a mandatory statutory duty under Government Code § 815.6 and Cal. Civil Code § 2080 *et seq.*

The other individual plaintiffs in the action also allege specific incidents occurring on or around specific dates occurring between January to August 2019 on or around particular locations in the City.  SAC ¶¶ 124-150 (Garcia); *id.* ¶¶ 151-172 (Zepeda); *id.* ¶¶ 173-191 (El-Bey); *id.* ¶¶ 192-209 (Haugabrook); *id.* ¶¶ 210-218 (Diocson); *id.* ¶¶ 219-231 (Ashley).

Plaintiff KFA, in turn, seeks prospective relief on behalf of itself and its members.  The Court's June 2, 2020 Order in response to the City's second motion to dismiss stated that KFA "asserts that it need only 'rais[e] a single incident . . . to hold the City liable under *Monell*'… Accepting this clarification, the Court interprets KFA's claims in the SAC as seeking only to obtain a ruling that the City's policies and practices are unconstitutional and not that each past application of those policies and practices to its members was unconstitutional."  Dkt. No. 65 at 7.  The Court also ruled that to "the extent KFA does seek a declaration that the City has unconstitutionally applied the Ordinance or related policies or practices to each of its members, the Court STRIKES that request."  *Id.* at 7, n.4.

The interrogatories were propounded on behalf of Plaintiff Zamora only.  During the February 2, 2021 meet-and-confer call, the City asked Plaintiffs whether the interrogatories were propounded on behalf of all Plaintiffs rather than just Zamora. Plaintiffs previously propounded RFPs on behalf of Plaintiff El-Bey only.  After the City served objections and responses to the El-Bey RFPs, Plaintiffs clarified that they

February 16, 2021

P a g e | **3**

**C**ity's Meet-and-Confer Letter

intended to propound the RFPs on behalf of all Plaintiffs and not just El-Bey.  The City subsequently served amended objections and responses to the RFPs based on an agreement that the RFPs were propounded on behalf of all Plaintiffs and not just El-Bey. During the February 2 call, Plaintiffs confirmed that the interrogatories were propounded on behalf of plaintiff Zamora only.

Summary of Interrogatories:

The interrogatories do not reflect the limited scope of Zamora's alleged claims.  Several interrogatories seek information dating back to April 2016 – nearly three years before Zamora's first alleged incident occurred – and request detailed information regarding issues that have no direct nexus or relevance to Zamora's claims for damages or asserted prospective relief.  For example, the interrogatories request:

➢ The City identify each and every training conducted, or attended by, City employees, contractors or agents dating back to April 2016 relating to LAMC 56.11 or encampment cleanups and immediate threats to public health and safety, including the title of the training, the group to which the training was conducted, the location of the training, and identifying all materials included in the training.  (**Interrogatory Nos. 1-2**)

➢ The City identify every location where property seized pursuant to LAMC 56.11 has been stored since April 2016, including the location, square footage, facility opening date, and any increase or decrease in storage capacity.  (**Interrogatory Nos. 3-4**)

➢ The City identify every employee assigned to the HOPE team dating back to January 1, 2018, including name, job title, department and division, assigned HOPE division, and dates assigned to the details.  (**Interrogatory No. 5**)

➢ The City identify each and every encampment cleanup conducted on March 21, 2019 and June 11, 2019, including by providing the type of cleanup, the location of the cleanup, the individuals who participated in the cleanup, the start and end time of the cleanup, and additional information for any individuals involved in such cleanups occurring in Council Districts 4, 9 and 10. (**Interrogatory Nos. 6-9**)

➢ The City identify each and every individual working in the City Council Offices for Council Districts 4, 6, 9, 10, 13, and 15 who have been assigned to or are responsible for working with LASAN and/or LAPD to schedule the deployment

February 16, 2021

P a g e | **4**

City's Meet-and-Confer Letter

---

of LASAN or other City resources to conduct encampment cleanups at any time
since July 1, 2018.  (**Interrogatory No. 10**)

➢ The City identify each and every individual employed by the City as an ECI,
Assistant Chief ECI, or Chief ECI who participated in any encampment cleanups
since January 1, 2018, including dates any individual held any of these positions.
(**Interrogatory No. 11**)

➢ The City identify all databases or enterprise systems used by any City
department, including LSD, LAPD, UHRC, to compile data or document any
aspect of encampment cleanups, including the scheduling of encampment
cleanups, the posting of notices, the seizure or discard of property, by listing the
name of the database, the purpose of the database, the types of data collected,
the individuals responsible for collecting the data, the individuals who enter any
data into the system, and how often data is collected.  (**Interrogatory No. 13**)

➢ The City identify any reports, summaries, data analysis or any other outputs
that have been generated related to encampment cleanups by providing the
name of the report, identifying who generated the report, the purpose of the
report, identifying all individuals to whom any reports, summaries, or analysis
were distributed, the dates all reports, summaries, and analysis were generated,
and the frequency any such reports, summaries, or data analysis are generated.
(**Interrogatory No. 14**)

**<u>Scope of Permissible Discovery under Rule 26:</u>**

Rule 26(b)(1) addresses the standard for the scope of discovery:  "Parties may obtain
discovery regarding any nonprivileged matter that is relevant to any party's claim or
defense and proportional to the needs of the case, considering the importance of the
issues at stake in the action, the amount in controversy, the parties' relative access to
relevant information, the parties' resources, the importance of the discovery in
resolving the issues, and whether the burden or expense of the proposed discovery
outweighs its likely benefit."  F.R.Civ.P. 26(b)(1).

The December 2015 amendment to Rule 26 abrogated cases applying the old discovery
standard for "reasonably calculated to lead to the discovery of admissible evidence."
*See In re Bard IVC Filters Prods. Liab. Litig.,* 317 F.R.D. 562 (D. Az. 2016).   The test is
whether evidence "is relevant to any party's claim or defense."  *Id.*  The 2015
amendments also restored the proportionality factor in defining the scope of discovery

February 16, 2021

P a g e | **5**

**C**ity's Meet-and-Confer Letter

and, under the amended Rule 26, relevancy is no longer sufficient to obtain discovery; the request must also be proportional to the needs of the case.  *Centeno v. City of Fresno*, Case No. 1:16-cv-00653-DAD-SAB, 2016 U.S. Dist. LEXIS 180013, * 9 (E.D. Cal. Dec. 29, 2016).

The "parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." *Symantec Corp. v. Zscaler, Inc.*, Case No. 17-cv-04426-JST (MEJ), 2018 U.S. Dist. LEXIS 3973, at *3-4 (N.D. Cal. Jan. 9, 2018).  There is "a shared responsibility on all the parties to consider the factors bearing on proportionality before propounding discovery requests, issuing responses and objections, or raising discovery disputes before the courts."  *Id.*; *Estrada v. City & Cnty. of San Francisco*, Case No. 16-cv-00722-MEJ, 2016 U.S. Dist. LEXIS 173740, *4 (N.D. Cal. Dec. 14, 2016).

Rule 26(b)(2) imposes further limitations on the scope of the discovery.  The Court "must limit the frequency or extent of discovery allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained through some other source that is more convenient, less burdensome, or less expensive; … (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)."  F.R.Civ.P. 26(b)(2)(C); *Mkt. Lofts Cmty. Assoc. v. Nat'l Union Fire Ins. Co.*, Case No. CV 15-3093-RGK (SPx), 2016 LEXIS 188073, * 11 (C.D. Cal. Mar. 9, 2016).

**<u>The Interrogatories seek discovery that is not relevant to Zamora's claims.</u>**

Plaintiffs' January 21, 2021 letter contends that the expansive discovery requested in the interrogatories is required to establish *Monell* liability and because Plaintiffs seek prospective and declaratory relief under the Declaratory Judgment Act.

    *<u>Monell</u> Liability:*

Plaintiffs' contention the discovery sought in the interrogatories is relevant and needed to establish *Monell* liability is misplaced.  Plaintiffs' challenge LAMC 56.11, a duly enacted ordinance, which designates LASAN as the administrative agency for promulgation of the SOPs.   The City does not dispute that its encampment cleanups or enforcement actions implement or execute LAMC 56.11.  "A rule or regulation promulgated, adopted, or ratified by a local governmental entity's legislative body ***unquestionably*** satisfies *Monell's* policy requirements."  *Thompson v. City of Los Angeles*,

885 F.2d 1439, 1444 (9th Cir. 1989) (emphasis added), *overruled on other grounds by Bull v. City & Cty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010).  The Supreme Court confirmed in *Monell* that the City may be liable for alleged actions of its employees if the action alleged to be unconstitutional "implements or executes a policy statement, **ordinance**, regulation, or decision officially adopted or promulgated by that body's officers[.]" *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 690-691 (1978) (emphasis added).  Indeed, the City even offered to stipulate on *Monell* issues to streamline discovery, but Plaintiffs rejected the reasonable proposal.

Plaintiffs continue to argue that the discovery is needed to establish liability under *Monell* for *unwritten* policies and customs.  The City has repeatedly requested that Plaintiffs identify the specific *unwritten* policies or practices that Plaintiffs contend necessitate Plaintiffs' discovery demands.  While the City first requested this information back in August 2020, Plaintiffs have never identified in writing the specific *unwritten* policies or practices that purportedly require expansive discovery.  Indeed, as the City noted in prior meet-and-confer letters, identifying the specific *unwritten* policies or practices would enable the Parties to address their disputes regarding relevance and proportionality or, alternatively, could lead to a stipulation regarding the alleged "unwritten" policies or practices that Plaintiffs contend necessitate such broad discovery.  During the February 2, Plaintiffs did not identify the specific unwritten policies or practices, referred to Plaintiffs' 60-page SAC, and represented that Plaintiffs had already addressed this issue when they had not.

Even if Plaintiffs identified a specific unwritten policy, they would still need to allege that this unwritten policy subjected Zamora to a deprivation of constitutional rights under the Fourth Amendment and Due Process Clause.  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404-405 (1997).  Zamora raises no such allegations in Plaintiffs' 60-page complaint.  SAC ¶¶ 151-172.

Plaintiffs' January 21 meet-and-confer letter also contended that expansive discovery is need to establish *Monell* liability under a failure to train theory.  This is a different theory of liability based on inaction or omission rather than a direct act in furtherance of the ordinance.  *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011).  Zamora does not allege any such claims.  SAC ¶¶ 151-172.  And simply claiming that there was a failure to train does not alleviate Plaintiffs obligation to identify the specific conduct that caused Zamora's deprivation of constitutional rights for which there was an alleged training failure.

---

<u>Declaratory Judgment Act and Prospective Relief:</u>

Plaintiffs' contention that expansive discovery is needed because Plaintiffs seek prospective relief, including declaratory relief, is also misplaced.  The Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201(a), "does not create new substantive rights, but merely expands the remedies available in federal courts." *Shell Gulf of Mexico, Inc. v. Ctr. For Biological Diversity., Inc.*, 771 F.3d 632, 635 (9th Cir. 2014).  The DJA is a procedural statute that "merely offers an additional remedy to litigants."  *Team Enterprises, LLC v. Western Inv. Real Estate Trust*, 721 F. Supp. 2d 898, 911 (E.D. Cal. 2010) (citations omitted).  "A declaratory judgment is not a theory of recovery."  *Id.*  Nor is a request for declaratory relief an independent cause of action, but rather a remedy that is derivative of the underlying claims.  *Gilliam v. Bank of Am., N.A.*, No. SA CV 17-1296-DOC (JPRx), 2018 U.S. Dist. LEXIS 227706, at *48 (C.D. Cal. June 22, 2018); *Canatella v. Reverse Mortg. Sols., Inc.*, No. 13-cv-05937-HSG, 2016 U.S. Dist. LEXIS 143481, at *19 (N.D. Cal. Oct. 17, 2016) ("where, as here, the plaintiff's underlying claims fail, so too does [plaintiff's] declaratory relief claim.").

Moreover, declaratory relief is not available to adjudicate past constitutional violations.  *See Bayer v. Nieman Marcus Group, Inc.*, 861 F.3d 853, 868 (9th Cir. 2017).  Declaratory relief is prospective to address continuing or future violations.  *Id.*  Plaintiffs' contention that expansive discovery going back four years is relevant to Plaintiffs' claims for declaratory relief disregards the fact that prospective relief considers the City's existing procedures and practices.  Indeed, the Court already made clear that plaintiffs cannot seek declaratory relief relating to alleged past constitutional violations.  *See* Dkt. No. 65 at 7.

**The Interrogatories seek discovery that is not proportional to Zamora's claims.**

Proportionality under Rule 26 is determined by assessing the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Even assuming that the interrogatories seek some relevant information, the interrogatories as drafted are not proportional to the discovery needs of this litigation, particularly for Zamora's two specific alleged incidents.  The interrogatories request

information dating back to April 2016 regarding trainings and storage facilities, despite the fact that no plaintiff alleges an incident occurring before January 2019.

Plaintiffs demand that the City identify all individuals involved in encampment cleanups or the HOPE team dating back to January 1, 2018, without any explanation for how such information is relevant to Zamora's (or any individual plaintiffs') specific claims.

Similarly, Plaintiffs demand that the City identify each and every individual working in the City Council Offices for Council Districts 4, 6, 9, 10, 13, and 15 since July 1, 2018 who have been assigned to or are responsible for working with LASAN and/or LAPD to schedule the deployment of resources to conduct encampment cleanups, while Zamora alleges two incidents that occurred in Council District 10 in March and June 2019. During the February 2 meet-and-confer call, Plaintiffs stated that the interrogatory sought relevant information because LASAN's March 21, 2019 incident report referenced a complaint from CD 10 as a reason for the rapid response cleanup. Plaintiffs' interrogatory, however, is not limited to identifying individuals in Council District 10 in 2019.

Plaintiffs also demand that the City identify all databases, reports, summaries and analysis, including the names of reports, data collected, individuals who input the data, the distribution list for any reports, etc. During the meet-and-confer call, Plaintiffs again simply referenced the discovery was relevant to *Monell* and prospective declaratory relief without explaining how such information is relevant to such issues or why the scope of the requests were proportional to the discovery needs of the case.

### City's Production of Incident-Specific Discovery:

The City produced incident specific discovery relating to the individual plaintiffs' specific alleged incidents, including LASAN cleanup and health-hazard reports, posting surveys, and photographs taken during the cleanups. Incident-specific documents also included LAPD reports, including Watch Commander Reports, Sergeant's Daily Reports, Daily Field Activity Reports, and Computer Aided Dispatch Reports. These documents were produced on November 9, 2019 on (CTY00001-2212) and December 10, 2019 (CTY002213-2677).

Plaintiffs' January 21, 2021 meet-and-confer letter states that the City failed to provide any documents relating to Zamora's alleged incidents on March 21, 2019 and June 11,

2019.  On November 9, 2019, the City produced an incident report and related documents for an incident on March 21, 2019 (CTY000079-167), identified as Case ID No. 53162 for a Rapid Response incident occurring at 6th Street and Kingsley. Individuals involved in this incident included ECI M. Tran, P. Pedrosa, J. Saucedo, and J. Gamez.  On December 10, 2019, the City produced LAPD incident-specific documents for March 21, 2019 (CTY002423-2447).  LAPD Officers I. Lucero and C. Argueta were present at 6th Street and Kingsley (CTY002443).  On October 8, 2020, the City produced LAPD body worn video (BWV) reflecting this incident.

During the February 2 call, Plaintiffs stated for the first time that these documents did not reflect Zamora's March 21, 2019 incident.  The City produced these documents over a year ago and identified these documents in its Rule 26(a) Initial Disclosures as relating to Zamora's alleged March 21, 2019 incident.  In addition, the City produced the BWV on October 8, 2020 reflecting the March 21, 2019 incident.  Plaintiffs' counsel is obviously in the best position to know whether or not the BWV or pictures produced with reports reflect their clients.  Thus, while Plaintiffs contend that the City did not produce incident-specific documents for Zamora, Plaintiffs did not raise this issue with the City until the January 21, 2021 letter.

On November 9, 2019, the City also produced documents for incidents occurring on June 11, 2019, including: CTY000168-325, Case ID NO. 56806; CTY00326-351, Case ID No. 56909; CTY00352-408, Case ID No. 56974; and CTY000435-459, Case ID No. 56976. On December 10, 2019, the City produced LAPD incident-specific documents for June 11, 2019 incidents (CTY002465-2496).  The City also produced LAPD BWV for the incidents reflected in these reports.  Following the February 2 meet-and-confer call, the City identified another incident report for Case ID No. 53162 occurring on June 11, 2019 and produced this incident report at CTY020332-20441.

**City's Production of Other Discovery:**

Notwithstanding the City's outstanding objections based on relevance and proportionality, the City produced substantial discovery unrelated to Plaintiffs' specific incidents, including training materials, sign-in sheets, course certificates, job descriptions, organization charts, storage records, chain-of-custody receipts, government claims for damages, contract involving Chrysalis and Clean Harbors, and numerous other documents.  The City also exported data from MyLA 311, WPIMS, and AMS databases relating to encampment cleanups occurring from January 1, 2018 to the

present and produced this information in excel spreadsheets in December 2020.  (AMS database CTY020221; CTY020330; MyLA-311 database CTY020223; and WPIMS database CTY020222; CTY020331).

**Plaintiff Zamora's Specific Interrogatories:**

As summarized in detail above, Zamora's interrogatories do not reflect the limited scope of Zamora's claims and requests for relief.  After demanding that the City produce discovery regarding all encampment cleanups since January 1, 2018 and production of voluminous documents, Plaintiffs now object to the City's use of this information in reference to Plaintiffs' overbroad and disproportionate interrogatories seeking discovery on matters not relevant to Zamora's (or any individual plaintiffs' claims) or the City's defenses.  While the City contends that its original verified responses and objections were appropriate, the City has provided additional information in amended responses in a good-faith effort to address Plaintiffs' discovery demands and avoid motion practice, without prejudice to the City's objections.

**Interrogatory Nos. 1 & 2:**

Interrogatory Nos. 1 and 2 requests that the City identify all training conducted by the City since April 2016 regarding LAMC 56.11 or encampment cleanups identifying the handling or disposing of material as immediate threats to public health and safety, including "the topic of the training, the title of the training, the group to which the training was conducted (i.e., all of LA Sanitation, Environmental Compliance Inspectors or Officers specifically, one on one training), where the training was conducted, and any materials provided as part of the training (such as Powerpoint slides)."

In response to these interrogatories, the City identified the training materials and documents by bates numbers as well as additional on the job training in the field and training during safety tailgate meetings.

The City's amended responses further describe the training requirements for ECIs, identify specific documents detailing course requirements and training frequency, identify specific training courses by name and bates, class attendance rosters and course certificates where available by bates, for LASAN and LAPD.  The City included additional information and an excel identifying trainings of LSD employees maintained by the Industrial Safety and Compliance Division.

**Interrogatory Nos. 3 & 4:**

Interrogatory Nos. 3 and 4 request that the City identify every location where property seized pursuant to LAMC 56.11 has been stored since April 2016, including the location, square footage, facility opening date, and any increase or decrease in storage capacity.

The City's original response identified the City's storage facilities by location, addressed the process for storing property at these locations, and referenced chain-of-custody forms and storage-related information produced by bates number.

The City's amended responses provide additional information regarding the square footage of storage facilities, the change in capacity for existing storage facilities, new storage facilities and square footage, the dates of new storage capacity and changes to existing storage capacity.  The City also described in more granular detail the specific storage related documents referenced in the City's document production by bates.

**Interrogatory No. 5:**

Interrogatory No. 5 requests that the City identify every employee assigned to the HOPE team from January 1, 2018 to the present by providing "1) their name; 2) job title; 3) division and department to which they were assigned; 4) to which HOPE team they were assigned; and 5) dates assigned to the detail(s)."

The City's original response identified the incident-specific documents produced identifying the names of individuals involved in plaintiffs' specific incidents, identified a list of 57 ECIs, and addressed the City's excels extracting data containing identifying first and second responders for encampment cleanups occurring since January 1, 2018.

The City's amended response includes additional information identifying LAPD HOPE officers by name, job title, and HOPE bureau contained within organization charts LAPD HOPE officers, additional information regarding individuals involved in incidents occurring on March 21, 2019 and June 11, 2019 in Council District 10, and further explains the information contained with the WPIMS excel database regarding individuals involved as first and second responders for encampment cleanups conducted from January 1, 2018 to the end of 2020.

**Interrogatory Nos. 6-9:**

Interrogatory Nos. 6 through 9 request that the City identify each and every encampment cleanup conducted on June 11, 2019 (Rog 6) or March 21, 2019 (Rog 8), including the "type of ENCAMPMENT CLEANUP (CLSA, Rapid Response, etc.), the location of the ENCAMPMENT CLEANUP, the team or detail(s) that participated in the ENCAMPMENT CLEANUP, and the start time and end time of the ENCAMPMENT CLEANUP" and identify all individuals who participated in encampment cleanups conducted on June 11, 2019 in Council District 4 and 10 (Rog 7) or on March 21, 2019 in Council Districts 4, 9 and 10 (Rog. 9).

The City's original responses addressed these requests by reference to the information contained in the excels of extracted data from WPIMS database. (CTY020222; CTY020331), MyLA-311 database (CTY020223), and the AMS database (CTY020221; CTY020330).

The City's amended responses identify the information contained within the WPIMS excel by row number and Case ID Number for operations conducted on March 21, 2019 and June 11, 2019 for further response, identifies specific information relating to the City's operations on March 21, 2019 and June 11, 2019, including LASAN and LAPD personnel involved in those incidents, the times of those incidents, and references to reports by bates for incidents relating to Zamora's claims, and provides additional information and tables addressing the encampment cleanup operations by Council District, cleanup type (CLSA or rapid response), location, and individuals involved in those incidents by Council District on March 21, 2019 and June 11, 2019.

**Interrogatory No. 10:**

Interrogatory No. 10 requests that the City identify "each and every individual working in the City Council offices for Council Districts 4, 6, 9, 10, 13 and 15 who have been assigned to or are responsible for working with LA Sanitation and/or LAPD to schedule the deployment of LA Sanitation or other city resources to conduct ENCAMPMENT CLEANUPS, at any time since July 1, 2018."

The City's original response objected to this interrogatory on multiple grounds. The City agreed to reassess its objections and responses based on Plaintiffs' statements during the February 2 meet-and-confer call that the relevance of this request related to the fact that the City's March 21, 2019 incident report for 6th Street and Kingsley

referenced a complaint from CD 10 (notwithstanding the fact that Plaintiffs stated during the same call that this report did not reflect Zamora's March 21, 2019 incident).

The City's amended response identifies individuals working for Council Districts 4, 6, 9, 10, 13 and 15 who typically communicate with LASAN regarding homeless encampment cleanups, or who communicated with LASAN regarding homeless encampment cleanups in the past, including dates when individuals worked in such capacity.

**Interrogatory No. 11:**

Interrogatory No. 11 requests that the City identify "each and every individual employed by the CITY as an Environmental Compliance Inspector (or officer), including Chief Environmental Compliance Inspector(s) and Assistant Environmental Compliance Inspector, who has participated in ENCAMPMENT CLEANUPS since January 1, 2018, including the dates they held those positions."

The City's original response identified the incident-specific documents produced identifying the names of individuals involved in plaintiffs' specific incidents, identified a list of 57 ECIs, and addressed the City's excels extracting data containing identifying first and second responders for encampment cleanups occurring since January 1, 2018.

The City's amended response includes additional information identifying individuals involved in incidents occurring on March 21, 2019 and June 11, 2019 in Council District 10, provides information regarding incident-specific information by bates, and further explains the information contained with the WPIMS excel database regarding ECIs for encampment cleanups conducted from January 1, 2018 to the end of 2020.

**Interrogatory No. 12:**

While this interrogatory was not at issue during the Parties' meet-and-confer, the City's amended responsive include an amended Exhibit A that corrects a typo and provides information relating to BWV files relating to incidents on June 11, 2019 that were produced on October 8, 2020.

**Interrogatory No. 13:**

Interrogatory No. 13 requests that the City identify all databases used by any City department or agency to compile data or document any aspect of any encampment

cleanups by listing "1) the name of the database; 2) a brief statement of the database's purpose; 3) a general description of the types of data that is collected; 4) who is responsible for collecting data; 5) who is responsible for entering data into the database or system; 6) how often data is collected."

The City's original response addressed databases used to store or compile information, including MyLA 311, WPIMS, and AMS, addressed the types of information relating to encampment cleanups stored or maintained on those databases, and referenced the data extracted from the databases identifying this information for encampments cleanups from January 1, 2018 to December 2020 (WPIMS database, CTY020222; CTY020331; MyLA-311 database, CTY020223; and the AMS database, CTY020221; CTY020330).

The City's amended responses contain additional information regarding the databases and their uses, contains additional explanation of the data fields and codes that are referenced in the databases, provides additional information on the methods of inputting data, including human versus system inputs, explains how service requests are initiated and processed, and identifies personnel who input data, and also adds a description of the Collection Information System (CIS) that contains data related to tonnage and information from that system that is used to report total tonnage relating to cleanups used in weekly reports referenced in the amended response to Interrogatory No. 14.

**Interrogatory No. 14:**

Interrogatory No. 14 requests that for every database listed in Interrogatory No. 13, the City identify "any reports, summaries, data analysis or other outputs that have been generated related to ENCAMPMENT CLEANUPS since January 1, 2019 by providing 1) the name of the report, summary, etc.; 2) IDENTIFYING who generated the data; 3) the purpose of the report, summary, analysis or other output; 4) to whom the report, summary, etc., was distributed; 5) the date the report, summary, etc. was generated.  If the report, summary, etc., was generated more than once or is generated on a regular basis, identify the frequency with which the report is generated (daily, weekly, quarterly, etc)."

The City's original response objected to this interrogatory on various grounds.  During the February 2 meet-and-confer call, the City agreed to provide an amended response providing information regarding routine or regularly-generated reports related to encampment cleanups.

The City's amended response identifies only one routine, periodic report sent to the Mayor's Office and Council Districts containing information regarding CARE service requests and other data points containing information generated primarily from MyLA 311 with tonnage data provided from CIS. The amended response also addresses how the databases can be queried in different ways, for different reasons, at the request of different departments or person, which results in the generation a variety of different kinds of reports.

**<u>Conclusion:</u>**

The City's amended responses provide more information than required under Rule 26 and reflect a good-faith effort to resolve discovery disputes and avoid motion practice. The City agrees that the Parties are likely at an impasse on issues of relevance and proportionality and that Court intervention may be necessary to resolve these issues. Nonetheless, the City remains will to meet and confer regarding the City's amended responses after Plaintiffs have an opportunity to review them.

The City appreciates Plaintiffs' cooperation in working with the City to resolve or narrow the disputed discovery issues.

Sincerely,

*/s/ Felix Lebron*

Felix Lebron
Deputy City Attorney

EXHIBIT 39

MICHAEL N. FEUER, City Attorney
KATHLEEN A. KENEALY, Chief Deputy City Attorney
SCOTT MARCUS, Chief, Civil Litigation Branch
GABRIEL S. DERMER, Assistant City Attorney
**FELIX LEBRON, Deputy City Attorney (SBN 232984)**
**A. PATRICIA URSEA, Deputy City Attorney (SBN 221637)**
Business and Complex Litigation Division
200 North Main Street, Room 675
Los Angeles, CA  90012-4131
Telephone No:  213.978.7559
Facsimile:  213.978.7011
felix.lebron@lacity.org
patricia.ursea@lacity.org

Attorneys for Defendant **CITY OF LOS ANGELES**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

JANET GARCIA, et al.,

                    Plaintiffs,

          vs.

CITY OF LOS ANGELES,

                    Defendant.

**CASE NO.:  CV19-6182-DSF-PLA**
**Assigned to Judge Dale S. Fischer**

**DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE**

PROPOUNDING PARTY:        Plaintiff MIRIAM ZAMORA

RESPONDING PARTY:        Defendant CITY OF LOS ANGELES

SET NUMBER:        ONE

Pursuant to California Code of Civil Procedure §§ 2030.210 et seq., Defendant City of Los Angeles ("Defendant" or "City") amends its responses and objections to Plaintiff Miriam Zamora's ("Plaintiff") Interrogatories – Set One, as follows:

**PRELIMINARY STATEMENT**

Defendant makes this response to Plaintiff's first set of Interrogatories solely for the purpose of this action. Each response is subject to all objections as to competence, relevance, materiality, propriety, admissibility, privilege, privacy, proprietary information, trade secrets and the like, and any and all other objections on grounds that would require the exclusion of any response herein if such were offered in court, all of which objections and grounds are reserved and may be interposed at the time of trial.

The identification of any document by Defendant should not constitute a waiver of its rights to assert a privilege or objection as to any other document and right to withhold the production thereof. The fact that a document is identified should not be taken as a concession of Defendant's right to withhold any other document pursuant to an appropriate claim of privilege or objection, nor is a concession or waiver of said rights to be implied or inferred by propounding party.

No incidental or implied admissions are intended in these responses. The fact that Defendant has responded to any or all of any demand should not be taken as an admission that Defendant accepts or admits the existence of any facts set forth or assumed by such demand or that such response constitutes admissible evidence. The fact that Defendant has responded to any or all of any demand is not intended to and shall not be construed to be a waiver by Defendant of all or any part of any objection to any demand.

The following responses are based upon information known at this time and are given without prejudice to provide and use any subsequently discovered information at trial. This preliminary statement is incorporated herein by reference to each of the responses below as if stated in full.

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

## GENERAL OBJECTIONS

Defendant makes the following general objections to each interrogatory propounded by Plaintiff:

Defendant objects to each and every interrogatory insofar as said interrogatory seeks information protected by the attorney-client privilege or the attorney-work product doctrine. Plaintiff's interrogatories requests interpretation of the significance of documents as they apply to legal and factual issues of this case. This information is part of the work product of Defendant and its attorneys of record with regard to this litigation and therefore is privileged and undiscoverable. Plaintiff is presumably capable of determining which documents relate to special factual and legal issues and consequently any attempt by Plaintiff to require Defendant and its attorneys to prepare Plaintiff's case. Defendant hereby claims such privileges and to the extent that Defendant inadvertently provides information that may arguably be protected from discovery under the attorney-client privilege or the work product doctrine, such inadvertent disclosure does not constitute a waiver of any such privilege or doctrine.

Defendant objects to each and every interrogatory insofar as it seeks identification of all persons having knowledge of the information requested in the interrogatory or the facts referred to in the response thereto, on the grounds that such information would necessarily be incomplete. Individuals having knowledge of specific facts with respect to specific interrogatories may be named in the files and documents referred to by Defendant in its responses to said interrogatories.

Defendant objects to each and every interrogatory insofar as it seeks identification of all writings which support the facts provided in responses to that interrogatory on the grounds that providing such information would be unduly burdensome and oppressive. Defendant has made available for inspection and copying documents relating to the subject of this litigation. To identify each and every document which relates to any given issue in this complex litigation would require the Defendant to make a compilation, abstract, audit or summary of its business records and such a compilation, abstract, audit or summary does not exist. Therefore, Defendant

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

refers Plaintiff to Defendant's business records and files which have been referenced in individual interrogatory responses.

Except for the references to specific documents in the text of the individual answers, Defendant has not attempted to specify each individual interrogatory to which each document is relevant.  Most of the documents relate to more than one of the individual interrogatories due to the overlapping of the subject matter of the interrogatories and documents.  The relevance of each document to the various issues addressed by these interrogatories is apparent from the contents of each document.  Defendant declines to list specific documents which relate to particular problems for the following reasons:

a.      Such a designation would be unduly burdensome and oppressive in that it would require Defendant to make a compilation, abstract audit or summary of its voluminous business records related to the subject of this litigation herein and such a compilation, abstract, audit or summary does not now exist.  On this ground, Defendant refers Plaintiffs to Defendant's files and records which have been made available to Plaintiffs for inspection and copying.

b.      The analysis of Defendant's documents and files and the interpretation of the significance of each specific document as it applies to the legal and factual issues of this case are part of the work product of Defendant and its attorneys with regard to this litigation and therefore not subject to discovery at this time.  Defendant and its attorneys of record are presumably equally capable of determining which documents relate to specific legal and factual issues and any attempt to require Defendant to require Defendant to make and disclose such analysis is an improper attempt by Plaintiffs to require Defendant and its attorneys to prepare Plaintiff's case.

c.      Defendant's responses do not attempt to identify or designate any documents of any other parties to this action, including the inquiring party, which supports the facts offered by Defendant in support of its responses with the exception of those documents which are contained in Defendant's own files and records related to the subject of this litigation.

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

Defendant is informed and believes that many of the documents which Defendant is still in the process of discovering and analyzing will support Defendant's contention in this lawsuit and Defendant reserves the right to relay on any such documents in support of its contentions.

Defendant objects to each and every interrogatory insofar as the interrogatories are vague, ambiguous, overly broad, unduly burdensome, oppressive, harassing, and seek information and documents not relevant to the subject matter of the pending action and not reasonably calculated to lead to the discovery of admissible evidence.

Defendant objects that the "Relevant Time" period of "April 9, 2016 to the present" is overly broad, unduly burdensome, oppressive, harassing, seeks information and documents not relevant to the subject matter of the pending action and not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case given that the Second Amended Complaint (Dkt. No. 42, "SAC") alleges that Plaintiff Zamora's specific incidents occurred on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard.

Defendant objects to each and every interrogatory insofar as the interrogatories seek information that is not relevant to Plaintiff Zamora's specific claims alleged SAC for incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard and are overbroad to the extent that the interrogatories seek information relating to any individual plaintiff other than Plaintiff Zamora.

Defendant objects to each and every interrogatory insofar as said interrogatory seeks to impose obligations upon Defendant not required by the California Code of Civil Procedure or the Local Rules of the Superior Court of the County of Los Angeles.  Defendant will not comply with any part of this interrogatory which imposes obligations upon it not required by such rules.

These General Objections shall be deemed incorporated into each and every specific response below.

## **RESERVATION OF RIGHT TO SUPPLEMENT OR MODIFY RESPONSES**

Defendant reserves the right to supplement, modify, or correct its responses and

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

objections to the demands, or any part of them, as Defendant acquires additional information in the course of its investigation and discovery in this action.

## SPECIFIC OBJECTIONS AND RESPONSES

Without waiving or limiting in any manner any of the foregoing Objections, but rather incorporating them into each of the following responses to the extent applicable, Defendant objects and responds to the Notice's specific Requests as follows:

## INTERROGATORY NO. 1

IDENTIFY all trainings conducted by the CITY for its employees, contractors, or agents, regarding LAMC 56.11, since that law was amended in April 2016, and the topic of the training, the title of the training, the group to which the training was conducted (i.e., all of LA Sanitation, Environmental Compliance Inspectors or Officers specifically, one on one training), where the training was conducted, and any materials provided as part of the training (such as PowerPoint slides).

## RESPONSE TO INTERROGATORY NO. 1:

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the interrogatory seeks information that is not relevant to Plaintiff Zamora's specific claims alleged in the SAC for incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard.  *See In re Bard IVC Filters Prods. Liab. Litig.*, 317 F.R.D. 562 (D. Az. 2016). Defendant objects that the interrogatory is overbroad to the extent that it seeks information relating to any individual plaintiff other than Plaintiff Zamora.  Defendant objects that the interrogatory is overbroad in seeking information dating back to April 2016, three years before Plaintiff Zamora's specific alleged incidents occurred. *Unilin Beheer B.V. v. NSL Trading Corp.*, No. CV 14-2210 BRO (SSx), 2015 U.S. Dist. LEXIS 192143, *14 (C.D. Cal. Feb. 27, 2015).  Defendant objects that the interrogatory is not proportional to the needs of the case, insofar as the burden or expense of searching for and producing information dating back to April 2016, three years before the specific

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

alleged incidents occurred, outweighs the benefit of such discovery to Plaintiff Zamora's specific claims alleged in the SAC.  *See IBP, Inc. v. Mercantile Bank*, 179 F.R.D. 316, 321 (D. Kan. 1998); *Bashkin v. San Diego Cnty.*, Case No. 08-CV-1450-WQH (WVG), 2011 U.S. Dist. LEXIS 3439, at * 4-5 (S.D. Cal. Jan. 13, 2011).

In particular, Defendant objects that Plaintiffs' have not pled a failure-to-train theory and Defendant does not dispute that it promulgated LAMC 56.11 and enforced it in the relevant time period.  *See Thompson v. City of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989) ("A rule or regulation promulgated, adopted, or ratified by a local governmental entity's legislative body unquestionably satisfies Monell's policy requirements."), *overruled on other grounds by Bull v. City & Cty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010).

Defendant objects that Plaintiffs' definition of "IDENTIFY" is overbroad.  *See Unilin Beheer B.V. v. NSL Trading Corp.*, No. CV 14-2210 BRO (SSx), 2015 U.S. Dist. LEXIS 192143, *14 (C.D. Cal. Feb. 27, 2015); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007).  Defendant has made available for inspection and copying documents relating to the subject of this litigation; to IDENTIFY each and every document by providing the form of each document, creation dates, past and present custodians, etc., would require the Defendant to make a compilation, abstract, audit or summary of its business records and such a compilation, abstract, audit or summary does not exist and be unduly burdensome, oppressive and not proportional to the needs of the case. Defendant further objects that the interrogatory requires Defendant not only to IDENTIFY every training but also to specify every employee, agent or contractor who attended each training, as well as the topics of each such training, which would require the Defendant to make a compilation, abstract, audit or summary of its business records and such a compilation, abstract, audit or summary does not exist and be unduly burdensome, oppressive and not proportional to the needs of the case.  *Hoffman v. Cnty.*

*of Los Angeles,* Case No. CV-15-03724-FMO(ASx), 2016 U.S. Dist. LEXIS 123515, *
15-16 (C.D. Cal. Jan. 6, 2016); *Estrada v. City & Cnty. of San Francisco*, Case No. 16-
cv-00722-MEJ, 2016 U.S. Dist. LEXIS 173740, *4 (N.D. Cal. Dec. 14, 2016).  Defendant
further objects that the term "training" is vague and ambiguous insofar as it suggests that
the only way an individual can be taught or instructed is through formal presentations and
that the only relevant education to enforcing LAMC 56.11 is in the form of City-
conducted trainings.  Defendant objects that the interrogatory contains subparts seeking
information on distinct subjects and these subparts constitute separate interrogatories
against Plaintiff's limit of 25.  F.R.Civ.P. 33(a); *Collaboration Props. v. Polycorn, Inc.*,
224 F.R.D. 473, 475 (N.D. Cal. 2004).  Defendant further objects to the extent this
interrogatory seeks information protected by the attorney-client privilege or the attorney-
work product doctrine.  F.R.Civ.P. 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.*, 219
F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.*, Case No. CV 10-
7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Subject to and without waiving these objections, Defendant responds as follows:

(a)	Environmental Compliance Inspectors ("ECIs"), prior to their
appointment as an ECI, must meet the civil service minimum requirements by having
either have two years of full-time paid experience in a position at the level in explaining
or enforcing environmental health laws, ordinances, or regulations pertaining to
wastewater, solids, recyclables and/or stormwater treatment.  Other ECIs, as a way of
meeting the minimum required qualifications for the classification, may have completed
a certain number of units from an accredited college or university in biology, chemistry,
environmental science, biochemistry, solid waste management technology, water supply
technology, stormwater or wastewater treatment technology, or engineering prior to their
appointment.  In accordance with Charter Section 1010(b) and Civil Service Commission
Rule 5.31, selective certification will be used for some positions that require special

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

possession of a current Hazardous Waste Operations and Emergency Response Standard (HAZWOPERS) certification (40-hour training), or a Hazardous Materials Specialist (HAZMAT) certification, both as certified by the California Specialized Training Institute, Office of Emergency Services. Further training and courses, including the course frequency and hours, as well as which courses are required for ECIs in the respective divisions (Watershed Protestation Division ("WPD") and Livability Services Division ("LSD")), are listed in the training matrix produced at CTY015234-015234 (WPD/LSD Training Matrix). As reflected in the matrix, LSD ECIs are required to take a 40-hour OSHA Hazardous Waste Operations and Emergency Response (HAZWOPER) course and a subsequent annual refresher course, OSHA Blood Borne Pathogen, OSHA Medical Surveillance, and OSHA Heat Illness & Injury. Additional available courses include DOT HM 181/232.

In addition, LSD employees (and WPD employees) involved in encampment cleanups and/or LAMC 56.11 enforcement attending trainings by other experienced ECIs and/or Senior ECIs and/or Chief ECIs, the Unified Homeless Resources Center ("UHRC"), the City Attorney's Office, Chrysalis, and the Los Angeles Police Department ("LAPD"). Additional training may occur in the field as ECIs, some with education and/or credentials in biology, biochemistry, chemical engineering, fire science, wastewater technology, and similar scientific disciplines instruct LSD employees on how to proceed with cleanup operations and address health hazards. Training also occurs during safety tailgate meetings and as-needed additional meetings (for example, when court decisions require changes in operations), which may occasionally involve written materials.

Documents related to training and education were previously produced in the City's response to Request for Production. Defendant refers Plaintiff to these documents for further response. F.R.Civ.P. 33(d)(1); *Rainbow Pioneer # 44-18-04A v. Hawaii-*

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

*Nevada Inv. Corp.*, 711 F.2d 902, 906 (9th Cir. 1983).  See Bates Nos:

- CTY012270-CTY012284 – "Environmental Compliance Officer Training Program, January 2016, describing training required of WPD ECIs before creation of LSD"

- CTY011905-CTY011905 and CTY012098-CTY012098 – Charts reflecting ECI Trainings - Operations, Posting, Clean Streets LA (CSLA) and HOPE (2019)

- CTY010750-CTY010750 – Spreadsheet tracking ECI trainings (2018-2020)

- CTY014688-CTY014702 – LAMC 56.11 SOP Training Materials and Attendance Rosters (2019)

- CTY006278-CTY006397, CTY006710-CTY006748, CTY008275-CTY008293 – Los Angeles Municipal Code 56.11 by Gonzalo Barriga MS, Lt. Environmental Officer, LASAN, Watershed Protection, Environmental Enforcement

- CTY012220-CTY012227 – Chrysalis Bulky Item Storage Training and Rosters (2020)

- CTY012266-CTY012269 – Rosters re LSD training on Mental Health/Crisis Communication and De-escalation & Sensitivity Training by LAPD (2019)

- CTY014763-CTY014764 – LSD LAMC 56.11 City Attorney Training Attendance Roster (2019)

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

- CTY012228-CTY012228 – CARE Team Training – UHRC (2019)

- CTY012232-CTY01223 – UHRC CARE Team Training Rosters (2019)

- CTY006413-006345 – LASAN Safety and Personal Protection Equipment at Homeless Encampment Cleanups

- CTY019332-CTY019336 – LASAH CARE Trainings

- CTY012108-CTY012123 – "Operation Healthy Streets Exposure Control Plan for Bloodborne Pathogens," March 27, 2018, including attendance roster listing ECI attendees (2018)

- CTY015165-CTY015170 – RAP homeless shelter training, including LAMC 56.11 Industrial Safety and Compliance Division Attendance Roster (2020)

- CTY015193-CTY015205; CTY012217-CTY012219 – ISCD Training Attendance Rosters and Written Materials – Temporary adjustment to enforcement of specific sections of LAMC 56.11 (2020)

- CTY015171-CTY015188 – LSD Attendance Roster for Rec & Parks Health Hazard Determination (2020)

- CTY014997-CTY015004 – Methane Safety Tailgate Roster

- CTY012124-CTY012201 – Operation Healthy Streets Protocol; Bloodborne

10
DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

Pathogens Tailgate with attendance roster

- CTY015006-CTY015007 – Protecting against Chemical Hazards Tailgate Roster

- CTY004507-CTY004510 – Memorandum of Agreement between LASAN and LAPD Regarding the Screening and Storage of Certain Excess Personal Property of Custodial Arrestees (2017/2018)

- CTY015243-CTY015243 – HOPE/RAPID RESPONSE TEAM UPDATE presentation (2017)

- CTY015244-CTY015244 – LAMC 56.11 Posting Training Presentation

- CTY019334-CTY019334 – LAHSA CARE and CARE+ Comprehensive Overview (2019)

- CTY019390-CTY019390 – Operation Healthy Streets Skid Row PowerPoint

- CTY020307-CTY020307 – CARE Program Supervisors Meeting (2019)

- CTY015150-CTY015157 – Training Documentation\Property Storage by Chrysalis\ (ECI)

- CTY015158-CTY015158 – Unattended Property/bulky Items Regional Storage Overview Roster (2020)

- CTY014856-CTY014856 – Performing Health Hazard Determinations Tailgate Training Roster (2020)

- Certificates evidencing ECI's completion of HAZWOPER courses were produced at CTY010828 - CTY010857 (2020 Certificates for Daniel Truong, Sergio Arvayo, Jazmine Saucedo, Alyssa Mireles, Jesus Sanchez, Jesus Gamez, Branid Cruz, Jay Kim, Salvador Rosales, Michael Tran, Daniel Pearlman, Nekpen Aimiuwu, Matthew Bates, Abraham Abrahamian, Bernard Dancel, Pawan Verma, Karen Chebatoris, Warren Tan, Rachel Camacho, Karen Spencer, Arez Arzoumanian, Jordan Wooten, Sudha Shrestha, Demetress M. Anderson, Gilberto Campos, Ashley Avendano, Andrew Damron, Eduardo Valencia, Diana Powell, Ruben Hernandez); CTY010996-CTY011017 (2020 Certificates Howard Wong, Mark Trujillo, Chin Teo, Seyla Te, Adam Smith, Ching Peng, Steven Pederson, Katrina Montgomery, Ron Metcalf, Ingrid Medina, Eric Lee, Gary Lara, Michael Gunby, Isaac Frequez, Joe Fortaleza, Erick Estrada, Lucita Arzadon, Susan Berberabe, Christian Centeno, Carolyn Cook, Behzad Eghtesady); see also CTY011108 - CTY011109; CTY011696-CTY011697; CTY011883-CTY011884 (2019 Certificates); CTY010909 - CTY010953; CTY011206 - CTY011208; CTY011266 -CTY011269; CTY011493-CTY011495; CTY011645 - CTY011648; CTY011126 -CTY011130; CTY011712-CTY011716; CTY011131 - CTY011135; CTY011717 -CTY011721; CTY011252-CTY011253; CTY011772 - CTY011774; CTY011031 -CTY011032; CTY011254-CTY011255; CTY011266 - CTY011269; CTY011192 - CTY011192; CTY011813-CTY011814 (2018 Certificates)

- California Specialized Training Institute, Hazardous Materials Technician Series Course Materials – CTY004852-CTY005256 (A-Week June 29-23, 2017);

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

CTY005257-005874 (B-Week July 10-14, 2017); CTY005875-6278 (C-Week June 24-28, 2017); CTY013750-14470 (Specialist Student Manual, Technician Workbook)

- CTY015329-CTY015342 – HAZWOPER DOCUMENTS\8 Hour HAZWOPER Refresher)

- CTY013362-CTY013400 – Medical Management and Rehabilitation Course Materials

- CTY014765-CTY014816 – Operation Healthy Streets Protocol

- CTY012236-CTY012240 – Clean Harbor Invoicing Training and Rosters (2018)

- CTY006398-006412 – LASAN LAMC 56.11 Posting Training

- CTY012285-CTY012292 – 2019-2020 Rosters reflecting Tailgate trainings on variety of topics, including postings, and training by LAHSA

- CTY012202-CTY012202; CTY014541-CTY014618 – Bloodborne Pathogen Tailgate Attendance Rosters (2018); CTY012210 - CTY012216 - Blood Borne Pathogen Training Rosters (2019)

- CTY012309-CTY012309 – Handling Hazardous Waste Tailgate training roster (2020)

- CTY008275–CTY008293; CTY020306-CTY020306 – LAMC 56.11 Training PowerPoints

- CTY020307-CTY020307 – CARE Program Supervisors Meeting (2019)

- CTY020310-CTY020310 – Homeless Encampment Authorizations Process

(b)    Concurrently served with these Amended Responses is an Excel spreadsheet that reflects the trainings of LSD employees that are maintained by the Industrial Safety and Compliance Division ("ISCD").  ISCD maintains records for Bureau-wide trainings, including new employee trainings, safety, and field training.  Division-specific trainings may not be reflected in ISCD records.  This spreadsheet will be included in the City's next production.

(c)    The Los Angeles Police Department also receives training regarding LAMC 56.11 and homeless encampments.  Documents related to such training and education were previously produced in the City's response to Request for Production.  Defendant refers Plaintiff to these documents for further response.  F.R.Civ.P. 33(d)(1); *Rainbow Pioneer # 44-18-04A v. Hawaii-Nevada Inv. Corp.*, 711 F.2d 902, 906 (9th Cir. 1983).  See Bates Nos.:

- CTY004471-CTY004473 – Operations Order No. 5 - Training Requirements for Sworn Personnel Assigned to Homeless Outreach Programs (2016)

- CTY006440-CTY006480, CTY006562-006590 – Homeless Briefing – "New LAMC 56.11"

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

- CTY006591-CTY006595 – 56.11(3) Regulation and Impoundment of Stored Personal Property Discard of Certain Stored Personal Property

- CTY006596-CTY005697 – "LAMC 56.1(c) Attachments"

- CTY006598-CTY006598 – "LAMC 56.11 (d) Bulky Items"

- CTY006599-CTY006599 – "LAMC 5.11 Regulation of Property on City Streets"

- CTY006600-CTY006601– "LAMC 56.11.10: Unlawful Conduct Evidentiary Recommendations for Law Enforcement Personnel Only"

- CTY006602-CTY006602 – "Tents – Code section 56.11.10(h)"

- CTY006603-CTY006603 – "Attachments: Barrier, String, Rope, Wire, Chain, etc." – Code section 56.11.10(c)"

- CTY006605-CTY6006702 – "Los Angeles Municipal Code 56.11 Standard Operating Protocols," April 2016

- CTY006707-CTY006709 – "Homeless Outreach and Proactive Engagement (HOPE) Team"

- CTY006703-CTY006706 – "Los Angeles Police Department El Pueblo Historical Statistics, Strategies, and Weaknesses"

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

- CTY006604-CTY006604  – "Bulky Items – Code Section 56.11.10(d)"

- CTY006481-CTY006495 – LAMC 56.11 Training

- CTY006505-CTY006509 – "The Key to Understanding OSHA Propane Regulations"

- CTY006510-CTY006513 – "Alley Enforcement for Encampments"

- CTY006514-CTY006541 – "Homeless Encampment Briefing, by Alin Sahagian, Neighborhood Prosecutor Devonshire Area (2019)

- CTY010643-CTY010643 – LAMC 56.11 Training Roster (2018)

- CTY006753-CTY006759 – "City Council Deputy Training Meeting – Overview on LAMC 56.11/85.02"

- CTY006760-CTY006787 – "OWB SLO Training 3/9/17 – LAMC 56.11"

- CTY006787-CTY006815 – 2016 HOPE Orientation, including Employee Sign-In Sheets and Rosters;

- CTY006816-CTY006827 – 2017 HOPE Orientation, including Employee Sign-In Sheets and Rosters

- CTY004475-CTY004476 – Special Order No. 13 – Policy Regarding Police

16

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

Contacts with Persons Experiencing Homelessness – Established (2016)

- CTY004477-CTY004479 – Regulations Affecting the Storage of Personal Property in Public Areas – Los Angeles Municipal Code Section 56.11, Notice 1.11 from Director of Operations (2016)

- CTY004455- CTY004458 – Procedures on the Seizure, Booking, and Storage of Personal Property Following A Custodial Arrest, Notice 1.11 from Chief of Police (2019)

**INTERROGATORY NO. 2.**

IDENTIFY all trainings attended by any City employees, contractors or agents participating in ENCAMPMENT CLEANUPS that referred to or related to the identification and handling or disposal of property which the City considers to be "an immediate threat to public health and safety," as that term is used in LAMC 56.11, by providing the date of the training, the topic of the training, the title of the training, the group to which the training was conducted (i.e., all of LA Sanitation, ECIs specifically, one-on-one), where the training was conducted, and any materials provided as part of the training (such as PowerPoint slides).

**RESPONSE TO INTERROGATORY NO. 2:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the interrogatory seeks information that is not relevant to Plaintiff Zamora's specific claims alleged in the SAC for incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard. *See In re Bard IVC Filters Prods. Liab. Litig.*, 317 F.R.D. 562 (D. Az. 2016). Defendant objects that the interrogatory is overbroad to the extent that it seeks

information relating to any individual plaintiff other than Plaintiff Zamora.  Defendant objects that the interrogatory is overbroad in seeking information dating back to April 2016, three years before Plaintiff Zamora's specific alleged incidents occurred. *Unilin Beheer B.V. v. NSL Trading Corp.*, No. CV 14-2210 BRO (SSx), 2015 U.S. Dist. LEXIS 192143, *14 (C.D. Cal. Feb. 27, 2015).  Defendant objects that the interrogatory is not proportional to the needs of the case, insofar as the burden or expense of searching for and producing information dating back to April 2016, three years before the specific alleged incidents occurred, outweighs the benefit of such discovery to Plaintiff Zamora's specific claims alleged in the SAC.  *See IBP, Inc. v. Mercantile Bank*, 179 F.R.D. 316, 321 (D. Kan. 1998); *Bashkin v. San Diego Cnty.*, Case No. 08-CV-1450-WQH (WVG), 2011 U.S. Dist. LEXIS 3439, at * 4-5 (S.D. Cal. Jan. 13, 2011).

In particular, Defendant objects that Plaintiffs' have not pled a failure-to-train theory and Defendant does not dispute that it promulgated LAMC 56.11 and enforced it in the relevant time period.  *See Thompson v. City of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989) ("A rule or regulation promulgated, adopted, or ratified by a local governmental entity's legislative body unquestionably satisfies Monell's policy requirements."), *overruled on other grounds by Bull v. City & Cty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010).

Defendant objects that Plaintiffs' definition of "IDENTIFY" is overbroad.  *See Unilin Beheer B.V. v. NSL Trading Corp.*, No. CV 14-2210 BRO (SSx), 2015 U.S. Dist. LEXIS 192143, *14 (C.D. Cal. Feb. 27, 2015); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007).  Defendant has made available for inspection and copying documents relating to the subject of this litigation; to IDENTIFY each and every document by providing the form of each document, creation dates, past and present custodians, etc., would require the Defendant to make a compilation, abstract, audit or summary of its business records and such a compilation, abstract, audit or summary does not exist and

be unduly burdensome, oppressive and not proportional to the needs of the case. Defendant further objects that the interrogatory requires Defendant not only to IDENTIFY every training but also to specify every employee, agent or contractor who attended each training, as well as the topics of each such training, which would require the Defendant to make a compilation, abstract, audit or summary of its business records and such a compilation, abstract, audit or summary does not exist and be unduly burdensome, oppressive and not proportional to the needs of the case. *Hoffman v. Cnty. of Los Angeles,* Case No. CV-15-03724-FMO (ASx), 2016 U.S. Dist. LEXIS 123515, *15-16 (C.D. Cal. Jan. 6, 2016); *Estrada v. City & Cnty. of San Francisco*, Case No. 16-cv-00722-MEJ, 2016 U.S. Dist. LEXIS 173740, *4 (N.D. Cal. Dec. 14, 2016). Defendant further objects that the term "training" is vague and ambiguous insofar as it suggests that the only way an individual can be taught or instructed is through formal presentations and that the only relevant education to enforcing LAMC 56.11 is in the form of City-conducted trainings. Defendant objects that the interrogatory contains subparts seeking information on distinct subjects and these subparts constitute separate interrogatories against Plaintiff's limit of 25. F.R.Civ.P. 33(a); *Collaboration Props. v. Polycorn, Inc.*, 224 F.R.D. 473,475 (N.D. Cal. 2004). Defendant further objects to the extent this interrogatory seeks information protected by the attorney-client privilege or the attorney-work product doctrine. F.R.Civ.P. 26(b)(3)(A)-(B); *Kintera, Inc. v. Convio, Inc.*, 219 F.R.D. 503, *507 (S.D. Cal. 2003); *Reinsdorf v. Sketchers U.S.A., Inc.*, Case No. CV 10-7181 DDP (SSx), 2013 U.S. Dist. Lexis 200627, * 15-17 (C.D. Cal. Sep. 9, 2013).

Subject to and without waiving these objections, Defendant responds as follows:

(a) Environmental Compliance Inspectors ("ECIs"), prior to their appointment as an ECI, must meet the civil service minimum requirements by having either have two years of full-time paid experience in a position at the level in explaining or enforcing environmental health laws, ordinances, or regulations pertaining to wastewater, solids,

recyclables and/or stormwater treatment. Other ECIs, as a way of meeting the minimum required qualifications for the classification, may have completed a certain number of units from an accredited college or university in biology, chemistry, environmental science, biochemistry, solid waste management technology, water supply technology, stormwater or wastewater treatment technology, or engineering prior to their appointment. In accordance with Charter Section 1010(b) and Civil Service Commission Rule 5.31, selective certification will be used for some positions that require special possession of a current Hazardous Waste Operations and Emergency Response Standard (HAZWOPERS) certification (40-hour training), or a Hazardous Materials Specialist (HAZMAT) certification, both as certified by the California Specialized Training Institute, Office of Emergency Services. Further training and courses, including the course frequency and hours, as well as which courses are required for ECIs in the respective divisions (Watershed Protestation Division ("WPD") and Livability Services Division ("LSD")), are listed in the training matrix produced at CTY015234-015234 (WPD/LSD Training Matrix). As reflected in the matrix, LSD ECIs are required to take a 40-hour OSHA Hazardous Waste Operations and Emergency Response (HAZWOPER) course and a subsequent annual refresher course, OSHA Blood Borne Pathogen, OSHA Medical Surveillance, and OSHA Heat Illness & Injury. Additional available courses include DOT HM 181/232.

In addition, LSD employees (and WPD employees) involved in encampment cleanups and/or LAMC 56.11 enforcement attending trainings by other experienced ECIs and/or Senior ECIs and/or Chief ECIs, the Unified Homeless Resources Center ("UHRC"), the City Attorney's Office, Chrysalis, and the Los Angeles Police Department ("LAPD"). Additional training may occur in the field as ECIs, some with education and/or credentials in biology, biochemistry, chemical engineering, fire science, wastewater technology, and similar scientific disciplines instruct LSD employees on how

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

to proceed with cleanup operations and address health hazards. Training also occurs during safety tailgate meetings and as-needed additional meetings (for example, when court decisions require changes in operations), which may occasionally involve written materials.

Documents related to training and education were previously produced in the City's response to Request for Production. Defendant refers Plaintiff to these documents for further response. F.R.Civ.P. 33(d)(1); *Rainbow Pioneer # 44-18-04A v. Hawaii-Nevada Inv. Corp.*, 711 F.2d 902, 906 (9th Cir. 1983). See Bates Nos:

- CTY012270-CTY012284 – "Environmental Compliance Officer Training Program, January 2016, describing training required of WPD ECIs before creation of LSD"

- CTY011905-CTY011905 and CTY012098-CTY012098 – Charts reflecting ECI Trainings - Operations, Posting, Clean Streets LA (CSLA) and HOPE (2019)

- CTY010750-CTY010750 – Spreadsheet tracking ECI trainings (2018-2020)

- CTY014688-CTY014702 – LAMC 56.11 SOP Training Materials and Attendance Rosters (2019)

- CTY006278-CTY006397, CTY006710-CTY006748, CTY008275-CTY008293 – Los Angeles Municipal Code 56.11 by Gonzalo Barriga MS, Lt. Environmental Officer, LASAN, Watershed Protection, Environmental Enforcement

- CTY012220-CTY012227 – Chrysalis Bulky Item Storage Training and Rosters

21

(2020)

- CTY012266-CTY012269 – Rosters re LSD training on Mental Health/Crisis Communication and De-escalation & Sensitivity Training by LAPD (2019)

- CTY014763-CTY014764 – LSD LAMC 56.11 City Attorney Training Attendance Roster (2019)

- CTY012228-CTY012228 – CARE Team Training – UHRC (2019)

- CTY012232-CTY01223 – UHRC CARE Team Training Rosters (2019)

- CTY006413-006345 – LASAN Safety and Personal Protection Equipment at Homeless Encampment Cleanups

- CTY019332-CTY019336 – LASAH CARE Trainings

- CTY012108-CTY012123 – "Operation Healthy Streets Exposure Control Plan for Bloodborne Pathogens," March 27, 2018, including attendance roster listing ECI attendees (2018)

- CTY015165-CTY015170 – RAP homeless shelter training, including LAMC 56.11 Industrial Safety and Compliance Division Attendance Roster (2020)

- CTY015193-CTY015205; CTY012217-CTY012219 – ISCD Training Attendance Rosters and Written Materials – Temporary adjustment to enforcement of specific

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

sections of LAMC 56.11 (2020)

- CTY015171-CTY015188 – LSD Attendance Roster for Rec & Parks Health Hazard Determination (2020)

- CTY014997-CTY015004 – Methane Safety Tailgate Roster

- CTY012124-CTY012201 – Operation Healthy Streets Protocol; Bloodborne Pathogens Tailgate with attendance roster

- CTY015006-CTY015007 – Protecting against Chemical Hazards Tailgate Roster

- CTY004507-CTY004510 – Memorandum of Agreement between LASAN and LAPD Regarding the Screening and Storage of Certain Excess Personal Property of Custodial Arrestees (2017/2018)

- CTY015243-CTY015243 – HOPE/RAPID RESPONSE TEAM UPDATE presentation (2017)

- CTY015244-CTY015244 – LAMC 56.11 Posting Training Presentation

- CTY019334-CTY019334 – LAHSA CARE and CARE+ Comprehensive Overview (2019)

- CTY019390-CTY019390 – Operation Healthy Streets Skid Row PowerPoint

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

- CTY020307-CTY020307 – CARE Program Supervisors Meeting (2019)

- CTY015150-CTY015157 – Training Documentation\Property Storage by Chrysalis\ (ECI)

- CTY015158-CTY015158 – Unattended Property/bulky Items Regional Storage Overview Roster (2020)

- CTY014856-CTY014856 – Performing Health Hazard Determinations Tailgate Training Roster (2020)

- Certificates evidencing ECI's completion of HAZWOPER courses were produced at CTY010828 - CTY010857 (2020 Certificates for Daniel Truong, Sergio Arvayo, Jazmine Saucedo, Alyssa Mireles, Jesus Sanchez, Jesus Gamez, Branid Cruz, Jay Kim, Salvador Rosales, Michael Tran, Daniel Pearlman, Nekpen Aimiuwu, Matthew Bates, Abraham Abrahamian, Bernard Dancel, Pawan Verma, Karen Chebatoris, Warren Tan, Rachel Camacho, Karen Spencer, Arez Arzoumanian, Jordan Wooten, Sudha Shrestha, Demetress M. Anderson, Gilberto Campos, Ashley Avendano, Andrew Damron, Eduardo Valencia, Diana Powell, Ruben Hernandez); CTY010996-CTY011017 (2020 Certificates Howard Wong, Mark Trujillo, Chin Teo, Seyla Te, Adam Smith, Ching Peng, Steven Pederson, Katrina Montgomery, Ron Metcalf, Ingrid Medina, Eric Lee, Gary Lara, Michael Gunby, Isaac Frequez, Joe Fortaleza, Erick Estrada, Lucita Arzadon, Susan Berberabe, Christian Centeno, Carolyn Cook, Behzad Eghtesady); see also  CTY011108 - CTY011109;   CTY011696-CTY011697;   CTY011883-CTY011884   (2019 Certificates); CTY010909 - CTY010953; CTY011206 - CTY011208; CTY011266

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

-CTY011269; CTY011493-CTY011495; CTY011645 - CTY011648; CTY011126 -CTY011130; CTY011712-CTY011716; CTY011131 - CTY011135; CTY011717 -CTY011721; CTY011252-CTY011253; CTY011772 - CTY011774; CTY011031 -CTY011032; CTY011254-CTY011255; CTY011266 - CTY011269; CTY011192 - CTY011192; CTY011813-CTY011814 (2018 Certificates)

- California Specialized Training Institute, Hazardous Materials Technician Series Course Materials – CTY004852-CTY005256 (A-Week June 29-23, 2017); CTY005257-005874 (B-Week July 10-14, 2017); CTY005875-6278 (C-Week June 24-28, 2017); CTY013750-14470 (Specialist Student Manual, Technician Workbook)

- CTY015329-CTY015342 – HAZWOPER DOCUMENTS\8 Hour HAZWOPER Refresher)

- CTY013362-CTY013400 – Medical Management and Rehabilitation Course Materials

- CTY014765-CTY014816 – Operation Healthy Streets Protocol

- CTY012236-CTY012240 – Clean Harbor Invoicing Training and Rosters (2018)

- CTY006398-006412 – LASAN LAMC 56.11 Posting Training

- CTY012285-CTY012292 – 2019-2020 Rosters reflecting Tailgate trainings on variety of topics, including postings, and training by LAHSA

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

- CTY012202-CTY012202; CTY014541-CTY014618 – Bloodborne Pathogen Tailgate Attendance Rosters (2018); CTY012210 - CTY012216 - Blood Borne Pathogen Training Rosters (2019)

- CTY012309-CTY012309 – Handling Hazardous Waste Tailgate training roster (2020)

- CTY008275–CTY008293; CTY020306-CTY020306 – LAMC 56.11 Training PowerPoints

- CTY020307-CTY020307 – CARE Program Supervisors Meeting (2019)

- CTY020310-CTY020310 – Homeless Encampment Authorizations Process

(b)   Concurrently served with these Amended Responses is an Excel spreadsheet that reflects the trainings of LSD employees that are maintained by the Industrial Safety and Compliance Division ("ISCD").  ISCD maintains records for Bureau-wide trainings, including new employee trainings, safety, and field training.  Division-specific trainings may not be reflected in ISCD records.  This spreadsheet will be included in the City's next production.

**INTERROGATORY NO. 3**.

IDENTIFY each location where property that has been seized by the CITY pursuant to Los Angeles Municipal Code Section 56.11, is or has been stored after it was seized, at any time from April 16, 2016 to the present, including the address of the storage

26

facility, the date each storage facility was opened, and the square footage of any portion of the building that is used for storage of property seized from homeless encampments.

**RESPONSE TO INTERROGATORY NO. 3:**

Defendant incorporates the General Objections as though fully set forth here. Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the interrogatory seeks information that is not relevant to Plaintiff Zamora's specific claims alleged in the SAC for incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard. *See In re Bard IVC Filters Prods. Liab. Litig.*, 317 F.R.D. 562 (D. Az. 2016). Defendant objects that the interrogatory is overbroad to the extent that it seeks information relating to any individual plaintiff other than Plaintiff Zamora. Defendant objects that the interrogatory is overbroad in seeking information dating back to April 2016, three years before Plaintiff Zamora's specific alleged incidents occurred. *Unilin Beheer B.V. v. NSL Trading Corp.*, No. CV 14-2210 BRO (SSx), 2015 U.S. Dist. LEXIS 192143, *14 (C.D. Cal. Feb. 27, 2015).

Defendant objects that the interrogatory is not proportional to the needs of the case, insofar as the burden or expense of searching for and producing information dating back to April 2016 outweighs the benefit of such discovery to Plaintiff Zamora's specific claims alleged in the SAC. For the period January 1, 2018 to July 31, 2020 alone, Defendant has identified 32,730 incidents within WPIMS constituting "encampment cleanups" as defined in the Interrogatories, and 2016 is three years before the specific alleged incidents occurred. *See IBP, Inc. v. Mercantile Bank*, 179 F.R.D. 316, 321 (D. Kan. 1998); *Bashkin v. San Diego Cnty.*, Case No. 08-CV-1450-WQH (WVG), 2011 U.S. Dist. LEXIS 3439, at * 4-5 (S.D. Cal. Jan. 13, 2011). Defendant further objects that the discovery sought is not proportional to the needs of the case because the burden and expense of the proposed discovery outweighs the benefit of such information, and the

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

interrogatory is not relevant, particularly given that Plaintiffs' theory of the case as articulated in the SAC is that Defendant does *not* store property but instead destroys it unlawfully. *Hoffman v. Cnty. of Los Angeles,* Case No. CV-15-03724-FMO(ASx), 2016 U.S. Dist. LEXIS 123515, * 15-16 (C.D. Cal. Jan. 6, 2016); *Estrada v. City & Cnty. of San Francisco*, Case No. 16-cv-00722-MEJ, 2016 U.S. Dist. LEXIS 173740, *4 (N.D. Cal. Dec. 14, 2016).

Additionally, most information and documents related to storage are in the possession and custody of Chrysalis, a third-party company that contracts with LAHSA (not Defendant) to provide involuntary and voluntary storage for homeless individuals; Defendant understands that Plaintiffs have issued a document subpoena to Chrysalis and that documents with responsive information to this interrogatory are encompassed in that subpoena.  Defendant objects that it has produced any storage-related documents it has identified in its investigation and has worked with Chrysalis to identify further documents, which Defendant has also produced as they were made available.  Defendant objects that requiring it collecting documents from Chrysalis and analyze and summarize them in response to this interrogatory creates an undue burden that is not proportional to the needs of the case and requires Defendant to make a compilation, abstract, audit or summary of its records and such compilation, abstract, audit or summary does not exist. *Hoffman v. Cnty. of Los Angeles,* Case No. CV-15-03724-FMO(ASx), 2016 U.S. Dist. LEXIS 123515, * 15-16 (C.D. Cal. Jan. 6, 2016); *Estrada v. City & Cnty. of San Francisco*, Case No. 16-cv-00722-MEJ, 2016 U.S. Dist. LEXIS 173740, *4 (N.D. Cal. Dec. 14, 2016).

Subject to and without waiving these objections, Defendant responds as follows: As specified in the chart below, the City currently has eight involuntary storage locations, totaling approximately 9,600 square feet of storage capacity:

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

| Facility | Address | Storage Capacity |
|---|---|---|
| East Valley Yard (Valley) | 11050 Pendleton St, Sun Valley, CA 91352 | 800 sq. ft. (1 Conex Box) |
| West Valley Yard (Northridge) | 8840 Vanalden Ave, Northridge, CA 91324 | 800 sq. feet (1 Conex Box) |
| Hyperion Water Reclamation Plant (West | 12000 Vista Del Mar, Playa Del Rey, CA 90293 | 800 sq. ft. (1 Conex Box) |
| North Central Yard (Northeast) | 452 N San Fernando Rd, Los Angeles, CA 90031 | 800 sq. ft. (1 Conex Box) |
| Gaffey Yard (San Pedro) | 1400 N. Gaffey San Pedro CA. 90731 | 2400 sq. ft. (3 Conex Boxes) |
| South LA Yard *Overflow yard [see below] | 786 S Mission Rd, Los Angeles, CA 90023 | 800 sq. ft. (1 Conex Box) |
| Jefferson Yard (Jefferson Site) | 6000 W. Jefferson Blvd., Los Angeles 90232 | 1,600 sq. ft. (2 Conex Boxes) |
| Lopez Canyon | 11950 Lopez Canyon Rd. Sylmar, CA 91342 | 1,600 sq. ft. (2 Conex Boxes) |

Two of the above-referenced facilities recently opened in 2020:  The Lopez Canyon facility (June 2020) and Jefferson Yard (July 2020).  In addition, in May 2020 the storage space at the Gaffey Yard was increased from one Conex box to three Conex

29

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

boxes.

　　　*The South LA Yard is only used as an overflow storage site for the Chrysalis Towne Location; LASAN Staff does not take material to this site.

　　　Chrysalis, a third-party independent contractor that contracts with LAHSA (not Defendant) to provide involuntary and voluntary storage for homeless individuals operates the Bin, located at 507 Towne Avenue The approximate size of the involuntary storage space available at the Bin is 2,000 square feet.  When involuntary storage is available, LASAN delivers non-hazardous property to the storage facility that is nearest to the location of the cleanup and has capacity, completes a chain of custody form transferring custody of property at the storage facility to Chrysalis, and notifies Chrysalis of the delivery.  Property stored in the facilities may be moved by Chrysalis to the Bin after the cleanup or Chrysalis may arrange to drop the property off to the individual a public area (by a restaurant or supermarket) closer to the cleanup area or the individual. The City does not track that information.

　　　To the extent the City had in its possession chain of custody forms or other storage-related information, it has produced such documents and intends to produce any additional such documents if they are identified in its investigation or provided to the City by Chrysalis.  *See* Bates Nos. CTY004841 (2019 Storage Data); CTY009268-CTY011938 (chain of custody forms); CTY0004843-CTY004850 (chain of custody forms); CTY019486-CTY019492 (chain of custody form noting locations); see also CTY004827 (Appendix A to Chrysalis Agreement, noting storage facilities and LASAN post-cleanup delivery locations); CTY004842 (Chrysalis Agreement, "UAP Container Location Information" noting storage locations and capacity); CTY016065-CTY016065 (January-June 2019 CSLA_HOPE_OHS Metrics & Totals); CTY015150-CTY015157 (Chrysalis Unattended Property Regional Storage Overview); CTY019488-CTY019488 (Unattended Property, Involuntary Storage Bin Policy); CTY019492-CTY019492 (2018

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

Unattended Property Metrics).  Defendant refers Plaintiff to these documents for further response.  F.R.Civ.P. 33(d)(1); *Rainbow Pioneer # 44-18-04A v. Hawaii-Nevada Inv. Corp.*, 711 F.2d 902, 906 (9th Cir. 1983).  Defendant does not intend to withhold any storage-related documents it identifies during its investigation.

**INTERROGATORY NO. 4.**

If any of the storage facilities identified in Interrogatory Two [sic] has increased or decreased in size or storage capacity since the building began being used for storage, provide the original size, the date when the storage facility increased or decreased in size, and the capacity and size after the increase or decrease.

**RESPONSE TO INTERROGATORY NO. 4:**

Defendant incorporates the General Objections as though fully set forth here. Defendant incorporates the General Objections as though fully set forth here.  Defendant objects that the interrogatory seeks information that is not relevant to Plaintiff Zamora's specific claims alleged in the SAC for incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard.  *See In re Bard IVC Filters Prods. Liab. Litig.*, 317 F.R.D. 562 (D. Az. 2016).  Defendant objects that the interrogatory is overbroad to the extent that it seeks information relating to any individual plaintiff other than Plaintiff Zamora.  Defendant objects that the interrogatory is overbroad in seeking information dating back to April 2016, three years before Plaintiff Zamora's specific alleged incidents occurred. *Unilin Beheer B.V. v. NSL Trading Corp.*, No. CV 14-2210 BRO (SSx), 2015 U.S. Dist. LEXIS 192143, *14 (C.D. Cal. Feb. 27, 2015).

Defendant objects that the interrogatory is not proportional to the needs of the case, insofar as the burden or expense of searching for and producing information dating back to April 2016 outweighs the benefit of such discovery to Plaintiff Zamora's specific

claims alleged in the SAC.  For the period January 1, 2018 to July 31, 2020 alone, Defendant has identified 32,730 incidents within WPIMS constituting "encampment cleanups" as defined in the Interrogatories, and 2016 is three years before the specific alleged incidents occurred.  *See IBP, Inc. v. Mercantile Bank*, 179 F.R.D. 316, 321 (D. Kan. 1998); *Bashkin v. San Diego Cnty.*, Case No. 08-CV-1450-WQH (WVG), 2011 U.S. Dist. LEXIS 3439, at * 4-5 (S.D. Cal. Jan. 13, 2011).  Defendant further objects that the discovery sought is not proportional to the needs of the case because the burden and expense of the proposed discovery outweighs the benefit of such information, and the interrogatory is not relevant, particularly given that Plaintiffs' theory of the case as articulated in the SAC is that Defendant does *not* store property but instead destroys it unlawfully.  *Hoffman v. Cnty. of Los Angeles,* Case No. CV-15-03724-FMO(ASx), 2016 U.S. Dist. LEXIS 123515, * 15-16 (C.D. Cal. Jan. 6, 2016); *Estrada v. City & Cnty. of San Francisco*, Case No. 16-cv-00722-MEJ, 2016 U.S. Dist. LEXIS 173740, *4 (N.D. Cal. Dec. 14, 2016).

Additionally, most information and documents related to storage are in the possession and custody of Chrysalis, a third-party company that contracts with LAHSA (not Defendant) to provide involuntary and voluntary storage for homeless individuals; Defendant understands that Plaintiffs have issued a document subpoena to Chrysalis and that documents with responsive information to this interrogatory are encompassed in that subpoena.  Defendant objects that it has produced any storage-related documents it has identified in its investigation and has worked with Chrysalis to identify further documents, which Defendant has also produced as they were made available.  Defendant objects that requiring it collecting documents from Chrysalis and analyze and summarize them in response to this interrogatory creates an undue burden that is not proportional to the needs of the case and requires Defendant to make a compilation, abstract, audit or summary of its records and such compilation, abstract, audit or summary does not exist.

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

*Hoffman v. Cnty. of Los Angeles,* Case No. CV-15-03724-FMO(ASx), 2016 U.S. Dist. LEXIS 123515, * 15-16 (C.D. Cal. Jan. 6, 2016); *Estrada v. City & Cnty. of San Francisco*, Case No. 16-cv-00722-MEJ, 2016 U.S. Dist. LEXIS 173740, *4 (N.D. Cal. Dec. 14, 2016).

Defendant notes that the reference to "Interrogatory Two" appears to be a typographical error and interprets this reference to be properly to "Interrogatory Three."

Subject to and without waiving these objections, Defendant responds as follows:

As specified in the chart below, the City currently has eight involuntary storage locations, totaling approximately 9,600 square feet of storage capacity:

| Facility | Address | Storage Capacity |
|---|---|---|
| East Valley Yard (Valley) | 11050 Pendleton St, Sun Valley, CA 91352 | 800 sq. ft. (1 Conex Box) |
| West Valley Yard (Northridge) | 8840 Vanalden Ave, Northridge, CA 91324 | 800 sq. feet (1 Conex Box) |
| Hyperion Water Reclamation Plant (West) | 12000 Vista Del Mar, Playa Del Rey, CA 90293 | 800 sq. ft. (1 Conex Box) |
| North Central Yard (Northeast) | 452 N San Fernando Rd, Los Angeles, CA 90031 | 800 sq. ft. (1 Conex Box) |
| Gaffey Yard (San Pedro) | 1400 N. Gaffey San Pedro CA. 90731 | 2400 sq. ft. (3 Conex Boxes) |

33

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

| South LA Yard *Overflow yard [see below] | 786 S Mission Rd, Los Angeles, CA 90023 | 800 sq. ft. (1 Conex Box) |
|---|---|---|
| Jefferson Yard (Jefferson Site) | 6000 W. Jefferson Blvd., Los Angeles 90232 | 1,600 sq. ft. (2 Conex Boxes) |
| Lopez Canyon | 11950 Lopez Canyon Rd. Sylmar, CA 91342 | 1,600 sq. ft. (2 Conex Boxes) |

Two of the above-referenced facilities recently opened in 2020: The Lopez Canyon facility (June 2020) and Jefferson Yard (July 2020). In addition, in May 2020 the storage space at the Gaffey Yard was increased from one Conex box to three Conex boxes.

*The South LA Yard is only used as an overflow storage site for the Chrysalis Towne Location; LASAN Staff does not take material to this site.

Chrysalis, a third-party independent contractor that contracts with LAHSA (not Defendant) to provide involuntary and voluntary storage for homeless individuals operates the Bin, located at 507 Towne Avenue The approximate size of the involuntary storage space available at the Bin is 2,000 square feet. When involuntary storage is available, LASAN delivers non-hazardous property to the storage facility that is nearest to the location of the cleanup and has capacity, completes a chain of custody form transferring custody of property at the storage facility to Chrysalis, and notifies Chrysalis of the delivery. Property stored in the facilities may be moved by Chrysalis to the Bin after the cleanup or Chrysalis may arrange to drop the property off to the individual a public area (by a restaurant or supermarket) closer to the cleanup area or the individual. The City does not track that information.

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

To the extent the City had in its possession chain of custody forms or other storage-related information, it has produced such documents and intends to produce any additional such documents if they are identified in its investigation or provided to the City by Chrysalis.   *See* Bates Nos. CTY004841 (2019 Storage Data); CTY009268-CTY011938 (chain of custody forms); CTY0004843-CTY004850 (chain of custody forms); CTY019486-CTY019492 (chain of custody form noting locations); see also CTY004827 (Appendix A to Chrysalis Agreement, noting storage facilities and LASAN post-cleanup delivery locations); CTY004842 (Chrysalis Agreement, "UAP Container Location Information" noting storage locations and capacity); CTY016065-CTY016065 (January-June 2019 CSLA_HOPE_OHS Metrics & Totals); CTY015150-CTY015157 (Chrysalis Unattended Property Regional Storage Overview); CTY019488-CTY019488 (Unattended Property, Involuntary Storage Bin Policy); CTY019492-CTY019492 (2018 Unattended Property Metrics).   Defendant refers Plaintiff to these documents for further response.   F.R.Civ.P. 33(d)(1); *Rainbow Pioneer # 44-18-04A v. Hawaii-Nevada Inv. Corp.*, 711 F.2d 902, 906 (9th Cir. 1983).   Defendant does not intend to withhold any storage-related documents it identifies during its investigation.

## INTERROGATORY NO. 5.

IDENTIFY every City employee assigned to the HOPE team, as that term is defined by the Los Angeles Police Department or LA Sanitation in conjunction with homeless outreach and engagement and ENCAMPMENT CLEANUPS, from January 1, 2018 to the present and provide 1) their name; 2) job title; 3) division and department to which they were assigned; 4) to which HOPE team they were assigned; and 5) dates assigned to the detail(s).

## RESPONSE TO INTERROGATORY NO. 5:

Defendant incorporates the General Objections as though fully set forth here.

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

Defendant objects that the interrogatory seeks information that is not relevant to Plaintiff Zamora's specific claims alleged in the SAC for incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard.  *See In re Bard IVC Filters Prods. Liab. Litig.*, 317 F.R.D. 562 (D. Az. 2016). Defendant objects that the interrogatory is overbroad to the extent that it seeks information relating to any individual plaintiff other than Plaintiff Zamora and information dating back to January 1, 2018.  *Unilin Beheer B.V. v. NSL Trading Corp.*, No. CV 14-2210 BRO (SSx), 2015 U.S. Dist. LEXIS 192143, *14 (C.D. Cal. Feb. 27, 2015). Defendant objects that the interrogatory is not proportional to the needs of the case, insofar as the burden or expense of searching for and producing information dating back to 2018 outweighs the benefit of such discovery to Plaintiff Zamora's specific claims alleged in the SAC.  For the period January 1, 2018 to July 31, 2020 alone, Defendant has identified 32,730 incidents within WPIMS constituting "encampment cleanups"; Plaintiffs' incidents represent only a small subgroup of those cleanups and all relevant information related to those cleanups has been produced and intends to produce any supplementary documents it locates in its investigation.  *See IBP, Inc. v. Mercantile Bank*, 179 F.R.D. 316, 321 (D. Kan. 1998); *Bashkin v. San Diego Cnty.*, Case No. 08-CV-1450-WQH (WVG), 2011 U.S. Dist. LEXIS 3439, at * 4-5 (S.D. Cal. Jan. 13, 2011).  In order to respond to this interrogatory, Defendant would need to manually collect, analyze and summarize the Watershed reports associated with those cleanups, as well as personnel records, thus requiring Defendant to make a compilation, abstract, audit or summary of its records and such compilation, abstract, audit or summary does not exist.  *Hoffman v. Cnty. of Los Angeles,* Case No. CV-15-03724-FMO(ASx), 2016 U.S. Dist. LEXIS 123515, * 15-16 (C.D. Cal. Jan. 6, 2016); *Estrada v. City & Cnty. of San Francisco*, Case No. 16-cv-00722-MEJ, 2016 U.S. Dist. LEXIS 173740, *4 (N.D. Cal. Dec. 14, 2016). Defendant objects that the interrogatory contains subparts seeking information on distinct

subjects and these subparts constitute separate interrogatories against Plaintiff's limit of 25.  F.R.Civ.P. 33(a); *Collaboration Props. v. Polycorn, Inc.*, 224 F.R.D. 473,475 (N.D. Cal. 2004).  Defendant further objects that the term "detail(s)" is vague and ambiguous and Defendant interprets it to mean the location of the cleanup in which any given employee participated.  Defendant also objects that the term "homeless outreach and engagement" is vague, ambiguous and overbroad to the extent the term is meant to encompass activities other than those associated with cleanup operations.

Subject to and without waiving these objections, Defendant responds as follows: Defendant has produced documents that contain information responsive to this request and refers Plaintiff to these documents for further response.  F.R.Civ.P. 33(d)(1); *Rainbow Pioneer # 44-18-04A v. Hawaii-Nevada Inv. Corp.*, 711 F.2d 902, 906 (9th Cir. 1983).  More specifically:  Defendant produced an organization chart that identifies HOPE members in 2019 at CTY004393 and will include the 2020 version of that chart in its next production; both charts are attached as Exhibit B hereto.  See also Bates Nos. CTY019503-CTY019503 (UHRC Organizational chart).  Concurrently served with these Amended Responses is an Excel spreadsheet that reflects the trainings of LSD employees that are maintained by the Industrial Safety and Compliance Division ("ISCD"), which reflects the names and titles of LSD employees and relevant dates.  This spreadsheet will be included in the City's next production.   In addition, ECIs involved in cleanups 2018-2020 are typically listed in column E ("First Responder") and column F ("Second Responder") in the WPIMS database export produced at Bates Nos. CTY020222 and CTY020331.  Defendant also has produced Watershed Protection Division reports associated with the incidents alleged in the complaint, which typically identify the names of ECIs involved in those cleanups.  *See* Bates Nos. CTY000001- CTY002369; CTY003240-CTY004085.

With respect to incidents alleged by Plaintiff Zamora on March 21, 2019 and

June 11, 2019:

Encampment cleanup operations conducted on March 21, 2019 are identified in the WPIMS database (CTY20222) and can be found on the WPIMS excel file starting at row 5672, Case ID No. 53125, and ending at row 5718, Case ID No. 53162.  The City produced the incident report and related documents for Zamora's alleged incident on March 21, 2019 (CTY000079-167), identified as Case ID No. 53162 for a Rapid Response incident occurring at 6th Street and Kingsley.  Individuals involved in this incident included ECI M. Tran, P. Pedrosa, J. Saucedo, and J. Gamez.  The City produced LAPD incident-specific documents for March 21, 2019 (CTY002423-2447).  LAPD Officers I. Lucero and C. Argueta were present at 6th Street and Kingsley (CTY002443).

Encampment cleanups conducted on June 11, 2019 are identified in the WPIMS database (CTY20222) and can be found on the WPIMS excel file starting at row 8010, Case ID No. 56909, and ending at row 8066, Case ID No. 56981.  The City produced reports for incidents occurring on June 11, 2019: CTY000168-325, Case ID NO. 56806; CTY00326-351, Case ID No. 56909; CTY00352-408, Case ID No. 56974; and CTY000435-459, Case ID No. 56976.  The City has produced a report for Case ID No. 53162 occurring on June 11, 2019 at Harvard and 5th Street.  (CTY020332 - CTY020441).  Individuals involved in this incident included ECI P. Pedrosa and T. Kuruvilla.  The City produced LAPD incident-specific documents for June 11, 2019 incidents (CTY002465-2496).  LAPD Officers I. Lucero and L. Bermudez were present at a rapid response conducted at this same time on June 11, 2019 at 3rd and Harvard (CTY002495).

Also, the following is a list of Environmental Compliance Inspectors active in Livability Services Division as of October 28, 2020:

1) Anderson, Demetress Washington ECI

2) Anguiano, Berenice Cazador ECI

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

3) Arevalo, Samantha DC Tillman ECI

4) Arvayo, Sergio Washington ECI

5) Arzoumanian, Arek Dct ECI

6) Avendano, Ashley DC Tillman ECI

7) Awujo, Felix (Awugo In Sdoa) Washington ECI

8) Bartz, Jaqueline Harbor ECI

9) Bates, Matthew Harbor ECI

10) Beattie, Romy DC Tillman ECI

11) Calleros, Shayla Washington ECI

12) Camacho, Rachel East Valley ECI

13) Campos, Gilberto DC Tillman ECI

14) Cardenas, Daniela Cazador ECI

15) Chebatoris, Karen Washington ECI

16) Cruz, Stephany Washington ECI

17) Damron, Andrew DC Tillman ECI

18) Dancel, Bernard Cazador ECI

19) Dangelo, Dana East Valley ECI

20) Escorcia, Daniel Washington ECI

21) Ferreira, Edward DC Tillman ECI

22) Flores, Aaron DC Tillman ECI

23) Gamez, Jesus Washington ECI

24) Gharios, Brandon Washington ECI

25) Gonzalez, Franklin Washington ECI

26) Gonzalez, Sara N Washington ECI

27) Hernandez, Daniel E DC Tillman ECI

28) Hu, Yuan-Chien DC Tillman ECI

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

29) Kim, Jay J DC Tillman ECI

30) Kuruvilla, Tim East Valley ECI

31) Landeros, Amber East Valley ECI

32) Lara, Jessie East Valley ECI

33) Marinez, Karina DC Tillman ECI

34) Milo, Austin Harbor ECI

35) Mireles, Alyssa Cazador ECI

36) Nguyen, Alexander Cazador ECI

37) Okolue, Benjamine DC Tillman ECI

38) Pearlman, Daniel Harbor ECI

39) Pedrosa, Philip Cazador ECI

40) Powell, Diana Harbor ECI

41) Quiroz, Kioga Washington ECI

42) Rivas, Roberto DC Tillman ECI

43) Rodriguez, Alan Washington ECI

44) Salvacion, Teodoro Washington ECI

45) San Miguel, Jesse DC Tillman ECI

46) Sanchez, Jesus R Washington ECI

47) Saucedo, Jazmine DC Tillman ECI

48) Shrestha, Sudha Washington ECI

49) Speight, Earl Washington ECI

50) Spencer, Karen Washington ECI

51) Tran, Michael Harbor ECI

52) Truong, Daniel Washington ECI

53) Valencia Eduardo DC Tillman ECI

54) Villareal, John DC Tillman ECI

40

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

55) Williams, Brandi DC Tillman ECI

56) Wooten, Jordan Washington ECI

57) Zhang, Andy Washington ECI

## INTERROGATORY NO. 6.

IDENTIFY each and every ENCAMPMENT CLEANUP that was conducted on June 11, 2019 by the CITY, including by providing the type of ENCAMPMENT CLEANUP (CLSA, Rapid Response, etc.), the location of the ENCAMPMENT CLEANUP, the team or detail(s) that participated in the ENCAMPMENT CLEANUP, and the start time and end time of the ENCAMPMENT CLEANUP.

## RESPONSE TO INTERROGATORY NO. 6:

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the interrogatory seeks information that is not relevant to Plaintiff Zamora's specific claims alleged in the SAC for incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard.  *See In re Bard IVC Filters Prods. Liab. Litig.*, 317 F.R.D. 562 (D. Az. 2016). Defendant objects that the interrogatory is overbroad to the extent that it seeks information relating to any individual plaintiff other than Plaintiff Zamora.  *Unilin Beheer B.V. v. NSL Trading Corp.*, No. CV 14-2210 BRO (SSx), 2015 U.S. Dist. LEXIS 192143, *14 (C.D. Cal. Feb. 27, 2015).  In particular, Defendant objects that in order to respond to this interrogatory, Defendant would need to manually collect, analyze and summarize the reports associated with those cleanups, as well as personnel records, requiring Defendant to make a compilation, abstract, audit or summary of its records and such compilation, abstract, audit or summary does not exist.  *Hoffman v. Cnty. of Los Angeles,* Case No. CV-15-03724-FMO(ASx), 2016 U.S. Dist. LEXIS 123515, * 15-16 (C.D. Cal.

41
DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

Jan. 6, 2016); *Estrada v. City & Cnty. of San Francisco*, Case No. 16-cv-00722-MEJ,
2016 U.S. Dist. LEXIS 173740, *4 (N.D. Cal. Dec. 14, 2016).

Subject to and without waiving these objections, Defendant responds as follows:
Defendant has produced electronically exportable information for 2018-2020 from the
AMS database (CTY020221; CTY020330) the MyLA-311database (CTY020223) and
the WPIMS database. (CTY020222; CTY020331).   Defendant refers Plaintiff to these
documents for further response.   F.R.Civ.P. 33(d)(1); *Rainbow Pioneer # 44-18-04A v.
Hawaii-Nevada Inv. Corp.*, 711 F.2d 902, 906 (9th Cir. 1983).   The authorization numbers
and service request numbers associated with a particular cleanup in AMS can be cross-
referenced with the same number in MyLA311, which provides additional information
about the cleanup as well as other information related to service requests, which may or
may not have resulted in a cleanup.   WPIMS lists the names of first and second responders
for each cleanup.   In the "Reason Code" column in the MyLA311 database, code 75 and
code 55 are generally used to denote smaller and larger encampments, respectively, which
may influence whether a CARE or CARE+ team responds.

Encampment cleanup operations conducted on June 11, 2019 are identified in
the WPIMS database (CTY20222) and can be found on the WPIMS excel file starting at
row 8010, Case ID No. 56909, and ending at row 8066, Case ID No. 56981.

In addition, the City produced reports for incidents occurring on June 11, 2019:
CTY000168-325, Case ID NO. 56806; CTY00326-351, Case ID No. 56909; CTY00352-
408, Case ID No. 56974; and CTY000435-459, Case ID No. 56976.   The City has
produced a report for Case ID No. 53162 occurring on June 11, 2019 at Harvard and 5th
Street.   (CTY020332 - CTY020441).   Individuals involved in this incident included ECI
P. Pedrosa and T. Kuruvilla.   The rapid response commenced at approximately at 9:00
a.m. and concluded at approximately 10:30 a.m.   The City produced LAPD incident-
specific documents for June 11, 2019 incidents (CTY002465-2496).   LAPD Officers I.

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

Lucero and L. Bermudez were present at a rapid response conducted at this same time on June 11, 2019 at 3rd and Harvard (CTY002495).

Encampments cleanups conducted on June 11, 2019 (CTY20222) in Council Districts 4 and 10 included the following comprehensive posted cleanups (CSLA) and rapid responses:

**Council District 4**: Rapid Response; Lead ECI M. Tran; Second ECI J. Kim

| Case ID No. | Address |
|---|---|
| 56931 | Los Feliz to Zoo Drive |

**Council District 10:** Posted Comprehensive Cleanup (CSLA); ECI E. Ferreira, CH Villareal

| Case ID No. | Address |
|---|---|
| 56803 | 2350 Washington and Cimarron St. |
| 56806 | 3325 W Wilshire Blvd and Catalina St. |
| 56814 | 8592 Venice and Melvin St. |
| 56812 | 3450 W Wilshire Blvd |
| 56808 | 3300 W Country Club |
| 56815 | Alameda Street |
| 56804 | 3146 Country Club Drive |
| 56805 | 3250 W San Marino St. |

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

| 56807 | 4250 W. 4th St |
|-------|----------------|
| 56809 | 3933 W Wilshire Blvd |
| 56813 | 8620 Beverlywood St |

**Council District 10:** Rapid Response, Lead ECI M. Bates; ECI D. Truong

| Case ID No. | Address |
|-------------|---------|
| 56905 | La Brea and Obama |
| 56947 | Rodeo Place and Crenshaw |
| 56951 | Exposition and Flower |
| 56971 | 4220 Montclair Street and 28th St |
| 56972 | Hoover and 10 Freeway |

**Council District 10:** Rapid Response; Lead: ECI B. Dancel; ECI E. Estrada

| Case ID No. | Address |
|-------------|---------|
| 56967 | Washington and Manhattan |
| 56906 | Pico and Saint Andrews |
| 56973 | 10th and Wilton Place |
| 56974 | Gramercy and Olympic |
| 56976 | Normandie and San Marino St |

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

**Council District 10:** Rapid Response; Lead: ECI P. Pedrosa; ECI T. Kuruvilla

| Case ID No. | Address |
|---|---|
| 56916 | 3rd and Oxford Avenue |
| 56920 | Harvard and 5th St |
| 56983 | 8th and Hobart Blvd |
| 56984 | Vermont and 4th St |

No posting operations (posting surveys) were conducted on June 11, 2019 in Council District 4 or Council District 10.

**INTERROGATORY NO. 7.**

IDENTIFY all individuals employed by or contracted with the CITY who participated in ENCAMPMENT CLEANUPS on June 11, 2019 in Council Districts 4 and 10, including by providing the location of each ENCAMPMENT CLEANUP that the individual participated in on that date.

**RESPONSE TO INTERROGATORY NO. 7:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the interrogatory seeks information that is not relevant to Plaintiff Zamora's specific claims alleged in the SAC for incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard. *See In re Bard IVC Filters Prods. Liab. Litig.*, 317 F.R.D. 562 (D. Az. 2016). Defendant objects that the interrogatory is overbroad to the extent that it seeks information relating to any individual plaintiff other than Plaintiff Zamora. *Unilin Beheer B.V. v. NSL Trading Corp.*, No. CV 14-2210 BRO (SSx), 2015 U.S. Dist. LEXIS 192143,

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

*14 (C.D. Cal. Feb. 27, 2015).  In particular, Defendant objects that in order to respond to this interrogatory, Defendant would need to manually collect, analyze and summarize the reports associated with those cleanups, as well as personnel records, requiring Defendant to make a compilation, abstract, audit or summary of its records and such compilation, abstract, audit or summary does not exist.  *Hoffman v. Cnty. of Los Angeles,* Case No. CV-15-03724-FMO(ASx), 2016 U.S. Dist. LEXIS 123515, * 15-16 (C.D. Cal. Jan. 6, 2016); *Estrada v. City & Cnty. of San Francisco*, Case No. 16-cv-00722-MEJ, 2016 U.S. Dist. LEXIS 173740, *4 (N.D. Cal. Dec. 14, 2016).

Subject to and without waiving these objections, Defendant responds as follows: The authorization numbers and service request numbers associated with a particular cleanup in AMS can be cross-referenced with the same number in MyLA-311, which provides additional information about the cleanup as well as other information related to service calls, which may or may not have resulted in a cleanup.   WPIMS lists the names of first and second responders for each cleanup.  In the "Reason Code" column in the MyLA-311 database, code 75 and code 55 are generally used to denote smaller and larger encampments, respectively, which may influence whether a CARE or CARE+ team responds.  All three databases include a "Council District" column containing information about the Council District associated with each cleanup and/or service request.

Encampment cleanup operations conducted on June 11, 2019 are identified in the WPIMS database (CTY20222) and can be found on the WPIMS excel file starting at row 8010, Case ID No. 56909, and ending at row 8066, Case ID No. 56981.

In addition, the City produced reports for incidents occurring on June 11, 2019: CTY000168-325, Case ID NO. 56806; CTY00326-351, Case ID No. 56909; CTY00352-408, Case ID No. 56974; and CTY000435-459, Case ID No. 56976.   The City has produced a report for Case ID No. 53162 occurring on June 11, 2019 at Harvard and 5th Street.  (CTY020332 - CTY020441).  Individuals involved in this incident included ECI

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

P. Pedrosa and T. Kuruvilla. The rapid response commenced at approximately at 9:00 a.m. and concluded at approximately 10:30 a.m. The City produced LAPD incident-specific documents for June 11, 2019 incidents (CTY002465-2496). LAPD Officers I. Lucero and L. Bermudez were present at a rapid response conducted at this same time on June 11, 2019 at 3rd and Harvard (CTY002495).

Encampments cleanups conducted on June 11, 2019 (CTY20222) in Council Districts 4 and 10 included the following comprehensive posted cleanups (CSLA) and rapid responses:

**Council District 4**: Rapid Response; Lead ECI M. Tran; Second ECI J. Kim

| Case ID No. | Address |
|---|---|
| 56931 | Los Feliz to Zoo Drive |

**Council District 10:** Posted Comprehensive Cleanup (CSLA); ECI E. Ferreira, CH Villareal

| Case ID No. | Address |
|---|---|
| 56803 | 2350 Washington and Cimarron St. |
| 56806 | 3325 W Wilshire Blvd and Catalina St. |
| 56814 | 8592 Venice and Melvin St. |
| 56812 | 3450 W Wilshire Blvd |
| 56808 | 3300 W Country Club |
| 56815 | Alameda Street |

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

| 56804 | 3146 Country Club Drive |
|-------|-------------------------|
| 56805 | 3250 W San Marino St. |
| 56807 | 4250 W. 4th St |
| 56809 | 3933 W Wilshire Blvd |
| 56813 | 8620 Beverlywood St |

**Council District 10:** Rapid Response, Lead ECI M. Bates; ECI D. Truong

| Case ID No. | Address |
|-------------|---------|
| 56905 | La Brea and Obama |
| 56947 | Rodeo Place and Crenshaw |
| 56951 | Exposition and Flower |
| 56971 | 4220 Montclair Street and 28th St |
| 56972 | Hoover and 10 Freeway |

**Council District 10:** Rapid Response; Lead: ECI B. Dancel; ECI E. Estrada

| Case ID No. | Address |
|-------------|---------|
| 56967 | Washington and Manhattan |
| 56906 | Pico and Saint Andrews |
| 56973 | 10th and Wilton Place |
| 56974 | Gramercy and Olympic |

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

| 56976 | Normandie and San Marino St |
|---|---|

**Council District 10:** Rapid Response; Lead: ECI P. Pedrosa; ECI T. Kuruvilla

| Case ID No. | Address |
|---|---|
| 56916 | 3rd and Oxford Avenue |
| 56920 | Harvard and 5th St |
| 56983 | 8th and Hobart Blvd |
| 56984 | Vermont and 4th St |

No posting operations (posting surveys) were conducted on June 11, 2019 in Council District 4 or Council District 10.

**INTERROGATORY NO. 8.**

IDENTIFY each and every ENCAMPMENT CLEANUP that was conducted on March 21, 2019 by the CITY, including by providing the type of ENCAMPMENT CLEANUP (CLSA, Rapid Response, etc.), the location of the ENCAMPMENT CLEANUP, the team or detail(s) that participated in the ENCAMPMENT CLEANUP, and the start time and end time of the ENCAMPMENT CLEANUP.

**RESPONSE TO INTERROGATORY NO. 8:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the interrogatory seeks information that is not relevant to Plaintiff Zamora's specific claims alleged in the SAC for incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard. *See In re Bard IVC Filters Prods. Liab. Litig.*, 317 F.R.D. 562 (D. Az. 2016).

Defendant objects that the interrogatory is overbroad to the extent that it seeks information relating to any individual plaintiff other than Plaintiff Zamora. *Unilin Beheer B.V. v. NSL Trading Corp.*, No. CV 14-2210 BRO (SSx), 2015 U.S. Dist. LEXIS 192143, *14 (C.D. Cal. Feb. 27, 2015). In particular, Defendant objects that in order to respond to this interrogatory, Defendant would need to manually collect, analyze and summarize the reports associated with those cleanups, as well as personnel records, requiring Defendant to make a compilation, abstract, audit or summary of its records and such compilation, abstract, audit or summary does not exist. *Hoffman v. Cnty. of Los Angeles,* Case No. CV-15-03724-FMO(ASx), 2016 U.S. Dist. LEXIS 123515, * 15-16 (C.D. Cal. Jan. 6, 2016); *Estrada v. City & Cnty. of San Francisco*, Case No. 16-cv-00722-MEJ, 2016 U.S. Dist. LEXIS 173740, *4 (N.D. Cal. Dec. 14, 2016).

Subject to and without waiving these objections, Defendant responds as follows: Defendant has produced electronically exportable information for 2018-2020 from the AMS database (CTY020221; CTY020330) the MyLA-311database (CTY020223) and the WPIMS database. (CTY020222; CTY020331). F.R.Civ.P. 33(d)(1); *Rainbow Pioneer # 44-18-04A v. Hawaii-Nevada Inv. Corp.*, 711 F.2d 902, 906 (9th Cir. 1983). The authorization numbers and service request numbers associated with a particular cleanup in AMS can be cross-referenced with the same number in MyLA311, which provides additional information about the cleanup as well as other information related to service requests, which may or may not have resulted in a cleanup. WPIMS lists the names of first and second responders for each cleanup. In the "Reason Code" column in the MyLA311 database, code 75 and code 55 are generally used to denote smaller and larger encampments, respectively, which may influence whether a CARE or CARE+ team responds.

Encampment cleanup operations conducted on March 21, 2019 are identified in the WPIMS database (CTY20222) and can be found on the WPIMS excel file starting at

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

row 5672, Case ID No. 53125, and ending at row 5718, Case ID No. 53162.

In addition, the City produced the incident report and related documents for Zamora's alleged incident on March 21, 2019 (CTY000079-167), identified as Case ID No. 53162 for a Rapid Response incident occurring at 6th Street and Kingsley.  Individuals involved in this incident included ECI M. Tran, P. Pedrosa, J. Saucedo, and J. Gamez. The rapid response commenced at approximately 10:38 a.m. and concluded at approximately 11:34 a.m.  The City produced LAPD incident-specific documents for March 21, 2019 (CTY002423-2447).  LAPD Officers I. Lucero and C. Argueta were present at 6th Street and Kingsley (CTY002443).

Encampments cleanups conducted on March 21, 2019 (CTY20222) in Council Districts 4, 9, and 10 included the following comprehensive posted cleanups (CSLA) and rapid responses:

**Council District 4:**  Comprehensive Posted Cleanups (CSLA): Lead ECI D. Pearlman, and Second ECIs A. Mireles, ECI S. Calleros and CH S. Camacho:

| Case ID No. | Address |
|---|---|
| 53037 | 1425 N Sierra Bonita Ave |
| 53038 | 1427 N La Brea Avenue |
| 53039 | 7140 Sunset Blvd |
| 53040 | 7408 W. Sunset Blvd |
| 53041 | 7720 W. Sunset Blvd |
| 53042 | 7022 Sunset Blvd |

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

| 53043 | 4503 W. Hollywood Blvd |
|-------|------------------------|
| 53044 | 1561 N. Lyman Place |

**Council District 4:**  Rapid Response, Lead: ECI G. Lara; Second ECIs B. Dancel, S. Cruz, and T. Kuruvilla.

| Case ID No. | Address |
|-------------|---------|
| 53172 | 10th and Wilton |
| 53173 | 3rd and Western |

**Council District 9:** Comprehensive Posted Cleanups (CSLA): Lead ECI A. Abrahamian; Second ECIs D. D'Angelo, J. Kim, Clean Harbors L. Sanchez

| Case ID No. | Address |
|-------------|---------|
| 52959 | 5725 S San Pedro |
| 52961 | 416 W 52nd Street |
| 52960 | 52nd Place |
| 52962 | 52nd Place |
| 52958 | 353 W48th Street |
| 52956 | 295 E 48th Street |
| 52957 | 317 W45th Street |

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

| 52963 | 334 W 54th Street |
|-------|-------------------|

**Council District 10:** Rapid Response; Lead ECI M. Tran; Second ECIs P. Pedrosa, J. Saucedo, J. Gamez

| Case ID No. | Address |
|-------------|---------|
| 53158 | 3rd and Western |
| 53159 | Duplicate of Case ID 53158 (extra case number generated) |
| 53160 | 6th and Manhattan |
| 53161 | Duplicate of Case ID 53160 (extra case number generated) |
| 53162 | 6th and Kingsley Drive |
| 53163 | Duplicate of Case ID 53162 (extra case number generated) |

No posting operations (posting surveys) were conducted on March 21, 2019 in Council District 4, Council District 9 or Council District 10.

**INTERROGATORY NO. 9.**

IDENTIFY all individuals employed by or contracted with the CITY who participated in ENCAMPMENT CLEANUPS on March 21, 2019 in Council Districts 4, 9, and 10, including by providing the location of each ENCAMPMENT CLEANUP that the individual participated in on that date.

**RESPONSE TO INTERROGATORY NO. 9:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the interrogatory seeks information that is not relevant to Plaintiff

Zamora's specific claims alleged in the SAC for incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard. *See In re Bard IVC Filters Prods. Liab. Litig.*, 317 F.R.D. 562 (D. Az. 2016). Defendant objects that the interrogatory is overbroad to the extent that it seeks information relating to any individual plaintiff other than Plaintiff Zamora. *Unilin Beheer B.V. v. NSL Trading Corp.*, No. CV 14-2210 BRO (SSx), 2015 U.S. Dist. LEXIS 192143, *14 (C.D. Cal. Feb. 27, 2015). In particular, Defendant objects that in order to respond to this interrogatory, Defendant would need to manually collect, analyze and summarize the reports associated with those cleanups, as well as personnel records, requiring Defendant to make a compilation, abstract, audit or summary of its records and such compilation, abstract, audit or summary does not exist. *Hoffman v. Cnty. of Los Angeles,* Case No. CV-15-03724-FMO(ASx), 2016 U.S. Dist. LEXIS 123515, * 15-16 (C.D. Cal. Jan. 6, 2016); *Estrada v. City & Cnty. of San Francisco*, Case No. 16-cv-00722-MEJ, 2016 U.S. Dist. LEXIS 173740, *4 (N.D. Cal. Dec. 14, 2016).

Subject to and without waiving these objections, Defendant responds as follows: The authorization numbers and service request numbers associated with a particular cleanup in AMS can be cross-referenced with the same number in MyLA-311, which provides additional information about the cleanup as well as other information related to service calls, which may or may not have resulted in a cleanup. WPIMS lists the names of first and second responders for each cleanup. In the "Reason Code" column in the MyLA-311 database, code 75 and code 55 are generally used to denote smaller and larger encampments, respectively, which may influence whether a CARE or CARE+ team responds. All three databases include a "Council District" column containing information about the Council District associated with each cleanup and/or service request.

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

Encampment cleanup operations conducted on March 21, 2019 are identified in the WPIMS database (CTY20222) and can be found on the WPIMS excel file starting at row 5672, Case ID No. 53125, and ending at row 5718, Case ID No. 53162.

In addition, the City produced the incident report and related documents for Zamora's alleged incident on March 21, 2019 (CTY000079-167), identified as Case ID No. 53162 for a Rapid Response incident occurring at 6th Street and Kingsley. Individuals involved in this incident included ECI M. Tran, P. Pedrosa, J. Saucedo, and J. Gamez. The rapid response commenced at approximately 10:38 a.m. and concluded at approximately 11:34 a.m. The City produced LAPD incident-specific documents for March 21, 2019 (CTY002423-2447). LAPD Officers I. Lucero and C. Argueta were present at 6th Street and Kingsley (CTY002443).

Encampments cleanups conducted on March 21, 2019 (CTY20222) in Council Districts 4, 9, and 10 included the following comprehensive posted cleanups (CSLA) and rapid responses:

**Council District 4:**  Comprehensive Posted Cleanups (CSLA): Lead ECI D. Pearlman, and Second ECIs A. Mireles, ECI S. Calleros and CH S. Camacho:

| Case ID No. | Address |
|---|---|
| 53037 | 1425 N Sierra Bonita Ave |
| 53038 | 1427 N La Brea Avenue |
| 53039 | 7140 Sunset Blvd |
| 53040 | 7408 W. Sunset Blvd |
| 53041 | 7720 W. Sunset Blvd |

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

| 53042 | 7022 Sunset Blvd |
|-------|------------------|
| 53043 | 4503 W. Hollywood Blvd |
| 53044 | 1561 N. Lyman Place |

**Council District 4:** Rapid Response, Lead: ECI G. Lara; Second ECIs B. Dancel, S. Cruz, and T. Kuruvilla.

| Case ID No. | Address |
|-------------|---------|
| 53172 | 10th and Wilton |
| 53173 | 3rd and Western |

**Council District 9:** Comprehensive Posted Cleanups (CSLA): Lead ECI A. Abrahamian; Second ECIs D. D'Angelo, J. Kim, Clean Harbors L. Sanchez

| Case ID No. | Address |
|-------------|---------|
| 52959 | 5725 S San Pedro |
| 52961 | 416 W 52nd Street |
| 52960 | 52nd Place |
| 52962 | 52nd Place |
| 52958 | 353 W48th Street |
| 52956 | 295 E 48th Street |

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

| 52957 | 317 W45th Street |
|-------|------------------|
| 52963 | 334 W 54th Street |

**Council District 10:** Rapid Response; Lead ECI M. Tran; Second ECIs P. Pedrosa, J. Saucedo, J. Gamez

| Case ID No. | Address |
|-------------|---------|
| 53158 | 3rd and Western |
| 53159 | Duplicate of Case ID 53158 (extra case number generated) |
| 53160 | 6th and Manhattan |
| 53161 | Duplicate of Case ID 53160 (extra case number generated) |
| 53162 | 6th and Kingsley Drive |
| 53163 | Duplicate of Case ID 53162 (extra case number generated) |

No posting operations (posting surveys) were conducted on March 21, 2019 in Council District 4, Council District 9 or Council District 10.

**INTERROGATORY NO. 10.**

IDENTIFY each and every individual working in the City Council offices for Council Districts 4, 6, 9, 10, 13 and 15 who have been assigned to or are responsible for working with LA Sanitation and/or LAPD to schedule the deployment of LA Sanitation or other city resources to conduct ENCAMPMENT CLEANUPS, at any time since July 1, 2018.

**RESPONSE TO INTERROGATORY NO. 10:**

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the interrogatory seeks information that is not relevant to Plaintiff Zamora's specific claims alleged in the SAC for incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard.  *See In re Bard IVC Filters Prods. Liab. Litig.*, 317 F.R.D. 562 (D. Az. 2016). Defendant objects that the interrogatory is overbroad to the extent that it seeks information relating to any individual plaintiff other than Plaintiff Zamora and information dating back to July 1, 2018.  *Unilin Beheer B.V. v. NSL Trading Corp.*, No. CV 14-2210 BRO (SSx), 2015 U.S. Dist. LEXIS 192143, *14 (C.D. Cal. Feb. 27, 2015); *see also Rivera v. Nibco, Inc.*, 364 F.3d 1057, 1072 (9th Cir. 2004) ("District courts need not condone the use of discovery to engage in fishing expeditions.").

Defendant objects that the interrogatory is not proportional to the needs of the case, insofar as the burden or expense of searching for and producing information dating back to July 1, 2018 outweighs the benefit of any such discovery to Plaintiff Zamora's specific claims alleged in the SAC.  *See IBP, Inc. v. Mercantile Bank*, 179 F.R.D. 316, 321 (D. Kan. 1998); *Bashkin v. San Diego Cnty.*, Case No. 08-CV-1450-WQH (WVG), 2011 U.S. Dist. LEXIS 3439, at * 4-5 (S.D. Cal. Jan. 13, 2011).  Defendant does not dispute that it promulgated LAMC 56.11 and enforced it in the relevant time period.  *See Thompson v. City of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989) ("A rule or regulation promulgated, adopted, or ratified by a local governmental entity's legislative body unquestionably satisfies Monell's policy requirements."), *overruled on other grounds by Bull v. City & Cty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010).  Defendant objects that the interrogatory contains subparts seeking information on distinct subjects and these subparts constitute separate interrogatories against Plaintiff's limit of 25. F.R.Civ.P. 33(a); *Collaboration Props. v. Polycorn, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004).

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

Defendant further objects that Councilmember Ryu (formerly Councilmember for CD 4) left office in November 2020 and Councilmember Wesson (formerly Councilmember for CD 10) left office in December 2020 and the staff in the council districts has changed significantly as a result of the departures, which increases the burden of investigating historical information in response to this interrogatory. Defendant further objects that this interrogatory requires Defendant to make a compilation, abstract, audit or summary of its records and such compilation, abstract, audit or summary does not exist. *Hoffman v. Cnty. of Los Angeles,* Case No. CV-15-03724-FMO(ASx), 2016 U.S. Dist. LEXIS 123515, * 15-16 (C.D. Cal. Jan. 6, 2016); *Estrada v. City & Cnty. of San Francisco*, Case No. 16-cv-00722-MEJ, 2016 U.S. Dist. LEXIS 173740, *4 (N.D. Cal. Dec. 14, 2016). Defendant objects to any further response to this interrogatory, but will meet and confer with Plaintiff regarding the relevance, if any, to Plaintiff Zamora's specific alleged claims and proportionality of the interrogatory under Rule 26(b). Without waiving any, and based on these objections, Defendant objects to any further response to this interrogatory, but will meet and confer with Plaintiff regarding the relevance, if any, to Plaintiff Zamora's specific alleged claims and proportionality of the interrogatory under Rule 26(b).

Subject to and without waiving these objections, Defendant responds as follows: Individuals working for Council Districts 4, 6, 9, 10, 13 and 15 who typically communicate with LASAN regarding homeless encampment cleanups, or who communicated with LASAN regarding homeless encampment cleanups in the past, are listed below:

Council District 4:

- Alice Roth, Field Deputy  (2/2017-5/2019)
- Nikki Ezhari, Field Deputy (2/2017-5/2019)
- Catherine Landers, Field Deputy (2/2017-5/2019)

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

- Shannon Prior, Field Deputy  (2/2017-5/2019)
- Brad Fingard, Field Deputy (8/1/2019 - 6/2020)
- Elizabeth Oh, Homeless Coordinator (1/2021 to present)

Council District 6:
- Marcos Sanchez, District Director (7/1/2018 to present)
- Lorena Bernal, Field Deputy (7/1/2018 to present)

Council District 9:
- James Westbrooks, Deputy Chief of Staff & Director of District Operations (7/1/2018 to present)
- Nora Gutierrez, Senior Field Deputy (7/1/2018 to present)

Council District 10:
- Cairo Rodgriguez, Deputy (7/1/2018 to 12/12/20)
- Jamie Hwang, Deputy (7/1/2018 to 12/12/20)
- Elizabeth Carlin, Deputy (7/1/2018 to 12/12/20)
- Billie Green, Deputy (7/1/2018 to 12/12/20)
- Albert Lord, Deputy (7/1/2018 to 12/12/20)
- Kimani Black, Assistant District Director (7/1/2018 to 12/12/20)
- Dhakshike Wickrema, Senior Director for Mental Health and Homeless Advocacy (1/2021 to present)
- Mayra Guevara, Staff Assistant (1/2021 to present)
- Kimani Black, Senior Deputy for Constituent Services (1/2021 to present)
- Mary Jones, Deputy for Constituent Services (1/2021 to present)

60
DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

Council District 13:

- Hector Vega, Field Deputy (7/1/2018 to present)

Council District 15:

- Caitlin Muldoon, Field Deputy (7/1/2018 to present)
- Isabella Blue, Constituent Services Deputy (7/1/2018 to present)
- Gabriela Medina, District Director (7/1/2018 to present)

**INTERROGATORY NO. 11.**

IDENTIFY each and every individual employed by the CITY as an Environmental Compliance Inspector (or officer), including Chief Environmental Compliance Inspector(s) and Assistant Environmental Compliance Inspector, who has participated in ENCAMPMENT CLEANUPS since January 1, 2018, including the dates they held those positions.

**RESPONSE TO INTERROGATORY NO. 11:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the interrogatory seeks information that is not relevant to Plaintiff Zamora's specific claims alleged in the SAC for incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard. *See In re Bard IVC Filters Prods. Liab. Litig.*, 317 F.R.D. 562 (D. Az. 2016). Defendant objects that the interrogatory is overbroad to the extent that it seeks information relating to any individual plaintiff other than Plaintiff Zamora and information dating back to January 1, 2018. *Unilin Beheer B.V. v. NSL Trading Corp.*, No. CV 14-2210 BRO (SSx), 2015 U.S. Dist. LEXIS 192143, *14 (C.D. Cal. Feb. 27, 2015). Defendant objects that the interrogatory is not proportional to the needs of the case, insofar as the burden or expense of searching for and producing information dating

61

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

back to 2018 outweighs the benefit of such discovery to Plaintiff Zamora's specific claims alleged in the SAC.  For the period January 1, 2018 to July 31, 2020 alone, Defendant has identified 32,730 incidents within WPIMS constituting "encampment cleanups"; Plaintiffs' incidents represent only a small subgroup of those cleanups and all relevant information related to those cleanups has been produced and intends to produce any supplementary documents it locates in its investigation.  *See IBP, Inc. v. Mercantile Bank*, 179 F.R.D. 316, 321 (D. Kan. 1998); *Bashkin v. San Diego Cnty.*, Case No. 08-CV-1450-WQH (WVG), 2011 U.S. Dist. LEXIS 3439, at * 4-5 (S.D. Cal. Jan. 13, 2011).  In order to respond to this interrogatory, Defendant would need to manually collect, analyze and summarize the Watershed reports associated with those cleanups, as well as personnel records, thus requiring Defendant to make a compilation, abstract, audit or summary of its records and such compilation, abstract, audit or summary does not exist.  *Hoffman v. Cnty. of Los Angeles,* Case No. CV-15-03724-FMO(ASx), 2016 U.S. Dist. LEXIS 123515, * 15-16 (C.D. Cal. Jan. 6, 2016); *Estrada v. City & Cnty. of San Francisco*, Case No. 16-cv-00722-MEJ, 2016 U.S. Dist. LEXIS 173740, *4 (N.D. Cal. Dec. 14, 2016).  Defendant objects that the interrogatory contains subparts seeking information on distinct subjects and these subparts constitute separate interrogatories against Plaintiff's limit of 25.  F.R.Civ.P. 33(a); *Collaboration Props. v. Polycorn, Inc.*, 224 F.R.D. 473,475 (N.D. Cal. 2004).

Subject to and without waiving these objections, Defendant responds as follows: Defendant has produced documents that contain information responsive to this request and refers Plaintiff to these documents for further response.   F.R.Civ.P. 33(d)(1); *Rainbow Pioneer # 44-18-04A v. Hawaii-Nevada Inv. Corp.*, 711 F.2d 902, 906 (9th Cir. 1983).  More specifically:  ECIs involved in cleanups 2018-2020 are listed in column E ("First Responder") and column F ("Second Responder") in the WPIMS database export produced at Bates Nos. CTY020222 and CTY020331.  Defendant also has produced

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

Watershed Protection Division reports associated with the incidents alleged in the complaint, which typically identify the names of ECIs involved in those cleanups. *See* Bates Nos. CTY000001- CTY002369; CTY003240-CTY004085. Concurrently served with these Amended Responses is an Excel spreadsheet that reflects the trainings of LSD employees that are maintained by the Industrial Safety and Compliance Division ("ISCD"), which reflects the names and titles of LSD employees and relevant dates. This spreadsheet will be included in the City's next production.

With respect to incidents alleged by Plaintiff Zamora on March 21, 2019 and June 11, 2019:

Encampment cleanup operations conducted on March 21, 2019 are identified in the WPIMS database (CTY20222) and can be found on the WPIMS excel file starting at row 5672, Case ID No. 53125, and ending at row 5718, Case ID No. 53162. The City produced the incident report and related documents for Zamora's alleged incident on March 21, 2019 (CTY000079-167), identified as Case ID No. 53162 for a Rapid Response incident occurring at 6th Street and Kingsley. Individuals involved in this incident included ECI M. Tran, P. Pedrosa, J. Saucedo, and J. Gamez.

Encampment cleanups conducted on June 11, 2019 are identified in the WPIMS database (CTY20222) and can be found on the WPIMS excel file starting at row 8010, Case ID No. 56909, and ending at row 8066, Case ID No. 56981. The City produced reports for incidents occurring on June 11, 2019: CTY000168-325, Case ID NO. 56806; CTY00326-351, Case ID No. 56909; CTY00352-408, Case ID No. 56974; and CTY000435-459, Case ID No. 56976. The City has produced a report for Case ID No. 53162 occurring on June 11, 2019 at Harvard and 5th Street. (CTY020332 - CTY020441). Individuals involved in this incident included ECI P. Pedrosa and T. Kuruvilla.

Also, the following is a list of Environmental Compliance Inspectors active in

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

Livability Services Division as of October 28, 2020:

1) Anderson, Demetress Washington ECI

2) Anguiano, Berenice Cazador ECI

3) Arevalo, Samantha DC Tillman ECI

4) Arvayo, Sergio Washington ECI

5) Arzoumanian, Arek Dct ECI

6) Avendano, Ashley DC Tillman ECI

7) Awujo, Felix (Awugo In Sdoa) Washington ECI

8) Bartz, Jaqueline Harbor ECI

9) Bates, Matthew Harbor ECI

10) Beattie, Romy DC Tillman ECI

11) Calleros, Shayla Washington ECI

12) Camacho, Rachel East Valley ECI

13) Campos, Gilberto DC Tillman ECI

14) Cardenas, Daniela Cazador ECI

15) Chebatoris, Karen Washington ECI

16) Cruz, Stephany Washington ECI

17) Damron, Andrew DC Tillman ECI

18) Dancel, Bernard Cazador ECI

19) Dangelo, Dana East Valley ECI

20) Escorcia, Daniel Washington ECI

21) Ferreira, Edward DC Tillman ECI

22) Flores, Aaron DC Tillman ECI

23) Gamez, Jesus Washington ECI

24) Gharios, Brandon Washington ECI

25) Gonzalez, Franklin Washington ECI

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

26) Gonzalez, Sara N Washington ECI

27) Hernandez, Daniel E DC Tillman ECI

28) Hu, Yuan-Chien DC Tillman ECI

29) Kim, Jay J DC Tillman ECI

30) Kuruvilla, Tim East Valley ECI

31) Landeros, Amber East Valley ECI

32) Lara, Jessie East Valley ECI

33) Marinez, Karina DC Tillman ECI

34) Milo, Austin Harbor ECI

35) Mireles, Alyssa Cazador ECI

36) Nguyen, Alexander Cazador ECI

37) Okolue, Benjamine DC Tillman ECI

38) Pearlman, Daniel Harbor ECI

39) Pedrosa, Philip Cazador ECI

40) Powell, Diana Harbor ECI

41) Quiroz, Kioga Washington ECI

42) Rivas, Roberto DC Tillman ECI

43) Rodriguez, Alan Washington ECI

44) Salvacion, Teodoro Washington ECI

45) San Miguel, Jesse DC Tillman ECI

46) Sanchez, Jesus R Washington ECI

47) Saucedo, Jazmine DC Tillman ECI

48) Shrestha, Sudha Washington ECI

49) Speight, Earl Washington ECI

50) Spencer, Karen Washington ECI

51) Tran, Michael Harbor ECI

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

52) Truong, Daniel Washington ECI

53) Valencia Eduardo DC Tillman ECI

54) Villareal, John DC Tillman ECI

55) Williams, Brandi DC Tillman ECI

56) Wooten, Jordan Washington ECI

57) Zhang, Andy Washington ECI

**INTERROGATORY NO. 12.**

For each discrete body-worn video produced by the City of Los Angeles on October 8, 2020 in response to Plaintiffs' Request for Production of Documents, Set One, IDENTIFY the footage and provide the badge number, rank and detail or assignment of the individual officer who was wearing the body camera which recorded the footage.

**RESPONSE TO INTERROGATORY NO. 12:**

Defendant incorporates the General Objections as though fully set forth here. Subject to and without waiving these objections, Defendant responds as follows: See AMENDED Exhibit A hereto, which is a chart containing responsive information.

**INTERROGATORY NO. 13.**

IDENTIFY all databases or enterprise system used by the Livability Services Division, Unified Homeless Response Center, LAPD or any other CITY department or agency to compile data or to document any aspect of any ENCAMPMENT CLEANUPS, including but not limited to the scheduling of ENCAMPMENT CLEANUPS, property seized or discarded pursuant to ENCAMPMENT CLEANUPS, postings of notices related to ENCAMPMENT CLEANUPS, by listing 1) the name of the database; 2) a brief statement of the database's purpose; 3) a general description of the types of data that is collected; 4) who is responsible for collecting data; 5) who is responsible for entering data into the database or system; 6) how often data is collected.

**RESPONSE TO INTERROGATORY NO. 13:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the interrogatory seeks information that is not relevant to Plaintiff Zamora's specific claims alleged in the SAC for incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard. *See In re Bard IVC Filters Prods. Liab. Litig.*, 317 F.R.D. 562 (D. Az. 2016). Defendant objects that the interrogatory is overbroad to the extent that it seeks information relating to any individual plaintiff other than Plaintiff Zamora. *Unilin Beheer B.V. v. NSL Trading Corp.*, No. CV 14-2210 BRO (SSx), 2015 U.S. Dist. LEXIS 192143, *14 (C.D. Cal. Feb. 27, 2015). Defendant objects that the interrogatory is not proportional to the needs of the case, insofar as the burden or expense of searching for and producing information outweighs the benefit of such discovery to Plaintiff Zamora's specific claims alleged in the SAC. *See IBP, Inc. v. Mercantile Bank*, 179 F.R.D. 316, 321 (D. Kan. 1998); *Bashkin v. San Diego Cnty.*, Case No. 08-CV-1450-WQH (WVG), 2011 U.S. Dist. LEXIS 3439, at * 4-5 (S.D. Cal. Jan. 13, 2011). Defendant does not dispute that it promulgated LAMC 56.11 and enforced it in the relevant time period. *See Thompson v. City of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989) ("A rule or regulation promulgated, adopted, or ratified by a local governmental entity's legislative body unquestionably satisfies Monell's policy requirements."), *overruled on other grounds by Bull v. City & Cty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010).

Defendant further objects that Plaintiff's definition of "IDENTIFY" is overbroad. *See Unilin Beheer B.V. v. NSL Trading Corp.*, No. CV 14-2210 BRO (SSx), 2015 U.S. Dist. LEXIS 192143, *14 (C.D. Cal. Feb. 27, 2015); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007). Defendant further objects that the interrogatory requires Defendant not only to IDENTIFY every database across multiple City departments and not specify every employee who collected or entered information into the database, which would require the Defendant to make a compilation, abstract, audit or summary of its business

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

records and such a compilation, abstract, audit or summary does not exist.  *Hoffman v. Cnty. of Los Angeles,* Case No. CV-15-03724-FMO(ASx), 2016 U.S. Dist. LEXIS 123515, * 15-16 (C.D. Cal. Jan. 6, 2016); *Estrada v. City & Cnty. of San Francisco*, Case No. 16-cv-00722-MEJ, 2016 U.S. Dist. LEXIS 173740, *4 (N.D. Cal. Dec. 14, 2016). Defendant further objects that the interrogatory contains subparts seeking information on distinct subjects and these subparts constitute separate interrogatories against Plaintiff's limit of 25.  F.R.Civ.P. 33(a); *Collaboration Props. v. Polycorn, Inc.*, 224 F.R.D. 473,475 (N.D. Cal. 2004).

Defendant objects that the manner in which information about cleanups is stored has no relevance to whether Plaintiffs' constitutional rights were violated or whether LAMC 56.11 is facially unconstitutional.  Defendant objects that it has produced the electronically exportable information from the relevant databases for the period 2018-2020 in response to Plaintiffs' request for production, which includes the name of the database and shows the type of data that is collected.

Subject to and without waiving these objections, Defendant responds as follows: Documents responsive to this interrogatory were produced by Defendant and are referenced below by Bates Number.  Defendant refers Plaintiff to these documents for further response.  F.R.Civ.P. 33(d)(1); Rainbow Pioneer # 44-18-04A v. Hawaii-Nevada Inv. Corp., 711 F.2d 902, 906 (9th Cir. 1983).

**(a) MYLA 311:** MyLA 311 is a database that contains citywide service requests including service requests to be addressed by LASAN, as well as some of the data that is stored in AMS. See CTY020223.  MyLA 311 uses fields and codes to log information relating to service requests, including requests for homeless encampment cleanups, illegal dumping, and other requests.  A service request is typically initiated in one of three ways – by a person: (1) calling the LASAN Customer Care Center, which request is then inputted into the database by the LASAN agent/operator who took the call; (2) using the self-service mobile application, which generates a service ticket and populates certain fields in MyLA 311; and (3) using the "Create Service Ticket" function on the MyLA

311 or LASAN website, which generates a service ticket and populates certain fields in MyLA 311.  Under some circumstances, a service request may also be made by a LASAN employee who observes an item located in the public right of way (recorded as a "Driver Self Report").   The "Source of Request Code" field in MyLA 311 shows the manner in which any particular request was initiated.

When a service ticket is initiated in MyLA 311 as a result of a request, the system generates a Service Request Number and based on available information, populates various fields, namely the Service Request Address, Service Request Type, Creation Date, Source of Request, Service Date (based on pre-established dates on which various geographical locations in the City are serviced), names of requestor (or "proxy" for anonymous requestors), the department responsible for servicing the request (Ticket Owner), Council District, and where appropriate, certain portions of the Item and/or Comments fields.  The Assigned To field is also populated by the system based on which of the six district yards is assigned to service the location: EV–East Valley, NC–North Central, SLA–South LA, WLA–West LA, HB–Harbor, and WV–West Valley.

The remaining fields, including Reason Code, Resolution Code, Driver Names, Truck Number, Last Updated By Agent, Resolution, certain portions of the Item and/or Comments fields, and Date Service Rendered fields, are populated based on information provided by the LASAN employee(s) involved in investigating and/or servicing the request.  In many instances, employees investigating or servicing requests will transmit such information to MyLA 311 by using a mobile application called SANSTAR, a mobile fulfillment system designed to transmit certain data to and from MyLA 311 and other databases.  The Resolution codes are as follows:

A – Completed

AS – Already Serviced

B –Duplicated Request

C – Cancelled

CNPS – Cancelled by Parent SR

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

CPS – Closed by Parent SR

CR – Complaint Resolved

E – Address Not in City Limits

F – Non-City Service At Address

GI – General Information

NCPP – Not at Curb/On Private Property

NEP – No Encampment Present

NHHP – No Health Hazard Present

Q – Item Not Out

T – Transferred Call

US – Unable to Schedule

The Authorization Date and Authorization Number fields are populated by the MyLA 311 system based on information entered in the Authorization Management System (AMS).

**(b) AMS:** AMS is an acronym for Authorization Management System. This database contains information about authorizations for noticed (comprehensive) cleanups. See CTY020221 (2018-2019 data export) and CTY020330 (2019-2020 data export); see also CTY014742 - CTY014751 ("LSD Public Right of Way Verification (AMS)"). The Service Request Number, Address and Council District fields are automatically populated from MyLA 311 data. Most of the other fields, including the Date Approved, Cross Streets, and Location Comments are typically entered by LASAN administrative clerks, or additional staff. The "Submitted by" field reflects the name of the person who inputted information related to Authorizations. The administrative clerks who presently served in this role are Tiffany Hill, who began serving in this role in 2019, and Jocelyn Hernandez and Diana Gonzalez, both of whom served in this role in 2018 and 2019 as well. Other staff who may have submitted information in prior years as reflected by the Submitted By field were Sabrena Edwards, Angel Ibarra, Leon Ho, Danielle Maldonado, George Faavae, and Cassandra Serrano. Information in the

Expiration Date field as related to authorizations is program-generated based on a preset algorithm. The field showing the relevant LAPD precinct is also program-generated based on the location at issue.

Certain data about scouting events, which are operations during which time the locations at issue are assessed for, among things, potential cleanup operations and notice posting locations, was once in development for use in AMS. It is not currently known if that functionality will ever be developed and implemented at a later date.

**(c) WPIMS:** WPIMS is an acronym for Watershed Protection Information Management System. This database contains basic data about encampment cleanups including dates and addresses of cleanups, identification of relevant Council Districts, names of LASAN responders, and resolution information. See CTY020222 (2018-2019 WPIMS data export) and CTY020331 (2019-2020 WPIMS data export). Starting in 2019, WPIMS also includes itemized data collection, which provides estimates of how much, e.g., pounds of waste and urine feces, number of sharps, drug paraphernalia, reactive and ignitable compounds, were collected. The Call Received By field typically identifies the ECI who first acknowledged and/or reviewed a service request for an encampment cleanup.

The WPIMs database also houses documents related to the cleanups, including Watershed Protection Division, Livability Services Division reports, notice-posting surveys, waste manifests where applicable, and health hazard assessments. Such documents are typically uploaded to the WPIMs system by one of the ECIs who participated in the cleanup. There is no automated method for exporting such documents from WPIMS; instead, each such document must be downloaded manually one document or report at a time. The First Responder column typically identifies the ECI who was responsible for overseeing or directing the resolution of the service request for that encampment cleanup. The First Responder column also identifies the ECI who typically would have inputted any information in the Resolution field and would have recorded the number or amount of specific items collected during the cleanup, e.g., estimated pounds

of waste and urine feces, number of sharps, drug paraphernalia, reactive and ignitable compounds, based on information received from the field team members involved in the cleanup.

**(d) Collection Information System (CIS):** CIS is a database that is used to track the various commodities collected; commodity tonnages; refuse collection truck operator routes, hours worked, and the locations where the commodities are disposed (landfills); the collection or delivery of trash bins; and work order charges. Administrative clerks enter data collected from refuse collection truck operators into CIS. The CIS database can be queried in different ways, for different reasons, at the request of different persons, departments or entities, which results in the generation a variety of different kinds of reports. The information contained in CIS is used by multiple divisions for different reasons, including for residential collection services, tracking bins, calculation of tipping fees, work order charges for waste collection services, and calculation of total tonnages. Total CARE/CARE+ tonnage data is pulled monthly from CIS and used in weekly reports to the Mayor's Office and Council Districts. The weekly reports contain information about CARE homeless encampment service requests, sources of requests, and monthly tonnage among other data points. See Bates Nos. CTY019337-CTY020160 (2019-2020 weekly reports to the Mayor's Office and Council Districts).

## INTERROGATORY NO. 14.

For each of the databases or enterprise systems identified in response to Interrogatory 13, IDENTIFY any reports, summaries, data analysis or other outputs that have been generated related to ENCAMPMENT CLEANUPS since January 1, 2019 by providing 1) the name of the report, summary, etc.; 2) IDENTIFYING who generated the data; 3) the purpose of the report, summary, analysis or other output; 4) to whom the report, summary, etc., was distributed; 5) the date the report, summary, etc. was generated. If the report, summary, etc., was generated more than once or is generated on

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

a regular basis, identify the frequency with which the report is generated (daily, weekly, quarterly, etc).

**RESPONSE TO INTERROGATORY NO. 14:**

Defendant incorporates the General Objections as though fully set forth here. Defendant objects that the interrogatory seeks information that is not relevant to Plaintiff Zamora's specific claims alleged in the SAC for incidents occurring on or around March 21, 2019 at 6th Street and Ardmore and on or around June 11, 2019 at 5th Street and Harvard.  *See In re Bard IVC Filters Prods. Liab. Litig.*, 317 F.R.D. 562 (D. Az. 2016). Defendant objects that the interrogatory is overbroad to the extent that it seeks information relating to any individual plaintiff other than Plaintiff Zamora.  *Unilin Beheer B.V. v. NSL Trading Corp.*, No. CV 14-2210 BRO (SSx), 2015 U.S. Dist. LEXIS 192143, *14 (C.D. Cal. Feb. 27, 2015).  Defendant objects that the interrogatory is not proportional to the needs of the case, insofar as the burden or expense of searching for and producing information outweighs the benefit of such discovery to Plaintiff Zamora's specific claims alleged in the SAC.  *See IBP, Inc. v. Mercantile Bank*, 179 F.R.D. 316, 321 (D. Kan. 1998); *Bashkin v. San Diego Cnty.*, Case No. 08-CV-1450-WQH (WVG), 2011 U.S. Dist. LEXIS 3439, at * 4-5 (S.D. Cal. Jan. 13, 2011).  Defendant does not dispute that it promulgated LAMC 56.11 and enforced it in the relevant time period.  *See Thompson v. City of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989) ("A rule or regulation promulgated, adopted, or ratified by a local governmental entity's legislative body unquestionably satisfies Monell's policy requirements."), *overruled on other grounds by Bull v. City & Cty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010).

Defendant further objects that Plaintiff's definition of "IDENTIFY" is overbroad. *See Unilin Beheer B.V. v. NSL Trading Corp.*, No. CV 14-2210 BRO (SSx), 2015 U.S. Dist. LEXIS 192143, *14 (C.D. Cal. Feb. 27, 2015); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007).  Defendant further objects that the interrogatory requires Defendant

73
DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

not only to IDENTIFY every report generated across multiple City departments, identify all individuals who generated any such reports, identify all individuals who received any such reports, which would require the Defendant to make a compilation, abstract, audit or summary of its business records and such a compilation, abstract, audit or summary does not exist.  *Hoffman v. Cnty. of Los Angeles,* Case No. CV-15-03724-FMO(ASx), 2016 U.S. Dist. LEXIS 123515, * 15-16 (C.D. Cal. Jan. 6, 2016); *Estrada v. City & Cnty. of San Francisco*, Case No. 16-cv-00722-MEJ, 2016 U.S. Dist. LEXIS 173740, *4 (N.D. Cal. Dec. 14, 2016).  Defendant further objects that the interrogatory contains subparts seeking information on distinct subjects and these subparts constitute separate interrogatories against Plaintiff's limit of 25.  F.R.Civ.P. 33(a); *Collaboration Props. v. Polycorn, Inc.*, 224 F.R.D. 473,475 (N.D. Cal. 2004).

Defendant further objects that the types of summaries or reports that are generated from cleanup data have no relevance to whether Plaintiffs' constitutional rights were violated or whether LAMC 56.11 is facially unconstitutional.  *Unilin Beheer B.V. v. NSL Trading Corp.*, No. CV 14-2210 BRO (SSx), 2015 U.S. Dist. LEXIS 192143, *14 (C.D. Cal. Feb. 27, 2015); *Rivera v. Nibco, Inc.*, 364 F.3d 1057, 1072 (9th Cir. 2004) ("District courts need not condone the use of discovery to engage in fishing expeditions.").  Defendant objects that it has produced the electronically exportable information from the relevant databases for the period 2018-2020 in response to Plaintiffs' request for production and reports or summaries from those databases were identified during its investigation, Defendant has produced those as well and intends to produce any other such documents if identified in the course of its ongoing investigation.  Without waiving any, and based on these objections, Defendant objects to any further response to this interrogatory, but will meet and confer with Plaintiff regarding the relevance, if any, to Plaintiff Zamora's specific alleged claims and proportionality of the interrogatory under Rule 26(b).

Subject to and without waiving these objections, Defendant responds as follows:

**(a) MyLA 311:** MyLA 311 is a database that contains citywide service requests

74

including service requests to be addressed by LASAN, as well as some of the data that is stored in AMS. See CTY020223.  The MyLA 311 database can be queried in many different ways, for many different reasons, at the request of many different persons, departments or entities, which results in the generation of an innumerable number of different kinds of reports.  The database contains over 30 data fields that can be sorted, filtered and/or queried to create any number of possible permutations of data that can then be generated into a variety of different reports.  These data fields include, among other things, service request numbers, addresses, service request types, service request status, council districts, authorization dates, employee names associated with the ticket(s), and information about the resolution of the request.

Requests for reports generated from MyLA 311 data come from a variety of sources and greatly vary in the nature and type of information and/or report sought.  It is impossible to identify or describe all such reports.  For example, members of the public request reports containing data stored in MYLA 311 under the California Public Records Act (CPRA) seeking a variety of different types of information.  A CPRA request may ask, for example, for all service tickets related to homeless encampments for a particular time-frame, or all service tickets related to illegal dumping a particular council district, or all requests of a particular nature made on a particular day or in a particular geographical location, and so on.  As another example, a LASAN service yard or yards may request information about open tickets in a particular area and/or in a particular time-frame to determine how to schedule their operations.  Other examples include reports generated to respond to litigation-related inquiries, or questions from other City departments, or Council Districts, the UHRC, and the Mayor's Office.  The only routine or periodic reports that are generated from the MyLA 311 database are reports that are included in weekly reports to the Mayor's Office and Council Districts, which contain illegal dumping service requests, CARE homeless encampment service requests, sources of requests, among other data points.  See Bates Nos.  CTY019337-CTY020160 (2019-2020 weekly reports to the Mayor'

**(b)  AMS and WPIMS.**  AMS is an acronym for Authorization Management System; this database contains authorizations for noticed encampment cleanups.  WPIMS is an acronym for Watershed Protection Information Management System; this database contains basic data about encampment cleanups including dates and addresses of cleanups, identification of relevant Council Districts, names of LASAN responders, resolution information and (as of 2019) estimated itemized collection information.  Both AMS and WPIMS databases can be queried in many different ways, for many different reasons, at the request of many different persons, departments or entities.  LSD does not run reports from AMS and WPIMS on a standard, routine basis, rather, reports from these databases are generated whenever there is a particular need for any given data set contained in these databases.  For all these reasons, it is not possible to identify all the variants of such reports.

**(c) Collection Information System (CIS):**  CIS is a database that is used to track the various commodities collected; commodity tonnages; refuse collection truck operator routes, hours worked, and the locations where the commodities is disposed (landfills); the collection or delivery of trash bins; and work order charges.  Administrative clerks enter data collected from refuse collection truck operators into CIS.  The CIS database can be queried in different ways, for different reasons, at the request of different persons, departments or entities, which results in the generation a variety of different kinds of reports.  The information contained in CIS is used by multiple divisions for different reasons, including for residential collection services, tracking bins, calculation of tipping fees, work order charges for waste collection services, and calculation of total tonnages. Total CARE/CARE+ tonnage data is pulled monthly from CIS and used in weekly reports to the Mayor's Office and Council Districts.  The weekly reports contain information about CARE homeless encampment service requests, sources of requests, and monthly tonnage among other data points.  See Bates Nos.  CTY019337-CTY020160 (2019-2020 weekly reports to the Mayor's Office and Council Districts).  The specific individuals included on the distribution list for weekly reports varies over time, but generally the

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

distribution list for weekly reports includes chiefs of staff, deputy chiefs of staff, communication directors, district directors, policy directors, field deputies, senior administrative analysts for the Chief Administrative Office (CAO), the Board of Public Works, and various LASAN staff.

Dated:   February 16, 2021          MICHAEL N. FEUER, CITY ATTORNEY
                                     KATHLEEN KENEALY, CH. DEPUTY CITY ATTORNEY
                                     SCOTT MARCUS, CH. CIVIL LITIGATION BRANCH
                                     GABRIEL DERMER, ASST. CITY ATTORNEY
                                     **FELIX LEBRON, DEPUTY CITY ATTORNEY**
                                     A. PATRICIA URSEA, DEPUTY CITY ATTORNEY


                                     By:   */s/ A. Patricia Ursea*
                                           A. Patricia Ursea
                                           Deputy City Attorney
                                           Attorneys for Defendant
                                           CITY OF LOS ANGELES

DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE

## CERTIFICATE OF SERVICE

I, A. Patricia Ursea, am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 200 North Main Street, Room 675, Los Angeles, CA 90012.

On February 16, 2021, I served a copy of the following documents described as:

**DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE**

[x] **BY E-MAIL**

By transmitting via electronic mail to the e-mail address(es) set forth below on this date. I am aware that service is presumed invalid if the email transmission is returned as undeliverable.

## SEE ATTACHED SERVICE LIST

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 16, 2021, at Los Angeles, California.

/s/ A. Patricia Ursea

## SERVICE LIST

Shayla R. Myers
Mallory B. Andrews
LEGAL AID FOUNDATION OF LOS ANGELES
7000 S. Broadway
Los Angeles, CA 90003
Email: smyers@lafla.org
           mbandrews@lafla.org


Catherine E. Sweetser
Kristina A. Harootun
John C. Washington
SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP
11543 W. Olympic Blvd.
Los Angeles, CA 90064
Email: csweetser@sshhzlaw.com
           kharootun@sshhzlaw.com
           jwashington@sshhzlaw.com


Benjamin Allan Herbert (SBN 277356)
William L. Smith (SBN 324235)
KIRKLAND & ELLIS LLP 555
South Flower Street Los Angeles, CA 90071
Email: benjamin.herbert@kirkland.com
           william.smith@kirkland.com


Michael A. Onafur
KIRKLAND & ELLIS LLP
333 S. Hope Street
Los Angeles, CA 90070
Email: benjamin.herbert@kirkland.com
           michael.onufer@kirkland.com
           william.smith@kirkland.com

Garcia v. COLA                          AMENDED EX. A
CV19-6182-DSF-PLA          Defendant's Amended Response to Zamora Interrogatory No. 12

| Folder/File Name | Officer who recorded video | Rank | Assignment | Date of footage | Location |
|---|---|---|---|---|---|
| 190814002524 Folder | Officer James Arredondo #34252 | Police Officer II | 35HOPE23-W2 | 8/14/2019 | Cedros Bessemer |
| File Name *Cedros Bessimer* | | | | | Cedros Calvert |
| 190814002524 Folder | Officer James Arredondo #34252 | Police Officer II | 35HOPE23-W2 | 8/14/2019 | Cedros Bessemer |
| File Name *Cedros Bessimer 2* | | | | | Cedros Calvert |
| 190814002524 Folder | Officers Kristan Delatori #32914 | Senior Lead Officer (PIII+I) | 9SL41-W4 | 8/14/2019 | Cedros Bessemer |
| File Name *City Flagdown* | | | | | Cedros Calvert |
| 190814002524 Folder | Officer Jacob Underwood #41233 | Police Officer II | 35HOPE21-W2 | 8/14/2019 | Cedros Bessemer |
| File Name *CSLA Cedros* | | | | | Cedros Calvert |
| 190814002524 Folder | Officer Cody Derosa #41105 | Police Officer II | 35HOPE23-W2 | 8/14/2019 | Cedros Bessemer |
| File Name *Hope CSLA* | | | | | Cedros Calvert |
| 190814002524 Folder | Officer Cody Derosa #41105 | Police Officer II | 35HOPE23-W2 | 8/14/2019 | Cedros Bessemer |
| File Name *Hope CSLA 2* | | | | | Cedros Calvert |
| 190814003493 | Officer Jacob Underwood #41233 | Police Officer II | 35HOPE21-W2 | 8/14/2019 | Cedros Bessemer |
| Folder File Name *CSLA-Calvert* | | | | | Cedros Calvert |
| 190110002014 Folder | Officer Andrew Paxton #41331 | Police Officer II | 34HOPE24-W2 | 1/10/2019 | Alexandria at Sixth Street 90005 |
| File Name-*Homeless Outreach* | | | | | |
| 190110002014 Folder | Officer Kevin Cottle #41580 | Police Officer II | 34HOPE24-W2 | 1/10/2019 | Alexandria at Sixth Street 90005 |

Garcia v. COLA                              AMENDED EX. A
CV19-6182-DSF-PLA          Defendant's Amended Response to Zamora Interrogatory No. 12

| Folder/File Name | Officer who recorded video | Rank | Assignment | Date of footage | Location |
|---|---|---|---|---|---|
| File Name- *Sanitation* | | | | | |
| 190110002015 Folder | Officer Ivan Lucero #40488 | Police Officer II | 34HOPE25-W2 | 1/10/2019 | Alexandria at Sixth Street 90005 |
| File Name- *Axon Body 2 Video 2019.01.10* | | | | | |
| 190110002015 Folder | Officer Carolina Argueta #39027 | Police Officer II | 34HOPE25-W2 | 1/10/2019 | Alexandria Avenue at Sixth Street |
| File Name *RRT Bulky Hazardous* | | | | | |
| 190129001222 Folder | Sgt. Jerald Case #36032 | Sergeant I | 35HOPE20-W2 | 1/29/2019 | Tyrone Avenue at Aetna Avenue 91401 |
| File Name *Axon Body 2 Video 2019.01.29* | | | | | |
| 1901290012222 Folder | Officer Brenda Nix #36125 | Police Officer III | 35HOPE21-W2 | 1/29/2019 | Tyrone Avenue at Aetna Avenue 91401 |
| File Name *Rrt* | | | | | |

Garcia v. COLA                            AMENDED EX. A
CV19-6182-DSF-PLA           Defendant's Amended Response to Zamora Interrogatory No. 12

| Folder/File Name | Officer who recorded video | Rank | Assignment | Date of footage | Location |
|---|---|---|---|---|---|
| 1901290012222 Folder | Officer Armen Shahinian #40840 | Police Officer II | 35HOPE21-W2 | 1/29/2019 | Tyrone Avenue at Aetna Avenue 91401 |
| File Name *RRT Cleanup* | | | | | |
| 1901290012222 Folder | Officer Brenda Nix #36125 | Police Officer III | 35HOPE21-W2 | 1/29/2019 | Tyrone Avenue at Aetna Avenue 91401 |
| File Name *Rrt-2* | | | | | |
| 1901290012222 Folder | Office Jacob Underwood #41233 | Police Officer II | 34HOPE24-W2 | 1/29/2019 | Tyrone Avenue at Aetna Avenue 91401 |
| File Name *–Spoke with SGT* | | | | | |
| 190321001772 Folder | Officer Ivan Lucero #40488 | Police Officer II | 34HOPE25-W2 | 3/21/2019 | Sixth Street at Kingsley Drive 90005 |
| File Name *Axon Body 2 Video 2019.03.21 0951* | | | | | |
| 190321001772 Folder | Officer Ivan Lucero #40488 | Police Officer II | 34HOPE25-W2 | 3/21/2019 | Sixth Street at Kingsley Drive 90005 |
| File Name *Axon Body 2 Video 2019 03.21.2019 1009* | | | | | |
| 190321001772 Folder | Officer Carolina Argueta #39027 | Police Officer II | 34HOPE25-W2 | 3/21/2019 | Sixth Street at Kingsley Drive 90005 |

Garcia v. COLA                                    AMENDED EX. A
CV19-6182-DSF-PLA              Defendant's Amended Response to Zamora Interrogatory No. 12

| Folder/File Name | Officer who recorded video | Rank | Assignment | Date of footage | Location |
|---|---|---|---|---|---|
| File Name *RRT* | | | | | |
| 190321002004 Folder | Officer Ivan Lucero #40488 | Police Officer II | 34HOPE25-W2 | 3/21/2019 | Sixth Street at Kingsley Drive 90005 |
| File Name *Axon Body 2 Video 2019.03.21 1036* | | | | | |
| 190321002004 Folder | Officer Ivan Lucero #40488 | Police Officer II | 34HOPE25-W2 | 3/21/2019 | Sixth Street at Kingsley Drive 90005 |
| File Name *Axon Body 2 Video 2019.03.21 1040* | | | | | |
| 190321002004 Folder | Officer Carolina Argueta #39027 | Police Officer II | 34HOPE25-W2 | 3/21/2019 | Sixth Street at Kingsley Drive 90005 |
| File Name *RRT Bulky* | | | | | |
| 190424001194 Folder | Officer Alan Woodard #37419 | Police Officer II | 5F6-W2 | 4/24/2019 | 25327 S McCoy Avenue at Lomita |
| File Name *Axon Body 2 Video 2019.04.24 0827* | | | | | |
| 190424001194 Folder | Officer Christopher Eick #38627 | Police Officer II | 5FL5-W2 | 4/24/2019 | 25327 S McCoy Avenue at Lomita |
| File Name *Axon Body 2 Video 2019.04.24 0948* | | | | | |
| 190424001194 Folder | Officer Christopher Eick #38627 | Police Officer II | 5FL5-W2 | 4/24/2019 | 25327 S McCoy Avenue at Lomita |

Garcia v. COLA                              AMENDED EX. A
CV19-6182-DSF-PLA           Defendant's Amended Response to Zamora Interrogatory No. 12

| Folder/File Name | Officer who recorded video | Rank | Assignment | Date of footage | Location |
|---|---|---|---|---|---|
| File Name *Axon Body 2 Video 2019.04.24 0954* | | | | | |
| 190424001194 Folder | Officer Alan Woodard #37419 | Police Officer II | 5F6-W2 | 4/24/2019 | 25327 S McCoy Avenue at Lomita |
| File Name *Axon Body 2 Video 2019.04.24 1221* | | | | | |
| 190424001194 Folder | Officer Christopher Eick #38627 | Police Officer II | 5FL5-W2 | 4/24/2019 | 25327 S McCoy Avenue at Lomita |
| File Name *Axon Body 2 Video 2019.04.24 1231* | | | | | |
| 190429001306 Folder | Officer Brent Burkhart #34214 | Police Officer III | 35HOPE26-W2 | 4/29/2019 | Aetna Street at Van Nuys 91401 |
| File Name *CSLA* | | | | | |
| 190429001306 Folder | Officer Armen Shahinian #40840 | Police Officer II | 35HOPE25-W2 | 4/29/2019 | Aetna Street at Van Nuys 91401 |
| File Name *CSLA Cleanup* | | | | | |
| 190429001306 Folder | Officer Cory Garza #40811 | Police Officer II | 35HOPE25-W2 | 4/29/2019 | Aetna Street at Van Nuys 91401 |
| File Name *CSLA Vnys* | | | | | |
| 190429001306 Folder | Officer Cory Garza #40811 | Police Officer II | 35HOPE25-W2 | 4/29/2019 | Aetna Street at Van Nuys 91401 |
| File Name *CSLA Vnys 2* | | | | | |
| 190429001306 Folder | Officer Jerome Knopp #37244 | Polce Officer II | 35HOPE26-W2 | 4/29/2019 | Aetna Street at Van Nuys 91401 |
| File Name *CSLA 2* | | | | | |

Garcia v. COLA                                        AMENDED EX. A
CV19-6182-DSF-PLA              Defendant's Amended Response to Zamora Interrogatory No. 12

| Folder/File Name | Officer who recorded video | Rank | Assignment | Date of footage | Location |
|---|---|---|---|---|---|
| 190521001477 Folder | Officer Alan Woodard #37419 | Police Officer II | 5F6-W2 | 5/21/2019 | 800 West Lomita at Vermont |
| File Name *Axon Body 2 Video 2019.05.21 0904* | | | | | |
| 190521001477 Folder | Officer Alan Woodard #37419 | Police Officer II | 5F6-W2 | 5/21/2019 | 800 West Lomita at Vermont |
| File Name *Axon Body 2 Video 2019.05.21 1004* | | | | | |
| 190521001477 Folder | Officer Alan Woodard #37419 | Police Officer II | 5F6-W2 | 5/21/2019 | 800 West Lomita at Vermont |
| File Name *Axon Body 2 Video 2019.05.21 1009* | | | | | |
| 190521001477 Folder | Officer Alan Woodard #37419 | Police Officer II | 5F6-W2 | 5/21/2019 | 800 West Lomita at Vermont |
| File Name *Axon Body 2 Video 2019.05.21 1014* | | | | | |
| 190521001477 Folder | Officer Paul Ulmer #40007 | Police Officer II | 5F6-W2 | 5/21/2019 | 800 West Lomita at Vermont |
| File Name *Axon Body 2 Video 2019.05.21 BOS* | | | | | |
| 190521001477 Folder | Officer Paul Ulmer #40007 | Police Officer II | 5F6-W2 | 5/21/2019 | 800 West Lomita at Vermont |
| File Name *Axon Body 2 Video 2019.05.21 BOS 2* | | | | | |

Garcia v. COLA                                    AMENDED EX. A
CV19-6182-DSF-PLA          Defendant's Amended Response to Zamora Interrogatory No. 12

| Folder/File Name | Officer who recorded video | Rank | Assignment | Date of footage | Location |
|---|---|---|---|---|---|
| 190604002243 Folder | Officer Ivan Lucero #40488 | Police Officer II | 34HOPE25-W2 | 6/4/2019 | Western Avenue at Oakwood Avenues 90004 |
| File Name *Axon Body 2 Video 2019.06.04 1058* | | | | | |
| 190604002243 Folder | Officer Carolina Argueta #39027 | Police Officer II | 34HOPE25-W2 | 6/4/2019 | Western Avenue at Oakwood Avenues 90004 |
| File Name RRT Bulky | | | | | |
| Arguenta 39027 Inc. 1501 RRT_BULKY_Hazardous; Arguenta 39027 Inc. 1769 RRT_BULKY_Hazardous; Arguenta 39027 Inc. 2291 RRT_Trash_Hazardous; Arguenta 39027 Inc. 2474 RRT_BULKY_Hazardous | Officer Argueta, Carolina #39027 | Police Officer II | 34HOPE21-W2 | 6/11/2019 | Pico/ St. Andrews 10th St/ Wilton Pl.Gramercy Dr./ Olympic Normandie / San Marino |
| Cho 33817 Inc. 1555 Clean_Up; Cho 33817 Inc. 1795 Clean_Up; Cho 33817 Inc. 2332 Clean_Up | Officer Harris Cho #33817 | Police Officer III | 20SL53-W2 | 6/11/2019 | St. Andrews/ Pico10th St./ Gramercy Pl.Gramercy Dr. /Olympic |

Garcia v. COLA                              AMENDED EX. A
CV19-6182-DSF-PLA          Defendant's Amended Response to Zamora Interrogatory No. 12

| Folder/File Name | Officer who recorded video | Rank | Assignment | Date of footage | Location |
|---|---|---|---|---|---|
| Chung 41347 Inc. 1546 Rapid_ Response _Security; Chung 41347 Inc. 1820 Rapid_ Response_Security; Chung 41347 Inc. 2314 Rapid_ Response_Security | Officer Kevin Quyen Chung #41347 | Police Officer II | 34HOPE24-W2 | 6/11/2019 | St. Andrews/ Pico10th St./Wilton Pl./ Gramercy Dr. /Olympic |
| Landry 32465 Alley_Clean_Up_ Inc. 1646 | Officer Christopher Landry #32465 | Police Officer III | 20SL13-W2 | 6/11/2019 | 6th W/O Berendo |
| Panameno 33799 Inc. 2145 RRt_Response Panameno 33799 Inc. 2317 RRT_Response | Sergeant Douglas W. Panameno #33799 | Sergeant I | 34HOPE20-W2 | 6/11/2019 | 10th St./Wilton Pl. Gramercy Dr. /Olympic |
| Paxton 41331 Inc. 1546 Rapid_ Response _Security; Paxton 41331 Inc. 1820 Rapid_ Response _Security; Paxton 41331 Inc. 2314 Rapid_ Response _Security | Officer Andrew Paxton #41331 | Police Officer II | 34HOPE24-W2 | 6/11/2019 | St. Andrews/ Pico 10th St./ Wilton Pl. Gramercy/ Olympic |

# Exhibit B to Defendant's Amended Responses

# to Zamora Interrogatories Set One




# OO DEPARTMENT HOMELESS COORDINATOR ORGANIZATION CHART

## DP 11 - 2019



**Homeless Coordinator**
Commander Donald Graham
(213) 486-6055

**Homelessness Outreach & Proactive Engagement (HOPE)**

**Secretary**
Angely Huynh
Serial No. N1405

**Homeless Coordination Unit Commander's Aide**
Sgt. II Celina Robles
Serial No. 38064

**Unified Homelessness Response Center (UHRC)**
Lt. II Yasir Gillani
Serail No. 35215
OIC, UHRC

**Valley Bureau**

**South Bureau**

**Central Bureau**

**West Bureau**

**P III +I Asst Homeless Coord.**
Monique Contreras
Serial No. 38228

**P III George Harper**
Serial No. 41439

**P II Hung Kun Ma**
Serial No. 40368

PO II Robert Chellew
Serial No. 37991

PO II Ryan Simmons
Serial No. 41087

PO II Gabriel Cohen
Serial No. 41706

PO II Susan Hsu
Serial No. 37637

PO II Jerome Knopp
Serial No. 37244

PO II Sean Taylor
Serial No. 41422

PO II Robert Burke
Serial No. 38313

Sgt. Jerald Case
Serial No. 36032

PO III Brent Burkhart
Serial No. 34214

PO II James Arredondo
Serial No. 40840

PO II Hector Pereida
Serial No. 41308

PO II Daniel Harty
Serial No. 41155

PO II Cody Derosa
Serial No. 41105

PO II Christopher Aboyte
Serial No. 41906

PO II Ernesto Zasueta
Serial No. 36199

PO II Jacob Underwood
Serial No. 41233

PO II Sheila Gutierrez
Serial No. 39250

PO II Cory Garza
Serial No. 40811

Sgt. Marya Mason
Serial No. 34418

PO III Robert Garcia
Serial No. 39970

PO II Kyle Aratani
Serial No. 41604

PO II Ryan Rankin
Serial No. 37944

PO II Jeffrey Fitzpatrick
Serial No. 37996

PO II Keith Horeczko
Serial No. 35806

PO II Jack Guerrero
Serial No. 36852

PO II Lopez Munoz
Serial No. 38101

PO II Jorge Carpio
Serial No. 41578

PO II (Vacant)

PO II (Vacant)

Sgt. Werner Flores
Serial No. 33456

PO III David Weston
Serial No. 38719

PO II Luis Robles
Serial No. 33278

PO II Christian Guerrero
Serial No. 41407

PO II Ulises Taveras
Serial No. 38070

PO II Jesus Contreras
Serial No. 39961

PO II Jaime Gonzalez
Serial No. 35970

PO II Jose Cabrera
Serial No. 39743

PO II Tyrone Acosta
Serial No. 27558

PO II Lenny Torres
Serial No. 36797

PO II Steven Alcala
Serial No. 41458

Sgt. Adrian Maxwell
Serial No. 32387

PO III John Nguyen
Serial No. 39294

PO II Ivan Lucero
Serial No. 40488

PO II Mark Mahlknect
Serial No. 41586

PO II Matthew Godoy
Serial No. 41837

PO II Marco Ramirez
Serial No. 40604

PO II Won Kim
Serial No. 42236

PO II Kevin Chung
Serial No. 41347

PO II Andrew Paxton
Serial No. 41334

PO II Kevin Cottle
Serial No. 41580

PO II Carolina Argueta
Serial No. 39027

CTY004393




# OO DEPARTMENT HOMELESS COORDINATOR ORGANIZATION CHART

## DP 10 - 2020

**Homeless Coordinator**
Commander Donald Graham
(213) 486-6055

**Homelessness Outreach & Proactive Engagement (HOPE)**

### Valley Bureau

Sgt. Jerald Case
Serial No. 36032

PO III Brent Burkhart
Serial No. 34214

PO II James Arredondo
Serial No. 34252

PO II Rebecca Reese
Serial No. 39573

PO II Hector Pereida
Serial No. 41308

PO II Jerome Knopp
Serial No. 37244

PO II Daniel Harty
Serial No. 41155

PO II Sean Taylor
Serial No. 41422

PO II Cody Derosa
Serial No. 41105

PO II Robert Burke
Serial No. 38313

PO II Christopher Aboyte
Serial No. 41906

PO II Jacob Underwood
Serial No. 41233

PO II Ernesto Zasueta
Serial No. 36199

PO II Cory Garza
Serial No. 40811

PO II
Vacant

PO II Mario Ververa
Serial No. 37985

PO II Steven Alcala
Serial No. 41458

### Central Bureau

Sgt. Werner Flores
Serial No. 33456

PO III David Weston
Serial No. 38719

PO II Luis Robles
Serial No. 33278

PO II Christian Guerrero
Serial No. 41407

PO II Ulises Taveras
Serial No. 38070

PO II Jesus Contreras
Serial No. 39961

PO II Jaime Gonzalez
Serial No. 35970

PO II Jose Cabrera
Serial No. 39743

PO II Tyrone Acosta
Serial No. 27558

PO II Lenny Torres
Serial No. 36797

PO II Santiago Cervantes
Serial No. 38387

### South Bureau

Sgt. Marya Mason
Serial No. 34418

PO III Robert Garcia
Serial No. 39970

PO II Kyle Aratani
Serial No. 41604

PO II Ryan Rankin
Serial No. 37944

PO II Jeffrey Fitzpatrick
Serial No. 37996

PO II Keith Horeczko
Serial No. 35806

PO II Jack Guerrero
Serial No. 36852

PO II Lopez Munoz
Serial No. 38101

PO II Jorge Carpio
Serial No. 41578

PO II Jose Ortega
Serial No. 37975

PO II Manuel Anaya
Serial No. 38222

### West Bureau

Sgt. Adrian Maxwell
Serial No. 32387

PO III John Nguyen
Serial No. 39294

PO II Ivan Lucero
Serial No. 40488

PO II Marc Mahlknect
Serial No. 41586

PO II Matthew Godoy
Serial No. 41837

PO II Marco Ramirez
Serial No. 40604

PO II Won Kim
Serial No. 42236

PO II Kevin Chung
Serial No. 41347

PO II Andrew Paxton
Serial No. 41334

PO II Kevin Cottle
Serial No. 41580

PO II Carolina Argueta
Serial No. 39027

---

**Unified Homelessness Response Center (UHRC)**
Lt. II Yasir Gillani
Serial No. 35215
**OIC, UHRC**

PO II Sharon Azpeitia
Serial No. 35516

PO II Ryan Simmons
Serial No. 41087

PO II Gabriel Cohen
Serial No. 41706

**Homeless Coordination Unit Commander's Aide**
Sgt. II Shon Wells
Serial No. 31394

P III +I **Asst Homeless Coord.**
Robert Chellew
Serial No. 37991

P III George Harper
Serial No. 41439

P II Hung Kun Ma
Serial No. 40368

**Secretary**
Angely Huynh
Serial No. N1405

## VERIFICATION

I, HOWARD WONG, hereby declare:

I am the Assistant Chief Environment Compliance Officer for City of Los Angeles Department of Public Works, Bureau of Sanitation's Livability Services Division and Watershed Protection Division. I have read the responses to Interrogatory Nos. 1(a), 2(a), 3-9, 11, and 13(c) in **DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE** in *Garcia v. City of Los Angeles, et al.*. Case No. CV19-6182-DSF-PLA.  Based on a reasonable investigation, the information in the responses to the above-referenced Interrogatories is true and correct to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 16, 2021 in Los Angeles, California.

Howard Wong

VERIFICATION

## VERIFICATION

I, HOWARD WONG, hereby declare:

I am the Assistant Chief Environment Compliance Officer for City of Los Angeles Department of Public Works, Bureau of Sanitation's Livability Services Division and Watershed Protection Division. I have read the responses to Interrogatory Nos. 1(a), 2(a), 3-9, 11, and 13(c) in **DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE** in *Garcia v. City of Los Angeles, et al.*. Case No. CV19-6182-DSF-PLA.  Based on a reasonable investigation, the information in the responses to the above-referenced Interrogatories is true and correct to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 16, 2021 in Los Angeles, California.

_____
Howard Wong

VERIFICATION

## **<u>VERIFICATION</u>**

I, DOMINGO OROSCO, hereby declare:

I am the Assistant Division Manager for City of Los Angeles Department of Public Works, Bureau of Sanitation's Livability Services Division. I have read the responses to Interrogatory Nos. 13(b) and 14(b) in **DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE** in *Garcia v. City of Los Angeles, et al.*. Case No. CV19-6182-DSF-PLA.  Based on a reasonable investigation, the information in the responses to the above-referenced Interrogatories is true and correct to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 16, 2021 in Los Angeles, California.

Domingo Orosco

# **VERIFICATION**

I, John Alipio, declare:

I am employed by the Los Angeles Police Department in the Legal Affairs Division. I have read the response to Interrogatory No. 12 in **DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE** and **AMENDED EXHIBIT A - Defendant's Amended Response to Zamora Interrogatory No. 12** ("**AMENDED EXHIBIT A**") in *Garcia v. City of Los Angeles, et al.*. Case No. CV19-6182-DSF-PLA. Based on a reasonable investigation, the information in **AMENDED EXHIBIT A** is true and correct to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 12, 2021 in Los Angeles, California.

John Alipio

VERIFICATION

1

## **VERIFICATION**

2

3    I, ROBERT J. POTTER, hereby declare:

4        I am the Manager for City of Los Angeles Department of Public Works, Bureau of

5    Sanitation's Solid Resources Support Services Division. I have read the responses to

6    Interrogatory No. 10 in **DEFENDANT CITY OF LOS ANGELES' AMENDED**

7    **OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S**

8    **INTERROGATORIES SET ONE** in *Garcia v. City of Los Angeles, et al.*. Case No.

9    CV19-6182-DSF-PLA.  Based on a reasonable investigation, the information in the

10   responses to the above-referenced Interrogatory is true and correct to the best of my

11   knowledge and belief.

12

13        I declare under penalty of perjury that the foregoing is true and correct.

14

15        Executed on February 16, 2021 in Los Angeles, California.

16

17

18   _____

19                    Robert J. Potter

20

21

22

23

24

25

26

27

28

1
2

## VERIFICATION

3   I, CECILE BUNCIO, hereby declare:

4   I am the Division Manager for City of Los Angeles Department of Public Works,

5   Bureau of Sanitation's Customer Care Center Division.  I have read the responses to

6   Interrogatory Nos. 13(a) and 14(a) in **DEFENDANT CITY OF LOS ANGELES'**

7   **AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S**

8   **INTERROGATORIES SET ONE** in *Garcia v. City of Los Angeles, et al.*. Case No.

9   CV19-6182-DSF-PLA.  Based on a reasonable investigation, the information in the

10  responses to the above-referenced Interrogatories is true and correct to the best of my

11  knowledge and belief.

12

13  I declare under penalty of perjury that the foregoing is true and correct.

14

15  Executed on February _16_, 2021 in Los Angeles, California.

16
17
18  _____
19  Cecile Buncio
20
21
22
23
24
25
26
27
28

VERIFICATION

## **VERIFICATION**

I, KELLY WAKABAYASHI, hereby declare:

I am a Senior Management Analyst I for the City of Los Angeles Department of Public Works, Bureau of Sanitation's Financial Management Division.  I have read the responses to Interrogatory Nos. 13(d) and 14(c) in **DEFENDANT CITY OF LOS ANGELES' AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF ZAMORA'S INTERROGATORIES SET ONE** in *Garcia v. City of Los Angeles, et al.* Case No. CV19-6182-DSF-PLA.  Based on a reasonable investigation, the information in the responses to the above-referenced Interrogatories is true and correct to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 11, 2021 in Los Angeles, California.

_____
Kelly Wakabayashi