UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES-GENERAL

Case No.: **CV 19-6182-DSF (PLAx)**                                    Date: **April 28, 2021**

Title:    **Janet Garcia, et al. v. City of Los Angeles**

PRESENT:  THE HONORABLE    **PAUL L. ABRAMS**
                              **UNITED STATES MAGISTRATE JUDGE**

     **Christianna Howard**                    **N/A**                         **N/A**
        Deputy Clerk                  Court Reporter / Recorder              Tape No.

ATTORNEYS PRESENT FOR PLAINTIFF(S):            ATTORNEYS PRESENT FOR DEFENDANT(S):
              NONE                                         NONE

PROCEEDINGS:  (IN CHAMBERS)   **Plaintiffs' Motions to Compel Discovery Responses (ECF Nos. 121, 122)**

On April 7, 2021, the parties in this action filed (1) a Joint Stipulation (alternatively "JS Rogs" (ECF No. 121)), along with a number of declarations and exhibits, in support of their positions regarding plaintiff Miriam Zamora's Motion to Compel defendant City of Los Angeles (alternatively the "City") to provide further responses to Interrogatory numbers 1, 2, 3, 4, 7, 9, and 14 ("Mot. Rogs" (ECF No. 121-1)); and (2) a Joint Stipulation (alternatively "JS RFPs" (ECF No. 122)), along with a number of declarations and exhibits, in support of their positions regarding plaintiff Ali El-Bay's Motion to Compel defendant to provide further responses to Request for Production ("RFP") of documents numbers 1, 2, 11-19, 23, 26, 29, 30, 33, 34, 35, 36, 38, 39, 43, 44, 45, 47, 48, and 49 ("Mot. RFPs" (ECF No. 122-1)).[1]  Plaintiffs also request attorneys' fees with respect to both Motions.  On April 14, 2021, the parties filed their Supplemental Memoranda (alternatively "Supp'l Mem.") (ECF Nos. 123 ("Def't's Supp'l Mem."), 124 ("Pls.' JS Rogs Supp'l Mem."), 125 ("Pls.' JS RFPs Supp'l Mem.")).  Having considered the pleadings submitted in connection with the Motions, the Court has concluded that oral argument will not be of material assistance in determining the Motions.  Accordingly, the hearings scheduled for April 28, 2021, are **ordered off calendar**.  See Local Rule 7-15.

_____

     [1]    The JS Rogs, declarations, and exhibits, with 14 interrogatories at issue, consist of approximately 1,481 pages.  The JS RFPs, declarations, and exhibits, with 27 RFPs at issue, consist of approximately 2,027 pages.  The Court, in nearly 20 years, has rarely -- if ever -- been presented with Joint Stipulations of such length and in circumstances where some of the issues could and should have been resolved without Court intervention.  Yet, the parties expect this Court and its staff to wade through over 3,500 pages to resolve the myriad issues raised in these Motions that should never have made it to this Court.  Going forward, the Court will not hesitate to recommend that a special master be appointed, at the parties' expense, to address discovery issues if it determines that the parties are abusing the Court's scarce resources.

**Legal Standard**

The Court will examine the issues in the Motion using the general standard set forth in Federal Rule of Civil Procedure 26 ("Rule 26"). Rule 26 provides that a party may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). Factors to consider include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Id. Information need not be admissible in evidence to be discoverable. Id. However, a court "must limit the frequency or extent of discovery otherwise allowed by [the Federal] rules" if "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C). Finally, the Court is mindful of the imperative that the Federal Rules of Civil Procedure be "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1 (emphasis added); see also Landis v. N. Am. Co., 299 U.S. 248, 254-55, 57 S. Ct. 163, 81 L. Ed. 153 (1936) (a court has the inherent power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants" and "[h]ow this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance").

Relevance "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351, 98 S. Ct. 2380, 57 L. Ed. 2d 253 (1978) (citing Hickman v. Taylor, 329 U.S. 495, 501, 67 S. Ct. 385, 91 L. Ed. 451 (1947)). Even so, the scope of discovery is not without limits as Rule 26(b) (as amended in 2015) now provides that discovery is limited to information that is relevant to a claim or defense in the lawsuit *and* proportional to the needs of the case. The party seeking to compel discovery "has the initial burden of demonstrating relevance" under Rule 26. See Integon Preferred Ins. Co. v. Saavedra, 2019 WL 4228372, at *2 (C.D. Cal. July 12, 2019) (citations omitted). Thereafter, "[t]he party who resists discovery has the burden to show discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections." Duran v. Cisco Sys., Inc., 258 F.R.D. 375, 378 (C.D. Cal. 2009) (citing Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975); Sullivan v. Prudential Ins. Co. of Am., 233 F.R.D. 573, 575 (C.D. Cal. 2005)).


**Background**

Plaintiffs[2] state that in July 2020, they propounded RFPs, seeking to "obtain documents on discrete topics relevant to this litigation, including as relevant here, the Specific Incidents[3] and other cleanups conducted where

---

[2]     Although the RFPs and Interrogatories were propounded by individual plaintiffs, unless otherwise indicated, and for ease of reference, the Court will refer to the arguments made in the Motions as having been made by "plaintiffs."

[3]     As summarized by defendant in its amended discovery responses, plaintiff El-Bey alleges claims for specific incidents occurring on or around January 10, 2019, and June 4, 2019, at different locations; plaintiff Garcia alleges claims for specific incidents occurring on or around January 29, 2019, and April 29, 2019, at

(continued...)

Plaintiffs have resided, training conducted by the City, and the City's use of storage facilities to store impounded property." (JS Rogs at 2).[4]  The City objected to most of the requests as not relevant to the claims of the individual plaintiff who propounded the requests, and asserted that any burden required to respond or to produce the requested documents, therefore, is not proportional to the needs of the case. (Id.).  With respect to the Interrogatories served on December 8, 2020, plaintiffs state that the City "has refused to provide the answers to even the most straightforward interrogatories, objecting to each and every one on the basis of relevance, even when the request seeks, for example, the names of City employees who were present at the cleanups that form the basis of the Plaintiff's individual claim for damages." (Id.).  With respect to certain of the Interrogatories, the City provided a response that plaintiffs assert "impermissibly rel[ied] on Rule 33 [of the Federal Rules of Civil Procedure] to cite to business records -- the very records it has refused to produce in response to" plaintiffs' RFPs. (Id. at 3).  They further argue that the City has "failed to produce responsive documents, including most egregiously, documents related to Ms. Zamora's Specific Incidents." (Id.).  Plaintiffs also contend that although the City agreed to conduct a "'rolling production' of the documents it agreed to produce in response to the RFPs," it failed to "even identify a date certain by which it will be complete." (Id.).

Defendant responds that the parties "fundamentally disagree about the discovery needed for this case," but asserts that it has "made every reasonable effort to provide Plaintiffs with the discovery they requested," as evidenced in part by even a "cursory review of the City's Amended Objections and Responses" to plaintiff Zamora's Interrogatories. (Id.).  Among other things, it complains that plaintiffs seek information "dating back to April 2016 on a vast array of topics unrelated to the [S]pecific [I]ncidents that form the basis of their complaint," which took place in 2019. (Id.).

The discovery cut-off date in this action is July 26, 2021.  (JS Rogs app. B).


**Discovery at Issue**

In an effort to simplify the disputes at issue, and streamline this Order (both Herculean tasks), the Court notes that the Interrogatories can be grouped into four categories:  training relating to encampment cleanups (Interrog. Nos. 1, 2); information relating to the location where seized property is stored (Interrog. Nos. 3, 4); individuals employed by the City who participated in cleanups on June 11, 2019, and March 21, 2019 (Interrog. Nos. 7, 9); and information regarding database and enterprise systems identified by defendant (Interrog. No. 14).

In addition to the plaintiff-specific documents sought by RFP number 1, plaintiffs group the remaining at-issue RFPs into a number of categories:  (1) encampment cleanups enumerated in the SAC, and other unalleged cleanup events (RFP No. 2); (2) written policies related to encampment cleanups (RFP Nos. 11-15); (3) training related to encampment cleanups (RFP Nos. 16-19); (4) exemplars and instructions related to forms and notices

---

[3](...continued)
different locations; plaintiffs Zamora and Zepeda allege claims for specific incidents occurring on or around March 21, 2019, and June 11, 2019, at different locations; plaintiff Haugabrook alleges claims for specific incidents occurring sometime in March 2019 and again a month later at the same location; plaintiff Diocson alleges claims for a specific incident on or around April 24, 2019; and plaintiff Ashley alleges claims for a specific incident on or around May 21, 2019 (collectively, "Specific Incidents").  (JS Rogs at 42-43).

[4]     Many of the same issues, arguments, and objections, etc., are raised and discussed in the JS RFPs. For ease of reference, the Court will cite primarily to the JS Rogs unless otherwise noted, and only to one instance of an argument raised by a party.

used in cleanups and enforcement of LAMC 56.11 (RPF Nos. 23, 26, 29); (5) documentary evidence of the City's customs, practices, and application of policies relating to cleanup and disposition of property (RFP Nos. 30, 33, 34, 44, 43, 44, 45); (6) summaries, reports, analysis and data compilations relating to the City's customs, practices, and application of policies relating to cleanup and disposition of property (RFP Nos. 35, 36, 47, 48, 49); and (7) complaints relating to the City's customs, practices, and application of policies relating to cleanup and disposition of property (RFP Nos. 38, 39). (JS RFPs at 2).

Defendant instead groups the RFPs into two "overarching" categories: (1) discovery related to the Specific Incidents alleged in the SAC (RFP Nos. 1, 2), and (2) Policy/Practice discovery, i.e., "requests about topics, events, and/or time periods unrelated to the incidents alleged in the SAC and [that] have no (or at best, minimal) bearing on Plaintiffs' claims." (Def't's Supp'l Mem. at 1).

The Court will first consider the parties' arguments with respect to several of defendant's specific objections to the discovery requests generally; then consider plaintiffs' specific arguments about defendant's responses to the Interrogatories; and then rule on the requests themselves.

Given the extensive meet and confer efforts already engaged in by the parties, some of which led to agreements between the parties, and the volume of material the Court had to sift through in order to determine (a) the parties' stance on each request, and (b) the current status of any given request, the Court wants to make it perfectly clear that if ***anything*** in this Order requires defendant to provide ***more*** than what is required by the terms of a request, or what has already been agreed to by the parties, the parties' agreement controls. The Court anticipates that there will be no need for it to become involved in any satellite litigation with respect to such issues.

### **Defendant's Specific Objections**

#### **Relevance**

The City objects to most of the requests on the grounds of relevance, and suggests that the only relevant discovery goes to discovery related to the Specific Incidents involving the individual plaintiffs as set forth in the SAC. (See JS Rogs at 3, 5). It asserts that although plaintiffs contend they need additional information "primarily to establish *Monell*[5] liability and declaratory relief," plaintiffs "do not need discovery to establish the existence of some unwritten policy or practice that allegedly caused Plaintiffs' harm and Plaintiffs seek to declare unconstitutional," because, as set forth in the Second Amended Complaint ("SAC"), Los Angeles Municipal Code ("LAMC") 56.11 "codifies the City's longstanding policy of seizing and destroying homeless people's belongings." (Id. at 4 (citing Lebron Decl. ¶ 2 Ex. 27)). It argues that the only discovery relevant to proving an issue in this action, "relates to the circumstances under which Plaintiffs allege their property was seized and/or destroyed by the City." (Id. at 5). Thus, defendant contends that "the parties are entitled to discovery relevant to show: (1) whether Plaintiffs' property was in fact seized and/or destroyed by the City; (2) whether any such seizure and/or destruction was unreasonable under the Fourth Amendment; (3) whether Plaintiffs received notice and opportunity to be heard sufficient to satisfy due process; and (4) whether any destroyed property was the type that should have been stored under California Civil Code § 2080 *et seq*." (Id. at 5, 44).

---

5      Monell v. Dep't of Soc. Servs. of N.Y.C., 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

Defendant also complains that although plaintiffs have not alleged a failure-to-train <u>Monell</u> theory, they nevertheless seek information relating to the City's training with respect to encampment cleanups and LAMC 56.11. (<u>Id.</u> at 39). With respect to its response to Interrogatory number 1, for example, defendant states that it provided "an overview of the types of trainings that are required and/or provided in connection with LAMC 56.11 and pointed Plaintiffs to a spreadsheet it produced that listed a training matrix" for two of the City's Divisions. (<u>Id.</u> at 39-40). It asserts that plaintiffs seek "abstract information wholly untethered from their claims, such as trainings going back to 2016, on the basis that the discovery is needed for *Monell* and declaratory relief," but fail to establish that the information is relevant. (<u>Id.</u> at 44).

The City argues that plaintiffs' contention that they need the requested information to show <u>Monell</u> liability "is simply false." (<u>Id.</u> at 4 (citing <u>Gonzalez v. City of Schenectady</u>, 2011 WL 6010910, at *5 (N.D.N.Y. Nov. 30, 2011) ("discovery related to strip searches is unnecessary as it is undisputed that the search was conducted pursuant to the City's written policy, which had been in effect since 1999"))). Specifically, defendant states that the *core facts* relevant to <u>Monell</u> liability and prospective liability are not in dispute as the City conceded in its Answer that it (1) promulgated LAMC 56.11 and related protocols; (2) conducts encampment cleanups pursuant to LAMC 56.11 during which it removes and/or discards items on the public right of way, including items that may belong to homeless persons; (3) does not obtain a warrant before removing and/or discarding items pursuant to LAMC 56.11; (4) "provides notice (or not) in connection with removing and/or discarding items, as specified in LAMC 56.11"; and (5) has enforced LAMC 56.11 since 2016 and continues to enforce it "to this day." (<u>Id.</u> (citing Answer ¶¶ 16, 20, 21, 56, 68, 102, 114); Def't's Supp'l Mem. at 4). Defendant states that it has "offered to stipulate to *Monell* liability to streamline discovery and trial," but that plaintiffs have refused that offer. (JS Rogs at 4; Def't's Supp'l Mem. at 4 (citing Ursea Decl. ¶¶ 2-4 Exs. 1, 2)).

Defendant also argues that the information requested is not needed to prove entitlement to declaratory or other prospective relief, because a declaratory judgment "provides prospective relief to address future or continuing violations, not past harms." (JS Rogs at 4). It states that plaintiffs' request for prospective relief "depends on the City's *existing* policies and practices -- which are not in dispute and in any event could not be proven by historical documents or information." (<u>Id.</u> at 4-5 (emphasis in original)).

Defendant states that, notwithstanding this lack of relevance, it has "reasonably responded" to all of plaintiffs' requests and identified, "among other things, training materials, cleanup locations, storage capacity, employee names, database information, and other overbroad information sought by Plaintiffs." (<u>Id.</u> at 5). It complains that plaintiffs never requested a meet and confer regarding the City's *amended* objections and responses to the Interrogatories before serving their portion of the JS, and submits that plaintiffs have not articulated a "valid theory for why any of the information they seek to compel is relevant to their claims." (<u>Id.</u>). They conclude that it appears that "Plaintiffs have received so much information from the City, they have yet to read it all" and, as a result, have moved to compel information that has already been provided. (<u>Id.</u>).

In its Supplemental Memorandum, the City again contends that the Motions have no merit and that it has "more than satisfied its discovery obligations in this case." (Def't's Supp'l Mem. at 1). It claims that it has "produced the vast majority of discovery responsive" to the Incident-Specific requests, and "is in the process of investigating and/or producing the handful of additional documents and information identified in Plaintiffs' motions (most of which were first raised in Plaintiff's [joint] stipulations)." (<u>Id.</u>). With respect to the Policy/Practice requests, defendant notes that it has objected primarily on relevance and proportionality grounds and that these requests seek all documents related to over 40,000 encampment cleanups since 2016; all documents related to trainings conducted since 2016 on a variety of topics, including tangential topics such as "illegal dumping"; over half a million email documents; and records relating to arrests, even though no plaintiff alleges he or she was arrested, and no claim is made for unlawful arrest. (<u>Id.</u>). It again asserts that plaintiffs' arguments that the discovery is required for <u>Monell</u> liability and prospective relief "are specious," as the City

admitted most of the facts relevant to <u>Monell</u> liability and prospective relief in its Answer, but that "[n]evertheless, in an effort to balance its objections with Plaintiffs' purported (though unsubstantiated) need for such discovery, the City has made numerous compromises and has produced over 26,000 documents (totaling 92,000 pages) including raw data from three databases reflecting tens of thousands of cleanups from 2018 to 2020." (<u>Id.</u>).  It states that using plaintiffs' search terms and custodians to search for responsive emails resulted in collecting over 500,000 documents, and to require the City to review all of these simply is not proportional to the needs of this case. (<u>Id.</u> at 2).  It denies "cherry picking" the documents to be produced and states that it "will not withhold any responsive documents it identifies in its investigation," but "will not agree to locate, review, and produce 'all' such discovery." (<u>Id.</u>).

The City further notes that plaintiffs have "largely acknowledge[d], that the City has produced discovery responsive to every one of Plaintiffs' requests," and asserts that the "basis for Plaintiffs' motions is that they need the City to identify, review, and produce ***all*** Policy/Practice Discovery," without justifying that purported need. (<u>Id.</u> (emphasis in original)).  It points out that it would cost over $600,000 to produce "even a fraction of the additional Policy/Practice Discovery Plaintiffs seek to compel, which does not even include the burdens imposed by over 500,000 email communications" -- discovery that is "unnecessary to resolve the issues in this case and the burden imposed on the City far outweighs Plaintiffs' unsubstantiated need for such discovery under <i>Monell</i> or for prospective relief." (<u>Id.</u>).

With respect to Incident-Specific discovery, defendant acknowledges that "both parties are entitled to discovery relevant to these claims." (<u>Id.</u>).  It contends that there is no real dispute and that it has produced the "vast majority" of Incident-Specific documents in response to RFP number 1, "including Government Claims and LAPD criminal records, arrest reports, booking and identification records, Automated Filed Data Reports, and printouts of search results conducted by first and last name." (<u>Id.</u> at 3 (citing JS RFPs Lebron Decl. ¶¶ 17, 21)).  It also produced documents relating to plaintiffs' "specific alleged incident(s), including encampment cleanup reports, Health Hazard Checklists, posting surveys, incident/case pictures during cleanups, and hazardous and non-hazardous waste records from the City's Bureau of Sanitation ('LASAN')." (<u>Id.</u> (citing JS RFPs Lebron Decl. ¶ 15)).  The City asserts that it has no intention of "withholding Incident-Specific Discovery or discovery that Plaintiffs identify with reasonable specificity in their pleadings, discovery, and/or meet-and-confer calls." (<u>Id.</u> (citing JS RFPs Ursea Decl. ¶¶ 12(a), 27, Lebron Decl. ¶¶ 19-20)).  It notes, for instance, that in their portion of the JS RFPs, plaintiffs identified a few documents for the first time that they believe should be produced in response to RFP number 1:  two citations issued in 2017 and 2018 to Garcia and Diocson and a 2018 Field Investigation Card for Ashley. (<u>Id.</u> (citing Lebron Decl. ¶ 27)).  Despite the fact that no plaintiff alleges unlawful arrest or citation, the City produced these "and other" documents on April 14, 2021. (<u>Id.</u> (citing Bates Nos. CTY092977-95469 (a total of 2,492 pages))).

The City also notes that plaintiffs identified certain cleanups from the database information produced by the City in December, that may have involved plaintiffs Zamora and Haugabrook, and states that it is "investigating those cleanups and is willing to meet and confer about the production of any potentially responsive documents it finds."[6] (<u>Id.</u>).  It also agreed to supplement its responses to Interrogatory numbers 7 and 9 to identify truck drivers and laborers present at certain cleanups identified in the SAC. (<u>Id.</u>).

---

[6]   To the extent that defendant "finds" "potentially responsive" documents related to the Specific Incidents, it must promptly produce such documents.  Both parties are reminded of their continuing duty to supplement their discovery responses "**in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect**." Fed. R. Civ. P. 26(e)(1) (emphasis added).

With respect to the Policy/Practice discovery, the City contends that plaintiffs are improperly seeking to compel discovery "mostly from **2016 to the present**" as follows:

> **(1) All policies, procedures, manuals, etc.** related to cleanups, LAMC 56.11, and storage (RFP Nos. 11-15); **(2) All documents "related to trainings"** (including flyers, communications, calendar invitations, sign-in sheets, and notes) regarding cleanups, LAMC 56.11, and illegal dumping (RFP Nos. 16-19; see also Interrogatory Nos. 1 and 2); **(3) All communications related to "the use of forms" and "the use of notices[]"** regarding cleanups and/or storage (RFP Nos. 23, 26, 29); **(4) All documents related to cleanups and storage**, including all reports, summaries, data compilations, and tracking documents (RFP Nos. 30, 33-36, 43-45, 47-49; *see also* RFP [No.] 2 (requesting a subset of these documents); and **(5) All complaints** about seizures of homeless persons' property (RFP Nos. 38-39).

(Id. at 4 (emphasis in original)).  It argues that plaintiffs have failed to show that *any* of this discovery is relevant, as it is related to Monell liability and declaratory relief, and the City, in its answer, concedes that it promulgated LAMC 56.11; conducts cleanups pursuant to that code, during which it removes and/or discards certain items that may belong to homeless persons; does not obtain a warrant before removing and discarding such items; "provides notice (or not) when removing and/or discarding such items"; and has enforced LAMC 56.11 since 2016, and continues to enforce it "to this day."  (Id. (citing Lebron Decl. ¶ 3 Ex. 28 (Answer to SAC) ¶¶ 16, 20, 21, 56, 68, 102, 114)).

Defendant reiterates that the discovery requested, therefore, is not proportional to the needs of the case.  (Id. at 5).  It states that it has "produced over 26,000 documents about unrelated cleanups, in unrelated locations, and involving unrelated encampments, people, and property."  (Id.).  This includes raw data from three databases, "detailing information about more than 40,000 cleanups from 2018 to 2020, and [defendant] invited Plaintiffs to identify any specific cleanups about which they wanted additional information."  (Id. (citing JS RFPs Ursea Decl. ¶¶ 12(a), 27)).  It reviewed approximately 1,200 government claims and "produced all responsive ones," and all non-privileged policy and training materials it identified from as early as 2012.  (Id. (citing JS RFPs Ursea Decl. ¶¶ 10, 24, 25, 39, 42)).  Finally, it has collected over 280 gb of raw data (over 500,000 emails from 2018 to the present) with respect to the 30 custodians and search terms proposed by plaintiffs.  (Id. (citing JS RFPs Ursea Decl. ¶ 32)).  It argues that requiring it to produce additional Policy/Practice discovery "would require extensive time and resources not proportional to the needs of the case."  (Id. (citing Wong Decl. ¶¶ 28-29 (collecting reports related to RFP numbers 33 and 34[7] would take 8,347 hours and cost $433,000); Munoz Decl. ¶¶ 5-6 (reviewing and redacting the 486 complaints for RFP 39 would require 1,994 hours and cost $82,736.64); Carter Decl. ¶ 5 (reviewing the 120,000 release from custody ("RFC") citations requested in RFP 39 would take 95 days and cost $117,000))).  The City submits that it has "already produced tens of thousands of documents and close to 100,000 pages of such discovery, even though Plaintiffs has [sic] not articulated the relevance of these requests," and asserts that the Motions, seeking to compel the City "to identify, review, and produce *all* such [Practice/Policy] discovery should be denied."  (Id.).

---

[7]     RFP number 33 seeks "All HOPE/Rapid Response 56.11 Enforcement Reports and related DOCUMENTS," including "related Health Hazard checklists, HOPE Metrics sheets, photographs, and other DOCUMENTS related to those reports" (JS RFPs at 254); RFP number 34 seeks "All Health Hazard Assessment Reports and related documents created by LA Sanitation to document ENCAMPMENT CLEANUPS," including but not limited to "Health Hazard checklists, Metrics sheets, photographs, and other DOCUMENTS related to these reports."  (Id. at 275).

Plaintiffs argue that the Policy/Practice discovery is relevant because they are bringing an "*as-applied* challenge" to the way in which the City enforces LAMC 56.11, and training, storage and destruction of belongings, and other information sought, is "unquestionably relevant to the issue." (JS Rogs at 26-27). They contend that they have "more than sufficiently pled *Monell* liability and need not identify each and every theory of liability in its pleadings [such as failure to train] to seek discovery about that particular theory." (Id. at 27; Pls.' JS Rogs Supp'l Mem. at 4-5 (citing Miller v. Pancucci, 141 F.R.D. 292, 296 (C.D. Cal. 1992))). Plaintiffs also argue that this case is "not simply about the City's written policies." (Pls.' JS Rogs Supp'l Mem. at 5 (citing SAC ¶¶ 68-123, 244, 263)). They state that there is no support for the City's narrow relevance and proportionality arguments, in which it contends that plaintiffs are entitled only to discovery about the Specific Incidents alleged by the individual plaintiff who propounded the requests. (Pls.' JS Rogs Supp'l Mem. at 2, 4; JS Rogs at 27). They state that even if this were a case for only money damages, an individual plaintiff would "undoubtedly be entitled to policies and procedures and training about the specific policies and practices that were the proximate cause of the injury and 'me too' evidence about additional, similar incidents" (Pls.' JS Rogs Supp'l Mem. at 4), and that they would still be required to prove that the violations "were the result of widespread and longstanding policies, customs or practices to establish *Monell* liability, for which the requested discovery would be both relevant and proportional." (JS Rogs at 2 n.1 (citation omitted)).

Finally, plaintiffs' state that there is no merit to the City's argument that it offered to stipulate to Monell discovery. (Pls.' JS Rogs Supp'l Mem. at 5). They explain that the "City proposed that the parties bifurcate the trial and as part of that bifurcation, agreed to stipulate *Monell* [sic] liability, which *Plaintiffs* raised during the initial discussion, as a condition of the bifurcation proposal." (Id. (italics in original)). Plaintiffs state that the proposal was rejected "for all of the reasons spelled out the [sic] July 30, 2020 letter, . . . including significantly, that the proposal did not account for [plaintiff] Ktown for All's claims at all." (Id. (citing JS RFPs Myers Decl. ¶ 29 Ex. P)). According to plaintiffs, the City never responded to that letter. (Id.).

Plaintiffs contend that defendant's relevance and proportionality objections impact its responses to plaintiffs' requests. (Id. at 2). Plaintiffs note, for instance, that defendant "exclud[ed] columns of data that contain critical information from spreadsheets it produced" and did not disclose that the columns were excluded; represented that it was producing "all South LA cleanups," but excluded reports "from more than 30 cleanups that occurred at the specific location alleged by Plaintiff"; produced select cleanup reports for June 11, 2019, but failed to produce others; failed to produce arrest and field interview documents for numerous plaintiffs; and identified the names of Environmental Compliance Inspectors ("ECIs"), but failed to state that other LA Sanitation workers were even present at the cleanups, and did not identify those individuals. (Id. at 2-3 (citing JS Rogs Myers Decl. ¶¶ 66-83; Riskin Decl. Exs. A-C)).[8]

Plaintiffs further note, for instance, that although the City stated in response to Interrogatory number 14 that it would provide information "regarding 'routine or regularly-generated reports relate[d] to encampment

---

[8]     Adrian Riskin, who runs an online blog seeking to increase government transparency and practice civic activism using the California Public Records Act ("CPRA"), states that he routinely submits requests related to homeless and homeless encampments to LA Sanitation, the LAPD, the City Attorneys' Office and various city council districts, "through the City's Nextrequest portal, when that is available." (JS Rogs Riskin Decl. ¶¶ 3-4). Using that methodology, he has received emails relating to cleanups; "Online Encampment Authorizations"; monthly tonnage reports for 2019; excel spreadsheets from LA Sanitation related to homeless encampment authorizations; and emails dating between March and May 2020, between the staff who liaise with City Council offices regarding sweep scheduling and their assigned Council offices. (Id. ¶¶ 5-9).

cleanups,'" it identified only one such report in its amended responses. (Id. at 3). Plaintiffs contend that they were able to "identify additional reports that the City failed to identify, let alone disclose," including reports sent monthly to Council offices that list encampment cleanups and dates of service, which "are unquestionably 'routine or regularly-generated reports related to encampment cleanups,'" but that the City argues it was not required to identify in the first place. (Id. (citing JS Rogs Riskin Decl. Ex. C)).

Similarly, plaintiffs claim that the City agreed in November 2020 to provide data from the databases used by LA Sanitation to track data related to encampment cleanups, but then withheld "significant data from the databases it produced, as well as the existence of an entire database" -- the Collection Information System ("CIS") database -- which the City first disclosed in February 2021 in its amended responses to the Interrogatories. (Id.). Plaintiffs requested the data from CIS, but the City never responded, and it now contends that the data is not relevant or proportional to the needs of this case. (Id. at 3-4 (citing JS Rogs Myers Decl. ¶ 39)). Plaintiffs contend that this database "appears to contain more complete data than any other database produced by Defendant, about whether encampment cleanups were actually conducted," and more precise addresses where the cleanups took place. (Id. at 4).

With respect to the RFPs, plaintiffs note that the City seems to believe that "it has done enough because it has produced thousands of pages of documents." (Pls.' JS RFPs Supp'l Mem. at 1). They argue that defendant "continues to withhold highly relevant documents, cherry picks the documents it actually produces, refuses to provide written responses that comply with Rule 34, and refuses to complete its production within a 'reasonable time' required by Rule 34." (Id.). They note that the City "has represented that it is not withholding documents responsive to a number of Plaintiffs' requests and on other requests would produce a subset of responsive documents; yet the City has inexplicably failed to produce those documents." (Id.). Additionally, despite representing to this Court, the District Judge, and plaintiffs that it had produced "all reports for cleanups in South LA" that were conducted in March 2019, the City recently produced documents demonstrating "that far more cleanups took place in South LA in March 2019 than the ones for which the City produced documents," including numerous cleanups that "did in fact take place at the exact location and at the exact time the [individual] Plaintiff alleges," and still has not produced documents related to those cleanups. (Id. at 1-2).

They also assert that defendant is withholding discovery based on its belief that plaintiffs' claims under the Declaratory Judgment Act have no merit, and contend that they are entitled to discovery on issues that are relevant to their claims and the City's defenses. (Id. at 3-4). They submit that if the City's policies, practices, and customs have not changed since LAMC 56.11 was implemented in 2016, "then cleanups going back that far would also be relevant and have a tendency to show how cleanups are currently conducted." (Id. at 4). They contend that the past policies and trainings will also "get at this very question -- whether the policies, customs, and practices have changed over time." (Id.).

Plaintiffs conclude that they are "entitled to and in fact need this discovery to prove their case," and that "nothing short of an Order from this Court will compel the City to comply with its discovery obligations." (JS Rogs at 3).

After careful consideration of the parties' positions, the Court determines that plaintiffs have sufficiently demonstrated that they are bringing an "as-applied" challenge to the way in which the City enforces LAMC 56.11 and that the information being sought by the requests, which encompasses the City's policies, practices, and customs with respect to encampment cleanups pursuant to LAMC 56.11, is relevant to the claims and defenses in this action, including, but not limited to, plaintiffs' Monell claim, notwithstanding defendant's concession that it promulgated and enforces LAMC 56.11.

Accordingly, defendant's objections that the requested discovery is not relevant because it seeks information or documents not related to any plaintiffs' individual incidents, and/or seeks information or documents not relevant to and/or not necessary to support plaintiffs' claim for <u>Monell</u> liability since defendant concedes that it promulgated and enforces LAMC 56.11, and/or not relevant to plaintiff's claim for declaratory relief, are **overruled**, except to the extent otherwise indicated herein.

### Proportionality and Burden

Plaintiffs observe that in response to the requests, in addition to its relevance objection, defendant also objected on proportionality grounds and suggested that because none of the requests is relevant to plaintiffs' individual claims, the burden required to produce information or documents is, per se, not proportional to the needs of the case.  (JS Rogs at 2, 7, 32-33).  With respect to the proportionality factors of Rule 26 of the Federal Rules of Civil Procedure, plaintiffs argue that the amount in controversy relied on by defendant to dispute proportionality (<u>i.e.</u>, $10,000 in monetary damages per plaintiff), is "largely irrelevant," and that the scope of this litigation and the issues at stake "are not hypothetical, nor are they up for debate."  (<u>Id.</u> at 33, 34).  Plaintiffs further note that the City's resources "far outmatch" plaintiffs' and "there is nearly complete asymmetry of access to relevant information."  (<u>Id.</u> at 34).  Finally, they assert that the discovery at issue is important to resolving the issues in this case, both with respect to individual harm and to establish <u>Monell</u> liability, and central to "how the City enforces LAMC 56.11 and conducts cleanups, and how it trains its employees to do so," among other things.  (<u>Id.</u> at 34-35).

Defendant contends that because it has no "centralized database or repository containing all LAMC 56.11 or encampment cleanup training materials or records," plaintiffs' requests put "an enormous burden on the City."  (<u>Id.</u> at 48).  It states that it has "produced training materials it has located and has identified such materials by title and bates number in response" to the Interrogatories.  (<u>Id.</u>).  The City also notes that it agreed to collect email communications, using the 30 custodians and broad search terms proposed by plaintiffs -- which netted over 500,000 emails (approximately 70,000 from LAPD custodians, and 475,000 from non-LAPD custodians).  (<u>Id.</u> at 31, 48).  Defendant states that the parties "had initially agreed to meet and confer regarding this data set," but plaintiffs served their portion of the Joint Stipulation(s) "while the City was in the process of producing documents from the first 70,000 emails" from the LAPD custodians.  (<u>Id.</u> at 31, 48).

With respect to other requests, defendant notes that the information sought is not proportional because it has "identified 32,780 incidents within WPIMS [database] constituting 'encampment cleanups' [since 2016] as defined in the Interrogatories, and 2016 is three years before the [S]pecific [I]ncidents alleged."  (<u>Id.</u> at 69-70).  It asserts that plaintiffs' requests "impose an expense and burden on the City that far outweighs any need it [sic] has for such information."  (<u>Id.</u> at 48).  With respect to the storage facility requests, defendant states that plaintiffs have issued a document subpoena to Chrysalis -- a third-party company that contracts with LAHSA to provide involuntary and voluntary storage for homeless individuals -- and asserts that "documents with responsive information" to the requests relating to storage facilities "are encompassed in that subpoena."  (<u>Id.</u> at 70).  Defendant argues that the burden on it is enormous because plaintiffs "are ***not*** contending that the City failed to produce documents responsive [to] th[ese] request[s] but [r]ather, Plaintiffs argue that the City should unequivocally state in its response to this RFP that it has produced 'all' responsive documents."  (JS RFPs at 92, 101, 148).

The City contends that the "discovery demand[ed] significantly outweighs the benefit of such information in resolving the alleged claims and vastly exceeds Plaintiffs' alleged damages," which, as stated in plaintiffs' Rule 26(a)(1) Initial Disclosures, reflect that the "individual Plaintiffs claim $10,000 in damages and Plaintiff El-Bey

seeks statutory damages." (JS RFPs at 33 (citations omitted)).  It also notes that it submitted declarations "show[ing] that it would cost over $600,000 to produce even a fraction of the additional Policy/Practice Discovery Plaintiffs seek to compel, which does not even include the burdens imposed by over 500,000 email communications.  (Def't's Supp'l Mem. at 2, 5 (citations omitted)).

Plaintiffs respond that the purported burden "is primarily of the City's own making," as it has rejected "every attempt by Plaintiffs to address Defendant's objections." (Pls.' JS RFPs Supp'l Mem. at 4).  They contend that, as acknowledged by the District Judge, plaintiffs' allegations make it clear that their claims for "injunctive and declaratory relief are significant and potentially more consequential than their request[s] for [monetary] damages," and that this is further evidenced by the fact that the District Judge has "already issued a Preliminary Injunction, enjoining the enforcement of two provisions of LAMC 56.11 city-wide, on the ground that it was unconstitutional on its face." (JS Rogs at 1 (citing Myers Decl. ¶ 14 & Ex. 12; ECF Nos. 36, 58)).  The District Judge also "found the City in Contempt for violating the preliminary injunction on numerous occasions city-wide." (Id. at 33-34 (citing ECF No. 106)).  Plaintiffs assert that although the City argues that production of documents related to the cleanups is too burdensome because there are more than 30,000 entries in the WPIMS database system from January 1, 2018, to the present, a significant number of these entries do not result in cleanups for which documentation would be created. (Pls.' JS RFPs Supp'l Mem. at 4-5).  They also state that Howard Wong, the Assistant Chief Environment Compliance Officer for the City of Los Angeles Department of Public Works, Bureau of Sanitation's Livability Services Division ("LSD") and Watershed Protection Division ("WPD"), does not dispute this fact. (Id. at 5; see also JS Rogs Wong Decl., JS RFPs Wong Decl.).

With respect to the production of responsive emails, plaintiffs also observe that the City has "long objected to the production of *any* emails responsive to any of Plaintiffs' discovery requests," and required plaintiffs "to propose custodians and search terms." (Pls.' JS RFPs Supp'l Mem. at 5).  Plaintiffs provided those terms and assert that the City determined five months later that the search terms are "overbroad," and still has not proposed a reasonable alternative. (Id.).  They suggest that "[a]bsent an order from this Court, compelling the City to produce documents responsive to Plaintiffs' requests, the City will simply wind down the discovery clock, without producing any responsive emails." (Id.).

After considering the parties' arguments, the Court determines that the importance of the issues at stake in this action, the parties' relative access to relevant information, the resources of the parties, the importance of the discovery in resolving the issues at stake, and the fact that, as noted by the District Judge (ECF No. 36 at 22), plaintiffs' allegations make it "clear that their claims for injunctive and declaratory relief are significant and potentially more consequential than their request for [$10,000 each in monetary] damages," all weigh in favor of plaintiffs; the burden and expense of producing the proposed discovery weigh in favor of defendant.  On balance, the Court finds that the requests are proportional to the needs of the action, as otherwise limited herein, and defendant's proportionality and burden objections are **overruled**, except to the extent otherwise indicated herein.

### Overbreadth

With respect to the JS RFPs, plaintiffs assert that "[c]onsistent with the mandate of proportionality," they are seeking the following:

1) all documentation for cleanups that impacted or likely impacted Plaintiffs, going back only to **January 1, 2018**; 2) only discrete types of documents for other cleanups conducted **the year before the Specific Incidents** [i.e., 2018] and **to the present**; and 3) data captured in the City's

databases, which is easily and frequently exported, for cleanups from **April 2016 to the present**.

(JS RFPs at 2 (emphases added)).  They note that many of the requests seek only a "specific type of document"; for instance, RFP numbers 30-34 seek specific forms, and RFP numbers 35-36 seek reports, statistics, and analyses.  (Id. at 2 n.1).  Plaintiffs also contend that the time frame requested for some of the requests -- since April 2016 when LAMC 56.11 was amended to its current form -- is not overbroad given that it is only a two year and eight month period prior to the "first individual incident."  (JS Rogs at 36).  They state that defendant bears the burden of showing a request is overbroad, and has not done so.  (JS RFPs at 85, 97).  They note that "three years of policy documents [for instance] is more than reasonable for purposes of *Monell* discovery."  (Id.).

With respect to certain of the requests, defendant contends that they are overbroad to the extent they seek information "relating to any individual plaintiff other than" the plaintiff who propounded the discovery requests.  (JS Rogs at 51; JS RFPs at 18).  It also objects to the requests as overbroad to the extent a request seeks information "dating back to April 2016" (JS Rogs at 51), or is "regarding encampment cleanups dating back two years and eight months that are unrelated, and not relevant to, [each Plaintiff's] specific claims alleged in the SAC."  (JS RFPs at 34).

To the extent the City objects to the requests as overbroad because they seek information relating to any individual plaintiff other than the plaintiff who propounded the requests, defendant's objection is **overruled**.

To the extent the City objects to the requests as overbroad because they seek information dating back to April 2016, or to some other time period prior to when plaintiffs' alleged Specific Incidents occurred, defendant's objection is **overruled in part**.

The Court finds that with respect to all of the requests, given the significant amount of information and documents being requested, it is reasonable to **narrow the time frame for all requests to January 2018 to the present**, unless already more narrowly limited by the request(s) itself or by prior agreement of the parties.

### Plaintiffs' Complaints About the City's Interrogatory Responses

#### Rule 33 and the City's Responses to Interrogatories

Plaintiffs contend that the City provided a response to a number of Interrogatories that "impermissibly rel[ied] on Rule 33 [of the Federal Rules of Civil Procedure] to cite to business records -- the very records it has refused to produce in response to" plaintiffs' RFPs.  (JS Rogs at 3).

The Court has reviewed defendant's amended responses and determines that defendant properly invoked Rule 33 and did not "impermissibly" rely on it to cite to business records.  The Court **sustains** defendant's invocation of Rule 33.

#### Waiver of Attorney-Client Privilege or Work Product Protection

Plaintiffs contend that defendant has waived its privilege and/or work product objections because it has failed to provide a privilege log.  (See JS Rogs at 38).

Defendant disputes this contention and notes that it made the objections to preserve its rights because, "until the search was conducted and documents reviewed, the City would not know whether or not the search results yielded any responsive or privileged communications." (Id. at 50). It contends that plaintiffs' argument that the City has waived these objections on the over half-million documents that the City has not yet reviewed "is unreasonable given the volume of documents," and the fact that during meet and confer discussions, the parties discussed producing privilege logs after document production concluded. (Id.).

The Court agrees with defendant and **sustains** defendant's attorney-client privilege and/or work product protection objections.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

With the foregoing in mind, the Court rules as follows:

## Specific Documents and Information Identified by Plaintiffs or Defendant in the Joint Stipulations

The Court notes that scattered throughout the almost 600 pages of the Joint Stipulations (without even counting the declarations), plaintiffs have specifically identified various documents that they assert have not been produced by defendant, and defendant has represented that it will produce (or has produced) certain documents. It is not, however, the Court's responsibility to comb through the over 3,500 filed pages to find and address every such needle in this enormous haystack.

Notwithstanding the foregoing, the Court notes that some of the aforementioned items that were noted in this Order -- some of which may otherwise be encompassed by the Court's ruling on the specific requests -- include the following:

- the City represented that it is "in the process of investigating and/or producing the handful of additional [Incident-Specific] documents and information identified in Plaintiffs' motions (most of which were first raised in Plaintiffs' [Joint] stipulations)";

- the City states it has no intention of withholding Incident-Specific discovery "or discovery that Plaintiffs identify with reasonable specificity in their pleadings, discovery, and/or meet-and-confer calls";

- plaintiffs identified certain cleanups from the database information produced by the City in December that may have involved plaintiffs Zamora and Haugabrook, and the City is "investigating those cleanups and is willing to meet and confer about the production of any potentially responsive documents it finds" (but see supra note 6);

- the City "invited" plaintiffs to identify any specific cleanups about which they wanted additional information from the three databases produced by defendant "detailing information about more than 40,000 cleanups from 2018 to 2020";

- plaintiffs contend that defendant "exclud[ed] columns of data containing critical information from spreadsheets it produced";

- plaintiffs contend that defendant stated it was "willing to provide raw data [relating to RFCs for violation of LAMC 56.11] from January 1, 2018 to November 2020 from an LAPD database that tracks arrests"; the City states that it offered to produce electronically exportable information relating to RFCs in its Consolidated Crime Analysis Database;

- plaintiffs contend that defendant excluded cleanup reports from more than 30 South LA cleanups "that occurred at the specific location alleged by Plaintiff";

- plaintiffs contend that defendant produced select cleanup reports for June 11, 2019, but failed to produce others; the City agreed to produce body-worn video ("BWV") reflecting the June 11, 2019, Specific Incident involving Zamora and Zepeda, and agreed to meet and confer regarding WPIMS incident/case numbers and production of reports that plaintiffs believe may be related to the incidents alleged by plaintiffs Zamora and Zepeda, and Haugabrook;

- plaintiffs contend that defendant failed to produce arrest and field interview documents for "numerous plaintiffs"; the City states it has produced two citations -- issued to Garcia and Diocson -- and a Field Investigation Card for Ashley that had been identified by plaintiffs in the JS RFPs;

- plaintiffs contend that defendant failed to identify LA Sanitation workers present at the cleanups; the City agreed to supplement its responses to Interrogatory numbers 7 and 9 to identify truck drivers and laborers present at certain cleanups identified in the SAC;

- plaintiffs identified additional routine or regularly-generated reports that the City failed to identify or disclose, including reports sent monthly to Council offices that list encampment cleanups and dates of service;

- plaintiffs requested data from the City's CIS database that defendant failed to produce;

- the City states that the parties had "initially agreed to meet and confer" regarding the 500,000 emails located by the City as a result of the search conducted using plaintiffs' search terms and custodians; the City was in the process of producing documents from the first 70,000 responsive emails from LAPD custodians that it had identified using plaintiffs' search terms and custodians, when plaintiffs served their Joint Stipulations;

- plaintiffs are aware of at least one monthly report -- a tonnage report -- created by LA Sanitation, which appears to be sent to the City Council offices detailing information about each encampment cleanup and each illegal dumping pickup conducted in each Council district;

- plaintiffs identify Executive Directive #16 as being responsive and relevant; defendant represents that Executive Directive #16 does not even mention encampment cleanups, LAMC 56.11, or seizure and destruction of homeless persons' belongings;

- the City agreed to produce a spreadsheet of electronically searchable information relating to claims against the City; plaintiffs contend that the City's electronic database fails to capture claims that were submitted in paper form or uploaded as PDF attachments;

- plaintiffs contend the City agreed to search for complaints to LAPD and to export all intake summaries that related to the seizure or destruction of unhoused persons' belongings, as well as a spreadsheet containing the complaints to the LAPD, but did not do so; defendant states that it identified 486 complaints in LAPD's Complaint Management System ("CMS") submitted between April 1, 2016, and December 15, 2020.

Again, this list is not intended to be exhaustive -- only illustrative of items that could and should have been resolved before these Motions were filed.  While a number of these items are specifically discussed or encompassed by the Court's Order below, some may not be.

The Court orders the parties to conduct a further meet and confer conference by telephone, **no later than May 12, 2020**, to resolve these items and any other such "agreements" made by a party, and/or issues or documents that have been identified as incomplete or "missing" in the Joint Stipulations or declarations and that are not otherwise mentioned or encompassed below.  The meet and confer should be conducted keeping in mind this Order, including the limitation to the time period beginning January 1, 2018, if applicable (i.e., unless otherwise agreed to, or more strictly narrowed by the request itself).  All documents to be produced as a result of this meet and confer shall be produced **no later than June 9, 2021**.

## Interrogatory Numbers 1, 2, 3, 4, 7, 9, and 14

### Interrogatory Numbers 1 and 2 (Training Information from April 2016)

Defendant's responses are sufficient.  Plaintiffs' Motion is **denied**.  However, if the City should locate and produce additional responsive training documents dating **from January 1, 2018**, **or after,** the City shall supplement its responses to Interrogatory Numbers 1 and 2 to specifically identify such documents by Bates number.[9]  Both parties are reminded of their continuing duty to supplement their discovery responses "**in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect**."  Fed. R. Civ. P. 26(e)(1) (emphasis added).

### Interrogatory Numbers 3 and 4 (Information Relating to the Location Where Seized Property is Stored)

The information is more easily obtainable from another source (Chrysalis).  In any event, defendant's Interrogatory responses are sufficient.  Plaintiffs' Motion is **denied**.

### Interrogatory Numbers 7 and 9 (Individuals Employed by the City Who Participated in March 21, 2019, and June 11, 2019, Cleanups)

The City has stated that it will supplement its responses to Interrogatory numbers 7 and 9 to identify truck drivers and laborers present at the March 21, 2019, and June 11, 2019, encampment cleanups.  Accordingly, plaintiffs' Motion is **granted**.  **No later than May 26, 2021**, defendant shall provide a further response to Interrogatory Numbers 7 and 9 identifying truck drivers and laborers present at the subject cleanups.

### Interrogatory Number 14 (Database and Enterprise System Information)

Interrogatory number 14 asked defendant to identify any "reports, summaries, data analysis or other outputs that have been generated related to ENCAMPMENT CLEANUPS **since January 1, 2019**," including the name of the report, who generated the data, the purpose of the report, to whom the report was distributed, and the date of the report or the frequency (e.g., weekly, monthly) with which the report is generated.  (JS Rogs at 104-05

---

[9]   Nothing herein is intended to limit defendant's option to utilize Rule 33 in further responding to any Interrogatories.

(emphasis added)).

After the parties met and conferred, the City agreed to identify "routine or regularly generated reports related to encampment cleanups." (Id. at 111). In its amended response to this Interrogatory, defendant objected that it "has produced the electronically exportable information from the relevant databases for the period 2018-2020" in response to plaintiffs' requests for production and that "reports or summaries from those databases were identified during its investigation," and were also produced. (JS Rogs at 108). It further provided a substantive response stating that the "only routine or periodic reports that are generated from the MyLA 311 database are reports that are included in weekly reports to the Mayor's Office and Council Districts, which contain illegal dumping service requests, CARE [Comprehensive Cleaning and Rapid Engagement] homeless encampment service requests, sources of requests, among other data points," and that it had provided those reports. (Id. (citing CTY019337-CTY020160 (2019-2020 weekly reports to the Mayor's Office and Council Districts)).

With respect to LASAN's Authorization Management System ("AMS") and Watershed Protection Information Management System ("WPIMS") databases, defendant explained that AMS contains authorizations for noticed encampment cleanups, and WPIMS contains basic data about encampment cleanups including dates and addresses of cleanups, identification of relevant Council Districts, names of LASAN responders, resolution information, and, as of 2019, estimated itemized collection information. (Id. at 109). It states that these databases "can be queried in many different ways, for many different reasons, by many different persons, departments, or entities." (Id. at 108, 109-10). They also state that reports are not run on a standard, routine basis from the AMS and WPIMS databases, but only "whenever there is a particular need for any given data set contained in these databases." (Id. at 109-10).

Lastly, the City identified the CIS database used to track the "various commodities collected; commodity tonnage; refuse collection truck operator routes, hours worked, and the locations where the commodities is [sic] disposed (landfills); the collection or delivery of trash bins; and work order charges." (Id. at 110). It states that total "CARE/CARE+ tonnage data is pulled monthly from CIS and used in weekly reports to the Mayor's Office and Council Districts," and the weekly reports contain information about CARE homeless encampment service requests, sources of requests, and monthly tonnage among other data points. (Id. (citing CTY19337-CTY020160 (2019-2020 weekly reports to the Mayor's Office and Council Districts))). It also generally described the individuals who would receive these weekly reports. (Id.).

Plaintiffs contend they are aware "of at least one monthly report," which they deem to be a "tonnage report," "created by LA Sanitation, which appears to be sent to the City Council offices, as recently as 2019," and which contains "detailed information about each encampment cleanup and each illegal dumping pickup that was conducted in each council district during the month." (Id. at 112 (citing Riskin Decl. ¶ 6 Ex. B (stating that the reports were produced by the City in response to a California Public Records Act request))). They state the City failed to disclose the existence of these reports. (Id.).

The City responds that the "tonnage data is not relevant to Plaintiffs' alleged claims or Monell liability and Plaintiffs [sic] demands for amended responses and extracted tonnage data from CIS is not proportional to the discovery needs of the case." (Id. at 113).

The Court determines that tonnage data is, at best, marginally relevant to the claims or defenses in this case. That being said, to the extent the City did not identify or produce "routine or regularly generated reports related to encampment cleanups" generated from its CIS system, or by LA Sanitation or some other entity, since January 2019, plaintiffs' Motion is **granted**. **No later than May 12, 2021**, defendant shall provide a further response to Interrogatory Number 14 identifying such reports, if any additional reports exist.

**RFPs at Issue (1, 2, 11-19, 23, 26, 29, 30, 33-36, 38, 39, 43-45, 47-49)**

### RFP No. 1 (Documents That Relate to Any Individual Plaintiff)

In its amended response, defendant stated that it would "produce additional non-privileged, responsive documents, if any, relating to individual Plaintiffs in Defendant's possession, custody or control." (JS RFPs at 19). In its Supplemental Memorandum, defendant states that on April 14, 2021, it produced the documents that plaintiffs identified in their portion of the JS RFPs as missing. (Def't's Supp'l Mem. at 3 (citing CTY092977-CTY-95469)). Plaintiffs request that the City be ordered to "provide a sworn affidavit attesting to the extent to which the City has searched for responsive documents and a complete, explicit response as to the finality of their production." (JS RFPs at 29).

Based on the foregoing, plaintiff's Motion is **granted in part**. **No later than May 26, 2021**, defendant shall provide a supplemental response to RFP No. 1 detailing the steps taken by the City to search for documents responsive to RFP number 1 and stating whether it has now produced all non-privileged, responsive documents in its possession, custody, or control that it has located as a result of that search. If the City locates additional responsive documents as a result of the documents identified by plaintiffs in the Joint Stipulations, or otherwise, then **no later than June 9, 2021**, it shall produce the additional non-privileged, responsive documents in its possession, custody, or control. The parties are again reminded of their continuing duty to supplement their discovery responses "**in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect**." Fed. R. Civ. P. 26(e)(1) (emphasis added).

### RFP No. 2 (Cleanup Events Stated in the SAC and Others)

RFP number 2 seeks documents relating to any cleanups that took place at the specific locations where the individual plaintiffs have been residing, from **January 1, 2018**, to the present. (JS RFPs at 33-34). Plaintiffs explain that the documents they are seeking include the following: health hazard assessment reports and checklists; photographs; posting surveys; Encampment Online Authorization forms for scheduled Comprehensive cleanups; communications regarding the cleanups; and LAPD documents related to the cleanups. (Id. at 41 n.6).

Defendants respond in great detail about the burden and expense of searching for and producing these documents and distinguish between incident-specific discovery and discovery related to so-called "unalleged" encampment cleanups, i.e., cleanups that are not alleged in the SAC. (Id. at 37-40).

#### Incident-Specific Discovery

Plaintiffs explain that despite its objections, the City produced documents in October 2019 and February 2020, related to all of the Specific Incidents enumerated in the SAC. (Id. at 44). They note, however, that the City "has withheld a significant number of documents related to the Specific Incidents, including documents the City explicitly informed this Court it had produced." (Id.). They specifically refer to documents relating to the incidents alleged by plaintiffs Zamora, Zepeda, and Haugabrook. (Id. at 44-49).

Defendant responds that with respect to the Incident-Specific discovery, on November 9, 2019, and December 10, 2019, it produced documents, encampment cleanup reports, Health Hazard Checklists, posting surveys, incident/case pictures during cleanups, and hazardous and non-hazardous waste records from the City's Bureau of Sanitation. (Id. at 62). It also produced various LAPD Reports. (Id.). On January 10, 2020, it produced

reports for encampment cleanups conducted in March 2019 in South Los Angeles in an attempt to pinpoint plaintiff Haugabrook's alleged incident.  (<u>Id.</u>).  The City asserts that it later produced documents reflecting Zamora and Zepeda's alleged incident on June 11, 2019, and "will request available BWV [body-worn video] and meet-and-confer with Plaintiffs regarding the production of BWV."  (<u>Id.</u> at 65).  It also notes that to the extent plaintiffs believe defendant has additional information relating to the March 21, 2019, incident alleged by plaintiffs Zamora and Zepeda, "the City will meet-and-confer regarding WPIMS incident/case numbers and production of reports."  (<u>Id.</u>).  With respect to plaintiff Haugabrook, defendant suggests that plaintiffs have identified "additional incidents that they believe reflect Haugabrook's claims based on the WPIMS excel spreadsheet" and, therefore, "have an obligation to raise the issue before moving to compel so that the City can meet and confer regarding Plaintiffs' identified WPIMS incident/case reports."  (<u>Id.</u> at 66-67).

Based on the foregoing, plaintiffs' Motion to compel documents responsive to RFP number 2 related to Incident-Specific discovery is **granted**.  **No later than May 12, 2021**, the parties shall meet and confer with regard to the WPIMS incident/case numbers plaintiffs believe relate to the March 21, 2019, incident alleged by plaintiffs Zamora and Zepeda, and to the incident(s) alleged by plaintiff Haugabrook.  **No later than June 9, 2021**, defendant shall produce responsive documents -- as agreed during the meet and confer -- related to those incident/case numbers.

## Unalleged Encampment Cleanups

Defendant contends that the request to produce all documents and reports for all encampment cleanups conducted from January 1, 2018, at five specified areas "where the individual Plaintiffs were living," are not relevant to plaintiffs' claims, including <u>Monell</u>.  (<u>Id.</u> at 71; <u>see also id.</u> at 40).  It also asserts that plaintiffs have not identified a single *unwritten* policy that subjected plaintiffs to a deprivation of constitutional rights under the Fourth Amendment and the Due Process Clause.  (<u>Id.</u> at 73).  The Court has already rejected these arguments.

The City also complains about the burden and expense of the proposed discovery and asserts that it far outweighs the likely benefit.  (<u>Id.</u> at 75-76).  It states that during the meet and confer process, it "agreed to produce additional information extracted from WPIMS and other databases."  (<u>Id.</u> at 76 (citing Ursea Decl. ¶ 12)).  It thus produced an excel spreadsheet containing additional data regarding encampment cleanups conducted in 2018 and 2019, and another for cleanups conducted in 2020.  (<u>Id.</u> (citations omitted)).  It further states that there is "no automated method for exporting documents and reports saved on WPIMS," and that in order to obtain a document or report on the system, it must be downloaded by an ECI one document at a time.  (JS RFPs at 77).  It notes that other documents not stored on WPIMS, identified by incident/case number, must also be collected, and might include, for example, hazardous and non-hazardous waste disposal records and authorizations for posted cleanups maintained in the AMS system maintained by Los Angeles' Department of Sanitation.  (<u>Id.</u>).  It asserts that to search for and produce all of the requested documents concerning the 32,730 encampment cleanups located using WPIMS since January 1, 2018,

> an ECI would need to reference a spreadsheet identifying all of incident/case numbers [sic] the address listed for the encampment cleanup, the date and type of cleanup (posted comprehensive cleanup or compliance action), manually download reports and documents in WPIMS, conduct additional searches by incident/case number for pictures and media files not save on WPIMS, and manually collect and assemble by incident/case number any waste disposal records or cleanup authorizations.

(Id.).  The City notes it is currently short-staffed with 12 ECI positions vacant, and that the foregoing process is "extremely time-consuming and expensive."  (Id.).  Accordingly, it argues that the Motion to compel production of all documents regarding all of the unalleged encampment cleanups, dating back to January 1, 2018, should be denied.  (Id. at 78).  It further asserts that in "the spirit of compromise," it produced over 26,000 documents about unrelated cleanups, in unrelated locations, and involving unrelated encampments, people, and property.  (Def't's Supp'l Mem. at 5).  It also produced raw data from three databases, detailing information about more than 40,000 cleanups from 2018 to 2020, "and invited Plaintiffs to identify any specific cleanups about which they wanted additional information."  (Id. (citing Ursea Decl. ¶¶ 12(a), 27)).

Plaintiffs argue that the City's claim of burden "is simply not credible."  (Pls.' JS RFPs Supp'l Mem. at 4).  Specifically, they state that "it is not credible that each document must be produced one at a time, instead of, for example, by providing the database to an e-discovery vendor, which could export the data, or that this must be done by an ECI, instead of an administrative clerks [sic] within LA Sanitation that enter data in the databases."  (Id. at 4-5).

As previously discussed, the Court determines that some documents and information from January 2018 forward relating to other encampment cleanups in the locations in which plaintiffs resided are relevant and proportional to the needs of the case.  However, the Court also finds that the burden on the City to produce all of the documents related to the 32,000 to 40,000 encampment cleanups identified by the City's databases since January 1, 2018, is not proportional to the needs of the case.

Based on the foregoing, plaintiffs' Motion to compel documents responsive to RFP number 2 related to unalleged encampment cleanups is **granted in part**.  **No later than May 12, 2021**, plaintiffs shall provide defendant with a list of **no more than 100 total incidents since January 1, 2018,** from the 2018-2019 AMS and WPIMS database information, with Bates numbers CTY19503-CTY020305; the MyLA311 database for 2018-2020; and/or the AMS and WPIMS database for 2019-2020, produced on December 29, 2020 (or from a combination thereof, totaling no more than 100).  (See JS RFPs Ursea Decl. ¶ 27).

With respect to each incident identified, defendant shall produce the following from the WPIMS database, the AMS database, and/or other storage locations, as applicable:  (1) health hazard assessment reports and checklists; (2) photographs; (3) posting surveys; (4) Encampment Online Authorization forms for scheduled Comprehensive Cleanups; and (5) LAPD documents related to the cleanups.[10]  (See JS RFPs at 41 n.6).

**No later than June 9, 2021**, defendant shall produce the resulting documentation pertaining to plaintiffs' selected incidents.

### Documents Related to Encampment Cleanups and Enforcement of LAMC 56.11:  RFP Nos. 11-15 (Written Policies); 16-19 (Training); 23, 26, 29 (Exemplars and Instructions Related to Forms and Notices)

RFP numbers 11-15 seek written "policies, procedures, directives, manuals, bulletins, and special orders," from April 2016 forward, relating to:  (a) conducting encampment cleanups (RFP No. 11); (b) LAMC 56.11, including but not limited to the handling of people's belongings (RFP No. 12); (c) the storage of property pursuant to

---

[10]   Plaintiffs' also state that they are seeking "communications regarding the cleanups."  (JS RFPs at 41 n.6).  Such communications are discussed herein with respect to the emails located by defendant in response to RFP numbers 23, 26, and 29.

LAMC 56.11 (RFP No. 13); (d) HOPE Teams[11] (RFP No. 14); and (e) the seizure or destruction of property because it constitutes an "immediate threat to the health and safety of the public" (RFP No. 15). Defendant objected to those requests but responded that it had previously produced responsive documents "and will produce additional responsive documents in Defendant's possession, custody or control." (JS RFPs at 79).

RFP numbers 16-19 seek all documents relating to trainings conducted by or for the City regarding (a) LAMC 56.11 (RFP No. 16); (b) encampment cleanups (RFP No. 17); (c) illegal dumping (RFP No. 18); and (d) at any time since January 1, 2012, as to "what constitutes 'an immediate threat to public health and safety'" (RFP No. 19).

RFP numbers 23, 26, and 29 seek all communications related to (1) the use of forms used by the City or any of its contractors, that are related to (a) encampment cleanups (RFP No. 23); and (b) storage of personal property taken, seized, or otherwise obtained by the City (RFP No. 26); and (2) notices used by the City or any of its contractors, that are related to encampment cleanups (RFP No. 29).

Plaintiffs complain that defendant's written responses fail to comply with Rule 34 because defendant "refuses to state that it is producing *all* documents in its possession, custody or control." (Id. at 82 (emphasis in original)). They also allege defendant failed to identify whether it was withholding documents responsive to the requests, failed to identify whether it limited its search for responsive documents in any way based on its objections, and has failed to finish its production of responsive documents or provide a date certain to do so. (Id. at 82, 84-85). They state that they are aware of additional documents that defendant "inexplicably still failed to produce." (Id. at 84). For instance, training documents reference "Executive Directive #16, which provides the 'mandate for HOPE/PUBLIC Right-of-Way Enforcement Teams,'" but defendant never produced that Directive. (Id.). They also argue that knowing which HOPE teams "are tasked with what jurisdiction, or how the HOPE teams are trained or instructed to carry out their work," "would be extremely helpful to Plaintiffs in figuring out who to depose . . . and in order to effectively question these witnesses." (Id. at 112-13).

Defendant primarily objects to these requests as overbroad and not proportional to the needs of the case. (JS RFPs at 81). It argues that because the relevance of policies and procedures other than LAMC 56.11 "is, at best, minimal, it is not proportional to the needs of this case to require the City to identify each and every policy, manual, etc." (Id. at 92). Defendant notes, for instance, that Executive Directive #16 "is a document from 2016 that does not even mention encampment cleanups, LAMC 56.11, or seizure and destruction of homeless persons' belongings," and illustrates "Plaintiffs' apparent -- even broader -- expectation of what constitutes a responsive document." (Id. at 93). Thus, it contends, "it would not be proportional to compel the City to locate, review, and produce 'all' responsive documents." (Id.).

With respect to RFP number 13, seeking documents related to the storage of property, defendant specifically contends that plaintiffs have failed to show how the requested documents will help determine whether plaintiffs received due process when their items were seized; whether the City could have provided more process when they seized plaintiffs' items; "the Court has concluded that the City's storage capacity is -- as a matter of law not relevant to determining the constitutionality of LAMC 56.11"; whether the belongings should have been stored rather than destroyed; and is not relevant to plaintiffs' contention that they had difficulty obtaining their impounded property. (Id. at 108-09).

---

[11]   Plaintiffs explain that "HOPE Teams are a specialized detail made up of LAPD officers and LA Sanitation employees specifically tasked with enforcement of LAMC 56.11 in 'rapid response' actions during which property is seized and destroyed." (JS RFPs at 112).

With respect to RFP number 15, defendant specifically contends that the issue is whether the items belonging to plaintiffs that the City allegedly destroyed in 2019 "were in fact health and safety hazards," and that plaintiffs fail to explain how policies and manuals dating back to 2016 would have any bearing on whether the allegedly destroyed property "in fact posed an immediate threat to health and safety." (Id. at 124-25).

With respect to RFP numbers 16-19, 23, 26, and 29, defendant specifically outlines the alleged burden in locating certain training documents stored in cloud servers and in paper copy. (Id. at 131-33). It contends that what training the City's ECIs received in the three years before the subject incidents is irrelevant, and that training from 2016 to the present has no bearing on whether plaintiffs' rights were violated during the alleged cleanups; additionally, defendant contends that plaintiffs fail to explain how training documents would contain impeachment evidence (as plaintiffs allege). (Id. at 147).

With respect to RFP numbers 23, 26, and 29 specifically, defendant describes the burden involved in locating "email instructions or clarifications related to the use of the forms," as well as the burden in obtaining documents from cloud servers as discussed above. (Id. at 186). It contends that it has already "produced the forms Plaintiffs requested," and has "produced training materials concerning those forms." (Id. at 201). It states that it has also agreed to produce certain emails "and has in fact produced over 20,000 such emails," and was in the process of "producing the agreed-upon emails when Plaintiffs served their portion of this stipulation." (Id.).

Defendant explains that on November 24, 2020, plaintiffs proposed "20 specific custodians from four different departments -- LAPD, LASAN, UHRC, and the City Attorneys' Office -- plus 'all Council staff,' and 'City witnesse[s] identified in the Rule 26" disclosures. (Id. at 202). It states that the search terms were broad, such that the searches were likely to result in "false hits." (Id.). Plaintiffs proposed alternative search terms on December 7, 2020, and "accused the City of unreasonably delaying running the search terms Plaintiffs initially proposed." (Id.). The City agreed to have "the respective ITA [Information Technology Agency] departments run Plaintiffs' proposed custodians and search terms, with the agreement that after the results came back, the parties would likely need to meet and confer to reasonably limit the dataset." (Id.).

With respect to emails of all Council staff, the City stated that it would identify the employees in each Council district that "were/are most likely to communicate about cleanups, 56.11, and related authorizations 2018 to the present and that it would propose a subset of custodians from those Council Districts" once the inquiry was completed. (Id. at 203). The City also invited plaintiffs to provide the names of council staff members. (Id.). Between December 14 and 17, 2020, the ITA department for the LAPD ran searches for emails from 2018 to 2020 of the 12 LAPD custodians plaintiffs proposed, using the search terms plaintiffs proposed. (Id.). The resulting data was uploaded by the City's e-discovery vendor and completed on January 6, 2021, resulting in 70,623 documents. (Id.).

On February 17, 2021, ITA completed email collection for the 27 LASAN custodians and 2 UHRC custodians using plaintiffs' proposed search terms. (Id.). The 250 gb of raw data collected exceeded the storage space available under the City's agreement with its e-discovery vendor and it had to re-negotiate a new agreement, which became effective on March 1, 2021. (Id.). Defendant notified plaintiffs that the parties would need to meet and confer to limit the dataset, but plaintiffs never responded. (Id.).

On March 5, 2021, the City produced 4,650 documents from the LAPD dataset; on March 18, 2021, plaintiffs served their portion of the JS RFPs. (Id. at 204). Defendant contends it was not notified that plaintiffs intended to serve the JS RFPs, or of the grounds upon which the Motion would be based. (Id.). It further states that plaintiffs "did not notify the City . . . as to any of the Plaintiff-specific or policy-related documents Plaintiffs allege to be 'missing' from the City's production." (Id.). On March 24, 2021, the City produced 19,068 more

documents from the LAPD dataset of 70,623 email documents, which, defendant contends, included at least one of the categories of documents plaintiffs contend the City had withheld -- the "HE/ID [Homeless Encampment/Illegally Dumping] Confirmation Sheets." (Id. (citing Ursea Decl. ¶ 42)).

On March 30, 2021, the e-discovery vendor completed uploading the 250 gb of data, which resulted in approximately 475,000 documents. (Id.). Based on all of this, defendant states that "Plaintiffs' accusations of the City's unreasonable delay, failures to meet and confer, and 'withholding' of documents, plainly have no merit." (Id.). It also submits that plaintiffs' demand that all communications be produced within 21 days, "is not proportional to the needs of the case." (Id. at 204-05).

With respect to RFP number 26, defendant asserts that it is virtually identical to RFP number 23, except "that it is far broader in that it does not even tie the forms to encampment cleanups or 56.11 . . . but instead asks for communications related to the use of form[s] related to storage of property 'taken, seized, *or otherwise obtained*." (Id. at 218 (emphasis in original)).

Plaintiffs respond that the burden alleged is "in essence, nothing more than the routine obligation of a party to identify responsive discovery," especially as it applies to ESI (electronically stored information): "1) identifying custodians; 2) formulating searches; 3) running those searches; 4) exporting data; and 5) screening for privilege." (Id. at 139). They note that the City "has been in active litigation about these specific issues [raised in this action] since 2011," and the "information should be readily available, as it would be implicated in every discovery request ever made to the City (to say nothing of the City's obligation to produce documents responsive to the CPRA)." (Id.). Plaintiffs also argue that defendant has not identified, "as is its burden, what sources of data are not 'readily accessible' so the parties can address the burden," and, in fact, the City's objection "spelling out the process for obtaining the documents makes clear that the relevant records are stored in active servers (and in paper copy)." (Id. at 143).

Plaintiffs' Motion is **granted in part** as to RFP number 23, 26, and 29. With respect to the approximately 70,623 documents defendant located and which it has described as the "LAPD dataset," **no later than May 12, 2021**, the parties shall meet and confer and come to an agreement with respect to determining a subset of these documents (whether narrowed by search terms, and/or date, and/or some other agreed-upon method), such that the 70,623 documents are reduced to no more than approximately 7,000 responsive documents. **No later than June 9, 2021**, defendant shall produce the non-privileged, narrowed group of responsive documents.

With respect to the approximately 475,000 documents being stored by the e-discovery vendor, **no later than May 12, 2021**, the parties shall meet and confer and come to an agreement with respect to determining a subset of these documents (whether narrowed by custodian, and/or search terms, and/or date, and/or some other agreed-upon method), such that the 475,000 documents are reduced to no more than approximately 47,500 responsive documents. **No later than June 9, 2021**, defendant shall produce the non-privileged, narrowed group of responsive documents.

Plaintiffs' Motion is **granted in part** as to RFP numbers 11-15 and 16-19. **No later than June 9, 2021**, to the extent not already produced, defendant shall produce documents responsive to these RFPs dating from January 1, 2018, forward, and relating to LAMC 56.11. Executive Directive #16 (and documents relating solely to Executive Directive #16 and not otherwise responsive to RFP numbers 11-15 and 16-19) need not be produced.

**RFP Nos. 30, 33-34, 43-45 (Documents Relating to City's Customs, Practices, and Application of Policies Relating to Cleanup and Disposition of Property); and RFP Nos. 35, 36, 47-49 (Summaries, Reports, Analysis and Data Compilations Relating to the City's Customs, Practices, and Application of Policies Relating to Cleanup and Disposition of Property)**

These RFPs seek documents relating to the City's customs, practices, and application of policies relating to the cleanup and disposition of property, including:  (1) the posting of notices for encampment cleanups (RFP No. 30); (2) all HOPE/Rapid Response 56.11 Enforcement Reports and related documents (RFP No. 33); (3) all Health Hazard Assessment Reports created by LA Sanitation to document encampment cleanups (RFP No. 34); (4) the City's capacity to store property seized pursuant to LAMC 56.11 or as part of an encampment cleanup (RFP No. 43); (5) any change in the City's capacity to store property seized pursuant to LAMC 56.11 or as part of encampment cleanups (RFP No. 44); (6) all statistics, reports, analysis, or data compilations related to the use or capacity of storage facilities (RFP No. 45); (7) reports, summaries, statistics, analysis or data compilations related to (a) encampment cleanups (RFP No. 35); (b) the enforcement of LAMC 56.11 (RFP No. 36); and (8) documents that track or document when, where, what, and/or how much property (a) is taken or seized by the City pursuant to LAMC 56.11 (RFP No. 47); (b) is stored (RFP No. 48); and (c) stored in storage facilities has been retrieved or destroyed and by whom (RFP No. 49).

Among other things, plaintiffs note that the City "stated only generally that it was willing to produce data from three databases, WPIMS, AMS, and My 311," used to collect LA Sanitation data, from January 1, 2018, to November 2020.  (JS RFPs at 290).  Defense counsel also indicated to plaintiffs that "they had 'identified and reviewed additional documents responsive to Plaintiffs' requests, including organizational charts, job descriptions, tonnage reports, cleanup reports to the Mayor's Office and powerpoints,'" and were "continuing [their] investigation into what ha[d] been collected and whatever may be left to collect; [and they would] continue to review and produce as soon as possible on a rolling basis."  (Id. at 291 (citing Myers Decl. ¶ 54 & Ex. AH)).  Then, in December 2020, defendant "inexplicably produced approximately 550 black and white PDFs (totaling approximately 4000 pages) of 'Data Center reports' created by LA Sanitation, compiling information about, among other data, Encampment Cleanups," but did not provide an amended response to the requests or explain why those documents were being produced.  (Id. at 289).

Defendant states that the Release from Custody citations (RFCs) that plaintiffs are seeking with respect to RFP number 36 are "burdensome to identify, review, and produce."  (Id. at 340).  LAPD searched for and located approximately 120,622 RFCs dated between April 2016 to the present, in its Consolidated Crime Analysis Database ("CCAD") that would need to be located and hand-searched to identify the approximately 3,808 RFCs related to LAMC 56.11.  (Id. (citing Carter Decl. ¶¶ 3-4)).  Defendant states that it has offered to compromise and produce electronically exportable information, but that requiring it to also perform manual searches is not proportional to the needs of the case.  (Id.).

Plaintiffs assert that during the meet and confer the City indicated it was "willing to produce only raw data from the City's database about the City's issuance of Release from Custody citations . . . for violations of LAMC 56.11, which the City purported to produce in December 2020."  (Id. at 304).  They state that the production was incomplete because the City's spreadsheet excluded critical columns of data, "including the citation numbers for the RFC, which is used in court filings and is therefore a vital piece of information," and included only those RFCs "in which the top-line charge is LAMC 56.11 (i.e., the first charge on the citation), but excludes those instances in which 56.11 was an additional charge."  (Id.).  They state that they are aware of the deficiency in this production "only because this data was produced to a third party pursuant to the CPRA and then provided to Plaintiffs," and, among other things, included eight columns for violation types; therefore, the data produced

to the third party includes citations where the first offense listed was not for LAMC 56.11.  (Id. at 304-05 (citing Myers Decl. ¶ 74 Ex. AR)).

Based on the foregoing, plaintiffs' Motion is **granted in part**.  **No later than May 12, 2021**, defendant shall provide plaintiffs with an explanation relating to the 4,000 PDF pages produced in December 2020.  **No later than June 9, 2021**, it shall also re-produce the RFC data to also include citations **since January 1, 2018**, where LAMC 56.11 is the cited offense at any of the first three levels of violation.  Defendant's "rolling production" of documents related to LAMC 56.11 **since January 1, 2018**, responsive to these RFPs, shall be completed **no later than June 9, 2021**.

### RFP Nos. 38 and 39 (Complaints Relating to the City's Customs, Practices, and Application of Policies Relating to Cleanup and Disposition of Property)

These RFPs seek (1) all Government Tort claims filed against the City since 2016 related to the seizure and/or destruction of homeless people's belongings (RFP No. 38); and (2) all complaints or grievances filed against the City, including the LAPD, related to the seizure and/or destruction of homeless people's belongings (RFP No. 39).

Defendant asserts that from April 1, 2016, to July 30, 2020, "a total of 26,755 government tort claims were filed against the City."  (JS RFPs at 310).  It states that in order to search for and produce responsive documents, it "would need to create search parameters to query Defendant's City Attorney's Office Citylaw database to search government claims during this period; however, there are no fields to identify or segregate claims filed relating to the seizure or destruction of homeless people's belongings and such claims could be input into the database by different causes relating to civil rights, property, miscellaneous, and inputs as claims against different departments, such as LASAN, LAPD, or the City."  (Id. at 312).  Thus, it would have to run "multiple queries to identify potentially responsive government claims out of these 26,775 claims by claim number."  (Id. at 312-13).  The City also suggests that there "are likely government tort claims not stored within Citylaw, which would require a search of hard copy files of government claims stored offsite that would need to be recalled from storage and manually searched for responsive documents."  (Id. at 313).  After submitting this amended response, plaintiffs note that the "City inexplicably reversed course," and agreed to produce Government Tort Claims it could search for electronically using search terms . . . which limited the searches to only those claims that were actually filed electronically."  (Id. at 313-14).  They state that the City identified and turned over 35 claims submitted by 20 individuals.[12]  (Id. at 314).

Plaintiffs contend that government tort claims are relevant to whether the City "has a widespread custom and practice of engaging in these violations and whether the City was on notice of the practices and did not address the issues about which individuals complained."  (Id.).  They acknowledge that the City produced the documents related to 35 such claims based on its electronic search, but note that the City's electronic search excluded any and all Government Tort claims that were submitted in paper form or uploaded as PDF attachments.  (Id. at 314).  They explain that Government Tort claims "can be filed with the City . . . by using the City's . . . form and

---

[12]    Defendant explains that in searching for electronically filed government tort claims, it identified approximately 1,200 claims, and determined that approximately 30 were responsive.  (JS RFPs at 323 (citing Ursea Decl. ¶ 10)).  It states that although it had "previously agreed only to produce a spreadsheet of electronically searchable information from the database, [it] took the extra step to manually download each of the [30] claims identified," and produced the documents to plaintiffs on December 18, 2020.  (Id. (citing Ursea Decl. ¶ 24)).

submitting it via mail or in person, or by using the City's government tort claim portal." (Id. at 314 n.24 (citation omitted)).  They assert that the search agreed to by defendant is inadequate because the search was "likely to leave out claims submitted by unhoused residents," and plaintiffs "can also show that the City has withheld documents responsive to this request."  (Id.).  Plaintiffs also argue that the alleged burden of searching for responsive Government Tort Claims, "is a burden of the City's own making."  (Id. at 319 (citing United States ex rel. Guardiola v. Renown Health, 2015 WL 5056726, at *5 (D. Nev. Aug. 25, 2015) (organizations should give "thought to the risk of litigation and corresponding obligations" when considering how to store their documents))); see also Lou v. Ma Labs, Inc., 2013 WL 12328278, at *2 (N.D. Cal. Mar. 28, 2013) (finding that the "burden defendants claim excuses them from producing such documents is of their own making, and thus not compelling"), clarified on denial of reconsideration, 2013 WL 1615785 (N.D. Cal. Apr. 15, 2013) (citations omitted).

Defendant replies that plaintiffs have not met their burden to establish the relevance of Government Tort Claims from 2016 to the present.  (Id. at 322).  It notes that of the 1,200 claims retrieved based on its electronic search, only 30 (i.e., 2.5%) were related to the seizure or destruction of homeless people's belongings.  (Id.).  Defendant asserts that even if the information being sought was marginally relevant, the burden of manually searching for responsive claims documents from 2016 that are not electronically searchable, is not proportionate to the needs of the case.  (Id. at 322-23).

With respect to RFP number 39, plaintiffs again note that after refusing to produce documents in response to this request, on "November 19, the City inexplicably reversed course," and agreed to search for complaints to LAPD and to export all intake summaries that related to the seizure or destruction of unhoused persons's belongings. (Id. at 330).  It also agreed to produce a spreadsheet containing complaints to the LAPD by December 18, 2020, but did not do so.  (Id.).  They assert that on December 29, 2020, defendant stated that it was still working on getting the requested police complaints, but has not communicated with plaintiffs about this request since that time.  (Id. at 330-31).  They argue that the six-month delay in producing documents is "inexcusable," and that the agreement to produce only complaints filed with the LAPD is insufficient.  (Id. at 340).  Plaintiffs also contend that the "City's failure to operate or centralize a formal grievance or complaint process for unhoused people to complain about their property being taken or destroyed does not justify refusing to conduct a reasonable search for these highly relevant and responsive documents."  (Id. at 335 (citing Thomas v. Cate, 715 F. Supp. 2d 1012, 1033 (E.D. Cal. 2010))).

Defendant states that complaints received by the LAPD are logged in the CMS system, and that since April 2016 it "logged over 12,000 complaints within CMS."  (Id. at 328).  It identified 486 complaints that were submitted between April 1, 2016, and December 15, 2020, after a search of CMS using various search terms related to this action.  (Id. at 339-40).  It states that the average time required to "collect, review, and redact a complaint file [to protect confidential information such as victims' names] is approximately four hours," for a total of approximately 1,994 hours of work at a cost of approximately $83,000.  (Id. at 326, 340; see also Def't's Supp'l Mem. at 5 (citations omitted)).  It also asserts that there are hard copies of files located offsite that would need to be recalled from storage and manually searched for responsive documents.  (JS RFPs at 329).

With respect to RFP number 38, defendant represents that it has already produced documents related to the 30-35 claims related to LAMC 56.11 that it was able to search for and locate electronically using relevant search terms. Based on defendant's representations of the burden of locating and producing paper and mailed complaints that are not searchable, and the marginal relevance of many of those documents to the parties' claims and defenses, the Court finds that the request to produce additional claims documents is not proportional to the needs of the case.  Plaintiffs' Motion to compel further documents in response to RFP number 38 is **denied**.

With respect to RFP number 39, **no later than June 9, 2021**, defendant shall produce to plaintiffs the responsive, non-privileged documents from the subset of the 486 complaints identified by the City after a search of its CMS database, that were **submitted between January 1, 2018, and December 15, 2020**, and that relate to the seizure and/or destruction of homeless people's belongings.   Accordingly, plaintiffs' Motion to compel further documents in response to RFP number 38 is **granted in part**.

*********************************************

As set forth herein, plaintiffs' Motions to compel (ECF Nos. 121, 122) are **granted in part** and **denied in part**.

Plaintiffs' requests for sanctions with respect to both Motions is **denied**.

IT IS SO ORDERED.


cc:      Counsel of Record


Initials of Deputy Clerk _____ch_____