**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JANET GARCIA; GLADYS ZEPEDA; MIRIAM ZAMORA; ALI EL-BEY; PETER DIOCSON, JR.; MARQUIS ASHLEY; JAMES HAUGABROOK; KTOWN FOR ALL, an unincorporated association; ASSOCIATION FOR RESPONSIBLE AND EQUITABLE PUBLIC SPENDING, an unincorporated association, | No. 20-55522<br><br>D.C. No. 2:19-cv-06182-DSF-PLA |
| *Plaintiffs-Appellees*, | |
| v. | OPINION |
| CITY OF LOS ANGELES, a municipal entity, | |
| *Defendant-Appellant*, | |
| and | |
| DOES, 1–7, | |
| *Defendant.* | |

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted January 13, 2021
Pasadena, California

2          GARCIA V. CITY OF LOS ANGELES

Filed September 2, 2021

Before:  Michelle T. Friedland and Mark J. Bennett, Circuit
Judges, and David A. Ezra,[*] District Judge.

Opinion by Judge Friedland;
Dissent by Judge Bennett

---

**SUMMARY**[**]

---

**Civil Rights**

The panel affirmed the district court's preliminary injunction prohibiting the City of Los Angeles from discarding homeless individuals' "Bulky Items" that are stored in public areas, as authorized by a provision of its municipal code.

As part of the City's response to the homelessness crisis, section 56.11 of the City's municipal code (the "ordinance") strictly limits the storage of personal property in public areas.  Under subsection (3)(i) of the ordinance (the "Bulky Items Provision"), the City, without notice, may remove and may discard any "Bulky Items" (generally any item too large to fit into a 60-gallon container) stored in a public area unless the Bulky Item is designed to be used as a shelter.

---

[*] The Honorable David A. Ezra, United States District Judge for the District of Hawaii, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel first agreed with the district court that Plaintiffs were likely to succeed on their claim that the Bulky Items Provision violates the Fourth Amendment's protection against unreasonable seizures.  The panel noted that in *Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012), this court upheld a preliminary injunction that prohibited Los Angeles from summarily destroying homeless individuals' publicly stored personal property.  The panel saw no meaningful distinction between the destruction of property enjoined in *Lavan* and the destruction of property enjoined here.

The panel also concluded that the ordinance's clauses authorizing the discarding of Bulky Items were not functionally separable and therefore were not severable from the remainder of the Bulky Items Provision.  The City contended that because the ordinance included a severability clause, the district court erred in not severing the clauses that specifically authorized discarding Bulky Items ("the destruction clauses").  The City argued that, without the destruction clauses, the remainder of the Bulky Items Provision would be constitutional because the removal alone of Bulky Items would be lawful, and thus, the entire Bulky Items Provision should not have been enjoined.

Applying California law, the panel explained that the presence of a severability clause is not conclusive, and that to be severable an invalid provision also must be grammatically, functionally, and volitionally separable from the remainder of the act.  All three criteria must be satisfied.  The panel held that the Bulky Items Provision was not functionally autonomous absent the destruction clauses because those clauses were necessary to the Provision's operation and purpose.  No paragraph of the ordinance provided that the City may "move" or "remove" property

from a public area without specifying what happened after that movement or removal.  This structure indicated that "may remove," as the phrase was used in the ordinance, described only the initial step of a multi-step enforcement process—making the larger phrase "may remove and may discard" a unitary whole.

In addition to being functionally inseparable in light of the structure of the ordinance, the destruction clauses of the Bulky Items Provision also were functionally inseparable in practice.  The panel noted that the City's own statements made clear that discarding Bulky Items was "inextricably connected" to full enforcement of the Provision. Accordingly, the panel could not say that the Bulky Items Provision could stand on its own, unaided by the clauses authorizing destruction.  Rather, the ability to destroy Bulky Items appeared to be an integral part of the Bulky Items Provision's operation and purpose.  This meant that the destruction clauses were not functionally separable.

The panel held that the district court appropriately concluded that the remaining preliminary injunction factors, set forth in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), tipped in Plaintiffs' favor.

Dissenting, Judge Bennett stated that the Los Angeles City Council included a robust severability clause in the ordinance, and that the presence of such a clause established a presumption in favor of severance.  Judge Bennett believed that the "may discard" provision of the ordinance should be severed, and that the constitutionality of the "may remove" provision should then be separately analyzed.  Judge Bennett noted that the district court did not directly address the City's severance argument.  He therefore would remand the case to the district court to consider whether the "may remove"

provision is facially constitutional, and if it finds that it is, to reconsider whether the injunctive relief it ordered is appropriate.

## COUNSEL

Jonathan H. Eisenman (argued), Deputy City Attorney; Blithe S. Bock, Managing Assistant City Attorney; Scott Marcus, Senior Assistant City Attorney; Kathleen A. Kenealy, Chief Deputy City Attorney; Michael N. Feuer, City Attorney; Office of the City Attorney, Los Angeles, California; for Defendant-Appellant.

Shayla Myers (argued), Mallory B. Andrews, and Alex Flores. Legal Aid Foundation of Los Angeles, Los Angeles, California; Catherine Sweetser, Schonbrun Seplow Harris Hoffman & Zeldes LLP, Los Angeles, California; Benjamin A. Herbert and Michael Onufer, Kirkland & Ellis LLP, Los Angeles, California; for Plaintiffs-Appellees.

Theane Evangelis, Bradley J. Hamburger, Daniel R. Adler, William F. Cole, and Andrew T. Brown, Gibson Dunn & Crutcher LLP, Los Angeles, California, for Amicus Curiae League of California Cities.

Eric S. Tars, Tristia Bauman, and Brandy Ryan, National Homelessness Law Center, Washington, D.C., for Amicus Curiae National Homelessness Law Center.

## OPINION

FRIEDLAND, Circuit Judge:

The City of Los Angeles appeals a preliminary injunction prohibiting it from discarding homeless individuals' "Bulky Items" that are stored in public areas, as authorized by a provision of its municipal code.  We agree with the district court that Plaintiffs are likely to succeed on their claim that this provision, on its face, violates the Fourth Amendment's protection against unreasonable seizures.  We also conclude that the clauses authorizing the discarding of those items are not severable from the remainder of the provision.  Accordingly, we affirm.

### I.

The escalating homelessness crisis in the City of Los Angeles ("the City") has forced an unprecedented number of residents to live, sleep, and store their belongings exclusively in public places.  In January of 2019, the year this litigation began, there were over 35,000 homeless individuals living in the City.[1]  L.A. Homeless Servs. Auth., *2019 Greater Los Angeles Homeless Count—Data Summary: City of Los Angeles* 1 (2020).  Of these individuals, more than 17,000 lived in vehicles, tents, or makeshift shelters.  L.A. Homeless Servs. Auth., *2019 Greater Los Angeles Homeless Count—Vehicles, Tents, and*

---

[1] The parties use both "homeless" and "unhoused" in their briefs when describing individuals experiencing homelessness.  Given that the parties have not expressed a terminological preference, we follow the lead of the district court, which used the term "homeless" when analyzing the merits of the preliminary injunction motion.

*Makeshift Shelters Counted by Geographic Area* 5 (2019).[2]
The term "makeshift shelter" refers to "dwellings made from
scavenged materials such as boxes, shopping carts, or scrap
metal." L.A. Homeless Servs. Auth., *2020 Greater Los
Angeles Homeless Count—Vehicles, Tents, and Makeshift
Shelters Counted by Geographic Area* 1 (2020).

Part of the City's response to this crisis is section 56.11
of its municipal code ("the ordinance"), which strictly limits
the storage of personal property in public areas.[3] Under most
provisions of the ordinance—such as those addressing
publicly stored property that is unattended; obstructing City
operations; impeding passageways required by the
Americans with Disabilities Act; or within ten feet of an
entrance, exit, driveway, or loading dock—the City may
impound that property and must store it for ninety days to
give its owner the opportunity to reclaim it. *See* L.A., Cal.,
Mun. Code § 56.11(3)(a), (c)–(e) (2016); § 56.11(5). But
the City may also, pursuant to the ordinance, discard
publicly stored property without impounding it when it

---

[2] These figures come from a point-in-time count that is conducted
annually by the Los Angeles Homeless Services Authority. The numbers
increased in the January 2020 count, which recorded 41,290 homeless
individuals living in the City, of whom 19,630 lived in vehicles, tents, or
makeshift shelters. These counts, moreover, are likely underinclusive—
according to the Authority, "the estimated number of persons in vehicles,
tents, and makeshift shelters accounts for only a share of the total
unsheltered population that is counted." L.A. Homeless Servs. Auth.,
*2020 Greater Los Angeles Homeless Count—Total Point-in-Time
Homeless Population by Geographic Areas* 1 (2020); L.A. Homeless
Servs. Auth., *2020 Greater Los Angeles Homeless Count—Vehicles,
Tents, and Makeshift Shelters Counted by Geographic Area* 1, 3 (2020).

[3] A "public area" is any property "owned, managed or maintained
by the City," including any road, sidewalk, "medial strip, space, ground,
building or structure." L.A., Cal., Mun. Code § 56.11(2)(k) (2016).

constitutes an immediate threat to public health or safety or is evidence of a crime or contraband.  § 56.11(3)(g)–(h). Finally, the City may discard without first impounding publicly stored personal property when it is a "Bulky Item" that is not designed to be used as a shelter.  § 56.11(3)(i).

It is subsection (3)(i) of the ordinance, which we refer to as either the Bulky Items Provision or the Provision, that is the subject of this litigation.  The Bulky Items Provision states that

> [w]ithout prior notice, the City may remove and may discard any Bulky Item, whether Attended or Unattended, Stored in a Public Area unless the Bulky Item is designed to be used as a shelter.  For any Bulky Item that is designed to be used as a shelter but does not constitute a Tent as defined in Subsection 2(q), with pre-removal notice as specified in Subsection 4(a), the City may remove and discard the Bulky Item, whether Attended or Unattended.  If the Bulky Item violates subsection 3(d)–(h) herein, even if it is designed to be used as a shelter, without prior notice, the City may remove and discard the Bulky Item, whether Attended or Unattended.

*Id.*  The ordinance defines a "Bulky Item" as

> any item, with the exception of a constructed Tent, operational bicycle or operational walker, crutch or wheelchair, that is too large to fit into a 60-gallon container [which is a common size for curbside-pickup household trash bins] with the lid closed, including, but

> not limited to, a shed, structure, mattress, couch, chair, other furniture or appliance.

§ 56.11(2)(c). The ordinance makes it a misdemeanor for anyone to "willfully resist, delay or obstruct a City employee from removing or discarding a Bulky Item." § 56.11(10)(d).

Acting pursuant to the ordinance, the Los Angeles Bureau of Sanitation, with the assistance of the Los Angeles Police Department, conducts cleanups of homeless encampments. These include both "noticed cleanups, which are either noticed in advance" or "conducted on a regular schedule," and "rapid response[]" cleanups, which are neither noticed nor scheduled but instead triggered by resident complaints or demands by the City Council. During cleanups, City employees typically prohibit individuals from moving their Bulky Items to another location; rather, they "immediately destroy" those items by "throwing [them] in the back of a trash compactor, crushing the item[s]." For example, City employees have discarded a crate that a person used to secure his pet dog at night; carts that a person used to transport his possessions; wooden pallets and a cushion on which a person slept; and bins that a person used to keep her clothing dry—sometimes in the presence of their respective owners.

A group of homeless individuals who have had their personal property destroyed by the City, along with two organizations that advocate for the interests of homeless individuals, brought this litigation. As relevant here, Plaintiffs contended that the Bulky Items Provision, on its face, violates the Fourth Amendment's protection against unreasonable seizures and the Fourteenth Amendment's guarantee of procedural due process. Three Plaintiffs who had been specifically injured by the destruction of Bulky

Items moved to preliminarily enjoin the City from enforcing the Bulky Items Provision. In opposing the motion, the City raised a cursory severability argument, asserting that the Provision authorizes two distinct actions—removing property and discarding property—and that the district court should analyze the constitutionality of those two actions separately. The City cited as support the ordinance's severability clause, which provides that "[i]f any subsection, sentence, clause or phrase of" the ordinance is held invalid, "such decision shall not affect the validity of the remaining portions." § 56.11(12). The clause further declares that the City Council "would have adopted [§ 56.11], and each and every subsection, sentence, clause and phrase thereof not declared invalid or unconstitutional, without regard to whether any portion of the ordinance would be subsequently declared invalid or unconstitutional." *Id.*

The district court granted the requested preliminary injunction, holding that Plaintiffs were likely to succeed on both their Fourth Amendment claim and their Fourteenth Amendment claim. In discussing the Fourth Amendment's protection against unreasonable seizures, the district court reasoned that the Bulky Items Provision was likely unconstitutional under our precedents holding that a warrant or a recognized exception to the warrant requirement must accompany a seizure for it to be reasonable. Turning to Plaintiffs' procedural due process claim, the court observed that the Provision lacked any notice requirement and thus "provide[d] no process at all."[4] The court did not expressly address the City's severability argument, and it preliminarily

---

[4] The Bulky Items Provision provides for prior notice with respect to most Bulky Items that are designed to be used as shelters. § 56.11(3)(i). Because we do not reach Plaintiffs' procedural due process claim, we do not discuss the significance, if any, of this language.

enjoined the City from enforcing the Bulky Items Provision in its entirety.[5]  The City timely appealed.

## II.

Courts consider four factors in deciding whether to grant a preliminary injunction: the plaintiff's likelihood of success on the merits; her likelihood of suffering irreparable harm in the absence of preliminary relief; whether the balance of equities tips in her favor; and whether an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The first factor is the "most important."  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

We review an order granting a preliminary injunction for abuse of discretion.  *BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 760 (9th Cir. 2018).  We review the underlying legal principles de novo.  *Id.*

## III.

### A.

The Fourth Amendment protects individuals from unreasonable government seizures of their property, even when that property is stored in public areas.  *Recchia v. City of L.A. Dep't of Animal Servs.*, 889 F.3d 553, 558 (9th Cir. 2018).  "Because warrantless . . . seizures are *per se*

---

[5] The district court also enjoined the City from enforcing the ordinance's criminal penalty for interfering with a City employee's removal or destruction of a Bulky Item.  § 56.11(10)(d).  The injunction further prohibits the City from posting signs, notices, or other public information stating that the City will enforce the Bulky Items Provision or the criminal penalty.

unreasonable, the government bears the burden of showing that a warrantless . . . seizure falls within an exception to the Fourth Amendment's warrant requirement." *Id.* (quoting *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012)); *see also Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005); *G & G Jewelry, Inc. v. City of Oakland*, 989 F.2d 1093, 1099 (9th Cir. 1993). The destruction of property has long been recognized as a seizure. *United States v. Jacobsen*, 466 U.S. 109, 124–25 (1984).

Consistent with these well-established principles, in *Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012), we upheld a preliminary injunction that prohibited Los Angeles from summarily destroying homeless individuals' publicly stored personal property. The facts of *Lavan* are strikingly similar to those here: Los Angeles officials, acting pursuant to an earlier version of § 56.11, "seized and summarily destroyed" property that was momentarily unattended on sidewalks. *Id.* at 1025–26. Los Angeles contended in its appeal of the preliminary injunction that the Fourth Amendment did not apply to its seizure and destruction of the plaintiffs' personal property. *Id.* at 1027. We definitively rejected this argument and held that the "destruction of the property rendered" Los Angeles's conduct unreasonable under the Fourth Amendment. *Id.* at 1030.

We see no meaningful distinction between the destruction of property enjoined in *Lavan* and the destruction of property enjoined here. The fact that Plaintiffs' items are larger than sixty gallons does not reduce their possessory interests in those items. Indeed, the property that the City impermissibly destroyed in *Lavan* included large objects similar to the Bulky Items at issue in this litigation, such as

carts. *Id.* at 1025.[6]  Plaintiffs have therefore demonstrated a likelihood of success on the merits of their claim that the Bulky Items Provision violates the Fourth Amendment on its face.[7]

---

[6] The dissent points out that *Lavan* also concerned smaller items of property "such as identification documents, medications, family memorabilia, toiletries, cell phones, and sleeping bags," and suggests that this distinction lessens *Lavan*'s control over this case. Dissent at 37. But *Lavan* specifically emphasized that the "simple rule" that the "government may not take property like a thief in the night" "holds regardless of whether the property in question is an Escalade or an EDAR, a Cadillac or a cart." 693 F.3d at 1032 (quoting *Clement v. City of Glendale*, 518 F.3d 1090, 1093 (9th Cir. 2008)). In no way did *Lavan* limit its reasoning to certain types of property. We note that one unique feature of Bulky Items is that they can hold other, smaller items— including "phones, cleaning supplies, and clothes," all of which a homeless individual lost when her storage bins containing those items were destroyed pursuant to the Bulky Items Provision.

[7] Other provisions of the ordinance separately authorize the destruction of Bulky Items if they constitute an immediate threat to public health or safety or are evidence of a crime or contraband. § 56.11(3)(g)–(h). The "proper focus of [our] constitutional inquiry" in response to a facial challenge is limited to conduct that "the law actually authorizes"—in other words, to applications in which it is the challenged law alone that authorizes the government's conduct. *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015). Conduct that is independently authorized by a legal provision or doctrine other than the challenged law is thus not relevant to that law's facial constitutionality. *See id.* at 418–19 (explaining that warrantless searches conducted with consent or in exigent circumstances would be excluded from consideration in the Fourth Amendment analysis of a facial challenge to a law authorizing warrantless hotel record searches). Accordingly, Plaintiffs' challenge to the Bulky Items Provision does not implicate the Provision's final sentence to the extent that sentence authorizes the destruction of Bulky Items that violate §§ (3)(g) and (3)(h) of the ordinance. *See* § 56.11(3)(i) ("If the Bulky Item violates subsection 3(d)–(h) herein, even if it is

**B.**

Perhaps in recognition of *Lavan*, the City does not attempt to defend the Bulky Items Provision's authorization of the *destruction* of property.   Rather, the City rests its entire appeal on the contention that, in light of the severability clause in the ordinance, the district court erred in not severing from the Provision the clauses that specifically authorize discarding Bulky Items (which we refer to as "the destruction clauses," given the City's characterization of the Provision as "allowing for the summary destruction of Bulky Items").   The City argues that, without the destruction clauses, the remainder of the Provision would be constitutional because the removal alone of Bulky Items would be lawful, and thus, the entire Provision should not have been enjoined.   We conclude that, under California law, the destruction clauses are not severable from the remainder of the Bulky Items Provision.

**1.**

Severability of municipal ordinances is "a matter of state law."  *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1325 (9th Cir. 2015) (en banc) (quoting *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam)).  In California, the presence of a severability clause in a statutory scheme that contains an invalid provision "normally calls for sustaining the valid part of the enactment."  *Cal. Redevelopment Ass'n v. Matosantos*, 267 P.3d 580, 607 (Cal. 2011) (quoting *Santa Barbara Sch. Dist. v. Superior Ct.*, 530 P.2d 605, 618 (Cal.

---

designed to be used as a shelter, without prior notice, the City may remove and discard the Bulky Item, whether Attended or Unattended.").

1975)).[8]  This presumption, however, is "not conclusive."
*Id.* (quoting *Santa Barbara*, 530 P.2d at 618); *see also, e.g.*,
*Metromedia, Inc. v. City of San Diego*, 649 P.2d 902, 908–
09 (Cal. 1982) (holding that an ordinance was not severable
despite its severability clause because the resulting law
"would be difficult to apply" in a constitutional manner and
would be "less effective in achieving the city's goals").

To be severable, the invalid provision also "must be
grammatically, functionally, and volitionally separable"
from the remainder of the act.  *Id.* (quoting *Calfarm Ins. Co.
v. Deukmejian*, 771 P.2d 1247, 1256 (Cal. 1989)).  "All three
criteria must be satisfied."  *McMahan v. City & County of
San Francisco*, 26 Cal. Rptr. 3d 509, 513 (Ct. App. 2005).
Thus, even though the ordinance contains a severability
clause, *see* § 56.11(12), we must consider whether the
destruction clauses of the Bulky Items Provision are
grammatically, functionally, and volitionally separable from
the rest of the Provision.  We conclude that these clauses are
not functionally separable, and therefore are not severable.

An invalid part of a law is functionally separable "if it is
not necessary to the measure's operation and purpose."
*Hotel Emps. & Rest. Emps. Int'l Union v. Davis*, 981 P.2d
990, 1009 (Cal. 1999).  In other words, the "part to be
severed must not be part of a partially invalid but unitary
whole.  The remaining provisions must stand on their own,
unaided by the invalid provisions nor rendered vague by
their absence nor inextricably connected to them by policy
considerations.   They   must   be   capable   of   separate

---

[8] Given our holding that the destruction clauses are not severable,
we need not decide whether the warrantless removal of Bulky Items
stored in public areas would be constitutional—a question that is far from
clear.

enforcement."   *People's Advoc., Inc. v. Superior Ct.*, 226 Cal. Rptr. 640, 649 (Ct. App. 1986).

California courts have explained that the functional separability inquiry considers whether the remainder of a law would be "functionally autonomous" within the statutory scheme—that is, whether it would retain "efficacy" without the invalid provision.  *Barlow v. Davis*, 85 Cal. Rptr. 2d 752, 758 (Ct. App. 1999).  A pair of cases illuminates this concept.  In *California Redevelopment Ass'n v. Matosantos*, the California Supreme Court considered two provisions of a state law: one that provided for redevelopment agencies' "windup and dissolution," and another that "offer[ed] an alternative" in which those agencies could "continue to operate if the cities and counties that created them agree[d] to make payments into" certain government funds.  267 P.3d at 587.  After holding that the alternative payment scheme was invalid, the court asked whether it was functionally separable from the valid dissolution procedures.  *Id.* at 608.  The court concluded that it was, reasoning that the dissolution procedures "can be implemented whether or not the continuation payment program . . . is valid."  *Id.*

The statute the court confronted in *Matosantos* differed significantly from the scheme at issue in another California case, *Barlow v. Davis*.  There, a state law set numerical "participation goals" for how many state contracts were awarded to bidders that prioritized businesses owned by women, minorities, or disabled veterans; a related provision required relevant state departments to annually report on "the level of participation" by such businesses in state contracts.  85 Cal. Rptr. 2d at 754.  After the provision setting participation goals was deemed unconstitutional by our court, the California Court of Appeal held that it was not functionally separable from the provision imposing

reporting requirements, because "[f]ar from being functionally autonomous, the reporting requirements . . . find efficacy only when correlated with the" participation goals. *Id.* at 758; *see id.* ("With the abrogation of the numerical participation goals for minority and women business enterprises, the reports cannot serve the function intended by the statute.").

The Bulky Items Provision more closely resembles the statutory scheme in *Barlow* than in *Matosantos*. That is, we do not think the Provision is functionally autonomous absent the destruction clauses because those clauses are "necessary to the [Provision's] operation and purpose." *Hotel Emps.*, 981 P.2d at 1009. No paragraph of the ordinance provides that the City may "move" or "remove" property from a public area without specifying what happens after that movement or removal. *See* § 56.11(3)(a) ("the City may impound"); § 56.11(3)(d) ("the City may move and may immediately impound"); § 56.11(3)(f) ("the City may remove and impound"); § 56.11(3)(g) ("the City may remove and may discard"); *cf.* § 56.11(3)(c) (the City "may temporarily move" property blocking City operations but only "during the time necessary to conduct the City operations").

This structure indicates that "may remove," as the phrase is used in the ordinance, describes only the initial step of a multi-step enforcement process—making the larger phrase "may remove and may discard" a "unitary whole," *People's Advoc.*, 226 Cal. Rptr. at 649.[9] If the Bulky Items Provision

---

[9] Our reading is reinforced by the title of § 56.11(3), which describes the subsections that follow as setting out the "Regulation and Impoundment of Stored Personal Property; [and the] Discard of Certain Stored Personal Property"—not just the "removal" of personal property.

does not specify that removed property is to be either
impounded or discarded (or, as one other clause of the
ordinance provides, temporarily moved while a City
operation is in progress), it is unclear how a City employee
would enforce the Provision: she may remove a Bulky Item
from a public area, but what should she do next?  She could
impound the Bulky Item—but interpreting "may remove" as
synonymous with "may impound" would render superfluous
the specific authorizations of impoundment elsewhere in the
ordinance.    And "[i]nterpretations that render statutory
language meaningless are to be avoided." *Plantier v.
Ramona Mun. Water Dist.*, 441 P.3d 870, 878 (Cal. 2019).
Moreover, our inserting "impound" in the Provision in place
of "discard" would "rewrite or redefine the provision[] . . .
to be free of the intrinsic association with" discarding, which
we may not do. *Barlow*, 85 Cal. Rptr. 2d at 758.

The absence of a post-removal notice procedure in the
Bulky Items Provision further prevents us from reading a
hypothetical   post-severance   Provision   as   implicitly
describing impoundment.  The ordinance is deliberate in
offering some form of notice every time personal property is
impounded.    § 56.11(3)(a)–(b),  (d)–(f) (providing for
impoundment and stating that "[p]ost-removal notice shall
be provided as set forth in Subsection 4(b), below").  Indeed,
the only other paragraphs in § 56.11(3) without either that
statement or a cross-reference to a paragraph providing that
statement about notice are the two other provisions that
expressly   authorize   the   destruction   of   property.
§ 56.11(3)(g) (property that constitutes an immediate health
or safety threat); § 56.11(3)(h) (property that is evidence of
a crime or contraband).  The Provision's silence on notice
indicates that the destruction clauses are necessary to the

Provision's operation and purpose within the ordinance's scheme.[10]

We are not persuaded by the City's argument that the notice procedures in § 56.11(4)(b) would flow automatically to the Provision upon severance.  Section 56.11(4)(b), titled "Post-Removal Notice," states that "[u]pon removal of Stored Personal Property, written notice shall be conspicuously posted in the area from which the Personal Property was removed."  It then specifies certain information that the written notice must contain, including the address where the property will eventually be located and a statement that property may be discarded after ninety days of impoundment.  § 56.11(4)(b).  If this provision applied automatically to all paragraphs of § 56.11(3), it would again render other parts of the ordinance superfluous— specifically, the five sentences throughout § 56.11(3) that guarantee post-removal notice following the impoundment of property in various circumstances.  To avoid such superfluity, we must conclude that § 56.11(4)(b)'s function is to set out the manner and components of post-removal notice whenever it is required, rather than to ensure post-removal notice after every removal of property.  *See Plantier*, 441 P.3d at 878.

---

[10] This anomaly that severance would produce also casts doubt on whether the City Council intended for the Bulky Items Provision to stand on its own without reference to discarding Bulky Items—doubt that cuts against volitional separability despite the ordinance's severability clause. *See, e.g.*, *Hotel Emps.*, 981 P.2d at 1010 (holding that the invalid portions of a law were not volitionally separable despite the presence of a severability clause).

**2.**

In addition to being functionally inseparable in light of the structure of the ordinance, the destruction clauses of the Bulky Items Provision also are functionally inseparable in practice. We have previously understood California's functional separability requirement to include an evaluation of a party's actual method of enforcing a partially invalid law. In *Acosta v. City of Costa Mesa*, 718 F.3d 800 (9th Cir. 2013), a city criminalized engaging in "disorderly, insolent, or disruptive behavior" when speaking at city council meetings. *Id.* at 806. We determined that the ordinance violated the First Amendment because it allowed the city to prohibit nondisruptive speech that was merely insolent. *Id.* at 815–16. We further held that the invalid language was not functionally separable from the remainder of the ordinance because, according to the trial testimony of the city chief of police, "officials relied on the [invalid] word . . . as a key part of effectuating" the ordinance's purpose. *Id.* at 821.[11] Following *Acosta*, we must consider whether the destruction clauses are necessary to the Provision's operation and purpose such that their absence would affect its enforcement

---

[11] Similarly, California courts have appeared to consider both the practical difficulties in enforcing what would remain of a law after severance and how well the law after severance would effectuate the ordinance's purpose. *Metromedia*, 649 P.2d at 908 (concluding that an ordinance regulating billboards could not be severed to encompass only commercial speech because the resulting law "would be difficult to apply" when the authority to remove a billboard would depend on deciphering its content and "would offer no assurance that a substantial number of billboards, or any particular billboard, would be removed, or that the erection of new billboards would be inhibited").

and effectiveness as a practical matter as well as in the abstract.[12]

We are not starting from scratch in answering this question: the City has repeatedly insisted that it could not enforce the Bulky Items Provision at all without the destruction clauses. Declarations of City officials in the record attest that the City does not have storage space to impound Bulky Items and is therefore unable to remove those items from public areas without immediately destroying them; similarly, the City admits in its brief "that the City lacks capacity to store Bulky Items." Our dissenting colleague disagrees, concluding that the City told us in its briefs and at argument "that it can remove (without destroying) the property implicated by the Bulky Items Provision." Dissent at 32, 32 n.8. But we are unable to find any such statements in our review: the City's reference to "its ability to remove Bulky Items under Section 56.11(3)(i)," and its statement that it "can, consistently with the Fourth Amendment, tow away cars," are clearly contending legal permissibility, not practical capability.[13] Nor can the City's vague prediction that its inability to store Bulky Items "can change based on all kinds of circumstances" reasonably be read as an "averment that it

---

[12] The dissent suggests that *Acosta* misinterpreted California law to reach its holding. Dissent at 30 n.5. Even if we agreed—which we do not—we would still be bound by *Acosta*. *See Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc).

[13] The dissent points to the suggestion in the City's briefing that it currently has the practical ability to tow and then store cars, Dissent at 32 n.8, but that provides no reason to assume that the lots where towed cars are stored have room for Bulky Items or the ability to catalog them—especially given the City's specific contrary admissions of its inability to store Bulky Items.

can remove Bulky Items without destroying them if it
redistributes its resources," Dissent at 33 n.9.

On appeal, the City characterizes its lack of storage
capacity as an irrelevant and temporary obstacle and urges
us to sever the destruction clauses despite its inability to
remove Bulky Items without destroying them.  But the City
has consistently disclaimed its ability to store Bulky Items
since this litigation began over two years ago.

The City's own statements make clear that discarding
Bulky Items is "inextricably connected" to full enforcement
of the Provision.  *People's Advoc.*, 226 Cal. Rptr. at 649.
Given the City's admissions that it cannot remove Bulky
Items without destroying them, we must conclude that the
City "relie[s] on" the invalid clauses of the Bulky Items
Provision not merely "as a key part of effectuating" the
Provision, but as the sole method of effectuating it.  *Acosta*,
718 F.3d at 821.

\* \* \*

For these reasons, we cannot say that the Bulky Items
Provision could "stand on [its] own, unaided by" the clauses
authorizing destruction.  *People's Advoc.*, 226 Cal. Rptr.
at 649.  Rather, the ability to destroy Bulky Items appears to
be an integral part of the Provision's "operation and
purpose."  *Hotel Emps.*, 981 P.2d at 1009.  This means the
destruction clauses are not functionally separable.  And
because an invalid provision must be "grammatically,
functionally, *and* volitionally separable" to be severable,
*Matosantos*, 267 P.3d at 607 (emphasis added) (quoting
*Deukmejian*, 771 P.2d at 1256), we hold that the destruction
clauses are not severable.  It follows that the district court
correctly decided that Plaintiffs are likely to succeed on the

merits of their Fourth Amendment challenge to the entirety of the Provision.

Finally, we hold that the district court appropriately concluded that the remaining *Winter* factors tipped in Plaintiffs' favor. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The City contends that because the district court failed to consider the destruction clauses of the Provision separately from the clauses authorizing removal, its analysis of the equities was fatally flawed. But because the destruction clauses are not severable from the Provision, there is no merit to this argument. The City raises no other objections to the district court's *Winter* analysis, and we discern no problems with it.[14] We thus affirm the grant of the preliminary injunction.[15]

## IV.

We emphasize that our holding imposes no new constraints on the City: our prior caselaw states clearly that the government may not summarily destroy the unabandoned personal property of homeless individuals that is kept in public areas. The City is free to draft a lawful version of the Bulky Items Provision, just as it is free to explore alternative methods to respond to the needs of its

---

[14] Given our holding, we need not consider whether Plaintiffs have demonstrated a likelihood of success on the merits of their claim that the Bulky Items Provision, on its face, violates the Fourteenth Amendment's procedural due process guarantee.

[15] Because the City has conceded that the constitutionality of the criminal penalty for impeding enforcement of the Bulky Items Provision is dependent on whether the Provision itself is facially unconstitutional, we affirm the district court's enjoining of that penalty provision as well.

housed residents while also respecting the rights of its tens
of thousands of homeless residents.

**AFFIRMED.**

BENNETT, Circuit Judge, dissenting:

Los Angeles ("the City") enacted an ordinance that
regulates bulky personal property left or stored in public
areas, including by homeless individuals. The ordinance
allows the City to both remove and discard certain of these
bulky items, without notice. Plaintiffs facially challenged
the ordinance as violative of the Fourth Amendment. The
City argued, both below and on appeal, that the "may
remove" provision was severable from the "may discard"
provision. The district court preliminarily enjoined the
ordinance as violative of the Fourth Amendment but did not
directly address the City's severance argument.[1] The
majority affirms, including because it finds that the
ordinance is not severable. I believe the ordinance *is*
severable, that the "may discard" provision should be
severed, and that the constitutionality of the "may remove"
provision should then be separately analyzed.[2] I thus
respectfully dissent. I would remand the case to the district
court to consider whether the "may remove" provision is
facially constitutional, and if it finds that it is, to reconsider
whether the injunctive relief it ordered was appropriate.

---

[1] The district court noted that "the City has repeatedly pointed out
that the [o]rdinance has a severability provision . . . ."

[2] The City does not defend the constitutionality of the "may discard"
clause in this appeal.

## I.

The "Bulky Items Provision" states:

> No Person shall Store any Bulky Item in a
> Public Area.  Without prior notice, the City
> may remove and may discard any Bulky
> Item, whether Attended or Unattended,
> Stored in a Public Area unless the Bulky Item
> is designed to be used as a shelter.  For any
> Bulky Item that is designed to be used as a
> shelter but does not constitute a Tent as
> defined in Subsection 2(q), with pre-removal
> notice as specified in Subsection 4(a), the
> City may remove and discard the Bulky Item,
> whether Attended or Unattended.   If the
> Bulky Item violates Subsection 3(d)–(h)
> herein, even if it is designed to be used as a
> shelter, without prior notice, the City may
> remove and discard the Bulky Item, whether
> Attended or Unattended.

L.A., Cal., Mun. Code § 56.11(3)(i) (2016).

"Bulky Items" are defined as:

> any item, with the exception of a constructed
> Tent, operational bicycle or operational
> walker, crutch or wheelchair, that is too large
> to fit into a 60-gallon container [which is a
> common size for curbside-pickup household
> trash bins] with the lid closed, including, but
> not limited to, a shed, structure, mattress,
> couch, chair, other furniture or appliance.

*Id.* § 56.11(2)(c).

A "public area" is land "owned, managed or maintained
by the City," including any road, sidewalk, "medial strip,
space, ground, building or structure." *Id.* § 56.11(2)(k).

## II.

"Severability is a matter of state law." *Sam Francis
Found. v. Christies, Inc.*, 784 F.3d 1320, 1325 (9th Cir.
2015) (en banc) (alterations and citation omitted). Under
California law, "[i]n determining whether the invalid
portions of a statute can be severed, we look first to any
severability clause." *Cal. Redevelopment Ass'n v.
Matosantos*, 267 P.3d 580, 607 (Cal. 2011). "The presence
of such a clause establishes a presumption in favor of
severance." *Id.* "Although not conclusive, a severability
clause normally calls for sustaining the valid part of the
enactment." *Id.* (quotation marks and alteration omitted);
*see also Calfarm Ins. v. Deukmejian*, 771 P.2d 1247, 1256
(Cal. 1989) (en banc).

The Los Angeles City Council included a robust
severability clause in the ordinance. *See* L.A., Cal., Mun.
Code § 56.11(12).[3] The clause "declares that [the City

---

[3] Los Angeles Municipal Code § 56.11(12) provides in full:

> If any subsection, sentence, clause or phrase of this
> article is for any reason held to be invalid or
> unconstitutional by a court of competent jurisdiction,
> such decision shall not affect the validity of the
> remaining portions of this ordinance. The City
> Council hereby declares that it would have adopted
> this section, and each and every subsection, sentence,
> clause and phrase thereof not declared invalid or
> unconstitutional, without regard to whether any
> portion of the ordinance would be subsequently
> declared invalid or unconstitutional.

Council] would have adopted this section, and each and every subsection, sentence, clause and phrase thereof not declared invalid or unconstitutional, without regard to whether any portion of the ordinance would be subsequently declared invalid or unconstitutional." *Id.* Thus, I start with a presumption in favor of severing any unconstitutional portion of the ordinance.

## A.

Though the presumption in favor of severability is the most important guiding principle, *see Matosantos*, 267 P.3d at 607, "[t]he invalid provision must be grammatically, functionally, and volitionally separable," *id.* (citation omitted). The majority considers only functional separability, concluding that the "may discard" provision is not functionally severable. Majority at 14–22. I address all three criteria. *See McMahan v. City & Cnty. of San Francisco*, 26 Cal. Rptr. 3d 509, 513 (Ct. App. 2005) ("All three criteria must be satisfied.").

First, "[g]rammatical separability . . . depends on whether the invalid parts [of the Bulky Items Provision] can be removed as a whole without affecting the wording or coherence of what remains." *Matosantos*, 267 P.3d at 607 (quotation marks and citations omitted). Removal of the "may discard" clause from the Bulky Items Provision does not impact the coherence or wording of the remaining text.[4]

---

[4] Only the "may discard" clauses in the second and fourth sentences of the Bulky Items Provision are impacted by this facial challenge. Under subsection 4(a), Bulky Items covered by the third sentence require pre-removal notice, and, after removal, individuals have ninety days to recover their property before it is destroyed. The constitutional analysis of a facial challenge to the third sentence would significantly differ from

Indeed, the provision would read as follows if the "may discard" clause were excised from the second and fourth sentences of the provision:

> No Person shall Store any Bulky Item in a Public Area. Without prior notice, the City may remove any Bulky Item, whether Attended or Unattended, Stored in a Public Area unless the Bulky Item is designed to be used as a shelter. For any Bulky Item that is designed to be used as a shelter but does not constitute a Tent as defined in Subsection 2(q), with pre-removal notice as specified in Subsection 4(a), the City may remove and discard the Bulky Item, whether Attended or Unattended. If the Bulky Item violates subsection 3(d)–(h) herein, even if it is designed to be used as a shelter, without prior notice, the City may remove the Bulky Item, whether Attended or Unattended.

This remaining provision, with "may discard" excised from the second and fourth sentences, makes sense. Thus, the "may discard" clause is grammatically severable.

Second, "[v]olitional separability depends on whether the remainder [of the Bulky Items Provision] would have been adopted by the legislative body had the latter foreseen the partial invalidation of the [provision]." *Matosantos*, 267 P.3d at 608 (quotation marks and citations omitted); *see also Calfarm Ins.*, 771 P.2d at 1256 ("[T]he remainder of the initiative, after deleting the insolvency standard, would

_____

the analysis of a facial challenge to the second and fourth sentences, because of that notice and recovery period.

likely have been adopted by the people had they foreseen the invalidity of the insolvency standard."). We have stated that volitional severability is the most important element of the three in the severability analysis. *Katz v. Child.'s Hosp. of Orange Cnty.*, 28 F.3d 1520, 1531 (9th Cir. 1994). Here, the severability clause specifically states that the City Council "*would* have adopted . . . each and every . . . clause and phrase [of the ordinance] not declared invalid or unconstitutional, without regard to whether any portion of the ordinance would be subsequently declared invalid or unconstitutional." L.A., Cal., Mun. Code § 56.11(12) (emphasis added). This is a clear indication of the City Council's intent to adopt the remaining valid portions of the ordinance, which would help achieve the objectives of the ordinance. *Cf. Santa Barbara Sch. Dist. v. Superior Ct.*, 530 P.2d 605, 618 (Cal. 1975) (en banc).

Finally, "[f]unctional separability depends on whether the remainder of the [ordinance] is complete in itself." *Matosantos*, 267 P.3d at 608 (quotation marks, alterations, and citation omitted). In other words, the ordinance is functionally severable *if* the invalid part "is not necessary to the measure's operation and purpose." *Hotel Emps. & Rest. Emps. Int'l Union v. Davis*, 981 P.2d 990, 1009 (Cal. 1999). In making that determination, we ask whether the remaining parts of the ordinance are "capable of independent application"—that is, whether those provisions can "stand on their own, unaided by the invalid provisions nor rendered vague by their absence nor inextricably connected to them by policy considerations." *Barlow v. Davis*, 85 Cal. Rptr. 2d 752, 757 (Ct. App. 1999) (citation omitted); *accord People v. Libr. One, Inc.*, 280 Cal. Rptr. 400, 409 (Ct. App. 1991).

The majority cites the analysis undertaken by the California Supreme Court in *Matosantos*—"that the

dissolution procedures [in the statute at issue there] '*can be
implemented* whether or not the continuation payment
program . . . is valid,'" Majority at 16 (emphasis added)
(quoting *Matosantos*, 267 P.3d at 608).  The majority then
relies on how the ordinance here was enforced in practice, as
well as on some select statements made by some city
officials, to conclude that the ordinance is not functionally
severable.  Majority at 20–23.[5]  But the *Matosantos* court did
not focus on how the statute would have been or had been
enforced in assessing functional separability; instead, it
stated that "[s]peculation as to what the Legislature may
have expected is immaterial . . . ; the issue under this
[functional separability] prong is simply whether Assembly
Bill 1X 26 is complete in itself such that it *can be enforced*
notwithstanding  Assembly  Bill  1X  27's  invalidity."
*Matosantos*,  267  P.3d  at  608  (emphasis  added).   This

_____

[5] The majority cites *Acosta v. City of Costa Mesa*, 718 F.3d 800 (9th
Cir. 2013) (per curiam), in support of its position, noting that the *Acosta*
court looked to the testimony of the chief of police and how he claimed
the law was enforced in determining functional severability.  Majority
at 20–23.  In doing so, the *Acosta* court relied on *Long Beach Lesbian &
Gay Pride, Inc. v. City of Long Beach*, 17 Cal. Rptr. 2d 861, 868 (Ct.
App. 1993), and in particular, the California Court of Appeal's
discussion of the testimony of a "city official" as to how an ordinance
had been enforced.  718 F.3d at 821.  But in *City of Long Beach*, the
court was looking not just at an ordinance's severability; it was also
looking at the ordinance's constitutionality.  And it discussed the
testimony of a "city official" (the city manager) as to how the ordinance
had been enforced *only* in connection with its constitutionality analysis,
*not* its separate severability analysis.  17 Cal. Rptr. 2d at 868.  I do not
read *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc) as
requiring us to be bound by the *Acosta* court's misreading of the *City of
Long Beach* in its case-specific analysis, contrary to the majority's
assertion.  *See* Majority at 21 n.12.  *Miller* notes that *stare decisis* binds
us to holdings of prior cases as well as explications of governing rules of
law, but mentions only that "mode of analysis" binds lower courts.
335 F.3d at 900.

strongly suggests an abstract inquiry into whether it is functionally *possible* for the post-severance provision to be enforced.

Practical difficulties in enforcing the ordinance after the excision of the "may discard" clause are not irrelevant, as they relate to whether the provision *could* be enforced following the severance. But the question a court must determine under California law is not whether an ordinance was or wasn't enforced in part at some time in the past—the question is whether it can be currently implemented as severed.

The majority cites *Metromedia, Inc. v. City of San Diego*, 649 P.2d 902 (Cal. 1982) (en banc), in support of its functional severability analysis: "California courts have appeared to consider both the practical difficulties in enforcing what would remain of a law after severance and how well the law after severance would effectuate the ordinance's purpose." Majority at 20 n.11. But *Metromedia* involved a San Diego ordinance, "which, with certain exceptions, ban[ned] erection of off-site billboards within the city limits" to "promot[e] traffic safety and improv[e] community appearance." 649 P.2d at 903 (footnote omitted). The United States Supreme Court held that the ordinance's prohibition on noncommercial speech violated the First Amendment. *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 521 (1981).

The severability inquiry in *Metromedia* raised difficult questions about how the City of San Diego would "distinguish between commercial and noncommercial speech, a task rife with constitutional enigmas." *Metromedia*, 649 P.2d at 903. The majority implies that these challenges are like those Los Angeles would face here, were the ordinance severed. Majority at 20 n.11. But

difficulties San Diego might have had in determining which
billboard content is protected by the First Amendment bears
no similarity to difficulties Los Angeles might have in
determining, for example, whether it can store a jacuzzi
removed from a public park.  And while the California
Supreme Court found that severing the billboard ordinance
would not effectuate San Diego's intent of promoting traffic
safety through the reduction of the number of billboards,
*Metromedia*, 649 P.2d at 908–09, the court's concern
appears to go more to *volitional* severability, rather than
*functional* severability.  *See Matosantos*, 267 P.3d at 608.

Again, as California law makes clear, the relevant
functional severability question is whether the seizure
provision *can be enforced* notwithstanding the destruction
provision's invalidity.  *See id.*  Abstractly, of course, items
that are not inherently dangerous to store can be seized
without being destroyed, and routinely are, every day, in
every state and many municipalities.[6]  And many items both
parties have pointed to in this case could be seized and *not*
destroyed.[7]  Moreover, the City tells us just that in its briefs
and at oral argument—that it can remove (without
destroying) the property implicated by the Bulky Items
Provision.[8]  That was not the City's preferred course absent

---

[6] And if post-severance there were items the City decided it would
*not* wish to store after seizure (assuming seizure were not enjoined after
remand), it could, of course, simply choose not to seize them in the first
place.

[7] Dog kennels, carts, plastic bins, household appliances, furniture,
and auto parts are a few examples cited in the parties' briefs.

[8] Having already acknowledged that "municipalities cannot
summarily destroy the cars they tow," the City represents:

an injunction—the City preferred that it be able to enforce the ordinance *as written*.  But that is almost always the case when a law is challenged, but parts of the law can perhaps be saved.  By, in essence, making enforcement decisions for the City, the majority strips the City of its ability to determine what is or isn't possible and how it can best use its resources to effectuate its local policies.[9]

The ordinance's purpose is "to balance the needs of the residents and public at large to access clean and sanitary public areas consistent with the intended uses for the public areas."  L.A., Cal., Mun. Code § 56.11(1).  The destruction clause "is not necessary to the [ordinance's] operation and purpose," *Hotel Emps. & Rest. Emps. Int'l. Unions*, 981 P.2d at 1009, as its excision still results in a functional ordinance that can achieve the City Council's stated purpose.

Moreover, in citing the structure of the ordinance as counseling against severability, asking: "[a city official] may remove a Bulky Item from a public area, but what should she

---

There is no question that the City can, consistently with the Fourth Amendment, tow away cars left parked on its highways, streets, or alleyways for a long period of time. L.A. Mun. Code, § 80.77(a). So, too, can the City remove from its public areas items that (1) are being stored there, and (2) are "too large to fit into a 60-gallon container with the lid closed." L.A. Mun. Code §§ 56.11(2)(c), (2)(k), (2)(o), (3)(i).

[9] Since we must look at functional severability in the abstract under California law, rather than rely on past statements made by City officials, the majority should look to the City's averment that it can remove Bulky Items without destroying them if it redistributes its resources, even though the City would likely temporarily stop removing certain Bulky Items.  This is especially so because there is nothing remotely illogical or impossible about seizing *without* destroying.

do next?," Majority at 17–18, the majority ignores the fact that even the unsevered ordinance does not provide a mandate—it states "may discard" not "must discard," L.A., Cal., Mun. Code § 56.11(3)(i).  This means the ordinance, as originally conceived, already furnishes city officials with discretion on what to do with removed Bulky Items.  And because the ordinance builds in discretion, it stands to reason that the post-removal notice procedures outlined in section 56.11(4)(b) *can* be used for items removed under section 56.11(3)(i), as the City represented at oral argument.  And again, if practical difficulties mean the City will seize fewer items, that is hardly a reason *not* to sever.

Bottom line, the ordinance is functionally severable because it "can be enforced notwithstanding [the "may discard" clause's] invalidity." *Matosantos*, 267 P.3d at 608. Thus, given the presumption in favor of severing and the satisfaction of all three severability criteria, I believe the ordinance is severable.

**B.**

We, of course, are tasked here with interpreting California severance law.  But the separation of powers principles underlying California law echo similar federal principles, which also support severability here.  As a matter of general statutory interpretation, the Supreme Court has declared that "when confronting a constitutional flaw in a statute, we [should] try to limit the solution to the problem. We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328–29 (2006) (citations omitted); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 646 (2012) (Ginsburg, J., concurring in part, concurring in

the judgment in part, and dissenting in part) ("For when a court confronts an unconstitutional statute, its endeavor must be to conserve, not destroy, the legislature's dominant objective.").[10]  This, of course, flows directly from one of the most basic principles of our democracy—it is for the legislative branch, not the judicial branch, to legislate.  *See Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 136 (1810) ("To the legislature all legislative power is granted.").

California courts look to "the specific language of the ordinance to determine if it is susceptible [to] a limit[ed] construction that will avoid unconstitutionality." *Metromedia, Inc.*, 649 P.2d at 905.  The California Supreme Court has made it clear that "in considering the issue of severability, it must be recognized that the general presumption of constitutionality, fortified by the express statement of a severability clause, normally calls for sustaining any valid portion of a statute unconstitutional in part."[11] *Santa Barbara Sch. Dist. v. Superior Ct.*, 530 P.2d

---

[10] "Courts even have found that a strained construction is desirable if it is the only construction that will save an act's constitutionality, and may imply constitutionally requisite procedures for a statute's administration to preserve its validity."  Sutherland, *Sutherland Statutes and Statutory Construction* § 45:11 (2020) (quotation marks and footnotes omitted).  In line with the preference to preserve constitutionality, "[p]ublic policy generally favors severability of an unconstitutional statute."  *Id.*

[11] This general principle also applies outside the severance context.  California law dictates that "[i]n considering the constitutionality of a legislative act, [the reviewing court] presume[s] its validity, resolving all doubts in favor of the Act.  Unless conflict with a provision of the state or federal Constitution is clear and unquestionable, [the reviewing court] must uphold the Act."  *County of Sonoma v. State Energy Res. Conservation etc. Com.*, 40 Cal.3d 361, 368 (Cal. 1985) (citation

605, 617 (Cal. 1975) (en banc) (quoting *Ex parte Blaney*, 184 P.2d 892, 900 (Cal. 1947)).

### III.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In concluding that a preliminary injunction was warranted, the district court's "irreparable harm" and "balance of equities" analyses focused mainly on the destruction of the property of the homeless, not on the property's temporary removal. So too does the majority, which hinges its holding on the conclusion that the "may discard" clause cannot be severed from the ordinance.

In the majority's view, there is "no meaningful distinction between the destruction of property enjoined in

---

omitted). In fact, California law permits courts to go even further in the name of preserving constitutionality:

> Apart from the authority to sever under a severability clause, courts also have the power to reform a statute to preserve its constitutionality. We may rewrite a statute to cure constitutional invalidity when we can assert confidently that (i) it is possible to reform the statute in a manner that closely effectuates policy judgments clearly articulated by the enacting body, and (ii) the enacting body would have preferred the reformed construction to invalidation of the statute.

*River Garden Retirement Home v. Franchise Tax Bd.*, 113 Cal. Rptr. 3d 62, 70–71 (Ct. App. 2010) (quotations marks and citation omitted).

*Lavan* [*v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012)] and the destruction of property enjoined here," Majority at 12–13, and therefore, the ordinance violates the Fourth Amendment. *Id.* But the majority's conclusion that this case is indistinguishable from *Lavan* is belied by the fact that *Lavan* concerned a much broader ordinance,[12] which affected personal property such as identification documents, medications, family memorabilia, toiletries, cell phones, and sleeping bags. *See* 693 F.3d at 1025. The ordinance here is much narrower and affects a much narrower subset of property. And, of course, if the ordinance is properly severed, this case would also be distinct from *Lavan* in that it only considers removal, not removal *and* destruction. *Lavan* thus does not resolve this case.

## IV.

The harm done here by the majority, in affirming an injunction that may well be overbroad given the incorrect severability analysis, is far more than just theoretical. Homelessness is a tragedy. The effect of the homelessness crisis on the homeless is immeasurable. But the crisis affects more than the homeless. As the crisis increases in Los Angeles, so too does the number of Bulky Items stored in the city's streets, parks, and public spaces. City residents tell the City daily of their loss of access to public parks, threats to their safety, and the general degradation of their quality of

---

[12] The ordinance at issue provided that "[n]o person shall leave or permit to remain any merchandise, baggage or any article of personal property upon any parkway or sidewalk." *Lavan*, 693 F.3d at 1026 (alteration in original) (quotation marks and citation omitted). The City claimed that its practice of removing and destroying such property was permitted by the ordinance. *Id.*

38          GARCIA V. CITY OF LOS ANGELES

life.  The City conducts frequent cleanups, but still, items of
all kinds are amassed daily in Los Angeles public areas.

Items "frequently encounter[ed] in the public rights of
way include boats, tubs, jacuzzi[e]s, sofas, industrial waste,
automobile parts, bed frames, mattresses, and other
household appliances."  These images from published media
outlets and presented to the court by *amicus curiae* League
of California Cities illuminate this problem:



(Above image from City Announces Special Task Force for
Homeless Encampment Safety (Los Angeles Sentinel,
Jan. 11, 2018), https://lasentinel.net/city-announces-special-
task-force-for-homeless-encampment-safety.html.)



(Above image from City OKS Swifter Removal of Homeless Items from City Sidewalks & Parks (Los Feliz Ledger, June 23, 2015), https://www.losfelizledger.com/article/city-council-votes-to-remove-homelesspossessions-quicker-from-city-sidewalks-parks.)



(Above image from Hannah Fry & Ahn Do, O.C.'s Grand
Homelessness Plan Collapsing as Residents Balk at Having
Shelters in Their Neighborhoods (L.A. Times, Mar. 23, 2018),
https://www.latimes.com/local/lanow/la-me-homeless-
collapse-oc-20180322-story.html.)

The homeless unquestionably have a right to own
personal property without unreasonable government
intrusions. *See Lavan*, 693 F.3d at 1030. But the City has
the "universally acknowledged power and duty to enact and
enforce all . . . laws . . . as may rightly be deemed necessary
. . . [to protect] the safety, health, morals, comfort, and
welfare of its people." *Knoxville Iron Co. v. Harbison*,
183 U.S. 13, 20 (1901). The ordinance reflects an attempt at
balancing the interests at stake here.

The City essentially concedes that part of that balancing
was unconstitutional—the portion that allows destruction of
certain seized property without notice. But the portion of the
ordinance that allows seizure of that property without notice
may well pass constitutional muster. At the very least, the
district court should have been directed to reconsider its
injunction in light of the severability of the ordinance. The

League of California Cities amicus brief states that the preliminary injunction "robs the people of Los Angeles of the ability to balance the needs of all of its residents and decide issues of local governance and policy through their elected representatives." By incorrectly determining that the ordinance is not severable, the majority inappropriately rebalances the interests of various members of the Los Angeles community, thereby stripping from Los Angeles's political branches their right to conduct the balancing.

I would therefore reverse the district court and remand for further consideration as to whether the severed ordinance should be enjoined.

## United States Court of Appeals for the Ninth Circuit

### Office of the Clerk
95 Seventh Street
San Francisco, CA 94103

### Information Regarding Judgment and Post-Judgment Proceedings

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36.  Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise.  To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing  (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

**(1)   A.   Purpose (Panel Rehearing):**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ▶ A material point of fact or law was overlooked in the decision;
  - ▶ A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ▶ An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

**B.   Purpose (Rehearing En Banc)**
- A party should seek en banc rehearing only if one or more of the following grounds exist:

> ►     Consideration by the full Court is necessary to secure or maintain
> uniformity of the Court's decisions; or
>
> ►     The proceeding involves a question of exceptional importance; or
>
> ►     The opinion directly conflicts with an existing opinion by another
> court of appeals or the Supreme Court and substantially affects a
> rule of national application in which there is an overriding need for
> national uniformity.

**(2)**    **Deadlines for Filing:**

- A petition for rehearing may be filed within 14 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment. Fed. R. App. P. 40(a)(1).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication.  9th Cir. R. 40-2.

**(3)**    **Statement of Counsel**

- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist.  The points to be raised must be stated clearly.

**(4)**    **Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**

- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms*.
- You may file a petition electronically via the appellate ECF system.  No paper copies are required unless the Court orders otherwise.  If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper.  No additional paper copies are required unless the Court orders otherwise.

## Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)

- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms*.

## Attorneys Fees

- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-7806.

## Petition for a Writ of Certiorari

- Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov

## Counsel Listing in Published Opinions

- Please check counsel listing on the attached decision.
- If there are any errors in a published <u>opinion</u>, please send a letter **in writing within 10 days** to:
  - ► Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Jean Green, Senior Publications Coordinator);
  - ► and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 10. Bill of Costs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form10instructions.pdf*

**9th Cir. Case Number(s)**

**Case Name**

The Clerk is requested to award costs to (*party name(s)*):

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature**                    **Date**

*(use "s/[typed name]" to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd , and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee | | | | $ |
| **TOTAL:** | | | | $ |

***Example:** Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10);*
*TOTAL: 4 x 500 x $.10 = $200.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 10**                                          *Rev. 12/01/2018*

# City Announces Special Task Force for Homeless Encampment Safety

By City News Service
Published January 11, 2018



*Los Angeles officials last Friday announced the formation of a special task force that has begun an effort to survey high fire hazard zones in order to identify and clear out homeless encampments. (file photo)*

Los Angeles officials last Friday announced the formation of a special task force that has begun an effort to survey high fire hazard zones in order to identify and clear out homeless encampments.

The move comes after the December Skirball Fire in Bel-Air that destroyed six homes was believed to have been started at a homeless encampment in the Sepulveda Pass in a wooded area that city officials said they were unaware existed.

8/27/2021　City Announces Special Task Force for Homeless Encampment Safety | Los Angeles Sentinel | Los Angeles Sentinel | Black News

Case 2:19-cv-06182-DSF-PLA　Document 147　Filed 09/03/21　Page 47 of 58　Page ID #:8303

Mayor Eric Garcetti and Los Angeles Fire Department Chief Ralph Terrazas described the task force, which consists of personnel from the LAFD, the Los Angeles Homeless Services Authority and the Bureau of Sanitation, as a more proactive and systematic approach than what has been done in the past to identify homeless encampments in high fire hazard zones.

ADVERTISEMENT

During a news conference at a downtown fire station, Terrazas said the city "never had an organized, systematic approach like we do now," and that "we're taking this to the next level, I want a more formalized process."

Terrazas said that in the past if LAFD personnel came across an encampment in a high fire hazard zone they would notify the proper departments, but that the LAFD did not do any proactive surveying as is now being done.

Terrazas said the survey would take about a week, and any encampments that are identified will be visited by LAHSA and Bureau of Sanitation workers to encourage the people there to move out while also offering them services.

"Somebody said to me, isn't this a little bit like trying to find the cow that kicked over Mrs. O'Leary's lantern in (the Chicago Fire). I don't believe that is the case," Garcetti said. "I think that we can make a good faith effort to at least have more people in the high risk areas."

Garcetti also said that the task force is a "multi-jurisdictional approach that a few years ago we didn't have" and that the LAHSA personnel would work to move the homeless people "to beds, to shelters, to new housing that we're building. Homelessness is a difficult issue but we do have beds that are available."

Terrazas also said the survey would be part of a regular undertaking.

ADVERTISEMENT

cited in Garcia v. City of Los Angeles
No. 20-55522 archived on August 27, 2021

"We want to institutionalize this process, this is not simply a one and you're done. This is something that we will continually have to do until we get a handle on this problem," he said.

Categories: **Local** | **News**

Tags: **fire hazard zones** | **Los Angeles Fire Department Chief Ralph Terrazas** | **Mayor Eric Garcetti**

© 2021 **Los Angeles Sentinel** All Rights Reserved • A Bakewell Media Publication

**About** • **Archives** • **Contact Us** • **Corrections & Misprints** • **Media Kit**

**Terms of Service** • **Privacy Policy**

**LA Watts Times** • **Taste of Soul**



August 27, 2021

| Search for... | Search |



For the best homes, all signs point to™    TRACY DO
tracy do | COMPASS
DRE 01350025



cited in Garcia v. City of Los Angeles
No. 20-55522 archived on August 27, 2021

Case 2:19-cv-06182-DSF-PLA  Document 147  Filed 09/02/21  Page 50 of 58  Page ID #:8306

# City OKS Swifter Removal of Homeless Items from City Sidewalks & Parks

BY LOS FELIZ LEDGER ON JUNE 23, 2015



A homeless encampment, like the one pictured near the 110 Freeway in Northeast Los Angeles, would be removed faster under one of today's new ordinances passed by the Los Angeles City Council.

*This story was updated Tuesday, June 23rd at 7:40 p.m. to include comments from Dana Cremin, the founder of the East Hollywood Los Feliz Homeless Coalition.*

LOS ANGELES–A set of rules allowing the city to more quickly dismantle homeless encampments won final approval today from the Los Angeles City Council over the objections of a vocal group of protesters.

About a dozen protesters disrupted the council meeting, calling the rules "criminal" and jangling keys as they shouted "House keys, not storage!" while being escorted out of the council chamber by security officers.

Case 2:19-cv-06182-DSF-PLA Document 147 Filed 09/02/21 Page 51 of 58 Page ID #:8307

Despite the outbursts, the council adopted a faster process for removing personal property left on sidewalks and in city parks. The council had tentatively adopted the rules last week, but the decision was not unanimous and required a second vote.

City leaders who support the new rules say they will replace existing ones that are too broad and had rendered anything left on the ground vulnerable to seizure.

They also cited a 12% increase in the transient population and an 85% jump in the number of tents and encampments, based on the latest countywide homeless count.

Dana Cremin, the founder of the East Hollywood Los Feliz Homeless Coalition, said today she welcomed the new ordinances.

Cremin, who has recently secured funding from Los Angeles City councilmembers Tom LaBonge and Mitch O'Farrell as well as Los Angeles County Supervisor Sheila Kuehl to partner with People Assisting the Homeless (PATH), an organization that helps pair the homeless with services, said the city's actions today ensure safety and security for all Angelenos and a move in the right direction to help the city's growing homeless population.

"The city council today did not criminalize homeless," she said. "The ordinances clear the streets for the right of way for all Angelenos . . . Tents, mattresses, couches are just bulky items that the homeless claim . . . that are an onerous problem for the Los Angeles Police Dept. as well as on the city's budget for storage."

Cremin advocates instead for more permanent housing solutions and connecting the homeless with services, many of which, she said, are available and unused.

Due to a lack of consistent outreach, according to Cremin, many homeless persons chose not to seek shelters for a variety of reasons including fearing doing so will mean intrusion in their lives by law enforcement or separation from friends they've meet on the street. As other experts have noted, Cremin also reminded many homeless persons are in need of therapeutic assistance for drug and alcohol abuse or mental illness.

"I'm happy these ordinances were passed," she said. "This is a good thing."

Los Feliz has seen a steady uptick in homelessness in recent months. A growing number of homeless created an encampment at the area's "Vermont Triangle" starting last December. The high profile location of the Triangle at Vermont and Prospect avenues, considered a gateway to Los Feliz, was swept of the homeless in late January. But just hours after the city

Cited in Garcetti v. City of Los Angeles No. 20-55522 archived on August 27, 2021

had cleared the site, some homeless set up camp again and have been there intermittently since.

Additionally, local business owners have recently reported an uptick in the homeless population along boutique filled Vermont Avenue.

Councilmember Mike Bonin (District 11) said that because of the city's inability to deal with homelessness over the past 10 years, "we are now a city of encampments."

Under the two ordinances backed today, the noticing period before removing personal items from parks and sidewalks will be shortened from 72 hours to 24. No notice will be needed for the removal of bulky items from sidewalks and parks.

The city will be required to store any non-bulky belongings for 90 days. If items are not claimed, the property may be discarded.

The ordinances were adopted as city officials work to reach a settlement in a lawsuit filed against the city by several homeless people. The case led to an injunction preventing the city from removing the belongings of the homeless.

One of the protesters, Pete White, told City News Service that they want city leaders to fund more housing for the poor, instead of following the current strategy of relying on enforcement and storage facilities.

"They're not trying to build more housing," White said, citing a city report that found that "we're spending $100 million across everything that we do, and $87 million of that goes to the police department."

White, who founded the Los Angeles Community Action Network–which targets issues affecting impoverished Angelenos–said the "real emphasis is on policing and enforcement ... and really stop-gap measures that do very little to change the material conditions of people who live in the streets."

White joined homeless advocates with the Downtown Women's Action Coalition and other groups outside City Hall this morning to protest the new rules, which they say will make it "nearly impossible" for the homeless to keep their belongings in a public area.

Councilmember Jose Huizar, whose district includes downtown's Skid Row area many of the city's homeless services are centralized, said last week that getting rid of the injunction "is a critical piece in getting a better handle" on homelessness in the city.

Huizar acknowledged there are some flaws in the newly adopted ordinances, but said the city has "court requirements, settlement discussions that are happening, so we have to move forward with something."

He said the ordinances will be further refined in the City Council's newly formed homeless committee, which he chairs.

One of the ordinances applies specifically to items left at city parks.

It will allow officials to remove personal items that remain at city parks–including beaches–past closing time and when there is already a sign at the park stating that leaving behind items is prohibited.

If there is no sign, the city would need to give 24 hours notice before items are removed.

A second ordinance for sidewalks, bans tents from 6 a.m. to 9 p.m. but allows the homeless to set up tents to use as shelter at night.

If the city does not have enough space to store the items left on sidewalks, officials would not be allowed to remove them, city attorneys said.

Under both ordinances, an item that is a health or safety risk–such as something that could spread disease, contains fecal matter, or is a dangerous weapon–will be discarded without any advance notice. Items considered contraband or evidence of a crime could also be removed by the city without notice.





***Los Feliz Ledger***

---

## Be First to Comment

## Leave a Reply

Your email address will not be published. Required fields are marked *

# O.C.'s grand homeless plan collapsing as residents balk at having shelters in their neighborhoods

latimes.com/local/lanow/la-me-homeless-collapse-oc-20180322-story.html

By Hannah Fry, Anh Do March 23, 2018 5 AM PT                                   March 23, 2018



A cyclist passes trash from the Santa Ana River homeless camp in Anaheim in February after it was cleared and more than 700 people relocated.

(Allen J. Schaben / Los Angeles Times)

Just a few days ago, Orange County appeared to have a grand plan to deal with its swelling homeless population.

The idea was to move hundreds of people being evicted from camps along the Santa Ana River into motels and eventually into three temporary shelters in Huntington Beach, Irvine and Laguna Niguel, marking the county's most concrete effort yet to find housing for the unsheltered.

But the plan is now in serious jeopardy after those three communities vowed to do whatever it takes to keep the shelters out. Leaders in Irvine and Laguna Niguel voted to sue the county to block the shelter plan, and local officials want to drop the Huntington Beach location.

Now the county is scrambling to find a solution. Officials have pushed the homeless out of encampments because of complaints from nearby residents. But the county's existing homeless shelters are already at capacity, and a federal judge has demanded that local governments find places for the evicted people to live.

Advertisement

The biggest wildcard now is what action U.S. District Judge David O. Carter will take if the county cannot find emergency shelter space. Carter has for weeks been trying to broker a plan and has warned officials that he does not want those displaced by the sweeps to end up at the Santa Ana Civic Center, which is already overwhelmed with camps.

"We have a countywide problem of people sleeping in the streets," said Fred Smoller, an associate professor of political science at Chapman University. "If the political system hasn't solved the problem, the legal system will have to step in."

Smoller and others said the crumbling plan underscores a basic problem at the center of the homeless crisis: Though everyone seems to want to get the unsheltered off the streets, few areas are willing to have housing in their backyard.

Andrew Do, chairman of the Orange County Board of Supervisors, said neighborhoods are going to have to make sacrifices in order to solve the problem.

"Every city has its own homeless population and it would be shirking one's responsibility to deny that and not to offer some help," Do said. "Cities, when you don't provide viable alternatives, what do you think the judge will do? The court may have to issue a temporary restraining order that will not allow cities to enforce anti-camping ordinances — and then guess what, the whole county can be like the riverbed."

Orange County, one of the most affluent areas in the nation, faces special challenges because it has a relatively sparse infrastructure of services and support for those who don't have homes.

"The county is between a rock and a hard place," said Mohammed Aly, a lawyer and homeless advocate for the Santa Ana River population. "Every shelter that they named is already full or beyond capacity. And the armories are closing on April 15."

Like many other parts of California including Los Angeles and San Francisco, Orange County has seen an increase in its homeless population. Many set up camps along the river. Officials started clearing out the camps, prompting a federal lawsuit by homeless advocates.

Advertisement

Carter temporarily halted the evictions and toured the camps. He demanded the county come up with shelter for those being pushed out of the river area.

Earlier this week, the Orange County Board of Supervisors voted 4 to 1 to study a new emergency shelter plan at three locations. The homeless would be sent first to a site in Irvine, which would have a capacity of 200, then to Huntington Beach, which would have a capacity of 100. If more shelter is necessary, they would be taken to property near City Hall in Laguna Niguel, which could serve up to 100 people.

The sites would be used only after current county shelters reach capacity. The housing would be in tent-like structures.

But on Wednesday, Orange County Supervisor Michelle Steel withdrew her support for placing a homeless shelter on the site of an abandoned landfill in Huntington Beach.

Advertisement

City officials contend that the site on Gothard Street is contaminated with methane. The county operated the 33-acre facility from 1947 to 1982.

"From what we hear of the proposal, it would be inhumane for the county to relocate up to 100 individuals to create a homeless tent city on that parcel in Huntington Beach," City Atty. Michael Gates said Tuesday. "It's right by Central Park. It's right near where kids play sports and, more importantly, that piece of property has been known as a contaminated site."

Steel said she has directed county staff to look for alternative solutions through collaboration with city leaders and local agencies."

Steel's communications director, Michelle Cook, said Wednesday that Steel changed her mind about studying the location after she learned that the county would have to install additional gas monitors there and that special building requirements would have to be implemented. Cook said county staff incorrectly identified the site as a feasible option.

Advertisement

Steel, who represents District 2, which includes Huntington Beach, was quiet during much of Monday's Board of Supervisors meeting when the emergency shelters were discussed.

However, before casting her vote, she told her colleagues that she had spoken with Huntington Beach Mayor Mike Posey to let him know what they were considering.

"It's going to be a temporary site. We don't know how long it's going to take," she said. "We already let them know, so I'm OK with it."

Huntington Beach, Laguna Niguel and Irvine all have vowed legal fights to keep the emergency shelter out.

Advertisement

"I am stunned that anyone at the county thought it was a good idea to place 100 homeless individuals in tents that are adjacent to not only a residential neighborhood of young families, but also a day-care center where innocent children play and just a few hundred yards from an elementary school," said Laguna Niguel Mayor Elaine Gennawey. "This is a public safety tragedy waiting to happen and we will do everything in our power to prevent this from occurring."

Supervisor Todd Spitzer, who cast the dissenting vote on the emergency shelter plan, argued that the county can fashion a remedy to the homeless problem within the current shelter system. He also noted that some homeless people don't want to stay in shelters.

"I am not going to vote to push this into communities when we have that finite group — about 250 — who have somehow in some way indicated they don't want services," he said.

The Board of Supervisors will take up the issue again next week. Do, the board chairman, said that if cities don't like the proposed shelter sites, they should work together to find locations that are more suitable.

Advertisement

"Why not work with us to find a solution? Don't just tell us no," Do said. "What have you done to provide the homeless viable alternatives? The county only has 19 properties. If you don't want us to put it on X, give us another location."

To homeless advocates, there's a certain predictability to what's happened.

Lili Graham, director of litigation for the Legal Aid Society of Orange County, said the county should simply allow the homeless to remain in the river camps until better shelter can be found.

"The riverbed wasn't perfect, but people gravitated to it because they had a sense of community there. Now we're seeing what happens when we take people away from an environment they've known for a long time and have nowhere to put them," she said. "Someone in Laguna Niguel, Irvine or Huntington Beach would never understand what some of these men and women go through."

Advertisement

**hannah.fry@latimes.com**

**anh.do@latimes.com**



Hannah Fry

Hannah Fry is a Metro reporter covering Orange County for the Los Angeles Times. She joined the newspaper in 2013 as a reporter for the Daily Pilot, a Times Community News publication. Fry most recently covered breaking news for The Times and was part of the team that was a 2020 Pulitzer finalist for its coverage of a boat fire that killed 34 people off the coast of Santa Barbara. She grew up in Orange County and got her start as an intern at the Orange County Register.



Anh Do

Anh Do is a Metro reporter covering Asian American issues and general assignments. A second-generation journalist, she has worked at the Dallas Morning News, Seattle Times, Orange County Register and Nguoi Viet Daily News, the largest Vietnamese-language newspaper in the U.S.

cited in Garcia v. City of Los Angeles
No. 20-55522 archived on August 27, 2021